ANDREW M. CALAMARI (AC-4864)
ASSOCIATE REGIONAL DIRECTOR
Alexander M. Vasilescu (AV-2575)
Doria Bachenheimer (DB-3307)
Steven G. Rawlings (SR-0623)
Danielle Sallah (DS-8686)
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
Northeast Regional Office
3 World Financial Center
New York, NY 10281
(212) 336-1100

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------------x

SECURITIES AND EXCHANGE COMMISSION        :
                                          :
                    Plaintiff,            :
                                          :        __ Civ. ___ (   )
         - against -                      :
                                          :
STEVEN BYERS, JOSEPH                       :
SHERESHEVSKY,                             :
WEXTRUST CAPITAL, LLC,                     :
WEXTRUST EQUITY PARTNERS, LLC,            :
WEXTRUST DEVELOPMENT GROUP, LLC,          :
WEXTRUST SECURITIES, LLC, and             :
AXELA HOSPITALITY, LLC,                    :
                                          :
                    Defendants.           :
                                          :

-------------------------------------------------------------------------x

## MEMORANDUM OF LAW IN SUPPORT OF
## APPLICATION FOR EMERGENCY RELIEF

## TABLE OF CONTENTS

Preliminary Statement.................................................................................................1

STATEMENT OF FACTS........................................................................................4

    A.    The Defendants and Relevant Parties....................................................4

    B.    Fraudulent Misrepresentations in the Various
           Securities Offerings.........................................................................6

           1.    The GSA Offering Fraud...........................................................7

           2.    Crowne-Phoenix Offering Fraud ..................................................11

           3.    The Block III, Peoria and Other Fraudulent Securities Offerings.............14

                 a.    The Block III Offering Fraud...........................................14

                 b.    The Peoria Offering Fraud..............................................15

                 c.    Additional Fraudulent Offerings.......................................17

    C.    The Defendants Are Engaged in Ongoing Fraudulent Offerings............................. 19

    D.    Fraudulent Over-Raising ..................................................................21

    E.    To Further their Fraudulent Offerings, the Wextrust Securities, Byers
           and Shereshevsky Failed To File Proper BD Forms With the Commission
           And Pass Licensing Exams ................................................................23

    F.    Byers and Shereshevsky Are Being Arrested On a Criminal Complaint.............24


ARGUMENT.......................................................................................................24

I.    The Defendants Should Be Temporarily Restrained and Preliminarily Enjoined From
    Further Violations of The Federal Securities Laws......................................................24

    A.    The Commission Has Made a Substantial Showing that the Defendants Have
           Violated the Antifraud Provisions of the Securities Act and the Exchange Act......25

    B.    The Commission Has Made a Substantial Showing that the Defendants
           Have Violated the Broker-Dealer Registration and Disclosure Provisions.............30

II.     The Court Should Grant A Temporary Restraining Order and Preliminary Injunction........32

III.    An Order Appointing A Receiver For The Wextrust Entity Defendants Is
        Necessary And Appropriate...................................................................................................34

IV.     An Order Freezing The Assets Of The Defendants And Ordering An
        Accounting Is Necessary......................................................................................................36

V.      An Order Expediting Discovery And Preventing Document Destruction Is Necessary
        And Appropriate...................................................................................................................39

CONCLUSION...............……………................................................................................................40

## TABLE OF AUTHORITIES

### Cases

*Aaron v. SEC*, 446 U.S. 680 (1980)......................................................................................26-27

*Basic Inc. v. Levinson*, 485 U.S. 224 (1988) ............................................................................25-26

*Dierdre C. Steinhaus*, Exchange Act Rel. No. 32400, 1993 SEC LEXIS 1289 (June 1, 1993).......32

*Ernst & Ernst v. Hochfelder*, 425 U.S. 185 (1976)..........................................................................26

*Esbitt v. Dutch-American Mercantile Corp.*, 335 F.2d 131 (2d Cir. 1964)......................................34

*Massachusetts Fin. Servs. v. Security Investor Protection Corp.*, 411 F. Supp. 411 (D. Mass.),
*aff'd*, 545 F.2d 754 (1st Cir. 1976)..................................................................................................30

*Novak v. Kasaks*, 216 F.3d 300 (2d Cir. 2000)................................................................................26

*Int'l Controls Corp. v. Vesco*, 490 F.2d 1334 (2d Cir. 1974), *cert. denied,* 417 U.S. 932 (1974)....37

*ITT v. Cornfeld*, 619 F.2d 909 (2d Cir. 1980)...........................................................................26-27

*SEC v. American Board of Trade, Inc.*, 830 F.2d 431 (2d Cir. 1987) .........................................34-35

*SEC v. Banner Fund Int'l*, 211 F.3d 602  (D.C. Cir. 2000) ........................................................25-26

*SEC v. Capital Gains Research Bureau*, 375 U.S. 180 (1963)..........................................................27

*SEC v. Cavanagh*, 155 F.3d 129 (2d Cir. 1998)........................................................................ 24, 33

*SEC v. Commonwealth Chem. Secs., Inc.*, 574 F.2d 90 (2d Cir. 1978) ............................................33

*SEC v. Dunlop*, 253 F.3d 768 (4th Cir. 2001)..................................................................................38

*SEC v. Gonzalez de Castilla*, 145 F. Supp. 2d 402 (S.D.N.Y. 2001))................................................37

*SEC v. Kenton Capital, Ltd.*, 69 F. Supp.2d 1 (D.D.C. 1998) ..........................................................26

*SEC v. Lybrand*, No. 00 Civ. 1387 (SHS), 2000 WL 913894 (S.D.N.Y. July 6, 2000) ...................38

*SEC v. Margolin*, No. 92 Civ. 6307 (PKL), 1992 WL 279735 (S.D.N.Y. Sept. 30, 1992) ...............38

*SEC v. Management Dynamics, Inc.*, 515 F.2d 801 (2d Cir. 1975)........................... 24-25, 29, 32-33

*SEC v. Manor Nursing Centers, Inc.*, 458 F.2d 1082 (2d Cir. 1972) ..............................25, 29, 33-34

*SEC v. Martino*, 255 F. Supp.2d 268 (S.D.N.Y. 2003), *aff'd*, 94 Fed. Appx. 871 (2d Cir. 2004) ...30

*SEC v. Materia*, 745 F.2d 197 (2d Cir. 1984), *cert. denied,* 471 U.S. 1053 (1985)..........................34

*SEC v. McNulty*, 137 F.3d 732 (2d Cir. 1998)...................................................................................26

*SEC v. Musella*, 578 F. Supp. 425 (S.D.N.Y. 1984) ..........................................................................33

*SEC v. Nat'l Executive Planners, Ltd.*, 503 F. Supp. 1066  (M.D.N.C. 1980) ...............................30

*SEC v. Unifund SAL*, 910 F.2d 1028 (2d Cir. 1990) ........................................... 24-25, 32-33, 37, 39

*SEC v. Vaskevitch*, 657 F. Supp. 312 (S.D.N.Y. 1987).......................................................................37

*SEC v. Zandford*, 535 U.S. 813 (2002).................................................................................................26

*Steadman v. SEC*, 603 F.2d 1126 (5th Cir. 1979)................................................................................26

*United States v. O'Hagan*, 521 U.S. 642 (1997).................................................................................26

## Statutes and Rules

Section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a).……………….……………........33

Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) ……….…….… .............33

Section 15(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78o(b)…………....…..30, 31, 33

Section 15(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78o(b)…………...………..30-33

Section 15(c) of the Securities Exchange Act of 1934, 15 U.S.C. § 78o(c)…………..………........33

Section 17(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78q(a)…………..……............33

Rule 10b-3 of the Securities Exchange Act of 1934, 17 C.F.R. § 240.10b-3………………….…..33

Rule 10b-5 of the Securities Exchange Act of 1934, 17 C.F.R. § 240.10b-5………………...…….33

Rule 15b1-1 of the Securities Exchange Act of 1934, 17 C.F.R. § 240.15b1-1…….....…………...32

Rule 15b3-1 of the Securities Exchange Act of 1934, 17 C.F.R. § 240.15b3-1…...………….32-33

Rule 15b7-1 of the Securities Exchange Act of 1934, 17 C.F.R. § 240.15b7-1…….....…………...33

ANDREW M. CALAMARI (AC-4864)
ASSOCIATE REGIONAL DIRECTOR
Alexander M. Vasilescu (AV-2575)
Doria Bachenheimer (DB-3307)
Steven G. Rawlings (SR-0623)
Danielle Sallah (DS-8686)
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
3 World Financial Center
New York, New York 10281
(212) 336-1100

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x

SECURITIES AND EXCHANGE COMMISSION      :
                                        :
                    Plaintiff,          :
                                        :        __ Civ. ___ (   )
            - against -                 :
                                        :
STEVEN BYERS, JOSEPH                     :
SHERESHEVSKY,                           :
WEXTRUST CAPITAL, LLC,                  :
WEXTRUST EQUITY PARTNERS, LLC,          :
WEXTRUST DEVELOPMENT GROUP, LLC,        :
WEXTRUST SECURITIES, LLC, and           :
AXELA HOSPITALITY, LLC,                 :
                                        :
                    Defendants.         :
                                        :
---------------------------------------------------------------x

## MEMORANDUM OF LAW IN SUPPORT OF
## APPLICATION FOR EMERGENCY RELIEF

### PRELIMINARY STATEMENT

Plaintiff Securities and Exchange Commission (the "Commission") submits this

memorandum of law in support of its emergency application for a temporary restraining order,

preliminary injunction, asset freezes, appointment of receiver, accountings, expedited discovery,

and an order requiring the preservation of documents against defendants Steven Byers ("Byers")

and Joseph Shereshevsky ("Shereshevsky") (the "Individual Defendants") and defendants,

Wextrust Capital, LLC ("Wextrust"), Wextrust Equity Partners, LLP ("WEP"), Wextrust

Development Group ("WDG"), Wextrust Securities, LLC ("Wextrust Securities") and Axela

Hospitality, LLC ("Axela") (the "Wextrust Entity Defendants," collectively "the Defendants".)

