UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff,

- against -

STEVEN BYERS, JOSEPH SHERESHEVSKY, WEXTRUST CAPITAL, LLC, WEXTRUST EQUITY PARTNERS, LLC, WEXTRUST DEVELOPMENT GROUP, LLC, WEXTRUST SECURITIES, LLC, and AXELA HOSPITALITY, LLC,

Defendants,

- and -

ELKA SHERESHEVSKY,

Relief Defendant.

08 Civ. 7104 (DC)

ECF Case

**RECEIVER'S OPPOSITION TO INTERNATIONAL AD-HOC COMMITTEE OF WEXTRUST CREDITORS' MOTION OBJECTING TO ENTRY AND SEEKING MODIFICATION OF PRELIMINARY INJUNCTION**

TIMOTHY J. COLEMAN
Receiver for Wextrust Entities

DEWEY & LEBOEUF LLP
1301 Avenue of the Americas
New York, NY 10019-6092
Tel. (212) 259-8000

Attorneys for Receiver

November 6, 2008

# Table of Contents

Page

I.  PRELIMINARY STATEMENT ........................................................................1

II. BACKGROUND ..........................................................................................3

    A.  Purpose of the Receivership........................................................................3

    B.  Efforts of the Receivership to date...........................................................6

III. THE RECEIVERSHIP ORDERS PROPERLY PLACED
     RESTRICTIONS ON THE PARTIES' ABILITY TO AFFECT THE
     PROPERTY THAT IS SUBJECT TO THE JURISDICTION OF THIS
     COURT. ........................................................................................................9

    A.  If Movants are qualified to otherwise initiate a bankruptcy case,
       Movants can file a bankruptcy case under the Receivership Order.........................9

    B.  Movants are not qualified to initiate a bankruptcy case. ......................................11

IV. THE COURT WAS WITHIN ITS AUTHORITY IN AUTHORZING
     AND DIRECTING THE RECEIVER TO MANAGE THE ASSETS
     THAT ARE SUBJECT TO THE JURISDICTION OF THIS COURT. ...........................13

V.  THE RELIEF MOVANTS SEEK WOULD CREATE CHAOS,
     INEFFICIENCIES, AND DUPLICATION OF EFFORT AND
     PREJUDICE INVESTORS. ...........................................................................17

    A.  Movants' suggested relief would prohibit the Receiver from
       carrying out his duties............................................................................19

    B.  Movants' suggested relief would prejudice investors............................................20

    C.  Movants' suggested relief is unnecessary............................................................21

VI. CONCLUSION.............................................................................................25

# Table of Authorities

## Cases

*Adams v. Marwill (In re Bayou Group, LLC),*
363 B.R. 674 (S.D.N.Y. 2007) ......................................................................... 14, 16

*Bailey v. Proctor,*
160 F.2d 78 (1st Cir. 1947) .................................................................................. 22

*Eberhard v. Marcu,*
530 F.3d 122 (2d Cir. 2008) ............................................................... 5, 7, 9, 18, 23

*In re Beyond.com Corp.,*
289 B.R. 138 (Bankr. N.D. Cal. 2003) ................................................................. 13

*J.I. Case Co. v. Borak,*
377 U.S. 426 (1964) ............................................................................................. 10

*Jackson Dairy, Inc. v. H.P. Hood & Sons,*
596 F. 2d 70 (2d Cir. 1979) ................................................................................. 11

*Lankenau v. Coggeshall & Hicks,*
350 F.2d 61 (2d Cir. 1965) ............................................................................... 9, 23

*Manhattan Rubber Mfg. Co. v. Lucey Mfg. Co.,*
5 F.2d 39 (2d Cir. 1925) ...................................................................................... 23

*Mills v. Electric Auto-Lite Co.,*
396 U.S. 375 (1970) ............................................................................................. 10

*Northern Pipeline Co. v. Marathon Pipeline Co.,*
458 U.S. 50 (1982) ............................................................................................... 17

*Phelan v. Middle States Oil Corp.,*
154 F.2d 978 (2d Cir. 1946) ................................................................................ 18

*Scholes v. Lehmann,*
56 F.3d 750 (7th Cir. 1995) ................................................................................. 18

*SEC v. Am Bd of Trade, Inc.,*
830 F. 2d 431 (2d Cir. 1987) ....................................................................... 9, 17, 23

*SEC v. Credit Bancorp, Ltd.,*
290 F.3d 80 (2d Cir. 2002) ......................................................... 20, 22, 23, 25

*SEC v. Lincoln Thrift Ass'n,*
577 F.2d 600 (9th Cir. 1978) ............................................................................... 23

*SEC v. Manor Nursing Centers, Inc.,*
458 F.2d 1082 (2d Cir. 1973) ................................................................................ 9

*SEC v. Shiv,*
379 F. Supp. 2d 609 (S.D.N.Y. 2005) .................................................... 18, 23, 24

*SEC v. Tipco, Inc.*,
   554 F.2d 710 (5th Cir. 1977) ................................................... 22

*SEC v. TLC Investments and Trade Co.*,
   147 F. Supp. 2nd 1031 (C.D. Cal. 2001) .......................... 23, 24

*SEC v. Wencke*,
   622 F.2d 1363 (9th Cir. 1980) ........................................... 9, 10

*Tcherepnin v. Franz,*
   485 F.2d 1251 (7th Cir. 1973) ................................................ 24

## Other Authorities

11 U.S.C. § 1101(1) ...................................................................... 15

11 U.S.C. § 1126(c) ...................................................................... 12

11 U.S.C. § 303(b) ....................................................................... 12

11 U.S.C. § 303(i) ........................................................................ 11

11 U.S.C. § 305(a)(1) ................................................................... 13

11 U.S.C. § 366 ............................................................................ 21

11 U.S.C. § 543 .............................................................. 5, 15, 16

28 U.S.C. § 1334(a) ..................................................................... 17

28 U.S.C. § 1334(e)(1) ................................................................. 10

28 U.S.C. § 151 ...................................................................... 10, 17

28 U.S.C. § 157(d) ....................................................................... 16

28 U.S.C. § 754 ............................................................................... 9

28 U.S.C. § 959(b) ................................................................... 5, 13

Timothy J. Coleman (the "Receiver"), Receiver for the Wextrust Entities[1], submits this opposition to the International Ad-Hoc Committee of Wextrust Creditors' ("Movant," and together with the Consortium, "Movants"[2]) motion objecting to the entry, and seeking modification of the Court's Order Appointing Temporary Receiver entered on August 11, 2008 (Dkt. No. 2) ("Initial Receivership Order"), the Court's Amended Order Appointing Temporary Receiver entered on September 11, 2008 (Dkt. No. 36) ("Amended Receivership Order") and its October 24, 2008 Order On Consent Imposing Preliminary Injunction and Other Relief Against the Defendants and Relief Defendant entered on October 24, 2008, (Dkt. No. 65) ("Preliminary Injunction Order" and together with the Court's Initial and Amended Receivership Orders, the "Receivership Order").

