UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SECURITIES AND EXCHANGE COMMISSION,

                Plaintiff,

    - against -

STEVEN BYERS, JOSEPH SHERESHEVSKY,
WEXTRUST CAPITAL, LLC, WEXTRUST
EQUITY PARTNERS, LLC, WEXTRUST
DEVELOPMENT GROUP, LLC, WEXTRUST
SECURITIES, LLC, and AXELA HOSPITALITY,
LLC,

                Defendants,

    - and -

ELKA SHERESHEVSKY,
                Relief Defendant.

08 Civ. 7104 (DC)

## FIRST INTERIM REPORT OF RECEIVER

TIMOTHY J. COLEMAN
Receiver for Wextrust Entities

DEWEY & LEBOEUF LLP
1301 Avenue of the Americas
New York, NY 10019-6092
Tel. (212) 259-8000

November 7, 2008

Attorneys for Receiver

# TABLE OF CONTENTS

**Page**

**Table of Authorities** ......................................................................................................... iii

**I.    BACKGROUND** ..........................................................................................................1

     A.    Wextrust Entities and Wextrust Affiliates ....................................................5
          1.    Wextrust Capital, LLC ......................................................................7
          2.    Wextrust Equity Partners ..............................................................11
          3.    Wextrust Development Group .........................................................13
          4.    Wextrust Securities ........................................................................15
          5.    Axela Hospitality .........................................................................18

     B.    Wextrust Securities Offerings ......................................................................18
          1.    Real Estate Offerings .....................................................................22
          2.    African Diamond Mining Offerings ...............................................32
          3.    High-Yield Commercial Lending Offerings....................................34
          4.    GDRs and Similar Offerings...........................................................35
          5.    Commodities Speculation Funds ....................................................37

     C.    Wextrust Assets ...........................................................................................38
          1.    Real Estate Portfolio ......................................................................39
               a.    Hotels .................................................................................40
              b.    Commercial Real Estate.....................................................41
               c.    Residential Real Estate ......................................................43
           2.    Diamond Mining Interests ..............................................................46
          3.    High-Yield Loans............................................................................51

**II.   THE RECEIVERSHIP ORDER AND APPLICABLE LEGAL
      STANDARDS** ..........................................................................................................54

     A.    The Receivership Order .................................................................................54

     B.    Applicable Legal Standards ...........................................................................56
          1.    Liquidation in Receivership............................................................58
          2.    Distribution of Assets .....................................................................61

**III.  RECEIVERSHIP ACTIONS AND FINDINGS**...............................................................63

     A.    Preservation of the *Status Quo*....................................................................63
          1.    The *Status Quo Ante* ....................................................................63
          2.    Steps to Preserve the *Status Quo* ................................................66

     B.    Investigation of Financial Condition of Wextrust Entities ....................................67
          1.    Financial Statements ......................................................................68
          2.    Cash Flow Statements.....................................................................76

        3.      Property Valuations ......................................................................78
            a.     Assets ...............................................................................78

C.      Disposition of Investor Funds and Extent of Commingling ...................................79
      1.      Disposition of Investor Funds ...................................................................79
      2.      Extent of Commingling...........................................................................81

D.      Prevention of Further Dissipation of Assets ........................................................86
      1.      Evidence of Further Dissipation ................................................87
      2.      Steps to Prevent Further Dissipation in the United States ........................88
      3.      Steps to Prevent Further Dissipation in Foreign Jurisdictions...................89

E.      Preservation of Books, Records and Documents....................................................92

F.      Response to Investor Inquiries.................................................................94

G.     Bankruptcy Determination.......................................................................94

H.     Affirmative Claims Against Third Parties .............................................................95

I.      Administrative Costs of the Receivership............................................................95

**IV.    CONCLUSION AND RECOMMENDATIONS..........................................................96**

# TABLE OF AUTHORITIES

**Cases**

*Bailey v. Proctor*,
160 F.2d 78 (1st Cir. 1947) ..................................................................... 60

*Booth v. Clark*,
58 U.S. 322 (1855) ................................................................................. 90

*Crites, Inc., v. Prudential Ins. Co. of America*,
322 U.S. 408 (1944) ............................................................................... 57

*Cunningham v. Brown*,
265 U.S. 1 (1924) ............................................................................. 61, 84

*Eberhard v. Marcu*,
530 F.3d 122 (2d Cir. 2008) ...................................................... 56, 58, 59

*Esbitt v. Dutch-American Mercantile Corp.*,
335 F.2d 141 (2d Cir. 1964) .................................................................. 59

*Harkin v. Brundage*,
276 U.S. 36 (1928) ................................................................................. 57

*In re Bayou Group, LLC*,
363 B.R. 674 (Bankr. S.D.N.Y. 2007) ............................................. 56, 58

*Lankenau v. Coggeshall & Hicks*,
350 F.2d 61 (2d Cir. 1965) .................................................................... 59

*Liberte Capital Group, LLC v. Capwill*,
148 Fed. App'x 426 (6th Cir. 2005) ...................................................... 62

*Scholes v. Lehman*,
56 F.3d 750 (7th Cir. 1995) ................................................................... 60

*SEC v. Am. Bd. of Trade, Inc.*,
830 F.2d 431 (2d Cir. 1987) ...................................................... 56, 57, 58, 59

*SEC v. Bartlett*,
422 F.2d 475 (8th Cir. 1975) ................................................................. 58

*SEC v. Credit Bancorp, Ltd.*,
290 F.3d 80 (2d Cir. 2002) ............................................................. passim

*SEC v. Elliott*,
953 F.2d 1560 (11th Cir. 1992) ....................................................... 62, 84

*SEC v. Fischbach Corp.*,
    133 F.3d 170 (2d Cir. 1997) ................................................ 61

*SEC v. Forex Asset Management LLC*,
    242 F.3d 325 (5th Cir. 2001) ................................................ 61

*SEC v. Infinity Group Company*,
    226 Fed. App'x 217 (3d Cir. 2007) ................................................ 61, 84

*SEC v. Lincoln Thrift Ass'n*,
    577 F.2d 600 (9th Cir. 1978) ................................................ 60

*SEC v. Manor Nursing Centers, Inc.*,
    458 F.2d 1082 (2d Cir. 1973) ................................................ 56, 57, 58

*SEC v. Tipco, Inc.*,
    554 F.2d 710 (5th Cir. 1977) ................................................ 60

*SEC v. TLC Investments and Trade Co.*,
    147 F. Supp. 2d 1031 (C.D. Cal. 2001) ................................................ 59, 60

*Taylor v. Sternberg*,
    293 U.S. 470 (1935) ................................................ 57

*United States v. Durham*,
    86 F.3d 70 (5th Cir. 1996) ................................................ 62, 84

*United States v. Real Property Located at 13328 and 13324 State Highway*,
    89 F.3d 551 (9th Cir. 1996) ................................................ 84

*Wolfson v. Clayton*,
    253 Fed. App'x 752 (10th Cir. 2007) ................................................ 57

## Other Authorities

Peter M. Fass Et Al.,
    Real Estate Investment Trusts Handbook (2007) ................................................ 10

Phillip S. Stenger, Receivership Sourcebook (2d ed. 2006) ................................................ 90, 93

Ralph E. Clark, Law and Practice of Receivers (3d ed. 1969) ................................................ 90

Receiver Timothy J. Coleman (the "Receiver") respectfully submits this First Interim Report, pursuant to the Court's Order Appointing Receiver, dated August 11, 2008, as amended by order dated September 11, 2008 ("Receivership Order").

This report summarizes the factual findings and actions taken by the Receiver to date. Section I of the report sets forth background information concerning the Wextrust Entities and Wextrust Affiliates, Wextrust securities offerings and the real estate and other assets in the receivership estate.[1] Section II summarizes the procedural posture of this matter and includes a brief overview of legal standards governing equity receiverships in Securities and Exchange Commission (the "SEC") enforcement actions. Section III provides a report on the actions taken by the Receiver to date. Section IV sets forth recommendations for the Court's consideration.

I.    **BACKGROUND**

In the late 1990s and early 2000s, defendant Steven Byers ("Byers") was in the business of real estate lending through his company, Wexford Bancorp. From late 1999 through 2000, Byers invested in a variety of leveraged real estate deals, including several apartment complexes in the Midwest and office buildings in Tennessee and New Orleans. By late 2001, those properties were in distress, as the loans were in default and the lenders were threatening foreclosure. Byers took over the management of the properties and personally guaranteed the debt.

In 2002, Byers began to refinance properties he owned or controlled through a series of private offerings of securities. The securities were typically issued by a limited liability

---

[1] The "Wextrust Entities," as defined in the Receivership Order, are the five companies named as defendants in this action. Those entities are Wextrust Capital, LLC ("Wextrust Capital"); Wextrust Equity Partners, LLC ("WEP"); Wextrust Development Group, LLC ("WDG"); Wextrust Securities, LLC ("Wextrust Securities"); and Axela Hospitality, Inc. ("Axela"). "Wextrust Affiliates" refers to entities the Wextrust Entities control or in which they have an ownership interest. "Wextrust" refers collectively to the Wextrust Entities and/or Wextrust Affiliates. *See* Order Appointing Temporary Receiver, No. 08:civ. 7104 (SWK) (S.D.N.Y. Aug. 11, 2008). "A.1" refers to the number page in the Appendix of exhibits filed herewith.

company that Byers managed, which controlled a particular property or group of properties. Purchasers of the securities were offered returns in the form of periodic distributions of income from the properties, and the potential for substantial profits when the properties were sold. Those returns were to be generated through business plans that called for capital expenditures to renovate and improve the properties, thereby increasing occupancy and income, as well as resale value.

In 2003, Byers formed Wextrust Capital, a holding company for various other businesses, including Wexford Equity Partners, a commercial real estate operator, and Wexford Development Group, a residential real estate development company. (The names of some of the entities were later changed from Wex*ford* to Wex*trust*.) Around the same time, Byers joined forces with defendant Joseph Shereshevsky ("Shereshevsky"). Shereshevsky previously had worked as a property manager for a real estate investment in which Byers was involved. He proved to be a prodigious fund raiser, based in part on his extensive contacts in the Orthodox Jewish communities in Norfolk, Virginia, where he was based, Brooklyn, and Israel. From 2003 through 2004, Byers conducted 21 securities offerings, through which he raised approximately $28.2 million from 292 investors. Most of those offerings were to finance income-producing real estate projects, many of which were distressed properties in which Byers held an interest.

In 2005, Byers and Shereshevsky formed Wextrust Securities, which became the enterprise's captive securities dealer. The firm established offices in Norfolk, Manhattan and Tel Aviv, Israel. The offices, which were located in high-rent districts and lavishly equipped, served several purposes. They housed boiler rooms in which Byers, Shereshevsky and as many as 30 individuals they employed sold securities to investors. (Some of these individuals were licensed securities brokers; others, including Byers and Shereshevsky, were not.) They were used as

"trophy offices" to impress investors who visited with the financial strength and resources of Wextrust.  And they were used, along with the Chicago headquarters of Wextrust Capital, to manage the various Wextrust Entities and the ever-expanding number of Wextrust Affiliates that were formed for the purpose of issuing securities and managing real estate and other ventures.

From 2005 through 2008, Wextrust Securities sold approximately $270 million worth of securities in approximately 50 offerings.  The brokers they employed were encouraged to solicit their friends and relatives.  As a result, many of the investors are related, both to one another and to Wextrust brokers who solicited their investments.  Many of the investors were told that their money was "guaranteed" by Wextrust Capital.  In some cases, Byers and Shereshevsky raised money by issuing securities that were backed by a written guarantee of Wextrust Capital.  In general, Byers, Shereshevsky and their associates used the purported financial wherewithal of Wextrust Capital to assure potential investors that their money would be safe.  Wextrust Securities received substantial commissions, typically 10 percent, on its sales of securities. Byers and Shereshevsky, who controlled Wextrust Securities, profited handsomely.

Byers and Shereshevsky diversified the growing Wextrust enterprise beyond its roots in real estate.  Beginning in 2005, Wextrust Securities raised a total of approximately $34.3 million to finance hotel projects in Chicago, Phoenix and Baltimore, and approximately $42.8 million for "hard money" lending funds, which provided high-interest secured financing for distressed real estate projects.  Beginning in 2006, Wextrust Securities sold approximately $53.9 million worth of securities to finance diamond mining ventures in South Africa and Namibia.  Also beginning in 2006, Wextrust Entities raised almost $30 million through the sale of "Guaranteed Depository Receipts" and similar securities, and sold almost $20 million worth of securities to create funds investing in commodities.  In all, approximately $313 million in securities were sold to

approximately 1,400 Wextrust investors in more than 70 securities offerings.  More than 60 percent of the investors lived in four areas – Norfolk, New York, Chicago, and Israel.  In 2007, Axela Hospitality, LLC ("Axela") was formed to develop and manage a hotel portfolio.

The Wextrust Entities and Wextrust Affiliates were structured in a manner that enabled Byers and Shereshevsky to control them.  The proceeds of the securities offerings were deposited in accounts controlled by Byers and Shereshevsky.  Wextrust investors generally were told that the money they paid for securities would be used only for specified purposes.  However, investor funds were routinely commingled with other funds, and were used to pay Wextrust operating expenses and to finance projects that were unrelated to the investments with which they were associated.  The Wextrust Entities and Wextrust Affiliates were also structured to ensure that Wextrust Capital, which is in effect the ultimate parent company with respect to most of the Wextrust assets, would receive fee revenue and other income regardless of whether the real estate project or other underlying investment was profitable.

Over approximately the past five years, Byers and Shereshevsky amassed a portfolio of real estate that ranges from a hotel in central Chicago, to a shopping center in Michigan, to a 13-building office park in Tennessee, to a luxury condominium building in Brooklyn.  During the height of the real estate boom, they caused various Wextrust Entities and Wextrust Affiliates to pay approximately $200 to $250 million dollars for those properties.  The acquisitions were heavily leveraged through mortgage financing.

The burgeoning Wextrust empire became increasingly expensive to operate.  In addition to debt service, the business plans for the properties required extensive capital investment in renovations and improvements.  The operating expenses of the enterprise included substantial office rent, payroll for dozens of employees and extensive international travel for Byers,

Shereshevsky and their associates. In addition, Byers and Shereshevsky continued to pay millions of dollars in distributions to a rapidly growing number of investors, despite the fact that some of the properties underlying the investments had been lost through foreclosures or otherwise and, in one case, were never purchased at all.

By mid-2008, in the midst of rapidly deteriorating conditions in the real estate and credit markets, Wextrust discontinued distribution payments. By August 11, 2008, when this case was commenced, the cash flow of the Wextrust properties was negative. Based on the Receiver's investigation and analysis, the combined negative cash flow for the Wextrust Entities for the four months ending January 31, 2009 will be at least $146,000 not including the administrative costs of the receivership.

Section I.A., below, provides further detail on each of the Wextrust Entities. Section I.B includes an overview of the Wextrust securities offerings, and a description of each of the principal types of such offerings. Section I.C describes the properties and assets in the receivership estate, including commercial and residential real estate, financial assets and African diamond mining interests.

## A. Wextrust Entities and Wextrust Affiliates

The Wextrust Entities include three Illinois limited liability companies (Wextrust Capital, WEP and WDG) and two Delaware limited liability companies (Wextrust Securities and Axela). Wextrust Capital served as an umbrella organization that held ownership interests in other Wextrust Entities and Wextrust Affiliates, and provided management services to them. WEP served as the division responsible for Wextrust's portfolio of commercial real estate, including office buildings, warehouses and other properties located primarily in the Midwestern United States. WDG served as the residential real estate development division, which consisted primarily of condominium, townhouse, and single family home developments in the Chicago and

New York metropolitan areas.  Wextrust Securities was Wextrust's captive broker dealer, which conducted more than 50 Wextrust offerings and raised the majority of the $313 million in proceeds from victims of the Ponzi scheme alleged in the complaint.  Axela was a small operation that provided limited asset management services to the three properties that comprised Wextrust's hotel portfolio.

The Wextrust Entities and Wextrust Affiliates were controlled and managed by Byers, Shereshevsky and a small group of associates.  Wextrust Capital owns 21 percent of Wextrust Securities, LLC, 79 percent of Wextrust Equity Partners, 80 percent of Axela Hospitality, LLC, and 80 percent of Wextrust Development Group, LLC.[2]  Figure 1, below, depicts the ownership structure of the Wextrust Entities.  An organizational chart found in Wextrust records identifies Byers as the Chief Executive Officer and Shereshevsky as the Chief Operating Officer of Wextrust Capital.  *See* A.1.  The executive, financial and operational functions of the enterprise were largely centralized in the Chicago headquarters of Wextrust Capital, where Byers maintained his principal office, and the Norfolk headquarters of Wextrust Securities, where Shereshevsky was based.  The other principal Wextrust offices were located in New York, Nashville, Tel Aviv and Pretoria.

---

[2] The remaining owners of Wextrust Securities are: Byers, through the Byers Family Partnership (5 percent); Shereshevsky, through the Shereshevsky Family Partnership (7 percent); Weldon Turner (former CEO, and sole Director of Summit Capital), individually and through Aydan Investments, Ltd. (28 percent); Stuart Jacobowitz (former CFO), individually and through Spark Enterprises, Inc. (14 percent); Avraham Ingber (Managing Director), individually and through Tri Enterprises, Ind. (24 percent); and Joseph Friedman (1 percent).  Michael Gorney and Byers own the remaining 20 and one percent of WEP, respectively.  Bilthoven LLC, a company owned by Elmer Coppoolse, owns the remaining 20 percent of Axela.  Donald Price owns the remaining 20 percent of WDG.

**Figure 1: Ownership Structure of Wextrust Entities**



1. **Wextrust Capital, LLC**

Wextrust Capital was formed by Byers in June 2003.[3]  Byers was designated as manager of Wextrust Capital by the company's June 2003 operating agreement.  A.11.  The headquarters of Wextrust Capital occupy approximately 10,000 square feet of a prime office building in downtown Chicago.  Prior to the commencement of this action, as many as 27 individuals were employed in the Chicago offices, including accountants, financial managers, real estate professionals,  administrative assistants, and others.

Wextrust Capital provided management services to other Wextrust Entities and Wextrust Affiliates, in return for management fees.  For example, payroll for all Wextrust employees was centralized in Chicago.  As discussed in greater detail below, cash from other Wextrust Entities and Wextrust Affiliates was routinely pooled in Wextrust Capital bank accounts.  That cash was then used to fund payroll and other overhead expenses, to pay for real estate and other assets

---

[3] The company is owned by Byers, Amnon Cohen, the Byers Family Partnership, LP, Daniella, LLC, and the Shereshevsky Family LP II.  The 2003 Wextrust Capital Operating Agreement specified that Byers owned 63.75 percent of the company and Cohen owned 36.25 percent of the company.  This agreement was amended on January 1, 2006 to reflect the current ownership.  The Receiver has not identified the beneficial owner of Daniella, LLC.

purchased by Wextrust Entities and Wextrust Affiliates, to pay distributions to investors in various Wextrust securities offerings, and for other purposes.  *See* Section III. C, *infra*.

Wextrust Capital featured prominently in the Wextrust securities offerings.  For example, the private placement memoranda ("PPMs") used to market the offerings typically featured the Wextrust Capital logo on their cover pages.  Byers, Shereshevsky and other Wextrust Capital personnel were identified in the offering materials as the principal management personnel for the various investment projects, and the materials highlighted their affiliation with Wextrust Capital. *See, e.g.* A.79-82 (Crowne-Phoenix Investors, LLC PPM at 28-31, discussing Byers, Shereshevsky, Cohen and other Wextrust Capital employees as the management team for CP Managers and highlighting Wextrust Capital's history).  In some cases, Wextrust securities offerings were backed by an explicit guarantee by Wextrust Capital.  *See* A.148-54.  Many victims of the alleged scheme were led to believe that their investments – whether in a hotel project, a commercial office building or a diamond mining venture in Southern Africa – were backed by an implicit guarantee of Wextrust Capital.  For example, one victim who purchased an interest in one Wextrust real estate securities offering was told that her investment was guaranteed by Wextrust, and was led to believe that there was no possibility she would lose the money she invested.

Wextrust Capital owns controlling interests in the other Wextrust Entities, and owns or controls the more than 150 Wextrust Affiliates that were formed in connection with the Wextrust securities offerings.  Typically, a Wextrust Entity held a "common membership interest" and served as the manager of another limited liability company ("LLC") that had direct or indirect ownership in real estate or other assets.  Wextrust Capital typically had a controlling ownership interest and management control of the entities that managed the underlying assets and issued

securities. Based on such interlocking entities and agreements, Wextrust Capital acquired economic interests and management control over the Wextrust portfolio of real estate and other assets.

For example, Axela Hospitality, LLC (of which Wextrust Capital owns 80 percent, through its ownership of Wextrust Hospitality Management, LLC) is a common member of Crowne-Phoenix Investors, LLC ("CP Investors"), a Delaware LLC. CP Investors owns the sole membership interest in Crowne-Phoenix Holdings, LLC ("CP Holdings"). CP Holdings, in turn, is the owner of the Crowne Plaza Hotel in Phoenix, Arizona, a 248-room, full service hotel. Crowne-Phoenix Managers, LLC ("CP Managers") is the managing member of CP Investors, which is, in turn, managed by WEP (of which Wextrust Capital also owns 80 percent). Wextrust personnel, such as Byers, Shereshevsky, and Coppoolse, are also described as managers of CP Managers in the PPM. *See* A.55, A.79-82. Wextrust Securities raised approximately $9.3 million in an offering of "preferred membership interests" in CP Investors, which were sold to approximately 83 investors. Figure 2, below, depicts the structure of the Crowne-Phoenix entities.

