UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SECURITIES AND EXCHANGE
COMMISION,

          Plaintiff,

          against

STEVEN BYERS, et al.,

          Defendants.

Case No. 08-CV-07104(DC)

DECLARATION OF LAWRENCE A. COSTA

Lawrence A. Costa, hereby declares, under penalties of perjury:

1.     I am a preferred member of, and the largest single investor in, Block III Mines & Minerals, LLC, a Virginia limited liability company ("Block III"). As explained below, I have been authorized to act as the representative of the preferred members (*i.e.* the investors and contributors of $11 million of capital) of Block III. I make this affidavit based on personal knowledge and in support of the motion of the preferred members of Block III to modify the Amended Order Appointing Temporary Receiver, dated September 11, 2008 (the "Amended Order"), insofar as the Amended Order places any limitations on the rights of the preferred members to replace Block III Managers, LLC (the "Current Manager") as the sole manager of Block III and as the "tax matters partner," in accordance with Block III's operating agreement.

2.     I have invested in approximately 20 different limited liability companies promoted by WexTrust Capital, LLC and WexTrust Securities, LLC (collectively "WexTrust"), including Block III. I invested $3 million of the $11 million invested in Block III.

3.     In connection with my investment in Block III and other WexTrust diamond mining operations, I had made several trips to South Africa, at which time I had the opportunity

to visit the mining sites and meet the various people responsible for running the mining operations, including the CEO and the CFO of their operations as well as certain mine managers.

4. Block III was formed to raise capital to invest in the Block III diamond mine in Namibia, Africa. The capital raised by Block III was to be loaned to DEVA Investments (Pty) Ltd., a Namibian corporation ("DEVA"). In exchange for making the loan to/and or investment in DEVA, Block III was issued 30% of the equity capital stock in DEVA. The other shareholders of DEVA included Pure Africa Minerals (Pty) Ltd, a South African corporation ("PAM"), Juno Investments, Inc., a Namibian corporation ("Juno") and RZT Investments, Ltd., a South African corporation ("RZT"). The internal affairs of DEVA are governed by a Shareholder's Agreement dated March 15, 2007, by and among PAM, Block III, RZT and Juno, a copy of which is attached to this Affidavit as Exhibit A, (the "DEVA Shareholders Agreement").

5. DEVA's right to operate Block III emanates from a certain Joint Venture Agreement dated March 1, 2007 between DEVA, as assignee of Pure Africa Holdings (Pty), Ltd., Boomriver Diamond Mining (Proprietary) Ltd and Namibian Former Robben Island Political Prisoners Trust ("Robben Island Trust"), which holds the Exclusive Prospecting License ("EPL") for the mining area known as "Block III" (the "Joint Venture Agreement"). A copy of the Joint Venture Agreement is attached as Exhibit B.

6. In connection with my investment in Block III and other WexTrust Africa diamond mines and my trips to the actual mining sites in Africa, I have come to understand the mining business. Except for certain equipment assets that may have actually been purchased, there are "no hard" assets owned by a mining business. In the case of the Block III mine, the Joint Venture Agreement gives the mine operator (i.e., DEVA) the right to operate the mine.

The Joint Venture Agreement requires 30% of the net income from operations to be paid to the Robben Island Trust, with the balance of the proceeds divided among the shareholders of DEVA. DEVA has numerous employees, including a mine manager, geologist, numerous workers to operate the equipment and certain technical engineers and certain workers to operate the equipment. In order for DEVA to be financially successful, it must find diamonds in sufficient quantity and quality to generate income in excess of the operating expenses of the mine. If the mine should not operate for any reason, DEVA's joint venture rights are subject to termination by the Robben Island Trust, in which case DEVA and its investors, including Block III, would have no opportunity to earn income, and there would likely be a total loss of Block III's investment. Because DEVA's equipment is located in a remote region, if the mine stops operating for any reason, the cost and expense of retrieving the equipment could make it not cost effective to even retrieve it. Based upon my communications with the Receiver, which are described below, the Receiver does not appear to have any understanding whatsoever as to how to operate a diamond mining business.

