UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SECURITIES AND EXCHANGE
COMMISION,

Case No. 08-CV-07104(DC)

Plaintiff,

against

REPLY DECLARATION OF LAWRENCE P.
COSTA

STEVEN BYERS, et al.,

Defendants.

Lawrence P. Costa, hereby declares, under penalties of perjury:

1.     I submit this declaration in reply to the papers submitted in opposition to my
motion to modify the amended order appointing a temporary receiver, submitted by the Receiver
and by the SEC.   The opposition contains numerous points of misinformation, innuendo and
tries to establish "guilt by association," all of which is improper and, more important, fails to
respond substantively to my motion.

2.     As probably the single largest investor in the various WexTrust entities, I am a
*victim* of the fraud perpetrated by Messrs. Shereshevsky and Byers.   The papers submitted by the
Receiver and the SEC would lead one to think I had participated in the perpetration of the fraud
and my intentions and conduct have been to profit personally at the expense of the other
investors. Nothing could be further from the truth.   I am making this motion on behalf of the
investors of Block III Mines & Minerals, LLC ("Block III") owning more than 90% of the
preferred interests, at my sole personal expense and after I alone poured additional funds into the
mine to save it from extinction.   Had either the Receiver or the SEC had any questions or
concerns about my plan of action (or anything else) as it relates to reorganizing Block III or

saving its investment/loan in DEVA Investment (Pty) Ltd. ("DEVA"), they were free to discuss them with me. Contrary to what the Receiver states, however, he showed no interest at all in a business plan of action to save the Block III mine. This issue was discussed in my meeting with the Receiver in September 2008 in Norfolk, Virginia and was further addressed in my correspondence to him. For reasons unknown, he has never responded. Rather, if he follows his mandate to "secure and take control" of Block III's assets, and the result is the shutdown of DEVA's business, there will be nothing for the investors in Block III, and the interest that Byers and Shereshevsky had in Block III will be worthless, thereby providing no benefit to the larger group of investors.

3.      My plan of action was relatively simple: provide working capital to DEVA to allow it to have a diamond mine that has the potential to become functional, operational and profitable. This would serve as a basis not only to repay the investors in Block III, but also the investors in the other WexTrust entities who may have an interest in Pure Africa Minerals (Pty) Ltd. ("PAM"), which had an ownership interest in DEVA. (Since PAM is now in liquidation, it is not certain if PAM will benefit in any way.) I did not ask anyone else to put up funds, and did not seek any extraordinary benefits; I sought to assure only that the funds I have lent be secured. I did not request a modification of any existing agreement, the dilution of the interests of any of investors in Block III (or DEVA), or the modification of anyone's position as it relates to this investment. My focus has been to try to salvage the investment that not only I made, but all the other thirty-five investors made in Block III. That is why thirty investors owning over ninety percent (90%) of the preferred interests now support my action. (One more investor, Sheldon M. Rabinovici, voluntarily asked to join our effort since I originally filed my Motion, and he

provided me with a Consent in Writing, attached as Exhibit A. A revised list of preferred investors supporting our action is attached as Exhibit B.)

4.      As an investor in IDEX Mines & Minerals, LLC ("IDEX") and Block III, I traveled to Southern Africa to inspect the mining operations and sites. I have made three trips to South Africa and Namibia since Shereshevsky and Buyers were arrested. In these trips, I have become acquainted with DEVA's personnel on the ground, understanding their jobs and roles, and I have established a personal relationship with the head of the Robben Island Political Prisoners Trust, the joint venture partner of DEVA for the Block III mine. (See letter attached as Exhibit C.) At this time, I believe I understand the problems and challenges DEVA is facing in order to make the Block III mine successful. In addition, I have substantial experience owning and operating companies that employ several thousand employees, including a company known as Worldwide Language Resources, Inc. ("WWLR"). Several of these companies operate in hostile, harsh, austere and remote locations in foreign countries. I regularly work with foreign nationals in these places. In short, I have extensive experience managing companies and people and operating in places like Namibia and South Africa, where the interests of Block III lie.

5.      To the extent that the entity that I will have formed to manage Block III, Costa Manager, LLC, is able to effect cooperation between Mr. Van der Merwe and Mr. Lewis, as officers of DEVA, and the Receiver, or to provide records of DEVA to him, I will try to do so. I would note, however, that these entities are represented by independent legal counsel and I do not have control over them and their decisions. I have no reason not to provide any financial records which the Receiver desires. I would note, however, that through the Receiver's relationship with PAM's liquidators, he probably has access to the records he claims he has not seen. Furthermore, while the records may be helpful to sort out where my (and the other

3

investors') funds went, they are not relevant to either my motion or what needs to be done to make DEVA (and Block III's investment) a business success.

6.      Having said that, I have never done anything directly or indirectly to prevent the Receiver from receiving any records from PAM, IDEX, DEVA or Block III or any other entity. The Receiver's flimsy circumstantial assertions that I have obstructed him are completely false and meritless. Messrs. Van der Merwe and Lewis independently made the decision, without any input from me, as to how they would respond to the Receiver's request for records. I also never told Van der Merwe that I would support a termination of the Receivership or that I had any involvement with the hiring of legal counsel to oppose the Receiver. To suggest I had any involvement in the decision to not cooperate with the Receiver is not only false and unsubstantiated, but pure hogwash, particularly in light of my own efforts to meet and cooperate with the Receiver, which were rebuffed by him.

