**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

SECURITIES AND EXCHANGE
COMMISSION,

                Plaintiff,

          - against -

STEVEN BYERS, JOSEPH SHERESHEVSKY,
WEXTRUST CAPITAL, LLC, WEXTRUST
EQUITY PARTNERS, LLC, WEXTRUST
DEVELOPMENT GROUP, LLC, WEXTRUST
SECURITIES, LLC, and AXELA
HOSPITALITY,
LLC,

                Defendants,

          - and -

ELKA SHERESHEVSKY,

                Relief Defendant.

08 Civ. 7104 (DC)

ECF Case

---

## THE RECEIVER'S MEMORANDUM OF LAW IN OPPOSITION TO THE PROPOSED INTERVENING DEFENDANTS' MOTION TO INTERVENE

TIMOTHY J. COLEMAN
Receiver for WexTrust
Entities

DEWEY & LEBOEUF LLP
1301 Avenue of the Americas
New York, NY 10019-6092
Tel. (212) 259-8000

Attorneys for Receiver

December 19, 2008

**Table of Contents**

I.    INTRODUCTION.............................................................................................. 1

II.   STATEMENT OF FACTS................................................................................. 3

     A.   THE OFFERINGS. ................................................................................ 3

     B.   FUND MANAGEMENT. ....................................................................... 4

     C.   INVESTMENT. ...................................................................................... 5

     D.   THE APPOINTMENT OF A RECEIVER............................................. 6

     E.   COMMINGLING OF MONEY IN THE FUNDS ................................. 8

     F.   RECEIVER'S PLAN. ........................................................................... 14

III.  ARGUMENT.................................................................................................. 14

     A.   LEGAL STANDARD. .......................................................................... 14

     B.   THE COMMODITY INVESTORS' RIGHTS ARE NOT IMPAIRED............... 16

     C.   THE SEC AND THE RECEIVER ARE ADEQUATELY PROTECTING ALL
          INVESTORS.......................................................................................... 20

     D.   ALLOWING THE COMMODITY INVESTORS TO INTERVENE IN THIS
          MATTER WOULD IMPOSE A DISPROPORTIONATE BURDEN ON OTHER
          INVESTORS.......................................................................................... 21

     E.   TAGLIAFERRO & LOPRESTI AND HENDERSON & LYMAN LIKELY
          SHOULD BE DISQUALIFIED. .......................................................... 22

IV.   CONCLUSION .............................................................................................. 25

Timothy J. Coleman (the "Receiver"), Receiver for WexTrust Capital, LLC; WexTrust Equity Partners, LLC; Wexford Development, LLC (a/k/a WexTrust Development Group, LLC); WexTrust Securities, LLC; and Axela Hospitality, LLC (collectively, the "WexTrust Entities") respectfully submits this opposition to the Proposed Intervening Defendants' ("Commodity Investors")[1] Motion to Intervene pursuant to Rules 24(a) and (b) of the Federal Rules of Civil Procedure (Dkt. No. 145).

## I.      INTRODUCTION

Although they admit that their funds have been inextricably intermingled with those of other innocent victims of the WexTrust Ponzi scheme (through a series of unauthorized "loans"), the Commodity Investors seek to intervene in this matter to ensure that they lose *less* than other victims of the same fraud. The Commodity Investors base their request on the flawed premise that their funds should never have been part of the receivership. They further argue that, because the Receiver may use their funds for receivership expenses, they must intervene to protect their assets. The Commodity Investors' arguments fail for at least five independent reasons.

***First,*** the Commodity Investors' interests will not be impaired. The Commodity Funds are properly within the receivership.[2] Given the nature and extent of commingling in the Commodity Funds identified to date, which is far more extensive than that identified by the Commodity Investors' counsel, the Commodity Investors no longer have an interest in segregated funds—because there *are* no segregated funds and never were any. Accordingly, it

---

[1]      The Commodities Investors are identified as Timothy M. Holmes Revocable Trust, Larry Costa, Kristine Szabo, Stanley Simpson, Andrew Campbell, James D. Leckinger, Avraham Hochman, and Karen Polter.

[2]      The Commodity Funds consist of four funds: the WexTrade Principal Protected Fund I, LLC ("WPP Fund"), WexTrade Diversified Futures Fund I, LLC ("WDF Fund"), WexTrade Principal Offshore Fund I, Ltd. ("WPO Fund"), and WexTrade Diversified Offshore Futures Fund I, Ltd. ("WDOF Fund"). (*See* Declaration of Vincent Paul Schmeltz III ("Schmeltz Decl.") at ¶ 4).

will not impair their interests for the Receiver to handle their funds in the same manner as those of other WexTrust victims.

*Second,* the Commodity Investors' legitimate interest in this matter—minimizing the loss they suffered from the fraud alleged in the criminal and civil cases—is well protected by the Receiver and the Securities and Exchange Commission. *Third,* the Commodity Investors will be afforded an opportunity to be heard when the Court determines a plan of distribution—they need not be allowed to interfere with administration of the receivership estate at this stage in order to protect their rights. *Fourth,* allowing the Commodity Investors to participate in this matter would unnecessarily increase the complexity of this case and impose disproportionately greater burdens on non-Commodity Funds investors who would have to bear the costs of additional litigation. *Fifth,* the Commodity Investors should be denied an opportunity to intervene because their counsel—Henderson & Lyman and Tagliaferro & LoPresti—have used confidential information that Henderson & Lyman obtained in a substantially related matter (purportedly for the receivership) in an action adverse to the Receiver.

Ultimately, as the Court emphasized in its December 17, 2008 Order Denying the International Ad-Hoc Committee of WexTrust Creditors' Motion to Modify the Receivership Order (Dkt. No. 148), "[t]he Receiver is charged with protecting the investors as a whole, and the best way to maintain the status quo is to permit him to carry on with his investigation." (December 17 Order at 7-8.) Similarly, in its November 25, 2008 Order Denying G&H Parnters AG's Motion to Intervene (Dkt. No. 112), the Court stated that, "[a]s a practical matter, it does not make sense to allow individual victims and creditors to intervene as parties. There are allegedly 1,400 victims who invested in approximately sixty securities offerings that raised more than $250 million. There are dozens of creditors with divergent claims and interests. There is a

complex web of some 120 WexTrust entities and affiliates operating throughout the world. In these circumstances, it would not be efficient or effective to permit individual creditors to intervene as parties." (Nov. 25 Order at 2.) Because the Commodity Investors are in the same position as all other WexTrust investors, the same reasoning should apply here—and intervention should be likewise denied.

