UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - -x

SECURITIES AND EXCHANGE          :
COMMISSION,
                                 :
                Plaintiff,
                                 :
        - against -                           **OPINION**
                                 :
STEVEN BYERS et al.,                          08 Civ. 7104 (DC)
                                 :
                Defendants,
                                 :
        - and -
                                 :
ELKA SHERESHEVSKY,
                                 :
                Relief Defendant.
                                 :
- - - - - - - - - - - - - - - - - -x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 12-30-08

**APPEARANCES:**          (See last page)

**CHIN, District Judge**

In this securities fraud case, before the Court are the
applications for fees and expenses of (1) Timothy J. Coleman,
receiver for Wextrust Capital, LLC et al. (the "Receiver"), (2)
the Receiver's attorneys, Dewey & LeBoeuf LLP ("Dewey"), and (3)
the Receiver's accountants and financial advisors, Deloitte
Financial Advisory Services LLP ("Deloitte"). The applications
cover the period from August 11, 2008 through August 31, 2008,
and seek (1) fees of $57,300 for the Receiver, (2) fees of
$2,147,666.75 and reimbursement of expenses of $85,840.10 for
Dewey, and (3) fees of $66,640 and reimbursement of expenses of
$13,602.49 for Deloitte. The total sought for the twenty-day
period is $2,371,049.34.

The Securities and Exchange Commission (the "SEC")
supports the applications of the Receiver and Dewey, offering the
view that the amounts requested are "fair and reasonable." (SEC
Statement at 2). Certain creditors of and/or investors in the
Wextrust entities object.

For the reasons that follow, the applications are
granted, but only to the extent set forth below. The award of
fees to Dewey will be substantially reduced, as I find that the
amount requested -- $2.1 million in fees for twenty days of work
-- is excessive in the context of a securities receivership where
hundreds of victims of fraud have suffered substantial losses.

## BACKGROUND

### A. The Filing of this Action

On August 11, 2008, the SEC commenced this action
against defendants Steven Byers and Joseph Shereshevsky and five
Wextrust entities (the "Wextrust Entities") for their role in a
Ponzi scheme that purportedly defrauded more than one thousand
investors of approximately $255 million. See SEC v. Byers, No.
08 Civ. 7104 (DC), 2008 WL 5236644, at *1 (S.D.N.Y. Dec. 17,
2008). The SEC alleged a massive fraud involving a complex web
of some 240 Wextrust affiliates operating in the Middle East,
Africa, and the United States. Id.

The case was assigned to Judge Shirley Wohl Kram. The
SEC immediately requested an order appointing a temporary
receiver and counsel for the receiver, as well as an order
freezing assets. Because Judge Kram was unavailable, the

-2-

application was made to Judge Richard Sullivan, the Part I judge.
The same day, Judge Sullivan entered an order prohibiting
defendants and certain other persons from dissipating or
otherwise disposing of any assets of the Wextrust Entities.  The
same day, Judge Sullivan also entered an order (the "Receiver
Order") appointing the Receiver and charging him with, inter
alia, ascertaining the financial condition of the Wextrust
Entities, including the extent of commingling of funds among the
Wextrust Entities and affiliates, and determining whether any
Wextrust company should file for bankruptcy.  The Receiver was
charged also with taking control of the operations of the
Wextrust Entities and preserving their assets.

The case was reassigned to me on August 13, 2008.  It
has been actively litigated, with the defendants as well as
creditors and investors appearing in the action.

The Receiver's initial investigation shows that the
receivership estate has substantial assets, including, inter
alia: cash and cash equivalents of $23 million; funded loans of
some $5 million; interests in hotel properties with a net book
value of approximately $17.4 million; and interests in various
office buildings, warehouses, and retail shopping centers with a
net book value of approximately $42.3 million.  (First Joint
Monthly Application ("First Applic.") at 9-10).  There may be
other assets as well, including potential recoveries with respect
to claims for damages that the Receiver may have against
defendants and others.  (Id. at 10).

On the other hand, there are substantial operating and other expenses, including ordinary business expenses such as payroll, debt service, rent, utilities, and other vendor bills. (Id. at 9). It is unlikely that there will be sufficient assets to pay all creditors and make all defrauded investors whole, in view of the SEC's estimate that investors were defrauded of some $255 million.

