**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff,

- against -

STEVEN BYERS, JOSEPH SHERESHEVSKY,
WEXTRUST CAPITAL, LLC, WEXTRUST
EQUITY PARTNERS, LLC, WEXTRUST
DEVELOPMENT GROUP, LLC, WEXTRUST
SECURITIES, LLC, and AXELA HOSPITALITY,
LLC,

Defendants,

- and -

ELKA SHERESHEVSKY,

Relief Defendant.

08 Civ. 7104 (DC)

ECF Case

## RECEIVER'S PLAN FOR MANAGEMENT OF
## WEXTRUST REAL ESTATE PORTFOLIO

TIMOTHY J. COLEMAN
Receiver for Wextrust Entities

DEWEY & LEBOEUF LLP
1301 Avenue of the Americas
New York, New York 10019
Tel: (212) 259-8000


Attorneys for Receiver

January 15, 2009

# TABLE OF CONTENTS

A.    INTRODUCTION ...................................................................................................1

B.    THE WEXTRUST REAL ESTATE PORTFOLIO....................................................4

C.    THE RECEIVER'S MANAGEMENT RESPONSIBILITIES AND
      OBJECTIVES ........................................................................................................7

D.    VALUATION ANALYSIS ........................................................................................8

E.    MANAGEMENT ANALYSIS..................................................................................10

      1.    Execute Wextrust Business Plan................................................................11

      2.    Immediate Public Auction .........................................................................16

      3.    Bankruptcy Filing .....................................................................................18

      4.    Consensual Foreclosure .............................................................................22

      5.    Implement Revised Business Plans ............................................................24

      6.    Negotiations With Secured Lenders ..........................................................26

F.    MARKETING AND SALES PROCESS FOR SELECTED WEXTRUST
      PROPERTIES .......................................................................................................27

G.    CONCLUSION......................................................................................................29

## A. INTRODUCTION

Timothy J. Coleman, Receiver for the Wextrust Entities ("Receiver"), respectfully submits this Plan for Management for the Wextrust real estate portfolio. The Receiver does not seek any action by the Court at this time. The Receiver will request any further required authorization or confirmation, on notice to interested parties, prior to executing any of the transactions contemplated in this plan, as discussed below. (*See* Section E, *infra*). The purpose of this document is to provide notice to interested parties of the Receiver's plans with respect to real property of the Wextrust Entities and all entities they control or in which they have an ownership interest (collectively, "Wextrust Entities and Affiliates"). The Receiver's intention is to provide notice and relevant information, to ensure transparency, and to solicit questions, comments and offers from interested parties, including investors and creditors of the Wextrust Entities and Affiliates. This document has been served on all counsel who have entered appearances in this action and posted on the receivership website.

This plan contemplates that many of the Wextrust properties will be sold at fair market value, in a process expected to begin in or about February 2009. The marketing and sale process is designed to preserve the value of the estate and avoid a "fire sale" of the portfolio, and to facilitate a prompt distribution to victims. Sale proceeds will be retained by the receivership estate pending further order of the Court, in one or more accounts under the exclusive control of the Receiver, pursuant to the Court's orders and applicable law. The Receiver will submit a proposed plan of distribution for such proceeds and other assets of the estate.

Pursuant to the Court's September 11, 2008 amended receiver order ("Receiver Order"), the Receiver has succeeded to all rights to manage the Wextrust properties. Those rights arise out of the LLC and operating agreements relating to the Wextrust Entities and Affiliates. In general, each of the entities was formed for the purpose of owning, operating and selling a single real estate asset. The business plans set forth in the private placement memoranda and other marketing materials for the Wextrust securities offerings typically contemplated that the assets would be developed or improved, and then sold after a broadly defined holding period. Thus, investors were on notice that the Wextrust properties would be sold in the ordinary course of business.

As directed by the Court, the Receiver has, *inter alia*, taken control of all real estate and other U.S. assets of the Wextrust Entities and Affiliates, and has taken steps to ascertain the true financial condition of those entities and to preserve the *status quo*. (*See* First Interim Report of Receiver, November 7, 2008 ("First Interim Report") at 63-86). The Receiver has engaged attorneys, accountants and experts to assist with the management and evaluation of the Wextrust assets, together with Wextrust personnel. Based in part on extensive advice and analysis from those employees and professionals, the Receiver has developed the plan for management described herein for the Wextrust real estate portfolio.

Among other things, the Receiver has obtained professional valuations of the Wextrust properties and advice on the management and disposition of the properties. Based on that advice and analysis, and on all available information, the Receiver has considered the various management options for the real estate assets, and has made management decisions with respect to each of those assets. In making those decisions,

the Receiver has analyzed the facts and circumstances of each property, and of the overall portfolio, with particular attention to the following factors:

- location, structural characteristics and features, and current and future leasing revenue;

- market conditions in the relevant geographic location and for the type of property; the availability and cost of capital; and overall economic conditions; and

- the Receiver's duties and obligations as a court-appointed fiduciary with responsibility for preserving the value of the estate for the benefit of all Wextrust stakeholders.

The Receiver has determined that there is little, if any, going concern value in the Wextrust real estate operations as a whole, and that any such value is far outweighed by the substantial risk of loss that would be involved in continuing to operate the properties for an extended period. For properties in which the estate has equity, the Receiver plans to reduce or eliminate capital expenditures for improvements or renovations, reduce the holding period, and market the assets promptly in an effort to sell them at fair market value. For the remaining properties, the Receiver will seek, where feasible, to renegotiate or restructure the secured debts, and/or assist the secured creditors in selling the properties for the benefit of both such creditors and the estate. Based on the circumstances of this case, and on the difficult and volatile conditions facing all businesses in the current economy, the Receiver has determined that the plan described herein is a reasonable and prudent course of action.

The balance of this document is organized as follows. Section B is an overview of the Wextrust real estate portfolio. Detailed information on each of the Wextrust real estate assets is contained in Exhibits A and B to the Declaration of Mitchell P. Kahn in Support of Receiver's Plan for Management of Wextrust Real Estate Portfolio ("Kahn

Decl."), filed concurrently herewith.  Section C describes the Receiver's management responsibilities and objectives, based on the Receiver Order and applicable legal standards.  Section D describes the valuation analysis of the real estate portfolio.  Section E sets forth the Receiver's analysis of the various management options for each of the properties and the determination with respect to each property.  Section F describes the marketing and sales process for those properties the Receiver plans to offer for sale in the near term.

