UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>                        Plaintiff,<br><br>  - against -<br><br>STEVEN BYERS, JOSEPH SHERESHEVSKY, WEXTRUST CAPITAL, LLC, WEXTRUST EQUITY PARTNERS, LLC, WEXTRUST DEVELOPMENT GROUP, LLC, WEXTRUST SECURITIES, LLC, and AXELA HOSPITALITY, LLC,<br><br>                        Defendants,<br><br>  - and -<br><br>ELKA SHERESHEVSKY,<br>                        Relief Defendant. | No. 08 Civ. 7104 (DC)<br><br>ECF Case |

### DECLARATION OF MITCHELL P. KAHN IN SUPPORT OF RECEIVER'S PLAN FOR MANAGEMENT OF <u>WEXTRUST REAL ESTATE PORTFOLIO</u>

MITCHELL P. KAHN, being duly sworn, deposes and says:

1. I am the former Chief Executive Officer ("CEO") of Hilco Real Estate, LLC ("Hilco"). I was the acting CEO of Hilco at the time Hilco was engaged by Timothy J. Coleman, duly appointed receiver herein ("Receiver"), to advise him in the above-captioned matter. I served in this capacity until I was succeeded by Neil R. Aaronson, but am still a principal of Hilco and continuing to work in the same capacity on this project through the end of the engagement.

2. I have extensive experience in commercial real estate development and deal making involving restructuring, disposition, lease renegotiation, and acquisitions. I am a

DC1312649.4

graduate of the University of Wisconsin School of Business and the Northwestern University School of Law, and formerly practiced real estate law and developed and managed numerous retail shopping centers.

3. This declaration is submitted in support of the Receiver's Plan For Management of Wextrust Real Estate Portfolio ("Plan for Management"). Except as otherwise indicated, I have personal knowledge of the matters set forth herein and, if called as a witness, would testify competently thereto.[1]

## BACKGROUND AND SUMMARY OF HILCO ENGAGEMENT

4. Hilco's parent company, The Hilco Organization, is the nation's leading asset valuation and disposition firm. Hilco provides an array of advisory services to help businesses improve leverage and cash flow by repositioning and restructuring their real estate commitments, with a focus on optimizing value in the shortest time frame possible.

5. Hilco was retained by Dewey & LeBoeuf LLP, counsel to the Receiver, in September 2008. Since this time, I and others under my direction have been assisting the Receiver in ascertaining, among other things, (i) the financial condition of the Wextrust Entities and Affiliates and, particularly, the real estate interests held by the Wextrust Entities and Affiliates; (ii) measures needed to prevent further dissipation of the property and assets of Wextrust Entities and Affiliates; and (iii) whether one or more of the Wextrust Entities and Affiliates should undertake a bankruptcy filing.

6. The Receiver has directed Hilco to perform valuations of the numerous real estate properties held or controlled by the Wextrust Entities and Affiliates and make recommendations regarding a course of action, including sale, retention, or relinquishment of interest.

---

[1] Certain of the disclosures set forth herein relate to matters within the knowledge of other members at Hilco, and are based on information provided by them.

7. Our approach to this engagement was undertaken in three phases. Phase 1 was the valuation phase, which is discussed in greater detail below. During this phase, our team met with the Receiver, his attorneys and other advisors, and former Wextrust employees in Chicago, Nashville, and Bethesda, for a comprehensive briefing relating to the engagement. Our team then took additional valuation steps including, among other things, reviewing the books and records of the Wextrust Entities and Affiliates, physically inspecting the properties in question, collecting information from additional outside sources, and conducting valuation analyses applying accepted principles and methods commonly used by professionals in valuing and appraising real estate. This phase concluded with the submission of individualized written reports to the Receiver detailing, among other things, Hilco's valuation of each property, future projections relating to cash flow and other factors for each property, and a recommended disposition for each property.

