UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

SECURITIES AND EXCHANGE COMMISSION,

                 Plaintiff,

  - against -

STEVEN BYERS, JOSEPH SHERESHEVSKY, WEXTRUST CAPITAL, LLC, WEXTRUST EQUITY PARTNERS, LLC, WEXTRUST DEVELOPMENT GROUP, LLC, WEXTRUST SECURITIES, LLC, and AXELA HOSPITALITY, LLC,

                 Defendants,

  -  and -

ELKA SHERESHEVSKY,

                 Relief Defendant.

No. 08 Civ. 7104 (DC)

ECF Case

---

# MEMORANDUM OF LAW IN SUPPORT OF RECEIVER'S MOTION TO RELINQUISH INTERESTS IN CERTAIN RESIDENTIAL REALTY

TIMOTHY J. COLEMAN
Receiver for Wextrust Entities

DEWEY&LEBOEUF LLP
1301 Avenue of the Americas
New York, NY 10019-6092
Tel. (212) 259-8000

Attorneys for Receiver

February 6, 2009

## TABLE OF CONTENTS

|   |   | Page |
|---|---|---|
| I. | BACKGROUND | 1 |
|   | A. The Belmont Property | 5 |
|   | B. The Oakley Property | 7 |
|   | C. Riverside Arcade | 9 |
|   | D. St. Francis Property | 11 |
| II. | DISCUSSION | 12 |
| III. | CONCLUSION | 16 |

# TABLE OF AUTHORITIES

**Cases**

*SEC v. TLC Investments and Trade Co.*,
    147 F. Supp. 2d 1031 (C.D. Ca. 2001) ....................................................................... 14

**Statutes**

11 U.S.C. § 101(51B) ............................................................................................................ 1

11 U.S.C. § 554(a) .............................................................................................................. 13

28 U.S.C. § 754 ................................................................................................................... 12

**Other Authorities**

65 AM. JUR. 2D RECEIVERS § 153 (2008) ............................................................................ 12

ROBERT CHANNICK, *Shadow Cast on Office Leases; Downtown Chicago
    Vacancies Seen Rising by 50% by 2010*, CHICAGO TRIBUNE, Nov. 19, 2008
    at C39 ............................................................................................................................. 14

TIM JONES, *Housing Crisis Hits Midwest Hard; Foreclosure on the Rise Amid
    Lagging Economy in Region*, CHICAGO TRIBUNE, Nov. 4, 2007 at C 3 ....................... 14

BOB UPHUES, *Group Wants Arcade Named "Endangered*,"
    RIVERSIDE/BROOKFIELD LANDMARK, Nov. 18, 2008 .................................................... 11

BECKY YERAK, *More Houses Return to Lender; Mortgage Owners Increasingly
    Stuck with Foreclosed Homes They Can't Move at Auction*, CHICAGO
    TRIBUNE, Aug. 21, 2008 at C 1 ..................................................................................... 14

Timothy J. Coleman, Receiver for the Wextrust Entities ("Receiver"), respectfully submits this memorandum in support of his motion to relinquish the receivership estate's interests in four residential properties. For the reasons set forth below, the Receiver respectfully submits that the Court should approve the motion and grant relief substantially in the form of the proposed orders submitted herewith. The Receiver has submitted a separate proposed order for each property.

**I.    BACKGROUND**

Pursuant to the Court's orders, the Receiver has been appointed to manage the Wextrust Entities, as well as all entities they control or in which they have an ownership interest ("Wextrust Affiliates"). Among the Wextrust Affiliates are four single asset real estate entities, each of which owns or controls a residential property in the Chicago metropolitan area, which are the subject of this motion. (The Bankruptcy Code defines "single asset real estate" as "real property constituting a single property or project . . . which generates substantially all of the gross income of a debtor . . . and on which no substantial business is being conducted by a debtor other than the business of operating the real property and activities incidental thereto." 11 U.S.C. § 101(51B).) The Wextrust Affiliates and the properties at issue are identified in the table below.

