UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SECURITIES AND EXCHANGE COMMISSION,

                    Plaintiff,

     - against -

STEVEN BYERS, JOSEPH SHERESHEVSKY,
WEXTRUST CAPITAL, LLC, WEXTRUST
EQUITY PARTNERS, LLC, WEXTRUST
DEVELOPMENT GROUP, LLC, WEXTRUST
SECURITIES, LLC, and AXELA HOSPITALITY,
LLC,

                    Defendants,

     - and -

ELKA SHERESHEVSKY,

                    Relief Defendant.

08 Civ. 7104 (DC)

ECF Case

## SECOND INTERIM REPORT OF RECEIVER

TIMOTHY J. COLEMAN
Receiver for Wextrust Entities

DEWEY & LEBOEUF LLP
1301 Avenue of the Americas
New York, NY 10019-6092
Tel. (212) 259-8000

February 11, 2009                    Attorneys for Receiver

# TABLE OF CONTENTS

I.      MANAGEMENT OF THE WEXTRUST ENTITIES AND AFFILIATES ..................... 1

   A.   Property Management and Development Activities ................................... 2

        1.   Real Estate Portfolio ........................................................ 3

        2.   High Yield Loans ............................................................ 6

   B.   Financial Management ............................................................ 8

        1.   Expense Reduction Measures .................................................. 8

        2.   Cash Management ............................................................ 10

        3.   Internal Controls .......................................................... 12

   C.   Other Management Activities ..................................................... 13

        1.   FINRA Deregistration ....................................................... 14

        2.   Tax Issues ................................................................. 15

        3.   Insurance Issues ........................................................... 16

II.     FINANCIAL CONDITION OF THE WEXTRUST ENTITIES AND AFFILIATES .... 16

III.    EXTENT OF COMMINGLING OF WEXTRUST FUNDS .......................... 19

   A.   Nature and Scope of Commingling Analysis ......................................... 20

   B.   Deloitte's Findings and Receiver's Conclusions on Commingling .......................... 22

   C.   Tracing Methods as Applied to Wextrust Investor Funds ....................... 31

IV.     STATUS OF WEXTRUST INTERESTS IN SOUTH AFRICA .................... 35

V.      POTENTIAL CLAIMS AGAINST THIRD PARTIES ................... 37

VI.     INVESTOR RELATIONS AND RESPONSES TO INVESTOR INQUIRIES .............. 38

VII.    BANKRUPTCY DETERMINATION ........................... 39

VIII.   ADMINISTRATIVE COSTS OF THE RECEIVERSHIP ............. 40

IX.     CONCLUSION ........................................... 42

# TABLE OF AUTHORITIES

*Cases*

*Chase Manhattan Bank, N.A. v. Traditional Investments Corp.*,
No. 92 Civ. 2774 (SS), 1995 WL 72410 (S.D.N.Y. Feb. 21, 1995) ........................................ 32

*Cunningham v. Brown*,
265 U.S. 1 (1924) .................................................................................................. 31, 32

*Eberhard v. Marcu*,
530 F.3d 122 (2d Cir. 2008) ............................................................................................ 37

*In re Drexel Burnham Lambert Group*,
142 B.R. 633 (S.D.N.Y. 1992) ......................................................................................... 31

*In re Teltronics, Ltd.*,
649 F.2d 1236 (7th Cir. 1981) ......................................................................................... 22

*President of the Republic of South Africa and Others v. Quagliani*,
2009 ZACC 1 (CC) (S. Afr.) ............................................................................................ 37

*Quilling v. Trade Partners Inc.*,
No. 1:03- CV-236, 2008 WL 4366039 (W.D. Mich. Sept. 17, 2008) .................................... 32

*SEC v. Credit Bancorp Ltd.*,
297 F.3d 127 (2d Cir. 2002) ............................................................................................ 15

*SEC v. Credit Bancorp, Ltd.*,
290 F.3d 80 (2d Cir. 2002) .............................................................................................. 21

*SEC v. Ross*,
504 F.3d 1130 (9th Cir. 2007) ......................................................................................... 37

*United States v. 13328 and 13324 State Highway 75 North*,
89 F.3d 551 (9th Cir. 1996) ............................................................................................ 32

*United States v. Contents in Account No. 059-644190-69*,
253 F. Supp. 2d 789 (D. Vt. 2003) ................................................................................... 22

*Other Authorities*

DAVID MELTON, ACCOUNTING GUIDE TO ASSET TRACING,
http://www.assettracing.com (last visited Feb. 9, 2009) ..................................................... 22

*Statutes*

31 U.S.C. § 3713(b) (1982) ............................................................................................ 15

*Treatises*

2 DAN B. DOBBS, LAW OF REMEDIES (2d ed. 1993) .......................................................... 22, 32

Timothy J. Coleman, Receiver for the Wextrust Entities ("Receiver"), respectfully submits this Second Interim Report, pursuant to the Court's Order Appointing Receiver, dated August 11, 2008, as amended by order dated September 11, 2008 ("Receiver Order").

The Receiver was appointed six months ago, on August 11, 2008. The Receiver's first interim report was submitted approximately three months ago, on November 7, 2008. (Dkt. No. 88). This second interim report summarizes the Receiver's activities over the past three months, and sets forth the Receiver's factual findings concerning certain matters. Section I is an overview of the Receiver's continuing management of the Wextrust Entities and Affiliates. Section II provides an update on the financial condition of the receivership estate. Section III sets forth the Receiver's findings on the extent of commingling between and among the Wextrust Entities and Affiliates. Section IV discusses the status of the Wextrust interests in southern Africa, including recent steps the Receiver has taken to recover and repatriate assets. Section V discusses the Receiver's investigation into potential affirmative claims against third parties. Section VI describes the Receiver's efforts to keep Wextrust investors apprised of significant events and respond to investor inquiries.[1] Section VII describes the Receiver's ongoing assessment of whether any of the Wextrust Entities or Affiliates should undertake a bankruptcy filing. Section VIII details the administrative costs of the Receivership.

## I. <u>MANAGEMENT OF THE WEXTRUST ENTITIES AND AFFILIATES</u>

Pursuant to the Court's Orders, the Receiver has succeeded to the rights to manage the businesses, properties, and other assets of the Wextrust Entities and Affiliates. The Receiver's management responsibility includes entities that collectively control, among other things, a

---

[1] On January 15, 2009, the Receiver submitted a Plan for Management of the Wextrust Real Estate Portfolio (Dkt. No. 172) ("Management Plan"). The Receiver expects to submit a proposed plan of distribution in the near future.

portfolio of income-producing real estate with a book value of approximately $180 million.[2]  The

Receiver is required to preserve the *status quo* and to prevent further unnecessary dissipation,

encumbrance, or disposal of those properties and assets.  (Receiver Order at 3-4).  Accordingly,

the Receiver's responsibilities include real estate property management, management of the

remaining Wextrust employees, financial management of the Wextrust enterprise, and numerous

ancillary management issues, such as tax, accounting, insurance, regulatory, and legal matters

arising out of the continuing operation of the Wextrust Entities and Affiliates.  As a court-

appointed fiduciary, the Receiver is required to exercise management authority in a reasonably

prudent manner for the benefit of Wextrust stakeholders.  (*See* Management Plan at 7-8

(discussing Receiver's management responsibilities and objectives)).

### A.    Property Management and Development Activities

As described in the First Interim Report, the Receiver succeeded to the management of

the Wextrust real estate portfolio, which included three hotels, 23 commercial properties in eight

states, 10 residential and commercial real estate development projects, and two high yield loan

portfolios with a total of 27 loans secured by various commercial and residential real estate

properties.  (First Interim Report at 40-46, 51-52).  The Receiver has actively managed the

commercial properties, made improvements necessary to increase certain properties' value to the

receivership estate, safeguarded the development projects against further dissipation in value,

relinquished certain properties for which the secured debt is likely to exceed any value that could

be obtained from selling the property, and sought to maximize the value of the loans.

---

[2] This figure differs from that in the First Interim Report (which estimated WEP's book value at $192 million) due to the relinquishment of Rogers Plaza discussed in Section I.A.1 of this report.

1. <u>Real Estate Portfolio</u>

The Court has authorized the Receiver to use, lease, and sell assets; to make and authorize payments in the ordinary course of business; and to pay necessary business expenses from available funds. (Receiver Order at 5, 7-8). Pursuant to that authority, over the past 90 days, the Receiver has continued to manage the Wextrust real estate operations, with the assistance of Wextrust employees and professional advisors. As discussed below, many Wextrust employees have resigned or have been dismissed by the Receiver in the past six months. However, the Receiver has retained a small group of employees who are responsible for managing the Wextrust real estate portfolio. Those employees include real estate professionals and accounting and clerical personnel. The Receiver has implemented a system of internal controls to ensure that the remaining Wextrust employees are appropriately supervised, and to ensure integrity and compliance with the law. (*See infra* Section I.B.2). In addition to the Wextrust employees, the Receiver has been assisted by professional advisors from The Hilco Organization ("Hilco"), a real estate valuation and advisory firm, Deloitte Financial Advisory Services ("Deloitte"), and legal counsel.[3]

In the past 90 days, the Receiver has collected approximately $5.9 million in rent, primarily from tenants of warehouses and office buildings. The Receiver expects that income stream to continue, pursuant to long-term leases on the properties. The Receiver has taken steps to renew leases on certain properties, replace certain tenants, and negotiate leases on vacant properties. As a result, the Receiver has entered into more than 20 new or extended leases in the past three months.

---

[3] The Court has authorized the Receiver to engage accountants, attorneys, and experts to assist in carrying out his duties and responsibilities. The Receiver has selected professional advisors in consultation with the SEC. Applications for fees and other expenses for such professional advisors are subject to approval by the Court and the SEC. (Receiver Order at 5-6).

