UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

SECURITIES AND EXCHANGE COMMISSION,

         Plaintiff,

   - against -

STEVEN BYERS, JOSEPH SHERESHEVSKY,
WEXTRUST CAPITAL, LLC, WEXTRUST
EQUITY PARTNERS, LLC, WEXTRUST
DEVELOPMENT GROUP, LLC, WEXTRUST
SECURITIES, LLC, and AXELA HOSPITALITY,
LLC,

         Defendants,

   - and -

ELKA SHERESHEVSKY,

         Relief Defendant.

08 Civ. 7104 (DC)

ECF Case

---

## RECEIVER'S PROPOSED PLAN OF DISTRIBUTION

TIMOTHY J. COLEMAN
Receiver for Wextrust Entities

DEWEY & LEBOEUF LLP
1301 Avenue of the Americas
New York, NY 10019-6092
Tel. (212) 259-8000

March 27, 2009

Attorneys for Receiver

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................. 1

APPLICABLE LEGAL STANDARDS ..................................................................... 4

DISCUSSION ............................................................................................................ 7

I.   A *Pro Rata* Distribution is the Most Equitable Approach in the Circumstances of this Case................................................................................................ 7

    A.   Commingling of Investor Funds .................................................. 10

    B.   Similarly Situated Victims ............................................................ 12

    C.   Lack of Adherence to the Corporate Form .................................. 13

II.  Alternative Distribution Approaches ..................................................... 17

    A.   Imposition of a Constructive Trust .............................................. 17

    B.   Distribution of Funds According to Level of Risk ....................... 19

    C.   Distribution of Funds According to Nature of Investment Interest ............................. 20

    D.   Distribution of Funds According to Timing of Investment .......................... 21

    E.   Initiation of Bankruptcy Proceedings or Invocation of Bankruptcy Principles............ 22

III. Proposed Claims Solicitation and Verification Process ........................ 27

    A.   Treatment of Various Classes of Claimants.................................. 27

    B.   Administrative Claims .................................................................. 27

    C.   Tax Claims .................................................................................... 28

    D.   Secured Creditor Claims .............................................................. 29

    E.   Validation of Investor Claims ...................................................... 30

        1.   Disqualification of Certain Claims and Claimants ................. 33

        2.   Securities Investor Protection Corporation Claims................. 36

    F.   Verification of Claims of Unsecured Creditors ........................... 37

    G.   Plan for Partial Cash Distribution and Establishment of Reserve for Future Expenses and Distributions................................................... 39

CONCLUSION ........................................................................................................ 39

# TABLE OF AUTHORITIES

*Cases*

*Anderson v. Stephens*,
  875 F.2d 76 (4th Cir. 1989) ................................................................. 17

*Beale v. Kappa Alpha Order*,
  192 Va. 382 (Va. 1951) ....................................................................... 14

*CFTC v. Eustace*,
  No. 05-cv-2973, 2008 WL 471574 (E.D. Pa. Feb. 19, 2008) ................ 26

*CFTC v. Franklin*,
  652 F. Supp. 163 (W.D. Va 1986) ........................................................ 17

*CFTC v. Topworth International Ltd.*,
  205 F.3d 1107 (9th Cir. 1999) ...................................................... 15, 26

*Cunningham v. Brown*,
  265 U.S. 1 (1924) ................................................................... 5, 10, 22

*Dana v. 313 Freemason*,
  266 Va. 491 (Va. 2003) ....................................................................... 14

*Dunlop-McCullen v. Local 1-S*,
  149 F.3d 85 (2d Cir. 1998) ................................................................. 36

*Eberhard v. Marcu*,
  530 F.3d 122 (2d Cir. 2008) ............................................................... 23

*EBG Holdings LLC v. Vredezicht's Gravenhage 109 B.V.*,
  No. 3184-cv-VCP, 2008 WL 4057745 (Del. Ch. Sept. 2, 2008) ............ 14

*Endico Potatoes, Inc. v. CIT Group/Factoring, Inc.*,
  67 F.3d 1063 (2d Cir. 1995) ............................................................... 22

*Estate of Reece*,
  470 N.Y.S.2d 974 (N.Y. Sur. Ct. 1983) ................................................ 17

*FDIC v. Bernstein*,
  786 F. Supp. 170 (E.D.N.Y. 1992) ......................................................... 7

*Gallagher v. Reconco Builders, Inc.*,
  415 N.E.2d 560 (Ill. App. 1980) .......................................................... 14

*In re 599 Consumer Electronics*,
  195 B.R. 244 (S.D.N.Y. 1996) ............................................................. 25

*In Re Augie/Restivo Banking Company, Ltd.*,
  860 F.2d 515 (2d Cir. 1988) ............................................................... 25

*In re Bonham*,
   229 F.3d 750 (9th Cir. 2000) ................................................................................... 26

*In re Flanagan*,
   503 F.3d 171 (2d Cir. 2007) ................................................................................... 18

*In re Heston Oil Co.*,
   63 B.R. 711 (Bankr. N.D. Okla. 1986) .................................................................. 17

*In re Lemons & Assoc., Inc.*,
   67 B.R. 198 (Bankr. D. Nev. 1986) ................................................................. 10, 17

*In re Trending Cycles for Commodities, Inc.*,
   27 B.R. 709 (Bankr. S.D. Fla. 1983) ........................................................................ 6

*Liberte Capital Group, LLC v. Capwill*,
   148 Fed. App'x 426 (6th Cir. 2005) .......................................................................... 9

*McFarland v. Winnebago South, Inc.*,
   863 F. Supp. 1025 (W.D. Mo. 1994) ................................................................... 7, 23

*People v. California Safe Deposit & Trust Co.*,
   167 P. 388 (Cal. 1917) ............................................................................................ 10

*Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*,
   324 U.S. 806 (1945) ................................................................................................ 36

*Quilling v. Trade Partners Inc.*,
   No. 1:03- CV-236, 2008 WL 4366039 (W.D. Mich. Sept. 17, 2008) ........................ 9

*Scholes v. Lehmann*,
   56 F.3d 750 (7th Cir. 1995) ................................................................................... 27

*SEC v. American Board of Trade, Inc.*,
   830 F.2d 431 (2d Cir. 1987) ................................................................................... 23

*SEC v. AmeriFirst Funding, Inc.*,
   No. 3:07-cv-1188-D, 2008 WL 919546 (N.D. Tex. Mar. 13, 2008) ........................ 14

*SEC v. Basic Energy & Affiliated Resources, Inc.*,
   273 F.3d 657 (6th Cir. 2001) ................................................................................. 34

*SEC v. Credit Bancorp*,
   290 F.3d 80 (2d Cir. 2002) .............................................................................. passim

*SEC v. Credit Bancorp, Ltd.*,
   297 F.3d 127 (2d Cir. 2002) ................................................................................... 29

*SEC v. Credit Bancorp, Ltd.*,
   99-cv-11395, 2000 U.S. Dist. LEXIS 17171 (S.D.N.Y. Nov. 29, 2000) ................ 36

*SEC v. Elliott,*
   953 F.2d 1560 (11th Cir. 1992) ...................................................................... passim

*SEC v. Elmas Trading Corp.,*
   85 B.R. 116 (D. Nev. 1987) .................................................................................. 24

*SEC v. Enterprise Trust Co.,*
   No. 08-C-1260, 2008 U.S. Dist. LEXIS 79731 (N.D. Ill. Oct. 7, 2008) .................. 34

*SEC v. First Jersey Securities, Inc.,*
   101 F.3d 1450 (2d Cir. 1996) ............................................................................... 21

*SEC v. First Securities Company of Chicago,*
   507 F.2d 417 (7th Cir. 1974) ............................................................................... 24

*SEC v. Fischbach Corp.,*
   133 F.3d 170 (2d Cir. 1997) ................................................................................... 5

*SEC v. Forex Asset Management LLC,*
   242 F.3d 325 (5th Cir. 2001) ........................................................................ 4, 5, 6

*SEC v. George,*
   426 F.3d 786 (6th Cir. 2005) ............................................................................... 10

*SEC v. Hardy,*
   803 F.2d 1034 (9th Cir. 1986) ....................................................................... 31, 33

*SEC v. Infinity Group Co.,*
   226 Fed. App'x 217 (3d Cir. 2007) ........................................................................ 5

*SEC v. Lund,*
   570 F. Supp. 1397 (C.D. Cal. 1983) ...................................................................... 4

*SEC v. Merrill Scott & Assocs., Ltd.,*
   No. 2:02-cv-39, 2006 U.S. Dist. LEXIS 93248 (D. Utah Dec. 21, 2006) ............... 35

*SEC v. TLC Investments and Trade Co.,*
   147 F. Supp. 2d 1031 (C.D. Cal. 2001) ................................................................ 24

*SEC v. Wang,*
   944 F.2d 80 (2d Cir. 1991) ............................................................................. 5, 30

*SEC v. Wencke,*
   783 F.2d 829 (9th Cir. 1986). .............................................................................. 31

*United States v. 13328 and 13324 State Highway 75 North,*
   89 F.3d 551 (9th Cir. 1996) ...................................................................... 5, 6, 9, 10

*United States v. Durham,*
   86 F.3d 70 (5th Cir. 1996) ......................................................................... 5, 6, 10

*United States v. Fairway Capital Corp.*,
   433 F. Supp. 2d 226 (D.R.I. 2006) ............................................................. 31, 32

*United States v. Vanguard Investment Co.*,
   6 F.3d 222 (4th Cir. 1993) .......................................................................... 6

*Wilson v. Wall*,
   73 U.S. 83 (1867) ........................................................................................ 5

**Statutes**

11 U.S.C. § 506 (2005) .................................................................................... 30

11 U.S.C. § 507 (2005) .................................................................................... 21

**Rules**

Rev. Proc. 2009-20 ......................................................................................... 29

Rev. Rul. 2009-9 ............................................................................................. 29

Treasury Regulation § 1.468B-1(c) ................................................................ 29

**Treatises**

1 Fletcher Cyc. Corp. § 41.30 (2008) ............................................................. 13

13 Moore's Federal Practice (3d ed.) .............................................................. 7

16 Fletcher Cyc. Corp § 7931 (2008) ............................................................. 4

2 Dan B. Dobbs, Law of Remedies (2d ed. 1993) ......................................... 9, 17

45 Am. Jur. 3d Proof of Facts § 1 (2008) ...................................................... 15

5 Scott on Trusts (4th ed. 1989 & Supp. 1995) ............................................ 10

Timothy J. Coleman, Receiver for the Wextrust Entities ("Receiver"), respectfully submits the Receiver's Proposed Plan of Distribution ("Receiver's Plan") for the Defendant Wextrust Entities and all entities they control or in which they have an ownership interest (collectively, the "Wextrust Entities and Affiliates"). The Receiver seeks the Court's approval of both the equitable principles and administrative procedures outlined herein so that he may prepare to distribute the proceeds and other assets of the receivership estate to victims.[1] This document has been served on all counsel who have entered an appearance in this action and posted on the receivership website.[2]

## PRELIMINARY STATEMENT

Over the past seven months, the Receiver has marshaled the assets of the receivership estate; adopted expense reduction, cash management, and internal control mechanisms; investigated the financial condition of, and the extent of commingling among, the Wextrust Entities and Affiliates; and made determinations regarding the management, disposition, and monetization of receivership assets. Although the Receiver's investigatory and management responsibilities are ongoing, the Receiver's Plan contemplates an administrative process for validating the claims of investors and soliciting claims from creditors. Once the claims process is complete, and after approval by the Court, the Receiver will be in a position to commence making partial distributions from the available cash assets of the receivership estate. The claims process, validation process, and anticipated formula for the partial distribution are summarized

---

[1] A proposed order approving the Receiver's Plan is attached as Exhibit A to the Notice of Motion for an Order Approving the Receiver's Proposed Plan of Distribution, filed concurrently herewith.

