UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SECURITIES AND EXCHANGE COMMISSION,

                  Plaintiff

      -against-

STEVEN BYERS, JOSEPH SHERESHEVSKY,
WEXTRUST CAPITAL, LLC, WEXTRUST
EQUITY PARTNERS, LLC, WEXTRUST
DEVELOPMENT GROUP, LLC, WEXTRUST
SECURITIES, LLC, and AXELA HOSPITALITY,
LLC,

                  Defendants,

     -and-

ELKA SHERESHEVSKY,
                  Relief Defendant.

Civil Action No.:  08-CV-07104 (DC)

(Electronically Filed)

## OBJECTION OF TCF NATIONAL BANK
## TO RECEIVER'S MOTION FOR AN ORDER APPROVING THE
## RECEIVER'S PROPOSED PLAN OF DISTRIBUTION

      TCF National Bank ("TCF"), by and through its undersigned attorneys, Bond, Schoeneck

& King, PLLC, submits this objection (the "Objection") to the Receiver's Motion For an Order

Approving the Receiver's Proposed Plan of Distribution (the "Distribution Motion").

### TCF's Interests as a Secured Creditor

      1.     TCF is a secured creditor of an entity related to one of the Wextrust Entity

Defendants (defined hereinafter), to which it made an $11.1 million term loan secured by a first

mortgage on an office building in Peoria, Illinois.

2.      Specifically, on December 10, 2007, TCF made a $11,063,000.00 term loan (the "Loan") to Peoria Office Holdings, LLC ("POH"), a Delaware limited liability company. The Loan is secured by a first mortgage on a 198,178 square foot office building located on .88 acres in Peoria, Illinois (the "Peoria Parcel"). TCF's borrower, POH, is connected to the Defendants in the following manner: Wextrust Equity Partners, LLC is the manager of Peoria Office Manager, LLC, which is the manager of Peoria Office Investors, LLC, which in turn is a member of POH. Steven Byers is manager of Wextrust Equity Partners, LLC.

3.      The Loan is guaranteed by Stephen Byers, Matthew Gurvey and Wextrust Equity Partners, LLC (the "Principal Guarantees").

4.      TCF also held the mortgage of the Peoria Parcel's previous mortgagor, who had no connection to the Defendants herein. TCF continued as mortgagee of the Peoria Parcel at the time of its conveyance to POH.

### Relevant Procedural History

5.      On August 11, 2008, the SEC filed its Complaint against defendants Joseph Shereshevsky ("Shereshevsky") and Stephen Byers ("Byers") (together, Shereshevsky and Byers are the "Individual Defendants"), Wextrust Capital, LLC ("Wextrust"), Wextrust Equity Partners, LLC ("WEP"), Wextrust Development Group, LLC ("WDG"), Wextrust Securities, LLC ("Wextrust Securities"), and Alexa Hospitality, LLC ("Alexa", and together with Wextrust, WEP, WDG and Wextrust Securities, the "Wextrust Entity Defendants" or "Wextrust Entities") (together the Individual Defendants and the Wextrust Entity Defendants are the "Defendants").

6.      On August 11, 2008, the Court entered the Order Freezing Assets (the "Freezing Order"). The Freezing Order directed the Defendants, as well as any other person or entity directly or indirectly holding any property owned by the Defendants, and certain affiliated

entities of the Defendants including POH, to hold within their control, retain and preserve any such property.

7.      Also on August 11, 2009, the Court entered the Order Appointing Temporary Receiver (the "Receiver Order"). The Receiver Order appointed Timothy J. Coleman of Dewey & LeBoeuf, LLP as receiver for the Wextrust Entity Defendants, to preserve the *status quo*, ascertain the true financial condition of the Wextrust Entity Defendants, determine the extent of commingling of funds, prevent further dissipation or disposal of assets, preserve the books and records, respond to investor inquiries and determine if the Wextrust Entity Defendants should undertake a bankruptcy filing.

