Alan Marder
MEYER, SUOZZI, ENGLISH & KLEIN, P.C.
990 Stewart Avenue, Suite 300
P.O. Box 9194
Garden City, New York, 11530-9194
Telephone: 516.741.6565
Facsimile: 516.741.6706
Email:  amarder@msek.com

Attorneys for Nashville Warehouse Partners, LLC
and Southeast Warehouse Partners, LLC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>                  Plaintiff,<br>    -against -<br><br>STEVEN BYERS, JOSEPH SHERESHEVSKY, WEXTRUST CAPITAL, LLC, WEXTRUST EQUITY PARTNERS, LLC WEXTRUST DEVELOPMENT GROUP, LLC, WEXTRUST SECURITIES, LLC, and AXELA HOSPITALITY, LLC,<br><br>                  Defendants,<br><br>    - and -<br><br>ELKA SHERESHEVSKY,<br><br>                  Relief Defendant. | No. 08 Civ. 7104 (DC)<br><br>ECF Case |

**OBJECTION BY NASHVILLE WAREHOUSE PARTNERS, LLC AND SOUTHEAST WAREHOUSE PARTNERS, LLC TO RECEIVER'S PROPOSED PLAN OF DISTRIBUTION**

April 27, 2009

Nashville Warehouse Partners, LLC ("Nashville") and Southeast Warehouse Partners, LLC ("Southeast" and, collectively with Nashville, the "Objecting Parties") hereby object to the Plan of Distribution ("Plan") proposed by Timothy J. Coleman, the Receiver appointed in the above captioned case (the "Receiver"), as follows:

## I. INTRODUCTION

The Receiver's proposed Plan casts a broad net over all of the so-called "Wextrust Entities" as well as all entities they control or in which they have an ownership interest (the "Wextrust Affiliates") alleging that: (a) they were all guilty of systematic and pervasive commingling of assets, (b) they all had the same or similar relationships with their "victims," (c) they all operated as "Ponzi-schemes," (d) they all used investor funds for unauthorized and illegal purposes, and (e) they all failed to observe corporate formalities and customary legal distinctions among each other.

Similarly, the Receiver paints all persons who engaged in business transactions with any Wextrust Entity or Affiliate with the same broad brush claiming that: (a) all of their funds were commingled, (b) they all were similarly situated with respect to whatever Wextrust Entity or Affiliate they invested with, (c) it would be difficult, time-consuming and expensive to trace their funds to any identifiable asset, (d) they were all equally defrauded,  (e) they all received Wextrust offerings prominently featuring Wextrust Capital, (f) they all received private placement memoranda ("PPMs") used to market the offerings typically featuring Wextrust Capital logo on their cover pages, (g) the offering materials disclosed the fact that the investments involved a high degree of risk, (h) the PPMs identified Byers, Shereshevsky and other Wextrust Capital personnel as the principal managers for the various investment projects, (i) their funds were routinely pooled into Wextrust Capital bank accounts and used to fund the enterprise's centralized payroll and other overhead expenses, pay for real estate and other assets purchased by the Wextrust Entities and Affiliates and pay distributions to investors in various Wextrust securities offerings, and (j) that their investments were backed by explicit or implicit guarantees from Wextrust Capital such that they all relied on the creditworthiness and financial wherewithal of Wextrust Capital and the Wextrust group of companies.

While the Receiver's contentions with respect to the conduct engaged in by the Wextrust group of companies and the manner in which investor funds were solicited and dealt with by the Wextrust group may be true with respect to many of Wextrust's companies and investors, **none** of the Receiver's contentions are true as they relate to the investment made by Nashville in Myatt Holdings, LLC ("Myatt") or the investments made by Southeast in BaxTech Holdings, LLC ("BaxTech"), which in turn wholly owns JeffMet Holdings, LLC and Bax Realty Holdings, LLC (collectively, with BaxTech, the "Bax Companies").  The Receiver has not introduced any evidence that demonstrates that either Myatt or the Bax Companies engaged in any fraudulent activity.  Moreover, there is no evidence that any Wextrust investor funds were commingled with the accounts of either Myatt or the Bax Companies.  Indeed, the financial statements attached to the Declaration of Ken Beall (the "Beall Decl.") demonstrate the contrary - that there <u>was no commingling of funds</u> and no pooling of funds with any other Wextrust Entities or Affiliates.  Both Myatt and BaxTech were adequately capitalized from their inception with collectively almost $5 million in capital funded by Nashville and Southeast (which capital was not commingled).  Myatt and the Bax Companies operated as independent companies, separate and distinct from all other Wextrust Entities and Affiliates, they observed all corporate formalities, maintained separate bank accounts, and employed independent certified public accounts who prepared regular financial statements.  Moreover, there were no PPM's ever prepared or delivered for either Nashville's and/or Southeast's investments in either Myatt or the Bax Companies.  Also, the Objecting Parties retained independent counsel to negotiate the terms of the underlying operating agreements for Myatt and BaxTech to protect the Objecting Parties' interests.  Finally, no Wextrust Entity gave any guaranty to the Objecting Parties.

