UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------- x
SECURITIES AND EXCHANGE
COMMISSION,

               Plaintiff,                        **08-CV-07104 (DC)**

   -against-

STEVEN BYERS, et al.,

               Defendants.

------------------------------------------------------------- x

## G&H PARTNERS AG'S OBJECTION TO
## THE RECEIVER'S PROPOSED DISTRIBUTION PLAN

SULLIVAN & WORCESTER LLP
Barry S. Pollack (BP 4039)
Joshua L. Solomon (JS 5848), *pro hac vice*
One Post Office Square
Boston, MA 02109
(617) 338-2800 (phone)
(617) 338-2880 (fax)
bpollack@sandw.com
jsolomon@sandw.com

# TABLE OF CONTENTS

Table of Contents ........................................................................................................... i

Table of Authorities ...................................................................................................... ii

I.   The Distribution Plan Should Not Foreclose the Presumptive or Proven Priority of Unsecured Creditors, Such as Settlement Creditors, Over Equity Holders. ............ 1

II.  The Receiver Should Implement a Process for Equitably Subordinating or Prioritizing Particular Claims Based on Individual Circumstances ....................... 8

III. The Distribution Plan Should Include a Process for Recouping Payments Made During the Course of This Receivership ................................................................ 11

Conclusion ................................................................................................................... 12

# TABLE OF AUTHORITIES

## CASES

*Allen v. Geneva Steel Co. (In re Geneva Steel Co.)*, 281 F.3d 1173 (10th Cir. 2002).............. 2-3, 6

*America Broadcasting System, Inc. v. Nugent (In re: Betacom of Phoenix, Inc.)*, 240 F.3d 823 (9th Cir. 2001) ........................................................................................6

*Bano v. Union Carbide Corp.*, 273 F.3d 120 (2d Cir. 2001)..............................................10

*Jezarian v. Raichle (In re Stirling Homex Corp.)*, 579 F.2d 206 (2d Cir. 1978).................... 2, 4-5

*In re Mobile Tool Int'l, Inc.*, 306 B.R. 778 (Bankr. D. Del. 2004)..........................................5

*In re Motels of Am., Inc.*, 146 B.R. 542 (Bankr. D. Del. 1992) ............................................5

*Newton National Bank v. Newbegin*, 74 F. 135 (8th Cir. 1896) ............................................2

*Palmer v. Metropolitan Bancorporation*, No. 82-141-CIV-T-WC, 1983 WL 144647 (M.D. Fla. May 23, 1983)............................................................5

*Scholes v. Lehmann*, 56 F.3d 750 (7th Cir. 1995)................................................................3

*In re U.S. Wireless Corp.*, 384 B.R. 713 (Bankr. D. Del. 2008)....................................... 5-6

## STATUTES

11 U.S.C. § 1129(b)(2)(B)(ii) ...............................................................................................2

11 U.S.C. § 510(b) ............................................................................................................2, 3

G&H Partners AG ("G&H"), a creditor of and investor in several of the entities named in this receivership action, hereby respectfully submits this objection to the Receiver's Proposed Plan of Distribution (the "Proposed Distribution Plan"). G&H objects to the Proposed Distribution Plan's automatic equal treatment of unsecured creditors of and investors in WexTrust and its affiliates. The Proposed Distribution Plan runs contrary to several fundamental principles of equity, such as the priority of those who have previously surrendered the risks and rewards of equity status, as well as the general priority of creditors over equity holders according to insolvency, liquidation, and reorganization laws and rules. In addition, G&H objects to the extent the receiver does not intend to provide for the review of individual claimants' particular circumstances for possible priority treatment. Finally, G&H objects to the omission of any mechanism during the distribution process for seeking recoupment of unwarranted administrative expenses prior to the final calculation of distributions to victims.

## I. The Distribution Plan Should Not Foreclose the Presumptive or Proven Priority of Unsecured Creditors, Such as Settlement Creditors, Over Equity Holders.

