UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff,

- against -

STEVEN BYERS, JOSEPH SHERESHEVSKY,
WEXTRUST CAPITAL, LLC, WEXTRUST
EQUITY PARTNERS, LLC, WEXTRUST
DEVELOPMENT GROUP, LLC, WEXTRUST
SECURITIES, LLC, and AXELA HOSPITALITY,
LLC,

Defendants,

- and -

ELKA SHERESHEVSKY,

Relief Defendant.

08 Civ. 7104 (DC)

ECF Case

## RESPONSE TO OBJECTIONS TO THE RECEIVER'S
## PROPOSED PLAN OF DISTRIBUTION

TIMOTHY J. COLEMAN
Receiver for Wextrust Entities

DEWEY & LEBOEUF LLP
1301 Avenue of the Americas
New York, NY 10019-6092
Tel. (212) 259-8000

May 11, 2009

Attorneys for Receiver

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ........................................................................................... 1

DISCUSSION ................................................................................................................... 6

I.     Alternatives to a *Pro Rata* Distribution Method .................................................... 6

II.    Treatment of Cash Distributions and Reinvestments ............................................. 9

III.   Wextrust Commodity Funds ................................................................................. 13

   A.   The Commodity Fund Victims Are Similarly Situated to the Other Wextrust Victims ... 14

      1.   The Commodities Laws Do Not Circumscribe the Court's Discretion in an Equity Receivership ..................................................................................... 15

      2.   The Wextrust Commodity Funds Were Part and Parcel of the Wextrust Ponzi Scheme ............................................................................................ 17

   B.   The Money in the Wextrust Commodity Funds Was Commingled ................................. 19

      1.   The Commodity Fund Victims' Money is Neither "Segregated" Nor "Accounted For" ..................................................................................... 20

      2.   Commodities Regulators Have Not Foreclosed Legal or Regulatory Action .............. 21

   C.   The Structure of the Wextrust Commodity Funds Imparted Control to the Defendants .. 23

   D.   The Receiver's Authority Extends to All Wextrust Entities and Affiliates, Including the Wextrust Commodity Funds ................................................................................... 24

   E.   Conclusion ......................................................................................................... 28

IV.   Interested Parties Requesting Additional Special Consideration .................................... 29

   A.   TCF National Bank .............................................................................................. 31

   B.   Q&Q Limited Partnership ..................................................................................... 37

   C.   Broadway Bank .................................................................................................... 40

   D.   Key Equipment Finance ........................................................................................ 41

   E.   Munden Family Partnership, LLP ........................................................................... 42

   F.   56 Walker, LLC ................................................................................................... 44

   G.   G&H Partners AG ............................................................................................... 45

   H.   Nashville Warehouse Partners, Southeast Warehouse Partners, and Space Park AIM Partnership ................................................................................. 46

V.    Disqualification of Certain Claimants .................................................................... 47

VI.   Miscellaneous Concerns ...................................................................................... 51

   A.   Provision of Specific Tracing Analyses for Every Investor ............................................ 51

   B.   Taxation of Distributions ...................................................................................... 53

   C.   Individual Statements for Verification of Investments ................................................. 54

CONCLUSION ............................................................................................................... 55

# TABLE OF AUTHORITIES

*Cases*

*Bear Stearns Securities Corp. v. Gredd*,
    397 B.R. 1 (S.D.N.Y. 2007) ...................................................................................... 18

*Boston Trading Group, Inc. v. Burnazos*,
    835 F.2d 1504 (1st Cir. 1988) ................................................................................. 27

*CFTC v. Equity Financial Group, LLC*,
    No. 04-cv-1512, 2005 U.S. Dist. LEXIS 20001 (D.N.J. Sept. 2, 2005) .............. 9, 10

*CFTC v. Eustace*,
    No. 05-2973, 2008 U.S. Dist. LEXIS 11810 (E.D. Pa. Feb 15, 2008) ........ 15, 18, 20

*CFTC v. Probber Int'l Equities Corp.*,
    504 F. Supp. 1154 (S.D.N.Y. 1981) ....................................................................... 27

*Cunningham v. Brown*,
    265 U.S. 1 (1924) ...................................................................................................... 3

*De Johnson v. Holder*,
    No. 07-4629, 2009 U.S. App. LEXIS 8118 (2d Cir. Apr. 15, 2009) ....................... 14

*Eberhard v. Marcu*,
    530 F.3d 122 (2d Cir. 2008) .............................................................................. 25, 33

*FDIC v. Bernstein*,
    786 F. Supp. 170 (E.D.N.Y.) ................................................................................. 30

*In re Flanagan*,
    503 F.3d 171 (2d Cir. 2007) ..................................................................................... 8

*In re O'Neil Village Personal Care Corp.*,
    88 B.R. 76 (Bankr. W.D. Pa. 1988) ....................................................................... 35

*Lankenau v. Coggeshall & Hicks*,
    350 F.2d 61 (2d Cir. 1965) ..................................................................................... 33

*Liberte Capital Group, LLC v. Capwill*,
    148 Fed. App'x 426 (6th Cir. 2005) ......................................................................... 2

*McFarland v. Winnebago South, Inc.*,
    863 F. Supp. 1025 (W.D. Mo. 1994) ..................................................................... 30

*Official Committee of Unsecured Creditors of WorldCom, Inc. v. SEC*,
    467 F.3d 73 (2d Cir. 2006) ............................................................................... 31, 49

*Precision Instrument Manufacturing Co. v. Automotive Maintenance Machinery Co.*,
    324 U.S. 806 (1945) ................................................................................................ 49

*Quilling v. Trade Partners Inc.*,
    No. 1:03- CV-236, 2008 WL 4366039 (W.D. Mich. Sept. 17, 2008) ...................................... 7

*Scholes v. Lehmann*,
    56 F.3d 750 (7th Cir. 1995) .................................................................................. 26

*SEC v. American Board of Trade*,
    830 F.2d 431 (2d Cir. 1987) ................................................................................. 33

*SEC v. Amerifirst Funding, Inc.*,
    No. 3:07-cv-1188, 2008 U.S. Dist. LEXIS 20044 (N.D. Tex. Mar. 13, 2008) .............. 2, 11, 18

*SEC v. Better Life Club of America, Inc.*,
    995 F. Supp. 167 (D.D.C. 1998) ........................................................................... 20

*SEC v. Black*,
    163 F.3d 188 (3d Cir. 1998) ................................................................................. 21

*SEC v. Capital Consultants, LLC*,
    397 F.3d 733 (9th Cir. 2005) ................................................................................ 34

*SEC v. Credit Bancorp, Ltd.*,
    168 F. Supp. 2d 122 (S.D.N.Y. 2001) ...................................................................... 5

*SEC v. Credit Bancorp, Ltd.*,
    290 F.3d 80 (2d Cir. 2002) ........................................................................... passim

*SEC v. Credit Bancorp, Ltd.*,
    No. 99-cv-11395, 2000 U.S. Dist. LEXIS 17171 (S.D.N.Y. Nov. 29, 2000) .................... 16, 26

*SEC v. Elliott*,
    953 F.2d 1560 (11th Cir. 1992) .............................................................. 7, 30, 34, 39

*SEC v. Enterprise Trust Co.*,
    No. 08-cv-1260, 2008 U.S. Dist. LEXIS 79732 (N.D. Ill. Oct. 7, 2008) ................................ 49

*SEC v. Forex Asset Management LLC*,
    242 F.3d 325 (5th Cir. 2001) ................................................................................ 33

*SEC v. George*,
    426 F.3d 786 (6th Cir. 2005) ......................................................................... 16, 18

*SEC v. Infinity Group Co.*,
    226 Fed. App'x 217 (3d Cir. 2007) ........................................................................... 2

*SEC v. Lauer*,
    No. 03-cv-80612, 2009 U.S. Dist. LEXIS 23510 (S.D. Fla. Mar. 25, 2009) ......................... 20

*SEC v. Lund*,
    570 F. Supp. 1397 (C.D. Cal. 1983) ....................................................................... 33

*SEC v. Merrill Scott & Assoc., Ltd.*,
    2:02-cv-39, 2006 U.S. Dist. LEXIS 93247 (N.D. Utah Dec. 21, 2006) ...................... 15, 16, 21

*SEC v. Shiv*,
    379 F. Supp. 2d 609 (S.D.N.Y. 2005) ......................................................... 2, 26, 33

*SEC v. TLC Investments and Trade Co.*,
    147 F. Supp 2d 1031 (C.D. Cal. 2001) ........................................................ 33, 34

*SEC v. Wang*,
    944 F.2d 80 (2d Cir. 1991) ...................................................................... 2, 31, 36

*Teltronics, Ltd. v. Heyman*,
    649 F.2d 1236 (7th Cir. 1981) ............................................................................... 26

*United States v. 13328 & 13324 State Highway 75 N.*,
    89 F.3d 551 (9th Cir. 1996) ...................................................................... 16, 34

*United States v. Durham*,
    86 F.3d 70 (5th Cir. 1996) ..................................................................................... 34

*United States v. Quintieri*,
    306 F.3d 1217 (2d Cir. 2002) ............................................................................... 14

*Wilson v. Wall*,
    73 U.S. 83 (1867) ..................................................................................................... 1

### Other Authorities

*In re MacGregor*,
    Exchange Act Release No. 57745 (April 30, 2008) ............................................... 48

### Rules

Fed. R. Civ. P. 24 .......................................................................................................... 14

### Treatises

13 Moore's Federal Practice (3d ed.) § 66.06[4][b] ..................................................... 30

16 Fletcher Cyc. Corp § 7931 (2008) ........................................................................... 33

2 DAN B. DOBBS, LAW OF REMEDIES (2d ed. 1993) ........................................................ 7

Timothy J. Coleman, Receiver for the Defendant Wextrust Entities ("Receiver"), respectfully submits this Response to Objections to the Receiver's Proposed Plan of Distribution for the Defendant Wextrust Entities and all entities they control or in which they have an ownership interest (collectively, the "Wextrust Entities and Affiliates").[1] The U.S. Securities and Exchange Commission ("SEC") has notified the Receiver that it will file a statement joining in this Response.

## PRELIMINARY STATEMENT

On March 27, 2009, the Receiver filed a proposed plan of distribution ("Receiver's Plan"). To date, more than 100 Wextrust victims have submitted written statements concerning the Receiver's Plan. Approximately 250 victims participated in two town hall meetings that the Receiver held in April 2009, in order to explain the Receiver's Plan and to respond to questions and comments. The Receiver appreciates the significant level of participation by Wextrust victims, and their efforts in submitting timely comments on the proposed plan.

In considering the proposed plan of distribution, the Court exercises its considerable equitable discretion as a "court of conscience."[2] In the Receiver's Plan and in the discussion herein, the Receiver has sought to provide the Court with relevant factual information, and to call the Court's attention to relevant precedent. The Receiver has sought to identify the options available to the Court for distributing the assets of the receivership estate, and has submitted the proposed plan of distribution as a recommendation to the Court. The Court, however, has broad discretion to fashion any plan of distribution that is fair and reasonable, and is not bound by any

---

[1] A full list of the Wextrust Entities and Affiliates covered by the Receiver's Plan is attached as Exhibit A to the Declaration of Vincent P. Schmeltz in Support of the Reply Brief in Support of the Receiver's Proposed Plan of Distribution ("Schmeltz Decl."), filed concurrently herewith.

[2] *See United States v. Durham*, 86 F.3d 70, 73 (5th Cir. 1996) ("Sitting in equity, the district court is a 'court of conscience.'") (citing *Wilson v. Wall*, 73 U.S. 83, 90 (1867)).

specific rule or formula, much less by the Receiver's recommendation.  *See SEC v. Wang*, 944 F.2d 80, 85 (2d Cir. 1991).  The Receiver stands ready to implement any plan of distribution that the Court may order.

In developing the proposed plan, the Receiver has been guided by the facts surrounding the fraud alleged in the complaint, and by a substantial body of equity jurisprudence, notably including recent Second Circuit precedent.  The complaint alleges, and the Receiver's investigation has shown, that the Wextrust enterprise was operated as a Ponzi scheme, in which the proceeds of sales of securities were used to fund payments to earlier investors and to finance the overall operations of the enterprise, thereby perpetuating the fraudulent scheme.  Although the Second Circuit has repeatedly emphasized district courts' broad discretion in approving plans of distribution in such cases, it has observed that the *pro rata* method of distribution is the "favored" approach in cases "where the funds of the defrauded victims were commingled and where victims were similarly situated with respect to their relationship to the defrauders."  *SEC v. Credit Bancorp, Ltd.*, 290 F.3d 80, 88-89 (2d Cir. 2002).[3]

Based on the Receiver's investigation, there is overwhelming evidence that those circumstances are present in this case.  As previously reported, the Receiver has found that the funds of Wextrust victims were systematically commingled by defendants Steven Byers, Joseph

---

[3] The Credit Bancorp case, which was commenced in this District in 1999, resulted in at least twenty-one published opinions, including five Second Circuit opinions.  Judge Robert W. Sweet presided over the district court proceedings, which included extensive litigation concerning the plan of distribution that was adopted in the case.  The Second Circuit affirmed the district court's approval of the receiver's proposed *pro rata* plan of distribution, in an opinion that has been followed in numerous cases in this and other circuits.  *See SEC v. Credit Bancorp*, 290 F.3d 80 (2d Cir. 2002).  This precedent has been followed in many other cases in this circuit and throughout the federal court system.  *See, e.g.*, *SEC v. Shiv*, 379 F. Supp. 2d 609 (S.D.N.Y. 2005); *SEC v. Infinity Group Co.*, 226 Fed. App'x 217 (3d Cir. 2007); *Liberte Capital Group, LLC v. Capwill*, 148 Fed. App'x 426 (6th Cir. 2005); *SEC v. AmeriFirst Funding, Inc.*, No. 3:07-cv-1188-D, 2008 WL 919546 (N.D. Tex. Mar. 13, 2008); *SEC v. Merrill Scott & Assocs., Ltd.*, No. 2:02-cv-39, 2006 U.S. Dist. LEXIS 93248 (D. Utah Dec. 21, 2006); *CFTC v. Equity Financial Group, LLC*, No. 04-cv-1512, 2005 U.S. Dist. LEXIS 20001 (D.N.J. Sept. 2, 2005).

