UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

SECURITIES AND EXCHANGE COMMISSION,

                Plaintiff,

   - against -

STEVEN BYERS, JOSEPH SHERESHEVSKY,
WEXTRUST CAPITAL, LLC, WEXTRUST
EQUITY PARTNERS, LLC, WEXTRUST
DEVELOPMENT GROUP, LLC, WEXTRUST
SECURITIES, LLC, and AXELA HOSPITALITY,
LLC,

                Defendants,

       - and -

ELKA SHERESHEVSKY,

                Relief Defendant.

No. 08 Civ. 7104 (DC)

ECF Case

---

## <u>THIRD INTERIM REPORT OF RECEIVER</u>

TIMOTHY J. COLEMAN
Receiver for Wextrust Entities

DEWEY & LEBOEUF LLP
1301 Avenue of the Americas
New York, NY 10019-6092
Tel. (212) 259-8000

May 11, 2009                Attorneys for Receiver

# TABLE OF CONTENTS

**Page**

I.  MANAGEMENT OF THE WEXTRUST ENTITIES AND AFFILIATES .......................3

    A.  Property Management and Development Activities ..................................................3

        1.  Sales of Properties..........................................................................................5

        2.  Consensual Foreclosure ................................................................................8

        3.  Development Projects ...................................................................................12

        4.  High Yield Loans .........................................................................................13

    B.  Financial Management.........................................................................................15

        1.  Expense Reduction Measures ......................................................................16

        2.  Cash Management.........................................................................................17

        3.  Authorization of Disbursements ..................................................................19

    C.  Other Management Activities ..............................................................................20

        1.  Disposition of Personal Property .................................................................21

        2.  Tax Issues.....................................................................................................21

        3.  Insurance Issues ...........................................................................................22

        4.  Commodities ................................................................................................22

II.  FINANCIAL CONDITION OF THE WEXTRUST ENTITIES AND AFFILIATES .....23

III.  DISPOSITION OF INVESTOR FUNDS ........................................................................26

IV.  STATUS OF WEXTRUST INTERESTS IN SOUTH AFRICA .....................................31

V.  POTENTIAL CLAIMS AGAINST THIRD PARTIES ...................................................34

VI.  INVESTOR RELATIONS AND RESPONSES TO INVESTOR INQUIRIES................35

    A.  Publication of Proposed Plan of Distribution .......................................................35

    B.  Town Hall Meetings ...........................................................................................36

VII.  BANKRUPTCY DETERMINATION ...............................................................................37

**Page**

VIII.   ADMINISTRATIVE COSTS OF THE RECEIVERSHIP.................................................37

IX.   CONCLUSION...............................................................................................................40

# TABLE OF AUTHORITIES

**Cases**

*Eberhard v. Marcu*,
   530 F.3d 122 (2d Cir. 2008) ................................................................................... 34

*SEC v. Ross*,
   504 F.3d 1130 (9th Cir. 2007) ............................................................................... 34

**Other Authorities**

AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS, CONSULTING SERVICES PRACTICE
   AID 98-1, PROVIDING BANKRUPTCY AND REORGANIZATION SERVICES, A NONAUTHORITATIVE
   GUIDE (1998).......................................................................................................... 23

UNITED STATED SECURITIES AND EXCHANGE COMM'N, BILLING INSTRUCTIONS FOR RECEIVERS IN
   CIVIL ACTIONS COMMENCED BY THE U.S. SECURITIES AND EXCHANGE COMMISSION (2008).. 34

Timothy J. Coleman, Receiver for the Wextrust Entities ("Receiver"), respectfully submits this Third Interim Report, pursuant to the Court's Order Appointing Receiver, dated August 11, 2008, as amended by order dated September 11, 2008 (Dkt. No. 36) ("Receiver Order").

The Receiver was appointed nine months ago, on August 11, 2008. The Receiver has previously submitted first and second interim reports on a quarterly basis on November 7, 2008 (Dkt. No. 88) and February 11, 2009 (Dkt. No. 191), respectively. This third quarterly interim report summarizes the Receiver's activities over the past three months, and sets forth the Receiver's further factual findings concerning certain matters. Section I is an overview of the Receiver's continuing management of the Wextrust Entities and all entities they control or in which they have an ownership interest ("Wextrust Entities and Affiliates"). Section II is an updated report on the financial condition of the receivership estate. Section III sets forth the Receiver's further findings on the disposition of proceeds from Wextrust's sales of securities. Section IV discusses the status of the Wextrust interests in southern Africa, including the Receiver's continuing efforts to recover and repatriate assets. Section V discusses the Receiver's investigation into potential affirmative claims against third parties. Section VI describes the Receiver's efforts to provide information to Wextrust investors and to respond to investor inquiries. Section VII describes the Receiver's ongoing assessment of whether any of the Wextrust Entities or Affiliates should undertake a bankruptcy filing. Section VIII details the administrative costs of the Receivership.

In the nine months since this action was commenced, the Receiver has completed much of the work mandated by the Receiver Order. The Receiver has taken steps to preserve the *status quo*; to ascertain the true financial condition of the Wextrust Entities and Affiliates; to determine

the extent of commingling of funds among the Wextrust Entities and Affiliates; to prevent the further dissipation, encumbrance and disposal of Wextrust assets; to preserve the books records and documents of the Wextrust Entities and Affiliates; to respond to investor inquiries; and to determine whether the Wextrust Entities or Affiliates should undertake a bankruptcy filing. The Receiver has taken control of Wextrust assets and interests in the United States, and continues to pay necessary business expenses required to preserve Wextrust assets and property; to take steps to locate assets conveyed to third parties or otherwise concealed; to take preliminary steps to ascertain the disposition and use of the proceeds of Wextrust securities offerings; and to take all necessary steps to gain control of Wextrust assets in foreign jurisdictions. (*See* Receiver Order at 3-5.)

The Receiver has recovered substantial economic value for the benefit of the estate, and thus for the victims of the fraud alleged in the complaint. The Receiver has sold four properties for a total of approximately $6.3 million. The proceeds of those sales have been used principally to repay secured creditors of the Wextrust Entities and Affiliates, who are among the victims of the fraud. The remainder of the proceeds has been retained in the receivership estate for the benefit of other victims. The Receiver has secured releases from numerous obligations, secured and unsecured, reducing the estate's liabilities – and thereby increasing the equity in the estate – by at least $11.4 million. The Receiver has also saved the estate several million dollars through cost reduction measures. As a result of the Receiver's disposition of properties and cost reduction measures, the Wextrust enterprise is projected to generate positive cash flow for May 1, 2009 through August 31, 2009, compared to a cash deficit for the four months ending January 31, 2009, projected in the first interim report.

In the three months since the Receiver's second interim report, the Receiver has implemented a sales and marketing process for the Wextrust real estate portfolio, as contemplated in the Management Plan filed on January 15, 2009. Also in the past three months, the Receiver has submitted a proposed plan of distribution, and has taken steps to ensure participation by victims and other interested parties in the Court's consideration of that proposal. In the next three months, the Receiver expects to continue executing the Management Plan, and to take other actions for the benefit of Wextrust victims, as summarized below.

I.      **MANAGEMENT OF THE WEXTRUST ENTITIES AND AFFILIATES**

Pursuant to the Court's Orders, the Receiver has succeeded to the rights to manage the businesses, properties, and other assets of the Wextrust Entities and Affiliates. The Court directed the Receiver to preserve the *status quo* and to prevent further dissipation, encumbrance, or disposal of those properties and assets. (Receiver Order at 3-4.) Accordingly, the Receiver's responsibilities include real estate property management, management of the remaining Wextrust employees, financial management of the Wextrust enterprise, and numerous ancillary management issues, such as tax, insurance, regulatory, and legal matters arising out of the continuing operation of the Wextrust Entities and Affiliates.

A.      **Property Management and Development Activities**

As directed by the Court, the Receiver took control of all of the real estate assets of the Wextrust Entities and Affiliates. Those assets consisted of four principal components: (1) three hotel assets managed by Axela Hospitality; (2) the 10 properties owned by or under the *de facto* control of Wextrust Development Group, which are residential properties, such as condominium developments and single family homes (many in early stages of development); (3) 23 properties in eight states owned and managed by Wextrust Equity Partners, which are primarily income-producing commercial properties, such as office buildings and warehouses; and (4) the portfolio

of 27 high yield loans secured by various real estate properties.  (*See* Receiver's Plan for Management of the Wextrust Real Estate Portfolio, Jan. 15, 2009 (Dkt. No. 172), at 4 ("Management Plan").)[1]

In the 90 days ending April 30, 2009, the Receiver has collected approximately $6.2 million in rent, primarily from tenants of warehouses and office buildings.  During this period, the Receiver has renewed 11 leases and negotiated three new leases on properties, for a total of approximately 121,000 square feet of leasable space.  The Receiver estimates these leases will result in approximately $1.25 million in income over the life of the leases.  From the beginning of the receivership through April 2009, the Receiver has collected approximately $16.6 million in rent.

The Receiver has also approved and supervised a wide range of management and operational activities necessary to preserve the *status quo* and to prevent further unnecessary dissipation, encumbrance, or disposal of the Wextrust real estate portfolio.  As discussed in Section I.B.3, the Receiver has authorized payment of necessary business expenses for the Wextrust real estate properties, including loan payments, taxes, insurance, capital expenditures, and ordinary course expenses associated with operating the properties.

In consultation with receivership attorneys, accountants, and experts, the Receiver also examined the business plans for these properties prepared by former Wextrust management and disclosed to investors in the private placement memoranda, ("PPMs") and determined that, with some exceptions, the business plans should be modified.  (*Id*. at 11.)[2]  The Receiver has thus

---

[1] This section does not discuss the Wextrust interests in South Africa and Namibia, which are discussed in Section IV.

[2] As discussed in Section I.A.3 below, the Receiver has determined that completing construction of the 47 Dean Street project is likely to result in a net economic benefit to the estate.  Also, as discussed in Section I.A.1, the Receiver has sold the Outlots parcel associated with the Hammond Industrial Holdings and the Bax Realty Holdings facility consistent with the business plans contemplated in the PPMs.

developed an alternative plan for managing the properties, which contemplates conducting an orderly sale of many of the properties, and relinquishing the estate's interest in those properties that do not appear to have significant equity net of secured debt, all subject to the Court's approval. The Receiver is also continuing to manage the high yield loan portfolio, including maintaining foreclosure proceedings on properties used to secure defaulted loans and negotiating with borrowers for loan repayment. The Receiver has determined that this strategy will maximize the net economic benefit to the estate from the Wextrust real estate portfolio.

