**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | 08 Civ. 7104 (DC) |
| Plaintiff, | |
| - against - | ECF Case |
| STEVEN BYERS, JOSEPH SHERESHEVSKY, WEXTRUST CAPITAL, LLC, WEXTRUST EQUITY PARTNERS, LLC, WEXTRUST DEVELOPMENT GROUP, LLC, WEXTRUST SECURITIES, LLC, and AXELA HOSPITALITY, LLC, | |
| Defendants, | |
| - and - | |
| ELKA SHERESHEVSKY, | |
| Relief Defendant. | |

### FOURTH JOINT MONTHLY APPLICATION OF THE RECEIVER AND DEWEY & LEBOEUF, LLP FOR ALLOWANCE OF COMPENSATION AND REIMBURSEMENT OF EXPENSES INCURRED DURING THE PERIOD NOVEMBER 1, 2008 THROUGH NOVEMBER 30, 2008

**TO:   THE HONORABLE DENNY CHIN**
**      UNITED STATES DISTRICT COURT**

Timothy J. Coleman, receiver (the "Receiver") for Wextrust Capital, LLC, *et al*.,

(collectively, the "Wextrust Entities")[1], and Dewey & LeBoeuf LLP ("D&L"), as counsel

to the Receiver, hereby submit their Fourth Joint Application for Allowance of

---

[1]      The SEC Complaint (as defined below) identifies five Wextrust Entities: Wextrust Capital, LLC ("WTC"), Wextrust Equity Partners, LLC ("WEP"), Wextrust Development Group, LLC, n/k/a Wexford Development, LLC ("WDG"), Axela Hospitality, LLC (Axela") and Wextrust Securities, LLC ("Wextrust Securities").

Compensation and Reimbursement of Expenses Incurred During the Period November 1, 2008 through November 30, 2008 ("Fourth Interim Application"). The Receiver requests interim approval of fees in the amount of $32,887.50 for the period November 1, 2008 through November 30, 2008 ("Fourth Application Period"). D&L requests interim approval of fees in the amount of $916,432.80 and reimbursement of expenses in the amount of $54,873.63 for the Fourth Application Period.[2]

This Fourth Interim Application contains the following sections:

**Section I** provides a brief summary of the background of the receivership and also contains case status information required by Section C.2 of the Billing Instructions for Receivers in Civil Actions Commenced by the U.S. Securities and Exchange Commission ("SEC Billing Guidelines").

**Section II** summarizes the procedures used by the D&L in compiling its billing records and other information requested by the SEC Billing Guidelines. Section II also describes in greater detail the various discounts taken by D&L, including the audit it performed at the request of the Securities and Exchange Commission ("SEC"), the SEC's requests for additional reductions, and the 20% holdback D&L applied for the purpose of complying with this Court's Opinion of December 30, 2008 (Dkt. No. 166) ("Fee Opinion") with respect to the First Joint Monthly Application of the Receiver and Dewey & LeBoeuf, LLP for Allowance of Compensation and Reimbursement of Expenses Incurred During the Period August 11, 2008 Through August 31, 2008 (Dkt. No. 92)

---

[2] The amount of fees requested for the Receiver and D&L reflects discounts in the amount of $83,817.50 (as reflected in paragraph 23(a) below); $144,480.50 (as reflected in paragraph 23(b) below); $22,859.50 (as reflected in paragraph 23(c) below); $308,344 (as reflected in paragraph 23(d) below) and $34,457.50 (as reflected in paragraph 23(e) below). The amount of fees further reflects a 20% holdback of $ 229,108.20 (as reflected in paragraph 23(f) below). The total fee discount amounts and holdbacks for the Fourth Application Period alone amount to $823,067.20.

("First Interim Application"). Section II also describes the various exhibits to this Fourth Interim Application.

Section III contains a narrative description of each activity category in which D&L professionals provided services to the Receiver during the Fourth Application Period, in accordance with Section D of the SEC Fee Guidelines.

Section IV contains a summary of all expenses for which D&L seeks reimbursement, the procedures and policies adopted by D&L to insure compliance with Section E of the SEC Fee Guidelines and the expense reductions taken by D&L.

Section V briefly summarizes the standards to be applied by the Court in determining fee awards in SEC equity receiverships.

I.      CASE BACKGROUND AND STATUS

        A.      Case Background

                1.      On August 11, 2008, the SEC filed its Complaint ("SEC Complaint") against individual defendants Joseph Shereshevsky ("Shereshevsky"), Steven Byers ("Byers") and the Wextrust Entities (collectively, the "Defendants"). The SEC Complaint alleged that the Defendants committed fraud in connection with at least 60 private placement offerings, which raised at least $255 million from at least 1,196 investors. These offerings occurred primarily during the period 2005 through 2007

                2.      The SEC further alleged that the Defendants represented to their investors (in many instances members of the Orthodox Jewish communities in New York City, Norfolk, Virginia, Israel and elsewhere solicited by Shereshevsky) that investments in particular securities offerings would be invested in properties associated with the investments. According to the SEC Complaint, Defendants used the investments to pay prior investors with respect to other offerings or to fund operating deficits either at the

holding company level or at the level of the various LLC entities formed by Byers and Shereshevsky to own specific property. The SEC Complaint further alleged that the Defendants failed to disclose Shereshevsky's status as a convicted felon and that certain Defendants violated broker-dealer registration requirements.

3.      To prevent further diversions of funds and dissipation of the assets of the Wextrust Entities, the SEC sought, *inter alia,* a freeze order barring any further dissipation of Wextrust Entity assets, including monies deposited in bank accounts, and the appointment of a receiver to take control of the Wextrust Entities and their affiliates.

4.      On August 11, 2008, the District Court entered its Order Appointing Temporary Receiver, entered as Docket No. 2 ("Initial Receivership Order").[3] The Initial Receivership Order appointed Timothy J. Coleman, a partner in D&L, as Temporary Receiver and ordered him to:

(a)      preserve the *status quo* with respect to the Wextrust Entities and all entities which the Wextrust Entities either controlled or in which they had an ownership interest, including without limitation over 240 entities and funds described in Exhibit A to the Initial Receivership Order (collectively, the "Wextrust Affiliates");

(b)      ascertain the true financial condition of the Wextrust Entities and Affiliates and the disposition of investor funds;

---

[3]      On September 11, 2008, the Court amended the Initial Receivership Order through the means of the Amended Order Appointing Temporary Receiver (Dkt. No. 36) ("Amended Receivership Order"). The Amended Receivership Order expanded the powers provided for under the Initial Receivership Order, by, *inter alia*, authorizing the establishment of a new cash management system to replace the byzantine collection of bank accounts employed by the Defendants, allowing the Receiver to enter into loan agreements and credit facilities to the extent necessary and authorizing the private or public sale of assets of the Wextrust Entities and Affiliates. The Amended Receivership Order is incorporated by reference in the Court's Amended Order on Consent Imposing Preliminary Injunction and Other Relief Against the Defendants and Relief Defendant, entered on October 24, 2008 (Dkt. No. 65) ("P.I. Order").

(c)     determine the extent of the commingling of funds between and among the multitude of Wextrust Entities and Affiliates;

(d)     prevent any further dissipation of the property of the Wextrust Entities and Affiliates;

(e)     prevent the further encumbrance or disposal of the property of the Wextrust Entities and Affiliates;

(f)     preserve the books, records and documents of the Wextrust Entities and Affiliates;

(g)     be available to respond to inquiries of Wextrust investors; and

(h)     determine if one or more of the Wextrust Entities and Affiliates should undertake bankruptcy filings.

5.     To accomplish the foregoing, the Initial Receivership Order provided the Receiver with various powers, including taking immediate possession and control of the numerous hotels, commercial properties, residential developments, mining operations and other Wextrust properties and assets located throughout the United States and overseas; obtaining exclusive control and sole signatory authority over bank and brokerage firm accounts owned or otherwise controlled by the Wextrust Entities and Affiliates both here and offshore; succeeding to all rights to manage the Wextrust Entities and Affiliates pursuant to the terms of various limited liability company ("LLC") operating and management agreements; paying from funds available to the Receiver necessary business expenses so as to preserve the assets and properties notwithstanding

the Court's Order Freezing Assets[4]; and taking preliminary steps to locate concealed assets and ascertain the disposition and use of funds obtained by the Defendants from the sale of securities.

