UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X
SECURITIES AND EXCHANGE
COMMISION,

                          Plaintiff,              Case No. 08-CV-07104(DC)

                                                  **DECLARATION OF**
    -against-                                     **LAWRENCE A. COSTA**

STEVEN BYERS, et al.,

                          Defendants.
-------------------------------------------------------X

       LAWRENCE A. COSTA hereby declares, under penalties of perjury, as

follows:

       1.    I make this declaration based on personal knowledge and in

opposition to the Receiver's Motion for Contempt and Other Relief against me (the

"Motion").

A. **My Background**

       2.    I am a 51 year old father of four children, two of whom are

adopted. I also am a 27 year veteran of the United States Army, having served 12

years on active duty with service in Iraq during the First Gulf War. I still hold my

rank of Lieutenant Colonel and possess a Top Secret Clearance.

       3.    I started a small company in the attic of my home and grew it

into a multi-national, multi-million dollar successful business. My company

currently employs over five hundred (500) people in seven (7) countries.

## B. My Losses from Investing in Wextrust

4.     My losses from my investments in companies promoted by WexTrust Capital, LLC and WexTrust Securities, LLC (collectively "WexTrust") exceed $10 million. To my knowledge, my investment losses exceed those of every other WexTrust investor.

5.     I am a preferred member of, and the largest single investor in, Block III Mines & Minerals, LLC, a Virginia limited liability company ("Block III"). Until June 4, 2009, I was also on the Board of DEVA investments (Pty) Ltd., a Namibian corporation (DEVA").

6.     Block III could have appointed anyone to the DEVA Board, and not just one of its investors. I did not owe my position on the DEVA Board to the fact that I was a Block III investor.

## C. My $1.2 Million Voluntary Loan to DEVA

7.     Block III was formed to raise capital to invest in the Block III diamond mine in Namibia, Africa. The capital raised by Block III was to be loaned to DEVA. In exchange for making the loan to DEVA, Block III was issued 30% of the equity capital stock in DEVA. The other shareholders of DEVA include Pure Africa Minerals (Pty) Ltd, a South African corporation ("PAM"), Juno Investments, Inc., a Namibian corporation ("Juno"), and RZT Investments, Ltd., a South African corporation ("RZT"). The internal affairs of DEVA are governed by a Shareholder's

Agreement dated March 15, 2007, by and among PAM, Block III, RZT and Juno, a copy of which is attached to this Declaration as Exhibit A.

8.  DEVA's right to operate the Block III mine emanates from a Joint Venture Agreement dated March 1, 2007 between DEVA, as assignee of Pure Africa Holdings (Pty), Ltd., Boomriver Diamond Mining (Proprietary) Ltd and the Namibian Former Robben Island Political Prisoners Trust ("NFRIPT"), which holds the Exclusive Prospecting License ("EPL") for the mining area known as "Block III" (the "Joint Venture Agreement"). A copy of the Joint Venture Agreement is attached as Exhibit B.

9.  In the case of the Block III mine, the Joint Venture Agreement gives the mine operator (i.e., DEVA) the right to operate the mine. The Joint Venture Agreement requires that 30% of the net income from operations be paid to NFRIPT, with the balance of the proceeds divided among the shareholders of DEVA. The Joint Venture Agreement also gives NFRIPT the right to terminate the Agreement if the mine ceases to operate for any reason. If the Joint Venture Agreement were terminated, DEVA and its investors, including Block III, would have no opportunity to earn income, and there would likely be a total loss of Block III's investment in DEVA.

10. At the time of the arrest of defendants Byers and Shereshevsky, I was advised that the NFRIPT was going to terminate the Joint Venture Agreement because construction of the Block III mine had not yet begun. When the Receiver showed no interest in addressing the situation, I determined that if I did

3

not act, Block III's investment in DEVA (and my own sizeable investment) would be lost.

11.     I met with the Receiver for approximately 15 minutes in South Africa in early September 2008 and I met with the Receiver for approximately one half hour prior to the Receiver's town hall meeting in Norfolk, Virginia on September 11, 2008. In those meetings, I attempted to communicate to the Receiver the grave circumstances of Block III's investment and expressed a desire to figure out a plan to save this investment. In order to memorialize those conversations and my proposed plan of action, I had my attorney in Virginia, Thomas E. Snyder, write a letter to the Receiver dated September 15, 2008. A copy of this letter is attached as Exhibit C. I never received a response to this letter from the Receiver.

12.     I advised the Receiver in the meeting of September 11, 2008 as well as in the letter dated September 15, 2008, that I wanted the opportunity to be in charge of the affairs of Block III in exchange for making a working capital loan to DEVA to allow it to achieve its objectives and to save the investment which had been made by the preferred members of Block III. In order to achieve that, I had my attorney request the names, addresses and capital contribution amounts of the preferred members of Block III in an e-mail to Robin L. Moore, an attorney with Dewey & LeBoeuf, as well as in a letter to the Receiver dated September 17, 2008. A copy of this letter is attached as Exhibit D. Under the terms of the Operating Agreement of Block III (attached as Exhibit E) as well as under VA Code §13.1-

1028, I was entitled, as an investor in Block III, to the information concerning the other investors.

