June 17th, 2009

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x
SECURITIES AND EXCHANGE COMMISSION,
Plaintiff,                                          08 Civ. 7104 (DC)

   - against -

STEVEN BYERS, et. al.                               ECF Case

                 Defendants,

   - and -

ELKA SHERESHEVSKY,
                 Relief Defendant

------------------------------------------------------------x

**RESPONSE TO THE RECEIVER'S SUPPLEMENTAL DATED JUNE 5th, 2009 REGARDING THE PROPOSED PLAN OF DISTRIBUTION**

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 6-18-09

Martin Malek *pro se*
1019 East 21st Street
Brooklyn, NY 11210
(71) 926-3517

1

## Introduction

Much has been submitted to you in the recent weeks regarding the treatment of investors in the four commodities funds (collectively, the "Futures Funds") covered by this proceeding, namely the WexTrade Principal Protected Fund I, LLC ("WPP Fund"); WexTrade Diversified Futures Fund I, LLC ("WDF Fund"); WexTrade Principal Offshore Fund I, Ltd. ("WPO Fund"); and WexTrade Diversified Offshore Futures Fund I, Ltd. ("WDOF Fund"). While I believe your honor has in front of him most of the information necessary to reach a conclusion in this case, there are a number of additional points I wish to summarize regarding my personal standing in this hearing, and how that might bear upon your decision regarding the Receiver's proposed plan of distribution

### I. The Receiver's Plan to Equitably Subordinate all Investors in the Futures Funds Is In Reality a 'Deep Pockets' Strategy

My core contention is that from the start of this proceeding the Receiver has chosen a strategy that ignores the contractual positions of the investors in the Futures Funds and attempts to collapse our capital accounts in the Futures Funds with the aggrieved investors in various Wextrust entities (collectively, the "Wextrust Investors") in order to provide the cash and net worth needed to fund the ongoing expenses and an ultimate negligible return to the Wextrust Investors.

In order to do so, the Receiver had to ignore the fact that (a) The Futures Funds were not part of the ongoing ponzi scheme concocted by Byers, et.al. to misappropriate investor's funds to pay liabilities not associated with the investor's target investment (b) The Futures Funds had been successfully managed by separate registered CTA's up until

2

the filing of this case(the "August 08 Filing"), (c) all the investor's funds were fully accounted for in segregated capital accounts at the time of the August 08 Filing.

By ignoring these facts and lumping the successful Futures Funds in with the dozens of fraudulently managed Wextrust entities the Receiver created a large pile of cash with which to work with. This was nothing more than a thinly veiled attempt at a 'deep pockets' strategy, whereby the entity with the largest positive equity along with its' cash balance (in this case, almost the entire cash balance of the combined receivership, as the Futures Funds had in excess of $17 million dollars in liquid cash and no offsetting liabilities of any consequence at the start of this hearing, whereas the other Wextrust entities were real estate entities saddled with illiquid properties encumbered with secured debt that in many cases exceeded the value of the intangible assets ) would be used to pay the ongoing shortfalls in various Wextrust entities as real property was disposed, cover the Receiver's ongoing legal and associated expenses, and ultimately return some cash to the Wextrust Investors.

It was precisely this outcome (namely using the Futures Funds as a 'deep pocket') that a number of my fellow investors attempted to forestall in the Motion to Intervene dated December 15th, 2008 (the "Motion to Intervene"). Although your ruling dated January 30th, 2009 denied the motion given the complexities and overhead of managing numerous entities under the Wextrust umbrella as separate proceedings, I submit that the burden of proof necessary to collapse the class of investors in the Futures Funds into the Wextrust Investors should be much greater then that used by this court to determine the Motion to Intervene.

3

Tellingly, in the Receiver's papers concerning that the Motion to Intervene, as well as the current motion before this court, nowhere does the Receiver provide a list of all entities detailing what the estimated equity value or potential recoveries are for each one. I humbly submit that the reason this has never been supplied up to this date is that by doing so the Receiver would have displayed to this court the blatant abuse of equity he is attempting to have placed upon the class of investors in the Futures Funds.

