UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - -x

SECURITIES AND EXCHANGE                :
COMMISSION,
                                       :
              Plaintiff,
                                       :
         - against -
                                       :
STEVEN BYERS <u>et al.</u>,
                                       :
              Defendants,
                                       :
         - and -
                                       :
ELKA SHERESHEVSKY,
                                       :
              Relief Defendant.
                                       :
- - - - - - - - - - - - - - - - - -x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 7-23-09

**OPINION**

08 Civ. 7104 (DC)

**APPEARANCES:**    (See last page.)

**CHIN, District Judge**

On August 11, 2008, the Securities and Exchange
Commission (the "SEC") filed the instant complaint against Steven
Byers, Joseph Shereshevsky, and five Wextrust entities controlled
by them (the "Wextrust entities"). The complaint alleges that
Byers and Shereshevsky operated a massive Ponzi scheme that
defrauded more than 1,000 investors of approximately $255
million.

The same day the complaint was filed, this Court
(Sullivan, J., sitting in Part I) appointed Timothy J. Coleman
(the "Receiver") as receiver over the Wextrust entities. The
receivership order authorized the Receiver to, inter alia,
ascertain the condition of, and assume managerial control over,

the Wextrust entities to prevent dissipation of the receivership estate and to determine what should be done with the assets of the estate.

The Receiver, after ten months of investigation, has determined that the most prudent and equitable course of action is a liquidation of the receivership estate and distribution of the proceeds to creditors and victims of the alleged Ponzi scheme. To that end, the Receiver now moves for approval of a proposed plan of distribution (the "Plan"). The Plan was formulated in cooperation with the SEC, which supports the Plan in its entirety.

"An equitable plan is not necessarily a plan that everyone will like," SEC v. Credit Bancorp, Ltd., No. 99 Civ. 11395 (RWS), 2000 U.S. Dist. LEXIS 17171, at *95 (S.D.N.Y. Nov. 29, 2000), and that is indeed the case here. The Plan is controversial in many respects -- including the provisions calling for liquidation of the receivership estate, and a subsequent pro rata distribution of the proceeds that draws no distinctions among investors. Reflecting the controversial nature of the Plan, more than 100 investors and creditors have lodged objections to the Plan. I held a hearing on May 21, 2009 (the "Hearing") on the Receiver's motion to approve the Plan and reserved decision.

As a District Court sitting in equity, it is my responsibility to approve a distribution plan only if it is fair and reasonable. For the reasons set forth below, I conclude that

-2-

the Plan is both fair and reasonable, and it is therefore
approved.

## BACKGROUND[1]

I discuss briefly the status of the Receiver's
investigation, the different types of investments in the alleged
Ponzi scheme, the creditors of the receivership estate, and a
summary of the Plan.

## I.  The State of the Receivership

On January 15, 2009, the Receiver filed a Plan for
Management of Wextrust Real Estate Portfolio (the "Management
Plan").  The purpose of the Management Plan was to provide notice
to investors of the Receiver's investigation as to the real
estate holdings.  On March 27, 2009, the Receiver submitted to
the Court the Plan, the purpose of which is to establish the
principles that will govern the liquidation and subsequent
distribution of assets.

At the Hearing, the Receiver provided a brief status
report on his investigation.  The estate has approximately $15 to
$20 million in cash on hand.  (Tr. at 7).  The majority of the
cash is in the accounts of the commodity funds.  (Id. at 70).

---

[1]      Familiarity with the facts and procedural history of
this case is assumed.  I only summarize here facts and procedural
history relevant to the Plan.  For further recitations of the
facts of this case, see the Court's prior decisions: SEC v.
Byers, 08 Civ. 7104 (DC), 2008 U.S. Dist. LEXIS 105207 (S.D.N.Y.
Dec. 30, 2008); SEC v. Byers, 08 Civ. 7104 (DC) 2008 U.S. Dist.
LEXIS 103127 (S.D.N.Y. Dec. 17, 2008); SEC v. Byers, 08 Civ. 7104
(DC), 2008 U.S. Dist. LEXIS 100085 (S.D.N.Y. Nov. 25, 2008).

-3-

The portfolio of commercial real estate has a book value of $250 million, with approximately $200 million in secured claims against the real estate. (Id.). The Receiver was careful to note that, given the state of the commercial real estate market, the current market value is almost certain to be far below the book value. (Id.). The Receiver expects that he would be able to liquidate the real estate portfolio within six to eighteen months, upon approval by the Court of the Plan. (Id.).

Although he was not able to say definitively what sort of a distribution defrauded investors could expect, the Receiver's best estimate was between 5 and 50 cents on the dollar. (Id. at 11).

## II. Types of Investments

### A. The Real Estate Investments

Most of the Wextrust entities were limited liability corporations established for the purpose of owning, operating, and then selling a single real estate asset. (Management Plan at 2). The majority of the properties were purchased between 2004 and 2007 -- prior to the crash of the real estate market. (Id. at 5).[2] In some instances the perpetrators of the scheme actually did use investor money to buy specific pieces of property, but in many instances they did not, and used the money

---

[2] Indeed, as the Receiver pointed out at the Hearing, because of the conditions in the market, "the timing of this case could not have been worse." (Tr. at 14).

-4-

investors thought was to buy real estate for unauthorized purposes instead. (Tr. at 7-9).

There are four principal components to the Wextrust real estate portfolio, collectively referred to herein as the "Real Estate Funds":

- First, hotels, managed by an entity called Axela Hospitality, LLC. Although the hotels are valuable, they have little or no equity due to economic conditions.

- Second, commercial properties, managed by an entity called Wextrust Equity Partners. According to valuations conducted by the Receiver's advisors,[3] the fair market value of these properties is greater than the secured debt.

- Third, residential properties, managed by an entity called Wextrust Development Group, LLC. The fair market value of these properties is less than the secured debt.

- Finally, the portfolio of high yield real estate loans, held by various affiliates. A majority of these loans are in default. (Management Plan at 4-10).

---

[3]     The valuations are not disclosed in the Management Plan, as the Receiver believes that publicly disclosing those values would adversely affect his ability to sell them at the highest possible price. (Id. at 10).

Based on the valuations, market conditions, and the advice from his accountants, attorneys, and financial advisers, the Receiver concludes as follows:

> The Receiver has determined that there is little, if any, going concern value in the Wextrust real estate operations as a whole, and that any such value is far outweighed by the substantial risk of loss that would be involved in continuing to operate the properties for an extended period.

(<u>Id.</u> at 3). For those assets where a sale would be imprudent -- due to the fact that the fair market value has fallen below the amount of the secured creditors' interests -- the Receiver will attempt to renegotiate or restructure the secured debts and/or assist the secured creditors in selling the properties. (Plan at 2).

## B. **The Commodity Funds Investments**

There are four Wextrust commodity funds: (1) the WexTrade Principal Protected Fund I, LLC (the "WPP Fund"); (2) the WexTrade Diversified Futures Fund I, LLC (the "WDF Fund"); (3) the WexTrade Principal Offshore Fund I, Ltd. (the "WPO Fund"); and (4) the WexTrade Diversified Offshore Futures Fund I, Ltd. (the "WDOF Fund") (collectively, the "Commodity Funds"). (12/19/08 Schmeltz Decl. ¶ 4). The offerings for the four Commodity Funds raised approximately $17 million, spread across the four funds as follows: $3,380,000 for the WPP Fund; $11,817,022.21 for the WDF Fund; $325,000 for the WPO Fund; and $1,422,475 for the WDOF Fund. (12/19/08 Sordillo Decl. ¶ 10).

