**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>- against -<br><br>STEVEN BYERS, JOSEPH SHERESHEVSKY, WEXTRUST CAPITAL, LLC, WEXTRUST EQUITY PARTNERS, LLC, WEXTRUST DEVELOPMENT GROUP, LLC, WEXTRUST SECURITIES, LLC, and AXELA HOSPITALITY, LLC,<br><br>Defendants,<br><br>- and -<br><br>ELKA SHERESHEVSKY,<br><br>Relief Defendant. | 08 Civ. 7104 (DC)<br><br><br>ECF Case |

## FIFTH JOINT MONTHLY APPLICATION OF THE RECEIVER AND DEWEY & LEBOEUF, LLP FOR ALLOWANCE OF COMPENSATION AND REIMBURSEMENT OF EXPENSES INCURRED DURING THE PERIOD DECEMBER 1, 2008 THROUGH DECEMBER 31, 2008

**TO:  THE HONORABLE DENNY CHIN**
**UNITED STATES DISTRICT COURT**

Timothy J. Coleman, receiver (the "Receiver") for Wextrust Capital, LLC, *et al*.,

(collectively, the "Wextrust Entities")[1], and Dewey & LeBoeuf LLP ("D&L"), as counsel

to the Receiver, hereby submit their Fifth Joint Application for Allowance of

---

[1]     The SEC Complaint (as defined below) identifies five Wextrust Entities:  Wextrust Capital, LLC ("WTC"), Wextrust Equity Partners, LLC ("WEP"), Wextrust Development Group, LLC, n/k/a Wexford Development, LLC ("WDG"), Axela Hospitality, LLC (Axela") and Wextrust Securities, LLC ("Wextrust Securities").

Compensation and Reimbursement of Expenses Incurred During the Period December 1, 2008 through December 31, 2008 ("Fifth Interim Application"). The Receiver requests interim approval of fees in the amount of $24,975 for the period December 1, 2008 through December 31, 2008 ("Fifth Application Period"). D&L requests interim approval of fees in the amount of $674,399 and reimbursement of expenses in the amount of $72,171.75 for the Fifth Application Period.[2]

This Fifth Interim Application contains the following sections:

**Section I** provides a brief summary of the background of the receivership and also contains case status information required by Section C.2 of the Billing Instructions for Receivers in Civil Actions Commenced by the U.S. Securities and Exchange Commission ("SEC Billing Guidelines").

**Section II** summarizes the procedures used by the D&L in compiling its billing records and other information requested by the SEC Billing Guidelines. Section II also describes in greater detail the various discounts taken by D&L, including the audit it performed at the request of the Securities and Exchange Commission ("SEC"), and the 20% holdback D&L applied for the purpose of complying with this Court's Opinion of December 30, 2008 (Dkt. No. 166) ("Fee Opinion") with respect to the First Joint Monthly Application of the Receiver and Dewey & LeBoeuf, LLP for Allowance of Compensation and Reimbursement of Expenses Incurred During the Period August 11,

---

[2]     The amount of fees requested for the Receiver and D&L reflects discounts in the amount of $66,230 (as reflected in paragraph 26(a) below); $115,558 (as reflected in paragraph 26(b) below); $6,562.50 (as reflected in paragraph 26(c) below); $183,856.50 (as reflected in paragraph 26(d) below); and $4,519.50 (as reflected in 26(e) below). The amount of fees further reflects a 20% holdback of $168,599.75 (as reflected in paragraph 26(f) below). The total fee discount amounts and holdbacks for the Fifth Application Period alone amount to $545,326.25.

2008 Through August 31, 2008 (Dkt. No. 92) ("First Interim Application").[3]  Section II

also describes the various exhibits to this Fifth Interim Application.

**Section III** contains a narrative description of each activity category in which

D&L professionals provided services to the Receiver during the Fifth Application Period,

in accordance with Section D of the SEC Fee Guidelines.

**Section IV** contains a summary of all expenses for which D&L seeks

reimbursement, the procedures and policies adopted by D&L to insure compliance with

Section E of the SEC Fee Guidelines and the expense reductions taken by D&L.

**Section V** briefly summarizes the standards to be applied by the Court in

determining fee awards in SEC equity receiverships.

## I.      CASE BACKGROUND AND STATUS

A.      Case Background

1.      On August 11, 2008, the SEC filed its Complaint ("SEC

Complaint") against individual defendants Joseph Shereshevsky ("Shereshevsky"),

Steven Byers ("Byers") and the Wextrust Entities (collectively, the "Defendants").  The

SEC Complaint alleged that the Defendants committed fraud in connection with at least

60 private placement offerings, which raised at least $255 million from at least 1,196

investors.  These offerings occurred primarily during the period 2005 through 2007.

2.      The SEC further alleged that the Defendants represented to their

investors (in many instances members of the Orthodox Jewish communities in New York

City, Norfolk, Virginia, Israel and elsewhere solicited by Shereshevsky) that investments

in particular securities offerings would be invested in properties associated with the

---

[3]      The Fee Opinion is reported at *Securities and Exchange Comm'n v. Byers,* 590 F. Supp. 2d 637
(S.D.N.Y. 2008).

investments.  According to the SEC Complaint, Defendants used the investments to pay prior investors with respect to other offerings or to fund operating deficits either at the holding company level or at the level of the various LLC entities formed by Byers and Shereshevsky to own specific property.  The SEC Complaint further alleged that the Defendants failed to disclose Shereshevsky's status as a convicted felon and that certain Defendants violated broker-dealer registration requirements.

3.      To prevent further diversions of funds and dissipation of the assets of the Wextrust Entities, the SEC sought, *inter alia,* a freeze order barring any further dissipation of Wextrust Entity assets, including monies deposited in bank accounts, and the appointment of a receiver to take control of the Wextrust Entities and their affiliates.

4.      On August 11, 2008, the District Court entered its Order Appointing Temporary Receiver, entered as Docket No. 2 ("Initial Receivership Order").[4] The Initial Receivership Order appointed Timothy J. Coleman, a partner in D&L, as Temporary Receiver and ordered him to:

(a)     preserve the *status quo* with respect to the Wextrust Entities and all entities which the Wextrust Entities either controlled or in which they had an ownership interest, including without limitation over 240 entities and funds described in Exhibit A to the Initial Receivership Order (collectively, the "Wextrust Affiliates");

---

[4]      On September 11, 2008, the Court amended the Initial Receivership Order through the means of the Amended Order Appointing Temporary Receiver (Dkt. No. 36) ("Amended Receivership Order").  The Amended Receivership Order expanded the powers provided for under the Initial Receivership Order, by, *inter alia*, authorizing the establishment of a new cash management system to replace the byzantine collection of bank accounts employed by the Defendants, allowing the Receiver to enter into loan agreements and credit facilities to the extent necessary and authorizing the private or public sale of assets of the Wextrust Entities and Affiliates.  The Amended Receivership Order is incorporated by reference in the Court's Amended Order on Consent Imposing Preliminary Injunction and Other Relief Against the Defendants and Relief Defendant, entered on October 24, 2008 (Dkt. No. 65) ("P.I. Order").

(b)     ascertain the true financial condition of the Wextrust Entities and Affiliates and the disposition of investor funds;

(c)     determine the extent of the commingling of funds between and among the various Wextrust Entities and Affiliates;

(d)     prevent any further dissipation of the property of the Wextrust Entities and Affiliates;

(e)     prevent the further encumbrance or disposal of the property of the Wextrust Entities and Affiliates;

(f)     preserve the books, records and documents of the Wextrust Entities and Affiliates;

(g)     be available to respond to inquiries of Wextrust investors; and

(h)     determine if one or more of the  Wextrust Entities and Affiliates should undertake bankruptcy filings.

5.     To accomplish the foregoing, the Initial Receivership Order provided the Receiver with various powers, including taking immediate possession and control of the numerous hotels, commercial properties, residential developments, mining operations and other Wextrust properties and assets located throughout the United States and overseas; obtaining exclusive control and sole signatory authority over bank and brokerage firm accounts owned or otherwise controlled by the Wextrust Entities and Affiliates both here and offshore; succeeding to all rights to manage the Wextrust Entities and Affiliates pursuant to the terms of various limited liability company ("LLC") operating and management agreements; paying from funds available to the Receiver

necessary business expenses so as to preserve the assets and properties notwithstanding the Court's Order Freezing Assets[5]; and taking preliminary steps to locate concealed assets and ascertain the disposition and use of funds obtained by the Defendants from the sale of securities.

6.      The Initial Receivership Order further authorized the Receiver to engage attorneys, accountants and experts to assist him in carrying out the duties prescribed by this Court.  To that end, the Receiver, in consultation with the SEC, retained D&L as legal counsel.  The Receiver subsequently retained Jerry Klein, CPA, and Deloitte Financial Advisory Services ("Deloitte") as his accountants and Hilco Real Estate as his real estate advisors.