Emergency relief is needed to halt the misappropriation of funds by the Defendants and stop the

fraudulent offerings of securities that have raised at least $255 million from at least 1,196

investors since at least 2002 to the present.

Among the emergency relief, the Commission seeks an immediate asset freeze of all

Defendants' assets and the immediate appointment of a receiver for the Wextrust Entity

Defendants. At approximately the same time that the Commission makes this emergency

application, Defendants Shereshevsky and Byers will be arrested on a criminal complaint to be

filed in the District alleging felony violations relating to the same fraudulent schemes alleged in

this civil action.

Defendants are engaging in ongoing fraudulent offerings of securities. Defendant

Wextrust purports to be a globally diversified private equity company, which owns or controls

Wextrust Securities, a registered broker-dealer, WEP and WDG, both Illinois limited liability

companies involved in real estates investments, and Axela, which manages and provides services

to real estate assets. All of these entities, as well as hundreds of limited liability companies

("LLCs") created in connection with the various offerings, are owned or controlled by Defendant

Shereshevsky, a convicted felon, Defendant Byers and others. The private placements are

conducted through the captive broker-dealer, Wextrust Securities. The targets of the fraudulent

offerings are primarily members of the Orthodox Jewish community.

2

As explained herein and in the accompanying declarations and exhibits, from at least 2002 through the present, the Defendants have raised money in at least 60 different offerings of securities, usually in the form of private placements and have created 150 limited liability companies to act as issuers or facilitators of the offerings. While the Defendants own a number of actual operating properties, many of the private placement memoranda we have reviewed in the course of an expedited investigation have misrepresented to investors that funds raised will be used for specific investments in real estate or other assets identified in offering memoranda, when in fact some or all of the offering proceeds were immediately diverted to undisclosed uses, typically to make payments to prior investors in earlier unrelated securities offerings or to meet shortfalls at other Wextrust related entities. In addition, none of the offering documents disclose to investors that Defendant Shereshevsky is a convicted felon who pled guilty to bank fraud in June 2003.

Overall, Wextrust documents show that Defendants have diverted over $100 million from issuer LLC entities to other Wextrust entities. In one egregious example, a securities offering conducted from 2005 through April 2008, Defendants falsely represented to investors that more than $9 million raised in that offering would be used to purchase seven specifically identified real estate properties that were leased by federal government agencies, such as the General Services Administration (the "GSA offering".) In fact, the Defendants never purchased the seven properties identified in the GSA offering documents, and used the proceeds for other purposes.

Expedited relief is needed as the Defendants are in the midst of raising funds in at least four private placement offerings and, as discussed below and addressed in the Complaint, plan to divert the funds raised to pay, among other things, the obligations owed to investors in prior

offerings. Shereshevsky and Byers are both flight risks, and can easily transfer funds overseas, as they regularly travel overseas and have holdings in South Africa, Namibia and/or Israel. Absent an immediate asset freeze and appointment of receiver, as well as other emergency relief, Byers and Shereshevsky could readily remove assets beyond the jurisdiction of this Court.

## STATEMENT OF FACTS

The facts and evidence in support of this emergency application are contained in the Rule 6.1 Declaration of Danielle Sallah, and the attached declarations and accompanying exhibits thereto: (a) the declaration of Tamara R. Heller, a Staff Examiner at the New York Regional Office of the Commission, dated August 8, 2008 (attached hereto as Exhibit A with Exhibits 1-78 thereto, separately bound in the accompanying Volumes 1, 2 and 3) ("Heller Declaration" or "Heller Decl."); (b) the declaration of William Schorsch, dated July 17, 2008 (attached to Heller Decl. as Ex. A), ("Schorsch Decl."); (c) the declaration of Nannette L. Wauchop, dated June 30, 2008 (attached to Heller Decl. as Ex. B) ("Wauchop Decl."); and (d) the declaration of Patricia K. Singleton dated July 25, 2008 (attached to Heller Decl. as Ex. C) ("Singleton Decl.".)

## A.    The Defendants and Relevant Parties

**Steven Byers,** age 46, resides in Oakbrook, Illinois. Together with Shereshevsky, Byers owns or controls the Wextrust Entity Defendants as he is Wextrust's Chairman and owns sixty percent of that entity. Byers is also President and Chief Executive Officer of WEP and an owner of Wextrust Securities. (Heller Decl. at ¶ 3, Ex. 19.)

**Joseph Shereshevsky,** age 52, who is also known as "Joseph Heller" or "Yossi," was convicted in this District in June 2003 of committing the felony of bank fraud. The criminal docket reveals that Shereshevsky stole $300,000 by depositing and cashing stolen checks. (Heller Decl. at ¶ 4, Ex. 13, *U.S. v. Shereshevsky*, 94 Cr. 248 (CSH), 2003 U.S. Dist. LEXIS

4

10868 at *1 (S.D.N.Y. June 23, 2003).) Together with Byers and others, Shereshevsky owns or

controls the Wextrust Entity Defendants as he owns twenty percent of Wextrust through a

partnership interest held in the name of his wife, Elka Shereshevsky, and, during the relevant

time period, has been Wextrust's Chief Operating Officer.

**Wextrust** is an Illinois limited liability company that Byers formed in 2003. (Heller

Decl. at ¶ 5, Ex. 6 at 10-11.) According to the company's website, Wextrust purports to be a

globally diversified private equity and specialty finance company, specializing in investment

opportunities ranging from real estate to specialty finance and investment banking. (Heller Decl.

at ¶ 5, Ex. 17 (Snapshot from www.wextrust.com).) Wextrust is headquartered in Chicago,

Illinois, and maintains offices in New York, New York, Norfolk, Virginia, Atlanta, Georgia,

Boca Raton, Florida, Nashville, Tennessee, Tel Aviv, Israel, and Johannesburg, South Africa.

(Heller Decl. at ¶ 5, Ex. 17 (Snapshot from www.wextrust.com).) Wextrust purports to have five

main areas of business: (1) Wextrust Securities, a registered broker dealer which acts as selling

agent for Wextrust's offerings of units in various limited liability companies; (2) WEP and

WDG, which purportedly manage $500 million of real estate owned by various limited liability

companies whose units were sold to investors in various offerings; (3) Wextrust Commodities

Managers, LLC, which manages various managed futures funds with assets of at least $15

million; (4) certain high yield debt funds which manage assets of approximately $35 million; and

(5) major interests in diamond mines and operations in Africa held through Pure Africa Mining

Ltd. and other affiliates, in which Wextrust has a substantial interest. (Heller Decl. at ¶ 5, Ex. 18

at unnumbered 6.)

5

**B.**     **Fraudulent Misrepresentations in the Various Securities Offerings**

The Defendants have knowingly and recklessly made false and material misrepresentations to investors about how moneys raised in the various offerings will be used. Private placement documents in a number of offerings represented that funds were being raised purportedly for specific investments, when in fact they were actually to be used to pay investors in prior unrelated offerings or to pay the operating expenses of the various Wextrust Entities. Documents obtained from Wextrust Securities reveal that during the past year, inter-entity transfers have greatly escalated and the Wextrust Entities are running a substantial deficit on funds owed to various investors. (Heller Decl. at ¶ 18, Exs. 43, 46-49.)

Wextrust Securities' records show that as of December 31, 2007, the Defendants transferred more than $100 million between entities. A combined balance sheet circulated by email on May 3, 2008, from Wextrust's comptroller to Byers, shows "liabilities" of Wextrust as of year end 2007. The balance sheet lists 45 loans, totaling more than $74 million, that were made by LLC entities that had recently raised money in private placements to other LLC entities that were in need of cash. The same balance sheet includes "negative" liabilities that reflect "receivables" totaling at least $54 million owed to Wextrust Entities from various LLC Entities: i.e., loans that the Wextrust Entities made to those investment entities. (Heller Decl. at ¶ 19, Ex. 23 at 13-17.) A residual inter-company loan balance of approximately $19 million as of December 31, 2007 appears to reflect monies that Wextrust may have used for general corporate purposes. (Heller Decl. at ¶ 19, Ex. 23 at 17; *see also* Ex. 38 at unnumbered pages 3-4.)

The diversion of funds from the various LLC Entities (which raised funds from investors) to the Wextrust Entity Defendants is contrary to representations in the offering memoranda that

proceeds will be used only for specific purposes. The offering documents also tout

Shereshevsky's background while failing to disclose that he is a convicted felon.

Detailed below are specific examples of the Defendants' fraud involving four separate offerings:

GSA Investors, LLC: Crowne-Phoneix Holdings, LLC: Block III Mines & Minerals, LLC: and

Peoria Office Holdings, LLC. In all, the Defendants raised at least $35 million in just these four

offering frauds.

### 1.    **The GSA Offering Fraud**

One of Defendants' first securities offerings, which commenced in 2005 and continued

through at least April 2008, was an outright sham. Documents from Wextrust Securities show

that in 2005, Byers, Shereshevsky and the other defendants created GSA Investors, LLC to act as

the issuer for a $9.2 million private placement. According to the offering memorandum ("the

GSA PPM"), attached as Exhibit 26 to the Heller Declaration, the proceeds raised were to be

used to purchase and operate seven commercial properties leased to the U.S. General Services

Administration. These representations were false. The Defendants raised funds in the GSA

offering for the purpose of diverting those funds for other purposes. In fact, GSA Investors LLC

did not acquire any real property.