## I.    PRELIMINARY STATEMENT

On August 11, 2008, the Securities Exchange and Commission (the "SEC") filed this civil enforcement action against Byers, Shereshevsky and the Wextrust Entities (as amended, the "SEC Complaint").[3] The SEC Complaint alleges the discovery of a massive Ponzi-type scheme perpetrated upon the investors of Wextrust Entities and seeks to halt further dissipation of assets through a "freeze order" and the appointment of the Receiver. The Receivership Order empowers and requires that the Receiver undertake certain acts to preserve and marshal assets

---

[1]  This Court's Order Appointing Temporary Receiver dated August 11, 2008, defines "Wextrust Entities" as Wextrust Capital, LLC, Wextrust Equity Partners, LLC, Wextrust Development Group, LLC, Wextrust Securities, LLC and Axela Hospitality, LLC. The same Order extends the Receiver's authority to over 240 additional legal entities and funds in which any of the Wextrust Entities have ownership interests or which are under the control of the Wextrust Entities ("Wextrust Affiliates"), some, but not all, of which the Order specifically identifies in Exhibit A to the Order.

[2]  The Receiver also directs this Opposition to the Joinder of the so-called International Consortium of Wextrust Creditors ("Consortium") in Support of Motion by the International Ad-Hoc Committee of Wextrust Creditors Objecting to Entry and Seeking Modification of Preliminary Injunction (Dkt. No. 73) ("Consortium Joinder," and together with the Movant's motion, the "Motion"). The Consortium has joined in the Motion, "since the legal arguments the Consortium would make and the legal authority the Consortium would cite are identical to those of the Committee." (Consortium Joinder at 4).

[3]  Capitalized terms not otherwise defined shall have the same definition as set forth in the SEC Complaint.

and recommend a methodology for their distribution.  Claiming that the Court has entered orders that prejudice their rights, Movants seek to amend those orders, thereby removing provisions which protect the very assets under the control of the Receiver and that are subject to the *in rem* jurisdiction of this Court.  In effect, Movants seek relief that would enable them to file numerous bankruptcy cases in several jurisdictions requiring the Receiver to administer his receivership in a confused, chaotic and very expensive manner, all at the expense of the victims of the fraud. One would think from the Motion that the SEC commenced an equity receivership to harm the investors in Wextrust and to circumvent bankruptcy law, and then enlisted the Receiver to assist in its efforts.  As shown below, the facts and law are the opposite of Movants' contentions.

If granted, the relief Movants seek would disrupt the Receiver's orderly efforts to "(1) preserve the *status quo*; (2) ascertain the true financial condition of the Defendant WexTrust Entities [and the WexTrust Affiliates] . . . and of the disposition of investor funds; (3) determine the extent of commingling of funds . . .; and (4) prevent further dissipation of . . . property and assets . . . ." for the ultimate benefit of ***all*** WexTrust investors.  (Amended Receivership Order at 3-4.)  Most importantly, Movants seek to deprive the Receiver of the authority to determine whether one or more bankruptcy cases should be filed in the first instance.  This Court directed the Receiver to make that determination.  (S*ee* Amended Receivership Order at 10.)  Movants' insistence that they be empowered to commence one or more involuntary bankruptcies therefore is wholly at odds with the language and intent of the Receivership Order and, moreover, is wholly irresponsible given the short time since the Receiver's appointment and current economic conditions.

The Court acted well within its authority in issuing the orders of which Movants complain.  The Receivership Order is necessary to ensure the efficient and cost-effective

administration of the receivership estate. The Receivership Order should not be disturbed absent a *specific showing* of need (and Movants have made none).

## II.    BACKGROUND

### A.    Purpose of the Receivership

The SEC Complaint alleges that the defendants participated in a Ponzi-type scheme to defraud investors in connection with Wextrust securities offerings. Among other things, the SEC Complaint alleges that the defendants failed to disclose that the proceeds of various Wextrust offerings were used for purposes other than those for which the money was raised. The SEC Complaint also alleges that the defendants failed to disclose Shereshevsky's prior felony conviction for bank fraud. The SEC Complaint alleges violations of various provisions of the Securities Act, including section 17(a)(1), and the Securities Exchange Act, including section 10(b). The SEC Complaint seeks various forms of equitable relief, including injunctions against future violations of the securities laws, disgorgement, prejudgment interest and civil monetary penalties.

Simultaneously with the filing of the SEC Complaint, the SEC sought, and the Court granted, emergency relief, including a temporary restraining order ("TRO"), an order freezing the assets of the defendants ("Freeze Order") and the appointment of a receiver. On October 24, 2008, the Court issued its Preliminary Injunction Order granting a preliminary injunction and continuing the previously-granted provisional remedies on the consent of all parties to the case.

The TRO preliminarily enjoined the defendants from violating certain provisions of the Securities Act and the Securities Exchange Act; ordered Byers and Shereshevsky to provide verified accountings for themselves and for the Wextrust Entities; and prohibited the destruction, alteration or concealment of documents by any of the defendants. The Freeze Order broadly

froze all assets of Byers, Shereshevsky and the Wextrust Entities, subject to the Receivership Order.

The Receivership Order directs the Receiver to:

- preserve the *status quo*;
- ascertain the true financial condition of the Wextrust Entities and  Affiliates, and the disposition of investor funds;
- determine the extent of commingling of investor funds between the Wextrust Entities and Affiliates;
- prevent further dissipation of the assets of the Wextrust Entities and Affiliates;
- prevent the encumbrance or disposal of assets of the Wextrust Entities, the Wextrust Affiliates and investors;
- preserve the books, records and documents of Wextrust Entities and Affiliates;
- be available to respond to investor inquiries; and
- determine if the Wextrust Entities and Affiliates should undertake a bankruptcy filing.

To fulfill these obligations, the Receivership Order empowers the Receiver, *inter alia*,

- to take possession and control of all Wextrust assets and properties;
- to pay from available funds necessary business expenses required to preserve the assets of Wextrust Entities and Affiliates;
- to engage accountants, attorneys and other professionals; and
- to take all necessary steps to gain control over, and repatriate, assets in foreign jurisdictions.

Of particular significance with respect to the Motion is the Receiver's succession "to all rights to manage all properties owned or controlled, directly or indirectly, by the Wextrust Defendants . . . pursuant to the LLC and operating agreements relating to each entity[.]" (Amended Receivership Order at 5.)

On September 11, 2008, at the request of the Receiver and on consent of all parties to the action, the Court amended the Receivership Order to authorize the Receiver, *inter alia*, to establish a cash management system and to encumber and sell assets, subject to certain notice requirements.  The amendments also permit the Receiver to commence bankruptcy cases in this district if he determines it is appropriate to do so, prosecute the bankruptcy petitions "subject to

the same parameters and objectives as a chapter 11 trustee" and "remain in possession, custody, and control of the title 11 estates . . . ." (Amended Receivership Order at 10.) This right of the Receiver to continue to manage the Wextrust Entities and Affiliates as debtors in possession is inherent in the power this Court granted to the Receiver to succeed to all management rights relating to the Wextrust Entities and Affiliates pursuant to the limited liability company operating agreement applicable to each such Entity or Affiliate.[4] The Receivership Order empowers the Receiver to act as managing member for each such entity and, therefore, pursuant to relevant state law and as required by federal statute,[5] to remain as the sole responsible party with respect to making the decision to file bankruptcy. Contrary to the Movants' contentions (Movants' Memorandum of Law at 5), once in bankruptcy the Receiver does not become a trustee. The Receiver remains in possession of the assets as managing member of a debtor in possession, subject to the rights of any party in interest to challenge such possession pursuant to section 543 of the Bankruptcy Code or to request a chapter 11 trustee. Initially, the dispute would be brought in this Court, but this Court can resolve it or refer it to the bankruptcy court. Quite simply, district courts routinely reserve the option to determine how the bankruptcy proceeds because the determination may or may not impair other valid goals of the receivership. If there is a connection, the district court can reconcile any competing interests by making a determination itself.