**Figure 2: Structure of CP Phoenix Entities**



The offering materials for CP Investors contemplate a 10 percent annual distribution to the purchasers of securities. However, the company is not required to make any distributions at all from its operating income, and the timing and amount of any such distributions are in the sole discretion of the company's management. *See* A.56; A.127. Although the company did not generate any net operating income, it paid approximately $375,000 in distributions between December 2007 and March 2008.

It is not uncommon for real estate investment transactions to be structured with multiple levels of ownership entities. Such multi-tiered structures enable a developer or sponsor, such as Wextrust, to create multiple tranches of investments with different levels of risk and return; limit the various investors' liabilities; segregate the investments of the various tranches; and provide the sponsor/developer with multiple streams of income. *See* PETER M. FASS ET AL., REAL ESTATE INVESTMENT TRUSTS HANDBOOK § 1:1 (2007). The transaction described above was structured in a way that provided Wextrust, the sponsor, with substantial revenue – regardless of whether the Crowne-Phoenix Hotel was profitable. In addition to the economic interest resulting

from Axela's common membership, multiple Wextrust Affiliates perform various services and each such entity receives fees for performing those services. Pursuant to the offering documents, Wextrust Securities was entitled to receive a 10 percent commission for each Preferred Interest sold, for a total of $930,000. According to the marketing materials, Coldwell Banker Commercial/WTC, an affiliate of Wextrust Capital, served as the real estate broker for the acquisition and was entitled to receive a commission of $360,000. Axela was also entitled to an asset management fee equal to one percent of the hotel's gross income. By virtue of the structure of the transaction, Wextrust was entitled to receive substantial revenue even if the investors never received any return on their investment or repayment of principal. *See* A. 79-83.

## 2. Wextrust Equity Partners

WEP manages the Wextrust portfolio of commercial real estate, which includes properties in nine states, with a total book value of approximately $192 million and a secured debt of approximately $160 million, based on the company's records as of August 31, 2008. The WEP properties include commercial office buildings and complexes, shopping centers, warehouses, mixed use developments and an apartment building. The properties are described in detail below. *See* Section I.C.1.b., *infra*.

WEP was formed by Byers in January 2003. Wextrust Capital owns approximately 80 percent of WEP. Michael Gorney, a real estate professional based in Nashville, owns the remaining 20 percent. Wextrust Capital is the managing member of WEP.[4] Gorney is identified in Wextrust marketing materials as a Principal of WEP and Director of Acquisitions for Wextrust Capital.

---

[4] The January 2003 Operating Agreement specifies that Byers and Wextrust Capital, LLC owned 1 percent interest and 99 percent interests in Wexford Equity Partners, respectively. The 2003 Operating Agreement was amended in 2006, and the ownership was changed to Byers owning a one percent interest, Wextrust Capital, LLC owning a 79 percent interest, and Michael Gorney, owning a 20 percent interest in the company. The 2006 Amendment also changed the name from Wexford Equity Partners to Wextrust Equity Partners.

WEP functioned as the commercial real estate acquisition and management division of Wextrust. Typically, Gorney identified properties for potential acquisition, obtained financing for such acquisitions and managed, directly or indirectly, the Wextrust portfolio of commercial real estate properties. Certain of the properties are managed by professional third-party management companies in return for management fees. The operations of WEP are based in a converted single-family home in Nashville. In addition to Gorney, WEP has a handful of other employees who perform property management, accounting and clerical services.

The acquisition of the WEP properties was financed principally through Wextrust securities offerings and mortgage financing. From approximately May 2003 to July 2008, Wextrust conducted at least 35 offerings associated with WEP properties, which raised approximately $96 million from more than 1,000 investors in the United States and Israel. WEP currently manages, directly or indirectly, properties associated with 23 such offerings. Those offerings are described in further detail below. *See* Section I.B.1, *infra.*

WEP has controlling interests in the Wextrust commercial real estate portfolio through common membership interests in, and management agreements with, various Wextrust Affiliates. WEP is a common member of each of the Wextrust Affiliates that directly or indirectly own the underlying real estate assets, and is the managing member of those entities. WEP is also entitled to receive management fees from the Wextrust Affiliates that own the properties. WEP, in turn, pays management fees to Wextrust Capital.

For example, Tennessee Office Ventures, LLC ("TO Ventures") (which is 80 percent owned by WEP)[5] is a common member of Tennessee Office Investors, LLC ("TO Investors"). TO Investors has an ownership interest in Tennessee Office Holdings, LLC ("TO Holdings").

---

[5] Gorney owns the other 20 percent interest in Tennessee Office Ventures, LLC.

TO Holdings, in turn, is the owner of 13 properties located in Middle and East Tennessee.

Tennessee Office Managers, LLC ("TO Managers"), the managing member of TO Investors, is

also owned by WEP. *See* A.156-57, A.159. Wextrust Securities raised approximately $4.4

million in an offering of "preferred membership interests" in Tennessee Office Investors, which

were sold to approximately 49 investors. Through its indirect common membership interest in

TO Investors, WEP has a 24 percent interest in cash flow, sales, and refinancing proceeds after

distributions and repayment of principal to investors. *See* A.164-67. WEP is also entitled to

receive management fees from TO Investors through its ownership of TO Managers. *See* A.161-

62.

### 3. Wextrust Development Group

WDG is the real estate development division of Wextrust.[6] From 2003 to 2008, it was

involved in about a dozen development projects. The projects include condominiums,

townhouses, subdivisions and mixed use developments. Most of the projects are located in the

Chicago suburbs, with a few others in the New York metropolitan area and Wisconsin. Those

properties are described in detail below. *See* Section I.C.1, *infra*.

WDG was formed by Byers and Donald Price in August 2003. Originally, 60 percent of

the company was owned by the Byers Family Trust, and 40 percent was owned by Price, a

Chicago-area real estate developer who serves as manager of WDG and Director of

Development Services for Wextrust Capital. In 2007, Byers and Price negotiated an agreement

to transfer the Byers Family Trust share to Wextrust Capital, increase Wextrust Capital's share in

WDG to 80 percent, and reduce Price's share to 20 percent. Although this agreement was never

finalized or executed, the parties acted as if it had been, with Wextrust Capital providing

---

[6] Wex*ford* Development Group is referred to in the complaint as "Wex*trust* Development Group, LLC." Byers planned to change the name of the company to Wextrust Development Group, but did not formally do so.

operating revenue for WDG.

The WDG developments were financed through Wextrust securities offerings and mortgage financing. From 2004 to 2008, Wextrust conducted at least 14 offerings associated with WDG properties, which raised approximately $53 million from 568 investors in the United States and Israel. *See* Section I.B.1, *infra*.

Byers, Wextrust Capital and WEP provided personal guarantees for the mortgage debts of some of the WDG properties. For example, Byers and Wextrust Capital each provided guarantees for the mortgage on Riverside Arcade, a mixed-use commercial development located in a Chicago suburb. Byers and WEP each provided guarantees for a mortgage on the Hamptons of Hinsdale project, a residential development in another Chicago suburb. Wextrust Capital guaranteed a mortgage on a lakefront site in St. Francis, Wisconsin, and WEP guaranteed the mortgage on a luxury townhouse development in Chicago.

WDG's operations were based in Hinsdale, Illinois. The company was managed principally by Price, who identified development projects, obtained financing, acquired land and directed the construction of various projects. Price was assisted by four other employees in Hinsdale and a WDG employee in New York. The Hinsdale office has been closed, and Price is currently working in the Chicago headquarters of Wextrust Capital, at the direction of the Receiver.

WDG had ownership interests in the properties in its portfolio, typically through a common membership in a limited liability company that directly or indirectly held real property acquired for the development projects it managed. For example, WDG is a common member of Homer Investors, LLC ("Homer Investors"), which owns the sole membership interest in Homer Development, LLC, which is the owner of lots and other real estate assets in the Stonebridge

Woods subdivision, located in the Homer Glen Village suburb of Chicago. Homer Managers, LLC is the manager of Homer Investors, which is, in turn, managed by WEP. Byers, Shereshevsky, and Price are also described as managers of Homer Managers in the PPM. *See* A.175-77.

In 2006, Wextrust Securities raised approximately $2.6 million in an offering of "preferred membership interests" in Homer Investors, which were sold to approximately 28 investors. Through its common membership interest in Homer Investors, WDG has a significant economic ownership interest in the company and is entitled to receive management fees for organizing and performing due diligence on the property. In addition, WDG is entitled to receive all profits and proceeds of home sales after distributions and repayment of principal to investors. *See* A.171; A.189-93.[7]

### 4. Wextrust Securities

Wextrust Securities, which was formed in March 2005 and licensed as a broker dealer in March 2006, was the principal source of funding for Wextrust. From 2005 through 2008, Wextrust Securities conducted at least 50 securities offerings, which raised at least $270 million. The offerings were private placements of unregistered securities, which relied on both federal and state exemptions from registration requirements for limited offerings to accredited investors.[8]

The majority of Wextrust Securities offerings were of equity securities, typically structured as "preferred membership interests" in a Virginia limited liability company. The

---

[7] This assumes the project will be completed and sold as originally planned. At present, the Receiver and his advisors have not yet made a determination whether the project should be completed as planned.

[8] *See* The Securities Act of 1933 and Regulation D promulgated thereunder (prohibiting sales of unregistered securities unless protected by an exemption and setting forth the specific securities required to be registered).

offerings included investments in real estate, hotels, diamond mining ventures, commodities funds and commercial lending funds.  In a few cases, Wextrust Securities sold Guaranteed Depository Receipts and similar securities, at least some of which were guaranteed by Wextrust Capital.  The files on each investor and copies of the LLC agreements and other documents, as well as the investor accounts established in connection with the investment offerings, were maintained in the Norfolk office of Wextrust Securities, which was managed by Shereshevsky.

Wextrust Securities employed a sales force of as many as 150 individuals located throughout the eastern United States and Israel.  The firm had at least 30 registered securities representatives, and approximately 120 unregistered individuals who were paid to help solicit investments.  The sales force marketed securities through telephone calls, PPMs, brochures and other written materials, advertising, and in-person sales pitches.  Wextrust Securities opened large, expensively equipped offices in high-rent districts in New York, Norfolk and Ramat Gan, Israel (a suburb of Tel Aviv), which were featured prominently on the Wextrust website.  Those offices were used frequently to make sales presentations to potential investors.  Prior to August 2008, the sales force was reduced substantially, to less than 25 registered representatives and approximately 15 non-registered persons actively soliciting investments.

The Wextrust Securities sales strategy included targeting individuals in the Orthodox Jewish communities in its principal marketing areas.  Approximately 63 percent of the victims of the alleged scheme live in four areas:  Norfolk (25%); New York (17%); Israel (15%); and Chicago (6%).

Wextrust Securities was managed by Byers and Shereshevsky, together with Michael Mostofsky, Weldon Turner, and Amnon Cohen.  *See* A.199 (defining "Management" as Byers, Mostofsky, and Turner, and providing that the Managers may delegate their authority to

manage).  Byers and Shereshevsky developed securities offerings, determined the firm's overall

sales strategy, controlled and disposed of the proceeds of the offerings, and personally solicited

investments.  Michael Mostofsky, a registered representative, was the lead broker for the firm in

Norfolk, and was also designated as Director of the Private Equity Group of Wextrust Capital.

*See* A.232-36.  Mostofsky supervised the firm's broker dealer operations in Norfolk.  *Id*.  Amnon

Cohen, a registered representative and the Manager and Director of Financial Services for

Wextrust Capital, played a similar role in New York.  Weldon Turner, a U.S. citizen, was

designated as the Chief Executive Officer of Wextrust Securities.  He directed and supervised the

sales force in Israel.[9]

Wextrust Securities received commissions on its sales of securities, typically in the

amount of 10 percent.  Thus, of the approximately $270 million raised in securities offerings

from 2005 through 2008, the firm was entitled to receive approximately $27 million.[10]  The

firm's commissions were used to pay its sales force, including Byers and Shereshevsky, who –

although they were not registered representatives – received payments for soliciting investments.

*See* A.237-44.

The proceeds of Wextrust Securities offerings typically were deposited in bank accounts

in a branch of Wachovia Bank in Norfolk, which were controlled by Byers and Shereshevsky.

*See* A.245-55.  Beginning in approximately March 2004, separate accounts were typically

maintained for each issuer of securities.  However, Byers and Shereshevsky routinely caused

funds to be transferred from the issuers' accounts to the account of Wextrust Capital, and in

some cases to the accounts of other entities.  The use of proceeds of Wextrust Securities

---

[9] According to a Wextrust Securities SEC filing, the firm's owners included Wextrust Capital, entities controlled by Byers and Shereshevsky, Turner and other individuals associated with the firm's Israel operations.  *See* A.263-72.

[10] The Receiver has not yet confirmed the amount of proceeds retained by Wextrust Securities as commissions.

offerings is discussed in further detail below.  *See* Section III.C., *infra*.

### 5.  Axela Hospitality

Axela was formed in October 2007 for the purpose of developing and managing a hotel portfolio for Wextrust.  The company provided limited asset management services for three hotels, the Park View and Drake hotels in Chicago, and a Crowne Plaza in Phoenix.  As the asset manager, Axela supervised the on-site hotel management, which was responsible for running the properties on a day-to-day basis.  Wextrust Capital acquired the Park View before Axela was formed.  After Axela was formed, Wextrust Securities conducted securities offerings to finance the purchase of the Drake and the Crowne Plaza.  Those offerings raised a total of approximately $21.1 million.

Axela was managed by Elmer Coppoolse, a former hotel executive and internet entrepreneur who served as its Chief Executive Officer.  Coppoolse is the brother-in-law of Michael Gorney, of WEP.  *See* Section I.A.2, *supra*.  Coppoolse was responsible for identifying and developing hotel properties, obtaining financing and directing the on-site management of the properties.  Axela was based in a small temporary office in Bethesda, Maryland, where it had two employees in addition to Coppoolse.

### B.  Wextrust Securities Offerings

From 2003 through 2008, Wextrust conducted more than 70 offerings of securities.  *See* A.256-59.  Typically, the offering materials stated that a specified maximum amount of funds would be raised.  *See, e.g.*, A.85 (stating that the total offering amount for CP Investors would be $9.3 million, comprised of 93 preferred interests of $100,000 each).  In some cases, Wextrust sold additional securities and raised additional funds.  For example, the PPM for Homer Investors specified that the "total amount of proceeds from the sale of preferred interests will be $1,720,000," with a minimum investment of $50,000.  *See* A.171-72.  Pursuant to the Homer

Investors LLC agreement, if the maximum amount were raised, an investor making the minimum investment would expect to own approximately three percent of the preferred membership interests, and to receive a proportional amount of distributions and sale proceeds. However, Wextrust Securities raised a total of $2,613,000, so that a $50,000 investor owned only approximately a two percent interest. Wextrust records show that Wextrust "over-raised" on at least 29 securities offerings, raising an aggregate total of $172,533,590 compared to the aggregate amount offered, as reflected in the PPMs, of $142,545,000.

From 2003 through early 2005, when Wextrust Securities was formed, the offerings were conducted by Wextrust employees, only some of whom were registered representatives, and independent contractors, who also solicited investments. Beginning in approximately March 2005, the offerings were conducted by Wextrust Securities in a more systematic manner. The number and size of the offerings increased from 11 offerings in 2003, which raised a total of approximately $8,851,851, to 16 offerings in 2007, which raised a total of $97,209,203. The proceeds of the Wextrust offerings fell precipitously in 2008, to approximately $32 million. Figure 3 below shows proceeds from these offerings.

**Figure 3: Wextrust Investments, By Type and Year**



The nature of the Wextrust securities offerings evolved over time. Prior to 2005, Wextrust offered "membership units" in various entities.[11]  Beginning in 2005, the vast majority of Wextrust transactions were offerings of "preferred membership interests" in a Wextrust Affiliate.  As noted above (*see* Section I.A.4, *supra*), the Wextrust Securities offerings were purported to be exempt from registration pursuant to Rule 506 of Regulation D to the Securities Act of 1933.

---

[11] For example, in 2003, Wextrust offered membership units in Carlisle Park, LLC, a company with a 50 percent ownership interest in Carlisle, LLC, which owned a 100 percent interest in an apartment project located in Houston, Texas, as well as an equity interest in the apartments themselves.  Also in 2003, Wextrust offered membership units in Advantage Regency Holdings, LLC, a company that owned apartment properties located in Knoxville, Tennessee that was financed through the offering.

The earliest Wextrust securities offerings were to finance relatively small and simple apartment building investments. Byers owned an interest in many of these properties prior to forming Wextrust Capital, and many of the properties were distressed prior to the offerings. Beginning in 2005, the firm began to expand into larger and more sophisticated investment funds. For purposes of this report, the Wextrust offerings are divided into the following five categories: (1) real estate investments; (2) diamond mining ventures; (3) high-yield commercial lending; (4) Guaranteed Depository Receipts ("GDRs") and similar securities; and (5) commodities funds. Table 1, below, shows the number and proceeds of the offerings in each of those categories.[12] The offerings are described in further detail in the following sections.

---

[12] The Table includes securities for which there is evidence that PPMs were issued and accounts and investments for which Wextrust appears to have raised funds, but for which no records of PPMs or Offering Memoranda have been found.

| Table 1:  Wextrust Securities Investment Projects, 2003 – 2008 | | |
|---|---|---|
| **Type of Investment Project** | **Number of Offerings** | **Aggregate Proceeds \*** |
| **Real Estate** | 52 | $169,585,579 |
| **Diamond Mining** | 6 | $53,940,000 |
| **High-Yield Commercial Lending** | 3 | $42,770,471 |
| **GDRs and Similar Securities** | 9 \*\* | $29,904,150 |
| **Commodities** | 4 | $16,944,497 |
| **Total** | **74** | **$313,144,697** |

*Includes initial investments made by investors as well as re-invested funds
from previous investments.

**As described in Section I.B.4, below, the GDR and similar securities offered investors
the choice of various annual percentage rates.  Each of these percentage rates has been
treated as a separate offering because Wextrust recorded investor funds in this manner.

### 1.     Real Estate Offerings

**2003 Offerings**.  In its first year of operation, Wextrust conducted five private placement offerings, which raised a total of more than $5 million.  These offerings included:  (1) a $1 million offering by Uptowne Square LLC, which owned a multi-family apartment complex in Oklahoma City; (2) a $930,000 offering by Carlisle Park, LLC, which was to acquire a 50 percent interest in two small apartment buildings in Houston; (3) a $600,000 offering by Hilltop Investors, LLC, which was to acquire a 40 percent interest in an apartment complex in Anderson, Indiana; (4) a $1,560,000 offering by Advantage Regency Holdings, LLC, which owned an office building and an office park in Knoxville, Tennessee; and (5) a $660,000 offering by 1250

South Michigan Avenue, LLC, which was to acquire approximately a 20 percent equity interest in a condominium construction project in Chicago.[13]

The business plans associated with these real estate investments anticipated that the value of the underlying properties would be increased through factors such as capital improvements, increased rent, and higher occupancy rates (for the commercial properties). Each of the offerings anticipated that the properties would be held for five to 10 years and then sold for a profit. Byers, Shereshevsky and Cohen were identified as the managing members of the issuers, and investors were told that they would manage the properties.

In addition, company records show that Wextrust marketed five additional securities offerings for which PPMs do not appear to have been issued. These records show that: (1) $1,176,000 was raised for an 1805 Highpoint Investors, LLC, which indirectly owned a 25 percent interest in an office building in Napersville, Illinois;[14] (2) $200,000 was raised for Midtown Estates Investors, LLC, which indirectly owned a 35 percent interest in a garden-style apartment building in Elkhart, Indiana; (3) $1.6 million was raised from a single investor for Myatt Holdings, LLC, which owns a warehouse in Nashville, Tennessee; (4) $395,000 was raised for an investment identified as "Eastpoint;" and (5) $1,860,000 was raised for Hilltop Ridge Apartments.

Most of these early investment offerings (Uptowne Square, Hilltop Investors, 1805 Highpoint, Carlisle Park, Midtown Estates, and Eastpoint) were to finance properties Byers owned himself or with a variety of associates. Many of the properties were financially troubled

---

[13] These figures and dates in Section I.B.1 are based on PPMs found in the company's records. Other company records indicate that investor funds were received prior to the offering date on the PPM, indicating earlier marketing efforts may have occurred.

[14] While the vast majority of these investments appear to have occurred in 2003, company records indicate that one investment of $50,000 was received in December 2002.

before the offerings were made.  For example, Uptowne Square was under threat of foreclosure the year before the offering.  By the time of the offering, Byers had become a guarantor for this portfolio, and another investment property offered that year, Midtown Estates, had been pledged as collateral for it.  *See* A.273-74.  In December 2002, 1805 Highpoint, another property owned by Byers, lost its anchor tenant.  This occurred a month before the first tranche of investments in the offering.  *Id.*  Shortly thereafter, the mortgage lender foreclosed on Carlisle Park, 1805 Highpoint, Midtown Estates, and Hilltop.

| Table 2: 2003 Real Estate Offerings | | | |
|---|---|---|---|
| **Issuer** | **Amount Offered** | **Amount Sold** | **Number of Investors** |
| Uptowne Square, LLC | $1,000,000.00 | $1,070,000.00 | 14 |
| Carlisle Park,  LLC | $930,000.00 | $980,000.00 | 11 |
| Hilltop Investors, LLC | $600,000.00 | $673,000.87 | 18 |
| Advantage Regency Holdings, LLC | $1,560,000.00 | $1,720,000.00 | 21 |
| 1250 S. Michigan LLC | $660,000.00 | $601,303.54 | 11 |
| 1805 Highpoint | Unknown | $1,176,000.00 | 7 |
| Midtown Estates | Unknown | $200,000.00 | 5 |
| Myatt Holdings | Unknown | $1,600,000.00 | 1 |
| East Point | Unknown | $395,000.00 | 11 |
| Hilltop Ridge Apartments | Unknown | $1,860,000.00 | 22 |
| | **$4,750,000.00 (known)** | **$10,275,304.41** | **121** |

**2004 Offerings**.  The next year, Wextrust conducted five more real estate related offerings, which raised a total of $22,270,752.  In contrast to the transactions in 2003, those offerings were to finance the purchase of additional properties, as opposed to refinancing properties in which Byers already had interests.