7. Since my initial investment in Block III and other WexTrust affiliated entities, I have been able to establish cordial working relationships with Michael van der Merwe and Thomas Lewis of DEVA and other persons in charge of the other mining operations in Southern Africa. At the time of the arrest of Joseph Shereshevsky and Steven Byers, I was advised by Messrs. Van der Merwe and Lewis that Mr. Shereshevsky had not fulfilled Block III's financial obligations to DEVA as only $4.4 million of the $11 million raised had been sent to Africa. Thus, DEVA was in imminent danger of having its joint venture mining license terminated by the Robben Island Trust. If that was to occur, the entire investment of Block III would be lost.

8. Upon learning of the grave circumstances of Block III and DEVA, I attempted to engage in a dialogue with Timothy Coleman, the Receiver, appointed by this Court. I met with Mr. Coleman for approximately 15 minutes while I was in South Africa in early September 2008, and I met with Mr. Coleman for approximately one half hour prior to his town hall meeting in Norfolk, Virginia on September 11, 2008. In my meetings with Mr. Coleman, I attempted to communicate to him the grave circumstances of Block III's investment and expressed a desire to figure out a plan to save this investment. In order to memorialize my conversations with Mr. Coleman and my proposed plan of action, I had my attorney, Thomas E. Snyder, write a letter to the Receiver dated September 15, 2008, a copy of which is attached as Exhibit C. We never received a response to this letter from Mr. Coleman.

9. I had advised the Receiver in my meeting of September 11, 2008 as well as in my letter of September 15, 2008, that I would like to have the opportunity to be in charge of the affairs of the Block III in exchange for making a working capital loan to DEVA to allow it to achieve its objectives and to save the investment which had been made by the preferred members of Block III. In order to achieve that, I had my attorney, Thomas E. Snyder, request the names, addresses and capital contribution amounts of the preferred members of Block III in an e-mail to Robin L. Moore, an attorney with Dewey & LeBoeuf, as well as in a letter to Mr. Coleman dated September 17, 2008, a copy of which is attached as Exhibit D. Under the terms of the Operating Agreement of Block III as well as under VA Code §13.1-1028, I am entitled, as an investor in Block III, to the information concerning the other investors.

10. On September 22, 2008, the Receiver responded to our request for information by providing us with a letter dated September 20, 2008 saying they were considering our request, and would get back to us. The Receiver's letter, dated September 20, 2008, is attached as

Exhibit E. My attorney responded immediately to the Receiver's letter and on September 22, 2008 advised the Receiver that we did not understand why he could not provide us with the information concerning the other investors that we had requested and made clear again why that information had been requested. We also again requested information on Mr. van der Merwe. A copy of my attorney's September 22, 2008 letter is attached as Exhibit F.

11. By a letter dated October 2, 2008, the Receiver's attorney, Leo Gagion, finally responded to my attorney's prior correspondence, which letter was received on October 3, 2008. A copy of Mr. Gagion's letter is attached as Exhibit G. In Mr. Gagion's letter, he stated that the Receiver considered my attempt to contact the other preferred investors in Block III to be contrary to the Amended Order, which allegedly forbids actions which would interfere with the Receiver's "taking control" of assets, and for that reason my attempting to contact the other preferred investors in Block III was an improper purpose. When I met with Mr. Coleman on September 11, 2008, I advised him and his assistants that I wanted to lend money and take control of Block III with the consent of the other preferred investors. Thus, the Receiver knew why I wanted to contact the other preferred investors from my first meetings with him. Mr. Gagion's letter of October 2, 2008 was the first time I was advised that the Receiver considered this to be an improper communication. I understand that Mr. Snyder and Mr. Gagion spoke on October 3, 2008 and Mr. Gagion had indicated he would get back to him the following week. When Mr. Snyder did not receive a response or a further phone call from Mr. Gagion, he responded to his October 2, 2008 correspondence with a letter dated October 13, 2008, a copy of which is attached as Exhibit H. As can be seen from all of my correspondence to the Receiver, I have tried to be open and transparent with the Receiver as to my objective, which is to save the investment that the preferred investors have made in Block III for their benefit.