7.      The SEC's claims that I did not include in my initial papers that I am a Director of DEVA not only are wrong, but the implication that it somehow should defeat this motion is irrational.      It was included in Mr. Lewis' Declaration, which I submitted in support of my Motion. Thus, clearly I was not concealing that fact. More significantly, the Receiver had access to all of the corporate documents involving DEVA, and so advised me in my meeting of September 11, 2008. It is inconceivable the Receiver did not know that, as a consequence of my being the largest investor in Block III, I was appointed to the Board of Directors of DEVA. There was no need to state the obvious, and to imply I "concealed" this fact is intellectually dishonest.      It also is an irrational argument--my position on the Board of DEVA only helps the Block III investors.

4

8. I do not vouch for the integrity or veracity of Mr. Van der Merwe. It was my determination that if the investors in Block III were going to have any opportunity to recoup their investment, we could either work with Mr. Van der Merwe or we would simply have a complete loss. He has been and remains the Chief Executive Officer of DEVA; all of the employees in the diamond mine have relationships with him, report to him and are under his control; all of the suppliers and contractors know him and work with him; all of the relevant governmental officials have worked with him and know him; and the Robben Island Political Prisoners Trust (the holder of the Exclusive Prospecting License for Block III) knows and works with him. With the precarious position of the mine, my concern was (and remains) that if Mr. Van der Merwe was no longer there, prior to there being an actual working, functioning, cash flowing mine, it could result in the shut down of the operation. If the mine were to be shut down, DEVA's joint venture could be terminated by the Robben Island Political Prisoners Trust, and Block III's entire investment would be lost. When I met with the Receiver in Norfolk on September 11, 2008, I communicated this belief to him. At that time, the Receiver advised me that he believed that Mr. Van der Merwe was corrupt, dishonest and a crook, though he has never provided me with any corroborating evidence. (Even now the Receiver's conclusion of Mr. Van der Merwe's dishonesty appears to be more guilt by association than actual proof.) Even if the Receiver's conclusions and opinions concerning Mr. Van der Merwe were (are) true, as a practical matter, it did not affect the decision which had to be made if we were going to salvage Block III (i.e., work with Mr. Van der Merwe). In my view, the Receiver's approach to this is naïve and demonstrates his inexperience, particularly when it comes to analyzing and making business decisions. I believe he has a prosecutor's mentality, and he is not equipped to serve as the manager of any business enterprise.

5

9.      I did agree to loan DEVA the sum of $1.2 million to provide it with working capital. The copy of my loan agreement is attached to this Declaration as Exhibit D. This loan is secured by a security interest in all of the equipment owned by DEVA. If the mine is terminated for any reason, or if a creditor of DEVA should put it into liquidation, I will be repaid my loan out of the proceeds from the sale of this equipment. It is my belief that if DEVA does not become profitable and is liquidated, the investors in Block III and all other investors in DEVA will likely not receive anything for their investment. The only way that any investor in Block III will achieve anything is if this mine can achieve profitability. Regardless of what has happened on a historical basis, the Receiver's review of the books and records will not advance anything to achieve this real business goal and objective and does not bear at all on this motion.

10.      Another irrelevant point made by the Receiver is that I offered to purchase the assets of a company called Redlex 420 (Pty) Ltd ("Redlex"), which owns and leases diamond mining equipment, after I was advised it had been put in liquidation, and its assets were in the process of being sold. My offer to purchase such assets was made in a manner consistent with the customs for liquidations in South Africa, and there was nothing unlawful about it. Furthermore, contrary to the Receiver's suggestion, I am aware of no duty that required me to advise the Receiver that I was trying to acquire assets from a liquidator of a South African company. While the Receiver alleges that I tried to buy the equipment at far below market prices, in truth, the equipment is located in remote locations, its condition is questionable, there were no auction fees to the liquidator and I was buying everything sight unseen. Redlex's assets are going to be sold whether I purchase them or not. I would note that I had nothing to do with putting either PAM or Redlex, or any other entities, into liquidation. I am aware of nothing preventing me from making an offer, at arms-length, to purchase Redlex's assets, which can

either be accepted or rejected by the liquidator. The Receiver's implication that I have acted improperly is not only ridiculous and irrelevant, but is clearly intended to impugn me personally. I would note if I am able to acquire equipment which could be useful for DEVA's operation of the Block III mine, this would be helpful for its long term operational abilities.

11. From my perspective and the perspective of the other investors in Block III, the Receiver adds nothing to what we are trying to do. DEVA remains a precarious business operation and we have to deal with the cards with which we have been dealt, including the people who are in place to try and turn this into a successfully operating business. If we are successful , it will be a win-win situation, not just for the investors in Block III, but for other WexTrust investors, whose funds may have gone into Block III. (The SEC's original affidavits filed in this case establish that the investments in Block III did not all go to Africa, and, to the extent that they have gone into other WexTrust entities, the Block III investors also are owed funds from those entities as well.) Just because Block III no longer is subject to the control of the manager originally set up by the defendants, as now run by the Receiver, does not mean it cannot be subject to claims made by other WexTrust entities, or itself have a claim against other WexTrust entities. It would be my intention to work such matters out in a fair and equitable manner.

12. It appears that the Receiver really wants to keep Block III under his Receivership because it may be a source of potential funds to pay his fees and costs. Based on his initial fee application, it appears that those numbers are going to be so large that the only one who would benefit at all from any of the WexTrust entities will be the Receiver. To me and to other investors of Block III, the Receiver's fees and costs thus far are outrageous. The investors in Block III do not want to be subject to the Receiver's control, delays or inattention. Let the

Receiver do a forensic accounting and tell us what happened to our money. Let the Block III investors, however, be free from a process and procedure which adds no value, but only costs.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on December 4 2008.

Lawrence P. Costa

1307579v2