## II.   <u>STATEMENT OF FACTS</u>

### A.   THE OFFERINGS.

In September and October 2006, WexTrust Securities, LLC ("WexTrust Securities") conducted offerings of interests in two Commodity Funds—the WPP Fund and the WDF Fund. (Riley Decl., ¶ 15a; Adrian Decl., ¶ 3.) In June 2007, WexTrust Securities offered similar investments to non-U.S. investors in the WPO Fund and the WDOF Fund.[3] (Riley Decl., ¶ 15b.) WexTrust Securities was to receive commissions of up to 3% of the equity that it raised. (Adrian Decl., ¶ 4.) Initially, WexTrust Securities was the sole designated Selling Agent for the Commodity Funds. (*Id.* at ¶ 5.) In July 2008, WexTrust Capital also entered into an agreement with third-party Brewer Financial to sell the Commodity Funds. (*Id.*) The offerings for the four Commodity Funds (or, as referred to in the Private Placement Memoranda ("PPM"), "Companies") raised approximately $17 million. (*Id.* at ¶ 6.)[4]

Investors executed subscription documents (i.e. an application to invest in the Commodity Funds, including an Investor Suitability Questionnaire, an Anti-Money Laundering

---

[3]     Originally, the name of the Commodity Funds was "Wexford," not "WexTrade." On March 1, 2008, supplements to each Fund's PPM were filed changing the name to "WexTrade." (Riley Decl., ¶ 15c.)

[4]     The raise for each individual fund is, approximately, as follows: $3,380,000.00 for the WPP Fund, $11,817,022.21 for the WDF Fund, $325,000.00 for the Wexford Principal Offshore Fund, and $1,422,475.00 for the Wexford Diversified Offshore Fund. (Sordillo Decl., ¶ 10.)

Questionnaire and registration information) and an LLC Agreement. (Riley Decl., ¶ 15d; (Adrian Decl., ¶ 7.) Before the Commodity Funds began trading, individuals who WCM accepted provided money to WexTrust Securities that was held by the Escrow Agent – Wachovia, a third-party bank. (Riley Decl., ¶ 15e; Adrian Decl., ¶ 8.)

The PPMs for WDF Fund and WPP Fund specifically held that:

> Subscription proceeds will be promptly forwarded to a third-party bank (the "Escrow Agent") and the funds accompanying the subscription will be held in federally insured bank accounts (e.g., money market deposit accounts), short-term certificates of deposit, short-term government securities and other investments permitted under Rule 15c2-4 of the Securities Exchange Act of 1934, as amended, pending completion of the Offering.[5]

(Riley Decl., ¶ 15f.)

While in escrow, the Commodity Funds were to provide investors an 8% per annum return on their investment. (Riley Decl., ¶ 15h.) In addition, WexTrust Securities was to ensure that these funds were not used for ***any purpose*** while in escrow. *See* SEC Rule 15c2-4.

## B.    FUND MANAGEMENT.

On September 3, 2007, after WexTrust Securities raised a combined total of $8 million in equity, the Commodity Funds were released to WexTrade Commodity Managers LLC ("WCM") for trading. (Adrian Decl., ¶¶ 9, 10.) WCM is a Delaware limited liability company and a Commodity Pool Operator ("CPO") registered with the Commodity Futures Trading Commission ("CFTC") and a member of the National Futures Association[6] ("NFA"). (Riley Decl., ¶ 15l.; Adrian Decl., ¶ 13.) WCM managed the Commodity Funds. (Adrian Decl., ¶ 12; Riley Decl., ¶ 15i.)

---

[5]    This language is not included in the PPMs for the Offshore Funds.

[6]    The National Futures Association (NFA) is the industrywide, self-regulatory organization for the U.S. futures industry.

In fact, management and operation of the WDF Fund and the WPP Fund is placed solely within the power of WCM, as Manager. (Riley Decl., ¶ 15j.) As Section 7.01 of the LLC Agreements state:

> The management and control of the conduct and operation of the Company and its business shall be vested exclusively in the Manager. Except as otherwise specifically limited in this Agreement, or under applicable law, the Manger shall: (i) manage the affairs and business of the Company; (ii) exercise the authority and powers granted to the Company; and (iii) otherwise act in all other matters on behalf of the Company. The Manager shall take all actions which shall be necessary or appropriate to accomplish the Company's purposes in accordance with the terms of this Agreement.

(Riley Decl., ¶ 15k.)

In turn, WexTrust Capital, LLC ("WexTrust Capital") managed WCM. (Riley Decl., ¶ 15m; Adrian Decl., ¶ 13.) Under the LLC Agreement for WCM, "[t]he Member, which is also the manager of the Company, has the exclusive right to manage the Company's business." (Riley Decl., ¶ 15n.) The Member of WCM is WexTrust Capital. (*Id.*).

## C. INVESTMENT.

The Commodity Funds traded collectively through a "master-feeder" structure. (Riley Decl., ¶ 15o; Adrian Decl., ¶ 10.) WCM allocated, for trading, a certain percentage of the offering proceeds of each Fund. (*Id.*; Riley Decl., ¶ 15p.) Those funds were fed up to a "master fund," known as WexTrade Master Fund I, Ltd. ("Master Fund"). (Riley Decl., ¶ 15q; Adrian Decl., ¶ 10.) WCM then apportioned the money held in the Master Fund to individual Commodity Trading Advisors ("CTAs"), who speculated in commodity futures, including energy, metals, grains, and meats; U.S. currency and foreign exchange; interest rate related products; and global equity indices. (Riley Decl., ¶ 15r; Adrian Decl., ¶ 10.) WCM monitored the performance of the CTAs and made decisions about the risk of the portfolios on a daily basis. (Adrian Decl., ¶ 12.)

Due to the leveraged nature of commodity trading, WCM transferred offering proceeds to the Master Fund that met the acceptable margin requirements for Fortis Clearing America's LLC (Fortis), a Futures Commission Merchant. (Adrian Decl., ¶ 11.) The proceeds that were not transferred remained in interest bearing accounts. (*Id.*) While the Commodity Funds were actively traded, WCM allocated proceeds from each of the Commodity Funds as follows: $298,099.30 of $3,380,000.00 for the WPP Fund; $2,935,190.70 of $11,817,022.21 for the WDF Fund; $52,878.09 of $325,000.00 for the WPO Fund; and $491,222.67 of $1,422,475.00 for the WDOF Fund.[7] (Riley Decl., Ex. H; Sordillo Decl., ¶ 10.) The make up of the Master Fund (i.e. the proportion of funds transferred from each Fund into the Master Fund) was decided by WCM. (Riley Decl., ¶ 22.)