## B. The Appointment of the Receiver

Judge Sullivan appointed Coleman as Receiver from a pool of three candidates proposed by the SEC. The correspondence submitted to Judge Sullivan showed that the SEC had contacted prospective receiver candidates in mid-June 2008 to inquire about their possible interest. At least three prospective candidates submitted proposals to the SEC, as the SEC submitted these proposals to the Court.

One proposal was from a lawyer based in Washington, D.C. He proposed to use as his counsel his law firm, an international firm with offices in, among other places, Washington, D.C. and New York. He proposed to bill at his firm's usual hourly rates, less a discount of five percent. The firm's usual hourly rates, before applying the discount, ranged for partners from $375 to $700 per hour and for associates from $250 to $425. The proposed receiver's usual hourly rate was $650.

A second proposal was from a financial consultant based in Atlanta, Georgia. He was not a lawyer, but had extensive experience as a receiver. He proposed to engage as his counsel

-4-

an international law firm headquartered in Atlanta with an office in, among other places, New York. His standard rate was $350 per hour, and the law firm's usual rates ranged from $195 to $650 per hour for lawyers. Both the financial consultant and the law firm proposed to bill at five percent below their usual rates, to reflect a "public service discount."

The third proposal was from Coleman, who proposed to use his law firm, Dewey, as his counsel. In his proposal, Coleman emphasized that he had a "longstanding commitment to public service." (7/3/08 Coleman Letter to SEC at 1). He noted that Dewey shared that commitment, and that "the firm [was] prepared to make its most experienced partners in the relevant practice areas available to support the receivership, and to do so at a substantial public service discount." (Id.).

Coleman proposed to bill for all his work, both legal and non-legal, at $250 per hour, well below his standard hourly rate of $850 ($980 in complex litigation and investigative work). (Id. at 4). He proposed to bill for other Dewey professionals who performed "receivership services, as opposed to legal services," at not more than $200 per hour. (Id.). As for legal work for the initial phase of the case, Coleman proposed as follows:

> The standard hourly rates for the lead partners who would supervise this matter range from $850 to $950. Based on the public service nature of this engagement, [Dewey] is prepared to extend a discount in the form of a capped blended hourly rate for legal services provided in Phase One. <u>The blended hourly rate charged for all partners and</u>

-5-

> associates will not exceed $550 per hour.
> For example, if the actual blended hourly
> rate based on standard billing rates were
> $650 per hour, the firm would reduce its fees
> so that the blended hourly rate charged would
> be no more than $550 per hour.
>
> Alternatively, as we discussed, [Dewey] would
> be prepared to charge its standard hourly
> rates, less a 10 percent discount. Based on
> our estimate, either the capped blended rate
> or the 10 percent discount, together with the
> discounts set forth above for receiver fees
> and non-legal services, would yield a total
> cost reduction of at least 15 to 20 percent.

(Id. at 4-5) (emphasis in original).

## C. The Fee Applications

### 1. The Receiver

On November 17, 2008, the Receiver and Dewey submitted their "First Joint Monthly Application" for compensation and reimbursement of expenses. The application covered the period from August 11, 2008 through August 31, 2008. (First Applic. at 2).

The Receiver seeks "interim compensation" of $57,300, based on a reduced hourly rate of $250, with travel time billed at a further reduced rate of $125 per hour. (First Applic. at 11). The Receiver worked 247.40 hours on this matter during the period. (Id., Ex. B). At his standard hourly rate of $850, the Receiver's fees would have been $210,290; hence, the application proposes a reduction of $152,900 for the Receiver's services to reflect a "public service discount." (Id. at 12 & Ex. B).

The Receiver's services included meeting with attorneys, paralegals, accountants, investors, the SEC and other

-6-

government agencies, and Wextrust employees. In general, the Receiver supervised the Dewey attorneys and carried out the duties of the receivership. (First Applic. at 25). In essence, the Receiver took over operations of a "multi-national conglomerate with operations including commodities trading, commercial and residential real estate management and development, diamond mining and commercial lending through its high yield funds." (Id. at 6). The Receiver took steps to secure and stabilize the business operations of the Wextrust Entities and affiliates to prevent any further dissipation of assets. (Id. at 7).

## 2. **Dewey**

Dewey seeks interim approval of fees of $2,147,666.75 and reimbursement of expenses of $85,840.10 for the twenty-day period.