**B.      THE WEXTRUST REAL ESTATE PORTFOLIO**

The Wextrust Entities and Affiliates collectively own or control a portfolio of real estate properties.  The portfolio consists of four principal components:  (1) three hotel assets managed by Axela Hospitality, LLC ("Axela");  (2) the properties owned or managed by Wextrust Equity Partners, LLC ("WEP") which are primarily income-producing commercial properties, such as office buildings and warehouses; (3) the properties controlled by Wextrust Development Group, LLC ("WDG"), which are residential properties, such as apartment buildings and single family homes; and (4) the portfolio of so-called high yield real estate loans held by various Wextrust Affiliates.  Table 1, below, lists the Axela, WEP, and WDG. [1]

Typically, each real estate project is owned by a Wextrust Entity or Affiliate formed for the specific purpose of purchasing or developing the real estate asset.  In general, the entity that owns each property owns no other significant assets, and does not conduct any substantial business other than operating the property.  The Wextrust high

---

[1] The high yield portfolio is described in detail in the First Interim Report at 51-53.  The Wextrust Entities and Affiliates also own or control interests in various diamond mining ventures.  (*See* First Interim Report at 46-51).  The Receiver does not address disposition of those assets herein.

yield loan portfolio consists of loans made to third parties secured by real estate assets. The loans were short-term, high-interest loans with high loan-to-value ratios. A majority of the loans are in default. (Kahn Decl. ¶ 42; First Interim Report at 51-53).

The Wextrust real estate portfolio was financed through a combination of mortgage lending and the sale of securities. Most of the properties were purchased between 2004 and 2007, when real estate prices were at historically high levels. In general, the vast majority of the purchase price for each property was borrowed from financial institutions on a secured basis. The remaining financing was from the proceeds of Wextrust securities offerings.[2]

---

[2] In many cases, proceeds of Wextrust securities offerings that were designated to finance a real estate acquisition were diverted to other purposes, including payment of distributions to investors in other projects. Also, Wextrust routinely sold substantially more shares than investors were led to believe, and the proceeds of such "over-raising" were used for undisclosed purposes. *See* First Interim Report at 18-19, 81-86.

| Table 1: Wextrust Property Portfolio | | | |
|---|---|---|---|
| **Wextrust Entity** | **Type** | **State** | **Name** |
| Axela | Hotel | IL | Park View Hotel |
| Axela | Hotel | IL | Wyndham Drake Hotel |
| Axela | Hotel | AZ | Crowne Plaza Hotel |
| WEP | Office | AL | Interstate Park |
| WEP | Office | IL | The Chase Bank Building (Peoria) |
| WEP | Office | TN | Belle Meade Centre |
| WEP | Office | TN | Executive Plaza |
| WEP | Office | TN | Park Village & Parkway Business Center II |
| WEP | Office | TN | Shallowford Business Park East |
| WEP | Office | TN | Tennessee Portfolio |
| WEP | Office | TN | West Bearden Office Plaza |
| WEP | Retail / Mixed Use | IL | 116 North York Street |
| WEP | Retail / Mixed Use | IL | 45 S. Washington |
| WEP | Retail / Mixed Use | IL | First Highland |
| WEP | Retail / Mixed Use | IN | Hilltop Apartments |
| WEP | Retail / Mixed Use | MI | First Wyoming |
| WEP | Retail / Mixed Use | TN | Commerce Center |
| WEP | Retail / Mixed Use | WI | South Pine |
| WEP | Warehouse | LA | Hammond Industrial Park |
| WEP | Warehouse | MS | Corinth Industrial |
| WEP | Warehouse | TN | Baxtech |
| WEP | Warehouse | TN | Clarksville Industrial |
| WEP | Warehouse | TN | Myatt |
| WEP | Warehouse | TN | New Salem |
| WEP | Warehouse | TN | Wilma Rudolph |
| WEP | Warehouse | TN | Workman Road |
| WDG | Residential Condos | NY | 47 Dean Street |
| WDG | Residential Condos and Town Homes | IL | Hamptons of Hinsdale |
| WDG | Individual Homes | IL | Stonebridge Woods |
| WDG | Residential Condos and Retail | IL | 625 Paragon |
| WDG | Residential Condos | IL | 2435 West Belmont |
| WDG | Residential Condos and Town Homes | IL | 2825 Oakley |
| WDG | Residential Condos | WI | SF Development Co. |

Wextrust management prepared business plans for each of the properties. Those plans were described in the private placement memoranda ("PPMs") and other marketing materials used in connection with the Wextrust securities offerings. With respect to the WEP properties, in general, the business plans contemplated that the property would be purchased, renovated or improved, and then sold or refinanced after a broadly defined holding period with the expectation of a profit. With respect to the WDG residential properties, the business plans contemplated that they would be sold on or before completion. With respect to the high yield loans, a majority of which are in default, the Wextrust business plan did not contemplate default or provide for that outcome. (*See* Kahn Decl. ¶ 42).

## C. THE RECEIVER'S MANAGEMENT RESPONSIBILITIES AND OBJECTIVES

Pursuant to the Receiver Order, the Receiver has succeeded to all rights to manage the Wextrust real estate portfolio. (*See* Receiver Order at 5; 12/17/08 Mem. Decision at 10-11). The Receiver Order authorizes the Receiver to take steps to preserve and maximize the value of the Wextrust assets. For example, the Receiver has the power to pay "necessary business expenses required to preserve the assets and property" of Wextrust Entities and Affiliates. (Receiver Order at 5). The Receiver is authorized to "use, lease, sell, and convert into money all assets of the Wextrust Entities, either in public or private sales or other transactions on terms the Receiver reasonably believes based on his own experience and input from his advisors to be most beneficial to the Wextrust Entities and those entitled to the proceeds." (*Id.* at 8). For sales of substantial

assets (generally, those worth more than $750,000), the Receiver must provide notice and obtain the Court's approval before consummating the transaction. (*Id.*).[3]

The Receiver is charged with protecting the interests of all Wextrust stakeholders. (*See* 12/17/08 Mem. Decision at 7-8; 11/14/08 Tr. at 8). In managing the assets of the Wextrust Entities and Affiliates, the Receiver's principal objective is to preserve the value of those assets for the benefit of all interested parties, and to preserve the Court's ability to approve a fair distribution of the remaining assets to the victims of the scheme alleged in the complaint. *See generally Phelan v. Middle States Oil Corp.*, 154 F.2d 978, 991 (2d Cir. 1946); 2 RALPH E. CLARK, LAW AND PRACTICE OF RECEIVERS §§ 381, 396 (3d ed. 1969); 12 WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE, § 2981 (2008). As a court-appointed fiduciary, the Receiver is required to act in a reasonable and prudent manner, and not to expose estate assets to excessive risk. *See Corbin v. Federal Reserve Bank of New York*, 475 F. Supp. 1060, 1069 (S.D.N.Y. 1979) (national bank receiver did not breach fiduciary duty by declining to risk exposure to floating interest rates in volatile market).