8. Phase 2 of Hilco's approach is ongoing, and includes providing advice and recommendations to the Receiver regarding the most effective way to maximize the value of the specific real estate assets comprising the receivership estate as well as assisting with ongoing management of the Wextrust properties. With the participation of the Receiver, his legal counsel, and his other advisors, Hilco has been assisting the Receiver in determining whether certain assets should be relinquished. Attached hereto as **Exhibit A** is a description of each of the assets that Hilco has recommended the Receiver relinquish in short order and the reasons therefore. In addition, Hilco has been working with the Receiver in determining which assets can be monetized, the time frame for any such monetization, the best methods of monetizing those assets, whether assets should be packaged or sold on an asset-by-asset basis, determining the forms of consideration to be received by the estate, and the like. Attached hereto as **Exhibit B** is a description of each of the assets that Hilco has recommended that the Receiver sell and

relevant information regarding each of the assets.

9. Phase 3 of Hilco's approach is also still ongoing, and primarily will involve the implementation of the strategy determined in Phase 2 to maximize the value of the receivership estate. This phase will include, among other things, the development, design, and implementation of an individualized marketing program for the sale or relinquishment of certain receivership assets, as described in greater detail below and in the Plan for Management. Phase 3 of Hilco's engagement will also entail the coordination of the sales processes for the sale of certain assets after consultation with and approval by the Receiver and his legal counsel, assistance in the negotiation of sale and relinquishment terms, regular reporting to the Receiver and his advisors, and participation and attendance at court hearings, where appropriate, when approval is sought for any transaction involving receivership real estate assets.

10. Several Hilco team members have participated in this engagement in a variety of capacities, and their specific involvement is outlined in greater detail below. Personally, in addition to my supervisory role, I offered consulting advice focused on, among other things, commercial real estate development and disposition.

11. Hilco's level of compensation for consulting and advisory services, however, was capped at a flat fee independent of the number of Hilco employees involved in the engagement or the total number of hours expended. Hilco's compensation consists of two separate components. First, as compensation for Hilco's consulting and advisory services, Hilco is paid in monthly installments of $165,000, currently through February 2009, subject to compliance with the Securities and Exchange Commission's applicable fee guidelines and final approval by the Court. Hilco may be required to continue its consulting and advisory services in some (albeit diminished) capacity after February 2009, and the parties will discuss appropriate compensation structure per the circumstances. Second, as compensation for disposition services, Hilco will be

paid a disposition fee on a sliding scale based on the aggregate gross proceeds of each sale, ranging from 1.5% to 5% of the gross proceeds. Any commissions Hilco receives on sales it brokers will be subject to disclosure to and review and approval by the Court in the context of Hilco's final fee and expense application.

**VALUATIONS PROCESS AND ANALYSIS OF MARKET CONDITIONS GENERALLY**

12. At the direction of the Receiver and with the assistance of Deloitte Financial Advisory Services ("Deloitte"), Hilco conducted a valuation analysis for each asset within the Wextrust real estate portfolio. The steps taken in this process with respect to each group of assets is described in greater detail below. Generally speaking, Hilco employees reviewed the books and records of the Wextrust Entities and Affiliates, physically inspected the properties, and collected information from additional sources. Hilco also reviewed and analyzed comparable transactions in each marketplace along with trends and statistics in that marketplace to get a better indication of value. For example, some of this additional information centered on recent sales data relating to comparable properties, actual and projected leasing income from Wextrust properties, and expected returns on capital investments. Hilco then reviewed all of the asset and market-specific information and applied accepted principles and methods commonly used by professionals in valuing and appraising real estate.

13. In ordinary circumstances, professional real estate valuations like those compiled by Hilco for the Receiver provide a generally reliable measure of the fair market value of a property. The actual sale price, however, of a unique property is determined by a wide variety of factors, and cannot be predicted with precision. Moreover, the predictive value of such analysis is diminished during periods of volatility, particularly in real estate and credit markets. Current market conditions have thus compounded the difficulty in predicting the sales price of Wextrust real estate assets.