| WEXTRUST AFFILIATE | PROPERTY NAME AND ADDRESS | DESCRIPTION |
|---|---|---|
| 2435 West Belmont Investors, LLC ("West Belmont Investors") | 2435 West Belmont Avenue, Chicago, IL ("Belmont Property") | Partially completed apartment building; foundation completed, construction halted |
| River's Edge Investors, LLC ("River's Edge Investors") | 2825 Oakley Avenue, Chicago, IL ("Oakley Property") | 13,500 square feet of vacant, undeveloped land |
| Riverside Investors, LLC ("Riverside Investors") | Riverside Arcade, 1 Riverside Drive, Riverside, IL ("Riverside Arcade") | 16,000 square foot mixed use building; currently vacant; no certificate of occupancy |
| SF Development Company, LLC ("SF Development") | The 4000 block of South Lake Drive, St. Francis, WI ("St. Francis Property") | 7.5 acres of vacant, undeveloped land |

Each of the Wextrust Affiliates identified above is included in Exhibit A to the Court's October 24, 2008 Order on Consent Imposing Preliminary Injunction (Dkt. No. 65), which is a non-exclusive list of Wextrust Affiliates. Each of the properties identified above (collectively, "Subject Properties") is owned or controlled, directly or indirectly, by one or more Wextrust Entities or Affiliates. (*See* Declaration of Donald Price, sworn to Feb. 6, 2009 ("Price Decl."), ¶¶ 3, 6, 10, 11).

Pursuant to the Court's Amended Order Appointing Temporary Receiver, issued September 11, 2008 (Dkt. No. 36) ("Receiver Order"), the Receiver has taken possession and control of the Subject Properties and has continued to manage them, with the assistance of Wextrust employees and professional advisors. As discussed in the Receiver's Plan for Management of the Wextrust Real Estate Portfolio, submitted January 15, 2009 (Dkt. No. 172) ("Management Plan"), the Receiver has obtained a valuation of the Subject Properties from real estate valuation and advisory consultant Hilco Real

Estate, LLC ("Hilco"). Based on Hilco's valuation analysis, the value of the Wextrust residential properties – including the Subject Properties – has fallen substantially below the amount of secured interests in the properties. (*See* Management Plan at 22-24).[1] Moreover, the Receiver has determined that the carrying costs associated with the Subject Properties, which produce no income, are approximately $1.3 million on an annualized basis. (*See* Declaration of Mark Radke, sworn to Feb. 6, 2009 ("Radke Decl."), ¶ 5, 8, 9, 12).

The Receiver has consulted with the secured creditors with interests in the Subject Properties in an effort to obtain to greatest possible economic benefit for the estate, or at least to minimize the estate's potential liabilities for deficiency judgments. For example, the Receiver has offered to provide creditors with deeds in lieu of foreclosure, which would extinguish the debts and avoid any deficiency claims. Currently, the secured lender on the St. Francis Property has expressed strong interest in a deed in lieu of foreclosure, including a waiver of deficiency claims. (Radke Decl., ¶ 2, 4).

The Receiver's advisors and counsel are working with the secured lenders to finalize agreements for the prompt disposition of the Subject Properties. In each case, the Receiver is seeking the lender's agreement to accept a deed in lieu of foreclosure and to waive any deficiency claim. As discussed below, the lender on the St. Francis Property has indicated strong interest in that request, and discussions with the other lenders are continuing. Although such an agreement would benefit the estate by avoiding any deficiency claim, and would likely benefit the lender by avoiding the significant expense

---

[1] In order to avoid any adverse impact on the market for the Subject Properties, the Receiver is not including the amount of Hilco's valuations in the moving papers. The Receiver is prepared to provide that information when and as directed by the Court. The Receiver is unaware of any current third-party appraisals of the Subject Properties.

of even a consensual foreclosure filing, that result may not be practicable with respect to some of the properties, in which case the Receiver would agree to a stipulated judgment of foreclosure or similar disposition.  Based on discussions with the lenders, the Receiver has concluded that the relief sought herein would not prejudice his ability to dispose of the assets on terms favorable to the estate.  (*Id.*).