The Receiver has approved and supervised a wide range of management and operational activities in the ordinary course of managing the Wextrust real estate portfolio. Such ordinary course activities include the payment of debt service, utility charges, property taxes, routine maintenance costs, and numerous other operating expenses. The Receiver has authorized certain capital expenditures necessary to preserve the value of the assets, such as approximately $80,000 in tenant improvements to Peoria Office Holdings, LLC related to a new lease, and $33,000 in tenant improvements associated with a new lease for West Bearden Office Plaza. However, the Receiver has not proceeded with certain capital expenditures contemplated by Wextrust business plans which predated the receivership based on the substantial level of expenses and the unavailability of funding. (*See* Management Plan at 11-15). The Receiver has also authorized expenditures to preserve the *status quo* and the value of certain properties that are not currently producing significant income, such as winterization measures for Hamptons of Hinsdale and Riverside Arcade. (*See* Ex. A to Declaration of Mitchell P. Kahn In Support of Receiver's Plan for Management of Wextrust Real Estate Portfolio ("Kahn Decl.") (Dkt. No. 173) at 2-4). In the past 90 days, the Receiver has authorized payments of approximately $4.3 million in operating expenses that recur on a regular basis (*e.g.*, utilities) and approximately $980,000 for non-recurring expenses, such as replacing carpeting, repaving a parking lot, repairing HVAC systems, landscaping, painting, and repairing stairwells.

The Receiver has continued to manage development and construction work on two real estate properties. Those properties include a residential condominium in the Boerum Hill neighborhood in Brooklyn (47 Dean Street)[4] and a single-family home located in Hinsdale, Illinois (6126 Plymouth). The Receiver has determined that completing construction of those

---

[4] *See* Management Plan at 15.

assets is likely to result in a net economic benefit to the estate.  Funding for those projects has been secured through credit facilities that were in place prior to the appointment of the Receiver.

As discussed in the Management Plan, the Receiver is also taking steps to sell or otherwise dispose of numerous Wextrust real estate assets.  For example, in November 2008, the Receiver entered into a sales contract to sell a single-family residence located at 451 Repton Road in Riverside, Illinois for $870,000.  In consideration for the sale, Hinsdale Bank & Trust, the mortgage lender on the property, agreed to accept a price below the current mortgage balance of approximately $925,000, to waive any deficiency judgment against the estate, and to release any jointly and severally liable parties on the note.  Given conditions in the suburban Cook County, Illinois market at the time and the existence of a willing buyer with financing, the Receiver determined that the transaction was in the best interests of the receivership estate.  On December 2, 2008, the Receiver filed a motion to approve the sale with the Court along with supporting papers (Dkt. Nos. 126-29).  No party in interest objected to the sale.  On December 11, 2008, the Court approved the sale, and the sale closed on or about December 22, 2008.

The Receiver also entered into a contract with Picou Brothers Construction Company, the contractor on the construction of the Hammond Industrial Outlots parking lot and related work, to sell the Hammond Outlots property.  The property consisted of 24 acres of property that was adjacent to its existing warehouse property.[5]  Prior to the receivership, Wextrust was actively involved in developing the Hammond Outlots property as the location for a warehouse. However, construction financing was not available to complete the project and Picou Brothers was owed approximately $2.5 million for work on the parking lot and other foundation work. The Receiver negotiated the sale of the property in its existing state to Picou free and clear of

---

[5] The property is owned by Hammond Industrial Outlots, LLC ("Hammond Outlots"), a company wholly-owned by Hammond Industrial Holdings, LLC and controlled by the Receiver.

liens and encumbrances. The sale satisfied Picou's existing $2.5 million claim (secured

by various mechanics' liens) against the receivership estate and the receivership estate received

an additional $400,000. The Receiver filed the motion and supporting papers seeking approval

of the Hammond Outlots sale on December 2, 2008 (Dkt. Nos. 121-25). The Court entered

an Order approving the sale on December 22, 2008 (Dkt. No. 161).

On December 12, 2008, the Receiver filed a motion and supporting papers with the Court

seeking approval to relinquish the receivership estate's interests in Rogers Plaza, a 330,000

square foot semi-enclosed shopping mall located in Wyoming, Michigan (a suburb of Grand

Rapids) (Dkt. Nos. 140-43). The Receiver sought to relinquish Rogers Plaza because it suffered

from a number of operational issues, had significant carrying costs, and the Receiver had

determined, in consultation with his advisors, that the selling price of the property was unlikely

to exceed the property's secured debt. On December 22, 2008, the Court held a hearing,

overruled the objections to the proposed transaction, and entered the order proposed by the

Receiver (Dkt. No. 160).

On February 6, 2009, the Receiver submitted a motion for Court approval to relinquish

four additional residential properties (Dkt. Nos. 184-88). The Receiver is continuing to negotiate

with mortgage lenders and other creditors concerning the disposition of other Wextrust

properties. The Receiver has begun marketing additional Wextrust properties and expects to

increase those marketing efforts substantially in the coming months in an effort to preserve and

monetize the value of the assets.

## 2. High Yield Loans

The Receiver also continues to manage a portfolio of high yield loans in an effort to

achieve the maximum possible return. As discussed in the First Interim Report, there are two

portfolios: (1) Wexford High Yield Debt Fund I, LLC ("High Yield I") and (2) Wexford High

Yield Debt Fund III, LLC ("High Yield III") and its offshore participant, Wexford High Yield Debt Offshore Fund, Ltd. ("Offshore Fund").[6] Each loan portfolio is in a precarious financial position, although the Receiver anticipates some recovery.

The High Yield I portfolio consists of 11 loans in which Wextrust has an aggregate exposure of over $5 million, all of which are in default. The loans are secured by a variety of commercial and residential real estate assets. Of these loans, Wextrust (or its joint venture partner) has initiated foreclosure proceedings on four properties and has taken title to an industrial property in Dallas, Texas through foreclosure. The Receiver's representatives are actively marketing this last property and looking into alternative ways to generate income from the asset. For the remaining, potentially viable, loans, the Receiver's team is negotiating with borrowers in order to obtain some recovery.

The High Yield III portfolio includes 16 loans for which Wextrust has a combined participation interest in excess of $10 million. The Receiver's team has employed a variety of strategies to maximize value from these loans – many of which are in default. The Receiver is engaged in discussions with its joint-venture partner, HPC U.S. Fund I, L.P. ("HPC"), regarding the purchase of at least one of these loans. In addition, the Receiver is discussing options with a participant in two joint venture loans, which may include a possible buyout of Wextrust's interests. The Receiver has implemented a variety of other strategies for obtaining recovery on the remaining loans, including negotiating a possible buyout of Wextrust's interests with loan participants, submitting a loan to HUD for refinancing (which would pay off Wextrust in approximately 90 days), jointly pursuing a claim with HPC (at HPC's expense) against a title company over an error in the title policy (which, if successful, would result in a complete

---

[6] The Offshore Fund was established to allow foreign citizens to invest in High Yield Debt Fund III, LLC (First Interim Report at 34-35).

recovery), and signing an extension that allows additional time to pay back a loan. Of the remaining loans in this portfolio that are not in good standing, Wextrust has initiated foreclosure proceedings for one and is attempting to negotiate settlements with the remaining borrowers.

## B. Financial Management

The Court's orders require the Receiver to preserve the *status quo* of the Wextrust Entities and Affiliates. (Receiver Order at 3-4). As detailed in the First Interim Report, prior to the Court's appointment of the Receiver, the Wextrust business was in complete disarray, with a lack of internal controls for business decisions and cash management, hundreds of bank accounts held in dozens of banks, and high operating and other expenses. Moreover, with the filing of the SEC's complaint, the main source of funds for operating the business – payments from purchasers of securities – was extinguished. The Receiver thus immediately took a number of steps to stabilize and add value to the estate, and these efforts have continued over the last three months. For example, the Receiver has taken a number of expense-reducing actions, such as drastically reducing the Wextrust workforce, closing offices, and negotiating a variety of cost-saving agreements with third parties. The Receiver currently is establishing a more efficient, effective, and cost-reducing cash management system that will consolidate the more than 300 bank accounts identified to date at a single financial institution. In addition, the Receiver has implemented a system of internal controls that apply to all Wextrust transactions and ensure that business decisions are based on reliable information.

### 1. Expense Reduction Measures

The Wextrust operations incur numerous expenses on a regular basis, including payroll, rent, debt service, taxes, and a wide range of other expenses. The Receiver has made extensive efforts to reduce those expenses to the maximum extent possible, consistent with the mandate to preserve the *status quo* and the value of the Wextrust assets.

One of the most significant operating expenses is the Wextrust payroll.  As of August 15, 2008, employee headcount was 68, resulting in a monthly payroll of more than $535,000, or $6.4 million per year, exclusive of commissions paid to Wextrust Securities brokers and others, and exclusive of travel and other expenses that Wextrust paid for defendants Byers and Shereshevsky and other Wextrust executives.  (*See* First Interim Report at 64-65).  As of February 1, 2009, headcount has been reduced through attrition and terminations to 19 employees, 9 of whom are on-site employees at various WEP properties.  This reduction results in a monthly savings of approximately $390,000, or approximately $4.7 million on an annualized basis.  The current monthly payroll of approximately $145,000 represents a reduction of more than 70 percent.

The Receiver has substantially reduced office rental expenses.  As of August 11, 2008, Wextrust Entities and Affiliates leased six offices in the United States and an office in Israel. Several of those offices were located in high-grade buildings and were outfitted with luxurious and expensive furnishings and facilities.  Most of those locations have been closed, and overall monthly rent has been reduced by approximately $65,000.  For example, the Receiver has reduced space in the Wextrust headquarters office in Chicago, resulting in a monthly cost savings of $16,000 and the elimination of $85,000 in back rent.

The Receiver has reduced a wide variety of other costs.  For example, on January 29, 2009, the Receiver conveyed title to Wextrust's nine-seat 1968 Dassault Falcon 20C jet airplane, which was appraised at approximately $100,000, in return for a complete release of more than $320,000 due to an aircraft maintenance company retained by prior Wextrust management to conduct a major overhaul of the plane.  In addition, the Receiver was able to obtain a personal property tax assessment reduction of approximately $1.3 million from Maricopa County, Arizona on the Crowne Plaza Phoenix hotel.  This reduction resulted in a two-thirds reduction in

the tax owed and savings of approximately $33,000. In December 2008, the Receiver also entered into a settlement agreement on behalf of Drake Oak Brook Holdings, LLC to restore a business relationship with the Drake Oak Brook hotel's linens and china supplier. The terms of the agreement reduced the approximately $42,000 outstanding debt by approximately 35%, provided that payments could be made through a series of interest-free monthly installments, and ensured that the vendor would again supply the Drake Oak Brook. The hotel's ability to purchase these items from the vendor – rather than rent them as it had been doing – represents an additional savings of thousands of dollars a month.