[2] In addition, within five (5) business days of this filing, a copy of the Receiver's Plan will be e-mailed to all investors for whom the Receiver has a valid e-mail address. For investors who do not have a valid e-mail address, the Receiver will mail a copy of the Moving Papers to such investors at their last known physical address by regular domestic or Federal Express international mail. The Receiver's Plan is also available for inspection and copying during regular business hours at the Office of the Clerk of the District Court, by written request to the District Court Clerk's Offices, or by using the PACER filing system utilized by the District Court at <http:11ecf.nysd.uscourts.gov>.

below.

As detailed in the Receiver's Plan for Management of Wextrust Real Estate Portfolio (Dkt. No. 172) ("Plan of Management"), filed on January 15, 2009, the Receiver has concluded that there is little, if any, going concern value in the Wextrust real estate operations as a whole, and that any such value is far outweighed by the substantial risk of loss involved in continuing to operate the properties for an extended period of time.  The Receiver is aware of no objections to the conclusions, principles, and procedures set forth in the Plan of Management.

Accordingly, for properties in which the receivership estate has equity, the Receiver, pursuant to the process outlined in the Plan of Management, is reducing or eliminating capital expenditures for improvements or renovations, shortening the holding period for the properties, and marketing the properties in an effort to sell them at fair market value.  This process was designed by the Receiver and his advisors to maximize the value of the properties and facilitate a prompt distribution to victims.  Over the past few months, the Receiver has sought court approval to sell interests in property formerly held by BaxTech Holdings, LLC; Repton Development Company, LLC; and Hammond Industrial Outlots, LLC, thereby realizing value for the estate.[3]

For the remaining real estate assets in which the fair market value has fallen substantially below the amount of the secured creditors' interests, the Receiver has sought, and will continue to seek, where feasible, to renegotiate or restructure the secured debts and/or assist the secured creditors in selling the properties for the benefit of both such creditors and the estate.  The Receiver recently has filed motions to relinquish interests in property formerly held by 2435 West Belmont Development, LLC; 2825 Oakley, LLC; Crowne-Phoenix Investors, LLC; Drake

---

[3] The Receiver also did not disturb a sale for a Wexford Homes property held by 6126 Plymouth Development, LLC that had been entered into prior to the receivership.

Oak Brook Investors, LLC; First Wyoming Plaza, LLC; Hilltop Investors, LLC; Homer Glenn Investors, LLC; Riverside Arcade, LLC; and SF Development Company, LLC.  By taking these actions, the Receiver has reduced risk and operational costs to the estate, and has in some cases obtained releases from substantial deficiency claims.[4]

At the beginning of the receivership, there were three Axela Hospitality, LLC hotel properties, 23 Wextrust Equity Partners, LLC real estate properties, and eight Wexford Development, LLC residential real estate properties in the estate.  To date, the Receiver has sought court approval to sell or relinquish 12 of the 34 Wextrust real estate assets.  The Receiver will continue to adhere to the process outlined in the Plan of Management for the remaining properties.

The Receiver has also determined that approximately $40 million in Wextrust investor funds were transferred to Africa, and were subsequently commingled with funds of various other entities and properties owned and/or controlled by South African Wextrust Affiliates.  The Receiver has filed nine creditor claims in South African liquidation proceedings involving such entities.  The Receiver may pursue similar claims against additional African entities to attempt to recoup receivership assets after weighing the costs and benefits to the estate of pursuing such actions.

Returning to the Receiver's Plan, the Applicable Legal Standards section discusses the Court's equitable authority to implement a plan of distribution.  Section I sets forth the legal and factual bases for the Receiver's recommendation of a *pro rata* distribution, including the evidence of systematic and pervasive commingling of assets, and the relationship among the victims and wrongdoers in this case.  Section II discusses various alternative approaches to

---

[4] In addition to the receivership estate's real estate portfolio, there are also two high yield loan portfolios. The Receiver and his advisors are continuing to manage these loan portfolios in an effort to reduce costs and maximize potential recovery to victims.

distribution and the basis for the Receiver's rejection of those alternatives.  Section III describes

the Receiver's proposed claims process, including the Receiver's proposed procedure for

validation of investors' interests and the compilation and verification of the claims of unsecured

creditors.  This section concludes with an analysis of the Receiver's proposed classification of

claimants and the order in which their claims would be paid.

## APPLICABLE LEGAL STANDARDS

The Court has broad discretion to implement an equitable plan of distribution for the

victims of the Wextrust fraud, and the Amended Order Appointing Temporary Receiver (Dkt.

No. 36) ("Receiver Order") contemplates such a plan.  The Receiver Order expressly prohibits

the Receiver from returning any receivership assets to victims "without further order of this

Court after a hearing on notice to all parties in interest."[5]  (Receiver Order at 12.)  Similarly, the

Order Freezing Assets (Dkt. No. 3) ("Freeze Order") anticipates the approval of a plan of

distribution by the Court, finding that the asset freeze is necessary in this case "to preserve the

Court's ability to approve a fair distribution for victims of the fraud."  (Freeze Order at 2.)

Furthermore, it is customary for equity receivers to propose plans of distribution in SEC

receivership cases.[6]

The Second Circuit and other appellate courts have held that district courts have broad

discretion in fashioning relief in equity receiverships and in setting the procedures for prompt

---

[5] The Receiver Order was incorporated by reference as Exhibit D to the Court's Order on Consent Imposing Preliminary Injunction and Other Relief Against the Defendants and Relief Defendant (Dkt. No. 65) ("Preliminary Injunction Order"), which was entered on October 24, 2008.

[6] *See, e.g., SEC v. Credit Bancorp, Ltd.*, 290 F.3d 80, 88-90 (2d Cir. 2002) (affirming approval of plan of distribution proposed by receiver); *SEC v. Forex Asset Management LLC*, 242 F.3d 325, 328 (5th Cir. 2001) ("Prior to approving the Receiver's distribution plan, the district court sought objections to the plan . . . ."); *SEC v. Lund*, 570 F. Supp. 1397, 1404 (C.D. Cal. 1983) ("The receiver or trustee, in addition to handling other duties if necessary, is given the task of locating those members of the public who were injured by the illegal activity and to pay each injured party an amount determined by the trustee to be fair and equitable."); 16 Fletcher Cyc. Corp § 7931 (2008) ("*Upon proper application*, notice to the parties, and proof, the court may order distribution of the assets in the hands of a receiver to the parties entitled to receive them.") (emphasis added).

and efficient adjudication and administration of that relief.[7]  Accordingly, the Second Circuit has

stated that – in the exercise of this broad discretion – a district court may adopt any proposed

plan of distribution that is "fair and reasonable."  *SEC v. Wang*, 944 F.2d 80, 85 (2d Cir. 1991).

The Court's exercise of discretion in adopting a plan of distribution is guided by

equitable principles.  *See United States v. Durham*, 86 F.3d 70, 73 (5th Cir. 1996) ("Sitting in

equity, the district court is a 'court of conscience.'") (citing *Wilson v. Wall*, 73 U.S. 83, 90

(1867)).  In the receivership context, courts frequently approve a *pro rata* distribution to

similarly situated victims, relying on the equitable maxim that "equality is equity."  *See, e.g.*,

*United States v. 13328 and 13324 State Highway 75 North*, 89 F.3d 551, 553-54 (9th Cir. 1996)

(approving like distributions to similarly situated parties and citing as authority the original

Ponzi-scheme case of *Cunningham v. Brown*, 265 U.S. 1, 13 (1924)).

The Second Circuit and other appellate courts routinely affirm district court approvals of

*pro rata* distributions in SEC enforcement actions involving Ponzi-schemes.[8]  The Second

---

[7] *See, e.g., Credit Bancorp, Ltd.*, 290 F.3d at 91 (finding that the district court's approval of a plan of
distribution was "within the Court's equitable discretion"); *SEC v. Fischbach Corp.*, 133 F.3d 170, 175
(2d Cir. 1997) ("The crafting of a remedy for violations of the [Securities Exchange Act of 1934] lies
within the district court's broad equitable discretion."); *SEC v. First Jersey Securities, Inc.*, 101 F.3d
1450, 1474 (2d Cir. 1996) (stating that the district court has "broad equitable power to fashion appropriate
remedies" in securities fraud cases); *Wang*, 944 F.2d at 85 (stating that the trial court is vested with
"broad discretionary power . . . to craft an equitable decree"); *SEC v. Infinity Group Co.*, 226 Fed. App'x
217, 218 (3d Cir. 2007) ("District Courts have wide equitable discretion in fashioning distribution plans
in receivership proceedings . . . ."); *Forex Asset Management*, 242 F.3d at 331 (stating that the district
court enjoys "broad discretionary power" in shaping equity decrees); *SEC v. Elliott*, 953 F.2d 1560, 1566-
67 (11th Cir. 1992) ("The district court has broad powers and wide discretion to determine relief in an
equity receivership."); *SEC v. Hardy*, 803 F.2d 1034, 1037-39 (9th Cir. 1986) ("'[I]t is a recognized
principle of law that the district court has broad power and wide discretion to determine the appropriate
relief in an equity receivership.'") (citations omitted).

[8] *See SEC v. Enterprise Trust Co.*, Nos. 08-3798 & 08-3852, slip op. (7th Cir. Mar. 18, 2009) (affirming
receiver's plan of distribution); *Liberte Capital Group, LLC v. Capwill*, 148 Fed. App'x 426, 436 (6th
Cir. 2005) (affirming *pro rata* disbursement plan and noting that in two previous cases "the courts
rejected a tracing method, even though tracing was clearly possible"); *SEC v. Basic Energy & Affiliated
Resources, Inc.*, 273 F.3d 657, 668 (6th Cir. 2001) (approving district court's plan to treat investors "in
the same manner" as others because "[a]s the Supreme Court noted in the original Ponzi case, such cases
'call strongly for the principle that equality is equity'") (citing *Cunningham*, 265 U.S. at 13); *Forex Asset*

Circuit adopted a clear standard for the use of such *pro rata* plans of distribution in *Credit Bancorp*, 290 F.3d 80.  In *Credit Bancorp*, investors had transferred cash or securities to a holding company and, in exchange, received a promise of a quarterly dividend based on profits earned through various arbitrage investments.  In actuality, however, the company was "running a classic Ponzi scheme," paying "investors a return out of the assets transferred by later investors."  (*Id.* at 83-85.)  In addition, the company "commingled the assets of . . . other investors" and "neither segregated customer deposits nor earmarked a particular customer's deposited assets to be used to pay that customer's custodial dividend."  (*Id.* at 84-85.)