8.      The Receiver Order also appears to stay creditors such as TCF from enforcing their rights by providing, in relevant part, that:

> no person or entity, including any creditor or claimant against any of the Defendants, or any person acting on behalf of such creditor or claimant, shall take any action to interfere with the taking control, possession, or management of the assets, including, but not limited to, the filing of any lawsuits, liens, or encumbrances, or bankruptcy cases to impact the property and assets subject to this order.

9.      On September 11, 2009, the Court entered the Amended Order Appointing Temporary Receiver (the "Amended Receiver Order"). The Amended Receiver Order, among other things, allowed the Receiver to encumber assets of the Wextrust Entities, and to sell, lease, use or convert into money all assets of the Wextrust Entity Defendants in public or private sales. Encumbrances or sales of assets exceeding $750,000.00 would, pursuant to the Amended Receiver Order, require a motion for Court approval on at least four (4) business days' written notice to the SEC, Individual Defendants, creditors and investors. The Amended Receiver Order also provided that if the Receiver determines that any of the Wextrust Entity Defendants should

1554003.11 4/24/2009

file bankruptcy, the Receiver is authorized to commence the cases and remain in possession and control of the chapter 11 estates.

10.      On October 24, 2009, the Court entered an Order on Consent Imposing Preliminary Injunction and Other Relief Against the Defendants (the "Preliminary Injunction Order"). The Preliminary Injunction Order, among other things, directed Defendants and all other persons either acting on their behalf or receiving notice of the Preliminary Injunction Order, to forbear from destroying, altering or otherwise concealing or interfering with the access of Plaintiff SEC and the Receiver to all books and records pertaining to, without limitation, Defendants' finances or business operations. The Preliminary Injunction Order also incorporated the terms of the Receiver Order and Amended Receiver Order.

11.      On January 15, 2009, the Receiver filed the Receiver's Plan for Management of Wextrust Real Estate Portfolio (the "Management Plan"). The Management Plan did not seek any action from the Court, but instead set forth the Receiver's conclusion that because there was no going concern value to the Defendants' real estate operations as a whole, the Receiver would seek to market the properties in an effort to sell them at fair market value. The Management Plan reported that the Receiver had retained the services of the Hilco Organization for real property services, Deloitte Financial Advisory Services as a financial advisor, and Dewey & LeBoeuf as legal counsel. Creditors, investors and parties in interest in this action have had no opportunity to object to the Management Plan, and the Management Plan has not been approved by the Court.

12.      The Management Plan also examined six (6) options for handling each of the properties owned by the Defendants, including: (1) implementing the Wextrust business plan for each property; (2) selling the properties at public auction; (3) consenting to foreclosure by the

4

secured creditor; (4) filing bankruptcy; (5) implementing a revised business plan; and (6) pursuing workout negotiations with secured creditors to recover value for the estate by marketing the property for the benefit of the secured creditor.   The Management Plan ruled out options (1), (2), and (4) as unlikely to produce any net economic gain for investors.  It also determined that option (3), consensual foreclosure, made sense only for the Defendants' residential portfolio, but not for any of the commercial properties.  As for option (6), workout negotiations with secured lenders, the Management Plan reported that this strategy will be pursued with respect to three of the Defendants' larger hotel properties.

  13. For the vast majority of the Defendants' portfolio, including the Peoria Parcel, the Management Plan set forth the Receiver's intention to pursue option (5), by implementing revised business plans for each of the properties, most of which will involve marketing the properties for sale.

  14. On March 27, 2009, the Receiver filed its Proposed Plan of Distribution (the "Distribution Plan"), and Distribution Motion.  The Distribution Plan "contemplates an administrative process for validating the claims of investors and soliciting claims from creditors. Once the claims process is complete, and after approval by the Court, the Receiver will be in a position to commence making partial distributions from the available cash assets of the receivership estate." *See* Distribution Plan (Distr. Plan) at 1.