Notwithstanding the lack of evidence to support the Receiver's pro rata request as to Myatt and the Bax Companies and the affirmative evidence which directly refutes the Receiver's position, the Receiver nonetheless apparently seeks to consolidate Myatt's and the Bax Companies' assets into the receivership estate, effectively stripping the Objecting Parties of their respective membership interests and rights, and to treat the Objecting Parties as pro rata creditors of the

receivership estate.[1]  The Objecting Parties submit that the Receiver's proposed Plan must not be approved with respect to the Objecting Parties' investments in Myatt and the Bax Companies.  As a court of equity, this Court should not allow the Receiver to strip the Objecting Parties of their membership interests and rights based solely upon the fact that certain Wextrust Affiliates may have been members in Myatt and BaxTech and the principals of the Wextrust Entities may have committed bad acts that were entirely unrelated to the operations of either Myatt or the Bax Companies.

II.   FACTS

   A.   Myatt Holdings, LLC

In late 2001, Ken Beall, the manager of Nashville, was approached by Michael Gorney with an offer to invest in a single-tenant, 500,000 square foot, industrial building in Nashville, Tennessee (the "Myatt Property"). Beall Decl., ¶ 3.  Mr. Gorney was a personal friend of Mr. Beall who Mr. Beall knew since 1987. Id.  After Mr. Gorney contacted Mr. Beall, Mr. Beall and Mr. Gorney negotiated the terms of a joint venture for the acquisition of the Myatt Property, which joint venture was ultimately structured as Myatt, an Illinois limited liability company. Id.  The members of Myatt are Nashville, an entity managed by Mr. Beall, and ROMM 3, LLC, an Illinois limited liability company ("ROMM"). Id.  On August 20, 2001, the Articles of Organization for Myatt were filed with the Illinois Secretary of State and on December 24, 2001, Nashville and ROMM executed that certain Operating Agreement (the "Myatt Operating Agreement") of Myatt Holdings, LLC, dated December 24, 2001. Id.  There never have been any other members of Myatt other than Nashville and ROMM.

---

[1]   The Plan does provide that the rights of certain "secured creditors" will remain unimpaired.  In his Plan, the Receiver defines secured creditors to include "those holding partnership interests in which they occupy the position of tenants in common."  To the extent the Objecting Parties are included within this description, and their membership interest and rights to distributions from either Myatt or the Bax Companies will remain unimpaired under the Plan, the Objecting Parties have no objection to the Plan.  Unfortunately, because the language of the Plan is vague and ambiguous, the Objecting Parties cannot determine whether they do fall within the definition of the term "secured creditor" and are thus forced to file the instant objection to protect their interests and rights.

Myatt acquired the Myatt Property on or about December 4, 2001, with first trust deed financing from Regions Bank in the amount of $9,350,000 and short term bridge financing from H. Preston Ingram in the amount of $1,650,000 that was secured by a second deed of trust against the Myatt Property.  Id. at ¶ 4.  Thereafter, on December 24, 2001, in accordance with the terms of the Myatt Operating Agreement, Nashville made its initial capital contribution to Myatt of $1,600,000 and ROMM made its initial capital contribution to Myatt of $100.  Id.  Nashville funded its capital contribution of $1,600,000 by causing a wire transfer in that amount to be sent directly to Lawyers Title Insurance Corporation, the escrow company that handled the purchase of the Myatt Property.  Id.  The proceeds from Nashville's capital contribution together with loan proceeds previously received by Myatt from the escrow for the Myatt Property were used to payoff the second deed of trust to H. Preston Ingram.  Id.

Since the time of the formation of Myatt and the initial capital contributions of Nashville and ROMM referenced above, no additional capital contributions have been made by anyone to Myatt.  Id. at ¶ 5.  The Myatt Property was acquired subject to a tenant lease with Reemay, Inc., a South Carolina corporation ("Reemay"), and Reemay has continuously occupied the Myatt Property pursuant to the tenant lease since Myatt's acquisition of the Myatt Property.  Id. at ¶ 6.