The receiver proposes to treat all unsecured creditors and investors equally in all cases, but provides no compelling reason for, and no authority that supports, doing so categorically or even presumptively. Such an approach runs directly contrary to several equitable principles and laws. As a fundamental matter, unlike ordinary creditors, equity holders generally enjoy greater risks and rewards in connection with their investments. The receiver may rely on a somewhat contrary theory that the investors here were the most direct victims of the Ponzi scheme and therefore should be universally elevated to creditor status. The receiver ignores, however, a subcategory of victim who suffered the direct fraud of those behind the Ponzi scheme, but who relinquished the potential rewards associated with equity status before these proceedings, in favor of a fixed debt obligation.

This Court has broad equitable discretion to alter priorities. For example, when adopting a plan for distributions, the Court could draw in part from the "absolute priority rule," a longstanding tenet that one United States Court of Appeals has referred to as "a central feature of American bankruptcy law." *Allen v. Geneva Steel Co. (In re Geneva Steel Co.)*, 281 F.3d 1173, 1180 (10th Cir. 2002). As that court explained the rule, "unsecured creditors stand ahead of investors in the receiving line and their claims must be satisfied before any investment loss is compensated." *Id.* at 1180 n.4; *see also Jezarian v. Raichle (In re Stirling Homex Corp.)*, 579 F.2d 206, 211 (2d Cir. 1978) (explaining that under the "absolute priority rule," "after all creditors have been paid, provision may be made for stockholders").[1]

The only explanation that the Proposed Distribution Plan offers for ignoring the presumptive priority of creditors over equity holders is the assertion in a footnote that investors are "tort creditors" as a result of the underlying WexTrust fraud. This explanation, however, also runs contrary to law establishing that an investor's priority will generally remain that of an investor, and not a creditor, even if the investor has a cause of action as a result of its investment. *See* 11 U.S.C. § 510(b) ("For the purpose of distribution under this title, a claim arising from rescission of a purchase or sale of a security of the debtor or of an affiliate of the debtor, for damages arising from the purchase or sale of such a security, or for reimbursement or contribution allowed under section 502 on account of such a claim, shall be subordinated to all claims or interests that are senior to or equal the claim or interest represented by such security, except that if such security is common stock, such claim has the same priority as common stock."). In fact, the *Geneva Steel* opinion, cited above, dealt with the very issue that the

---

[1] In bankruptcy proceedings, this absolute priority rule is codified for reorganizations in 11 U.S.C. § 1129(b)(2)(B)(ii).

receiver's proposal raises – the status of defrauded investors – and held that under § 510(b) and longstanding distribution principles, those investors should be treated as investors, not creditors, for purpose of establishing priority. 281 F.3d at 1177 ("[A] fraud claim arising from the purchase or sale of a security is treated not as a general unsecured claim but rather as a claim below or equivalent to the rights afforded by the underlying security." (internal quotation marks omitted)).

While G&H recognizes that these statutes apply to bankruptcy proceedings, the well-established policies behind them apply with no less force in this receivership action. The receiver himself has acknowledged the persuasive force of bankruptcy concepts. In fact, his attempt to justify his "tort creditor" approach itself invokes bankruptcy-related authority, albeit in an inaccurate way through a quotation taken out of context. In explaining his rationale for treating investors as "tort creditors," the receiver cites to *Scholes v. Lehmann*, 56 F.3d 750 (7th Cir. 1995). The *Scholes* quotation on which he relies, however, concerns whether defrauded investors have standing to initiate bankruptcy proceedings. *See id.* at 755 ("The conceivable alternatives to these suits for getting the money back into the pockets of its rightful owners [include] . . . most plausibly, an adversary action, in bankruptcy. . . . Concerning this last alternative, it is true that investors, including limited partners in a corporation's investment fund, are not contractual creditors of the corporation, any more than the corporation's stockholders are. But *defrauded* investors, as we have pointed out, are tort creditors. So Douglas's corporations were insolvent from the outset and *could have been petitioned into bankruptcy*." (internal citations omitted; first emphasis in original)). Neither this quotation, nor the *Scholes* opinion more generally, in any way involved the priority of defrauded investors *vis a vis* unsecured creditors. Indeed, because of 11 U.S.C. § 510(b), quoted above, the court could not have used

3

this "tort creditor" concept as a way of equating shareholders to unsecured creditors for distribution purposes in a bankruptcy context. Thus, while the receiver, through his citation to *Scholes*, purports to invoke bankruptcy concepts in support of his treatment of creditors, bankruptcy law is actually in direct conflict with his position.