Shereshevsky and others acting in concert with them.  (*See* Second Interim Report at 19-34.)  As discussed below and in the Receiver's Plan, the Wextrust Entities and Affiliates were operated as a coordinated fraudulent scheme, such that the victims were similarly situated with respect to their relationship with Wextrust, irrespective of the specific nature of their investments.  (*See* Receiver's Plan at 7-17; Sections I & III *infra*.)

The Receiver has also sought to balance the equities in fashioning the proposed plan.  Courts have frequently cited the maxim "equality is equity" in distributing assets to fraud victims.  *See Cunningham v. Brown*, 265 U.S. 1, 13 (1924).  In keeping with that principle, the Receiver's Plan seeks to ensure that the claims of similarly situated victims are processed and evaluated in a consistent manner, and that the plan results in distributions that are in equal proportion to the victims' losses.  For example, the Receiver's Plan treats distributions to Wextrust investors in the same way, regardless of whether they were cash distributions, or like-kind reinvestments or "roll-overs" of earned income.  (*See* Section II *infra*.)  Similarly, the proposed plan seeks to provide a fair distribution not only to investors in Wextrust securities, but also to unsecured creditors who were victimized by Wextrust.  The Receiver's Plan also seeks to mitigate the disparity in outcomes that would result were secured creditors compensated in full, rather than being required to share in the overall loss with other victims.  (*See* Section IV *infra*.)

The Receiver has carefully considered the objections and other statements submitted by victims and other interested parties.  For purposes of this response, the Receiver has organized the objections to the proposed plan into six categories, which are set forth in Table 1 below.

**Table 1**
*Statements by Category*[4]

| Category | Statement or Docket Number |
|---|---|
| I.  Alternatives to *Pro Rata* Distribution Approach | Statement Numbers: 1, 22, 31, 32, 35, 39, 40, 41, 43, 52, 53, 54, 64, 69, 73, 74, 75, 76, 77, 78, 82, 84, 86, 87, 90, 95, 98, 99.<br>Docket Numbers:     257, 263. |
| II.  Calculation of *Pro Rata* Distribution | Statement Numbers: 2, 4, 6, 31, 35, 44, 62, 77 |
| III.  Commodity Fund Objections | Statement Numbers: 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 24, 25, 27, 28, 29, 30, 33, 36, 37, 38, 48, 49, 50, 51, 55, 63, 67, 72, 83, 89, 91, 92.<br>Docket Numbers:     250, 251, 253, 254, 255, 256, 259, 260, 261, 262, 264, 265, 266, 267, 268, 269, 271, 272, 273, 274. |
| IV. Requests for Special Consideration | Statement Numbers: 66, 93, 94<br>Docket Numbers:     280, 282, 284, 288, 290, 293.<br>Letters to Court:    April 27, 2009 letter from Munden Family Partnership, LLP. |
| V.  Treatment of Former Employees/Insiders | Statement Numbers: 23, 34, 35, 42, 56, 77, 96, 100.<br>Docket Numbers:     249, 294,<br>Letters to Court:    April 24, 2009 letter from former employee. |
| VI.  Miscellaneous Concerns | Statement Numbers: 5, 45, 47, 56, 59, 60, 68, 77, 81, 84, 85, 88, 94, 96, 97, 102.<br>Docket Numbers:     258, 270. |
| VII.  Support for the Receiver's Plan | Statement Numbers: 3, 46, 57, 58, 61, 62, 65, 70, 71,79, 80, 96, 100, 101. |

The discussion below addresses each category of objection in turn.  Section I discusses methods of distribution proposed as alternatives to the *pro rata* approach of the Receiver's Plan. Section II provides further details on the Receiver's proposed treatment of cash distributions and reinvestments for the purpose of calculating Wextrust investors' *pro rata* recoveries.  Section III

---

[4] Several statements address issues in more than one category and therefore are listed more than once.

responds to objections by certain investors in the various Wextrust Commodity Funds. Section IV responds to certain secured creditors and other parties who seek various forms of relief other than as proposed in the Receiver's Plan. Section V addresses the concerns raised by the Receiver's proposed disallowance of certain investor claims based on evidence that the claimant participated in the Wextrust fraud scheme. Section VI discusses various issues concerning the implementation of the Receiver's Plan.

The six categories of objections have a common theme. Not surprisingly, each represents an attempt by one or more victims to obtain priority for his or her claims to the limited receivership *res* – necessarily at the expense of the remaining victims. As the court held in *SEC v. Credit Bancorp, Ltd.,* 168 F. Supp. 2d 122, 135-36 (S.D.N.Y. 2001), however, "every [interested party] has unique facts; to elevate a claim in equity, those facts should demonstrate that fairness requires greater consideration." In the Receiver's judgment, none of the objections identify any factual or equitable basis to alter the Court's discretion to approve the proposed plan of distribution. Moreover, none of the objections establish that fairness requires a result different from the proposed plan. The Receiver respectfully submits that the facts, the weight of equity jurisprudence and the balance of equities in this case support the Receiver's Plan.

**DISCUSSION**

I.  **Alternatives to a *Pro Rata* Distribution Method**

A number of the objections propose alternatives to a *pro rata* method of distribution. The alternatives fall in to two broad categories – those based on tracing of assets, and those based on distinctions among investment types. Each of those categories is summarized below.

The objections based on tracing seek, implicitly or explicitly, the imposition of a state law constructive trust. The proposed tracing methods vary, but they can be classified as follows:

**Distribution Based on Timing of Investment**. Objectors supporting this approach state that certain investments made in the last weeks of Wextrust's operation prior to the receivership can be, and in fact may have already been, traced to the investors. The objectors state that there is a low likelihood that these investments were commingled. (*See, e.g.*, Statements 43, 52, 64.)

**Distributions Based on a Partial or Modified Tracing Analysis.** Various objectors proposed a partial or modified tracing analysis to determine the net transfer into and out of specific investments. Some argued that any specific funds that can be immediately traceable should be returned to the investors to whom they can be traced. (*See, e.g.*, Statement 64.) Other objectors proposed that the cost of the tracing analysis could be borne directly by some or all of the investors, or suggested that investors could conduct their own tracing analyses. (*See, e.g.*, Statement 69.)

**Giving Investors Control Over the Assets in which They Invested.** Some objectors suggested giving investors in each asset an opportunity to negotiate with the creditors of that asset and, if successful, to take over managing the asset. (*See, e.g.*, Statement 73.) Others proposed allowing groups of investors to take control over the assets in which they invested, subject to a tracing analysis conducted at their own expense. (*See, e.g.*, Statement 69.) Other objectors argued that investors in a specific asset should have exclusive authority to decide how to dispose of that asset. (*See, e.g.*, Statement 74.)

The second broad category of objections includes proposals to distinguish among victims based on the characteristics of the securities they purchased from Wextrust and/or the issuers of those securities. More specifically, those objections fall into the following three sub-categories:

**Distribution Based on Security and Quality of the Investment.** Objectors proposing this approach argue that distributions should be made based on the specific assets or funds in which investors intended to invest. (*See, e.g.*, Statements 1, 31, 39, 40, 41, 77, 82, 98.) Some of these objections propose a two-pronged approach whereby funds obtained through the sale and/or operation of real estate assets would be distributed to the

investors in those funds, but other commingled liquid assets would be distributed *pro rata*. (*See* Statement 22.) Other objectors state that a distribution based on specific investments is also warranted because each investment was made through a separate limited liability company. (*See* Statements 35, 74, 77.)

**Distribution Based on Risk Profile of Investment**. These objections generally state that it was inappropriate to group all investors together for the purposes of distribution because some investors had divergent risk appetites and their investments had different risk profiles. Some of these objections state that a *pro rata* distribution effectively rewards high-risk investors at the expense of prudent investors. (*See* Statements 77, 98.)

**Distribution Based on Nature of Investments.** These objections propose that investors who held GDR, GSPN, and/or promissory note interests should be given favored status in light of their purported status as debt securities holders. In other words, some would propose that such debt holders be treated akin to bondholders in a bankruptcy liquidation, who are granted a preference over those holding only equity interests, such as LLC shareholders in various Wextrust Entities and Affiliates. (*See, e.g.*, Statements 53, 54, 87.)

The Receiver has considered each of the alternatives advanced in those objections. Indeed, all of them were discussed in the Receiver's Plan. (*See* Receiver's Plan at 17-26.)

With respect to the constructive trust proposals, although tracing may be possible for some investors' funds, the Receiver has concluded that such partial tracing should not be applied here, because it would be arbitrary and inequitable. Although there are numerous precedents for tracing, particularly in English and early-American case law, modern federal courts have consistently criticized the use of tracing methods in the context of equity receiverships as arbitrary and unfair, even where, unlike here, it is possible and cost-effective to trace assets to particular victims.[5] The Court has discretion to order a *pro rata* distribution notwithstanding the

---

[5] *See, e.g., 13328 and 13324 State Highway 75 North*, 89 F.3d at 553 (rejecting the application of tracing fictions where funds of fraud victims were commingled, finding that to allow one claimant to better its position over other victims would frustrate equity); *SEC v. Elliott*, 953 F.2d 1560, 1569 (11th Cir. 1992) ("In the context of this receivership the remedy of restitution to various investors seeking to trace and reclaim specific assets as originating with them is disallowed as an inappropriate equitable remedy."); *Quilling v. Trade Partners Inc.*, No. 1:03- CV-236, 2008 WL 4366039, at *3 (W.D. Mich. Sept. 17, 2008) ("In receivership proceedings, tracing principles have been soundly rejected as a basis upon which to accord greater compensation to one class of victim over another"); *see also* 2 DAN B. DOBBS, LAW OF REMEDIES (2d ed. 1993) §§ 6.1(3), 6.1(4). Moreover, the Second Circuit has cautioned against the

availability of such tracing evidence. *See SEC v. Credit Bancorp*, 290 F.3d 80, 89-90 (2d Cir. 2002) (affirming a *pro rata* distribution of estate assets despite evidence that certain assets could be traced to identifiable victims).[6]

As set forth in the Receiver's Plan, the Receiver has concluded that a distribution based on the timing of investments, the nature of investments, or the level of risk investors accepted when making their investments would be unworkable, because it would require highly subjective and post-hoc evaluations of investment risk, would be costly and time-consuming, and could result in protracted litigation that would consume additional estate resources. Moreover, the extent of commingling in this case means that investor funds may never have gone to the investment for which they were intended, thus undermining the logic of a distribution based investors' intended investment. (*See* First Amended Complaint ¶ 3) (Dkt. No. 16.)

The Receiver has concluded that, based on the evidence, the substantial body of case law approving *pro rata* distributions in comparable circumstances, and the Receiver's own balancing of the equities, the *pro rata* method of distribution is far more equitable and practical than any of the proposed alternatives. The SEC concurs. It is well within the bounds of the Court's discretion to adopt this method in this case.

---

imposition of the drastic state law remedy of a constructive trust in federal insolvency proceedings. *See In re Flanagan*, 503 F.3d 171, 180-81 (2d Cir. 2007).

[6] Certain victims have made the novel suggestion that they be permitted to conduct their own tracing analysis, based on Wextrust records. (*See, e.g.*, Statements 69, 73, 74.) Such an effort would not be without costs to the receivership estate, as the expense of providing investors with the data required to conduct such an analysis in usable format could be substantial. Even if a tracing analysis conducted by investors at their own expense were feasible, the results would be biased and unreliable, and would likely result in further expense and delay.

## II.    Treatment of Cash Distributions and Reinvestments

The Receiver's Plan proposes to return to each investor and unsecured creditor a ratable share of his or her gross investment in Wextrust securities, less any cash distributions already received during the life of the investment.  (Receiver's Plan at 7-8.)  The Receiver has received several inquiries and objections from interested parties either challenging or requesting additional information about the formulae the Receiver will use in calculating each victim's *pro rata* share.  After consultation with the SEC, the Receiver carefully considered the various alternative approaches to calculating ratable share amounts propounded in both relevant cases and in the instant objections.  The Receiver's proposed approach is outlined below.

Courts have identified four principal methods used to calculate individual distributions in cases in which *pro rata* distributions are approved to similarly situated victims.  *See generally CFTC v. Equity Financial Group, LLC*, No. 04-cv-1512, 2005 U.S. Dist. LEXIS 20001, *82-84 (D.N.J. Sept. 2, 2005) (hereinafter "*Equity Financial*").  Each of these methods treats periodic cash distributions paid to investors before the appointment of an equity receiver differently.

First, courts may simply ignore the distributions.  (*Equity Financial* at 83.)  In this case, however, in which hundreds of investor victims either received no interim cash distributions or chose to reinvest or "roll over" their distributions into other investments – thereby increasing their exposure to the Wextrust fraud – the Receiver, after consultations with the SEC, has determined that ignoring cash distributions entirely would not be an equitable solution.

Second, courts can order investors to repay all of the cash distributions that they received during the pendency of their investments, and then redistribute the augmented assets of the estate after all repayments are received.  (*Equity Financial* at 83.)  As a theoretical matter, this method might result in a more precise resolution of claims.  However, the Receiver has concluded that it would be unworkable for a variety of practical reasons.  It is likely to be difficult, if not

impossible, to obtain repayment from many of the investors who received distributions. There are a large number of investors throughout the eastern United States and in several foreign jurisdictions. Many of them may not have assets sufficient to pay a judgment. (*See, e.g.*, Statements 3, 43, 45, 47, 52.) Those who do may elect not to pay them, resulting in costly and protracted collection efforts. The time and resources required to administer such a plan would be substantial, resulting in both delays and reductions in distributions to all victims.