### 1. Sales of Properties

In consultation with real estate advisor The Hilco Organization ("Hilco"), the Receiver has implemented a three-phase marketing and sales process designed to obtain fair market value for the properties, minimize transaction costs, and facilitate an expeditious distribution to victims of the alleged scheme. (*See* Management Plan at 24-25.)

The first phase of the plan – the preparation phase – has been substantially completed. Hilco has gathered information about 33 WEP properties (associated with 20 WEP entities), which Hilco made accessible on its website on April 15, 2009.[3] Among other things, Hilco has collected and analyzed leases; environmental reports; financial documents, such as operating statements and budgets; rent rolls as of March 1, 2009; title documents; maps and surveys; zoning information; and demographic information for the WEP properties. Interested parties may obtain this information by executing and returning a confidentiality agreement. (*See* Declaration of Mark S. Radke in Support of Third Interim Report of Receiver, ("Radke Decl."), filed concurrently herewith, Ex. A.) Hilco will also provide parties contemplating serious offers additional information about the properties on a confidential basis.

---

[3] The Hilco website is http://www.hilcorealestate.com/property/ properties.asp?client_id=226. The Receiver's website also contains a link to the Hilco website.

The second phase of the process – marketing – has also begun.  On April 15, 2009, Hilco issued a press release announcing the sale of the properties.  (*Id*. at Ex. B.)  The Wall Street Journal also published a story about the sale of the properties.  (*Id*. at Ex. C.)  Beginning on April 15, 2009, Hilco also commenced a direct marketing, print advertising, and internet advertising campaign.  In addition, Hilco sent over 10,000 e-mails to a wide variety of potential purchasers.  The combination of advertising, e-mail "blasts," and media coverage has generated strong interest in the portfolio, including more than 300 calls, emails and other inquiries to the Receiver and receivership advisors.  To date, 193 confidentiality agreements have been signed.

The Receiver has sold four Wextrust real estate properties since the commencement of the receivership.  As discussed in the Second Interim Report, the Receiver obtained the Court's approval of the sales of the Hammond Outlots property in Louisiana and a single family residence in Riverside, Illinois in December, 2008.  In February 2009, the Receiver also closed on the sale of a single family residence in Downers Grove, Illinois.

Each of these sales resulted in significant benefit to the estate, either from the net cash proceeds realized from the sale or from releases of mortgage lender deficiency claims.  Such releases have the effect of reducing the unsecured claims against the estate's assets.[4]

For example, the sale of Hammonds Outlots to Picou Brothers Construction Company satisfied approximately $3.2 million in existing mechanics and materialmen's liens against the estate, and brought cash proceeds of approximately $400,000 into the estate, resulting in an aggregate benefit to the receivership of approximately $3.6 million.  Similarly, in consideration for the sale of Riverside, Illinois property, Hinsdale Bank & Trust agreed to accept a sale price of

---

[4] The Receiver's Proposed Plan of Distribution, filed on March 27, 2009 (Dkt. No. 243), requests that the Court restrict any deficiency claims of secured creditors to ensure that they can only be recouped against the respective, property-specific limited liability holding companies, and not the receivership estate as a whole.  (*Id*. at 30.)  The Court has not yet ruled on this proposal.

approximately $53,000 below the existing mortgage indebtedness of approximately $925,000, to waive any deficiency judgment against the estate, and to release any jointly and severally liable parties on the applicable promissory note. The sale of this property thus resulted in a reduction of approximately $53,000 in unsecured deficiency claims against the estate. In addition, the Receiver negotiated with Heritage Bank, the secured lender on the Downer's Grove, Illinois property, to have the bank fund necessary finish work on the property, thus enabling the receivership estate to complete the sale to the buyer. That sale yielded a surplus of approximately $231,000 above the existing mortgage indebtedness owed to Heritage Bank (which included advances made by Heritage to complete the finish work).

Most recently, on March 17, 2009, the Receiver sought approval of the sale of a 100,000 square foot warehouse in Memphis, Tennessee owned by Wextrust affiliate Bax Realty Holdings. The Receiver considered several competing offers and ultimately selected HSA Acquisitions as the successful bidder. The sales price accepted by the Receiver, approximately $3.7 million, was consistent with the Hilco valuation analysis. On April 1, 2009, the Court entered an order approving the sale, which closed on April 10, 2009.

### Table 1: Sales of Wextrust Real Estate

| Property | Closing Date | Sales Price | Approximate Total Benefit to Receivership |
|----------|--------------|-------------|-------------------------------------------|
| Hammond Outlots | 01/06/2009 | $400,000 | $3,607,000[5] |
| 451 Repton | 12/22/2008 | $870,000 | $923,000[6] |
| 6126 Plymouth | 02/19/2009 | $1,360,00 | $1,360,000 |
| Bax Realty Holdings | 04/9/2009 | $3,716,000 | $3,716,000 |
| **Total** | | $6,346,000 | $9,606,000 |

---

[5] This figure includes the $400,000 in sales proceeds and approximately $3,207,000 in debt forgiveness discussed above. (*See also* Dec. 22, 2008 Hearing Tr. at 4:9-19.)
[6] This figure includes the $870,000 in sales proceeds and $53,000 in debt forgiveness discussed above.

## 2.  **Consensual Foreclosure**

The Receiver has also determined that the estate's interest in several properties should be relinquished.  The value of these properties was substantially below the amount of debt secured by the properties, and each of these properties had substantial carrying costs, such that relinquishment of these properties results in a net economic benefit to the estate.  The Management Plan identified nine properties in this category. Since filing the Management Plan, the Receiver has filed motions to relinquish the estate's interest in six of these properties and two hotel properties.[7]

On February 6, 2008, the Receiver filed a motion to relinquish the estate's interest in a planned condominium project located at 2435 West Belmont Avenue in Chicago, Illinois ("Belmont Property"); a planned condominium/luxury town home project located at 2825 Oakley Avenue in Chicago ("Oakley Property"); a mixed-use office and retail condominium project located at 1 Riverside Drive in the Chicago suburb of Riverside, Illinois ("Riverside Arcade"); and an undeveloped tract of land located at the 4000 block of South Lake Drive in St. Francis, Wisconsin ("St. Francis").  (*See* Notice of Motion for an Order Approving Receiver's Motion to Relinquish Interests in Certain Residential Realty, filed Feb. 6, 2009 (Dkt. No. 184) ("Motion to Relinquish Certain Residential Realty").)  No objections were filed to the Receiver's motion to relinquish these properties.  Finding that these properties were of inconsequential value to the receivership estate and that no sale or other transaction could be consummated which would result in any monetary return to the estate, the Court granted the Receiver's motion to relinquish the estate's interest in these properties on February 20, 2009.  (Dkt. Nos. 198, 199,

---

[7] The Receiver also relinquished one property prior to filing the Management Plan.  On December 12, 2008, the Receiver filed a motion and supporting papers with the Court seeking approval to relinquish the receivership estate's interests in Rogers Plaza, a 330,000 square foot semi-enclosed shopping mall located in Wyoming, Michigan (a suburb of Grand Rapids) (Dkt. Nos. 140-43).  On December 22, 2008, the Court held a hearing, overruled the objections to the proposed transaction, and entered the order proposed by the Receiver (Dkt. No. 160).

200, and 202.)  The Receiver estimates that these four properties, which were not producing income, had carrying costs of approximately $1.3 million on an annualized basis.  (*See* Motion to Relinquish Certain Residential Realty at 3.)

The Receiver has already successfully negotiated deed in lieu of foreclosure agreements with two of the four mortgage lenders on these properties, and has reached a tentative agreement on deed in lieu transactions with the other two mortgage lenders.[8]  (*See* Radke Decl. at Ex. E.) The Receiver estimates that the waiver of deficiency claims associated with the four deeds in lieu described above, in addition to the waiver of the deficiency claim on the Homer Glen property described below, will discharge deficiency claims in the aggregate amount of approximately $6.8 million against the estate.  The Receiver has already closed with the mortgage lenders on the Riverside Arcade and St. Francis properties.  Both First Bank (the mortgage lender on the Belmont property) and Lakeside Bank (the mortgage lender on the Oakley property) have agreed to deed in lieu transactions with a full waiver of all deficiency claims.  Moreover, settlements with a joint venture partner on both properties will result in the dismissal of litigation pending with respect to both properties, thus reducing the legal fees of the receivership estate.

On March 3, 2009, the Receiver filed a Motion to Relinquish Interests in the Wyndham Drake and Crowne Plaza Phoenix hotels.  (Dkt. No. 207.)  These properties were purchased at the height of the commercial real estate boom, and the fair market value of these properties had fallen substantially below the amount of the debt secured by the properties.  (Management Plan at 26.)  The cash flow generated by the hotels was not sufficient to pay debt service to the lender

---

[8] A "deed in lieu" is a transaction in which a borrower conveys title to real property to a secured lender in lieu of a foreclosure proceeding.  The mortgage lender gains title to its collateral without expending further time and incurring the cost of proceeding with a judicial foreclosure.  The borrower, in turn, may in some instances be able to obtain a waiver and release from the mortgage lender relating to any deficiency claims on underlying obligations related to the borrower's loan.  The Receiver has obtained such waivers in negotiating deeds in lieu, which release the estate from unsecured indebtedness and thus provide substantial economic benefits to the estate.

or fund renovations needed to maintain the competitiveness of the hotels. (*See* Memorandum of Law in Support Of Receiver's Motion to Relinquish Interests in the Wyndham Drake and Crowne Plaza Phoenix Properties (Dkt. No. 211) at 6-8.)[9] On May 1, 2009, the Court entered an order, over objections, finding that the properties were of inconsequential value to the estate and allowing relinquishment of these properties. The Receiver estimates that relinquishment of these properties will result in significant savings. The forecasted combined negative cash flow for the two hotels, inclusive of debt service, was approximately $1,469,000 for 2009. Relinquishment will also result in a significant reduction in professional fees associated with extensive negotiations by the Receiver's counsel and Hilco with the third-party hotel management companies regarding contractually required upgrades, workout negotiations with the secured lender, negotiations with the secured lender regarding funding of operations, negotiating with local regulatory authorities regarding compliance with local codes, and the resolution of continual operational problems.