6. The Initial Receivership Order further authorized the Receiver to engage attorneys, accountants and experts to assist him in carrying out the duties prescribed by this Court. To that end, the Receiver, in consultation with the SEC, retained D&L as legal counsel. The Receiver subsequently retained Jerry Klein, CPA, and Deloitte Financial Advisory Services ("Deloitte") as his accountants and Hilco Real Estate as his real estate advisors.

7. The tasks presented by the Initial Receivership Order can only be described as monumental. In comparison to many SEC cases alleging Ponzi schemes, this case does not involve a stock fund "boiler room" operation. Rather, Wextrust is a multi-national conglomerate with a wide variety of business operations. For example, one of the principal areas of activity during the Fourth Interim Period involved highly suspect investments made by the former principals of Wextrust in diamond mining operations located in South Africa and Namibia. The Amended Receivership Order required the Receiver to investigate these investments and recover any assets acquired through those investments. Thus, from the commencement of the receivership on August 11, 2008, the Receiver and his attorneys were confronted with the many difficulties inherent in repatriating foreign assets into the United States. Moreover, both the Receiver's foreign and domestic activities took place during the onset of probably the

---

[4] On August 11, 2008, the Court entered its Order Freezing Assets ("Freeze Order") (Dkt. No. 3). The Freeze Order prohibits the Defendants and various other persons from transferring, assigning or otherwise disposing of any assets, funds or other property of the Wextrust Entities and Affiliates.

most significant contraction in the global economy since the Great Depression, thus making the requirements of the Receivership Orders only that much more difficult to fulfill.

        8.      The Receiver's prior fee applications describe in detail the initial strategy of the Receiver with respect to taking control of Wextrust and its far-flung assets, preventing any further dissipation of assets and stabilizing its business operations. The prior fee applications also detail the efforts of the Receiver and his counsel to preserve documentary and electronic evidence located at Wextrust's 10 domestic and foreign offices (many of which the Receiver has now closed). The Fourth Application Period saw a marked decrease in evidence preservation efforts and other types of work designed to establish a status quo. By the end of October, the Receiver had largely stabilized Wextrust's management and operations. During the Fourth Application Period, the Receiver, his counsel and his other professionals turned toward the complex task of determining which properties within the receivership estate could be salvaged and which could not. The Receiver, after receiving Hilco's analysis of the value of the properties owned by the various single asset LLC's in early November, worked extensively with Hilco in developing a strategy for disposition of these properties. This disposition process included the development of a marketing plan for the WEP commercial real estate properties, continued efforts to salvage the three Axela hotel properties and the decision to relinquish most of the WDG residential developments because the receivership lacked the wherewithal to continue development. The Receiver's counsel continued forbearance and other negotiations with mortgage lenders, commercial vendors and other third parties to facilitate this process. The Receiver and his counsel also

worked extensively during the Fourth Application Period on identifying likely targets for future litigation as a means of supplementing the recoveries to be achieved from asset sales. At the same time, the Receiver made every effort to reduce the administrative expenses of the estate. The Receiver achieved a reduction in D&L's base lodestar figure[5] of approximately $700,000 during November as compared to the base lodestar figure for October.

9. Notwithstanding the concerted efforts of the Receiver and his professionals to reduce the cost of the receivership, the Receiver continued during the Fourth Application Period to focus on one his primary goals: to keep the investor victims of Wextrust's former management fully informed of his activities and provide them with a detailed analysis of his efforts to maximize their recoveries. Begun during the Third Application Period (October 1-31, 2008), the Receiver and D&L completed and disseminated the Receiver's First Interim Report on November 7, 2008 (Dkt. No. 88). The First Interim Report covered virtually all aspects of the receivership, including the numerous private placement memoranda used by Wextrust to raise funds, the real estate properties which Wextrust owned or financed, the South African mining operations and related litigation and the difficulties in tracing the monies transferred to Wextrust by investors. Another area of focus during the period was litigation in this Court. In early November, the Receiver and D&L completed a comprehensive opposition to the motion of the International Ad-Hoc Committee of Wextrust Creditors ("Ad Hoc Committee") to

---

[5] D&L computes the base lodestar figure by multiplying total hours billed during a particular application period by the customary rates of the professionals involved in the case. The base lodestar figure in this case serves as a starting point from which the various discounts are taken subject to a further and thorough review by the SEC. *Cf.* Fee Opinion at 15-16 (lodestar figure is subject to adjustment to arrive at a reasonable fee). In addition, the Receiver has agreed to an additional hold-back of twenty percent of the discounted lodestar amount, subject to reconsideration at the end of the case based on the results achieved. *See generally* Section II below, as well as similar sections in the Second and Third Interim Applications.

modify the Amended Receivership Order to permit the filing of involuntary bankruptcy petitions and to bar the Receiver from management of Wextrust Entities and Affiliates if chapter 11 bankruptcies were filed. The Receiver and his counsel also filed an extensive opposition to the motion of Larry Costa to remove the Block III investment in a Namibian diamond mine from the scope of the receivership (in effect requiring the Receiver to fight for control of the South African properties on two different continents). In both instances, the Receiver's and the SEC's oppositions to these motions were successful.

          10.      Although the business operations of Wextrust stabilized as the receivership continued, the Receiver and his professionals still had to address a plethora of business issues arising primarily from the misguided, and in some instances non-existent, management practices of Wextrust's two former principals. As financial conditions deteriorated through the first half of 2008—the very time when the Wextrust Entities and Affiliates most needed a coherent management strategy—Byers and Shereshevsky largely ceased to function. This was particularly apparent with respect to the development of the Park View Hotel in Chicago and Wextrust's two other hotel properties, with the Receiver and his professionals being compelled by circumstances to confront and address a series of difficult of operational and legal issues during the Fourth Interim Period. The Receiver's attorneys also continued their investigation of the commingling of investor funds with the general operational funds of the Wextrust Entities and Affiliates and addressed additional issues relating to the apparent use by Byers, Shereshevsky and other insiders of corporate funds for personal gain. Section III

of this Fourth Interim Application describes in considerably greater detail the work done in these and other areas.

B.    Case Status

11.    In accordance with Section C.2. of the SEC Fee Guidelines, the Receiver and D&L state as follows:

(a)    As of February 28, 2009 the receivership estate had approximately $23.1 million in cash held in approximately 370 bank and brokerage accounts.  Of this, approximately $7.6 million is available in accounts of WEP, WDG, WTC, Axela and PAM and $13.7 million is held by the commodity funds.

(b)    The Receiver filed the third series of Standardized Fund Accounting Reports ("SFARs") with the SEC in April 2009, covering the period December 1, 2008 through February 28, 2009.  The SFARs are filed on a quarterly basis. In accordance with the SEC Billing Guidelines, the SFARs were filed as Exhibit A to the Third Interim Application of Deloitte Financial Advisory Services LLP for Allowance of Compensation and Reimbursement of Expenses Incurred During the Period October, 2008 Through December 31, 2008 (Dkt. No. 322).  To avoid burdening the Court's docket with this voluminous report, the Receiver and D&L have not refiled the SFARs. Parties wishing to review the SFARs may view it as an attachment to the Third Interim Deloitte Application.

(c)    It is estimated that, as of March 31, 2009, accrued, unpaid administrative expenses amounted to approximately $8.5 million.  These administrative expenses consist in substantial part of accrued and unpaid professional fees and expenses owed to D&L and Deloitte.  In addition to these administrative expenses, the receivership

estate incurred and paid payroll and other operating expenses during the period December 1, 2008 through February 28, 2009 as indicated in paragraph 11(d) below.

(d)     As provided in the SFARs, for the period December 1, 2008 through February 28, 2009, the Wextrust Entities and Affiliates had received approximately $8.7 million in cash and cash equivalents.  For the period from December 1, 2008 through February 28, 2009, the Wextrust Entities and Affiliates have disbursed approximately $10.9 million in ordinary business expenses, including payroll, funded debt service and vendor trade payables.  Through March 31, 2009, the receivership estate has paid to the Receiver and D&L, Deloitte and Hilco the compensation and expenses approved by this Court pursuant to its Fee Opinion and in Orders entered on March 3, 2009 (Dkt. Nos. 205 and 206) and March 13, 2009 (Dkt. No. 214).  In addition, the receivership estate has paid $253,168.97 in compensation and expense reimbursement sought by various South African advocates, counsel and consultants pursuant to an order entered by the Court on January 26, 2009 (Dkt. No. 176).  No other disbursements had been made to estate professionals as of March 31, 2009.  On May 29, 2009, the Court issued its Memorandum Decision (Dkt. No. 353) granting the Third Interim Application of the Receiver and D&L covering the period October 1, 2008 through October 31, 2008 (Dkt. No. 238).  D&L subsequently received payment of these fees and expenses.