13. On September 22, 2008, the Receiver responded to my request for information by providing a letter dated September 20, 2008, stating that the request was under consideration and a response would be provided to me. A copy of this letter is attached as Exhibit F. My attorney responded immediately to the Receiver's letter and, on September 22, 2008, advised the Receiver that I did not understand why the Receiver could not provide the information concerning the other investors and made clear again why that information had been requested. A copy of this letter is attached as Exhibit G.

14. By letter dated October 2, 2008, one of the Receiver's attorneys, Leo Gagion ("Gagion") of Dewey & LeBoeuf, finally responded to the September 22, 2008 letter from my attorney. A copy of this letter is attached as Exhibit H. In Gagion's letter, he stated that the Receiver considered my attempt to contact the other preferred investors in Block III to be contrary to the Receivership Order, and for that reason he considered my attempting to contact the other preferred investors in Block III an improper purpose, but said nothing about helping DEVA before it collapsed. See Ex. H.

15. The Receiver knew, from the September 11, 2008 meeting, why I wanted to contact the other preferred investors. Although my Virginia counsel and Gagion spoke on October 3, 2008 and Gagion indicated that he would get back to him the following week, my Virginia counsel never received a response or a further

phone call from Gagion. As can be seen from all of the correspondence between counsel for the Receiver and my counsel, I tried to be open and transparent with the Receiver as to my objective, which was to save the investment that the preferred investors made in Block III, for the benefit of all.

16.     As part of the temporary solution to the financial problems of Block III and DEVA, I volunteered to lend DEVA $1.2 million as a working capital loan, which DEVA needed to pay salaries and construction costs in order for the mine to become operational. By making such a loan to DEVA, I took a significant personal financial risk that had the effect of protecting the financial interests of every single WexTrust investor who had invested in Block III.

17.     I had no obligation to make the $1.2 million loan, but did so because the Receiver was not making such a loan or indeed taking any action to prevent the loss of the investment in Block III. Thus far, the loan has not been repaid and I expect to lose every penny of it.

D.    **My Motion to Modify the Receivership Order**

18.     Because the Receiver had shown no interest in solving the financial problems of DEVA and Block III, and had in fact avoided any discussion with me about the rapidly deteriorating situation in Africa, on November 14, 2008, I moved before this Court, with the support of approximately 90% of the preferred members of Block III, for permission to replace the Receiver as the manager of Block III, with an entity controlled by me.

19.     The Court denied that motion by Order dated January 30, 2009.
A copy of the Order is attached as Exhibit I.  The Court further directed me,
pursuant to the January 30, 2009 Order, to cooperate with the Receiver "to the
extent that [I], as an investor in Block III, an entity over which the Receiver
assumed control pursuant to the term of the Amended Receiver Order, is required
to cooperate with the Receiver."

E.     **My Resignation from the DEVA Board**

20.     On June 4, 2009, I resigned from my position as a DEVA
director.  See correspondence dated June 8, 2009 attached as Ex. J.  Subsequently,
on June 8, 2009, my counsel delivered a disk containing all documents that I
acquired as a DEVA board member to the Receiver's counsel, for delivery to
whomever the Receiver nominated to replace Costa as a DEVA director.  *Id.*

F.     **Slanderous Remarks and Misstatements Made By the Receiver
Directed Towards Costa**

20.     I understand that the Receiver has made a number of remarks
about me that are highly pejorative and false.  One such assertion is that I told
Michael van der Merwe that I would support a termination of the Receivership
(which purportedly prompted van der Merwe not to cooperate with the Receiver).
That is not true.  I never did anything or said anything to this effect and the
Receiver has no evidence to support this assertion.

21.     I also understand that the Receiver thinks that I engaged in
wrongdoing by acquiring an interest in Juno.  This makes no sense.  The interest I

7

acquired in Juno was not owned by any WexTrust investor and/or controlled by the Receiver.

22. Also, contrary to the Receiver's assertion that I previously revealed confidential information that I had learned as a director of DEVA in my November 12, 2008 declaration, that is not so. None of the information contained within my prior Declaration is confidential information that I learned as a DEVA director.

## G. My Charitable Contributions

23. It is my understanding that the Receiver wishes to interview me to deny a distribution to me from the receivership estate. Although I do wish to receive a distribution, my desire to receive a distribution from the receivership is motivated by a sense of justice, not a desire to receive money for myself. In fact, I have already committed to contributing to charity any amount of money I receive as a distribution from the receivership. Specifically, I will donate such amounts as charitable contributions in equal shares, to the ASPCA, Norwich University, and Fathers and Family.

WHEREFORE, the Receiver's motion for contempt and other sanctions directed at me should be denied.

Executed on the _18_ day of June, 2009.

Lawrence A. Costa