An example of what I am referring to would have looked something like this:

## Analysis of Entities Covered by SEC v. Byers

| Entity Name | Approx. Amt Invested by Investor Class | Type of Asset Invested into | Approx. Amt of Secured Debt + Unsecured Debt[1] | Was Cash/Assets Diverted / Stolen from Entity ? | Cash Balance at start of proceeding | Estimated Market Value of Assets | Approx. Net Worth of Entity |
|---|---|---|---|---|---|---|---|
| Wex Entity I | $600,000 | 3rd Mortgage against 625 W. Division Condominiums, L.P. | $0 | Yes | $15,000 | Unknown | Most likely $0 |
| Wex Entity II | $7.75 million | 1st Mortgage against Atlantic City, NJ property | $5,000,000 | Yes | $25,000 | $3m - $10m | $0 - $2.25 million |
| Wex Entity III | $15 million | Investment in South African properties | Unknown | Unknown | Unknown | Unknown | Unknown |
| ....... | ( Complete | List of Wextrust | Entities ) | ....... | | | |
| WPP Fund | $3.434 million | Commodity Futures | $0 | No | > $3.434 Million | All Cash | > $3.434 Million |
| WDF Fund | $10.997 million | Commodity Futures | $0 | No | > $10.997 Million | All Cash | > $10.997 Million |
| WPO Fund | $321,000 | Commodity Futures | $0 | No | > $321,000 | All Cash | > $321,000 |
| WDOF Fund | $1.758 million | Commodity Futures | $0 | No | > $1.758 Million | All Cash | > $1.758 Million |

---

[1] Both the SEC & the Receiver have proposed equitably subordinating the claims of unsecured creditors to that of the general class of investors. G&H Partners has filed a brief in opposition to this, and there may other unsecured creditors who oppose this attempt as well. Pushing aside my opinion as to the merits of either side's argument, for the purposes of illustrating the implied net worth of each entity in the Estate, the Receiver ought to have included the unsecured class as a separate itemized liability.

While I am not in possession of the definitive data, all the testimony to date by the Receiver indicates that would such a chart be generated the fact is it would look similar in style & substance to what I have attempted to illustrate above. The overwhelming majority of both cash and current net worth in this proceeding is being provided by the four individual commodity pools – the Futures Funds - in order to benefit investors in dozens of entities[2]. Most of these entities have little to no discernable net worth because they invested in real estate at the height of the market, **not because** they were defrauded[3]. There are also a few investment vehicles that might generate net worth in the future if asset values rebound.

The conclusion is inescapable: without pulling in the Futures Funds under the guise of claiming the investors in such funds were the victims of the same fraud as investors in Wextrust entities, the Receiver would have little to no current equity, (and certainly the vast majority of the cash!) to work with.

## II. A More Reasoned Plan by the Receiver's Would Have Distinguished Between Four Broad Based Categories of Investors

If the Receiver would have provided the table entitled "Analysis of Entities Covered by SEC v. Byers" it would have been clear that there are four broad based investor groups ("Four Tiers") covered by this proceeding (collectively, the "Estate").

First, there exists the Futures Funds, the four commodity pool entities that collectively make up in excess of $17,000,000 in net worth (collectively these claims are

---

[2] The Receiver agreed to this fact, when asked by the court during the May 21st, 2009 hearing (see transcript, page 85 line 24) "THE COURT: What I'm hearing is that most of the cash that's available is from the commodities funds. Is that true, first of all?    MR. RADKE: Yes. "

[3] The Receiver testified that there are approximately $250 million of gross real estate assets encumbered with approximately $200 million in secured debt. This is compared to the approximately $10 million that was the known extent of the fraud, mainly surrounding properties associated with the "GSA investment".

"Tier 1 Investments", although I will divide them by subgroup, below). All four funds were managed by outside registered commodities futures advisors and generated profits that accrued to each individual's capital account. At the time of the filing of this Estate, the overwhelming majority (98%+) of its' collective assets were in cash and cash equivalents.

As a matter of law, it is my opinion that Tier 1 Investments (with the exception of investors who used purported profits from other investments in entities covered by the Estate) could and should be treated equally. Tier 1 Investments are legally segregated capital accounts in a commodities trading pool. The mere existence of tainted investors within the pool should not be the basis for equitably subordinating all investors in the pool. Under that theory, as some fellow Futures Funds investors have pointed out, the Estate would have been better off had some of the tainted money been invested in traditional mutual funds; if say $10 million of tainted funds was invested in a mutual fund containing $100 million in total assets it would be highly accretive for the Estate to include that fund within its purview, collapse all the mutual fund investors within the general scheme's investors, and an additional $90 million would thereby be created!