-6-

The Commodity Funds were managed by WexTrade Commodity Managers LLC ("WCM"). (12/18/08 Adrian Decl. ¶ 10). WCM was registered with the Commodity Futures Trading Commission (the "CFTC") and the National Futures Association (the "NFA"). (Id. ¶ 13). WCM, in turn, was managed by WexTrust Capital, LLC, a named defendant in this case. (Id.).

The Commodity Funds traded through what is called a "master-feeder" structure, under which WCM allocated a percentage of the offering proceeds of each fund to a master fund. (Id. ¶¶ 10-11). The master fund then allocated that money to traders who used it to speculate in commodity futures such as energy, metals, and grains. (Id.). WCM monitored the performance of the traders on a daily basis. (Id. ¶ 12).

The Commodity Funds began trading in September 2007. (Id. ¶¶ 9, 10). The Commodity Funds made real trades with real assets. (Tr. at 62). When the SEC filed its complaint on August 11, 2008, all trading positions in the Commodity Funds were liquidated, leaving a substantial amount of cash. (12/18/08 Adrian Decl. ¶ 14).[4] It is the largest pool of cash in the receivership estate, and has been used to pay administrative expenses of the estate. (12/19/08 Schmeltz Decl. ¶ 13).

---

[4] The number $17.5 million was used at the Hearing (tr. at 63), but the Court has been unable to verify the precise amount in the record.

## C. **The Diamond Mine Investments**

From 2006 to 2008 Shereshevsky and Byers conducted six securities offerings to invest in diamond mines in South Africa and Namibia, ultimately raising $54 million. (1/30/09 Decision at 2). According to evidence uncovered by the Receiver, of the $54 million raised, approximately $40 million was transferred to a South African company called Pure African Minerals (Pty) Limited. (Id.). The Receiver has been unable to ascertain precisely what happened to the $40 million, and has commenced litigation in South Africa to gain access to the relevant books and records. That litigation is still ongoing, and the Receiver intends to aggressively pursue any Wextrust assets in Africa. (Id.; Plan at 3).

## II. **Types of Creditors**

While it is not clear from the record precisely how many creditors of the Wextrust entities exist, it is clear that the number of creditors, and the debts owed those creditors, is substantial.

## A. **Secured Creditors**

The secured creditors fall into two categories: Those creditors holding perfected liens on collateral, and those creditors with a partnership interest in a specific property. (Plan at 29-30). Both types of secured creditors have recourse against specific collateral, and must be paid out of the proceeds of that collateral. (Id. at 30). In general, the Receiver

-8-

expects the secured creditors to fare better -- proportionally
speaking -- than any other claimants. (Id.)

**B.  Unsecured Creditors**

Unsecured creditors are vendors and similar parties who
do not have secured claims against the receivership estate.  (Id.
at 37).  The Receiver has been paying ordinary and necessary
expenses as they come due, but has determined that, in certain --
unspecified -- instances, paying some invoices is not necessary
to preserve the value of the receivership estate.  This latter
group of unsecured creditors, as well as any outstanding claims
not yet submitted to the Receiver, will be eligible for a
distribution under the Plan on the same terms as the defrauded
investors.  (Id. at 37-38).

**IV.  Summary of the Plan**

The Plan contemplates a series of distributions.  Upon
approval of the Plan by the Court, the Receiver will make an
immediate distribution from the cash assets of the estate, which
will be followed by subsequent distributions from the sale of the
receivership assets.  (Plan at 1).

**A.  Liquidation of the Receivership Estate**

While neither the Management Plan nor the Plan uses the
word liquidation, a liquidation of the assets controlled by the
Receiver is clearly what is contemplated.[5]

---

[5]     The fact that the Plan is effectively a liquidation is
buttressed by the Receiver's and SEC's defense of this Court's
authority to approve a liquidation.  (See Receiver Response to

-9-

## B. Pro Rata Distribution

The Plan proposes a pro rata distribution of assets,
under which each investor would receive a distribution based on a
certain percentage -- not yet determined -- of the amount
originally invested. (Plan at 7-17).

## C. Calculation of Investors' Pro Rata Distribution

The Plan proposes that distributions be calculated
based on the "net investor method." (Id. at 11). Under this
approach, any cash distributions received prior to the SEC's
filing of this suit would be subtracted from the total amount
invested and that would be the starting point for the pro rata
distribution. The method is illustrated by the following
examples:

- ■ Investor A had a gross investment of $100,000 and
  received a cash distribution of $20,000. His net
  investment amount would be $80,000. Assuming a pro
  rata multiplier of 10%,[6] Investor A's distribution would
  be $8,000.
- ■ Investor B had a gross investment of $250,000 and
  received a cash distribution of $50,000. Her net
  investment amount would be $200,000. Assuming a

Objections at 33-34; SEC Statement in Support at 4-5).

[6] Solely for simplicity, the Court will use 10% as the
pro rata multiplier throughout this Opinion. The Receiver has
not yet determined what the pro rata multiplier will be, and the
Court's use of 10% should not be deemed an endorsement of that
amount.

pro rata multiplier of 10%, Investor B's distribution

                    would be $20,000.

The Receiver recommends the net investor method on the ground

that it would be the most equitable.

        The Plan also proposes that any distributions investors

chose to roll over into the funds -- rather than receive in the

form of cash -- be added to the baseline amount for calculating

their distribution under the Plan.  (Id. at 12).  In other words,

the Plan would treat a rolled-over distribution as an out-of-

pocket loss.  The following examples illustrate the proposal:

- ■    Investor A had a gross investment of $100,000.  Rather

        than take a cash distribution, he rolled over $20,000

        back into his Wextrust investment.  His net investment

        amount would be $120,000.  Assuming a pro rata

        multiplier of 10%, Investor A's distribution would be

        $12,000.

- ■    Investor B had a gross investment of $100,000.

        Investor B took a cash distribution of $20,000 at one

        point, and later rolled over $50,000.  Her net

        investment amount would be $130,000.  Assuming a pro

        rata multiplier of 10%, Investor B's distribution would

        be $13,000.

The formula the Receiver proposes, then, is as follows:

                [(Total Out of Pocket Cash Investment Paid
                Into Wextrust Scheme) + (Roll-Over
                Distributions - Cash Distributions)] * Pro
                Rata Multiplier

(Id.).

## D.  **Procedure for Calculating Distribution**

The Plan proposes the following priority of claims:
(1) administrative claims of the estate (including fees for the
Receiver, his attorneys and advisers); (2) tax liabilities of the
estate; (3) secured creditors; and (4) unsecured creditors and
defrauded investors.  (Plan at 27).  The Plan sets forth two
procedures for calculating the amount of distribution:  One for
defrauded investors, and one for creditors.