7.      As has been described in prior fee applications, the tasks presented by the Initial and Amended Receivership Orders can only be described as monumental and required the immediate mobilization of D&L professionals to assure that the Receiver was in a position to comply with these Orders.  In comparison to many SEC cases alleging Ponzi schemes, this case does not involve a stock fund "boiler room" operation.  Rather, Wextrust is a multi-national conglomerate with a wide variety of business operations.  Much of the work done by the Receiver and D&L during the first several months of the receivership focused on gaining a thorough understanding of Wextrust's business operations and its real estate properties and other assets.  Also, the Receiver and his counsel, with the crucial assistance of Deloitte Financial Advisory Services ("Deloitte"), engaged in the difficult and time-consuming process of first

---

[5]      On August 11, 2008, the Court entered its Order Freezing Assets ("Freeze Order") (Dkt. No. 3). The Freeze Order prohibits the Defendants and various other persons from transferring, assigning or otherwise disposing of any assets, funds or other property of the Wextrust Entities and Affiliates.

locating bank accounts and other business records and then organizing the data to render it usable to the Receiver and the SEC and other governmental entities investigating the massive fraud perpetrated by Wextrust former principals in concert with third parties.

8.      By December, the Receiver, his professionals and a small group of remaining Wextrust employees had largely stabilized business operations, although strained relations with mortgage lenders and vendors and other problem areas remained. In December, the Receiver and D&L increasingly focused not just on analyzing the WEP, Axela and WDG properties, but on beginning the disposition process. The Receiver succeeded in selling two real estate properties during the Fifth Application Period and also rid the estate of the numerous operational problems associated with the Rogers Plaza shopping mall in Michigan. The Receiver also worked closely with Neal Aaronson, Mitchell Kahn and other Hilco executives on the Receiver's Plan of Management of Wextrust Real Estate Portfolio, filed with the Court on January 15, 2009 (Dkt. No. 172). The Plan of Management disclosed to all investors and other stakeholders the reasons for the Receiver's decision to focus his sales efforts on the WEP commercial properties and to abandon efforts to rehabilitate the WDG residential developments in metropolitan and suburban Chicago. Through the concerted efforts of the Receiver and his advisors, investors and other stakeholders knew, five months into the case, which properties could be salvaged and utilized as a source of recovery and which could not. With respect to those properties which could not be salvaged, the Receiver and his counsel focused increasingly on negotiations with mortgage lenders which relieved the estate of deficiency claims which would only serve to dilute recoveries to defrauded investors. Obviously the prognosis would have been better had the recession which began to grip

the global economy in September 2008 only worsened in December. However, the Receiver was not at liberty to wait out this unprecedented contraction in the credit markets; circumstances forced him to present a near term, viable strategy.

9.     December 2008 also saw the commencement or work in earnest on a plan for distributing the assets of the receivership estate. The complex work done by D&L, Deloitte and Jerry Klein in tracing investments made by the victims of prior management and the sources of the funds in Wextrust's maze of bank and brokerage account began to bear fruit. The conclusions (later reflected in the Receiver's Second Interim Report filed on February 11, 2009 (Dkt. No. 191)) were consistent with the Receiver's expectations. Wextrust had engaged in extensive commingling of investor funds, abuse of the legal separateness of business entities and other misleading and in many instances fraudulent practices, making any attempt to allocate funds to particular groups of investors through the use of legal fictions and other mechanisms futile. As a result, the Plan of Distribution arrived at the fairest result: the decision to make *pro rata* distributions to investors and unsecured creditors out of the general corpus of the estate. On July 23, 2009 (the day before the filing of this Fifth Interim Application), the Court issued its Opinion approving all aspects of the Plan of Distribution (Dkt. No. 428) ("Plan Distribution Opinion"), including *pro rata* distributions to creditors and investors.

10.     The proceeds of real estate sales and other profitable dispositions are not the only source of recovery. During the Fifth Interim Period, the Receiver and his counsel continued discovery on the misuse of corporate funds by former company management and the company's practice of rolling over cash dispositions into new investments without notice to the affected investors. They also continued their

8

investigation of transfers to equity raisers and possible claims against the professional firms retained by former management to prepare the private placement memoranda and other materials used to solicit investments. The Receiver and D&L, with the assistance of South African advocates and solicitors and forensic account Daniel Sabbagh, continued their efforts to determine the disposition of some $40 million transferred by former management to shell entities in South Africa and Namibia for the supposed purpose of investing in diamond mining operations. The Receiver and D&L shared the information gleaned from these investigations with governmental authorities in the United States and South Africa involved in criminal investigations against former management and other persons.

11.     The Receiver also continued during the Fifth Application Period to keep the investor victims of Wextrust's former management fully informed of his activities. D&L personnel mailed copies of the First Interim Report to investors without computer access, sent correspondence to investors who had never been in contact with the Receiver, worked on improvements to the Receiver's website and posted new filings to the website.

12.     At the same time the Receiver and his counsel pursued these various avenues of recovery, they made every effort to reduce the administrative expenses of the estate. The Receiver achieved a reduction in D&L's base lodestar figure[6]

---

[6]     D&L computes the base lodestar figure by multiplying total hours billed during a particular application period by the customary rates of the professionals involved in the case. The base lodestar figure in this case serves as a starting point from which the various discounts are taken subject to a further and thorough review by the SEC. *Cf.* Fee Opinion at 15-16 (lodestar figure is subject to adjustment to arrive at a reasonable fee). In addition, the Receiver has agreed to an additional hold-back of twenty percent of the discounted lodestar amount, subject to reconsideration at the end of the case based on the results achieved. *See generally* Section II below, as well as similar sections in the Second, Third and Fourth Interim Applications.

of approximately $527,000 during December as compared to the base lodestar figure for November.

B.    Case Status

13.    In accordance with Section C.2. of the SEC Fee Guidelines, the Receiver and D&L state as follows:

(a)    As of May 31, 2009 the receivership estate had approximately $17.2 million in cash held in approximately 190 bank and brokerage accounts. Of this, approximately $7.8 million is available in accounts of WEP, WDG, WTC, Axela and PAM and $9.4 million is held by the commodity funds.

(b)    The Receiver filed the fourth series of Standardized Fund Accounting Reports ("SFARs") with the SEC in July 2009, covering the period March 1, 2009 through May 31, 2009. The SFARs are filed on a quarterly basis. In accordance with the SEC Billing Guidelines, the SFARs are attached as **Exhibit A** to this Fifth Interim Application.

(c)    It is estimated that, as of May 31, 2009, accrued, unpaid administrative expenses amounted to approximately $9.6 million. These administrative expenses consist in substantial part of accrued and unpaid professional fees and expenses owed to D&L and Deloitte. In addition to these administrative expenses, the receivership estate incurred and paid payroll and other operating expenses during the period March 1. 2009 through May 31, 2009 as indicated in paragraph 13(d) below.

(d)    As provided in the SFARs, for the period March 1, 2009 through May 31, 2009, the Wextrust Entities and Affiliates had received approximately $10.3 million in cash and cash equivalents. For the period from March 1, 2009 through May 31, 2009, the Wextrust Entities and Affiliates have disbursed approximately $12.9

million in ordinary business expenses, including payroll, funded debt service and vendor trade payables. Through May 31, 2009, the receivership estate has paid to the Receiver and D&L, Deloitte and Hilco the compensation and expenses approved by this Court pursuant to its Fee Opinion, in its Orders entered on March 3, 2009 (Dkt. Nos. 205 and 206) and March 13, 2009 (Dkt. No. 214) and in its second opinion issued on May 29, 2009 (Dkt. No. 353). In addition, the receivership estate has paid approximately $253,169 in compensation and expense reimbursement sought by various South African advocates, counsel and consultants pursuant to an order entered by the Court on January 26, 2009 (Dkt. No. 176). No other disbursements had been made to estate professionals as of May 31, 2009. On June 8, 2009, the Court entered an Order approving Deloitte's Third Interim Application (Dkt. No. 371). On June 26, 2009, the Court approved the Second Interim Application of Various South African Advocates, Counsel, and Consultants for Allowance of Compensation and Reimbursement of Expenses Incurred Through May 26, 2009 (Dkt. No. 398). Deloitte and the South African professionals subsequently received payment of these fees and expenses.

(e)     The Receiver cannot at this time state when he expects the case to be concluded. The Receiver on March 27, 2009 filed with the Court his Motion for Order Approving Receiver's Proposed Plan of Distribution (Dkt. Nos. 241-43). The Court held a hearing on the Plan of Distribution on May 21, 2009. On July 23, 2009, the Court issued its Plan Distribution Opinion approving all aspects of the Plan. The Receiver will make a first interim distribution immediately upon completion of the claims adjudication procedure approved in the Plan Distribution Opinion.