Defendants, through GSA Investors, LLC, issued the GSA PPM seeking to raise more

than $9 million from investors. (Heller Decl. at ¶ 21, Ex. 26 at i.)  According to the GSA PPM,

the purpose of the offering was to raise funds that, together with a bank loan, would be used to

"acquire, operate, sell, refinance, mortgage and otherwise use and own for profit an undivided

indirect interest in the Properties, consisting of seven buildings all leased to the United States of

America General Services Administration located in Wisconsin, Illinois, Indiana and Florida."

(Heller Decl. at ¶ 23, Ex. 26 at i.)

In the GSA PPM, the Defendants represented that the purchase price for the seven properties would be approximately $28.3 million; that GSA Investors, LLC intend to raise $9.2 million by selling interests to "Preferred Members" and intended to assume a mortgage covering the properties in the amount of approximately $21.6 million.  (Heller Decl. at ¶ 24, Ex. 26 at 7.) The Defendants also represented in the "Use of Proceeds" section in the PPM, that the $9.2 million raised from investors would be used to pay a portion of the purchase price of the properties, closing costs, commissions and other expenses associated with acquiring the properties and to establish a working capital reserve.  (Heller Decl. at ¶ 24, Ex. 26 at 7.)

To give comfort to prospective investors, the GSA PPM specifically identified the mortgages that would be assumed in connection with the purchase, and further represented that "the Company is acquiring the Properties, in the Manager's view, at below replacement cost, thereby creating an immediate margin of safety for its investors."  (Heller Decl. at ¶ 25, Ex. 26 at 20.)  The Defendants also represented in the GSA PPM that the Manager (GSA Managers, LLC, which is managed by defendant WEP) "believes that the Properties, a government-tenant portfolio with seven office buildings in prime locations:  (i) present a superior investment opportunity in terms of offering a stable, government backed return which limits investors' downside; (ii) are located in markets which present sound demand characteristics and property appreciation possibility; and (iii) will be efficiently managed."  (Heller Decl. at ¶ 26, Ex. 26 at 20.)

Records from Wextrust Securities, attached as Exhibit 39 to the Heller Declaration, show that from 2005 through at least April 2008, the Defendants raised approximately $9 million from 103 investors.  (Heller Decl. at ¶ 27, Ex. 39 at unnumbered 6.)

However, as the accompanying declarations from representatives of the owner and lessee of seven properties confirm, the Defendants never purchased or negotiated to purchase the specific properties that they told investors they would purchase. Similarly, declarations from GSA officials, who work for the Federal Agency that leases the seven properties, also confirm that the Defendants never purchased the properties. (*See* Heller Decl. ¶ 28, Exs. A, B and C (Schorsch, Wauchop, and Singleton Declarations, respectively.) Moreover, a website maintained by the GSA lists the "Lessor/Owners" of the seven properties listed in the GSA private placement memorandum and none of the lessors/owners is GSA Investors LLC, Wextrust Capital or any other individual or entity that is affiliated with the proposed defendants. (*See* Heller Decl. at ¶ 28, Exhibit 70, the GSA Lease Inventory, as of July 2008, from www.gsa.gov.)

In the GSA PPM, Byers, Shereshevsky and the other defendants also made materially incomplete statements regarding Shereshevsky's biography. The GSA PPM touts Shereshevsky as "an executive officer of the Manager and is the Director of Operational Services of WexTrust Asset Management. Mr. Shereshevsky has been involved in real estate and multi-family management for the past 15 years and is a Principal of WexTrust Capital." (Heller Decl. at ¶ 29, Ex. 26 at 23.) Significantly, in the GSA PPM, the Defendants fail to disclose Shereshevsky's prior felony conviction. (*See* Heller Decl. at ¶ 29, Ex. 14 at 3-4 (criminal docket evidencing Shereshevsky's June 2003 bank fraud conviction) at 3-4.)

While the offering was still ongoing, the Defendants diverted the GSA offering proceeds to undisclosed and unrelated purposes. The combined balance sheet retrieved from Wextrust Securities shows that the Wextrust Entity Defendants "borrowed" $6,554,400 from GSA Investors, LLC as of December 31, 2007. (*See* Heller Decl. at ¶ 31, Ex. 23 at 16.) None of the documents the Commission staff retrieved from Wextrust Securities indicates that the

9

Defendants disclosed to GSA investors that the Defendants were diverting their funds to purposes other than the purchase of the seven properties.

Significantly, an email retrieved from Wextrust Securities reveals that Shereshevsky and another Wextrust principal discussed among themselves that the GSA Offering was a securities fraud. In a November 16, 2007 email from the Wextrust principal to Shereshevsky, attached as Exhibit 12 to the Heller Declaration, the Wextrust principal acknowledges that the GSA offering, and other offerings by the Defendants, were frauds, stating "You raised $9,000,000 from investors for GSA i.e. properties that never existed phony PPMs, etc. . . . Guys from enron got 20 years for doing that . . . You co-mingled (sic) funds over 100 times. Wiring high yield (another offering) funds for payroll, Africa, etc. is a crime."

Other emails from Wextrust Securities reveal that investors in the GSA Offering have complained to the Defendants that they have not received payments on their GSA Offering investments. (*See* Heller Decl. at ¶ 32, Ex. 50 (Email exchange, dated May 1-2, 2008, between Tennant and Cafazzo); Ex. 51 (Email exchange, dated April 7-8, 2008 between Tennant and the Lindquists).) These emails indicate that the Defendants have tried to fabricate excuses for their failure to pay investor distributions. (Heller Decl. at ¶ 32, Exs. 50 and 51.) For example, on May 1, 2008, an investor in the GSA Offering sent an email to Bryan Tennant, the head of investor services at Wextrust Securities, stating: "The lack of disclosure invites suspicion. Something as simple as how you schedule distributions or why they never come on a consistent date .... Any more questions are pointless; however there has to be some regulatory body or statute that requires diligence on Wextrust's part to inform me why there are delays or why checks NEVER arrive with any consistency." The next day, Tennant responded: "Distributions are made at such time as cash from the underlying properties is available. Unlike a debt

instrument, such as a bond, your equity ownership interest does not require payment by a date certain." (Heller Decl. at ¶ 32, Ex. 50.)  As complaints have mounted, however, the defendants in July again started paying distributions to at least some GSA investors. (Heller Decl. at ¶ 32.)

The Defendants profited from the fraudulent GSA offering.  Wextrust Securities acted as the placement agent in the sale of GSA LLC securities and several registered representatives at Wextrust Securities received commissions in connection with those sales.  Shereshevsky and his wife received transaction based compensation in 2007 of approximately $9,890, which is approximately 2.2 percent of the $457,000 raised by Wextrust Securities for GSA.

### 2.    Crowne-Phoenix Offering Fraud

The Crowne-Phoenix offering began in August 2007 and its private placement memorandum made material misrepresentations concerning the uses of the offering proceeds.

According to records the Examination Staff retrieved from Wextrust Securities, Crowne-Phoenix Investors LLC ("CP Investors") is a real estate LLC that the Defendants formed to acquire a "membership interest" in Crowne-Phoenix Holdings LLC ("CP Holdings".)  According to the Crowne-Phoenix Investors private placement memorandum dated August 8, 2007 ("Crowne-Phoenix PPM"), CP Holdings was formed to acquire, develop, operate and sell a Crowne Plaza branded hotel in Phoenix, Arizona. (Heller Decl. at ¶ 33, Ex. 21 at 1.)  Crowne-Phoenix Managers, LLC is the manager of CP Investors. (Heller Decl. at ¶ 34, Ex. 21.)

The Crowne-Phoenix PPM represented to investors that the issuer was seeking to raise $9.3 million to be used to pay part of the purchase of a hotel in Phoenix, Arizona, improvement of the hotel property, acquisition and closing fees, interest reserve and equity costs. (Heller Decl. at ¶ 36, Ex. 21 at 8.)  Specifically, the Crowne-Phoenix PPM represented that the $9.3 million raised from investors, together with the assumption of a primary mortgage of

approximately $21 million, would be used to pay the $24 million purchase price for the hotel, as well as to fund $3.6 million in required property improvements, acquisition costs, fees and the creation of an equity reserve. (Heller Decl. at ¶ 36, Ex. 21 at 8.)  Moreover, the Crowne-Phoenix LLC agreement, which was annexed to the PPM, specifically forbids any commingling of the funds raised in that offering. (Heller Decl. at ¶ 36, Ex. 21 at Limited Liability Agreement at 30, Article 10.5.)

These statements were false and, at the time the Crowne-Phoenix PPM was used to solicit investments, Byers, Shereshevsky and the other defendants knew or were reckless in not knowing they were false. Emails retrieved form Wextrust Securities reveal that the Defendants made improper transfers of funds shortly after the August 2007 offering commenced:  In an October 9, 2007 email, marked as Exhibit 45, Shereshevsky instructed "the equity raisers that all funds for crowne plaza should now be sent to Norfolk, Wachovia effective immediately.  All monies coming in should only be deposited into Wachovia account." (Heller Decl. at ¶ 37, Ex. 45.)  The Norfolk Wachovia account is where Wextrust maintains some of its house accounts as well as accounts for approximately 60 affiliated LLCs, among which it loaned and borrowed from. (Heller Decl. at ¶ 37, Ex. 23.)  As recorded in a November 20, 2007 email from Wextrust's accounting department, marked as Exhibit 43, (1) in October and November 2007, Crowne-Phoenix "loaned" Wextrust $650,000 to fund payroll needs; (2) in October and November 2007, Crowne-Phoenix "loaned" Wextrust approximately $1 million "to fund partial distribution check funding;" and (3) in October 2007, Crowne-Phoenix "loaned" Wextrust $600,000 to fund or loan moneys to two other private placement entities, Guaranteed Depository Receipt Fund ("GDR") and Pure Africa Minerals Ltd. (Pty.) ("PAM".)  (Heller Decl. at ¶ 37, Ex. 43.)