---

[4]  The former managers of the Wextrust Entities and Affiliates usually structured the Affiliates as limited liability companies. (*See* Declaration of John Sordillo in Support of Receiver's Opposition to Motion, submitted herewith, ¶ 3.) In many instances, a Wextrust holding company held a common membership interest in a second tier "investor" LLC and private placement investors held preferred membership interests with an extremely attractive distribution preference.

[5]  28 U.S.C. § 959(b) requires that a receiver shall "manage and operate the property in his possession . . . according to the requirements of the valid laws of the State in which such property is situated, in the same manner that the owner or possessor would be bound to do if in possession thereof." *See also Eberhard v. Marcu,* 530 F.3d 122, 132 (2d Cir. 2008) (receiver stands in the shoes of corporation within the receivership).

In sum, the SEC has discovered the existence of what appears to be a massive Ponzi scheme and has taken action to remove existing management in favor of a neutral third party receiver.[6] By its actions, the SEC has prevented further loss to the investors in Wextrust's multitude of single asset limited liability companies ("LLC Entities"). To accord investors further protection, the Court tasked the Receiver with marshalling and managing all assets, investigating the true economic state of affairs at the Wextrust Entities and Affiliates and the proper disposition of Wextrust assets. As part of his power to manage the Wextrust Entities and Affiliates, the Receiver may commence bankruptcy cases in a single district (the Southern District of New York) and continue to remain in possession of their assets and properties, subject to the rights of claimants and interest holders in those Entities and Affiliates. The decision on whether bankruptcy is in the best interests of claimants and investors must await the Receiver's factual investigation of such issues as the commingling of the cash of some LLC Entities with those of other Entities, what liabilities and equity interests may be asserted against a given LLC Entity or its assets and how best, in or out of bankruptcy, to distribute the assets within the receivership to claimants and investors.

### B.  Efforts of the Receivership to date

As will be set out in more detail in the First Interim Report of Receiver, the Receiver and his advisors (Dewey & LeBoeuf LLP, Deloitte Financial Advisory Services LLP ("Deloitte"), forensic accountant Jerry Klein and the Hilco Organization ("Hilco")) have engaged in a series of measures to meet the tasks set forth above  The Receiver has taken possession and control of Wextrust businesses, properties and assets throughout the United States, and is managing them

---

[6] Mr. Coleman has no prior relationship with Wextrust. District Judge Sullivan selected Mr. Coleman as Receiver from a list of three candidates proposed by the SEC. Prior to joining Dewey & LeBoeuf in 2006, Mr. Coleman served for eight years as an Assistant United States Attorney in this District. He has substantial prior experience in SEC enforcement litigation, including cases involving equity receiverships.

with the assistance of Wextrust employees and experts engaged pursuant to the Receivership Order. The Receiver, with the assistance of attorneys and advisors, has conducted asset security and evidence preservation operations in the United States and Israel, and has taken extensive steps to gain control of Wextrust interests in properties and assets in South Africa and Namibia. For example, the Receiver has taken steps to preserve evidence at 10 domestic and international sites, cut unnecessary expenses, prepare valuations of Wextrust assets, identify and take exclusive control of bank accounts, prepare financial statements for the Wextrust Entities and establish effective internal controls.

The Receiver, assisted by his attorneys, accountants and other advisors, is conducting an investigation of the financial condition of the Wextrust Entities and Affiliates, the extent of intermingling of funds and the disposition of the proceeds of Wextrust securities offerings, as required by the Receivership Order. (*See generally* Amended Receivership Order at 3-5); *cf. Eberhard*, 530 F.3d at 131 (authority of receiver appointed at the SEC's request "necessarily includes the power to investigate the defendant's transactions"). The results of that investigation to date will be discussed in detail in the Receiver's First Interim Report, which will be submitted shortly.

The Receiver has made extensive efforts to respond to investor inquiries, as requested by the Receivership Order, and to provide information to all parties in interest in a prompt and open manner. For example, in August and September of 2008 the Receiver held "town hall" meetings in New York, Chicago, Norfolk, Virginia and Tel Aviv to meet personally with investors and address their many concerns, including the whereabouts of what in many instances was the life savings they transferred to Byers and Shereshevsky. In early November, the Receiver will hold another meeting for investors in New York. With respect to South African mining operations in

which one or more Wextrust Affiliates made investments, the Receiver traveled to South Africa to assess the situation and has retained counsel to take steps to repatriate tens of millions of dollars in investor funds transferred to South Africa, as required by the Receivership Order. (*See* Amended Receivership Order at 5 (Receiver empowered to "[t]ake all necessary steps to gain control of the Defendants' interests in assets in foreign jurisdictions . . .which may be proceeds of Defendants' fraud, including . . . taking steps necessary to repatriate foreign assets").[7]

Working with Hilco, the Receiver has begun the process of determining the value of the receivership estate's assets, whether sales would result in a positive return to investors and whether placing any of the LLC Entities in bankruptcy would be in the best interests of investors and other parties in interest. However, at this point in time, it has not been determined that any particular LLC Entity needs to be placed in bankruptcy. (*See* Declaration of Mitchell A. Kahn in Support Receiver's Opposition ("Kahn Decl.") submitted herewith, ¶¶ 6, 8.). The Receiver and his advisors also have identified a substantial amount of commingling of investor funds between and among various Wextrust Entities and Affiliates. Based primarily on the reports and recommendations of his consultants, the Receiver will develop a course of action, including the potential use of bankruptcy, to facilitate the marshalling of assets and their distribution.

However, the use of a bankruptcy case by the Receiver, or anyone, should only be implemented after evaluating the benefits and burdens of its use.

---

[7]  The Receiver and Dewey & LeBoeuf expect to submit their first interim joint fee application to the Court in early November. It has been previously submitted to the SEC for review. The Receiver has consulted with the SEC in connection with all major expenditures. Dewey & LeBoeuf and other receivership advisors have agreed to substantial fee discounts in connection with their engagements, based on the public service nature of the receivership.

## III. THE RECEIVERSHIP ORDERS PROPERLY PLACED RESTRICTIONS ON THE PARTIES' ABILITY TO AFFECT THE PROPERTY THAT IS SUBJECT TO THE JURISDICTION OF THIS COURT.

### A. If Movants are qualified to otherwise initiate a bankruptcy case, Movants can file a bankruptcy case under the Receivership Order.