Three of the offerings in 2004 involved the purchase of income-producing properties – a shopping center in Wyoming, Michigan (First Wyoming Plaza, LLC), a seven-story mixed-use building in Highland Park, Illinois (First Highland Holdings, LLC), and a grocery-anchored retail center in Essex, Maryland (Hyde Park Investors, LLC).  As before, Wextrust planned to make capital improvements, charge increased rents, and sell the properties for a profit after holding them for several years.  The other two offerings were to finance development projects – one with a partner to build and develop a retail and office building in Nashville, Tennessee (Belle Meade Center Holdings, LLC), and another to gut a historic building and develop office condominiums Riverside, Illinois (Riverside Arcade, LLC).  The final offering, 2400 McCue Investors, LLC, sought funding for a joint venture between Wextrust Capital and another party for a condominium conversion of an apartment complex in Houston, Texas.  Unlike the other real estate offerings, this offering did not provide investors with an ownership interest in the property, but rather contemplated that investors would regain their investment capital and realize a 15 percent return within 18 months.

Additional investments, for which the Receiver has been unable to locate a PPM or company records showing that a PPM was issued, also occurred in 2004.  Company records indicate that Wextrust raised: (1) $1,040,000 for Freemac Holdings, LLC, which indirectly held approximately a 50 percent ownership interest in the Freeport McMoran Building in New Orleans, Louisiana; (2) $590,000 from a single investor for an investment identified as "Freeport" (which is likely related to the Freemac offering); (3) $300,000 from a single investor in Bax Realty Holdings, LLC; (4) $137,000 from a single investor in Music Row Investors, LLC, which was formed to acquire a 65 percent indirect interest in an office building in Nashville; and (5) $50,000 from a single investor for an investment identified in the company records as "1250

S. Michigan Avenue B." Company records indicate that Byers had a partial ownership interest in the Freeport McMoran Building and, like many of the 2003 offerings, the mortgage lender on this property foreclosed on it.

| Table 3: 2004 Real Estate Offerings | | | |
|---|---|---|---|
| **Issuer** | **Amount Offered** | **Amount Sold** | **Number of Investors** |
| First Wyoming Plaza, LLC | $6,750,000.00 | $8,733,826.28 | 104 |
| First Highland Holdings | Unknown | $4,487,082.78 | 31 |
| Hyde Park Investors, LLC | $1,800,000.00 | $1,310,000.00 | 17 |
| Belle Meade Center Holdings, LLC | $1,100,000.00 | $1,456,700.00 | 17 |
| Riverside Arcade, LLC | $2,030,000.00 | $2,235,581.49 | 18 |
| 2400 McCue Investors | $5,050,000.00 | $5,357,560.95 | 74 |
| FreeMac Holdings, LLC | Unknown | $1,040,000.00 | 8 |
| Freeport | Unknown | $590,000.00 | 1 |
| Bax Realty Holdings, LLC | Unknown | $300,000.00 | 1 |
| Music Row Investors, LLC | Unknown | $137,000.00 | 1 |
| 1250 S. Michigan Avenue, LLC B | Unknown | $50,000.00 | 1 |
| | **$16,730,000.00 (known)** | **$25,697,751.50** | **273** |

**2005 Offerings**. Beginning in 2005, when Wextrust Securities became the selling agent for Wextrust, the real estate-related securities offerings were generally structured in a more complex manner. Typically, the securities were issued by an "Investor" LLC, which would acquire an ownership interest in a "Holding" LLC. The Holding LLC would purchase the underlying asset, and would be responsible for leasing, operating, managing, and refinancing the projects. In addition, a "Manager" LLC would be formed to manage the business affairs of the Investor LLC. The Manager LLC, in turn, would be managed by WEP, Axela, or Wexford Development, depending on the nature of the real estate project. Most of the investment projects

were structured in the manner described above. On a few occasions, however, a Manager LLC was not established, and the property was managed directly by WEP.[15]

In 2005, Wextrust raised a total of $35,758,988 in nine real estate related securities offerings. Four of those offerings were to finance income-producing commercial properties that raised a total of $16,651,585. The largest of these was the GSA Investors, LLC offering, which was supposed to provide financing for a seven-building government tenant portfolio with offices in Indiana, Wisconsin, Illinois, and Florida, for which Wextrust raised $9,394,874.[16] The other offerings were to finance the purchase of offices or office parks located in Knoxville, Tennessee (Park Village Holdings, LLC and West Beardon Investors, LLC) and an office and retail space located in Elmhurst, Illinois (York Road Investors, LLC). The business plan in Wextrust's marketing documents remained unchanged from its previous income-producing offerings and specified that Wextrust would make capital improvements, increase rents and fill vacancies, and eventually sell the properties for a profit.

---

[15] Wexford Equity Partners (and later WEP) was usually designated as the manager of the Managing LLC, even for properties that were to be managed by WDG and Axela. In the section of the PPMs describing the manager of the Managing LLC, however, WDG or Axela (and its principals) would be listed as managers of the Managing LLC enitity. In very early offerings, only one LLC entity appears to have been created. For example, the PPM for Uptowne Square Apartments, LLC provides that the property was owned by Uptowne Square, LLC, which was 50 percent owned by Wexford Equity Partners. The managing member of Uptowne Square, LLC was Byers. In addition, for some of the residential development projects, such as the Stonebridge Woods development (Homer Investors, LLC), the Holding LLC was replaced with a Development LLC. Thus, the Investor LLC would own an interest in the Development LLC which, in turn, would own the property to be developed. Where the development project involved a joint venture, additional permutations occurred. For example, in 47 Dean St., a Brooklyn condominium project, unaffiliated third-party investors owned interests in the Holding LLC in a joint-venture relationship with Wextrust investors.

[16] The complaint alleges that "GSA Investors LLC did not acquire any real property." *See* Complaint, at ¶ 26. To date, the Receiver is not aware of any evidence that the properties were purchased. In addition, the Receiver's advisors have reviewed documents showing tenancy for all of the Wextrust properties. Although GSA is a tenant of Interstate Park, GSA does not appear as a tenant of any property listed in the GSA offering documents. Wextrust records show that the proceeds of the GSA offering were used for Wextrust operating expenses and to fund shortfalls in unaffiliated investments managed by Wextrust. For example, $235,000 of proceeds from the GSA offering was transferred to the Wextrust Capital operating account on January 10, 2006, and an additional $210,000 of GSA proceeds was transferred to IDEX Mines & Minerals, LLC on January 6, 2006. *See* Section III.C., *infra*, for a discussion of commingling and the disposition of investor funds.

In 2005, Wextrust Securities also began marketing offerings for residential real estate development projects to be managed by Wexford Development. Wextrust sold securities to finance four such projects in 2005: (1) a condominium project in Brooklyn, New York (52 Dean Street) offered by Dean Street Investors, LLC; (2) a residential condominium and townhouse development in Hinsdale, Illinois (Hamptons of Hinsdale) offered by Grant Street Investors, LLC; (3) a residential townhouse and condominium complex in Chicago (River's Edge) offered by River's Edge Investors, LLC; and (4) a residential condominium project in Chicago (West Belmont) offered by West Belmont Investors, LLC. The total amount raised in those four offerings was $19,107,403.

Company records show that Wextrust also raised: (1) $1,000,000 from two investors for a investment named Wex-New Orleans,[17] (2) $429,500 from four investors for an investment named Wextrust Qualified Investors LLC – Dean Street, and, (3) $350,000 from six investors for an investment named "Dean Street Managers." The Receiver has not located the PPMs for these offerings and has not determined the specific nature of these investments.

Finally, Wextrust offered its first hotel investment in 2005. Wextrust offered Preferred Membership Interests in Gold Coast Investors, LLC, which acquired a Days Inn hotel in the Lincoln Park area of Chicago, which is now known as the Park View Hotel. The business plan for the project contemplated terminating the hotel's franchise affiliation with Days Inn and repositioning it from a limited service hotel to an upscale, boutique property. This repositioning was projected to increase occupancy and room rates, and to facilitate an eventual sale for profit. *See* Section I.C.1.a, *infra*. The renovation is substantially complete, but the hotel has not opened.

---

[17] Company records indicate that these investments occurred as early as 2004.

| Table 4: 2005 Real Estate Offerings | | | |
|---|---|---|---|
| **Issuer** | **Amount Offered** | **Amount Sold** | **Number of Investors** |
| GSA Investors, LLC | $9,200,000.00 | $9,394,874.00 | 103 |
| Park Village Holdings, LLC | $2,100,000.00 | $2,455,980.22 | 31 |
| West Bearden Investors, LLC | $1,950,000.00 | $3,168,611.61 | 37 |
| York Road Investors, LLC | $1,100,000.00 | $1,632,119.26 | 20 |
| Dean Street Investors, LLC | $3,000,000.00 | $3,605,000.00 | 51 |
| Grant Street Investors, LLC | $6,500,000.00 | $7,967,846.30 | 89 |
| River's Edge Investors, LLC | $3,080,000.00 | $3,084,337.29 | 41 |
| West Belmont Investors, LLC | $3,050,000.00 | $4,450,219.58 | 58 |
| Wex-New Orleans | Unknown | $1,000,000.00 | 2 |
| Wextrust Qualified Investors LLC - Dean Street | Unknown | $429,500.19 | 4 |
| Dean Street Managers LLC | Unknown | $350,000.00 | 6 |
| Gold Coast Investors, LLC | $9,000,000.00 | $13,221,263.45 | 121 |
| | **$38,980,000.00 (known)** | **$50,759,751.90** | **563** |

**2006 Offerings.** The number of Wextrust real estate related offerings fell to seven in 2006, but some of the offerings were larger and more complex than those in the previous three years. In 2006, Wextrust sold securities to finance five income-producing commercial projects, including a nine-building office park in Montgomery, Alabama (Interstate Park Investors, LLC); an office/warehouse flex building in Chattanooga, Tennessee (Shallowford Investors, LLC); two warehouses located in Murfreesboro and Knoxville, Tennessee (New Salem Investors, LLC and Workman Road Investors, LLC); and a group of 13 office and industrial buildings leased by the State of Tennessee, located in the Middle and Eastern regions of the state (Tennessee Office Investors, LLC). As with its previous offerings, Wextrust planned to make capital improvements, increase rents and fill vacancies, and eventually sell the properties for a profit. In

addition, Wextrust offered securities for the two residential development projects, including a single-family residential development in Homer Glen, Illinois (Stonebridge) issued by Homer Investors, LLC, a 24-unit condominium in Manhattan (West 82nd Street) issued by West 82nd Street Investors, LLC, and a second offering to 10 investors in West 82nd Street Holdings, LLC. These offerings raised a total of $26,672,394.

| Table 5: 2006 Real Estate Offerings | | | |
|---|---|---|---|
| **Issuer** | **Amount Offered** | **Amount Sold** | **Number of Investors** |
| Interstate Park Investors, LLC | $7,800,000.00 | $8,080,000.00 | 83 |
| Shallowford Investors, LLC | $825,000.00 | $800,000.00 | 6 |
| New Salem Investors, LLC | $1,050,000.00 | $1,150,000.00 | 21 |
| Workman Road Investors, LLC | $750,000.00 | $750,000.00 | 10 |
| Tennessee Office Investors, LLC | $3,650,000.00 | $4,400,000.00 | 49 |
| Homer Investors, LLC | $1,720,000.00 | $2,613,000.00 | 28 |
| West 82nd Street Investors, LLC | $8,470,000.00 | $692,035.87 | 96 |
| West 82nd Street Holdings, LLC | $8,470,000.00 | $8,187,358.25 | 10 |
| | **$32,735,000.00** | **$26,672,394.12** | **303** |

**2007**. In 2007, the dollar volume of Wextrust Securities' real estate equity offerings reached its highest level. Wextrust Securities offered four income-producing real estate investments and raised a total of $17,125,806 investor funds. These offerings were to finance a multi-tenant office building in Peoria, Illinois (Peoria Office Investors, LLC); a grocery-anchored retail center in Burlington, Wisconsin (S. Pine Street Investors, LLC); and two warehouses in Clarksville, Tennessee and Hammond, Louisiana (Clarksville Industrial Investors, LLC and Hammond Industrial Investors, LLC, respectively).

Wextrust also formed Axela, and announced an ambitious plan to build a hotel portfolio. In 2007, Wextrust Securities conducted offerings in the amount of $9.3 million to finance the purchase and renovation of a hotel in Phoenix (Crowne-Plaza Phoenix) and $14.5 million to finance the purchase and renovation of a hotel in Chicago (Drake Oak Brook). Similar to the

strategy for its income-producing properties, Wextrust's business plan was to renovate and re-position the hotels, increase occupancy and room rates, and eventually sell the properties for a profit.

Wextrust also offered preferred membership interests in 47 Dean Street Investors, LLC, to finance the development of a residential condominium in Brooklyn and an investment vehicle to provide mortgage financing to the Hamptons of Hinsdale development project that was first offered in 2005 (Hamptons of Hinsdale Mortgage Fund, LLC).

| Table 6: 2007 Real Estate Offerings | | | | |
|---|---|---|---|---|
| Issuer | Amount Offered | Amount Sold | | Number of Investors |
| Peoria Office Investors, LLC | $4,700,000.00 | $5,115,806.00 | | 56 |
| S. Pine Street Investors, LLC | $2,550,000.00 | $2,700,000.00 | | 35 |
| Clarksville Industrial, LLC | $1,100,000.00 | $1,100,000.00 | | 9 |
| Hammond Industrial Investors, LLC | $7,000,000.00 | $8,210,000.00 | | 82 |
| Crowne-Phoenix Investors, LLC | $9,300,000.00 | $9,303,004.40 | | 83 |
| Drake Oak Brook Investors, LLC | $14,500,000.00 | $11,761,707.39 | ^ | 100 |
| 47 Dean Street Investors, LLC | $2,425,000.00 | $3,375,000.00 | | 38 |
| Hamptons of Hinsdale Mortgage Fund, LLC | $8,000,000.00 | $13,089,858.82 | ^ | 102 |
| | $49,575,000.00 | $54,655,376.61 | | 505 |
| ^ Includes reinvestments. | | | | |

**2008.** In 2008, Wextrust Securities conducted three offerings of real estate securities: (1) a $1.7 million offering to finance the purchase of a warehouse/distribution, production, and office facility located in Corinth, Mississippi (Corinth Industrial Investors, LLC); (2) a $4.8 million offering to develop a 28-story condominium residential development in the Old Town area of Chicago's North Side (625 Paragon Investors, LLC); and (3) an $8 million offering to

develop a Cambria Suites hotel in Baltimore, Maryland (Axela Baltimore Investors, LLC). Collectively, these offerings raised approximately $1.7 million.

| Table 7: 2008 Real Estate Offerings | | | |
|---|---|---|---|
| Issuer | Amount Offered | Amount Sold | Number of Investors |
| Corinth Industrial Investors, LLC | $1,700,000.00 | $500,000.00 | 4 |
| Axela Baltimore Investors, LLC | $8,000,000.00 | $175,000.00 | 2 |
| 625 Paragon Investors, LLC | $4,800,000.00 | $1,025,000.00 | 10 |
| | **$6,500,000.00** | **$1,700,000.00** | **14** |

## 2. African Diamond Mining Offerings

Beginning in approximately 2005, Byers and Shereshevsky formed a network of companies in the United States, South Africa and Namibia for the purpose of investing in diamond mining ventures. Together with Michael van der Merwe, a South African national who purportedly had experience in the mining industry, Byers and Shereshevsky owned and controlled this network of companies. The ventures were financed through a series of securities offerings conducted by Wextrust Securities.[18]

From 2006 through 2008, Wextrust conducted six securities offerings to finance various diamond mining ventures, which raised a total of approximately $54 million. As discussed in greater detail below, (*see* Section III.C.1, *infra*), it appears that approximately $40 million of the proceeds from Wextrust offerings was transferred from the United States to South Africa. That total includes funds from investors in unrelated projects. Additionally, it appears that a portion

---

[18] In June 2004, Gateway Trust, LLC conducted an offering in Lion's Walk Lodge, LLC, a Virginia company, the purpose of which was to loan funds to acquire an interest in Lion's Walk Lodge and in Lion's Walk (Pty) Ltd., a South African company. Also in or around 2004, Wextrust Capital, through its subsidiary Lindsey Energy, invested $1,600,000 into the diamond operations at Vaticano, the purpose of which was to secure an interest in Vaticano Traders (Pty) Ltd., the owner of the mining claims and all diamond extraction equipment and assets at the Honingklip Mines.

of the investor proceeds raised in connection with the South African diamond mining ventures were used for Wextrust operating expenses and to finance unrelated projects in the United States.

In January 2006, Wextrust Securities conducted an offering of securities by IDEX Mines and Minerals, LLC, a Virginia company. According to the offering materials, the proceeds were to be used to acquire a 40 percent interest in Pure Africa Minerals (Pty), Ltd. ("PAM"), a South African company. The IDEX offering raised approximately $30.3 million.

In March 2007, Wextrust Securities sold securities in Block III Mines & Minerals, LLC, a Virginia company, which was to acquire an interest in Deva Investments (Pty), Ltd., a Namibian entity purportedly engaged in mining activities in southern Namibia. The proceeds of the Block III offering were approximately $11.2 million.

In 2007, Wextrust Securities conducted three offerings of securities to finance diamond mining ventures in an area of Namibia known as the Skeleton Coast. In April 2007, Wextrust Securities sold approximately $3 million worth of securities in Skeleton Coast Bret Investors LLC, a Virginia company, which was to be used to acquire an interest in Bret Investments (Pty), Ltd. ("Bret Namibia"), a Namibian company which was represented to have an interest in a mining property known as the Toscanini Mine, located in the Skeleton Coast area. In June 2007, Wextrust Securities raised approximately $6.2 million in an offering of securities by a similarly named Virginia company, Bret Investors Skeleton Coast, LLC, which was also to be used to acquire an interest in Bret Namibia. In November 2007, Wextrust Securities raised approximately $2 million in an offering of securities by Bret Investors Skeleton Coast III, LLC, a Virginia company, which was also to be used to acquire an interest in Bret Namibia.

Finally, in April 2008, Wextrust Securities conducted an offering in ATM II, LLC, a Delaware company, the purpose of which was to acquire an indirect 10 percent ownership in

PAM through the purchase of interests in other entities which in turn owned interests in PAM. Although Wextrust's goal was to raise $25 million in connection with this investment, it only raised $1.3 million.

| Table 8: African Diamond Mining Offerings | | | |
|---|---|---|---|
| **Issuer** | **Amount Offered** | **Amount Sold** | **Number of Investors** |
| IDEX Mines and Minerals, LLC | $23,000,000.00 | $30,340,000.00 | 90 |
| Block III Mines & Minerals, LLC | $11,000,000.00 | $11,200,000.00 | 39 |
| Skeleton Coast Bret Investors, LLC | $3,000,000.00 | $3,000,000.00 | 8 |
| Bret Investors Skeleton Coast | $6,000,000.00 | $6,150,000.00 | 22 |
| Bret Investors Skeleton Coast III | Unknown | $2,000,000.00 | 12 |
| ATM II, LLC | $25,000,000.00 | $1,250,000.00 | 6 |
| | **$68,000,000.00 (known)** | **$53,940,000.00** | **177** |

### 3.  High-Yield Commercial Lending Offerings

Wextrust Securities sold securities in companies that were formed to make and manage high-yield (*i.e.*, short-term, high interest) loans secured by commercial and residential real estate. In 2005, Wextrust Securities raised approximately $24.3 million from the sale of preferred membership interests in Wexford High Yield Debt Fund I, LLC ("High Yield I."). High Yield I made a total of 13 loans, five of which were made through a joint venture with Stillwater Capital Partners, an unaffiliated third party.

In 2006, Wextrust Securities sold securities to establish another high-yield loan fund, Wexford High Yield Debt Fund III ("High Yield III"), which raised approximately $17.1 million (There was no High Yield II offering.) In 2007, Wextrust formed Wexford High Yield Debt Offshore Fund, Ltd. ("Offshore Fund"), a Cayman Islands company, to enable foreign persons to invest in High Yield III. The proceeds of the offshore fund offering were approximately $1.4 million. In total, High Yield III made 16 loans, nine of which were made through a joint venture

with HPC Mortgage Fund, an unaffiliated third party, and seven of which were participated in by the Offshore Fund.  Those loans ranged from a $675,000 loan secured by a first mortgage on a parcel of land in Mine Hill, New Jersey to a $11,250,000 loan secured by a to-be-renovated, 5-story loft building in Manhattan.  The outstanding high-yield loans are discussed in Section I.C.3, *infra*.

| Table 9: High-Yield Commercial Lending Offerings | | | | |
|---|---|---|---|---|
| **Issuer** | **Amount Offered** | **Amount Sold** | | **Number of Investors** |
| Wexford High Yield Debt Fund I, LLC | $40,000,000.00 | $24,297,153.37 | ^ | 141 |
| Wextrust High Yield Debt Fund III, LLC | Unknown | $17,073,457.84 | ^ | 133 |
| Wextrust High Yield Debt Offshore Fund Ltd. | Unknown | $1,399,860.00 | | 7 |
| | **$40,000,000.00 (known)** | **$42,770,471.21** | | **281** |
| ^ Includes reinvestments. | | | | |

### 4.     GDRs and Similar Offerings

In 2006 and 2007, Wextrust issued three series of GDRs and similar securities, through which it raised almost $30 million in capital.  Unlike the preferred membership interests and other equity securities issued in the vast majority of other Wextrust offerings, these securities were purported to represent debt obligations of Wextrust Capital or WEP.  The securities were subordinated to the issuer's secured debt.