5

12. When I had my meeting with Mr. Coleman on September 11, 2008, he advised me that it was his belief that Michael van der Merwe was a disreputable and dishonest person. Though I have asked him for information to corroborate his conclusion on several occasions, I have never been provided with any of that information. Though Messrs. van der Merwe and Lewis may have not cooperated with the Receiver, they have been extremely cooperative with me and have provided me with full access to the mining sites of DEVA as well as all employees, including general managers, geologists and other employees. They have further introduced me to the head of the Robben Island Trust, which has allowed us to forestall a termination of the Joint Venture Agreement. Most significantly, they are working actively and diligently (especially Mr. Lewis) to try to make the Block III mine a functional and operating mine. I cannot vouch for the integrity, honesty or competence of Mr. van der Merwe's actions prior to my getting personally involved with Block III. (Though I have requested information on Mr. van der Merwe several times, the Receiver has not provided any.) My understanding is that the Receiver does not have good working relations with any of the people whose cooperation is critical to preserving Block III's investment.

13. The Operating Agreement for Block III is attached as Exhibit I. Section 6.13 of Block III's operating agreement provides, in pertinent part:

> One or more of the Managers may be removed at any time with cause by the affirmative vote of Preferred Members holding at least 75% of the Preferred Interests.

The preferred members have been the sole source of funding for Block III. To the extent that any defendant in the pending litigation has any interest whatsoever in Block III, it is as a very small minority investor.

14. After considerable time and effort, and using my own personal resources, I located many of the preferred investors in Block III. Twenty-seven preferred investors, owning 88.60% of the preferred interest of Block III, have signed a Consent in Writing expressing the desire for the Receiver to no longer be in control of Block III and requesting a limited liability company owned by me to take control as the manager and tax matters partner of Block III. A copy of the list of all persons who have signed proxies is attached to this Affidavit as Exhibit J and copies of the executed proxy forms are attached as Exhibit K. Thus, the vast majority of persons who invested in Block III – who own a super majority (i.e., almost 89%) of the preferred interest ownership in Block III – would like to see a change in the manager in control of Block III.

15. At the time of the arrest of Messrs. Byers and Shereshevsky, I was advised that Robben Island Trust was going to terminate the Joint Venture Agreement if construction of the mine did not promptly commence, thus making time of the essence. When the Receiver showed no interest in discussing this situation in my meeting with him on September 11, 2008, (he did tell me I could make an offer to buy the mine), I determined if I did not act, Block III's $11 million investment would be lost. I was advised Mr. van der Merwe arranged for new equipment financing totaling $1.8 million. I agreed to lend to DEVA up to $1.2 million as a working capital loan. To date, the sum of $1,025,000 has been advanced by me to DEVA. Under the terms of my loan, I am to receive interest at the rate of 6% per annum. My loan will be repaid as a priority repayment if and when the mine becomes operational. The new equipment financing and the existing loans will be repaid in accordance with their terms. Thereafter, the loans made to DEVA by Block III, which I understand total $4.4 million, can be repaid and thereafter the distributions made to the other shareholders of DEVA, including Block III can occur.

16. Under this plan of reorganization, all new financing is provided by me or by vendors arranged by Mr. van der Merwe. Neither WexTrust nor any other person was requested to put up any money. All of the existing agreements remain as they were at the time the parties entered those agreements. Most importantly, none of the preferred investors' interest in Block III is diluted or reduced. I believe it is clear that this gives the preferred investors in Block III the only potential opportunity to recover their investment.

17. There remain numerous obstacles to make this investment successful: The Robben Island Trust could again attempt to terminate the joint venture; employing an efficient and productive work force remains problematic; finding competent management is a challenge; having the right equipment on site and maintaining it is a challenge; politics with the Namibian diamond ministry can become an issue; the worldwide price of (and demand for) diamonds must remain at a sufficient level in these uncertain economic times; and, of course, we must be able to recover a sufficient amount of diamonds to generate sufficient cash flow to pay operating expenses and allow for a return to the investors. The focus must be on the future, not the past, if Block III will be able to return anything to its investors.

18. Even if Block III is no longer under the control of the Receiver, it still can settle claims between it and other WexTrust entities.

WHEREFORE, the motion of the preferred members of Block III to modify the Amended Order, insofar as the Amended Order places any limitations on the rights of the preferred members to replace the Current Manager as the sole manager of Block III and as the "tax matters partner," in accordance with Block III's operating agreement, should be granted.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on November 12, 2008.

_____
Lawrence A. Costa

1303813v2