### D. THE APPOINTMENT OF A RECEIVER.

The Receiver was appointed temporary receiver to the WexTrust Entities pursuant to the Court's August 11, 2008 Order Appointing Temporary Receiver (Dkt. No. 2). This order was subsequently amended by the Amended Order Appointing Temporary Receiver ("Receivership Order") (Dkt. No. 36), which was specifically incorporated by reference as Exhibit D to the Court's October 24, 2008 Order on Consent Imposing Preliminary Injunction (Dkt. No. 65).

Specifically, the Court granted the Receiver authority over "the Defendant Wextrust Entities and all entities they control or in which they have an ownership interest, including but not limited to, those entities listed on Exhibit A . . . ." Receivership Order at 3. Exhibit A[8] includes each of the Commodity Funds. At the time the Receiver was first appointed, Fortis

---

[7]     The process by which WCM and its consultant, NAV Consulting, apportioned money from each Feeder Fund to the Master Fund is set forth in detail in ¶¶ 21-24 of the Declaration of Nancy Riley. We have provided this detail to show the extensive control WCM had over the Commodity Funds.

[8]     Exhibit A was subsequently incorporated by reference as Exhibit A to the Court's October 24, 2008 Order on Consent Imposing Preliminary Injunction (Dkt. No. 65)

notified Paul Adrian, the former Manager of WCM, that it should liquidate all trading positions in the Commodity Funds and that the CTAs should cease initiating new positions. (Adrian Decl., ¶ 14.) Furthermore, the Receiver worked with banking institutions and clearing firms to freeze all of the Commodity Funds assets.[9] (Schmeltz Decl., ¶ 5.)

Throughout the course of the Receivership, the Receiver has worked with the National Futures Association to: (1) ascertain the state of the Commodity Funds; (2) determine the extent, if any, the Commodity Funds were involved in the alleged Ponzi scheme; and (3) to locate and secure all of the offering proceeds. (Schmeltz Decl., ¶ 7.) The NFA came to WexTrust's Chicago Office on August 12, 2008, to begin a nearly two-month audit of the Commodity Funds. (Schmeltz Decl., ¶ 8.) In addition, the CFTC's Division of Enforcement ("CFTC Division of Enforcement") contacted counsel for the Receiver on August 13, 2008. (Schmeltz Decl., ¶ 9.) Since then, the CFTC Division of Enforcement, the NFA, and the Receiver's counsel have been in regular contact, and the Receiver's counsel has provided these agencies with all of the documents and information they have requested. (Schmeltz Decl., ¶ 10.)

Furthermore, Paul Adrian, the Manager of WCM, hired the Henderson & Lyman law firm (one of the firms representing the Commodity Investors) to represent him personally.[10] Henderson & Lyman assisted Mr. Adrian with the NFA audit and in doing so they conducted an independent investigation into the disposition of the Commodity Funds. (Adrian Decl., ¶ 16.) During the course of the receivership, Mr. Adrian provided Henderson & Lyman with certain

---

[9] Avidus, a clearing firm for the Commodity Funds, still is holding approximately $33,000. The Receiver is taking steps to recover these funds as well. (Schmeltz Decl., ¶ 6.)

[10] Henderson & Lyman is the law firm that WCM had previously hired to assist in setting up the Offshore Funds. (Adrian Decl., ¶ 18.)

documents of WCM and the Commodity Funds, as such documents were requested by the NFA. (*Id.* at ¶ 17.) Henderson & Lyman sought to be paid by the receivership for its efforts on behalf of Mr. Adrian *and WexTrust*. (Riley Decl., ¶¶ 26-31.)

## E.    COMMINGLING OF MONEY IN THE FUNDS

The Receiver has engaged Deloitte Financial Advisory Services, LLP ("Deloitte FAS") to perform several analyses, including analyzing the cash flow for each Fund—both prior to and after escrow was broken and the Commodity Funds began to trade. John Sordillo has led the engagement for Deloitte FAS, including its tracing of commingling in the WDF and WPP Funds. Mr. Sordillo's qualifications are set forth in his Declaration, which we have filed simultaneously, as is Deloitte FAS's methodology for performing this work. (Sordillo Decl., ¶¶ 1-10.) Mr. Sordillo has concluded that the funds were irreparably commingled with the proceeds invested in WexTrust projects with no relationship to the Commodity Funds. (Sordillo Decl., ¶ 25.)

### 1.    Commingling in the Diversified Futures Fund

After the WDF Fund began raising money, the second investor to put money into the WDF Fund was Larry Costa, an individual investor who has sought to intervene in this case.[11] Mr. Costa was already a WexTrust investor, in High Yield Fund I ("WHYF I"). Sometime prior to January 10, 2007, Mr. Costa sought to invest $400,000 in the WDF Fund. He requested that the funds be transferred from WHYF I to the WDF Account.[12] At that time, however, the balance in the WHYF I account was only $156,711.17, which was insufficient to make Mr. Costa's requested investment into the WDF Fund. To facilitate the requested transfer, WexTrust

---

[11]    The entire discussion of commingling is set forth in Mr. Sordillo's Declaration in paragraphs 11-25. To maintain an easy to follow narrative, we have omitted further citation in this discussion.

[12]    The WDF Fund Escrow Account consists of both account 2577 and account 2564. However, for ease or reference, these accounts will be referred to as "WDF" or the "WDF Account."

used money from a $600,000 transfer that occurred on January 5, 2007, from an account belonging to West 82nd Street (another WexTrust Fund in which Mr. Costa was not an investor), into a WexTrust Capital Account. Subsequently, on January 10, 2007, $400,000 of the West 82nd Street money was moved to the WHYF I account and, from there, into the WDF Account on Mr. Costa's behalf. In short, Mr. Costa's investment in the WDF Fund is not an investment of his own money.

Following the first instance of commingled money entering the WDF Fund, a subsequent investment occurred that resulted in more commingled funds entering the WDF Fund. On July 2, 2007, August Fowler (another investor) made a series of deposits with WexTrust, totaling $200,000, which went into the main WexTrust operating account at Wachovia bank, designated "the 8459 Account." He designated $100,000 for investment in the WDF Fund. The balance in the 8459 Account just prior to the time of Mr. Fowler's deposits was approximately $74,600. As a result of the preexisting balance in the 8459 Account it is not possible to determine which money—Mr. Fowler's deposit or the $74,600 already in the account—is being used for the $100,000 investment by Mr. Fowler in the WDF Fund. We have not identified where the $74,600 that had been in the account came from.