A lodestar calculation based on Dewey's standard hourly rates would result in a fee of $2,725,467.75 for 5,503.15 hours of work during the period in question. (Id. at 11-13 & Ex. B).[1] Dewey's standard hourly rates for the personnel who worked on this matter ranged from $650 to $950 for partners; $425 to $605 for associates; and $125 to $275 for paralegals. Other Dewey personnel who worked on the matter included the following: "Counsel" and "Senior Counsel" (454.1 hours at $625 per hour); "Clnt Specialist" (226.50 hours at $395 per hour); summer

---

[1] These figures appear to include the Receiver's time. (See First Applic., Ex. B).

associates (104.60 hours at $285 per hour); and "Lit Support" (68.2 hours at $230 or $250 per hour).

Dewey is not, however, seeking compensation for the lodestar amount of $2,725,467.75; rather, it seeks $2,147,666.75. Dewey notes that this reduction of $520,501 is "a discount in excess of 20 percent." (Receiver's Response to Objections and Court's Order ("Receiver Resp.") at 2; see First Applic. at 12). The reduction is primarily the result of the following: (a) the reduction of Coleman's hourly rate to $250 for all work (and $125 for travel time); and (b) the reduction of the hourly rate to $200 for"receivership services" as opposed to "legal services" for all others. (Receiver Resp. at 2-3). Dewey also notes that it had agreed to cap the blended hourly rate for its legal services at $550, and that the "blended rate for legal services performed by [Dewey] professionals in August (excluding the Receiver) was approximately $478 per hour." (First Applic. at 11, 12). The $478 blended rate includes time billed by summer associates, paralegals, and litigation support clerks. (Receiver Resp. at 18).[2]

The figure of $2,147,666.75 also reflects reductions made at the request of the SEC. The Receiver and Dewey had

---

[2]    In fact, in its proposal Dewey agreed to cap its blended hourly rate "for all partners and associates" at $550 per hour.  (7/3/08 Coleman Letter to SEC, at 5).  It did not suggest that the capped blended hourly rate would include work performed by summer associates, paralegals, and litigation support clerks. If summer associates, paralegals, and litigation support clerks were excluded, the blended hourly rate would be $502.  (Receiver Resp. at 20).

-8-

submitted their first fee application to the SEC on October 17, 2008, to allow the SEC an opportunity to review the application before it was submitted to the Court. (First Applic. at 12). The SEC requested a reduction of $70,620.50, and the Receiver and Dewey agreed. This reduction includes reductions for re-characterizing as "receiver work" certain work that had been initially characterized as legal work; the elimination of time spent on billing or fee applications; reductions for certain research that the SEC believed had been billed at too high a rate; and the elimination of a small amount that the SEC believed was non-billable firm overhead. (Receiver Resp. at 12-13 n.8).

Dewey provided the following services: asset analysis and recovery, including identifying and analyzing real estate and other assets owned by the Wextrust Entities; asset disposition, including analyzing certain assets to consider selling; case management, including conferences and communications relating to the management of the case, meetings with the SEC and other government agencies; bankruptcy analysis, to determine whether any Wextrust Entities or affiliates should file in bankruptcy; evidence preservation, including taking custody of documents and other property, interviewing employees, and securing the premises at Wextrust offices in Chicago; Hinsdale, Illinois; New York; Bethesda; Nashville; Atlanta; Norfolk; Boca Raton; Pretoria, South Africa; and Tel Aviv, Israel; business operations, to maintain operations of Wextrust businesses, including dealing with employees and vendors; financial analysis, primarily

-9-

consisting of analyses of hotel and other properties; general
litigation, including inventorying pending litigation matters;
receivership court proceedings; non-legal case and receivership
administration; investor relations; and travel time. (First
Applic. at 15-25).

As for expenses, the amount requested of $85,840.10
reflects a write-off of $10,795.27 in computer legal research
expenses and an additional write-off for part of the Receiver's
airfare for travel to Israel and South Africa. Dewey actually
incurred $106,468.57 in expenses attributable to this matter.
(First Applic. Ex. E).

## 3. Accountants and Financial Advisors

Deloitte seeks "interim compensation" of $66,640 and
reimbursement of expenses of $13,602.49 for the period from
August 11,2008, through August 31, 2008. (Deloitte Applic. at
8).