## D. VALUATION ANALYSIS

The Receiver has been directed to ascertain the true financial condition of the Wextrust Entities and Affiliates, and to determine whether any of the Wextrust Entities or Affiliates should undertake bankruptcy filings. (Receiver Order at 4). The Receiver has been authorized to engage accountants, attorneys, and experts to assist in those tasks. (*Id.*

---

[3] The provision of the Receiver Order authorizing sales of property is modeled on Section 363 of the Bankruptcy Code, which sets forth the powers of a trustee or a debtor-in-possession in connection with the sale, use or lease of property of the estate, and is consistent with the Judicial Code provisions governing sales of realty by a receiver. *See* 28 U.S.C. § 2001 (2000). Notably, in bankruptcy, a trustee or debtor-in-possession may conduct sales in the ordinary course of business without any notice to creditors. *See* 11 U.S.C. §§ 363(c)(1), 1107(a). Thus, the Receiver Order provides for notice of ordinary course transactions that may not be required in a bankruptcy case.

at 5).  The Court has approved the engagement of the Hilco Organization, Deloitte Financial Advisory Services, and Dewey & LeBoeuf.  (*Id.* at 12).  Professionals from each of those firms, together with Wextrust employees, have assisted in developing the Receiver's management plan and the supporting analysis.[4]

At the direction of the Receiver and with the assistance of Deloitte, Hilco has conducted a valuation analysis for the Wextrust real estate portfolio.  The Receiver's advisors have reviewed the books and records of the Wextrust Entities and Affiliates, physically inspected the properties, collected information from other sources and conducted valuation analyses applying accepted principles and methods commonly used by professionals in valuing and appraising real estate.  For example, Hilco's analyses have considered recent sales of comparable properties, the actual and projected leasing income from the Wextrust properties, and the expected returns on capital investments. (Kahn Decl. ¶ 12).

In ordinary circumstances, professional real estate valuations provide a generally reliable measure of the fair market value of a property.  However, the sale price of a unique property is determined by a wide variety of factors, and cannot be predicted with precision.  Moreover, the predictive value of such analysis is diminished during periods of volatility, particularly in the real estate and credit markets.  Current market conditions

---

[4] Prior to retaining professional advisors, the Receiver obtained proposals from multiple forensic accountants and real estate consultants and consulted with the SEC on the selection and compensation of advisors.  Hilco Real Estate, an affiliate of the Hilco Organization, will receive commissions on sales of real estate it brokers, subject to disclosure with respect to transactions presented to the Court for approval and court review in the context of Hilco's final fee and expense application.  Kahn Decl. ¶ 11.

have thus made it more difficult to predict the sales price of Wextrust real estate assets. (Kahn Decl. ¶ 13).[5]

With those caveats, Hilco's valuation analysis provides a reasonable basis to assess the financial condition of the Wextrust properties and to make management decisions. With respect to many of the WEP commercial real estate properties, based on Hilco's valuations, it appears that the fair market value of the properties is greater than the amount of secured debt. With respect to the WDG residential real estate portfolio, the Receiver has determined that the current fair market value of most of the properties is less than the secured debt. With respect to the three hotels in the Axela portfolio, the Receiver has determined that, although the properties are highly valuable, the estate has little or no equity in them based on current market conditions.

The Receiver's valuations of specific properties are not included in this plan. Disclosing those figures in a publicly filed document could adversely affect the Receiver's ability to maximize the value of the estate by imposing a *de facto* ceiling on the sales price. (Kahn Decl. ¶ 17). The Receiver is prepared to provide the valuations to the Court *in camera*, and/or to provide them to investors on a confidential basis.

## E.    MANAGEMENT ANALYSIS

Based on the valuation analysis described above, the Receiver has conducted a management analysis of each of the properties in the Wextrust real estate portfolio. The Receiver has considered the analysis and advice of professional advisors and Wextrust staff, and financial and other information concerning each property. In exercising his

---

[5] In the case of certain properties, the Receiver may have access to independent valuations or appraisals obtained by lenders or other third parties, and will consider such information as additional evidence of the fair market value of the properties. *See, e.g.*, 12/22/08 Tr. at 10-17 (discussing Hilco valuation and bank appraisal of Wextrust property).

business judgment in this regard, the Receiver has been guided by the goal of maximizing the overall value of the receivership estate for the benefit of all Wextrust investors and creditors.

The Receiver has considered several management options for each of the properties, including the following: (1) executing the pre-existing Wextrust business plan for the property; (2) selling the property immediately at a public auction; (3) consenting to foreclosure by secured creditor(s) pursuant to state law; (4) filing a bankruptcy petition; (5) implementing a revised business plan for the property; and (6) pursuing workout negotiations in an effort to recover value for the estate by marketing properties for the benefit of secured creditors. Each of those options is discussed in detail below.

### 1. Execute Wextrust Business Plan

The Receiver and his advisors have reviewed the business plans prepared by Wextrust management and considered the feasibility and advisability of proceeding with them. Based on the circumstances of this case and current market conditions, the Receiver has determined that, in most cases, those business plans cannot and should not be executed.

The business plans for many of the properties – as disclosed in the PPMs – involve a high degree of risk. The level of risk has undoubtedly increased for most, if not all, of the Wextrust properties, due to the dramatic change in economic conditions in the months since Wextrust sold securities to finance the purchase and development of those properties. In light of the current economic recession, the nationwide decline in home prices and commercial rents, and the collapse of the credit markets, the likelihood of achieving the results envisioned in most of the Wextrust business plans is remote. (Kahn Decl. ¶ 14). Based solely on current market conditions, one might reasonably assume

that the Wextrust business plans – even assuming they were reasonably achievable at the time they were made – are simply not feasible in the circumstances of this case.