14. As has been widely documented in the press, the current economic recession is getting progressively worse, which has led to a substantial nationwide decline in home prices and commercial rents as well as a collapse of the credit markets. Accordingly, while Hilco was deferential to the results and expectations outlined in the respective business plans for each individual asset, it appears than in light of external market factors, the likelihood of achieving the results envisioned in most of the business plans is remote. For example, although some of the business plans call for the individual properties to be held for many more years, there is a substantial risk that holding these properties for extended periods of time would result in greater losses in value, not to mention the expenditure of substantial additional carrying costs. Indeed, it can be said generally that based on the circumstances of this case and current economic conditions, the continued operation of the real estate portfolio by the Receiver for an extended period would risk further losses to the estate. Moreover, in light of the continuing decline in real estate prices, there is a substantial risk that holding the properties for extended periods would result in further losses in value.

15. In evaluating the Wextrust real estate portfolio for the purpose of offering recommendations to the Receiver, Hilco explored available options for maximizing the value of any returns to parties-in-interest. For example, Hilco evaluated the efficacy of raising additional capital to complete certain projects and/or selectively filing bankruptcy petitions for one or more of the assets. Unfortunately, however, Wextrust lacked a well-functioning business organization and, with the indictment of its principals, the prospects for further financing appear to have evaporated. The Receiver's investigation reaffirmed the SEC's initial allegation that the enterprise was operated as a Ponzi scheme, such that pieces of the portfolio were kept afloat only by misusing the proceeds of securities sales. It has also become apparent that many of the Wextrust assets are severely overleveraged, diminishing financing prospects.

16. Accordingly, based on the company's history and current market conditions, there is no reason to believe that any lender would provide sufficient debtor-in-possession financing for a bankruptcy reorganization. Likewise, neither bank financing nor the issuance of additional securities appears likely in this case in light of the fact that the market for commercial real estate credit has largely collapsed in recent months.

17. I understand that the Receiver has decided not to include Hilco's asset-specific valuations in the Plan for Management. It is my belief that this decision is prudent in this case because disclosing the valuations publicly may adversely affect the Receiver's ability to maximize the value of the estate by potentially imposing a *de facto* ceiling on the sales price.

18. In the sections that follow, however, I have outlined the specific steps taken by Hilco during the respective investigatory and valuations processes for each category of assets.

## **WEXTRUST EQUITY PARTNERS, LLC PORTFOLIO**

19. The Wextrust Equity Partners, LLC ("WEP") portfolio is comprised of 23 real estate assets dispersed throughout the United States. The business plans for the WEP properties generally contemplated that the individual property would be purchased, renovated or improved, and then sold or refinanced after a broadly defined holding period with the expectation of eventual profit.

20. Todd Haney, President of Hilco's Valuation Services, and his team have been primarily involved with investigating and valuating the WEP portfolio. Over his career, Mr. Haney has managed hundreds of valuation and consulting assignments involving a broad range of property types throughout the United States and Canada. Properties appraised include traditional industrial, retail, office and multi-family residential properties, as well as complex properties with environmental concerns, designated with historical status, and the like.

21. Hilco's approach to the WEP portfolio has been four-fold. First, Mr. Haney and

his team took steps to gain a firm understanding of all of the real estate assets within the portfolio. To accomplish this task, Hilco, among other things, completed site visits, conducted interviews and attended meetings with property managers or former Wextrust personnel familiar with the operation and lease/tenant profile of the assets, completed reviews of historical and projected lease data, and evaluated additional financial and contractual information related to each individual property.

22. Second, as part of its ongoing advisory and consulting duties, Hilco advised the Receiver on all matters related to the WEP properties including, but not limited to, capital spending, leasing, and negotiations with lenders, numerous creditors, property management companies, and tenants.

23. Third, Hilco developed valuation scenarios for each of the properties. The valuation work entailed completing detailed discounted cash flow analyses encompassing re-leasing assumptions for existing tenants and lease modeling for speculative tenants, expense projections, and application of capitalization and discount rates.

24. Fourth, after consultation with and approval by the Receiver and his other advisors, Hilco began developing individualized marketing strategies for 21 of the assets that were determined to have potential positive equity value. This task is still ongoing.