In addition, the Receiver has considered other management options, including conducting public or private sales of the properties; holding the properties in the expectation of an appreciation in value; and filing bankruptcy petitions.  Based on the analysis and recommendations of Hilco and Deloitte, and after considering the available management options, the Receiver has determined that it would be in the best interests of the estate, and of all Wextrust stakeholders, to cooperate with the secured creditors in foreclosing on the Subject Properties.  (*See* Management Plan at 22-24).

The Receiver is authorized to "use, lease, sell, and convert into money all assets of the Wextrust Entities, either in public or private sales or other transactions on terms the Receiver reasonably believes based on his own experience and input from his advisors to be beneficial to the Wextrust Entities "  (Receiver Order at 8).  Because each of the Subject Properties has a cost basis of more than $750,000, the Receiver may only relinquish the estate's interest in the Subject Properties with the Court's approval, on at least four days written notice to all parties having filed notices of appearance in this action.  (*Id.*)  Accordingly, the Receiver has served this motion on all parties who have filed notices of appearance, and has posted the moving papers and a summary description of the relief requested on the receivership website.  In addition, the Receiver has sent the

same information to all purchasers of Wextrust securities issued to finance the Subject Properties, to the extent the Receiver has contact information for them.[2]

Each of the Subject Properties is described in further detail below. Additional details on the properties, including a map and photographs, are annexed to the Radke Declaration. (Radke Decl., ¶ 12, 13).

### A. The Belmont Property

Beginning in approximately November 2005, Wextrust Securities raised $4,450,220 from securities investors to finance a 48-unit condominium project in the Hamlin Park neighborhood of Chicago's North Side. The site for the project, located at 2435 West Belmont Avenue, was purchased on February 15, 2007 by a Wextrust Affiliate, 2435 West Belmont Development, LLC ("Belmont Development") for $3,344,008. To date, an industrial building on the site has been demolished and the foundation for the proposed apartment building has been laid. (*See* First Interim Report of Receiver, filed Nov.7, 2008 (Dkt. No. 88) ("First Interim Report") at 45).

Based on the ownership structure for the project, the receivership estate has a 50 percent interest in the property.[3] The members of Belmont Development are another Wextrust Affiliate, West Belmont Investors, LLC (which is owned by Wexford Equity

---

[2] Four members in the International Ad-Hoc Committee of WexTrust Creditors have investments in either the Riverside Arcade or Oakley Properties addressed in this memorandum. No members of the International Consortium of WexTrust Creditors have investments in any of these properties. *See* Notice of Members of the International Ad-Hoc Committee of WexTrust Creditors, filed Nov. 20, 2008 (Dkt. No. 110); Notice of Members of The International Consortium of WexTrust Creditors, filed Nov. 25, 2008 (Dkt. No. 115). Much of the information concerning the Subject Properties contained herein was included in the Management Plan. Since providing notice of the Receiver's intention to consent to foreclosure of the Subject Properties in that plan on January 15, 2009, the Receiver has not had any requests for additional information about those properties, and is not aware of any objections to plan for the properties.

[3] According to the operating agreement for 2435 West Belmont Development, LLC, the Sharing Ratio on all residual profits under the agreement is 50/50, and the two members share in gross-ups to cover prior losses. The members also share pro rata in a 30% contemplated internal rate of return. (Price Decl., ¶ 5).

- 5 -

Partners, LLC) and an unaffiliated entity, CD Belmont, LLC. The latter entity is owned by a group of investors that includes Anita Goyal, a Chicago area real estate developer. Centerstone Development Group, Inc., ("Centerstone Development"), the general contractor on the Belmont Property, is owned in whole or in part by Goyal. (Price Decl., ¶ 3, 4, 5).