The Receiver is seeking to achieve further expense reductions, as outlined in the Plan of Management. For example, the Receiver has sought the Court's approval to relinquish four properties that generate no income but incur total annual carrying costs of approximately $2.7 million. The Receiver expects to identify additional cost savings in the near term by relinquishing other properties with negative cash flow that present no chance of producing a net return to the estate via a sale or similar transaction. (*See* Management Plan at 22-24).

### 2. Cash Management

The Receiver Order authorized the Receiver to "establish a new cash management system by closing, transferring, consolidating, and opening bank accounts and securities accounts" and to invest funds in certain highly stable investments. (Receiver Order at 6-7). The Receiver has located and taken control of approximately 300 Wextrust accounts at more than 50 financial institutions. The Receiver is in the process of consolidating those accounts at a single financial institution in order to minimize the transaction costs, administrative burden, and risk of errors associated with maintaining such a large number of accounts and depositories.

The Receiver has implemented a phased process for consolidating the Wextrust accounts. This phased approach is necessary to prevent disruption of the operating accounts

used for the ongoing management of the Wextrust assets, particularly the real estate portfolio. Phase I of the consolidation involves the transfer of over 100 non-operating accounts held at over 10 separate financial institutions that have significant balances. This phase is approximately two-thirds complete. The execution of this phase, as with future phases, also involves the simultaneous closure of old accounts deemed to be consolidated, unnecessary, or inactive – thus eliminating future account-related fees associated with maintaining these legacy accounts. Furthermore, one financial institution, Wachovia Bank, agreed to credit back all account fees, overdrawn fees, and commercial fees accrued during the pendency of the receivership for the accounts to be closed, thus providing even greater savings to the estate.

Phase II involves the transfer of direct-deposit or "lockbox" deposit accounts currently set up for Wextrust real estate properties that do not currently have lockboxes or other pre-existing Wextrust Equity Partners ("WEP") automated deposit capabilities. This phase is being conducted simultaneously with Phase I. Currently, two WEP operating entities are receiving rent deposits into accounts held at The Private Bank. In addition, a lockbox has been opened for another WEP entity, which the Receiver expects to begin accepting deposits on a transition basis in February and March of this year. Additional Wextrust real estate properties that do not have pre-existing automated deposit mechanisms in place are also scheduled to be converted in February and March.

Phase III involves the close-out and transfer of the WEP operating accounts that currently have an automated deposit feature. These accounts will be transferred over the course of a few months, as tenants are notified and given time to change the established depository method unique to each property. This process should ensure minimal disruption in monthly rental inflow. To specifically ease the transition, each WEP property will have a single, pre-existing

operating account that will remain open to accept deposits and process vendor payables until the respective legacy deposit accounts can be transferred to the designated account for each property at The Private Bank and new check stock for payables is ordered and ready for full transition. Once operational, the Receiver will be able to fully utilize the unique cost-saving features of the new bank accounts such as internet-based wire transfer and deposit capability, view-only account access rights and email alert updates for the careful monitoring and administration of the estate's cash-flow by his advisors, and check-batching capabilities to streamline the processing of payables.

3. Internal Controls

The Receiver has implemented a system of internal controls applicable to all Wextrust transactions. As discussed in the First Interim Report, Wextrust had no effective system of internal controls prior to the commencement of this case. (*See* First Interim Report at 68-72). With the assistance of Deloitte, Hilco, and legal counsel, the Receiver has designed and implemented internal controls to prevent dissipation of assets or other wrongdoing; to ensure compliance with all applicable laws and regulations; and to ensure the accuracy and reliability of financial and other information.

Pursuant to the Court's orders, the Receiver is the sole authorized signatory for all Wextrust accounts. The Receiver personally approves all expenditures of Wextrust funds, as well as significant transactions, including, *inter alia*, leases, vendor contracts, and agreements with financial institutions. The system of internal controls requires a determination by counsel that all actions by the Receiver or those acting at his direction are authorized by the Court's orders and/or applicable law. The system ensures that the Receiver's business judgments are based on accurate and reliable information and, where appropriate, by the analysis and recommendations of qualified Wextrust employees and professional advisors. The system is also

designed to ensure that all individuals involved in managing the Wextrust enterprise, including the Receiver, are accountable for their actions.

Transactions in the ordinary course of business are reviewed carefully to ensure that they are required to preserve the value of the receivership estate. Such transactions include, among other things, operating expenses, such as insurance payments and certain taxes, as well as other expenses, such as debt service. All such expenses are reviewed by Deloitte and legal counsel before being submitted to the Receiver for approval. Non-recurring transactions require a written Request for Action ("RFA") setting forth the basis for the expenditure or other action. Leases, vendor contracts, loan agreements, and other transactions require a RFA, which is signed by two or more Wextrust employees or professional advisors in addition to the Receiver.

### C. Other Management Activities

The Receiver has also undertaken a number of other activities necessary to manage the Wextrust business effectively. For example, Wextrust Securities, which operated as the sales arm of Wextrust, held a broker-dealer license with the Financial Industry Regulatory Authority ("FINRA"). The Receiver has taken steps to have Wextrust Securities' license cancelled, saving tens of thousands of dollars in past and future fees, membership costs, and fines. In addition, the Receiver has been assessing income and other tax issues for the various Wextrust Entities and Affiliates. Finally, the Receiver has analyzed and maintained essential aspects of Wextrust's insurance coverage.

1. FINRA Deregistration

Wextrust Securities, LLC was licensed as a broker-dealer in March 2006.[7]  The Receiver has taken possession and control Wextrust Securities, and has made arrangements with its principal regulator, FINRA, to cancel the firm's registration.

Before deciding to have the Wextrust Securities registration cancelled, the Receiver considered alternative options for maximizing the value of the estate, such as the sale of Wextrust Securities and/or its affiliated licenses.  The Receiver determined that the Wextrust Securities business and license had no significant value, based on the loss of reputation and goodwill resulting from the charges in this case.[8]  Accordingly, the Receiver determined that the cancellation of the firm's membership in FINRA was in the best interests of the estate.

In January 2009, the Receiver filed FINRA Form BDW to begin the process of terminating Wextrust Securities' membership in FINRA.  In early February 2009, the Receiver and his advisors had additional communications with FINRA regarding the payment of outstanding dues, fees, and other charges required for full termination of membership.  After further consideration, the Receiver elected to forgo payment of these fees and accept "cancellation" status rather than "termination" status for Wextrust Securities.  Cancellation of membership achieves the same *de facto* result as termination of membership – that is, saving the estate from having to pay future membership fees, fines, and expenses associated with the ongoing management and administration of the former FINRA account, such as costs associated

---

[7] The broker-dealer license was issued by the National Association of Securities Dealers ("NASD"), a self-regulatory organization for the securities industry.  In 2007, the NASD merged with New York Stock Exchange Regulation to become the Financial Industry Regulatory Authority ("FINRA").  FINRA is also a self-regulatory organization, and is the largest independent securities regulator in the United States, overseeing its member broker-dealerships and securities professionals and ensuring that they are in compliance with U.S. securities laws, rules, and regulations.

[8] For example, the sale of the broker-dealer business would require formal approval by FINRA and the SEC, the payment of substantial outstanding fees and fines owed by Wextrust Securities, and the consent of a potential acquirer to agree to operate the entity with the understanding that negative disclosures and the stigma associated with the firm and its former management would attach to all publicly-available filings and required documentation.

with the submission of regular mandatory reports and other filings. Cancellation, however, relieves the estate from the obligation of having to pay more than $15,000 in outstanding dues, fees, and other charges required for formal termination of FINRA membership.

Finally, as required by applicable regulations, the Receiver filed termination forms – known as U5 forms – for the 31 registered representatives formerly employed by Wextrust Securities.[9] Each U5 form was submitted to FINRA and provided to the former representatives by December 19, 2008.

## 2. Tax Issues

The Receiver and his advisors have also been assessing the impact that any federal, state, and local income tax liabilities and compliance obligations might have on the estate. The Federal Debt Priority Statute provides the federal government with priority over other claimants as to the payment of debts in certain circumstances. *See* 31 U.S.C. § 3713(b) (1982); *SEC v. Credit Bancorp Ltd.*, 297 F.3d 127, 142 (2d Cir. 2002) (reversing District Court Order that, *inter alia*, declared that a receivership estate's debts to its customers took priority over its debts to the United States). The Receiver expects to provide additional information on income tax issues in the Receiver's Third Interim Report.

The Receiver and his advisors have also been assessing and managing other tax issues, including real and personal property tax issues for various Wextrust Affiliate properties. For example, the Receiver's advisors recently appealed a personal property assessment at the CP Phoenix, negotiated a nearly 70% reduction of the assessment, and accordingly reduced the personal property tax bill by approximately two-thirds.

---

[9] Although many of the Wextrust registered representatives were terminated before the Receiver was appointed, prior Wextrust management failed to submit the required paperwork to FINRA.

3. Insurance Issues

The Receiver and his advisors have been working with Wextrust's insurance carriers to maintain the essential aspects of Wextrust's insurance coverage. The Receiver is in the process of negotiating renewals of the property damage, general liability, automobile, workers compensation, and umbrella liability policies for several of the Wextrust Affiliate properties. This process involves an analysis of the total insured values of the relevant properties, their general liability exposures, and the premium rates charged and terms offered by prospective insurers. Various carriers are being used to achieve cost efficiencies in the coverage obtained. The Receiver anticipates that the majority of insurance renewals will be bound by February 16, 2009. Upon a determination that certain properties should be sold, the Receiver will cancel or amend coverage for the relevant properties, as appropriate, after each sale.