The district court approved the receiver's proposed *pro rata* plan of distribution.  The Second Circuit affirmed, holding that a *pro rata* approach is favored when:

> (1) Funds of the defrauded victims were commingled; and
> (2) Victims were similarly situated with respect to their relationship to the defrauders.

*Credit Bancorp*, 290 F.3d at 88-89 (collecting cases).

In implementing a plan of distribution, the district court's use of summary proceedings to allow, disallow, and subordinate the claims of interested parties has been approved as an appropriate and efficient adjudication mechanism, so long as potential claimants are afforded an

---

*Mgmt*, 242 F.3d at 328, 332 (affirming *pro rata* distribution even though some investor funds were not commingled); *CFTC v. Topworth Int'l Ltd.*, 205 F.3d 1107, 1110 (9th Cir. 1999) (approving receiver's plan that proposed combining multiple entities into one fund "[b]ecause each entity appeared to be the alter ego of the other"); *13328 and 13324 State Highway 75 North*, 89 F.3d at 553 (in upholding *pro rata* distribution to victims, stating "[t]his Court believes that where, as here, the struggle over the res derived from fraudulent conduct is between innocent parties, tracing should not and will not apply."); *United States v. Vanguard Investment Co.*, 6 F.3d 222, 227 (4th Cir. 1993) (approving *pro rata* distribution although some investors could trace their funds as all investors shared same equitable position); *Durham*, 86 F. 3d at 73 (affirming *pro rata* distribution even though money could be traced to particular claimants); *Elliott*, 953 F.2d at 1570 (affirming district court's decision to disallow tracing in Ponzi-scheme, holding that all former securities owners "occupied the same legal position" and thus some should not be preferred over others); *In re Trending Cycles for Commodities, Inc.*, 27 B.R. 709, 710-11 (Bankr. S.D. Fla. 1983) (in a "pool operation, [in which] there is no record of any specifically identifiable property held for any specific customer," court approves distribution plan "based upon an amount equal to the total out-of-pocket deposit made by a customer minus withdrawals with respect to such contracts" under a rescission/restitution theory) (citations omitted).

opportunity to be heard and present claims.[9]  Indeed, the use of these summary proceedings "promotes judicial efficiency and reduces litigation costs to the receivership, thereby preserving receivership assets for the benefit of [claimants]."  *Bernstein*, 786 F. Supp. at 177 (internal citations omitted).  In light of these principles, the Receiver respectfully requests that the Court exercise its broad equitable discretion (1) to adopt the Receiver's proposed plan of distribution as outlined herein and (2) employ summary proceedings to adjudicate receivership claims in accordance with the claims solicitation and verification process detailed in Section III below.

## DISCUSSION

## I.       A *Pro Rata* Distribution is the Most Equitable Approach in the Circumstances of this Case

Put simply, a *pro rata* distribution acknowledges that, for all intents and purposes, the perpetrators of the underlying fraud in this case failed to observe corporate formalities and customary legal distinctions among the various Wextrust Entities and Affiliates, effectively meaning that assets originally intended to be kept separate were commingled and used for unauthorized and illegal purposes.  Accordingly, this deliberate avoidance of the corporate form erased traditional legal boundaries among the various entities such that they effectively became alter egos of one another.  Thus, the fairest and most reasonable approach to distributing the remaining funds in this case is to return to each investor and unsecured creditor a ratable share of his or her gross investment in the entire Wextrust enterprise, less any cash distributions or like-

---

[9] *Elliott*, 953 F.2d at 1567 ("[A] district court does not generally abuse its discretion if its summary procedures permit parties to present evidence when the facts are in dispute and to make arguments regarding those facts."); *McFarland v. Winnebago South, Inc.*, 863 F. Supp. 1025, 1034 (W.D. Mo. 1994) ("[T]he receivership court has the power to use summary procedures in allowing, disallowing, and subordinating claims of creditors, so long as creditors have fair notice and a reasonable opportunity to respond."); *FDIC v. Bernstein*, 786 F. Supp. 170, 177 (E.D.N.Y. Jan. 10, 1992) ("A district court has extremely broad discretion in supervising an equity receivership and in determining the appropriate procedures to be used in its administration."); 13 Moore's Federal Practice (3d ed.) § 66.06[4][b] ("The powers of the courts include the allowance, disallowance, and subordination of the claims of creditors.").

kind benefits already received during the life of the investment.  As discussed in Section III.E.1 below, however, if approved by the Court, the Receiver's Plan would also provide a mechanism for the partial or complete disqualification of certain former Wextrust employees and associates (who are also investors) from inclusion in any distribution based on evidence that their conduct facilitated the Wextrust Ponzi-scheme.

As demonstrated in Sections I.A and I.B below, as well as the Receiver's prior filings, there is overwhelming evidence that, as in *Credit Bancorp*, the funds of the defrauded investors were commingled in this case and the victims were similarly situated with respect to their relationship to the Defendants.  Thus, based on the authority of this Circuit and for the reasons set forth in this Plan, a *pro rata* distribution is warranted in this case.

By contrast, one alternative approach to distribution would require an individual tracing analysis to determine the specific entity, investment project, and/or expenditure funded by each dollar invested.  In other words, using one of several tracing methods to establish whether certain assets can be identified with particular victims for the purpose of distributing such assets preferentially to those individuals.  This process is described in detail in the Receiver's Second Interim Report at pp. 31-34.  As outlined in that report, the Receiver engaged Deloitte Financial Advisory Services ("Deloitte") to conduct a preliminary analysis assessing whether tracing methods would produce meaningful results in the circumstances of this case, and to determine the feasibility and cost of applying such methods.  Based on Deloitte's findings, the Receiver has concluded that, in light of the systematic and pervasive commingling of assets in this case and avoidance of corporate formalities by the former management of the Wextrust Entities and Affiliates, a complete tracing analysis would be difficult, time-consuming, and expensive – and the ultimate benefit to the estate would be minimal at best.  (Second Interim Report at 33.)

Cases involving Ponzi-schemes that *have* permitted the return of identifiable assets to particular victims are easily distinguished here.  As the Second Circuit recognized in *Credit Bancorp*, 290 F.3d at 89-90, "[i]n those cases the reason the assets were returned was not merely because they were traceable, but because the assets had somehow been segregated in the manner of true trust accounts and/or had never been placed in the defrauder's control."

Moreover, courts and commentators have roundly criticized the use of tracing methods in the context of equity receiverships as arbitrary and unfair.[10]  Such criticism persists even when, unlike here, it is possible and cost-effective to trace certain assets to particular investors:

> To allow any individual to elevate his position over that of other investors similarly "victimized" by asserting claims for restitution and/or reclamation of specific assets based upon equitable theories of relief such as fraud, misrepresentation, theft, etc. would create inequitable results, in that certain investors would recoup 100% of their investment while others would receive substantially less . . . . In the context of this receivership the remedy of restitution to various investors seeking to trace and reclaim specific assets as originating with them is disallowed as an inappropriate equitable remedy.

*Elliott*, 953 F.2d at 1569 (citing and affirming district court decision approving a *pro rata* distribution).

Thus, in cases involving similar operative facts – namely, extensive commingling and a lack of adherence to corporate formalities – a *pro rata* distribution is favored as both fair and reasonable in the exercise of the district court's broad equitable discretion to implement a plan of distribution.  *See, e.g.*, *Liberte Capital Group, LLC*, 148 Fed. App'x at 436  (affirming *pro rata* distribution plan and noting that in two previous cases "the courts rejected a tracing method,

---

[10] *See, e.g., 13328 and 13324 State Highway 75 North*, 89 F.3d at 553 (rejecting the application of tracing fictions where funds of fraud victims were commingled, finding that to allow one claimant to better its position over other victims would frustrate equity); *Quilling v. Trade Partners Inc.*, No. 1:03- CV-236, 2008 WL 4366039, at *3 (W.D. Mich. Sept. 17, 2008) ("In receivership proceedings, tracing principles have been soundly rejected as a basis upon which to accord greater compensation to one class of victim over another"); *see also* 2 DAN B. DOBBS, LAW OF REMEDIES (2d ed. 1993) §§ 6.1(3), 6.1(4) (hereinafter "Dobbs").

even though tracing was clearly possible"); *13328 and 13324 State Highway*, 89 F.3d at 553

(upholding *pro rata* distribution to victims and stating that "[i]nstead of engaging in a tracing

fiction, the equities demand that all [defrauded customers] share equally in the fund of pooled

assets").

Again, *pro rata* distribution avoids the arbitrary and costly application of tracing rules

and prevents some victims from recovering more than others simply because of the "merely

fortuitous fact that the defrauders spent the money of the other victims first" or the fact that there

are insufficient records to trace some victims' funds to after-acquired property. *Durham*, 86 F.3d

at 72; *see also Credit Bancorp*, 290 F.3d at 89; *Elliott,* 953 F.2d at 1570 ("[T]he equities weigh

against allowing some to benefit from the fortuity that [the defendant] had not sold all of the

securities."); *SEC v. George*, 426 F.3d 786, 799 (6th Cir. 2005) (stating that the "mere

coincidence" that defendants paid certain victims to delay discovery of scheme does not entitle

such victims to "preferential treatment").[11]

A. Commingling of Investor Funds

With respect to the first prong of the Second Circuit's *Credit Bancorp* test, the Receiver,

with assistance from Deloitte, has determined that the extent of commingling of Wextrust funds

by and among the Wextrust Entities and Affiliates was profound. Particularly important was the

Receiver's determination, set forth in Section II of the Receiver's Second Interim Report, "that it

---

[11] *See also Cunningham*, 265 U.S. at 13; *Ruddle v. Moore*, 411 F.2d 718, 719 (D.C. Cir. 1969) (tracing fiction "has nothing to be said for it as a principle governing conflicting claims to restitution by equally wronged parties"); *In re Lemons & Assoc., Inc.*, 67 B.R. 198, 213-14 (Bankr. D. Nev. 1986) ("[A] creditor cannot sufficiently identify or trace the trust res through a commingled fund where the fund is too small to satisfy the claims of similarly situated parties. To do so would allow that claimant to benefit at the expense of those who have equally strong equitable claims to the same fund."); *People v. California Safe Deposit & Trust Co.*, 167 P. 388, 389-90 (Cal. 1917) (refusing to indulge in tracing fiction to allow bank's fraud victim to take full fraud amount from assets of bank in receivership because to do so would harm depositors who were "as much entitled as . . . petitioner to the favorable consideration of a court of equity"); 5 Scott on Trusts § 519 (4th ed. 1989 & Supp. 1995) (condemning use of tracing fiction to favor one victim over another).

would not be feasible to attempt to trace commingled Wextrust funds to individual victims"

because the cost of doing such an analysis would be prohibitive and the results, under the law

and practice relating to equitable tracing, would be of no value in determining a fair and

reasonable plan of distribution.[12]  (Second Interim Report at 20.)[13]  Based on Deloitte's findings,

the Receiver thus concluded that:

(1)  The funds of Wextrust victims were commingled;
(2)  The extent of the commingling was pervasive and systemic, continuing from the commencement of the Wextrust business enterprises until the appointment of the Receiver; and
(3)  The process of tracing would be prohibitively expensive and its value would be questionable.