  15. The majority of the Distribution Plan is devoted to making an argument in favor of a *pro rata* distribution plan, as allegedly more equitable and workable than other distribution schemes such as tracing, imposition of constructive trusts,  or distributions according to level of investor risk, nature of investment interest, or timing of investment.  The Distribution Plan also

attempts to make the case for the superiority of a plan of distribution pursuant to an equity receivership over a bankruptcy proceeding.

16.     The Distribution Plan also "requests that the Court restrict any deficiency claims of [the] secured creditors to ensure that they can only be recouped against the respective, property-specific limited liability holding companies, and not the receivership estate as a whole or the individual shareholding investors." *See* Distr. Plan at 30. Therefore, the Distribution Plan, if approved by the Court, would purport to extinguish TCF's rights under the Principal Guarantees.

## **Argument**

17.     It is abundantly clear that the relief the Receiver is seeking in the Distribution Motion is the liquidation of the Defendants' assets. The Distribution Plan calls for a hierarchy of claims treatment, a claims allowance and bar date procedure, as well as, after additional Court approval, the making of cash distributions. When combined with the Management Plan, which sets forth the Receiver's strategy for marketing and selling the assets of the Defendants, the Management Plan and Distribution Plan clearly constitute a liquidation of the assets subject to the Receivership.

18.     The Distribution Motion should be denied for several reasons. First, neither the Freezing Order nor the Amended Receiver Order requires or envisions the Receiver obtaining the power he seeks in the Distribution Plan. Second, in order to approve the Distribution Motion, the Court would have to significantly increase the power of the Receiver, in direct contravention of several decisions of the Second Circuit Court of Appeals. Third, what the Distribution Motion actually seeks is for this Court to conduct a proceeding akin to one under chapter 7 or 11 of title 11 of the United States Code (hereinafter, the "Bankruptcy Code") but

1554003.11 4/24/2009

without the benefit of the expertise of a United States Bankruptcy Court, the administrative and oversight powers of the office of the United States Trustee of the United States Department of Justice, or the framework provided by the Bankruptcy Code, the one statute drafted by Congress specifically for this purpose. Fourth, the Distribution Motion seeks to unfairly impair secured claims and strip secured creditors, including TCF, of their rights to pursue claims (including deficiency claims) against all obligors, something not permitted under applicable law, including state law and the Bankruptcy Code.

A.   *The Receiver Lacks the Legal Authority to Implement the Distribution Plan*

19.   One of the first assertions the Receiver makes in the "Applicable Legal Standards" section of the Distribution Plan is that the Amended Receiver Order "contemplates such a plan". *See* Distr. Plan at 4. The Amended Receiver Order contains no such language contemplating a plan of distribution. In fact, the gravamen of the Amended Receiver Order (and the Receiver Order), is to empower the Receiver to preserve the *status quo*, ascertain the true financial condition of Defendant Entities, determine the extent of commingling of funds, prevent further dissipation or disposal of assets, preserve books and records, respond to investor inquiries and determine if the Defendant Entities should undertake a bankruptcy filing.

20.   Moreover, the Receiver's papers are devoid of citation to any statute providing him with any powers beyond those provided by this Court. As a result, the Receiver has no power beyond that set forth in an order of this Court.

21.   Neither the Receiver Order nor the Amended Receiver Order authorize the Receiver to implement the Distribution Plan.

22.   Among the first assertions the Receiver makes in the "Applicable Legal Standards" section of the Distribution Plan is that the Freezing Order "anticipates the approval of

7

a plan of distribution by the Court…" *See* Distr. Plan at 4. To support this contention, the

Receiver quotes the Freezing Order to the effect that the freeze is necessary to "preserve the

Court's ability to approve a fair distribution for victims of the fraud." *Id.* A fuller quotation from

the Freezing Order, however, sheds additional light on the Court's intention:

> Further, it appears that an order freezing the Defendants' assets, as
> specified herein, is necessary to preserve the *status quo*, to protect
> investors and clients of the Defendants from further transfers of
> funds and misappropriation, to protect this Court's ability to award
> equitable relief in the form of disgorgement of illegal profits from
> the fraud and civil penalties, and to preserve the Court's ability to
> approve a fair distribution for victims of the fraud.