Myatt regularly caused accounting statements to be prepared for the company.  Compiled statements of assets, liabilities, and members' equity (income tax basis), and related statements of revenues and expenses (income tax basis) for Myatt were issued by KraftCPAs on a monthly basis from formation of Myatt until June 30, 2003, and quarterly thereafter.

    **B.**    **BaxTech Holdings, LLC**

In late 2003, Mr. Beall was again approached by Mr. Gorney with an offer to invest in two single-tenant industrial buildings: one located in Birmingham, Alabama (the "Alabama Property") and the other located in Memphis, Tennessee (the "Tennessee Property" and with the Alabama

Property, the "BaxTech Properties").  Id. at ¶ 8.  Negotiations ensued between Mr. Beall, the manager of Southeast, and Michael Gorney relative to the formation of a joint venture for the acquisition of the BaxTech Properties, which joint venture was structured as BaxTech, a Delaware limited liability company.  Id.  The members of BaxTech are Southeast, ROMM, and RAM-Tenn, LLC, an Illinois limited liability company ("RAM").  Id.  Mr. Beall did not receive any private placement memoranda in connection with the proposed investment in the BaxTech Properties.  Id.  Moreover, Southeast, on the one hand, ROMM and RAM, on the other hand, were represented by separate legal counsel in the preparation and negotiation of the organizational documentation for BaxTech.  Id.  There were and never have been any other members of BaxTech other than Southeast, ROMM, and RAM.  Id.

On January 21, 2004, the Certificate of Formation for BaxTech was filed with the Delaware Secretary of State and on or about January 26, 2004, Southeast, ROMM, RAMM fully executed the Operating Agreement of BaxTech Holdings, LLC dated January 26, 2004.  Id. at ¶ 8.  The Alabama Property was acquired by JeffMet Holdings, LLC, a Delaware limited liability company, which is wholly owned by BaxTech, and the Tennessee Property was acquired by Bax Realty Holdings, LLC, a Delaware limited liability company, which is also wholly owned by BaxTech.  Id. at ¶ 9.

Southeast made an initial capital contribution to BaxTech of $3,350,000 and neither ROMM nor RAM made an initial capital contribution to BaxTech.  Id. at ¶ 10.  The Southeast capital contribution was made in two installments.  First, a check for $335,000 drawn on the account of Civic Plaza Capital Corporation ("Civic Plaza"), an entity owned and controlled by Mr. Beall, was paid to ROMM on December 2, 2003 to reimburse ROMM for escrow deposits it had previously made for the acquisition of the BaxTech Properties.  Id.  Second, a wire transfer of $3,015,000 was sent from the account of Civic Plaza to the account of BaxTech on January 27,

2004.  Id.  The vast majority of those funds were then immediately wired on the same day by BaxTech to the escrow agent to fund the closing of the BaxTech Properties.

Since the time of the formation of BaxTech and the initial capital contribution of Southeast referenced above, no additional capital contributions have been made by anyone to BaxTech.  Id. at ¶ 11.  The BaxTech Properties were acquired subject to tenant leases with tenants, which tenants continuously occupied their respective BaxTech Property pursuant to their respective tenant lease while each BaxTech Property was owned by the applicable BaxTech subsidiary limited liability company.  Id. at ¶ 12.

The Alabama Property was sold on December 7, 2007, and the net sales proceeds therefrom were distributed to the members of BaxTech in accordance with the provisions of BaxTech's Operating Agreement.  The Tennessee Property was sold by the Receiver on April 10, 2009 and the Receiver is presumably holding the proceeds of sale for the benefit of BaxTech.  Id. at ¶ 13.

BaxTech regularly caused accounting statements to be prepared for the company.  Compiled statements of assets, liabilities, and members' equity (income tax basis), and related statements of revenues and expenses (income tax basis) for BaxTech were issued by KraftCPAs on a quarterly basis from the formation of BaxTech.

### III. ARGUMENT

#### A. There is No Evidence that Either Myatt or the Bax Companies Were Involved in any Alleged Fraud

There is no evidence before the Court which suggests that either Myatt or the Bax Companies were involved in any fraudulent scheme or activity.  Also, there is no evidence that suggests that any other Wextrust investor funds were ever commingled with the assets of Myatt or Bax Companies.  Rather, the only evidence before the Court illustrates that these companies were traditional joint ventures between parties seeking to invest in real estate.  The only distributions that the Objecting Parties ever received on account of their investments were from the rents,

issues, and profits (including refinancings) from the underlying real property investments. Because Myatt and the Bax Companies had no involvement in the fraud alleged against other Wextrust Entities and because there is no evidence that other investor funds were ever commingled with either Myatt or the Bax Companies, there is no basis in law or in equity to disregard the legal form of these separate entities and strip the Objecting Parties of their respective membership interests and rights.