Furthermore, even before § 510 became law, the Second Circuit invoked general equitable principles to reject the position the receiver now takes. In *Stirling Homex*, investors who claimed to have been defrauded into purchasing stock and who asserted claims under federal securities laws faced the prospect of creditors exhausting all of the estate's resources. Those investors thus sought to avoid subrogation as investors by relying on their fraud claims. *See Stirling Homex*, 579 F.2d at 211 ("[T]he question is whether persons who were allegedly induced by fraud to purchase Homex stock should be allowed, in a reorganization proceeding, to assert claims in such a way as to achieve parity with ordinary unsecured tort and contract claimants."). The court recognized that the stockholders, as holders of claims against the estate, fell within the definition of "creditors" in a broad sense of the term. *Id.* at 212. In this respect, the court used the term "creditor" in a way not unlike the quotation from the Seventh Circuit's *Scholes* opinion on which the receiver relies. The Second Circuit nevertheless rejected alteration of the usual priority as between creditors and defrauded investors.

The Second Circuit's reasoning reflects the difference between those holding claims based on fixed obligations and those who continue to hold the risks and rewards of equity status through the initiation of insolvency proceedings:

> We will not allow stockholders whose claims are based solely on the alleged fraud that took place in the issuance of stock to deplete further the already meager pool of assets presently available to the general creditors. . . .

\*   \*   \*   \*

4

> In theory, the general creditor asserts a fixed dollar claim and leaves the variable profit to the stockholder; the stockholder takes the profit and provides a cushion of security for payment of the lender's fixed dollar claim. The absolute priority rule reflects the different degree to which each party assumes a risk of enterprise insolvency; no obvious reason exists for reallocating that risk.

*Id.* at 213-14 (internal quotation marks, editing, and citations omitted); *see also Palmer v. Metro. Bancorporation*, No. 82-141-CIV-T-WC, 1983 WL 144647, at *1 (M.D. Fla. May 23, 1983) (citing to *Stirling Homex* in non-bankruptcy context for the holding that "the absolute priority rule require[s] that the claims of general creditors be satisfied before an insolvent corporation's shareholders receive any distribution").

These principles have led to the priority of those investors who convert their equity status into fixed dollar obligations before the initiation of insolvency-type proceedings, through settlements or otherwise, over those who continued to enjoy the potential rewards of equity status. *See, e.g., In re Mobile Tool Int'l, Inc.*, 306 B.R. 778, 782 (Bankr. D. Del. 2004) ("[T]he Defendants divested themselves of all forms of ownership when they sold the securities back to the Debtors and accepted notes in exchange. As such, they no longer enjoyed the primary benefit of ownership: the potential for unlimited profits. The Debtors' liability to the Defendants became fixed when the Debtors issued promissory notes. When the Defendants received the promissory notes, they removed the variable nature of their investment and placed themselves in the position of general creditors."); *In re Motels of Am., Inc.*, 146 B.R. 542, 544 (Bankr. D. Del. 1992) ("The option agreement divested [claimant] of all the indicia of ownership. . . . These contractual terms are consistent with the purpose of the agreement – to provide [claimant] with an income stream in exchange for giving up the rights and risks associated with an equity security holder."); *cf. In re U.S. Wireless Corp.*, 384 B.R. 713, 725 (Bankr. D. Del. 2008) (subordinating claim of judgment creditor, but distinguishing judgment

5

debts from situations where "a claimant exchanges his or her equity interest for a fixed debt obligation").