Third, courts can adopt what has been termed the "rising tide" approach to making *pro rata* payments. (*Equity Financial* at 82-83.) Under this approach, investors would be permitted to retain their previously received cash distributions, but those amounts would be deducted, dollar for dollar, from the investors' respective *pro rata* shares calculated based on their gross investment amounts. For example, if Investor A had a gross investment in Wextrust of $100,000, received $15,000 in cash distributions from Wextrust before the appointment of the Receiver, and stood to collect a $10,000 *pro rata* distribution payment, Investor A would be excluded completely from any distribution. By contrast, if Investor B had a gross investment in Wextrust of $100,000 but rolled over $15,000 in distributions into other Wextrust investments instead of receiving the money in cash, Investor B would still collect a distribution amount calculated based on his or her initial $100,000 investment. Accordingly, such an approach would tend to favor those investors who chose to roll over their investments rather than receiving interim cash distributions, who in many cases would receive nothing. Moreover, Deloitte has estimated that approximately 45 percent of investors could be faced with the prospect of being excluded from any distribution, assuming a 10 percent *pro rata* percentage.[7]

---

[7] *See* Declaration of John P. Sordillo in Support of the Reply Brief in Support of the Receiver's Proposed Plan of Distribution ("Sordillo Decl.") ¶ 5, filed concurrently herewith. A multiplier of 10 percent was used for estimative purposes only and does not reflect a judgment by the Receiver of the final amount of estate assets that will be available for ultimate distribution to victims.

The fourth method – which the Receiver proposes in this case – is known as the "net investor method."  This method would provide that any cash distributions received by an investor would be subtracted from the total amount invested and the allowable claim would then be based on that net amount.  For example, under the same scenario described above, Investor A, with his $100,000 investment in Wextrust, would receive a *pro rata* distribution payment based upon a net investment amount of $85,000, reduced from $100,000, because of the prior receipt of $15,000 in cash distributions.  In the recent case of *SEC v. Amerifirst Funding, Inc.*, No. 3:07-cv-1188, 2008 U.S. Dist. LEXIS 20044 (N.D. Tex. Mar. 13, 2008), the district court adopted a variation of this approach after evaluating the three alternative methods described above.  The court favored this approach, *inter alia*, because it simultaneously attempted to (1) balance the positions of those investors who received cash distributions and those who did not and (2) include individuals who received cash distributions in excess of their estimated *pro rata* distributions that would have been denied any recovery under the "rising tide" approach.  (*Id.* at *17-20.)

None of the four methods discussed above has addressed the treatment of distributions that were reinvested or "rolled over" into additional investments in the fraudulent scheme.  In an effort to reach a more equitable balance between the treatment of investors who received cash distributions and those who simply rolled over their distributions, the Receiver would propose that the rolled-over amounts also be taken into consideration when calculating each investor's *pro rata* distribution amount in this case.  For that reason, the Receiver and the SEC would propose that the Court adopt the following uniform formula for calculating distributions for investors:

> Pro Rata Share = [(Total Out of Pocket Cash Investment Paid Into Wextrust Scheme) + (Roll-Over Distributions – Cash Distributions)] * Pro Rata Multiplier

The application of this formula is more properly illustrated in the examples below.

**Investor A**:  $1,000,000 total investment, $200,000 roll-over distribution, no cash distribution.
[($1,000,000) + ($200,000 – $0)] * 10%[8] = **$120,000 pro rata distribution**

**Investor B**:  $1,000,000 total investment, $0 roll-over distribution, $200,000 cash distribution.
[($1,000,000) + ($0 – $200,000)] * 10% = **$80,000 pro rata distribution**

**Investor C**:  $1,000,000 total investment, $400,000 roll-over distribution, $300,000 cash distribution.
[($1,000,000) + ($400,000 – $300,000)] * 10% = **$110,000 pro rata distribution**

**Investor D**:  $1,000,000 total investment, $100,000 roll-over distribution, $400,000 cash distribution.
[($1,000,000) + ($100,000 – $400,000)] * 10% = **$70,000 pro rata distribution**

The proposed formula attempts to strike a balance between the interests of investors who received the majority of their prior distributions in cash and those who either received no distributions or who chose (often at the urging of Wextrust employees) to reinvest their distributions in other Wextrust investments.  Accordingly, the Receiver respectfully submits that the net investor approach, as described above, would be the most equitable and practical approach in the circumstances of this case.

---

[8] This multiplier is for illustrative purposes only and does not reflect a judgment by the Receiver of the final amount of estate assets that will be available for ultimate distribution to victims.

### III.   **Wextrust Commodity Funds**

Approximately 40 percent of the objections to the Receiver's Plan were submitted by victims who purchased securities issued by four Wextrust Affiliates that were involved in commodities speculation (collectively, the "Wextrust Commodity Funds").[9]  As discussed below, the Receiver respectfully submits that the objections of those victims ("Commodity Fund Victims") are wholly unsupported by the factual record, applicable case law, and the balance of equities.  However, based on the high level of participation by the Commodity Fund Victims in the distribution plan process, their objections are set forth and analyzed in detail below.

The Commodity Fund Victims object to the Receiver's Plan, request the immediate return of the full amounts of their investments, and advance four principal arguments in support of their position.[10]  First, the Commodity Fund Victims argue that they are not similarly situated with the other Wextrust investors because, unlike the other Wextrust investors, they were not defrauded.  The Receiver will demonstrate that the Commodity Fund Victims are the same as all other Wextrust investors.  Second, the Commodity Fund Victims argue that their funds were segregated and not commingled with the funds of other victims.  The Receiver has already demonstrated that the money in the commodities funds was pervasively commingled.  Third, they argue that Wextrust did not exercise control over the Wextrust Commodity Funds because the actions and corporate identities of Wextrust and the Wextrust Commodity Funds are distinct and unaffiliated.  Fourth, the Commodity Fund Victims argue that this Court improperly included the Wextrust Commodity Funds in the receivership estate in light of the Receiver's management authority with respect to the Funds.  As illustrated below, however, the structure of

---

[9] The Commodity Funds consist of four funds:  the WexTrade Principal Protected Fund I, LLC ("WPP Fund"); WexTrade Diversified Futures Fund I, LLC ("WDF Fund"); WexTrade Principal Offshore Fund I, Ltd. ("WPO Fund"); and WexTrade Diversified Offshore Futures Fund I, Ltd. ("WDOF Fund").

[10] *See, e.g.,* Statements 67, 92.

the Wextrust Commodity Funds imparted control to the Defendants, and the Receiver's authority extends to all Wextrust Entities and Affiliates, including the Wextrust Commodity Funds.

A. <u>The Commodity Fund Victims Are Similarly Situated to the Other Wextrust Victims</u>

The Court has already ruled that investors in the Wextrust Commodity Funds are similarly situated to the other victims. On December 15, 2008, a group of Commodity Fund Victims ("Proposed Intervenors") moved to intervene in this action, pursuant to Fed. R. Civ. P. 24.[11] The Receiver opposed the motion. On January 30, 2009, the Court ruled that the Receiver and the SEC adequately represented the Proposed Intervenors' interests, and that "[t]he position of the Proposed Intervenors is no different from that of the other creditors and victims in this case."[12] (Mem. Decision (Dkt. No. 181) ("Commodity Decision"), at 2.) Pursuant to the law of the case doctrine, there is no reason for the Court to disturb this finding as the Commodity Fund Victims have failed to demonstrate that compelling reasons exist for finding otherwise. *See De Johnson v. Holder*, No. 07-4629, 2009 U.S. App. LEXIS 8118, *9 (2d Cir. Apr. 15, 2009) ("The law of the case doctrine commands that 'when a court has ruled on an issue, that decision should generally be adhered to by that court in subsequent stages in the same case' unless 'cogent and compelling reasons militate otherwise.'") (quoting *United States v. Quintieri*, 306 F.3d 1217, 1225 (2d Cir. 2002)).

The extent of commingling in the Wextrust Commodity Funds, coupled with other evidence of the Defendants' control over the Wextrust Commodity Funds, demonstrates that the Commodity Fund Victims were victims of the same fraud as other Wextrust investors. As a result, the Commodity Fund Victims' funds should be included in the receivership estate and

---

[11] The Proposed Intervenors were eight of the Commodity Fund Victims, some of whom have also objected to the Receiver's Plan individually or through counsel.

[12] The Court's Memorandum Decision was appealed to the Second Circuit and is now at the briefing stage. The Receiver's brief is due on June 1, 2009, and argument will be heard in late summer 2009.

those victims should receive the same treatment (including the same *pro rata* distribution) as other victims.

### 1. The Commodities Laws Do Not Circumscribe the Court's Discretion in an Equity Receivership

A court sitting in equity has broad discretion under the securities laws to place funds under the control of an equity receiver when those funds are shown to have been tainted by a defendant's fraudulent conduct. *See, e.g.*, *SEC v. Merrill Scott & Assoc., Ltd.*, 2:02-cv-39, 2006 U.S. Dist. LEXIS 93247, *17-21 (N.D. Utah Dec. 21, 2006). The Commodity Fund Victims argue that the commodities laws preclude the treatment of their funds as receivership property. Yet, they fail to cite any precedent for their assertion that the Court's discretion is circumscribed by the Commodities Act or any other applicable laws or regulations.

The fact that the Wextrust Commodity Funds sold securities for the purported purpose of speculating in commodities (as opposed to real estate or diamond mining) does not affect the Court's discretion. Indeed, Ponzi schemes involving commodities speculation are no less common than those involving other types of investments, and federal courts frequently appoint receivers and approve plans of distribution in cases brought by the Commodity Futures Trading Commission. There is no statutory or other impediment to a court's discretion to order an appropriate distribution in such cases, including one based on a *pro rata* approach. *See CFTC v. Eustace*, No. 05-2973, 2008 U.S. Dist. LEXIS 11810, *22 (E.D. Pa. Feb 15, 2008) (approving a *pro rata* distribution to similarly situated commodity investors in Ponzi scheme).

In *Credit Bancorp*, victims of a Ponzi scheme similar to the one at issue here attempted to trace and exclude their purportedly identifiable property on the grounds that applicable law provided that Credit Bancorp did not have an ownership interest in the assets in question. The court found this argument unpersuasive:

> Nor does the fact that Credit Bancorp "expressly agreed" and "the applicable law provided" that it would not have an ownership interest in the [investors'] assets distinguish this case. As previously mentioned, the fact that the [investors] might be entitled under other law to recover their assets does not end the inquiry in this equity receivership because equitable concerns may supersede those other rights.

*SEC v. Credit Bancorp, Ltd.*, No. 99-cv-11395, 2000 U.S. Dist. LEXIS 17171, *54-55

(S.D.N.Y. Nov. 29, 2000). Citing the Ninth Circuit's decision in *United States v. 13328 & 13324 State Highway 75 N.*, 89 F.3d 551, 553 (9th Cir. 1996) ("*Real Property*"), as further support, the court also held:

> In *Real Property*, the perpetrator of the fraudulent investment scheme posed as an investment advisor . . . Presumably, an agreement with an investment advisor would not provide the advisor with an ownership interest in his customer's assets – and applicable law would be to the same effect. Yet the [*Real Property*] court denied the investor's request to trace his assets. *Id.*

As in *Credit Bancorp* and *Real Property*, it was well within the Court's equitable discretion to order that funds obtained from the Commodity Fund Victims, which were raised, used, and commingled as part of the Wextrust fraud, remain in the receivership estate. *See also Merrill Scott*, 2006 U.S. Dist. LEXIS at *17-21 (because defendant had "exercised substantial, if not absolute, control" over various commingled investor accounts, those accounts, as well as assets purchased with money from those accounts, were properly subject to the control of the receiver). Moreover, if the Commodity Fund Victims received a full return of their investments, similarly situated investors in other Wextrust securities would take proportionately less. *See SEC v. George*, 426 F.3d 786, 799 (6th Cir. 2005) ("The mere coincidence that the defendants chose the relief defendants (instead of others) to receive funds contributed by other investors in order to delay the discovery of this scheme does not entitle the relief defendants to preferential treatment.").

### 2. The Wextrust Commodity Funds Were Part and Parcel of the Wextrust Ponzi Scheme

In spite of the Commodity Fund Victims' protestations, the simple but unfortunate fact remains – the Commodity Fund Victims are part of the same Ponzi scheme perpetrated by the Defendants against all Wextrust victims. The SEC has alleged, among other things, that the Defendants acted through the Wextrust Entities to fraudulently raise money in various offerings, each of which was purportedly for a particular investment, without disclosing that funds raised were actually being used to pay prior investors in unrelated offerings and to make unauthorized payments to fund the operations of the Wextrust Entities, which were operating at a deficit. (*See* First Amended Complaint ¶ 3) (Dkt. No. 16.) The money raised through the offerings of securities by the Wextrust Commodity Funds fared no better. As they had done countless times before, the Wextrust Defendants used escrowed funds for various purposes and then replaced the raided funds with money stolen from unrelated investors.

In addition, as they had done with their other investment vehicles, Wextrust Capital and its principals used the Wextrust Commodity Funds to secure additional capital from existing investors and to give those investors one more reason to keep their money invested in the larger Wextrust enterprise. In order words, they used the Wextrust Commodity Funds as yet another means in which to attract additional capital to perpetuate their fraudulent scheme. Because these funds were part of the pattern of fraud, the Commodity Fund Victims should be treated the same as all Wextrust investors.