On March 18, 2009, the Receiver filed a motion to relinquish the estate's interest in Hilltop Apartments, a 132-unit residential apartment complex located in Anderson, Indiana ("Hilltop"); and the estate's ownership interest in two homes and 22 finished lots in Stonebridge Woods, a single family subdivision project located in Homer Glen, Illinois ("Homer Glen"). *See* Memorandum of Law in Support of Receiver's Motion to Relinquish Interests in the Hilltop and Homer Glen Properties (Dkt. No. 231). Both Hilltop and Homer Glen were in default on their mortgage indebtedness and had significant carrying costs associated with maintenance issues, unpaid debt service expenses, and professional fees that would have drained the receivership

---

[9] Based on work performed by Hilco, the Receiver estimated that the Wyndham Drake and CP Phoenix hotels would have required $2.3 million and $1.5 million in renovations, respectively, to make them competitive in their class. Intercontinental Hotel Group, the third-party manager for the CP Phoenix, also maintained that not making the vast majority of these upgrades to the CP Phoenix would violate the management contract between Wextrust and IHG and thus excuse IHG's continued management of the hotel.

estate's capital.  (*Id.* at 3-4.)  No objections were filed to the Receiver's motion to relinquish those properties.  Again finding that these properties were of inconsequential value to the receivership estate and that no sale or other transaction could be consummated which would result in any monetary return to the estate, the Court entered orders allowing relinquishment of these properties on April 1, 2009.  Barrington Bank & Trust, the mortgage lender on the Homer Glen property, has agreed to a deed in lieu transfer and waiver of any deficiency claims arising from its ultimate disposition of the property.  The mortgage lender on the Hilltop Apartments property (which became the subject of a foreclosure action before the receivership commenced) agreed in early April 2009 to waive all deficiency claims against the receivership estate in connection with the Receiver's agreement to execute an agreed order permitting the sale of the Hilltop property out of the Indiana state court mortgage foreclosure action to a third party purchaser unaffiliated with the Hilltop mortgage lender.  The value of the waiver to the receivership estate is $1.4 million based on mortgage indebtedness of approximately $3.2 million and the sale price of $1.8 million.  The sale to the third party purchaser closed on April 28, 2009.

In total, the receiver has secured releases of approximately $11.4 million from secured creditors in conjunction with property sales and relinquishments.  As discussed above, the sale of the Hammonds Outlots parcel resulted in the discharge of approximately $3.2 million in existing mechanics and materialmen's liens.  The mortgage lender on the Riverside, Illinois property released the receivership from approximately $53,000 in unsecured debt related to the sale of that property.  Moreover, the deeds in lieu obtained for five relinquished properties, discussed above, resulted in a discharge of deficiency claims of approximately $6.8 million.  In addition, the Hilltop mortgage lender waived deficiency claims of approximately $1.4 million.

**Table 2: Relinquishment of Wextrust Real Estate**

| Property | Relinquishment Date | Deed In Lieu or Similar Transaction | Approximate Annual Savings[10] |
|---|---|---|---|
| Rogers Plaza | 01/22/2008 | No | NA[11] |
| Belmont Property | 01/20/2009 | Yes | $217,000 |
| Oakley Property | 01/20/2009 | Yes | $430,000 |
| Riverside Arcade | 01/20/2009 | Yes | $325,000 |
| St. Francis | 01/20/2009 | Yes | $283,000 |
| Hilltop | 04/01/2009 | Yes | NA |
| Homer Glen | 04/01/2009 | Yes | NA |
| Wyndham Drake hotel | 05/01/2009 | No | $767,000 |
| CP Phoenix hotel | 05/01/2009 | No | $702,000 |
| **Total** | | | $2,724,000 |

3. **Development Projects**

The Receiver has determined that completing construction the 47 Dean Street project, a residential condominium in the Boerum Hill neighborhood in Brooklyn, is likely to result in a net economic benefit to the estate. (Management Plan at 15.) Accordingly, the Receiver has continued to manage development and construction work on this project. The building shell is complete, and electrical contractors, HVAC, and interior framing contractors have begun work. In the coming weeks, the exterior brickwork is expected to begin and the sprinkler and plumbing systems will be installed. (*See* Radke Decl. at Ex. D.) Construction is scheduled to be substantially complete in Fall 2009, at which point the Receiver anticipates issuance of a Temporary Certificate of Occupancy. Upon receipt of the Temporary Certificate of Occupancy, units under contract can begin closing. Currently, Letters of Interest for the purchase of two units have been offered. In total, 10 units will be offered for sale at prices ranging from $980,000 to $1,550,000.

---

[10] Annual savings refers to estimated carrying costs for properties not generating income and estimated negative cashflow for income-generating properties.

[11] The valuation of these properties was far below the secured debt, such that the Receiver did not expend resources to completely assess the amount of carrying costs or cash flow.

The project has also qualified for a 15-year property tax abatement. The Receiver is in the process of obtaining the approval of the Project Offering Plan from the New York Attorney General's Office. Once the Project Offering Plan is approved, the Receiver will market the project through prepared brochures and print materials, websites, and advertising campaigns.

### 4.    <u>High Yield Loans</u>

The Receiver continues to manage the Wextrust portfolio of high yield loans. As discussed in the First Interim Report, there are two high yield portfolios: (1) Wexford High Yield Debt Fund I, LLC ("High Yield I") and (2) Wexford High Yield Debt Fund III, LLC ("High Yield III") and its offshore participant, Wexford High Yield Debt Offshore Fund, Ltd. ("Offshore Fund"). The loans for both portfolios are secured by a variety of commercial and residential real estate assets.

**High Yield I and WexWater.** The High Yield I portfolio consists of 11 loans in which Wextrust has an aggregate exposure of over $5 million, all of which are in default. (Second Interim Report at 6-7.) Stillwater Capital Partners, LLC participates in five of the 11 High Yield I loans through a joint venture (WexWater LLC) with Wextrust. The Receiver has continued to manage the High Yield I portfolio of high yield loans, and Stillwater manages the WexWater joint venture portfolio of high yield loans. As discussed in the Second Interim Report, the Receiver has initiated foreclosure proceedings on four properties. (*Id*. at 7.) The Receiver has completed foreclosure proceedings on one of the four properties, taken title to the property, and is actively marketing the property. The Receiver is also engaged in settlement discussions with the partial owner of another of the four properties. The Receiver approved the retention of local counsel to complete this work, which resulted in cost savings for the estate.

**High Yield III and Wextrust/HPC Mortgage Fund, L.P.** The High Yield III portfolio includes 16 loans for which Wextrust has a combined participation interest in excess of $10

million.  (*Id.* at 7.)  HPC U.S. Fund I, LP ("HPC"), a private German investment fund, participates in nine of the High Yield III loans through Wextrust/HPC Mortgage Fund, L.P ("Wex/HPC"), a joint venture among HPC, High Yield III, and Wextrust.  Fifteen of the 16 High Yield III loans are in default.

The Receiver is in the process of taking title to the property that secured the High Yield III loan made to Metro Development, LLC.   As with High Yield I, the Receiver approved the use of local counsel to prosecute the interests of High Yield III in this property in order to reduce professional fees for the estate.  The default notice for this loan was served on Metro Development, LLC on February 3, 2009, and the foreclosure complaint was filed on April 6, 2009.  The property, located in Mine Hill, New Jersey, is a 1.75 acre parcel of land with an existing single family home.

The loan made by the Wex/HPC joint venture to Ellis Family Partnership, LP was repaid on March 31, 2009.  The original principal amount of the loan was $1,400,000, and the joint venture accepted and received a discounted payoff in the amount of $1,496,213.67.  After consulting with receivership advisors and Wextrust's joint venture partner, HPC, the Receiver determined that the discounted payoff was the best option for repayment, especially considering the specialty nature of the collateral (an assisted living facility).  Even with the reduction, the joint venture recognized profit equal to the interest charged on the loan since inception at a blended rate of 13.5 percent.  Proceeds were sent to the Wex/HPC joint venture and were used to pay down operating and capital loans made by HPC to the venture, as required under the partnership agreement.[12]

---

[12] Such loans are made into the joint venture's portfolio when a property held in the portfolio needs funding.  For example, as discussed below, HPC made such loans to fund certain expenses for Boardwalk & Lincoln, LLC. Proceeds from any loans held in the portfolio are then used to satisfy the operating and capital loans made by the joint venture participants.

In the last 90 days, the Wex/HPC joint venture also commenced or finalized foreclosure proceedings on two properties. Again, local counsel was used for these proceedings. Boardwalk & Lincoln, LLC, a borrower that received a loan from Wex/HPC, was put into involuntary bankruptcy, and on February 27, 2009, the Wex/HPC venture took title to the property through a sale in the bankruptcy case. The property, which consists of four contiguous parcels totaling 21,700 square feet of land, is located in Atlantic City, New Jersey. The property contains four existing structures, which were previously residential buildings, but are now vacant, in serious disrepair, and uninhabitable. HPC, the managing partner of the joint venture, has funded expenses incurred during the foreclosure process as well as expenses necessary to secure the buildings in compliance with Atlantic City codes.[13]

The Wex/HPC venture also took title to the property securing the high yield loan made to the Seed America Foundation on March 24, 2009. The property, located in East Providence, Rhode Island, consists of three office/industrial buildings that have all been vacant since approximately 2001. Although the net rentable area is approximately 128,000 square feet, the buildings are currently unusable, and one of the buildings is contaminated with mold and must be demolished. The Receiver is evaluating options for selling this property.

**B.    Financial Management**

The Receiver has continued to manage the business and financial aspects of the Wextrust enterprise, including taking additional expense reduction actions and continuing to implement a more efficient cash management system. These efforts to further reduce costs and increase efficiency over the last 90 days are a continuation of the Receiver's ongoing effort to preserve and recover assets for the benefit of the estate.

---

[13] This funding was made available through operating and capital loans made to the joint venture. As discussed above, the proceeds from the borrower's payoff of the Ellis Family Partnership loan was used to substantially satisfy these loans.