(e)     The Receiver cannot at this time state when he expects the case to be concluded.  The Receiver on March 27, 2009 filed with the Court his Motion for Order Approving Receiver's Proposed Plan of Distribution (Dkt. Nos. 241-43).  The Court held a hearing on the Plan of Distribution on May 21, 2009 and took the Plan of Distribution under advisement.  Even if the Court approves the Plan of Distribution, the

Receiver expects that it would be a minimum of several months before any distribution could be made due to the complexity of Wextrust's business operations and the Receiver's strategy of avoiding a "fire sale" of real estate properties during a period of declining commercial real estate values and limited credit available to prospective purchasers.

12.     As described in further detail in the Plan of Distribution, the Receiver has established a detailed procedure for handling creditor and investor claims. Depending on the Court's ruling, the Plan may have to be modified as to the dates contemplated for various filings.  However, the Receiver does not intend to modify the structure of the Plan's claims resolution process, unless ordered to do so.

13.     As of February 28, 2008, the primary assets of the receivership estate consisted of the following:

(i)     Cash and cash equivalents in the amount of approximately $21.3 million;

(ii)     Funded loans in the amount of $5 million held by various Wextrust Entities, primarily Wextrust High Yield Debt Funds I and III;

(iii)     LLC entity membership interests held by Axela in one hotel property with a book value, net of related debt, of approximately $17,400,000. The Court on May 1, 2009 granted the Receiver's motion to relinquish interests in the other two hotel properties (*see* Dkt. Nos. 300 and 301);

(iv)     LLC entity common membership interests held by defendant Wextrust Equity Partners ("WEP") in various office buildings, warehouses and a retail shopping center with a combined book value, net of related debt, of approximately $37,200,000;

(v)     Investments in PAM and other South African mining properties with an as yet undetermined book value;

(vi)     Various investor notes and other payables reflected on the books and records of WDG with a combined value as yet undetermined; and

(vii)     Unliquidated litigation recoveries.

14. The Receiver requested valuations of certain real estate projects in which one or more of the Wextrust Entities and Affiliates either hold secured or unsecured debt through the various high yield funds, hold an equity position or exercise control. The Receiver has received certain valuations. However, because of concerns about the effect disclosure of those valuations would have on the estate's ability to market and sell those properties in the near term and maximize the return to investors, the Receiver has decided not to make public disclosure of these valuations.

15. The Receiver currently holds no liquidated litigation recoveries. The Receiver may have causes of action against a number of third parties, including Byers and Shereshevsky. Pursuit of such claims would require additional expenditures for attorney's fees, forensic accounting services and expert witnesses. The Receiver anticipates that potential defendants will be the subject of one or more lawsuits filed in the District Court and that the likelihood of success would be substantial. However, the Receiver at this juncture cannot estimate the likelihood of collecting on any judgment against potential defendants.

## II. PRIOR INTERIM FEE APPLICATIONS, FEES AND EXPENSES REQUESTED HEREIN, DISCOUNTS AND HOLDBACKS AND DESCRIPTION OF EXHIBITS

16. In connection with the period August 11, 2008 through and including August 31, 2008 ("First Application Period"), the Receiver and D&L sought approval from this Court of compensation and reimbursement of expenses. In the First Interim Application, the Receiver sought compensation in the amount of $57,300. D&L sought compensation in the amount of $2,147,666.25 and reimbursement of its expenses in the amount of $85,840.

17.     On December 30, 2008, the Court issued the Fee Opinion granting the Receiver's request for compensation in full and D&L's request for reimbursement of expenses.  However, the Court reduced the fees requested by D&L by a factor of 20% of the requested $2,147,666.25, resulting in an interim fee award of $1,718,144.40 for the First Application Period.  The interim fee award is subject to D&L's right to apply for payment of the 20% reduction ($429,533.35) at the conclusion of the case.  Fee Opinion at 23.

18.     On or about February 12, 2009, the Receiver and D&L filed and served their Second Interim Application (covering the month of September 2008) (Dkt. No. 193).  The Second Interim Application provided for substantial discounts and a 20% hold back ("20% Hold-Back").  D&L reserved the right to apply for payment of the 20% Hold-Back for the period ($377,506) at the conclusion of the case.

19.     On March 3, 2009, the Court entered its Order Granting the Second Interim Application ("Second Application Order") (Dkt. No. 206).  The Second Application Order allowed the Receiver fees of $51,562.50 and D&L fees of $1,510,024 on an interim basis, subject to the right to apply for the 20% Hold-Back at the conclusion of the case.  The Court also approved reimbursement of expenses in the amount of $161,990.42.

20.     On or about March 27, 2009, the Receiver and D&L filed and served their Third Interim Application (covering the month of October 2008) (Dkt. No. 238).  The Third Interim Application provided for substantially the same types of discounts as the Second Interim Application and a 20% Hold-Back with the right to apply

for payment of the 20% Hold-Back for the period ($304,001.24) at the conclusion of the case.

21.     As noted above, on May 29, 2009 the Court entered its Memorandum Decision approving the Third Interim Application (Dkt. No. 353) ("Second Fee Opinion"). The Second Fee Opinion allowed the Receiver fees of $41,725, D&L fees of $1,216,004.97 and D&L expenses in the amount of $136,317.78. The Second Fee Opinion permits D&L to seek payment of the 20% Holdback at the conclusion of the case.

22.     The Second Fee Opinion was necessitated by a letter objection to the Third Interim Application lodged by G&H Partners, AG ("G&H") on or about April 8, 2009. The Second Fee Opinion largely confirmed the findings and conclusions set forth in the First Fee Opinion. The Court, however, did address two issues raised by G&H. First, the Court rejected G&H's contention that the urgency and complexity of this case had dissipated by October 2008 and thus D&L's fee request should be subject to additional reduction. The Court noted that the case was complex and that the complexity of the case was fully demonstrated at the May 21, 2009 hearing on the Receiver's Proposed Plan of Distribution. *See* Second Fee Opinion at 3. The Court also rejected G&H's argument that the Receiver had erred in not retaining less expensive law firms in the various parts of the country where Wextrust had its operations. The Court noted that the Receiver and D&L were attending to various urgent matters during October 2008. The Court also questioned whether retaining additional counsel now would result in any savings to the estate given the need for new counsel to acquire knowledge regarding the

case and the need for D&L to supervise, at least to some extent, new counsel retained by the Receiver.  *Id.* at 3-4.

23.     In connection with this Fourth Interim Application, the Receiver and D&L have agreed to the same series of discounts and holdbacks as were agreed to in connection with the Second and Third Interim Applications.  They are summarized as follows:

(a)     Pursuant to the public service discount applicable to this matter, the hourly fee for all services performed by the Receiver personally has been reduced from Mr. Coleman's standard hourly rate of $850 to $250.  This results in a reduction of the Receiver's fees (some of which are unquestionably legal in nature) from $116,705 to $32,887.50, a reduction of $83,817.50.  A description of the Receiver's activities is under Task Codes B420 and 430 (B430 lists travel time only and has been billed at $125 per hour, half the reduced rate of $250 per hour).

(b)     Fees for D&L professionals performing non-legal receivership services, including non-legal case administration, business operations and investor relations activities, continue to be billed at a capped rate of not more than $200 per hour.  Based on the $200 cap for non-legal receivership services, the fees for services in these three activity categories -- Business Operations (B210); Case Administration/ Receivership Non-Legal (B320); and Investor Relations (B400) -- have been reduced from $402,128.50 to $257,648, a reduction of $144,480.50.  This is the same type of discount applied to the base lodestar amount in all prior interim applications at the time the Receiver and D&L filed each application.

(c)     Section E.2.j. of the SEC Fee Guidelines permits non-working travel time to be billed at fifty percent of the professional's billing rate. The actual reduction for the Fourth Interim Period was $8,337.50 with respect to the Receiver, with the Receiver billing his travel time at half his reduced rate (or $125 per hour). D&L reduced its portion of this category by 50% (from $45,719 to $22,859.50).

(d)     At the time it submitted this Fourth Interim Application to the SEC on April 7, 2009, D&L also submitted an audit of its legal fees for the Fourth Application Period and suggested reductions. The audit eliminated all attorney billings of 30 hours or less (except for four partners who provided critical services in specific areas). The audit also eliminated all billings of five D&L attorneys (Jill H. Blumberg, Ariel E. Henderson, Morgan W. Holtman, Ying Lin and Hugh Sandler). The audit also provided for reductions in task codes B120, B130, B140, B160, B170, B230, B240, B270 and B280.[6] The total amount of the reduction per the D&L audit was $308,344.