Nevertheless, I recognize that since (a) $1.8 million of funds were diverted from escrow[4] before the funds started trading commodities, and (b) a number of investors in the Futures Funds used proceeds from various WexTrust holding accounts that they were purported entitled to, it may be the conclusion of the court as a matter of equity to

---

[4] Before the official launch of the four entities that make up the Futures Funds, an escrow account was set up to accumulate a critical mass of investors in the various funds. As investors were located and their monies were invested, such funds were placed within an escrow account. When the balance in the escrow account exceeded approximately $8 million, escrow was broken and the various commodities futures traders were given access to the trade using the funds. Investors continued to invest additional capital. Such capital was deposited directly into the appropriate fund's futures brokerage account.

6

distinguish between various sub classes of Tier 1 Investments. If so, I have attempted to provide a breakdown of the subclasses under Section 3, entitled, "Delineating the Various Subclasses of Tier 1 Investments"[5]

The second class of investors are those that invested in Real Estate related investments, funded partially in equity and partially in secured debt, whereby the underlying investment is significantly 'underwater' (meaning there is no discernable equity value that will accrue to the Estate.) when measured by today's market value of the underlying asset(s) (collectively, "Tier 4", or a "Tier 4 Investment"). Although I am unfamiliar with all the details surrounding this entity, for purposes of illustration I believe an example of a Tier 4 Investment would be the Wextrust High Yield Debt Fund III ("High Yield III"). This entity holds a third priority secured position via a loan in the original principal amount of $600,000 made to 625 W. Division Condominiums, L.P., a proposed condominium development in Chicago. It is most likely that given the current market for proposed new condominium projects in Chicago that the underlying real estate at 625 West Division Street has a current market value less than combined first and second positions. If so, this note has little to no practical value[6].

Second, there are a number of entities in the Estate whereby the investors invested in an illiquid asset (again, mainly real estate), where the current appraised value of the underlying asset approaches and possibly exceeds the aggregate amount of secured and

---

[5] See page 11

[6] While it is possible that such claims might have a nuisance value in certain proceedings – see for example the current General Motors bankruptcy where it was thought at one point that the class of Common Stockholders, although hopelessly underwater, might receive 1% of a 'New GM' in the eventual reorganization - for the purposes of this argument I am ignoring any litigation nuisance value these entities and their investors might have. Should the court follow one or more of the suggested outcomes in this filing I would be more than happy to discuss and/or debate the possibility of assigning some value to the Tier 4 investors based upon a perceived nuisance value.

7

unsecured debt associated with the asset and its' accompanying parent entity (collectively, "Tier 3", or a "Tier 3 Investment"). An example of a potential Tier 3 Investment, based upon the transcript from the May 21st, 2009 hearing is Pessi Rothschild's investment in Hammond Industrial[7].

According to Mrs. Rothschild's statement before the court, she invested in three entities in the Estate. One of the investments went into one of the Futures Funds. Another of the investments was called "Hammond Industrial". Mrs. Rothschild claimed to know that the Hammond Industrial entity contains a positive net worth, namely is current on its liabilities, owns an underlying piece of real estate that would it be put up for sale the net proceeds would be enough to satisfy whatever secured and unsecured creditors exist with sufficient funds to be distributed to its investors[8]. She then contrasts her investment in Hammond Industrial with that of a third investment, the Phoenix Crown Plaza Hotel, which as she describes it, "unfortunately, due to the US fallout in the real estate market, is now relinquished."

While Mrs. Rothschild represented herself *pro se*, the crux of her argument rings true. Her investment in one of the Futures Funds was not impaired whatsoever. Her investment in Hammond Industries should also generate some positive value. Her investment in the Phoenix Crown Plaza Hotel is worthless. According to the distribution proposed by the Receiver, all three investments are treated equally. In order to arrive at

---

[7] See the official transcript taken in court on May 21st, 2009 : Section 71, Line 15 through Section 78
[8] I am ignoring for now the existence of the Receiver's expenses. How such overarching expenses in managing the entire Estate should be applied to each individual entity is a complex matter. Clearly, I am arguing that the bulk of the Receiver's fees should not be the burden of the investors in the Futures Funds. I do make a suggestion as to how they should be applied in the Section 4 entitled "In Conclusion : A Proposal for a Just and Equitable Distribution of Assets"

this conclusion, the Receiver must both disregard the contractual law as well as the equities at hand.