Since the Receiver's appointment, he and his advisers
have been reviewing documents and interviewing investors to
compile information regarding each investor.  (Id. at 32).
Beginning on May 15, 2009, the Receiver began sending statements
to defrauded investors setting forth what the Receiver believes
to be their total investments, and their recovery based on the
net investor method, discussed above.  Investors had until June
30, 2009 to respond to these statements.  If they did not
respond, the Receiver was to presume they had no objection to
their statements.  If there was a dispute, the Receiver and the
investor were to attempt to resolve it by August 7, 2009.[7]  Any
dispute that could not resolved would be brought before the
Court.

As to creditors, the Receiver proposes a slightly
different procedure for claim adjudication.  All creditors,
whether secured or unsecured, had to submit detailed records to

---

[7]      By Order dated July 23, 2009, I extended that date to
thirty days after entry of this Opinion.

the Receiver by June 30, 2009. The Receiver was to then post a
spreadsheet of all claims on his website by July 7, 2009, from
which the creditors could then dispute the amounts. The parties
would attempt to resolve any disputes on their own by August 7,
2009,[8] after which remaining disputes would be decided by the
Court. (Plan at 38-39).

## E. Exclusion of Deficiency Claims

As to the secured creditors, the Plan proposes that, in
the event that the amount of the sale of the collateral is less
than the secured creditors' claims -- a likelihood, given the
significant drop in the commercial real estate market -- the
Court prohibit the secured creditors from seeking to recoup
deficiency claims against the receivership estate as a whole.
(Id. at 29-30). Instead, the Receiver proposes that the secured
creditors be required to attempt to recoup any deficiency from
the property-specific limited liability holding company. (Id.).
In other words, the Plan proposes that the deficiency claims be
excluded entirely from the distribution.

## F. Disqualification of Wextrust Employees

The Receiver proposes that the defendants, their
relatives, and "individuals such as Wextrust employees who
actively participated in the development, implementation, and/or
marketing of the fraudulent scheme" be disqualified from
receiving a distribution under the Plan, or have their

---

[8]      This date was also extended to thirty days after entry
of this Opinion.

-13-

distribution significantly reduced, based on their level of
involvement in the Ponzi scheme, and any commissions and/or
finder's fees they may have received. (Id. at 33-34). The
Receiver believes that employees and others who participated in
the scheme are not similarly situated to the victims of the Ponzi
scheme.

The Plan proposes that any party who is disqualified
from receiving a distribution be put on notice of this fact and
have the opportunity to contest the determination. The Court
will, as necessary, resolve any disputes.

## DISCUSSION

I begin by addressing the Court's jurisdiction over
this case. I then discuss whether I have the authority to
approve the Plan. Next I address the various objections made to
the Plan, ruling on each in turn. I conclude that the Plan is
fair and reasonable, with one exception.

## I. Authority of The Court to Approve the Plan

### A. Jurisdiction

The International Consortium of Wextrust Creditors (the
"Consortium") argues that the Court no longer has jurisdiction
over this case. The basis for the Consortium's argument is an
appeal pending before the Second Circuit of one of the Court's
prior decisions in this case. In support of its argument the
Consortium cites cases setting forth the general proposition that
the filing of a notice of appeal divests the district court of

-14-

jurisdiction as to the matters being appealed. See, e.g., Griggs v. Provident Consumer Discount Co., 459 U.S. 56, 58 (1982) ("The filing of a notice of appeal . . . confers jurisdiction on the court of appeals and divests the district court of its control over those aspects of the case involved in the appeal."); McCue v. City of New York, 503 F.3d 167, 169 (2d Cir. 2007) (citing Griggs for same proposition).

As the Receiver points out, however, the Consortium ignores controlling case law that flatly contradicts its argument. While the general proposition the Consortium sets forth is correct, it does not apply in a case where, as here, the decision being appealed involves a preliminary injunction. See Webb v. GAF Corp., 78 F.3d 53, 55 (2d Cir. 1996) ("Although the filing of a notice of appeal ordinarily divests the district court of jurisdiction over issues decided in the order being appealed, jurisdiction is retained where, as here, the appeal is from an order granting or denying a preliminary injunction."); Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, 11A Federal Practice and Procedure: Civil § 2962, at 438 (3d ed. 2005) ("An appeal from the grant or denial of a preliminary injunction does not divest the trial court of jurisdiction or prevent it from taking other steps in the litigation while the appeal is pending.").

Accordingly, the Court continues to have jurisdiction over this case.[9]

**B. The Court's Authority to Approve a Distribution Plan**

In general, this Court has broad authority to craft remedies for violations of the federal securities laws. See Official Comm. of Unsecured Creditors of WorldCom, Inc. v. SEC, 467 F.3d 73, 81 (2d Cir. 2006); SEC v. Fischbach Corp., 133 F.3d 170, 175 (2d Cir. 1997). Courts have held that within that broad authority lies the power to approve a plan of distribution proposed by a federal receiver. See SEC v. Credit Bancorp, Ltd., 290 F.3d 80, 82-83 (2d Cir. 2002) (affirming approval of distribution plan as "within the equitable discretion of the District Court"); SEC v. Wang, 944 F.2d 80, 88 (2d Cir. 1991) (same); see also SEC v. Forex Asset Mgmt. LLC, 242 F.3d 325, 332 (5th Cir. 2001) ("Because we find that the district court did not abuse its discretion when it approved the Receiver's plan, we AFFIRM."). The Court has the authority to approve any plan provided it is "fair and reasonable." Wang, 944 F.2d at 81 (distribution plan should be "reviewed under [the District Court's] general equitable powers to ensure that it is fair and reasonable"); see also SEC v. Enter. Trust Co., No. 08 Civ. 1260, 2008 U.S. Dist. LEXIS 79731, at *10 (N.D. Ill. Oct. 7, 2008)

---

[9]    I also reject the Consortium's request, made in the alternative, to stay these proceedings in the interest of fairness. The interest of fairness overwhelmingly weighs in favor of a prompt resolution of this case and a distribution of assets to defrauded investors.

("There are no hard rules governing a district court's decisions in matters like these.  The standard is whether a distribution is equitable and fair in the eyes of a reasonable judge.").

###  C.  **The Court's Authority to Approve a Liquidation Plan**

The Court's equitable authority extends to approving the Plan, for the following four reasons.

First, as just discussed, the Court has broad equitable authority when considering a plan of distribution in a case such as this.

Second, in Credit Bancorp, the Second Circuit approved a distribution plan that was effectively a liquidation of a defendant's assets.  290 F.3d at 90.  In the District Court opinion affirmed by the Second Circuit, Judge Sweet considered several different plans of distribution.  While observing that "an equity receivership should not be employed as a substitute for a bankruptcy proceeding to effectuate the liquidation of a defendant firm," Credit Bancorp, 2000 U.S. Dist. LEXIS 17171, at *89, Judge Sweet nonetheless approved a distribution plan that called for the "partial" sale and distribution of assets of a defendant in a Ponzi scheme.  Id.  The plan could only be characterized as "partial" due to the fact that "the Receiver has not yet been able to marshal and bring under his control all Credit Bancorp assets."  Id. at *88.  Moreover, the plan also expressly contemplated the possibility of additional distributions.  See id. at *161 ("There is nothing inherent in the [plan] which precludes future distributions.  Indeed, if the

-17-

Receiver is successful in [an action to recoup assets] then there may be significant additional funds.").