14.     As noted above, and as described in further detail in the Plan of Distribution, the Receiver has established a detailed claims verification and adjudication procedure for handling creditor and investor claims.  Now that the Court has approved the Plan of Distribution, the Receiver can proceed further with the process of verifying claims he had commenced even before the Court issued the Plan Distribution Opinion. On July 7, 2009, the Receiver posted a spreadsheet of all known, unpaid and unsecured creditors and other claimants on his website (www.wextrustreceiver.com).  The Plan Distribution Opinion approves an extension of the deadline for resolution of disputes with creditors and investors regarding their claims from August 7, 2009 until thirty days after the date of the Court's ruling on the Plan of Distribution (or until August 22, 2009). Parties seeking further information regarding the claims verification and adjudication procedure should reference the Plan of Distribution and the Plan Distribution Opinion, both of which are posted on the Receiver's website.

15.     As of May 31, 2009, the primary assets of the receivership estate consisted of the following:

(i)     Cash and cash equivalents in the amount of approximately $17.2 million;

(ii)     Funded loans in the amount of $5 million held by various Wextrust Entities, primarily Wextrust High Yield Debt Funds I, II and III and High Yield Debt Offshore Fund I, Ltd.;

(iii)     LLC entity membership interests held by Axela in the Park View Hotel property with a book value, net of related debt, of approximately $4,500,000.  The Court on May 1, 2009 granted the Receiver's motion to relinquish interests in the other two hotel properties (*see* Dkt. Nos. 300 and 301).  On June 29, 2009, the Receiver filed a motion to relinquish interests in the Park View Hotel (*see* Dkt. Nos. 400-404) and on July 23, 2009, the Court granted that motion (Dkt. No. 400);

(iv)     LLC entity common membership interests held by defendant Wextrust Equity Partners ("WEP") in various office buildings, warehouses and

a retail shopping center with a combined book value, net of related debt, of approximately $37,000,000;

(v)     Investments in Pure Africa Minerals (pty) Ltd. ("PAM") and other South African mining properties with an as yet undetermined book value;

(vi)     Various investor notes and other payables reflected on the books and records of WDG with a combined value as yet undetermined; and

(vii)     Unliquidated litigation recoveries.

16.     The Receiver requested valuations of certain real estate projects in which one or more of the Wextrust Entities and Affiliates either hold secured or unsecured debt through the various high yield funds, hold an equity position or exercise control.  The Receiver has received certain valuations.  However, because of concerns about the effect disclosure of those valuations would have on the estate's ability to market and sell those properties in the near term and maximize the return to investors, the Receiver has decided not to make public disclosure of these valuations.

17.     The Receiver currently holds no liquidated litigation recoveries. The Receiver may have causes of action against a number of third parties, including Byers and Shereshevsky.  Pursuit of such claims would require additional expenditures for attorney's fees, forensic accounting services and expert witnesses.  The Receiver anticipates that potential defendants will be the subject of one or more lawsuits filed in the District Court and that the likelihood of success would be substantial.  However, the Receiver at this juncture cannot estimate the likelihood of collecting on any judgment against potential defendants.

## II.     PRIOR INTERIM FEE APPLICATIONS, FEES AND EXPENSES REQUESTED HEREIN, DISCOUNTS AND HOLDBACKS AND DESCRIPTION OF EXHIBITS

18.     In connection with the period August 11, 2008 through and
including August 31, 2008 ("First Application Period"), the Receiver and D&L sought
approval from this Court of compensation and reimbursement of expenses.  In the First
Interim Application, the Receiver sought compensation in the amount of $57,300.  D&L
sought compensation in the amount of $2,147,666.25 and reimbursement of its expenses
in the amount of $85,840.10.

19.     On December 30, 2008, the Court issued the Fee Opinion granting
the Receiver's request for compensation in full and D&L's request for reimbursement of
expenses.  However, the Court reduced the fees requested by D&L by a factor of 20% of
the requested $2,147,666.25, resulting in an interim fee award of $1,718,144.40 for the
First Application Period.  The interim fee award is subject to D&L's right to apply for
payment of the 20% reduction ($429,533.35) at the conclusion of the case.  Fee Opinion
at 23.

20.     On or about February 12, 2009, the Receiver and D&L filed and
served their Second Interim Application (covering the month of September 2008) (Dkt.
No. 193).  The Second Interim Application provided for substantial discounts and a 20%
hold back ("20% Hold-Back").  D&L reserved the right to apply for payment of the 20%
Hold-Back for the period ($377,506) at the conclusion of the case.

21.     On March 3, 2009, the Court entered its Order Granting the
Second Interim Application ("Second Application Order") (Dkt. No. 206).  The Second
Application Order allowed the Receiver fees of $51,562.50 and D&L fees of $1,510,024
on an interim basis, subject to the right to apply for the 20% Hold-Back at the conclusion

of the case.  The Court also approved reimbursement of expenses in the amount of

$161,990.42.

22.     On or about March 27, 2009, the Receiver and D&L filed and

served their Third Interim Application (covering the month of October 2008) (Dkt. No.

238).  The Third Interim Application provided for substantially the same types of

discounts as the Second Interim Application and a 20% Hold-Back with the right to apply

for payment of the 20% Hold-Back for the period ($304,001.24) at the conclusion of the

case.

23.     As noted above, on May 29, 2009 the Court entered its

Memorandum Decision approving the Third Interim Application (Dkt. No. 353) ("Second

Fee Opinion").[7]  The Second Fee Opinion allowed the Receiver fees of $41,725, D&L

fees of $1,216,004.97 and D&L expenses in the amount of $136,317.78.  The Second Fee

Opinion permits D&L to seek payment of the 20% Holdback at the conclusion of the

case.

24.     The Second Fee Opinion was necessitated by a letter objection to

the Third Interim Application lodged by G&H Partners, AG ("G&H") on or about April

8, 2009 and filed in the docket on April 10, 2009 (Dkt. No. 276).  The Second Fee

Opinion largely confirmed the findings and conclusions set forth in the first Fee Opinion.

The Court, however, did address two issues raised by G&H.  First, the Court rejected

G&H's contention that the urgency and complexity of this case had dissipated by October

2008 and thus D&L's fee request should be subject to additional reduction.  The Court

noted that the case was complex and that the complexity of the case was fully

---

[7]     The Second Fee Opinion is reported at *Securities & Exchange Comm'n v. Byers,* 2009 U.S. Dist.
LEXIS 51429 (S.D.N.Y. May 29, 2009).

demonstrated at the May 21, 2009 hearing on the Receiver's Proposed Plan of Distribution. *See* Second Fee Opinion at 3. The Court also rejected G&H's argument that the Receiver had erred in not retaining less expensive law firms in the various parts of the country where Wextrust had its operations. The Court noted that the Receiver and D&L were attending to various urgent matters during October 2008. The Court also questioned whether retaining additional counsel now would result in any savings to the estate given the need for new counsel to acquire knowledge regarding the case and the need for D&L to supervise, at least to some extent, new counsel retained by the Receiver. *Id.* at 3-4.

            25.     On or about June 4, 2009, the Receiver and D&L filed and served their Fourth Interim Application (covering the month of November 2008) (Dkt. No. 238). The Fourth Interim Application provided for substantially the same types of discounts as the Second and Third Interim Applications and a 20% Hold-Back with the right to apply for payment of the 20% Hold-Back ($229,108.20) at the conclusion of the case. On June 17, 2009, G&H filed an objection to the Fourth Interim Application (G&H's fourth such filing in the case) (Dkt. No. 378). On that same date, D&L filed its response to the objection (Dkt. No. 381). The Fourth Interim Application remains under advisement with the Court.

            26.     In connection with this Fifth Interim Application, the Receiver and D&L have agreed to the same series of discounts and holdbacks as were agreed to in connection with the Second, Third and Fourth Interim Applications. They are summarized as follows:

(a) Pursuant to the public service discount applicable to this matter, the hourly fee for all services performed by the Receiver personally has been reduced from Mr. Coleman's standard hourly rate of $850 to $250. In addition, at the request of the SEC the Receiver agreed to reduce his fee request in connection with his conference with D&L attorneys on December 4, 2009. All told, the Receiver has reduced his fee request from $91,205 to $24,975, a reduction of $66,230. A description of the Receiver's activities is under Task Codes B420 and 430 (B430 lists travel time only and has been billed at $125 per hour, half the reduced rate of $250 per hour).

(b) Fees for D&L professionals performing non-legal receivership services, including non-legal case administration, business operations and investor relations activities, continue to be billed at a capped rate of not more than $200 per hour. Based on the $200 cap for non-legal receivership services, the fees for services in these three activity categories -- Business Operations (B210); Case Administration/ Receivership Non-Legal (B320); and Investor Relations (B400) -- have been reduced from $331,181.35 to $215,623.35, a reduction of $115,558. This is the same type of discount applied to the base lodestar amount in all prior interim applications at the time the Receiver and D&L filed each application.