In early 2008, the Defendants used money from other offerings to pay back the Crowne-Phoenix bank account for all the outward transfers. In an email dated February 25, 2008, marked as Exhibit 46, Byers told Shereshevsky that some of the money raised for a new offering, West 82nd Street LLC, was used to repay some of the deficit owed to CP Investors:

> We will be closing on W. 82nd [another LLC] very soon. We can use the money but obviously we used $1.1 million for the Gold Coast [another LLC] and *another $1.6 million for Crowne for which we raised but never paid back.*

Significantly, in the private placement memoranda for the West 82nd Street offering, marked as Exhibits 28 and 29 to the Heller Declaration, the Defendants did not disclose to investors that some of the money raised would be loaned to other Wextrust affiliates. None of the documents the Commission staff retrieved from Wextrust Securities indicates that the Defendants disclosed to Crowne-Phoenix investors that the Defendants were diverting their funds to purposes other than the purchase of properties identified in the offering documents.

Similar to the GSA PPM, in the Crowne-Phoenix PPM, the Defendants make materially incomplete statements regarding Defendant Shereshevsky's biography, stating that he is a "principal and integral part of Wextrust," and that Shereshevsky was "instrumental in the founding of Wextrust Securities." (Heller Decl. at ¶ 40, Ex. 21 at 29.) The Crowne-Phoenix PPM fails to disclose Shereshevsky's prior felony conviction.

In addition to the diverted proceeds, the Defendants profited from the Crowne-Phoenix offering fraud. Records the Commission staff retrieved from Wextrust Securities show that Wextrust Securities acted as selling agent for the Crowne-Phoenix offering. (*See* Heller Decl. at ¶ 41, Ex. 21 at unnumbered 2.) Other records from Wextrust Securities, marked as Exhibit 40, reveal that Defendant Shereshevsky and his wife received $130,953, or approximately one percent of the funds raised by Wextrust Securities in connection with the Crowne-Phoenix

13

offering. (Heller Decl. at ¶ 41, Ex. 40 at unnumbered 3.)

### 3.    The Block III, Peoria and Other Fraudulent Securities Offerings

Evidence retrieved from Wextrust Securities reveals that the fraudulent diversion of investors' monies, as illustrated above in the GSA and Crowne-Phoenix Offerings, is widespread and common to many, if not all of the 60 offerings conducted by the Defendants since at least 2003. On this Order to show cause, the Commission submits evidence showing that the Block III, Peoria and other securities offerings conducted by the Defendants were fraudulent.

### a.    The Block III Offering Fraud

According to records the Examination Staff retrieved from Wextrust Securities, Block III Mines & Minerals, LLC ("Block III") is a Virginia limited liability company organized to make a loan to and acquire an interest in a Namibian company, Deva Investments (Pty), Ltd., which owns the exploration and mining rights in a group of diamond mines in Namibia known as Block III. (*See* Heller Decl. at ¶ 42, Ex. 30 at i.)

The private placement memorandum for the Block III Offering, dated March 22, 2007 ("Block III PPM") sought to raise $11 million from investors. (Heller Decl. at ¶ 45, Ex. 30 at 4.) The Block III PPM represents that the proceeds of the offering will be used as follows: (a) $4.5 million would be used for new equipment and operating capital, (b) $1.5 million would be used to fund a reserve for a purchase option on two other mines, (c) $1.75 million would fund an operating reserve, (d) $300,000 would pay legal and operating expenses, and (e) approximately $2.95 million would be paid in fees to Wextrust and Wextrust Securities. (Heller Decl. at ¶ 45, Ex. 30 at 7.) Moreover, the operating agreement attached to the Block III PPM specifically limited the use of funds to expenses related to Block III. (Heller Decl. at ¶ 45, Ex. 30 at Operating Agreement at 26.)

14

These statements were false and, at the time the Block III PPM was used to solicit investments, Byers, Shereshevsky and the other defendants knew or were reckless in not knowing they were false. Almost immediately after they began raising money, the Defendants diverted the proceeds to unauthorized uses. The balance sheet from Wextrust Securities (Heller Decl. at ¶ 46, Ex. 23 at 16) shows that $3,990,910 of proceeds raised by Block III Mines & Minerals LLC was diverted to Wextrust Entities. None of the documents the Commission staff retrieved from Wextrust Securities indicates that the Defendants disclosed to Block III investors that the Defendants were diverting their funds to purposes other than the purchase of five purposes described in the Block III PPM.

The Block III PPM also omits material information regarding Shereshevsky's background. Like the Crowne-Phoenix offering, the Block III PPM describes Shereshevsky as a "principal and integral part of Wextrust," and states that Shereshevsky was "instrumental in the founding of Wextrust Securities." (Heller Decl. at ¶ 48, Ex. 30 at 20-21.) The Block III PPM fails to disclose Shereshevsky's prior felony conviction. (Heller Decl. at ¶ 48, *comparing* Ex. 30 *with* Ex. 14.)

Defendant Wextrust Securities acted as a selling agent in the Block III offering. (Heller Decl. at ¶ 47, Ex. 30 at unnumbered 2.) In addition, according to records from Wextrust Securities, Defendant Shereshevsky and his wife received transaction based compensation of $249,577, or approximately two percent of the funds raised by Wextrust Securities, in connection with the Block III offering. (Heller Decl. at ¶ 49, Ex. 40 at unnumbered 4-5.) The Shereshevskys also received $750,000 in bonuses in connection with the Block III offering.

### b.    The Peoria Offering Fraud

According to records the Examination Staff retrieved from Wextrust Securities, Peoria

15

Office Investors LLC is a real estate limited liability company formed by the Defendants to own

the sole membership interest in Peoria Office Holdings, LLC ("PO Holdings"). (*See* Heller

Decl. at ¶ 50, Ex. 27 at unnumbered 2.) The Defendants formed PO Holdings to acquire and

operate an office building in Peoria, Illinois. Through Peoria Office Investors, the Defendants

issued a PPM dated November 9, 2007 (the "Peoria Office PPM"), seeking to raise $4.7 million

from 47 investors. (Heller Decl. ¶ 50, Ex. 27.)

The Peoria Office PPM represented to investors that the $4.7 million in proceeds

expected to be raised, together with a mortgage of approximately $11 million, would be used to

pay the $14.75 million purchase price and the remaining money would pay closing costs, legal

fees, acquisition fees and equity costs. (Heller Decl. at ¶ 53, Ex. 27 at 7.) Moreover, the

operating agreement, which was annexed to the PPM, specifically forbids any commingling of

the funds raised in that offering. (Heller Decl. at ¶ 53, Ex. 27 at Limited Liability Agreement at

29.)

These representations were false and, at the time the Peoria Investors PPM was issued in

November 2007 and used to solicit investments, Byers, Shereshevsky and the other defendants

knew or were reckless in not knowing they were false. The evidence shows that at the time of

the offering, the Defendants intended to divert proceeds to other Wextrust Entities and for the

Individual Defendants' own use. The Wextrust balance sheet indicates that, as of December 31,

2007, Wextrust had "borrowed" approximately $1,048,860 from the Peoria Office Investors LLC

offering proceeds. (Heller Decl. at ¶ 54, Ex. 23 at 17.) An email dated November 19, 2007, that

Shereshevsky sent another Wextrust principal that was copied to Byers openly discussed that the

Wextrust Entity Defendants were operating at a loss of $1 million per month and that the general

diversion of funds from offerings would be necessary to pay payroll and other expenses of the

various Wextrust Entities. (Heller Decl. at ¶ 55, Ex. 47.) The Commission staff has not found

any Wextrust documents that disclose to investors that the Defendants intended to divert offering

proceeds to other uses. *Id.*

As with the other offerings, the Defendants omitted material information concerning

Shereshevsky, including his 2003 felony bank fraud conviction. (Heller Decl. at ¶ 58, *comparing*

Ex. 27 *with* Ex. 14.)

Defendant Wextrust Securities acted as the placement agent for the Peoria Office

offering. Records from Wextrust Securities reveal that in 2007, Defendant Shereshevsky and his

wife received $59,462, or approximately two percent of the funds raised by Wextrust Securities,

in connection with the Peoria Office Investors offering. (Heller Decl. at ¶ 59, Ex. 40 at

unnumbered 3.)

### c.    Additional Fraudulent Offerings

Emails among Byers, Shereshevsky and others at the Wextrust Entity Defendants show

that numerous other offerings conducted by the Defendants are also fraudulent. (Heller Decl. at

¶ 60, Exs. 12 and 47.) Several emails reveal that during the past year Byers, Shereshevsky and

others have discussed the ever increasing deficit in funds owed to investors and the need to raise

additional funds to pay prior investors. (Heller Decl. at ¶ 60, Ex. 60.) Byers and Shereshevsky

and the Wextrust Entity Defendants have staked their ability to extricate themselves from these

deficits on the success of their diamond mining investments in Africa. (Heller Decl. at ¶ 60, Ex.

47.)

For example, in an email dated November 15, 2007, a Wextrust principal confronted

Shereshevsky about wiring $225,000 from the Crowne-Phoenix account to an account for

Wextrust affiliates in South Africa -- specifically, Pure Africa Minerals (Pty) Ltd., a South

17

African company formed to own mines in South Africa and Namibia. The email indicates that a Wextrust principal's concern was that money was needed to pay down a loan from Broadway Bank in connection with the Crowne-Phoenix investment for which a Wextrust principal and Byers had signed a personal guarantee. (Heller Decl. at ¶ 61, Ex. 47.) Shereshevsky's response reveals the widespread and deliberate commingling, the inability of the company to make payroll without loans, and that the African investments were the "only hope" for getting the Individual Defendants out of the "mess" they were in. Shereshevsky responded, in part, to a Wextrust principal (emphasis added):

> U have no idea what u r talking about. *Wextrust borrowed about a month ago 750,000 from Skelton coast* [in Africa]. *Now we needed it so we took back 250,000. we* [sic] *are still owed 450,000 and I will continue to take it out until it is paid.*

The Wextrust principal forwarded this email to Byers, stating (emphasis added):

> *Why are we paying money to Africa before pay back Broadway Bank.* This is crazy. We both signed a personal guarantee here. Not comfortable with Joe [Sherevshesky] having Carte Blance with the company's $$$$. If this continues, I will ask for a forensic audit.