It is well-settled that a district court has broad authority under the securities laws and the court's general equitable powers to appoint a receiver in an SEC enforcement action. *Eberhard,* 530 F.3d at 131 ("District courts possess broad power to remedy violations of federal securities laws," including the power to appoint receivers); *SEC v. Manor Nursing Centers, Inc.,* 458 F.2d 1082, 1100-06 (2d Cir. 1973) (recognizing district court's authority to appoint receiver "to effectuate the purposes of the federal securities laws"); *see also SEC v. Am. Bd. of Trade, Inc.,* 830 F. 2d 431, 436 (2d Cir. 1987).

"A receiver appointed in any civil action or proceeding involving property . . . situated in different districts shall . . . be vested with complete jurisdiction and control of all such property with the right to take possession thereof." 28 U.S.C. § 754. Accordingly, there has developed the general rule that, to give effect to a district or state court's *in rem* or *quasi in rem* jurisdiction in a receivership proceeding, the court with jurisdiction must have exclusive control of the property. *See Lankenau v. Coggeshall & Hicks*, 350 F.2d 61, 64 (2d Cir. 1965).

Likewise, when a district court takes control over property by appointing a receiver, the court has the power "to issue a stay, effective against all persons, of all proceedings against the receivership entities." *SEC v. Wencke*, 622 F.2d 1363, 1369 (9th Cir. 1980); *see also Lankenau,* 350 F. 2d at 62 (staying "all persons . . . from commencing or continuing any suits against the defendant herein or his property"). As *Wencke* makes plain, "all persons" includes **nonparties.** *Wencke*, 622 F.2d at 1370-71. Applying a stay to nonparties is consistent with the "broad equitable powers of the federal courts to shape equitable remedies to the necessities of particular

9

cases, especially where a federal agency seeks enforcement in the public interest." *Id.* at 1371

(citing, *inter alia*, *Mills v. Electric Auto-Lite Co.,* 396 U.S. 375, 386 (1970); *J.I. Case Co. v. Borak*, 377 U.S. 426, 433 (1964)).

Movants complain of the Receivership Order's supposed bar on the filing and prosecution of involuntary bankruptcy petitions. (Movants' Memorandum of Law at 11-16.) The Receivership Order, however, simply requires Movants to come to this Court to establish sufficient cause for allowing Movants to take action against the property subject to the jurisdiction of this Court. Such a limitation makes eminent sense in the current situation, where Movants propose the use of bankruptcy without evaluating necessary information regarding the Wextrust Entities and Affiliates. Such ill-founded bankruptcy cases, if not dismissed, will only serve to create mass inefficiencies, increase already substantial costs of administration and severely prejudice investors hopeful of receiving a distribution from Wextrust properties and other assets. The Receiver, and this Court, would be forced to coordinate the Receiver's interests in potentially multiple bankruptcy and litigation cases in multiple jurisdictions across the country Conversely, if any bankruptcy were filed in the Southern District of New York, this Court would continue to have jurisdiction over all assets in the receivership and in the bankruptcy because (1) 28 U.S.C. § 1334(e)(1)[8] grants the District Court exclusive jurisdiction over all property in the bankruptcy case, and (b) the bankruptcy court is a unit of the district court pursuant to 28 U.S.C. § 151.

Movants argue that in order to grant this limited restriction, the SEC must show the traditional elements for a preliminary injunction (i.e., irreparable injury and a balancing of equities) and that the SEC cannot make such a showing. (*See* Movants' Memorandum of Law at

---

[8] "The district court in which a case under title 11 is commenced or is pending shall have exclusive jurisdiction . . . of all the property, wherever located, of the debtor as of the commencement of such case, and of the property of the estate . . . ."

16.); *see also Jackson Dairy, Inc. v. H.P. Hood & Sons,* 596 F. 2d 70 (2d Cir. 1979) (stating preliminary injunction standards). To the contrary, the facts cited above would support a finding of irreparable injury to the vast number of investors who are not within Movants' client groups. Once the receivership estate's limited resources are consumed by the increased administrative costs resulting from involuntary bankruptcies, neither the Receiver nor the other investors will have any way to recoup these expenses barring evidence of bad faith on the part of Movants (a proceeding that would consume even more of the receivership estate) and a source of funding to pay the fees and damages resulting from the filing. *See* 11 U.S.C. § 303(i). Also, a balancing of the equities would clearly favor requiring Movants or any other group seeking to file involuntary bankruptcies to make a showing as to what benefits can be achieved at the cost of interfering with the Receiver's investigation and increasing the administrative expenses of the receivership estate. There are obviously serious issues going to the merits of whether particular LLC Entities should file bankruptcy cases.

Instead of Movants' invitation to chaos, any required bankruptcy case should be coordinated in this District and the Receiver should be allowed to recommend the most efficient use of bankruptcy to minimize costs and confusion and to maximize returns to holders of claims and interests. As explained above, if circumstances warrant bankruptcy, the Receiver himself will recommend and file it.[9]

**B.** **Movants are not qualified to initiate a bankruptcy case.**

The law firms representing Movants have disclosed who their clients are and, in some cases, what interests they may have pursuant to the Court's direction to disclose that information

---

[9] In an effort to increase transparency in connection with this case, the Receivership Order actually requires the Receiver to give notice of his intent to file a bankruptcy case. (*See* Amended Receivership Order at 10).

to the Court, the SEC and the Receiver.[10]  It is not surprising that Movants did not volunteer that information.  Movants are not Wextrust creditors authorized to file involuntary bankruptcy petitions.  Section 303 of the Bankruptcy Code requires that in instances where the debtor has twelve or more creditors (and most Wextrust Entities and Affiliates fall into that category), an involuntary bankruptcy case may only be commenced by three or more creditors holding unsecured claims that are not contingent as to liability or the subject of a bona fide dispute as to liability or amount.  *See* 11 U.S.C. § 303(b)(1).  Although both law firms indicate that their respective clients are "creditors," they admit their rights arise out of their assertion of damages claims arising from securities fraud and those claims are unliquidated at this time.[11]  The securities they hold are equity securities similar to the shares of preferred stock issued by a corporation.  The fact that shareholders assert unliquidated fraud claims does not make them creditors eligible to file involuntary bankruptcy petitions in accordance with section 303(b) of the Bankruptcy Code.

As alluded to above, Bankruptcy Code section 303 (b)(1) does not allow an unsecured or under-secured creditor to file an involuntary petition unless the creditor's claim is "not

---

[10]  Movants' disclosure is inadequate.  For example, the Dechert firm's disclosure in some instances does not indicate the amount of the investment.

[11]  The Brown Rudnick firm lists its clients as creditors of one or more Wextrust Affiliates in the chart attached to their correspondence, but also refers to them in their cover letter as holding interests.  The term "interests" in bankruptcy generally refers to status as the holder of an equity interest.  *See, e.g.*, 11 U.S.C. § 1126(c) and (d) (distinguishing between classes of "claims" and "interests" in connection with voting on acceptance of a chapter 11 plan).  The Dechert firm also describes members of the Ad Hoc Committee as holding interests in Wextrust and admits in the chart disclosing the firm's clients that they are "investors" in one or more LLC Entities.  As noted in footnote 4, the typical right held by an investor in an LLC Entity would be a preferred membership interest in a second tier "investor LLC" which owns the property-holding single asset entity.  The "claims" of these investors would arise from violations of federal and state securities laws based on the purchase of equity securities from the various LLC Entities.