In September 2006, Wextrust Capital commenced an offering of $20 million in GDRs.  This offering was made on a revolving basis so that when Wextrust Capital repaid GDRs, the principal amount of the repaid GDR would become available for re-issuance.  According to the offering materials, the purpose of these offerings was to make short-term loans to Wextrust Affiliates in connection with their acquisitions of real estate.  Wextrust offered GDRs with a 12-

month, 18-month, or three-year maturity, with return rates of 7 percent, 7.75 percent, and 9 percent, respectively.  The interest was payable annually.  The proceeds of this first offering of GDRs were more than $9 million.

In October 2006, Wextrust Capital offered another $20 million in GDRs, which was called the 8.5% Rollover Guaranteed Deposit Fund ("8.5 % Rollover GDR").  This offering was limited to individuals who had previously invested in other Wextrust securities.  Investors in the 8.5% Rollover GDR were offered the opportunity to reinvest the distributions or other income from their previous Wextrust investments to a GDR with a one-year maturity and an interest rate of 8.5 %.  The Rollover GDR offering raised an additional $15,043,460.[19]

In December 2007, WEP offered a series of similar securities.  These securities were called Guaranteed Subordinated Promissory Notes ("GSPNs").  The GSPNs were guaranteed by Wextrust Capital, but subordinated to the secured debt of both WEP and Wextrust Capital.  The proceeds were to be used to make short-term loans to Wextrust Affiliates or third parties in connection with their acquisition of real estate and to make short-term debt or equity investments that Wextrust Capital deemed to be in the best interests of WEP.  GSPNs were available with a 12-month, 18-month, or 36-month maturity and respective return rates of 7 percent, 7.75 percent, and 9 percent per annum, payable at maturity.[20]  There was also a three-year lock-in GSPN, with a nine percent interest rate, payable annually, and a 3 percent per annum interest rate, payable at maturity.  The GSPN offering raised more than $5 million.

---

[19] In December 2007, Wextrust Capital issued a supplement to the October 2006 8.5 % Rollover GDR offering, changing the name to 8.5% Unsecured Subordinated Promissory Notes ("USPN").  The investor database indicates that an account associated with this offering received deposits in the amount of $641,774.

[20] As with GDRs, the holder of a GSPN could call the GSPN for prepayment, upon 60 days prior written notice, provided that: (i) the Manager consented to such prepayment; and (ii) the Company had sufficient liquidity to make such prepayment, subject to a 3 percent early withdrawal fee.  This fee would be waived for holders of the 12-month (7 percent) GSPN provided that they invested the prepayment proceeds in an entity affiliated with the company.

| Table 10: GDRs and Similar Offerings | | | | |
|---|---|---|---|---|
| **Issuer** | **Amount Offered** | **Amount Sold** | | **Number of Investors** |
| GDR - General | $20,000,000.00 | See individual GDR offering | | See individual GDR offering |
| GDR 12 month @ 7% | | $4,603,471.86 | ^ | 27 |
| GDR 18 mos. @ 7.75% | | $250,000.00 | | 3 |
| GDR 3 years @ 9% | | $100,000.00 | | 2 |
| GDR 3 years @ 12% | | $4,062,012.45 | | 47 |
| 8.5% Rollover GDR | $20,000,000.00 | $15,043,459.66 | ^ | 162 |
| GSPN – General | $20,000,000.00 | See individual GSPN offering | | See individual GSPN offering |
| GSPN 1 Year @ 7% | | $2,965,676.69 | ^ | 32 |
| GSPN 3 Years @ 9% | | $216,987.27 | | 1 |
| GSPN 3 Years @ 12% | | $2,020,767.95 | ^ | 12 |
| USPN 8.5% Rollover | N/A ** | $641,774.00 | | 61 |
| | **$60,000,000.00 (known)** | **$29,904,149.88** | | **347** |
| ^ Includes reinvestments. <br> ** USPN was a supplement to the 8.5% GDR Rollover. | | | | |

### 5.     Commodities Speculation Funds

In September and October 2006, Wextrust Securities conducted offerings of securities to finance two funds that were formed to speculate in commodities.  The two funds were WexTrade Principal Protected Fund I, LLC and WexTrade Diversified Futures Fund I, LLC.  In June 2007, similar investments were offered to non-U.S. investors in WexTrade Principal Offshore Fund I, Ltd. and WexTrade Diversified Offshore Futures Fund I, Ltd.  The offerings for the four commodities funds raised approximately $17 million.

The Diversified Futures Funds were marketed as a vehicle for speculating in exchange traded futures and options contracts, as well as spot foreign currency markets.  The Principal Protected Funds were marketed as a lower-risk method of speculating in commodities, based on

a purported principal protection component, pursuant to which a portion of the proceeds of the offerings were to be invested in United States government securities and investment grade securities.

The Funds were managed by WexTrade Commodity Managers LLC ("WCM"), a Delaware limited liability company that is, in turn, managed by Wextrust Capital.[21]  The proceeds from the sales of these securities were to be transferred to a "master fund," known as WexTrade Master Fund I, Ltd.  The money in this Master Fund was then allocated by WCM to individual commodity trading advisors, who speculated in commodity futures, foreign exchange, and other instruments.  Currently, the Master Fund's assets are in cash, and commodities trading activities have been halted.

| Table 11: Commodities and Futures Funds | | | |
|---|---|---|---|
| **Issuer** | **Amount Offered** | **Amount Sold** | **Number of Investors** |
| Wexford Principal Protected Fund I, LLC | $50,000,000.00 | $3,380,000.00 | 18 |
| Wextrade Diversified Futures Fund I, LLC | $50,000,000.00 | $11,817,022.21 | 51 |
| Wexford Principal Offshore Fund I, Ltd. | $10,000,000.00 | $325,000.00 | 3 |
| Wexford Diversified Offshore Futures Fund I, Ltd. | $10,000,000.00 | $1,422,475.00 | 9 |
| | **$120,000,000.00** | **$16,944,497.21** | **81** |

### C.     Wextrust Assets

As discussed in the previous section, the various securities offerings conducted by Wextrust Entities and Wextrust Affiliates from 2003 through 2008 were represented to investors to be for the purpose of financing the purchase or development of real estate properties, or for

---

[21] WCM is registered with the Commodity Futures Trading Commission as a commodity pool operator and is a member of the National Futures Association.

investments in diamond mining ventures, commercial lending funds, and commodities funds. In at least one case, the assets that were to be purchased with the proceeds of an offering were not purchased. *See* Section I.B.1, *supra* (discussing GSA offering). In other cases, assets that were financed through Wextrust securities offerings are no longer owned or controlled by any Wextrust Entity or Wextrust Affiliate, such as the properties financed by 2003 and 2004 real estate offerings, which were foreclosed upon. *Id*. This section describes the properties and assets that are currently owned or controlled by Wextrust Entities or Wextrust Affiliates, and includes information such as the date and terms of acquisition of each asset, if available. The financial condition of the Wextrust Entities and Wextrust Affiliates is discussed below. *See* Section III.B, *infra*.

### 1. Real Estate Portfolio

Wextrust Entities and Wextrust Affiliates own or control approximately 40 properties in 10 states that were purchased for an aggregate purchase price of approximately $267 million.[22] Those properties include three hotels, purchased for a combined total of approximately $65.2 million; 21 office buildings or office parks purchased for a total of approximately $91 million; 11 warehouses purchased for a total of approximately $63 million; and four buildings with retail or commercial space purchased for a total of approximately $48.3 million. Wextrust and Wextrust Affiliates also have ownership interests in 12 residential development projects in Illinois, Indiana, New York, and Wisconsin.

---

[22] Maps of the real estate assets, by type, can be found at A.260. The Receiver's real estate consultant has established a valuation range for this property. Due to the necessity for maintaining the optimum ability to negotiate dispositions, should that be decided in the future, these valuations are not being publicly disclosed at this time.

### a. Hotels

The Axela portfolio includes three hotel properties – the Park View and the Wyndham Drake Hotel, which are located in Chicago, and the Crowne Plaza Phoenix, which is located in Phoenix, Arizona.

**Park View Hotel.** The Park View Hotel is a 194-room, 13-story property located in the Lincoln Park area of Chicago. The hotel was built in 1923 and was formerly affiliated with the Days Inn chain. The property was purchased by Wextrust Affiliate Gold Coast Investors, LLC on December 28, 2005 for approximately $20.8 million. The property was closed in December 2006 for an extensive renovation. Since that time, it has not generated significant revenue. The debt on the property is approximately $27.6 million.

The renovation of the hotel was substantially completed prior to the commencement of this case. Before the hotel can be opened, however, an extensive punch list must be completed, hotel licensing issues must be resolved, necessary code work must be completed, a certificate of occupancy must be obtained, furniture must be installed, and other requirements must be met. There are significant carrying costs associated with maintaining the hotel in an unopened status. The Receiver is marketing the property through Hilco Real Estate, subject to Court approval, pursuant to the Receivership Order.

**Wyndham Drake Hotel.** The Wyndham Drake Hotel (formerly known as the Drake Oak Brook) is a 160-room, 4-story hotel located in an affluent Western suburb of Chicago. It was purchased by Wextrust Affiliate Drake Oak Brook Holdings on January 10, 2008 for approximately $20 million. The secured debt on the property is approximately $16.7 million.

The day-to-day operations of the hotel are managed by the Wyndham Hotel Group, a third-party hotel management company. Wyndham is required to obtain approval for certain types of actions and expenditures from the hotel's owner. Prior to the commencement of this

case, Axela developed a plan to build a 60-room addition to the property, additional ballroom space, and a luxury spa. The renovation is now on hold.

**Crowne Plaza Phoenix.** The Crowne Plaza Phoenix is a 248-room, 4-story hotel located in Scottsdale, Arizona. The hotel was purchased by Wextrust Affiliate CP Phoenix Holdings, LLC on October 23, 2007 for approximately $24.4 million. The debt on the property is approximately $21.1 million. The day-to-day operations of the property are managed by Intercontinental Hotel Group ("IHG"), a third-party management company. IHG must obtain approval for certain types of actions and expenditures. Although Axela planned extensive renovations for the property, only minimal improvements in non-public areas have been made, and further renovations are on hold.

### b.    Commercial Real Estate

The WEP portfolio consists of 37 income-producing properties associated with 23 investment offerings. The properties are located in Alabama, Illinois, Louisiana, Michigan, Mississippi, Tennessee, Wisconsin, and Wyoming. The portfolio includes warehouses, offices and office parks, retail properties, and an apartment building. WEP has 11 warehouses (associated with nine offerings) that range from 36,000 to 700,000 square feet. WEP has 21 offices or office parks (associated with nine offerings) that range from 7,500 to 270,000 square feet. WEP also has four retail properties, including two mixed-used buildings in Illinois and two grocery-anchored retail centers in Wyoming and Wisconsin. WEP also has a 132-unit apartment building located in Indiana. The total purchase price for all of the WEP properties was approximately $200 million.[23] Table 12 below provides detailed information about each property in the WEP portfolio.

---

[23] As indicated in Table 12, the Receiver has not verified the purchase prices for three of the properties.

| Type | State | Name | Purchase Date | Purchase Price * | Debt ** |
|---|---|---|---|---|---|
| | | **Table 12: Wextrust Equity Properties Portfolio** | | | |
| Office | AL | Interstate Park | 11/09/2006 | $28,450,000.00 | $23,500,000.00 |
| Office | IL | The Chase Bank Building (Peoria) | 12/10/2007 | N/A | $11,000,000.00 |
| Office | TN | Belle Meade Centre | 01/27/2005 | $7,032,000.00 | $1,772,309.00 |
| Office | TN | Executive Plaza | 12/21/2005 | $1,195,000.00 | $1,138,300.00 |
| Office | TN | Park Village & Parkway Business Center II | 08/31/2005 | $6,300,000.00 | $3,500,000.00 |
| Office | TN | Shallowford Business Park East | 10/19/2006 | $3,350,000.00 | $2,813,000.00 |
| Office | TN | Tennessee Portfolio | 06/30/2006 | $17,088,535.00 | $14,533,535.00 |
| Office | TN | West Bearden Office Plaza | 03/14/2005 | $9,000,000.00 | $7,529,000.00 |
| Retail / Mixed use | IL | 116 North York Street | 08/22/2005 | $3,700,000.00 | $2,800,000.00 |
| Retail / Mixed use | IL | 45 S. Washington | 06/23/2006 | N/A | $1,300,000.00 |
| Retail / Mixed use | IL | First Highland | 07/26/2004 | $13,000,000.00 | $9,800,000.00 |
| Retail / Mixed use | IN | Hilltop Apartments | Unknown | $4,650,000.00 | $3,159,000.00 |
| Retail / Mixed use | MI | First Wyoming | 12/16/2004 | $23,500,000.00 | $19,520,000.00 |
| Retail / Mixed use | TN | Commerce Center | 12/30/2003 | $3,500,000.00 | $3,880,000.00 |
| Retail / Mixed use | WI | South Pine | 06/07/2007 | $10,500,000.00 | $8,740,000.00 |
| Warehouse | LA | Hammond Industrial Park | 07/18/2007 | $28,400,000.00 | $23,500,000.00 |
| Warehouse | MS | Corinth Industrial | Unknown | N/A | $6,200,000.00 |
| Warehouse | TN | Baxtech | 01/27/2004 | $3,610,000.00 | $2,726,102.00 |
| Warehouse | TN | Clarksville Industrial | 08/06/2007 | $4,213,000.00 | $4,300,000.00 |
| Warehouse | TN | Myatt | 10/04/2001 | $10,600,000.00 | $10,300,000.00 |
| Warehouse | TN | New Salem | 02/21/2006 | $4,570,000.00 | $3,370,339.00 |
| Warehouse | TN | Wilma Rudolph | 03/15/2006 | $2,765,000.00 | $1,435,010.73 |
| Warehouse | TN | Workman Road | 03/17/2006 | $3,810,000.00 | $3,020,000.00 |
| | | **Total** | | **$189,233,535.00 (known)** | **$169,836,595.73** |

\* Based on Wextrust internal records. Not independently verified.
\*\* Includes secured debt and in some cases tenant improvement costs and other liabilities.

## c.     Residential Real Estate

As discussed above, WDG is the residential real estate division of Wextrust. *See* Section I.A.3, *supra*. Wextrust Securities began offering investments to finance WDG projects beginning in 2005, and raised a total of approximately $52.6 million. *See* Section I.B.1, *supra*. WDG currently has eight unfinished projects, including a small apartment building in Brooklyn, six projects in Illinois at various stages of development, and a vacant site in Wisconsin. The names used for the projects in the Wextrust Securities marketing materials are highlighted in bold below. This section also discusses two New Jersey development projects that are not managed by WDG.

**Brooklyn Apartment Building.**  Beginning in 2007, Wextrust Securities raised approximately $3.4 million to finance the development of a five-story, 10-unit luxury condominium building Brooklyn. The site is located at **47 Dean Street**, in the Boerum Hill neighborhood. The lot was purchased on September 26, 2007, for $2,400,000. The construction budget for the project is approximately $4,120,000 in hard costs and $2,115,000 in soft costs. Construction has been partially completed and is ongoing. The secured debt on the project is approximately $2.2 million. The offering prices for the units was projected to be between $1,010,000 and $1,550,000. Two units are currently under contract.

**Chicago Suburban Residential Development.**  Beginning in 2005, Wextrust Securities raised approximately $8 million to finance **Hamptons of Hinsdale**, a 116-unit residential development in Hinsdale, Illinois, 20 miles west of Chicago. The project is located on a 12.4-acre parcel of land purchased on July 15, 2002 for $18,000,000. The project contemplated a total of 12 structures, including:  (a) seven buildings containing a total of 23 luxury townhouses; and (b) five larger buildings with a total of 93 condominium apartments, with prices ranging from $339,900-$697,900 for condominiums and $695,000- $940,000 for townhouses. The total

development budget for the site was approximately $41 million, including purchase of the land. The secured debt on the project is approximately $24 million. The site work, including streets and utilities conduits, has been completed. One townhouse building, which has 4 units, is nearly completed. One of the five apartment buildings has been partially completed. One residential unit, a townhouse, was sold prior to the commencement of this action, for $1,017,734.

**Chicago Mixed-Use Development.** Beginning in 2004, Wextrust Securities raised approximately $2.3 million to finance the development of **Riverside Arcade**, a mixed-use commercial project in Riverside, Illinois, a suburban village located nine miles west of downtown Chicago. The project involved the complete renovation of a three-story historic building with approximately 16,000 square feet, consisting of five retail condominium units and eight office condominium units, with prices ranging from $252,000 - $1,815,000. The structure was purchased in December 2004 for $3.4 million. The construction budget for the project was approximately $1,160,000. The renovation of the building has been substantially completed. The secured debt on the property is approximately $2.8 million. None of the units have been sold.

**Chicago Subdivision.** Beginning in 2006, Wextrust Securities raised approximately $2.6 million to finance **Stonebridge Woods**, a single family home subdivision project in the suburban village of Homer Glen, Illinois, 11 miles southwest of Chicago. The project contemplated the construction of 28 custom built homes, with prices ranging from $740,000 to $1,100,000. The land for the project was purchased in March 2006 for $4,113,875. The secured debt on the project is approximately $4.7 million. WDG has built two homes and completed improvements (*e.g.*, sewage, drainage and utility conduits) on the remaining 26 lots. The two completed homes are listed for sale for $890,000 and $675,000, respectively.

**Chicago Apartment Building No. 1**.  Beginning in 2008, Wextrust Securities raised approximately $1.1 million to finance **625 Paragon**, a 28-story condominium project in the Old Town area of Chicago's North Side.  The project contemplated 241 mixed-income condominium apartments.  The Receiver is currently conducting an investigation with respect to the level of secured debt for this property.  WDG has not broken ground on the project.[24]

**Chicago Apartment Building No. 2.**  Beginning in 2005, Wextrust Securities raised $4,450,220 to finance **2435 West Belmont**, a 48-unit condominium project in the Hamlin Park neighborhood of Chicago's North Side, with contemplated selling prices ranging from $378,000 to $472,500 for market-rate units (the project included 8 affordable housing units with contemplated selling prices of $155,000 and $160,000).  The site for the project was purchased on February 15, 2007 for $3,344,008.  The construction budget for the project was $8,362,000 in hard costs and approximately $2,807,000 in soft costs.  To date, an industrial building on the site has been demolished and the foundation for the apartment building has been completed.  The secured debt on the project is approximately $3.5 million.  Construction was halted prior to the commencement of this action as a result of litigation.

**Chicago Apartment Building No. 3**.  **2825 Oakley** is a 19-unit luxury townhouse project in the Lakeview neighborhood of Chicago, with contemplated selling prices ranging from $638,000 to $765,000 for condominiums and $899,000 to $1,370,000 for townhouses.  The land was purchased on September 29, 2005 for $2.4 million.  No construction has commenced.  The secured debt on the property is approximately $2.4 million.  The project was put on hold prior to the commencement of this action as a result of litigation.

---

[24] The Receiver is still investigating ownership interests in this development project.

**Wisconsin Condominium Development**.  SF Development Co., wholly owned by WDG, purchased a 7.5 acre site in St. Francis, Wisconsin, a lake front community south of Milwaukee, on September 14, 2005, for $4,000,000.  SF Development contemplated building a 250-unit condominium development on the site.  No plans were drawn.  Wextrust does not appear to have raised money for this project from external investors.  The secured debt on the property is approximately $3.4 million.  Subsequent to the commencement of this action, the borrower, SF Development, defaulted on the loan.

**410 East Magnolia.**  410 East Magnolia LLC purchased this property, a four-unit residential beach-house condominium building located in Wildwood, New Jersey, in January 2006.  A former Wextrust employee purchased one of the four units in approximately November 2007.  The rest of the units are owned by 410 East Magnolia LLC and are now vacant.  Secured debt for these units is approximately $361,000.

**120 East Youngs Condominium.**  WEP purchased a four-unit residential beach-house condominium building in Wildwood, New Jersey on December 9, 2004 for $260,000.  On or about May 4, 2005, WEP sold the property to 120 East Youngs Condo LLC for $1.  One unit was purchased prior to the commencement of this case.  Secured debt on this property is $156,553.

## 2. Diamond Mining Interests

As discussed above, from 2006 through 2008, Wextrust Securities conducted six offerings of securities to finance diamond mining ventures in South Africa and Namibia. Those offerings raised a total of approximately $54 million.  Moreover, it appears that approximately $40 million was transferred from the United States to South Africa.  The proceeds of the offerings were to be used to make investments in, and loans to, various companies in South Africa and Namibia with interlocking ownership and management.  *See* Section I.B.2, *supra*.

This section describes the Wextrust interests in diamond mining ventures, and includes information about the nature of those interests, their potential value and their performance. The information in this report is based on Wextrust books and records located in the United States, and on information obtained from investors and others. However, the Receiver has not yet been able to take possession of the books and records of the Wextrust Affiliates in South Africa and Namibia, for reasons discussed below. *See* Section III.D.3, *infra*. Accordingly, the information available to the Receiver on the nature and value of Wextrust's interests in the diamond mining ventures has not been verified. Moreover, as discussed below, there is reason to believe that information provided to investors in the ventures is unreliable, at best.

The Wextrust diamond mining interests derive from rights to mine, prospect or explore for diamonds in certain sites in South Africa and Namibia, based on licenses and permits granted by the governments of those countries. The two sites in South Africa are located in the vicinity of the towns of Lichtenburg and Randfontein, in the northern part of the country, west of Johannesburg. The Skeleton Coast site is located on the central west coast of Namibia, north of Swakopmund. The Block III site is located near the southern coast of Namibia, east of Oranjemund. *See* A.275-96.