In addition to receiving investments of money that came from commingled sources prior to the point when trading began in the WDF Account, WDF Fund received commingled funds after the Fund began trading. For example, on October 29, 2007, about a month and a half after the WDF Fund began trading, $37,000 was transferred into the WDF Account from WexTrust Capital Account 8459 on behalf of James Newsome. The funds in the 8459 Account on that day consisted of: 1) an existing balance of approximately $78,000 from unknown sources; 2) $100,000 that had been transferred from a 47 Dean Street account (another WexTrust entity in

9

which Newsome did not own an interest); and 3) $625,000 from a variety of other sources. After these deposits were made on October 29, 2007, Mr. Newsome's requested $37,000 investment was executed from the 8459 Account into the WDF Fund. The funds that were transferred into WDF ultimately came from these significant deposits that were commingled in the 8459 Account, none of which related to Mr. Newsome.

One additional observation with respect to the money that James Newsome was investing in the WDF Fund is that he was not intending to invest new money in the WDF Fund. Rather, he appears to have intended to invest the returns from his investments in other WexTrust Funds, such as Gold Coast Investors, Grant Street Investors, West Bearden Investors and First Wyoming Investors. Mr. Newsome may have believed that his returns from these investments were then being accumulated in another WexTrust investment vehicle, the Guaranteed Depositary Receipt, or GDR Fund. It appears that Mr. Newsome was then attempting to invest the returns that had "accumulated" in his GDR Account in the WDF Fund—but, as the analysis above demonstrates, his investment came from a commingled bank account made up of multiple investors' funds, not from a segregated account with his money in it.

Some time later, Mr. Newsome sought to add to his investment in the WDF Fund by transferring $27,000 from his GDR account to WDF. However, this requested transfer into the WDF Fund did not come from GDR, either. Instead, WexTrust made a series of transfers in order to obtain the required funds for the transfer. On March 31, 2008, the day the transfer took place on Mr. Newsome's behalf, the 8459 Account did not initially have sufficient funds to wire the transfer, so money was first moved from CP Phoenix Investors account 3788 (another WexTrust project) into the 8459 Account. The money that was moved from the CP Phoenix Investors account can be traced directly to a deposit in the amount of $55,000 by another

investor in CP Phoenix unrelated to James Newsome. In fact, prior to this investor's deposit (on March 25, 2008), the balance in the CP Phoenix account was only $2,608.04. After the $55,000 deposit, the only other material transaction was the $27,000 transfer from the CP Phoenix account to the 8459 Account on March 31, 2008. Finally, that same day, WexTrust moved $27,000 from the 8459 Account to the WDF Account on Mr. Newsome's behalf. In other words, it is clear from this analysis that Mr. Newsome's investment in the WDF Fund was really money from an investor in CP Phoenix.

Funds also were used from the WDF Fund for purposes other than commodity investments. For example, amounts were transferred out of the WDF Fund Account for things such as Managed Funds Association conference registration fees for Steve Byers and Paul Adrian ($6,539.00 on February 2, 2007) and legal fees ($39,403.41 on March 21, 2007) (there are least half a dozen additional examples of these types of transfers). These amounts were ultimately paid back through transfers from the 8459 Account with money commingled from various sources.

WDF Fund money also was used in much more significant dollar amounts for purposes unrelated to those for which the funds were raised. For example, on April 23, 2007, Joseph Shereshevsky sent an email to Sheran Gabriel instructing her to transfer $1,000,000 from the WDF Fund Account into the 8459 Account. The balance in the 8459 Account just prior to the $1,000,000 transfer was $56,470.98. Immediately following this transfer, WexTrust made two transfers out of the 8459 Account. One, in the amount of $163,000, went to WHYF I. The second, for $800,000, went to Block III Mines & Minerals (another WexTrust entity) for investment in Pure Africa Holdings, (Pty) Ltd. These funds were returned to the WDF Fund Account on May 11, 2007, in two transfers: 1) a $500,000 transfer from Skeleton Coast Bret

Investors, LLC ("Skeleton Coast"); and 2) a $500,000 transfer from Hinsdale Hamptons Mortgage Fund ("Hinsdale"). The money in each of these two entities' accounts came from investors that can be identified and who appear to have intended to invest specifically in Skeleton Coast and Hinsdale, not in the WDF Fund.

In another instance, Joseph Shereshevsky authorized $275,000 to be transferred from the WDF Fund Account to the 8459 Account on July 18, 2007. This transfer was to assist Hammond Investors (another WexTrust entity) with a property closing. The money was ultimately returned on July 20, 2007 from the 8459 Account to the WDF Fund Account. Again, money coming back from the 8459 Account generally can not be determined to have come from any particular source, given the volume of intermingled cash movement into and out of this account and the constantly fluctuating balance of the account.

## 2. Commingling in the Principal Protected Fund

With respect to the WPP Fund, there are four cases of funds coming from sources other than direct deposits: two transfers from the 8459 Account and two transfers from the GDR Account. One example is the City First Foundation investment. On July 6, 2007, City First Foundation transferred $1.1 million into GDR bank account 2470 ("GDR Account"). At the time of this transfer, the balance in the GDR Account was approximately $86,000. Between July 16, 2007 and July 27, 2007, transfers totaling over $944,000 were made from the GDR Account to the 8459 Account. These transfers to the 8459 Account. These transfers to the 8459 Account were designated in WexTrust's internal records as being for the following purposes: Days Inn funding request, Rogers Plaza, Hammond Investor closing, end of month accounts payable, fund Chicago and WHYF July 31st payroll. Subsequently, on August 23, 2007, the 8459 Account balance was approximately $135,000. On the same day, money from Hamptons of Hinsdale Mortgage Fund account 4449 and WexTrust Capital Distribution account 6190 was transferred

into the 8459 Account in the amount of approximately $410,000, brining the total balance of the 8459 Account to approximately $500,000. On behalf of City First, WexTrust then transferred $200,000 into the WPP Fund Account. But, because City First's funds were no longer in the GDR Account, WexTrust funded this transfer from the 8459 Account—out of funds that almost certainly came from the Hamptons of Hinsdale project and the account designated for paying investor distributions.