The figure of $66,640 reflects 190.4 hours of work
billed at a reduced rate of $350 per hour. (Id., at 9 & Ex. B).
Deloitte had agreed to use a blended average hourly rate for
professional services not to exceed $350. (Id. at 9). In fact,
its standard hourly rates for its personnel who worked on this
matter ranged from $500 to $875, and had Deloitte billed at its
usual rates, its fees would have been $131,418. (Id., Ex. B).
Hence, the fee agreement results in a reduction of $64,778,
almost a 50 percent discount. (See id. at 9).

Deloitte provided the following services: business
analysis, to identify and analyze real estate and other assets;

-10-

case administration, including conferences and communications to coordinate site visits and formulate work plans and strategies; cash management and forecasting, to develop monthly cash forecasts, identify and confirm bank accounts, meet with managers of Wextrust assets, and develop budgets; cash tracing and forensic analysis, to evaluate how money was raised and used; and non-working travel time (billed at half-rate). (Deloitte Applic. at 11-13).

The expenses of $13,602.49 are not discounted and reflect primarily expenses related to travel. (Id., Ex. E).

## D. The Objections

Three sets of objections were submitted with respect to the fee applications.

By letter dated November 20, 2008, the law firm Dechert LLP wrote on behalf of the International Ad Hoc Committee of Wextrust Creditors (the "Committee"). The Committee opposed the applications on procedural grounds, requesting that the Court implement certain procedures that would apply if the Wextrust Entities were in bankruptcy. The Committee complained of the purported lack of a set procedure for notifying investors and creditors and giving them an opportunity to be heard.

By letter dated November 25, 2008, the law firm Brown Rudnick, LLP wrote on behalf of the International Consortium of Wextrust Creditors (the "Consortium"). The Consortium joined in the Committee's objections.

The law firm Sullivan & Worcester LLP submitted a series of objections on behalf of G&H Partners AG ("G&H"), a

-11-

creditor of and investor in the Wextrust Entities. G&H objected

to any payment prior to a submission to the Court by the Receiver

of an estimate of all fees and expenses incurred to date and a

monthly cap going further. G&H also suggested that Dewey should

discount its fees at least 60 percent. G&H also sought to

preclude Dewey from seeking payment for any time spent seeking

"immunity from liability for failure to exercise reasonable care

in this matter." (G&H Notice of Objection at 1-2). In a follow-

up letter, G&H continued to argue for a "drastic reduction," and

contended that both the number of hours for which compensation

was sought and the proposed hourly rates were excessive.

(Sullivan & Wocerster Letter dated 12/19/08).

## E. The Court's Order and Further Submissions

On December 15, 2008, the Court issued an order raising

certain questions and concerns regarding the fee applications.

The Receiver and Dewey have submitted a response. The SEC also

submitted a statement, setting forth its view that:

> [O]verall, the fees and expenses detailed in
> the August Fee Application are fair and
> reasonable considering that the Receiver and
> his counsel were thrust into a complex and
> unpredictable situation with little time to
> prepare in advance. The August Fee
> Application complies with the SEC's draft
> guidelines, and incorporates substantial
> public service discounts that would not have
> been available outside of the receivership
> context. Specifically, the Receiver agreed
> to reduce his hourly rate from $850 to $250;
> [Dewey] agreed to cap its blended hourly rate
> at $550 per hour; [Dewey] professionals
> performing non-legal receivership services
> capped their hourly rate at $200; the
> Receiver and [Dewey] did not charge for any

-12-

> time preparing their August Fee Application
> (although they are required to submit the
> application); time spent on non-working
> travel was billed at 1/2 the normal hourly
> rate; and the Receiver and [Dewey] wrote-off
> all charges for computerized legal research.
> In total, the Receiver and [Dewey] reduced
> their fees from approximately $2,725,468 to
> $2,204,967, a reduction of $520,501 or 19%
> from their original bill.

(SEC Statement at 2 (footnote omitted)).

G&H thereafter notified the Court that it had
petitioned the Chairman of the SEC to reconsider the agency's
position with respect to the fee applications and asked for an
evidentiary hearing on this matter "if the Court is inclined to
award payment to the [R]eceiver and his law firm in an amount in
excess of $1 million for their first 20 days of work." (G&H
Notice of Supp. Obj. at 1).