However, the business plans disclosed to investors in Wextrust securities reflect the expectations of investors.  The Receiver has sought to respect those expectations and to manage the real estate portfolio in a manner consistent with them, to the extent it would be practicable and in keeping with the Receiver's fiduciary duties to the Court and to all Wextrust stakeholders.  Thus, the Receiver has considered the Wextrust business plans in light of current circumstances and assessed the viability of executing them. Hilco's valuation analysis considered the Wextrust business plans, the potential economic benefit from achieving them, and the probability that the goals would be achieved.

The Park View Hotel in Chicago, one of the most valuable and visible properties in the portfolio, is illustrative of the challenges facing the Receiver.  Hilco has constructed an economic model to analyze the value of the Park View, which was purchased by Wextrust Affiliate Gold Coast Investors, LLC in 2005 for $15,525,000. The business plan for the Park View contemplated that Wextrust would close the hotel, terminate its affiliation with the Days Inn chain and convert the property to a "full service, high-end, 'hip,' boutique destination for both business and leisure travelers." The Wextrust plan envisioned extensive renovations to the property.  In fact the hotel was closed shortly after it was purchased and has never reopened.  Wextrust management renovated the hotel at a cost of approximately $16 million, more than $10 million in excess of the budgeted expense.  The hotel cannot be reopened until it is issued a certificate of occupancy and numerous other issues are resolved, which would cost as much as an additional $8 million.  (Kahn Decl. ¶ 31).

Hilco's valuation model for the Park View included three options: (1) sell the hotel immediately on an as-is basis at fair market value; (2) complete the planned renovation of the hotel and sell it after re-opening in 2009; and (3) complete the renovation and continue to operate the hotel for at least 12 months before marketing the property. Hilco's model was based on data concerning sales of comparable properties, average daily room rates, occupancy statistics and other market information. It also considered such factors as the cost to complete the renovation and reopen the property, the cost of capital, and the property's anticipated cash flow. With respect to the second and third options, Hilco performed a discounted cash flow analysis to determine the present value of the proceeds of a future sale of the hotel, and compared those figures to the proceeds of an immediate sale under the first option. Further, Hilco conducted a probability analysis to estimate the likelihood that the results envisioned in the second or third options could be achieved. Based on that probability analysis, it is unlikely that the Receiver (or any successor manager) could successfully execute the Wextrust business plan, based on the current circumstances of Wextrust and current economic conditions. Based on Hilco's analysis, and the preliminary results of the marketing process, the Receiver has determined that the likelihood of successfully executing the Wextrust business plan for the Park View is low, and the downside risk of failure includes millions of dollars in additional expenses and liabilities. (Kahn Decl. ¶ 32).

At the Receiver's direction, Hilco began marketing the Park View on October 15, 2008. The marketing process began with a press release and an extensive advertising effort that included, among other things, email messages to more than 10,000 potential purchasers. To date, Hilco has discussed the potential sale of the hotel with

approximately 150 parties, has provided tours of the property to approximately 40 groups, and has entered into confidentiality agreements with numerous parties to whom it has provided due diligence materials. Hilco established a bid deadline of January 15, 2009, and has received multiple offers, which are being considered by the Receiver. The bids involve various contingences and are subject to further due diligence and discussion. (Kahn Decl. ¶ 33).

Although the Receiver now has several bids on the Park View, there is no guarantee that any of them will result in a sale that will produce a net economic benefit to the estate. While the location of the property in the Lincoln Park area of Chicago has generated extensive interest, discussions with potential buyers indicate that the hotel presents certain challenges, including the fact that the building is 80 years old and the small room layouts are not optimal for a modern luxury property. Moreover, the market for the hotel has been impacted by current economic conditions. Average room rates and revenue per room have declined, and such conditions are reflected in the fact that hotel transactions in the Chicago area fell by approximately 70 percent in 2008. Accordingly, the Receiver is continuing to engage in discussions with the secured lenders in an effort to identify alternatives for maximizing the recovery, if any, for the estate. *Id.*

As the foregoing example illustrates, with respect to most of the properties, attempting to execute the Wextrust business plans, which indisputably involve a high degree of risk, would be imprudent and inconsistent with the Receiver's role as a court-appointed fiduciary. Based on the circumstances of this case and current economic conditions, the continued operation of the real estate portfolio by the Receiver for an extended period would risk further losses to the estate. Moreover, in light of the

continuing decline in real estate prices, there is a substantial risk that holding the properties for extended periods would result in further losses in value.[6]  Although there is a chance that conditions may improve during the contemplated holding periods, such a speculative possibility is insufficient, in the Receiver's judgment, to outweigh that risk.

In any event, it is unlikely that the Receiver could obtain sufficient financing to proceed with the Wextrust business plans.  Based on the Receiver's investigation, including Deloitte's analysis of the books and records of Wextrust, the only significant source of capital for the Wextrust Entities and Affiliates was bank financing and securities offerings.  Neither source of financing is likely to become available to the Receiver in the foreseeable future.  Indeed, the market for commercial real estate credit has collapsed.[7]

Based on the foregoing, the Receiver has determined that, in most cases, it would not be in the best interests of the receivership estate to continue to execute the Wextrust business plans.  In one case, the condominium project located at 47 Dean Street in Borough Park, Brooklyn, the Receiver has determined that the existing financing for the property is sufficient to complete construction and that the likely sales prices of the condominium units will be sufficient to repay the development loans and produce a return for the estate.  The Receiver is proceeding with construction and will request confirmation for sales transactions as the apartment units are sold.

---

[6] Kahn Decl. ¶ 14; *see* Dana Hedgpeth, *Tough '09 Is Seen for Commercial Real Estate*, Wash. Post, Jan. 6, 2009, at D3 (predicting 10 to 15 percent drop in rents nationwide); Angela Pruitt, *Commercial Real Estate Downturn More Dire Than Expected*, Daily Bankr. Review, Dec. 1, 2008, at 8 (predicting 35 percent drop in commercial property values from 2007 peak).

[7] Kahn Decl. ¶ 16, 32; *see* Lingling Wei and Jon Hilsenrath, *Developers Ask U.S. for Bailout as Massive Debt Looms,* Wall St. Journal, Dec. 22, 2008, at A1 (discussing credit market's systemic lack of capacity to refinance $530 billion of performing commercial real estate loans expiring in next three years).