## AXELA HOSPITALITY, LLC PORTFOLIO

25. The Axela Hospitality, LLC ("Axela") portfolio includes three hotel properties. The investigatory and valuation process related to Axela was supervised by Neil R. Aaronson, the current CEO of Hilco. Mr. Aaronson received a J.D. from the University of Pennsylvania Law School and a Bachelor of Economics Degree from the Wharton School of the University of Pennsylvania. He brings 10 years of merger, acquisition, disposition, investment, and general deal-making experience to Hilco, including in the hospitality sector.

26. With respect to the Axela portfolio, Hilco completed multiple site visits to each property, held multiple in person meetings with the property managers for each hotel, and conducted detailed reviews of the historical and projected financial and contractual information for each property.

27. As part of its valuation work, Hilco completed detailed discounted cash flow analyses and comparable hotel value analyses on each of the properties and utilized several different means of understanding the overall competitive environment for the lodging industry on both a macro and microeconomic level.

28. As with the WEP portfolio, as part of Hilco's advisory duties it also advised the Receiver on all matters related to the hotels including, but not limited to, matters relating to capital spending, hotel performance, and negotiations with lenders, numerous creditors, property management companies, and tenants.

29. Furthermore, Hilco evaluated and consulted the respective business plan for each hotel property. For example, with respect to the Wyndham Drake Hotel in Chicago, pursuant to the business plan disclosed to investors, Wextrust management planned to renovate the hotel over a period of 30 months, at an additional cost of $18.5 million, including a new wing with 100 rooms and additional meeting space. The business plan also contemplated that the hotel would be held for seven years.

30. After a thorough evaluation of property-specific and market factors, however, it became clear that it would be impracticable, and probably impossible, for the Receiver to continue with the planned renovation and operation of the Drake. First, the receivership does not have sufficient capital to finance such a renovation, and there is no reasonable likelihood that the Receiver could obtain sufficient financing in light of current market conditions. Second, as disclosed to investors in the PPM, the plan involves a degree of risk that would be unacceptably

high in light of the Receiver's role and fiduciary duties. For example, the PPM listed as risk factors an economic slowdown, the impact on the lodging industry of increased energy costs, and unanticipated obstacles to execution of the business plan – all of which have materialized. Executing the renovation plan could result in heavy losses for the receivership estate and for Wextrust stakeholders as a whole. Third, the continued operation of the hotel is expected to result in negative cash flow. Finally, there is no reason to believe that an addition to the hotel is warranted in the current Oakbrook market. Absent substantial improvements in economic conditions, of which there is no reason to predict based on current circumstances, holding the hotel for the planned seven-year period would likely incur large costs for the receivership estate, with no guarantee that any increase in the value of the hotel over that period would offset those costs. Accordingly, a marketing plan for the hotel is currently being prepared and negotiations with the lender have begun.

31. Changed circumstances and prevailing market conditions also led to the immediate creation and implementation of a complete marketing plan for the Park View Hotel. Hilco's valuation model for the Park View included three options: (1) sell the hotel immediately on an as-is basis at fair market value; (2) complete the planned renovation of the hotel and sell it after re-opening in late 2008; and (3) complete the renovation and continue to operate the hotel for at least 12 months before marketing the property. Our model was based on data concerning sales of comparable properties, average daily room rates, occupancy statistics, and other market information. Here, Wextrust management renovated the hotel at a cost of approximately $16 million, more than $10 million in excess of the budgeted expense. We also considered such factors as the cost to complete the renovation and reopen the property (more than $8 million), the cost of capital, and the property's anticipated cash flow.

32. With respect to the second and third options, Hilco performed a discounted cash

flow analysis to determine the present value of the proceeds of a future sale of the hotel, and compared those figures to the proceeds of an immediate sale under the first option. Further, Hilco conducted a probability analysis to estimate the likelihood that the results envisioned in the second or third options could be achieved. Based on that probability analysis, it is unlikely that the Receiver (or any successor manager) could successfully execute the Wextrust business plan, based on the current circumstances of Wextrust and current economic conditions. Thus, the likelihood of successfully executing the Wextrust business plan for the Park View is low, and the downside risk of failure includes millions of dollars in additional expenses and liabilities.