All construction activity on the property ceased when a dispute arose between members of the joint venture in late 2007. In July 2008, Belmont Development filed a lawsuit against CD Belmont, LLC and Anita Goyal, alleging breach of the operating agreement, breach of fiduciary duty, fraud, and conversion. (Price Decl., ¶ 3, 4, 5).

The secured debt on the property is approximately $3.85 million, evidenced by a properly recorded first construction mortgage held by First Bank and an assignment of rents. Belmont Development originally entered into a construction mortgage with First Bank on February 12, 2007 in the amount of $11,528,723, but has only drawn down approximately $3.85 million of that loan to pay for the property and construction expenses. Prior to the appointment of the Receiver, First Bank declared the mortgage in default based on several events of default including lack of payment on the loan and failure to complete construction by the agreed-upon date. First Bank has stated that it will make no further advances. (Price Decl., ¶ 5).

Based on Hilco's valuation analysis, the current fair market value of the property is substantially below the amount of those secured interests. (Kahn Decl., ¶ 9). Notably, the secured debt exceeds the purchase price of the land by more than $50,000.

The Receiver has not paid debt service on the property because Belmont Development has no funds available, and the Receiver has determined that debt service is

not a necessary business expense required to preserve the value of the property. The annual carrying costs for the property, based on historical debt service and property taxes obtained from the secured lender, are approximately $217,000. The monthly carrying costs include approximately $16,000 in debt service on the First Bank mortgage loan. Additional annual carrying costs include approximately $25,000 in property taxes. (Radke Decl., ¶ 5).[4] Because the property is a semi-excavated lot with no construction activity, there are few maintenance expenses needed to preserve the property.

The Receiver's counsel is discussing the disposition of the Belmont Property with First Bank. Based on those discussions, it appears that the bank may agree to accept a deed in lieu of foreclosure, although no definitive agreement has yet been reached. As noted above, the Receiver has concluded that the Court's approval of this motion would not adversely affect the result of those discussions.

### B. The Oakley Property

This project consists of two non-contiguous parcels of vacant, undeveloped land in the Lakeview neighborhood of Chicago, with a combined area of approximately 13,500 square feet. The contemplated project was a 19-unit luxury townhome development. The land was purchased on September 29, 2005 by a Wextrust Affiliate, 2825 Oakley, LLC, for $2.4 million. Wextrust raised approximately $2.9 million from securities investors to finance this property. No construction has commenced on the property, and the property produces no income. (Price Decl., ¶ 6, 7).

---

[4] The carrying cost figures cited herein do not include any allocation of overhead or administrative expenses. The Receiver, Wextrust employees, professionals from Hilco and Deloitte, and legal counsel have spent significant amounts of time managing the Subject Properties. The avoidance of that management burden would result in cost savings for the receivership estate. (Radke Decl., ¶ 3).

Like the Belmont Property, this project was owned jointly by Wextrust and a group of investors that included Anita Goyal. The members of 2825 Oakley, LLC are a Wextrust Affiliate, River's Edge Investors, LLC and CD Oakley, LLC, which is owned by Goyal and other third parties. Centerstone Development is also owned by Goyal. (Price Decl., ¶ 7, 8).

As in the case of the Belmont Property, the Oakley Property became embroiled in litigation prior to the commencement of this case. In October 2007, Centerstone Development and Centerstone Construction, LLC ("Centerstone Construction") filed mechanics' liens on the property. 2825 Oakley, LLC then filed a civil action, demanding that the Centerstone defendants file a lawsuit to enforce or release their claim for lien. The litigation was subsequently stayed, as the result of an involuntary bankruptcy proceeding against Goyal and Centerstone Development pending in the United States Bankruptcy Court for the Northern District of Illinois. (Price Decl., ¶ 8).

The secured debt on 2825 Oakley, LLC is approximately $3.1 million, evidenced by a properly recorded construction mortgage issued by Lakeside Bank and various properly recorded modifications thereto. 2825 Oakley, LLC entered into a mortgage loan with Lakeside Bank on September 29, 2005 in the amount of $10,285,000. 2825 Oakley, LLC has drawn down $3.1 million of the loan. Prior to the appointment of the Receiver, Lakeside Bank declared the mortgage in default and has stated that it will make no further advances. (Price Decl., ¶ 7).