## II. FINANCIAL CONDITION OF THE WEXTRUST ENTITIES AND AFFILIATES

As discussed in the First Interim Report, the Receiver's accountants have helped the Receiver to prepare basic financial statements and projections for the Wextrust Entities and Wextrust Affiliates.[10] Since that report, there have been limited changes in the balance sheets for most of these entities, as described in the following section and shown in Table 1 below. Cash inflows and outflows, analyzed in the next section, have been in line with the projections set forth in the First Interim Report. The final section sets out revised cash flow projections for the first six months of 2009.

In order to prepare an update of the aggregated balance sheet for the Wextrust Entities, the information from the August 31, 2008 aggregated balance sheets described in the First

---

[10]As discussed in the First Interim Report, these financial statements have not been audited and do not have the notes, corrections and adjustments needed to present information fairly and accurately in all material respects in accordance with Generally Accepted Accounting Principles. Furthermore, none of the financial information has been consolidated in anything other than a cursory, *pro forma* manner.

Interim Report was rolled forward.  The information described below comes directly from the accounting systems of the Wextrust Entities or from the records of third party property managers that the Receiver's advisors have manually adjusted to reflect certain sales of properties at WDG (451 Repton) and or relinquishments of property at WEP (Rogers Plaza).  As adjusted for the Repton and Rogers Plaza transactions, the assets and liabilities are as follows:  (1) Axela has total assets of approximately $54 million, current and long-term liabilities of approximately $51 million, and equity of approximately $3 million; (2) WEP has adjusted total assets of approximately $178 million, current and long-term liabilities of approximately $142 million and equity of approximately $36 million; (3) WDG and WDG-related assets total approximately $64 million, current and long-term liabilities total approximately $51 million and equity is approximately $13 million, as adjusted; and (4) Wextrust Capital has total assets of approximately $68 million, current and long-term liabilities of approximately $38 million, and equity of approximately $30 million.  In aggregate, the balance sheet shows these entities have assets of approximately $364 million, current and long-term liabilities of $282 million, and equity of approximately $82 million.[11]

---

[11] The summary of the aggregated balance sheet presented here provides an overview of the financial position of the Wextrust Entities.  The aggregated balance sheet is based on internal Wextrust records and information obtained from third party property managers, and is subject to the problems resulting from the lack of recordkeeping and internal controls discussed in Section III.B.1 of First Interim Report.  (*See* First Interim Report at 69-74).

# Table 1: Aggregated Balance Sheet Summary

WexTrust Capital, LLC, et al.
Aggregated Balance Sheet Summary(1)

| | Axela Hospitality, LLC and Affiliates ("Axela") as of August 31, 2008 | WexFord Development Group, LLC and Affiliates ("WDG") as of July 31, 2008 | WexTrust Capital, LLC and Affiliates ("WTC") as of July 31, 2008 or August 31, 2008 | WexTrust Equity Partners, LLC and Affiliates ("WEP") as of August 31, 2008 | TOTAL |
|---|---|---|---|---|---|
| Total Current Assets | $ 2,273,993 | $ 11,246,001 | $ 47,613,699 | $ 9,292,514 | $ 70,426,207 |
| Total Other Assets | 52,069,233 | 54,167,671 | 20,271,349 | 192,399,298 | 318,907,551 |
| Total Assets | $ 54,343,225 | $ 65,413,672 | $ 67,885,048 | $ 201,691,813 | $ 389,333,758 |
| | | | | | |
| Total Current Liabilities | $ 2,810,749 | $ 48,384,144 | $ 9,867,323 | $ 1,063,440 | $ 62,125,655 |
| Total Long-term Liabilities | 48,628,201 | 3,152,627 | 28,358,783 | 159,991,623 | 240,131,234 |
| Total Equity | 2,904,276 | 13,876,902 | 29,658,942 | 40,636,750 | 87,076,869 |
| Total Liabilities & Equity | $ 54,343,225 | $ 65,413,672 | $ 67,885,048 | $ 201,691,813 | $ 389,333,758 |
| | | | | | |
| Adjustments For Sales and Relinquishments | | | | | |
| Assets | | (1,246,364) | | (24,097,420) | (25,343,784) |
| Liailities | | (896,000) | | (19,454,141) | (20,350,141) |
| Equity | | (350,364) | | (4,643,279) | (4,993,643) |
| | | | | | |
| Adjusted Total Assets | $ 54,343,225 | $ 64,167,309 | $ 67,885,048 | $ 177,594,393 | $ 363,989,975 |
| | | | | | |
| Adjusted Total Liabilities | 51,438,950 | 50,640,771 | 38,226,106 | 141,600,922 | 281,906,748 |
| Adjusted Equity | 2,904,276 | 13,526,538 | 29,658,942 | 35,993,471 | 82,083,227 |
| Total Liabilities & Equity | $ 54,343,225 | $ 64,167,309 | $ 67,885,048 | $ 177,594,393 | $ 363,989,975 |

(1) - The Aggregated Balance Sheet Summary has not been audited, reviewed or compiled. They do not reflect adjustments or corrections that would be required to produce accurate and reliable financial statements. The basis of presentation is unknown. The information is not as of any specific point in time and was merely aggregated from books and records and available information much of which is known to contain material errors. For example, the book value of the CP Phoenix hotel is not reflected in the assets and liabilities of Axela and intercompany activities have not been reconciled and even recorded in many instances. No reliance whatsoever should be placed on this information.

As of November 30, 2008, Wextrust Entities and Affiliates had approximately $23.1 million in cash in over 300 U.S. bank accounts identified by the Receiver to date. This compares to $22.1 million in cash reported in the First Interim Report as of September 30, 2008. Pursuant to the Standardized Fund Accounting Reports ("SFARs") required by the Securities and Exchange Commission, which the Receiver submitted for the period September 1, 2008 through November 30, 2008, the Wextrust Entities and Affiliates reported $6.2 million in receipts and $5.2 million in disbursements.[12]

Deloitte has assisted in preparing a cash forecast for each Wextrust entity. This forecast, shown below in Table 2, documents the period from January through June 2009. Significantly,

---

[12] The SFARS do not represent all activity in the bank accounts under the control of the Receiver and therefore may not reflect all receipts and disbursements during the period.

this cash flow forecast anticipates that, on a combined basis, the Wextrust Entities will generate approximately $74,000, with the active WEP properties providing most of the positive cash flow (approximately $1,380,456) and Axela representing the bulk of the negative cash flow for the organization (approximately $1,306,969).

**Table 2: Wextrust Capital Cash Forecast**

Base Cash Flow Projections for Wextrust Capital, LLC and Affiliates, et al. for the Six Months Ending June 30, 2009 (1)

| | WexTrust Capital, LLC and Affiliates (2) | Wextrust Equity Partners, LLC and Affiliates (3) | WexFord Development Group, LLC and Affiliates | Axela Hospitality, LLC and Affiliates (4) (6) | Total for the 6 Months Ending 06/30/09 |
|---|---|---|---|---|---|
| Total Effective Income | - | 11,157,293 | 48,900 | 6,292,474 | 17,498,667 |
| Total Operating Expenses | 434,261 | 4,932,293 | 208,898 | 6,447,018 | 12,022,470 |
| Net Operating Income | (434,261) | 6,225,000 | (159,998) | (154,544) | 5,476,197 |
| | | | | | |
| Sales Proceeds | - | 3,544,860 | - | - | 3,544,860 |
| | | | | | |
| Non Operating Expenses: | | | | | |
| Debt Service - Interest (Including Swap Payments) | - | 4,011,274 | - | 93,000 | 4,104,274 |
| Debt Service - Principal | - | 3,241,838 | - | - | 3,241,838 |
| Capital Expenditures **(5)** | - | 123,500 | - | - | 123,500 |
| Tenant Improvements & Lease Commissions | - | 568,759 | - | - | 568,759 |
| Reserves | - | 108,883 | - | - | 108,883 |
| Other Non-Operating Expenses | - | 335,150 | - | 465,167 | 800,317 |
| Total Non-Operating Expenses | - | 8,389,404 | - | 558,167 | 8,947,570 |
| | | | | | |
| Net Cash Flow | (434,261) | 1,380,456 | (159,998) | (712,710) | 73,487 |

(1) - Does note include non-critical current or past due payments.
(2) - This includes WexTrust Securities, LLC, WexTrade Financial, LLC the commodity and high-yield fund entities.
(3) - Includes Wextrust Equity Partners, LLC corporate entity and excludes past due property taxes, at a minimum, approximately $400,000.
(4) - Includes net cash flow from third-party managed hotel properties (Drake Oak Brook and CP Phoenix).
(5) - Net of escrow draws available for capital expenditures.
(6) - The debt service related to the Axela represent the swap payments on the Drake Oak Brook hotel only. The other amounts related to debt service is currently not being paid.

### III.   EXTENT OF COMMINGLING OF WEXTRUST FUNDS

The SEC Complaint alleges that the defendants diverted funds raised for Wextrust investment projects "to pay investors in prior offerings and to pay the operating expenses of the various Wextrust Entities," and that the company's records show that the defendants transferred more than $100 million between these entities.  (Compl. ¶¶ 23-24).  The Court has ordered the Receiver to "determine the extent of commingling of funds between" Wextrust Entities and Wextrust Affiliates.  (Receiver Order at 4).

The Receiver, with the assistance of Deloitte, has determined that the extent of commingling of Wextrust funds was profound.  However, to the extent that non-cash assets, principally including real estate, were owned by separate Wextrust Entities or Affiliates, such assets were not commingled.  The Receiver has determined that it would not be feasible to attempt to trace commingled Wextrust funds to individual victims, because the cost of conducting such an analysis would be prohibitive, and the results would be of dubious value to the Court.

The extent of commingling and the traceability of victim funds are relevant to the availability of remedies in this case, including the distribution of receivership assets.  The Receiver will submit a proposed plan of distribution that addresses those issues in a manner consistent with the law of equity receiverships, bankruptcy law and other applicable legal standards, in an effort to assist the Court in the exercise of its equitable discretion in ordering a fair distribution to victims.