(*See* Declaration of John P. Sordillo in Support of Second Interim Report of Receiver ("Sordillo

Decl.") (Dkt. No. 192), filed concurrently with the Second Interim Report.)

As discussed in detail in the Second Interim Report, none of the tracing methods used by

courts in receivership or similar cases is practical as applied in this case.  Both "last in, first out"

(LIFO) and "first in, first out" (FIFO), as well as the "lowest intermediate balance" rule,

produced arbitrary results.  (Second Interim Report at 33.)  Accordingly, the Receiver has

---

[12] This section, entitled "Extent of Commingling of Wextrust Funds," is found on pages 19-34 of the Second Interim Report.

[13] Deloitte investigated commingling of the proceeds of the 78 Wextrust securities offerings that were conducted during the period from January 1, 2002 through August 11, 2008 (the date the Receiver was appointed).  Based on Deloitte's analysis, in 5 of the 78 offerings, Wextrust failed to raise any money from investors, such that no separate fund was created.  In other words, despite being listed as accounts in the investor database, no money was raised for these 5 investments.  In 62 of the remaining 73 offerings, Deloitte found actual evidence of commingling, and for the remaining 11 offerings, the available Wextrust records were insufficient to make a determination of the extent, if any, of commingling.  Because these 11 offerings occurred prior to March 2005, when segregated accounts were first created for each offering, the Receiver assumes that the funds associated with these offerings were deposited into pooled accounts and thus commingled.  Although the funds used to purchase many of the Wextrust real estate assets were commingled, however, the real estate property itself was not commingled among entities.  Rather, it was held solely in respective, property-specific entities.  Accordingly, as discussed in Section III.D below, to the extent that secured creditors have valid and perfected collateral interests, they will have to be satisfied prior to distributions of any remaining equity.  Any deficiency claims of these secured creditors, however, can be recouped only against the respective, property-specific limited liability holding companies, and not the receivership estate as a whole or the individual shareholding investors.

concluded that embarking upon a costly tracing analysis would not be in the best interests of the estate.

B.  Similarly Situated Victims

Like commingling, the second prong that guided the court's decision in *Credit Bancorp* to distribute assets *pro rata* – the existence of similarly situated investor-victims – is satisfied easily in this case.  Indeed, there are numerous similarities among the investor stakeholders, as chronicled in the Receiver's First Interim Report.  (*See* Dkt. No. 90 at 7-11.)  First, Wextrust Capital featured prominently in the Wextrust offerings.  For example, the private placement memoranda ("PPMs") used to market the offerings typically featured the Wextrust Capital logo on their cover pages and emphasized the fact that Wextrust Capital provided management services to the other Wextrust Entities and Affiliates in return for management fees.

Second, the offering materials disclosed the fact that the investments involved a high degree of risk, a warning featured prominently at the outset of the materials.[14]

Third, Byers, Shereshevsky, and other Wextrust Capital personnel were also identified in the PPMs as the principal managers for the various investment projects, and the offering materials highlighted their affiliation with Wextrust Capital.[15]

Fourth, cash from other Wextrust Entities and Affiliates was routinely pooled into Wextrust Capital bank accounts and used to fund the enterprise's centralized payroll and other overhead expenses, pay for real estate and other assets purchased by the Wextrust Entities and Affiliates, and pay distributions to investors in various Wextrust securities offerings.

---

[14] *See, e.g.*, A.47 of the Appendix to the Receiver's First Interim Report (attaching a page from the Crowne-Phoenix Investors, LLC PPM, stating in capital letters that "THIS OFFERING INVOLVES A HIGH DEGREE OF RISK").

[15] *See* A.79-82 of the Appendix to the Receiver's First Interim Report (attaching pages from the Crowne-Phoenix Investors, LLC PPM, which discuss Steven Byers, Joseph Shereshevsky, Amnon Cohen, and other Wextrust Capital employees as the management team for the investment and highlight Wextrust Capital's history).

Fifth, in some cases, Wextrust securities offerings were backed by explicit guarantees from Wextrust Capital.[16]  Similarly, even if not backed by an express guarantee, according to information obtained from investor interviews conducted by the Receiver, many victims of the alleged scheme were led to believe that their investments – whether in a hotel project, a commercial office building, or a diamond mining venture in Southern Africa – were backed by an implicit guarantee of Wextrust Capital.  Thus, all of the investors and creditors relied on the creditworthiness and financial wherewithal of Wextrust Capital and the Wextrust group of companies.

Accordingly, for all of the foregoing reasons, coupled with the pervasive commingling among the Wextrust accounts, the Receiver respectfully submits that a *pro rata* distribution is the fairest and most reasonable approach in this case.

C.  Lack of Adherence to the Corporate Form

Although the two *Credit Bancorp* standards are satisfied in this case, courts also rely on evidence of a lack of adherence to the corporate form by former managers of a Ponzi-scheme to justify *pro rata* distributions.  Generally speaking, courts will respect legal formalities and distinctions among affiliated companies unless there is such a blurring of the lines that the separate personalities of the entities no longer exist and continued adherence to the separate existences would sanction fraud or promote injustice.  *See generally* 1 Fletcher Cyc. Corp. § 41.30 (2008).  In ordinary circumstances, then, creditors of a specific corporate entity are only allowed to look to that entity for satisfaction of debts and not to the entity's parent or affiliated corporations, officers, shareholders, or employees.  If the Court were to uphold the technical corporate distinctions among the various Wextrust Entities and Affiliates in this case, however,

---

[16] *See* A.148-54 of the Appendix to the Receiver's First Interim Report (attaching a sample copy of Wextrust Capital, LLC's guarantee agreement for a Guaranteed Subordinated Promissory Note ("GSPN") security offering).

many similarly situated defrauded investors and unsecured creditors would be excluded from any recovery.

Fortunately, most states – including Delaware, Illinois, and Virginia, the three states in which the vast majority of the Wextrust Entities and Affiliates were incorporated – provide a mechanism through which courts may pierce the corporate veil and disregard traditional legal distinctions among affiliated entities and their controlling managers.[17]  As this principle relates to the present circumstance, when an enterprise is comprised of a myriad of smaller corporate components, courts often look for evidence demonstrating a lack of adherence to corporate formalities to buttress decisions to pierce the corporate veil, pool the assets of all of the various entities and affiliates into a single fund, and distribute the fund in accordance with *ratable* distribution principles.  Indeed, one federal district court found recently that *even without proof of specific instances of commingling*, a lack of corporate formalities and a unity of governance among separate legal entities alone justified a joint pooling and distribution of all assets of the affiliated entities.  *See SEC v. AmeriFirst Funding, Inc.*, No. 3:07-cv-1188-D, 2008 WL 919546, *4 (N.D. Tex. Mar. 13, 2008) (specifically rejecting the argument that the separateness of multiple corporate entities precludes pooling their assets and distributing *pro rata* in the context of an SEC receivership).

---

[17]  *See Dana v. 313 Freemason*, 266 Va. 491, 500 (Va. 2003) (stating that, in Virginia, "piercing the corporate veil is justified when the unity of interest and ownership is such that the separate personalities of the corporation and the individuals no longer exist and to adhere to that separateness would work an injustice"); *Beale v. Kappa Alpha Order*, 192 Va. 382, 399 (Va. 1951) (stating that, in Virginia, the general rule is that the corporate entity will be respected, but in extraordinary circumstances, the entity will be disregarded to prevent fraud or achieve equity); *Gallagher v. Reconco Builders, Inc.*, 415 N.E.2d 560, 563-64 (Ill. App. 1980) (stating that, under Illinois law, courts may pierce the corporate veil if there is "such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist" and circumstances are "such that an adherence to the fiction of separate corporate existence would sanction a fraud or promote injustice"); *EBG Holdings LLC v. Vredezicht's Gravenhage 109 B.V.*, No. 3184-cv-VCP, 2008 WL 4057745, *11 (Del. Ch. Sept. 2, 2008) (stating that courts may disregard Delaware corporate entities "in the interest of justice, when such matters as fraud, contravention of law or contract, public wrong, or equitable considerations among members of the corporation are involved.").

In conducting this analysis, courts frequently look to factors such as undercapitalization, the absence of accurate corporate records, commingling of corporate assets originally intended to remain separate, and the failure to adhere to the traditional corporate formalities articulated in the law and the entities' respective corporate governance documents.[18]

Here, there is overwhelming evidence that Wextrust's former managers, officers, and employees failed to adhere to such formalities.  First, all of the entities suffered from a lack of recordkeeping and proper internal controls, as discussed in Section III.B.1 of the Receiver's First Interim Report.  (*See* First Interim Report at 68-76.)  Second, the use of the "Linchpin" account to pool the entities' funds to facilitate improper inter-company "loans" among the various entities – that were not necessarily repaid by the receiving entity – evidences an intent by the former managers of the company to treat the Wextrust Entities and Affiliates as a single economic unit.  (*See* Second Interim Report at 24-31.)  Third, the fact that all of the Wextrust Entities and Affiliates were managed collectively by overlapping groups of individuals in the same locations, typically including Defendants Byers and Shereshevsky, lends credence to the fact that each individual LLC had little discernable separate identity or existence.

Under similar circumstances, federal courts in equity receiverships involving multiple corporate entities have pierced the corporate veil and permitted a *pro rata* distribution of the pooled assets of the entire enterprise.  For example, in *Topworth International Ltd.*, 205 F.3d at 1110, the Ninth Circuit affirmed a federal equity receiver's plan that proposed combining multiple entities into one fund "[b]ecause each entity appeared to be the alter ego of the other."  In *Topworth*, the CFTC had brought suit against Topworth International, Inc. and two related

---

[18] *See generally* 45 AM. JUR. 3D Proof of Facts § 1 (2008) ("The factors considered in determining whether to pierce the corporate veil are virtually limitless, but the courts have repeatedly relied on the presence of certain factors in decisions to pierce the corporate veil.  No matter which theory is applied, three of the most frequently cited factors are (1) undercapitalization; (2) a diversion of funds by the dominant shareholder(s); and (3) the failure to observe corporate formalities.").

companies for violations of the Commodities Exchange Act.  The district court ignored the corporate form of Topworth in approving a *pro rata* distribution due to its extreme undercapitalization and the Receiver's inability to obtain complete and accurate records for the company.

Likewise, in *Elliott*, 953 F.2d 1560, an equity receiver was appointed for the principal defendant (Elliott) and three of his affiliated companies.  The Eleventh Circuit affirmed the district court's decision to "treat[] the various companies as one entity for the purpose of the receivership proceedings," because "Elliott had commingled funds between the various companies and had failed to maintain a strict separation of the companies . . . ."  (*Id.* at 1565 n.1).  Thus, at the conclusion of the proceedings, the court approved a *pro rata* distribution across the multiple entities.