Freezing Order at 1-2.

23.     The emphasis of the Freezing Order is clearly on preserving the *status quo*, and

on halting any continuing fraud, as it is in the Amended Receiver Order. Even the language

containing the reference to a "fair distribution" is couched in terms of "*preserv[ing]* the Court's

ability" to approve a fair distribution. Such a distribution is by no means restricted to the scheme

set forth in the Distribution Plan. In fact, as demonstrated below, the best and most efficient

means of ensuring a fair distribution is to have the liquidation take place in the context of a

bankruptcy proceeding.

**B.     *The Distribution Plan is in Contravention of Second Circuit Court of
        Appeals Precedent***

24.     By the very nature of equity receiverships, there often arises a conflict between

the duties and goals of an equity receiver, and the treatment to which creditors, debtors and other

parties in interest are entitled under the Bankruptcy Code. The Second Circuit Court of Appeals

has had several opportunities to address this area of conflict, and has left little room for

misunderstanding about where an equity receivership should stop and a bankruptcy proceeding should begin.

25.     TCF respectfully submits that this Court, in the Receiver Order and in the Amended Receiver Order, foresaw that a proceeding in bankruptcy might be necessary at some point to liquidate assets, administer claims and effectuate a distribution to parties in interest. The Amended Receiver Order provides, in relevant part, that:

> the Receiver, be and he hereby is, authorized to commence cases under title 11 of the United States Code for such entities in this district, and in such cases the Receiver shall prosecute the bankruptcy petitions in accordance with title 11... .

TCF further respectfully asserts that the filing by the Receiver of the Distribution Plan marks a point of departure where the administration of this "estate" should be placed in the hands of the Bankruptcy Court.

26.     *Securities Exchange Commission v. American Board of Trade, Inc.*, 830 F.2d 431 (2d Cir. 1987)  involved a receiver who was appointed in order to halt violations of the Securities Act of 1933.  The equity receiver appointed by the district court in that case submitted a plan of distribution in order to liquidate one of the defendant entities, and the plan was approved by the district court judge.  The alleged wrongdoer had appealed many of the district court's orders, including the order freezing assets and the order appointing a receiver.  The Court of Appeals found that the district court did not abuse its discretion in appointing a receiver, freezing assets, or imposing sanctions.  The Court of Appeals did, however, register its displeasure with the district court's use of the equity receivership to effect the liquidation of certain entities:

> [w]e have in the past criticized the use of receivers to effect the liquidation of a defendant firm in litigation under the Securities Act or the Securities and Exchange Act...On several other occasions we repeated our view that *equity receiverships should not be used to effect the liquidation of defendants in actions brought under the*

9

> ***securities laws….[T]he functions undertaken by the district court
> in this case demonstrate the wisdom of not using a receivership as
> a substitute for bankruptcy. [T]he district court essentially
> transformed itself into a court of bankruptcy aided by a receiver
> performing the tasks of a bankruptcy trustee.*** For example, the
> court has taken upon itself the burden of processing proof-of-claim
> forms filed by thousands of …creditors, of setting priorities among
> classes of creditors, and of administering sales of real property, all
> without the aid of either the experience of a bankruptcy judge or the
> guidance of the bankruptcy code.

*Securities Exchange Commission v. American Board of Trade, Inc.*, 830 F.2d at
437-438 (emphasis added).

27.     The Court of Appeals explained in *American Board of Trade* that it had only

acquiesced in prior receivers' and district courts' non-bankruptcy liquidations because "by the

time the issue had reached us, the liquidation was usually near termination, and claimants could

not benefit from the initiation of bankruptcy proceedings." *Id.* at 437.