A ponzi scheme, which the Receiver maintains Wextrust Entities and Affiliates engaged in, involves the scenario where "earlier investors' returns are generated by the influx of fresh capital from unwitting newcomers rather than through legitimate investment activity." <u>SEC v. Credit Bancorp, Ltd.</u>, 290 F.3d 80, 89 (2d Cir. N.Y. 2002) (citations omitted). Here, the Objecting Parties were not paid returns with other investor funds. Rather, the distributions paid to the Objecting Parties were generated from the rents, issues, and profits of the underlying real property investments. Moreover, Myatt and the Bax Companies are independent and isolated from other Wextrust Entities and Affiliates. Indeed, Southeast and Nashville, respectively, are the majority members of Myatt and BaxTech, not any Wextrust Entity or Affiliate. Both Myatt and BaxTech have valid organizational documents and operating agreements. There is no evidence of any commingling of other investor funds. Other than a $100 capital investment made by ROMM in Myatt, the only capital invested in either entity came in the form of either Nashville's or Southeast's capital contributions (which capital contributions, contrary to the Receiver's general conclusions, were never deposited into a central account with Wextrust). Myatt and the Bax Companies had actual rent-paying tenants for the underlying real properties which generated rents, issues, and profits. Given the foregoing, there is no basis in law or in fact to justify the application of ponzi scheme case law to the Objecting Parties' investments in either Myatt or the Bax Companies and, thus, no basis to strip the Objecting Parties of their membership interests and rights.

Incredibly, the Receiver made little effort in his proposed Plan and supporting documentation to verify the true facts relevant to Myatt and the Bax Companies before he sought to consolidate Myatt and the Bax Companies into the receivership estate. For example, in his First

Interim Report, the Receiver states that in the first year of Wextrust's operations, 2003, Wextrust "raised [$1.6 million] from a single investor for Myatt Holdings, LLC . . . ."  First Interim Report, pg. 23.  This is not true.  Even with just a little due diligence, the Receiver could have verified that Myatt was actually formed and acquired the Myatt Property in late 2001, not in 2003.  Beall Decl, ¶ 3.  Moreover, the Receiver could have easily verified that the $1.6 million capital contribution made by Nashville was not deposited with Wextrust, but instead went into an escrow directly for the benefit of Myatt.  Id. at ¶ 4.  Similarly, Southeast's capital contributions are directly traceable and never were deposited into a central Wextrust account.  Thus, while the Receiver directs this Court's attention to the commingling analysis set forth in the Receiver's Second Interim Report, such analysis completely fails to address either Myatt or BaxTech.  Quite simply, there is no evidence that there was any commingling of any Westrust funds with any funds of either Myatt or the Bax Companies.  Finally, there is no evidence before the Court suggesting that any other funds were commingled in the accounts of either Myatt or the Bax Companies.  Simply put, Myatt and the Bax Companies are legitimate, independent and solvent companies.  They were not involved in any alleged fraudulent scheme, none of their assets were commingled, and thus there is no basis to include either Myatt's or BaxTech's assets in any plan of distribution or to strip the Objecting Parties of their membership interests and rights.

> B.  **Credit Bancorp Militates Against A Pro Rata Distribution of Myatt's and the Bax Companies' Assets**

In his Plan, the Receiver relies primarily on the case of SEC v. Credit Bancorp, Ltd. to support his proposition that the Court should collapse, among other entities, Myatt and the Bax Companies into the receivership estate and thereafter adopt a pro rata distribution of all of the assets of the receivership estate.  While the Second Circuit's decision in Credit Bancorp may be relevant to the other Wextrust Entities and Affiliates, its rationale does not extend to either Myatt or the Bax Companies.  The key issue in Credit Bancorp was whether shares of stock transferred to a company that defrauded the transferor and numerous other victims could be included in the receivership estate of the defrauding company for purposes of a pro rata distribution to the defrauded victims.  In that case, the victim unwittingly transferred ownership of certain shares of

stock directly to the defrauder believing that it was instead transferring the shares to a trustee to hold for the victim's sole benefit. SEC v. Credit Bancorp, Ltd., 290 F.3d at 88. The Second Circuit held that though it was called a trust, the agreement did not reflect a normal trust agreement and indeed the deposited shares went directly into accounts owned by the defrauder giving the defrauder the "sole right" to transfer those shares into other accounts. Id. The Second Circuit held that despite the fact that the shares were easily identifiable and had not been liquidated by the defrauder, a pro rata distribution was still appropriate. The fact that the shares were "traceable is 'a result of the merely fortuitous fact that the defrauders spent the money of the other victims first.'" Id. at 89.