These principles prompted the controlling bankruptcy provisions. *See Geneva Steel*, 281 F.3d at 1176 (noting that in passing § 510(b), Congress found "compelling" the principles that "allowing equity-holders to become effectively creditors – by treating these two classes as though they were one – gives investors the best of both worlds: a claim to the upside in the event the company prospers and participation with creditors if it fails. It also dilutes the capital reserves available to repay general creditors, who rely on investment equity for satisfaction of their claims."); *Am. Broadcasting Sys., Inc. v. Nugent (In re: Betacom)*, 240 F.3d 823, 829 (9th Cir. 2001) ("Congress relied heavily on the analysis of two law professors in crafting the statute. According to [that analysis], the dissimilar expectations of investors and creditors should be taken into account in setting a standard for mandatory subordination. Shareholders expect to take more risk than creditors in return for the right to participate in firm profits. The creditor only expects repayment of fixed debt."). Such principles apply equally here. It is, therefore, inappropriate for the receiver to ignore the presumption of creditor seniority, without offering any meaningful explanation or justification for doing so.[2]

There is a further reason to reject the receiver's automatic elevation of equity holders. By deeming all investors "tort creditors," and thus equating them to unsecured creditors, the receiver's plan improperly assumes that all investors have *valid* tort claims against WexTrust and its affiliates. There is little doubt that WexTrust and its principals engaged in a massive Ponzi

---

[2] The closest the receiver comes to addressing the presumption of priority for creditors is on pages 20 and 21 of the Proposed Distribution Plan, in which he rejects giving preference to "holders of guaranteed debt instruments." This brief passage, however, addresses only particular types of claimants – holders of Guaranteed Depository Receipts – whom the receiver refers to as "arguably 'bondholders.'" The receiver does not address the equitable principles that result in a presumption that unsecured creditors have priority over equity holders.

scheme and duped many unsuspecting investors. That certainty does not suggest, however, that every investor has a valid fraud claim. Assuming otherwise ignores such elements of fraud claims as actual and reasonable reliance on misrepresentations or material omissions. It also ignores such possible defenses as statutes of limitations or repose. However certain it is that defendants engaged in serious malfeasance, it is far from certain that all investors could succeed on a fraud claim. While G&H recognizes that it may be impractical to construct a claims process that requires each claimant to establish the validity of its fraud claim, this issue further undercuts the receiver's disruption of the usual presumption of priorities based on nothing more than labeling each and every investor a "tort creditor."[3]

Finally, even if the receiver does not begin with a presumption that unsecured creditors have priority over investors, the Court should require, in the exercise of its equitable discretion, that the receiver at least consider the nature of each unsecured creditor's claim to determine whether that type of claim, or perhaps even a portion of it, should be elevated above equity. Upon review of the particular types of unsecured debt claims, the receiver and/or the Court might conclude, for example, that debts (or portions of debts) that have already come due as of the time of liquidation warrant priority treatment. Thus, even if putting all unsecured creditors ahead of all investors would leave nothing for investors (the receiver has not yet said whether this is so)

---

[3] The receiver himself appears to have recognized this issue earlier in this action, when it suited his purpose of fending of an attempt by investors to force this matter into a bankruptcy. In his opposition to that effort, he wrote as follows:

> Although both law firms [representing those investors] indicate that their respective clients are 'creditors,' they admit their rights arise out of their assertion of damages claims arising from securities fraud and those claims are unliquidated at this time. The securities they hold are equity securities similar to the shares of preferred stock issued by a corporation. The fact that shareholders assert unliquidated fraud claims does not make them creditors eligible to file involuntary bankruptcy petitions in accordance with section 303(b) of the Bankruptcy Code.

(Receiver's Opposition to International Ad-Hoc Committee of WexTrust Creditors' Motion Objecting to Entry and Seeking Modification of Preliminary Injunction (docket no. 82), at 12 (internal footnote omitted).)

and result in inequity under the circumstances, elevation of particular unsecured obligations may be equitable and fair. To the extent that the Proposed Distribution Plan does not include this flexibility, the Court should require such assessments in the claims process.