This unified marketing strategy – emphasizing a well-diversified Wextrust portfolio to garner repeat investments from Wextrust victims – is reflected in the composition of the Commodity Fund Victims themselves. Many, if not most, of the Commodity Fund Victims also purchased securities issued by several other (non-commodity) Wextrust Affiliates. For example,

approximately 49 percent of the WDF investors, 56 percent of the WPP investors, 33 percent of the WDOF investors, and 67 percent of the WPO investors held investments in other Wextrust investment vehicles.[13]  Moreover, the WDF investors invested in an average of four other Wextrust securities, and the WPP investors invested in an average of three other Wextrust securities.[14]

To this point, one federal district court in a CFTC receivership involving commingled commodity funds found persuasive the fact that legally distinct investments were marketed together because "it encouraged investors to perceive the funds as part of a whole."  *Eustace*, 2008 U.S. Dist. LEXIS at *22 (approving a *pro rata* distribution to similarly situated victims of a Ponzi scheme); *see also Amerifirst*,  2008 U.S. Dist. LEXIS at *11-13 (ordering a *pro rata* distribution of funds even in the absence of specific instances of commingling because "a pooled distribution is equitable when the separate legal entities were involved in a unified scheme to defraud").  Similarly, the actions of the defrauders to "loan" money back and forth from the Wextrust Commodity Funds and other unrelated Wextrust investment vehicles did exactly that – delayed the detection of, and further perpetuated, the underlying Wextrust scheme.  *See George*, 426 F.3d at 799; s*ee also Bear Stearns Securities Corp. v. Gredd*, 397 B.R. 1, 13 (S.D.N.Y. 2007) (finding that improper "loans" or transfers were in furtherance of the underlying fraudulent scheme and were intended to avoid detection because "the payments . . . were essential to the continuation of the scheme.").  Thus, the Wextrust Commodity Funds were simply one facet of the larger Wextrust Ponzi scheme.

---

[13] *See* Exhibit A & ¶ 7 to the Sordillo Decl., filed concurrently herewith.

[14] *Id.*

B.     The Money in the Wextrust Commodity Funds Was Commingled

Wextrust Capital improperly and illegally used escrowed funds meant for the Wextrust Commodity Funds for non-commodity related business before the breaking of escrow, and it frequently misappropriated money from non-commodity victims to fill the requests of investors seeking to invest in the Wextrust Commodity Funds after the breaking of escrow.[15] This misuse of funds fits the same pattern as that experienced by other investors and, as a result, the Commodity Fund Victims should receive the same treatment as other investors.

At least $2.5 million of the $11.8 million in the WDF Fund (21 percent of the total raised) and $0.67 million of the $3.38 million (19 percent of the total raised) in the WPP Fund came from sources that had no relationship to investors in these two funds. Accordingly, based on its work in analyzing these funds and dozens of other Wextrust investments, Deloitte concluded that the commingling in the Wextrust Commodity Funds fit a consistent pattern, in which the principals of Wextrust would illegally and impermissibly transfer money throughout the entire enterprise without regard to formalities. (*See* Commodity Opposition at 14; Sordillo Declaration in Support of Commodity Opposition (Dkt. No. 158) ¶ 24.)

In turn, the tainted funds from the WDF and WPP Funds were then fed up into the Master Fund,[16] which contained funds from all four Wextrust Commodity Funds – including the offshore WDOF and WPO Funds. Such commingling was sufficient to taint all of the Wextrust Commodity Funds as they now constitute unsegregatable assets from many different investors

---

[15] The factual basis for the Receiver's findings concerning the disposition of Commodity Fund Victim funds are set forth on pages 8-14 of the Receiver's Memorandum of Law in Opposition to the Proposed Intervening Defendants' Motion to Intervene ("Commodity Opposition") (Dkt. No. 154).

[16] As detailed in the Commodity Opposition, the Commodity Funds traded collectively through a "master-feeder" structure. WCM allocated, for trading, a certain percentage of the offering proceeds of each of the four funds. Those funds were fed up to a "master fund" known as WexTrade Master Fund I, Ltd. ("Master Fund"). The master-feeding trading structure in the Master Fund further mixed already commingled money from the WDF and WPP funds with the WDOF and WPO funds.

and many different Wextrust offerings.  *See SEC v. Better Life Club of America, Inc.*, 995 F. Supp. 167, 181 (D.D.C. 1998) (finding that when tainted and non-tainted funds are commingled in an account controlled by the defendant, the entire account becomes tainted and subject to pretrial restraint); *cf. SEC v. Lauer*, No. 03-cv-80612, 2009 U.S. Dist. LEXIS 23510 (S.D. Fla. Mar. 25, 2009) ("The presence of some tainted funds . . . is sufficient to taint all.").  Moreover, in order to prove that the funds were commingled, a court only requires some evidence of commingling; there need not be evidence that the commingling was "systematic."  *Eustace*, 2008 U.S. Dist. LEXIS at *13.  The commingling in the Wextrust Commodity Funds more than satisfies this standard.

### 1.  *The Commodity Fund Victims' Money is Neither "Segregated" Nor "Accounted For"*

The Commodity Fund Victims' argument that the Court improperly included the Wextrust Commodity Funds in the receivership estate is based on the flawed premise that their funds were "segregated" and "accounted for" as of the date the Receiver was appointed.  This argument ignores the facts.  The money sitting in the Wextrust Commodity Funds is tainted because it includes money taken from individuals who did not intend to invest in the Wextrust Commodity Funds.  As a result, the Commodity Fund Victims are similarly situated to other victims of the fraud; they should not receive a distribution of the seemingly identifiable value of their investment because equitable principles dictate that all those from whom the money was misappropriated should be treated equally.

The Commodity Fund Victims lose sight of the fact that the individual defendants are alleged to have misappropriated money from unrelated victims and non-commodity Wextrust investments in order to fund the Wextrust Commodity Funds both before and after the funds broke escrow (and the defendants purportedly "lost control" over the funds).  (*See* Commodity

Opposition at 8-14.)  Instead, the Commodity Fund Victims argue that their funds were all "accounted for," and any Wextrust Commodity Funds that were "borrowed" were "subsequently replenished" by the individual defendants.  (*See, e.g.*, Statement 67.)  Therefore, they argue, their funds were segregated, directly traceable, and should be excluded from the estate as directed by the Third Circuit in *SEC v. Black*, 163 F.3d 188, 196 n.6 (3d Cir. 1998). [17]

In reality, however, these funds were "subsequently replenished" with funds stolen from unrelated, non-commodity fund investors during the time in which the individual defendants exercised unfettered control over the funds.  Thus, the *Black* holding is inapposite here.  As pointed out by the court in *SEC v. Credit Bancorp*, 290 F.3d 80, 89-90 (2d Cir. 2002), when it explicitly distinguished the *Black* holding, the return of particular assets to particular victims has occurred only when "the assets had somehow been segregated in the manner of true trust accounts *and/or had never been placed in the defrauder's control*."  *Id.* (emphasis added).

### 2. *Commodities Regulators Have Not Foreclosed Legal or Regulatory Action*

The Commodity Fund Victims attempt to bolster their claim by arguing that neither the National Futures Association ("NFA") nor the Commodity Futures Trading Commission ("CFTC") has taken action against WexTrade Commodity Managers ("WCM") proves that the money in the Wextrust Commodity Funds was not misused.  The NFA, however, is still in the process of conducting its audit of the Wextrust Commodity Funds and, thus, there is no evidentiary basis from which the Court can conclude that the funds were operated in compliance with the law.  Likewise, the CFTC's enforcement staff is aware of the underlying allegations and the Receiver's proposed treatment of the Wextrust Commodity Funds, and has not objected to

---

[17] The Commodity Fund Victims have also failed to show that the "replenishment" of their misappropriated funds with funds from other Wextrust investors cleansed the tainted funds.  *See Merrill Scott*, 2006 U.S. Dist. LEXIS at *26-27 ("Regardless of the merits of Dr. Powers' theory that an innocent party can cleanse the taint flowing from the use of commingled funds, that theory has no meaningful application here, where tainted money was used in an attempt to cure a taint.").

the Receiver's Plan.

It is premature to conclude that this definitively proves that there was "no wrongdoing alleged with respect to the commodities funds." For example, it is undeniable that Wextrust Securities was obligated to ensure that the escrowed funds were not used for *any* unauthorized purpose while in escrow. There is substantial evidence that WCM and its manager, Paul Adrian, knew or should have known of the improper use of the escrowed funds and neither stopped the improper activity nor disclosed the improper use of the funds to the Commodity Fund Victims. *See* Exhibit B to Schmeltz Decl. (attaching copy of email from former senior investment analyst for the Wextrust Commodity Funds stating that Paul Adrian had asked defendant Byers about the use of the escrowed funds "to pay bills," but that Paul Adrian did not stop Byers and continued raising money for the Wextrust Commodity Funds despite having knowledge of the improper use of the funds while in escrow). In addition, despite his fiduciary obligations to the Commodity Fund Victims, Paul Adrian did not: (1) notify either the CFTC or the NFA of obvious commingling among these accounts; or (2) take steps to wrest control of the Wextrust Commodity Funds, while they were in escrow, from Joseph Shereshevsky, who was not a principal in the fund and should not have had control over those funds. Accordingly, the Commodity Fund Victims are in the same position as other Wextrust investors: Wextrust employees neither notified any of them of, nor prevented, the commingling of their funds with other investments. As a result, the Commodity Fund Victims should be treated the same as all other Wextrust investors.

C.    The Structure of the Wextrust Commodity Funds Imparted Control to the Defendants

The third argument advanced by most Commodity Fund Victims is that the Wextrust Commodity Funds purportedly were wholly separate and distinct from the larger Wextrust enterprise. Not so. Instead, the management and operations of the Wextrust Commodity Funds were thoroughly intertwined with those of the Wextrust Entities and Affiliates – as is evident by the manner by which Wextrust both governed and marketed the Wextrust Commodity Funds.

First, as detailed above, Wextrust clearly exercised control over the funds through its misappropriation of escrowed funds. Second, as described in great detail in the Commodity Opposition, although it is true that WCM directly managed the Wextrust Commodity Funds, Wextrust Capital – one of the named defendants – had the exclusive right to manage WCM. (Commodity Opposition at 5.) Moreover, Steven Byers – one of the named defendants – was a Manager for both WCM and Wextrust Capital. In that position, Byers had authority to determine who invested in the funds, the amount of their investments, the manner in which the funds operated, the Commodity Trading Advisors ("CTAs") that were hired and the percentage each would receive, and the timing and amounts of disbursements. Wextrust Capital also accepted the subscription materials from investors, including their investment, and processed these materials in the Norfolk, Virginia office of Wextrust Securities, LLC.

Third, the establishment and subsequent marketing of the funds themselves further belies the Commodity Fund Victims' contention that the funds were wholly distinct from the larger Wextrust operation. For example, a December 5, 2006 Wextrust Capital press release makes it abundantly clear that the Wextrust Commodity Funds were to be marketed as simply one component of Wextrust's diversified approach to soliciting investors:

Wextrust Capital, LLC, a globally diversified private equity and specialty finance company, announced today that it has selected Paul J. Adrian as fund manager. In his new role, Mr. Adrian *will lead the development of Wextrust Capital's new commodity based investment funds* . . . "Paul is a seasoned veteran with a wealth of trading experience," said Steven Byers, chief executive officer of Wextrust Capital. "*We are pleased to have him on board as we create new investment opportunities for accredited and qualified investors who are seeking new and innovative ways* to put their capital to work."

Press Release, Marketwire, Wextrust Capital Names Paul J. Adrian Fund Manager (Dec. 5, 2006) (emphasis added).[18]

In the same press release, Paul Adrian, the WCM manager now claimed to have managed the Wextrust Commodity Funds "in isolation" from the rest of the Wextrust enterprise, stated:

"Wextrust Capital has a proven track record of protecting its clients' assets and delivering a superior return-on-investment through its diverse portfolio of principal investments," said Paul Adrian. "*I look forward to working with Wextrust Capital's talented management team in developing commodity-based investment funds* that provide portfolio diversity and performance uncorrelated to traditional equity and bond markets."

*Id.* (emphasis added).

Based on the evidence described above, Wextrust Capital and its principals exercised both *de jure* and *de facto* control over the Wextrust Commodity Funds. As a result, the Commodity Fund Victims were in the same position as other Wextrust investors and should be treated similarly with respect to the plan of distribution.

D.   The Receiver's Authority Extends to All Wextrust Entities and Affiliates, Including the Wextrust Commodity Funds

Some of the Commodity Fund Victims, represented by the law firm of Henderson & Lyman ("H&L Victims"), argue that, "[b]y standing in the shoes of WCM, the Receiver may do only what WCM could do. WCM could assert no claim to the holdings of the [Wextrust

---

[18] A copy of this Press Release has been attached as Exhibit C to the Schmeltz Decl. A copy of the release is also available at http://www.marketwire.com/press-release/Wextrust-Capital-Llc-700551.html.

Commodity Funds], so the Receiver should not be permitted to do so." (Statement 92 at 9.) [19] As a result, these investors plead, the Wextrust Commodity Funds should not even be a part of the receivership estate. Because these investors misread the law and the facts, however, it is plain that the Receiver has authority over the Wextrust Commodity Funds and can direct their distribution upon proper approval by the Court.

First and foremost, the H&L Victims assume, based on an inapposite case, that the Receiver could assert *only* claims on behalf on WCM, and not on behalf of the *dozens* of additional Wextrust Entities and Affiliates over which the Receiver exercises management authority – of which WCM is only one. This argument is similar to the argument made by Lawrence Costa, a Wextrust investor who attempted to intervene in this case but whose motion was denied by this Court's Memorandum Decision of January 30, 2009 (Dkt. No. 182) ("Costa Decision"). Costa cited *Eberhard v. Marcu*, 530 F.3d 122, 133-35 (2d Cir. 2008), in arguing that "a Receiver cannot have more authority than the entity over which he assumes control." (Costa Decision at 4.) The Court held that Costa had misread the *Eberhard* case, and that the case was simply "about a receiver's standing to bring a certain claim on behalf of a corporation over which he was appointed." (*Id.* at 5.) Here, the Receiver is not suing on behalf of WCM, and thus the Receiver's standing is not implicated here. Accordingly, H&L Victims' analogy to *Eberhard* is equally misplaced.

Moreover, in *Eberhard*, the district court had only appointed the receiver for the individual defendant – not for the related corporations that had been manipulated by the individual defendant. By contrast, in this case, the Receiver has been appointed specifically for

---

[19] In opposition to the H&L Victims' motion to intervene, the Receiver submitted evidence that both Henderson & Lyman and its co-counsel, Tagliaferro & LoPresti, should be disqualified from these proceedings. (*See* Commodity Opposition at 22-25.)

all Wextrust Entities and Affiliates – not solely for the individual defendants or WCM.