1. **Expense Reduction Measures**

The Receiver is continuing to reduce operating expenses incurred by Wextrust to the maximum extent possible, consistent with the Court's mandate to preserve the *status quo* and the value of the Wextrust assets. For example, as discussed in the Second Interim Report, headcount has been reduced by more than 70 percent, from 68 to 19 employees, nine of whom are on-site employees at various WEP properties. This reduction results in a monthly savings of approximately $390,000, or approximately $4.7 million on an annualized basis. (Second Interim Report at 9.) Further reductions are expected in the next quarter.

The Receiver has also substantially reduced office rental expenses. As of August 11, 2008, Wextrust Entities and Affiliates leased six offices in the United States and an office in Israel, some of which were located in high-grade buildings and were outfitted with luxurious and expensive furnishings and facilities. The Receiver has closed the Norfolk, Virginia; Bethesda, Maryland; Hinsdale, Illinois; and Ramat Gan, Israel offices. The Receiver is in the process of closing the New York office and has entered into a settlement with Wextrust's landlord to pay a portion of the back rent for that facility. In addition, the Receiver has negotiated with the landlord for the Chicago, Illinois office to significantly reduce space in that office. Similarly, the Receiver settled a dispute over back rent with the landlord for the Norfolk, Virginia office, agreeing to pay $81,500 for over $158,000 in outstanding rent and to vacate the premises. Overall monthly rent has been reduced from approximately $95,000 per month to approximately $13,000 per month. Through settlements with landlords for the various offices, the Receiver eliminated over $290,000 in back rent, at significant savings to the investors.

The Receiver has achieved additional cost savings through renegotiating contracts with various service providers. For example, the monthly cost for internet and telephone has been reduced from approximately $11,000 a month to $4,000 a month. Similarly, the Receiver has

made changes to the company's e-mail archiving service so that it covers only the few remaining employees and does not provide functions that are no longer necessary. These changes reduced monthly charges from approximately $2,000 to $180 month. Finally, the Receiver has discontinued a contract for printers in the Chicago, New York, and Norfolk offices, resulting in savings of approximately $7,250 per month. In total, changes to these services have resulted in savings of more than $15,500 per month.

## 2. Cash Management

As discussed in the Second Interim Report, the Receiver Order authorizes the Receiver to "establish a new cash management system by closing, transferring, consolidating, and opening bank accounts and securities accounts" and to invest funds in certain highly stable investments (Receiver Order at 6-7.) The Receiver is continuing consolidation efforts for the approximately 300 Wextrust bank and brokerage accounts held at more than 50 financial institutions at the inception of the receivership. As outlined in the Second Interim Report, this consolidation is being implemented in three phases.

Phase I and Phase II were conducted simultaneously and are substantially complete. These two phases involved the transfer of non-operating accounts with significant balances, as well as low transaction volume operating accounts that lacked direct deposit or "lockbox" deposit features. To date, over $18 million in 143 accounts held at 10 different financial institutions has been consolidated in approximately 70 accounts at a single financial institution, The Private Bank.

Phase III, which is continuing, involves the transfer of about $2.5 million and account closure of a total of 91 accounts, of which 35 are WEP operating accounts, 30 are WDG accounts, and 26 are other accounts comprised of low-balance Wextrust Entity and Wextrust Affiliate accounts.

Many of The Private Bank accounts that were established pursuant to Phase III of the consolidation process for operating entities are currently receiving deposits and processing withdrawals in the ordinary course of business. However, some of the original accounts for those operating entities have not been closed and must remain open for a period of time in order to clear outstanding checks and avoid a disruption of operations. Once all outstanding checks on the original accounts have cleared and sufficient time has passed to ensure that all monies are appropriately going to the new account, any remaining balances will be transferred into The Private Bank and the original accounts will be closed. The targeted completion date for all accounts listed as part of Phase III is June 2009.[14]

In addition to reducing bank charges associated with maintaining over 300 accounts in dozens of financial institutions, the new cash management system has substantial operational and other cost-saving benefits. First, transactional data for each new entity-specific operating account held at the Private Bank is automatically integrated into the accounting system used by WEP. This change provides greater operational control over the Wextrust Entities and Affiliates as well as improved accounts receivable and accounts payable management capabilities. Second, the new centralized banking system has internet-based wire transfers and deposit recording, view-only account access rights, and email alert updates on the accounts. These features have resulted in more efficient and cost-effective monitoring and administration of the estate's cash-flow by the Receiver and his advisors.

---

[14] Approximately 67 accounts will not be transferred to The Private Bank at this time for a variety of reasons, including that they (1) must be maintained at the existing financial institution per existing loan agreements; (2) are escrowed monies that cannot be transferred at this time; (3) are managed by a third party property manager in an area where The Private Bank does not operate; (4) are subject to a dispute; or (5) are located outside the United States. These accounts are currently frozen.

### 3. **Authorization of Disbursements**

The Court has authorized the Receiver to make and authorize payments in the ordinary course of business and to pay necessary business expenses from available funds. (Receiver Order at 5, 7-8.) Pursuant to that authority, the Receiver has authorized payment of expenses necessary to preserve the *status quo* of the Wextrust enterprise. Since the commencement of the Receivership, the vast majority of these expenses have been made in conjunction with operating the WEP real estate portfolio, including approximately $5.2 million in debt service payments; $1.3 million in taxes; and $2.8 million in ordinary course expenses, such as utility payments, repairs and maintenance, and landscaping; and $1.1 in capital expenditures, such as contractually required tenant improvement expenses. As shown below on Table 3, WEP has tenant receipts of approximately $12 million through February 28, 2009.

Moreover, the Receiver expects expenses for the Wextrust Entities to decline as operating assets are monetized. For example, as discussed in Section I.A.2, five WDG properties, two WEP properties, and two of the Axela hotels have already been relinquished, thus reducing expenses for these Wextrust Entities. In addition, some expenses, such as certain taxes and insurance, are paid annually and have already been paid in advance for the year. A detailed description of the disbursements that have been approved by the Receiver since the commencement of the receivership is set forth below in Table 3.

# Table 3:  Receipts and Disbursements

**Wextrust Capital, LLC, et al.**
**Consolidated Cash Receipts and Disbursements - Rounded (1) (2)**
**from 08/11/08 through 02/28/2009**

| RECEIPTS | Wextrust Capital, LLC and Affiliates | Commodity Funds | Wextrust Equity Partners, LLC and Affiliates (3) | PAM | Wexford Development Group, LLC and Affiliates | Axela Hospitality, LLC and Affiliates | TOTAL |
|---|---|---|---|---|---|---|---|
| Tenant Receipts | - | - | 12,020,000 | - | 10,000 | - | 12,030,000 |
| Sale of Receivership Assets | 10,000 | - | 400,000 | - | 350,000 | - | 760,000 |
| Construction Draws | 70,000 **(4)** | - | - | - | 670,000 | - | 740,000 |
| Other Receipts | 20,000 | 230,000 | - | - | 50,000 | 60,000 | 360,000 |
|  **TOTAL RECEIPTS** | **100,000** | **230,000** | **12,420,000** | **-** | **1,080,000** | **60,000** | **13,890,000** |
| **DISBURSEMENTS** | | | | | | | |
| Capital Expenditures, Tenant Improvements & Leasing Commissions | - | 60,000 | 1,130,000 | - | 680,000 | - | 1,870,000 |
| Insurance | - | - | 180,000 | - | 40,000 | 10,000 | 230,000 |
| Loan Payments | - | 20,000 | 5,170,000 | - | 20,000 | 60,000 | 5,270,000 |
| Management Fees | - | - | 520,000 | - | - | - | 520,000 |
| Ordinary Course Expenses | 80,000 | 20,000 | 2,810,000 | - | 100,000 | 320,000 | 3,330,000 |
| Labor Costs | 280,000 | 310,000 | 1,210,000 | 90,000 | 130,000 | 140,000 | 2,160,000 |
| Professional Expenses - Non-Receiver **(5)** | 20,000 | 110,000 | 60,000 | - | 10,000 | - | 200,000 |
| Taxes | - | 10,000 | 1,320,000 | - | 30,000 | - | 1,360,000 |
| **TOTAL DISBURSEMENTS** | **380,000** | **530,000** | **12,400,000** | **90,000** | **1,010,000** | **530,000** | **$ 14,940,000** |
| **NET CASH GENERATION / (BURN)** | **(280,000)** | **(300,000)** | **20,000** | **(90,000)** | **70,000** | **(470,000)** | **$ (1,050,000)** |

**(1) -** The receipts and disbursements in this analysis are cash transactions that are grouped by the entities that initiated the transaction, however, in some cases the cash transactions were executed on behalf of other Wextrust entities.  The cash transactions have been categorized by type based on information contained within the books and records of the Wextrust Entities.  The sources of cash receipts and disbursements data were a combination of general ledgers and bank transaction data.  Not all bank accounts or general ledgers were included in this analysis; entities with no or insignificant transaction activity during the period presented may not have been included.   This analysis includes Wextrust entities that were not reported in the Standardized Fund Accounting Reports because additional information continues to become available.

**(2) -** This analysis was prepared on a cash basis, therefore the timing of receipts and disbursements are different than what may be contained in accrual based financial reports.  For example, receipts may not be matched to related disbursements, or vice versa.  In addition, some disbursements included in this analysis had not cleared the bank as of February 28, 2009.

**(3) -** First Wyoming, LLC was excluded from this analysis because limited information (September 2008 only) was available and because the cash generated by this entity, along with the bank account balances, if any, were relinquished with the property under an order approved by the Court on December 22, 2008.

**(4) -** In WDG, third party lenders funded the operations of certain construction projects through loan draws.  These draws, which were included as receipts in this analysis, were used to specifically fund cash disbursements related to the same construction project.  The loan draws funded by the bank were approximately equal to the amounts disbursed.  In one instance, WTC funded payroll on a construction project on behalf of WDG in advance of a loan draw being available.  When the third party lender eventually funded the WDG payroll, it was received directly by WTC as a reimbursement.

**(5) -** Most professional expenses incurred by the Receiver are not included in this analysis.

## C.     Other Management Activities

The Receiver has undertaken a number of other activities necessary to manage the Wextrust business.  For example, in conjunction with closing the Norfolk office, the Receiver has disposed of personalty, where practicable, and donated property that could not be sold.  In addition, the Receiver is managing federal and state income tax matters and other tax issues for the various Wextrust Entities and Affiliates.  The Receiver has also taken steps to maintain essential aspects of Wextrust's insurance coverage.