(e)     On April 7, 2009, the Receiver and D&L submitted this Fourth Fee Application and its fee audit materials to the SEC. The SEC reviewed the materials and, after further communications with D&L, consented to an additional reduction in D&L's fee request in the amount of $34,457.50. This additional audit reduction consists of (i) a reduction of $19,377.50 with respect to certain billings the SEC viewed as falling within the "receiver function" and which D&L agreed to cap at $200 per hour; (ii) a reduction of $12,017.50 with respect to the billings of associate Nathan Larsen, which the SEC viewed as being more properly billed at senior paralegal rates and which D&L agreed to bill at a rate of $200 per hour; and (iii) a reduction of $3,062.50

---

[6]     The audit did not include task codes B210, B320 and B400 because, as explained in paragraph 23(b) above, D&L has classified those task codes as primarily pertaining to "receiver functions" and has capped its fees at $200 per hour. *See* further discussion in Fee Opinion at 20.

relating to the attendance of multiple counsel at the hearing before this Court on November 14, 2008. Based on the additional reductions and an agreed reduction in the expense request (*see* Section IV below), the SEC has no objection to the Fourth Interim Application.

(f) In the Fee Opinion, the Court applied an additional reduction factor of 20% of the D&L fee request after the various other reductions, subject to D&L's right to re-apply for the 20% reduction in connection with its final fee application in this case ("20% Hold-Back"). In accordance with the Fee Opinion, D&L has applied the 20% Hold-Back to its net fee amount of $1,145,541 to produce an interim fee request of $916,432.80, subject to D&L's right to re-apply for the 20% Hold-Back for the Fourth Interim Period in the amount of $229,108.20.

24. Accordingly, in connection with the Fourth Application Period, the Receiver requests interim compensation in the amount of $32,887.50. D&L requests interim compensation in the amount of $916,432.80 (a figure reflecting all the discounts and the 20% Hold-Back discussed in paragraph 23 above) and reimbursement of expenses in the amount of $54,873.63. Consistent with the Fee Opinion, the blended hourly rate for attorneys only has been calculated at $471.[7] After reductions for the hours written off (as opposed to capped) pursuant to the audit, all D&L professionals billed

---

[7] The blended hourly rate was calculated by dividing the total amount of attorney's fees (excluding all Receiver billings and all paralegal and other non-attorney professional billings and deducting the amount of attorneys' billings written off per the D&L audit, the reduction in attorney billings reflected in the additional SEC audit amount, the reduction in attorney billings resulting from the $200 cap on B210, B320 and B400 and the reduction in fees based on non-working travel time) by the total amount of hours billed by attorneys (excluding all Receiver time and all paralegal and other non-attorney professional time and deducting the hours written off (as opposed to capped) as a result of the D&L audit and half of the non-working travel time). The blended hourly rate does not reflect the reduction in fees resulting from application of the 20% Hold-Back. It does, however, reflect the hours worked by D&L attorneys on fee application and related matters in task code B410 (for which no compensation is sought per the SEC Fee Guidelines).

approximately 3,013 hours during the Fourth Application Period.  Hours per day on average were approximately 100.  The interim fees sought by D&L are approximately 55% of the net D&L Lodestar amount of $1,655,682.50 (see chart in paragraph 25 below).

25.     The following chart further demonstrates how the D&L interim fee request for the Fourth Interim Period was calculated:

Base Lodestar
Amount ...........................................................................................$1,772,387.50

Receiver's Gross Fees
Before Discount ............................................................................($116,705.00)

Net D&L Lodestar Amount ..........................................................$1,655,682.50

Discount Based on Cap on Task
Codes B210, B320 and B400.........................................................($144,480.50)

Deduction for 50% of Non-Working Travel Time ...........................($22,859.50)

Net amount before Audit and 20 % Hold-Back..............................$1,488,342.50

D&L Fee Audit ...............................................................................($308,344.00)

Additional SEC Fee Reduction........................................................($34,457.50)

20 % Hold-Back..............................................................................($229,108.20)

D&L Interim Fee Request................................................................$916,432.80

26.     The fee and expense amounts set forth above, the time commitment and the discounts applied by the Receiver and D&L take into account all relevant circumstances and factors as set forth in the New York Lawyer's Rules of Professional Responsibility, as it applies to D&L as attorneys and to the Receiver to the extent of his rendition of legal services to the receivership estate.  They take into account the nature of the services performed, the amount of time spent, the experience and ability

of the lawyers and legal assistants working on this engagement, the novelty and complexity of the specific issues involved, the time limitations imposed by the circumstances, and the responsibilities undertaken by the Receiver and D&L.  The fees requested and discounts also take into account the Fee Opinion and the Second Fee Opinion (which themselves take into account the complexity of the issues addressed and other factors referred to above).  D&L to a substantial extent uses the two Fee Opinions as a standard for determining D&L's interim fee requests in connection with the Fourth Application Period.

27.     This Fourth Interim Application includes certain exhibits[8]:

(a)     A Fee Schedule showing the total fees billed and hours worked during the Fourth Application Period by each D&L professional, along with the standard hourly billing rates of each such professional, is attached as **Exhibit A** hereto.

(b)     In accordance with Section D.3.c of the SEC Fee Guidelines, a summary reflecting the total fees billed and the hours worked by each professional in each of the activity categories in which D&L has divided its time is attached as **Exhibit B** hereto.

(c)     In accordance with the Section D.5 of the SEC Fee Guidelines, all time records of D&L professionals for the Fourth Application Period, arranged in chronological order within each activity category, are attached as **Exhibit C** hereto.

---

[8]     These exhibits do not reflect the discounts and 20% Hold-Back discussed in paragraphs 22-24 above.

    (d)  In accordance with Section E.1.a. of the SEC Fee Guidelines, a summary of all expenses incurred by D&L organized by expense category is attached as **Exhibit D** hereto.[9]

    (e)  Also submitted herewith is the Certification required by Section A.1 of the SEC Fee Guidelines.

    28.  The Receiver and D&L have previously filed the First, Second and Third Interim Applications in this case, as described above in paragraphs 16-22. D&L received no retainer in this case.

    29.  The Amended Receivership Order limits the Receiver and D&L to obtaining compensation solely from the assets and properties of the Wextrust Entities and Affiliates.

    30.  The Amended Receivership Order provides that the Receiver and his advisors shall be paid on a monthly basis during the first six months of the case and on a quarterly basis thereafter. In accordance with the SEC Fee Guidelines, and as noted above, the Receiver and D&L submitted the Fourth Interim Application and all Exhibits to SEC counsel 58 days prior to filing the Fourth Interim Application with the Court. The SEC has notified the Receiver and D&L that it has no objection to the Fourth Interim Application.

    31.  The Receiver and D&L professionals recorded all services performed in time increments of one tenth (0.10) of an hour. All services by D&L paralegals and other paraprofessionals support staff were professional in nature and, if

---

[9]  **Exhibit E** does not reflect the reduction in D&L computerized legal research expenses and travel expenses discussed in Section IV below.

not performed by the indicated paraprofessionals, would have been performed by attorneys.

32.     D&L took considerable care to ensure that paraprofessionals and other support staff were utilized to perform ministerial tasks, such as the creation and supplementation of electronic and hard copy data bases and the filing of pleadings in this Court using the ECF system. The Receiver and D&L placed these tasks for the most part within the Case Administration/Receivership Non Legal activity category (B320) and billed at rates capped at $200 per hour.

33.     Although 29 attorneys (56 less the 27 attorneys whose time was written off as part of the audit) billed time during the Fourth Application Period, a core group of attorneys performed the vast majority of the services. However, in some instances the receivership case required the involvement of senior attorneys with background and experience in the multitude of relevant litigation and transactional disciplines. As noted above in connection with discussion regarding the audit, the billings of attorneys who worked 30 hours or less on the case were written off in their entirety. In four instances relatively small amounts of time were spent by four attorneys with expertise relevant to specific issues in the case (Martin J. Bienenstock in connection with various matters relating to the litigation with the Ad Hoc Committee regarding involuntary filing and other bankruptcy issues, Timothy J. Carey in connection with the Wextrust commodities pools, Stuart Saft in connection with the Park View Hotel and other real estate matters and Abraham N. Slashy with respect to federal tax issues). These less significant involvements benefited the receivership estate because it gave the

core group of attorneys particular insight into and knowledge of important legal issues.

D&L did not write off the billings of these four attorneys.