The Receiver is asking the court to disregard contractual law by tearing up the subscription agreement Mrs. Rothschild had made with her investment in one of the Futures Funds. Because she made her investment into a fund in which a minority of investors used tainted funds, **even though the investment turned out to be a good one**, nevertheless her investment is being seized to benefit others.

In the case of her investment in Hammond Industries, the Receiver is asking the court to disregard contractual law by tearing up the subscription agreement Mrs. Rothschild had made with that entity. The investors in Hammond Industries currently own an illiquid asset. They are being denied the ability to hold onto that asset for their own benefit and account; rather the Receiver and his staff will decide the particulars of when and how this asset is disposed of. In the meantime the cash flows from this asset are diverted to pay in part the ongoing legal expenses associated with the overall case load of this proceeding. In fact, under the Receiver's Proposed Plan of Distribution, the proceeds would be equitably diverted, in large part[9] to benefit the investors in Tier 4, and **none of the proceeds used directly to benefit its owners!** In contradistinction to the Receiver, my proposed Plan of Distribution would equitably ensure that those who invested in a successful venture (Tier 3) benefit proportionately from its' success while those who made a failed investment (Tier 4) would not benefit at the expense of others (however,

---

[9] See the chart entitled 'Analysis of Entities Covered by SEC v. Byers'. It is my contention that the majority of claims in the Estate are Tier 4 and/or Tier 2. To date the Receiver has spent millions overseeing the Estate yet this basic analysis of the data was never done. Furthermore it is my contention that the reason it was never attempted is that its' natural conclusion would be highly deleterious to the case both the Receiver and the SEC are attempting to make in how monies should be distributed from the Estate.

see my additional thoughts on this class under Section 4, A Proposal for Equitably Distributing the Assets of the Estate).

Finally, there are a number of investors who invested in entities whereby the facts underlying the amount of monies invested, what funds were allocated, and even what exactly the entities own, is up for debate (collectively, "Tier 2", or the "Tier 2 Investors"). I submit to the court that here too, the Receiver's Proposed Plan of Distribution fails the test of being equitable.

An example of a Tier 2 investment is the entity known as Block III Mines & Minerals, LLC ("Block III"). Although the facts surrounding Block III are murky and dubious at best, we do know the following : Block III falls within the list of entities covered by the Estate. Block III is one of six entities that conducted securities offerings between 2006 and 2008, through Wextrust Securities, for the purpose of investing in diamond mining ventures in South Africa and Namibia. Approximately $11 million in equity was raised for Block III. The intent of Block III was to loan out its capital to DEVA Investment (Pty), Ltd. ("DEVA"), a Namibian corporation, sufficient funds to conduct a mining operation in an area of Namibia also designated as "Block III."[10]

At this juncture, it is highly speculative to guess what the eventual outcome of recovery will be for Estate as it concerns Block III. The physical investment is overseas, held as a loan through an offshore entity. The largest investor in Block III, Lawrence Costas has been allegedly avoiding the court intent over the control and disposition of this asset. Basic information regarding the operation of the underlying asset (ie. Status of

---

[10] The description of Block III is taken almost verbatim from page 11 of the Receiver's Amended Memorandum of Law in Support of Motion for Contempt and Other Relief, filed June 5th, 2009

10

mine operations or copies of current geologist reports) is currently not available. It even appears, based upon the testimony of DEVA's Chief Financial Officer Thomas Lewis, that only $4.4 million of the $11 million was actually received by DEVA!