There does not appear to be any difference between the Plan at issue in this case and the plan Judge Sweet approved in a decision affirmed in its entirety by the Second Circuit.[10] Both call for the liquidation of assets under the control of a federal receiver, with the understanding that when the receiver assumes control over additional assets, they too will be distributed. Moreover, while not addressing the precise issue before me, at least one District Court has interpreted Credit Bancorp as extending a District Court's equitable jurisdiction under circumstances such as these. See SEC v. Shiv, 379 F. Supp. 2d 609, 617 (S.D.N.Y. 2005) (interpreting Credit Bancorp as follows: "The Second Circuit . . . therefore extended the Receiver's equity jurisdiction to trace and repatriate funds from many discrete accounts, through an entity from which the funds had been diverted, back to the rightful owners, ratably in proportion to their losses.") (emphasis added).

Third, this case was brought by the SEC -- the agency charged with enforcing the federal securities laws. See Official Committee of Unsecured Creditors of WorldCom, Inc., 467 F.3d at 82. The Plan was drafted in consultation with the SEC, the SEC fully supports the Plan, and, in the SEC's view, the Plan "is

---

[10] To be clear, the Second Circuit never directly addressed whether the plan Judge Sweet addressed ran afoul of dicta cautioning District Courts not to use receivership proceedings to liquidate estates.

-18-

consistent with Second Circuit and other legal authority." (SEC Statement in Support at 1). The SEC's judgment is entitled to deference from this Court. See Dabit v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 395 F.3d 25, 34 n.6 (2d Cir. 2005), vacated on other grounds, 547 U.S. 71 (2006). In addition, the Receiver fully supports the Plan, and the Court may give weight to the Receiver's judgment. See CFTC v. Eustace, No. 05 Civ. 2973, 2008 U.S. Dist. LEXIS 11810, at *17 (E.D. Pa. Feb. 15, 2008).

Fourth, equity compels approval of the Plan. Cf. SEC v. TLC Invs. & Trade Co., 147 F. Supp. 2d 1031, 1036 (C.D. Cal. 2001) (approving liquidation plan in receivership on equitable grounds). The only alternative to the liquidation contemplated by the Plan is bankruptcy. The Receiver has considered a bankruptcy filing, and believes it would be inequitable. Although the question is a close one that gives me pause, in the end I agree.

This is an SEC fraud case involving a massive Ponzi scheme. The reason the Wextrust entities are in shambles is not -- as is typical in a bankruptcy case -- because of poor economic conditions or garden variety mismanagement. The reason is fraud. The principals of the Wextrust entities are accused of effectively looting the business for their own personal gain, and in the process defrauding hundreds of investors who trusted them with their hard-earned savings. They have been indicted for their alleged crimes. See United States v. Byers, et al., No. 08 Cr. 1092 (S.D.N.Y. Aug. 8, 2008). Under these circumstances, it

-19-

would be inequitable to force the case into bankruptcy, where the bankruptcy court would have less flexibility in determining the most equitable approach to distribute assets to victims. The overriding goal of these proceedings should be fairness to the defrauded investors, and forcing this case into bankruptcy would, I believe, be inconsistent with that goal.

A number of creditors argue that this Court lacks the authority to approve a liquidation plan based on Second Circuit dicta cautioning that, in general, a District Court should not permit a receivership proceeding to evolve into a liquidation proceeding. See, e.g., Eberhard v. Marcu, 530 F.3d 122, 131 (2d Cir. 2008) (noting, in dicta, that "we have expressed strong reservations as to the propriety of allowing a receiver to liquidate [an estate]") (internal citations and quotations omitted)[11]; SEC v. Am. Board of Trade, Inc., 830 F.2d 431, 436 (2d Cir. 1987) (noting, in dicta, that "equity receiverships should not be used to effect the liquidation of defendants in actions brought under the securities laws" but nonetheless affirming District Court's approval of liquidation plan). Dicta is not controlling, however, and, in any event, the Second Circuit's decision in Credit Bancorp casts serious doubt on the dicta in Eberhard and American Board of Trade.

---

[11]     While Credit Bancorp preceded Eberhard by six years, the Court in Eberhard did not cite or consider Credit Bancorp.

Accordingly, based on the unique facts of this case, I conclude that my equitable authority extends to approving a liquidation of the receivership estate.

## II. Objections to the Plan

I now discuss the objections to the Plan, guided by the principle that, in cases such as these, "equality is equity." Cunningham v. Brown, 265 U.S. 1, 13 (1924) (holding, in original Ponzi scheme case, that circumstances of Charles Ponzi's scheme "call strongly for the principle that equality is equity").

Many of the objections are made by investors attempting to assert a superior claim to the receivership res so that they can recoup their entire investment. This is not surprising, and anyone in the unfortunate -- and, in some cases, desperate -- situation as the investors would undoubtedly do the same. For a District Court sitting in equity, however, it is important to remember that each investor's recovery comes at the expense of the others. As the Second Circuit has acknowledged, "[w]hen funds are limited, hard choices must be made." Official Committee of Unsecured Creditors of WorldCom, Inc., 467 F.3d at 84 (internal citation and quotations omitted). Such is the case here, and the choices are indeed hard.[12]

---

[12]    To cite one particularly difficult example, at the Hearing the Court heard from Andrew Campbell, who invested $100,000 in one of the Commodity Funds just 35 days before the SEC filed the complaint and froze the funds. (Tr. at 79-80).

## A. **Pro Rata Distribution**

Many objections argue that a pro rata distribution is unfair, and that the distribution should instead be made based on level of risk, timing of investment, tracing analysis, or some other factor. In recommending pro rata distribution, the Receiver considered all options, and concluded that a pro rata distribution was the most equitable. (Plan at 8-9).

The Receiver's recommendation is supported by the case law, which is quite clear that pro rata distributions are the most fair and most favored in receivership cases. Indeed, the Second Circuit has explicitly held that "the use of a pro rata distribution has been deemed especially appropriate for fraud victims of a Ponzi scheme, in which earlier investors' returns are generated by the influx of fresh capital from unwitting newcomers rather than through legitimate investment activity." Credit Bancorp, 290 F.3d at 89 (internal citation and quotations omitted); see also SEC v. Infinity Group Co., 226 Fed. Appx. 217, 218 (3d Cir. 2007) ("[T]he Courts of Appeals repeatedly have recognized that pro rata distribution of a defrauder's assets to multiple victims of the fraud is appropriate and that District Courts act within their discretion in approving such distributions.").

The alternatives to pro rata distribution that have been proposed would create unfair results by rewarding certain investors over others based on arbitrary factors. Cf. Credit Bancorp, 290 F.3d at 89 (noting that, in Ponzi schemes, "whether

at any given moment a particular customer's assets are traceable is 'a result of the merely fortuitous fact that the defrauders spent the money of the other victims first'") (quoting United States v. Durham, 86 F.3d 70, 72 (5th Cir. 1996)). Tracing analysis -- proposed by a number of objectors -- in particular has been almost universally rejected by courts as inequitable. See, e.g., id. (rejecting tracing as inequitable); United States v. 13328 & 13324 State Highway 75 N., 89 F.3d 551, 553 (9th Cir. 1996) (holding that tracing would "frustrate equity"); Durham, 86 F.3d at 73 (holding that "following the tracing principle would be inequitable"); SEC v. Elliott, 953 F.2d 1560, 1569 (11th Cir. 1992) (rejecting tracing as inequitable). The Receiver considered and rejected tracing, based on equitable grounds and on the recommendation of his accountants that tracing would be "difficult, time-consuming, and expensive -- and the ultimate benefit to the estate would be minimal at best." (Id. at 8).