(c) Section E.2.j. of the SEC Fee Guidelines permits non-working travel time to be billed at fifty percent of the professional's billing rate. The actual reduction for the Fifth Interim Period was $10,150 with respect to the Receiver, with the Receiver billing his travel time at half his reduced rate (or $125 per hour). D&L reduced its portion of this category by 50% (from $13,125 to $6,562.50).

17

(d)　　At the time it submitted this Fifth Interim Application to the SEC on June 16, 2009, D&L also submitted an audit of its legal fees for the Fifth Application Period and suggested reductions.  The audit eliminated all attorney billings of 25 hours or less (except for five partners who provided critical services in specific areas).  The audit also provided for reductions in task codes B120, B130, B140, B160, B170, B230, B240, B270 and B280.[8]  These reductions were based on standard fee auditing criteria (duplicative services, excessive time, vague entries).  D&L also capped certain of its entries in the above-referenced task codes at $200 per hour because the work arguably was administrative in nature.  The total amount of the reduction per the D&L audit was $183,856.50.

(e)　　On June 22, 2009, after communications with the SEC, D&L agreed to an additional fee reduction of $4,519.50 and an additional expense reduction more particularly described in Section IV below.  The fee reductions primarily consisted of (i) capping certain additional entries at $200 per hour because the SEC considered these entries to be administrative in nature (what the SEC terms as within the "receiver function") and (ii) reducing fees with respect to a conference the Receiver held with D&L professionals on December 4, 2008.  Based on these additional fee and expense reductions, the SEC has no objection to the Fifth Interim Application.

(f)　　In the Fee Opinion, the Court applied an additional reduction factor of 20% of the D&L fee request after the various other reductions, subject to D&L's right to re-apply for the 20% reduction in connection with its final fee application in this case ("20% Hold-Back").  In accordance with the Fee Opinion, D&L

---

[8]　　The audit did not include task codes B210, B320 and B400 because, as explained in paragraph 26(b) above, D&L has classified those task codes as primarily pertaining to "receiver functions" and has capped its fees at $200 per hour.  *See* further discussion in Fee Opinion at 20.

has applied the 20% Hold-Back to its net fee amount of $842,998.75 to produce an interim fee request of $674,399, subject to D&L's right to apply for payment of the 20% Hold-Back for the Fifth Interim Period ($168,599.75) at the conclusion of the case.

27.     Accordingly, in connection with the Fifth Application Period, the Receiver requests interim compensation in the amount of $24,975. D&L requests interim compensation in the amount of $674,399 (a figure reflecting all the discounts and the 20% Hold-Back discussed in paragraph 26 above) and reimbursement of expenses in the amount of $72,171.75. Consistent with the Fee Opinion, the blended hourly rate for attorneys only has been calculated at approximately $463.[9] After reductions for the hours written off (as opposed to capped) pursuant to the audit, all D&L professionals billed approximately 2,292 hours during the Fifth Application Period. Hours per day on average were approximately 74. The interim fees sought by D&L are approximately 58% of the net D&L Lodestar amount of $1,153,905.25 (*see* chart in paragraph 28 below).

28.     The following chart further demonstrates how the D&L interim fee request for the Fifth Interim Period was calculated:

Base Lodestar
Amount .......................................................................................$1,244,700.25

Receiver's Gross Fees
Before Discount ............................................................................($91,205.00)

---

[9]     D&L calculated the blended hourly rate for attorneys only by dividing the total amount of attorney's fees (excluding all Receiver billings and all paralegal and other non-attorney professional billings and deducting the amount of attorney billings written off per the D&L audit and the SEC's additional review; the reduction in attorney billings resulting from the $200 cap on B210, B320 and B400;; and the reduction in fees based on non-working travel time) by the total amount of hours billed by attorneys (excluding all Receiver time and all paralegal and other non-attorney professional time and deducting the hours written off (as opposed to capped) as a result of the D&L audit and the SEC's additional review and half of the non-working travel time). The blended hourly rate does not reflect the reduction in fees resulting from application of the 20% Hold-Back. It does, however, reflect the hours worked by D&L attorneys on fee application and related matters in task code B410 (for which no compensation is sought per the SEC Fee Guidelines).

Net D&L Lodestar Amount ...........................................................$1,153,905.25

Discount Based on Cap on Task
Codes B210, B320 and B400..........................................................($115,558.00)

Deduction for 50% of Non-Working Travel Time .............................($6,562.50)

Net amount before Audit and 20 % Hold-Back.............................$1,031,374.75

D&L Fee Audit ..........................................................................($183,856.50)

Additional SEC Reduction ………………………………………. ($4,519.50)

20 % Hold-Back.........................................................................($168,599.75)

D&L Interim Fee Request..................................................................$674,399

  29.  The fee and expense amounts set forth above, the time commitment and the discounts applied by the Receiver and D&L take into account all relevant circumstances and factors as set forth in the New York Lawyer's Rules of Professional Responsibility, as it applies to D&L as attorneys and to the Receiver to the extent of his rendition of legal services to the receivership estate. They take into account the nature of the services performed, the amount of time spent, the experience and ability of the lawyers and legal assistants working on this engagement, the novelty and complexity of the specific issues involved, the time limitations imposed by the circumstances, and the responsibilities undertaken by the Receiver and D&L. The fees requested and discounts also take into account the Fee Opinion and the Second Fee Opinion (which themselves take into account the complexity of the issues addressed and other factors referred to above). D&L to a substantial extent uses the two Fee Opinions as a standard for determining D&L's interim fee requests in connection with the Fifth Application Period.

30.     This Fifth Interim Application includes certain exhibits[10]:

(a)     A Fee Schedule showing the total fees billed and hours worked during the Fifth Application Period by each D&L professional, along with the standard hourly billing rates of each such professional, is attached as **Exhibit B** hereto.

(b)     In accordance with Section D.3.c of the SEC Fee Guidelines, a summary reflecting the total fees billed and the hours worked by each professional in each of the activity categories in which D&L has divided its time is attached as **Exhibit C** hereto.

(c)     In accordance with the Section D.5 of the SEC Fee Guidelines, all time records of D&L professionals for the Fifth Application Period, arranged in chronological order within each activity category, are attached as **Exhibit D** hereto.[11]

(d)     In accordance with Section E.1.a. of the SEC Fee Guidelines, a summary of all expenses incurred by D&L organized by expense category is attached as **Exhibit E** hereto.[12]

(e)     Also submitted herewith is the Certification required by Section A.1 of the SEC Fee Guidelines.

31.     The Receiver and D&L have previously filed the First, Second, Third and Fourth Interim Applications in this case, as described above in paragraphs 18-25.  D&L received no retainer in this case.

---

[10]     These exhibits do not reflect the discounts and 20% Hold-Back discussed in paragraphs 26-28 above.

[11]     At the request of the SEC, D&L has redacted nine of the entries in **Exhibit D.**

[12]     **Exhibit E** does not reflect the reduction in D&L computerized legal research expenses and other deductions discussed in Section IV below.

32.     The Amended Receivership Order limits the Receiver and D&L to obtaining compensation solely from the assets and properties of the Wextrust Entities and Affiliates.

33.     The Amended Receivership Order provides that the Receiver and his advisors shall be paid on a monthly basis during the first six months of the case and on a quarterly basis thereafter.  In accordance with the SEC Fee Guidelines, and as noted above, the Receiver and D&L submitted the Fifth Interim Application and all Exhibits to SEC counsel 38 days prior to filing the Fifth Interim Application with the Court.  The SEC has notified the Receiver and D&L that it has no objection to the Fifth Interim Application.

34.     The Receiver and D&L professionals recorded all services performed in time increments of one tenth (0.10) of an hour.  All services by D&L paralegals and other paraprofessionals support staff were professional in nature and, if not performed by the indicated paraprofessionals, would have been performed by attorneys.

35.     D&L took considerable care to ensure that paraprofessionals and other support staff were utilized to perform ministerial tasks, such as the creation and supplementation of electronic and hard copy data bases and the filing of pleadings in this Court using the ECF system.  The Receiver and D&L placed these tasks for the most part within the Case Administration/Receivership Non Legal activity category (B320) and billed at rates capped at $200 per hour.

36.     Although 28 attorneys (50 less the 22 attorneys whose time was written off as part of the audit) billed time during the Fifth Application Period, a core

group of attorneys performed the vast majority of the services. However, in some instances the receivership case required the involvement of senior attorneys with background and experience in the multitude of relevant litigation and transactional disciplines. As noted above in connection with discussion regarding the audit, the billings of attorneys who worked 25 hours or less on the case were written off in their entirety. In five instances relatively small amounts of time were spent by five senior attorneys with expertise relevant to specific issues in the case (David D. Cleary in connection with various matters relating to asset disposition and professional retention matters, Maria A. Dantas in connection with various lender forbearance and hotel and other asset disposition and recovery issues, Stuart Saft in connection with the Park View Hotel and other real estate matters, Harvey Kurzweil in connection with the litigation commenced by the Receiver in South Africa and Abraham N. Shashy with respect to federal tax issues). These less significant involvements benefited the receivership estate because they gave the core group of attorneys particular insight into and knowledge of important legal issues. D&L did not write off the billings of these five attorneys.