The Wextrust principal then forward his email to Byers to Shereshevsky, who responded in part (emphasis added):

> *As of today the company owes Africa about 575,000 that is outstanding.* The company owes me quite a bit of money including 200,000 that I lent them this morning so we can cover payroll including yours.

> * * *

> The reason why it is more important to pay back Africa is because our only hope of getting out of our mess is Africa. Including you [the Wextrust principal]. We are in debt and I am working diligently to get us out of it. Go ahead and do a forensic audit. It will show that *we spend about 1,000,000 more a month than we make,* for the last 3 years especially the last 19 months. Now that you know that we take in less than we get by 1,000,000 a month do you still want your payroll??????? If no, please let me relieve you of it so you can do the right thing.

18

> [The Wextrust principal] . . . we are on the verge of becoming a very strong
> company. However even if we do it will be very hard going for the next 6 months
> to a year. *We may have to maneuver and do things that maybe we would not do if
> we were cash rich.* You want to bicker, go ahead and bicker. It won't do
> anything for us. You want to be a team man then show it.

(Heller Decl. at ¶ 61, Ex. 47.)

Emails retrieved from Wextrust Securities, marked as Exhibits 50-55 to the Heller

Declaration, also reveal that investors are complaining that payments to them are being delayed

or not paid, and they are concerned about their investments. To all the queries, a representative

from Wextrust Securities has responded without disclosing that Wextrust was running a deficit

and was using funds from other entities to make payments to prior investors. (Heller Decl. at ¶

62, Exs. 50-55.) In fact, behind the scenes, Byers, Shereshevsky and others have engaged in

frantic communications to drum up money to pay investors. (Heller Decl. at ¶ 62, Exs. 24-25,

46-49, 60-61.)

On May 13, 2008, an investor filed a complaint with the Illinois Office of the Attorney

General, in which he states that he "smells a rat" and that "This is smelling like a giant PONZI

scheme. My belie[f] is that Wextrust could be playing a huge, financial shell game. Their

financial situation may be so bad that they're delaying distributions to earn the float, and paying

our late distributions out of new investor dollars. I fear their house of cards is about to collapse,

leaving investors holding the bag." (Heller Decl. at ¶ 63, Ex. 78.)

## C.    The Defendants Are Engaged In Ongoing Fraudulent Offerings

The Defendants are currently in the midst of conducting at least four offerings in

investments or instruments which are securities in the form of investment contracts, notes or

other evidence of indebtedness: Drake Oak Brook Investors, LLC, a note offering by Defendant

WEP (the "GSPN"), 625 Paragon Investors, LLC ("625 Paragon") and ATM II. (*See* Heller

19

Decl. at ¶ 64, Exs. 32-35.)

The Drake Oak Brook offering commenced on November 10, 2007. The Defendants

seek to raise $14.5 million purportedly to acquire indirectly and develop a Wyndham branded

hotel. (Heller Decl. at ¶ 65, Ex. 34.) According to an investor list for the Drake offering that

indicates amounts committed and received, marked as Exhibit 75, to date, the offering has raised

approximately $11.6 million, with one investor investing $100,000 on July 21, 2008. (Heller

Decl. at ¶ 65, Ex. 75 at 2.)

The GSPN offering began in December 2007. As of July 15, 2008, the Defendants have

raised approximately $4.7 million. (Heller Decl. at ¶ 66, Ex. 57 at unnumbered 2.) In the private

placement memorandum for the GSPN offering, the Defendants represent that the proceeds will

be used to fund short-term loans to entities affiliated with WEP to fund security deposits, pay up-

front fees and costs related to property acquisitions, provide bridge loans, and provide financing

for tenant improvement costs and construction on currently owned real estate. (Heller Decl. at ¶

66, Ex. 35 at 5.)

The 625 Paragon offering commenced on or about April 17, 2008. The Defendants seek

to raise $4.8 million from investors to acquire indirectly and develop a residential complex in

Chicago, Illinois. (Heller Decl. at ¶ 67, Ex. 32.) The 625 Paragon private placement

memorandum represents that the offering proceeds will be used to make a $3 million

contribution to acquire an interest in Paragon/Division LLC and for placement fees and

syndication costs, a development fee, and a "preferred return reserve." (Heller Decl. at ¶ 67, Ex.

32 at 8.) According to an investor list for the 625 Paragon offering that indicates amounts

committed and received as of July 22, 2008, the 625 Paragon offering has raised approximately

$1,015,000, with one investor investing $100,000 on July 2, 2008 and another investing

$100,000 on July 10, 2008. (Heller Decl. at ¶ 67, Ex. 76 at 2.)

ATM II commenced on April 24, 2008. The Defendants seek to raise $25 million from investors to acquire 10% of Wextrust's interest in a Wextrust affiliate, a South African entity called Pure Africa Minerals (Pty) Ltd. (Heller Decl. at ¶ 68.) According to an investor list for the ATM II offering that indicates amounts committed and received as of July 22, 2008, ATM II has raised just over $1 million with one investor making a $250,000 investment on June 18, 2008. (Heller Decl. at ¶ 68, Ex. 59.)

Based on the balance sheet, emails, and Defendants' historical practice of diverting proceeds from offerings, it is clear that the Defendants intend to use some or all of the proceeds raised by these four LLC Entities to meet obligations of other Wextrust Entities. Significantly, a March 18, 2008 email retrieved from Defendant Wextrust Securities shows that Shereshevsky and Byers were well aware of improper activities they are engaged in (emphasis added):

> Please remember one thing. That although I always take care of you and myself, my goal in this thing as I have always told you from day one, is to get [W]extrust out of all the shit before the end of 09 or 10 at the latest. that is my primary concern. *We have faked it until we made it for long enough and now we must clean up.*

(Heller Decl. at ¶ 69, Ex. 61.)

An email reveals that as recently as July 2, 2008, Shereshevsky was stating, "We are in business. We are raising money. We received commitments today on atm, drake and paragon to the rune [sic] of over 2.5 million." (Heller Decl. at ¶ 70, Ex. 25.)

**D.    Fraudulent Over-Raising**

The Defendants have also engaged in widespread "over-raising" on several offerings and used proceeds from one offering for other uses. That is, Defendants are selling more than 100 percent of the interests in many of their LLC Entities. Wextrust Securities' records confirm that

the actual amount raised in at least nineteen offerings exceeds the total amount that that the

Defendants represented that they would raise in the various private placement memoranda by

more than $20 million. (*See* Heller Decl. at ¶ 71, Ex. 3 at 5; Ex. 36.)

Emails obtained during the Examination show that the purpose of the over-raising was to

supplement the firm's cash flow needs. For example, in an April 11, 2008 email to Byers,

Shereshevsky requests a short telephone conversation to discuss certain agenda items, one of

which is "Ideas for cash to survive until I finish this underwriting." Later that same day,

Shereshevsky sends a "follow up" email to Byers, stating, "We have to do some old fashion over

raising, raise for the GDR and High Yield (on shore) [another PPM] to get through these

months." (Heller Decl. at ¶ 72, Ex. 48.) Byers' view that over-raising translates into "profits"

is set out in a previous email to Shereshevsky on March 12, 2008, in which he states:

> Also, a big part of what we do is make money, profit, by raising more than the
> minimum that is required. Yes, it needs to be in reason but we have to have the
> ability to do this. We must determine with our accountants how we book and
> treat this and [the then-current CFO] can either get in line or get out of the way.

(Heller Decl. at ¶ 72, Ex. 49.)

The various private placement offering documents that Commission staff have reviewed

do not disclose to investors the consequence of such over-raising, such as the dilution of their

interests. (*See* Heller Decl., Exs. 20, 21, 26-35.) In reviewing the various documents and emails

retrieved from Wextrust Securities, the Commission staff has not found any communications in

which the Defendants inform investors that the amount they have invested as a percentage to any

particular offering has been diluted by over-raising or informing investors of the use of over-

raised funds.

E.   To Further their Fraudulent Offerings, Wextrust Securities,
     Byers and Shereshevsky Failed To File Proper BD Forms
     With the Commisson and Pass Licensing Exams

As Shereshevsky is a convicted felon, and his participation was essential to conduct the

fraudulent offerings, the Defendants hid from the Commission in its Form BD filing,

Shereshevsky's control and management of Wextrust Securities and the solicitation of investors.

In addition, Shereshevsky and Byers, who both also supervised Wextrust Securities and solicited

investors, both failed to register with the Commission as broker, or register with the FINRA

regulator as associated with Wextrust Securities, and both also failed to pass appropriate

licensing examinations.

As evidenced by emails and other records at Wextrust Securities, Shereshevsky and

Byers have been actively involved in the management and control of Wextrust Securities.

(Heller Decl. at ¶ 76, Ex. 66.) Emails retrieved and other records retrieved from Wextrust

Securities demonstrate that Shereshevsky and Byers are involved in soliciting investors to invest

in the private placement offerings and that Shereshevsky has been paid transaction-based

compensation for having solicited numerous investors. (Heller Decl. at ¶ 78, Exs. 15 and 16.)