Some of the Dechert clients do hold guaranteed depository receipts ("GDR's"), which could be debt depending on whether the GDR arose from the roll-over of a distribution from an initial equity investment or was purchased separately.  Even then, many of the GDR holders appear not to know the amounts of what may be a claim and as noted above, section 303 of the Bankruptcy Code does not accord standing to file an involuntary if the claim is the subject of bona fide dispute as to amount.  Because, among other things, no one currently knows the extent of loss, all such claims or interests are subject to dispute as to amount.

contingent as to liability or the subject of bona fide dispute as to liability or amount . . . ."  Here, none of the Movants has a claim undisputed as to amount because no one knows the amount of the damages yet.  In short, Movants seek leave to take legal action they have no standing to take.[12]

## IV.    THE COURT WAS WITHIN ITS AUTHORITY IN AUTHORZING AND DIRECTING THE RECEIVER TO MANAGE THE ASSETS THAT ARE SUBJECT TO THE JURISDICTION OF THIS COURT.

Movants argue that the provisions of the Receivership Order relating to the Receiver's right to commence and prosecute bankruptcy cases exceed the district court's authority and improperly nullify various provisions of the Bankruptcy Code and title 28.  Movants could only make their assertions by mischaracterizing the relief this Court granted.  This Court did not exceed its broad authority to allow the Receiver to proceed with his work free from the need to fight unmerited litigation.  Contrary to Movants' assertions (*see* Movants' Memorandum of Law at 5), the Court did not designate the Receiver as a post-petition trustee contrary to the Bankruptcy Code.  Instead, the Court directed the Receiver to succeed to the role of management in place of individuals under suspicion of having perpetrated a massive fraud on unsuspecting individuals, thereby replacing those individuals and ending any further misrepresentations and dissipation of assets.  The Receiver is required to act in accordance with state law, *see* 28 U.S.C. § 959(b), and with the various LLC agreements of the Wextrust Entities and Affiliates.  This Court properly appointed the Receive to act as authorized management of the Wextrust Entities

---

[12]  In an analogous situation, bankruptcy courts will often deny a debtor in possession's request for approval of a disclosure statement when in fact the plan proposed by the debtor is not confirmable on its face.  *See, e.g., In re Beyond.com Corp.*, 289 B.R. 138, 140 (Bankr. N.D. Cal. 2003) ("Because the underlying plan is patently unconfirmable, the disclosure statement may not be approved").  It is within this Court's equitable jurisdiction and discretion to fashion relief that will prevent victims of the Wextrust scheme from suffering further harm as a result of the Receiver and other parties having to defend against multiple involuntary bankruptcy cases brought by parties who are not qualified to file the underlying cases in the first instance, based on a determination that it is in the best interests of the investors for the Receiver to continue with his efforts.  *See* 11 U.S.C. § 305(a)(1) (bankruptcy court may dismiss a bankruptcy case or suspend all proceedings in the case if the court determines at any time that the interests of creditors and the debtor would be better served by such dismissal or suspension).

and Affiliates and to act with the authority granted under the governing state law and LLC agreements.

Movants' citation to this Court's decision in *Adams v. Marwill (In re Bayou Group, LLC),* 363 B.R. 674 (S.D.N.Y. 2007), only serves to confirm this point. In that case, the United States Trustee argued that a prior district court order similar in substance to the Receivership Order properly vested management authority in a federal equity receiver, but that somehow management authority had ceased upon the filing of a bankruptcy. This Court rejected that argument, noting that it had the authority, both inherently and pursuant to the federal securities laws, to remedy securities law violations by appointing a new corporate manager to oversee the affairs of entities used to perpetrate a Ponzi scheme. *Id.* at 684. The receiver's role qua receivership ended with the filing of a bankruptcy case, but the *Bayou* "receiver's" role as manager of the filing entities continued. *Id.* at 685.

Movants make much of trivial differences between the Receivership Order and the order their own counsel advocated in *Bayou*.[13] However, an examination of the language of the Receivership Order reveals that this Court intended the Receiver to also have full authority to "succeed to **all rights to manage** . . . **pursuant to the LLC and operating agreement relating to each entity** (emphasis supplied)." (Amended Receivership Order at 5.) The conclusion is inescapable that the Receiver has replaced the former, discredited management of Wextrust and has full power not only to determine when and if to commence bankruptcy cases (a proposition not contested in *Bayou*) or defend against any involuntary case, but also to continue to manage these same entities when and if they become debtors in possession. This Court in *Bayou* emphasized that allowing the debtor to remain in possession of the estate remained the preferred

---

[13] Indeed, on information and belief, the Dechert firm, counsel for the Movants, continues to maintain the propriety of the *Bayou* order on appeal to the Second Circuit.

method of conducting a chapter 11 case and that a debtor entity automatically becomes the debtor in possession upon filing, citing 11 U.S.C. § 1101(1).  This is of course does not license the Receiver to ignore the dictates of the Bankruptcy Code once a filing occurs.  As noted in *Bayou*, once the Receiver commences a chapter 11 case for any Wextrust Entity or Affiliate, such Entity or Affiliate will become subject to all the obligations of a debtor in possession under title 11 and challenges by appropriate parties.  Significantly, when the Receiver held town hall meetings across the country and around the world, the investors supported his efforts and management of Wextrust.  It is only a minority here that seeks relief that will hurt investors.

Contrary to Movants' assertions, the Receivership Order does no violence to section 543 of the Bankruptcy Code, which obligates a custodian to turn over the assets of the filing entity upon learning of the commencement of a bankruptcy.  First, the Receivership Order provides that any party in interest may litigate its rights under section 543 in this Court.  This Court may decide the dispute or refer it to the bankruptcy court.  This makes a lot more sense than Movants' assertion that the Receiver should turn over the property to an unspecified newcomer and then litigate to get the property back.  Movants conveniently neglect to point out that there is no one to whom the Receiver could turn over the property.  This reckless approach exposes Movants' motives.  The motives are not to maximize returns to investors.  The motives are to create a creditors' committee that Movants' attorneys want to represent.  The Receiver has nothing against attorneys wanting to represent creditors' committees.  But, the Receiver absolutely opposes the creation of chaos to make that happen.  Second, because the Court provided Mr. Coleman with authority to manage each Wextrust Entity and Affiliate pursuant to the applicable LLC and operating agreements (and under the state law that applies to such agreements), upon

the filing of a bankruptcy Mr. Coleman will cease being a custodian subject to section 543 and continue in his role as managing member. *See Bayou,* 363 B.R. at 687.[14]

Assuming, *arguendo,* that Mr. Coleman remained a custodian post-petition, the bankruptcy court may excuse compliance with subsection 543 (a), (b) and (c) if the interests of creditors would be better served by continuance of a receiver's possession. *See* Bankruptcy Code § 543(d)(1). Movants have never suggested the Receiver has failed in his duties as receiver or court-appointed managing member of the Wextrust Entities and Affiliates. Indeed, the evidence suggests that, since his appointment by this Court, Mr. Coleman has worked constantly on the wide range of difficult issues facing Wextrust and its investors and has literally traveled around the world to meet with investors personally at town hall meetings to address their concerns over the status of their savings. In any event, inasmuch as Movants have never established that they represent creditors of any Wextrust Entity or Affiliate, they can hardly be viewed as spokespersons for creditor interests.