The diamond mining interests are largely owned or controlled by a Wextrust Affiliate domiciled in South Africa, Pure Africa Minerals (Pty), Ltd. ("PAM"). According to information provided to Wextrust investors, PAM holds at least one prospecting permit, and has direct or indirect ownership interests in other companies that hold permits or licenses. PAM also has operating agreements with the holders of certain licenses or permits, pursuant to which it is entitled to a share of the income from the mining operations. *See* A.297-307.

PAM and several other Wextrust Affiliates, including Bret Investments (Pty), Ltd. and Deva Investments (Pty), Ltd., both of which are domiciled in Namibia, are part of a network of companies with interlocking ownership and management, which is referred to hereinafter as the "PAM Syndicate." Defendants Byers and Shereshevsky, together with Michael van der Merwe, controlled the PAM Syndicate. As a result of the arrests of Byers and Shereshevsky, it appears that van der Merwe now exercises *de facto* control over the PAM Syndicate. *See* A.339-40. Table 13 below is a chart showing the roles of the defendants, van der Merwe and their associates in the PAM Syndicate.

| Table 13: PAM Syndicate Organizational Structure | | |
|---|---|---|
| **COMPANY** | **DIRECTORS** | **DOMICILE** |
| PURE AFRICA HOLDINGS (PTY) LTD | Steven Byers, Joseph Shereshevsky, Michael van der Merwe & Elka Shereshevsky | South Africa |
| PURE AFRICA AGRICULTURAL (PTY) LTD | Michael van der Merwe | South Africa |
| PURE AFRICA PROPERTIES (PTY) LTD | Michael van der Merwe | South Africa |
| PURE AFRICA INVESTMENTS (PTY) LTD | Michael van der Merwe, Euzita Henning, Samuel Gross & Zwi Holles | South Africa |
| PURE AFRICA DEVELOPMENTS (PTY) LTD | Michael van der Merwe & Catherina Elizabeth Schmidt | South Africa |
| PURE AFRICA MINERALS (PTY) LTD | Steve Byers, Joseph Shereshevsky & Michael van der Merwe | South Africa |
| LIONS WALK (PTY) LTD | Michael van der Merwe | South Africa |
| GOLDEN RIBBON TRADING 307 (PTY) LTD | Christian Gouws | South Africa |
| REDLEX 420 (PTY) LTD (EARTH MOVING) | Elsje McDonald & Euzita Henning | South Africa |
| RAPICORP 35 (PTY) LTD | Michael van der Merwe | South Africa |
| MORNING GLOW PROPERTIES (PTY) LTD | Elsje McDonald | South Africa |
| PAM EXPORT | Christian Gouws | South Africa |
| AFRICAN SPIRIT TRADING 155 (PTY) LTD | Euzita Henning | South Africa |
| AFRICAN SPIRIT TRADING 250 (PTY) LTD | Christian Gouws | South Africa |
| TROPICAL PARADISE TRADING 508 (PTY) LTD | Sybrand Hanekom | South Africa |
| VATICANO TRADERS (PTY) LTD | Johannes Lubbe & Job Kubu | South Africa |
| BASFOUR 3650 (PTY) LTD | Michael van der Merwe & Marius Nel | South Africa |
| ROBATO INVESTMENTS (PTY) LTD | Pieter Johannes Van der Merwe | South Africa |
| BRET INVESTMENTS (PTY) LTD | Michael van der Merwe | Namibia |
| DEVA INVESTMENTS (PTY) LTD | Michael van der Merwe, Joseph Shereshevsky, Steve Byers, Larry Costa & Deon Nel | Namibia |
| JUNO INVESTMENTS (PTY) LTD | Michael van der Merwe, Joseph Shereshevsky, Steve Byers, Larry Costa & Deon Nel | Namibia |
| MARK INVESTMENTS (PTY) LTD | Michael van der Merwe | Namibia |
| Notes: 1. The source for the above information is company registration files and corporate governance documents. As there were some discrepancies between these documents, the above reflects the Receiver's best understanding. 2. Elsje McDonald is Michael van der Merwe's wife. 3. Euzita Henning is believed to be Michael van der Merwe's sister. | | |

According to representations made to investors, the Wextrust mining ventures were operational, and had produced significant income. A quarterly report on the ventures, dated December 2007, included a letter from Shereshevsky (in his capacity as Chairman of PAM's board), which stated that "mine production and sales have increased to a level that we now have secured significant financing for most of the new machinery for our South African operations." A.330. The quarterly report also contained a "CEO Report" prepared by van der Merwe, which projected that $8.9 million would be returned to PAM shareholders in 2008, and $21.5 million in 2009. A.333. A report prepared by a geologist employed by PAM, dated March 28, 2008, estimated the "total gross value of the properties currently in the Pure Africa portfolio" at more than $1 billion. *See* A.308-25.

The reliability of these optimistic statements about the income and value of the Wextrust diamond mining interests is questionable, based on several factors. First, one week after this action was commenced, the CFO of PAM advised the Receiver that the company was insolvent. *See* A.838-39.[25] On September 11, 2008, a purported creditor of PAM initiated a liquidation proceeding against the company in South Africa, which is pending.[26] Second, the geologist's report was prepared by a PAM employee rather than an independent valuation professional. Moreover, the report is admittedly speculative, stating that an

> assessment . . . of the so-called Blue Sky potential of each prospect . . . reflects the most optimistic approach, assuming positive results to all prospecting envisaged. The purpose of a Blue Sky assessment is to attach a theoretical value to a company's portfolio.

---

[25] Thomas Lewis, CFO and previously Financial Reporting Manager of PAM, was hired by Shereshevsky in 2007. Lewis is a U.S. citizen who is licensed as a certified public accountant in Virginia. *See* A.821-22.

[26] The petitioner in the liquidation proceeding appears to be another company controlled by van der Merwe, Storm Technologies (Pty) Ltd. The company is a "labor broker," which purportedly provided temporary employees to PAM. The status of the PAM liquidation proceeding is discussed in further detail below. *See* Section III.D.3, *infra*.

A.310. Third, the financial statements of the PAM Syndicate were prepared by an accountant employed by PAM, Sybrand Hanekom, who was disqualified from practicing in South Africa based on a finding that he misappropriated client funds. *See* A.398-407; A.408-09. Although investors complained about Wextrust's failure to provide adequate financial information about the diamond mining ventures, (*see, e.g.*, A.410-411), Hanekom's disqualification was not disclosed to the investors.

### 3. High-Yield Loans

As discussed above, Wextrust Securities conducted three offerings to fund real estate loan transactions. From July 2005 to December 2007, those offerings raised a total of $42.7 million. *See* Section I.B.3, *supra*. A portion of the proceeds of those offerings was used to make loans to third parties that were secured by real estate assets. According to Wextrust marketing materials, these so-called "high yield" or "hard money" loans were to be made at interest rates ranging from 10 to 18 percent, for terms ranging from 6 to 12 months, with loan to value ratios of at least 80 percent. In connection with these high-yield loans, Wextrust Affiliates entered into participation arrangements with third parties that funded portions of certain of the loans.

**High Yield I Loans.** A Wextrust Affiliate, Wexford High Yield Debt Fund I, LLC ("High Yield I"), is currently participating in 11 loans, ranging from $200,000 to $2.35 million, totaling an aggregate principal amount in excess of $10 million. The loans are secured by a variety of assets, including interests in a partially-completed condominium development, residential dwellings, two small unimproved lots, a vacant lot with water frontage zoned for condominium development, an industrial building, and multi-unit residential buildings. Wextrust has a 100 percent interest in seven of those loans, with an aggregate principal amount of $5.1 million. All of the loans are in default. Wextrust initiated foreclosure proceedings on some of the loans prior to the commencement of this action, and the Receiver is continuing

those proceedings. Wextrust, through the Receiver, is involved in continuing settlement discussions and negotiations with several borrowers regarding non-performing loans. Wextrust has taken title to at least two properties as a result of foreclosure proceedings.

**Wexwater Loans**. High Yield I entered into a joint venture agreement with a third party, Stillwater Capital Partners, LLC ("Stillwater"), to fund and service certain loans. Pursuant to the agreement, High Yield I has a 10 percent participation in the loans, and Stillwater has a 90 percent participation. The joint venture, known as Wexwater, LLC, made five loans ranging from $365,000 to $2.9 million, for a total principal amount of $5.7 million. The loans are secured by a variety of real estate assets, including unimproved parcels of land, a multi-tenant retail building, and a 61-room hotel. All five of the loans are in default. Prior to the commencement of this action, Wextrust lost its second mortgage position on one of the loans. The Receiver is pursuing workout discussions with the first mortgage holder on two of the remaining loans. Foreclosure proceedings with respect to another loan are pending.

**High Yield III and Offshore Loans.** Two Wextrust Affiliates, Wexford High Yield Debt Fund III, LLC and Wexford High Yield Debt Offshore Fund, Ltd. made a total of 16 loans. The loans ranged from $675,000 to $11.25 million, for a total principal amount in excess of $33 million. HPC U.S. Fund I, L.P., a U.S. interest of a private German investment fund, has participations in nine of the loans. High Yield III and High Yield Offshore have a combined participation interest of approximately $7.6 million in those nine loans. Seven of the nine Wextrust/HPC loans are in default.

Of the remaining loans, in which High Yield III or High Yield Offshore has a 100 percent interest, six are secured by an apartment building project in the Bronx (which has not been constructed); vacant land in Chicago; and a parcel of real estate in New Jersey consisting of three

residential lots, one of which has an existing house. Four of these six loans are in default. The Receiver is negotiating payment extensions with two borrowers. A seventh loan never closed, and Wextrust's interest is limited to collecting unpaid fees.

## II. THE RECEIVERSHIP ORDER AND APPLICABLE LEGAL STANDARDS

The Receivership Order and other orders issued by the Court in this action and the related criminal case are summarized in Section II.A.  Some of the legal standards applicable the receiverships in SEC enforcement actions are summarized in Section II.B.

### A. The Receivership Order

On August 11, 2008, the SEC filed this civil enforcement action Byers, Shereshevsky and the Wextrust Entities.  The complaint alleges that the defendants participated in a Ponzi-type scheme to defraud investors in connection with Wextrust securities offerings.  Among other things, the complaint alleges that the defendants failed to disclose that the proceeds of various Wextrust offerings were used for purposes other than those for which the money was raised.  The complaint also alleges that the defendants failed to disclose Shereshevsky's prior felony conviction for bank fraud.  The complaint alleges violations of various provisions of the Securities Act of 1933, including securities fraud in violation of Section 17(a)(1), and the Securities Exchange Act of 1934, including securities fraud in violation of Section 10(b).  The complaint seeks equitable relief, including injunctions against future violations of the securities laws, disgorgement, prejudgment interest and civil monetary penalties.

Simultaneously with the filing of the complaint, the SEC sought emergency relief, including a temporary restraining order ("TRO") and a preliminary injunction, an order freezing the assets of the defendants ("Freeze Order") and the appointment of a receiver.  The Court granted the SEC's request on August 11, 2008, pending a ruling on the SEC's application for a preliminary injunction.  On October 24, 2008, the Court issued a preliminary injunction, continuing the previously granted provisional remedies, on the consent of all parties to the action.

The TRO preliminarily enjoined the defendants from violating the securities laws; ordered Byers and Shereshevsky to provide verified accountings for themselves and for the Wextrust Entities; and prohibited the destruction, alteration, or concealment of documents by any of the defendants. The Freeze Order froze all assets of Byers, Shereshevsky and the Wextrust Entities, subject to the Receivership Order. The Freeze Order was issued pursuant to Section 20(b) of the Securities Act and Section 21(d) of the Securities Exchange Act, based on a finding that it was necessary, *inter alia*, to preserve the *status quo* and the Court's ability to approve a fair distribution for victims of the fraud.

The Receivership Order directs the Receiver to: (1) preserve the *status quo*; (2) ascertain the true financial condition of the Wextrust Entities and Wextrust Affiliates, and the disposition of investor funds; (3) determine the extent of commingling of investor funds between Wextrust Entities and Wextrust Affiliates; (4) prevent further dissipation of the assets of Wextrust Entities and Wextrust Affiliates; (5) prevent the encumbrance or disposal of assets of Wextrust Entities, Wextrust Affiliates and investors; (6) preserve the books, records and documents of Wextrust Entities and Wextrust Affiliates; (7) be available to respond to investor inquiries; and (8) determine if the Wextrust Entities and Wextrust Affiliates should undertake a bankruptcy filing. The Receivership Order authorizes the Receiver, *inter alia*, and subject to certain notice requirements: to take possession and control of all Wextrust assets; to succeed to all rights to manage all properties owned or controlled by the Wextrust Entities; to pay from available funds necessary business expenses required to preserve the assets of Wextrust Entities and Wextrust Affiliates; to engage accountants, attorneys and other professionals; to take all necessary steps to gain control over, and repatriate, assets in foreign jurisdictions; to establish a cash management system; to encumber and sell assets; and to commence bankruptcy cases as a debtor in

possession, carrying out the same fiduciary duties as a trustee, which is required of all debtors in possession.[27]

On August 8, 2008, the United States Attorney's Office filed a criminal complaint against Byers and Shereshevsky, alleging one count of conspiracy to commit securities fraud, in violation of 18 U.S.C. § 371. At the same time, the government obtained search warrants for the Wextrust offices in Chicago and Norfolk, which were executed on August 11, 2008. Byers and Shereshevsky have been ordered released on bail. The government has obtained orders of continuance extending the time to indict Byers and Shereshevsky to November 19, 2008 and November 21, 2008, respectively.

## B.    Applicable Legal Standards

In an SEC enforcement action, a district court has equitable jurisdiction to appoint a receiver. *Eberhard v. Marcu*, 530 F.3d 122, 131 (2d Cir. 2008) ("District courts possess broad power to remedy violations of federal securities laws," including the power to appoint receivers); *SEC v. Am. Bd. of Trade, Inc.,* 830 F.2d 431, 436 (2d Cir. 1987) ("*ABT*") ("Although neither the Securities Act of 1933 nor the Securities Exchange Act of 1934 explicitly vests district courts with the power to appoint trustees or receivers, courts have consistently held that such power exists."); *SEC v. Manor Nursing Centers, Inc.,* 458 F.2d 1082, 1105 (2d Cir. 1973) (recognizing

---

[27] The Receivership Order includes a finding that the SEC has made a "proper showing" under the Securities Act and the Securities Exchange Act "that appointment of a receiver for the Defendant Wextrust Entities is necessary." Thus, the Receiver was appointed pursuant to the federal securities laws and the Court's inherent authority. *See In re Bayou Group, LLC*, 363 B.R. 674, 684 (Bankr. S.D.N.Y. 2007) (citing *SEC v. Manor Nursing Ctrs., Inc.*, 458 F.2d 1082, 1103 (2d Cir. 1972); *SEC v. Am. Bd. of Trade, Inc.*, 830 F.2d 431, 436 (2d Cir. 1987)). The Receivership Order confers broad corporate management authority on the Receiver, subject to limited notice requirements, including, *inter alia*, the "rights to manage all properties owned or controlled, directly or indirectly," by the Wextrust Entities; the authority to "[p]ay from available funds necessary business expenses required to preserve the assets and property" of the Wextrust Entities and Wextrust Affiliates; the authority to invest cash, enter into agreements, and encumber assets; the authority to "use, lease, sell, and convert into money all assets of the Wextrust Entities"; and the authority to "commence cases under Title 11 of the United States Code . . . subject to the same parameters and objectives as a Chapter 11 trustee and . . . remain in possession, custody, and control of the Title 11 estates . . . ." Accordingly, the Receiver's corporate management authority will survive the filing of any bankruptcy petition arising out of this case. *See Bayou*, 363 B.R. at 683-85.

district court's authority to appoint receiver "to effectuate the purposes of the federal securities laws").  A receiver appointed pursuant to the court's equitable jurisdiction is considered to be an officer of the court, rather than an ordinary litigant.[28]

The duties and authorities of a receiver are defined by the district court order appointing the receiver and the federal common law of equity receiverships.  *SEC v. Credit Bancorp, Ltd.*, 290 F.3d 80, 90 (2d Cir. 2002) ("*CBL*") (holding that the "law of federal equity receiverships applies" to insolvency proceedings conducted in SEC receivership); *SEC v. Manor Nursing Centers,* 458 F.2d at 1104-05 (holding that equity jurisdiction conferred by securities laws includes power to fashion ancillary remedies).  The district court has jurisdiction to delegate a variety of authorities to a receiver, including the authority "to preserve, take control of, and liquidate the defendants' property for the benefit of the defrauded investors."  *Wolfson v. Clayton*, 253 Fed. App'x 752, 753 (10th Cir. 2007).

Typically, receivers in SEC enforcement actions are ordered to marshal assets, investigate fraudulent transactions, pursue fraudulent conveyance actions and other claims against third parties, and propose plans for distribution of the receivership estate's assets.  As the Second Circuit observed in an opinion issued earlier this year:

---

[28] *See, e.g., Crites, Inc., v. Prudential Ins. Co. of America*, 322 U.S. 408, 414 (1944) (co-receiver was officer of court, appointed to assist court in protecting and preserving, for benefit of all parties, property in court's custody); *Taylor v. Sternberg,* 293 U.S. 470, 472 (1935) ("The receiver is an officer of the court which appoints him."); *Harkin v. Brundage*, 276 U.S. 36, 55 (1928) ("[T]he receiver is an officer of the court and should be as free from 'friendliness' to a party as should the court itself."); *ABT*, 830 F.2d at 436-37 (primary purpose of appointing receiver was "promptly to install a responsible officer of the court who could bring the companies into compliance with the law, ascertain the true state of affairs . . . and report thereon to the court and the public shareholders and preserve the corporate assets") (internal citations and quotations omitted).

> Receivers appointed at the SEC's request are equipped with a variety of tools to help preserve the *status quo* while the various transactions are unraveled to obtain an accurate picture of what transpired. We have observed that a primary purpose of appointing a receiver is to conserve the existing estate. Receivers are directed to marshal the assets of the defendant and prevent the dissipation of the defendant's assets pending further action by the court. This authority necessarily includes the power to investigate the defendant's transactions. Moreover, where the entity in receivership is a corporation, the receiver may report to the SEC and convene shareholder meetings on its behalf.

*Eberhard v. Marcu*, 530 F.3d at 131-32 (internal quotations and citations omitted). The Receivership Order in this case is typical, both in its mandate to the Receiver and in the authorities with which it equips the Receiver. *See Bayou*, 363 B.R. at 684 (citing *SEC v. Manor Nursing Ctrs., Inc.*, 458 F.2d at 1103).

### 1.    Liquidation in Receivership

The Second Circuit and numerous other courts have recognized the need for liquidation by a Receiver in appropriate circumstances. Most recently, in the *CBL* case, the Second Circuit approved the partial liquidation of the assets of a corporate defendant in a securities fraud Ponzi scheme. 290 F.3d at 88-90. A district court's authority to order liquidation by an SEC receiver has been affirmed by numerous appellate courts.[29] The Second Circuit has never reversed a district court order authorizing liquidation by an SEC receiver. *ABT*, 830 F.2d at 437.

In four cases in the past five decades, the Second Circuit has expressed, in *dicta,* a concern that a bankruptcy court proceeding may be a more appropriate than a district court equity receivership for the liquidation of an insolvent company. However, none of those cases reversed a district court order authorizing liquidation in receivership. *See Eberhard v. Marcu,*

---

[29] *See, e.g., SEC v. Bartlett*, 422 F.2d 475 (8th Cir. 1975) (upholding denial of motion to vacate receivership, noting that receiver had made substantial progress toward liquidating corporation); *SEC v. Lincoln Thrift Ass'n,* 577 F.2d 600, 609 (9th Cir. 1978) (affirming denial of motion to transfer receivership proceedings to bankruptcy court based on "court's intimate knowledge of the factual data relevant to liquidation" and "the receiver's expertise developed in making his recommendation that the companies be liquidated").

530 F.3d at 132 ("the power of a securities receiver is not without limits"); *ABT*, 830 F.2d at 436 (noting that court was "disturbed" by "use of the receivership to effect the liquidation" of defendant securities firms, but affirming appointment of receiver); *Lankenau v. Coggeshall & Hicks*, 350 F.2d 61, 63 (2d Cir. 1965) (expressing view that insolvent broker-dealer should be liquidated in bankruptcy rather than receivership); *Esbitt v. Dutch-American Mercantile Corp.*, 335 F.2d 141, 143 (2d Cir. 1964) (criticizing liquidation of securities trading firm in receivership, but declining to order filing of bankruptcy petition).  The issue of whether liquidation in receivership was appropriate was not squarely presented in any of those cases.  In the *ABT* and *Esbitt* cases, the court observed that, because the district court had already made substantial progress toward liquidating the estate's assets, bankruptcy proceedings would not be in the interests of the parties.  *See ABT*, 830 F.2d at 436; *Esbitt*, 335 F.2d at 143.  Thus, the court considered the relative expense and burden of receivership and bankruptcy proceedings in connection with the views it expressed in those cases.[30]

In other jurisdictions, courts have permitted liquidation by SEC receivers on similar grounds.  For example, in *SEC v. TLC Investments and Trade Co.*, a district court in the Central District of California ordered the prejudgment liquidation of receivership assets. 147 F. Supp. 2d 1031 (C.D. Cal. 2001).  First, the *TLC* court held that "liquidation at this time, prior to entry of judgment, is appropriate because the evidence presented to the Court demonstrated that the TLC entities' liabilities were greater than their assets and because ongoing management alone will drain money out of the estate, money that otherwise could be returned to investors."  *Id.* at

---

[30] Whatever persuasive authority the *dicta* in those cases may have, it has been called into question by the Second Circuit's opinion in the *CBL* case, which squarely addressed the issue of whether the receiver should liquidate the estate's assets and held – as part of its *ratio decidendi* – that "receiverships are 'insolvency proceedings'" that are governed by the "law of federal equity receiverships," rather than any other insolvency law.  290 F.3d at 90.