In a similar situation, Elvira Hoganson wired $741,505 into the GDR Account on June 11, 2007. Substantially all of these funds were transferred from the GDR Account to other accounts and funds. For example, on June 13, 2007, $600,000 was transferred to the 8459 Account per Joseph Shereshevsky's instructions to fund the June 15th payroll. On June 29, 2007 Marianna Mayo (a WexTrust Securities employee) sent an email to Joseph Shereshevsky and Sheran Gabriel requesting that $240,000 of Ms. Hoganson's money be transferred into the WPP Fund, $100,000 into CP Phoenix, and $230,000 into WHYF I. The actual transfers into the designated investments occurred almost two months after this request. On August 23, 2007 (the same day as the City First transfer), WexTrust transferred $240,000 to the WPP Fund from the 8459 Account. The balance in the 8459 Account fluctuated significantly from June 11 to August 23. As a result, there is no way to attribute the money that was transferred to the WPP Fund on behalf of Ms. Hoganson to the money she originally deposited into the GDR Account that was later moved to the 8459 Account—although it appears almost certain that Ms. Hoganson's funds were dissipated and that the funds transferred for her came from the Hamptons of Hinsdale project and the account designated for paying investor distributions.

Finally, there were two transfers from GDR to the WPP Fund that took place on April 12, 2007: 1) a $10,000 transfer for the benefit of Isaiah Karlinsky; and 2) a $20,000 transfer for the

benefit of Fay Glick. The two individuals directed that their respective GDR accounts be used to fund their investment in the WPP Fund. However, their investments in the WPP Fund were not funded from a GDR bank account. Instead, the transfers were made from the 8459 Account, from a pool of money whose source appears to have come from a number of different places.

In short, at least $2.5 million of the $11.8 million in the WDF Fund and at least $0.67 million of the $3.38 million in the WPP Fund came from investors or other sources that had no relationship to investors in these two funds. Furthermore, based on its work analyzing these funds and over 30 other WexTrust investments, Deloitte FAS has concluded that the commingling in these Commodity Funds fits a consistent pattern in which the principals of WexTrust would shell-game money throughout their empire without regard to formalities.

## E. RECEIVER'S PLAN.

As the facts regarding commingling became apparent, the Receiver's counsel communicated to the CFTC's Division of Enforcement regarding the extent of the commingling. The Receiver's counsel also informed the CFTC Division of Enforcement of the Receiver's position that, given the extent of the commingling, (1) the Commodity Funds were tainted and, as such, Fund investors should be treated like all other investors and (2) the Receiver should be able to use the assets of the Commodity Funds, like the assets of other WexTrust entities, to pay the expenses of the Receivership. (Schmeltz Decl., ¶ 13.) To date, the Commodity Futures Trading Commission has not taken any formal action in this matter.

## III. ARGUMENT

### A. LEGAL STANDARD.

Federal Rule of Civil Procedure 24(a) provides that intervention as of right exists only when the proposed intervenor demonstrates that (1) its motion is timely; (2) it is asserting an interest relating to the property or transaction that is the subject of the action; (3) it is so situated

that, without intervention, disposition of the action may, as a practical matter, impair or impede the applicant's ability to protect its interest; and (4) its interest is not adequately represented by the other parties. *Int'l Design Concepts, LLC v. Saks, Inc.*, 486 F. Supp. 2d 229, 234 (S.D.N.Y. 2007) (citing *United States v. Pitney Bowes, Inc.*, 25 F.3d 66, 70 (2d Cir. 1994)). The party seeking to intervene bears the burden of proof on each element. *See Keith v. Daley,* 764 F.2d 1265, 1268 (7th Cir. 1985) ("The applicant has the burden of proving each of the four elements of intervention as of right; the lack of one element requires that the motion to intervene be denied."); *accord United States v. Pitney Bowes, Inc.*, 25 F.3d 66, 70 (2d Cir. 1994) ("Under Rule 24(a)(2) the purported intervenor must show that its interest is not adequately represented"). Failure to satisfy any one of these requirements compels denial of the application. *United States v. New York*, 820 F.2d 554, 556 (2d Cir. 1987). The decision as to whether to allow permissive intervention is within the Court's sound discretion, but courts typically do not allow permissive intervention when it would interfere with the administration of the case.

Courts within this Circuit and elsewhere have held that intervention as of right by creditors and investors in the *preliminary* stages of SEC enforcement actions is inappropriate. *See SEC v. Canadian Javelin, Ltd.*, 64 F.R.D. 648, 650 (S.D.N.Y. 1974) ("[The Second Circuit] has held that intervention as of right by victims of alleged securities frauds in an SEC enforcement action is inappropriate."). Indeed, "the majority of courts to have considered the subject of investor intervention under analogous circumstances have denied intervention." *SEC v. Credit Bancorp, Ltd.*, 194 F.R.D. 457, 468 (S.D.N.Y. 2000).

Such decisions—whether they deny intervention as of right or permissively—are based on several factors. ***First***, denial of intervention is warranted when proposed intervenors fail to prove that their rights will be impaired by such a denial. *See SEC v. Everest Management Corp.*,

475 F.2d 1236, 1237-39 (2d Cir. 1972) (holding that victims of alleged securities fraud's interests would not be impaired by the Court's failure to permit them to intervene as a matter of right under Fed. R. Civ. P. 24(a)). **Second,** courts recognize that the SEC "sufficiently represent[s] investor interests" in civil enforcement proceedings in light of its mandate and interests. *Credit Bancorp.*, 194 F.R.D. at 468. **Third**, if intervention were permitted in SEC enforcement actions, "[a]lready complicated securities cases would become more confused and complex," whereby "the complicating effect of the additional issues and additional parties [would outweigh] any advantage of a single disposition of the common issues." *SEC v. Everest Management Corp.*, 475 F.2d 1236, 1239-40 (2d Cir. 1973); *SEC v. Vesco*, 58 F.R.D. 182, 183 (S.D.N.Y. 1973) (investor participation would "only serve to multiply the issues and the parties involved and inhibit the Commission's efforts to proceed with prompt disposition of this action."). **Fourth,** courts recognize that a non-party can protect its interests in a case without intervening—such as by objecting to a plan of disposition. *SEC v. Credit Bancorp, Ltd.*, 194 F.R.D. at 468.

## B. THE COMMODITY INVESTORS' RIGHTS ARE NOT IMPAIRED.

The Commodity Investors contend that, because the property held by a commodity pool must be kept separate from all property, the Commodity Funds should not be included in the receivership. With this in mind, the Commodity Investors argue that their interest in a segregated pool of cash will be impaired if the Receiver "lump[s these funds] together with assets of the Wextrust Defendants." (Commod. Inv. Br. at 7.) This argument is fatally flawed in several respects.