## DISCUSSION

### A.   Applicable Law

A receiver appointed by a court who reasonably and
diligently discharges his duties is entitled to be fairly
compensated for services rendered and expenses incurred. See
generally 65 Am. Jur. 2d, Receivers § 219 (2d ed. 2008); Jeffrey
F. Ghent, Annotation, "Measure and Amount of Compensation of
Receiver Appointed By Federal Court," 6 A.L.R. Fed. 817, §§ 3-9
(1971 & Supp. 2008). The amount of the compensation is to be
determined by the court in the exercise of its reasonable
discretion. Gaskill v. Gordon, 27 F.3d 248, 253 (7th Cir. 1994);
United States v. Code Prods. Corp., 362 F.2d 669, 673 (3d Cir.

1966). In setting a reasonable fee, the court is to consider "all of the factors involved in a particular receivership." Gaskill, 27 F.3d at 253. These factors include, inter alia, "the complexity of problems faced, the benefits to the receivership estate, the quality of the work performed, and the time records presented." SEC v. Fifth Ave. Coach Lines, Inc., 364 F. Supp. 1220, 1222 (S.D.N.Y. 1973); accord Code Prods. Corp., 362 F.2d at 673 ("In allowing fees 'the considerations are the time, labor and skill required, but not necessarily that actually expended, in the proper performance of the duties imposed by the court upon the receivers, the fair value of such time, labor and skill measured by conservative business standards, the degree of activity, integrity and dispatch with which the work is conducted and the result obtained.'") (quoting Coskery v. Roberts & Mander Corp., 200 F.2d 150, 154 (3d Cir. 1952)); see also 6 A.L.R. Fed. 817, at §§ 7-12 (discussing factors).

While the results obtained by a receiver clearly are important, the benefits to a receivership estate may take "more subtle forms than a bare increase in monetary value." Gaskill, 27 F.3d at 253 (quoting SEC v. Elliott, 953 F.2d 1560, 1577 (11th Cir. 1992)). In addition, in a securities receivership, "[o]pposition or acquiescence by the SEC to the fee application will be given great weight." Fifth Ave. Coach Lines, 364 F. Supp. at 1222.

Courts typically determine reasonable attorneys' fees based on (i) the percentage of recovery method or (ii) the

-14-

lodestar method. SEC v. Goren, 272 F. Supp. 2d 202, 206
(E.D.N.Y. 2003) (citing Goldberger v. Integrated Resources, Inc.,
209 F.3d 43, 47 (2d Cir. 2000)). In this case, as the benefits
to the receivership estate are not yet fully known, it makes
sense only to apply the lodestar method.

Under the lodestar method, the Court first ascertains
the number of hours reasonably billed and then multiplies that
figure by the appropriate hourly rates to reach the lodestar
amount. See Baird v. Boies, Schiller & Flexner LLP, 219 F. Supp.
2d 510, 518 (S.D.N.Y. 2002) (citing Blum v. Stenson, 465 U.S. 886
(1984)). "Hours that are excessive, redundant, or otherwise
unnecessary are not 'reasonably expended' and should be excluded
from the initial fee calculation." Goren, 272 F. Supp. 2d at
208-09 (quoting Hensley v. Eckerhart, 461 U.S. 424, 434 (1983)).
In making a fee request, counsel should exercise billing judgment
to eliminate hours not reasonably expended; counsel "must act as
he would under the ethical and market restraints that constrain a
private sector attorney's behavior in billing his own clients."
Lunday v. City of Albany, 42 F.3d 131, 133 (2d Cir. 1994) (citing
Hensley, 461 U.S. at 434). The requested hourly rates are
appropriate if they "are in line with those prevailing in the
community for similar services by lawyers of reasonably
comparable skill, experience, and reputation." Blum, 465 U.S. at
896 n.11.

Once the lodestar amount is determined, adjustments can
then be made up or down to arrive at a reasonable fee, based on

-15-

traditional factors such as the quality and expertise of counsel, the magnitude and complexities of the litigation, the risks involved, the relation of the fees to any recovery, and other public policy considerations. Goldberger, 209 F.3d at 47, 50; Goren, 272 F. Supp. 2d at 206.