### 2.    Immediate Public Auction

Courts routinely direct the sale of property in public auctions, and federal equity receivers are specifically authorized to sell real estate at auction with court approval.  *See* 28 U.S.C. § 2001(a).  The Receiver has considered the costs and benefits of a traditional public auction process and has determined it would not maximize the value of any of the Wextrust assets.

A traditional public auction would provide some benefits.  Sales could be executed quickly, and the proceeds could be used to pay creditors immediately.  Similarly, immediate sales would relieve the estate of continued operating costs, which could result in a net savings for properties with negative cash flow.  Transaction costs for such sales would be relatively low in comparison to other marketing processes.  Prompt sales would also minimize the risk to the estate of further deterioration in the market for the properties.

However, those benefits are outweighed by the costs of this option.  Studies have shown that such a forced sale – commonly known as a "fire sale" – typically results in a substantial distressed-sale discount.  *See, e.g.,* Christopher J. Mayer, *Assessing the Performance of Real Estate Auctions*, 26 Real Estate Economics 41, 42, 61-62 (1998) (such traditional real estate auctions typically sell property at discount as much as one-third below fair market value, with discount increasing in down markets); Marcus T. Allen and Judith Swisher, *An Analysis of the Price Formation Process at a HUD Auction*, 20 J. Real Estate Research 279, 295 (2000) (HUD auction prices persistently below predicted market values).  Thus, the proceeds of such a sale would in all likelihood be far below fair market value.  (Kahn Decl. ¶ 46).

As discussed below, the Receiver has determined that marketing the real estate portfolio in an orderly fashion, using a flexible process tailored to each property's location, characteristics and value, is more likely to result in sales at fair market value than selling the properties in a traditional "courthouse-steps" auction. The Receiver's marketing and sales process is designed to avoid a distressed-sale discount through more extensive and effective marketing, more complete disclosure of information, and greater flexibility. Hilco will use a variety of advertising techniques in an effort to reach potential buyers in a cost-effective manner. For example, Hilco's press release announcing the sale of the Park View generated immediate media coverage that undoubtedly increased the level of interest in the hotel. *See* Alby Gallun, *Bank Trying to Sell Loan on Former Wextrust Hotel*, Chicago Real Estate Daily, Nov. 5, 2008. Hilco will conduct personal canvassing, in-person and telephone meetings with prospective purchasers, and property tours, as appropriate. Potential buyers will be given an opportunity to conduct due diligence pursuant to appropriate confidentiality agreements, and to raise questions and concerns about the properties. In order to control costs, Hilco will establish a virtual due diligence room on its website accessible to parties who have entered into such agreements. Hilco can use a variety of sales techniques to maximize selling prices, such as setting bid deadlines; requesting sealed bids; holding auctions; establishing minimum prices; selecting a "stalking horse" bidder; and/or reserving the right to reject or renegotiate the highest bid for a particular property. Those measures can be expected to increase the number of potential purchasers and to ensure that sale prices are more consistent with fair market value. (Kahn Decl. ¶ 45; *see* Section F, *infra*).

### 3.    Bankruptcy Filing

As directed by the Court, the Receiver has carefully considered whether any or all of the Wextrust Entities or Affiliates should file bankruptcy petitions. Based on the advice of the Receiver's bankruptcy counsel and other advisors, and on the Receiver's business judgment, it would not be in the best interests of the receivership estate for any of the entities to file bankruptcy petitions at the present time.

Bankruptcy can provide significant benefits. For example, a Chapter 11 bankruptcy case can enable a corporate debtor to stay foreclosure actions by secured creditors, compromise creditor claims, and emerge under a plan of reorganization. The Bankruptcy Code and Rules provide well-established procedures, and the Bankruptcy Court has the institutional competence to administer those procedures. A bankruptcy filing of all of the Wextrust Entities and Affiliates would avoid any concern about running afoul of the Second Circuit's admonition to the district courts to avoid using equity receiverships to circumvent bankruptcy and to avoid conducting bankruptcy procedures in the district court. *See, e.g., SEC v. Am. Bd. of Trade, Inc.*, 830 F.2d 431, 437-38 (2d Cir. 1987).

However, a bankruptcy in the circumstances of this case would result in severe adverse consequences. In a bankruptcy case, the individual single asset limited liability companies would become debtors in possession and the Receiver, in his role as managing member of those companies, would continue to manage the property owned by them, subject to the supervision of the Bankruptcy Court. (12/17/08 Mem. Decision at 11-13). In addition, one or more creditors' committees could be appointed, and would be entitled to retain counsel and professional advisors, also at the expense of the estate. *See* 11 U.S.C. §§ 1102, 1103. In this case, there is reason to believe that the existing unofficial

creditors' committees would seek official recognition in a bankruptcy case, adding to the administrative costs of the estate.

In addition, a bankruptcy filing would further delay a distribution to victims of the Wextrust fraud. As one respected jurist has noted, in comparison to receiverships, "[c]orporate bankruptcy proceedings are not famous for expedition," *Scholes v. Lehmann*, 56 F.3d 750, 755 (7th Cir. 1995) (Posner, *J.*). In the Receiver's judgment, it is likely that the expense and delay added by the commencement of Chapter 11 cases by one or more of the Wextrust Entities or Affiliates would be substantial.

Another adverse consequence of bankruptcy is that it would likely favor some groups of victims over others. In bankruptcy, lenders having perfected mortgages and rent assignments with respect to each individual property would have priority over all unsecured creditors and investors, and would be entitled to adequate protection of their interests in the debtor's property. *See, e.g.*, 11 U.S.C. §§ 362(d), 363(e), 364(d). Wextrust investors, all or substantially all of whom are tort creditors with unliquidated claims, (*see* 11/14/08 Tr. at 5-6, 35-36; *Scholes v. Lehmann*, 56 F.3d at 754, 755 (victims of securities Ponzi scheme who purchased limited partnership interests were tort creditors)), would be required to litigate their fraud claims, likely increasing further the costs to the estate.