33. Accordingly, at the direction of the Receiver, Hilco began marketing the Park View on October 15, 2008. Hilco prepared an offering memorandum for the Park View Hotel, a detailed due diligence package for all interested buyers, and issued a press release. Hilco sent multiple blast emails to over 10,000 potential interested parties. To date, Hilco has also spoken with approximately 150 interested buyers, toured approximately 40 groups through the building, has entered into confidentiality agreements and has worked with interested buyers to educate them on the status of the property and the disposition process on almost a daily basis. In addition, Hilco has worked with Dewey LeBoeuf in negotiating with the lender, restaurant tenant and multiple lien claimants. Hilco established a bid deadline of January 15, 2009, and has received multiple offers, which are being considered by the Receiver. The bids involve various contingencies and are subject to further due diligence and discussion. Moreover, although the Receiver now has several bids on the Park View, there is no guarantee that any of them will result in a sale that will produce a net economic benefit to the estate. While the location of the property in the Lincoln Park area of Chicago has generated extensive interest, discussions with potential buyers indicate that the hotel presents certain challenges, including the fact that the building is 80 years old and the small room layouts are not optimal for a modern luxury property.

Moreover, the marker for the hotel has been impacted by current economic conditions. Average room rates and revenue per room have declined, and such conditions are reflected in the fact that hotel transactions in the Chicago area fell by approximately 70 percent in 2008. Accordingly, the Receiver is continuing to engage in discussions with secured lenders in an effort to identify alternatives for maximizing the recovery, if any, for the estate.

34. After careful and comprehensive analysis and deliberation, individual marketing efforts are also underway for the final hotel property, the Crowne Plaza Phoenix Hotel.

### **WEXFORD DEVELOPMENT, LLC PORTFOLIO**

35. The Wexford Development, LLC ("WDG") portfolio consists of 8 residential real estate properties. The specific business plans for each property contemplated that they would be sold on or before completion of construction.

36. As with the WEP and Axela portfolios, a Hilco team lead by Geoffrey Schnipper has conducted a comprehensive review and valuation of the 8 real estate assets. Mr. Schnipper specializes in single-asset and portfolio disposition of owned real estate, project management, and deal structuring. He has represented a diverse client mix of REITs, Fortune 500 Companies, Banks, Home Builders, and the U.S. Bankruptcy Court handling the disposition of virtually every asset class of real estate. He is also Certified Commercial Investment Member of the National Association of REALTORS.

37. With respect to the WDG portfolio, Hilco conducted interviews with key former Wexford Development personnel, visited most of the properties, consulted local experts, and analyzed recent sale and current listing data to supplement Hilco's results. Hilco then performed feasibility analyses on incomplete developments using model driven build out and absorption scenarios to determine the viability of the project and identify any sources of positive equity. Based on this analysis, with the possible exception of two projects, the value of the WDG

residential properties has fallen substantially below the amount of secured interests in the properties.

## HIGH YIELD LOAN PORTFOLIO

38. Jeffrey W. Linstrom, Hilco's former General Counsel (now Executive Vice President), focused his attention on counseling related to the 11 loans comprising High Yield Debt Fund I and the 16 loans comprising High Yield Debt Fund. Separate reports were provided for each loan fund complete with valuations and recommendations. Mr. Linstrom has many years of legal experience in corporate reorganizations, bankruptcies, and lending transactions. Prior to joining Hilco, Jeff was a partner with Jones, Day Reavis Pogue and counsel with Skadden, Arps, Slate, Meagher Flom. He has also served as counsel to debtors and creditors' committees in some of the largest and most complex reorganization cases in the country.

39. Specifically, Mr. Linstrom and his team served as business advisor to the Receiver with respect to the workout strategy on each of the loans in the High Yield portfolio. In this capacity, Hilco reviewed loan files on each loan, interviewed the relevant employees of Wextrust with respect to the loans, attended meetings and conference calls with the joint venture partners and loan participants, consulted with Dewey & LeBoeuf LLP and outside counsel on many issues related to the portfolio, and interfaced with other outside consultants with respect to many of the loans.