Based on Hilco's valuation analysis, the current fair market value of the property is substantially below the amount of Lakeside Bank's secured interest. (Kahn Decl., ¶ 9).

Notably, the amount of secured debt approximates the price Wextrust paid for the property in late 2005.

The Receiver has not paid debt service on the property because 2825 Oakley, LLC has no funds available, and the Receiver has determined that debt service is not a necessary business expense required to preserve the value of the property. In addition, based on communications with Lakeside Bank, the Receiver estimates that the carrying costs associated with this property are approximately $406,000 on an annual basis. Those costs include approximately $32,500 per month in debt service, plus an annual payment of approximately $16,000 for property taxes. Some minimal maintenance fees, as well as insurance payments until title has transferred, are needed to preserve the property. As in the case of First Bank, the Receiver's representatives are discussing the disposition of the Oakley Property with Lakeside Bank and are seeking the bank's agreement to accept a deed in lieu of foreclosure. (Radke Decl., ¶ 8).

### C. Riverside Arcade

This property is a renovated historic building located in the village of Riverside, Illinois. The building is zoned for both office and retail uses. It was purchased in December 2004 for approximately $3.4 million. WexTrust raised approximately $2.3 million from securities investors. Wextrust management gutted the building and had substantially completed renovations on the property when the Receiver took over the property in 2008. Construction stopped at that time due to lack of funding. (First Interim Report at 44). Hilco estimates that the Receiver would be required to spend approximately $250,000 to complete the work necessary to obtain a certificate of occupancy for the property. The building is now vacant and produces no income. (Price Decl., ¶ 9, 10; Kahn Decl., ¶ 7).

The property is owned by Riverside Arcade, LLC, a Wextrust Affiliate. An unaffiliated individual has a claim to an 8.7 percent interest in that entity. Renovation work on Riverside Arcade was overseen by Wextrust Development Group, LLC. (Price Decl. ¶ 9, 10).

The property is subject to a properly recorded, first construction mortgage in the amount of approximately $2.9 million, currently held by CapFinancial CV3, LLC ("Cap Financial"). The mortgage was originally issued by Amcore Bank, N.A. on December 23, 2004. On July 23, 2008, CapFinancial purchased all interests in the loan from Amcore Bank. On September 11, 2008, CapFinancial recorded an assignment of the mortgage and a related UCC assignment. The mortgage is currently in default and CapFinancial will make no further advances. In addition to the mortgage, several mechanics liens have been filed on the property since the Receivership assumed control. (Price Decl., ¶ 9, 10).

The Receiver has not paid debt service on the property because Riverside Arcade, LLC has no funds available, and the Receiver has determined that debt service is not a necessary business expense required to preserve the value of the property. The Receiver has taken steps to preserve the value of the property, including winterization measures. The carrying costs associated with this property are approximately $21,000 per month for debt service. Annual property taxes are approximately $73,000. Modest carrying costs, including winterization measures, will be necessary to prevent deterioration of the property pending the transfer of title. (Radke Decl. ¶ 9).

The Receivership has received several letters from various parties expressing concerns regarding the safety of the semi-renovated property to the community. The

Village of Riverside, Illinois ("the Village") sent the Receiver a letter voicing distress that without completion of the renovation, the property, which is considered to be historic within the community, would deteriorate beyond repair and have to be demolished. The Receivership has also received at least one other letter indicating that, in its present state, the building may pose a danger to the public.[5] (Radke Decl. ¶ 10, 11).

Based on Hilco's valuation analysis, the current fair market value of the property is substantially below the amount of CapFinancial's secured interest. (Kahn Decl., ¶ 9). The Receiver's representatives are discussing the disposition of the property with CapFinancial, and are seeking an agreement from the bank to accept a deed in lieu of foreclosure.