The commingling analysis is discussed in three segments.   Section A outlines the scope of the commingling analysis.  Section B details Deloitte's and the Receiver's findings on the extent of commingling.  Section C provides a brief description of the feasibility of applying tracing methods to identify the funds of particular victims.

### A.      Nature and Scope of Commingling Analysis

The Receiver has tasked a team of Deloitte forensic accountants, assisted by Wextrust employees and legal counsel, to analyze the commingling of funds among the large number of accounts and other assets of the Wextrust Entities and Affiliates.  Deloitte has analyzed Wextrust's acquisition, handling, and disposition of investor funds and reported its findings on the extent of commingling.  Deloitte has also assisted the Receiver in evaluating the feasibility of tracing funds obtained from particular investors.  Based on Deloitte's analysis and findings, the

Receiver has determined that: (1) the funds of Wextrust victims were commingled; (2) the extent of commingling was pervasive and systematic, and continued from the commencement of the Wextrust business enterprise until the appointment of the Receiver; and (3) although it may be theoretically possible to trace some Wextrust funds to identifiable victims, the value of any such analysis would be questionable at best, and the process would be prohibitively expensive.

Deloitte's commingling analysis considered evidence concerning the proceeds of 78 Wextrust securities offerings that were conducted during the period from January 1, 2002 through August 11, 2008. That evidence included bank records, Wextrust internal financial records, various databases maintained by Wextrust, and other business records, including voluminous email traffic. Deloitte has conducted numerous interviews of Wextrust employees, and has had access to testimonial evidence obtained by legal counsel. (*See* Declaration of John P. Sordillo in Support of Second Interim Report of Receiver ("Sordillo Decl."), filed concurrently herewith, at ¶¶ 5-7, 9). For purposes of this analysis, "commingling" is defined as occurring when funds from one Wextrust account were combined with funds in another Wextrust account. (*Id*. ¶ 8). That definition includes, *inter alia*, the use of investor funds to finance projects unrelated to those for which the investor intended them to be used, or to pay distributions to investors in unrelated projects. Excluded from the definition of commingling were transfers requested by an investor for the purpose of disinvesting in one project and investing in a different project. The definition used in this analysis is consistent with the case law on commingling. *See, e.g.*, *SEC v. Credit Bancorp, Ltd.*, 290 F.3d 80, 84-85 (2d Cir. 2002) ("*CBL*") (finding commingling where the defendants were in control of the investor's assets, deposited the assets into a variety of accounts that held other investors' assets, and "shifted funds and securities regularly among brokerage accounts, and neither segregated customer deposits nor

earmarked a particular customer's deposited assets to be used to pay that customer's custodial dividend"); *see also* 2 DAN B. DOBBS, LAW OF REMEDIES, § 6.1(4) (2d ed. 1993) (hereinafter "Dobbs") ("Commingling" occurs when a claimant's funds are combined with the funds of a defendant or the funds of others, into a common fund, such as a bank account).[13] The definition also comports with the representations made to Wextrust investors that the Wextrust Entities and Affiliates that issued securities would not commingle their funds with those of any other entity, would pay their liabilities and expenses from their own funds and assets, and would not make any loans to other persons or entities.[14]

### B. Deloitte's Findings and Receiver's Conclusions on Commingling

Wextrust securities offerings were typically structured to finance a single specific investment property or venture, such as a hotel, office building, or high-yield loan fund. Accordingly, Deloitte treated the proceeds of each offering as a "fund" created to finance the associated project. Based on Deloitte's analysis, in five of the 78 offerings, Wextrust failed to obtain any money from investors, so that no fund was created. In 62 of the 73 offerings, Deloitte found that investor funds were commingled, as defined above. For 11 of the 73 securities offerings, the available Wextrust records are insufficient for the Receiver to make a determination of the extent, if any, of commingling. Because these 11 offerings occurred prior to the creation of segregated accounts in March 2005, however, the Receiver assumes that funds associated with these offerings were deposited into pooled accounts and thus commingled.

---

[13]When funds have been commingled, it is difficult – and often impossible – to segregate or trace the funds of particular victims, because of the fungible nature of cash. *See In re Teltronics, Ltd*., 649 F.2d 1236, 1240 (7th Cir. 1981) (finding tracing evidence with respect to commingled funds in bank accounts was insufficient, because "a customer can only roughly identify which money is his or hers"); *United States v. Contents in Account No. 059-644190-69*, 253 F. Supp. 2d 789, 792 (D. Vt. 2003) (stating that "the tracing requirement . . . poses particular problems in the case of money or other fungible property" since money cannot be traced once it is deposited into a bank account).[13] *See also* DAVID MELTON, ACCOUNTING GUIDE TO ASSET TRACING, http://www.assettracing.com (last visited Feb. 9, 2009) ("The most common fungible asset encountered in asset tracing is money.").

[14] Those representations are discussed in further detail in the First Interim Report at 84-85.

For purposes of the commingling analysis, the Wextrust securities offerings can be divided into three discrete periods. In the first period, from approximately September 2002 to May 2004, investor funds were commingled immediately upon receipt by depositing them in two pooled operating accounts at two different financial institutions. In the second period, from May 2004 to March 2005, investor funds were typically commingled immediately upon receipt by depositing them in a single pooled operating account. In the third period, from March 2005 to August 2008, investor funds were typically deposited in segregated accounts associated with specific Wextrust projects initially, then commingled with other assets. Each of the three periods is described in further detail below.

1.    <u>September 2002 to May 2004:  Commingling in Northern Trust and Bank of the Commonwealth Accounts</u>

Wextrust began conducting securities offerings in early 2002. (*See* First Interim Report at 6, 20, 23 n.14). Pursuant to the private placement memoranda ("PPMs"), subscription agreements, and other operative documents, Wextrust was required to hold all funds received from investors in an offering in a segregated escrow account until the offering raised a specified minimum sum. (*Id.* at 84). From 2002 through mid-2004, however, Wextrust did not deposit investor funds into any such segregated escrow accounts. Instead, investor funds were deposited in one of two Wextrust Capital operating accounts.

One of the operating accounts was established at the Northern Trust Company, a Chicago bank, on or about May 22, 2003.[15] The proceeds of six securities offerings were deposited into that account upon receipt, and thereby commingled.[16] In July 2003, Wextrust Capital opened

---

[15] Wextrust had more than one account at Northern Trust. The operating account, however, described above was the account that received investor funds. This account remained open until August 31, 2008.

[16] Those six offerings are identified in Appendix 1.

another operating account at Bank of the Commonwealth in Norfolk, Virginia.[17]  The proceeds of seven Wextrust securities offerings were deposited into the Bank of the Commonwealth account.[18]  A total of approximately $4.1 million of investor proceeds from 11 securities offerings was deposited into these two operating accounts and therefore became untraceable. Some investor proceeds have not yet been traced to a specific account due to inadequate records.[19]  (Sordillo Decl. ¶¶ 9-10, 12).

During this period, Wextrust employees routinely withdrew funds from the Northern Trust and Bank of the Commonwealth accounts to pay operating, such as payroll and office rent, and other expenses.  (*Id*. at ¶¶ 10-11).  All purchases associated with the investment projects financed by these securities offerings were made with funds from the two operating accounts. Based on those facts, the Receiver has determined that the proceeds of all of those offerings were commingled.  (*Id.* at ¶ 12).

### 2.    March 2004 to March 2005: Establishment of the Linchpin Account

In March 2004, Wextrust Capital opened a new operating account at a Norfolk branch of Wachovia Bank (the "Linchpin Account").[20]  That account served as the principal Wextrust operating account from early 2004 until the commencement of this case.  More than $155 million was transferred through this account during that period.  The account was referred to as the "Linchpin Account" by Wextrust employees, who used the account to transfer funds among numerous Wextrust Entities and Affiliates at the direction of Byers and Shereshevsky.  (*See* First Interim Report at 71-72).  In total, Wextrust deposited investor funds from 28 securities offerings

---

[17] The Bank of the Commonwealth operating account was closed in December 2004.
[18] Those six offerings are identified in Appendix 1.
[19] For example, although the investor database indicates that some investors deposited funds in connection with certain investments, certain records, such as copies of the investors' checks that are necessary to determine where an investor's proceeds were deposited, do not exist.
[20] Wextrust had only one account at Bank of Commonwealth, and this account was used for investor deposits and operating expenses.

into the Linchpin Account.[21]  (Sordillo Decl. ¶ 13).  Those offerings primarily were associated with various real estate projects and high-yield loans.

Wextrust also used these funds for purposes unrelated to those for which they were raised.  For example, from May 2004 to June 2004, almost $3.9 million of investor funds raised to finance six real estate projects was deposited in the Linchpin Account.  On June 29, 2004, a portion of this money was used to wire $1.132 million from the Linchpin Account to the account of Lion's Walk, an African investment, as a "loan."  At the same time, funds from the Linchpin Account were used to pay commissions, general operating expenses, and various other items. (Sordillo Decl. ¶ 14).

### 3. March 2005 to August 2008: Establishment of Segregated Accounts

In March 2005, Wextrust began establishing segregated accounts for Wextrust investment projects, eventually opening accounts for 44 such projects.  *See* Appendix 1.  Those accounts were held in a Norfolk branch of Wachovia Bank.  Deloitte has conducted a forensic analysis of all of those accounts.  Although Wextrust established the segregated accounts and deposited investor funds in the accounts in the first instance, the funds were systematically commingled through subsequent transfers to other accounts.  Deloitte has found that the investor funds deposited into accounts for each of the 44 projects accounts were commingled.

In a large number of cases, investor funds were withdrawn from segregated accounts before escrow conditions were satisfied, *i.e.*, before the minimum required amount had been raised.  In most cases, funds were withdrawn from a segregated account and transferred to the Linchpin Account, which was used to pay operating expenses, distributions, and other expenses.

---

[21] Those offerings are listed at Appendix 1.  As discussed in Section III.B.3, Wextrust began establishing segregated accounts in connection with its securities offerings in March 2005.  In some instances, however, investor funds associated with a particular offering were deposited in the Linchpin Account rather than the segregated account associated with the offering.