The operative facts of *Amerifirst, Topworth,* and *Elliott* mirror those of this case in that the Wextrust Entities and Affiliates' former managers, officers, and employees failed to adhere to corporate formalities such that the entire group of companies functioned as a single economic unit, wherein the individual LLCs had no meaningful separate existence.  Therefore, in addition to the equitable factors, evidence of commingling, and similarities between the defrauded investors described above, the lack of adherence to corporate formalities among the Wextrust Entities and Affiliates provides additional support for adopting a *pro rata* plan of distribution in this case.

## II.     Alternative Distribution Approaches

The Receiver has carefully considered other potential methods of distribution.  Section A discusses the imposition of a constructive trust over the assets of the receivership estate for the benefit of all or certain investors.  Sections B, C, and D analyze the implications of granting preferential status to certain investors based on differences in investors' level of assumed risk, type of investment, and timing of investment, respectively.  Finally, Section E provides a comparative analysis of a proposed distribution under the Bankruptcy Code.

### A.    Imposition of a Constructive Trust

The leading academic authority on equitable remedies has endorsed the concept of imposing a constructive trust on the collective commingled proceeds of a fraudulent scheme in certain circumstances:

> When the wrongdoer commingles funds of several victims with the funds of each other rather than with his own funds, some of the complexities of tracing may be diminished.  It may be that an account will contain funds traceable to victims as a class but not traceable to any particular victim.  In such a case, funds belonging to victims as a class may be treated as a unit subject to a constructive trust or equitable lien *and unavailable to general creditors*.  The portion of the fund identifiable to the victims can then be pro rated among the victims on the ground that they are all in the same boat and that there is no basis for rescuing one at the expense of the others.

Dobbs, § 6.1(4) (citations omitted) (emphasis added).[19]

_____

[19] Professor Dobbs' treatise on the law of remedies, Dobbs, *supra* note 10, has been cited frequently and with approval by the Supreme Court and various appellate courts.  *See, e.g., Dep't of the Army v. Blue Fox, Inc.*, 525 U.S. 255, 263-64 (1999); *In re Flanagan*, 503 F.3d 171, 183 (2d Cir. 2007).  *See also In re Lemons & Associates*, 67 B.R. at 213-14 (applying constructive trust for benefit of defrauded investors and *pro rata* distribution to Ponzi-scheme involving commingled funds); *CFTC v. Franklin*, 652 F. Supp. 163, 168 (W.D. Va 1986), rev'd on other grounds, *Anderson v. Stephens*, 875 F.2d 76 (4th Cir. 1989) (holding that victims of Ponzi-scheme were entitled to constructive trust and "[f]unds held in a constructive trust must be paid back before other creditors are paid"); *Estate of Reece*, 470 N.Y.S.2d 974 (N.Y. Sur. Ct. 1983) (holding that claimants that could trace funds received from settlements into escrow account held by their attorney were entitled to full payment with any excess funds in the account to be distributed *pro rata* to earlier defendants whose settlement funds were withdrawn).  *But see In re Heston Oil Co.*, 63 B.R. 711, 716 (Bankr. N.D. Okla. 1986) (refusing to impose a constructive trust where the trust would grant a "non-statutory priority" over innocent third parties, including a party with a secured interest, where funds were commingled and thus could not be identified by claimants).

- 17 -

Here, a state law constructive trust could be imposed for the benefit of defrauded investors under the theory that, given the fraudulent means used to procure investments in this case, the Wextrust Entities and Affiliates have no valid legal title to the funds.[20]  Instead, they merely hold the proceeds in a constructive trust for the benefit of investors.  If this theory were applied in this case, creditors potentially would be excluded from any recovery – not only in these equity proceedings, but in any future bankruptcy proceedings as well.  The Second Circuit has cautioned against the imposition of constructive trusts in federal insolvency proceedings.  As the Court observed recently:

> The effect of a constructive trust in bankruptcy is profound.  While the bankrupt estate is defined very broadly under § 541(a)(1) of the Bankruptcy Code to include all legal or equitable interests of the debtor, any property that the debtor holds in constructive trust for another is excluded from the estate . . . A constructive trust thus places its beneficiary ahead of other creditors with respect to the trust *res*.

*In re Flanagan*, 503 F.3d at 180-81.

Imposing such a drastic remedy in this case would be inequitable.  In the Receiver's judgment, a constructive trust on all of the assets of the Wextrust Entities and Affiliates would be difficult, time-consuming, and unfair to creditors, and would likely result in protracted litigation and additional administrative costs.

A second type of constructive trust would involve the application of the individual tracing analysis discussed in Section I above to benefit certain individuals who are able to trace their investments to specific Wextrust assets and, thus impose a constructive trust over those assets.  As the Second Circuit held in *Credit Bancorp*, however, whatever beneficial interest a particular investor might have in disputed assets "arising from a constructive trust" cannot

---

[20] *See In re Flanagan*, 503 F.3d 171, 181 (2d Cir. 2007) ("The question of whether the imposition of a constructive trust is appropriate in a particular set of circumstances is governed, in the first instance, by state law.").

"defeat the equitable authority of the District Court to treat all the fraud victims alike (in proportion to their investments) and order a *pro rata* distribution." *Credit Bancorp Ltd.*, 290 F.3d at 88. After weighing the equities of this case, and given the costly, time-consuming, and ultimately arbitrary nature of such an analysis, the Receiver respectfully requests that the Court exercise its broad discretion to distribute receivership assets on a *pro rata* basis, irrespective of the potential application of state law tracing fictions.[21]

B.   Distribution of Funds According to Level of Risk

Another proposal considered by the Receiver as a possible method of distributing receivership assets in an equitable fashion would involve allocating distributions based on the perceived level of risk associated with each individual investment. The rationale behind such a proposal would be that not all investors assumed the same degree of risk in making their investment decisions, because some investment vehicles were more speculative than others. Therefore, victims who invested in "safer" investments should be allocated a larger share of any equitable distribution of receivership assets.

Although this approach has some intuitive appeal, such an analysis would be far too subjective. First, as discussed in Section I.B above, most, if not all, of the PPMs featured a prominent pronouncement at the outset of the offering materials stating that the investment involved a high degree of risk. Second, many investors may have perceived real estate investments to be much more stable than African diamond mining ventures. As shown by the recent decline in the domestic real estate market, however, this may have been a fundamentally flawed assumption. Indeed, in a recent study by the Federal Housing Finance Agency released on February 24, 2009, domestic purchased home prices decreased 8.2% from the fourth quarter

---

[21] *See also Cunningham*, 265 U.S. at 11 (finding that absent sufficient evidence to support tracing fiction, there is no basis for the imposition of a constructive trust).

of 2007 through the fourth quarter of 2008, and home prices fell in 44 out of 50 states during the same period.[22]  The commercial real estate market has also been hit hard by the economic downturn.  According to one source, commercial property sales plunged 73 percent last year, vacancy rates are rising, and hundreds of large commercial properties are in default.[23]  Likewise, occupancy and average daily rates at U.S. hotel properties have also experienced the worst one-year decline for rates since the 1930s.[24]  By contrast, six junior diamond mining companies examined by industry insiders either "remained close to flat or showed gains between 2006 and 2007," before posting heavy losses in 2008.[25]

Such a comparative risk analysis would be difficult and time consuming, and could quickly degenerate into a hopeless morass of various classes and sub-classes, leading to additional costly litigation.  Furthermore, given the extent of the commingling in this case, investor funds intended to be used only for a purportedly "safe" investment may not have actually funded that investment (if the investment even existed in the first place).  Moreover, all investors were on notice of a high degree of risk.  The Receiver therefore has determined that this proposal would be a logistical nightmare to implement and execute, and would not benefit the estate.

C.  Distribution of Funds According to Nature of Investment Interest

Another option considered by the Receiver as a possible method of distributing receivership assets proved impractical for similar reasons.  This approach would require

---

[22] *See* Exhibit A to the Declaration of Mark S. Radke in Support of the Receiver's Proposed Plan of Distribution ("Radke Decl."), filed concurrently herewith, News Release, Federal Housing Finance Authority, Record Home Price Declines in Fourth Quarter; Isolated Pockets of Strength (Feb. 24, 2009).

[23] *See* Exhibit B to the Radke Decl., Sue Kirchhoff, *Economic Downturn Pounds Commercial Real Estate Market*, USA Today, Jan. 12, 2009.

[24] *See* Exhibit C to the Radke Decl., Kris Hudson, *Another Casualty of the Travel Slowdown: Outlook for Hotels Worsens*, The Wall Street Journal, Mar. 18, 2009.

[25] *See* Exhibit D to the Radke Decl., Avi Krawitz, *Diamond Mining Shares Show Heavy Losses in 2008*, Rapaport News, Nov. 6, 2008, *available at* www.diamonds.net/news/NewsItem.aspx?ArticleID=23992.

assigning a preference to holders of guaranteed debt instruments to the detriment of investors

holding equity securities only.  Such an approach would mirror the hierarchy of creditors

established by Section 507(a) of the Bankruptcy Code, which determines the order in which

creditors may lay claim to the assets of a debtor's bankruptcy estate.[26]  For example, in this case,

there are arguably "bondholders" in the sense that the Guaranteed Depository Receipts ("GDRs")

were sold as debt securities.  As described in greater detail in the Receiver's First Interim Report

(*see* First Interim Report at 35-37), in 2006 and 2007, Wextrust issued three series of GDRs and

similar securities, through which it raised nearly $30 million.  Unlike the preferred membership

interests and other equity securities issued in the vast majority of other Wextrust offerings, these

securities were purported to represent debt obligations of Wextrust Capital, LLC or Wextrust

Equity Partners, LLC.  These GDRs, however, were among the most commingled, in effect used

as a "piggy bank" for the cash needs of the growing Wextrust Ponzi-scheme.  Thus, a tracing

analysis would be required for such a plan of distribution, which would be costly and

unmanageable.

 D.  Distribution of Funds According to Timing of Investment

 The next option considered by the Receiver would involve a distribution of funds among

investors according to the date in which they invested into the Wextrust scheme.  For example, in

one sense, earlier investors have a legitimate argument that they should get a preference because

they did not have the ability to accrue interest during the lengthy pendency of their investments.

For this reason, some courts in SEC disgorgement actions have upheld the provision of

prejudgment interest to compensate such victims.  *See, e.g.*, *First Jersey Securities, Inc.*, 101

F.3d at 1476 ("The decision whether to grant prejudgment interest and the rate used if such

interest is granted are matters confided to the district court's broad discretion") (citing *Endico*

---

[26] 11 U.S.C. § 507(a) (2005).

*Potatoes, Inc. v. CIT Group/Factoring, Inc.*, 67 F.3d 1063, 1071-72 (2d Cir. 1995)).

On the other hand, as some investors have argued in this case, those who invested money more recently – some even days or weeks before the appointment of the Receiver – arguably should be granted a preference if the funds were neither commingled nor expended by the individual Defendants.  As described in greater detail in Section I above, however, the "merely fortuitous fact that the defrauders spent the money of the other victims first" (*Durham*, 86 F.3d at 72) should not determine the amount of an investor's ultimate distribution, a principle that harkens back to the Supreme Court's rationale for the *pro rata* plan of distribution it upheld in the original Ponzi-scheme case.  *See Cunningham*, 265 U.S. at 13.

Thus, given the relative equities between the two types of investors in this case, the Receiver concluded that a *pro rata* approach was the fairest and most reasonable solution.