28.     In fact, the Court of Appeals included in its *American Board of Trade* decision a

direct admonition to counsel for the Securities and Exchange Commission "as an officer of the

court" to *"bring our views, as stated in this and other decisions, to the attention of the district*

*court before the court embarks on a liquidation through an equity receivership." Id.* at 438

(emphasis added).

29.     Even earlier than its *Board of Trade* decision, the Court of Appeals had occasion

to address the inadvisability of an "equity" receivership liquidation:

> [l]ess well established is the scope of the powers that a receiver may
> be granted. Thus, the power to liquidate the estate has been held in
> one circuit to be almost nonexistent under the analogous provisions
> of the Securities Act of 1933… Similarly, in *Esbitt v. Dutch-
> American Mercantile Corp.*, 335 F.2d 141, 143 (2d Cir. 1964), we
> expressed strong reservations as to the propriety of allowing a
> receiver to liquidate; *it was permitted only because it had been
> virtually completed by the time the appeal had been decided.* As we
> said in *Esbitt*, which also concerned a receiver appointed in an
> action under the Securities Act of 1933, ***receiverships ancillary to***

10

> ***SEC actions against brokers or broker-dealers should not be
> continued, in a case involving insolvency, beyond the point
> necessary to get the estate into the proper forum for liquidation --
> the bankruptcy court.***

*Lankenau v. Coggleshall & Hicks*, 350 F.2d 61, 63 (2d Cir. 1965) (emphasis added).

30.     Thus, we can see that from early on, the Second Circuit Court of Appeals clearly

and unequivocally has stated its preference for bankruptcy liquidations over equity receivership

liquidations.  Moreover, in the *Board of Trade* and *Lankenau* cases the Court of Appeals gave as

its sole reason for not requiring a bankruptcy liquidation over the receivership liquidation the fact

that the liquidation was virtually complete by the time the issue reached the Court of Appeals.

Presented with a *fait accompli*, the Court of Appeals unsurprisingly declined to unring the bell.

It did, however, make it clear that had it been asked to decide before the liquidation had become

substantially complete, it would have ruled against an equity receivership liquidation.

31.     The Court of Appeals recently had reason to revisit the issue of using an equity

receivership to effect a liquidation more properly performed in the bankruptcy context in

*Eberhard v. March*, 530 F.3d 122 (2d Cir. 2008).  *Eberhard* dealt primarily with the authority of

a receiver over property claimed by a third party, and whether that third party had a right to a

jury trial.  Some, but not all, of the defendant entities in *Eberhard* were eventually removed to

bankruptcy court.  As part of its analysis in *Eberhard*, however, the Court of Appeals opined

that:

> [r]eceivers appointed [by the district court] at the SEC's request are
> equipped with a variety of tools to help preserve the *status quo*
> while the various transactions [are] unraveled...to obtain an accurate
> picture of what transpired.  We have observed that [a] primary
> purpose of appointing a receiver is to conserve the existing
> estate...***Yet the power of a securities receiver is not without limits.
> For example, we have expressed strong reservations as to the
> propriety of allowing a receiver to liquidate [an estate].***  In
> addition, because receivership should not be used as an alternative to

> bankruptcy, we have disapproved of district courts using
> receivership as a means to process claim forms and set priorities
> among various classes of creditors.

*Eberhard v. March*, 530 F.3d at 131-132 (internal citations omitted) (emphasis
added) (ellipsis and brackets in original).

32.     The Second Circuit Court of Appeals has made its position clear:  equity

receivership "should not be used as an alternative to bankruptcy" to effect a liquidation of a

defendant's estate in an action like this one.

33.     The Receiver has previously attempted to minimize the importance of the Second

Circuit's clear disapproval of equity receivership liquidations in a footnote to his Opposition to

International Ad-Hoc Committee of Wextrust Creditors' Motion Objecting to Entry and Seeking

Modification of Preliminary Injunction.  (*See* Docket No. 82 at 23, n. 15.)