Even a cursory review of the facts surrounding the Objecting Parties' investments in Myatt and BaxTech demonstrates that Credit Bancorp is not relevant. Unlike the defrauded party in Credit Bancorp, the Objecting Parties here never transferred title to any funds or assets to a Wextrust Entity. Rather, they carefully protected their investments by sending funds directly to escrow and to BaxTech for immediate forwarding to escrow (and to reimburse prior escrow deposits), which was utilized solely for the purposes of acquiring real property or paying off preexisting financing. Thus, the Receiver is not, as was the case in Credit Bancorp, simply proposing to deny the Objecting Parties the right to trace their investments, but instead is attempting to strip legally separate and distinct entities of their assets, consolidate such assets into the receivership estate, and thereafter make pro rata distributions of such assets to investors. Because the ruling of Credit Bancorp is limited to the facts at issue in that case, Credit Bancorp does not support the Receiver's pooled asset approach.

Indeed, not only does the Credit Bancorp decision not support the Receiver's argument, but that decision, by not rejecting case law that provides for the return of separate assets, actually supports the denial of the Receiver's requested relief. Specifically, the Second Circuit in Credit Bancorp distinguished other cases upholding the return of assets where "the assets had somehow been segregated in the manner of true trust accounts and/or had never been placed in the defrauder's control." Id. at 90. Key to the Second Circuit's decision was its conclusion that no true trust relationship existed in that case and that the victim had transferred ownership of its stock

to the defrauder. Here, however, ownership of the Objecting Parties' investments and/or the underlying real properties were never transferred to a Wextrust Entity. Rather, at all times, the assets were owned by separate and distinct legal entities: Myatt and the Bax Companies. Indeed, in his Second Interim Report the Receiver openly acknowledges that the real estate assets were owned by separate entities and were not commingled. Second Interim Report, pg. 20. Given that the Receiver is attempting to consolidate assets that do not belong to Wextrust Entities into the receivership estate, Credit Bancorp does not support the Receiver's Plan. To the contrary, Credit Bancorp compels that the separate assets of these legally distinct entities should be distributed in accordance with the underlying operating agreements for such entities.

C.  **Even If Credit Bancorp Were Applied to Myatt and the Bax Companies, The Two Pronged Test Does Not Apply to Myatt's or the Bax Companies' Assets**

In Credit Bancorp, the Second Circuit asserted that a pro rata distribution is appropriate where "the funds of the defrauded victims were commingled and where victims were similarly situated with respect to their relationship to the defrauders." Id. at 88-89. Under this test, there is no basis to strip Myatt and the Bax Companies of their assets.

1.  Neither Myatt's Nor the Bax Companies' Assets Are Commingled

As stated and shown above, Myatt and the Bax Companies were formed to acquire individual parcels of real estate, which they own exclusively. The capital invested by the Objecting Parties for the acquisitions was used in connection with the real estate, and there is no evidence of any other funds having been commingled with either Myatt or the Bax Companies. Finally, there is no evidence of any other investor funds having been commingled into either Myatt or the Bax Companies.

In fact, the Receiver himself even admits that there is no commingling of Myatt and/or the Bax Companies' assets. In the Second Interim Report of Receiver, filed on February 11, 2009, the Receiver plainly states: "The Receiver, with the assistance of Deloitte, has determined that the extent of the commingling of Wextrust funds was profound. However, to the extent that non-cash assets, principally including real estate, were owned by separate Wextrust Entities or Affiliates, such assets were not commingled." (Second Interim Report of Receiver, p.20.) Describing Myatt

and BaxTech as Wextrust Entities or Affiliates is a misnomer. The Receiver himself is forced to admit that their real estate assets were not commingled.

2.  <u>The Objecting Parties Are Not Situated Similarly To Wextrust's Victims</u>

The Receiver lists several "similarities among the investor stakeholders." (Receiver's Proposed Plan of Distribution, p. 12.) The Objecting Parties do not share *any* of these similarities. First, the Receiver directs this Court's attention to the prominence of Wextrust Capital in the offering to the victim. Here, the Receiver points to the private placement memoranda ("PPMs") used to market the offerings as an example and the prominent placement of the Wextrust Capital logo on such PPMs. The Objecting Parties, however, did not receive any PPM's by any Wextrust Entity. Rather, the Objecting Parties, through their own legal counsel, separately negotiated the operating agreements for each of their respective investments.