## II. The Receiver Should Implement a Process for Equitably Subordinating or Prioritizing Particular Claims Based on Individual Circumstances.

Whether or not the Court approves of the receiver's plan to treat all equity holders and unsecured creditors the same, the distribution plan should include a process by which specific circumstances can be taken into account for the purpose of possibly equitably subordinating or prioritizing certain claims. While the Proposed Distribution Plan does not appear to foreclose such a process, it also does not expressly create one. Therefore, G&H respectfully requests that the Court make clear in any order approving a distribution plan that the claims process shall include an ability for claimants to request equitable alteration of the default priority of their claims.

Given the generality of the Proposed Distribution Plan, G&H does not anticipate that the Court will, at this stage, make claimant-specific determinations. Nevertheless, G&H's situation – both in terms of contributions it has made to this receivership and the manner in which it converted portions of its equity holdings into debt – offer *examples* of the need for the distribution plan to provide a mechanism by which claimants can request priority during the claims-assessment process.

Some creditors and investors have likely provided significant services to the receivership estate, at significant financial cost to themselves. For example, when the receiver was struggling at the outset of the receivership to gain control of and understand WexTrust's dealings in South Africa, G&H made its South African counsel available to the receiver at no cost to the estate. G&H's counsel spent many hours assisting the receiver's South African legal team to understand

8

the roles of various WexTrust collaborators and entities in South Africa, and provided to the receiver many documents concerning WexTrust's South African activities. While the receiver's lawyers in South Africa ultimately cut off communication with G&H's South African lawyer after being told (erroneously) that G&H had sought to have the receiver removed, they did so only after G&H's lawyer had provided substantial assistance. In addition, G&H's counsel, both in South Africa and the United States, identified for the receiver a mistake in the way that South African service providers were charging the receivership for South African value added tax. That error, if it has been fixed by the receiver, should have saved the estate tens of thousand of dollars. G&H has never sought any reimbursement from the Court for the expenses it incurred in assisting the receiver in these ways.

Similarly, G&H has also incurred significant costs in its efforts to help protect the estate's assets from unreasonable and excessive legal fees. While these efforts have not been appreciated by the receiver and his law firm (from whose pockets such savings come), there can be little doubt that G&H's efforts have provided a substantial service to estate. When the SEC failed to scrutinize adequately the first fee application that the receiver's firm submitted, G&H incurred legal fees to do so itself. The Court ultimately agreed with G&H's position that the requested fees were excessive and should be reduced, cutting the first fee application by 20%. In so doing, the Court also relied on caselaw that G&H had brought to its attention, which the receiver and the SEC had failed to do despite this Court's order directing that they do so. The initial 20% cut has been carried forward by the receiver's law firm in subsequent fee applications, saving the estate hundred of thousand of dollars (and possibly millions by the conclusion of the receivership). While these efforts, undertaken at G&H's own expense, offered the prospect of benefiting the estate as a whole and not just G&H, G&H has never requested

9

reimbursement of its expenses from the Court. The claims process leading to distributions of estate assets should provide a mechanism by which claimants can offer such issues for consideration in determining the equitable share of the estate's assets to which those claimants should be entitled.

The manner in which certain parties have become creditors of WexTrust and its affiliates may provide another example of the need for such a claim-specific analysis. For example, in 2007, before the SEC had filed any action against WexTrust, G&H uncovered and made public through the filing of a complaint in New York certain aspects of the WexTrust fraud. While G&H had, at that time, no knowledge of the scope of the fraud, it incurred significant litigation costs in bringing pieces of the fraud to light. G&H ultimately settled certain of its claims in March 2008, surrendering a portion of its equity in exchange for specific payments and a WexTrust guarantee. Such considerations as prior litigation costs and the sacrificing of potential equity upside might well justify alteration of relative priorities during distribution of estate assets, particularly when considered in conjunction with the strong public policy favoring the enforcement of compromises and the settlement of disputes. *See, e.g., Bano v. Union Carbide Corp.*, 273 F.3d 120, 129 (2d Cir. 2001).