Accordingly, now that the individual defendants have been removed from their management

positions, the Receiver has standing to bring state law fraudulent conveyance claims on behalf of

the defrauded affiliated corporations for the ultimate benefit of the victims of this fraud.  *See,*

*e.g., SEC v. Shiv*, 379 F. Supp. 2d 609 (S.D.N.Y. 2005) (involving a receiver appointed for the

corporations manipulated by the individual defendants who had standing to sue on behalf of the

corporations under state law fraudulent conveyance and constructive trust theories); *accord*

*Scholes v. Lehmann*, 56 F.3d 750 (7th Cir. 1995) (same).

Here, the Receiver stands in the shoes of all Defendant Wextrust Entities and Affiliates,

and thus can bring claims for those entities whose assets were commingled and misappropriated

by the individual defendants to fund a portion of the Wextrust Commodity Funds at issue.

Accordingly, if the Wextrust Commodity Funds were not already in the estate – which they are –

the Receiver would have valid claims against those funds, standing in the shoes of the defrauded

Wextrust Entities and Affiliates.  Indeed, in *SEC v. Credit Bancorp, Ltd.*, 2000 U.S. Dist. LEXIS

17171 (S.D.N.Y. 2000), the court rejected nearly identical arguments:

> The [investors] attempt to avoid the import of the case law governing federal
> equity receiverships by contending that the Receiver merely stands in the shoes of
> Credit Bancorp.  Therefore, the argument goes, the Receiver has no better
> grounds to prevent them from recovering their securities than would Credit
> Bancorp and, pursuant to the credit facility agreements, Credit Bancorp would
> have no such grounds.  This argument is another variation on the [investors']
> attempt to have their claims considered in isolation from those of the other
> customers.  However, this is not a one-on-one contest between the [investors] and
> the Receiver.  Rather, this is a case in which numerous victims of a fraud have
> competing claims to a limited receivership *res*.  The relief sought by the
> [investors] would come at the direct expense of the other Credit Bancorp victims.

*Id*. at *61-62.[20]

---

[20] *Cf. Teltronics, Ltd. v. Heyman*, 649 F.2d 1236, 1239 (7th Cir. 1981) (rejecting, under Illinois
receivership law, argument that receiver takes no better title to property than person subject to
receivership, since receiver is empowered to manage the claims of defrauded rightful owners).

This Court's Memorandum Decision of December 17, 2008 (Dkt. No. 148) ("Creditors Committees Decision") echoed these same principles when the Court found that the "Receiver is charged with protecting the investments of <u>all</u> the Wextrust Entities' investors. Movants, on the other hand, are only concerned with recouping their own investments, presumably even at the expense of other investors." (Creditors Committees Decision at 7) (emphasis in original.)[21] Again, this is precisely the situation here – the Commodity Fund Victims would prefer to have their claims considered in isolation from the remaining Wextrust investors, despite equity jurisprudence to the contrary. Here, too, however, the Commodity Fund Victims should be treated equally with the hundreds of other victims of the same Wextrust fraud.[22]

---

[21] The Creditors Committees Decision, which is currently on appeal at the Second Circuit, ruled on the requests of two groups of Wextrust investors calling themselves the "International Ad-Hoc Committee of Wextrust Creditors" and the "International Consortium of Wextrust Creditors" (collectively, the "Committees"). In the Creditors Committees Decision, the Court granted in part and denied in part the relief requested by the Committees. First, the Court found that, pursuant to its *in rem* jurisdiction and its equitable discretion to administer the assets subject to the Receiver Order, it had the authority to preliminarily enjoin non-parties from filing involuntary bankruptcy petitions against the Wextrust Entities and Affiliates. Second, given the size and complexity of the Wextrust enterprise, the Court held that it would undermine the effectiveness – and indeed the very purpose – of the receivership for the District Court to permit such filings. Finally, the Court modified the Receiver Order to permit any party or non-party – including the Committees – to apply to the Court on three days' notice for an order seeking permission to file an involuntary bankruptcy petition upon a showing that such a petition is appropriate and would benefit the receivership estate. To date, no such application has been made.

[22] The remaining cases cited by the H&L Victims are equally inapposite and warrant only brief treatment. *See, e.g., CFTC v. Probber Int'l Equities Corp.*, 504 F. Supp. 1154, 1160 (S.D.N.Y. 1981) (property was in a series of four safety deposit boxes and consisted of identifiable municipal bonds, cash, and gold coins that were completely segregated in the safety boxes at all times, as opposed to being pervasively commingled with the funds of unrelated non-commodity Wextrust investors); *Boston Trading Group, Inc. v. Burnazos*, 835 F.2d 1504 (1st Cir. 1988) (case examined and interpreted the rights of a *bankruptcy receiver* under the *Massachusetts Fraudulent Conveyance Act* and had no bearing on whether a receiver, under the Court's equity power, could pursue claims on behalf of entities over which he was given specific authority).

E.     Conclusion

As the discussion above makes plain, the Commodity Fund Victims were in the same position as the other Wextrust investors and, under these legal principles, should be treated similarly.  Indeed, the Commodity Fund Victims were subjected to the same pattern of fraud as other investors, their money was neither "segregated" nor "accounted for," and the defrauders had control over the Wextrust Commodity Funds just as they did other Wextrust investments.  In addition, the Court gave the Receiver authority over all Wextrust Entities and Affiliates, including the Wextrust Commodity Funds, meaning the Receiver has the right to exercise control over the Wextrust Commodity Funds.

It is important to keep in mind that, given the nature of the Wextrust scheme, each investor has certain unique facts that could be emphasized to attempt to elevate his or her claim in equity.  The Commodity Fund Victims are no exception.  Understandably, they seek to accentuate these differences.  Upon further analysis, however, it becomes very clear that this Court had it right in holding that the Commodity Fund Victims' position is "no different from that of the other creditors and victims in this case."  (Commodity Decision at 2.)  Not only were the management and the operations of the Wextrust Commodity Funds inextricably intertwined with the larger Wextrust scheme, but the Wextrust Commodity Funds were similarly marketed, pervasively commingled, and looted in the same manner and pattern as the other, unrelated Wextrust Entities and Affiliates.

**IV.    Interested Parties Requesting Additional Special Consideration**

The primary conclusion reached by the Receiver and his advisors in formulating a plan of distribution was that Wextrust investors and unsecured creditors should be compensated on a *pro rata* basis in light of the pervasive commingling of the Wextrust Entities and Affiliates and the similarly situated relationships between Wextrust and these victims.  Although certain investors have argued for a preference in equity based on their financial circumstances or the nature and quality of their investments, as demonstrated in Sections I and III above, the Receiver respectfully submits that such disparate treatment is not warranted in this case.

Unlike Wextrust investors and unsecured creditors, however, secured creditors such as (1) those holding perfected liens on collateral and (2) those holding partnership interests in which they occupy the position of tenants in common with Wextrust Entities or Affiliates are not similarly situated with respect to their relationships with Wextrust.  As discussed in the Receiver's Plan, those secured creditors hold debts secured by Wextrust assets.  In contrast to the other victims, who are primarily equity investors, the secured creditors have liens, which were granted and perfected under state law, that constitute protected property interests in those assets. (Receiver's Plan at 29-30.)

By virtue of their security interests, the secured creditors are entitled to payment out of the proceeds of sales of collateral.  Because the Receiver is in the process of selling or otherwise disposing of properties pursuant to the Receiver's Plan for Management of the Wextrust Real Estate Portfolio (Dkt. No. 172) ("Plan of Management"), secured creditors will be paid before other victims, and will receive a higher return.  Thus, the secured creditors will recover a significantly higher percentage of their losses in a more expedited fashion than investors and unsecured creditors.  In order to balance the equities and mitigate the disparity between the treatment of secured creditors and other victims, the Receiver's Plan proposes that the Court

restrict any deficiency claims of these secured creditors to ensure that the secured creditors can only recoup their losses against the property-specific limited liability companies to which they made loans, and not against the Wextrust receivership estate as a whole.

The Receiver has obtained releases from several secured creditors in connection with sales and relinquishments of Wextrust real estate properties. Those releases, many of which were pursuant to deed in lieu of foreclosure agreements with mortgage lenders, have reduced the receivership estate's unsecured liabilities by approximately $11.4 million to date. (*See* Third Interim Report of Receiver at 6-12.)[23] The Receiver's Plan would, in effect, require other secured creditors similarly to release the estate from the unsecured portion of their claims.

Certain secured creditors and others have objected to the Receiver's Plan. Their specific arguments are addressed below. The vast majority of these objections either challenge the inherent fairness of the Receiver's Plan or the Court's legal authority to implement such an approach. As discussed below, however, the Court's authority to adopt this proposal, or any other method of distribution, derives from the fact that, in the exercise of its equitable discretion, the Court may use summary proceedings to allow, disallow, and subordinate the claims of interested parties. Such proceedings have been approved as an appropriate and efficient adjudication mechanism, so long as potential claimants are afforded an opportunity to be heard and present claims, which they have in this case.[24]

---

[23] The Third Interim Report of Receiver is being filed simultaneously with this Response.

[24] *Elliott*, 953 F.2d at 1567 ("[A] district court does not generally abuse its discretion if its summary procedures permit parties to present evidence when the facts are in dispute and to make arguments regarding those facts."); *McFarland v. Winnebago South, Inc.*, 863 F. Supp. 1025, 1034 (W.D. Mo. 1994) ("[T]he receivership court has the power to use summary procedures in allowing, disallowing, and subordinating claims of creditors, so long as creditors have fair notice and a reasonable opportunity to respond."); *FDIC v. Bernstein*, 786 F. Supp. 170, 177 (E.D.N.Y.) ("A district court has extremely broad discretion in supervising an equity receivership and in determining the appropriate procedures to be used in its administration."); 13 Moore's Federal Practice (3d ed.) § 66.06[4][b] ("The powers of the courts include the allowance, disallowance, and subordination of the claims of creditors.").

Indeed, this Court may adopt any proposed plan of distribution that is "fair and reasonable."[25] Here, the Receiver is proposing an equitable plan whereby defrauded investors and unsecured creditors share in any recovery while simultaneously ensuring that the secured creditors receive the value of their collateral and may pursue deficiency claims, if any, against the property-specific limited liability companies with whom they contracted initially. Accordingly, although the Court has broad discretion to approve any plan of distribution, the Receiver respectfully submits that the approach outlined in the Receiver's Plan strikes an appropriate balance among the legitimate claims of all interested parties in this case.

A.     TCF National Bank

TCF National Bank ("TCF") filed an objection to the Receiver's Plan dated April 24, 2009 (Dkt. No. 284). TCF is a lender, having made an approximately $11.1 million loan (the "TCF Loan") to Peoria Office Holdings, LLC on December 10, 2007, which was secured by a mortgage lien on an office building located in Peoria, Illinois (the "Peoria Property").[26] Payment of the TCF Loan was guaranteed by Defendant Byers; Matthew Gurvey, a former employee of Wextrust Capital; and Wextrust Equity Partners, LLC. Peoria Office Holdings has historically paid debts as they have come due and there are no existing defaults on the TCF Loan. Based on a valuation of the Peoria Property by Hilco Real Estate, the Receiver does not believe that TCF is undercollateralized on the Peoria Property, nor does TCF appear to allege otherwise in its

---

[25] *See Wang*, 944 F.2d at 85; *Credit Bancorp, Ltd.*, 290 F.3d at 91; *cf. Official Committee of Unsecured Creditors of WorldCom, Inc. v. SEC*, 467 F.3d 73, 84 (2d Cir. 2006) ("[w]e have long understood that the SEC's charge to enforce the securities laws carries with it the discretion to determine how to distribute recovered profits among injured investors.").

[26] Peoria Office Holdings is an entity owned and controlled by the Wextrust Entities. Specifically, Peoria Office Investors is the sole member in Peoria Office Holdings. Wextrust subscribed equity investments for Peoria Office Investors; individual investors hold 70 percent of the membership interests in Peoria Office Investors. The remaining 30 percent equity interest is held by Peoria Office Ventures, which is owned by Wextrust Equity Partners ("WEP") and Gracie Capital, Inc. (an entity owned by Matthew Gurvey). WEP is one of the named Wextrust Entities.

objection.

The Peoria Property is currently being marketed for sale pursuant to the Plan of Management.[27]  If and when the property is sold, TCF will be paid first out of the proceeds of its collateral.  If TCF has a deficiency claim, the Receiver's Plan proposes that the Court deny any further payment to secured creditors out of the general assets of the Wextrust receivership estate, in light of the fact that TCF will recoup a much higher percentage of its loss in a more expedited fashion than investors and unsecured creditors.  Thus, TCF, in equity, should also share some of the injury resulting from the Wextrust fraud.

TCF's objection focuses upon four points of contention with the Receiver's Plan: (1) neither the Amended Order Appointing Temporary Receiver (the "Receiver Order") (Dkt. No. 36) nor the Order Freezing Assets (the "Freeze Order") (Dkt. No. 3) bestows upon the Receiver the type of liquidation or distribution authority sought in the Receiver's Plan; (2) the Receiver's Plan is in contravention of Second Circuit precedent; (3) the Receiver's Plan improperly attempts to emulate a bankruptcy liquidation process without submitting to the jurisdiction and oversight of the bankruptcy courts; and (4) the Receiver's Plan seeks to impair secured claims and strip TCF of its right to pursue claims under the guarantees.  Each of these concerns is ill-founded.

First, TCF asserts that neither the Receiver Order nor the Freeze Order permits the actions described in the Receiver's Plan.  In actuality, the Receiver Order expressly contemplates such a plan and the Freeze Order anticipates the approval of a plan of distribution.  Furthermore, it is customary for equity receivers to propose plans of distribution in SEC receivership cases.[28]

---

[27] As discussed in the Plan of Management, the nature of assets in the receivership estate are such that continuing to hold them indefinitely risks further depreciation in value as result of operational costs and market risks.  The Receiver is aware of no objections to the conclusions, principles, and procedures set forth in the Plan of Management.