### 1.    Disposition of Personal Property

In conjunction with closing the Norfolk office, the Receiver conducted a week-long sale of personalty in February 2009, which raised approximately $35,000.  The Receiver donated personalty of *de minimis* value to Norfolk-area charities.  The Receiver has contracted with Atlantic Asset Management Group ("AAM"), a Norfolk-based licensed and bonded auction firm, to auction additional personalty that remained in the Norfolk office.  The auction started on May 4, 2009 and will continue for 10 calendar days.[15]

### 2.    Tax Issues

The Receivership tax counsel continue to manage the estate's federal, state, and local income tax liabilities and compliance obligations.  The Receiver is coordinating his efforts with the Bankruptcy and Insolvency Unit of the Internal Revenue Service, which is responsible for the IRS's interests in this matter.  The Receiver has also been in contact with regional field offices of the Internal Revenue Service and state authorities that have sent notices of tax levies for the Wextrust Entities and Affiliates.  The Receiver has informed these authorities of the receivership and, in the case of the IRS field offices, has informed them of the Bankruptcy and Insolvency Unit's involvement in the case.  The Receiver has, in turn, provided the notices from the IRS field offices to the Bankruptcy and Insolvency Unit, so that the federal tax issues may be resolved in a coordinated manner.  The Receiver has also filed protective federal and state extension requests for various Wextrust Entities and Affiliates.  These extensions do not bind the Receiver to pay the taxes claimed in the notices.  However, the filing of these extensions ensures that no penalties will be assessed for not filing tax federal income tax returns for the entities on

---

[15] The auction is posted to AAM's website: http://www.atlanticremarketing.com/auction_detail.php?id=112043. Prior to the start of the auction, AAM undertook marketing efforts for the auction, including internet advertising on Craig's List, AuctionZip, and AuctionFlex; an email blast to AAM's list serve; and newspaper ads in the auction classifieds of the Virginian Pilot.

April 15th, and gives the estate additional time to determine what the federal filing requirements of the entities will be.

### 3. Insurance Issues

As discussed in the Second Interim Report, the Receiver has worked with Wextrust's insurance carriers to maintain the essential aspects of Wextrust's insurance coverage. The Receiver negotiated renewals of the property damage, general liability, automobile, workers compensation, and umbrella liability policies for more than two dozen Wextrust properties. In addition to analyzing changes in the total insured values of the relevant properties, their general liability exposures, and other insurance issues, the Receiver has negotiated with numerous third parties, such as banks and third-party property managers, to arrange premium payments out of funds other than those held by the receivership estate. For example, the Receiver negotiated with the secured lender on the Wyndham Drake and CP Phoenix hotels to have the approximately $72,000 premium for the Wyndham Drake funded by the lender and the approximately $73,000 premium for the CP Phoenix funded out of the CP Phoenix hotel's operating funds. The Receiver will continue to work with the carriers to cancel or amend coverage for properties that are sold or relinquished so that the relevant portions of premiums paid on these properties are refunded to the estate.

### 4. Wextrust Commodity Funds

The Receiver has taken control of the Wextrust commodities assets, pursuant to the Receiver Order. (*See* Receiver Order at 4.) Those assets, which consist of cash held in bank accounts, have been frozen, and the commodities trading associated with the accounts has been discontinued. The Receiver continues to exercise control over these assets, the majority of which have been transferred to The Private Bank, pursuant to the cash management strategy discussed in Section I.B.2.

## II.    FINANCIAL CONDITION OF THE WEXTRUST ENTITIES AND AFFILIATES

As discussed in the Receiver's Management Plan, the Receiver has determined that Wextrust's real estate operations, as a whole, have little, if any, going concern value. (Management Plan at 3.)  The Management Plan thus contemplates selling or relinquishing the receivership estate's interest in many of the Wextrust real estate properties rather than continuing to remain exposed to the substantial risks associated with these properties and incurring costs associated with the management and maintenance of these properties.  (*Id.*)  Accordingly, preparing financial statements on a going concern basis would not provide a meaningful assessment of the financial condition of the estate.[16]  The Receiver is continuing to assess and monitor the financial condition of the Wextrust Entities and Affiliates based on the financial analysis commonly applied in similar circumstances.[17]

As shown in Table 4, below, Deloitte has aggregated financial information from the financial systems of Wextrust Entities and Affiliates that shows the current book value of the principal real estate assets, as recorded in the company's books and records.  In addition, Deloitte has assisted in the development of cash flow projections, which are presented below in Table 5. At the Receiver's direction, Deloitte has also begun preparing a preliminary recovery analysis. Because the analysis includes Hilco's valuations of the Wextrust real estate portfolio, that analysis is not included in this report.

---

[16]In connection with the first and second interim reports, Deloitte helped the Receiver to prepare basic financial statements and projections for the Wextrust Entities and Wextrust Affiliates.  These financial statements were not audited, did not have the notes, corrections and adjustments needed to present information fairly and accurately in all material respects in accordance with Generally Accepted Accounting Principles.

[17] Typically, such an analysis begins with the identification of the assets to be liquidated and then proceeds to the development of an estimation of the range of value the assets.  The analysis would also include an estimation of any recoverable claims of the estate.  The analysis also attempts to estimate the costs of administration of the estate. Ultimately, the estimated recovery is applied to the claims against the estate.  *See generally* AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS, CONSULTING SERVICES PRACTICE AID 98-1, PROVIDING BANKRUPTCY AND REORGANIZATION SERVICES,  A NONAUTHORITATIVE GUIDE § 11.30 (1998).

As shown in Table 4, the total book value of the Wextrust real estate portfolio is approximately $257 million. These values are based upon the accounting records and other information at Wextrust and do not represent the current market value. As discussed in the Management Plan, these properties were purchased at the height of the commercial real estate market and are heavily leveraged, and the Receiver contemplates that most of the proceeds of the sales of these properties will be used to pay the secured debt.

**Table 4:  Book Value of Wextrust Real Estate Assets**

Wextrust Capital, LLC, et al.
Net Book Value (1) (2)
as of February 28, 2009

|  | Axela (3) | WEP (4) (5) | WDG | Consolidated |
|---|---|---|---|---|
| Property |  |  |  |  |
| Building / Land | 35,136,348 | 180,857,502 | 41,509,752 | 257,503,602 |
| Loan Payable on Property | 30,594,691 | 144,826,952 | 38,304,264 | 213,725,907 |
| **Net Book Value** | $  4,541,657 | $ 36,030,550 | $  3,205,488 | $ 43,777,695 |
|  |  |  |  |  |
| Capitalized Costs: |  |  |  |  |
| Tenant Improvements | - | 2,006,403 | - | 2,006,403 |
| Capital Improvements | - | 1,826,783 | - | 1,826,783 |
| **Total Capitalized Costs** | $              - | $  3,833,186 | $              - | $  3,833,186 |
|  |  |  |  |  |
| **Net Book Value** | **$  4,541,657** | **$ 39,863,736** | **$  3,205,488** | **$ 47,610,881** |

(1) - Where possible, net book values were obtained from the SFAR as of 2/28/09. In large parts, SFAR data was based on accounting information provided by Wextrust, however, the cost of the building and the balance of the loan payable on the property were not always recorded in the accounting system.  To the extent available, these amounts were obtained from other internal sources as of the most recent date available.  Loan payable amounts in some cases include accrued interest and late fees assessed by the lender.
(2) - Amounts shown do not include properties where the relinquishment process has been initiated or has been relinquished as of 2/28/09.
(3) - Amounts represent the net book value for Gold Coast Development, LLC.
(4) - First Highland, LLC and Commerce Center Holdings, which are TIC properties, are included at 100% even though the Wextrust interest is less (78.21% and 35%, respectively).
(5) - Baxtech Holdings, LLC, which was sold in April of 2009, is included.

As in the previous interim reports, Deloitte has assisted in preparing a cash forecast. Table 5, below, shows the cash forecast for Wextrust for May 1, 2009 through August 31, 2009. This cash flow forecast anticipates that, on a combined basis, the Wextrust Entities will generate a positive cash flow of approximately $922,000,[18] with the active WEP properties providing most of the positive cash flow (approximately $1.2 million).  This represents an improvement of

---

[18] This cashflow is exclusive of administrative expenses, which are discussed in Section VIII.

approximately $850,000 over the cash flow presented in the Second Interim Report, which projected positive cash flow of approximately $73,000.  The improvement is primarily attributable to a reduction in negative cashflow from the Axela hotel portfolio and reductions in Wextrust Capital operating expenses.

As of February 28, 2009, Wextrust Entities and Affiliates had approximately $21.3 million in cash in over 370 U.S. bank accounts identified by the Receiver to date.[19]  This compares to $23.1 million in cash reported in the Second Interim Report as of November 30, 2008 and $22.1 million reported in the First Interim Report as of September 30, 2008.  Pursuant to the Standardized Fund Accounting Reports ("SFARs") required by the Securities and Exchange Commission, which the Receiver submitted for the period December 1, 2008 through February 28, 2009, the Wextrust Entities and Affiliates reported $8.7 million in receipts and $10.9 million in disbursements.[20]

---

[19] The number of bank accounts is greater than that reported in the Second Interim Report due to the implementation of the cash management plan discussed in Section I.B.2.  At this point, new bank accounts at The Private Bank have been opened, but not all legacy Wextrust accounts have been closed.

[20] A SFAR is a standardized reporting mechanism used in SEC receivership cases.  The report provides the SEC with a statement of income and disbursements for a reporting period (quarterly) and is means for the SEC to keep track of the financial condition of an entity in receivership. A SFAR does not represent all activity in the bank accounts under the control of the Receiver and therefore may not reflect all receipts and disbursements during the period.