### III.  SERVICES RENDERED BY RECEIVER AND D&L DURING FOURTH APPLICATION PERIOD

34.     In accordance with Section D.3 of the SEC Billing Guidelines, D&L segregated its time during the Fourth Application Period into fifteen activity categories[10]. Narrative summaries of these activity categories follow:

35.     <u>Asset Analysis and Recovery (B120)</u> Total Fees:     $156,049[11]

Although Wextrust sold securities to investors through a registered-broker dealer (Wextrust Securities), it also organized, provided initial capital and in most instances managed the real estate and other projects in which it solicited investments, including projects Wextrust financed.  During the Fourth Application Period, the Receiver and D&L continued analyzing real estate and other assets either owned or controlled by the Wextrust Entities and Affiliates and real estate on which the Wextrust high yield funds extended financing.  The liquidity crisis facing the Receiver at the inception of the receivership continued during the Fourth Application Period as general economic conditions deteriorated.  Many of the properties owned by the Wextrust Affiliates generate little or no cash flow.  Also, many of the projects which the Wextrust high yield funds had financed are in default.  With respect to these issues, of particular importance during the Fourth Application Period was the issuance by Hilco of valuation reports on the various properties.  These reports set the stage for disposition resolutions

---

[10]     This number includes task code B410 (Fee Applications) for which no compensation is sought in accordance with the SEC Billing Guidelines.
[11]     As noted above, **Exhibit C** hereto shows each professional working on a particular activity category and the total hours he or she billed in that category.  The fees for each activity category are stated herein without showing the discounts and the hold-back discussed in paragraph 23 above.

described in the Receiver's Plan of Management for Wextrust Real Estate Portfolio issued on January 15, 2009 (Dkt. No. 172). The Receiver and his counsel also continued their work on the status of the various Wextrade commodities funds, including the degree of commingling facilitated by former Wextrust management. Examples of services performed in this activity category and particular professionals involved include:

(a) reviewing the Hilco valuation reports issued in early November and preparation for and attendance at the meeting with Mitchell Kahn and other Hilco executives in New York on November 10, 2008 (David D. Cleary, Mohsin N. Khambati, Dean C. Gramlich);

(b) analyzing the TD Bank loan on the 120 E. Youngs property in New Jersey and negotiations with TD Bank on allowing legal title to the property to be transferred to the receivership estate (Jill H. Blumberg, Dean C. Gramlich, Jennifer O. Whitener);

(c) preparing a summary of third-party-owned property purchased with Wextrust assets, researching constructive trust and fraudulent transfer as a means of returning assets to the estate, discussing implementation of a freeze on the IRA accounts of Joseph and Elka Shereshevsky at Millennium Trust and following up with the Northern Trust and Wachovia Bank regarding various transactions relating to the personal bank accounts of Byers and other Wextrust personnel (Kristien M. Kahn, Scott T. Peloza);

(d) negotiating with Wells Fargo regarding the alleged default on its mortgage loan on the South Pine Street shopping center in Wisconsin and the

access of the receivership estate to the blocked account (Maria A. Dantas, Michelle M. Jenab);

(e)     continuing negotiations with Regions Bank (one of the primary mortgage lenders to various WEP entities in Tennessee and other Southeastern states) regarding an overall forbearance agreement and a resolution of swap agreement issues (Maria A. Dantas, Aline Attiyeh);

(f)     continued negotiations regarding the Boardwalk & Lincoln property in Atlantic City, New Jersey, including discussions with HPC Management, review of notices of abandonment and demolition on the site and discussions with the bankruptcy trustee regarding deposit and priority issues and the unwinding of the mortgage loan (Maria A. Dantas, Mohsin N. Khambati, Michelle M. Jenab);

(g)     negotiations regarding a confidentiality agreement relating to the High Yield Debt Fund I interest in the second mortgage on the Group West residential properties in Chicago and preparation of a subpoena to Heritage Bank, formerly the first mortgage lender on the property (Mohsin N. Khambati);

(h)     workout negotiations with defaulting borrowers and HPC Management on the Intervale, 410 E. Magnolia, 56 Walker Street and Seed America properties (Maria A. Dantas, Mohsin N. Khambati, Rebecca M. Reilly);

(i)     analyzing, with the assistance of Deloitte, Wextrust's commodity pool assets, including tracing funds into and out of the pools; preparing subpoenas to Avidus Trading, a foreign exchange trader in possession of Wextrust client funds, and certain of its employees; reviewing and analyzing subscription agreements; and research on the effect of commingling on the competing interests in client funds

(Timothy J. Carey, David D. Cleary, Vincent P. Schmeltz III, Nancy M. Riley, Ariel E. Henderson);

(j)      continued negotiations with UCB (construction lender on the 47 Dean Street condominium development in Brooklyn) regarding the funding of the 47 Dean Street construction loan, including the resolution of mechanics' lien issues arising from prior construction delays, and negotiations with Sheldon Liebb, a pre-receivership Wextrust employee, regarding an agreement allowing him to continue in his role in supervising completion of the construction (Mohsin N. Khambati, Matthew L. DiRisio, Renee I. Covitt);

(k)      analyzing the advisability of terminating leases of various Wextrust offices and potential breach of lease claims (David D. Cleary; Vincent P. Schmeltz III);

(l)      continuing negotiations with Amalgamated Bank (mortgage lender on the Park View Hotel) regarding loan defaults and mechanics' liens, reviewing proposals submitted by the Bank and discussing various exit strategies with Neil Aaronson of Hilco (Stuart Saft, Robin L. Moore, Mohsin N. Khambati; Renee I. Covitt); and

(m)      negotiations with John Breugelmans regarding the settlement of disputes regarding the proposed 625 W. Division condominium development in Chicago and outstanding loans owed to High Yield Fund III secured by the Spaulding Avenue properties in Chicago (Dean C. Gramlich).

36.      Asset Disposition (B130)          Total Fees:      $173,549.50

The Receiver and his counsel continued their focus on sale offers and other asset disposition issues during the Fourth Application Period. Partner David D. Cleary continued his review of purchase and acquisition proposals submitted by various persons and discussed pricing and related issues with Andrew Becker and other Hilco executives. David D. Cleary and other attorneys also began work on the Receiver's Plan of Management. D&L partner Maria A. Dantas and senior counsel Mohsin N. Khambati worked on various aspects of the sale of the Hammonds Outlots property in Louisiana (approved by the Court on December 22, 2008 (Docket No. 161)). D&L attorneys Dean C. Gramlich and Jill H. Blumberg engaged in negotiations with Ticor, the construction escrowee on the 6126 S. Plymouth single family residence, to facilitate the release of escrowed funds for the completion of finish work on the residence. Dean C. Gramlich concluded discussions with the two mortgage lenders on the Rogers Plaza shopping mall, setting the stage for relinquishment of that property in December (also approved by the Court on December 22, 2008 (Docket No. 160)). Dean Gramlich and Vincent P. Schmeltz also worked on extending the closing for the sale of the 451 Repton single family residence (approved by the Court on December 11. 2008 (Docket No. 219)). Associate Boaz I. Green negotiated the sale of personalty from Wextrust's office in Tel Aviv, Israel. David D. Cleary, Vincent P. Schmeltz III and John K. Warren worked on a memorandum addressing the Receiver's authority to sell assets free and clear of liens and other encumbrances and procedural issues relating to assets sales out of an SEC equity receivership.

On January 15, 2009, the Receiver filed his Plan for Management. Sale and other disposition activity will accelerate in the coming months. Hilco has completed

work on a comprehensive marketing plan and the Receiver and his advisors are in the process of implementing the plan. As noted in prior fee applications, the Receiver and his advisors must make every effort to avoid a "fire-sale" perception which would serve to lower returns on asset dispositions and ultimately to defrauded investors. At the same time, the Receiver's mandate includes timely distributions and, accordingly, he must proceed with the marketing plan.

37. Case Management/Legal (B140)                Total Fees: $79,158.50

This activity category consisted of a number of in-person and telephone conferences conducted by the Receiver, his attorneys and his advisors to, *inter alia*, discuss the disposition of various WEP, Axela and WDG properties based on Hilco's analysis of the portfolio, address a multitude of operational issues and implement the Receiver's strategy for recovering over $40 million in investor funds transferred to South Africa. The Receiver conducted meetings on operational issues with a limited number of his attorneys and advisors on November 5, 13 and 19. On November 10 and again on November 19, the Receiver conducted a status teleconference with D&L professionals regarding all aspects of the case, including progress on various assignments. These "all hands" meetings were necessary during the early stages of the receivership to coordinate the activities of D&L personnel, but were largely discontinued after the Fourth Interim Period as the Receiver began reducing the number of personnel involved in the case. The Receiver held meetings with Leo V. Gagion and other D&L attorneys to discuss litigation and corporate issues arising from Wextrust's investment in South African diamond mining operations and met with representatives of the United States Attorney on

November 14 to discuss the status of the South African recovery effort. These various conferences enabled the Receiver to maintain oversight over the legal work being done and to assign additional projects and also to keep federal authorities informed of the status of various matters.