Based upon all of the above, a Tier 2 investment most likely has limited current value. The litigation necessary to even uncover the facts as to the purported loan between DEVA and Block III may be more costly that the entire current value amount of the loan. But this much is known: At the time individuals made their investment into Block III, they know (a) they were investing indirectly, via a loan, into a Namibian diamond venture, (b) that the 'onshore' collateral of Block III consisted solely of a loan to a Namibian entity. Yet, given the highly speculative nature of an investment in Block III, the court is being asked to approve payments from both (1) a successful basket of commodity funds (Tier 1), and (2) net worth positive real estate entities owing real property worth more than the underlying secured loans (Tier 3); and transfer such gains in order to provide a less than 5% recovery[11] to a group. Now, I think we all agree that those who invested in Block III were mistreated. But it is wrong to argue as a matter of equity that investors in successful commercial US real estate ventures or US-traded commodity contracts should have 95% of their capital stripped and transferred to individuals who took a flyer on attempting to profit from the Namibian diamond industry!

## III. Delineating the Various Subclasses of Tier 1 Investments

---

[11] Based upon oral testimony by the Receiver to this court. See the official transcript taken in court on May 21st, 2009 : Section 17, Line 6

The facts surrounding the Futures Funds are complex. But the complexity of the fact pattern **should not** lead this court to figuratively throw up its' hands and conclude that either (a) all Tier 1 investors be treated equally among themselves[12] or, (b) all Tier 1 investors be treated as distinct from the remaining equity investors in the estate.[13]

I would submit to the court that a careful analysis of the facts surrounding the Futures Funds would lead to the conclusion that Tier 1 Investors should be divided into three subclasses:

**Class 1a** – This subclass comprises those investors in both the WPO Fund and the WDOF Fund. For reasons stated below investors in this class should be the least impaired.

**Class 1b** – This subclass comprises those investors in both the WPP Fund and the WDF Fund who **did not request that monies invested in other entities in this Estate be transferred, and thereby commingled, into either fund.** Therefore, this class is comprised **solely** of investors who invested with their own outside funds into either WPP Fund or WDF Fund. As a matter of note, this is where my personal claim to this proceeding lies as I personally invested $200,000 in the WDF Fund with funds drawn from my checking account at HSBC on May 26th, 2008.

**Class 1c** – This subclass comprises those investors in both the WPP Fund and the WDF Fund who either (a) instructed Wextrust to transfer profit and/or principal from a particular Wextrust investment into one of the two commodity funds, or (b) can be

---

[12] By collapsing **all** Tier 1 investors into general investors in the Estate, the Receiver's Proposed Plan Of Distribution would do just that. This, I submit is both inherently unjust, even to the point of my own personal fact pattern (which is not as agreeable as others) and therefore inequitable as a matter of law. In my opinion this is a subtle, yet significant argument against the Proposed Plan of Distribution.

[13] In the December 15th, 2008 Motion to Intercede, a number of investors in the Futures Funds took this position as a reason to essentially compel the court to remove the four commodity pools from the Estate. The court ruled, **in my opinion correctly,** that the fact pattern of the Futures Funds was such that they belonged within the Estate.

reasonably shown to have received distributions from a Wextrust investment and 'flipped' the funds back into one of the two commodity funds.

Under the Receiver's Proposed Plan of Distribution all three subclasses would be treated equally. I believe that a careful review of the facts would show that such a plan would be both unjust and inequitable.

### a) Class 1a

The easiest subclass to consider in this regard is Class 1a. As the Receiver infers from the conclusion of Deloitte based on its work in analyzing these four funds, only the WDF Fund and the WPP can be conclusively proven to have been in receipt of tainted funds.[14]

Therefore, with respect to Class 1a investors, since both WDOF Fund and WPO contained 100% untainted funds, the Receiver has only two arguments left with which to base his argument that these investors should be equally subordinated with other Wextrust investors. Firstly, the Receiver argues that these funds were incorporated, organized, and marketed by individuals who were also affiliated with the overall ponzi scheme. Marketing materials were drawn up attesting to the quality of the Class 1a investment, and therefore, in the words of the Receiver, "Wextrust Capital and its principals used the Wextrust Commodity Funds to secure additional capital from existing investors and to give those investors one more reason to keep their money investor in the larger Wextrust enterprise. In other words, they used the Wextrust Commodity Funds as yet another means in which to attract capital to perpetuate their fraudulent scheme."[15]

---

[14] Page 19, Response to Objections to the Receiver's Proposed Plan of Distribution, filed with the court on May 11th, 2009.
[15] Ibid, page 17

13

This argument fails the common sense test. Because the Wextrust principals established a legitimate fund and made money for the funds' investors legitimately, so the argument goes, the marketing appeal of the Wextrust 'enterprise' was improved. It is therefore the Receiver's opinion that such an increase in the goodwill of the enterprise is a reason to confiscate legitimate investor's capital. Under that theory, if the principals had entered into an agreement with a local business, identified and helped to close a suitable investor for such a business, then once that business went off and became an identifiable success all the shareholders of that business should subsequently have their equity seized in order to compensate for the goodwill their success engendered towards the fundraiser's fraudulent enterprise!