## 1. Criteria for Implementing Pro Rata Distribution

The Second Circuit in Credit Bancorp set forth two factors that must be satisfied to approve a pro rata distribution. First, investors' funds must have been commingled. Second, the victims must be similarly situated "with respect to their relationship to the defrauders." Id. at 88-89. I conclude that both factors are satisfied in this case.[13]

---

[13] Although not identified as a requirement for pro rata distribution by the Second Circuit in Credit Bancorp, the Receiver also notes that the substantial evidence of lack of adherence to corporate form by the Wextrust entities supports a

## a. **Commingling**

### (i) **Applicable Law**

The extent of commingling necessary to satisfy this requirement is unclear, and no case addresses it at any length. There are, however, cases in which courts have addressed commingling in different contexts and concluded that, due to the fungibility of money, any commingling is enough to warrant treating all the funds as tainted. See, e.g., United States v. Garcia, 37 F.3d 1359, 1365-66 (9th Cir. Cal. 1994) (holding, under money laundering statute -- 18 U.S.C. § 1956 -- that "presence of some tainted funds in the commingled account is sufficient to taint" legitimately-acquired funds in same account); SEC v. Better Life Club of Am., Inc., 995 F. Supp. 167, 181 (D.D.C. 1998) ("[W]hen legitimate assets are co-mingled with illegitimate ones such that the assets cannot be separated out, a constructive trust may extend over the entire asset pool.").

A recent decision from the Southern District of Florida is particularly instructive. In SEC v. Lauer, the District Court denied a motion by the defendant to lift an asset freeze order as to certain assets in a bank account. No. 03 Civ. 80612 (KAM), 2009 U.S. Dist. LEXIS 23510, at *4 (S.D. Fla. Mar. 25, 2009). In denying the motion, the District Court specifically rejected the defendant's argument that, because some of the money in a bank account was not attributable to any illicit activity, it was not

---

pro rata distribution.  (Plan at 13-14).

properly subject to the asset freeze order. Quoting the Eleventh
Circuit, the Court held that "'[b]ecause money is fungible, the
government must prove only that the tainted proceeds were
commingled with other funds,'" and that was sufficient to taint
all of the funds. Id. at *15 (quoting United States v. Ward, 197
F.3d 1076, 1083 (11th Cir. 1999)).[14]

The Court is aware of only one decision dealing with a
federal receivership in which a court addressed the extent of
commingling. In Eustace, the District Court, without discussion,
approved a pro rata distribution plan even where the evidence of
commingling was "not necessarily systematic." 2008 U.S. Dist.
LEXIS 11810, at *22.

## (ii) **Application**

As to the Real Estate Funds investors,[15] regardless of
the appropriate standard of commingling to apply, this
requirement is satisfied. The Receiver's investigation has
revealed that there was extensive commingling. According to an
analysis performed by Deloitte Financial Advisory Services LLP

---

[14]    The standard in Lauer was only whether the SEC had
probable cause to freeze the assets. See id. at *8 n.1 ("To
secure a pre-trial order restraining a defendant from using
potentially forfeitable assets to pay counsel of his choice, the
government need only show probable cause to believe that the
assets at issue are tainted by the defendant's alleged fraud.").

[15]    For the purposes of this analysis, the Court considers
the diamond mine investments as part of the Real Estate Fund
investments, on the ground that investments in the diamond mines
were made on the same terms as investments in the Real Estate
Funds, and there was as much commingling of the funds raised for
the diamond mine investments as the Real Estate Funds
investments.  (Plan at 3, 12-13).

-25-

("Deloitte"), of 78 discrete real estate funds, 5 funds did not raise any money, money raised in connection with 62 funds was commingled, and 11 funds lacked enough information to make a determination. (2/11/09 Sordillo Decl. ¶ 9). Under any standard of commingling, where 62 out of 78 funds -- almost 80% -- are commingled, this requirement is satisfied.

As to the Commodity Funds, the Receiver argues that the commingling in the Commodity Funds was "pervasive," relying on the conclusion of its accountant that "the commingling in the Commodity Funds fits a consistent pattern in which the principals of WexTrust would move money throughout the corporate family without regard to any corporate formalities." (12/19/08 Sordillo Decl. ¶ 25). The Receiver's counsel acknowledged at the Hearing, however, that "the amount of commingling between and among the commodity funds was probably less than what occurred in other investment vehicles." (Tr. at 87). This is consistent with the position of the Commodity Funds investors, many of whom acknowledge that some commingling occurred, but maintain that it was very limited.

As discussed below, there is some evidence that commingling occurred, and the law does not appear to require more than that. Accordingly, the commingling requirement is satisfied as to the Commodity Funds.

On May 19, 2009, the NFA, the self-regulatory organization of the commodities industry, filed a complaint (the "NFA Complaint") against the managers of the Wextrust commodities

-26-

funds. (See In the Matter of Wextrade Commodity Managers LLC and Paul Adrian, NFA Case No. 09-BCC-009 (May 19, 2009)).[16] One of the counts in the complaint is for commingling of assets, and it provides details of multiple instances of commingling in violation of NFA rules. (See id. ¶¶ 14-31). For example, on August 13, 2007, Joseph Shereshevsky allegedly authorized a transfer from one of the Commodity Funds to a Wextrust capital fund -- which is not a commodity fund -- in the amount of $472,000 with a notation that the transfer was "to help fund Aug 15th Payroll Chicago-Norfolk." (Id. ¶ 20).

While the allegations in the NFA complaint are just that -- allegations -- they are consistent with the Receiver's own investigation, which found multiple instances of commingling. In early 2007, for example, Lawrence Costa, then an investor in a Wextrust real estate fund, requested that $400,000 be transferred from his investment in the real estate fund into the WDF Fund. (12/19/08 Sordillo Decl. ¶ 11). At that time, however, the balance in Costa's real estate fund was only $156,711.17,[17] so to facilitate the transfer, Wextrust used money it obtained from a January 5, 2007 transfer from a real estate account -- in which

---

[16]     There was a suggestion at the Hearing that the CFTC might take an official position against the Plan (Tr. at 68-70), but by letter dated May 26, 2009, the SEC informed the Court that the CFTC would not take a position -- one way or the other -- on the Plan.

[17]     While not specified in the record, presumably some wrongdoing occurred if Costa believed, or claimed that, he had $400,000 in his account when, in fact, he had less than half that amount.

-27-

Costa was not an investor -- into a Wextrust capital account.
(Id.). On January 10, 2007, the $400,000 that originated in an
account in which Costa was not an investor was transferred from
the Wextrust capital account into Costa's real estate account,
and from there into the WDF Fund in Costa's name. (Id.). The
Receiver's investigation has revealed a number of instances of
commingling such as this. (See, e.g., id. ¶¶ 12, 16, 18, 19,
22).