## III.    SERVICES RENDERED BY RECEIVER AND D&L DURING FIFTH APPLICATION PERIOD

37.    In accordance with Section D.3 of the SEC Billing Guidelines, D&L segregated its time during the Fifth Application Period into fifteen activity categories[13]. Narrative summaries of these activity categories follow:

38.    <u>Asset Analysis and Recovery (B120)</u> Total Fees:    $95,357.50[14]

---

[13]    This number includes task code B410 (Fee Applications) for which no compensation is sought in accordance with the SEC Billing Guidelines.

[14]    As noted above, **Exhibit C** hereto shows each professional working on a particular activity category and the total hours he or she billed in that category. The fees for each activity category are stated herein without showing the discounts and the hold-back discussed in paragraph 26 above.

Although Wextrust sold securities to investors through a registered-broker dealer (Wextrust Securities), it also organized, provided initial capital and in most instances managed the real estate and other projects in which it solicited investments, including projects Wextrust financed. During the Fifth Application Period, the Receiver and D&L continued analyzing real estate and other assets either owned or controlled by the Wextrust Entities and Affiliates and real estate on which the Wextrust high yield funds extended financing. The liquidity crisis facing the Receiver at the inception of the receivership continued during the Fifth Application Period (and in fact worsened as lending institutions continued affecting the money supply by cutting back on lending). As noted in previous fee applications, many of the properties owned by the Wextrust Affiliates generate little or no cash flow. Those that do fell prey to the same problem facing normal businesses during this highly unusual time period: delays in collection (usually from commercial tenants who themselves faced year-end collection delays). Also, many of the projects which the Wextrust High Yield Funds had financed were in default and generated no interest or other cash flow. Although fees dropped in this activity code as compared to November (from $156,049 to $95,357.50), D&L lawyers continued to struggle with the same problems faced in October and November.

The Receiver and his counsel also continued their investigations of the misappropriation of funds by Wextrust's two former principals (including an interview with Steven Byers) and the possible recovery of commissions and other fees paid to equity raisers working in concert with Wextrust's former principals. Examples of services performed in this activity category and particular professionals involved include:

(a)     analyzing the marketability of the High Yield participation in the loan on the 410 E. Magnolia property in Wildwood, New Jersey and preparation of a deed in lieu of foreclosure agreement (Rebecca M. Reilly, Joshua Berengarten);

(b)     preparing, with the assistance of forensic accountant Jerry Klein, a chart showing commissions and other fees paid to brokers and finders and analyzing various equitable and legal bases for recovering these fees (Kristien M. Kahn, Bryan Westhoff, John K. Warren)

(c)     continuing discussions regarding placing a freeze on the IRA accounts of Joseph and Elka Shereshevsky at Millennium Trust and obtaining documents from Wachovia Bank regarding transfers to and from the Shereshevsky bank accounts (Scott T. Peloza);

(d)     interviewing Steven Byers regarding misappropriation of corporate funds and other issues, reviewing documents in preparation for the interview, obtaining documents by subpoena from Northern Trust regarding Byers' personal bank accounts and preparing summaries of activity in the Byers and Shereshevsky bank accounts for the SEC (Bryan Westhoff, John K. Warren);

(e)     negotiating with Wells Fargo regarding its assertion of late fees with respect to the alleged default on the mortgage loan on the South Pine Street shopping center in Wisconsin and the access of the receivership estate to the blocked account (Maria A. Dantas, Mohsin N. Khambati, Scott E. Frimmer);

(f)     continuing the negotiations with Regions Bank (one of the primary mortgage lenders to various WEP entities in Tennessee and other Southeastern states) regarding an overall forbearance agreement and the status of Regions' mortgage

loans on the Wyndham Drake and Crowne Plaza Phoenix hotels (Maria A. Dantas, Stuart Saft);

(g)  continued negotiations regarding the Boardwalk & Lincoln property in Atlantic City, New Jersey and the loans held by High Yield Fund I and co-lender HPC Management on the property, including discussions with HPC Management (Maria A. Dantas, Mohsin N. Khambati, Michelle M. Jenab);

(h)  negotiating with the seller of the Peoria office property regarding the unwinding of various escrows set up in connection with Wextrust's purchase of the property (Jill H. Blumberg);

(i)  negotiating with co-owner Peck regarding the replacement of Michael Gorney as manager of the Commerce Center Holdings property and Peck's possible buy-out of Wextrust's interest (Maria A. Dantas);

(j)  continuing the review of various commodities fund issues (Vincent P. Schmeltz III);

(k)  negotiating with co-lender Stillwater regarding the loan on the Brandermill Inn property in Virginia (Mohsin N. Khambati);

(l)  analyzing the advisability of terminating leases of various Wextrust offices and potential breach of lease claims (David D. Cleary; Vincent P. Schmeltz III); and

(m)  continuing the negotiations with Amalgamated Bank (mortgage lender on the Park View Hotel) regarding loan defaults and mechanics' liens and formulating a strategy for disposition of the property with Hilco (Stuart Saft, Mohsin N. Khambati, Renee I. Covitt, Joshua Berengarten).

39.  Asset Disposition (B130)            Total Fees:   $102,053.50

The Receiver and his counsel increased their focus on sales and other property dispositions in December.  Partners Mark S. Radke and David D. Cleary and other attorneys prepared an initial draft of the Receiver's Plan of Management, filed with the Court on January 15, 2009.  D&L attorneys Mohsin N. Khambati and Michael C. Phillipou worked on the transactional documents relating to the sale of the Hammond Outlots property in Louisiana (approved by the Court on December 22, 2008 (Docket No. 161)).  D&L attorneys Dean C. Gramlich and Jill H. Blumberg continued their work on facilitating the sale of the 6126 S. Plymouth single family residence, which eventually closed in February 2009, and also closed the sale of the 451 Repton property on December 23, 2008 after the Receiver obtained Court approval on December 11 (Dkt. No. 219).  Counsel Dean C. Gramlich commenced discussions with The Private Bank and other lenders regarding the relinquishment of WDG early stage developments.  Associate Boaz I. Green drafted an agreement for the liquidation of Summit Capital.  A number of D&L attorneys fielded calls from parties expressing an interest in the purchase of particular properties.  Counsel Vincent P. Schmeltz and paralegal Linda Lucas worked on sales of computers and other equipment located in Wextrust office sites.  Senior Counsel Mohsin N. Khambati commenced sale negotiations with the eventual purchaser of the Bax Realty property in February 2009.  Partner Maria Dantas worked on the sale of a Wextrust airplane to DuPage Aerospace.

On January 15, 2009, the Receiver filed his Plan for Management.  Sale and other disposition activity will accelerate in the coming months.  Hilco has completed work on a comprehensive marketing plan and the Receiver and his advisors are in the

process of implementing the plan. As noted in prior fee applications, the Receiver and his advisors must make every effort to avoid a "fire-sale" perception which would serve to lower returns on asset dispositions and ultimately result in reduced distributions to defrauded investors. At the same time, the Receiver's mandate includes timely distributions and, accordingly, he must proceed with the marketing plan.

    40. <u>Case Management/Legal (B140)</u>   Total Fees: $46,861

    This activity category consisted of a number of in-person and telephone conferences conducted by the Receiver, his attorneys and his advisors to, *inter alia*, discuss the disposition of various WEP, Axela and WDG properties based on Hilco's analysis of the portfolio, address a multitude of operational issues and implement the Receiver's strategy for recovering over $40 million in investor funds transferred to South Africa. The Receiver conducted meetings on operational issues with a limited number of his attorneys and advisors on December 3, 10 and 17. On December 4, 2008, the Receiver conducted a status teleconference with D&L professionals regarding all aspects of the case, including progress on various assignments. This "all hands" meeting was necessary to coordinate the activities of D&L personnel, but such meetings were largely discontinued as the Receiver focused on reducing the number of personnel involved in the case. D&L attorney Robin Moore and client specialist Thomas F. X. Feeney met with representatives of the U.S. Attorneys Office to discuss various pending investigations and the status of property seized by the government. D&L associate Kathleen E. Barber met on a weekly basis with Wextrust CFO Thomas Franklin, other Wextrust employees and Deloitte to discuss operations at the WEP commercial properties. These various

conferences enabled the Receiver and D&L to maintain oversight over the legal work being done and to assign additional projects and also to keep federal authorities informed of the status of various matters.

This category also includes work done by associate John Warren to monitor the Court's docket (there were a large number of filings in December). It should be noted that billings in this activity category were only 59% of the billings for November.

41.    Bankruptcy Analysis (General) (B160)  Total Fees:  $500

The activity category contains several entries by senior counsel Mohsin Khamabati on various bankruptcy-related matters.