Shereshevsky received transaction based commissions in connection with sales by Wextrust

Securities. (Heller Decl. at ¶ 82, Ex. 40 at unnumbered 2, 4-5.) Moreover, in an email exchange

dated April 9-10, 2008, Byers and Shereshevsky acknowledged that Shereshevsky received

commissions for soliciting investors. (Heller Decl. at ¶ 83, Ex. 24 at 1, 2 and 4.) The email

exchange further indicates that Defendants Byers and Shereshevsky knew it was wrong to

conceal Shereshevsky's role in soliciting investors. Instead of disclosure, Byers suggested they

"take all history into a positive" by calling Shereshevsky a "Risk Specialist" and compensating

him for commissions in another way:

23

My recommendation is that nothing should be on your card, just your name, and your position should be "Risk Specialist". Using that can take [sic] all history into a positive. Furthermore, you bring in potential investors and you tell them "what you told management" about the positive AND the RISKS and then turn them over to Mike or someone with a series 7. On compensation, we will have to rework. You will have to get paid salary plus bonus and then ownership distribution through the partnership interests. *Fees and % of fees for raising money will have to stop or we will be shut down. Take it out another way.*

(Heller Decl. at ¶ 83, Ex. 24 at 3-4) (emphasis added.)

**F.    Byers and Shereshevsky Are Being Arrested On a Criminal Complaint**

The Commission staff has been advised by the United States Attorney's Office for the

Southern District of New York that this morning that office will be seeking to arrest both Byers

and Shereshevsky on a criminal complaint alleging felonies based on the same factual conduct as

alleged in this civil action.

**ARGUMENT**

**I.**

**THE DEFENDANTS SHOULD BE
TEMPORARILY RESTRAINED AND PRELIMINARILY ENJOINED
FROM FURTHER VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

Because the SEC is "not . . . an ordinary litigant, but . . . a statutory guardian charged

with safeguarding the public interest in enforcing the securities laws," its burden to secure tem-

porary or preliminary relief is less than that of a private party. *SEC v. Management Dynamics,*

*Inc.,* 515 F.2d 801, 808 (2d Cir. 1975). It need not show irreparable injury or a balance of

equities in its favor. Id.; *see also SEC v. Unifund SAL*, 910 F.2d 1028, 1035 (2d Cir. 1990.)

Unlike ordinary litigants, the SEC must only make a "proper showing" of violative activity to

obtain a temporary restraining order or preliminary injunction against statutory violations. It

carries this burden when it makes a substantial showing of (i) a current violation, and (ii) the risk

of repetition. *E.g., SEC v. Cavanagh*, 155 F.3d 129, 132 (2d Cir. 1998); *Unifund SAL*, 910 F.2d

24

at 1036-37; *Management Dynamics, Inc.*, 515 F.2d at 807; *SEC v. Manor Nursing Centers, Inc.*, 458 F.2d 1082, 1100 (2d Cir. 1972.)

      In this case, the Defendants have violated, are violating, and, unless restrained, will continue to violate the antifraud provisions of the Securities Act of 1933 ("Securities Act") and the Securities and Exchange Act of 1934 ("Exchange Act"), Sections 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. Defendant Wextrust Securities has violated, and the Individual Defendants have aided and abetted violations of, the broker-dealer antifraud provisions of the Exchange Act, Section 15(c) of the Exchange Act and Rule 10b-3 thereunder. In addition, the Individual Defendants and Wextrust Securities have either directly violated, or aided and abetted violations of, various broker-dealer statutes and rules requiring Wextrust Securities to disclose to the Commission that Shereshevsky control that broker-dealer and that Shereshevsky has a prior felony conviction, and which require Byers and Shereshevsky to take and pass licensing exams. To the extent Shereshevsky effected the purchase and sale of securities for investors while not associated with Wextrust Securities, Shereshevsky violated Section 15(a) of the Exchange Act, which requires broker-dealers to register with the Commission.

      In the course of committing these violations, the Defendants have misappropriated funds totaling at least $255 million from 1,196 investors.

**A.    The Commission Has Made a Substantial Showing that the Defendants Have Violated the Antifraud Provisions of the Securities Act and the Exchange Act**

      Section 17(a) of the Securities Act prohibits fraud in the offer or sale of securities, and Section 10(b) of the Exchange Act and Rule 10b-5 prohibit fraud in connection with the purchase or sale of securities. *See Basic, Inc. v. Levinson*, 485 U.S. 224, 235 n.13 (1988.) "Section 17(a) is in substance almost identical to Section 10(b) . . . and to Rule 10b-5," *SEC v.*

*Banner Fund Int'l*, 211 F.3d 602, 609-10 (D.C. Cir. 2000), and consequently the sections "establish very similar requirements for proof of securities fraud." *SEC v. Kenton Capital, Ltd.*, 69 F. Supp.2d 1, 12 (D.D.C. 1998.)  Section 17(a) of the Securities Act prohibits fraud by any person in the offer or sale of securities and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder prohibits fraud in connection with the purchase or sale of a security.  To establish a violation of these provisions, the Commission must show that the Defendants made a material misrepresentation or omission and that they acted with scienter.

Misstatements or omissions of facts are actionable under the antifraud provisions if they are material. *Basic v. Levinson*, 485 U.S. at 231.  A fact is material if there is a substantial likelihood that a reasonable investor would consider it important in making an investment decision or if it would significantly alter the total mix of available information. *Id.* at 231-32.  A misrepresentation is made "in connection with the purchase or sale of any security" when the misrepresentation and the securities transaction are part of the same fraudulent scheme such as where there is no intent to deliver the securities or there is an intent to misappropriate the proceeds.  *SEC v. Zandford*, 535 U.S. 813 (2002); *United States v. O'Hagan*, 521 U.S. 642, 655-656 (1997).

To establish a violation of Section 17(a)(1) of the Securities Act, Section 10(b) of the Exchange Act and Rule 10b-5, the Commission must show that the defendant acted with scienter. *Aaron v. SEC*, 446 U.S. 680, 696 (1980); *Steadman v. SEC*, 603 F.2d 1126, 1134 (5th Cir. 1979).  Scienter is a "mental state embracing the intent to deceive, manipulate or defraud," *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193, n. 12 (1976), which, in the Second Circuit, amounts to knowing or reckless conduct. *See, e.g., Novak v. Kasaks*, 216 F.3d 300 (2d Cir. 2000); *SEC v. McNulty*, 137 F.3d 732, 741 (2d Cir. 1998); *ITT v. Cornfeld*, 619 F.2d 909 (2d Cir.

26

1980). Scienter is not required for a violation of Sections 17(a)(2) and (3) of the Securities Act. *Aaron*, 446 U.S. at 697; *SEC v. Capital Gains Research Bureau*, 375 U.S. 180, 195 (1963).

Section 15(c)(1) of the Exchange Act prohibits a broker or a dealer from effecting any transaction in, or inducing or attempting to induce the purchase or sale of, any security by means of any manipulative, deceptive, or other fraudulent device or contrivance. Similarly, Rule 10b-3 prohibits a broker or dealer from using or employing any act, practice, or course of business that is a manipulative, deceptive, or other fraudulent device or contrivance in connection with the purchase or sale of any security otherwise than on a national securities exchange. The elements of aiding and abetting liability are: (1) existence of a primary violation; (2) knowledge on the part of the actor that his acts were part of an illegal or improper scheme; and (3) substantial assistance. *See* Section 20(e) of the Exchange Act; *see also ITT v. Cornfeld*, 619 F.2d 909, 922 (2d Cir. 1980).

The Defendants each violated Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder. In addition, Wextrust Securities violated, and Byers and Shereshevsky each aided and abetted Wextrust Securities' violations of, the broker-dealer antifraud provisions, Section 15(c) and Rule 10b-3, in connection with the sale of units to investors in the various LLC offerings, including Crowne and GSA.

In the offerings detailed in this memorandum, the Defendants made material misrepresentations by falsely representing that funds raised from investors would be used to purchase specific assets identified in each PPM associated with respective offerings. The Defendants misrepresented how the funds from each offering would be used, and did not disclose that investors' funds would be diverted to other entities. The Crowne-Phoenix offering, in which the Defendants raised approximately $9.3 million from eighty-three investors,

27

illustrates the Ponzi-like commingling and distribution of funds by the Defendants. Documents and emails retrieved from Wextrust Securities reveal that at least $3.7 million of the proceeds raised from the 2007 Crowne offering have been diverted by the Defendants to fund payroll for Wextrust and Wextrust affiliates, pay deposits for two other Wextrust investment properties, make distributions to investors of other Wextrust affiliated investments, and make loans to other Wextrust affiliates.

Similarly, the offering documents for the 2005 GSA Offering falsely state that the Defendants would use the more than $9 million raised from investors to purchase seven specific properties that had long-term leases with agencies of the federal government. The GSA PPM, which the Defendants used to solicit investments from 2005 through at least April 2008, falsely portrays a conservative and safe investment in the GSA LLC by indicating that the seven properties would be purchased "below replacement costs" and steady annual 8.5% payments would be made to investors. In fact, the GSA has confirmed that none of the seven properties was purchased by the GSA LLC.

Moreover, declarations from a partner for the owner of the GSA properties, who were also the owners in 2005 when the GSA PPM was drafted by the Defendants, state that he never heard of any of the defendants (until the government recently contacted him), and the Defendants did not make any inquiries to the owners of the properties, let alone negotiate the purchase of the seven properties. Thus, at the time that the Defendants solicited investments in the GSA LLC, they had no reasonable basis to represent to investors that they could purchase the seven properties at below replacement cost, or that they would be able to even purchase said properties. Nevertheless, the offering went forward and the proceeds were misappropriated.

Records obtained from Wextrust Securities, i.e. the balance sheet, show that substantial funds, totaling $6,554,400 have been diverted from the GSA LLC investment by the Defendants. Meanwhile, the investors in GSA LLC have not been notified that the properties they invested in were never in fact purchased. Yet these investors have been being regular monthly distributions so that the fraud inflicted on them would remain concealed. Information retrieved by the staff of the Commission from Wextrust Securities show that, as money in the Ponzi-scheme began to run out, the GSA investors and others have had distributions cease from approximately February 2008. As complaints have mounted, however, the defendants in July again started paying distributions to at least some GSA investors.