Movants further maintain that the Receivership Order violates 28 U.S.C. § 157(d) because it provides for "extraordinary relief" in the form of "a preemptive withdrawal of the reference." (Movants' Memorandum of Law at 7.) The Receivership Order is devoid of any language seeking to provide for a future withdrawal of the reference in the event a bankruptcy case is commenced. What the Receivership Order does provide for is protection for the receivership (of particular importance in the nascent stages of the Receiver's investigation) and for the *in rem* jurisdiction of this Court over assets subject to dissipation by Wextrust's former

---

[14]   A typical LLC Entity operating agreement grants the company manager substantial authority to operate the company and conduct its business affairs. Attached as **Exhibit A** to the Declaration of Mark S. Radke, submitted herewith, is a true and correct copy of the Operating Agreement of GSH Development, LLC, one of the LLC Entities and owner of the Hamptons of Hinsdale condominium/town home development in Hinsdale, Illinois. Under section 6.1 of the Operating Agreement, the manager "has the exclusive right to manage the Company's business." The manager "shall take all actions which shall be necessary or appropriate to accomplish the Company's purposes in accordance with the terms of this Agreement."

principals. The entire argument seems premised on the notion that this Court has improperly meddled in bankruptcy issues. This line of reasoning ignores the fact that Congress vested original and exclusive jurisdiction over bankruptcy cases in the federal district courts. 28 U.S.C. § 1334(a). Further, on its motion, the district court may remove the reference. 28 U.S.C. 157 (d). Since the 1984 amendments to title 28 effected in the wake of the Supreme Court's decision in *Northern Pipeline Co. v. Marathon Pipeline Co.,* 458 U.S. 50 (1982), the bankruptcy court constitutes "a unit of the district court," not some special court divorced from the authority of the district court and superior federal courts. 28 U.S.C. § 151. This Court has not exceeded its jurisdictional authority by issuing an order insuring continuity of management in the event a bankruptcy case is filed only until such time as this Court (or at this Court's election, the bankruptcy court) determines who should manage the estate. As aforsesaid, Movants would have the Receiver relinquish all property immediately on the filing of a bankruptcy, but Movants nowhere mention who would then be in charge. That is simply irresponsible and worse.

The issue at bar is not what Movants contend it is, namely whether their ability to file involuntary bankruptcy cases can be limited if Movants are otherwise qualified to undertake such filings (*see* Section III above). Rather, the issue is whether bankruptcy should be used to create order or chaos. The Receivership Orders as entered create order. Movants request license for chaos.

## V. THE RELIEF MOVANTS SEEK WOULD CREATE CHAOS, INEFFICIENCIES, AND DUPLICATION OF EFFORT AND PREJUDICE INVESTORS.

A primary purpose of appointing a receiver is "promptly to install a responsible officer of the court who [can] bring the companies into compliance with the law, ascertain the true state of affairs . . . and report thereon to the court and the public shareholders and preserve the corporate assets." *Am. Bd. of Trade*, 830 F.2d at 436 (internal citations and quotations omitted.); *see also*

*Phelan v. Middle States Oil Corp.*, 154 F.2d 978, 991 (2d Cir. 1946); *Eberhard*, 530 F.3d at 131 (same). Courts also appoint receivers "to carry out the SEC's authority to enjoin violations of the Act and, insofar as possible, to restore to a defrauded entity or to defrauded persons that which was fraudulently diverted from its or their custody and control." *SEC v. Shiv*, 379 F. Supp. 2d 609, 618 (S.D.N.Y. 2005). A federal equity receivership is well-recognized as an efficient manner of administering a series of entities involved in a massive fraudulent scheme like the one that appears to have been perpetrated here. *See Scholes v. Lehmann*, 56 F.3d 750, 755 (7th Cir. 1995) (observing efficiency of federal equity receivership and noting that "[c]orporate bankruptcy proceedings are not famous for expedition").

Movants never state what legitimate purpose will be served by allowing involuntary filings so as to effect a change in the management already provided for in the Receivership Orders. That is because none exists. By seeking leave to file a series of involuntary bankruptcy cases involving some, but not all, of the Wextrust Entities and Affiliates, Movants request license for chaos. First of all, the separate entities appear to be more fiction than fact given all the commingling that occurred. Second, the Receiver would continue to be responsible for some unknown group of Wextrust Entities and Affiliates, but obviously cannot pursue his mandate to take control of all assets and property of the Wextrust Entities and Affiliates and to ascertain the use and disposition of funds obtained by the defendants through the sale of securities. The reason: some of those assets and properties will be under the *in rem* jurisdiction of different courts and potentially subject to differing management arrangements. Also, the filing of multiple involuntary bankruptcy cases will greatly increase the cost of administering the over 240 separate legal entities that make up the Wextrust conglomerate, a cost that many of the entities cannot withstand. (*See* Sordillo Decl., ¶¶ 3, 8-12.)

## A. Movants' suggested relief would prohibit the Receiver from carrying out his duties.

The Receivership Order tasks the Receiver with a number of duties, as discussed in Section II.A above, including determining whether any of the Wextrust Entities or Affiliates should undertake bankruptcy filings. To assist him in complying with the Receivership Order, the Receiver has retained Dewey & LeBoeuf, Mr. Klein, Hilco and Deloitte. These advisors are in the process of advising the Receiver on a number of issues, including the bankruptcy option and how to structure the bankruptcy so as to achieve the maximum return to investors. The Receiver currently is considering all manner of appraisals and other valuations; evaluating such issues as the feasibility of tracing investments so as to determine their ultimate disposition and how to best marshal the assets of the receivership estate; investigating the nature of the investors' stake in Wextrust (i.e., whether investors hold claims or equity interests); and holding discussions with secured creditors. Meanwhile, without even waiting for the Receiver's initial report or otherwise ascertaining the facts, Movants seek *carte blanche* to implement the bankruptcy option. The Receiver submits that to suggest the filing of bankruptcy cases without the requisite knowledge, given the complexity of Wextrust and current economic conditions, is irresponsible. The Movants, even if qualified petitioners, should not be permitted to file bankruptcy cases at this point. This Court should permit the Receiver to conclude his analysis and form his recommendations regarding bankruptcy.

Moreover, allowing the filing of involuntary bankruptcy cases would leave some of the Wextrust Entities and Affiliates subject to the receivership and some of the entities in separate bankruptcies in different jurisdictions. Such a division of the various Wextrust Entities and Affiliates will deprive the Receiver of the ability to fulfill the duties this Court created by its entry of the Receivership Order. For instance, the Receiver and his advisors have commenced an

investigation regarding the intermingling of investor funds. Completion of this type of investigation would require access to all Wextrust financial data, not just the information applicable to the particular Wextrust Entities and Affiliates remaining in the receivership.