1036.[31]  Second, the court held that "in the unique circumstances of this case, there is such a close connection between the actions necessary for ongoing oversight of the Receivership's assets and for liquidation of those assets that it is appropriate for the Receiver, rather than a bankruptcy court, to carry out the liquidation."  *Id.*  The *TLC* court noted, "[u]nfortunately, the investors in this situation have been victimized by the actions of the Defendants.  The Court can stop this from happening again, and it can return as much money as possible to the investors, but it cannot turn the TLC entities into an ongoing, profitable investment.  It would not be appropriate for the Court, or the Receiver on behalf of the Court, to become a real estate developer."  *TLC*, 147 F. Supp. 2d at 1043 n.8.[32]

A district court's authority to order liquidation by a federal equity receiver has been affirmed by numerous appellate courts.  *See, e.g., SEC v. Lincoln Thrift Ass'n*, 577 F.2d 600, 609 (9th Cir. 1978) (affirming district court's order refusing to transfer receivership liquidation proceedings to bankruptcy court); *SEC v. Tipco, Inc.*, 554 F.2d 710, 711 (5th Cir. 1977) (upholding district court's decision denying intervenor's objection to receiver's plan to liquidate corporate assets and distribute on *pro rata* basis); *Bailey v. Proctor*, 160 F.2d 78, 81 (1st Cir. 1947) ("[W]e now hold that a court of equity has inherent power to appoint a receiver to liquidate a corporation or investment trust where fraud, mismanagement or abuse of trust is present whether or not insolvency is likewise present."); *see also Scholes v. Lehman*, 56 F.3d 750, 755 (7th Cir. 1995) (Posner, *J.*) (observing the efficiency of federal equity receiverships, and noting that "[c]orporate bankruptcy proceedings are not famous for expedition").

---

[31] The *TLC* Court authorized the receiver to liquidate the assets of the estate, largely free from the constraints of the Bankruptcy Code, despite a local rule requiring receivers to follow that code in liquidation proceedings.  *See* 147 F. Supp. 2d at 1036.  There is no such local rule in this district.

[32] The assets in the TLC receivership estate "included distressed real estate throughout the country, racehorses, and racing dogs both in this country and Mexico."  The court noted that "[l]iquidation consists of selling off assets that need constant oversight and management by the Receiver, including the racehorses."  147 F. Supp. 2d at 1043.

## 2.    Distribution of Assets

It is typical for a receiver in an SEC enforcement case to propose a plan of distribution. *See, e.g., CBL,* 290 F.3d at 85 (noting that district court appointed receiver to "marshal CBL's assets and to prepare a distribution plan"); *SEC v. Forex Asset Management LLC*, 242 F.3d 325, 328 (5th Cir. 2001) (discussing district court's approval of receiver's plan of distribution); *SEC v. Infinity Group Company*, 226 Fed. App'x 217, 218 (3d Cir. 2007) (affirming district court's adoption of receiver's plan of distribution over defendant's repeated objections).  The Freeze Order in this case contemplates "a fair distribution for victims of the fraud."  Freeze Order at 2.

The district court has broad discretion to approve a plan of distribution.  *CBL*, 290 F.3d at 87 (reviewing district court's decision relating to choice of distribution plan for abuse of discretion).  "In shaping equity decrees the trial court is vested with broad discretionary power, and appellate review is correspondingly narrow."  *SEC v. Forex Asset Management LLC*, 242 F.3d 325, 331 (5th Cir. 2001); *see also SEC v. The Infinity Group Company*, 226 Fed. App'x 217, 218 (3d Cir. 2007) (noting that "district courts have wide equitable discretion in fashioning distribution plans in receivership proceedings") (citing *SEC v. Fischbach Corp.*, 133 F.3d 170 (2d Cir. 1997)).

Since at least the United States Supreme Court's decision in the original Ponzi scheme case in 1924, courts have frequently found that the most equitable method of distribution in such circumstances is a *pro rata* distribution of the proceeds of the receivership estate.  *See CBL*, 290 F.3d 80 (citing *Cunningham v. Brown*, 265 U.S. 1 (1924) (involving case of Charles Ponzi)).  In CBL, the Second Circuit stated that "a *pro rata* distribution has been deemed especially appropriate for fraud victims of a 'Ponzi scheme.'"  *CBL,* 290 F.3d at 89 (citing cases).  *Pro rata* distribution has been favored in such cases, even when it would be possible to trace assets in the receivership estate to particular victims.  *See id.*; *Liberte Capital Group, LLC v. Capwill*, 148

Fed. App'x 426, 436 (6th Cir. 2005) (affirming *pro rata* distribution plan and noting that in two previous cases "the courts rejected a tracing method, even though tracing was clearly possible"); *United States v. Durham*, 86 F.3d 70, 73 (5th Cir. 1996) (affirming district court's *pro rata* distribution even though majority of funds were traceable to specific claimants); *SEC v. Elliott*, 953 F.2d 1560, 1569-70 (11th Cir. 1992) (affirming district court's *pro rata* distribution plan even though securities were traceable to claimants).

## III.    RECEIVERSHIP ACTIONS AND FINDINGS

The Receiver has been charged with a broad mandate to secure Wextrust assets and evidence, to investigate and analyze the financial condition and activities of the Wextrust Entities and Wextrust Affiliates, and to respond to investor inquiries.  This section of the report summarizes the steps the Receiver has taken to date to carry out that mandate.

### A.    Preservation of the *Status Quo*

The Receivership Order directs the Receiver to preserve the *status quo*.  At the time of the Receiver's appointment on August 11, 2008, the Wextrust Entities and Wextrust Affiliates were in a state of profound instability and turmoil.  In order to stabilize and secure Wextrust business operations, properties and assets, the Receiver has conducted crisis management and security operations, and has taken control of the management of the Wextrust Entities and Wextrust Affiliates located in the United States.  Those steps are summarized below.

#### 1.    The *Status Quo Ante*

Many of the Wextrust Entities and Wextrust Affiliates have valuable, income-producing properties.  However, the Wextrust real estate portfolio – the most valuable set of assets in the receivership estate – is heavily leveraged, and certain of the properties are distressed.  Although many of the properties produce significant income in the ordinary course of business, the principal source of funding – payments from purchasers of securities – is no longer available. The Wextrust Entities and Wextrust Affiliates have a high level of expenses, including debt service and other operating expenses, such as payroll, office rent, utilities and insurance premiums, as well as construction costs and other expenses related to ongoing development projects.  A significant segment of the business operations in the receivership estate are located in foreign jurisdictions with a history of official corruption and failure to cooperate with U.S. law enforcement and judicial authorities, and remain under the control of Byers, Shereshevsky and

their associates.[33]  Wextrust Entities and Wextrust Affiliates have significant contingent

liabilities, including numerous civil actions pending in various jurisdictions.  *See* Section III.D.2,

*infra*.  The instability and turmoil have been exacerbated by the continuing global financial

crisis, which impacts the market value and continuing operations of the businesses and properties

in the receivership estate.

The vast majority of Wextrust assets are going concerns that require active management

and financing.  In particular, the commercial and residential real estate properties and

developments have a significant combined monthly debt service, and incur substantial operating

expenses, such as utilities, security and maintenance.  Prior to the commencement of this action,

those expenses were funded largely by the proceeds of Wextrust securities offerings.  *See*

Section III.C., *infra*.  As of August 11, 2008, many of the properties had substantial past due

balances on mortgage loans and vendor accounts.  For example, the Park View Hotel was more

than $1.1 million in arrears on its mortgage payments, and the hotel's utility bills had not been

paid in months.

By August 11, 2008, the operating expenses for the Wextrust Entities and Wextrust

Affiliates were a heavy burden.  The monthly payroll of approximately $500,000 included some

68 employees throughout the United States and in Israel and South Africa.  *See* A.412-19.[34]

---

[33] According to the 2008 Corruption Perceptions Index published by Transparency International, a widely used measure of official corruption, South Africa ranked 54th and Namibia ranked 61st.  (The index is available at http://www.transparency.org/policy_research/surveys_indices/cpi/2008.)  Earlier this year, the U.S. extradition treaty with South Africa was declared unconstitutional by the South African High Court.  *See Goodwin v. Director - General Department of Justice and Constitutional Development and Others*, Case No. CCT 52/08.  The United States does not have either an extradition treaty or a mutual legal assistance treaty with Namibia.  The lead defendant in a highly publicized securities fraud case pending in this court fled to Namibia to avoid prosecution in 2006, and the U.S. government's request for extradition has yet to be adjudicated.  *See* "The Guilty Men of Wall Street," *The Economist*, Oct. 14, 2008 (suggesting Namibia as a haven for white collar fugitives, such as former Comverse Technology CEO Kobi Alexander).

[34] In May, there were 89 employees on the monthly payroll, and Byers and Shereshevsky had not yet reduced their salaries to minimum wage.  Wextrust had payroll expenses of $672,112.38 for May, exclusive of independent contractors that were paid by each division.

Combined monthly rent for the principal Wextrust offices in the United States was more than $90,000.  Expenses for employee travel, including such items as private jet charters, sometimes exceeded $100,000 per month.[35]

As of August 11, 2008, a number of lawsuits were pending against Wextrust Entities and Wextrust Affiliates, seeking substantial damages.  Those cases were handled by a variety of outside attorneys and were not monitored systematically by any Wextrust employee.  *See* Section III.D.2, *infra*.  Wextrust management had failed to file tax returns and various other regulatory filings, and to make certain tax payments.[36]  As discussed in the next section, Wextrust had no centralized accounting or financial system.  Exacerbating this pervasive lack of organization, Wextrust Capital had replaced its chief financial officer twice in the months preceding the commencement of this action.  August 11, 2008 was the second day on the job for the current CFO.

In approximately June 2008, two months before the Receiver was appointed, Wextrust discontinued dividend payments to its approximately 1,400 investors.  Many of the victims of the alleged scheme had invested substantially all of their savings in Wextrust securities.  Others had mortgaged their homes to purchase securities from Wextrust.  The discontinuation of distributions caused severe economic hardship for many of the victims.  Beginning on August

---

[35] *See* A.420 (request from Shereshevsky to be booked into an expensive suite and have a private plane wait for him overnight); A.421 (request from Shereshevsky to get "cheapest rate [the hotel] will give . . . [on] the most expensive room."); A.422 (request from Shereshevsky that a private plane pick him up in New York to take him to Norfolk); A.423-26 (discussing hotel bills and charges for massage and escort services).

[36] The Receiver, with the assistance of attorneys and accountants, is examining potential federal and state tax liabilities.  The Receiver has discovered numerous Internal Revenue Service notices of past due payments, deficiencies, underpayments, and other issues.  In addition, Wextrust management routinely failed to file tax returns for Wextrust Entities and Wextrust Affiliates, and in some cases filed returns with inaccurate information.  As a result, the receivership estate may have tax liabilities that could impact the availability of funds for distribution to victims.  *See SEC v. Credit Bancorp, Ltd.*, 297 F.3d 127 (2d Cir. 2002) (discussing impact of federal tax debts on plan of distribution).  Many of the Wextrust Affiliates are required to file a federal Form 1065 and related Schedules K-1, but failed to do so.  The Receiver has provided information to victims about the preparation of Schedules K-1 and related tax issues.

11, 2008, the Receiver's investor relations organization has received more than 1,700 inquiries from victims seeking information and assistance. *See* Section III.F, *infra*.

### 2. Steps to Preserve the *Status Quo*

Beginning on August 11, 2008, the Receiver implemented crisis management and asset security measures designed to preserve the *status quo*. As discussed below, the Receiver's counsel and evidence preservation experts made forensically sound copies of substantially all Wextrust business records maintained in the United States and Israel, and conducted interviews of dozens of Wextrust employees and other witnesses, and hundreds of victims. *See* Section III.E, *infra*. The Receiver identified more than 250 Wextrust accounts at banks and other financial institutions and took exclusive control of those accounts as sole authorized signatory, pursuant to the Receivership Order. *See* Section III.D.2, *infra*. The Receiver took control of all real estate and other properties and assets of Wextrust Entities and Wextrust Affiliates in the United States, and took steps to prevent the disposal or encumbrance of those assets through litigation or other means. *See* Section III.D.2, *infra*. The Receiver also established an investor relations operation to provide information to victims of the alleged scheme, respond to their inquiries, and obtain documentary and testimonial evidence from them. *See* Section III.F, *infra*.

The Court has authorized the Receiver, *inter alia*, to "[t]ake and retain immediate possession and control of all of the assets and property" of the Wextrust Entities and Wextrust Affiliates; to "[s]ucceed to all rights to manage all properties owned or controlled, directly or indirectly," by them; and to "[p]ay from available funds necessary business expenses required to preserve the assets and property" of the Wextrust Entities and Wextrust Affiliates. *See* Receivership Order, at 4. The Receiver has exercised that authority in an effort to manage the enterprise in an efficient and cost-effective manner.

The Receiver, with the assistance of accountants, attorneys and experts engaged pursuant to the Receivership Order, is actively managing the commercial real estate, hotels and other properties in the receivership estate. The Receiver personally approves all payments of operating expenses, all business transactions and the handling of all pending legal proceedings. The Receiver has implemented procedures and internal controls to ensure that all payments and other transactions are authorized by this Court's orders and are necessary to preserve the receivership estate, and to ensure that all such transactions are effectively recorded and monitored. The Receiver, assisted by professional advisors, manages the remaining Wextrust employees, located primarily in the Chicago, Nashville and Norfolk offices.

The Receiver has taken steps to conserve the receivership estate and to maximize the value of Wextrust properties and assets. For example, the Receiver sought to increase revenue by causing Wextrust Entities and Wextrust Affiliates to enter into lease transactions for vacant commercial real estate, to collect accounts receivable and other payments, and to institute or continue foreclosure proceedings against borrowers. The Receiver has sought to reduce expenses through workout negotiations with lenders and landlords, deferral of significant expenditures, such as remodeling and other planned improvements to real estate assets, and by consolidating business operations, reducing payroll, and eliminating unnecessary expenses (such as cable television service and periodical subscriptions). The Receiver has also taken steps to mitigate potential damage to unfinished development projects, such as winterizing construction sites and providing security to prevent vandalism of Wextrust properties.

**B.      Investigation of Financial Condition of Wextrust Entities**

Pursuant to the Receivership Order, the Receiver is required to "ascertain the true financial condition" of the Wextrust Entities and Wextrust Affiliates, and "the disposition of investor funds," and to "determine the extent of commingling of funds between" Wextrust

Entities and Wextrust Affiliates. The Receiver has been authorized to "[t]ake preliminary steps to locate assets that may have been conveyed to third parties or otherwise concealed," and to "[t]ake preliminary steps to ascertain the disposition and use of funds obtained by the Defendants resulting from the sale of securities." Receivership Order at 4.

The Receiver, with the assistance of accountants and experts, has collected and examined financial statements and other records of the Wextrust Entities and Wextrust Affiliates. The Court has approved the Receiver's engagement of forensic accountant Jerry B. Klein, Deloitte Financial Advisory Services LLP ("Deloitte"), and The Hilco Organization ("Hilco") to assist in those efforts. With the assistance of Deloitte, the Receiver has prepared a preliminary assessment of the current financial condition and a cash flow analysis that projects the financial condition of the enterprise on a prospective basis. With the assistance of Hilco, the Receiver has prepared a valuation of the principal Wextrust properties. The status and results of the Receiver's financial investigation and analysis to date are discussed below.

### 1. Financial Statements

Wextrust maintained financial statements and other financial and accounting records in various locations. Among other things, Wextrust employees and/or external accountants prepared financial statements for the years ending December 31, 2005, December 31, 2006 and December 31, 2007. Wextrust employees and accountants maintained various other financial and accounting records for certain Wextrust business operations on an ongoing basis. The Receiver, with the assistance of accountants and other experts, has determined that the Wextrust financial records and other records are incomplete and unreliable.

That determination is based on evidence that Wextrust had no effective system of internal controls and that, as a result, its financial records are materially inaccurate. An effective financial reporting process requires internal controls and other measures to ensure the accuracy

and reliability of the information produced.  Internal control systems are designed to provide reasonable assurances of the reliability of financial information, and compliance with applicable laws, regulations and accounting rules and principles.  An effective control environment requires systems of checks and balances to ensure that no financial transaction is handled exclusively by a single individual, and that no individual can control an entire process or function.  Typical controls on cash and disbursements include:  procedures to ensure that all cash intended for the organization is received, promptly deposited, properly recorded, reconciled, and deposited or otherwise secured; approval requirements for disbursements to be made only with appropriate management authorization; multiple levels of authorization for disbursements, based on the amount and/or purpose; and procedures to ensure that disbursements are properly documented, and are promptly recorded.  Other types of controls include establishing a budget and comparing actual results to the budget on a regular basis; closing the books and records on a monthly basis; reconciling the underlying sub-ledgers to the general ledger at every closing; reconciling bank accounts every month; and requiring monthly financial statements to be reviewed by senior management and the board of directors or other supervisory body.  Top management plays a key role in determining the corporate culture and ensuring that internal controls are followed.[37]

      To be effective, internal controls must be implemented throughout the organization, such that separate legal entities deal with one another at arms length.  Inter-company transactions – such as affiliate loans – must be subject to approval requirements, documented properly and recorded promptly.  Such inter-company transactions must be reconciled regularly, at least at

---

[37] These concepts are discussed in the Committee of Sponsoring Organizations of the Treadway Commission, INTERNAL CONTROL – INTEGRATED FRAMEWORK (1992) [hereinafter "COSO Report"].  Specifically the Executive Summary (specifically page 3) discusses the role of internal control systems in financial reporting, Chapter 2 (specifically pages 23-27) discusses the control environment and top management's role in creating the environment, and Chapter 4 (specifically pages 50-51, 56) discuss the typical controls that should exist in a company.

every monthly closing of the books and records. The nature of such transactions must be adequately documented by agreements, loan documentation or other records. Individuals with custody or control of assets must not also have control of the associated record keeping systems. Accounting personnel responsible for performing reconciliations and other necessary accounting functions must have the experience level necessary to perform their duties and the ability to interact with other departments in the organization and access essential data.[38]

Wextrust management failed to implement an effective system of internal controls. Closings of Wextrust accounting systems often were not performed on a timely basis, and monthly closings did not always occur. For example, when the Receiver was appointed, accounting records for 14 Wextrust Affiliates had not been updated since June 2008, and transactions for the Wextrust Capital operating account and the Wextrust Securities operating account had not been entered for the entire 2008 calendar year. Even in those instances in which the accounting systems were closed, sub-ledgers and general ledgers were not consistently reconciled. Similarly, bank account information was not systematically reconciled with internal books and records. Some of the Wextrust Entities and Wextrust Affiliates failed to adjust their accounting records to reflect significant transactions that affected their assets and liabilities. For example, at least 18 high yield loans remained on the books after the loans were repaid or Wextrust's interest in the loans was extinguished. Conversely, at least seven outstanding high yield loans were not recorded on the books. In addition, substantial properties, such as the Crowne-Phoenix Hotel, were not recorded in the company's books and records.

Wextrust management failed to implement basic controls over cash transactions. Instead of an integrated system controlled from a centralized location, Wextrust Entities and Wextrust

---

[38] These concepts are discussed in the Executive Summary (at page 4) and the Reporting to External Parties (at page 129) of the COSO Report, *supra* note 37.

Affiliates maintained hundreds of accounts at numerous financial institutions. *See* A.427-28. Wextrust management failed to implement policies requiring multiple levels of approval for disbursements of funds. Instead, Byers and Shereshevsky had unfettered discretion to spend Wextrust funds without approval, accountability, documentation or recordkeeping requirements. Moreover, Wextrust management routinely placed individuals with no financial or accounting background in key financial positions. For example, the "Comptroller" for the "Private Equities Group," who was responsible for maintaining and reconciling the Wextrust Capital operating account and the Wextrust Affiliate investor accounts, had no formal training in accounting or finance.

Byers and Shereshevsky routinely directed Wextrust employees to transfer funds among various Wextrust Entities and Wextrust Affiliates in transactions that were frequently characterized as "affiliate loans." Such transactions typically were executed by transferring funds from a bank account in the name of a Wextrust Entity or Wextrust Affiliate to the Wextrust Capital operating account at a Norfolk branch of Wachovia Bank and then on to an unrelated fund or account. Byers and Shereshevsky used this account as a virtual piggy bank to finance transactions and operations as the need arose, and funded the account with the proceeds of securities sales.

For example, the accounting records for WexTrade Diversified Futures Fund I, LLC show that money was "loan[ed]" to the Wextrust operating account throughout 2007 for a variety of purposes. *See* A-427-28. These loans were used for a variety of purposes, such as funding real estate closings and paying expenses for Wextrust Capital. *See* Section III.C.2, *infra*. In some cases, proceeds from securities sales were earmarked to be transferred into the Wextrust Capital operating account before the company had even received them. For example, in a

January 28, 2008 email, Shereshevsky stated that Wextrust Securities would be receiving proceeds from the GDR and Drake Oak Brook Investors offerings that would be used to fund payroll expenses and distribution checks for earlier, unrelated investments. *See* A.429-30. In some instances, Byers and Shereshevsky caused funds to be transferred from the account of one Wextrust Entity or Wextrust Affiliate to another, without an intervening transfer to the Wextrust Capital operating account. For example, on June 30, 2006, $2.273 million was transferred from IDEX Mines and Minerals LLC to Tennessee Office Investors LLC to help fund the closing of a transaction. *See* A.431-40. In other instances, Byers and Shereshevsky caused funds to be transferred from a Wextrust Affiliate to a third party for the benefit of an unrelated Wextrust Affiliate. For example, on November 1, 2007, $800,000 was wired from the Crowne-Phoenix escrow account to Broadway Bank to make a loan payment for the benefit of 82nd Street Holdings.