To begin with, in determining whether it was appropriate for a court to freeze certain assets, the question is not whether (as the Commodities Investors try to frame it at page 13 of their "draft brief") a wrongdoer had an "interest" in the frozen property—it is whether the

16

wrongdoer **controlled** the property. *SEC v. Credit Bancorp, Ltd.*, 290 F.3d 80, 89-90 (2d Cir. 2002). As the Second Circuit held in *Credit Bancorp, Ltd.*, "[t]he cases relied on by SECO that involved Ponzi schemes and permitted the return of identifiable assets to particular victims are distinguishable. In those cases the reason the assets were returned was not merely because they were traceable, but because the assets had somehow been segregated in the manner of true trust accounts and/or had ***never been placed in the defrauder's control***." *Id.* (emphasis added); *see also SEC v. Black*, 163 F.3d 188, 196 n.6 (3rd Cir. 1998) (holding that certain accounts remained subject to the freeze because they were "commingled funds in a pooled account" under the control of one of the defendants).

As discussed above, WexTrade Commodity Managers exercised control over the funds—it managed them, apportioned them to CTAs for trading, monitored the CTAs' performance, daily assessed the risk strategies used for trading, and apportioned funds to the Master Fund. In turn, WexTrust Capital was the managing member of WexTrade Commodity Managers. And, WexTrust Capital was in the hands of the "evil zombies" who controlled it. *See Scholes v. Lehman*, 56 F.3d 750, 754 (7th Cir. 1995). These "evil zombies" had access to and control over the Commodity Funds—Defendant Joseph Shereshevsky regularly and systematically used them for purposes unrelated to commodity investing and unauthorized by either the PPMs or applicable commodity regulations. (J. Sordillo Decl., ¶ 19, 20 & 25.) Accordingly, the Court rightfully froze the Commodity Funds along with the rest of the assets WexTrust controlled. *See SEC v. Merrill Scott & Assoc., LTD*, No. 2:02 CV 39, 2006 U.S. Dist. LEXIS 93247, *17-21 (N.D. Utah Dec. 21, 2006) (because defendant had "exercised substantial, if not absolute, control" over various commingled investor accounts, those accounts, as well as assets purchased with money from those accounts, were properly subjected to the control of the receiver).

17

Next, the Commodity Investors' argument rests upon the fallacy that the Commodity Funds had "been segregated as a matter of law" and never "commingl[ed]." Draft Br. at 17. Evidently, the Commodity Investors have concluded that, because WexTrade Commodity Managers had a legal obligation to keep the Commodity Funds segregated, it must have done so. But, as Deloitte's analysis makes plain, nothing could be further from the truth. WexTrust engaged in massive commingling of these funds. It improperly used escrowed funds (in derogation of Rule 15c2-4) for non-commodity related business, and it frequently misappropriated money from non-Commodity Investors to fill the requests of investors (including Larry Costa, one of the proposed intervenors)[13] seeking to invest in the Commodity Funds. (Sordillo Decl., ¶ 11-25.)

While it is true that, pursuant to CFTC Regulation 17 C.F.R. § 4.20(c), "[n]o commodity pool operator may commingle the property of any pool that it operates or that it intends to operate with the property of any other person," WexTrust failed to follow this regulation. Consequently, the money invested by participants in the Commodity Funds was commingled with the money invested by individuals in other offerings.[14] The commingling was further exacerbated when the tainted funds held in WDF Fund and WPP Fund were fed up into the Master Fund and combined with the funds from WDOF Fund and WPO Fund.

---

[13] Mr. Costa is the same investor who seeks to have the Receiver removed as Manager of Block III Mines & Minerals, LLC (*see* Dkt. Nos. 96-99, 132), and has facilitated the obstruction of the Receiver's efforts to gain control of WexTrust assets located in Africa at great cost to the larger receivership estate. (*See* Dkt. Nos. 120-121.)

[14] The Commodity Investors have uncovered some evidence of commingling, which they refer to as "loans." As the discussion above demonstrates, however, these "loans" were unauthorized and improper, and they eviscerate the Commodity Investors' argument that their funds were "segregated"—particularly given the fact that the "loans" were repaid with money stolen from other non-Commodity Funds investors.

Courts consider funds that have been fraudulently obtained and used as part of a Ponzi scheme to be tainted. As Deloitte's analysis demonstrates, the Commodity Funds undeniably include funds that were fraudulently obtained and used as part of a Ponzi scheme. The Commodity Investors' argument (for which they cite no support) that, since only a limited percentage of their funds were tainted, the Court should release the remaining funds, is unavailing. Instead, courts conclude that, when tainted and non-tainted funds are commingled in an account controlled by the defendant, the entire account becomes tainted and subject to pretrial restraint.[15] *SEC v. Better Life Club of America, Inc.*, 995 F. Supp. 167, 181 (D.D.C. 1998) (holding that where legitimate membership fees had been commingled with fraudulently obtained investor funds, the entire account was tainted, and thus subject to the equitable interest of the defrauded plaintiffs.) In order to prove that the funds were commingled, a court only requires some evidence of commingling; there need not be evidence that the commingling was "systematic." *CFTC v. Eustace*, No. 05-2973, 2008 U.S. Dist. LEXIS 11810, *13 (E.D. Pa. Feb. 19, 2008). Here, Deloitte's report more than meets that standard.

Due to commingling (and to the master-feeder trading structure that further mixed money from each Commodity Fund), the Commodity Funds are not made up of the segregated funds that are traceable to specific individuals. Instead, they include the unsegregatable assets of many different investors from many different WexTrust Offerings. Accordingly, the Commodity Funds, like all WexTrust Offerings, are part of the alleged Ponzi scheme and the Commodity

---

[15] Once funds have been deemed tainted and placed under the control of the Receiver, the Receiver may use them to pay the receivership fees and expenses. Fees and expenses incurred by the receiver during the course of the receivership may be paid out of the investor funds to be distributed to plaintiff investors. "As a general rule, the expenses and costs of a receivership are charged to the property or fund administered." *Donovan v. Robbins*, 588 F. Supp. 1268, 1271 (N.D. Ill. 1984) (*citing Atlantic Trust Co. v. Chapman*, 208 U.S. 360, 375-6 (1908)). "It is up to the discretion of the court appointing the receiver as to who shall be charged with the costs of the receivership." *Id.* (*citing Bowersock Mills & Power Co. v. Joyce*, 101 F.2d 1000, 1003 (8th Cir. 1939)).