In considering applications for compensation by receivers and their attorneys, the courts have long applied a rule of moderation, recognizing that "receivers and attorneys engaged in the administration of estates in the courts of the United States . . . should be awarded only moderate compensation." In re New York Investors, Inc., 79 F.2d 182, 185 (2d Cir. 1935). Courts are not to award receivers and their attorneys "extravagant fees," but only "moderate ones." Id.; see also 6 A.L.R. Fed. 817, at § 4 ("[M]any courts have declared that the receiver's compensation should be moderate or no more than reasonable, rather than liberal or generous."). Courts should take particular care to scrutinize fee applications "to avoid even the appearance of a windfall." Goren, 272 F. Supp. 2d at 206 (citing City of Detroit v. Grinnell Corp., 495 F.2d 448, 469 (2d Cir. 1974)); see also id. at 213 (in substantially reducing fee application, court noted that it was "especially concerned by the threatened appearance of a windfall, an important public policy concern"). As a policy matter, the rule of moderation makes particular sense in circumstances such as those here, where hundreds of investors and creditors have been defrauded, and victims are likely to recover only a fraction of their losses.

## B. **Application**

The applications are granted, but only to the extent
set forth below.

### 1. **The Receiver**

On an interim basis, the Receiver's request for fees of
$57,300 is approved. The hourly rate of $250 ($125 for non-
working travel time) is a substantially discounted rate and is
reasonable. Likewise, in light of the complexities of the matter
and the need for immediate action, the number of hours expended
is reasonable.

### 2. **Dewey**

Dewey's application for fees and expenses is granted,
but only to the extent set forth below.

As an initial matter, I conclude that Dewey is entitled
to a substantial award of fees. There is no doubt that Dewey has
provided extensive and outstanding legal services that will
surely benefit the receivership estate. It did so quickly, and
under difficult circumstances, as it was required to assist the
Receiver in taking over the operations of multiple Wextrust
affiliates both here in the United States and abroad. The issues
presented were highly complex and covered a wide range of subject
matters, from preserving evidence to diamond mining to managing a
hotel to investigating a complex fraud. Moreover, the views of
the SEC are entitled to deference, and the SEC has stated its
view that the fees requested are fair and reasonable. Dewey is

-17-

entitled to be compensated for its efforts.[3]

On the other hand, I also conclude that a substantial reduction is required, for the following reasons.

First, the hours expended are excessive. Dewey's lawyers, paralegals, and support personnel logged 5,503.15 hours of time on this matter in a twenty-day period. That averages more than 275 hours per day, for twenty days straight. The request of $2,147,666 in fees averages $107,383 in fees per day. Some seventy-six different Dewey personnel worked on this matter in the first twenty days alone -- sixteen partners, thirty-one counsel or associates, and twenty-nine paralegals, summer associates, and other litigation support personnel. (First Applic., Ex. B). As the time records confirm, there was some excessiveness and redundancy here. Notwithstanding the complexity of the situation, the number of hours expended simply is not reasonable.

Second, the hourly rates for legal services are unreasonably high. I accept the representation that the rates are Dewey's standard rates, but the rates are excessive in the context of a securities receivership proceeding. In my December

---

[3]     As for the objections to the applications, the procedural objections are overruled. This is not a bankruptcy case, and the bankruptcy requirements simply do not apply. The procedural safeguards in place are adequate, and interested creditors and investors have been given notice of any applications made by the Receiver. Moreover, the SEC reviews the fee applications, and it has in place requirements that the Receiver and his advisors are following. As for the substantive objections, I have considered them in ruling on the application below.

-18-

15, 2008 order, I asked the parties to address the question of the hourly rates applied by courts in other securities receivership cases. Dewey responded by stating that it had not been able "to locate any materials on attorney billing rates in equity receivership cases analogous to Wextrust," and adding that "Wextrust is by no means typical of other SEC equity receiverships." (Receiver Resp. at 19). The SEC responded by stating that it "typically requests that its receivers and their law firms grant some type of public service discount -- typically 10% -- for legal services, although the actual discount agreed upon will vary depending on the circumstances." (SEC Statement at 9). The SEC cites only one specific example, an Investment Company Act case where partners at Kaye Scholer LLP charged $795 per hour as of October 2007. (Id.).