Based on the Receiver's analysis, the benefits of Chapter 11 would not outweigh those substantial costs. It is unlikely that any of the Wextrust Entities or Affiliates – individually or collectively – could advance a plan of reorganization that has any reasonable possibility of being confirmed. The overall Wextrust enterprise has little, if any, value as a going concern. The senior managers have been indicted or resigned. The

enterprise was poorly organized and managed, and was characterized by inadequate financial controls, no effective system of recordkeeping, and systematic misuse of investor funds. The Wextrust organization has no track record of success in real estate management. Indeed, the Receiver's investigation has validated the SEC's allegation that the enterprise was operated as a Ponzi scheme, such that the real estate portfolio was kept afloat only by misusing the proceeds of securities sales to pay overhead, such as payroll and travel expenses. (*See* First Interim Report at 63-66, 68-74, 79-86). Based on the company's history, particularly in light of current market conditions, there is no reason to believe that any lender would provide sufficient debtor in possession financing for such a reorganization (Kahn Decl. ¶ 16; Ben Levisohn, *Loans to Companies in Bankruptcy Dry Up*, Bus. Wk., Jan. 7, 2009 (online version) (DIP financing fell from $7.9 billion in second quarter of 2008 to $2.9 billion in fourth quarter)). Thus, in the Receiver's judgment, the possibility of reorganization is remote at best, and the potential benefit of reorganization should be given little if any weight.[8]

Absent reorganization, there is no reason to believe that liquidation in bankruptcy would yield a better result than a forced auction by the Receiver. As discussed above, a forced auction of the properties, whether under the auspices of this Court or the Bankruptcy Court, would likely result in sales at substantially below the fair market value

---

[8] In the Receiver's judgment, this analysis applies not only to the ultimate Wextrust parent entity, Wextrust Capital, LLC, but also to the intermediate subsidiaries – WEP, WDG and Axela – that managed other Wextrust Affiliates. Both the intermediate subsidiaries and the single asset real estate companies that held Wextrust properties were managed by the same group of individuals as Wextrust Capital, under the supervision of defendants Byers and Shereshevsky, and suffered from the same profound problems. The downstream Wextrust Affiliates that held individual assets were generally single asset real estate companies that existed only on paper. The assets of all of the entities were systematically commingled, and there was a generalized failure to observe corporate formalities. In those circumstances, there is no reason to believe that any one or a combination of the Wextrust Entities and Affiliates could be reorganized successfully. *See* First Interim Report at 11-14, 18, 63-66, 68-78.

of the properties.[9]  Especially in light of the added costs and delay of bankruptcy, there is

no reason to believe that such a sale would provide a net economic benefit the

receivership estate.

In considering bankruptcy, the Receiver has been mindful of the history of

abusive bankruptcy filings in so-called single asset real estate ("SARE") cases.  Congress

recently enacted the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005,

Pub. L. 109-8, 119 Stat. 23 (2005), which amended the Bankruptcy Code in certain

respects that are particularly relevant to this case.  One of the purposes of the Act was to

deter SARE companies from filing bankruptcy petitions for the improper purpose of

thwarting the efforts of secured creditors to exercise their rights to foreclosure under state

law.  The amendments expanded the definition of SARE to cover companies such as the

Wextrust Affiliates that own the properties at issue, and made it easier for secured

creditors to obtain relief from the automatic stay in bankruptcy.[10]  With respect to

properties that are worth less than the secured creditors' interests, the SARE provisions

likely would lead to foreclosure in any event, and a bankruptcy filing would only delay

that outcome and dissipate the estate.

Thus, in the case of the Rogers Plaza shopping center in Grand Rapids, MI, which

was worth less than the secured debts the Court granted the Receiver's application to

relinquish the property, finding that "a bankruptcy would take more time, cost more

---

[9] Kahn Decl. ¶ 46; *see* Todd C. Pulvino, *Effects of Bankruptcy Court Protection on Asset Sales*, 52 J. Fin. Econ., 151, 178-79 (1999) (sales under bankruptcy court supervision result in substantial discounts from fair market value).

[10] *See* 11 U.S.C. § 101(51B) (amended definition of SARE), § 362(d)(3) (providing for relief from automatic stay where reorganization is unlikely and income from property is insufficient to pay interest to secured creditors); *In re Scotia Pacific Co., LLC*, 508 F.3d 214 (5th Cir. 2007); *In re Kara Homes, Inc*., 363 B.R. 399 (D.N.J. 2007).  Counsel for one of the unofficial creditors' committees in this case conceded that a bankruptcy filing in this case "may" be an abusive filing.  (12/22/08 Tr. at 24).

money and more likely than not end the same way, with a foreclosure proceeding." (12/22/08 Tr. at 39). Moreover, the strong federal policy against bankruptcy filings by companies such as the Wextrust Entities and Affiliates in circumstances where foreclosure is imminent weighs against bankruptcy as an appropriate option in this case.

Based on the foregoing, the Receiver has determined that it would not be in the best interests of the estate to file any bankruptcy petitions at this time. The Receiver will continue to monitor the properties, with the assistance of bankruptcy counsel and professional advisors, in light of evolving circumstances and market conditions. Should it appear, based on changed circumstances, that bankruptcy filings are warranted, the Receiver will notify the Court and interested parties promptly.

**4. Consensual Foreclosure**

The number and amount of Wextrust securities offerings peaked in 2007, when Wextrust Securities raised more than $50 million to finance real estate projects. (*See* First Interim Report at 18-21, 30-31). Since 2007, the residential real estate market has suffered its largest decline in four decades. U.S. home prices have fallen every month since January 2007, and dropped by 18 percent between October 2007 and October 2008. According to recent reports, the rise in residential foreclosures has further depressed home prices, so much so that the prices for private sales have fallen to the same level as foreclosure sales. Jack Healy, *Home Prices Fell at Their Sharpest Pace in October*, N.Y. Times, Dec. 31, 2008 at B3.

Along with the overall market, the value of the Wextrust residential real estate portfolio has fallen precipitously. The purchase of those properties was heavily leveraged through secured mortgage financing. Based on Hilco's valuation analysis, with the exception of the Brooklyn condominium project discussed above, the value of the

Wextrust residential properties has fallen substantially below the amount of secured interests in the properties.  (Kahn Decl. ¶ 37).

The Receiver has considered whether to cooperate with secured lenders in foreclosure proceedings.  It is unlikely that foreclosure would result in any proceeds to the receivership estate.  Indeed, it is more likely to result in liabilities.  Because the value of the properties appears to be lower than the amount financed (typically 80 to 90 percent of the purchase price), the proceeds of foreclosure sales would be insufficient to pay the secured lenders, who would be entitled to be paid first out of such proceeds.  To the extent the proceeds are insufficient to pay those debts, the lenders may have deficiency claims against the estate.  Although the estate would be entitled to any proceeds in excess of the secured debt, the Receiver does not expect any such surplus.