40. Some of the loans were structured such that Wextrust had a joint venture partner while the remainder were set up so that Wextrust was the sole participant. When a joint venture partner was involved, Hilco initated contact to propose acquisition of Wextrust's position in the loans.

41. Eleven of the sole participant loans were secured by 8 properties, which included industrial real estate, land, single and multi-family properties, and partially completed residential

projects. Where Wextrust was the sole participant, Hilco performed a preliminary opinion of value on the underlying collateral of each loan. The methods employed to value the collateral mirror those used to value the development portfolio.

42. A majority of the loans are currently in default. The specific Wextrust business plans, however, did not contemplate default or provide for that outcome. The Receiver is pursuing remedies in the form of foreclosure proceedings with the expectation of a modest return, and remains open to a sale of the portfolio.

## COMPREHENSIVE MARKETING PLAN

43. Andrew Becker and Geoff Schnipper have been tasked with leading Hilco's ongoing sales and marketing efforts for the Wextrust properties to be marketed for sale. Hilco's involvement has and will continue to focus on two phases of the marketing process. The first step is the preparation phase, which is expected to be substantially completed over the next month. The preparation phase entails collecting information on each of the properties including, but not limited to, rent rolls and other management information, customary and necessary surveys, title reports, and the like. Deloitte and former Wextrust personnel are assisting in compiling this information.

44. The second stage is the marketing phase, which will entail the preparation of marketing materials, including brochures, website content, signage and advertising copy, and direct marketing materials to be sent to potential purchasers. In light of the circumstances of this case, the Receiver has adopted a marketing approach that is intended to minimize transaction costs while ensuring an effective marketing effort. The strategy includes direct marketing, print advertising, online listings and Internet-based information facilities. In order to maximize interest, Hilco will issue a "kickoff" press release announcing the sale of the entire group of properties, followed by strategic print and online advertising. Profiles of each property will be

available on both the Receiver's website and Hilco's website. Hilco will also contact potential purchasers directly by email, telephone, and in-person meetings. Finally, in some cases, Hilco may seek to partner with local real estate brokers to maximize exposure. Also, in sales of real estate of the size and scale of the Wextrust portfolio, it is common to spend one to two percent of the value of the property for marketing. In light of the circumstances of this case, in which a large number of investors have suffered devastating losses, the Receiver will take a far more conservative approach in order to minimize transaction costs while ensuring an effective marketing effort.

45. During the marketing phase, Hilco will provide additional information to parties contemplating serious offers on a confidential basis. In order to minimize transaction costs, Hilco will establish a secure web-based due diligence facility that will be available to interested parties who have entered into confidentiality agreements. Prospective buyers will be permitted to visit the properties as appropriate. The Receiver and his advisors will be available for discussions with such parties through the process of offer and acceptance. Furthermore, depending on the extent of interest and the amount of any offers, the Receiver may elect to withdraw one or more properties from the market temporarily or permanently, in order to revisit the plan for management of such properties. Finally, Hilco can and will use a variety of sales techniques to maximize selling prices, such as setting bid deadlines; requesting sealed bids; holding auctions; establishing minimum prices; selecting a "stalking horse" bidder; and/or reserving the right to reject or renegotiate the highest bid for a particular property. Those measures can be expected to increase the number of potential purchasers and to ensure that sale prices are more consistent with fair market value.

46. Hilco has completed a full portfolio review of each asset's characteristics and determined how best to market each asset individually. As it has done throughout the entire

process, Hilco has explored every available option for maximizing the value of the estate to interested parties. For example, Hilco has significant experience in providing auction/forced sale services. While useful in certain contexts, property sold at forced sales is typically sold at a substantial discount, wherein the proceeds of such a sale would in all likelihood be far below fair market value. Accordingly, after consultation with Hilco and his other advisors, the Receiver has determined that marketing the real estate portfolio in an orderly fashion is substantially more likely to result in sales at fair market value than selling the properties in an absolute auction.

I declare under penalty of perjury that the foregoing is true.

Executed on January 15, 2009

_____
Mitchell P. Kahn