### D. St. Francis Property

This project is a vacant, undeveloped 7.5 acre site in St. Francis, Wisconsin, a lake-front community south of Milwaukee. (First Interim Report at 46). The former management of Wextrust contemplated building a 250-unit condominium development on the site, but no plans were drawn and no construction work was done on the project. (Price Decl., ¶ 11).

The subject land is owned by a Wextrust Affiliate, SF Development Company, LLC ("SF Development"), which is indirectly owned by Wextrust Equity Partners, LLC. (Price Decl. ¶ 11, 12). Based on the Receiver's review of available records, Wextrust did not issue any securities or raise money from external investors to finance the project.

Wextrust obtained seller financing for the acquisition of the site. The land was purchased in September 2005 for $4,000,000. The seller, a not-for-profit corporation

---

[5] *See,* Bob Uphues, *Group Wants Arcade Named "Endangered,"* Riverside/Brookfield Landmark, Nov. 18, 2008.

- 11 -

called Eastcastle Place, Inc. ("Eastcastle"), holds a perfected first mortgage loan in the amount of approximately $3.4 million. (First Interim Report at 46). Prior to the commencement of the Receivership, Wextrust and Byers stopped making debt service payments to Eastcastle, which has declared the loan in default. Based on communications with the lender, monthly debt service payments are approximately $22,000. In addition, annual property taxes on the property are approximately $78,000. (Radke Decl. ¶ 12). Hilco has conducted a valuation analysis of the property and has determined that the current fair market value of the property is substantially less than the amount of Eastcastle's lien. (Kahn Decl., ¶ 9).

The Receiver has not paid debt service on the property because SF Development, has no funds available, and the Receiver has determined that debt service is not a necessary business expense required to preserve the value of the property. Based on discussions with the secured lender, Eastcastle has expressed strong interest in a deed in lieu of foreclosure and to waive a deficiency judgment. (Radke Decl., ¶ 4). There are no significant expenses associated with basic maintenance of the property, as it is undeveloped land.

## II. DISCUSSION

The Court has jurisdiction over the Subject Properties, and the Receiver has been authorized to take possession and control of them. *See* 28 U.S.C. § 754 ("A receiver appointed in any civil action or proceeding involving property, real, personal or mixed, situated in different districts shall . . . be vested with complete jurisdiction and control of all such property with the right to take possession thereof."). It is within a court's equitable discretion to permit a receiver to relinquish any rights to assets within the receivership when they cease to have value to the estate. S*ee* 65 Am. Jur. 2d Receivers §

153 (2008) ("If a receiver determines that a particular asset has so little value as to make its administration unprofitable, the receiver may petition the court for an instruction to abandon the asset as worthless."); *cf.* 11 U.S.C. § 554 (a) (trustee in bankruptcy may abandon property of the estate that is burdensome or that is of inconsequential value and benefit to the estate).

The Court has previously authorized the Receiver to dispose of property in order to preserve and maximize the value of the estate. On December 22, 2008, the Court granted the Receiver's motion to relinquish the estate's interest in the Rogers Plaza shopping center in Grand Rapids, Michigan. (*See* Order Granting Mot. of Receiver to Relinquish Interests in Rogers Plaza Property, Dec. 22, 2008 (Dkt. No. 140)). In ruling on that motion, the Court found that:

> There is $19.4 million in secured debt alone. There is additional unsecured debt. The unsecured debt continues to grow. There is a deficiency each month. In addition, there are expenses that would be entailed.
>
> By approving the request, the receivership assets will not be exposed. I mean, there is still the risk of a deficiency amount at the end, but that risk is here still today and would be if we adopted these other procedures as well. And the bank will take responsibility now for running the property, and that will reduce the burden on the receivership estate. (12/22/08 Tr. 38-39).

The Receiver respectfully submits that the Court should grant the relief requested for substantially the same reasons as in the case of the Rogers Plaza transaction.