**Transfers through the Linchpin Account**.  As discussed in Section III.B.2 below, Wextrust employees frequently transferred funds from one Wextrust Affiliate to another, unrelated Wextrust Affiliate through the Linchpin Account.  For example, as detailed in the First Interim Report, on April 23, 2007, Wextrust employees transferred $1 million from the Wexford Diversified Futures Fund I ("WDFF") to the Linchpin Account; then, on the same day, Wextrust employees transferred $800,000 and $163,000 from the Linchpin Account to Block III Mines & Minerals, LLC and Wexford High Yield Debt Fund I, LLC respectively.  (*See* First Interim Report at 83).  Figure 1, below, illustrates the flow of these funds.

**Figure 1:  Transfer between Wextrust Affiliates through the Linchpin Account
(origination of inter-company loan)**



On May 11, 2007, two Wextrust Affiliates, Skeleton Coast Bret Investors, LLC and Hinsdale Hamptons Mortgage Fund, LLC each initiated the transfer of $500,000 from their respective escrow accounts to the Linchpin Account.  On that same day, $1 million was transferred from the Linchpin account to the WDFF account.  (*Id*. at 84).  High Yield I did not

initiate a reciprocal transfer back to the Linchpin Account during this timeframe. As this example demonstrates, even if these transfers are characterized as inter-company "loans," such "loans" were not necessarily repaid by the entity receiving the funds. *See* Figure 2.

**Figure 2: Transfer between Wextrust Affiliates through the Linchpin Account ("repayment" of inter-company loan)**



In another instance, Shereshevsky directly authorized $275,000 to be transferred from the WDFF Account to the Linchpin Account. This transfer was to assist Hammond Investors (another Wextrust entity) with a property closing.[22] The $275,000 was transferred to the Linchpin Account, combined with almost $1.6 million in funds that had been transferred into the

---

[22] The Hammond account was established for the purpose of purchasing a multi-tenant warehouse, distribution, production, and office property related to the Hammond Industrial Investors, LLC securities offering.

Linchpin Account from Brett Investors Skelton Coast ("BISC") and GDR, and then a total of $1.872 million was transferred from the Linchpin Account to the Hammond Account to be used for closing.[23]  After the closing, additional securities for the Hammond Investment were sold, and on July 20, 2007, $275,000 was transferred from Hammond to WDFF.  (Declaration of John P. Sordillo in Support of Receiver's Opposition to the Proposed Intervening Defendant's Motion to Intervene, filed Dec. 19, 2008 and modified on Dec. 22, 2008 ("Sordillo Opposition Decl.") (Dkt. No. 158) ¶ 20).  In addition, approximately $4 million of the money raised from the sales of Hammond securities offerings after the property was purchased was transferred to the Linchpin Account – an amount significantly greater than the $1.872 million transferred from the Linchpin Account to assist in the Hammond closing.  (Sordillo Decl. ¶ 19).

**Transfers Among Wextrust Affiliates**.  In the second type of commingling, funds from one Wextrust Affiliate were transferred to another, unrelated Wextrust Affiliate.  For example, on June 30, 2006, approximately $2.27 million was transferred from a Wachovia account held by IDEX Mines & Minerals, LLC to a Wachovia account held by Tennessee Office Investors, LLC.  Sixty minutes later, approximately $2.27 million was transferred to Regions Bank for the purchase of 13 office buildings in connection with Tennessee Office Holdings, LLC.  (*See* Sordillo Decl. ¶ 16).  Figure 3, below, shows the flow of these funds.

---

[23] These funds were combined with funds in the Hammond account and $4.811 million was sent to the title company to close on the property.

**Figure 3: Transfers among Wextrust Affiliates**



**Transfers to Third Parties**.  A third type of commingling involved the transfer of

investor funds from a Wextrust Affiliate directly to a third party, such as a bank, for the benefit

of an unrelated Wextrust Affiliate's investment.  For example, on November 9, 2006, $4.75

million was wired from High Yield III to Colonial Bank to fund the purchase of the nine office

buildings in Alabama that are owned by Interstate Park Holdings, LLC.  (*See* First Interim

Report at 86; Sordillo Decl. ¶ 17).

**Other Commingling**.  Commingling also resulted from Wextrust's inability to

accommodate requests from investors to reinvest funds or to change their investment.  For

example, an investor in High Yield III sought to invest $400,000 in WDFF.  He requested that

the funds be transferred from High Yield III to the WDFF account.[24]  At that time, however, the balance in the High Yield III account was only $156,711.17, which was insufficient to make the investor's requested investment into the WDFF Account.  To facilitate the requested transfer, $600,000, which had been transferred on January 5, 2007 from an account belonging to West 82nd Street Investors, LLC (another Wextrust fund in which the investor was *not* an investor and which was unrelated to either High Yield III or WDFF), was moved into a Wextrust Capital account.  Subsequently, on January 10, 2007, $400,000 of what appears to have been the West 82nd Street money, in light of the bank balances, was moved from the Wextrust Capital Account to the High Yield III account.  On that same day, the investor's requested $400,000 transfer was then made from High Yield III to the WDFF Account.  (Sordillo Opposition Decl. ¶ 11).  Figure 4 demonstrates the movement of these funds.

### Figure 4:  Other Types of Commingling



---
[24] The WDFF escrow account consists of both account 2577 and 2564.  However, for ease of reference, this report refers to these accounts simply as the "WDFF Account."

- 30 -

Investor funds were diverted in various other ways.  For example, they were used to pay distributions or final pay-outs on previous, unrelated investments.  An August 18, 2006 e-mail from Byers informs a Wextrust Capital employee that payments required under repurchase agreements entered into by Wextrust Affiliates associated with six U.S. real estate projects will be made by using money from IDEX Mines & Minerals LLC, a Wextrust African diamond mining fund.  (Sordillo Decl. ¶ 20).  Bank records corroborate this.  On August 10, 2006, $1.2 million was transferred from the Wachovia account held by IDEX Mines & Minerals, LLC to a Wextrust Capital, LLC sweep account at Wachovia.  On August 25, $1,000,000 was transferred from the sweep account to the Linchpin Account, and approximately 10 minutes later that same day $1.2 million was transferred from the Linchpin Account to an operating account at Citibank.  On August 29, $870,000 was transferred from the Citibank operating account to another Citibank account and used to satisfy the repurchase agreements.  (Sordillo Decl. ¶ 20).

As the analysis and examples discussed above demonstrate, Wextrust funds – including victim funds – were commingled routinely and extensively.  Based on Deloitte's analysis, the Receiver has determined that Wextrust's commingling of funds was systematic and pervasive.

## C.    Tracing Methods as Applied to Wextrust Investor Funds

Having determined that Wextrust funds were commingled, the Receiver has considered whether any such funds can nonetheless be identified to particular victims.  In cases involving commingled assets, courts often employ tracing methods (sometimes referred to as "tracing fictions") to allocate assets among multiple parties.  *See, e.g.*, *Cunningham v. Brown,* 265 U.S. 1, 12-13 (1924) (discussing tracing analysis of commingled victim funds in Ponzi scheme case); *In re Drexel Burnham Lambert Group*, 142 B.R. 633, 639-40 (S.D.N.Y. 1992) (applying tracing

analysis to commingled funds in securities fraud case); *see generally* Dobbs at § 6.1(1) (discussing tracing in embezzlement, theft, forgery, and other cases).[25]

Case law and scholarly commentary have developed a variety of tracing methods. Three commonly used methods are the first in, first out ("FIFO"); last in, first out ("LIFO"); and "lowest intermediate balance" methods. *See* Dobbs at § 6.1(4) (discussing LIFO and lowest intermediate balance tests); *Chase Manhattan Bank, N.A. v. Traditional Investments Corp.*, No. 92 Civ. 2774 (SS), 1995 WL 72410, *3 (S.D.N.Y. Feb. 21, 1995) (discussing the application of LIFO). The FIFO and LIFO tracing methods are straightforward. Under the FIFO rule, the first money deposited into a commingled account is deemed to be the first money withdrawn from that account. *See Cunningham v. Brown,* 265 U.S. at 12. Thus, applying a FIFO analysis would mean that later depositors into a commingled account are more likely to be able to "trace" their money into the account than earlier depositors, particularly if there have been significant withdrawals from the account. *Id.* Conversely, a court could apply a LIFO tracing rule, and come to the nearly exact opposite result. *See, e.g., Chase Manhattan Bank*, 1995 WL 72410 at *3 (discussing LIFO in a similar context). The "lowest intermediate balance" rule is designed to avoid tracing funds to a wrongdoer as opposed to an innocent party. It thus presumes that money withdrawn from an account is that which a wrongdoer could legally use rather than that of the innocent party. *Cunningham*, 265 U.S. at 12.

At the Receiver's direction, Deloitte has conducted a preliminary analysis to assess whether any of those methods would produce meaningful results in the circumstances of this

---

[25] Courts and commentators have criticized tracing fictions as arbitrary and unfair, particularly in the context of equity receiverships. *See, e.g., United States v. 13328 and 13324 State Highway 75 North*, 89 F.3d 551, 553 (9th Cir. 1996) (rejecting the application of tracing fictions where funds of fraud victims were commingled, finding that to allow one claimant to better its position over other victims would frustrate equity); *Quilling v. Trade Partners Inc.*, No. 1:03- CV-236, 2008 WL 4366039, at *3 (W.D. Mich. Sept. 17, 2008) ("In receivership proceedings, tracing principles have been soundly rejected as a basis upon which to accord greater compensation to one class of victim over another"); *see also* Dobbs, §§ 6.1(3), 6.1(4).

case, and to assess the feasibility and cost of applying them. Based on Deloitte's analysis, both the FIFO and LIFO methods would produce arbitrary results, with all assets in a commingled account being allocated to different subsets of investors in a particular Wextrust project, depending on which of the two methods were used. (*See* Sordillo Decl. ¶ 22). Similarly, the lowest intermediate balance method could be applied in various ways, all of which would produce comparably arbitrary results. The results of Deloitte's preliminary tracing analysis are discussed in further detail in the Declaration of Deloitte forensic accountant John Sordillo, submitted herewith. (*See* Sordillo Decl. ¶¶ 21-25).