E.   Initiation of Bankruptcy Proceedings or Invocation of Bankruptcy Principles

The Receiver similarly concluded that initiation of bankruptcy proceedings or the invocation of bankruptcy principles in equity is not appropriate at this time, although he reserves the right to reconsider this conclusion should circumstances change.  With respect to the former, the initiation of bankruptcy proceedings at this juncture would be problematic for several reasons.  First, it would increase the administrative costs to be borne by the receivership estate, thus decreasing the funds remaining for distribution.  Second, victims would likely have to wait significantly longer before receiving any payments under a bankruptcy settlement.  Third, given the relatively rigid rules and formulae for the distribution of assets in bankruptcy, a bankruptcy trustee or judge would not have the same latitude enjoyed by courts overseeing equity receiverships to carefully craft a particularized plan to achieve the most equitable distribution possible.  For example, as outlined in greater detail in Section III.E.1 below, the Receiver will propose through this Plan a distribution whereby former Wextrust employees (who are also

investors) that are shown to have been involved in the perpetuation of the larger Wextrust enterprise, will either be disqualified from receiving distributions or will have their distributions reduced significantly.  Again, "[a] federal district court presiding over an equity receivership has extremely broad power to supervise the receivership . . . . Specifically, the receivership court has the power to use summary procedures in allowing, disallowing, and subordinating claims of creditors, so long as creditors have fair notice and a reasonable opportunity to respond." *Winnebago South,* 863 F. Supp. at 1034 (citing 7 Moore's Federal Practice ¶ 66.08[4])).

The application of bankruptcy principles in an equity receivership must also be considered cautiously, particularly given the Second Circuit's admonition that a receivership should not be used as an alternative to bankruptcy.  *See Eberhard v. Marcu*, 530 F.3d 122, 132 (2d Cir. 2008); *SEC v. American Board of Trade, Inc.*, 830 F.2d 431 (2d Cir. 1987).  In *Eberhard* and *American Board of Trade*, the receivership proceedings were much further along – the cases had run for years, as contrasted to this matter.  In addition, *American Board of Trade* involved entities who previously had been involved in the sale of unregistered securities in the form of short-term unsecured notes.  After appointment of the receiver, the entities stopped selling the securities and became grossly insolvent, requiring immediate liquidation.  By contrast, in this case, the Receiver is simultaneously attempting to enlarge the receivership estate and actively managing numerous solvent, operational real estate properties.  Accordingly, it is imperative that the Receiver retain the ability under the existing Receiver Order to pursue these important interests while at the same time be authorized to make a partial distribution under this Plan to speed recovery to victims.

Courts in other Ponzi-scheme cases have noted that, where, as here, "there is such a close connection between the actions necessary for ongoing oversight of the Receivership's assets and

for liquidation of those assets," then it is appropriate for the Receiver, rather than a bankruptcy court, to both oversee a partial distribution to victims and continue to manage solvent receivership assets. *SEC v. TLC Investments and Trade Co.*, 147 F. Supp. 2d 1031, 1036 (C.D. Cal. 2001). Such ongoing management and partial distributions are not commensurate with the full liquidation of an entire insolvent enterprise criticized (in dicta) by the Second Circuit in *Eberhard* and *American Board of Trade*.

Accordingly, the plan of distribution should continue to be guided primarily by the common law of federal equity receiverships. Some courts have, however, applied certain bankruptcy rules and policies in the context of a federal equity receivership after analyzing the purpose and legislative history of the particular rule to be applied analogously. *See, e.g.*, *SEC v. First Securities Company of Chicago*, 507 F.2d 417, 420 (7th Cir. 1974) (finding that, in the distribution of assets in a receivership, courts may look to the purpose and Congressional history of particular bankruptcy sections); *SEC v. Elmas Trading Corp.*, 85 B.R. 116, 118-19 (D. Nev. 1987) (finding that the purpose of a particular bankruptcy section would fit in a non-bankruptcy, receivership context involving the distribution of receivership funds). For this reason, the Receiver has taken into consideration some of the principles and protections of bankruptcy in devising this Plan, namely with respect to setting a claims bar date, defining claims, and distinguishing among claimants.

Even if formal bankruptcy proceedings were initiated in this case, the *de facto* result may be the same – yet at substantial additional cost and delay. For example, in a case involving numerous victims with claims against multiple corporate entities, the remedy of a *pro rata* distribution is, in effect, comparable to the substantive consolidation of such entities in bankruptcy. The seminal case within the Second Circuit regarding the standard for substantive

- 24 -

consolidation is *In Re Augie/Restivo Banking Company, Ltd.*, 860 F.2d 515 (2d Cir. 1988).  In *Augie*, the Second Circuit noted that the primary overriding purpose of substantive consolidation is to ensure the equitable treatment of all creditors.  (*Id*. at 518.)  The court began its analysis by examining a host of factors that it and other courts had considered in previous decisions when determining whether to permit substantive consolidation.  By so doing, the court determined that most historical analyses concentrated primarily on two common overriding inquiries:

> (1)  Whether creditors dealt with the entities as a single economic unit and did not rely on their separate identity in extending credit; <u>or</u>

> (2)  Whether the affairs of the debtors are so entangled that consolidation will benefit all creditors.

(*Id*.)

Notably, the Second Circuit decided to adopt an either/or test, which subsequently was held to imply that the satisfaction of only one of the two factors was likely sufficient.  "Conceivably, substantive consolidation could be warranted on either ground; the Second Circuit's use of the conjunction 'or' suggests that the two cited factors are alternatively sufficient criteria."  *In re 599 Consumer Electronics*, 195 B.R. 244, 248 (S.D.N.Y. 1996).

The rationale behind the first prong (single economic unit) is that creditors who make loans on the basis of the financial status of a separate entity expect to be able to look to the assets of their particular borrower for satisfaction of that loan – and such expectations create significant equities.  With respect to the second prong, the court noted that substantive consolidation should be used only after it has been determined that all creditors would benefit because untangling is either impossible or so costly as to consume the assets.

Here, a *pro rata* distribution would thus be analogous to substantive consolidation of the entities in bankruptcy because of the factors considered, particularly the expense of untangling the various entities.  For example, one Ninth Circuit case applied the *Augie* test to affirm a

- 25 -

bankruptcy court's *nunc pro tunc* substantive consolidation of various entities used by an individual to carry out a Ponzi-scheme.  According to the Ninth Circuit:

> The bankruptcy court ordered the *nunc pro tunc* substantive consolidation of WPI and APFC with Bonham's estate *in order to assure that the overcompensated initial investors would share in the losses suffered by subsequent investors* . . . . In doing so, the bankruptcy court determined that (1) the motions process was an appropriate procedure for substantive consolidation as long as there was notice and an opportunity to be heard, and (2) Bonham *had constructed a Ponzi scheme for which WPI and APFC were simply vehicles Bonham used to perpetuate the fraud.*

*In re Bonham*, 229 F.3d 750, 760 (9th Cir. 2000) (emphasis added).

In short, application of substantive consolidation in bankruptcy may lead to the same result as applying federal common law to the same facts to implement a *pro rata* plan of distribution.  The Second Circuit, however, has not addressed whether the requirements for substantive consolidation in bankruptcy are also a prerequisite for the pooling and *pro rata* distribution of the assets of separate companies in a receivership.  The only reported decision to do so held that the substantive consolidation doctrine does not apply outside bankruptcy.  *See CFTC v. Eustace*, No. 05-cv-2973, 2008 WL 471574, *6 (E.D. Pa. Feb. 19, 2008).  As discussed in Section I.C above, however, other courts have applied state veil piercing principles to find that funds owned by separate legal entities can be pooled and distributed on a *pro rata* basis, even absent evidence of commingling.[27]

---

[27] *See, e.g., SEC v. Amerifirst Funding, Inc.*, 3:07-cv-1188, 2008 WL 919546 (N.D. Tex. March 13, 2008); *Topworth Int'l, Ltd.*, 205 F.3d 1107; *Elliott*, 953 F.2d 1560.

**III.    Proposed Claims Solicitation and Verification Process**

This section sets forth the essential elements of the Receiver's proposed claims solicitation and verification process for both defrauded investors and unsecured creditors.[28]  By clearly delineating the procedure, expectations, and assumptions underlying this process, the Receiver hopes to provide notice and relevant information in an effort to ensure transparency and solicit questions, comments, and active participation from interested parties.

A.  Treatment of Various Classes of Claimants

The priority of each claim will be determined according to its classification, as indicated below in decreasing order of priority:

> (1) Administrative claims of the estate;
>
> (2) Government tax liabilities of the estate;
>
> (3) Secured creditors, to be paid of out the proceeds of their collateral; and
>
> (4) Unsecured creditors and defrauded investors, to be compensated *pro rata* according to the net value of their claims.[29]

Each classification and its respective claims process is described in greater detail below.

B.  Administrative Claims

As set forth in the Receiver's Second Interim Report (*See* Second Interim Report at 40-42), the Receiver Order provides that the Receiver and his professional advisors – *i.e.*, lawyers, accountants, and other professionals – shall be paid from the assets of the receivership estate.

---

[28] For the purposes of this Plan, any "claim" includes, but is not limited to, a right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured, or a right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured.  This definition parallels that found in Section 101(5) of the Bankruptcy Code.

[29] The Receiver is proposing *pro rata* treatment for both unsecured contract creditors and defrauded investors in this case.  In this regard, defrauded investors may be viewed as tort creditors with contingent, unliquidated, and potentially disputed claims.  *Scholes v. Lehmann*, 56 F.3d 750, 755 (7th Cir. 1995) ("*[D]efrauded investors*, as we have pointed out, are tort creditors.") (Posner, J.) (emphasis in original).

Accordingly, all applications for reimbursement must be made by application to the Court in accordance with SEC billing guidelines for receivers. In addition, a hearing on any fee application may be held if requested by the SEC or ordered by the Court. To date, the Receiver, Deloitte, and Dewey & LeBoeuf have been paid through September 2008 and Hilco Real Estate has been paid through January 2009. Going forward, Dewey & LeBoeuf will continue to apply a 20 percent reduction in its fees, in addition to previously agreed-upon discounts, and will request the Court's permission to request some or all of the amount of that reduction at the conclusion of the case. Based on the total amount of fees and expenses before the application of any discount or holdback, legal fees have declined substantially each month, beginning in September. Now that several of the major actions required by the Receiver have been completed, that trend is expected to continue.

In order to ensure sufficient operating capital and available funding for future administrative costs, the Receiver will retain a sufficient reserve from any partial cash distribution approved by the Court at the end of the claims process outlined herein.