34.     In that footnote, the Receiver characterized the Second Circuit's disapproval of

receiver liquidations as *dicta*.  However, "dicta" is not a fair description of the clear admonition

in *Board of Trade,* where the Second Circuit expressly stated that, regarding a liquidation in a

receivership as opposed to a bankruptcy proceeding:

> [t]he reason we have acquiesced in the past, of course, is that by the
> time the issue had reached us, the liquidation was usually near
> termination, and claimants could not benefit from the initiation of
> bankruptcy proceedings…We now state, however, that *in actions of*
> *the present kind brought in the future by the SEC, we expect*
> *counsel for the agency, as an officer of the court and as part of his*
> *or her individual professional responsibility, to bring our views, as*
> *stated in this and other decisions, to the attention of the district*
> *court before the court embarks on a liquidation through an equity*
> *receivership.*

*Securities Exchange Commission v. American Board of Trade, Inc.*, 830 F.2d at 437-38
(emphasis added).

35.     Given the fact that the Court of Appeals specifically found that it would have

decided differently had the receivership liquidation not been so far along by the time the matter

had reached it, TCF respectfully submits that the Court of Appeals' admonition in *Board of Trade* is controlling in this action.

36.     The outcomes in the *Board of Trade* and *Lankenau* decisions are distinguishable from the present facts only because those cases involved equity receivership liquidations which had advanced procedurally beyond the point of no return.  Each decision made clear that had the matter reached the Court earlier, the outcome would have been exactly the opposite, and the receivership liquidations would have been rejected in favor of a bankruptcy proceeding.

37.     The Receiver has also previously cited decisions from the First, Fifth and Ninth Circuit Courts of Appeals dating from 1947, 1977 and 1978, respectively, for the proposition that the district court has the authority to order liquidation by an equity receivership (*see* Docket No. 82, p.22 ), but the Second Circuit's views cannot be ignored on the basis of other Circuits' decisions.  Reaching even further afield, the Receiver has also cited to an eighty-four year old Second Circuit Court of Appeals decision for the inapposite proposition that a court does not have the authority to force the receiver into filing a bankruptcy petition.  (*See* Docket No. 82, p.23).  None of these decisions, however, addresses the primary issue in the case at bar - whether it is proper for a district court to direct an equity receiver to liquidate an estate rather than proceed to the proper forum for a liquidation (*i.e.*, bankruptcy court) - in the way the Second Circuit Court of Appeals does in the *Lankenau, Board of Trade* and *Eberhard* decisions.

38.     The case at bar is exactly the type of case that the Second Circuit Court of Appeals found should be halted and recast as a bankruptcy proceeding.  In fact, the *Board of Trade* decision expressly mentioned the district court's "tak[ing] upon itself the burden of…administering sales of real property" (precisely the burden the Receiver seeks to impose

upon this Court) as the type of action which should <u>not</u> be performed by a receiver under the supervision of a district court. *See Board of Trade*, 830 F.2d at 437- 438.

39.      Thus, TCF respectfully requests this Court to reject the Receiver's Distribution Motion, and direct that a bankruptcy proceeding is the most efficient and proper forum to handle the liquidation and distribution of the Defendants' property.[1]

**C.      *By the Relief Requested in the Distribution Motion, the Receiver Seeks to Conduct a de facto Proceeding Under Chapter 7 or 11 of the Bankruptcy Code***

40.      The Distribution Plan seeks to do each of the following: (i) put in place a proposed claims solicitation and verification process (Distr. Plan at 27); (ii) put in place a priority scheme for treatment of claims (*id.*); (iii) allow the receiver to retain a reserve from the distribution process for payment of professionals (*id.* at 28); (iv) put in place a procedure whereby the "receiver and/or the Court may properly deny investor or creditor claims…" (*id.* at 31); and (v) implement a claims bar date (*id.* at 33).