Second, the Receiver states that the offering materials disclosed the fact that the investments involved a high degree of risk, a warning featured prominently at the outset of the materials. Again, the Objecting Parties were not recipients of these materials.

Third, the Receiver points to the fact that Byers, Shereshevsky, and other Wextrust Capital personnel were identified in the PPMs as the principal managers for the various investment projects, and the offering materials highlighted their affiliation with Wextrust Capital. Once again, the Objecting Parties did not receive any PPMs and were certainly not inspired to make their investment by such offering materials. Indeed, the Objecting Parties negotiated their agreements with Mr. Gorney, not Mssrs. Byers or Shereshevsky.

Fourth, the Receiver states that another similarity among all the investors was that cash from other Wextrust Entities and Affiliates was routinely pooled into Wextrust Capital bank accounts and used to fund the enterprise's centralized payroll and other overhead expenses, pay for real estate and other assets purchased by the Wextrust Entities and Affiliates, and pay distributions to investors in various Wextrust securities offerings. This again is a similarity not shared by the Objecting Parties. As illustrated above, all of the capital contributed by the Objecting Parties was either paid into escrow set up for the benefit of Myatt and BaxTech or, in the case of BaxTech, was paid to reimburse a deposit. No other monies went into either Myatt or the Bax Companies

other than loan proceeds and rents, issues and profits from the underlying real estate (other than ROMM's $100 nominal capital contribution). Regardless of Wextrust's other endeavors, the distributions that Wextrust received from Myatt and the Bax Companies were earned through its management activities, not through any ponzi scheme.

Fifth, the final similarity asserted by the Receiver is that the victims believed their investments were backed by a guarantee of Wextrust Capital, whether explicitly or implicitly. The Receiver thus concludes that all of the investors and creditors relied on the creditworthiness and financial wherewithal of Wextrust Capital and the Wextrust group of companies. The Receiver would be hard-pressed to show where and how the Objecting Parties, who were both represented by counsel, relied on a guarantee of Wextrust or even on the creditworthiness of Wextrust in connection with their investments in Myatt and BaxTech.

The Objecting Parties do not share any of the similarities listed by the Receiver, thus they are not similarly situated to the victims of Wextrust's fraud. Neither of the Credit Bancorp standards are satisfied with respect to the Objecting Parties. Thus, even if Credit Bancorp authorized the Receiver to consolidate the assets of separate legal entities, which it does not, a pro rata distribution of the Objecting Parties' investments would still be inequitable under the Credit Bancorp test.

**D.     There is No Basis to Pierce Myatt's and/or the Bax Companies' Corporate Veils**

The Receiver maintains that even if the Credit Bancorp test is not satisfied, the failure to observe corporate formalities and customary legal distinctions among the various Wextrust Entities and Affiliates erased traditional legal boundaries among the various entities such that they effectively became alter egos of one another. (Receiver's Proposed Plan of Distribution, p. 7.) Thus, the Receiver intends to rely on corporate veil piercing and alter ego theories to ignore the legal boundaries which should prevent him from taking the Property of Myatt and the Bax Companies and collapsing such entities into a single entity along with the various Wextrust Entities and Affiliates for the purposes of a pro rata distribution. However, even a superficial look at the standards for veil piercing or treating companies as alter egos make it abundantly clear that such an approach should not be used with respect to Myatt and/or the Bax Companies.

The Receiver states that "[i]n conducting this analysis, courts frequently look to factors such as undercapitalization, the absence of accurate corporate records, commingling of corporate assets originally intended to remain separate, and the failure to adhere to the traditional corporate formalities articulated in the law and the entities' respective corporate governance documents." (Receiver's Proposed Plan of Distribution, p. 15.)

1.  <u>Myatt and BaxTech Were and Are Not Undercapitalized</u>

As illustrated thoroughly above, Myatt and BaxTech were and are not undercapitalized. In the case of Myatt, Nashville contributed initial capital of $1,600,000. In the case of BaxTech, Southeast supplied initial capital of $3,350,000. For both companies, in addition to the capital contributions and the monthly rent profits, both, either directly or indirectly, own and/or owned real property of significant value.