To the extent that the receiver does not currently intend to provide a process through which individual claimants' situations can be taken into account for possible equitable adjustment of priorities, G&H objects to the Proposed Distribution Plan and respectfully requests that the Court direct the receiver to implement such a process as part of any approved plan of distribution.

### III. The Distribution Plan Should Include a Process for Recouping Payments Made During the Course of This Receivership.

The receiver has reported that as of December 31, 2008, the receivership estate had accrued *unpaid* "administrative expenses" of approximately $9.5 million, consisting "in substantial part" of fees charged by the receiver's law firm, Dewey & LeBoeuf ("D&L"), and advisers Deloitte and Hilco. (*See* Receiver's and D&L's Third Fee Application (docket no. 238), at 9.) This sum does not include payments already made to such advisers prior to December 31, 2008, or any amounts incurred in the almost four months since the end of 2008. In short, the receiver has caused the receivership estate to incur enormous administrative expenses that are, by now, well into the eight figures, and much of that to D&L, the law firm where the receiver is a partner.[4]

These huge administrative expenses are troubling not only because they sit at the very top of the priority list under the Proposed Distribution Plan, but also because nobody (save, possibly, the receiver and his advisers) currently knows whether the recovery for investors and creditors through this action will even remotely approach what is being spent to administer the receivership. The Court has already made clear that the "results achieved and benefit to the receivership estate are critical factors that a court must consider in setting a fee award." Dec. 30, 2008 Order at 23. Yet, reading between the lines, the most recent interim report of the receiver

---

[4] G&H has already objected, on two occasions, to the fees that D&L is charging the receivership estate. Following the first such objection, the Court reduced those fees by 20%, finding D&L's charges excessive. G&H's second objection is currently before the Court. While G&H has been the most outspoken proponent of reducing D&L's excessive fees, it is not the only investor to have been offended by the vast sums that the receiver seeks to pay to his own firm. While the receiver and his firm may have provided certain competent services in this process, the exorbitant legal fees reflect how the receiver and his firm have potentially embarrassed the profession, making a joke of serious matters such as billing practices. *See, e.g.*, Objection of Jeffrey S. Meisles, dated April 23, 2008 (quoting Mario Puzo's "The Godfather," for the disturbing proposition that "a lawyer with his briefcase can steal more than a thousand men with guns," and contending that the receiver's plan for distribution "is nothing more that a transparent attempt to get at a readily available source of cash so that they can pay themselves exorbitant legal fees.").

suggests a probability that legal fees alone will grow to greater than (if not a multiple of) what investors and creditors recover. If that were the case, equity would suggest that the Court or its appointed officer (since the receiver's clear conflict of interest would hamper his ability to do so) turn to D&L to recoup some of the millions that the receiver paid to it on an interim basis.

While the Proposed Distribution Plan explains the process for divvying up assets among various claimants, including service providers such as D&L that get first priority (*see* Proposed Distribution Plan at 27), the plan provides no process for either subordinating the claims of or recouping assets paid to such service providers if appropriate. G&H respectfully requests that the Court require a process for subordinating or seeking reimbursement from service providers prior to the final calculation of distribution to victims, if and to the extent appropriate.

## CONCLUSION

For the reasons stated herein, G&H respectfully objects to the Proposed Distribution Plan and requests that the Court require the receiver to revise the plan accordingly.

Dated: April 27, 2009

G&H PARTNERS AG,

By its attorneys,

/s/ Joshua L. Solomon
Barry S. Pollack (BP 4039)
Joshua L. Solomon (JS 5848), *pro hac vice*
SULLIVAN & WORCESTER LLP
One Post Office Square
Boston, MA 02109
(617) 338-2800 (phone)
(617) 338-2880 (fax)
bpollack@sandw.com
jsolomon@sandw.com