[28] *See, e.g., SEC v. Credit Bancorp, Ltd.*, 290 F.3d 80, 88-90 (2d Cir. 2002) (affirming approval of plan of distribution proposed by receiver); *SEC v. Forex Asset Management LLC*, 242 F.3d 325, 328 (5th Cir.

Second, TCF asserts that certain Second Circuit decisions prevent the Receiver from implementing the Receiver's Plan, and cites *SEC v. American Board of Trade*, 830 F.2d 431 (2d Cir. 1987) and *Eberhard v. Marcu*, 530 F.3d 122 (2d Cir. 2008) for this proposition. Contrary to TCF's assertion, the Second Circuit has recognized the need for liquidation by a receiver in appropriate circumstances. In *SEC v. Credit Bancorp Ltd.*, 290 F.3d 80, 88 (2d Cir. 2002), for example, the Second Circuit approved the partial liquidation of the assets of a corporate defendant in a Ponzi scheme.[29]

In other jurisdictions, courts have permitted liquidation by SEC receivers on similar grounds. For example, in *SEC v. TLC Investments and Trade Co.*, 147 F. Supp 2d 1031 (C.D. Cal. 2001), the Central District of California ordered pre-judgment liquidation of receivership assets. Its reasons for doing so are instructive for a number of reasons. First, it held that "liquidation at this time, prior to entry of judgment, is appropriate because the evidence presented to the Court demonstrated that the TLC entities' liabilities were greater than their

---

2001) ("Prior to approving the Receiver's distribution plan, the district court sought objections to the plan . . . ."); *SEC v. Lund*, 570 F. Supp. 1397, 1404 (C.D. Cal. 1983) ("The receiver or trustee, in addition to handling other duties if necessary, is given the task of locating those members of the public who were injured by the illegal activity and to pay each injured party an amount determined by the trustee to be fair and equitable."); 16 Fletcher Cyc. Corp § 7931 (2008) ("*Upon proper application*, notice to the parties, and proof, the court may order distribution of the assets in the hands of a receiver to the parties entitled to receive them.") (emphasis added).

[29] In several cases, the Second Circuit has expressed in *dicta* the concern that it may be more appropriate to conduct the liquidation of an insolvent company in a bankruptcy case rather than in a district court receivership. *See, e.g., Eberhard*, 530 F.3d at 132; *Am. Bd. of Trade*, 830 F.2d at 436; *Lankenau v. Coggeshall & Hicks*, 350 F.2d 61, 63 (2d Cir. 1965) ("[R]eceiverships ancillary to SEC actions against brokers or broker-dealers should not be continued, in a case involving insolvency, beyond the point necessary to get the estate into the proper forum for liquidation – the bankruptcy court."). In each of those cases, despite the Second Circuit's misgivings, it nonetheless affirmed the district court's order authorizing liquidation by the receiver. Whatever persuasive force the dicta in those cases may have, it has been called into question by the Second Circuit's opinion in the *Credit Bancorp* case, a case which squarely addressed the issue of whether the receiver should liquidate the estate's assets. The Second Circuit in *Credit Bancorp*, 290 F.3d at 90, held – as part of its *ratio deciendi* – that an SEC receivership was an insolvency proceeding. Courts in this district have followed that decision in authorizing liquidations by SEC receivers. *See SEC v. Shiv,* 379 F. Supp. 2d 609 (S.D.N.Y. 2005).

assets and because ongoing management alone will drain money out of the estate, money that otherwise could be returned to investors." (*Id.* at 1036.)  Second, the court in *TLC* held that "in the unique circumstances of this case, there is such a close connection between the actions necessary for ongoing oversight of the Receivership's assets and for liquidation of those assets that it is appropriate for the Receiver, rather than a bankruptcy court, to carry out the liquidation." (*Id.*)  In other words, liquidation was appropriate given that the purpose of a receivership was not to engage in an on-going business, but rather to collect and preserve assets for ultimate distribution to adversely affected investors and creditors.

This approach is consistent with the strong modern trend in Second Circuit and other federal courts to approve *pro rata* distributions to similarly situated victims by relying on the equitable maxim that "equality is equity." *See, e.g., Credit Bancorp*, 290 F.3d at 89; *United States v. 13328 and 13324 State Highway 75 North*, 89 F.3d 551, 553-54 (9th Cir. 1996) (approving like distributions to similarly situated parties).  By contrast, if the case were moved into bankruptcy, certain groups of victims would be granted a preference, leaving other less fortunate victims who had the mere fortuity of investing in less successful projects with little or no recovery.  Such an outcome has been roundly criticized as inequitable in the context of Ponzi schemes with similar pervasive commingling.  *See United States v. Durham*, 86 F.3d 70, 72 (5th Cir. 1996); *Credit Bancorp*, 290 F.3d at 89; *Elliott*, 953 F.2d at 1570; *SEC v. Capital Consultants, LLC*, 397 F.3d 733, 738-39 (9th Cir. 2005) ("[E]quity demands equal treatment of victims in a factually similar case.").

TCF states that "the filing by the Receiver of the Distribution Plan marks a point of departure where the administration of this 'estate' should be placed in the hands of the Bankruptcy Court."  TCF appears to believe that the liquidation of legal entities used in

perpetrating a complex Ponzi scheme requires the immediate commencement of bankruptcy proceedings. This belief is erroneous, and the authorities discussed above do not reach any such conclusion. The liquidation of assets by a receiver under the guidance of a federal district court may be entirely appropriate depending on the circumstances. Bankruptcy proceedings would impact the estate negatively as the circumstances of this case dictate a clear preference for the use of equity rather than bankruptcy for the actual sale or other liquidation of the assets at issue in this case.

Third, TCF asserts that the Receiver is seeking to implement what is effectively a bankruptcy proceeding but without the oversight of the bankruptcy court. The Receiver, assisted by his advisors, has analyzed whether bankruptcy would be an appropriate course of action. At this point, the Receiver (who the Court has empowered to conduct an analysis of whether bankruptcies should be filed) has determined there is no reason to commence bankruptcy for any of the Wextrust properties.

There are clear reasons why the commencement of bankruptcy would not be favorable to the investors or unsecured creditors who are the victims of the Wextrust fraud. At a minimum, one or more bankruptcy proceedings would mean increased transaction costs which would hamper the administration of the Wextrust estate as a whole and dilute recoveries for creditors and investors. *See, e.g., In re O'Neil Village Personal Care Corp.*, 88 B.R. 76, 80 (Bankr. W.D. Pa. 1988) (finding that because management would not be returned to the former principals who had admitted wrongdoing, if a bankruptcy trustee were to replace the existing equity receiver, it would be "as clear a case of duplicative effort" as the court could imagine as the case was "already under the control of the receiver"). Indeed, many of the Wextrust Entities and Affiliates do not appear to generate sufficient cash flow to pay the administrative expenses and other costs

commonly incurred in a bankruptcy proceeding. The limited assets appear sufficient to satisfy the cost of operating the individual businesses in this receivership, but not the additional costs and expenses associated with any bankruptcy filing.

A clear loser in any bankruptcy proceedings would be investors, who, as a result of the bankruptcy priority scheme, may come last in the payment of distributions made by the estate. As a result, those arguably most harmed by the actions of the Wextrust principals would likely find themselves without any recovery or recourse. Moreover, TCF would derive little if any benefit from a bankruptcy petition. As noted above, Wextrust is not in default of its debt-service obligations to TCF. As also noted above, TCF appears to be a fully secured creditor. Here, a bankruptcy filing for Peoria Office Holdings would almost certainly result in substantial delays in the administration and liquidation of assets and distributions to interested parties.

Fourth, TCF asserts that the Receiver's Plan seeks to impair secured claims and strip secured creditors of their right to pursue claims against guarantees in a manner not permitted by law. The Receiver's Plan proposes that secured creditors have recourse against specific collateral and must be paid out of the proceeds of that collateral. As a result, the secured creditors will generally recover a much larger percentage of their claims than unsecured creditors or the defrauded investors. In an effort to balance the equities, the Receiver has proposed that the Court restrict any deficiency claims of these secured creditors to ensure that they can only be recouped against the property-specific limited liability companies to whom they lent capital instead of the receivership estate as a whole. TCF argues that there is no authority to do so, but this Court is granted broad discretion to subordinate the claims of creditors and implement any plan of distribution it sees fit as long as it is "fair and reasonable." *See Wang*, 944 F.2d at 85.[30]

---

[30] Although recognizing that it is not possible to predict with any certainty what TCF will recover in this case, it should be noted again that, at present, TCF appears to be fully secured in its underlying collateral.

Although the Court has the authority in the exercise of its equitable discretion to adopt any plan, the Receiver respectfully submits that the Receiver's Plan provides the fairest, most reasonable, and most equitable approach under the circumstances of this case.

## B. Q&Q Limited Partnership

Q&Q Limited Partnership ("Q&Q") submitted an objection to the Receiver's Plan via a letter addressed to the Receiver dated April 24, 2009. (*See* Statement 66.) In July 2008, Q&Q extended a $1.5 million bridge loan to Wextrust Equity Partners, LLC ("WEP") for the stated purpose of enabling WEP to close on the acquisition of property in Corinth, Mississippi by Corinth Industrial Holdings, LLC. Corinth Industrial Investors, LLC is the sole member of Corinth Industrial Holdings and is managed by Corinth Industrial Managers, LLC. In order to secure its obligation, Q&Q received a pledge of all of WEP's membership interests in and to Corinth Industrial Investors and Corinth Industrial Managers, as well as a personal guaranty from Defendant Byers. As reflected in Q&Q's objection, it appears that Q&Q was either misled by Byers and/or failed to conduct proper due diligence regarding WEP's interests in Corinth Industrial Investors.[31]

In reality, although WEP owns 100 percent of Corinth Industrial Managers, it owns only an indirect minority interest in Corinth Industrial Investors. Specifically, WEP owned 80 percent of Corinth Industrial Ventures, LLC, which in turn owned 25 percent of Corinth Industrial Investors. The remaining 75 percent ownership interest in Corinth Industrial Investors is held by individual Wextrust investors through equity subscriptions. Further, based on representations

Recognizing the principal that TCF, as a creditor, is only entitled to recover the full amount of its obligation, irrespective of the source, it should matter little if that recovery stems from the sale proceeds derived from its collateral as opposed to a *pro rata* distribution for claims against WEP.

[31] Counsel for the Receiver, in prior discussions, requested written correspondence and other loan-related materials from Q&Q in order to better ascertain whether Q&Q had been defrauded. To date, no such materials have been produced, although it would not alter the Receiver's conclusions set forth herein.

from Q&Q, the majority of the Q&Q loan was supposed to be used for the purchase of realty by Corinth Industrial Holdings, with the remainder to be held in escrow for purposes of an interest payment due to Q&Q. Based on Wextrust records, approximately $1.038 million of the Q&Q loan was used as intended. The remainder was used to pay operating expenses for Wextrust Capital. In short, Q&Q appears to have suffered from the same type of fraud and misrepresentations affecting a majority of the Wextrust investors.

The Receiver's Plan calls for a *pro rata* distribution to investors and unsecured creditors, which is appropriate in this situation because it meets both prongs of the test established in *SEC v. Credit Bancorp*, 290 F.3d 80, 89-90 (2d Cir. 2002). Here, there appears to have been commingling of Q&Q's loan by and among the Wextrust Entities and Affiliates as proceeds expressly designated for the purchase of property and repayment of a loan were, instead, used for general administrative expenses of Wextrust Capital.[32]

Q&Q maintains that a *pro rata* distribution is not equitable as applied to its situation. Specifically, Q&Q argues that such distribution is not appropriate because (1) the loan funds provided by Q&Q were never commingled with the funds of defrauded investors; (2) WEP closed on the project for which the loan was secured shortly after Q&Q made the loan for this specified purposed; and (3) the funds used to purchase the Corinth property came from two distinguishable sources, the bank and Q&Q itself.

The situation presented by Q&Q, however, aptly illustrates why a *pro rata* distribution is appropriate in this case. Q&Q has two possible remedies, and neither of them elevates it above

---

[32] As noted in the Receiver's Plan, the Receiver engaged Deloitte to conduct a preliminary analysis assessing whether it would be feasible to use a tracing method, which would essentially seek to tie certain assets to certain victims. Deloitte's findings led the Receiver to conclude that a complete tracing analysis would be prohibitively difficult, time-consuming, and expensive. (Receiver's Plan at 8.) Additionally, limited investigations in the context of responding to objections to the Receiver's Plan, such as Q&Q's, have further borne out that conclusion.

the other victims. First, Q&Q can proceed with a claim against WEP based on default of the note. This would give Q&Q a general, unsecured claim for $1.5 million against WEP, and Q&Q would have the same status as the numerous investors and unsecured creditors who are also holding claims against the Wextrust Entities and Affiliates. Second, the Court can allow Q&Q to foreclose on its collateral, giving WEP's ownership interests in Corinth Industrial Managers and Corinth Industrial Investors to Q&Q. This would make Q&Q an equity investor in the Wextrust entities – again with a claim in the amount of $1.5 million, and Q&Q would once again be similarly situated with the other Wextrust investors and creditors. In either of these scenarios, there is no reason for Q&Q to be treated differently than any other victim, and the *pro rata* distribution proposed by the Receiver's Plan would be most appropriate.

In the Receiver's judgment, it would be inequitable to elevate Q&Q over the claims and interests of other victims who have similarly suffered harm. (*See* Receiver's Plan at 10 (citing *SEC v. Elliott*, 953 F.2d 1560, 1570 (11th Cir. 1992))). That some of Q&Q's proceeds may be traced more readily than those of the other victims should not permit Q&Q to be given better treatment than another victim. As noted in the Receiver's Plan, *pro rata* distribution avoids the inequity of some victims recovering more because of the fact that there are insufficient records to trace some victims' funds to after-acquired property. (Receiver's Plan at 10.) Finally, the fact that some of Q&Q's funds can be traced because they were used shortly before Byers was apprehended does not entitle Q&Q to special treatment.[33]

---

[33] As noted above, courts have consistently criticized the use of tracing methods in the context of equity receiverships as arbitrary and unfair, and such criticism persists even when it is both possible and cost-effective to trace certain assets to particular investors. *See, e.g., Elliott*, 953 F.2d at 1569.