Base Cash Flow Projections for Wextrust Capital, LLC and Affiliates, et al. for the Four Months Ending August 31, 2009 (1)

| | WexTrust Capital, LLC and Affiliates (2) | Wextrust Equity Partners, LLC and Affiliates (3) | WexFord Development Group, LLC and Affiliates | Axela Hospitality, LLC and Affiliates (4) | Total for the 4 Months Ending 08/31/09 |
|---|---|---|---|---|---|
| Total Effective Income | - | 7,113,781 | 1,200 | 43,400 | 7,158,381 |
| Total Operating Expenses | 170,817 | 2,526,287 | 91,300 | 34,000 | 2,822,404 |
| Net Operating Income | (170,817) | 4,587,494 | (90,100) | 9,400 | 4,335,977 |
| Non Operating Expenses: | | | | | |
|   Debt Service - Interest (Including Swap Payments) | - | 2,609,865 | - | - | 2,609,865 |
|   Debt Service - Principal | - | 395,054 | - | - | 395,054 |
|   Capital Expenditures **(5)** | - | 27,950 | - | - | 27,950 |
|   Tenant Improvements & Lease Commissions | - | 122,104 | - | - | 122,104 |
|   Reserves | - | 75,490 | - | - | 75,490 |
|   Other Non-Operating Expenses | - | 182,724 | - | - | 182,724 |
|     Total Non-Operating Expenses | - | 3,413,188 | - | - | 3,413,188 |
| Net Cash Flow **(6)** | (170,817) | 1,174,306 | (90,100) | 9,400 | 922,789 |

(1) - Does not include non-critical current or past due payments.
(2) - This includes WexTrust Securities, LLC, WexTrade Financial, LLC the commodity and high-yield fund entities.
(3) - Amounts include First Highland, LLC and Commerce Center Holdings, which are TIC properties, at 100% even though the Wextrust interest is less (78.21% and 35%, respectively). Amounts exclude past due property taxes in excess of $400,000 and amounts for Baxtech Holdings, LLC due to the sale of the property.
(4) - Does not include net cash flow from third-party managed hotel properties (Drake Oak Brook and CP Phoenix) which were relinquished under an order approved by the Court on May 1, 2009.
(5) - Net of escrow draws available for capital expenditures.
(6) - Does not include most professional fees incurred by the Receiver.

## III.   DISPOSITION OF INVESTOR FUNDS

The Receiver Order requires the Receiver to investigate the disposition of investor funds. (Receiver Order at 4.) Deloitte, at the direction of the Receiver, has completed its analysis of the use of investor funds, described in the First Interim Report. (*See* First Interim Report at 79-81.)[21]

Deloitte has analyzed Wextrust records associated with 78 securities offerings. (*See* Second Interim Report at 21.) Deloitte analyzed contemporaneous company financial records, databases maintained by the company, and other contemporaneous documents, such as e-mails, and also

---

[21] This analysis is related to, but differs from, the commingling analysis described in the second interim report. That analysis focused on the nature and extent of commingling among the various Wextrust Entity and Affiliate accounts. The numbers presented in the First Interim Report were at an earlier stage of development and analysis. Since that time, Deloitte has continued to refine the analysis and in some instances the numbers herein presented are different from those presented in the First Interim Report.

conducted numerous interviews of Wextrust employees to evaluate the use of investor proceeds for these offerings. (*See* Declaration of John P. Sordillo in Support of Third Interim Report of Receiver, sworn to May 11, 2009 ("Sordillo Decl."), ¶ 6.) To date, Deloitte has assessed the disposition of investor proceeds for 44 of the 78 offerings. (Sordillo Decl. ¶ 8.) These 44 offerings, which are associated with approximately 72 bank accounts, were those for which Wextrust established segregated accounts, a practice which began in March 2005. (*See* Second Interim Report at 25; Sordillo Decl. ¶ 8.) Wextrust records for these 44 offerings included account statements, written descriptions of the deposits, withdrawals, and transfers, and other supporting documentation, such as e-mail correspondence. (Sordillo Decl. ¶ 9.)

Investor proceeds that were deposited primarily into the associated segregated accounts for these 44 offerings comprise approximately $187.7 million, or 60 percent, of total funds raised.[22] (Sordillo Decl. ¶ 10.) Of the $187.7 million, approximately $110.3 million was deposited into accounts associated with real estate investments, $44.2 million was deposited into accounts associated with investments in African diamond mining interests in South Africa and Namibia, $8.0 million was deposited into accounts associated with commodities trading activities, and $25.2 million was deposited into accounts associated with the Guaranteed Depository Receipts ("GDRs"), Guaranteed Subordinated Promissory Notes ("GSPNs"), and High Yield III.[23] (Sordillo Decl. ¶ 11.)

Investor proceeds were used for a variety of purposes, as shown in Figure 1 below. For example, approximately $58.4 million was used to purchase real estate, make capital

---

[22] This $187.7 million figure is the amount deposited inclusive of investor withdrawals or transfers during the same time period (March 2005-the commencement of the receivership.). Total funds raised refers to initial investments and reinvestments, which totaled approximately $313.5 million. (Sordillo Decl. ¶ 10.)
[23] These figures are net of investor movements of funds to accounts associated with other Wextrust investments.

investments, improvements, or other investment-related acquisitions.[24]  Of the approximately

$58.4 million used to purchase real estate, make capital investments, improvements, or other

investment-related acquisitions, approximately $32.7 million was transferred or "loaned" from

unrelated Wextrust Affiliate accounts to assist in the real estate closings.[25]  On many occasions, a

Wextrust Affiliate that had "loaned" funds to an unrelated Wextrust Affiliate to assist in a

property closing did not have sufficient funds for its own property closing and thus borrowed

funds from other, unrelated Wextrust Affiliates to close on its investment.  (Sordillo Decl. ¶ 12.)

These additional "loans" totaled approximately $27.0 million.  (*Id.*)  The net transfers to and

from Affiliates to assist in closing real estate transactions totaled approximately $5.7 million.

(*Id.*)

   In addition, approximately $40.1 million was transferred to the Linchpin account.

(Sordillo Decl. ¶ 14.)  This figure represents the net amount transferred to the Linchpin account

and not the total movement of funds to and from the account.  Deloitte estimates that

approximately $76 million was transferred to the Linchpin account from various Wextrust

Affiliate accounts, and approximately $35.9 million was transferred from the Linchpin account

to Wextrust Affiliate accounts.[26]  (*Id.*)

   Investor proceeds from the segregated accounts were used for other purposes:

(1) approximately $23.6 million was transferred to Pure Africa Minerals Pty. Ltd. and Pure

---

[24] This amount is net of approximately $2.8 million of loan proceeds from a third party used to close a transaction and the repayments of capital and loans of approximately $1.7 million.

[25] For example, on September 26, 2007**,** $432,000 was transferred from the Wextrust Capital operating account (the "Linchpin Account") to assist in the purchase of the 47 Dean Street property.  (Sordillo Decl. ¶ 13.)  Company records show that these transfers came from a variety of unrelated Wextrust Affiliate accounts, including those associated with Clarksville Industrial Investors, GDR, Interstate Park Investors, and two general Wextrust Capital accounts, including one account used for investor distributions.  (*Id.*)

[26] Deposits to and from the Linchpin account were made from accounts associated with real estate investments, accounts associated with investments in African diamond mining interests in South Africa and Namibia, accounts associated with commodities trading activities, and accounts associated with debt offerings.  As described in the First and Second Interim Reports, the funds transferred from a particular Wextrust Affiliate to the Linchpin account as "loan" to another Wextrust Affiliate were not necessarily transferred back from the receiving entity.  (*See* Second Interim Report at 26-27; Sordillo Decl. ¶ 14.)

Africa Investments Pty. Ltd.; (2) approximately $19.8 million was used to pay commissions to Wextrust employees and other individuals who solicited investments; (3) approximately $12.4 million was transferred to third-parties for various uses, such as repayment of debt on behalf of unrelated funds and investments in third party African entities related to diamond mining; (4) approximately $8.6 million was used to initiate the trading activities of the commodities offerings; and (5) approximately $17.2 million was used for other purposes, such as payment of dividends and distributions to investors, Wextrust Capital operating expenses, miscellaneous fees, investment-related expenses, travel expenses, bank fees, and transfers to various Wextrust bank accounts.[27]  (Sordillo Decl. ¶ 16.)

---

[27] Approximately $4.2 million was transferred to Wextrust employees.  Approximately $3.5 million was paid in dividends and distributions to investors.  Approximately $2.4 million was used to pay accounts payable and payroll expenses for Wextrust Capital.  Approximately $1.7 million was spent on miscellaneous fees, including architectural, consulting, legal, and other professional fees.  Approximately $1.8 million was used to pay investment-related expenses, such as mortgage-related expenses for Hamptons of Hinsdale.  Approximately $3.6 million was used for other purposes, such as travel expenses, bank fees, and transfers to various Wextrust bank accounts.  Deloitte was unable to determine the disposition of approximately $730,000 due to the lack of information available in the Wextrust records.  (Sordillo Decl. ¶ 16.)

**Figure 1: Uses of Proceeds of Analyzed Offerings**



Deloitte has been unable to perform an analysis like that described above for 34 of the 78 Wextrust offerings. The investor funds raised in connection with these 34 offerings predated the practice of segregating the proceeds of investor funds. Many of these funds were inextricably commingled in one of several Wextrust Capital operating accounts. (*See* Second Interim Report at 22-25.) Moreover, complete financial records and supporting documentation for these offerings have not been found in Wextrust's records.[28] (Sordillo Decl. ¶ 17.) To reconstruct the sources and uses of cash for these 34 offerings, the Receiver would need to obtain bank records from approximately 47 financial institutions for almost 300 accounts, including cancelled

---

[28] It is unclear why the records do not exist. However, Deloitte's investigation has identified numerous missing bank statements, checks and wire transfers that cannot be located, as well as references to missing documents or emails. (Sordillo Decl. ¶ 17.)

checks, wire transfer details, and relevant correspondence.  (*Id.*)  The level of activity associated with each of these approximately 300 accounts is unknown.  (*Id.*)

This would be a time-consuming and costly process.  In order to identify the use of the funds, each check and/or wire would need to be assessed to determine if sufficient descriptive information was provided to draw a conclusion with respect to usage.  (Sordillo Decl. ¶ 18.)  It is also likely that the information provided by the bank standing alone would be inconclusive for determining the usage of cash and that the bank records would have to be compared to supporting documentation from the company's files.  (*Id.*)  For example, where the payee name does not readily identify its purpose/use, supporting detail would need to be found.  As discussed above, supporting documentation for these 34 accounts found to date is sparse and it is unclear that sufficient corroborating information exists.  If corroborating information is not found, then it might be impossible to conclude how funds were used with any certainty.