This category also includes work done on the deregistration of Wextrust securities and the coordination of document filings in this Court. It should be noted that billings in this activity category were only 37% of the billings for October.

38. <u>Bankruptcy Analysis (General) (B160)</u> Total Fees: $41,996.50

David D. Cleary and attorneys in the Chicago office under his supervision finalized their analysis (initially prepared in August 2008) regarding potential bankruptcy and related capitalization issues as to each of the real estate LLC entities (the hotels, the WEP commercial properties and the WDG residential development projects) and prepared organizational charts of the various LLC entities in late October. The Receiver needed the analysis to determine, as required by the Amended Receivership Order, whether any Wextrust Entities or Affiliates might benefit from chapter 11 reorganization, how such filings might be accomplished and any specific impediments to filing with respect to individual single assets LLC's.

The activity category also contains partner Martin J. Bienenstock's analysis of various issues relating to the Plan of Distribution.

39. <u>Evidence Preservation (B170)</u>        Total Fees:    $3,717

At the inception of the case, the Receiver and D&L worked extensively with several data collection and preservation firms to insure that all existing documentary and electronic evidence was preserved, assembled and organized. That activity had

largely run its course by November. Billings in this activity category include continued work on accessing Wextrust's computer files in New York, the investigation of Michael Mostofsky and the service of subpoenas to obtain banking documents.

40.     Business Operations (B210)          Total Fees:     $205,625

Billings in this activity category also dropped significantly from comparable billings during October (by almost $132,000). Still, the Receiver and D&L continued to address a large number of business operation issues during the Fourth Application Period. Operational problems at the three Axela hotel properties continued to occupy the time of associate Robin L. Moore and senior counsel Mohsin Khambati. The partially renovated Park View Hotel presented a host of operational problems, including negotiations on the payment of past due utility bills, the allocation of utility expenses between Wextrust and the Perennial Restaurant (the principal tenant) and an appeal involving property taxes. Robin Moore also dealt with a variety of property improvement and other business issues related to the other two hotels (the Wyndham Drake Hotel in Oak Brook, Illinois and the Crown Plaza Hotel in Phoenix). Other properties necessitating attorney intervention included the Hamptons of Hinsdale condominium development (refund claims by condominium purchasers); the office building operated by Wextrust Affiliate First Highland, LLC (the preparation of rent rolls and operating statements for the Munden Family Partnership, an investor with a tenancy in common interest in the property); the 47 Dean Street condominium development (preparation of draw requests to insure timely payments to subcontractors); and the retail shopping center owned by First Wyoming Plaza, LLC near Grand Rapids, Michigan

(funding of operating expenses in the face of an ongoing dispute over ownership of a lockbox account).

The Receiver and D&L attorneys continued to deal with employee compensation and termination issues as the Receiver proceeded with the downsizing of business operations. Associates John K. Warren and Nancy M. Riley worked with Bank of America and other financial institutions to obtain on-line access to Wextrust bank accounts and facilitate wire transfers to meet expeditiously the obligations of particular Wextrust single asset Affiliates. D&L attorneys also worked with Deloitte and Wextrust employees to simplify the extraordinary number of bank accounts used by prior management by consolidating of Wextrust's bank accounts into a centralized cash management system at Private Bank. Another recurring issue consisted of maintaining general liability and property insurance on the various properties. D&L continued to refine the Request of Action (or "RFA") procedure for expediting the Receiver's approval of non-recurring payments to third parties.

With respect to this activity category, D&L capped its billing rates at $200 per hour, resulting in a fee reduction of $109,143 (53% of the base lodestar figure).

41.     Financial Analysis (B230)                    Total Fees: $145,138

During the Fourth Application Period this activity category consisted of the preparation and completion of the Receiver's First Interim Report on all aspects of the receivership, including the real estate properties owed by the single asset LLC entities, the private placement memoranda issued by Wextrust to prospective investors, the status of the South African litigation and all other litigation to which the Wextrust Entities and Affiliates were parties, cash flow and other financial issues, the forensic accounting work

done to trace the disposition of investor funds, and communications with investors. The Report included a number of charts and a national map showing the location of Wextrust properties. Associate Robin L. Moore acted as principal editor of the First Interim Report, but a number of other attorneys drafted particular sections. The preparation of such reports is common in SEC equity receiverships and the Receiver viewed the First Interim Report as essential in informing investors of the status of his efforts on their behalf. The Receiver filed the First Interim Report on November 7, 2008 (Docket No. 88).

42.     Litigation (General) (B240)          Total Fees: $391,079.50

This activity category covers work on the litigation commenced by the Receiver in South Africa to obtain access to the books and records of PAM and Pure Africa Holdings, Ltd. ("PAH") and recover the $40 million in cash transferred to South Africa. D&L attorneys in South Africa (Greg Nott and Rajen Ranchhoojee) and in the United States (Ilona B. Coleman and Miatta T. Dabo) assisted the Receiver's South African counsel in reviewing PAH, PAM and other entity financial reports, e-mails and other documents; revising the Receiver's reply affidavit in the litigation in the Pretoria High Court over access to documents and preparing the numerous exhibits thereto; authenticating the reply affidavit in accordance with South African law; and drafting an urgent motion for recognition of the receivership in the liquidation cases commenced by Storm Technologies against PAM and its affiliates.[12]  Local partner Greg Nott met

---

[12]     It should be emphasized that the Receiver did not commence the foreign liquidation of PAM and its affiliates and only learned of it after it had been commenced. These liquidations greatly complicated the Receiver's efforts to obtain documents relating to the flow of funds into Wextrust's South African affiliates.

frequently with David Bam and other South African counsel and advocates representing the Receiver in the High Court in Pretoria and worked on forensic auditing issues with Daniel Sabbagh, a South African forensic accountant retained by the Receiver. D&L attorneys Ilona B. Coleman and Miatta T. Dabo also analyzed issues relating to the liquidation proceedings and completed the preparation of nine extensive proofs of claims to be filed in the various liquidation cases. Ilona B. Coleman attended the first meeting of creditors on November 24, 2008. D&L partner Leo V. Gagion supervised and coordinated the activities of the various attorneys in consultation with the Receiver.

During the Fourth Application Period, Leo V. Gagion also continued in his role as principal point of contact for opposing counsel and other parties in interest in domestic litigation matters. Counsel Vincent P. Schmeltz III and associates Nancy M. Riley and Nathan D. Larsen worked on subpoenas and other discovery issued to Avidus Trading, Kenneth Wolf, Paul Adrian and accounting firm Calzada & Associates relating to the Wextrust commodities funds. Vincent Schmeltz deposed a representative of Calzada & Associates regarding the purported consolidation of the financial statements of Wextrust funds and other issues. Nathan Larsen also worked extensively with private investigators on locating Victoria Alvarado, a known associate of Byers. D&L attorneys in the firm's Chicago office also attended various hearings in a number of Illinois state court cases involving Wextrust Affiliates directly or involving Wexwater, a joint venture between WTC and Stillwater, which extended a number of speculative, high yield loans.

In D&L's Washington office, associate John K. Warren and client specialist (and former federal law enforcement agent) Thomas Feeney assisted the SEC and the U.S. attorneys' office in a number of matters, including opposition to Joseph

Shereshevsky's attempt to lift the freeze on his personal bank accounts. Associate Kristien Kahn, resident in the firm's New York office, drafted a memorandum on the interview with Zvi Gluck, one of Wextrust's principal equity raisers.

43. <u>Receivership Court Proceedings (B270)</u> Total Fees: $183,521

As discussed in the Third Interim Application, D&L represented the Receiver in a dispute with the Ad Hoc Committee and the International Consortium of Wextrust Investors ("Consortium") over those entities' request to modify the Amended Receivership Order. Pursuant to this Court's Order of October 15, 2008 setting a pre-motion conference, the Court heard argument from the Receiver and all other interested parties on October 23 regarding the dispute over the Amended Receivership Order's limitation on the ability of third parties to commence involuntary bankruptcies and other issues and, at the request of the Receiver's counsel, Martin J. Bienenstock, set a briefing schedule. On October 30, 2008, the Ad-Hoc Committee filed its Motion Objecting to Entry and Seeking Modification of Preliminary Injunction (Dkt. No. 70) ("Modification Motion"). In this Motion, the Ad-Hoc Committee sought leave to file immediately involuntary chapter 11 cases against various undisclosed Wextrust Entities and Affiliates, to strip the Receiver of the right to manage the Entities and Affiliates if a chapter 11 cases were filed and to obtain other relief.