The second argument the Receiver makes as to why Class 1a investors should be equally subordinated with other Wextrust investors is because the CFAs (commodity fund advisors) who traded using the capital of the WPO Fund and the WDOF Fund did so through a "master-feeder" structure. The Receiver claims that "Such commingling was sufficient to taint all of the Wextrust Commodity Funds as they now constitute unsegregatable (sic) assets from many different investors and many different Wextrust offerings.

Either the author of this theory is unknowledgeable with how master-feeder structures work, or else he is being intentionally dishonest. Today, a large proportion of both commodity and equity hedge funds and trading vehicles use a 'master-feeder' structure. This is done in order to facilitate the block trading of securities, or in this case, commodities. A simple example should suffice to explain why. If a CFA was managing a half a dozen different accounts on behalf of different funds but wanted to purchase oil

14

contracts on behalf of all of them, he/she would utilize a master-feeder structure and therefore be able to purchase one large lot of oil futures. A single futures broker would execute and clear the trade, all at the same time and price, into an account in the name of the 'master'. Once cleared, the individual 'feeder' funds would be allocated their percentage allocation. Without this structure, the CFA would have to sequentially purchase smaller lots over time, most likely at different prices, thereby hurting some investors while inadvertently helping others. It is precisely to remove such conflicts and allow for an order and efficient execution of large transactions that the 'master-feeder' structure was put into practice. To imply that a 'master-feeder' structure automatically makes all participant funds hopelessly commingled and liable for the tainted funds of one another is a extreme stretch and one which is not supported by relevant case law. In point of fact, the only case supporting this position that the receiver brought forth was *SEC v. Better Life Club of America*, which deals with a ponzi scheme that raised debt capital that purported to support the advertising campaign of 900 number phone lines. It has nothing to do whatsoever with whether or not the mere existence of a 'master-feeder' fund implies a hopeless commingling of clean and tainted funds.

### b) Class 1b

Under the Receiver's Proposed Plan of Distribution, Class 1b investors would be equally subordinated with other Wextrust investors. I submit that this is the wrong conclusion for this court to reach. Pushing aside the two arguments that were debunked under the prior subheading "a) Class 1a", the thrust of the Receiver's argument covers three admittedly strong equitable arguments. However, upon a detailed analysis of these

three lines of reasoning, it becomes apparent that these arguments put forth by the receiver fail to hold water.

### 1) 21% of the Equity Capital in the WDF Fund and 19% of the Equity Capital in the WPP Fund Came From Tainted Sources

Once again referring to a review of all four Futures Funds, Deloitte found that million in tainted capital was invested in the WDF Fund and $670,000 was invested in the WPP Fund. The Receiver then notes that "…Deloitte concluded that the commingling in the Wextrust Commodity Funds fit a consistent pattern in which the principals of Wextrust would illegally and impermissibly transfer money throughout the entire enterprise without regard to formalities".[16]

I think this statement of the Receiver is noticeable for what it **does not say**. Nowhere does Receiver state that funds in the WDF Fund and WPP Fund are 'hopelessly commingled'. Nowhere does the Receiver state that there mere presence of investors constituting 21% and 19% respectively should **ipso facto** taint the other 79%+ of investors' capital in the two funds. I believe the Receiver does make such arguments because they are legally and morally untenable.