Thus, the argument, advanced by the Commodity Fund
investors, that their money cannot have been commingled because,
when the SEC commenced this action, the money was still there
misses the mark. Their argument presumes that the money in
Commodity Fund accounts is "their" money, when, in fact, given
the commingling that occurred, in all likelihood it includes
money transferred from an investor who never had any intention of
investing in a commodity fund. The evidence of some commingling
in the Commodity Funds suggests that it is merely a coincidence
that the Commodity Funds were not commingled as extensively as
the Real Estate Funds -- and coincidence cannot be a basis to
treat the Commodity Funds investors more favorably than the Real
Estate investors. See SEC v. George, 426 F.3d 786, 799 (6th Cir.
2005) ("The mere coincidence that the defendants chose the relief
defendants (instead of others) to receive funds contributed by
other investors in order to delay the discovery of this scheme
does not entitle the relief defendants to preferential
treatment."). This is so even though, at the time they made

-28-

their investment, the Commodity Funds investors believed they were making a safe and regulated investment.

Thus, the evidence of commingling is sufficient to satisfy the first prong of the Credit Bancorp test.

### b. **Similarly Situated**

#### (i) **Applicable Law**

To determine whether parties are similarly situated, the Second Circuit has held, in different contexts, that "their circumstances need not be identical, but there should be a reasonably close resemblance of facts and circumstances." Lizardo v. Denny's, Inc., 270 F.3d 94, 101 (2d Cir. 2001); see also McGuinness v. Lincoln Hall, 263 F.3d 49, 54 (2d Cir. 2001) (holding that similarly situated does not mean identical, but rather similar "in all material respects").

#### (ii) **Application**

The Receiver cites five reasons in support of his conclusion that the Real Estate Funds investors were similarly situated. First, the role played by Wextrust Capital was common to all the investments, in that Wextrust Capital managed the various Wextrust entities and affiliates in exchange for management fees. (Plan at 12). Second, the offering materials all explicitly stated that the investments entailed a high degree of risk. Third, the offering materials highlighted the role played by defendants Byers and Shereshevsky as well as other Wextrust personnel. Fourth, cash from the operations was

routinely pooled to pay for operating expenses and distributions across various offerings. Finally, many of the securities offerings were backed by guarantees that they were backed by Wextrust Capital. (Plan at 12-13). I agree that the circumstances under which the Real Estate Funds investors made their investments was sufficiently close to satisfy this requirement.

It is a much closer call as to the Commodity Funds investors, but there, too, I conclude that the requirement is satisfied.

The Commodity Funds investors argue that they are not similarly situated to the Real Estate Funds investors in three principal respects. First, they argue that the commodities laws circumscribe the Court's discretion, and prevent it from approving the Plan. Second, they argue that the Commodity Funds should not be part of the receivership estate because they were not part of the Wextrust fraud. Finally, they argue that the Commodity Funds should not be part of the receivership estate because the Receiver lacks the authority to assert claims against the Commodity Funds.

As to the first argument, it is meritless. Federal courts regularly appoint receivers and approve distribution plans in cases involving violations of the federal commodities laws. See, e.g., CFTC v. Topworth Int'l, Ltd., 205 F.3d 1107, 1116 (9th Cir. 1999) (approving receiver's distribution plan in case brought by CFTC for violation of commodities laws); CFTC v.

Rolando, No. 08 Civ. 0064 (MRK), 2008 U.S. Dist. LEXIS 101225, at
*2 (D. Conn. Dec. 10, 2008) (same); Eustace, 2008 U.S. Dist.
LEXIS 11810, at *2 (same).

As to the argument that the Commodity Fund investors
are not similarly situated to the Real Estate investors because
Wextrust did not exercise control over the Commodity Funds, it is
belied by the evidence, which clearly shows that Shereshevsky and
Byers exercised control over the Commodity Funds, and that they
used the Funds as part of one overarching scheme to defraud
investors. First, Byers was a principal of both WCM -- the
manager of the Commodity Funds -- and Wextrust Capital -- a named
defendant in this case that also had the exclusive right to
manage WCM. (See NFA Complaint ¶ 3; Receiver Response at 23).
Second, Shereshevsky exercised a significant amount of control
over the funds, as evidenced by his ability to have funds
transferred back and forth between the Real Estate and Commodity
Funds. (12/19/08 Sordillo Decl. ¶ 19, 20 (detailing transfers
made at Shereshevsky's request)).[18] Third, a substantial number

_____

[18] At the Hearing, Martin Malek, an investor in one of the
Commodity Funds, argued that, under the Receiver's logic, if one
of Bernard L. Madoff's investors had received a cash distribution
from Madoff and subsequently invested it in the Fidelity Magellan
Fund -- one of the largest mutual funds in the world -- then the
entire Magellan Fund would be tainted, and could be distributed
to Madoff victims. (Tr. at 63-64). This argument misses the
mark. In the hypothetical posed, Madoff was not in control of
the Magellan Fund. Here, however, there is evidence that Byers
and Shereshevsky were running both the Real Estate Funds and the
Commodity Funds. This case, therefore, is distinguishable from
those cases in which courts have permitted investors to recoup
investments both because they were traceable and because they had
never been placed under the control of the perpetrator of the
fraudulent scheme. See Credit Bancorp, 290 F.3d at 90 (rejecting

-31-

of Commodity Funds investors also invested in Real Estate Funds. (See 5/11/09 Sordillo Decl. Ex. A (49% of investors in WDF and 56% of investors in WPP also invested in Real Estate Funds)). Finally, a December 5, 2006 Wextrust Capital press release refers to the "development of Wextrust Capital's new commodity based investment funds." (5/11/09 Schmeltz Decl. Ex. C). It is therefore clear that the Commodity Funds were, together with the Wextrust entities, part of a "unified scheme to defraud," and therefore are properly part of the receivership estate. See SEC v. Amerifirst Funding, Inc., No. 07 Civ. 1188, 2008 U.S. Dist. LEXIS 20044, at *12 (N.D. Tex. Mar. 13, 2008) (holding that "a pooled distribution is equitable when the separate legal entities were involved in a unified scheme to defraud"); Eustace, 2008 U.S. Dist. LEXIS 11810, at *22 (approving pro rata distribution plan where structure of scheme "encouraged investors to perceive the funds as a part of a whole").

          Finally, the Commodity Funds investors argue that the Receiver cannot include the Commodity Funds within the receivership estate because he only stands in the shoes of WCM, and therefore cannot assert a claim WCM would not be able to assert. This argument is premised on a misunderstanding of the Receiver's role. The Receiver is charged with protecting the interests of all investors in the Wextrust entities, and he has

similar argument on ground that "[i]n those cases the reason the assets were returned was not merely because they were traceable, but because the assets had somehow been segregated in the manner of true trust accounts and/or had never been placed in the defrauder's control.").

the authority to assert claims on behalf of any of those
entities. Thus the Receiver not only has the authority, but also
the duty, to assert claims against the Commodity Funds on behalf
of the Real Estate Funds investors whose assets were commingled
with the Commodity Funds. Cf. Credit Bancorp, 2000 U.S. Dist.
LEXIS 17171, at **61-62 (rejecting almost identical argument by
investors and characterizing it as another "attempt to have their
claims considered in isolation from those of the other
customers").