42.    Evidence Preservation (B170)        Total Fees:    $8,031

At the inception of the case, the Receiver and D&L worked extensively with several data collection and preservation firms to insure that all existing documentary and electronic evidence was preserved, assembled and organized. That activity had largely run its course by November. Billings in this activity category during December including the document review conducted by Nancy M. Riley at the offices of former Wextrust counsel Huff, Poole & Mahoney and further investigative work with the U.S. Attorney.

43.    Business Operations (B210)        Total Fees:    $204,129

Billings in this activity category remained at about the same level as November due to the continued need to address a host of operational, financial and other business issues relating to Wextrust's numerous commercial properties. Operational problems at the three Axela hotel properties continued to occupy the time of associate

Robin L. Moore and senior counsel Mohsin Khambati. The partially renovated Park View Hotel continued to present a host of operational problems, including negotiations on the payment of past due utility bills, insurance and vendor payables from available funds and theft from the property. Robin Moore also dealt with a variety of vendor payable, regulatory compliance and other operational issues related to the other two hotels (the Wyndham Drake Hotel in Oak Brook, Illinois and the Crown Plaza Hotel in Phoenix). Other properties necessitating attorney intervention included the Hamptons of Hinsdale condominium development (refund claims by condominium purchasers; Village of Hinsdale property maintenance requirements); the office building operated by Wextrust Affiliate First Highland, LLC (submission of operating statements to the Munden Family Partnership, an investor with a tenancy in common interest in the property, and negotiations with the mortgage lender over the payment of property taxes); Myatt Holdings (swap payment negotiations with lender Regions Bank); the 47 Dean Street condominium development (preparation of draw requests to insure timely payments to subcontractors; consulting agreement with Sheldon Liebb); the retail shopping center owned by First Wyoming Plaza, LLC near Grand Rapids, Michigan (funding of operating expenses prior to relinquishment approved on December 22, 2008); 410 E. Magnolia (obtaining flood insurance coverage); 509 Chauncey Street (funding of violations alleged by Environmental Control Board); the 116 York Road office building in Elmhurst, Illinois (utility payments) and the Commerce Center Holdings office complex (negotiations over buy-out by majority owner).

The Receiver and D&L attorneys continued to deal with employee compensation and termination issues as the Receiver proceeded with the downsizing of

business operations.  Chicago attorneys Vincent P. Schmeltz III and Dean Gramlich

began a review of management issues and payroll adjustments at the Chicago and other

Wextrust offices.  Associates John K. Warren and Nancy M. Riley worked with new

principal banker The Private Bank, Wachovia Bank and other financial institutions to

obtain on-line access to Wextrust bank accounts and facilitate the consolidation of bank

and brokerage accounts.  New York associate Kristien Kahn commenced the wind down

of operations of Wextrust's New York office and arranged for the storage of documents

formerly located at that site.  Associates John Warren and Jonathan Ware addressed a

number of issues related to the deregistration of Wextrust securities and broker

terminations.  D&L associate Renee I. Covitt worked with several paralegals to insure

that Wextrust LLC's maintained their good standing under Illinois and Delaware state

law.  D&L continued to refine the Request for Action (or "RFA") procedure for

expediting the Receiver's approval of non-recurring payments to third parties.

      With respect to this activity category, D&L capped its billing rates at $200

per hour, resulting in a fee reduction of $98,241.50 (48% of the base lodestar figure).

      44.   <u>Financial Analysis (B230)</u>      Total Fees:
$48,985.50

      During the Fourth Application Period this activity category consisted of

the preparation and completion of the Receiver's First Interim Report, filed with the

Court on November 7, 2008 (Dkt. No. 88).  During the Fifth Application Period, this

activity category included the beginning of work with Deloitte on the tracing analysis

included in the Second Interim Report and meetings between the Receiver and associate

Robin L. Moore regarding the topics to be covered therein.  The Receiver and D&L also

began work on initial drafts of a plan of distribution during the Fifth Interim Period (filed with the Court on March 27, 2009 (Dkt. Nos. 241-43) and approved on July 23, 2009 (Dkt. No. 428). The Receiver and Robin L. Moore worked on a memo describing the various equitable theories which could serve as bases for alternative types of distributions.

      45.    <u>Litigation (General) (B240)</u>      Total Fees: $309,932

This activity category covers work on the litigation commenced by the Receiver in South Africa to obtain access to the books and records of PAM and Pure Africa Holdings (pty) Ltd. ("PAH") and recover the $40 million in Wextrust investor funds transferred by Byers, Shereshevsky and South African national Michael van der Merwe to South Africa beginning in May 2004 and continuing through August 2008. During the Fifth Interim Period, D&L partner Leo V. Gagion worked with the Receiver on a possible settlement agreement relating to PAM syndicate entities subject to liquidation in South Africa. Associates Ilona B. Coleman and Rajen Ranchhoojee assisted the Receiver's South African counsel in reviewing PAH, PAM and other entity financial reports, e-mails and other documents. Attorneys Coleman and Teresa N. Chen provided documents to the National Prosecuting Authority in South Africa and prepared affidavits for use by the Authority. South African attorneys Greg Nott and Rajen Ranchoojee monitored the liquidation proceedings (which have subsequently become the chief forum for pursuit of the receivership's estate's interests).[15] D&L also retained

---

[15]     The Receiver did not commence the foreign, involuntary liquidation of PAH and its affiliates and only learned of it after it had been commenced. These liquidations initially complicated the Receiver's efforts to obtain documents relating to the flow of funds into Wextrust's South African affiliates and other relief from the High Court of Pretoria. However, they have since become the primary forum for litigation over the disposition of the Wextrust investor funds transferred to South Africa and claims relating to the misuse of those funds. The Wextrust receivership estate is by far the largest creditor in these proceedings

South African forensic accountant Daniel Sabbagh to assist in preparing a report to the South African Institute of Chartered Accountants regarding potential claims against Sybrand Louwrens Hanekom, PAM's accountant and a close colleague of van der Merwe.

During the Fifth Application Period, Leo V. Gagion also continued in his role as principal point of contact for opposing counsel and other parties in interest in domestic litigation matters. Counsel Vincent P. Schmeltz III and associates Nancy M. Riley prepared a memorandum on the meeting with former principal Steven Byers in New York attended by the Receiver and Leo V. Gagion and, with Nathan D. Larsen, continued follow-up work on subpoenas and other discovery issued to Avidus Trading, Paul Adrian and the accounting firm of Calzada & Associates relating to the Wextrust commodities funds. They also issued subpoenas to various other accounting and consulting firms involved with Wextrust (Zuckerman & Associates and the Berenfeld firm) and to South African investor Larry Costa and defended a motion to quash filed by the law firm of Huff, Poole & Mahoney during the holiday period. Nathan Larsen also continued his work on locating Byers associate Victoria Alvarado for the purposes of compelling her testimony.

D&L attorneys in the firm's Chicago office also attended various hearings in a number of Illinois state court cases involving Wextrust Affiliates directly or involving Wexwater, a joint venture between WTC and Stillwater which extended a number of speculative, high yield loans. Chicago associates Nancy M. Riley and Ariel E.

---

and the Receiver is taking a highly proactive role in the liquidations and the so-called "Section 417" proceedings undertaken in connection therewith.

Henderson continued their legal research on claims against Wextrust's former attorneys and accountants and the Receiver's standing to pursue such claims.

In D&L's Washington office, associates John K. Warren and Jonathan Ware responded to document subpoenas issued by the Meckler, Bulger firm. Client specialist (and former federal law enforcement agent) Thomas Feeney continued to assist the SEC and the U.S. attorneys' office in a number of matters. Associate Kristien M. Kahn, resident in the firm's New York office, prepared follow-up questions to be answered by Zvi Gluck, one of Wextrust's principal equity raisers, and worked with forensic accountant Jerry Klein on payments made to another Wextrust equity raiser, "Crunchman" Clemmons. Kristien Kahn also supervised research on possible fraudulent transfer claims based on asset transfers to charities.

46. <u>Receivership Court Proceedings (B270)</u> Total Fees: $165,848.50

As discussed above, D&L attorneys prepared motions relating to the sale of the Hammond Outlots and 451 Repton properties and the relinquishment of the Rogers Plaza shopping mall. D&L also addressed objections raised to the sale of Hammond Outlots and the Roger Park relinquishment filed by the International Ad Hoc Committee of Wextrust Creditors ("Ad Hoc Committee") and the International Consortium of Wextrust Creditors ("Consortium"). At a hearing on December 22, 2009 necessitated by these objections, the Court overruled them and entered orders approving the transactions (*see* Dkt. Nos 160 (Rogers Plaza) and 161 (Hammond Outlots)).