Finally selling documents sent to investors, such as private placement memoranda and operating agreements, omit to reveal Shereshevsky's criminal background and felony conviction, while touting his investment and skills. Shereshevsky knowingly, and Byers knowingly or recklessly, failed to disclose Shereshevsky's criminal background to investors, which is a material fact.

Because Byers and Shereshevsky control Wextrust Securities, Wextrust, WEP, and Axela, the individuals' scienter is imputed to those entities. *See Management Dynamics, Inc.*, 515 F.2d at 812; *Manor Nursing Centers*, 458 F.2d at 1096 n.16 (scienter of an individual who controls a business entity may be imputed to that entity.) These materially false statements and misrepresentations were made "in connection with" the purchase or sale of securities, and "in the offer or sale" of securities, namely units sold in the offerings of Crowne, GSA and LLC securities offerings.

**B.    The Commission Has Made a Substantial Showing that the Defendants
Have Violated the Broker-Dealer Registration and Disclosure Provisions**

Section 15(a)(1) of the Exchange Act requires brokers and dealers who effect nonexempt

securities transactions through interstate commerce to be registered with the Commission or, in

the case of a natural person, to be associated with a registered broker or dealer that is not a

natural person. The Commission is not required to show scienter to establish a violation of

Section 15(a)(1.) *See, e.g., SEC v. Martino*, 255 F. Supp.2d 268, 283 (S.D.N.Y. 2003), aff'd, 94

Fed. Appx. 871 (2d Cir. 2004). Section 3(a)(4) of the Exchange Act defines a "broker" as "any

person engaged in the business of effecting transactions in securities for the account of others."

The phrase "engaged in the business" connotes regular participation in securities transactions.

*See SEC v. Nat'l Executive Planners, Ltd.*, 503 F. Supp. 1066, 1073 (M.D.N.C. 1980). A person

effects transactions in securities if he or she participates in such transactions at key points in the

chain of distribution. *See Massachusetts Fin. Servs. v. Security Investor Protection Corp.*, 411 F.

Supp. 411, 415 (D. Mass.), *aff'd*, 545 F.2d 754 (1st Cir. 1976).

Section 15(b)(1) of the Exchange Act requires all brokers or dealers applying for

registration with the Commission to file a Form BD with the Commission, which, among other

things, requires brokers and dealers to disclose any person that has the power to "control" the

broker or dealer. Control affiliate is defined as "a control person or any other individual or

organization that directly or indirectly controls, is under common control with, or is controlled

by the applicant including any current employee." Similarly the Form BD requires a broker-

dealer to disclose whether it or a control affiliate has been convicted of a felony in the past ten

years. Therefore, Section 15(b) and Rules 15b1-1 and 15b3-1 required Wextrust Securities to

disclose Shereshevsky's felony conviction or file an amended Form BD to disclose the

conviction.

30

Section 15(b)(7) of the Exchange Act and Rule 15b7-1 thereunder require that all
registered broker-dealers ensure that associated individuals effecting securities transactions
have passed appropriate licensing exams.[1]

Shereshevsky violated Section 15(a) by effecting securities transactions while he was
not registered as, or associated with, a broker-dealer. Alternatively, to the extent Shereshevsky
effected securities transactions while associated with Wextrust Securities, Wextrust Securities
violated, and Byers and Shereshevsky aided and abetted violations of, Section 15(b)(7) of the
Exchange Act and Rule 15b7-1 thereunder, because Shereshevsky effected securities
transactions while at Wextrust Securities without having passed the appropriate licensing
examinations and without being registered as associated with Wextrust Securities. Byers
knowingly or recklessly allowed Shereshevsky to associate with Wextrust Securities while he
was not properly licensed or registered.

Wextrust Securities also violated, and Byers aided and abetted Wextrust Securities'
violation of, Section 15(b)(7) and Rule 15b7-1 thereunder, because Byers effected securities
transactions while at Wextrust Securities without having passed the appropriate licensing
examinations; and each effected securities transactions in their supervisory capacity as

---

[1]  The meaning of "effecting" or "involved in effecting" a securities transaction includes any
function in connection with the solicitation, receipt, or processing of such transaction except
solely clerical or ministerial functions. SEC Release No. 34-32018 (March 19, 1993.) Pursuant
to the NASD manual adopted by FINRA, persons associated with a member firm who are
engaged in the securities industry for a member firm must register as a "General Securities
Representative" and pass an appropriate qualification examination. *NASD Manual–Schedule of
By-Laws*, Schedule C (CCH) ¶ 1748 (July 1994). In addition, each supervisor must register as a
"General Securities Principal" and pass an appropriate qualification examination. *Id.* The
NASD's Form U-4, *Uniform Application For Securities Industry Registration Or Transfer*
(Revised November 1991), states that the appropriate exam for a "General Securities
Representative" is the Series 7 exam, and that the appropriate exam for a "General Securities
Principal" is the Series 24 exam.

"General Securities Principals" while at Wextrust Securities without having passed the supervisory license exams.

In addition, Wextrust Securities violated, and Byers aided and abetted violations of, Section 15(b)(1) and Rules 15b1-1 and 15b3-1, because Wextrust Securities failed to disclose in its Form BD, or any of the amendments thereto, that Shereshevsky acted as a control person of that registered broker-dealer from at least 2005 until the present. Shereshevsky exercised executive responsibility at Wextrust Securities. Byers aided and abetted Wextrust Securities' Section 15(b)(1) and Rules 15b1-1 and 15b3-1 violations by failing to cause Wextrust Securities to disclose Shereshevsky's control of the broker-dealer in its Form BD filings. *See, e.g., Dierdre C. Steinhaus*, Exchange Act Rel. No. 32400, 1993 SEC LEXIS 1289 (June 1, 1993) (broker-dealer violated Section 15(b)(1) of the Exchange Act and Rule 15b3-1, and president of the broker-dealer aided and abetted these violations, by filing with the Commission a Form BD that failed to disclose that the husband of the broker-dealer's president directly and indirectly controlled the broker-dealer).

## II.

## THE COURT SHOULD GRANT A TEMPRORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Section 20(b) of the Securities Act and Section 21(d) of the Exchange Act entitle the Commission, "upon a proper showing" to a temporary injunction or restraining order. Because the Commission is "not . . . an ordinary litigant, but . . . a statutory guardian charged with safeguarding the public interest in enforcing the securities laws," its burden to secure temporary or preliminary relief is less than that of a private party. *Management Dynamics, Inc.*, 515 F.2d at 807. It need not show irreparable injury or a balance of equities in its favor. *Id.* at 808; *see also Unifund SAL*, 910 F.2d at 1035. Unlike ordinary litigants, the Commission must only make a

"proper showing" of violative activity to obtain a temporary restraining order or preliminary injunction against statutory violations. It carries this burden when it makes a substantial showing of (i) a current violation, and (ii) the risk of repetition. *See, e.g., SEC v. Cavanagh,* 155 F.3d 129, 132 (2d Cir. 1998); *Unifund SAL*, 910 F.2d at 1036-37; *Management Dynamics, Inc.*, 515 F.2d at 807; *Manor Nursing Centers, Inc.*, 458 F.2d at 1100.

    As described above, the Defendants have violated Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5, and violated or aided and abetted violations of Sections 15(a), 15(b)(1) and 15(c) of the Exchange Act and Rules 10b-3, 15b-3 and 15b7-1. In addition, the Commission can meet the burden of showing risk of repetition. As the Second Circuit instructed in *SEC v. Management Dynamics, Inc.*:

> Certainly, the commission of past illegal conduct is highly suggestive of the likelihood of future violations. . . . [F]actors suggesting that the infraction might not have been an isolated occurrence are always relevant. . . . Moreover, appellate courts have repeatedly cautioned that cessation of illegal activity does not ipso facto justify the denial of an injunction.

515 F.2d at 807. In assessing likelihood of repetition, courts also look to such factors as the character of the violation, the degree of scienter involved and the degree to which a defendant's occupation or activities may present future opportunities to violate the law. *See, e.g., Cavanagh,* 155 F.3d at 135; *SEC v. Commonwealth Chem. Secs., Inc.,* 574 F.2d 90, 100-01 (2d Cir. 1978); *SEC v. Musella,* 578 F. Supp. 425, 444 (S.D.N.Y. 1984).

    Here, a temporary restraining order is warranted to preserve the status quo pending a preliminary injunction hearing. Byers and Shereshevsky, and the Wextrust Entity Defendants misappropriated funds raised from investors in Crowne-Phoenix, GSA and other offerings, and are currently engaged in other offerings to repay prior investors in Ponzi-scheme fashion. The Defendants misrepresented to investors that moneys raised in the Crowne-Phoenix, GSA and other

33

offerings were to be used to purchase specific assets, and failed to disclose that funds would be used to pay prior investors or diverted for other uses. The Defendants also falsely represented to investors in the GSA offering that seven specific properties would be purchased when the Defendants never engaged in reasonable efforts to purchase such properties and, in fact, never purchased any properties for the GSA offering. Finally, the Defendants failed to disclose to investors Shereshevsky's criminal record and hid from the Commission and FINRA, Shereshevsky's criminal background, control of Wextrust Securities and association with that registered broker-dealer. Also, Shereshevsky and Byers failed to take and pass required licensing exams.

Given the nature of these violations, a temporary restraining order is warranted to preserve the status quo.