In short, the specter of multiple bankruptcy cases for some LLC entities but not others and an active receivership will likely make it impossible for the Receiver to complete a full investigation. The whole concept underlying the Receivership Order—maximizing returns to investors—will be negated. Indeed, Movants do not even know which entities have the resources to finance bankruptcy cases, and which entities would simply lead to abandonment of assets to the investors' detriment.

### B. Movants' suggested relief would prejudice investors.

Separating the assets of the Wextrust Entities and Affiliates for the purpose of determining which assets should be part of which estate obviously presents a major issue which is avoided by proceeding with a single insolvency estate. *See SEC v. Credit Bancorp, Ltd.,* 290 F.3d 80, 90 (2d Cir. 2002) (receivership are "insolvency proceedings" within the meaning of UCC § 1-201(22) and "the law of federal equity receiverships applies"). Such a separation will create inefficiencies, duplicative efforts and cause the receivership to incur substantial costs otherwise available for distributions. (*See generally* Sordillo Decl., ¶¶ 8-12.)

The administration of separate insolvency estates will greatly increase the cost of administering the Wextrust estate. Many of the LLC Entities do not appear to generate sufficient cash flow to pay the administrative expenses and other costs common to a bankruptcy proceeding. (*Id.,* ¶ 7.) The assets within the receivership are limited but appear to be sufficient to satisfy the cost of operating the individual businesses during the time necessary for the Receiver to generate a strategic plan. However, additional costs and expenses not within the budgets of the Wextrust Entities and Affiliates may severely impact the Receiver's ability to

maintain operations, conduct his analysis and make distributions to creditors. (*Id.,* ¶ 6.) The costs associated with bankruptcy include so-called first-day motions and the preparation of Schedules and Statements of Financial Affairs for each filing entity, increased utility deposits under section 366 of the Bankruptcy Code, increases in working capital arising from reductions in vendor payment terms and the added costs associated with statutory committees and their professionals. (*Id.,* ¶¶ 8, 9.) Bankruptcy may force some of the Wextrust Affiliates to sell assets immediately in what are rather obviously less than optimal conditions. (*Id.,* ¶ 11.) Investors will suffer obvious prejudice to the extent the expenses of prosecuting multiple insolvency proceeding consumes assets otherwise available for distribution.

### C.    Movants' suggested relief is unnecessary

Finally, at no point do Movants maintain that the filing of multiple involuntary bankruptcy cases will provide some particular benefit to claimants or investors. They cannot point to any particular situation. The Receiver's experts have determined that, at this point, there is no need to commece bankruptcy cases for any of the Wextrust properties. (*See* Kahn Decl., ¶ 6.) If the Receiver determines at a later time that one or more bankruptcies are needed, the Receiver will not hesitate to commence the cases in the bankruptcy court for this federal district. In the meantime, and contrary to Movants' assertions (Movants' Memorandum of Law at 11), the Receivership Order provides many safeguards to creditors and investors that parallel applicable provisions of the Bankruptcy Code. (*See* Amended Receivership Order at 7-8 (requiring written notice to the SEC, the individual defendants and investors requesting notice of new encumbrances on assets in excess of $750,000 and of the lease or sale of property having an appraised value or cost basis in excess of $750,000).) If Movants later determine that changed circumstances mandate bankruptcy filings and none have occurred, the Receivership Order permits Movants to seek modification of the Receivership Order.

Movants also generally argue that bankruptcy cases provide a more appropriate framework for the liquidation of insolvent companies than a SEC receivership. (*See* Movants' Memorandum of Law at 9) It may prove beneficial to commence chapter 11 or 7 cases for a substantial number of the Wextrust Entities and Affiliates at some later point in time, particularly in connection with distributing assets through the mechanism of a chapter 11 plan. However, at this juncture, the Receiver (who the Court empowered to conduct an analysis of whether bankruptcies should be filed) and his consultants have not identified any situation that warrants a bankruptcy and cannot at this point make an informed recommendation on the subject. (*See* Kahn Decl., ¶ 6.)

Furthermore, in their comparison of the relative merits of bankruptcy and SEC receivership, Movants in some instances are simply incorrect. For example, the bankruptcy courts do not necessarily constitute a superior forum for the actual sale or other liquidation of the assets within a receivership estate. The Second Circuit and numerous other courts have recognized the need for liquidation by a receiver in appropriate circumstances. Most recently, in *Credit Bancorp,* 290 F.3d at 88, the Second Circuit approved the partial liquidation of the assets of a corporate defendant in a securities fraud Ponzi scheme. A district court's authority to order liquidation by a federal equity receiver has been affirmed by numerous appellate courts. *See, e.g., Bailey v. Proctor*, 160 F.2d 78, 81 (1st Cir. 1947) ("[W]e now hold that a court of equity has inherent power to appoint a receiver to liquidate a corporation or investment trust where fraud, mismanagement or abuse of trust is present whether or not insolvency is likewise present."); *SEC v. Tipco, Inc.*, 554 F.2d 710, 711 (5th Cir. 1977) (upholding the district court's decision to deny an intervenor the opportunity to challenge a receiver's plan to liquidate corporate assets and distribute them on a *pro rata* basis); *SEC v. Lincoln Thrift Ass'n*, 577 F.2d 600, 609 (9th Cir.

1978) (affirming district court's order refusing to transfer receivership liquidation proceedings to bankruptcy court). Indeed, in the Second Circuit, a receiver appears to have the right to choose the forum in which he or she proceeds with liquidation, as the court does not have authority to force the receiver into declaring bankruptcy. *Manhattan Rubber Mfg. Co. v. Lucey Mfg. Co.*, 5 F.2d 39, 42 (2d Cir. 1925) ("We think the command of the order below reaches out into limits that a court of equity may not go in administering the property of the corporation in possession of its receiver."). The Second Circuit has never reversed a district court order authorizing liquidation by an SEC receiver. *See Am. Bd. of Trade*, 830 F.2d at 437 (acknowledging that it had "never vacated or modified a receivership order on the ground that a district court had improperly attempted to effect liquidation.").[15]

In other jurisdictions, courts have permitted liquidation by SEC receivers on similar grounds. For example, in *SEC v. TLC Investments and Trade Co.*, 147 F. Supp 2nd 1031 (C.D. Cal. 2001), the Central District of California ordered pre-judgment liquidation of receivership assets. Its reasons for doing so are instructive for a number of reasons. **First**, it held that "liquidation at this time, prior to entry of judgment, is appropriate because the evidence presented to the Court demonstrated that the TLC entities' liabilities were greater than their

---

[15] In several cases, the Second Circuit has expressed in *dicta* the concern that it may be more appropriate to conduct the liquidation of an insolvent company in a bankruptcy case rather than in a district court receivership. *See, e.g., Eberhard*, 530 F.3d at 132; *Am. Bd. of Trade*, 830 F.2d at 436; *Lankenau*, 350 F.2d at 63 ("[R]eceiverships ancillary to SEC actions against brokers or broker-dealers should not be continued, in a case involving insolvency, beyond the point necessary to get the estate into the proper forum for liquidation – the bankruptcy court."). In each of those cases, despite the Second Circuit's misgivings, it nonetheless affirmed the district court's order authorizing liquidation by the receiver.