Such inter-company transactions were rarely supported by adequate documentation. For example, on April 23, 2007, $1,000,000 of proceeds from securities sales in WexTrade Diversified Futures Fund I, LLC was transferred to the Wextrust Capital operating account. *See* Section III.C.2, *infra*. The accounting records for this transaction simply note that the transfer was effectuated "per Steve Byers' and Joe Shereshevsky's instructions" as a "loan to WTC," *i.e.*, Wextrust Capital. *See* A.427-28. There is no evidence of any attempt to reconcile the amounts due to or due from each of the funds. Documentation of significant transactions in many cases was limited to cryptic notations in Excel spreadsheets and/or Quickbooks entries.[39]

Wextrust maintained various accounting systems on different platforms. For example, WEP employees used numerous computer systems for real estate accounting, Wextrust

---

[39] Excel is a popular electronic spreadsheet program published by Microsoft Corp. Quickbooks is a widely available accounting software system published by Intuit Inc., which is popular among small businesses.

Securities used a combination of Excel spreadsheets and Quickbooks files, and other entities used other systems. For some entities, the only accounting records maintained by Wextrust management were Excel spreadsheets. These disparate systems were largely incompatible with one another, and they were never integrated.

Wextrust management produced what were purported to be consolidated statements of financial condition for the years ended December 31, 2005 and December 31, 2006. Those financial statements were accompanied by an opinion of a Chicago accounting firm, Calzada & Associates, Ltd., which claimed to have reviewed them and opined that they presented fairly, in all material respects, the financial position of Wextrust Capital and numerous Wextrust Entities and Wextrust Affiliates. Neither Calzada & Associates nor its principal, Maria G. Calzada, who signed the opinion, is licensed or registered as a public accountant in Illinois. The accountant's opinion avoids stating that the financial statements were audited, or that they were prepared in accordance with generally accepted accounting principles. The opinion states that "[t]he financial statements were prepared by Certified Public Accountants as disclosed by Management." However, the Receiver is not aware of any evidence that any CPA actually prepared the statements. *See* A.441-513.[40]

Wextrust management also prepared a set of purported consolidated financial statements for the year ended December 31, 2007. Based on the analysis of the receivership accountants, those financial statements are incomplete, unaudited, and are not presented in conformity with generally accepted accounting principles. No accountant's opinion was included with these financial statements and there was no consolidating record, supporting workpapers or footnotes to explain the basis of representations. *See* A.514-23.

---

[40] Ms. Calzada has not responded to inquiries by the Receiver's counsel, and has been served with a subpoena.

Wextrust management caused financial statements to be prepared for various Wextrust Affiliates and groups thereof. For example, as noted above, financial statements for PAM and other members of the PAM Syndicate were prepared by a South African accountant who was previously disqualified. *See* Section I.C.2 *supra*. As in the case of the Wextrust Entities and Wextrust Affiliates in the United States, there is no evidence that any of the Wextrust Affiliates in South Africa and Namibia observed any internal controls or corporate formalities in connection with their numerous inter-company transactions. *See e.g.*, A.524-26; A.527-29. In May 2006, PAM retained PricewaterhouseCoopers to audit the financial statements of PAM and certain other members of the PAM Syndicate. *See* A.530-43. The audit was never completed. *See, e.g.*, A.550-54. Similarly, Wextrust management prepared a set of financial statements for High Yield Fund III for the year ended December 31, 2006. A Virginia accounting firm, Zuckerman & Associates, was engaged to conduct an audit of those statements, but that audit was never completed either, because the firm was unable to obtain the CFO's signature on a required management representation letter.[41]

Receivership accountants have prepared balance sheets for the Wextrust Entities as of August 31, 2008 directly from the accounting systems or from the records of third party property managers. These balance sheets indicate that: (1) Axela has total assets of approximately $54.3 million, current and long-term liabilities of approximately $51.4 million, and equity of approximately $2.9 million; (2) WEP has total assets of approximately $201.7, current and long term liabilities approximately $161 million; and equity of approximately $40.6 million (3) WDG and WDG-related assets total approximately $65.4 million, with current and long-term liabilities of approximately $51.5 million, and equity of approximately $13.9 million; and (4) Wextrust

---

[41] *See* A.555-58; A.559-62; A.563-70; A.571.

Capital has total assets of approximately $67.8 million, current and long term liabilities of approximately $38.2 million, and equity of approximately $29.7 million. In aggregate, the balance sheet shows that Axela, WEP, WDG, and Wextrust Capital have assets of approximately $389.3 million, total current and long-term liabilities of approximately $302.2 million ($62.1 million in current liabilities and $ 240.1 million in long-term liabilities), and equity of approximately $87.1 million.[42] *See* A.544-49.

Although the balance sheets and summary presented here provide an overview of the financial position of the Wextrust Entities, they are based on internal Wextrust records and information obtained from third party property managers, and are therefore subject to the problems resulting from the lack of recordkeeping and internal controls discussed above. They do not include adjustments or corrections that would be required to produce accurate and reliable financial statements pursuant to generally accepted accounting principles. They have not been audited, reviewed or compiled, and the basis of presentation is not known. Notably, Wextrust management aggregated the total assets and liabilities of the Wextrust Entities, but the balance sheets do not purport to be consolidated. These aggregated totals are merely the sum of the assets and liabilities of the Wextrust Entities. They do not account for or reconcile inter-company transfers.

---

[42] The Axela assets figure includes current receivables and the book value of the properties. It does not include a book value for the Crowne Plaza Phoenix hotel located in Phoenix, Arizona, because the value was not reflected in either Wextrust's or the third-party manager's records. The breakdown between current and long-term liabilities for the companies are as follows; (1) Axela has approximately $2.8 million in current liabilities and $48.6 million in long-term liabilities; (2) WEP has approximately $1 million in current liabilities and $160 million in long-term liabilities; (3) WDG has approximately $48.3 million in current liabilities and $3.2 million in long-term liabilities; and (4) Wextrust Capital has approximately $9.8 million in current liabilities and $28.4 million in long-term liabilities. The Wextrust Capital asset and liability figures include funded loans with outstanding principal balances, held primarily by the High Yield Funds and managed by Wextrust Captial; assets and liabilities for WexTrade Financial; and assets and liabilities for the commodities funds.

In order to prepare reliable financial statements, the Receiver would be required to conduct extensive, time-consuming and costly work.  Based on the nature of those assets and current economic conditions, particularly in the real estate and credit markets, the current market value of the assets is likely to be substantially different – and in all likelihood lower – than their book value.

## 2. Cash Flow Statements

A cash flow analysis anticipates revenues and expenses on a cash basis over a period of time.  The purpose of a cash flow analysis is to project the changes in a company's financial condition over the relevant period, the net amount of cash to be expended over the period, and the amount of cash that will remain at the end of the period.  Receivership accountants have assisted in the preparation of a monthly cash forecast for the period from October 1, 2008 to January 31, 2009, shown below in Table 14.  The forecast is based on operating budgets prepared by Wextrust management, adjusted for such items as actual rent rolls, past due payables, loan repayments and unfunded expenditures.

**Table 14: Base Cash Flow Projections for Wextrust Capital, LLC and Affiliates, et al. for the Four Months Ending January 31, 2009 (1)**

| | Wextrust Capital, LLC and Affiliates (2) | Wextrust Equity Partners, LLC and Affiliates (3) | Wextrust Development Group, LLC and Affiliates | Axela Hospitality, LLC and Affiliates (4) | Total For 4 Months Ending 01/31/09 |
|---|---|---|---|---|---|
| Total Effective Income | $ - | $ 7,348,369 | $ 32,600 | $ 203,813 | $ 7,584,782 |
| Total Operating Expenses | 581,578 | 2,743,613 | 177,075 | 186,463 | 3,688,729 |
| Net Operating Income | (581,578) | 4,604,756 | (144,475) | 17,350 | 3,896,053 |
| | | | | | |
| Non Operating Expenses: | | | | | |
| Debt Service - Interest | - | 2,754,809 | - | 62,000 | 2,816,809 |
| Debt Service - Principal | - | 334,648 | - | - | 334,648 |
| Capital Expenditures [5] | - | 193,214 | - | - | 193,214 |
| Tenant Improvements & Lease Commissions | - | 440,228 | - | - | 440,228 |
| Reserves | - | 72,588 | - | - | 72,588 |
| Other Non-Operating Expenses | - | 184,310 | - | - | 184,310 |
| Total Non-Operating Expenses | - | 3,979,797 | - | 62,000 | 4,041,797 |
| | | | | | |
| Net Cash Flow | $ (581,578) | $ 624,960 | $ (144,475) | $ (44,650) | $ (145,743) |

(1) - Does not include non-critical current or past due payments.
(2) - This includes WexTrust Securities, LLC, WexTrade Financial, LLC, the commodity and high-yield fund entities.
(3) - Includes Wextrust Equity Partners, LLC corporate entity and excludes approximately $400,000 of past due property taxes.
(4) - Includes net cash flow from third party managed hotel properties (Drake Oak Brook and CP Phoenix) in Total Effective Income.
(5) - Net of escrow draws available for capital expenditures.

As of September 30, 2008, Wextrust Entities and Wextrust Affiliates had approximately $22.1 million of cash in U.S. bank accounts identified by the Receiver to date. The net operating income ("NOI") for the Wextrust Entities on a combined basis is projected to be approximately $3.9 million over the four-month period. After debt service and other expenses, however, the combined entities are projected to have a negative net cash flow of approximately $146,000 for the four-month period. Each Wextrust Entity's projected cash flow over the period is set forth below.

Axela, including third party managed properties, is projected to generate NOI of approximately $17,000 over the four-month period and a negative net cash flow of approximately $45,000 after the swap payment for Drake Oak Brook. WEP is projected to generate approximately $4.6 million in NOI and is forecasted to generate net cash flow of approximately $600,000 after debt service and other cash usage over the four-month period.

Included in other cash usage are tenant improvement costs, capital expenditures, and reserves, which total approximately $900,000. Debt service includes principal payments on secured debt, which are projected to be $300,000 and interest of approximately $2.8 million. Wexford Development is projected to have a negative NOI and negative net cash flow of $145,000 over the four-month period, as no payments are projected for debt service and other cash usage. The other Wextrust entities are projected to have negative NOI and negative net cash flow of approximately $600,000 over the four-month period. The following items are included in the cash forecast of approximately: $283,000 of payroll; $63,000 in utilities; and $235,000 in other expenses, such as administrative costs, and payments of past due amounts.[43] No rent and debt service payments are projected in the four-month period.

As discussed in Section III.D.2, the Receiver has instituted a series of cost-cutting measures to mitigate negative cash flow. Those measures include termination of dozens of employees, resulting in a significant payroll reduction, and a reduction in operating expenses by closing the Baltimore, Hinsdale, and Atlanta offices. The Receiver and his advisors have negotiated payment plans for leases and necessary bills that have not been paid in months, such as cable television service and periodical subscriptions. The Receiver and his advisors have also renegotiated certain loan agreements and deferred capital expenditures and tenant improvements.

### 3. Property Valuations

#### a. Assets

The Receiver's real estate consultant, Hilco, has conducted a detailed, property-by-property analysis of the Wextrust real estate portfolio. In light of the current turmoil in the

---

[43] Wextrust Capital, Wextrust Securities, Wextrade Financial, the commodities and high yield funds have been grouped together in this analysis, because they have similar characteristics. None of these entities own real property, and the NOI reflects the cash surplus or deficit projected for the entity.

nation's credit markets, and the severe dislocation in the residential real estate market, Hilco's analysis is based on conservative assumptions. The valuation ranges are not included in this report. Based on the advice of Hilco, the Receiver has determined that public disclosure of the valuations would adversely impact the market for the properties.

Based on the initial assessment of the Receiver's advisors, the commercial real estate consists of: (1) properties that have no value for the Receiver's estate, (2) properties that have a positive valuation and, therefore, likely have equity for the receivership estate, and (3) properties where, for a variety of reasons, the positive valuation and equity value are in question. The portfolio of residential real estate at this point, given the serious distress in the wider real estate markets where these properties are located, provide less potential upside for the receivership estate. The receivership estate also controls three hotels. Each hotel is unique. Each hotel has potential value, but substantial challenges exist. The ongoing operation of hotels is difficult and can require substantial cash outlays.

### C. Disposition of Investor Funds and Extent of Commingling

The Receivership Order requires the Receiver to investigate the disposition of Wextrust investor funds, and the extent of commingling of funds between the Wextrust Entities and Wextrust Affiliates. With the assistance of receivership accountants, the Receiver has determined the amount of funds obtained from investors and the use of those funds. The Receiver has also begun a tracing analysis to determine the extent of commingling.

### 1. Disposition of Investor Funds

The Receiver has identified 74 Wextrust securities offerings, which raised a total of approximately $313 million. *See* Section I.B, *supra*. Of that total, approximately $222 million represents cash paid to Wextrust Securities, or to another Wextrust Entity or Wextrust Affiliate.

Of the remaining approximately $91 million, an as-yet-undetermined amount represents a combination of cash from investors and the reinvestment of investor funds.

The approximately $313 million in investor funds were used for various purposes, including asset purchases; loans to, and investments in, various companies (including the PAM Syndicate); commissions to Wextrust Securities; and Wextrust operating expenses. The receivership accountants have analyzed the proceeds of 33 securities offerings, totaling $181.3 million, or approximately 58% of the equity raised in dollar terms. As shown in Figure 3, below, of those offerings analyzed, approximately $62.9 million (35 percent) was used to purchase real estate, make capital investments, improvements or other investment related acquisitions; approximately $8.6 million (5 percent) was transferred to Wexford commodities accounts; approximately $23.6 million (13 percent) was transferred to the PAM Syndicate; approximately $17.6 million (10 percent) was paid to Wextrust Securities purportedly to cover overhead and pay commissions in connection with investor money raised; and approximately $68.6 million (38 percent) was transferred to other accounts not yet analyzed or used for other purposes.

**Figure 3: Uses of Proceeds of 33 Analyzed Offerings**



According to Wextrust records, approximately $45 million was paid in distributions to investors. That figure represents a combination of cash payments and reinvestments of distributions into either the same or different funds. The Receiver has not yet made a determination of the sub-total of distributions that were paid in cash. Receivership accountants are continuing to investigate and analyze the payment of distributions to Wextrust investors.

## 2. Extent of Commingling

Receivership accountants are conducting a tracing analysis to assist in the determination of the extent of commingling among Wextrust Entities and Wextrust Affiliates. To date, the Receiver's consultants have analyzed evidence associated with 33 securities offerings. The evidence includes internal Wextrust accounting records associated with approximately 70 bank accounts related to 46 offerings, bank records, a Wextrust investor database, and various other information, including interviews of Wextrust employees who were involved in funds management, investor relations and related activities. Due to the paucity of detailed records, the

accountants have analyzed varying time periods over the life cycle of the funds. Most of the funds analyzed to date have been assessed from the securities offering through to the purchase of an associated property, as it relates to real estate funds, and over a longer period as it relates to other funds.

Based on the Receiver's investigation to date, the commingling of funds was extensive in both duration and amount. From the first Wextrust securities offering, in approximately January 2003, through March 2005, Wextrust did not maintain separate accounts for investor funds raised in various offerings. Rather, the proceeds of those offerings were deposited directly into Wextrust operating accounts and commingled with other funds, including Wextrust working capital and the proceeds of other offerings. From March 2004 to March 2005, funds from dozens of investors and numerous securities offerings were deposited into a newly-created Wextrust Capital operating account, and operating expenses, commissions for brokers, and certain investor distributions were paid from it. Beginning in March 2005, Wextrust established separate bank accounts at Wachovia Bank in Norfolk and other financial institutions for various Wextrust Entities and Wextrust Affiliates. In general, the proceeds of securities offerings were initially deposited in accounts associated with the issuers.

Throughout the period from March 2005 to August 11, 2008, funds were frequently transferred among bank accounts of the various Wextrust Entities and Wextrust Affiliates. The Receiver has identified three principal types of commingling. In the first type, funds were transferred from the account of one Wextrust Affiliate to directly to another Wextrust Affiliate. In the second type, funds were transferred to the Wextrust Capital operating account, and those transfers were often (but not always) followed by a transfer in a like (or similar) amount to the account of another Wextrust Affiliate. In the third type, funds were transferred from a Wextrust

Affiliate to the Wextrust Capital operating account and then used to pay Wextrust Capital expenses.

**Figure 4: Commingling of Wextrust Funds**



For example, on April 23, 2007, $1 million was transferred from an account of WexTrade Diversified Futures Fund I, LLC at Wachovia to the Wextrust Capital operating account held at Wachovia. *See* A.572; A.573; A.575-88. On the same day, $963,000 was wired out of the Wextrust Capital operating account to Wextrust Affiliates unrelated to the Wextrust Diversified Futures Fund. Specifically, $800,000 was transferred to a Wachovia account of Block III Mines and Minerals, LLC (and $1 million was then wired from the Block III account to an account held in the name of Pure Africa and Minerals (Pty) Ltd. at ABSA Bank Limited in Johannesburg, South Africa). *See* A.589-90; A.591-97. Also, $163,000 was also transferred from the Wextrust Capital operating account to the Wachovia account of Wexford High Yield Fund LLC. *See*

A.579. Subsequently, on May 11, 2007, Wextrust Affiliates Skeleton Coast Bret Investors, LLC and Hinsdale Hamptons Mortgage Fund, LLC each made $500,000 transfers from their respective Wachovia accounts to the Wextrust Capital operating account held at Wachovia. *See* A.601; A.600-03; A.604; A.605-10. On the same day, $1,000,000 was transferred from the Wextrust Capital operating account to the Wexford Diversified Commodities Fund. *See* A.613.[44]

Notably, the vast majority of these funds transfers were executed prior to the satisfaction of escrow conditions imposed on the accounts into which proceeds were deposited. Pursuant to the PPMs, subscription agreements and other documents provided to investors, Wextrust was generally prohibited from using the proceeds of securities offerings before a minimum amount of securities were sold. For example, the PPM for Crowne-Phoenix Investors, LLC ("CP Investors") provided that:

> Prior to the initial closing of this Offering, all subscription proceeds will be held in a segregated escrow account. The Company [CP Investors] may not use funds received from subscribers until such time as subscriptions for Preferred Interests in an aggregate amount of at least $2,500,000 have been received and an initial closing occurs."

A.56.

---

[44] As discussed below, it is possible to interpret the various funds transfers described above as a loan from one Wextrust Affiliate (Wextrust Diversified Commodities Fund) to two other Wextrust Affiliates (Block III and High Yield), followed by the repayment of that loan by Skeleton Coast Bret Investors and Hinsdale Hamptons Mortgage Fund. However, the use of such tracing fictions has been criticized as analytically unsound. In the original Ponzi scheme case, *Cunningham v. Brown*, 265 U.S. 1, 44 S.Ct. 424, 68 L.Ed. 873 (1924), the Supreme Court held that "tracing" fictions should not be used to pursue individual recoveries when a fraud ensnares multiple victims whose funds are commingled. Instead, the Court held that all innocent victims should share equally in the recovered funds because equity demands equal treatment." *SEC v. Infinity Group Co.*, 226 Fed. App'x. at 218-219 (internal citations omitted). This principle enjoys near-universal acceptance, including in the Second Circuit, in which the court has found that, in a Ponzi "scheme, whether at any given moment a particular customer's assets are traceable is 'a result of the merely fortuitous fact that the defrauders spent the money of the other victims first.'" *SEC v. Credit Bancorp, Ltd.* 290 F.3d 80, 89 (2d Cir. 2002); *see also United States v. Real Property Located at 13328 and 13324 State Highway*, 89 F.3d 551, 553 (9th Cir. 1996) ("Instead of engaging in a tracing fiction, the equities demand that all Wymer's defrauded customer[s] share equally in the fund of pooled assets in accordance with the SEC plan."); *SEC v. Elliott*, 953 F.2d 1560, 1570 (11th Cir. 1992) (holding that it would not be equitable to allow some claimants who could trace their securities thanks to the mere fortuity that the wrongdoer had not yet used them); *United States v. Durham*, 86 F.3d at 73 (same). In the circumstances of this case, the use of tracing fictions would be complicated by the lack of internal controls and documentary support for such inter-company transactions.

The Receiver has been unable to confirm that proceeds of offerings transferred to other accounts were used in a manner consistent with the representations made to investors concerning the use of proceeds. For example, the PPM for CP Investors provides that the Manager, Crowne-Phoenix Managers, LLC, intends to use the proceeds substantially to purchase and renovate the Crowne-Plaza hotel. *See* A.59. Similarly, the CP Investors LLC agreement provides that the Company may not: (1) co-mingle its funds or assets with those of any other entity; (2) fail to pay its own liabilities and expenses out of its own funds and assets, (3) and make loans to any person or entity. *See* A.120-21.

The total proceeds of the 33 securities offerings analyzed to date were approximately $171 million, or approximately 55 percent of the total of approximately $313 million of Wextrust investments. With respect to the first type of commingling discussed above, direct transfers from one Wextrust Affiliate bank account to another, approximately $76.8 million was transferred directly from 22 Wextrust Affiliate bank accounts to non-related Wextrust Affiliate accounts; and approximately $63.3 million was received in Wextrust Affiliate accounts from non-related Wextrust Affiliate accounts. With respect to the second type, approximately $32.2 million was transferred from 30 Wextrust Affiliate accounts to the Wextrust Capital operating account, and approximately $65.2 million was transferred from the Wextrust Capital operating account to 30 Wextrust Affiliate accounts.

As discussed above, funds transferred in these two types of transactions were subsequently used for a variety of purposes, including the funding of real estate closings, payroll, and distributions. In one case, commingled funds were used to purchase a real estate asset before Wextrust Securities completed the securities offering that was intended to fund that purchase.

For example, on November 9, 2006, $4.75 million was wired from High Yield III to fund the purchase of Interstate Park. *See* A.614-17; A.618; A.619.