Investors are in the same unfortunate position as all other investors—they have no special interest in segregated funds that is being impaired in their absence.

## C. THE SEC AND THE RECEIVER ARE ADEQUATELY PROTECTING ALL INVESTORS.

As the Court recognized in its recent ruling on the motion of other third-parties that were seeking to modify the Receivership Order, "[t]he Receiver is charged with protecting the investors as a whole, and the best way to maintain the status quo is to permit him to carry on with his investigation." Mem. Dec. at 7-8 (Dkt. No. 148). Movants such as the Commodity Investors, on the other hand, "are only concerned with recouping their own investments, presumably even at the expense of other investors." *Id.* at 7. Because, as demonstrated above, the Commodity Investors are (despite their protestations to the contrary) victims of the same Ponzi scheme as the rest of the WexTrust investors, they are similarly situated with "the investors as a whole." Accordingly, the Receiver and the SEC can and will adequately protect their rights.

Like the Receiver, the SEC is "statutorily commissioned to represent the interest of individual investors in the public at large, such as applicants." *SEC v. Qualified Pensions*, No. 95-Civ-1746, 1998 U.S. Dist. LEXIS 942, *12-13 (D.D.C. Jan. 16, 1998) (finding that the individual investors seeking intervention had failed to make the prerequisite showing that their interests were not already adequately represented by the SEC). And, "[w]hile the SEC may not have an interest in advancing the claims of one defrauded investor at the expense of the other, several courts have held that the SEC or other governmental agencies in analogous enforcement actions sufficiently represent investor interests for the purposes of Rule 20(a)(2)." *SEC v. Credit Bancorp, Ltd.*, 194 F.R.D. 457, 468 (S.D.N.Y. 2000).

Not only are the SEC and the Receiver involved in this case to protect all investors, but the Receiver's counsel has discussed some of the issues in this matter with the CFTC Division of Enforcement. Receiver's counsel has informed the Division of commingling in the Commodity Funds and that the Receiver intends to treat the Commodity Investors like all other investors, including using the Commodity Funds to pay expenses of the receivership estate. To date, the Commodity Futures Trading Commission has not taken any formal action in this matter.

Ultimately, the Commodity Investors' argument—that the Receiver may treat the Commodity Funds similarly to other WexTrust investments—is nothing more than a challenge to the Receiver's strategy to maximize assets of the receivership, which is not a basis for intervention under Rule 24(a). The proposed intervenors' lack of faith in the Receiver to make the correct strategic decisions is not a basis for a finding of inadequacy of representation under Rule 24. *SEC v. TLC Investments and Trade Co.* 147 F. Supp. 2d 1031, 1042 (C.D. Cal. 2001).

### D. ALLOWING THE COMMODITY INVESTORS TO INTERVENE IN THIS MATTER WOULD IMPOSE A DISPROPORTIONATE BURDEN ON OTHER INVESTORS.

If the Court allows the Commodity Investors to intervene in the way in which they seek (either as of right or permissively), they would impose a disproportionate burden on other investors. Given their preference, the Commodity Investors would turn this matter into a side-show proceeding, in which they are allowed to take discovery into the current disposition of the Commodity Funds, obtain bank records and background material, and conduct an evidentiary hearing—all with the goal of "tracing" their money to a specific bank account and then withdrawing it, immediately. Of course, one imagines other investors—whether they are Commodity Funds investors or others—will make similar claims, inundating the Court and the receivership with work and further taxing the receivership's resources.

Courts do not favor such additional complexity and burden. "[I]ntervention would unduly delay the resolution of the enforcement action, and … would add an unwelcome layer of complexity outweighing any advantage of a single disposition of common issues." *SEC v. Credit Bancorp, Ltd.*, 194 F.R.D. 457, 468 (S.D.N.Y. 2000). Indeed, the more efficient course—as this Court already has recognized in ruling on the motions of others requesting intervention (*see* Introduction, *supra*)—is to allow the Receiver to complete and propose a plan of distribution, which the Commodity Investors can then challenge, if they would like. *See SEC v. Kings Real Estate Inv. Trust*, 222 F.R.D. 660, 668 (D. Kan. 2004). Rather than open this proceeding up to a series of mini-tracing hearings, which would clog the Court and tax the receivership, the Court should deny intervention at this time—holding open the possibility for the Commodity Investors to replead their cause when the Receiver proposes a plan of disposition.

### E.   TAGLIAFERRO & LOPRESTI AND HENDERSON & LYMAN LIKELY SHOULD BE DISQUALIFIED.

Under Illinois law, a lawyer may not represent a person with "interests adverse to a former client … if the matters involved in the two representations are the same or substantially related." *Schwartz v. Cortellonni*, 177 Ill.2d 166, 178, 685 N.E.2d 871, 877 (1997); *see also* 134 Ill.2d R. 1.9. In this case, Henderson & Lyman represented the Commodity Funds during the course of the receivership, had access to confidential information about them, and is using that confidential information in the course of a matter that is adverse to the receivership. Accordingly, disqualification is required. *La Salle National Bank v. County of Lake*, 703 F.2d 252, 255 (7th Cir. 1983) (setting forth test for determining whether matters are substantially related—including "making a factual reconstruction of the scope of the former representation[,] [determining] whether it is reasonable to infer that the confidential information allegedly given would have been given to a lawyer representing a client in those matters[, and considering]

whether the information is relevant to the issues raised in the litigation pending against the former client").

Henderson & Lyman may dispute that they represented the Receiver. In fact, they represented the acting manager of WexTrade Commodity Managers, while he was the Receiver's employee, in an NFA audit of WexTrade Commodity Managers. (Adrian Decl., ¶ 16; Riley Decl., ¶ 26-27, 29.) Throughout the course of the NFA's audit, Henderson & Lyman worked with the NFA to answer outstanding questions regarding WCM and the Commodity Funds. (Riley Decl., ¶ 27.)

Under Illinois' law, a lawyer has a duty to a third party when he or she "acted at the direction of or on behalf of the client for the benefit of a third party." *Schwartz v. Cortellonni*, 177 Ill.2d at 175, 685 N.E.2d at 875-76. Henderson & Lyman understood that its representation benefitted the Receiver—the firm made a presentation to the Receiver on commingling in the Commodity Funds as part of its efforts to obtain reimbursement from the Receiver for the firm's work. (Riley Decl., ¶ 30.) In its presentation, Henderson & Lyman provided time entries detailing their work during the receivership. (Riley Decl., ¶ 29.)