Neither Dewey nor the SEC cites to the cases cited by the objecting creditors. In Goren, which was also a securities fraud case brought by the SEC based on allegations that defendants had engaged in a Ponzi scheme, the court awarded Kaye Scholer, LLP, fees based on hourly rates ranging from $135 to $200, even though the firm billed (in 2003) at hourly rates ranging from $250 (or less) to $529. 272 F. Supp. 2d at 215. According to counsel for G&H, in SEC v. Cobalt Multifamily Investors I, LLC, No. 06 Civ. 2360 (S.D.N.Y.), Hogan & Hartson requested fees at hourly rates between $200 and $220 for associates and between $450 and $525 for partners, while Kirkpatrick & Lockhart billed for associates at $200 per hour and

for partners at between $300 and $390 per hour. (Sullivan &
Worcester 12/19/08 Letter at 2). In contrast, for example, here
Dewey seeks an hourly rate of $605 for three associates -- who
billed more than 481 hours among them -- who graduated from law
school in 2002. (See First Applic., Ex. B; 12/18/08 Radke Decl.,
Ex. E).

It is true, as Dewey notes, that the Receiver's rate
has been substantially discounted, to a rate of $250 per hour,
and that other Dewey personnel have billed at no more than $200
per hour for receiver -- as opposed to legal -- services. But in
his proposal to the SEC, the Receiver suggested that Dewey would
also provide a public service discount. Moreover, non-legal
services should not be billed at legal rates.

Dewey suggests that its agreement to cap its blended
hourly rate at $550 constitutes a public service discount, and
notes that its blended hourly rate for professionals is only
$478. The $478 rate, however, is illusory, as it includes time
billed by summer associates, paralegals, and litigation support
clerks. (Receiver Resp. at 18). In fact, the $478 blended rate
for legal work reflects no discount at all. Rather, it is based
on Dewey's standard rates, which I believe are too high for a
securities receivership case where hundreds of victims are
unlikely to recover their losses. The discount would be applied
only if the blended hourly rate exceeds $550.

Dewey also states that it made, at the SEC's request,
"a discounted fee proposal, which was accepted by the SEC and

-20-

approved by Judge Sullivan." (Receiver Resp. at 2). The suggestion is that Judge Sullivan was aware of Dewey's fee schedule and implicitly approved it by selecting Coleman. First, while it is true that Judge Sullivan chose Coleman from the three candidates submitted to him, in reality the SEC gave him little choice in the matter. The SEC submitted only three names; one was not a lawyer but a financial consultant who was located not in New York but in Atlanta, and the second was a lawyer at a law firm located in Washington, D.C. that was certainly not as well known in New York as Dewey, a highly-regarded and prominent New York City law firm. Moreover, Coleman was proposing to bill for his services at $250 per hour, which was substantially below the rates proposed by the other two receiver candidates. Second, Judge Sullivan was not presented with a detailed fee proposal for legal services. Although Dewey did disclose that the standard hourly rates for the lead partners who would work on the matter ranged from $850 to $950, its letter did not disclose the standard rates for other lawyers or professional personnel. Moreover, Dewey emphasized that it was prepared to extend a discount based on the public service nature of the engagement. (7/3/08 Coleman Letter to SEC at 5). In any event, in the emergency circumstances presented here, with the SEC proceeding by order to show cause and seeking the appointment of a receiver the same day it filed this action, there was no real opportunity for the Court to solicit other proposals or to consider other receivers.

-21-

I have no quarrel with Judge Sullivan's appointment of Coleman as Receiver and Dewey as counsel. Under the circumstances, I undoubtedly would have done the same. But with the benefit of hindsight, I wonder whether the SEC should have made more of an effort to present the Court with more options. In this economy, with law firms going out of existence or laying off lawyers for lack of work, and clients -- including large corporate clients -- insisting upon and obtaining alternative fee arrangements, see Jonathan D. Glater, Law Firms Feel Strain of Layoffs and Cutbacks, N.Y. Times, November 11, 2008, at B1, surely there would have been qualified law firms willing to perform these services at rates substantially lower than $850 or $950 per hour for partners and $605 per hour for associates six years out of law school. These factors are, in any event, relevant in considering the prevailing rates in the community for similar services by comparably experienced and skilled attorneys.

Dewey also notes that it has already discounted its fees by more than $500,000, a discount in excess of twenty percent. (Receiver Resp. at 2). Most of this reduction, however, is attributable to the billing of non-legal, receiver services at a reduced rate of $250 for Coleman and $200 for others, and, as noted above, non-legal work should not be billed at legal rates. In addition, the reductions made at the request of the SEC reflect the types of adjustments that a lawyer would ordinarily make in exercising her billing judgment before tendering a bill to a client.