Despite those costs, however, foreclosure on the Wextrust residential properties would result in net economic benefits to the receivership estate when compared to other options.  The estate is required to pay substantial ongoing costs to preserve the value of the residential properties.  For example, the estate has paid for security, insurance, winterization and other expenses to prevent deterioration from the elements and vandalism.  In foreclosure, the lender would have an economic incentive to preserve the value of the property, and could be expected to pay such costs.  Relinquishing distressed properties to the secured lenders would also reduce the administrative costs of the estate by relieving the Receiver, other professionals and Wextrust employees of the responsibility for managing those properties.  (*See* 12/22/08 Tr. at 30-31, 38-40 (discussion of lender's management of property and payment of expenses pending foreclosure)).

Based on the foregoing, the Receiver has determined that, for several properties, consensual foreclosure appears to be in the best interests of the receivership estate and the Wextrust stakeholders as a whole. Those properties are the following:

- 2435 West Belmont (Chicago Condominium Development)
- 2825 Oakley (Chicago Condominium Development)
- 410 E. Magnolia (Jersey Shore Condominium)
- 625 Paragon (Chicago Condominium Development)
- Hamptons of Hinsdale (Illinois Residential Development)
- Hilltop Apartments (Indiana Apartment Building)
- Riverside Arcade (Illinois Office/Retail Building)
- St. Francis (Wisconsin Condominium Development)
- Stonebridge Woods (Chicago Suburban Subdivision)

More detailed information about those properties is contained in Exhibit A to the Kahn Decl. The Receiver will submit a motion and proposed order seeking the Court's approval for the relinquishment of those properties, on notice to interested parties.

### 5. Implement Revised Business Plans

As discussed above, the business plans for all Wextrust real estate projects contemplated a sale or refinancing of the project after a specified holding period. In most cases, the business plans have not been executed, and the properties have not been held for as long as contemplated.

The Receiver has developed a modified plan for a total of 21 WEP properties, some of which have multiple assets. Those assets are listed below and further information on each of the properties is included in Exhibit B to the Kahn Decl. The marketing and sales process for those assets is described in further detail in the next section. In each case, the Receiver, based on advice and analysis from Hilco, Deloitte, counsel and Wextrust staff has determined that an orderly sale of the property at fair market value is in the best interests of the estate. That determination takes into account

the value of the properties, secured debts, transaction costs associated with marketing and sale, and the time needed to market and sell the properties. Based on all those considerations, the Receiver expects that the sale of the properties will result in a net economic benefit to the receivership estate and the Wextrust stakeholders as a whole.

- 116 N. York Road, LLC
- 45 South Washington Street Holdings, LLC
- Bax Realty Holdings, LLC
- Belle Meade Centre Partners, LLC
- Clarksville Industrial Holdings, LLC
- Commerce Center Holdings, LLC
- Corinth Industrial Holdings, LLC
- Executive Plaza Holdings, LLC
- First Highland, LLC
- Hammond Industrial Holdings, LLC
- Interstate Park Holdings, LLC
- Myatt Holdings, LLC
- New Salem Holdings, LLC
- Park Village Holdings, LLC
- Peoria Office Holdings, LLC
- Shallowford Holdings, LLC
- South Pine Street Holdings, LLC
- Tennessee Office Holdings, LLC
- West Bearden Holdings, LLC
- Wilma Rudolph Holdings, LLC
- Workman Road Holdings, LLC

The Receiver will be required to spend additional funds to preserve the value of the assets pending sale. Those expenditures will be limited to the minimum amounts necessary, and in most cases will be less than those contemplated by the business plans.

With respect to the high yield loan portfolio, the Receiver is assessing whether the estate's interest in any of the loans can be sold to third parties on terms that would provide an economic benefit to the estate. At the same time, the Receiver is taking steps, with the assistance of Hilco, to collect on the loans, and is pursuing Wextrust's remedies in pending foreclosure proceedings.

### 6. Workout Negotiations With Secured Lenders

The three hotel assets managed by Axela – the Park View, Crowne Plaza and Wyndham Drake – are valuable properties worth tens of millions of dollars. Based on the Receiver's efforts to market the Park View Hotel, it is expected that there will be a high level of interest in the properties by potential buyers, despite the current state of the economy and the deterioration of the hospitality market. Because the properties were purchased at the height of the market on a heavily leveraged basis, the receivership estate has little or no equity based on the current value of the hotels. Moreover, the costs of operating the hotels, both in cash and in administrative burden, are higher than those of any of the other properties. There is also a risk that the value of the hotels will continue to decline over time.

The Receiver has had extensive discussions with the secured creditors on the hotel. Because of the high value of the properties and the circumstances surrounding them, the Receiver is exploring the possibility of restructuring the debt and/or assisting the creditors by selling the properties for their benefit, in return for some economic contribution to the estate.

* * * * *

The Receiver has also considered various other options, such as a bulk sale of substantially all of the assets of one or more of the Wextrust Entities and Affiliates; securitization of Wextrust assets, such as receivables on the high yield loan portfolio; and even an application for relief under the federal government's Troubled Asset Relief Program. To date, the Receiver has not developed any viable alternative approaches. The Receiver welcomes suggestions and ideas from interested parties, and will carefully consider any rational option.

**F. MARKETING AND SALES PROCESS FOR SELECTED WEXTRUST PROPERTIES**

The Receiver has designed a marketing and sales process for the WEP and Axela properties identified in Section E, above. The process is designed to maximize the value of the receivership estate by obtaining the highest price for the properties, minimizing transaction costs and facilitating an expeditious distribution to victims of the alleged scheme.

The Receiver has sought to take into account the unique characteristics of the Wextrust portfolio, as well as current economic and market conditions. As described below, the marketing strategy includes both a national initiative for the entire portfolio of properties and a property-specific and geographically targeted approach for each asset. That strategy is designed to reach the broadest spectrum of potential purchasers, from smaller local end-users to large regional, national and global investors. Similarly, the negotiation strategy provides for varying approaches based on the characteristics of the properties, including sealed bids and more conventional processes. The Receiver's marketing and sales process consists of three phases – preparation, marketing and execution – which are described below.