The Subject Properties are encumbered with secured indebtedness of more than $13 million. (Price Decl. ¶ 5, 7, 10, 12). Based on Hilco's valuation analysis, the current fair market value of each of the properties – which were all purchased at the height of the now-burst real estate bubble – is substantially below the value of the secured interests.

Moreover, the administrative expenses in both time and money resulting from the Receiver's management of the properties is extensive. Based on that expected dissipation of estate assets, it would be in best interests of all Wextrust stakeholders to dispose of the Subject Properties through foreclosure. *See SEC v. TLC Investments and Trade Co.*, 147 F. Supp. 2d 1031, 1036 (C.D. Ca. 2001) (authorizing prejudgment liquidation of assets by receiver where "ongoing management alone will drain money out of the estate, money that otherwise could be returned to investors").

Based on current economic and market conditions, there is no factual basis for the Receiver to make a determination that the value of the Subject Properties is likely to increase in the foreseeable future to a level that would result in a positive equity interest for the receivership estate. Moreover, the cost of holding the properties for an extended period far outweighs any reasonably foreseeable economic benefit to the estate. Indeed, there is a substantial risk that the Subject Properties will suffer further declines in value, increasing the likelihood and magnitude of deficiency claims against the estate by the secured creditors.[6] In the Receiver's judgment, it would be inconsistent with the obligations of a court-appointed fiduciary to continue to expose the receivership estate to such risks.

The Receiver has considered various management alternatives for the Subject Properties. As discussed in the Management Plan, it would be inadvisable, and probably

---

[6] *See, e.g.,* Robert Channick, *Shadow Cast on Office Leases; Downtown Chicago Vacancies Seen Rising by 50% by 2010*; Chicago Tribune, Nov. 19, 2008 at C39 (noting that commercial real estate vacancies in downtown Chicago may rise by 50% over the next two years); Becky Yerak, *More Houses Return to Lender; Mortgage Owners Increasingly Stuck with Foreclosed Homes They Can't Move at Auction*, Chicago Tribune, Aug. 21, 2008 at C 1; (noting that lenders in the Chicago area are having an increasingly difficult time modifying mortgage agreements to avoid foreclosures, and that between 2006 and 2007, the number of foreclosure filings going to auction in the area climbed 98 percent); Tim Jones, *Housing Crisis Hits Midwest Hard; Foreclosure on the Rise Amid Lagging Economy in Region*, Chicago Tribune, Nov. 4, 2007 at C 3 (noting the particularly harsh conditions currently facing the Midwest – the housing crisis and economic performance that lags the rest of the nation.)

impossible, to continue to execute the Wextrust business plans for the properties. Doing so would require extensive further development and construction, which would be difficult or impossible to finance in the current market. Exposing the estate to the high risk of such a development project would be inconsistent with the Receiver's responsibilities as a court-appointed fiduciary. Alternatively, the Receiver could conduct a public sale of the Subject Properties, but there would be no economic benefit to the estate, because the secured creditors would be entitled to full repayment from the proceeds of the sale, and there is no reasonable expectation of any proceeds in excess of the secured debts. Moreover, the expenses of any public or private sale by the Receiver would drain further assets from the estate. Although bankruptcy might be possible, there is no basis for a determination that bankruptcy would produce any benefit for the estate, or for any interested party. Indeed, as the Court found with respect to the Rogers Plaza property, "a bankruptcy would take more time, cost more money and more likely than not end the same way, with a foreclosure proceeding." (12/22/08 Tr. 39).

In the event of an unanticipated improvement in market conditions or the price of any of the Subject Properties prior to a foreclosure sale, the receivership estate would be entitled to recover its share of any such increase. As the Court observed in connection with the Rogers Plaza motion, "a state judicial foreclosure proceeding would certainly be flexible enough to allow prospective buyers to come in and bid, if there is someone out there who thinks that things will turn around quickly." (12/22/08 Tr. 40).