A complete tracing analysis would be difficult, time-consuming, and expensive. Based on the volume of transfers among Wextrust Affiliates, either directly or through the Linchpin Account, it is likely that tracing analyses would need to be conducted of each of the segregated accounts associated with the 44 Wextrust offerings, as well as the Linchpin Account, the Bank of the Commonwealth operating account, and the Northern Trust account. Deloitte estimates that, at a minimum, such an analysis would take a period of four to six months to complete and would cost between $3 million and $5 million. (*See* Sordillo Decl. ¶ 25). The benefit of such an exercise would be minimal at best, as the vast majority of accounts had balances of less than $2,000 when the Receiver was appointed.

The Receiver has also considered whether the funds of any victims can be traced to investments in real estate or other non-cash property. In limited circumstances, investor funds appear to have been deposited into segregated accounts, where they remained until all or part of the funds were used for their originally intended purpose. To date, Deloitte has analyzed payments related to the 22 real estate purchases for which the company's records provide sufficient information to analyze whether investors' funds are traceable into the property (the

date of the closing and the amount and date of the transfer to the title company).[26]  Only eight of these 22 properties were purchased with payments made from segregated accounts in which no investor money was transferred out of the accounts prior to the closing on the properties.[27]  Five of these eight accounts had insufficient funds for closing and thus used money from unrelated Wextrust Affiliates or the Linchpin Account to purchase the properties associated with the investments.[28]  The remaining three accounts (Homer, South Pine, and Peoria) had sufficient funds to close, but the funds sent for closing did not reduce the account balance to zero (*i.e.*, some investors' funds were not used to purchase the property).[29]  (Sordillo Decl. ¶ 26).  Thus, it appears that for all 22 property purchases analyzed, tracing fictions would need to be applied to determine which investor funds were used in the purchase.  As discussed in the previous section, applying any of these fictions would arbitrarily allow different sets of investors to trace their funds into the properties.

Based on Deloitte's preliminary analysis, the Receiver has concluded that any benefit to the estate of additional tracing analysis would be outweighed by the substantial cost and delay involved.  Accordingly, the Receiver does not intend to conduct any such tracing analysis unless directed to do so by the Court.

---

[26] Four of the 22 offerings occurred prior to March 2005, and the investor proceeds were thus deposited in Wextrust Capital operating accounts.  It is therefore impossible to trace a particular investor's funds into the property associated with the investment.

[27] These accounts were:  West Bearden LLC, River's Edge Investors LLC, Homer Glen Investors LLC, S. Pine Street Investors LLC, Hammond Industrial Investors LLC, Peoria Office Investors LLC, Drake Oak Brook Investors LLC, and Corinth Investors LLC.

[28] In total, 15 of the 22 segregated accounts used approximately $19.1 million in funds from unrelated Wextrust Affiliate accounts and the Linchpin account to assist in closings.  In addition, when Wextrust purchased the Crowne Plaza Phoenix hotel, it obtained a loan of approximately $2.8 million from Broadway Bank to assist in the closing.

[29] In all but one instance (Corinth), the funds sent to close on the properties from the segregated accounts did not entirely deplete the investor funds in the accounts.  Corinth raised $500,000 prior to closing on the property; combined those funds with $1.035 million transferred to the Corinth account from the Linchpin account; and sent $1.538 million to the title company to purchase the property associated with the investment. However, because Corinth used funds from other unrelated sources to purchase the property, tracing fictions would need to be applied to these other accounts to determine whether non-Corinth investors could also trace their monies into the purchase of the property.

# IV.    STATUS OF WEXTRUST INTERESTS IN SOUTH AFRICA

As discussed in the First Interim Report, the Receiver has taken steps to prevent further dissipation of Wextrust assets in southern Africa.  (*See* First Interim Report at 89-92).  The Receiver's application for legal recognition in South Africa, submitted to the Pretoria High Court on September 23, 2008, is scheduled for a hearing on April 28, 2009.  However, the Receiver has obtained interim relief from the High Court, and has obtained information and evidence concerning the disposition of Wextrust investor funds transferred to Africa, as described below.

On September 11, 2008, a South African company controlled by Pure Africa Minerals ("PAM") CEO Michael van der Merwe filed an involuntary liquidation proceeding against PAM.  On September 11, 2008, a South African company controlled by Pure Africa Minerals ("PAM") CEO Michael van der Merwe filed an involuntary liquidation proceeding against PAM.  PAM is a member of the PAM Syndicate.[30]

On November 13, 2008, the Receiver filed a second, more limited, application with the High Court, seeking recognition for the purpose of asserting claims on behalf of Wextrust Entities and Affiliates in that liquidation proceeding.  On November 18, 2008, the High Court granted the Receiver's application.  On November 21, 2008, the Receiver filed nine creditor claims in the aggregate amount of approximately $30 million, on behalf of various Wextrust Entities.  Nine other creditors submitted claims totaling approximately $2.7 million.  Pursuant to the High Court's order, the Receiver's representatives participated in the first meeting of creditors, at which the High Court appointed a liquidator nominated by the Receiver.  In addition, the High Court has granted the Receiver access to PAM documents and computers

---

[30] As discussed on pages 87 and 88 of the First Interim Report, the Receiver has determined that, from May 2004 through August 2008, approximately $40 million in Wextrust investor funds was transferred from the United States to members of the PAM Syndicate, of which PAM received approximately $30 million.

seized by the liquidators, and the Receiver's forensic accountant has begun to examine the documents.

On January 12 and 13 and February 5 and 6, 2009, in connection with the liquidation proceeding, the Commissioner of the High Court held inquiries into PAM's financial activities. In those inquiries, the liquidators conducted examinations of numerous witnesses, including van der Merwe; former PAM accountant Sybrand Hanekom; PAM attorney Christoffel Lombard, and various others. Testimony is expected to continue in mid and late February 2009. The PAM liquidators have commenced proceedings against several other PAM Syndicate companies, including one company in Namibia. The Receiver is contemplating submitting claims in those proceedings.

Based on the documents and other evidence the Receiver has obtained to date, it appears that the $30 million in Wextrust investor funds transferred to PAM was thereafter transferred and commingled with funds of other PAM Syndicate entities and other businesses and properties owned and controlled by van der Merwe, Hanekom, and others acting in concert with them; that the extent of such commingling was extensive and pervasive; and that van der Merwe and Hanekom have failed to provide the liquidators with all relevant financial documentation relating to PAM and other PAM Syndicate members.

The Receiver is continuing to investigate the transfer of approximately $40 million in Wextrust funds to Africa, and to trace those funds to identifiable bank accounts or assets. In connection with that investigation, the Receiver will "[t]ake all necessary steps to gain control of . . . [and] repatriate" such assets. (Receiver Order at 5). In addition, the Receiver is continuing

to work with U.S. and South African law enforcement and regulatory authorities in an effort to carry out the Court's orders in the most efficient and cost-effective manner.[31]

## V.  POTENTIAL CLAIMS AGAINST THIRD PARTIES

The Receiver is authorized to take preliminary steps to locate any assets that may have been conveyed to third parties, and to investigate, prosecute and otherwise participate in litigation to collect, conserve or recover assets of Wextrust.  (Receiver Order at 5, 8).  As required by the Court's orders, the Receiver is continuing to conduct a comprehensive investigation of the activities and transactions of Wextrust.  To date, receivership attorneys and investigators have interviewed more than 60 witnesses.

Based on the results of that investigation to date, the Receiver has compiled a preliminary list of potential claims against third parties.  Such claims include, *inter alia*, fraudulent transfers, fraud, breach of fiduciary duty, and professional malpractice.  In assessing such claims, the Receiver must consider a variety of legal issues, including standing, jurisdictional, and other procedural issues that are particular to the receivership context.  *See, e.g., Eberhard v. Marcu*, 530 F.3d 122, 133-35 (2d Cir. 2008) (vacating trial verdict in fraudulent conveyance action based on receiver's lack of standing); *SEC v. Ross*, 504 F.3d 1130, 1140-45 (9th Cir. 2007) (vacating disgorgement order based on receiver's failure to obtain *in personam* jurisdiction over intervenor).  The Receiver must also consider whether pursuing a claim would produce a net economic benefit to the estate.

The Receiver has tasked forensic accountant Jerry B. Klein with identifying assets potentially available for recovery.  Among other efforts, Klein is analyzing evidence of payments

---

[31] On January 21, 2009, the South African Constitutional Court held in a unanimous opinion that the extradition and mutual legal assistance treaties between the United States and South Africa are valid under South African law, reversing a lower court ruling that had invalidated both treaties and called into question the United States government's ability to extradite fugitives and obtain evidence and legal assistance from South Africa.  *See President of the Republic of South Africa and Others v. Quagliani*, 2009 ZACC 1 (CC) (S. Afr.).

by Wextrust to executives, brokers, employees, and third parties, including commissions and loans.  Receivership attorneys are conducting further investigation and pre-filing discovery of potential claims, including issuing subpoenas for documents and depositions.  In some cases, the Receiver has sought judicial assistance to compel the production of evidence by third parties.  In addition to investigating the factual bases for third party liability, the Receiver is seeking evidence of the ability of potential defendants to pay a judgment or settlement to the estate.

The Receiver is coordinating with the SEC and the United States Attorney's Office to ensure that recoveries against third parties are pursued in the most efficient and cost-effective manner.  Although the Receiver is authorized to pursue claims, in some cases it may be preferable to defer to the SEC's efforts to pursue remedies such as disgorgement against relief defendants, or the United States Attorney's obligation to seek restitution in criminal prosecutions.  The Receiver has consulted multiple attorneys qualified to pursue claims on behalf of the estate, and will take steps to minimize legal expenses through the selection of counsel and the structuring of fee arrangements.  The Receiver will continue to consult with the SEC on the retention of professionals and commencement of any civil actions.