C. Tax Claims

There are tax implications for the Wextrust Entities and Affiliates as well as the individual investors in this case. The rules and authorities are unclear regarding the tax consequences of complex Ponzi-scheme receiverships, like the one at issue here, particularly with respect to the obligations of the Wextrust Entities and Affiliates and the receivership estate itself. It is important, however, for the Court to clarify two salient points for the Receiver, and the Receiver respectfully requests that the Court do so. The points are: (1) that it would be counterproductive for the Receiver to attempt to cause the Wextrust Entities and Affiliates to file tax returns for prior, current, and future tax years and send tax information to investors in light of the commingling of assets and the resulting uncertainty with respect to tax items; and (2) that it

- 28 -

is the sole responsibility of each individual investor and party-in-interest to determine his or her own tax status and liabilities and retain professional tax advisors, as necessary.  The Internal Revenue Service (the "I.R.S.") has recently issued two items of guidance to help taxpayers who are the victims of losses from Ponzi-type investment schemes more accurately determine their tax consequences.  *See* Rev. Rul. 2009-9; Rev. Proc. 2009-20.[30]

With that said, the Receiver and his advisors are still in the process of determining what tax liabilities, if any, must be paid by the Wextrust Entities and Affiliates that will impact the proposed distribution in this case.  As the Second Circuit noted in another opinion arising out of the Credit Bancorp Ponzi-scheme, *Credit Bancorp, Ltd.*, 297 F.3d at 139, the Receiver may engage the I.R.S., prior to making a distribution, "to obtain a determination of tax liability either through administrative procedures or through a judicial proceeding."  The Receiver and his advisors are exploring this and other options with respect to the receivership estate's tax obligations.  For example, the receivership estate may meet the statutory definition of a qualified settlement fund pursuant to Treasury Regulation § 1.468B-1(c).  If so, the Receiver would be obligated to file tax returns for the qualified settlement fund and, if necessary, pay any outstanding tax liability.  There may also be state and local tax obligations associated with a qualified settlement fund.  The Receiver and his tax advisors are currently determining the extent of the potential tax liabilities and available recourse, and will provide information regarding receivership tax liabilities and the implications for any future distributions in due course.

D.  Secured Creditor Claims

Secured creditors fall into either one of two categories: (1) those holding perfected liens on collateral and (2) those holding partnership interests in which they occupy the position of

---

[30] *Available at* http://www.irs.gov/newsroom/article/0,,id=205505,00.html?portlet=7.  A copy of this link was posted in the "Recent Events" section of the Receiver's website on March 23, 2009.

tenants in common with Wextrust Entities or Affiliates with respect to certain properties.  Unlike Wextrust investors and general unsecured creditors, both types of secured creditors hold secured debt interests in Wextrust assets.  These creditors demanded and received secured liens, which they perfected, and thus have recourse against specific collateral and must be paid out of the proceeds of that collateral.  This same principle applies whether in equity or in bankruptcy.[31]

Because secured creditors will receive a significantly greater percentage recovery on the claims than unsecured creditors or defrauded investors, the Receiver respectfully requests that the Court restrict any deficiency claims of these secured creditors to ensure that they can only be recouped against the respective, property-specific limited liability holding companies, and not the receivership estate as a whole or the individual shareholding investors.  Again, this Court has broad discretion in fashioning relief in this case, and in the exercise of this discretion, the Court may adopt any proposed plan of distribution that is "fair and reasonable."[32]  Here, the Receiver is proposing an equitable plan whereby the defrauded investors and unsecured creditors share in any recovery while simultaneously ensuring that the secured creditors receive the value of their collateral and may pursue deficiency claims, if any, against the property-specific limited liability companies with which they contracted initially.

E.   Validation of Investor Claims

As explained in Section I above, the Court has broad equitable discretion to employ summary proceedings in order to fairly adjudicate claims of the receivership.  "Receivership courts can employ summary procedures in allowing, disallowing and subordinating claims of creditors . . . . Summary proceedings should afford creditors fair notice and an opportunity to be heard . . . . They should also allow parties to present evidence when the facts are in dispute and

---

[31] *See* 11 U.S.C. § 506(a) (2005) (discussing the priority and determination of secured claims in bankruptcy).
[32] *See Wang*, 944 F.2d at 85; *Credit Bancorp, Ltd.*, 290 F.3d at 91.

to make arguments regarding those facts." *United States v. Fairway Capital Corp.*, 433 F. Supp.
2d 226, 241 (D.R.I. 2006) (quoting *Hardy,* 803 F.2d at 1037, 1040); *see also Elliott,* 953 F.2d at
1566; *SEC v. Wencke*, 783 F.2d 829, 837 n.9 (9th Cir. 1986).  In employing such procedures,
courts have instructed that "the rights of creditors of a receivership must be balanced against the
need for expeditious administration of the receivership."  *Hardy*, 803 F.2d at 1039.  Accordingly,
during the claims process, the Receiver and/or the Court may properly deny investor or creditor
claims that are not adequately substantiated by the claimant with accurate documentation.
*Fairway Capital Corp.*, 433 F. Supp. 2d at 246-47.

The Receiver will ensure that the investor and unsecured creditor claims and verification
process is handled in the most cost-effective manner by exploring alternative and third-party
staffing solutions.

In addition, the Receiver will ensure that any due process concerns related to the use of
summary proceedings to adjudicate claims are allayed in several ways.  First, as described in
greater detail in the next paragraph, the Receiver and/or his third-party advisors will consult
records submitted by investors since the inception of the receivership, as well as internal
Wextrust records, to determine the amount of each individual investor's claim.  More
specifically, the Receiver will start with each individual's beginning investment and subtract any
later cash distributions that were received by investors (and not redeposited in another Wextrust
investment) to determine that individual's "net investor claim."  Next, as described below, the
figure may be reduced, after approval by the Court, for certain Wextrust employees and
associates (who are also investors) based on evidence that their conduct facilitated the Wextrust
Ponzi-scheme.

Each investor will thus be assigned an "adjusted net investor claim" amount, which will be sent to the respective investor via electronic and/or regular mail for verification.  Although courts have held that a receiver need not separately serve process on the various claimants in a receivership claims process so long as the claimants are given notice and an opportunity to be heard,[33] the Receiver believes that it is important to afford each investor the opportunity to review and object to the accuracy of his or her adjusted net investor claim.

Over the past seven months, the Receiver and his advisors have compiled information from Wextrust investors concerning their respective investments.  For example, receivership counsel and advisors have interviewed approximately 1,235 investors and received approximately 12,000 documents from approximately 515 investors.

With the assistance of Deloitte, the Receiver has compared internal Wextrust records of investments, dividends, and repayments with investor records submitted to the Receiver and investor interviews.

After validating and cross-checking the claims of all investors for which the Receiver has records, the Receiver and his advisors will prepare individual statements based on each investor's assigned "adjusted net investor claim" amount, which will be sent to the respective investor via electronic and/or regular mail for verification.

The individual statements will also contain detailed information about how to dispute the amount of the claim, and the deadline by which the investor must do so.  More specifically, the Receiver respectfully requests that the Court approve the following deadlines with respect to investor claims:

---

[33] *See Fairway Capital Corp.*, 433 F. Supp. 2d at 237.

| **May 1, 2009:** | All individual statements must be distributed to investors. |
| **June 12, 2009:** | Investors must object to their statement amounts by this date; Any investors who did not receive statements must submit all new claims to the Receiver by this date. |
| **July 20, 2009:** | The Receiver will attempt to resolve all disputes by this date. The Receiver will request a hearing to resolve any remaining disputes. |

Such a claims bar procedure has been sustained as reasonable in the context of SEC equity receiverships. *See, e.g., Hardy*, 803 F.2d at 1038 (finding two-and-one-half month period during which investors could file claim forms was a reasonable length of time to respond to the Receiver's notices). The Receiver respectfully requests that the Court retain exclusive jurisdiction to determine any disputes with respect to the implementation of the Receiver's Plan.

The statements will also contain detailed contact information for the Receiver so that the Receiver and his advisors may answer any questions or concerns voiced by the investors with respect to the claims process. During April 2009, the Receiver will also hold town hall meetings in the United States and Israel to personally address any such questions or concerns. The meeting in Jerusalem will be held on Thursday, April 2, 2009, from 4:00 to 6:00 pm. Additional information about the meeting has been posted on the Receiver's website. The date and location for the U.S. meeting will be published on the Receiver's website as soon as it becomes available. The Receiver will also provide a toll-free number in advance of the U.S. meeting for interested parties who are unable to participate in person.

### 1. *Disqualification of Certain Claims and Claimants*

Excluding disqualified defendants and their related parties – as well as individuals such as Wextrust employees who actively participated in the development, implementation, and/or marketing of the fraudulent scheme – from participation in distributions has been held as reasonable, as it permits limited assets to be distributed to those who are most innocent. *See*

*Basic Energy & Affiliated Resources, Inc.*, 273 F.3d at 660-61.  In *Basic Energy*, the Sixth

Circuit approved a plan of distribution that categorized investors into one of four classes based

on their level of participation in the underlying fraudulent scheme and adjusted their net investor

claims accordingly for purposes of calculating their ratable shares.  Investors were classified as

to whether they were (1) "non-marketers" (*i.e.*, innocent investors); (2) "substantial marketers"

(*i.e.*, non-defendants but active participants in the development, implementation, and/or

marketing of the fraudulent scheme); (3) "insubstantial marketers" (*i.e.*, those individuals who

received small "finder" or referral fees but whose activity did not rise to the level of a

"substantial marketer"); and (4) defendants (*e.g.*, Byers and Shereshevsky).  The Sixth Circuit

approved the receiver's decision to reduce the insubstantial marketers' claims by 10%, the

substantial marketers' claims by 90%, and the defendants' claims by 100%.  Naturally, the

receiver did not propose a reduction in the claims of non-marketers.

  Disqualifying certain claimants or reducing certain claim amounts has been approved by

other courts as well, so long as the claimants are provided notice and an opportunity to be heard.

For example, *SEC v. Enterprise Trust Co.*, No. 08-C-1260, 2008 U.S. Dist. LEXIS 79731, *9-10

(N.D. Ill. Oct. 7, 2008), involved a receiver's plan of distribution that excluded two principals of

the investment company who were responsible for inducing clients to invest with the company,

prevented some clients from withdrawing their funds, and engaged in the speculative trading that

led to the losses.  The court rejected the principals' objections, stating: "[d]isqualifying those

who took the business over the edge is the most common feature, and the least contested aspect,

of distribution plans."  (*Id.* at 10.)  The court also noted that "[i]t is difficult to find cases in

which business officers like [the principals] took a share of a Receiver's distribution, and it will

not occur in this case.  They are not innocent victims of Enterprise's actions."  (*Id.* at 17.)

Similarly, in *SEC v. Merrill Scott & Assocs., Ltd.*, No. 2:02-cv-39, 2006 U.S. Dist. LEXIS 93248, *18 (D. Utah Dec. 21, 2006), the SEC proposed a plan of partial distribution that sought to exclude Dr. Powers, a Merrill Scott investor, on the grounds that Dr. Powers' "unusually close relationship with Merrill Scott and his activities in referring potential clients [made] him an 'insider' who should be equitably excluded from any distribution."  The court approved the SEC's exclusion of Dr. Powers from the distribution, noting that "[t]he record establishes that Dr. Powers was more intimately involved with Merrill Scott than the vast majority of clients and his activities extended to marketing and solicitation on Merrill Scott's behalf."  (*Id.* at *37.)