41.      In short, the Receiver asks this Court to do exactly what the Second Circuit Court of Appeals admonished district courts not to do in its *American Board of Trade* decision: to "essentially transform itself into a court of bankruptcy aided by a receiver performing the tasks of a bankruptcy trustee... tak[ing] upon itself the burden of processing proof-of-claim forms filed by thousands…of setting priorities among classes of creditors… all *without the aid of either the*

---

[1] The title of the Receiver's "Proposed Plan of Distribution" is misleading.  It is *not* merely a plan of distribution, because the Receiver must liquidate many of the Defendants' assets before he can proceed with any distribution.  It is clearly a plan of *liquidation*.  By proposing a plan of liquidation, the Receiver disregards the Second Circuit Court of Appeals' clearly stated opinions regarding a district court's use of a receiver to *liquidate* the estate he was charged with *preserving*.

*experience of a bankruptcy judge or the guidance of the bankruptcy code.*" *See Securities*

*Exchange Commission v. American Board of Trade, Inc.*, 830 F.2d at 437-38 (emphasis added).[2]

42.     The Distribution Plan sets forth an imitation proceeding which selectively

borrows from the Bankruptcy Code while seeking to have the district court fashion from whole

cloth a scheme to address the claims of thousands of investors and creditors.  This is precisely

the reason the Second Circuit has come down so firmly on the side of bankruptcy rather than

receivership liquidations. [3]

43.     The Seventh Circuit Court of Appeals had occasion to address the superiority of

bankruptcy in the context of a Ponzi scheme:

> Everything would have been clearer had the United States initiated
> an involuntary bankruptcy proceeding against the [criminal
> defendant].  That not only would have brought to the fore section
> 548 [avoidance powers] of the Bankruptcy Code[,] but also would
> have provided a superior way to marshal [the criminal defendant's]
> remaining assets and distribute them to her creditors....Bankruptcy
> would have made it pellucid that [certain creditors] cannot enjoy any
> priority over the other victims and cannot reap a profit while... other
> creditors go begging.  Moreover, bankruptcy would have enabled
> the trustee to recoup the sums distributed to the first generation of
> investors, who received $5 million or so against the $2.5 million
> paid in.  Those payments could have been reclaimed under the
> trustee's avoiding powers and made available to all of the bilked
> investors.

---

[2] The Bankruptcy Code was meant to be applied in its entirety, rather than piecemeal, and the relief it provides for both debtors and creditors is not to be denied lightly.  "Congress has enacted a uniform federal policy and has granted the bankruptcy courts power to fairly adjudicate and administer disputes between debtors and creditors.  The debtor would be irreparably harmed by the denial of his voluntary access to the rights conferred by the [Bankruptcy Code], and creditors would be irreparably harmed by their inability to secure access to the rights afforded creditors under the [Bankruptcy Code].  An order restricting access to the bankruptcy court, other than as specifically provided by Congress in the [Bankruptcy Code], would not be in the public interest." *See Jordan v. Independent Energy Corp.*, 446 F.Supp. 516, 530 (N.D. Tex. 1978).

[3] Recent objections to the Receiver's legal fees are but a minor example of matters which the United States Bankruptcy Court for the Southern District of New York and the office of the United States Trustee have considerable expertise in handling.  The Bankruptcy Court and office of the United States Trustee also have well-established procedures and policies in place to expedite the processing of these and many other such administrative matters which could impede this Court's ability to focus on the merits of the case itself.  If the equity receivership liquidation proceeds, the number and complexity of such administrative matters will continue to grow, accompanied by concomitant increases in (and objections to) the Receiver's legal fees.

*United States v. Frykholm*, 362 F.3d 413, 417 (7th Cir. 2004).

44.     Yet another weakness of the Receiver's argument in favor of the Distribution Plan concerns international assets.  The Bankruptcy Code contains a provision designed especially for this purpose.  Chapter 15 of the Bankruptcy Code empowers the trustee "to act in a foreign country on behalf of an estate created under section 541…in any way permitted by foreign law." 11 U.S.C. § 1505.  This chapter of the Bankruptcy Code incorporates the Model Law on Cross-Border Insolvency promulgated by the United Nations Commission on International Trade Law. A bankruptcy trustee's ability to marshal assets overseas could prove advantageous to creditors and investors in this case, given the Individual Defendants' dealings in at least two foreign countries.