2.  <u>There Is No Evidence Before the Court to Suggest that Myatt and BaxTech Have Kept Inadequate Records or Failed to Thoroughly Adhere to the Requirements Established for Limited Liability Companies</u>

First, it should be noted that limited liability companies require much different and, indeed, far fewer records and formalities than do corporations. Myatt was formed as an Illinois limited liability company and, as such, Illinois law defines its requirements. BaxTech was formed as a Delaware limited liability company and, as such, Delaware law defines its requirements. Under the law of both states, these requirements include the need for organizational documents and operating agreements. However, limited liability companies are purposefully without many of the formalities that define corporations. For example, as one observer wrote, "The [Illinois Limited Liability Company] Act does not provide specific default rules for many of the specific mechanics of the operation of an LLC, such as member meetings, actions taken without written consent, annual meetings or other analogous concepts. These matters may be specifically dealt with in the LLC's operating agreement, but there are no specific requirements in the [Illinois Limited Liability Company] Act which applies to them in the absence of such provisions." 2-39 Illinois Business Entities, Matthew Bender & Company, Inc. (2008).

Given the minimal requirements established for limited liability companies, Myatt and BaxTech more than complied with all of the formalities required of them. As established above, Myatt and BaxTech each have valid organizational documents, thorough operating agreements, and maintained separate bank accounts and financial records, including financial reports prepared by outside accountants.

      3.    <u>Myatt and BaxTech Adhered to Customary Legal Distinctions – There Was No Commingling of Funds</u>

Another classic factor in veil piercing analysis is the extent to which funds were commingled and thus the owner ignored the customary legal distinctions between multiple companies. As illustrated thoroughly above, and admitted by the Receiver himself, Myatt and BaxTech did not commingle their real estate assets. Likewise, the evidence before the Court illustrates that there was no commingling of funds.

      4.    <u>The Cases Relied on by the Receiver Do Not Support Piercing the Veil of the Myatt or the Bax Companies</u>

The Receiver primarily relies on three cases from outside the Second Circuit to support his argument for using veil piercing and alter ego theory as a basis for a pro rata distribution. They are: <u>SEC v. AmeriFirst Funding, Inc.</u>, 2008 WL 919546 (N.D. Tex. Mar. 13, 2008); <u>CFTC v. Topworth Int'l, Ltd.</u>, 205 F.3d 1107 (9th Cir. Cal. 1999); and <u>SEC v. Elliott</u>, 953 F.2d 1560 (11th Cir. Fla. 1992). However, each of these cases is so completely distinguishable from the facts surrounding the Objecting Parties' investments in Myatt and the Bax Companies as to render them irrelevant.

      (a)    <u>AmeriFirst Is Distinguishable</u>

The Receiver contends that the Texas court in <u>AmeriFirst</u> found that even without proof of specific instances of commingling, a lack of corporate formalities and a unity of governance among separate legal entities alone justified a joint pooling and distribution of all assets of the affiliated entities. (Plan at 14.) This argument is inapplicable to the Objecting Parties. As illustrated above, Myatt and BaxTech did not ignore corporate formalities. Indeed, they more than fulfilled the state requirements for limited liability companies. However, even if this argument did

-14-

apply to Objecting Parties, AmeriFirst involves completely different facts and is easily distinguishable. In AmeriFirst, the court struggled with the issue of how to equitably distribute the assets of a ponzi scheme that spanned across several related, but seemingly independent companies. While the court in AmeriFirst did in fact decide that even without the commingling of funds a court can pool the separate entities' funds for a pro rata distribution, the Receiver failed to mention the foundation upon which the AmeriFirst court decided this was possible. The court wrote that such a pooled distribution is equitable only "when the separate legal entities were involved in a ***unified scheme to defraud***." AmeriFirst, 2008 WL at *4 (emphasis added). According to the court in AmeriFirst, each of the separate entities whose assets the Receiver wishes to pool must be involved in the unified scheme to defraud investors. This means that both Myatt and BaxTech must be involved in the unified scheme to defraud if the Receiver is to pool their assets with the actual victims of the fraud. Myatt and BaxTech, however, had no involvement in Wextrust's scheme to defraud.

    (b)  Topworth Does Not Apply Here

In Topworth, the Commodities Futures Trading Commission brought suit against Topworth International, Inc., and two related companies for violations of the Commodities Exchange Act. Topworth, 205 F.3d at 1109. The rationale used by the Ninth Circuit in Topworth, however, is inapplicable to the Objecting Parties, Myatt and/or the Bax Companies. The Ninth Circuit held that an alter ego determination was appropriate in Topworth due to the extreme undercapitalization of the company. The court wrote, "The record contained evidence that Topworth was undercapitalized, with a capitalization of $2, two shares for $1 each. In light of the millions of dollars flowing to Topworth, this extreme undercapitalization supports an alter ego determination." Id. at 1112-1113. The same rationale applied to the Objecting Parties would not and could not support an alter ego determination. Myatt and BaxTech are far from undercapitalized. Nashville funded $1.6 million and Southeast $3.35 million in capital respectively into Myatt and BaxTech.