C.    Broadway Bank

Broadway Bank filed an objection dated April 24, 2009 (Dkt. No. 282).  Broadway Bank

expresses concern that the treatment of its claim was not "expressly spelled out" in the

Receiver's Plan.  Broadway Bank further argues that the Receiver's Plan impermissibly "crams

down" or reduces Broadway Bank's secured claim by restricting its recourse to its collateral in

violation of federal Bankruptcy laws.

Broadway Bank is a secured lender that participated in, among other things, certain high

yield loan transactions with or involving one or more of the Wextrust Entities.[34]  High Yield III,

a Wextrust Affiliate, is currently in default on payment of its obligations to Broadway Bank.  On

February 4, 2009, Broadway Bank submitted a letter to this Court requesting a pre-motion

conference in order to intervene in this case.  At a hearing on February 9, 2009, the parties

agreed to continue this matter pending attempts to resolve their differences amicably.  Those

efforts appear to have stalled.  The resolution of those issues is not necessary to evaluate the

Receiver's Plan.  The Receiver's Plan is simply intended to outline the specific equitable

principles that the Receiver proposes for the treatment of the various classes of Wextrust victims

and provide a mechanism for disputing individual claims with the Receiver and the Court at a

---

[34] Wexford/HPC Mortgage Fund L.P. ("Wex/HPC"), a joint venture between Wextrust High Yield Debt
Fund III ("High Yield III") and other partners, lent $7.75 million to Boardwalk and Lincoln, LLC
("Boardwalk"), which loan is secured by, among other things, a mortgage on property located in Atlantic
City, NJ (the "Boardwalk Property").  Broadway Bank participated in the loan in an amount in excess of
$5 million.  Boardwalk then defaulted on payment and was forced into an involuntary bankruptcy.
Broadway Bank sold its participation interest in the Boardwalk loan to High Yield III.  The transaction
was facilitated by High Yield III borrowing funds from Broadway Bank in the principal sum of
$5,125,000.  As collateral, Broadway Bank took a security interest.  Broadway Bank is also the first
priority mortgage lender on the 625 W. Division proposed condominium project in Chicago.  High Yield
Fund III holds what was originally a third priority secured position on the same collateral with respect to a
loan in the original principal amount of $600,000 made to 625 W. Division Condominiums, L.P.
Wextrust, during the spring of 2008, made approximately $1.8 million in additional loans to retire a
second priority secured position on the 625 W. Division property held by Hermes Capital, LLC.  The
Hermes entity is, on information and belief, an affiliate of Broadway Bank.

later date.

Broadway Bank claims to be a secured creditor. The Receiver's Plan sets forth a bar date for claims of secured and unsecured creditors. Broadway Bank is free to follow that process and file a timely claim. At that time, Broadway Bank is free to argue for its interpretation of its collateral and whether this is materially different than the Receiver's interpretation. Moreover, the "cram down" analogy to the Bankruptcy Code is not applicable here as the Wextrust Entities and Affiliates are not in bankruptcy. For reasons previously articulated, bankruptcy may not provide procedural or substantive benefits to the vast majority of creditors and investors harmed by the fraud and mismanagement prevalent here. By contrast, the Receiver's Plan relies upon this Court's equitable authority to provide some recovery and comfort to those who were harmed by the Wextrust Defendants, a remedy that may otherwise be unavailable in bankruptcy.

D.    Key Equipment Finance

Key Equipment Finance, Inc. filed an objection to the Receiver's Plan dated April 24, 2009 (Dkt. No. 280). By way of assignment, Key Equipment is party (lessor) to a lease/sale financing agreement (the "Key Lease") concerning the provision of television sets for the Wyndham Drake Hotel formerly owned and operated by Drake Oakbrook Holdings, LLC ("Drake Holdings") and located in Oakbrook, Illinois. The lease was for a term of 60 months beginning in August 2006 with a monthly payment of $2,750. Drake Holdings' payment obligations under the Key Lease were separately guaranteed by Wextrust Equity Partners, LLC (the "WEP Guaranty").

As noted in Key Equipment's objections, Drake Holdings failed to make the required payments under the Key Lease. On March 3, 2009, the Receiver filed a motion (Dkt. No. 207) to relinquish interests in the Wyndham Drake hotel and allow parties-in-interest to pursue legal and

other remedies against the underlying property and their collateral. This Court granted the Receiver's motion on May 1, 2009 (Dkt. No. 300). As owner of the underlying television sets, Key Equipment may now proceed to reclaim its property, which is no longer part of the receivership estate. This is precisely the remedy accorded to all other secured creditors under the Receiver's Plan. As described in the Receiver's Plan and elsewhere in this Response, access to their collateral provides secured creditors, and in this instance, equipment lessors, with potentially a far more immediate, tangible, and significant recovery in this case than otherwise afforded to unsecured creditors and investors.

For precisely this reason, the Receiver has requested that the Court, on equitable grounds, not allow secured creditors to assert deficiency judgments against the receivership estate, which would only serve to further dilute recoveries for harmed unsecured creditors and investors. For that same reason, Key Equipment should be precluded from pursuing its claim to fully lease all property for all 60 months under the Key Lease against the WEP Guaranty. Allowing Key Equipment to proceed on its claims against the WEP Guaranty is effectively an end-run around the prohibition on deficiency claims. Key Equipment is fortunate, in this instance, to have access to tangible collateral that it can use, sell or lease for value. Thus, if the Receiver's Plan is approved, Key Equipment should be treated the same as all other secured creditors in this case.

E.    Munden Family Partnership, LLP

The same arguments made against allowing secured creditors to assert deficiency claims against the general corpus of the receivership estate apply equally to the letter objection of the Munden Family Partnership, LLP ("Munden").[35]  Munden asserts an interest as a tenant in

---

[35] Munden's objection was faxed directly to the Court, with a copy to the Receiver, on April 27, 2009.

common in a mixed use commercial/residential building located at 1770 First Street in Highland

Park, Illinois, an affluent suburb north of Chicago.  First Highland, LLC ("First Highland"), one

of the Wextrust Affiliates, owns 78.21 percent of the building and Munden owns the remaining

21.79 percent.  Although Munden holds a far better priority position than other investors because

of its part ownership in marketable commercial real estate, it still insists that if that tenancy in

common interest does not satisfy its investment of approximately $802,000, any remaining

"unsecured" portion should be paid *pro rata* out of the corpus of the receivership estate.

As described in the Receiver's Plan, secured creditors fall into either one of two

categories: (1) those holding perfected liens on collateral and (2) those holding interests in which

they occupy the position of tenants in common with Wextrust Entities or Affiliates with respect

to certain properties.  (Receiver's Plan at 29-30.)  Munden holds a fee simple interest in property

owned in part by a receivership entity.  However, that entity (First Highland) has the right to

manage the property under the Agreement Relating to Co-Ownership filed by Munden with its

letter objection ("Co-Ownership Agreement").  The property is currently being marketed for sale

and, after satisfaction of the interests of the mortgage lender (MB Financial), Munden will be

entitled to its percentage share of the proceeds of the sale (around 22 percent).  Munden has also

received monthly distributions from property operations prior to the commencement of the

receivership.

To the extent that any shortfall exists in Munden's recovery of its $802,000 investment in

the First Highland property (and as yet Munden has not shown that any shortfall will occur),

Munden is properly limited under the Receiver's Plan to any other contractual or other rights it

may have against First Highland.  As demonstrated above, it would be inequitable to allow

Munden or other secured creditors to share in the general corpus of the receivership estate after it

first exercises its priority rights.

F.    56 Walker, LLC

The sole member of 56 Walker, LLC ("56 Walker") submitted an objection dated April 27, 2009 to the Receiver's Plan. (*See* Statement 93.)  56 Walker is a borrower that is and has been in default on the principal amount of loans (the "56 Walker Loans") aggregating in excess of $11,250,000, and obtained for purposes of developing a mixed-use real estate project in Tribeca.  The loans were assigned to and made by Wextrust/HPC Mortgage Fund, LP ("Wex/HPC"), a joint venture between, among others, Wextrust Capital, Wextrust High Yield Debt Fund III, and HPC US Fund I, LP ("HPC").  Whether as a result of its own actions, the recent difficulties in the real estate market, or a combination of these and other factors, the project has fallen behind.  In prior discussions with the borrower, it has become clear that 56 Walker is unable to make debt-service payments on the outstanding loan obligations.  In the past, 56 Walker, its principal, and their representatives made each of the same arguments regarding delays, lack of funding, and fraud and mismanagement at Wextrust Capital, which allegedly affected 56 Walker.  In that same dialogue, representatives for the Receiver, Wex/HPC, and HPC dismissed and/or rejected each of the arguments and allegations raised by representatives for 56 Walker and its sole principal.

Principally, the Receiver's position is that any delays in funding were caused by 56 Walker; Wex/HPC had funds available for distribution draws; and, any fraud or mismanagement that occurred at Wextrust did not affect the 56 Walker Loan.  Through these discussions, it has become abundantly clear that 56 Walker and its principal have used the SEC Complaint against the Wextrust Entities and Affiliates and the appointment of the Receiver to gain additional time on their payment obligations.  Recently, Broadway Bank, a participant in the 56 Walker Loans,

brought a foreclosure action against 56 Walker for defaulting on its loan obligations. The objection to the Receiver's Plan by 56 Walker consists of little more than unsecured claims alleged against the Wextrust estate. Whether or not these claims have any merit, and the Receiver has argued previously that they do not, is not something that should be addressed in the context of the Receiver's Plan. The Receiver's Plan sets forth clear procedures for asserting unsecured claims against the receivership estate and 56 Walker and its principal are welcome to make use of that process if and when the Court approves the Receiver's Plan or another plan of distribution in this case.

G. G&H Partners AG

G&H Partners AG's ("G&H") objection (Dkt. No. 293), seeks to challenge the Court's earlier finding in its Memorandum Decision of November 25, 2008 (Dkt. No. 112) ("G&H Decision") that "G&H is not in a substantially different position from other creditors." (G&H Decision at 2.) As in the case with the Wextrust Commodity Fund Victims, pursuant to the law of the case doctrine, there is no reason for this Court to disturb this finding as G&H has failed to demonstrate that compelling reasons exist for finding otherwise.

According to G&H, under a settlement agreement dated March 25, 2008, G&H was owed $4,150,000 from certain Wextrust Entities and Affiliates to settle claims arising out of the Wextrust fraud. *See* Exhibit B to Sordillo Decl. (attaching copy of settlement agreement). According to Wextrust records, G&H received $175,000 in payments under the settlement agreement. Although G&H is currently invested in only one Wextrust Affiliate, IDEX Mines and Minerals, LLC, $100,000 of the $175,000 it received under the settlement agreement was funded from a commingled Wachovia bank account associated with Drake Oak Brook Investors, LLC, and the remainder was funded with commingled monies from a Wachovia bank account

associated with ATM II, LLC. (Sordillo Decl. ¶¶ 9-10.) In light of this evidence, Deloitte has concluded that the funds paid to G&H were misappropriated from unrelated investors in other Wextrust securities. (Sordillo Decl. ¶ 11.)

G&H's claim is based on a contract, the settlement agreement. Although G&H brought an action in New York state court, it voluntarily dismissed that action and did not obtain a judgment against any Wextrust Entity or Affiliate. Thus, it has no claim to priority as a judgment creditor. Similarly, G&H does not have a security interest in any Wextrust property. Accordingly, G&H's claim under the settlement agreement would be treated as a general unsecured claim under the Receiver's Plan. If the Receiver's Plan is approved by the Court, G&H will have an opportunity to challenge the Receiver's calculation of its ratable distribution amount, pursuant to the same procedures applicable to other victims.

H.  Nashville Warehouse Partners, Southeast Warehouse Partners, and Space Park AIM Partnership

Several entities, including Nashville Warehouse Partners, LLC ("Nashville"), Southeast Warehouse Partners, LLC ("Southeast"), and Space Park AIM Partnership ("Space Park"), have objected to the Receiver's Plan on the basis that their circumstances are exceptional and they should not be included in the general distribution of assets.[36] These investors have already received a substantial return on a successful real estate investment, and are now seeking to claim additional return from the receivership estate. They argue that they should be in a category separate from other investors, but fail to show that fairness requires such a distinction. In the Receiver's view, these parties are similarly situated to other defrauded investors entitled to a *pro rata* distribution in the manner set forth in the Receiver's Plan. If the Receiver's Plan is

---

[36] *See* Dkt. No 290 (objection of Nashville Warehouse Partners, LLC and Southeast Warehouse Partners, LLC); Dkt. No. 288 (objection of Space Park AIM Partnership).

approved by the Court, these parties will have an opportunity to challenge the Receiver's calculation of their ratable amounts, pursuant to the same procedures applicable to other victims.

## V.    Disqualification of Certain Claimants

Nine objections were filed by, or on behalf of, individuals who were paid to solicit investments in Wextrust.  These objections challenge the Receiver's proposal to reduce or eliminate compensation for Wextrust employees who "actively participated in the development, implementation, and/or marketing of the fraudulent scheme."  Conversely, two other objections have taken the position that *all* former Wextrust employees should be disqualified entirely from receiving any distribution.

The objections to the Receiver's proposal to reduce or eliminate compensation to former affiliated Wextrust individuals articulate three major concerns:  (1) that some former employees were unaware of the fraud, and therefore should not be subject to any penalty for their participation; (2) that the former employees have suffered as much, if not more, than other Wextrust investors as they have been subject to the additional mental and social strains of having involved their friends and family members in the fraud; and (3) that the Receiver's proposed plan is too vague and subjective, in that it contains no process to determine which individuals will receive a reduction and in what amount.  In contrast, two of the objections protest against former Wextrust employees receiving any recovery at all.