Deloitte estimates that, at a minimum, such an analysis could take a period of four to six months to complete at a cost of $3 million to $5 million**.**  (Sordillo Decl. ¶ 19.)  There is also substantial risk that such a project would ultimately be inconclusive or incomplete due to the lack of adequate record-keeping at Wextrust.  (*Id.*)  Based on Deloitte's analysis to date, the Receiver has concluded that any benefit to the estate of additional analysis of the disposition of investor funds would be outweighed by the substantial cost and delay involved.

## IV.   STATUS OF WEXTRUST INTERESTS IN SOUTH AFRICA

As discussed in the First and Second Interim Reports, the Receiver has taken steps to prevent any further dissipation of Wextrust assets in South Africa and Namibia.  (*See* First Interim Report at 89-92; Second Interim Report at 35-37.)

In furtherance of these efforts, the liquidators of Pure Africa Minerals ("PAM"), one of which was nominated by the Receiver and approved and appointed by the Master of the High

Court of South Africa, have liquidated certain PAM Syndicate companies, including (1) African Spirit Traders (Pty) Ltd (which acquired various diamond processing plants); (2) Redlex 420 (Pty) Ltd (which procured and leased various earth moving equipment); (3) Vaticano Traders (Pty) Ltd (which was the administering entity of the Lichtenburg mines); and Brett Investments (Pty) Ltd (which was the administrating company of the Toscanini mine in Namibia). In April 2009, the liquidators filed an application in the High Court of Namibia seeking to liquidate Deva Investments (Pty) Ltd ("Deva"), the Namibian entity through which the Block III mine is administered, for payment of PAM funds that were transferred in the amount of R1 749 712 (approximately $200,000).

Since January 2009, the liquidators have been conducting inquiries into the business of PAM and the PAM Syndicate, including oral testimony, pursuant to South African law. The Receiver's South African counsel have attended these hearings, which are conducted in Afrikaans.[29] The hearings are expected to conclude within the next 60 days. Through the liquidation process, the Receiver has obtained financial records and other evidence concerning the activities of the PAM Syndicate.

The liquidators have identified PAM Syndicate assets, including equipment and machinery located at the mines. The estimated value of the assets identified to date is at least R 33 million (approximately $4,000,000).

The Receiver is analyzing transfers of funds from PAM to other PAM Syndicate entities. That analysis includes an assessment of the purpose of the transactions and the likelihood of

---

[29] In connection with these hearings, the liquidators have examined ten witnesses, including individuals associated with PAM, including Michael van der Merwe ("MVDM"), Elsjerie van der Merwe, Christoffel Lombard (PAM's former attorney), Euzita Henning (MVDM's sister and a director of Storm Technologies (Pty) Ltd ("Storm"), the company which brought the liquidation proceedings against PAM), Sybrand Hanekom (Financial Manager of PAM and auditor of various PAM Syndicates), Antoinette Botha (an employee of Storm Technologies); Danie du Plessis (a partner with PricewaterhouseCoopers responsible for the PAM account) and Leon van der Merwe (MVDM's relative).

recovering the funds. To this end, the Receiver's advisors have examined PAM's financial statements and bank statements pertaining to accounts held by PAM and have also interviewed various witnesses. However, based on discrepancies and irregularities found in these records, their reliability is questionable.

Based on the Receiver's preliminary analysis, PAM had no operational income. Its primary source of funds was investments from victims in the United States. The financial documents show transfers from PAM to PAM Syndicate entities and other entities in excess of R70 000 000 (approximately $8.3 million) for fiscal year 2007 and approximately R80 000 000 (approximately $9.5 million) for fiscal year 2008. For example, PAM appears to have transferred money to numerous PAM Syndicate entities from 2006 through 2008, including: Bret Investments (Pty) Ltd. (approximately R35 million ($4.1 million)); Tropical Paradise Trading 508 (Pty) Ltd. (approximately R13 million ($1.5 million)); Pure Africa Agriculture (Pty) Ltd. (approximately R11 million ($1.3 million)); Vaticano Traders (Pty) Ltd. (approximately R19.5 million ($2.3 million)); and African Spirit Traders (Pty) Ltd. (R10 million ($1.2 million). Moreover, PAM made transfers to other entities that were unaffiliated with PAM or the PAM Syndicate, including transfers of over R10 000 000 ($1.2 million) to Morning Glow Properties, a company owned by Elsjerie van der Merwe, the wife of Michael van der Merwe. Based on this preliminary analysis, the Receiver has identified a substantial number of suspicious transfers and is continuing to investigate the use of these funds.

Based on the evidence described above, the Receiver is considering an application to the High Court of South Africa to freeze assets that were purchased with Wextrust investor funds. The Receiver is also considering claims for the return of those assets, which could then be repatriated.

## V.     POTENTIAL CLAIMS AGAINST THIRD PARTIES

The Receiver is authorized to take preliminary steps to locate any assets that may have been conveyed to third parties, and to investigate, prosecute and otherwise participate in litigation to collect, conserve or recover assets of Wextrust.  (Receiver Order at 5, 8.)  As required by the Court's orders, the Receiver is continuing to investigate potential claims against third parties.  To date, receivership attorneys and investigators have interviewed more than 60 witnesses.  The Receiver has subpoenaed more than 15 entities and has collected and reviewed over 75,000 documents obtained in response to those subpoenas.

The Receiver has compiled a preliminary list of potential claims against third parties. Such claims include, *inter alia*, fraudulent transfers, fraud, breach of fiduciary duty, and professional malpractice.  In assessing such claims, the Receiver must consider a variety of legal issues, including standing, jurisdiction, and other procedural issues that are particular to the receivership context.  *See, e.g.*, *Eberhard v. Marcu*, 530 F.3d 122, 133-35 (2d Cir. 2008) (vacating trial verdict in fraudulent conveyance action based on receiver's lack of standing); *SEC v. Ross*, 504 F.3d 1130, 1140-45 (9th Cir. 2007) (vacating disgorgement order based on receiver's failure to obtain *in personam* jurisdiction over intervenor).  The Receiver will also consider whether pursuing a claim would produce a net economic benefit to the estate.  *See* UNITED STATED SECURITIES AND EXCHANGE COMM'N, BILLING INSTRUCTIONS FOR RECEIVERS IN CIVIL ACTIONS COMMENCED BY THE U.S. SECURITIES AND EXCHANGE COMMISSION (2008), at 1,7.

The Receiver has tasked forensic accountant Jerry B. Klein with identifying assets potentially available for recovery. Among other efforts, Klein is analyzing evidence of payments by Wextrust to executives, brokers, employees and third parties, including commissions and loans; evidence of contributions by Wextrust to charities; and evidence of payments by Wextrust

for the personal property, including real estate and home improvements, of Shereshevsky and Byers. Receivership attorneys are reviewing Klein's reports for potential additional third-party claims.

The Receiver is coordinating with the SEC and the United States Attorney's Office to ensure that recoveries against third parties are pursued in the most efficient and cost-effective manner. Although the Receiver is authorized to pursue claims, in some cases it may be preferable to defer to the SEC's efforts to pursue remedies such as disgorgement against relief defendants, or the United States Attorney's ability to seek restitution in criminal prosecutions. The Receiver will continue to consult with the SEC on the retention of professionals and the commencement of any civil actions.

## VI. INVESTOR RELATIONS AND RESPONSES TO INVESTOR INQUIRIES

The Receiver is required to "be available to respond to investor inquiries." (Receiver Order at 4.) In the past 90 days, approximately 1,000 emails have been received by the receivership email addresses, including (1) objections to the Receiver's Proposed Plan of Distribution, (2) inquiries or opinions regarding the Receiver's April town hall meetings, (3) routine requests regarding the status of Wextrust properties and legal proceedings, (4) requests to update contact information, and (5) requests to explain the distribution or objection process. The Receiver has sent approximately 300 substantive written responses to investor inquiries in the past 90 days.

### A. Publication of Proposed Plan of Distribution

On Friday, March 27, 2009, the Receiver filed his Proposed Plan of Distribution ("Receiver's Plan") (Dkt. No. 243) with the Court. The Receiver's Plan proposes a *pro rata* distribution of estate assets, based on findings that Wextrust engaged in systemic and pervasive commingling of victim funds, and that victims were similarly situated with respect to their

relationships with Wextrust.  The Receiver solicited comments, questions, and advice on the proposed plan from interested parties.  The Receiver's response to objections received to date are being filed today, May 11, 2009.

Within three days of the plan's filing, the Receiver sent either an email notification or a hard copy of the plan to all known investors who had provided contact information.  The Receiver also posted a copy of the Plan of Distribution online, compiled and posted a list of "Frequently Asked Questions" regarding the distribution plan online, and responded to investor telephone and email inquiries.

The Receiver will begin the process of distributing individual claims letters to investors by May 15, 2009.  These letters will detail the amount the investor invested in each Wextrust entity, according to Wextrust records, records received from investors, and investor interviews.  Investors will then be asked to review their claim statement and make any objections to the amounts listed by June 12, 2009.

### B.  **Town Hall Meetings**

The Receiver held a town hall meeting in Jerusalem on April 2, 2009. Approximately 100 people attended the town hall meeting, which was held at the Ramada Hotel in Jerusalem.  The Receiver held a second town hall meeting on April 23, 2009 in Chesapeake, Virginia, which is in the Norfolk metropolitan area.  Representatives of the SEC participated in the meeting, made a presentation on the status of the case and expressed the SEC's support for the Receiver's proposed plan of distribution.  The Receiver conducted only one meeting in the United States in order to minimize costs.  The Receiver chose Chesapeake as the location for that meeting, because the area had the highest number of investors and highest projected attendance.  Approximately 150 persons participated in the meeting, either in person or by telephone.