The Receiver vigorously opposed the Modification Motion for a number of reasons, including the fact that immediate bankruptcy filings would provide no benefit to Wextrust investors and would substantially increase administrative expenses. In late October and early November, D&L attorneys Martin J. Bienenstock, Mark S. Radke, David D. Cleary, Dean C. Gramlich, Vincent P. Schmeltz III and John K. Warren

prepared an extensive opposition arguing that the filing of involuntary bankruptcies would not benefit Wextrust investors and would increase administrative expenses by creating one or more dual administrations and that existing case law allowed the Receiver to continue to manage Wextrust Entities and Affiliates in the event he deemed chapter 11 a beneficial alternative. D&L partner David D. Cleary worked extensively with Hilco and Deloitte on declarations supporting the opposition. The Receiver filed the opposition and the supporting declarations on November 6, 2008 (Dkt. Nos. 81-85). On December 17, 2008, this Court entered its Memorandum Decision largely denying the Modification Motion (Dkt. No. 148).

In addition to this litigation, D&L joined with the SEC in opposing the November 14, 2008 Motion of Lawrence Costa to Modify the Amended Order Appointing Temporary Receiver ("Costa Motion") (Dkt. Nos 96-100). The Costa Motion had as its purpose the termination of the Receiver's control over Block III Mines & Minerals, LLC, one of the entities involved in former management's ill fated investment in African diamond mines. The Receiver prepared an opposition to the Costa Motion (Dkt. Nos. 119-120). Once again, the Receiver and the SEC were successful. On January 30, 2009, this Court entered its Memorandum Decision denying the Costa Motion (Dkt. No. 182).

In addition to these matters, D&L attorneys worked on a motion to relinquish the receivership estate's interest in the Rogers Plaza shopping mall and negotiated with both the lenders on the property (Citizens Bank and RAIT Financial) regarding the terms of the relinquishment order. D&L attorneys also drafted motions for approval of the sale of the Hammond Outlots and 451 Repton properties, which were

filed in early December.  The Court approved all three of these motions in December, despite the opposition of the Ad Hoc Committee and the Consortium to the Rogers Plaza and Hammond Outlots motions.

44.     Federal and State Tax Matters (B280)  Total Fees:  $33,626

This activity category covers D&L's legal work on the increasing number of tax matters facing the receivership estate.  D&L partner Abraham Slashy and other attorneys reviewed IRS notices sent to Wextrust and analyzed various tax issues relating to the receivership.  Christine Y. Chi and associate Kristien M. Kahn responded to investor inquiries regarding the GSA tax return and K-1's.  Senior counsel Mohsin N. Khambati addressed issues arising from a personal property tax increase on the Crown Plaza Hotel in Phoenix and a related appeal.

45.     Case Administration/Receivership Non-Legal (B320)  Total Fees: $104,145.50

This activity category covers work primarily done by D&L paralegals and litigation support personnel in creating and maintaining electronic and hard copy filing systems and document depositories; accessing and conducting searches on Concordance and other data bases and assisting attorneys in their searches; uploading hard copy documents to the Concordance data base; updating the Extranet site and creating a new folder structure; creating a new Intralinks data base; preparing spreadsheets on all Wextrust Entities and Affiliates; assisting in other aspects of the preparation of the First Interim Report; indexing documents; creating and updating document binders; updating mailing and contact lists; sorting and delivering mail from the Receiver mail box; coding investor materials; posting documents to the Receiver's website; assisting Kristien Kahn

in the wind down of Wextrust's former New York office; assisting Ilona Coleman in authenticating documents at the South African Embassy in New York; and assisting in the RFA process.

With respect to this activity category, D&L capped its billing rates at $200 per hour, resulting in a fee reduction of $10,299.50.

46.    <u>Investor Relations (B400)</u>        Total Fees: $92,358

In connection with this category, D&L attorneys Margaret V. Dennis, Ying Lin and Eric Laufgraben supervised temporary paralegals hired though LegalTrak to assist in responding to investor inquiries fielded during the Fourth Application Period. Use of temporary personnel at a billing rate of $40 per hour reduced expenses of the receivership estate substantially. In addition to supervising the investor call center and in some instance responding to certain calls, attorneys Dennis, Lin and Laufgraben and various D&L paralegals sorted materials received from investors and entered them into the investor database; reviewed investor emails in the website inbox; scanned boxes of investor materials onto compact discs; researched investor claims that their initial investments had been rolled over into new investments without their knowledge and provided related materials to the United States Attorney; updated the investor call log data base and interview data base; interviewed investors who had not previously contacted the Receiver; mailed copies of the First Interim Report to investors without computer access; and created investor contact lists with respect to the Hammond Outlots sale.

D&L attorneys and paralegals also worked with the Receiver in organizing the New York "town hall meeting" of investors on November 10, 2008 and arranging for video feeds to investors in Chicago and Norfolk, Virginia.

With respect to this activity category, D&L capped its billing rates at $200 per hour, resulting in a fee reduction of $25,038.

47.     Receiver Time (B420)                     Total Fees: $106,930

This category covers work performed by the Receiver during the Fourth Application Period in performing the duties established under this Court's orders. Generally, the Receiver supervised all legal work performed by D&L and all aspects of the business operations of the Wextrust Entities and Affiliates. The Receiver's activities ranged from conferences with working groups of D&L attorneys and paralegals regarding the South African litigation, investor relations and other matters to meetings with the United States Attorneys' office. The Receiver supervised the preparation of the First Interim Report and the oppositions to the Modification Motion and the Costa Motion. The Receiver attended all hearings before this Court during the Fourth Application Period. The Receiver analyzed the financial condition of Wextrust, communicated extensively with Hilco on asset disposition issues and personally approved all payments and other disbursements to third parties. The Receiver also responded to investor inquiries and attended the New York "town hall" meeting on November 10. The Receiver worked on the various matters relating to the ongoing South African/Namibian litigation and supervised the forensic work undertaken by Deloitte and Jerry Klein. Although the Receiver's standard billing rate is currently $850 per hour, D&L has

reduced his hourly rate to $250 as part of its public service discount, as discussed in Section II above.

With respect to this activity category, the reduction in the Receiver's billing rate (to $250 per hour for his regular time and $125 for his travel time) resulted in a fee reduction of $83,817.50.

48.    Travel Time                          Total Fees: $55,494

This activity category covers all non-working travel time of D&L professionals during the Fourth Application Period. **Exhibits A, B** and **C** and the amount stated above reflect the actual travel time of the professionals. Section E.2.j. of the SEC Fee Guidelines permits non-working travel time to be billed at fifty percent of the professional's billing rate. The actual reduction was $8,337.50 with respect to the Receiver, with the Receiver billing his travel time at half his reduced rate (or $125 per hour). D&L reduced its portion of this category ($45,719) to $22,859.50.

IV.    **EXPLANATION OF EXPENSES AND RELATED POLICIES**

49.    D&L seeks reimbursement of its out-of-pocket costs in the amount of $54,873.63, a reduction of $64,380.50 from expenses actually incurred. **Exhibit D** sets forth the various categories of expenses for which D&L seeks reimbursement. Also, pages 181 through 256 of **Exhibit C** to the Fourth Interim Application contain further detail regarding each of the expense categories for which D&L seeks reimbursement. D&L will retain the documentation supporting these expenses for a period of seven years in accordance with the SEC Fee Guidelines and will provide the SEC with copies upon request.

50.    D&L observed the following policies in connection with its expenses during the Fourth Application Period:

(a)     In accordance with Section E.2.b. of the SEC Fee Guidelines, D&L seeks its internal photocopying expenses (listed as reproduction expenses in **Exhibit D**) at a rate of $.15 per page.  D&L made 46,526 regular internal photocopies during the Fourth Application Period at the $.15 rate.

(b)     In accordance with Section E.2.g., D&L seeks reimbursement of outgoing facsimile charges at a rate of $1.00 per page for outgoing transmissions.  D&L made 1,157 outgoing facsimile transmissions during the Fourth Application Period.  D&L cannot readily determine its toll charges.  D&L has not charged for incoming facsimile transmissions.