---

[16] Ibid, page 19. Uncharacteristically in my opinion, this is a blatant attempt by Deloitte to taint the WDF Fund and WPP Fund investors with the broad brush stroke of the ponzi. The fact is, in all cases except one, monies from various ponzi schemes were **injected into both funds** in order to fund the capital accounts of certain investors in both funds. The names of those investors and their corresponding amounts are known **in detail** to both Deloitte and the Receiver. Four individuals and/or entities make up 33% of the tainted funds - Larry Costa (400k), August Fowler (200k), City first Foundation (200k) and Elvira Hoganson (240k). Again, without sounding repetitive my plan severely punishes those individuals by assigning them to Class 1c and equitably subordinating their capital accounts. It is clear that money was not indiscriminately seized **from** the two funds with the exception of a single transaction at the inception of one of the funds that was quickly replaced. While the details of this transaction are extremely complex and subject to much interpretation and debate, I would humbly submit to the court that the fact that the Receiver **has not** cited this single transaction in any of his numerous briefs as the reason to equity subordinate **all investors in all four funds** is because he understands that the argument, though a fair one, does not carry enough muster to persuade the court to overlook contractual law and act 'equitably' in seizing over $16 million dollars from dozens of disparate investors.

16

First off, as has been mentioned in detail by other respondents in briefing papers before this court, commodity pools by their very nature are governed by a strict set of rules designed to identify, segregate and track individual capital accounts. Much like a shareholder in a mutual fund knows how many shares (and by extension his/hers percentage ownership) of the fund he/she owns, an investor in a commodity pool knows at all times what the size, location and status of his/her capital account is. The mere presence of a number of small accounts that were funded with tainted capital does not hopelessly commingle the other capital accounts much like a mutual fund would not be hopelessly tainted if a criminal would invest the proceeds of fraud into it.

Secondly, the Receiver knows the accounts are not hopelessly commingled because he is in receipt of the detailed report prepared by Deloitte. If he so chooses, the Receiver could supply the court with the list and balances of all accounts that were (a) funded with tainted funds, and (b) funded with non-tainted funds. Those capital accounts funded with tainted monies from various Wextrust entities should be seized and equitably subordinated – this is exactly my definition of Class 1c (for more detail see note 14). The vast majority of investors in these two funds who invested clean money should not, as a matter of law and equity, be automatically equitably subordinated solely because unbeknownst to them they happen to invest in a fund where 20% of its investors were doing so with tainted funds. Although the Receiver would like to characterize these two funds as fitting a "consistent pattern in which. […] transfer money throughout the entire enterprise with regard to formalities", the truth here is that Class 1b investors invested in two successful funds whose accounts were not indiscriminately raided for its' cash without regard to formalities. As a matter of fact, it is **precisely because these funds**

17

**were successfully invested and were not raided by Wextrust principals** that we have over $17,000,000 in equity in which to argue about!

Stripping away all the clamor about tainted funds being used by a small minority and you are left with Deloitte's characterization of these funds fitting "a consistent pattern" of behavior. I submit to the court that the mere fact there was illegal behavior that fit someone's definition of a pattern should not be enough to engage the court extreme use of equity in subordinating dozens of non-complicit investors in the scheme. On the contrary, principals of equity would indicate that those investors in the fund using tainted funds should be punished to the fullest extent of the court's jurisdiction while those investors with clean capital should be spared the use of such extreme remedy.

## 2) All Investors in WDF Fund and WPP Fund Should be Equitably Subordinated Because Escrow Was Tainted

This argument falls back on the prior one. If it can be shown that individuals either (a) funded an escrow with tainted funds, or (b) had their capital account while in escrow raided by Wextrust principals, then those capital accounts should be equitably subordinated. To the extent this did not occur, which it did not for Class 1b participants, then the court should not be called upon to exercise an equitable remedy and abrogate the contractual rights those Class 1b investors have to their non-tainted equity.

## 3) The Receiver Stands in the Shoes of the Defrauded Wextrust Entities and Affiliates to Bring Claims for Those Entities Whose Assets Were Misappropriated and/or Commingled

Here the Receiver uses the valid argument that he is empowered to manage the claims of the defrauded rightful owners of tainted property and extend it in ways receivership law was never meant to be taken. I am not disputing the fact that the