For these reasons, I conclude that all investors are
similarly situated. Both factors set forth by the Second Circuit
in Credit Bancorp are therefore satisfied, and a pro rata
distribution is appropriate.

## B. **Method of Calculating the Pro Rata Distribution**

The Receiver considered three other methods of
calculating the pro rata distribution before concluding that the
net investor method would be the most equitable.

First, the Receiver could simply ignore any
distributions investors received, and base his calculation on the
amount of the gross investment. The Receiver does not believe
this would be an equitable option due to the number of investors
who received distributions. (Receiver Response at 9). In other
words, ignoring distributions would inequitably reward those who
already received some money back at the expense of those who
never received a distribution.

-33-

Second, the Court could order investors to repay all
the cash distributions they received from the Wextrust entities,
and then the Receiver could make a distribution based on each
investors' actual investment.  The practical problems associated
with this approach, however, preclude it from being a viable
option.  Many of the investors may not have the money, and
litigation to collect it would be expensive, time-consuming, and,
in some instances, cruel.  (Id. at 10).

Third, the Court could order what is known as the
"rising tide" approach.  Under this approach, the amount of an
investor's received cash distributions would be deducted, dollar
for dollar, from the amount of the investor's total distribution
award.  (Id. at 10).  For example, assume Investor A had a gross
investment of $100,000, and had received $15,000 in cash
distributions.  If the pro rata multiplier were 10%, then
Investor A would be entitled to $10,000.  Because Investor A
received $15,000 in cash distributions, however -- more than the
distribution amount -- he would not actually receive a
distribution at all.  (Id.).  Deloitte, the Receiver's
accountant, has estimated that, assuming a 10% multiplier, using
the rising tide approach would mean that 45% of investors would
receive no distribution.  For this reason, the Receiver does not
recommend this approach.  (Id.).

I agree that the net investor method is the most
equitable.  It would provide the greatest number of investors

-34-

with the greatest recovery possible without inequitably rewarding some investors at the expense of others.

## C. **Treatment of Rolled-Over Distributions**

Several objections have been raised to one aspect of the net investor method -- namely, its treatment of rolled-over distributions. The objection is that giving credit to investors for distributions that they rolled over is inequitable because, in a Ponzi scheme, all distributions of "profit" are illusory. The following example illustrates the issue:

- Investor A invests $100,000 in Wextrust and receives a $20,000 distribution in cash. Under the Plan, her starting point for a distribution will be $80,000.
- Investor B invests $100,000 in Wextrust and, at the urging of Wextrust employees, decides to roll over her $20,000 distribution rather than simply receive it in cash. Her starting point for a distribution under the Plan will be $120,000.

Several of the objectors argue that this result is inequitable, because Investor B is actually out-of-pocket only $100,000, not $120,000. The rolled-over distribution is illusory, they claim, as there were no profits.

These objections ignore two important points, however. First, Investor B could have received the $20,000 distribution, but chose not to -- often at the urging of Wextrust employees -- and thus that money is properly akin to a loss. Second, and more

important, is that ignoring the rolled-over distributions results in an inequity. Using the same examples above:

- Investor A invests $100,000 in Wextrust and receives a $20,000 distribution in cash. Her starting point for the distribution is $80,000, and thus she will receive $8,000. That $8,000, however, is in addition to the $20,000 she has already received, and thus her total recovery from her gross amount invested is $28,000.

- Investor B invests $100,000 in Wextrust and, at the urging of Wextrust employees, decides to roll over her $20,000 distribution rather than simply receive it in cash. Her starting point for the distribution here will be $120,000, and thus she will receive $12,000. That $12,000, however, is her total recovery. She would have been better off, in the end, if she had received a distribution in cash.

Ignoring the rolled-over amount, as the objectors propose, would further penalize those investors who chose to roll over their investments rather than receive them in cash. Such a result would be inequitable.

Accordingly, the Receiver's proposal to account for rolled-over distributions is approved.

## D. Deficiency Claims

The Plan proposes that the Court only permit secured creditors to recover out of their collateral, and prohibit them from recovering under the Plan for their deficiency claims. The

-36-

Receiver argues that, because the secured creditors will receive a greater percentage of their claims than the defrauded investors -- due to the fact that secured creditors will be paid ahead of investors -- it would be inequitable to permit the secured creditors to recover more. (Plan at 29). I agree, and conclude it is within my equitable authority to do so.

In Official Comm. of Unsecured Creditors of WorldCom, Inc., the Second Circuit affirmed the District Court's approval of a distribution plan that excluded certain creditors from recovery under the plan because of the amount they had already recovered. 467 F.3d at 84.[19] The Court also cited approvingly the following holding of the District Court: "[I]t is fair and reasonable that the limited funds available for distribution not be directed to those who have already recovered more than the approximately thirty-six cents on the dollar recovered by general creditors, and rather be used to increase the still-considerably smaller recovery of those covered by the proposed Distribution Plan." Id. at 84.

Similarly, in Credit Bancorp, Judge Sweet rejected the argument advanced by a group of investors that their assets were not properly part of the receivership estate on the ground that

_____

[19]    The plan in that case was not proposed by a federal receiver, but rather by the SEC pursuant to the "Fair Fund provision" of the Sarbanes-Oxley Act of 2002, Pub. L. No. 107-204, § 308(a), 116 Stat. 745, 784 (2002) (codified at 15 U.S.C. § 7246(a). The Second Circuit held, however, that the same "fair and reasonable" standard applies to SEC-proposed distribution plans as to receivership cases, and the court cited receivership cases in its decision. See id. at 82-83.

the defendant did not have an ownership interest in those assets. 2000 U.S. Dist. LEXIS 17171, at *54. "[T]he fact that the [investors] might be entitled under other law to recover their assets does not end the inquiry in this equity receivership because equitable concerns may supersede those other rights." Id.

Based on the Second Circuit's decision in Worldcom, and the Court's broad equitable authority to "classify claims sensibly in receivership proceedings," SEC v. Enter. Trust Co., 559 F.3d 649, 652 (7th Cir. 2009) (Easterbrook, C.J.), I approve the Plan's proposal for treatment of any deficiency claims the secured creditors may have.[20]

### E. **Disqualification of Parties Involved in the Fraud**

The Receiver's proposal to treat differently those involved in the fraudulent scheme when distributions are being made is eminently reasonable and is supported by caselaw. See, e.g., SEC v. Basic Energy & Affiliated Res., 273 F.3d 657, 660 (6th Cir. 2001) (affirming distribution plan that prohibited defendants from recovering at all, and reduced recovery of employees based on level of involvement in fraudulent scheme); SEC v. Enter. Trust Co., No. 08 Civ. 1260, 2008 U.S. Dist. LEXIS 79731, at *10 (N.D. Ill. Oct. 7, 2008) ("Disqualifying those who took the business over the edge is the most common feature, and

---

[20]    For the same reasons, I reject the argument advanced by several objectors that I lack the authority to permit the Receiver to treat unsecured creditors the same as defrauded investors, and approve that portion of the Plan.

the least contested aspect, of distribution plans."); <u>SEC v.</u>
<u>Merrill Scott & Assocs.</u>, No. 02 Civ. 39, 2006 U.S. Dist. LEXIS
93248, at **18-19 (D. Utah Dec. 21, 2006) (excluding from
distribution party who referred clients to defendant).[21] It is
therefore approved.