The Receiver also had to defend litigation commenced on December 15, 2008 by the Timothy Holmes Revocable Trust and other parties ("Commodities Fund Investors") seeking to intervene for the purpose of excluding $17.6 million in funds

invested in the four commodities funds managed by Wextrade Commodity Managers, LLC ("WCM") (*see* Dkt. No. 145). Because of the crucial effect this litigation could have had on the estate's liquidity, the Receiver agreed to an expedited briefing schedule, responding to the invention motion four days after it was filed (Dkt. No. 154). Both the SEC and the Commodities Futures Trading Commission fully supported the Receiver on the issue. On January 30, 2009, the Court entered a Memorandum Decision (Dkt. No. 181) denying the intervention motion, reasoning that the Receiver adequately represented the interests of the Commodities Fund Investors and that their intervention would unnecessarily complicate an already complicated case.

In addition to this litigation commenced by the Commodities Fund Investors, D&L also filed an opposition on December 1, 2009 (Dkt. Nos. 119-120) to the litigation commenced by Block III investor Larry Costa to eliminate the Receiver's control over Block III (one of the investment vehicles used by Byers and Shereshevsky to funnel money to van der Merwe in South Africa) (*see* Dkt. Nos. 96-100). Again the SEC joined the Receiver's efforts to bar Costa from taking control over Block III to the detriment of all other defrauded investors. On January 30, 2009, the same date the Court denied the Commodities Fund Investors' motion to intervene, the Court entered a Memorandum Decision (Dkt. No. 182) denying Costa's attempts to eliminate the Receiver's control over Block III, holding that the Block III investors lacked the power to remove the Receiver and requiring Costa to cooperate with the Receiver's South African investigation.

In assessing the costs of this litigation with the Commodities Fund Investors and Costa, it is important to note that the Receiver did not commence either

litigation.  In opposing these attempts by self-interested investors to gain preferential treatment over other Wextrust investors, the Receiver complied with his duty to act on behalf of all investors to protect the limited assets available for distribution.

47.    Federal and State Tax Matters (B280)  Total Fees:  $16,723

This activity category covers D&L's legal work on the increasing number of tax matters facing the receivership estate.  D&L partner Abraham N. Shashy communicated with the IRS regarding the issuance of IRS Form W-9's by Wextrust. Associate Kristien M. Kahn prepared powers of attorney requested by the IRS, worked on federal income tax liability issues and obtained a proposal from Deloitte to assist in tax liability matters.  Kristien Kahn also prepared a database of all materials received from the IRS.  Senior counsel Mohsin N. Khambati addressed issues arising from an appeal on Cook County property tax liability issues relating to the Park View Hotel.

48.    Case Administration/Receivership Non-Legal (B320)  Total Fees: $69,705.50

This activity category covers work primarily done by a team of D&L paralegals and litigation support personnel in New York and Washington, D.C. relating to a host of support services.  Activities during this period included maintaining and updating the Concordance document database; scanning and copying documents used in the RFA process; uploading tax documents to the firm Extranet to facilitate attorney access; generally maintaining electronic and hard copy filing systems and document depositories; creating and refining the new Live Note database used for deposition preparation; assisting associate Boaz I. Green in producing documents to the liquidator appointed in Israel; and indexing boxes of documents retrieved from the former Wextrust

office in Hinsdale (closed down during the Fifth Interim Period to reduce costs). D&L paralegals continued to assist the Receiver by creating and updating document binders used at the hearings during the Fifth Interim Period, obtaining certified copies of court documents for use in the South African litigation; updating mailing and contact lists; and sorting and delivering mail from the Receiver mail box. New York personnel continued to assist associate Kristien Kahn in the closing of the New York office and the preservation of records removed from the office. Senior Litigation Support Manager Adam Lew worked on locating a document scanning firm in South Africa and assisted the Receiver in a power point presentation to the SEC. Clerks in D&L's Managing Attorneys' Office in New York assisted in the filing and serving of pleadings and other court documents and the delivery of court documents to chambers.

With respect to this activity category, D&L capped its billing rates at $200 per hour, resulting in a fee reduction of $2,419.50.

49.     <u>Investor Relations (B400)</u>          Total Fees: $72,243.75

In connection with this category, D&L attorneys Margaret V. Dennis, Ying Lin and Eric Laufgraben supervised temporary paralegals hired though LegalTrak to assist in responding to investor inquiries. Use of temporary personnel at a billing rate of $40 per hour reduced expenses of the receivership estate substantially. In addition to supervising the investor call center and in some instance responding to certain calls, associates Dennis, Lin, Laufgraben and John K. Warren and various D&L paralegals acting under their direction sorted materials received from investors; coded the materials and updated charts showing the materials received; reviewed investor emails in the website inbox; responded to numerous investor inquiries regarding the sale of the

Hammond Outlots property and the relinquishment of Rogers Plaza; prepared memoranda on investor interviews; and worked on improvements to the Receiver's website (probably the most useful source of information for Wextrust investors with computer access). D&L support personnel also prepared and sent a letter to all Wextrust investors who had not previously contacted the Receiver.

With respect to this activity category, D&L capped its billing rates at $200 per hour, resulting in a fee reduction of $14,897.

50. <u>Receiver Time (B420)</u>                    Total Fees: $79,305

This category covers work performed by the Receiver during the Fifth Application Period in performing the duties established under this Court's orders. Generally, the Receiver supervised all legal work performed by D&L and all aspects of the business operations of the Wextrust Entities and Affiliates. The Receiver's activities included an extensive analysis and preparation of a legal memorandum on the equitable theories underlying various options for the distribution of estate assets to investors and conferences with Deloitte on the related issue of the extent of commingling of investor funds obtained by Wextrust. The Receiver worked with D&L attorneys and paralegals on the South African litigation, various investor relations matters and potential claims against former Wextrust professionals and other third parties. The Receiver attended the interview with Steven Byers on December 10 and met with SEC representatives to discuss the interview. The Receiver also supervised the preparation of his proposed Plan of Management and met and corresponded with Hilco to discuss the Plan and the underlying Hilco valuations. The Receiver attended all hearings before the Court during the Fifth Application Period. The Receiver analyzed Wextrust's business operations and

financial condition and personally approved all non-recurring payments and other disbursements to third parties. Although the Receiver's standard billing rate is currently $850 per hour, D&L has reduced his hourly rate to $250 as part of its public service discount, as discussed in Section II above.

With respect to this activity category, the reduction in the Receiver's billing rate (to $250 per hour for his regular time and $125 for his travel time) and the additional SEC reductions resulted in a total fee reduction of $66,230.

51.     Travel Time                                    Total Fees: $25,025

This activity category covers all non-working travel time of the Receiver and partner Mark S. Radke during the Fifth Application Period. **Exhibits B, C** and **D** and the amount stated above reflect actual travel time. Section E.2.j. of the SEC Fee Guidelines permits non-working travel time to be billed at fifty percent of the professional's billing rate. The actual reduction was $10,150 with respect to the Receiver, with the Receiver billing his travel time at half his reduced rate (or $125 per hour). D&L reduced its portion of this category (15 hours of Mark S. Radke's time) from $13,125 to $6,562.50.

## IV.     EXPLANATION OF EXPENSES AND RELATED POLICIES

52.     D&L seeks reimbursement of its out-of-pocket costs in the amount of $72,171.75, a reduction of $53,392.05 from expenses actually incurred. **Exhibit E** sets forth the various categories of expenses for which D&L seeks reimbursement. Also, pages 173 through 237 of **Exhibit D** to the Fifth Interim Application contain further detail regarding each of the expense categories for which D&L seeks reimbursement. D&L will retain the documentation supporting these expenses for a period of seven years

in accordance with the SEC Fee Guidelines and will provide the SEC with copies upon request.

53. D&L observed the following policies in connection with its expenses during the Fifth Application Period and also reduced its expenses as further described below:

(a) In accordance with Section E.2.b of the SEC Fee Guidelines, D&L seeks its internal photocopying expenses (listed as reproduction expenses in **Exhibit E**) at a rate of $.15 per page. D&L made 23,403 regular internal photocopies during the Fifth Application Period at the $.15 rate. On **Exhibit E**, this is a combination of color copies (15¢) and reproduction ($3,510.30).

(b) In accordance with Section E.2.g., D&L seeks reimbursement of outgoing facsimile charges at a rate of $1.00 per page for outgoing transmissions. D&L made 824 outgoing facsimile transmissions during the Fifth Application Period. D&L cannot readily determine its toll charges. D&L has not charged for incoming facsimile transmissions.

(c) **Exhibit E** (and **Exhibit D** at pages 185-194) reflect total Lexis and WestLaw charges of $43,445.13. D&L has written off all such charges, resulting in a reduction in total expenses of $43,445.13.

(d) **Exhibits E** and **Exhibit D** (*see* page 199) reflect professional fees due and owing to Daniel Sabbagh, the forensic auditor retained by the Receiver in South Africa. These fees have already been sought in a separate fee application for South African professionals filed in January 2009. To account for this error, D&L has reduced its expense request by $8,507.64.