## III.

### AN ORDER APPOINTING A RECEIVER FOR THE WEXTRUST ENTITY DEFENDANTS IS NECESSARY AND APPROPRIATE

Although the Securities Act and the Exchange Act do not specifically vest the Court with the power to appoint a temporary receiver in a civil injunctive action brought by the Commission, courts have consistently held that such a power exists in order to effectuate the purpose of the federal securities laws. *SEC v. American Board of Trade, Inc.*, 830 F.2d 431, 436 (2d Cir. 1987); *SEC v. Materia*, 745 F.2d 197, 200 (2d Cir. 1984), *cert. denied*, 471 U.S. 1053 (1985). Courts will appoint a receiver where necessary (1) to preserve the status quo while various transactions are being unraveled in order to determine an accurate picture of the fraudulent conduct, *Manor Nursing Centers, Inc.*, 458 F.2d at 1105; (2) to protect "those who have already been injured by a violator's actions from further despoliation of their property or rights," *Esbitt v. Dutch-American Mercantile Corp.*, 335 F.2d 131, 143 (2d Cir. 1964); (3) to

34

prevent the dissipation of the defendant's assets pending further action by the court, *American Board of Trade, Inc.*, 830 F.2d at 436; (4) to install a responsible officer of the court who could bring the companies into compliance with the law, *id.* at 437; or (5) to place hopelessly insolvent entities in bankruptcy to effect their liquidation. *Id.* at 436.

Here, the immediate appointment of a receiver is necessary for Wextrust, WEP, WDG, Wextrust Securities and Axela and all of the entities they own or exercise control over in order to secure the remaining assets, prepare an accounting and determine the extent of commingling of the various entities' assets. The evidence shows that the Defendants have operated Wextrust and the LLCs as a single entity. Wextrust, WEP and Axela operate as managers of the various managers of each LLC and there do not appear to be any other entities who exercise ownership or control over the LLCs. In fact, in certain private placement memoranda, Wextrust or WEP is described as being the beneficial owner of over 120 entities that operate commercial and multi-family properties. A Wextrust consolidated balance sheet as of December 31, 2006 indicates that Wextrust holds real property valued at over $271 million, evidencing Wextrust's interest in the properties held by the LLCs.

Emails retrieved from Wextrust Securities reveal that the Defendants owe substantial funds to investors and are operating at a deficit. The Defendants past conduct, such as making unauthorized transfers of funds from one entity to another, transferring funds to South Africa, lying about investments in seven real estate projects in connection with the GSA offering, and failing to disclose Shereshevsky's criminal background, indicate that they cannot be trusted to safeguard the remaining assets and act in the best interests of investors. A receiver will insure that funds will be protected and appropriate decisions can be made about Wextrust's future

viability. A receiver will also be able to insure that an accounting is performed in order to understand the true financial condition of the various entities controlled by the Defendants.

More importantly, a receiver is necessary to marshal what may be substantial real estate and other assets and devise a plan for administering the assets, including making determinations about whether assets can be sold to recover proceeds to distribute to investors and whether the entities should be placed in bankruptcy. The Commission does not have sufficient information yet to determine whether the real estate owned by the Defendants is fully encumbered or whether the interests in the diamond mines can be sold, but it is important to appoint a receiver to gain control over all the properties, assess their value and potential for return to victims or make determinations about whether the entities should be placed into bankruptcy.

A receiver is also necessary to gather information about assets that may exist abroad and make a determination regarding whether repatriation is possible.

The Commission staff has found three candidates for the position of receiver, who have each submitted detailed proposals setting forth billing rates for themselves and professionals they are likely to hire, as well as summary information detailing their relevant experience and qualifications. Upon the Court's request, the Commission staff is prepared to submit to the Court the relevant information for each candidate

### IV.

### AN ORDER FREEZING THE ASSETS OF THE DEFENDANTS AND ORDERING AN ACCOUNTING IS NECESSARY

In its Complaint, the Commission seeks injunctive relief, disgorgement, prejudgment interest thereon and civil penalties. The ancillary remedy of an immediate freeze of the assets of the Defendants is appropriate here in order to ensure that sufficient funds are available to satisfy any final judgment the Court might enter against the Defendants and to protect those assets

against dissipation. *See Int'l Controls Corp. v. Vesco*, 490 F.2d 1334, 1347 (2d Cir. 1974), *cert. denied*, 417 U.S. 932 (1974) (noting that "an asset freeze may be appropriate to assure compensation to those who are victims of a securities fraud"); *see also Unifund SAL*, 910 F.2d at 1041; *SEC v. Vaskevitch*, 657 F. Supp. 312, 315 (S.D.N.Y. 1987). When there are concerns that defendants might dissipate assets, a court need only find some basis for inferring a violation of federal securities laws in order to impose a freeze order. *Unifund SAL*, 910 F.2d at 1041; *see* 15 U.S.C. § 78u(d)(5) [Exchange Act, § 21(d)(5)] (court may grant any equitable relief appropriate or necessary for benefit of investors.)[2] Here, the Commission has shown significant cause for concern about the safety of client assets. An asset freeze is necessary to prevent any further misappropriation and commingling of funds from the assets of the scores of LLC managed by the Defendants. An asset freeze is also necessary to preserve the Defendants' ability to disgorge ill-gotten gains to more than 1,000 investors in the various securities offerings conducted by the Defendants since at least 2002.

The reasons supporting the freeze of assets apply with equal force to the Commission's request for a verified accounting of the Wextrust Entity Defendants by the Defendants. The equitable remedy of a sworn accounting is frequently imposed to provide an accurate measure of unjust enrichment and a defendant's current financial resources. This is needed to determine accurately the scope of the fraud and the Defendants' ability to disgorge ill-gotten gains. *See* Exchange Act Section 21(d)(5) (codifying Section 305 of the Sarbanes-Oxley Act, which

---

[2]    The ancillary remedy of a freeze order requires a lesser showing than that needed to obtain an injunction against future securities law violations. *See SEC v. Gonzalez de Castilla*, 145 F. Supp. 2d 402, 415 (S.D.N.Y. 2001) (stating that "courts may order a freeze even where the SEC has failed to meet the standard necessary to enjoin future violations of the securities laws".) When there are concerns that defendants might dissipate assets, or transfer or secrete assets beyond the jurisdiction of the United States, this Court need only find some basis for inferring a violation of the federal securities laws in order to impose a freeze order. *Unifund SAL*, 910 F.2d at 1041.

provides that "[i]n any action or proceeding brought or instituted by the Commission under any

provision of the securities laws, the Commission may seek, and any Federal court may grant, any

equitable relief that may be appropriate or necessary for the benefit of investors".) Courts utilize

this remedy following a preliminary injunctive hearing where, as here, defendants engaged in an

elaborate, long-running fraud and attempted to dissipate investor assets. *See, e.g., SEC v. Lybrand,*

No. 00 Civ. 1387(SHS), 2000 WL 913894, at *12 (S.D.N.Y. July 6, 2000) ("In light of the SEC's

showing on the merits and the threat of dispersal of assets, an accounting is appropriate to

determine: (1) the amount of profit reaped from the allegedly illicit sales; (2) the present location of

such proceeds; and (3) these defendants' ability to pay."); *SEC v. Margolin*, No. 92 Civ.

6307(PKL), 1992 WL 279735, at *7 (S.D.N.Y. Sept. 30, 1992) (granting SEC's request for a

preliminary injunction and verified accounting where "the sophisticated nature of defendants'

scheme and the number of accounts that were involved present a formidable obstacle to the

Commission in its attempt to ascertain the profits reaped from the fraudulent scheme and

defendants' ability to pay."); *cf. SEC v. Dunlop*, 253 F.3d 768, 776 (4th Cir. 2001) (affirming

district court's order requiring defendant, who used corporations he controlled "in the classic

operation of a 'Ponzi' scheme," to provide a sworn accounting of the corporate defendants' assets

and transfers of assets to himself or entities he or the corporate defendants controlled.)

     Here, an accounting is necessary to reveal the extent of financial harm to investors in the

Wextrust Entities and the scores of securities offerings the Defendants have conducted from at least

2002, and the ability of Defendants to return these ill-gotten gains. Accountings of the Defendants'

funds are particularly important here. Byers and Shereshevsky controlled numerous entities that

they used to raise funds from investors. They then fraudulently commingled funds among the

various entities and transferred funds overseas to investments in South Africa.

## V.

## AN ORDER EXPEDITING DISCOVERY AND PREVENTING DOCUMENT DESTRUCTION IS NECESSARY AND APPROPRIATE

The Commission further requests expedited discovery to supplement its motion for preliminary injunctions. Federal Rules of Civil Procedure 30(a), 33(a) and 34(b) provide for expedited discovery in appropriate circumstances. Given the egregious and ongoing nature of the fraud, the Commission has brought this action on an expedited basis. The Commission has not yet obtained certain relevant documents from the Defendants, such documents identifying each of the investors, the funds raised in each of Defendants' securities offerings, the Defendants' bank and brokerage records, credit cards and documents which identify all of the assets of the Wextrust Entities. Expedited discovery is needed to enable the Commission to present a more complete evidentiary record to the Court and will sharpen and focus the issues that must be decided by the Court at a hearing on the preliminary injunction motion. Expedited discovery will also assist the Commission in locating additional assets and effectuating any order entered by this Court freezing assets of the Defendants.

In aid of expedited discovery, the Commission also seeks an order prohibiting Defendants, or any of their agents, from fabricating, destroying or altering any relevant records. Good faith preservation of documents cannot be assumed here in light of the very nature of the fraud perpetrated on the Defendants on their investors. *See Unifund SAL*, 910 F.2d at 1040 n.11.

39

## CONCLUSION

For the foregoing reasons, the Commission respectfully requests that this Court grant its application for emergency relief to ensure the immediate cessation of violations of the federal securities laws and to protect the assets rightfully belonging to investors that were fraudulently obtained by the Defendants.

Dated: New York, New York
August 11, 2008

Alexander M. Vasilescu (AV-2575)
Steven G. Rawlings (SR-0623)
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
3 World Financial Center
Room 4300
New York, New York 10281
Tel: (212) 336-0178

*Of Counsel:*
   Andrew M. Calamari
   Doria Stetch Bachenheimer
   Danielle Sallah