Whatever persuasive force the dicta in those cases may have, it has been called into question by the Second Circuit's subsequent opinion in the *Credit Bancorp* case, a case which squarely addressed the issue of whether the receiver should liquidate the estate's assets and which Movants fail to cite in their Memorandum of Law. The Second Circuit in *Credit Bancorp*, 290 F.3d at 90, held – as part of its *ratio deciendi* – that an SEC receivership was an insolvency proceeding. Courts in this district have followed that decision in authorizing liquidations by SEC receivers. *See SEC v. Shiv,* 379 F. Supp. 2d 609 (S.D.N.Y. 2005).

assets and because ongoing management alone will drain money out of the estate, money that otherwise could be returned to investors." *Id.* at 1036.

**Second**, the court in *TLC* held that "in the unique circumstances of this case, there is such a close connection between the actions necessary for ongoing oversight of the Receivership's assets and for liquidation of those assets that it is appropriate for the Receiver, rather than a bankruptcy court, to carry out the liquidation." *Id.* In other words, liquidation was appropriate given that the purpose of a receivership was not to engage in an on-going business, but rather to collect and preserve assets for ultimate distribution to adversely affected investors and creditors. As the *TLC* court noted, "[u]nfortunately, the investors in this situation have been victimized by the actions of the Defendants. The Court can stop this from happening again, and it can return as much money as possible to the investors, but it cannot turn the TLC entities into an ongoing, profitable investment. It would not be appropriate for the Court, or the Receiver on behalf of the Court, to become a real estate developer." *TLC*, 147 F. Supp. 2d at 1043 n.8.

Following such precedent, district courts—even in this District—continue to exercise their equitable powers to liquidate and resolve claims among various types of creditors. This Court has held that "[t]he Second Circuit, like the Seventh Circuit, therefore extended the Receiver's equity jurisdiction to trace and repatriate funds from many discrete accounts, through an entity from which the funds had been diverted, back to the rightful owners, ratably in proportion to their losses." *SEC v. Shiv*, 379 F. Supp. 2d at 617; *see also Tcherepnin v. Franz,* 485 F.2d 1251 (7th Cir. 1973) (court had ancillary jurisdiction over actions brought by receiver to trace and restore funds and assets that defendants had diverted, to create a fund from which fraud victims could be compensated.). As the *Shiv* court noted, the Second Circuit has held this action "was a proper exercise of discretion to implement the SEC's authority to obtain an order

from a District Court to enjoin fraud, freeze accounts that are the instrumentalities of fraud, and repatriate funds on a ratable basis to defrauded claimants." *Id.* (citing *Credit Bancorp,* 290 F.3d at 88-89, 90).

Movants have reviewed many of the same authorities and come to the conclusion that the liquidation of legal entities used in perpetrating a complex Ponzi scheme, as a matter of public policy, requires the immediate commencement of bankruptcies. Movants are wrong. The authorities discussed above do not come to any such overall conclusion. Liquidation of assets by a receiver under the guidance of a federal district court may be entirely appropriate depending on the circumstances. At this juncture of the case, the investigation of which prospective debtors have rights against specific assets and which investors may properly assert claims against specific assets, regardless of which LLC Entity formally owns the assets, has not progressed to the point where placing particular LLC Entities in bankruptcy will provide any demonstrable benefit to investors. Indeed the Receiver has already shown that splitting the insolvency estates to be administered by bankruptcy courts and this Court will needlessly interfere with the Receiver's investigation and greatly increase the costs of administration. (*See* Section V.B above.)

The Receivership Order properly charges the Receiver with certain duties. He should be permitted to complete them. Meanwhile, that same Order contains provisions that meet the concerns expressed by Movants and allow all parties to seek relief from the Court, if justified.

## VI. CONCLUSION

For all of the foregoing reasons, the Receiver respectfully requests that this Court deny the Motion and grant such other and further relief as the Court deems appropriate.

Dated:  November 6, 2008

Respectfully Submitted,

s/ Leo V. Gagion
Leo V. Gagion
Martin F. Bienenstock
Mark S. Radke, *pro hac vice*
DEWEY & LEBOEUF LLP
1301 Avenue of the Americas
New York, New York, 10019-6092
(212) 259-8000 (t)
(202) 259-6333 (f)

Attorneys for Timothy J. Coleman, Receiver
for the Wextrust Entities and Affiliates

## CERTIFICATE OF SERVICE

The undersigned, an attorney, states that I am one of the attorneys for Timothy J. Coleman, Receiver, in this matter and do hereby certify that on November 6, 2008, I caused a true and correct copy of the foregoing **RECEIVER'S OPPOSITION TO INTERNATIONAL AD-HOC COMMITTEE OF WEXTRUST CREDITORS' MOTION OBJECTING TO ENTRY AND SEEKING MODIFICATION OF PRELIMINARY INJUNCTION** to be served upon the following:

**Via Electronic Mail**

Alexander M. Vasilescu
Securities and Exchange Commission
(212) 336-1322 (f)
vasilescua@sec.gov

Andrew M. Calamari
Securities and Exchange Commission
(212) 336-0178 (f)
calamaria@sec.gov

Steven G. Rawlings
Securities and Exchange Commission
(212) 336-1324 (f)
rawlingss@sec.gov

Edward F. Malone
Attorney for Barrington, Bank & Trust Co.
and Hinsdale Bank & Trust Co. Company
(312) 984-3100 (f)
edward.malone@bfkn.com

George R. Mesires
Attorney for Barrington, Bank & Trust Co.
and Hinsdale Bank & Trust Co. Company
(312) 984-3150 (f)
george.mesires@bfkn.com

Barry S. Pollack
Attorney for G&H Partners AG
(617) 338-2880
bpollack@sandw.com

Shalom Jacob, Esq.
Attorney for INTERNATIONAL AD-HOC
COMMITTEE OF WEXTRUST CREDITORS
shalom.jacob@dechert.com

**Via Electronic Mail**

Barry S. Zone
Attorney for Defendant STEVEN BYERS
(212) 752-3868 (f)
bzone@gskny.com

Jason Canales
Attorney for Defendant STEVEN BYERS
(212) 980-5192 (f)
jcanales@gskny.com

Stephen Richard Popofsky
Attorney for Defendant STEVEN BYERS
(212) 980-5192 (f)
spopofsky@gskny.com

John C. Meringolo
Attorney for Defendant JOSEPH
SHERESHEVSKY
(212) 202-4936 (f)
jmeringolo@aol.com

Michael Fred Bachner
Attorney for Defendant ELKA
SHERESHEVSKY
(212) 344-7774 (f)
mb@bhlawfirm.com

Martin Siegel, Esq.
Attorney for INTERNATIONAL
CONSORTIUM OF WEXTRUST
CREDITORS
msiegel@brownrudnick.com

_____ s/ Leo V. Gagion _____