The tracing analysis described above is continuing. Based on the findings described above, it appears that the extent of commingling was extensive, pervasive and systematic. While it is possible to determine that funds from one Wextrust Affiliate account were moved to another Wextrust Affiliate account or the Wextrust Capital operating account, for many transactions there is insufficient information to determine the ultimate use of the funds. Employee emails and other documents would need to be searched and compiled to reconstruct the use of these funds, and it is uncertain whether these documents would provide sufficient detail to do so. Such a process would be lengthy and expensive. In addition, most of the Wextrust Affiliate accounts made transfers into the Wextrust Capital operating account, making it impossible to determine the actual use of a large portion of the investor funds, based on the constant turnover and an ever-changing balance in this account.

### D. Prevention of Further Dissipation of Assets

The Receivership Order requires the Receiver to prevent further dissipation, encumbrance or disposal of the property and assets of the Wextrust Entities and Wextrust Affiliates. Receivership Order at 4. As discussed above, the Receiver has taken possession and control of the Wextrust assets and property in the United States. The Receiver has also taken control of all known Wextrust accounts at banks and other financial institutions in the United States, as authorized by the Receivership Order. The Receiver has taken steps to prevent further dissipation of U.S. properties and assets, and to gain control of Wextrust interests in assets in foreign jurisdictions. Those activities are discussed in this section of the report.

1.      **Evidence of Further Dissipation**

Based on the Receiver's investigation, including an examination of bank records and Wextrust internal records, as well as extensive interviews, there has been no further dissipation of assets located in the United States since August 11, 2008. With the assistance of receivership accountants, the Receiver is continuing to take preliminary steps to locate assets that may have been conveyed to third parties or otherwise concealed, as provided by the Receivership Order. The Receiver has not been able to determine whether any further dissipation of assets located in foreign jurisdictions has occurred. Based on the facts and circumstances summarized below, there is reason to believe that Wextrust interests in South Africa and Namibia are at risk of further dissipation.

The Receiver has identified certain suspicious transactions executed prior to the commencement of this case. For example, on approximately August 1, 2008, Wachovia Bank froze numerous Wextrust bank accounts in response to a freeze notice from the Department of Justice and in anticipation of this Court's entry of an order freezing those assets. Based on the Receiver's investigation, between August 1, 2008 and August 11, 2008, defendant Joseph Shereshevsky directed his wife, Relief Defendant Elka Shereshevsky, to open an account at a branch of BB&T Bank in Norfolk in her own name. The opening deposits in the BB&T Account consisted of, *inter alia*, two checks designated as "loans" to ATM II, LLC, a Wextrust Affiliate that issued securities to fund African diamond mining ventures. Based on that information, the SEC filed an amended complaint, which added Elka Shereshevsky as a Relief Defendant, and applied for an order freezing all identifiable assets held in her name. On August 28, 2008, Elka Shereshevsky consented to that application, and the order was entered by the Court.

As discussed above, the Receiver has determined that, from May 2004 through August 2008, approximately $40 million in Wextrust investor funds was transferred from the United

States to members of the PAM Syndicate in Africa. A portion of the transferred funds was used to make investments in, and loans to, PAM Syndicate companies. For example, IDEX Mines & Minerals, LLC purportedly loaned PAM approximately $17 million dollars in connection with a mining venture. Substantial amounts of such funds appear to have been dissipated through payments of excessive compensation to PAM CEO van der Merwe and other PAM associates, and for other expenses. *See* A.813; A.814-15; A.816-18; A.819-20. The Receiver has reason to suspect that van der Merwe has attempted to dissipate Wextrust assets through such means as selling diamonds purportedly extracted from Wextrust mining operations, and has taken steps to conceal his dissipation of assets by liquidating PAM.

## 2. Steps to Prevent Further Dissipation in the United States

Exhibit B to the Receivership Order is a list of Wextrust Bank accounts in the United States, South Africa and Israel, which was prepared by the SEC and submitted in support of its application for emergency relief on August 11, 2008. The Receiver has taken control of all of those accounts, with the exception of accounts at banks in South Africa and Israel.[45] In addition, the Receiver has identified more than 250 bank accounts in the United States, and has taken steps to obtain exclusive control of those accounts. The Receiver has notified all known Wextrust financial institutions of the Court's orders in this case. Pursuant to the Receivership Order, the Receiver has established a cash management system to consolidate the numerous Wextrust bank accounts.

As noted above, Wextrust Entities and Wextrust Affiliates are defendants in numerous civil actions that were pending as of August 11, 2008. There were a variety of pending state and federal claims both by and against Wextrust Entities and Wextrust Affiliates as of the date of the

---

[45] Based on the information available to the Receiver, the accounts listed on Exhibit B to the Receivership Order do not have substantial balances. The Receiver has not identified any other Wextrust foreign bank accounts.

Receiver's appointment, including actions pending in Illinois, Tennessee, New Jersey, Florida, Louisiana, Indiana, and elsewhere. The claims primarily center on real estate transactions, but range from mechanic's liens and individual investor suits to foreclosures, breaches of contracts and leases, and bankruptcy proceedings. The Receiver and his advisors have negotiated with many of the plaintiffs in the pending proceedings to obtain stays and, where necessary, have taken steps to defend against the creditors' claims and avoid adverse judgments. *See* A.626-28

The Receivership Order prohibits any person with notice of the order from "filing . . . any lawsuits, liens, or encumbrances, or bankruptcy cases . . . to impact the property and assets" subject thereto. Nonetheless, a number of individuals and entities have either initiated or threatened legal proceedings against the Receiver and receivership estate. In most of the pending cases, the Receiver has obtained stays or voluntary dismissals pending the resolution of this action.

As discussed above, the Receiver has implemented internal controls to prevent unauthorized disbursements or other dissipation or disposal of Wextrust properties and assets. *See* Section III.A.2, *supra*. By means of such controls, the Receiver is carefully monitoring the continuing operations of Wextrust businesses and employees to prevent any further dissipation.

### 3. Steps to Prevent Further Dissipation in Foreign Jurisdictions

The Receiver has taken control of Wextrust operations in Israel. The operations of the Wextrust Securities office in Ramat Gan have been shut down, and all employees have been terminated. There are no significant Wextrust properties or assets in Israel.

The Receiver has taken extensive steps to prevent further dissipation, encumbrance and disposal of Wextrust assets and interests in Africa. Those efforts have been difficult, and have resulted in only limited success to date.

The Receivership Order authorizes the Receiver to "take all necessary steps to gain control of the Defendants' interests in assets in foreign jurisdictions," including a number of South African and Namibian companies listed in Exhibit A to the Receivership Order, which are members of the PAM Syndicate, as well as "funds maintained in accounts in foreign institutions," and to take "steps necessary to repatriate foreign assets." Receivership Order at 5. However, the Freeze Order applies only to assets "located within the territorial jurisdiction of the United States courts." Freeze Order at 3. Accordingly, the orders issued by this Court did not grant any extraterritorial authority for the Receiver to take control of Wextrust assets and interests in Africa[46] *See* A.716 at ¶ 5.5.

In light of the Receiver's lack of extraterritorial authority, and in an effort to avoid litigation, the Receiver's South African attorneys contacted PAM management on approximately August 13, 2008 and requested their cooperation. In response, van der Merwe and his associates agreed to provide information and assistance, and consented to the inspection and copying by the Receiver's agents of all books, records and documents related to Wextrust in their possession, custody or control. Simultaneously with the Receiver's efforts to obtain cooperation from van der Merwe and his associates, the Receiver sought to take control of the PAM Syndicate by exercising the corporate governance rights of the Wextrust Affiliates domiciled in the United States that own or control the PAM Syndicate entities. Accordingly, the Receiver appointed new directors to certain PAM Syndicate entities, and those directors demanded access to the

---

[46] *See e.g.*, RALPH E. CLARK, LAW AND PRACTICE OF RECEIVERS § 317 (3d ed. 1969); *Booth v. Clark*, 58 U.S. 322, 338 (1855) ("[A receiver] has no extra territorial power of official action; none which the court appointing him can confer, with authority to enable him to go into a foreign jurisdiction to take possession of . . . property . . . . "). Historically, South Africa has followed English law, which imposes "very strict limitations" on receivers appointed by foreign courts. *See* PHILLIP S. STENGER, RECEIVERSHIP SOURCEBOOK 57 (2d ed. 2006).

companies' books and records pursuant to their rights under South African law, and demanded an emergency board meeting.  A.691-92 ¶ 80.

On approximately August 20, 2008, van der Merwe withdrew his consent to the Receiver's inspection of Wextrust books and records.  Subsequently, van der Merwe and his associates engaged in a pattern of activities that obstructed the Receiver's efforts to gain control of Wextrust assets, interests and records in Africa, including agreeing to various meetings and then cancelling them on or shortly before the scheduled dates, raising frivolous and contradictory legal arguments in discussions and correspondence with the Receiver's counsel, and commencing, without notice to the Receiver, a liquidation proceeding against PAM.  In addition, the Receiver's continuing investigation revealed extensive evidence that van der Merwe and his associates had participated in the scheme to defraud Wextrust investors alleged in the complaint.  For example, van der Merwe misrepresented facts and made baseless and misleading statements to Wextrust investors.  As discussed above, Sybrand Hanekom, the PAM accountant, purported to act as a registered auditor and chartered accountant for PAM and other PAM Syndicate companies, despite having been disqualified from the practice of accounting in South Africa.  See A.679-82 at ¶¶ 62.1-63.6.

In response to the obstructive conduct of van der Merwe and his associates, and the emerging evidence of their participation in the alleged fraud, the Receiver commenced a legal action in the High Court of South Africa in Pretoria, seeking recognition of the Receiver's authority with respect to Wextrust Entities and Wextrust Affiliates domiciled in the United States which own and control companies in the PAM Syndicate.  On September 23, 2008, the Receiver filed a lengthy application for urgent relief, and sought an expedited hearing.  On September 30, 2008, the High Court denied the Receiver's request for an expedited hearing, and the matter was

struck from the urgent hearing roll. The case remains pending, and the Receiver requested that the Deputy Judge President of the High Court set a hearing date as soon as possible. On November 4, 2008, the High Court determined that, due to its heavy case load, it would not be able to entertain a hearing on the Receiver's application until April 28, 2009. [47]

As noted above, on September 11, 2008, Storm Technologies (Pty) Ltd., another PAM Syndicate company that is believed to be controlled by van der Merwe, filed a liquidation proceeding against PAM. On September 30, 2008, the directors of Pure Africa Holdings (Pty), Ltd. ("PAH") appointed by the Receiver held a directors meeting and demanded access to the books and records of PAH, to which they are entitled under South African law. Van der Merwe cancelled a meeting of the PAM board of directors previously scheduled for the same date, based on the pendency of the liquidation proceeding. On October 2, 2008, the High Court appointed a liquidator nominated by the Receiver as joint provisional liquidator of PAM. The Receiver intends to participate in creditors' meetings and other proceedings in that matter. *See* A.787 at ¶ 30.4 & 30.5. The Receiver continues to consult with U.S. and South African law enforcement authorities in an effort to prevent further dissipation of assets.

### E. Preservation of Books, Records and Documents

The Receivership Order requires the Receiver to "preserve the books, records, and documents" of the Wextrust Entities and Wextrust Affiliates, and authorizes the Receiver to take immediate possession and control of such evidence, and to make expenditures required to preserve the evidence. The Receiver has made forensically sound copies of all potentially

---

[47] South African High Court rules provide for urgent relief in certain circumstances, which are generally more limited that the procedures for emergency applications under the Federal Rules of Civil Procedure. In general, South African law does not provide for execution of foreign judgments or orders unless they are final and nonappealable. Accordingly, there is no legal basis for the Receiver to obtain *execution* of the Freeze Order or Receivership Order. However, South African law does provide for *recognition* of foreign judicial orders, such as the Court's orders in this action. The Receiver's application in the High Court seeks such recognition. *See* A.716.

relevant business records located in the principal Wextrust offices and other locations in the United States, and has secured additional records located in offsite storage facilities.

Beginning on August 11, 2008, the Receiver took possession of Wextrust offices throughout the United States and Israel. In Chicago and Norfolk, the Receiver's counsel coordinated their efforts with FBI agents who executed search warrants in those locations. The Receiver also took possession of the offices in New York, Nashville and Bethesda, Maryland, in which significant numbers of employees and documents were located. The Receiver's attorneys visited Wextrust offices in Atlanta and Boca Raton, Florida, which were small satellite offices that did not have significant evidence. The Receiver took possession of the Wextrust Securities office in Ramat Gan, Israel, and has closed that office. As discussed above, the Receiver has commenced litigation in South Africa in an effort to take possession and control of the PAM Syndicate offices and the evidence located therein. *See* Section III.D.3 *supra*.

With the assistance of Deloitte, the Receiver has collected and made forensically sound copies of substantially all Wextrust documents maintained on electronic media in the United States and Israel, including more than 150 desktop computers, more than 25 portable computers, 10 servers and various other electronic devices. The Receiver has collected and preserved hard copy documents from approximately 70 custodians in Wextrust offices in the United States and Israel. In addition, the Receiver has secured a substantial volume of documents located in offsite storage facilities.[48]

---

[48] Because a substantial amount of the books, records and documents of Wextrust are located in offices used for ongoing business operations, the Receiver determined that it was necessary to make forensically sound copies of those documents in order to prevent spoliation, establish a chain of custody and preserve the integrity of the evidence. *See* PHILLIP S. STENGER, RECEIVERSHIP SOURCEBOOK 82 (2d ed. 2006) ("The first thing a receiver must do is secure the records of the receivership estate so that he can identify assets, liabilities, potential causes of action and, perhaps most importantly, prevent the destruction or disbursement of vital records.")

### F.     Response to Investor Inquiries

The Receivership Order requires the Receiver to "be available to respond to investor inquiries."  Receivership Order at 4.  The Receiver has responded via email or telephone to more than 1,700 inquiries from the victims of the scheme alleged in the complaint, and has contacted and interviewed a total of 1,061 investors, or approximately 75 percent of the approximately 1,400 individual investors.  To facilitate communications with investors, the Receiver has established a toll-free telephone number and a dedicated email address.  The Receiver has provided information to investors in the form of letters and other content posted on the receivership website, www.wextrustreceiver.com.  Among the materials available on the website are court papers and transcripts in this action and the related criminal case, including this report; the Receiver's letters to investors; a fact sheet and other content explaining the receivership and related issues; links to the SEC and United States Attorney websites, and to websites established by Wextrust investor groups; and Hebrew translations of certain materials.

The Receiver has met in person, and personally communicated by telephone and email, with numerous investors, including more than 500 individuals who participated in a series of "town hall" meetings conducted in August and September 2008.

### G.     Bankruptcy Determination

The Receivership Order requires the Receiver to "determine if the Defendant Wextrust Entities and all entities they control or in which they have an ownership interest should undertake a bankruptcy filing."  The order also authorizes the Receiver, upon such a determination, to commence cases under the Bankruptcy Code on two days' notice to interested parties, and to prosecute such cases as a debtor in possession, carrying out the same fiduciary duties as a trustee, which is required of all debtors in possession.  Receivership Order at 10.

Working with Hilco, the Receiver has begun the process of determining the value of the receivership estate's assets, whether sales would result in a positive return to investors, and whether placing any of the Wextrust Entities or Wextrust Affiliates in bankruptcy would be in the best interests of investors and other parties in interest. However, at this point in time, it has not been determined that any particular Wextrust Entity or Wextrust Affiliate needs to be placed in bankruptcy.

**H.     Affirmative Claims Against Third Parties**

The Receivership Order authorizes the Receiver to investigate and pursue or defend claims in U.S. and foreign tribunals "to collect, conserve, or otherwise recover assets" of the Wextrust Entities and Wextrust Affiliates. In addition to pending claims against Wextrust and the South African litigation discussed above, the Receiver is evaluating potential claims against various third parties. Pursuant to the Receivership Order and the applicable billing guidelines, the Receiver must make a determination that affirmative litigation is likely to produce a net economic benefit to the receivership estate before proceeding. The Receiver is assessing such claims in consultation with the SEC.

**I.      Administrative Costs of the Receivership**

The Receivership Order provides that the Receiver and his advisors shall be paid from the assets of the receivership estate. All applications for reimbursement must be made by application to the Court in accordance with SEC billing guidelines for receivers. A hearing on any fee application may be held if requested by the SEC or ordered by the Court. The order provides that the Receiver and his advisors shall be paid on a monthly basis for the first six months of the case, and quarterly thereafter. To date, neither the Receiver nor any of his advisors have received any payment.

The administrative costs incurred by the receivership estate include the Receiver's fees, billed at $250 per hour, fees and expenses for attorneys, accountants and other professionals engaged by the Receiver, which are subject to substantial public service discounts, and expenses associated with the preservation of evidence and various other activities. The Receiver and receivership counsel Dewey & LeBoeuf will submit their first joint monthly application for allowance of compensation and reimbursement of expenses, reflecting expenses incurred from August 11, 2008 through August 31, 2008. That application will request interim approval of fees in the amount of approximately $62,000 for the Receiver, fees in the amount of approximately $2,270,000 for Dewey & LeBoeuf, and reimbursement of expenses in the amount of approximately $90,000. The Receiver expects that the level of professional fees and expenses will decrease significantly over time as the receivership estate is further stabilized.

## IV.    CONCLUSION AND RECOMMENDATIONS

Over the past 90 days, the Receiver has taken steps to "preserve the status quo while the various transactions are unraveled to obtain an accurate picture of what transpired." *Eberhard v. Marcu*, 530 F.3d at 131-32. The Receiver's analysis of the financial condition of the Wextrust Entities and Wextrust Affiliates, and the extent of commingling, should be substantially completed within the next 90 days.

The Receiver has marshaled the assets of the Wextrust Entities and Wextrust Affiliates in the United States. The Receiver's efforts to marshal the Wextrust assets in South Africa and Namibia are continuing, in consultation with the SEC.

In addition to marshalling the assets, "a primary purpose of appointing a receiver is to conserve the existing estate . . . and prevent the dissipation" of those assets. *Eberhard v. Marcu*, 530 F.3d at 131-32. The value of the receivership estate will be dissipated by the passage of time unless prompt and effective steps are taken to conserve the estate. Based on the nature of the

Wextrust assets, including hotels, office buildings, shopping centers, diamond mining ventures and various other properties, "ongoing management alone will drain money out of the estate, money that otherwise could be returned to investors." *SEC v. TLC Investments and Trade Co*., 147 F. Supp. 2d at 1036. In particular, the negative cash flow of the collective Wextrust enterprise will drain at least approximately $150,000 out of the estate over the next 90 days – in addition to the substantial administrative costs of the receivership – unless steps are taken to reduce the operating expenses of the enterprise.

The Receiver is preparing a plan to prevent such dissipation through an orderly disposition of the assets in the estate. On November 4, 2008, Hilco provided its valuation analysis of the Wextrust properties to the Receiver. Based on a preliminary review of that analysis and the cash flow forecast prepared by the receivership accountants, the market values of many of the Wextrust real estate assets are greater than their liabilities, and the properties are currently generating positive cash flow. The values of other properties are less than their liabilities, and the ongoing cost of managing those properties continues to drain assets out of the estate. The Receiver's plan of disposition will be designed to minimize the ongoing cost of managing the estate, and to maximize the value that can be realized from the assets, and ultimately returned to Wextrust investors. The plan will include a recommendation for each property in the estate, based on the valuation and characteristics of the property, and current market conditions.

The Receiver, in consultation with attorneys, accountants and experts, is considering a range of options for each property and asset in the estate. With respect to the real estate assets, those options include, *inter alia*, public or private sales of properties with significant equity value; continued operation or development of properties, where the cost of doing so is likely to

result in a net economic benefit to the estate; workout negotiations with lenders to reduce the operating costs of certain properties; and, in the case of properties with negative equity value and/or cash flow, relinquishment of the asset to the secured lender. With respect to the high-yield loans, commodities speculation funds and diamond mining interests, the Receiver is also considering a range of options, including sales to third parties, such as Wextrust investors who have expressed an interest in such assets. *See CBL*, 290 F.3d at 85-86 (discussing return of stock to victim in return for cash payment to receivership estate). In the course of the investigation of Wextrust, the Receiver has learned of numerous parties who are interested in purchasing estate assets, as well as various other potential transactions.

The Receiver is also assessing measures to enhance the value of the estate, including recovering funds through claims against third parties, in order to increase the amount of funds available for distribution. Such claims may include fraudulent conveyance actions against parties who received funds obtained from investors in Wextrust securities offerings. *See Eberhard v. Marcu*, 530 F.2d at 132-35 (discussing receiver's standing to pursue fraudulent conveyance claims).

The Receiver respectfully submits that it would be premature to propose a plan of distribution at this stage of the case. In order to ensure a fair distribution for victims of the alleged fraud, the Court, in the exercise of its broad equitable discretion, may consider such factors as the extent of distribution payments and repayments of principal to investors, the full extent and specific details of the commingling of funds among Wextrust Entities and Wextrust Affiliates, the feasibility of tracing assets to particular victims, and the characteristics of the various types of securities purchased by Wextrust investors. The Receiver respectfully submits that a proposed plan of distribution should be submitted only after the Court has had an

opportunity to consider the Receiver's plan for disposition of Wextrust properties and assets, and the results of the Receiver's further investigation of the relevant facts.

The Receiver will provide a further report within approximately the next 90 days, or at such other time as the Court may direct. The Receiver remains available to provide any further information or advice that the Court may require.

Dated: New York, New York,
November 7, 2008

Respectfully submitted,

TIMOTHY J. COLEMAN
Receiver for Wextrust Entities

DEWEY & LEBOEUF LLP
1301 Avenue of the Americas
New York, NY 10019-6092
Tel. (212) 259-8000

Attorneys for Receiver