These entries establish that Henderson & Lyman was representing WCM and Commodity Funds in connection with the NFA's audit.[16] (Riley Decl., ¶ 29.) This is sufficient to impose a duty on Henderson & Lyman, even if the Receiver did not directly employ the firm. *See, e.g., Herbes v. Graham et al.*, 180 Ill. App. 3d 692, 698-700; 536 N.E.2d 164, 167-68 (Ill. App. Ct.

---

[16] We are willing to produce these time entries to the Court for an *en camera* review, together with a letter written by Henderson & Lyman detailing their work, in which the firm recognized that its work benefitted WexTrust, stating: "In summary, all of our services were reasonable and necessary to the on going management and operation of WexTrade. As a result, we are respectfully requesting that the receiver retain Henderson & Lyman and authorize payment of our invoices." (Riley Decl., ¶ 31.) We provide this detail only to advance this briefing and in no way intend to waive any attorney-client privilege that attaches to the substance of the letter.

1989) (finding that an attorney-client relationship, and hence the duty to maintain confidentiality, can arise even if the attorney is not ultimately hired when the initial meeting "was concerned with the possibility" of retaining that attorney in the future). Clearly, here, Henderson & Lyman intended to be retained by the Receiver, and performed work intended to benefit the Receivership Estate.

In addition, it is clear that Henderson & Lyman obtained confidential information during the course of their work—the firm had access to WexTrade Commodity Managers' files. ( P. Adrian Dec, ¶ 17.) This gave the firm access to confidential client information, including the records of trades, bank accounts, and company policies. Now, based on its access to this information (and after its unsuccessful attempt to get paid by the Receiver for its efforts), Henderson & Lyman seeks to remove the Commodity Funds from the receivership estate—an effort that is plainly adverse to the receivership. Because Henderson & Lyman has obtained confidential information it now seeks to use in an action adverse to the Receiver, the firm—and, by virtue of its receipt of confidential information, Tagliafero and LoPresti—should be disqualified from this action. *See In re Polaroid ERISA Litigation*, 354 F. Supp. 2d 494, 498 (S.D.N.Y. 2005) (citing *Analytica, Inc. v. NPD Research, Inc.*, 708 F.2d 1263, 1266 (7th Cir. 1983) (noting that one of the firms representing plaintiff "was disqualified not for anything it did or failed to do but simply because as . . . co-counsel it had access, actual or potential, to whatever confidential information [the other firm] had obtained")); *Rella v. N. Atl. Marine,* No. 02-Civ.-8573, 2004 U.S. Dist. LEXIS 22309, *25-26 (S.D.N.Y. Nov. 1, 2004).[17]  Regardless, this bad

---

[17]  New York law applies to Mr. LoPresti, a New York lawyer, while Illinois law applies to the work performed by Henderson & Lyman.

faith also militates against allowing the Commodity Investors to intervene at the Court's discretion, and their motion should be denied.

## IV. <u>CONCLUSION</u>

For all of the foregoing reasons, the Receiver respectfully requests that this Court deny the Commodity Investors' Motion for Leave to Intervene.

Dated: December 19, 2008                              Respectfully Submitted,


<u>s/ Vincent P. Schmeltz III</u>
Vincent P. Schmeltz III, *pro hac vice*
DEWEY & LEBOEUF LLP
Two Prudential Plaza, Suite 3700
180 North Stetson Avenue
Chicago, IL 60601
(312) 794-8000 (t)
(312) 794-8100 (f)

Mark S. Radke, *pro hac vice*
DEWEY & LEBOEUF LLP
1101 New York Avenue, NW
Washington, D.C. 20005-4213
(202) 346-8000 (t)

(202) 346-8102 (f)
Attorneys for Timothy J. Coleman, Receiver
for the WexTrust Entities

# CERTIFICATE OF SERVICE

The undersigned, an attorney, states that I am one of the attorneys for Timothy J. Coleman, Receiver, in this matter and do hereby certify that on December 19, 2008, I directed the service of a true and correct copy of the foregoing **(1) THE RECEIVER'S MEMORANDUM OF LAW IN OPPOSITION TO THE COMMODITY INVESTORS' MOTION TO INTERVENE; (2) THE DECLARATIONS OF RILEY, SCHMELTZ, ADRIAN, AND SORDILLO THERETO; AND (3) THE EXHIBITS THERETO** upon the following individuals in the manner indicated below:

**Via ECF Notification and/or Electronic Mail**

Alexander M. Vasilescu, Esq.
Andrew M. Calamari, Esq.
Steven G. Rawlings, Esq.
Alistaire Bambach, Esq.
Danielle Sallah, Esq.
Philip Moustakis, Esq.
**Attorneys for Plaintiff SECURITIES AND EXCHANGE COMMISSION**

Barry S. Pollack, Esq.
Joshua L. Solomon, Esq.
**Attorneys for G&H PARTNERS AG**

Barry S. Zone, Esq.
Jason Canales, Esq.
Stephen Richard Popofsky, Esq.
**Attorneys for Defendant STEVEN BYERS**

Edward F. Malone, Esq.
George R. Mesires, Esq.
**Attorneys for BARRINGTON, BANK & TRUST CO. AND HINSDALE BANK & TRUST CO.**

John C. Meringolo, Esq.
**Attorney for Defendant JOSEPH SHERESHEVSKY**

Michael Fred Bachner, Esq.
**Attorney for Defendant ELKA SHERESHEVSKY**

**Via ECF Notification and/or Electronic Mail**

Shalom Jacob, Esq.
Shmuel Vasser, Esq.
**Attorneys for purported group of investors described as INTERNATIONAL AD-HOC COMMITTEE OF WEXTRUST CREDITORS**

Martin Siegel, Esq.
**Attorney for purported group of investors described as INTERNATIONAL CONSORTIUM OF WEXTRUST CREDITORS**

Paul A. Levine, Esq.
**Attorney for purported non-party KEY EQUIPMENT FINANCE, INC.**

David B. Gordon, Esq.
Beth L. Kaufman, Esq.
**Attorneys for non-party LARRY COSTA.**

Harris Kay, Esq.
Marc X. LoPresti, Esq.
**Attorneys for non-parties TIMOTHY M. HOLMES REVOCABLE TRUST, LARRY COSTA, KRISTINE SZABO, STANLEY SIMPSON, ANDREW CAMPBELL, JAMES D. LECKINGER, AVRAHAM HOCHMAN, AND KAREN POLTER.**

s/ Vincent P. Schmeltz III