-22-

In view of the long-established principle that in receivership situations, lawyers should be awarded moderate fees and not extravagant ones, the request for fees of $2,147,666.75 for twenty days of work is excessive.

Finally, as noted above, the results achieved and benefit to the receivership estate are critical factors that a court must consider in setting a fee award. While Dewey has worked hard, it is simply too early to tell the extent to which its efforts will benefit the receivership estate. This is all the more reason to apply a rule of moderation now.

In light of the voluminous nature of fee applications, "courts have recognized that it is unrealistic to expect a trial judge to evaluate and rule on every entry in an application. These courts have endorsed percentage cuts as a practical means of trimming fat from a fee application." N.Y. State Ass'n for Retarded Children, Inc. v. Carey, 711 F.2d 1136, 1146 (2d Cir. 1983) (internal citations omitted). I will apply an additional twenty percent cut here, to account both for the excessiveness in the number of hours and the hourly rates. I will cut the request by twenty percent, or $429,533.35. Together with the $521,501 that Dewey had agreed to cut, the original lodestar amount has been reduced by some $951,034.

Hence, I will allow Dewey fees of $1,718,144.40. At the conclusion of the case, Dewey may apply for payment of all or part of the $429,533 I am eliminating now. Depending on the results achieved and the benefits to the receivership estate, I would consider awarding some or all of these fees to Dewey then.

The request for reimbursement of expenses of $85,840.10 is approved as reasonable.

## 3. **Deloitte**

On an interim basis, Deloitte's request for fees of $66,640 is also approved. The hourly rate of $350 is reasonable, and the requested fees reflect almost a fifty percent discount from what the fees would be at Deloitte's usual rates. Likewise, in light of the complexities of the matter and the need for immediate action, the number of hours expended is reasonable. The request for reimbursement of expenses of $13,602.49 is also approved as reasonable, in light of the amount of traveling that was required.

## CONCLUSION

For the reasons set forth above, the applications for fees and reimbursement of expenses for the period August 11, 2008 through August 31, 2008, are granted, on an interim basis, as follows:

1. The Receiver is allowed fees of $57,300;

2. Dewey is allowed fees of $1,718,144.40 and reimbursement of expenses of $85,840.10;

3. Deloitte is allowed fees of $66,640 and reimbursement of expenses of $13,602.49;

4. Dewey may apply for additional fees of up to $429,533.35 for the period from August 11, 2008 through August 31, 2008, at or about the time that the final distribution of receivership assets is

-24-

in progress; and

5.    The Wextrust Entities, as the term is defined in
      the Receivership Order, are hereby authorized and
      directed on an interim basis to pay the Receiver,
      Dewey, and Deloitte the amounts awarded herein
      from available funds.

SO ORDERED.

Dated:    New York, New York
          December 30, 2008

                                    _____
                                    DENNY CHIN
                                    United States District Judge

**APPEARANCES**

Attorneys for Plaintiff
Securities and Exchange Commission:

        ALISTAIRE BAMBACH, Esq.
        NEAL JACOBSON, Esq.
        ALEXANDER M. VASILESCU, Esq.
        STEVEN G. RAWLINGS, Esq.
        DANIELLE SALLAH, Esq.
        Securities & Exchange Commission
        New York Regional Office
        Three World Financial Center, Room 4300
        New York, New York  10281

Attorneys for Timothy J. Coleman, Receiver
for the Wextrust Entities and Affiliates:

        DEWEY & LEBOEUF LLP
            By:  Martin J. Bienenstock, Esq.
                 Leo V. Gagion, Esq.
                 Mark S. Radke, Esq.
                 Dean C. Gramlich, Esq.
        1301 Avenue of the Americas
        New York, New York  10019-6092

Attorneys for the International Ad-Hoc
Committee of Wextrust Creditors:

        DECHERT LLP
            By:  Shalom Jacob, Esq.
                 Shumuel Vasser, Esq.
        1095 Avenue of the Americas
        New York, New York  10036

Attorneys for the International Consortium
of Wextrust Creditors:

        BROWN RUDNICK LLP
            By:  Martin S. Siegel, Esq.
        Seven Times Square
        New York, New York  10036

Attorneys for G&H Partners AG:

        SULLIVAN & WORCESTER LLP
            By:  Barry S. Pollack, Esq.
                 Joshua L. Solomon, Esq.
        One Post Office Square
        Boston, Massachusetts  02109