**1. Preparation Phase**

The Receiver and his advisors are actively preparing to market and sell the properties. Those preparations are expected to be substantially completed over the next month. The preparation phase includes collecting information on each of the properties, including financial information, rent rolls and other management information, such as the materials contained in Exhibit B to the Kahn Decl., as well as customary and necessary surveys, title reports and the like. Deloitte and Wextrust personnel are assisting in

compiling that information. In addition, Hilco is preparing marketing materials, including brochures, website content, signage and advertising copy, as well as direct marketing materials to be sent to potential purchasers. (Kahn Decl. ¶ 43-44). Receivership attorneys are preparing standard form contract documents, confirmation applications and other legal materials to expedite the execution phase, as described below.

### 2. Marketing Phase

The Receiver has determined that an effective marketing strategy calls for providing as much information as possible to the largest number of potential purchasers. In sales of real estate of the size and scale of the Wextrust portfolio, it is common to spend one to two percent of the value of the property for marketing. In light of the circumstances of this case, in which a large number of investors have suffered devastating losses, the Receiver will take a far more conservative approach in order to minimize transaction costs while ensuring an effective marketing effort. (Kahn Decl. ¶ 44).

The strategy includes direct marketing, print advertising, online listings and Internet-based information facilities. In order to maximize interest, Hilco will issue a "kickoff" press release announcing the sale of the entire group of properties, followed by strategic print and online advertising. Profiles of each property will be available on both the receivership website and the Hilco website. Hilco will contact potential purchasers directly by email, telephone and in-person meetings. In some cases, Hilco may seek to partner with local real estate brokers to maximize exposure. (Kahn Decl. ¶ 44).

During the marketing phase, Hilco will provide additional information to parties contemplating serious offers on a confidential basis.[11]  In order to minimize transaction costs, Hilco will establish a secure web-based due diligence facility that will be available to interested parties who have entered into confidentiality agreements.  Prospective buyers will be permitted to visit the properties as appropriate.  The Receiver and his advisors will be available for discussions with such parties through the process of offer and acceptance.  Depending on the extent of interest and the amount of any offers, the Receiver may elect to withdraw one or more properties from the market temporarily or permanently, in order to revisit the plan for management of such properties.  (Kahn Decl. ¶ 45).

### 3.	Execution Phase

All sales will be subject to confirmation by the Court, as provided by the Receiver Order and applicable law.  In order to minimize transaction and administrative costs, the Receiver will seek to combine as many transactions as practicable in a single application.  The Receiver will provide notice to interested parties sufficient to comply with the Receiver Order and due process requirements.  Upon confirmation, the Receiver will seek to consummate the transaction as soon as possible.  Sale proceeds will be maintained by the receivership estate, pending further order of the Court.

### G.	CONCLUSION

The foregoing reflects the Receiver's best professional and business judgment on an effective plan for managing the Wextrust real estate portfolio.  Although the Receiver has relied heavily on qualified and experienced attorneys, accountants and consultants in

---

[11] Such additional information may include estimated operating results, cash flow projections, discounted cash flow analyses, comparable sales data, market demographics and various other data.

formulating the plan described above, the performance of the properties is ultimately the Receiver's responsibility.  Based on that performance, and on the results of the marketing and sales process described in Section F, above, the Receiver may alter the management of the properties as necessary to maximize the value of the estate.  The Receiver respectfully solicits comments, questions and advice from the Court and interested parties.  The Receiver expects to submit a Second Interim Report in February 2009, which will include updated information on the management of the properties.

Dated: New York, New York
        January 15, 2009                            Respectfully submitted,

                                                    TIMOTHY J. COLEMAN
                                                    Receiver for Wextrust Entities

                                                    DEWEY & LeBOEUF LLP
                                                    1301 Avenue of the Americas
                                                    New York, New York 10019
                                                    Tel: (212) 259-8000

                                                        Of Counsel.

## <u>CERTIFICATE OF SERVICE</u>

The undersigned, an attorney, states that I am one of the attorneys for Timothy J. Coleman, Receiver, in this matter and do hereby certify that on January 15, 2009, I directed the service of a true and correct copy of the foregoing (1) **Receiver's Plan for Management of Wextrust Real Estate Portfolio** and (2) **The Declaration of Mitchell P. Kahn In Support and the Exhibits Thereto** upon the following individuals in the manner indicated below:

<u>**Via ECF Notification & Electronic Mail**</u>
Alexander M. Vasilescu, Esq.
Andrew M. Calamari, Esq.
Steven G. Rawlings, Esq.
Alistaire Bambach, Esq.
Danielle Sallah, Esq.
Philip Moustakis, Esq.
**Attorneys for Plaintiff SECURITIES AND EXCHANGE COMMISSION**

Barry S. Pollack, Esq.
Joshua L. Solomon, Esq.
**Attorneys for G&H PARTNERS AG**

Barry S. Zone, Esq.
Jason Canales, Esq.
Stephen Richard Popofsky, Esq.
**Attorneys for Defendant STEVEN BYERS**

Edward F. Malone, Esq.
George R. Mesires, Esq.
**Attorneys for BARRINGTON, BANK & TRUST CO. AND HINSDALE BANK & TRUST CO.**

John C. Meringolo, Esq.
**Attorney for Defendant JOSEPH SHERESHEVSKY**

Michael Fred Bachner, Esq.
**Attorney for Defendant ELKA SHERESHEVSKY**

<u>**Via ECF Notification & Electronic Mail**</u>
Shalom Jacob, Esq.
Shmuel Vasser, Esq.
**Attorneys for purported group of investors described as INTERNATIONAL AD-HOC COMMITTEE OF WEXTRUST CREDITORS**

Martin Siegel, Esq.
**Attorney for purported group of investors described as INTERNATIONAL CONSORTIUM OF WEXTRUST CREDITORS**

Paul A. Levine, Esq.
**Attorney for purported non-party KEY EQUIPMENT FINANCE, INC.**

David B. Gordon, Esq.
Beth L. Kaufman, Esq.
**Attorneys for non-party LARRY COSTA.**

Harris Kay, Esq.
Marc X. LoPresti, Esq.
**Attorneys for non-parties TIMOTHY M. HOLMES REVOCABLE TRUST, LARRY COSTA, KRISTINE SZABO, STANLEY SIMPSON, ANDREW CAMPBELL, JAMES D. LECKINGER, AVRAHAM HOCHMAN, AND KAREN POLTER.**

  s/ Mark S. Radke_____