It is only with reluctance that the Receiver seeks the Court's approval to relinquish the estate's interests in the Subject Properties. Doing so will not generate any revenue for the estate, and the estate may incur deficiency liabilities. However, after considering the

facts and the available options, the Receiver has concluded that the relief sought is the least worst alternative for all Wextrust stakeholders.  The Receiver is prepared to provide any additional information that the Court may require in support of this motion.

## III. CONCLUSION

For the foregoing reasons**,** the Receiver respectfully requests that the Court enter an Order, substantially in the form of the proposed orders submitted herewith, granting the relief requested in this motion and such other relief as the Court may deem just and proper.

Dated: Washington, D.C.
       February 6, 2009

|  |  |
|---|---|
|  | s/ Mark S. Radke_____ |
|  | Mark S. Radke, *pro hac vice* |
| Dean Gramlich | Dewey & LeBoeuf LLP |
| Margaret Dennis | 1101 New York Avenue, NW |
|  | Washington, D.C. 20005-4213 |
| Of Counsel. | Tel: (202) 346-8000 |
|  | Fax: (202) 346-8102 |
|  |  |
|  | Counsel to Timothy J. Coleman, Receiver for the Wextrust Entities and Affiliates |

**CERTIFICATE OF SERVICE**

The undersigned, an attorney, states that I am one of the attorneys for Timothy J. Coleman, Receiver, in this matter and do hereby certify that on February 6, 2009, I directed the service of a true and correct copy of the foregoing **MEMORANDUM OF LAW IN SUPPORT OF RECEIVER'S MOTION TO RELINQUISH INTERESTS IN CERTAIN RESIDENTIAL REALTY , NOTICE OF MOTION REGARDING THE SAME, PROPOSED ORDER REGARDING THE SAME, AND DECLARATIONS OF KAHN, PRICE, AND RADKE, AND EXHIBITS IN SUPPORT OF THE SAME** upon the following individuals in the manner indicated below:

**Via ECF Notification & Electronic Mail**
Alexander M. Vasilescu, Esq.
Andrew M. Calamari, Esq.
Steven G. Rawlings, Esq.
Alistaire Bambach, Esq.
Danielle Sallah, Esq.
Philip Moustakis, Esq.
Attorneys for Plaintiff SECURITIES AND EXCHANGE COMMISSION

**Via ECF Notification & Electronic Mail**
Barry S. Pollack, Esq.
Attorney for G&H PARTNERS AG

**Via ECF Notification & Electronic Mail**
Barry S. Zone, Esq.
Jason Canales, Esq.
Stephen Richard Popofsky, Esq.
Attorneys for Defendant STEVEN BYERS

**Via ECF Notification & Electronic Mail**
Edward F. Malone, Esq.
George R. Mesires, Esq.
Attorneys for BARRINGTON, BANK & TRUST CO. AND HINSDALE BANK & TRUST CO.

**Via ECF Notification & Electronic Mail**
John C. Meringolo, Esq.
Attorney for Defendant JOSEPH SHERESHEVSKY

**Via ECF Notification & Electronic Mail**
Michael Fred Bachner, Esq.
Attorney for Defendant ELKA SHERESHEVSKY

**Via ECF Notification & Electronic Mail**
Shalom Jacob, Esq.
Shmuel Vasser, Esq.
Attorneys for purported group of investors described as INTERNATIONAL AD-HOC COMMITTEE OF WEXTRUST CREDITORS

**Via ECF Notification & Electronic Mail**
Martin Siegel, Esq.
Attorney for purported group of investors described as INTERNATIONAL CONSORTIUM OF WEXTRUST CREDITORS

**Via ECF Notification & Electronic Mail**
Paul A. Levine, Esq.
Attorney for purported non-party creditor KEY EQUIPMENT FINANCE, INC.

**Via ECF Notification & Electronic Mail**
David B. Gordon, Esq.
Beth L. Kaufman, Esq.
Attorneys for non-party LARRY COSTA.

**Via Electronic, 1st Class, or FedEx Mail**
All Known Investors in First Wyoming Plaza, LLC

    s/ Mark S. Radke_____