## VI.    INVESTOR RELATIONS AND RESPONSES TO INVESTOR INQUIRIES

The Receiver is required to "be available to respond to investor inquiries."  (Receiver Order at 4).  The Receiver continues to respond to investor inquiries via telephone and email.  In the past 90 days, approximately 340 emails have been received, most of them attaching documents concerning Wextrust investments.  The Receiver has sent approximately 160 substantive written responses to investor inquiries in the past 90 days.

On December 10, 2008, the Receiver sent a letter to all known Wextrust investors who had not yet been interviewed, asking them to contact the Receiver's investor relations desk and

to provide any relevant documentation regarding their investments.  Beginning on December 12, 2008, the Receiver began to receive approximately 7 to 10 calls per day from investors in response to that letter.  Since then, the Receiver has interviewed an additional 86 investor entities, bringing the total number of interviews to 1,147, more than 80 percent of the investor entities.  The Receiver has also collected approximately 11,500 documents from investors, and has made those documents available to the government agencies investigating this matter.

On November 10, 2008, the Receiver conducted a town hall meeting in New York.  Approximately 16 individuals attended the meeting in person.  Another approximately 187 individuals participated by telephone.  In addition to the Receiver, representatives of the SEC and the Receiver's bankruptcy counsel made presentations at the meeting.  The Receiver will continue to conduct town hall meetings as this matter progresses.

On January 15, 2009, the Receiver filed the Management Plan.  The purpose of the plan was to provide notice to investors and other interested parties of the Receiver's plans for the Wextrust real estate assets, together with specific information on each of the Wextrust real estate properties.  To date, the Receiver has not received any objections to the plan.

On February 3, 2009, a redesigned version of the receivership website was made available.  The website is designed to be more user-friendly, and will assist in the Receiver's efforts to market and sell Wextrust real estate assets.  The website provides access to all public court filings in this action, explanatory materials, and links to other electronic resources.

VII.    **BANKRUPTCY DETERMINATION**

The Receiver has been directed to determine whether any of the Wextrust Entities or Affiliates should undertake a bankruptcy filing.  (Receiver Order at 4).  On December 17, 2008, the Court denied, in part, a motion to amend the Receiver Order to permit involuntary

bankruptcy petitions to be filed against Wextrust Entities or Affiliates without this Court's approval. (Dkt. No. 148). An interlocutory appeal of that order is pending in the Second Circuit. To date, no party has sought the Court's approval to file a bankruptcy petition.

As set forth in the Management Plan, the Receiver has determined that no bankruptcy petition should be filed at this time. Based on the valuation of the Wextrust real estate properties and the Receiver's analysis of the available management options, the Receiver has concluded that there would be no benefit to the estate in commencing a bankruptcy proceeding. In the Receiver's judgment, any benefits of bankruptcy would be outweighed by increased costs and delay. However, the Receiver is continuing to monitor the properties in light of the current volatility in the real estate and credit markets, and may change that conclusion based on future developments. (*See* Management Plan at 18-22).

## VIII.   <u>ADMINISTRATIVE COSTS OF THE RECEIVERSHIP</u>

The Receiver Order provides that the Receiver and his advisors shall be paid on a monthly basis for the first six months of the case, and quarterly thereafter. (Receiver Order at 11). The Receiver and receivership counsel, Dewey & LeBoeuf LLP ("D&L"), submitted their first joint monthly application for allowance of compensation and reimbursement of expenses, reflecting expenses incurred from August 11, 2008 through August 31, 2008, on November 17, 2008. On December 30, 2008, the Court issued an opinion ("Fee Opinion") (Dkt. No. 166), approving, on an interim basis, the Receiver's fees in the amount of $57,300, the fees of D&L in the amount of $1,718,144.40 and the expenses of D&L in the amount of $85,840.10. The Court reduced the fee award to D&L by 20 percent, but ruled that D&L may apply for some or all of the amount of reduction at the conclusion of the case, based on the results achieved and the benefit to the receivership estate. The Court also granted Deloitte's first interim application in

full, resulting in approval of fees in the amount of $66,640 and $13,602.49 in expenses. (Fee Opinion at 23-24). On January 26, 2009, the Court granted interim fee awards of R 2,383,523.95 (approximately $253,168.97) to several South African advocates and a South African forensic accountant retained by the Receiver, covering the period from August 11, 2008 through December 31, 2008. (Dkt. No. 176).

The Receiver and D&L will file a second interim fee application shortly, covering the period September 1, 2008 through September 30, 2008. The SEC has reviewed that application, and has advised the Receiver that the agency approves the award requested. The application will request approximately $1.75 million in fees and expenses for the Receiver and D&L. The September application will reflect a 20 percent reduction in D&L's fees, in addition to previously agreed-upon discounts, and will request the Court's permission to request some or all of the amount of that reduction at the conclusion of the case.

Deloitte will also file its second interim fee application shortly, which will seek compensation for financial advisory and consultation services provided to the Receiver for the period September 1, 2008 through September 30, 2008, as well as computer forensic and data compilation services for the period August 12, 2008 through September 30, 2008. The total amount sought by Deloitte for these periods is approximately $545,000 in fees and $81,000 in expenses. In January 2009, Hilco submitted its first interim application to the SEC. That application will be submitted to the Court upon SEC approval.

Professional fees have declined consistently since August 2008. Although the level of fees for September 2008 was approximately the same as for August, the September fee applications will cover a full month, a period approximately 30 percent longer than the 21-day period covered by the August applications. Based on the total amount of fees and expenses

before the application of any discount or holdback, legal fees have declined substantially in each month, beginning in September. Now that several of the major actions required by the Receiver have been completed, that trend is expected to continue.

## IX.     CONCLUSION

Although the work of the Receiver is continuing, several of the steps the Court ordered the Receiver to take have been completed. The Receiver has determined the extent of commingling among the Wextrust Entities and Affiliates, as discussed herein. In the Receiver's judgment, the financial analysis conducted by Deloitte, together with the asset valuation conducted by Hilco (as reported in the Management Plan), provide a sufficient basis to assess the true financial condition of the Wextrust Entities and Affiliates, with the exception of the Wextrust interests in Africa. The books, records and documents of the Wextrust Entities and Affiliates in the United States have been secured. The Receiver has made a determination with respect to bankruptcy, subject to future reevaluation, as discussed above.

The Receiver will continue to manage the estate in a manner designed to preserve the *status quo* and the value of Wextrust properties and assets. The Receiver will continue to report on the financial condition of the receivership estate on a periodic basis. The Receiver will continue to take steps to prevent further dissipation or encumbrance of assets, including the internal controls, expense reductions and other management actions discussed herein, and the transactions outlined in the Management Plan. Similarly, the Receiver will continue to take steps to recover assets through sales of property, litigation and other available means. The Receiver will continue to be available to respond to investor inquiries, and will continue to take steps to inform investors and other interested parties of significant developments.

Dated:  New York, New York,
        February 11, 2009

Respectfully submitted,

TIMOTHY J. COLEMAN
Receiver for Wextrust Entities


s/ Mark S. Radke_____
Mark S. Radke, *pro hac vice*
DEWEY & LEBOEUF LLP
1301 Avenue of the Americas
New York, NY 10019-6092
Tel. (212) 259-8000

Attorneys for Receiver

<u>**CERTIFICATE OF SERVICE**</u>

The undersigned, an attorney, states that I am one of the attorneys for Timothy J. Coleman, Receiver, in this matter and do hereby certify that on February 11, 2009, I directed the service of a true and correct copy of the foregoing **SECOND INTERIM REPORT OF RECEIVER, DECLARATION OF JOHN P. SORDILLO IN SUPPORT OF SECOND INTERIM REPORT OF RECEIVER, AND EXHIBITS IN SUPPORT OF THE SAME** upon the following individuals in the manner indicated below:

<u>**Via ECF Notification & Electronic Mail**</u>
Alexander M. Vasilescu, Esq.
Andrew M. Calamari, Esq.
Steven G. Rawlings, Esq.
Alistaire Bambach, Esq.
Danielle Sallah, Esq.
Philip Moustakis, Esq.
Attorneys for Plaintiff SEC

<u>**Via ECF Notification & Electronic Mail**</u>
Barry S. Pollack, Esq.
Joshua Solomon, Esq.
Attorneys for G&H PARTNERS AG

<u>**Via ECF Notification & Electronic Mail**</u>
Barry S. Zone, Esq.
Jason Canales, Esq.
Stephen Richard Popofsky, Esq.
Attorneys for Defendant STEVEN BYERS

<u>**Via ECF Notification & Electronic Mail**</u>
Edward F. Malone, Esq.
George R. Mesires, Esq.
Attorneys for BARRINGTON BANK & TRUST CO. AND HINSDALE BANK & TRUST CO.

<u>**Via ECF Notification & Electronic Mail**</u>
John C. Meringolo, Esq.
Attorney for Defendant JOSEPH SHERESHEVSKY

<u>**Via ECF Notification & Electronic Mail**</u>
Francesca Morris, Esq.
Attorney for non-parties HERITAGE COMMUNITY BANK AND TICOR TITLE INSURANCE

<u>**Via ECF Notification & Electronic Mail**</u>
Michael Fred Bachner, Esq.
Attorney for Defendant ELKA SHERESHEVSKY

<u>**Via ECF Notification & Electronic Mail**</u>
Shalom Jacob, Esq.
Shmuel Vasser, Esq.
Attorneys for non-party INTERNATIONAL AD-HOC COMMITTEE OF WEXTRUST CREDITORS

<u>**Via ECF Notification & Electronic Mail**</u>
Martin Siegel, Esq.
Attorney for non-party INTERNATIONAL CONSORTIUM OF WEXTRUST CREDITORS

<u>**Via ECF Notification & Electronic Mail**</u>
Paul A. Levine, Esq.
Attorney for non-party KEY EQUIPMENT FINANCE, INC.

<u>**Via ECF Notification & Electronic Mail**</u>
David B. Gordon, Esq.
Beth L. Kaufman, Esq.
Attorneys for non-party LARRY COSTA.

<u>**Via ECF Notification & Electronic Mail**</u>
Harris Kay, Esq.
Marc X. LoPresti, Esq.
Attorneys for various non-party investors

s/ Mark S. Radke_____ _____