The Receiver, based on evidence regarding certain investors who were similarly involved in the marketing and solicitation of funds from other investors on behalf of Wextrust, will propose that the Court exercise its discretion to exclude certain individuals from participation in any distribution, or reduce those individuals' claims substantially.  In addition to district and appellate court precedent for taking such actions, this approach would be consistent with the principles espoused in *Credit Bancorp* to grant *pro rata* distribution to only those individuals who are "similarly situated with respect to their relationship to the defrauders." *Credit Bancorp Ltd.*, 290 F.3d at 88.

Furthermore, a court sitting in equity has wide discretion to refuse distributions to such individuals under the doctrine of "unclean hands."  The Supreme Court has held that a district court may freely refuse to:

> [A]id the unclean litigant.  It is not bound by formula or restrained by any limitation that tends to trammel the free and just exercise of discretion . . . . Accordingly one's misconduct need not necessarily have been of such a nature as to be punishable as a crime or as to justify legal proceedings of any character. Any willful act concerning the cause of action which rightfully can be said to transgress equitable standards of conduct is sufficient cause for the invocation of

the maxim.

*Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 814-15 (1945).[34]

In *Credit Bancorp*, the district court invoked the doctrine of unclean hands to approve the SEC's proposal to deny particular individuals the opportunity to take part in a distribution based on their involvement in the underlying fraud (even though they were not charged with any illegality). The plan was approved as long as the SEC notified the Court, the parties, and the individual in question, and established appropriate procedures to resolve any related disputes. *SEC v. Credit Bancorp, Ltd.*, 99-cv-11395, 2000 U.S. Dist. LEXIS 17171, *150 (S.D.N.Y. Nov. 29, 2000).

### 2. *Securities Investor Protection Corporation Claims*

Since the inception of the Receivership, the Receiver and his advisors – in consultation with the SEC – have researched the availability of Securities Investor Protection Corporation ("SIPC") claims by defrauded Wextrust investors in this case. By way of background, Congress created SIPC in 1970 to protect investors when a brokerage firm fails and cash and securities are missing from individual investors' accounts. SIPC funds can then be used to satisfy the claims of each customer up to a maximum of $400,000 for missing securities and $100,000 for missing cash from individual accounts. In this case, however, according to the Receiver's investigation, there were no specifically identifiable bank or brokerage accounts belonging to specific Wextrust investors. Instead, funds were raised by private placement debt or securities offerings and then placed into Wextrust accounts tied to specific Wextrust entities or investments, and subsequently commingled. By contrast, in the recent Madoff litigation, each individual investor allegedly had a specific account that held his or her cash or securities. Accordingly, the Receiver has

---

[34] *See also Dunlop-McCullen v. Local 1-S*, 149 F.3d 85, 90 (2d Cir. 1998) ("[W]hile equity does not demand that its suitors shall have led blameless lives, as to other matters, it does require that they shall have acted fairly and without fraud or deceit as to the controversy in issue.").

determined – after consultations with the SEC – that SIPC claims are not a viable option for Wextrust investors in this case.

As the Receiver is an officer of the Court and does not represent any single investor or group of investors in this matter, this section is intended to provide a general analysis only, and should not be interpreted as the provision of legal advice to any particular investor or group of investors.  Individuals with questions regarding available legal avenues for additional recovery outside of the receivership, or the availability of any tax deductions or other benefits, should consult with or retain individual legal counsel or tax professionals, who are best equipped to address each individual's unique situation.

F.   Verification of Claims of Unsecured Creditors

The Receiver Order provides that the Receiver is empowered to "pay from available funds necessary business expenses required to preserve the assets and property" of the Wextrust Entities and Affiliates.  (Receiver Order at 5.)  As detailed in the Receiver's Second Interim Report, the Receiver continues to pay such ordinary and necessary expenses as they come due, and has undertaken a variety of measures to cut costs, introduce legal and accounting controls, and streamline cash management operations.  Accordingly, all transactions in the ordinary course of business are reviewed carefully to ensure that they are required to preserve the value of the receivership estate, and they will continue to be paid, as appropriate, in the execution of the Receiver Order.

The Receiver has received a small number of invoices, however, which he has determined are not necessary to be paid immediately from available funds to preserve the value of receivership assets.  The Receiver's Plan contemplates verifying claims of such unsecured creditors in the same manner as defrauded investor claims, except that an individual statement will not be distributed to each unsecured creditor.  Each claim already submitted will be

compared with internal Wextrust records for verification and catalogued.  With respect to

additional outstanding claims not yet submitted to the Receiver, the Receiver respectfully

requests that the Court approve the following deadlines:

| | |
|---|---|
| **June 12, 2009:** | By this date, all creditors – whether secured, unsecured, liquidated, unliquidated, or government – **<u>MUST</u>** submit detailed, dated, and complete invoices to the Receiver at the following email address: WexTrustInvoice@dl.com .  This email address is also posted prominently on the Receiver's website under the tab "Information for Creditors." |
| **June 19, 2009:** | The Receiver will post a spreadsheet of all unpaid, unsecured claims of creditors on his website under the tab "Information for Creditors."  Creditors will then be given the opportunity to review and dispute their claims. |
| **July 20, 2009:** | The Receiver will endeavor to resolve disputes with unsecured creditors by this date.  The Receiver will request a hearing on an unresolved claims. |

It is important to note that the onus will be upon each creditor individually to comply

with these relevant dates.  Again, during this process, the Receiver and/or the Court may

properly deny claims that are not adequately substantiated.  To ensure that all potential creditors

and/or investors have notice of, and are bound by, the provisions of this Plan, the claims process

– and the claims bar date in particular – will be explained in detail on the Receiver's website.

The Receiver will then endeavor to negotiate the claims of unsecured creditors to

conserve time and resources for the parties and the Court.  The negotiations will be based on the

Receiver's projection of available cash, operational and administrative funding needs, and a

projection of the *pro rata* share of each claimant.  Finally, the Receiver will request a hearing to

resolve any remaining disputes between the Receiver and the respective creditor.

G.  Plan for Partial Cash Distribution and Establishment of Reserve for Future Expenses and Distributions

After the claims solicitation, verification, and adjudication process is complete, the Receiver will file a separate motion with the Court seeking approval for a partial cash distribution according to the principles of *pro rata* distribution outlined herein.  This cash distribution will only be paid to qualifying investors who have complied with the claims bar requirements set forth in this plan and the attached Notice of Motion and general, unsecured creditors of the receivership estate with non-contingent, undisputed, and liquidated claims.

The Receiver will also ensure that there are sufficient remaining cash reserves to fund future operating costs, administrative expenses, and the *pro rata* claims of any unsecured creditors holding contingent, disputed, or unliquidated claims.  Future distributions will be paid on a periodic basis, after approval by the Court, from these remaining reserves and the proceeds of the sale of receivership assets pursuant to the Receiver's Plan of Management.

## CONCLUSION

The foregoing reflects the Receiver's best professional judgment on an equitable plan for distribution of receivership assets to victims of this fraud that is consistent with controlling legal authority and falls within the purview of the Court's broad equitable discretion to approve a fair and reasonable plan of distribution.  The Receiver respectfully solicits comments, questions, and advice from the Court and interested parties with respect to the substance as well as the administrative implementation of the Receiver's Plan.  Finally, the Receiver respectfully requests that the Court enter an order approving the steps outlined herein, substantially in the proposed form annexed to the Notice of Motion for an Order Approving the Receiver's Proposed Plan of Distribution, filed concurrently herewith.  The Receiver respectfully requests this relief so that he may begin the process of distributing the proceeds and other assets of the receivership estate to

the victims of this fraud, both investors and creditors of the Wextrust Entities and Affiliates.

Dated:  New York, New York,

March 27, 2009                                          Respectfully submitted,

                                                       TIMOTHY J. COLEMAN
                                                       Receiver for Wextrust Entities

                                                       s/ Mark S. Radke
                                                       Mark S. Radke, *pro hac vice*
                                                       Dewey & LeBoeuf LLP
                                                       1101 New York Avenue, NW
                                                       Washington, D.C. 20005-4213
                                                       Tel: (202) 346-8000
                                                       Fax: (202) 346-8102

                                                       *Attorneys for the Receiver*

*Of Counsel:*
Mark S. Radke
John K. Warren

<u>**CERTIFICATE OF SERVICE**</u>

The undersigned, an attorney, states that I am one of the attorneys for Timothy J. Coleman, Receiver, in this matter and do hereby certify that on March 27, 2009, I directed the service of a true and correct copy of the foregoing **RECEIVER'S PROPOSED PLAN OF DISTRIBUTION AND ALL SUPPORTING DOCUMENTS** upon the following individuals in the manner indicated below:

<u>**Via ECF Notification & Electronic Mail**</u>
Alexander M. Vasilescu, Esq.
Andrew M. Calamari, Esq.
Steven G. Rawlings, Esq.
Alistaire Bambach, Esq.
Danielle Sallah, Esq.
Philip Moustakis, Esq.
Attorneys for Plaintiff SECURITIES AND
EXCHANGE COMMISSION

<u>**Via ECF Notification & Electronic Mail**</u>
Barry S. Pollack, Esq.
Joshua Solomon, Esq.
Attorneys for G&H PARTNERS AG

<u>**Via ECF Notification & Electronic Mail**</u>
Barry S. Zone, Esq.
Jason Canales, Esq.
Stephen Richard Popofsky, Esq.
Attorneys for Defendant STEVEN BYERS

<u>**Via ECF Notification & Electronic Mail**</u>
Edward F. Malone, Esq.
George R. Mesires, Esq.
Attorneys for BARRINGTON BANK &
TRUST CO. AND HINSDALE BANK &
TRUST CO.

<u>**Via U.S. Mail, First Class**</u>
Joseph Shereshevsky
*Pro Se* Defendant

<u>**Via ECF Notification & Electronic Mail**</u>
Francesca Morris, Esq.
Attorney for non-parties HERITAGE
COMMUNITY BANK AND TICOR TITLE
INSURANCE

<u>**Via ECF Notification & Electronic Mail**</u>
Michael Fred Bachner, Esq.
Attorney for Defendant ELKA
SHERESHEVSKY

<u>**Via ECF Notification & Electronic Mail**</u>
Shalom Jacob, Esq.
Shmuel Vasser, Esq.
Attorneys for INT'L AD-HOC COMMITTEE
OF WEXTRUST CREDITORS

<u>**Via ECF Notification & Electronic Mail**</u>
Martin Siegel, Esq.
Attorney for INT'L CONSORTIUM OF
WEXTRUST CREDITORS

<u>**Via ECF Notification & Electronic Mail**</u>
Paul A. Levine, Esq.
Attorney for non-party KEY EQUIPMENT
FINANCE, INC.

<u>**Via ECF Notification & Electronic Mail**</u>
David B. Gordon, Esq.
Beth L. Kaufman, Esq.
Attorneys for non-party LARRY COSTA.

<u>**Via ECF Notification & Electronic Mail**</u>
Harris Kay, Esq.
Marc X. LoPresti, Esq.
Attorneys for various non-party investors

<u>**Via ECF Notification & Electronic Mail**</u>
Ethan Holtz, Esq.
Edward P. Gilbert, Esq.
Attorneys for RAIT PARTNERSHIP, L.P and
RAIT ROGERS PLAZA, LLC

s/ Mark S. Radke
_____