**D.**     ***The Distribution Plan Seeks to Unfairly Impair Secured Claims and Strip Secured Creditors of Their Rights to Pursue Deficiency Claims Against Their Guarantors***

45.     The Distribution Plan appears to deprive secured creditors of any reasonable say with respect to the marketing process.  This point is made eminently clear by the fact that the Receiver merely filed his Management Plan with the Court, and has not provided creditors with an opportunity to object, or requested Court approval.[4]  The Management Plan sets forth a three phase marketing plan for the properties, but does not provide any explanation as to how any individual property would be marketed, leaving secured creditors to guess at the precise strategy the Receiver intends to employ.

---

[4] If the Receiver also intends to treat his motion for approval of the Distribution Plan as a motion for approval of the Management Plan, his pleadings have not made this point clear.  However, because liquidation of the Defendants' assets is integral to the Distribution Plan, the Receiver may later argue that approval of the Management Plan is at least implicit in connection with the instant Motion.  To the extent that approval of the Management Plan is sought pursuant to the instant motion, TCF objects on the same grounds asserted herein.

46.     Moreover, the Distribution Plan allows the Receiver to surcharge secured creditors' collateral with various costs and expenses, without any notice to the secured creditors of the nature of these costs and expenses.  While §506(c) of the Bankruptcy Code permits a trustee to surcharge collateral, that power is limited to situations where a benefit is conferred upon the secured party.

47.     The Distribution Plan seeks to have the Court "restrict any deficiency claims of [the] secured creditors to ensure that they can only be recouped against the respective, property-specific limited liability holding companies, and not the receivership estate as a whole or the individual shareholding investors." *See* Distr. Plan at 30.

48.     The Distribution Plan is less than clear on exactly how this provision would restrict the secured creditor's remedies.  However,  a strict reading of this proposed restriction would seem to prevent a mortgagee from pursuing any guarantors or obligors other than its mortgagor.  Such a scheme has no basis in law, and is not countenanced by the Bankruptcy Code, where mortgagees are free to pursue all remedies and claims available under state law, subject to the automatic stay of § 362 of the Bankruptcy Code.

49.     Tellingly, the Receiver cites no case law in support of his extraordinary request to limit the secured creditors' remedies and claims.  The Receiver's mere mention of the district court's "broad discretion" in fashioning relief in the case (Distr. Plan at 30) falls far short of justifying a restriction of secured creditors' rights, in abrogation of both state law and the Bankruptcy Code.

### Conclusion

The relief requested by the Receiver in the Distribution Motion would, if granted, do four things:

1554003.11 4/24/2009

A)      Place this Court in direct conflict with Second Circuit Court of Appeal's clearly articulated disapproval of such receivership liquidations;

B)      Require this Court to conduct what is essentially a bankruptcy proceeding, but without the considerable experience and expertise of the office of the United States Trustee and a Bankruptcy Judge, making for a much more inefficient and expensive liquidation;

C)      Put this Court's imprimatur on a restriction of secured creditors' rights which even a federal Bankruptcy Court, which is also a court of equity, is not permitted to do; and

D)      Subject the Court to a significant administrative load which would be much more efficiently handled by the Bankruptcy Court and the office of the United States Trustee.

Based on the foregoing, TCF respectfully requests that this Court deny the relief requested in the Distribution Motion in its entirety, and grant such other and further relief as it deems just and proper.


Dated: April 24, 2009
       Syracuse, New York

BOND, SCHOENECK & KING, PLLC

By: _____
    Louis Orbach (LO 9611)
    E-mail:  lorbach@bsk.com
    One Lincoln Center
    Syracuse, New York 13202
    Tel:  (315) 218-8000
    Fax:  (315) 218-8100

    *Attorneys for TCF National Bank*

1554003.11 4/24/2009