(c) Elliott Is Easily Distinguished as Well

In Elliott, the SEC brought suit against Mr. Elliott himself as well as several companies he owned and operated for various violations of the Securities and Exchange Act, which amounted to a large ponzi scheme. The Receiver claims that the Eleventh Circuit affirmed the District Court's decision to "treat[] the various companies as one entity for the purpose of the receivership proceeding," since "Elliott had commingled funds between the various companies and had failed to maintain a strict separation of the companies. . . ." (Plan at 16) quoting Elliott, 953 F.2d at 1565 n.1. The Receiver's statement is inaccurate. The issue of collapsing the various entities into a single entity for the purposes of the receivership was not an issue on appeal. Rather, the quoted statement was merely part of the background information and was relegated to a footnote. Nowhere else in Elliott is this issue even mentioned. The actual issues on appeal included questions of due process in summary proceedings, the transfer of legal title to securities, the right to setoff in a receivership proceeding, the interpretation of a contract, and administrative issues. It would thus be improper to rely on Elliott as support for the proposition that various companies can be treated as one for the purpose of distributions in a receivership case.

Even if Elliott provided proper precedent for the Receiver's argument, it is not applicable to the Objecting Parties, Myatt or the Bax Companies. The Eleventh Circuit clearly states that the District Court's basis for treating the various companies as one, or collapsing the companies, was that Elliott had "commingled funds" between each of the companies *and* had "failed to maintain a strict separation of the companies." Elliott, 953 F.2d at 1565 n.1. There is no evidence of any funds from either Myatt or BaxTech being commingled. These companies were and are separate from all the Wextrust Entities. The Eleventh Circuit's decision in Elliott is inapplicable to the facts here and cannot be used to support the Receiver's attempt to ignore the separateness of the Myatt and the Bax Companies and their assets.

E. **Due Process Demands that Objecting Parties Be Given an Opportunity to Conduct Discovery**

Should the Court find that it is not yet convinced of the separateness and indeed, the uniqueness of the Objecting Parties' situation from the victims in these proceedings, due process

demands that the Objecting Parties be given an opportunity to conduct discovery in order to present further facts to distinguish themselves and rebut the Receiver's factual conclusions.  The issue of whether or not summary proceedings, such as these, are appropriate to decide ownership of property, which ownership Myatt and the Bax Companies would lose if the Receiver is allowed to pool their assets for the distribution, was dealt with by the Eleventh Circuit in <u>Elliott</u>.  There, the court recognized that such a procedure as the pooling of the assets of various entities must provide the owner of the property with due process of law.  The court decided that summary proceedings do not per se violate claimants' due process interests and that should a claimant desire further proceedings, they must show why they require such proceedings to protect their due process rights.  <u>Id</u>. at 1571.  In <u>Elliott</u>, however, the court admitted that the facts were undisputed.  <u>Id</u>. at 1570.  When the facts are in dispute, the Eleventh Circuit held that the district court must "permit parties to present evidence" and "to make arguments regarding those facts."  <u>Id</u>. at 1567.  Having only recently become involved in these proceedings, the Objecting Parties have not yet had an opportunity to seek discovery from the Receiver.  Based on their own facts and documents, the Objecting Parties dispute all of the facts asserted by the Receiver relevant to the Objecting Parties investments in Myatt and the Bax Companies.  The Receiver has been conducting discovery for months.  Such one sided discovery, however, has lead to inaccurate statements of the facts, as illustrated by the fact that the Objecting Parties do not fit into any of the categories in which the Receiver claims all other investors fit.   Due process requires that the Objecting Parties be given the opportunity to conduct discovery of their own to protect their investments.

//
//
//
//
//
//
//
//

IV. **CONCLUSION**

Because the Receiver has not and cannot establish the commingling of other investor funds in Myatt or the Bax Companies, that the Objecting Parties are similarly situated to other investors, or that Myatt or the Bax Companies failed to adhere to the formalities associated with the operation of limited liability companies, the Receiver's proposed Plan of pooled pro rata distribution cannot be approved as to Myatt or the Bax Companies or the Objecting Parties' investments therein.

Dated: April 27, 2009     MEYER, SUOZZI, ENGLISH & KLEIN, P.C.


By: /s/ Alan E. Marder
    Alan E. Marder
    990 Stewart Avenue, Suite 300
    P.O. Box 9194
    Garden City, New York, 11530-9194
    Telephone: 516.741.6565
    Facsimile: 516.741.6706

    Attorneys for Nashville Warehouse Partners, LLC and Southeast Warehouse Partners, LLC