The primary concern voiced by the objectors is that former employees or "finders" were innocent of Wextrust's fraud and therefore should not be penalized for their involvement.  While it may be the case that certain individuals were entirely unaware of Wextrust's fraudulent enterprise, there is still ample justification for finding that these former employees were not similarly situated in their relationship to the defrauders when compared with the other investors.  Given the limited pool of resources available, a reduction or elimination of the employees'

investment claims is warranted in order to provide recovery for investors who did not participate

in the fraud. Former Wextrust employees and others who were paid to solicit investments are

distinguishable from other investors both in that (1) many of them (some perhaps unwittingly)

have violated the law by soliciting investments in securities without appropriate licensing, and

(2) many of them received substantial compensation for their brokerage activities, thus

mitigating their total losses.

Based on the Receiver's investigation, many of these affiliated individuals were actively

selling securities, and were acting as "brokers" as that term is defined by the Securities Exchange

Act of 1934 ("Exchange Act"). Under Sections 15(a) and (b) of the Exchange Act, brokers are

required to register with the SEC, pass and maintain various licensing tests, and be associated

with a brokerage firm that is also registered with the SEC, Financial Industry Regulatory

Authority (FINRA), and applicable state regulatory authorities. Failure to comply with these

requirements violates the law and may result in enforcement actions against the broker and/or his

or her employer.

Individuals who were engaged in activities that did not rise to the level of brokering

securities may nonetheless have also violated the Exchange Act as "finders" selling securities for

commissions. For example, the SEC recently sanctioned an unregistered finder who received

cash commissions based on the dollar amount of the securities purchase. The SEC barred the

finder from associating with any broker-dealer for one year and required him to disgorge all ill-

gotten gains from his sales of securities in violation of the registration requirement. *In re

MacGregor*, Exchange Act Release No. 57745 (April 30, 2008). Many individuals employed or

compensated by Wextrust participated in activities that would be considered either brokerage or

finder activities, and those activities perpetuated the fraud. It is within the Court's discretion to

consider that conduct in connection with the plan of distribution. Indeed, it is axiomatic that a court sitting in equity has wide discretion to deny or limit relief to a party who has unclean hands. *See, e.g., Precision Instrument Manufacturing Co. v. Automotive Maintenance Machinery Co.*, 324 U.S. 806, 814-15 (1945) (finding that a district court may freely refuse to "aid the unclean litigant").

Other courts have found such plans to be reasonable, as in *Basic Energy & Affiliated Resources, Inc.*, 273 F.3d 660 (6th Cir. 2001), which approved a plan of distribution that categorized investors and adjusted their investor claims based upon their status as (1) non-marketers; (2) substantial marketers; (3) insubstantial markets; and (4) defendants. Indeed, as noted in *SEC v. Enterprise Trust Co.*, where the court disqualified two of the company's principals from any compensation, "[d]isqualifying those who took the business over the edge is the most common feature, and the least contested aspect of distribution plans." No. 08-cv-1260, 2008 U.S. Dist. LEXIS 79732, *10 (N.D. Ill. Oct. 7, 2008). Disqualification of such individuals is also consistent with the view of the Second Circuit that the "most grievously injured claimants should receive the greatest share" in any distribution. *WorldCom*, 467 F.3d at 84.

Furthermore, permitting affiliated Wextrust individuals to participate in the distribution would further diminish what may already be a shallow pool of resources available to compensate investors, and many of the former employees and finders have been substantially compensated to bring new investors into the scheme. Based upon a review of Wextrust records, many employees and finders received thousands, and in a few cases hundreds of thousands of dollars, purely as commissions for bringing new investors into Wextrust. In the Receiver's judgment, providing the same individuals who profited from Wextrust's fraud for years with their full ratable shares of any distribution would lead to an inequitable result.

In keeping with these concerns, the Receiver proposes the following clarifications to the Receiver's Plan with regard to a reduction or disqualification in compensation for former employees. Named defendants should be disqualified from recovery. Wextrust employees or finders who received more than $100,000 in commissions or finders fees should be subject to a 90 percent reduction in the amount of their net investor claims. Individuals who received between $10,001 and $100,000 in commissions or finders fees should be subject to a 50 percent reduction in their net investor claims. Lastly, individuals who received $10,000 or less in commissions should be subject to a 25 percent reduction in their net investor claims. The Receiver will include the total amount of verified commissions or finders fees received by individual brokers and finders in the communications to be sent to all investors for verification (who, in this case, are also affiliated Wextrust employees). If an individual disagrees with the amount that the Receiver has been able to verify, then that individual will have an opportunity to dispute the claim through the process outlined in the Receiver's Plan. Courts have approved similar approaches under like circumstances. *See Basic Energy & Affiliated Resources, Inc.*, 273 F.3d 660 (6th Cir. 2001); *Credit Bancorp,* 2000 U.S. Dist. LEXIS at *150 (approving plan to disqualify certain employees and insiders as long as the Court, the parties, and the individuals in question were notified and appropriate procedures were established to resolve any related disputes).

Although the Receiver is aware of the substantial hardship that many former employees of Wextrust are currently experiencing, the overriding concern must be to return the bulk of the receivership estate's assets to the most innocent investors. Legal precedent, equitable principles, and objections from several of the other investors all support a reduction in compensation for those who have profited from selling fraudulent securities, even if these individuals were

unaware of Wextrust's activities.

**VI.**    **Miscellaneous Concerns**

    A.    <u>Provision of Specific Tracing Analyses for Every Investor</u>

       A number of objectors have argued that investors did not receive enough information to evaluate the Receiver's Plan. Some of these objectors opined that the Receiver was obligated to provide specific, detailed information regarding commingling of funds in specific investments in order to show that a *pro rata* distribution was appropriate for the particular investors in these investments. Moreover, some objectors requested all Wextrust financial records for specific investments to enable them to conduct their own tracing analyses. Finally, some objections requested a comparison of the return to investors in specific assets or funds under a *pro rata* distribution versus an investment specific distribution to only investors in that particular Wextrust Entity or Affiliate.

       Throughout the course of the receivership, the Receiver has made information available to all investors. First, the Receiver has maintained a comprehensive website [www.wextrustreceiver.com] for all investors, creditors, and other interested parties since the inception of the receivership. The website provides detailed information on all civil and criminal filings – including links to thousands of pages of court filings, orders, and transcripts – as well as individual postings for all significant recent events, tax information, letters to investors, contact information for the receivership, information for creditors, frequently asked questions about the receivership, and detailed information regarding purchasing receivership assets. The website also includes a Hebrew language page, where important announcements are translated into Hebrew for the benefit of Israeli investors. The website is monitored and updated on a daily basis, and the Receiver has received significant positive input regarding his website content from investors, creditors, and other individuals following the case.

Second, the Receiver has provided investors with an email address and a toll free phone number to contact the Receiver's advisors. Third, he has also conducted a series of town hall meetings in Israel and in the United States. Two recent such meetings were held immediately after the filing of the Receiver's Plan. The first meeting was held in Jerusalem on April 2, 2009. This meeting was attended by over 100 investors and lasted for almost four hours. The Receiver was accompanied by one of his associates, a native Hebrew speaker who had been working on this case since its inception, to provide simultaneous translation for the benefit of Israeli investors who are not English speakers.

Then, on April 23, 2009, the Receiver held a town hall meeting in Chesapeake, VA. Approximately 150 people attended the meeting, either by phone or in person, at the Chesapeake Conference Center. The meeting lasted approximately two hours. After the meeting ended, the Receiver stayed an additional 45 minutes to answer further investor inquiries. Steven Rawlings and Alistaire Bambach from the SEC provided a brief overview of the case status from the SEC's perspective and expressed the SEC's support for the Receiver's Plan. The Receiver then provided a report on the status of the receivership and an explanation of the Receiver's Plan. The Receiver also responded to questions and comments from the audience.

Finally, the Receiver has filed two interim reports, a plan for management of the entire Wextrust real estate portfolio, and a proposed plan of distribution – all of which have been accompanied by detailed supporting declarations and exhibits. These filings are all available on the Receiver's website.

In sum, objections regarding a lack of information regarding commingling in specific investments and funds are without merit. The Receiver laid out the findings regarding commingling in the Second Interim Report. The discussion states, in relevant parts:

> [I]n 62 of the 73 offerings, Deloitte found that investor funds were commingled. . . . For 11 of the 73 securities offerings, the available Wextrust records are insufficient for the Receiver to make a determination of the extent, if any, of commingling.  Because these 11 offerings occurred prior to the creation of segregated accounts in March 2005, however, the Receiver assumes that funds associated with these offerings were deposited into pooled accounts and thus commingled.

(Second Interim Report at 22.)

Thus, investors were on notice that the Receiver and his financial advisors had concluded that the receivership funds and investments were pervasively commingled.

The Second Interim Report further stated that, based on Deloitte's analysis, any benefit to the estate of a full tracing analysis would be outweighed by the costs and delay that such an analysis would involve.  (Second Interim Report at 34.)  The Receiver further stated that, unless directed to do so by the Court, he did not intend to conduct such an analysis.  Accordingly, the Receiver concluded that the provision of such highly specific information was too costly, and would provide little or no benefit to the estate or to victims.

B.    Taxation of Distributions

The Receiver acknowledges the concerns of certain investors regarding distributions to individuals holding Wextrust investments through an Individual Retirement Account ("I.R.A."). Individuals holding Wextrust investments through an I.R.A. may have a different tax liability depending on whether the distribution is made to the individual on the one hand, or the I.R.A or the broker investing on behalf of the I.R.A. on the other.  **It is the sole responsibility of each individual to determine his or her own tax liabilities and retain professional tax advisors, as necessary**.

With that said, generally, the Receiver will make a distribution to the investor of record. However, if an investor of record prefers that another party receive the distribution, then the investor of record may submit a request to the Receiver.  The Receiver will consider each request

and will notify the investor of record in a timely manner if it has been approved.

      C.    <u>Individual Statements for Verification of Investments</u>

The Receiver will begin the process of distributing individual claims letters to investors by May 15, 2009.  The May 15, 2009 deadline was included in the Receiver's Amended Notice of Motion (Dkt. No. 248), which was approved by the Court (Dkt. No. 252), to account for the revised objection deadline.  In order to ensure accurate information on each individual's investment and any distributions or repayment of principal, Deloitte has reviewed materials from several sources including:  (1) Wextrust records, (2) documents provided by investors, and (3) notes from investor interviews.  Investors will be asked to carefully review the individual claims letters they receive and submit any objections by June 12, 2009.

## CONCLUSION

Based on the foregoing, none of the objections identifies any facts or authorities that would preclude the Court from approving the Receiver's Plan. The Receiver respectfully submits that the overwhelming weight of the evidence and authority supports the principles and procedures outlined in the Receiver's Plan. Accordingly, the Receiver respectfully requests that the Court approve the Receiver's Plan in all respects.

Dated: New York, New York,
      May 11, 2009

Respectfully submitted,

TIMOTHY J. COLEMAN
Receiver for Wextrust Entities

s/ Mark S. Radke
Mark S. Radke, *pro hac vice*
Dewey & LeBoeuf LLP
1101 New York Avenue, NW
Washington, D.C. 20005-4213
Tel: (202) 346-8000
Fax: (202) 346-8102

*Attorneys for the Receiver*

<u>**CERTIFICATE OF SERVICE**</u>

The undersigned, an attorney, states that I am one of the attorneys for Timothy J. Coleman, Receiver, in this matter and do hereby certify that on **May 11, 2009** I directed the service of a true and correct copy of the foregoing **Response to Objections to the Receiver's Proposed Plan of Distribution** upon the following individuals in the manner indicated below:

<u>**Via First Class Mail**</u>
Joseph Shereshevsky, 35857-054
MDC Brooklyn
Metropolitan Detention Center
P.O. Box 329002
Brooklyn, New York 11232

<u>**Via ECF Notification & Electronic Mail**</u>
Alexander M. Vasilescu, Esq.
Andrew M. Calamari, Esq.
Steven G. Rawlings, Esq.
Alistaire Bambach, Esq.
Danielle Sallah, Esq.
Philip Moustakis, Esq.
Attorneys for Plaintiff SEC

Barry S. Pollack, Esq.
Joshua L. Solomon, Esq.
Attorneys for non-party G&H Partners AG

Barry S. Zone, Esq.
Jason Canales, Esq.
Stephen Richard Popofsky, Esq.
Attorneys for Defendant Steven Byers

Michael Fred Bachner, Esq.
Attorney for Defendant Elka Shereshevsky

Philip A. Byler, Esq.
Andrew T. Miltenberg, Esq.
Attorneys for non-party Broadway Bank

Shalom Jacob, Esq.
Shmuel Vasser, Esq.
Attorneys for non-party Int'l Ad-Hoc
Committee of Wextrust Creditors

Louis Orbach, Esq.
Attorney for non-party TCF National Bank

<u>**Via ECF Notification & Electronic Mail**</u>
Martin Siegel, Esq.
Attorney for non-party Int'l Consortium of
Wextrust Creditors

Paul A. Levine, Esq.
Attorney for non-party Key Equipment
Finance, Inc.

David B. Gordon, Esq.
Beth L. Kaufman, Esq.
Attorneys for non-party Lawrence Costa

Harris Kay, Esq.
Marc X. LoPresti, Esq.
Attorneys for various non-party investors

Ethan Holtz, Esq.
Edward P. Gilbert, Esq.
Attorneys for Rait Partnership

Francesca Morris, Esq.
Attorney for Ticor Title Insurance Co. and
Heritage Community Bank

John M. Bradham, Esq.
Peter B. Katzman, Esq.
Attorneys for non-parties Space Park AIM and
ISSB Partnerships

Alan E. Marder, Esq.
Attorney for various interested parties

Edward F. Malone, Esq.
George R. Mesires, Esq.
Attorneys for Barrington and Hinsdale Banks


_____s/ Mark S. Radke___ _____