## VII. BANKRUPTCY DETERMINATION

The Receiver has been directed to determine whether any of the Wextrust Entities or Affiliates should undertake a bankruptcy filing.  (Receiver Order at 4.)  As set forth in the Management Plan and the Plan of Distribution, the Receiver has determined that no bankruptcy petition should be filed at this time.  Based on the valuation of the Wextrust real estate properties and the Receiver's analysis of the available management options, the Receiver has concluded that there would be no benefit to the estate in commencing a bankruptcy proceeding.  In the Receiver's judgment, any benefits of bankruptcy would be outweighed by increased costs and delay.  However, the Receiver is continuing to monitor the properties in light of the current volatility in the real estate and credit markets, and may change that conclusion based on future developments.  (*See* Management Plan at 18-22.)[30]

## VIII. ADMINISTRATIVE COSTS OF THE RECEIVERSHIP

The Receiver Order provides that the Receiver and his advisors shall be paid on a monthly basis for the first six months of the case, and quarterly thereafter.  (Receiver Order at 11.)  On December 30, 2008, the Court issued an opinion ("Fee Opinion") (Dkt. No. 166), approving, on an interim basis, the Receiver's first interim request for fees in the amount of $57,300, the fees of D&L in the amount of $1,718,144 and the expenses of D&L in the amount of $85,840.  The Court reduced the fee award to D&L by 20 percent, but ruled that D&L may apply for some or all of the amount of reduction at the conclusion of the case, based on the

---

[30] On December 17, 2008, the Court issued a memorandum decision (Dkt. No. 148) addressing various requests by the International Ad-Hoc Committee of Wextrust Creditors and the International Consortium of Wextrust Creditors (collectively, the "Committees").  The Committees sought, *inter alia*, to modify the Receiver Order so that involuntary bankruptcy petitions could be filed against the estate.  The Court granted in part and denied in part the requested relief, finding that it had the authority to preliminarily enjoin non-parties from filing involuntary bankruptcy petitions against the estate but modified the Receiver Order to permit any party or non-party – including the Committees – to apply to the Court for an order seeking permission to file an involuntary bankruptcy petition upon a showing that such a petition is appropriate and would benefit the receivership estate.  The Committees appealed the Court's decision to the Second Circuit.  The Committees filed their opening brief on March 23, 2009 and the Receiver and the SEC filed their responsive briefs on April 29, 2009 and May 1, 2009, respectively.  The Second Circuit will hear oral argument as early as June 22, 2009.

results achieved and the benefit to the receivership estate. The Court also granted Deloitte's first interim application in full, resulting in approval of fees in the amount of $66,640 and $13,602 in expenses. (Fee Opinion at 24-25.). On January 26, 2009, the Court granted interim fee awards of R 2,383,523 (approximately $253,000) to several South African advocates and a South African forensic accountant retained by the Receiver, covering the period from August 11, 2008 through December 31, 2008. (Dkt. No. 176).

On March 3, 2009, the Court entered an Order (Dkt. No. 206) approving, on an interim basis, the second interim request of the Receiver and Dewey & LeBoeuf ("D & L") for allowance of fees and expenses (covering September 2008). The Court approved the Receiver's second interim fee request of $51,562, D&L's second interim fee request of $1,510,024 and D& L's expense request of $161,990. Also on March 3, 2009, the Court entered an Order (Dkt. No. 205) approving Deloitte's second interim fee application. Unlike Deloitte's first interim application, which addressed only Deloitte's financial advisory fees, Deloitte's second interim application reflected fees for both financial advisory services during September 2008 and computer forensic and electronic discovery services for the period August 18 through September 30, 2008. The Court approved Deloitte's fees for financial advisory services in the amount of $275,000 and related expenses of $50,573, and Deloitte's fees for computer forensic services in the amount of $269,855 and related expenses of $30,588. The Receiver, D&L and Deloitte heavily discounted the fees associated with their second interim fee applications, and D&L volunteered a 20 percent fee hold-back after application of the discounts. The discounts and the hold-back reduced D&L's fees alone to approximately 53 percent of D&L's base lodestar amount.

On March 13, 2009, the Court entered an Order (Dkt. No. 214) approving the first interim application of Hilco for compensation and reimbursement of expenses. Hilco's first interim application covered the period September 2, 2008 through February 1, 2009. The Court awarded Hilco $783,750 in fees ($825,000 less a five percent hold-back) and $14,001 in expenses.

On March 27, 2009, the Receiver and D&L filed their third interim fee and expense application, covering work performed in October 2008. (Dkt. No. 238.) The Receiver sought an interim award of fees in the amount of $41,725, and D&L sought interim fees in the amount of $1,216,004 and expenses in the amount of $136,317. Again, both the Receiver and D&L discounted their fees, and D&L volunteered a twenty percent hold-back on its fees. After the SEC's request for an additional reduction, total reductions and hold-backs for the October period alone amounted to $1,231,547.03. The law firm of Sullivan & Worcester has objected by letter to the third interim application on various grounds, and D&L has filed a response to those objections.

The fee application process has proven to be burdensome and time-consuming, due to the required audit and review procedures. For example, the Receiver, D&L attorneys and other professionals have spent over 500 hours preparing the first four fee applications, for which D&L will receive no compensation. D&L will file monthly applications for November 2008, December 2008, and January 2009, and will file quarterly applications thereafter, pursuant to the Receiver Order. The Receiver expects that fee applications will be made current within the next three months.

Professional fees continue to decline. Based on the total amount of fees and expenses before the application of any discount or holdback, legal fees have declined substantially in each month beginning in September 2008. As reflected in Figure 2, below, gross fees and expenses

for D&L and the Receiver declined by approximately 17.5 percent from September to October, 29 percent from October to November, 28 percent from November to December, and 22.5 percent from December to January.[31]

**Figure 2:  Administrative Costs**



## IX.    <u>CONCLUSION</u>

Although the work of the Receiver is continuing, the majority of the work mandated by the Court under the Receiver Order has been completed.  The Receiver has determined the extent of commingling among the Wextrust Entities and Affiliates, discussed in the Second Interim Report, and the disposition of investor funds, discussed herein.  In the Receiver's judgment, the financial analysis conducted by Deloitte, together with the asset valuation conducted by Hilco (as

---

[31] Fees in Figure 2 do not include fees associated with Deloitte's computer forensic and electronic discovery services or fees associated with South African Advocates, Counsel, and Consultants.  Fees for D & L after November 2008 reflect estimates based on unaudited bills.  Fees represented for Deloitte for January 2009-March 2009 are also estimates.

reported in the Management Plan), provide a sufficient basis to assess the true financial condition of the Wextrust Entities and Affiliates, with the exception of the Wextrust interests in Africa. The books, records and documents of the Wextrust Entities and Affiliates in the United States have been secured. The Receiver has made a determination with respect to bankruptcy, subject to future reevaluation, as discussed above.

The Receiver has also implemented a plan for managing the real estate assets, has begun the sales and marketing process for many of the properties, and has relinquished properties that are not likely to return equity to the estate through a sale. The Receiver has continued to manage the High Yield loan portfolio. In addition, the Receiver has submitted a proposed plan of distribution, taken extensive steps to ensure participation by victims and interested parties, and has responded to objections to the proposed plan.

The Receiver will continue to manage the estate in a manner designed to preserve the *status quo* and the value of Wextrust properties and assets. The Receiver will continue to report on the financial condition of the receivership estate on a periodic basis. The Receiver will continue to take steps to prevent further dissipation or encumbrance of assets, including the internal controls, expense reductions and other management actions discussed herein, and the transactions outlined in the Management Plan. Similarly, the Receiver will continue to take steps to recover assets through sales of property, litigation and other available means. The Receiver will continue to be available to respond to investor inquiries, and will continue to take steps to inform investors and other interested parties of significant developments.

Dated:  New York, New York,
            May 11, 2009

                                                    Respectfully submitted,

                                                    Timothy J. Coleman
                                                    Receiver for Wextrust Entities


                                                    s/ Mark S. Radke_____
                                                    Mark S. Radke, *pro hac vice*
                                                    DEWEY & LEBOEUF LLP
                                                    1301 Avenue of the Americas
                                                    New York, NY 10019-6092
                                                    Tel. (212) 259-8000

                                                    Attorneys for Receiver

## CERTIFICATE OF SERVICE

The undersigned, an attorney, states that I am one of the attorneys for Timothy J. Coleman, Receiver, in this matter and do hereby certify that on **May 11, 2009** I directed the service of a true and correct copy of the foregoing **Third Interim Report of Receiver and all Supporting Declarations and Exhibits** upon the following individuals in the manner indicated below:

**Via First Class Mail**
Joseph Shereshevsky, 35857-054
MDC Brooklyn
Metropolitan Detention Center
P.O. Box 329002
Brooklyn, New York 11232

**Via ECF Notification & Electronic Mail**
Alexander M. Vasilescu, Esq.
Andrew M. Calamari, Esq.
Steven G. Rawlings, Esq.
Alistaire Bambach, Esq.
Danielle Sallah, Esq.
Philip Moustakis, Esq.
Attorneys for Plaintiff SEC

Barry S. Pollack, Esq.
Joshua L. Solomon, Esq.
Attorneys for non-party G&H Partners AG

Barry S. Zone, Esq.
Jason Canales, Esq.
Stephen Richard Popofsky, Esq.
Attorneys for Defendant Steven Byers

Michael Fred Bachner, Esq.
Attorney for Defendant Elka Shereshevsky

Philip A. Byler, Esq.
Andrew T. Miltenberg, Esq.
Attorneys for non-party Broadway Bank

Shalom Jacob, Esq.
Shmuel Vasser, Esq.
Attorneys for non-party Int'l Ad-Hoc
Committee of Wextrust Creditors

Louis Orbach, Esq.
Attorney for non-party TCF National Bank

**Via ECF Notification & Electronic Mail**
Martin Siegel, Esq.
Attorney for non-party Int'l Consortium of
Wextrust Creditors

Paul A. Levine, Esq.
Attorney for non-party Key Equipment
Finance, Inc.

David B. Gordon, Esq.
Beth L. Kaufman, Esq.
Attorneys for non-party Lawrence Costa

Harris Kay, Esq.
Marc X. LoPresti, Esq.
Attorneys for various non-party investors

Ethan Holtz, Esq.
Edward P. Gilbert, Esq.
Attorneys for Rait Partnership

Francesca Morris, Esq.
Attorney for Ticor Title Insurance Co. and
Heritage Community Bank

John M. Bradham, Esq.
Peter B. Katzman, Esq.
Attorneys for non-parties Space Park AIM and
ISSB Partnerships

Alan E. Marder, Esq.
Attorney for various interested parties

Edward F. Malone, Esq.
George R. Mesires, Esq.
Attorneys for Barrington and Hinsdale Banks


_____s/ Mark S. Radke___ _____