(c)     **Exhibit D** (and **Exhibit C** at pages 194-203) reflect total Lexis and WestLaw charges of $63,754.22.  D&L has written off all such charges, resulting in a reduction in total expenses of $63,754.22.

(d)     At the request of the SEC, D&L has written off $626.28 in out of town transportation charges.  *See* **Exhibit C** at page 254.

(e)     **Exhibit E** (and **Exhibit D** at pages 204-205) reflect miscellaneous charges of $15,130.50, with $14,872.50 of that amount attributable to payments to Morrison Security.  These charges are for required security personnel at the Wextrust offices in Chicago and New York.

(f)     With respect to all expenses, D&L seeks reimbursement only for the actual cost of its filing fees, postage and overnight delivery fees, long distance telephone charges and other costs and expenses.  D&L has not included in any request for expense reimbursement the amortization of the cost of any investment, equipment or capital outlay (except to the extent that any such amortization is included

within the permitted allowable amounts set forth in the SEC Billing Guidelines for photocopies and facsimile transmissions).

(g)     Whenever possible, D&L has used email to transmit documents via portable document format, thereby reducing facsimile, overnight courier and copying costs otherwise chargeable to the receivership estate.

(h)     In accordance with Section E.2.j. of the SEC Billing Guidelines, D&L has not sought reimbursement for local travel expenses, including mileage, transportation and meals.

(i)     With respect to long distance travel expenses, D&L professionals have used the lowest available airfare and have not sought reimbursement for luxury accommodations or deluxe meals.  In maintaining its expense documentation, D&L retains copies of receipts relating to long distance travel.

(j)     D&L has not sought reimbursement for secretarial, word processing, proofreading or document preparation expenses (other than by professionals or paraprofessionals), data processing and other staff services (exclusive of paraprofessional services) or clerical overtime.

(k)     In some instances, cost incurred during a particular application period will not be reflected in D&L's records until a subsequent application period.  D&L will seek reimbursement for such "trailing" expenses in subsequent fee application periods.

## V.     FACTORS TO BE CONSIDERED BY THE COURT IN AWARDING FEES

The case law on equity receiverships sets forth the standards for approving receiver compensation and the fees and expenses of the receiver's counsel.  The District Court has discretion to determine compensation to be awarded to a court-appointed

equity receiver and his or her counsel and "may consider all of the factors involved in a particular receivership in determining the appropriate fee." *Gaskill v. Gordon*, 27 F.3d 248, 253 (7th Cir. 1994). Many authorities (some quite dated) provide "convenient guidelines", but in the final analysis, "the unique fact situation renders direct reliance on precedent impossible." *Securities & Exchange Comm'n v. W.L. Moody & Co.*, 374 F. Supp. 465, 480 (S.D. Tex. 1974), *aff'd*, 519 F. 2d 1087 (5th Cir. 1975).

As noted by this Court in the Fee Opinion, the reviewing court will normally consider a number of factors in determining a reasonable fee. *See* Fee Opinion at 13-14. In allowing counsel fees in SEC receiverships, "[t]he court will consider . . . the complexity of problems faced, the benefit to the receivership estate, the quality of work performed, and the time records presented." *Securities & Exchange Comm'n v. Fifth Ave. Coach Lines, Inc.,* 364 F. Supp. 1220, 1222 (S.D.N.Y. 1973); s*ee also United States v. Code Prods*., 362 F.2d 669, 673 (3rd Cir. 1966) (court should consider the time, labor and skill required (but not necessarily expended), the fair value of such time, labor and skill, the degree of activity, the dispatch with which the work is conducted and the result obtained). " '[R]esults are always relevant.' " *Securities & Exchange Comm'n v. Elliott*, 953 F.2d 1560, 1577 (11th Cir. 1992), *quoting Moody,* 374 F Supp. at 480. However, a good result may take a form other than a bare increase in monetary value. *Id*. ("Even though a receiver may not have increased, or prevented a decrease in, the value of the collateral, if a receiver reasonably and diligently discharges his duties, he is entitled to compensation."). Obviously, overall results can be determined only at the conclusion of the case.

Another "basic consideration is the nature and complexity of the legal problems confronted and the skill necessary to resolve them." *Moody*, 374 F. Supp. at 485. Moreover, "[t]ime spent cannot be ignored." *Id.* at 483. This is particularly true when the dimension and complexity of a receivership prevent counsel from taking on other full time assignments. *Id.* at 483-486 (describing the efforts of the receiver counsel's in the difficult task of determining ownership and disposability of a bank's assets and the high priority given to the matter by counsel). Another "significant factor is the amount of money involved." *Id.* at 486; *see also Gasser v. Infanti Int'l, Inc.,* 358 F. Supp 2d 176, 182 (E.D.N.Y. 2005) (receiver's legal fees "must be reasonable in light of the services rendered by counsel and the amount of property held in the receivership"). Also, as this Court noted in its Fee Opinion, "opposition or acquiescence by the SEC to the fee application will be given great weight." Fee Opinion at 14 (*quoting SEC v. Fifth Ave. Coach Lines, Inc.,* 364 F. Supp 1220, 1222 (S.D.N.Y. 1973)).

Under these standards the Receiver and D&L have adequately demonstrated that the amount of fees requested is appropriate. The Receiver and D&L have diligently pursued the Receiver's overall recovery strategy during the Fourth Application Period, thereby setting the stage for asset dispositions that will maximize payments to the victims of what appears to be a massive fraud. The benefit to investors, though not quantifiable at this stage of the receivership, will become quantifiable as the case proceeds. The Receiver has worked tirelessly during this period to oversee Wextrust's business operations, report the status of those operations to investors, determine the value of Wextrust's business assets and use all justified legal remedies at his disposal to recover additional assets. In accordance with the Amended Receivership Order, the Receiver,

through the First Interim Report and other means, has provided investors with substantial information and enabled them to monitor the Receiver's activities on their behalf. The Receiver has assisted federal governmental authorities in their investigation of the Ponzi scheme allegedly perpetrated by Byers, Sherevesky and others acting in concert with them. The amounts at issue in this case are substantial by any measure; hundreds of millions of dollars of assets and investments are within the scope of the receivership.

As emphasized by the Court in the Second Fee Opinion, the issues being addressed by the Receiver and D&L are highly complex, ranging from commodities trading to real estate finance to diamond mining to the investigation of complex fraud perpetrated over a multi-year period. *See* Second Fee Opinion at 3. The magnitude of this case greatly limits the ability of the Receiver and his core group of attorneys to accept other employment at this time. Nor will comparisons with other receiverships adequately reflect the effect of the unprecedented crisis in the nation's financial markets that has accelerated as the receivership itself has proceeded, making the Receiver's efforts only that much more difficult and time consuming. In keeping with the Fee Opinion's emphasis on the rule of moderation discussed therein (*see* Fee Opinion at 16), the Receiver and D&L have agreed to reductions totaling $823,067.20 as a means of addressing the amount of time devoted by D&L to the case during the Fourth Application Period and its standard billing rates.

Based on the foregoing, we respectfully submit that the compensation sought by the Receiver and D&L is wholly warranted.

WHEREFORE, PREMISES CONSIDERED, the Receiver and D&L respectfully request that the Court:

(a)     grant interim approval of the Receiver's compensation in the amount of $32,887.50;

(b)     grant interim approval of D&L compensation in the amount of $916,432.80, subject to D&L right to seek payment of the 20% Hold-Back ($229,108.20) at the conclusion of the case;

(c)     grant interim approval of D&L's request for reimbursement of its out-of-pocket expenses in the amount of $54,873.63;

(d)     order the Wextrust Entities to pay within ten (10) business days from available cash the approved fees of the Receiver and D&L in the amounts set forth herein and reimburse D&L for its approved expenses; and

(e)     grant such other relief as the Court deems appropriate.

Dated: New York, NY
      June 4, 2009

Counsel to the Receiver,
Timothy J. Coleman


/s/  Harvey Kurzweil
Harvey Kurzweil
Dewey & LeBoeuf LLP
1301 Avenue of the Americas
New York, NY 10019
212.259.8000 (t)
212.259.6333 (f)

and

Mark S. Radke (*pro hac vice*)
Dewey & LeBoeuf LLP
1101 New York Avenue – NW
Suite 1100
Washington, D.C. 20005
202.346.8000 (t)
202.348.8102 (f)

CH 26311.3 100186 000001 6/4/2009 01:18pm
CH 26311.1 100198 000001 6/2/2009 09:50am