18

receiver has the right to seize capital accounts that were improperly funded with tainted capital; again those claims are segregated into Class 1c. The Receiver wishes to use his powers to prosecute claims of the aggrieved parties by seizing clearly defined assets belonging to bystanders on the theory that they had the misfortune of investing wisely alongside some tainted capital. Under this theory, if one would participate in funding a commercial property mortgage through a pass-through trust (as happens fairly often with large commercial mortgages) and 20% of the participants used fraudulent capital to fund their share of the mortgage, if a Receiver is then appointed to make restitution on behalf of victims and is lucky enough that at the inception of the case the pass-through trust is included in the estate, he could in theory seize the entire face value of the syndicated loan since he supposedly stands in the shoes of the defrauded entities and therefore has the ability to equitably subordinate everyone in an attempt to gain restitution for a larger class of aggrieved investors. This argument flies in the face of common sense and should not be used as a reason to equitably subordinate the entirety of Class 1b.

## IV. In Conclusion : A Proposal for a Just and Equitable Distribution of Assets

As discussed earlier, I would submit that the court divide claimants into four tiers. This would allow for much of the managerial and overhead benefits to be gained by grouping individual investors together, while still preserving the majority of investment returns that individuals would have received in their respective investments. If the court agrees with my presumption of grouping the investors in this way then I would recommend the plan of distribution be set as follows:

| Tier | Description | Treatment in Plan of Distribution |
|---|---|---|
| Tier 1a | Investors in WPO and WDOF | Return of capital account minus **Estate and Hardship Fees** |
| Tier 1b | Investors in WPP & WDF who used **untainted** funds | Return of capital account minus **Estate and Hardship Fees** |
| Tier 1c | Investors in WPP & WDF who used **tainted** funds | Equitable Subordination, grouping together Tiers 1c, 2 & 4 |
| Tier 2 | Assets of unknown value | Equitable Subordination, grouping together Tiers 1c, 2 & 4 |
| Tier 3 | Holders of illiquid assets where the strong possibility exists that there is positive equity | Investors in individual LLCs should be given the option to manage assets amongst themselves, with a portion of the entity assigned to pay the **Estate and Hardship Fees** |
| Tier 4 | Holders of illiquid assets where there is little to no positive equity | Equitable Subordination, grouping together Tiers 1c, 2 & 4 |

We all recognize that in an Estate of this magnitude there are going to be substantial administrative claims that will need to be paid. We also recognize that due to the twin blows of the fraud perpetrated by Byers, et. al. as well as the severe dislocations in the real estate market, many of the investors in Tiers 2 & 4 will see little to no return. Therefore, I recommend to the court that those tiers with positive equity, namely Tiers 1a, 1b & 3, set aside a certain percentage of all distributions made (herein after described as the "Estate and Hardship Fees"). This court can determine the amount of this fee in any number of ways; however my suggestion is to set it at **20%**, with 10% set aside for administrative claims and 10% set aside for redistribution to claimants in tier 2 & 4.

Tier 3 consists of entities that invested in performing real estate with potentially significant positive equity. Although I am personally not a claimant of this tier, I strongly believe the court ought to allow investors in those LLCs to essentially act as replacements

to Byers et. al. and continue managing those properties as they see fit. My proposal calls upon the court to gather the ownership information of those entities and, much like the formation of a creditors committee, see to it that each entity forms a management committee to oversee the maintenance and operation of these entities. To continue to allow the receiver to collect large sums of monies to manage and ultimately dispose of real estate when the owners of such real estate stand ready to manage their own affairs would be an outrageous outcome. Again, we all recognize the administrative claims and the hardships that claimants from tier 2 & 4 are undergoing and so I recommend to the court that the same fee applied to tier 1a & 1b be applied and that the court order a percentage of equity in all Tier 3 entities set aside, and over time disposed of, in order to general a pool of capital with which to fulfill those claims.

There has been considerable discussion over the possibility that some of the capital raised for Tier 4 and/or Tier 2 investments were diverted. If it is too complex and expensive due to the tremendous commingling between real estate investments one could understand if no other solution is possible, these tiers were to be treated jointly. After months of investigations it is clear that this is not the case with the commodity funds. I beg that your honor please not place your blind trust in the receiver, closely look at the facts and recognize that the receiver's plan is unjustifiable.


Dated: New York, New York
June 17th, 2009
(212) 810-0144

By: _Martin Malek_
Martin Malek, *pro se*, creditor/investor
1019 East 21st Street
Brooklyn, NY 11210