     Any investor whom the Receiver intends to exclude from
receiving a distribution shall be notified of the Receiver's
decision and the evidence supporting it.  The investor will then
have an opportunity to respond to the Receiver.  If they are
unable to resolve any dispute, the Court will decide the issue.
<u>Cf.</u> <u>Credit Bancorp</u>, 2000 U.S. Dist. LEXIS 17171, at *150
(approving similar procedure).

### F.   **Summary Proceedings**

     It is well-settled that a District Court has the
authority, in implementing a distribution plan in a receivership
case, to use summary proceedings to evaluate claims and claim
priority, provided the parties have an opportunity to be heard to
argue their claims.  <u>See</u> <u>Elliott</u>, 953 F.2d at 1567 (holding that
"a district court does not generally abuse its discretion if its
summary procedures permit parties to present evidence when the

---

    [21]    The Court also has the authority to consider the
culpability of any investor seeking to recover under the Plan
under the equitable doctrine of unclean hands.  <u>See</u> <u>Credit</u>
<u>Bancorp</u>, 2000 U.S. Dist. LEXIS 17171, at *118 n.48 (noting that
"unclean hands" of parties "would be a relevant consideration in
equity").

facts are in dispute and to make arguments regarding those facts"); SEC v. Wencke, 783 F.2d 829, 837-38 (9th Cir. 1986) (rejecting challenge to District Court's use of summary proceedings); FDIC v. Bernstein, 786 F. Supp. 170, 177 (E.D.N.Y. 1992) ("[O]ne common thread keeps emerging out of the cases involving equity receiverships -- that is, a district court has extremely broad discretion in supervising an equity receivership and in determining the appropriate procedures to be used in its administration."). As the Eleventh Circuit recognized in Elliott, a summary proceeding is the preferred course of action in a federal receivership because it "reduces the time necessary to settle disputes, decreases litigation costs, and prevents further dissipation of receivership assets." 953 F.2d at 1566.

Accordingly, it is clear that the Court has the authority to approve the processes for claim adjudication described herein, and I hereby exercise my authority to do so.

The timeline the Receiver has proposed is reasonable. It will provide investors and creditors with adequate notice of their recovery, will permit them to discuss the specifics of their claims with the Receiver, and, if the parties cannot resolve the matter, will permit them to make their case before the Court.

Because several of the deadlines have already passed or will soon pass, I hereby extend the deadline, for both investors and creditors, as follows: To the extent that there are disagreements between the Receiver and the investors or

creditors, they have thirty days from entry of this Opinion to resolve them on their own. When thirty days have passed the Receiver shall contact the Court to set a hearing at which the Court will resolve the remaining disputes as promptly as possible.

## G.   Remaining Objections

The Court has reviewed all the objections submitted regarding the Plan. To the extent the Court has not discussed any specific objection, it is overruled.

## CONCLUSION

For the foregoing reasons, the Receiver's Plan is approved, with the exception that the schedule is modified as set forth above.

The Receiver shall post this decision on his website forthwith.

SO ORDERED.

Dated:   New York, New York
         July 23, 2009

DENNY CHIN
United States District Judge

-41-

**APPEARANCES**

Attorneys for Plaintiff
Securities and Exchange Commission:

        ALISTAIRE BAMBACH, Esq.
        NEAL JACOBSON, Esq.
        ALEXANDER M. VASILESCU, Esq.
        STEVEN G. RAWLINGS, Esq.
        DANIELLE SALLAH, Esq.
        Securities & Exchange Commission
        New York Regional Office
        Three World Financial Center, Room 4300
        New York, New York  10281

Attorneys for Timothy J. Coleman, Receiver
for the Wextrust Entities and Affiliates:

        DEWEY & LEBOEUF LLP
            By:  Martin J. Bienenstock, Esq.
                  Leo V. Gagion, Esq.
                  Mark S. Radke, Esq.
                  Dean C. Gramlich, Esq.
                  John K. Warren, Esq.
        1301 Avenue of the Americas
        New York, New York  10019-6092

Attorneys for the International Ad-Hoc
Committee of Wextrust Creditors:

        DECHERT LLP
            By:  Shalom Jacob, Esq.
                  Shumuel Vasser, Esq.
        1095 Avenue of the Americas
        New York, New York  10036

Attorneys for the International Consortium
of Wextrust Creditors:

        BROWN RUDNICK LLP
            By:  Martin S. Siegel, Esq.
        Seven Times Square
        New York, New York  10036

Attorneys for G&H Partners AG:

        SULLIVAN & WORCESTER LLP
            By:  Joshua L. Solomon, Esq.
        One Post Office Square
        Boston, Massachusetts  02109

Attorneys for Key Equipment Finance Inc.,:

                    LEMERY GREISLER LLP
                         By:  Paul A. Levine, Esq.
                    50 Beaver Street
                    Albany, New York  12207

Attorneys for Broadway Bank:

                    NESENOFF & MILTENBERG LLP
                         By:  Philip A. Byler, Esq.
                    363 Seventh Avenue, Fifth Floor
                    New York, New York  10001

Attorneys for TCF National Bank:

                    BOND, SCHOENECK & KING, PLLC
                         By:  Louis Orbach, Esq.
                    One Lincoln Center
                    Syracuse, New York  13202

Attorneys for Space Park AIM Partnership and Space Park ISSB
Partnership:

                    MAZZEO SONG & BRADHAM LLP
                         By:  John M. Bradham, Esq.
                              David H. Hartheimer, Esq.
                              Peter B. Katzman, Esq.
                    708 Third Avenue, 19th Floor
                    New York, New York  10017

Attorneys for Nashville Warehouse Partners, LLC and Southeast
Warehouse Partners, LLC:

                    MEYER, SUOZZI, ENGLISH & KLEIN, P.C.
                         By:  Alan E. Marder, Esq.
                    990 Stewart Avenue, Suite 300
                    Garden City, New York  13202

Attorneys for Lawrence Costa:

                    SCHOEMAN, UPDIKE & KAUFMAN, LLP
                         By:  Beth L. Kaufman, Esq.
                    60 East 42nd Sreet
                    New York, New York  10165

Attorneys for Munden Family Partnership, LP, LLC:

                    SAMUELS & BERNSTEIN LLP
                         By:  Calvin A. Bernstein, Esq.
                    180 North LaSalle Street, Suite 1925
                    Chicago, Illinois 60601

-43-

MARTIN MALEK
Investor <u>Pro Se</u>
1019 East 21st Street
Brooklyn, New York 11210

KEVIN MCKEOWN
Investor <u>Pro Se</u>

TIMOTHY HOLMES
Investor <u>Pro Se</u>

PESS ROTHSCHILD
Investor <u>Pro Se</u>

ANDREW CAMPBELL
Investor <u>Pro Se</u>