(e) At the request of the SEC, D&L has reduced certain its travel expenses (under the line items "Travel Out of Town—Air Fare" and "Travel Out of Town—Transportation" in **Exhibit E**) by fifty percent or, in one instance, has completely written off the taxi cab fare. The reductions relate to reimbursement of certain airfare and taxi cab expenses. *See* **Exhibit D** at page 231 (air fare for witness Jen Edmiston) and pages 234-236 (taxi cab fares). The total additional reduction is $1,439.28.

(f) **Exhibit E** (and **Exhibit D** at pages 195-197) reflect miscellaneous charges of $15,476.25, with $13,140 of that amount attributable to payments to Morrison Security. These charges are for required security personnel at the Wextrust office in Chicago and the Park View Hotel.

(g) Page 211 of **Exhibit D** reflects conference call charges in the amount of $9,776.28 on November 10, 2008. This charge relates to the cost of allowing investors outside the New York metropolitan area participate by telephone in the New York "town hall" investor meeting on November 10, 2008.

(h) With respect to all expenses, D&L seeks reimbursement only for the actual cost of its filing fees, postage and overnight delivery fees, long distance telephone charges and other costs and expenses. D&L has not included in any request for expense reimbursement the amortization of the cost of any investment, equipment or capital outlay (except to the extent that any such amortization is included within the permitted allowable amounts set forth in the SEC Billing Guidelines for photocopies and facsimile transmissions).

(i)     Whenever possible, D&L has used email to transmit documents via portable document format, thereby reducing facsimile, overnight courier and copying costs otherwise chargeable to the receivership estate.

(j)     In accordance with Section E.2.j. of the SEC Billing Guidelines, D&L has not sought reimbursement for local travel expenses, including mileage, transportation and meals.

(k)     With respect to out of town travel expenses, D&L professionals have used the lowest available airfare and have not sought reimbursement for luxury accommodations or deluxe meals.  In maintaining its expense documentation, D&L retains copies of receipts relating to out of town travel.

(l)     D&L has not sought reimbursement for secretarial, word processing, proofreading or document preparation expenses (other than by professionals or paraprofessionals), data processing and other staff services (exclusive of paraprofessional services) or clerical overtime.

(m)     In some instances, cost incurred during a particular application period will not be reflected in D&L's records until a subsequent application period.  D&L will seek reimbursement for such "trailing" expenses in subsequent fee application periods.  Also, the Fifth Interim Application contains a number of trailing expenses (particularly in the telephone and travel categories) from earlier periods in the receivership.

## V.     FACTORS TO BE CONSIDERED BY THE COURT IN AWARDING FEES

The case law on equity receiverships sets forth the standards for approving receiver compensation and the fees and expenses of the receiver's counsel.  The District Court has discretion to determine compensation to be awarded to a court-appointed

equity receiver and his or her counsel and "may consider all of the factors involved in a particular receivership in determining the appropriate fee." *Gaskill v. Gordon*, 27 F.3d 248, 253 (7th Cir. 1994). Many authorities (some quite dated) provide "convenient guidelines", but in the final analysis, "the unique fact situation renders direct reliance on precedent impossible." *Securities & Exchange Comm'n v. W.L. Moody & Co.*, 374 F. Supp. 465, 480 (S.D. Tex. 1974), *aff'd*, 519 F. 2d 1087 (5th Cir. 1975).

As noted by this Court in the Fee Opinion, the reviewing court will normally consider a number of factors in determining a reasonable fee. *See* Fee Opinion at 13-14. In allowing counsel fees in SEC receiverships, "[t]he court will consider . . . the complexity of problems faced, the benefit to the receivership estate, the quality of work performed, and the time records presented." *Securities & Exchange Comm'n v. Fifth Ave. Coach Lines, Inc.,* 364 F. Supp. 1220, 1222 (S.D.N.Y. 1973); s*ee also United States v. Code Prods*., 362 F.2d 669, 673 (3rd Cir. 1966) (court should consider the time, labor and skill required (but not necessarily expended), the fair value of such time, labor and skill, the degree of activity, the dispatch with which the work is conducted and the result obtained). " '[R]esults are always relevant.' " *Securities & Exchange Comm'n v. Elliott*, 953 F.2d 1560, 1577 (11th Cir. 1992), *quoting Moody,* 374 F Supp. at 480. However, a good result may take a form other than a bare increase in monetary value. *Id*. ("Even though a receiver may not have increased, or prevented a decrease in, the value of the collateral, if a receiver reasonably and diligently discharges his duties, he is entitled to compensation."). Obviously, overall results can be determined only at the conclusion of the case.

Another "basic consideration is the nature and complexity of the legal problems confronted and the skill necessary to resolve them." *Moody*, 374 F. Supp. at 485. Moreover, "[t]ime spent cannot be ignored." *Id.* at 483. This is particularly true when the dimension and complexity of a receivership prevent counsel from taking on other full time assignments. *Id.* at 483-486 (describing the efforts of the receiver counsel's in the difficult task of determining ownership and disposability of a bank's assets and the high priority given to the matter by counsel). Another "significant factor is the amount of money involved." *Id.* at 486; *see also Gasser v. Infanti Int'l, Inc.,* 358 F. Supp 2d 176, 182 (E.D.N.Y. 2005) (receiver's legal fees "must be reasonable in light of the services rendered by counsel and the amount of property held in the receivership"). Also, as this Court noted in its Fee Opinion, "opposition or acquiescence by the SEC to the fee application will be given great weight." Fee Opinion at 14 (*quoting SEC v. Fifth Ave. Coach Lines, Inc.,* 364 F. Supp 1220, 1222 (S.D.N.Y. 1973)).

Under these standards the Receiver and D&L have adequately demonstrated that the amount of fees and reimbursement of expenses requested is appropriate. The Receiver and D&L have diligently pursued the Receiver's overall recovery strategy during the Fifth Application Period, thereby setting the stage for asset dispositions that will maximize payments to the victims of what appears to be a massive fraud. The benefit to investors, though not quantifiable at this stage of the receivership, will become quantifiable as the case proceeds. The Receiver worked tirelessly during this period to oversee Wextrust's business operations; formulate a Plan of Management for the disposition of Wextrust's commercial real estate holdings; avail the estate of all justified legal remedies at the Receiver's disposal to recover assets and formulate a Plan of

Distribution.  The Court recently approved all aspects of the Plan formulated by the Receiver and his advisors.  In accordance with the Amended Receivership Order, the Receiver and his counsel also provided investors with substantial information and enabled them to monitor the Receiver's activities on their behalf.  The Receiver has assisted federal governmental authorities in their investigation of the Ponzi scheme allegedly perpetrated by Byers, Sherevesky and others acting in concert with them.  The amounts at issue in this case are substantial by any measure; hundreds of millions of dollars of assets and investments are within the scope of the receivership.

As emphasized by the Court in the Second Fee Opinion, the issues being addressed by the Receiver and D&L are highly complex, ranging from commodities trading to real estate finance to diamond mining to the investigation of complex fraud perpetrated over a multi-year period.  *See* Second Fee Opinion at 3.  The magnitude of this case greatly limits the ability of the Receiver and his core group of attorneys to accept other employment at this time.  Nor will comparisons with other receiverships adequately reflect the effect of the unprecedented crisis in the nation's financial markets that has accelerated as the receivership itself has proceeded, making the Receiver's and D&L's efforts only that much more difficult and time consuming.  In keeping with the Fee Opinion's emphasis on the rule of moderation discussed therein (*see* Fee Opinion at 16), the Receiver and D&L have agreed to reductions totaling $545,326.25 as a means of addressing the amount of time devoted by D&L to the case during the Fifth Application Period and its standard billing rates.

Based on the foregoing, we respectfully submit that the compensation sought by the Receiver and D&L is wholly warranted.

WHEREFORE, PREMISES CONSIDERED, the Receiver and D&L respectfully request that the Court:

(a)     grant interim approval of the Receiver's compensation in the amount of $24,975;

(b)     grant interim approval of D&L compensation in the amount of $674,399 subject to D&L right to seek payment of the 20% Hold-Back ($168,599.75) at the conclusion of the case;

(c)     grant interim approval of D&L's request for reimbursement of its out-of-pocket expenses in the amount of $72,171.75;

(d)     order the Wextrust Entities to pay within ten (10) business days from available cash the approved fees of the Receiver and D&L in the amounts set forth herein and reimburse D&L for its approved expenses; and

(e)     grant such other relief as the Court deems appropriate.

Dated: New York, NY
July 24, 2009

Counsel to the Receiver,
Timothy J. Coleman

/s/   Harvey Kurzweil
Harvey Kurzweil
Dewey & LeBoeuf LLP
1301 Avenue of the Americas
New York, NY 10019
212.259.8000 (t)
212.259.6333 (f)

and

Mark S. Radke (*pro hac vice*)
Dewey & LeBoeuf LLP
1101 New York Avenue – NW
Suite 1100
Washington, D.C. 20005
202.346.8000 (t)
202.348.8102 (f)

CH 27133 3 100186 000001 7/24/2008 10:21am
CH 26311.1 100198 000001 6/2/2009 09:50am