UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SECURITIES AND EXCHANGE COMMISSION,

                Plaintiff,

    - against -

STEVEN BYERS, JOSEPH SHERESHEVSKY,
WEXTRUST CAPITAL, LLC, WEXTRUST
EQUITY PARTNERS, LLC, WEXTRUST
DEVELOPMENT GROUP, LLC, WEXTRUST
SECURITIES, LLC, and AXELA HOSPITALITY,
LLC,

                Defendants,

    - and -

ELKA SHERESHEVSKY,

                Relief Defendant.

No. 08 Civ. 7104 (DC)

ECF Case

# FOURTH INTERIM REPORT OF RECEIVER

TIMOTHY J. COLEMAN
Receiver for Wextrust Entities

DEWEY & LEBOEUF LLP
1301 Avenue of the Americas
New York, NY 10019-6092
Tel. (212) 259-8000

August 11, 2009

Attorneys for Receiver

# TABLE OF CONTENTS

**Page**

I. LIQUIDATION OF WEXTRUST ASSETS ......................................................................3

  A. Liquidation of U.S. Assets ..................................................................................3

  B. U.S. Marketing Activities ....................................................................................6

  C. Liquidation of Wextrust Interests in Africa .......................................................8

II. DISTRIBUTION TO THE WEXTRUST VICTIMS ........................................................11

  A. The Plan of Distribution......................................................................................11

  B. Status of the Claims Adjudication Process .........................................................11

  C. Preparation for the First Interim Distribution ....................................................13

III. ESTATE MANAGEMENT OPERATIONS ......................................................................14

  A. Management of Remaining Real Estate Properties ..............................................14

    1. U.S. Real Estate Operations....................................................................14

    2. High Yield Loans.....................................................................................17

  B. Financial Management..........................................................................................19

    1. Expense Reduction Measures ..................................................................19

    2. Cash Management.....................................................................................20

  C. Other Management Activities ...............................................................................21

IV. FINANCIAL CONDITION OF THE WEXTRUST ENTITIES AND AFFILIATES .....22

V. INVESTIGATIONS AND LITIGATION ........................................................................27

  A. Claims Against Parties in the United States .........................................................27

  B. Claims against Non-U.S. Parties..........................................................................29

  C. Ancillary Litigation..............................................................................................30

  D. Receivership Court Litigation...............................................................................32

  E. Appellate Litigation .............................................................................................33

VI. CONCLUSION....................................................................................................................34

Timothy J. Coleman, Receiver for the Wextrust Entities ("Receiver"), respectfully submits this Fourth Interim Report, pursuant to the Court's Order Appointing Receiver, dated August 11, 2008, as amended by order dated September 11, 2008 (Dkt. No. 36) ("Receiver Order").

The Receiver was appointed on August 11, 2008, one year ago today. Although much remains to be done, the Receiver has now completed many of the tasks directed by the Court in the Receiver Order. The Receiver has marshaled assets, collected evidence, and taken a variety of steps to preserve the *status quo*. The Receiver has made determinations on the disposition of Wextrust investor funds, and on the extent of commingling among the Wextrust Entities and the entities they control or in which they have an ownership interest ("Wextrust Entities and Affiliates"). Those and other actions have been summarized in the three quarterly interim reports previously submitted by the Receiver. Recently, the Court approved the Receiver's Proposed Plan of Distribution (Dkt. No. 243) ("Receiver's Plan"). In an opinion issued on July 23, 2009 ("Distribution Order") (Dkt. No. 428), the Court approved the Receiver's Plan in all respects, including the liquidation of Wextrust assets and the *pro rata* distribution of the proceeds to victims of the Wextrust fraud. This fourth quarterly interim report describes the Receiver's activities over the past three months.

Section I summarizes the status of the liquidation of Wextrust assets. The Receiver has, with the Court's approval, abandoned numerous properties that were determined to be of no value to the estate. The Receiver has begun to sell real and personal property, both in the United States and Africa, and expects to arrange for additional sales in the coming months. The Receiver and his professional advisors are now focusing their efforts on marketing the remaining properties and recovering their fair market value for the benefit of the estate.

Section II describes the implementation of the Plan of Distribution. The claims process set forth in the Distribution Order and the Receiver's Plan is well underway. Claim statements have been sent to investors. The Receiver expects that most disputed claims will be resolved by August 24, 2009. The Receiver will seek the Court's assistance in resolving any remaining claims shortly thereafter, and will then proceed to make a first interim distribution to Wextrust victims.

Section III is an overview of the Receiver's continuing management of the Wextrust Entities and Affiliates, which includes the management of Wextrust real estate operations and all other business and financial aspects of the Wextrust enterprise. In the past three months, the Receiver has taken further steps to reduce Wextrust operating expenses, including headcount reductions and the closing of all but one of the Wextrust offices.

Section IV reports on the current financial condition of the receivership estate. Over the past year, the Wextrust enterprise has moved from a substantially negative cash flow to a positive cash flow, exclusive of administrative costs. Cash flow for the coming quarter is also projected to be positive, and administrative costs have declined dramatically.

Section V discusses the status of Wextrust-related litigation in the United States and Africa, including the Receiver's handling of affirmative claims against third parties. This case has generated extensive litigation in the receivership court and elsewhere, and the Receiver has been forced to participate in such litigation, at great expense to the estate. The Receiver is seeking to resolve all Wextrust-related litigation as expeditiously as possible, and to resolve estate claims through out-of-court settlements, subject to Court approval.

# I. LIQUIDATION OF WEXTRUST ASSETS

## A. Liquidation of U.S. Assets

The Distribution Order approved the Receiver's Plan, including the liquidation of assets controlled by the Receiver. In the United States, those assets are comprised primarily of the Wextrust Real Estate portfolio, but also include other assets, such as the personalty associated with Wextrust's several offices. As discussed in the Receiver's Plan for Management of the Wextrust Real Estate Portfolio (Dkt. No. 172) ("Management Plan"), the Receiver has implemented a three-phase plan for selling the Wextrust real estate holdings. In addition, the Receiver has held a series of auctions to sell Wextrust personalty. The Receiver has also seized and begun selling certain assets in Africa.

At the time the Receiver was appointed, the Wextrust real estate portfolio consisted of four principal components: (1) three hotel assets managed by Axela Hospitality ("Axela"); (2) 10 residential properties owned by or under the control of Wexford Development Group ("WDG"), such as condominium developments and single family homes (all of which were in the early stages of development); (3) 23 properties or property groups in eight states owned and managed by Wextrust Equity Partners ("WEP"), which are primarily income-producing commercial properties, such as office buildings and warehouses; and (4) a portfolio of 27 "high yield" loans secured by various real estate properties. (*See* Management Plan at 4-7.)

The Receiver has sold four Wextrust real estate properties since the commencement of the receivership: (1) the Hammond Outlots property in Louisiana; (2) a single family residence in Riverside, Illinois; (3) a 100,000 square foot warehouse in Memphis, Tennessee owned by Wextrust affiliate Bax Realty Holdings; and (4) a single family residence in Downers Grove,

Illinois.[1]  The Receiver has also entered into contracts to sell two additional properties: a four-unit residential condominium located in Wildwood, New Jersey, for a purchase price of $285,000; and an office/retail space in Elmhurst, Illinois for a purchase price of $3,150,000.

The Receiver has also conducted sales of personalty in conjunction with the closing of the Norfolk, Chicago, and New York offices.  As discussed in the Third Interim Report, Section I.C.1, the Receiver conducted a week-long sale of personalty from the Norfolk office, which raised a total of approximately $35,000.  The Receiver contracted with Atlantic Asset Management Group ("AAM"), a bonded auction firm, to auction personalty that remained in the Norfolk office.  The two-week auction ended on May 26, 2009 and raised approximately $8,000.  On April 27 and 28, 2009, the Receiver conducted a sale of personalty in conjunction with closing the New York office, which raised approximately $1,500, and is negotiating with AAM to auction additional personalty.  The Receiver also conducted a sale of personalty from the Chicago office that was open to investors on July 27, 2009 and open to the public on July 28, 2009.  This sale raised approximately $12,000.  The Receiver donated personalty of *de minimis* value from the Chicago office to a school in Oak Park, Illinois.

As discussed in the Management Plan, the market values of a number of real estate properties in the Wextrust portfolio had fallen substantially below the amount of debt secured by the properties, primarily as a result of the collapse of the United States real estate market.  Also, those properties were incurring substantial carrying costs.  Accordingly, the Receiver determined, and the Court agreed, that relinquishment of those properties would result in a net economic benefit to the estate.  Many of these properties were not current on their debt, produced no income, and were not expected to produce income in the foreseeable future.  As shown in

---

[1] The total sales price of these four properties was $6.3 million.  In addition, the sales of the Hammonds Outlots and the Riverside, Illinois property extinguished approximately $3.2 million in liens and mortgage indebtedness, for a total benefit to the estate of approximately $9.6 million.

Table 1, the Receiver relinquished the estate's interests in the three hotel properties formerly managed by Axela.[2]  The Receiver estimates that the relinquishment of these properties will result in annual savings of approximately $4,369,000.  In addition, the Receiver relinquished the estate's interest in two commercial real estate projects that were formerly managed by WEP.[3]  The Receiver also relinquished six of the properties being developed by WDG at the time the Receivership commenced.  The Receiver estimates that the relinquishments of the WDG properties will result in annualized savings of approximately $3,455,000.[4]  As discussed in Section III.A.1, the Receiver has determined that one WDG condominium project, 47 Dean Street in Brooklyn, New York, should be developed.  In total, the Receiver obtained Court approval to relinquish 11 properties for an estimated annual savings of approximately $7.8 million.

**Table 1:  Relinquishment of Wextrust Real Estate**

| Property | Relinquishment Date | Approximate Annual Savings[5] |
|---|---|---|
| **Hotel Properties** | | |
| Wyndham Drake Hotel | 05/01/2009 | $767,000 |
| CP Phoenix Hotel | 05/01/2009 | $702,000 |
| Park View Hotel | 07/23/2009 | $2,900,000 |
| **Commercial Real Estate[6]** | | |
| Rogers Plaza | 12/22/2008 | NA |
| Hilltop | 04/01/2009 | NA |

---

[2] None of the properties managed by Axela remain in the estate.

[3] These properties are: (1) Roger's Plaza, a semi-enclosed shopping mall located in Wyoming, Michigan; and (2) Hilltop Apartments, a 132-unit residential apartment complex located in Anderson, Indiana.

[4] These properties are: (1) a planned condominium project located at 2435 West Belmont Avenue in Chicago, Illinois; (2) a planned condominium/luxury town home project located at 2825 Oakley Avenue in Chicago; (3) a mixed-use office and retail condominium project located at 1 Riverside Drive in the Chicago suburb of Riverside, Illinois; (4) an undeveloped tract of land located at the 4000 block of South Lake Drive in St. Francis, Wisconsin; (5) the estate's ownership interest in two homes and 22 finished lots in Stonebridge Woods, a single family subdivision project located in Homer Glen, Illinois; and (6) a partially-completed, multi-family development project located at 5726 South Washington Street, Hinsdale, Illinois.

[5] Annual savings refers to estimated carrying costs for properties not generating income and estimated negative cash flow for income-generating properties.

[6] Because it was obvious that the market value of these properties was far below the secured debt, the Receiver did not expend resources to assess the amount of carrying costs or negative cash flow.

| Property | Relinquishment Date | Approximate Annual Savings[5] |
|---|---|---|
| **Residential and Commercial Development** | | |
| Belmont Property | 02/20/2009 | $217,000 |
| Oakley Property | 02/20/2009 | $430,000 |
| Riverside Arcade | 02/20/2009 | $325,000 |
| St. Francis | 02/20/2009 | $283,000 |
| Homer Glen | 04/01/2009 | NA |
| Hamptons of Hinsdale | 06/26/2009 | $2,200,000 |
| **Total** | | $7,824,000 |

B.    **U.S. Marketing Activities**

In consultation with real estate advisor The Hilco Organization ("Hilco"), the Receiver has implemented a three-phase marketing and sales process designed to obtain fair market value for the properties, minimize transaction costs, and facilitate an expeditious distribution to victims of the alleged scheme.  (*See* Management Plan at 27-29.)

The preparation phase of the plan has been completed.  As discussed in the Third Interim Report, Hilco gathered information about 33 WEP properties (associated with 20 WEP entities), which Hilco made accessible on its website on April 15, 2009.[7]  (Third Interim Report at 5.)  The marketing phase of the process has now begun in earnest.  On April 15, 2009, Hilco issued a press release announcing the sale of the properties and commenced a direct marketing, print advertising, and internet advertising campaign.  This release was reported by more than 50 publications, including the Bizjournals network and Business Wire.  In addition, advertisements for the real estate portfolio have appeared in the Wall Street Journal, Chicago Tribune, and Pioneer Press.  Information about the sale has also been posted on GlobeSt.com, a widely-used commercial real estate news website.

---

[7] The Hilco website is http://www.hilcorealestate.com/property/ properties.asp?client_id=226.  The Receiver's website also contains a link to the Hilco website.  Among other things, Hilco has collected and analyzed leases; environmental reports; financial documents, such as operating statements and budgets; rent rolls; title documents; maps and surveys; zoning information; and demographic information for the WEP properties.

The marketing has generated a substantial amount of interest in the portfolio.  As of the beginning of August, 354 inquiries have been received and 278 confidentiality agreements have been signed.  Although a majority of inquiries have come from parties located in Illinois and Tennessee, a substantial number have also been received from parties in New York, California, and Texas.  Many of the properties have received dozens of inquiries.  The Receiver is currently considering offers on three properties.

The Receiver has taken targeted steps to increase the attractiveness of the properties, including certain improvements, lease renewals and new leases.  For example, the Receiver made approximately $80,000 in tenant improvements on the West Bearden Office Plaza, a six-building office park located in Knoxville, Tennessee.   Those improvements were critical to the Receiver's ability to renew seven leases on the property and negotiate two new leases, for a total leased area of approximately 26,000 square feet, or 18 percent of the total leasable space.  The Receiver has also converted four gross leases to net leases.[8]

Similarly, the Receiver has made improvements, such as roof repair and painting, to the Hammond Industrial property in Louisiana.  The Receiver also renewed a lease for this property that comprises approximately 260,000 square feet, or roughly 37 percent of the total leasable area for the property.  Although the renewing tenant had an option to renew its lease for two years, the Receiver was able to negotiate a five-year lease, which will provide significant value to a potential buyer.

The Receiver has also renewed valuable leases for certain other properties.  For example, the Workman Road property, a warehouse located in Knoxville, Tennessee, had a single tenant,

---

[8] Under a gross lease, the owner is responsible for property taxes, insurance costs, and maintenance; whereas, these expenses are paid by the tenant under a net lease.  The conversion of gross leases to net leases thus represents a significant improvement to the value of the property because it indirectly increases cash flows, one of the primary factors in assessing the value of a commercial leasing property.

whose lease was expiring.  The Receiver negotiated a three-year renewal with the tenant, which the Court approved on July 15, 2009.  The Receiver estimates that this lease will result in approximately $1 million in revenue over the life of the lease.

Over the past year, the Receiver has renewed 36 leases and negotiated 15 new leases on properties, for a total of approximately 496,000 square feet of leasable space.  The Receiver estimates these leases will result in approximately $13.6 million in revenue over the life of the leases, thereby enhancing the value of the properties and the expected proceeds of the liquidation.

C.    **Liquidation of Wextrust Interests in Africa**

The Receiver is participating in liquidation proceedings in South Africa and Namibia.[9] As reported previously, the Wextrust Entities and Affiliates have interests in diamond mining ventures in those two countries.  (*See* First Interim Report at I.C.2.)  Those interests are owned or controlled by an interlocking group of companies affiliated with Pure Africa Minerals (Pty) Ltd. ("PAM"), a South African entity.  Those companies are referred to collectively as the "PAM Syndicate."  Wextrust is the largest creditor of PAM and other PAM Syndicate entities.

On September 11, 2008, a liquidation (or "winding-up") proceeding was commenced against PAM in South Africa.  In November 2008, the Receiver submitted numerous proofs of claim, which represented approximately 90 percent of all creditor claims submitted in the PAM liquidation.  The Receiver, standing in the shoes of Wextrust, the largest creditor of PAM, has

---

[9] The Liquidators were appointed pursuant to the South African Companies Act, which provides for liquidators to be appointed and supervised by a judicial official, the Master of the High Court.  The Liquidators are authorized to maintain control of estate assets and records, and to take various actions, including litigation.  The Liquidators are required to submit a plan of distribution of estate assets, subject to a confirmation process.  The Liquidators are entitled to remuneration and to reimbursement of expenses, which are paid out of estate assets.  The Liquidators must obtain authorization from creditors for certain actions.  *See* Companies Act of 1973 s. 339, 384, 386, 403 and 409 at Ex. A.

been able to exert substantial influence over the activities of the court-appointed liquidators of PAM ("Liquidators").

The Liquidators have filed four other liquidation applications and are in the process of filing an additional application against PAM Syndicate entities, based on a determination that PAM had claims against those entities, and that the entities had significant assets. Further liquidation applications are being contemplated. The PAM Syndicate liquidation proceedings that have been filed to date are summarized in Table 2, below.

**Table 2:  PAM Syndicate Liquidation Proceedings**

| DEBTOR/DEFENDANT | JURISDICTION | DATE FILED | STATUS |
|---|---|---|---|
| Pure Africa Minerals (Pty) Ltd. | South Africa | 9/11/08 | Final liquidation order granted on 9/16/08 |
| Redlex 420 (Pty) Ltd. | South Africa | 11/20/08 | Final liquidation order granted 1/15/09 |
| African Spirit (Pty) Ltd. | South Africa | 11/20/08 | Final liquidation order granted on 1/15/09 |
| Vaticano Traders (Pty) Ltd. | South Africa | 11/20/08 | Final liquidation order granted on 2/24/09 |
| Brett Investments (Pty) Ltd. | Namibia | 11/12/08 | Provisional liquidation order granted.  Return date for final liquidation order is 9/21/09. |

The Liquidators have seized numerous physical assets, consisting principally of diamond mining equipment, from various mining sites and other facilities controlled by PAM Syndicate

entities.  In July 2009, certain of those assets were sold at auction in South Africa.  (*See* Park Village Auctions Advertisement at Ex. B.)  To date, approximately 6 million rand (approximately 720,000 USD)[10] in proceeds have been raised from the sale of these assets. Additional sales are expected.  The Liquidators will shortly pay approximately R150,000 (approximately 18,000 USD) to the receivership estate to reimburse the estate for fees previously paid to the Liquidators' counsel in July 2009.  The remaining funds will be held by the Liquidators pending the conclusion of the liquidation proceedings.  A portion of those funds may be used to pay ongoing expenses of the Liquidators, with the consent of the Receiver as the major creditor, pursuant to South African law.  (*See* Ex. A at s. 384.)

In addition to the equipment discussed above, the Receiver has obtained evidence that a significant quantity of diamonds extracted from PAM Syndicate operations remains in South Africa and/or Namibia, subject to claims or restrictions of various governmental and private parties.  The Receiver and the Liquidators are taking steps to gain control of those diamonds. The Receiver has not determined the value of the diamonds, and cannot provide any estimate at this time of when they will be secured and liquidated, if at all.

The Receiver has also obtained evidence that the assets of the PAM Syndicate include various permits, licenses and other rights to engage in diamond mining activities in South Africa and Namibia.  Because the records of Wextrust and the PAM Syndicate are incomplete and unreliable, and because the numerous contractual and other arrangements concerning such mining rights are complex, and are in some cases in dispute, numerous questions remain.  The Receiver is continuing to assess the validity and value of the rights, the nature of Wextrust's interest in the rights, and the Receiver's ability to assign or otherwise dispose of such interest.

---

[10] An exchange rate of 8.07 South African rand to USD was used.

The Receiver will continue to take steps to liquidate Wextrust assets in Africa as promptly and efficiently as possible. The Receiver will then take the necessary steps to repatriate such assets and distribute them to victims pursuant to the Plan of Distribution.

## II.    DISTRIBUTION TO THE WEXTRUST VICTIMS

### A.    The Plan of Distribution

The Plan of Distribution, as approved by the Court on July 23, 2009, has four main components. First, the estate assets will be distributed on a *pro rata* basis. Second, distributions will be calculated using the "net investor method." Under this method, cash distributions received by an investor prior to the commencement of the SEC's complaint will be subtracted from the total amount of the investor's investment, and this adjusted figure will be the starting point for determining the investor's *pro rata* distribution. Those investors who chose to roll-over their distribution into additional Wextrust investments – rather than take the distribution in cash – will have the distribution amount added to the amount of the investment. Third, secured creditors are barred from asserting deficiency claims against the estate and obtaining distributions under the approved plan. Fourth, certain groups of individuals may be disqualified from obtaining distributions, in whole or in part, based on participation in the misconduct or other equitable grounds.

### B.    Status of the Claims Adjudication Process

The Plan of Distribution sets forth a detailed claims solicitation and verification process for both Wextrust investors and unsecured creditors. (*See* Plan of Distribution at 27-39; Distribution Order at 12-13; 39-41.) By May 29, 2009, all domestic and international investors were mailed hard copies of individual claims statements listing their gross investments in cash, in-kind fund income accumulation, principal withdrawals, cash distributions, transfers between funds, transfers to/from third parties, and cumulative net-investor claims based on the foregoing

figures.  They were then given the opportunity to review and approve or dispute their claims amounts.  The individual statements also contained detailed contact information for the receivership and instructions regarding how to dispute the amount of the claim, and the deadline by which each investor must do so.  At the Receiver's request, the deadline for disputing claims was subsequently extended by the Court to June 30, 2009.  Pursuant to the Plan, any investor who the Receiver seeks to disqualify will receive notice of the intended disqualification and the evidence in support of the disqualification.  The investor will be given an opportunity to respond, and any unresolved issues will be decided by the Court.

Many creditors have also communicated with the Receiver's representatives and counsel by telephone and e-mail about issues relating to the claims process.  The Receiver has collected, categorized, and logged each claim on a rolling basis.  To date, the Receiver and his representatives have responded to approximately 300 telephone inquiries and 250 e-mail inquiries from investors relating to the Plan of Distribution, particularly with respect to the claims validation and solicitation process.[11]  In addition, of the approximately 1,750 claims statements sent to investors, approximately 540 statements have been returned to the Receiver accepting the investors' claims amounts, approximately 210 have been returned disputing the claims amounts, approximately 50 investor statements were returned to sender, and approximately 10 additional statements were created for new claimants.[12]  Deloitte Financial Advisory Services LLP ("Deloitte") is analyzing the disputed claims.  On July 23, 2009, the Court extended the deadline for the Receiver to attempt to resolve all disputes with creditors and

---

[11] Calls and e-mails related to the Plan of Distribution comprised the majority of investor inquiries over the last three months.  In total, the Receiver received approximately 550 e-mails over this period and has responded to all e-mails that requested or required a response.

[12] There was some duplication in the number of statements sent to investors because the Receiver had multiple addresses on file for certain investors, and thus wanted to ensure that one or more of the statements reached the intended investors.  To date, Deloitte has determined that there are approximately 1,353 unique investors in the Wextrust enterprise.

investors relating to their outstanding claims. Under the new deadline, the Receiver will attempt to resolve all such disputes by August 24, 2009, 30 days after the date of the Court's ruling on the Plan of Distribution.[13] At the conclusion of that time period, the Receiver will seek the Court's intervention on any unresolved claims.

On July 7, 2009, the Receiver posted a spreadsheet of all unpaid, unsecured claims of creditors on the receivership website. The spreadsheet reflects the claims against the estate received to date (but does not indicate whether such claims have been determined to be valid). The Receiver gave notice to all creditors for whom contact information was available and encouraged them to review and/or dispute their claims information. To date, approximately 72 claims of creditors are in dispute or under further review, and approximately 29 new claims have been added to the list of outstanding claims of the estate.

All claims are now being reviewed by the Receiver for validity. The amount Wextrust investors and creditors may ultimately receive on the allowed (not objected to) amount of their claims will be based on, among other things, the nature of the claim and the aggregate amount of allowed unsecured claims and investor claims to be paid from estate assets.

C.    **Preparation for the First Interim Distribution**

After the claims solicitation, verification, and adjudication process is completed, the Receiver will seek the Court's approval for an initial cash distribution. This distribution will be paid to qualifying claimants in amounts specifically approved by the Court at the conclusion of the claims process. The Receiver will also ensure that there are sufficient remaining cash reserves to fund future operating costs, administrative expenses, and any outstanding claims unresolved by the Court. Future distributions will then be paid on a periodic basis, after approval

---

[13] The thirtieth day after the Distribution Order is Saturday, August 22, 2009. Pursuant to the Federal Rules of Civil Procedure, the Receiver is permitted to the next business day, Monday, August 24, 2009, to seek the Court's intervention on any unresolved claims. (Fed. R. Civ. P. 6(a)(3).)

by the Court, from these remaining reserves, the proceeds of the sale of receivership assets and other estate income, pursuant to the process outlined in the Management Plan.

## III.  ESTATE MANAGEMENT OPERATIONS

### A.  Management of Remaining Real Estate Properties

#### 1.  U.S. Real Estate Operations

As directed by the Court, the Receiver took control of all of the real estate assets of the Wextrust Entities and Affiliates, which now consist primarily of the WEP commercial properties. As shown in Table 3, the WEP portfolio consists of income-producing commercial properties, such as office buildings and warehouses, located in five states.  In the 90 days ending July 31, 2009, the Receiver has collected approximately $6.7 million in rent.  The Receiver has renewed eight leases and negotiated four new leases on properties during this period.

**Table 3:  WEP Real Estate Portfolio**

|  | Entity | Type | State | Name |
|---|---|---|---|---|
| 1 | WEP | Office | AL | Interstate Park |
| 2 | WEP | Office | IL | The Chase Bank Building (Peoria) |
| 3 | WEP | Office | TN | Belle Meade Centre |
| 4 | WEP | Office | TN | Executive Plaza |
| 5 | WEP | Office | TN | Park Village & Parkway Business Center II |
| 6 | WEP | Office | TN | Shallowford Business Park East |
| 7 | WEP | Office | TN | Tennessee Portfolio |
| 8 | WEP | Office | TN | West Bearden Office Plaza |
| 9 | WEP | Retail / Mixed use | IL | 116 North York Street |
| 10 | WEP | Retail / Mixed use | IL | 45 S. Washington |
| 11 | WEP | Retail / Mixed use | IL | First Highland |
| 12 | WEP | Retail / Mixed use | TN | Commerce Center |
| 13 | WEP | Retail / Mixed use | WI | South Pine |

| | Entity | Type | State | Name |
|---|---|---|---|---|
| 14 | WEP | Warehouse | LA | Hammond Industrial Park |
| 15 | WEP | Warehouse | MS | Corinth Industrial |
| 16 | WEP | Warehouse | TN | Clarksville Industrial |
| 17 | WEP | Warehouse | TN | Myatt |
| 18 | WEP | Warehouse | TN | New Salem |
| 19 | WEP | Warehouse | TN | Wilma Rudolph |
| 20 | WEP | Warehouse | TN | Workman Road |

The Receiver has also continued to manage development and construction work on the 47 Dean Street project, a residential condominium in the Boerum Hill neighborhood in Brooklyn, New York.

Significant progress has been made to date. The exterior facades are mostly complete, and the brickwork on the front and rear facades is finished. As shown in Figure 1, below, one side of the building has been waterproofed and finished with a three coat stucco system.

**Figure 1: 47 Dean Street Facade**



In addition, the built-up roof, shown in Figure 2 below, is near completion, and the elevator work, shown in Figure 3, is expected to be completed by the end of August. The electrical work is also nearly finished.

**Figure 2:  47 Dean Street Roof**        **Figure 3:  47 Dean Street Elevator**

 

The interior framing and rough plumbing are also in place, as shown in Figure 4. Inspections of the rough plumbing, duct work, and other HVAC components are ongoing. Once those inspections are complete, the remaining interior walls and partitions will be insulated, and sheetrock will be put into place. Construction on the project is projected to be completed by late November.

**Figure 4:  47 Dean Framing**



The Receiver is awaiting the New York Attorney General's approval to begin marketing the condominium units. In conjunction with obtaining marketing approval, the Receiver anticipates having Unit 2A substantially complete, so that it can serve as a model unit for potential buyers to inspect.

### 2. <u>High Yield Loans</u>

The Receiver continues to manage the Wextrust portfolio of high yield loans. As discussed in prior interim reports, there are two high yield portfolios: (1) Wexford High Yield Debt Fund I, LLC ("High Yield I") and (2) Wexford High Yield Debt Fund III, LLC ("High Yield III") and its offshore participant, Wexford High Yield Debt Offshore Fund, Ltd. ("Offshore Fund"). The loans for both portfolios are secured by a variety of commercial and residential real estate assets.

**High Yield I and WexWater.** The High Yield I portfolio presently consists of six loans in which Wextrust has an aggregate participation interest of over $1.5 million, all of which are in default.[14] (*See* Second Interim Report at 6-7; Third Interim Report at 13-14.) Stillwater Capital Partners, LLC participates in two of the six remaining High Yield I loans through a joint venture (WexWater LLC) with Wextrust. The Receiver has continued to manage the High Yield I portfolio of loans, and Stillwater manages the WexWater joint venture portfolio of high yield loans. The Receiver and Wexwater/Stillwater are continuing with foreclosure proceedings on three properties. The Receiver is also close to completing a sale on one of the properties to which he had previously taken title. The Receiver is engaged in settlement discussions with the

---

[14] As of the date of this report, the remaining High Yield I participation interest consists of interests in two High Yield I loans and two Wexwater loans. The participation interest fully discounts any present value of two additional loans where High Yield I is in a junior position to first lien lenders who have commenced foreclosure proceedings on the collateral. The estimated remaining participation interest also does not include the loan amount or fair market value of the South Dallas property that the Receiver previously foreclosed upon. Finally, the estimated participation interest does not include two loans in which WexWater's junior liens were previously foreclosed upon by senior lenders.

partial owner of another of the four properties.  The Receiver approved the retention of local counsel to complete this work, which resulted in cost savings for the estate.

**High Yield III and Wextrust/HPC Mortgage Fund, L.P.**  The High Yield III portfolio presently includes thirteen loans for which Wextrust has a combined participation interest in excess of $5 million.[15]  HPC U.S. Fund I, LP ("HPC"), a private German investment fund, participates in eight of the High Yield III loans through Wextrust/HPC Mortgage Fund, L.P. ("Wex/HPC"), a joint venture among HPC, High Yield III, and Wextrust.   All of the High Yield III loans are in default.

The Receiver is in the process of taking title to the property that secured the High Yield III loan made to Metro Development, LLC and is also currently engaged in settlement discussions with the existing owner/investors in that underlying property.   As with High Yield I, the Receiver approved the use of local counsel to prosecute the interests of High Yield III in this property in order to reduce professional fees for the estate.  The default notice for this loan was served on Metro Development on February 3, 2009, and the foreclosure complaint was filed on April 6, 2009.  The property, located in Mine Hill, New Jersey, is a 1.75 acre parcel of land with an existing single family home.

In the last 90 days, the Wex/HPC joint venture has also been engaged in litigation with Broadway Bank in order to clear title and determine rights and priorities with respect to the property located on 56 Walker Street in New York and has been in discussions with Broadway Bank to determine rights and interests in a property located in Atlantic City.  (*See* Section V.C., *infra*.)

---

[15] As of the date of this report, the remaining High Yield III participation interest consists of interests in five High Yield III loans and eight Wex/HPC (as defined below) loans.  The present estimated interest excludes any value in the Kingsdale/Breugelmans/625 W. Division loans or the Intervale loan.  One of the loans, Ellis Family Partnership, was previously refinanced and paid by the borrower.

B.  **Financial Management**

The Receiver has continued to manage the business and financial aspects of the Wextrust enterprise, including taking additional expense reduction actions and continuing to implement a more efficient cash management system.  Those efforts to further reduce costs and increase efficiency over the past 90 days are a continuation of the Receiver's ongoing effort to preserve and recover assets for the benefit of the estate.

1.  **Expense Reduction Measures**

The Receiver is continuing to reduce operating expenses incurred by Wextrust to the maximum extent possible, consistent with the Court's mandate to preserve the *status quo* and the value of the Wextrust assets.  As discussed above, the focus of the remaining Wextrust business is managing the real estate portfolio, which is now primarily comprised of the WEP properties.  Accordingly, over the past 90 days, the Receiver executed a reorganization designed to reduce operating expenses while maintaining key employees to preserve the value of the assets.  Pursuant to the reorganization, the Receiver made further headcount reductions, and only 15 employees remain (some of whom now work on a part-time basis).  Eight of those employees work on-site at various WEP properties.

The Receiver, in consultation with his advisors and the SEC, also hired a consultant, Badger Real Estate Advisors, LLC ("Badger"), to assist in the management and sale of these assets.  Mitchell Kahn, who was previously a Principal of Hilco and the Hilco professional primarily responsible for the Wextrust matter, will serve as the lead contact for Badger.  These changes resulted in a net monthly savings of approximately $25,000.  In the last year, overall headcount has been reduced by more than 78 percent, from 68 to 15.

The Receiver has also substantially reduced office rental expenses.  Over the past month, the Receiver's team completed liquidating the personalty from Wextrust's New York office and

reached a settlement with its landlord, Bank of America, over past due rent. Under the settlement, the Receiver paid two months of back rent for the use of the office space since August 2008. In addition, the Receiver closed the Chicago headquarters office in late July 2009. The Wextrust operations – which consist mainly of legacy WEP properties – will be managed from the Nashville office, the only office that remains open. As a result of these reductions, Wextrust's rental expenses have been reduced from more than $90,000 a month at the commencement of the receivership to $1500 a month. In addition, through settlements with landlords for the various offices, the Receiver eliminated over $290,000 in back rent, a significant savings to the investors.

### 2. <u>Cash Management</u>

As discussed in the Third Interim Report, the Receiver Order authorizes the Receiver to "establish a new cash management system by closing, transferring, consolidating, and opening bank accounts and securities accounts" and to invest funds in certain highly stable investments (Receiver Order at 6-7.) The Receiver has substantially completed consolidation efforts for the approximately 300 Wextrust bank and brokerage accounts held at more than 50 financial institutions at the inception of the receivership. As outlined in the Third Interim Report, this consolidation was implemented in three phases.

Phase I and Phase II were conducted simultaneously and are now complete. These two phases involved the transfer of non-operating accounts with significant balances, as well as operating accounts with a low volume of transactions that lacked direct deposit or "lockbox" deposit features. To date, over $18 million in 143 accounts held at 10 different financial institutions has been consolidated into 67 accounts at a single financial institution, the Private Bank.

Phase III, which is substantially complete, involved the transfer of about $2.5 million and the closing of an additional 84 accounts. The funds from those accounts were consolidated into the same 67 Private Bank accounts established for Phase I and II. Closing documentation for all of the 84 accounts in Phase III has been submitted to the relevant banking institutions for transfer and closure by the Receiver. Only 14 of these 84 accounts remain open, and these accounts will be closed once the banking institutions' legal department account closure requirements and transfer procedures are met. Once the pending accounts have been closed, a total of 227 accounts will have been consolidated into 67 Private Bank accounts.[16] All of the Private Bank accounts that were established in the consolidation process for operating entities are currently receiving deposits and processing withdrawals in the ordinary course of business.

C. **Other Management Activities**

The Receiver has undertaken a number of other activities necessary to manage the Wextrust business. For example, the Receiver is managing federal and state income tax matters and other tax issues for the various Wextrust Entities and Affiliates. The Receiver has also taken steps to maintain essential aspects of Wextrust's insurance coverage.

The Receiver's tax counsel continue to manage the estate's federal, state, and local income tax liabilities and compliance obligations. The Receiver is coordinating his efforts with the Bankruptcy and Insolvency Unit of the Internal Revenue Service ("IRS"), which is responsible for the IRS's interests in this matter. In addition, the Receiver's tax counsel have met with the IRS' Office of Chief Counsel to determine the obligations of the Wextrust Entities and Affiliates to file returns. These discussions are continuing, and the Receiver believes that it

---

[16] Approximately 73 accounts will not be transferred to the Private Bank at this time for a variety of reasons, including that they: (1) must be maintained at the existing financial institution per existing loan agreements; (2) are escrowed monies that cannot be transferred at this time; (3) are managed by a third party property manager in an area where the Private Bank does not operate; (4) are subject to a dispute; or (5) are located outside the United States.

is very unlikely that investors will receive K-1s and other similar returns for 2008 and subsequent years.

As discussed in the Second Interim Report, the Receiver has worked with Wextrust's insurance carriers to maintain the essential aspects of Wextrust's insurance coverage. The Receiver has negotiated renewals of the property damage, general liability, automobile, workers compensation, and umbrella liability policies for more than two dozen Wextrust properties. The Receiver continues to evaluate insurance coverage needs as properties are sold and relinquished, to obtain refunds where appropriate, and to work with Wextrust's insurance carriers as issues arise.

## IV.     FINANCIAL CONDITION OF THE WEXTRUST ENTITIES AND AFFILIATES

As discussed in the Third Interim Report, the Receiver has determined that Wextrust's real estate operations, as a whole, have little, if any, going concern value and that preparing financial statements on a going concern basis thus would not provide a meaningful assessment of the financial condition of the estate.[17] Deloitte has assisted in the aggregation of financial information from the financial systems of Wextrust Entities and Affiliates that shows the current book value of the principal real estate assets, as recorded in the company's books and records. As shown in Table 4, the total book value of the remaining Wextrust real estate portfolio is approximately $219 million.[18] Those values are based upon the accounting records and other information maintained by Wextrust and do not represent the current market value. As

---

[17] As discussed in the Third Interim Report, Deloitte helped the Receiver prepare basic financial statements and projections for the Wextrust Entities and Wextrust Affiliates in connection with the first and second interim reports. These financial statements were not audited, did not have the notes, corrections and adjustments needed to present information fairly and accurately in all material respects in accordance with Generally Accepted Accounting Principles.

[18] The Third Interim Report indicates a book value of approximately $260 million. The difference in that book value and the book value shown in Table 4 is attributable to the relinquishment of Hamptons of Hinsdale and 4641 Linscott, the sale of the Baxtech property, and the addition of capitalized construction costs related to 47 Dean Street.

discussed in the Management Plan, these properties were purchased at the height of the commercial real estate market and are heavily leveraged, and the Receiver contemplates that most of the proceeds of the sales of these properties will be used to pay the secured debt.

### Table 4:  Book Value of Wextrust Real Estate Assets

Wextrust Capital, LLC, et al.
Net Book Value (1) (2)
as of May 31, 2009

| Property | Axela (3) | WEP (4) | WDG | Consolidated |
|---|---|---|---|---|
| Building / Land | 35,136,348 | 177,513,387 | 6,559,251 | 219,208,886 |
| Loan Payable on Property | 30,594,691 | 142,170,575 | 5,080,189 | 177,845,455 |
| **Net Book Value** | $ 4,541,657 | $ 35,342,812 | $ 1,479,062 | $ 41,363,532 |
| | | | | |
| Capitalized Costs: | | | | |
| Tenant Improvements | - | 2,059,613 | - | 2,059,613 |
| Capital Improvements | - | 2,010,304 | - | 2,010,304 |
| **Total Capitalized Costs** | $ - | $ 4,069,917 | $ - | $ 4,069,917 |
| | | | | |
| **Net Book Value** | **$ 4,541,657** | **$ 39,412,729** | **$ 1,479,062** | **$ 45,433,449** |

**(1)** - Where possible, net book values were obtained from the SFAR as of May 31, 2009 although the amounts noted here will not always agree with amounts reported on the SFARs. In large parts, SFAR data was based on accounting information provided by Wextrust; however, please note that the cost of the building and the balance of the loan payable on the property were not always recorded in the accounting system.  To the extent available, these amounts were obtained from other internal sources as of the most recent date available.  Loan payable amounts in some cases include accrued interest and late fees assessed by the lender.
**(2)** - The amounts shown do not include properties where the relinquishment process was initiated or had been relinquished as of May 31, 2009.
**(3)** - Amounts represent the net book value for Gold Coast Development, LLC, which owns the Parkview Hotel.  Based on the actual market value and significant operating costs of the hotel, the Receiver filed a motion to relinquish the property on June 29, 2009.  On July 23, 2009, the United States District Court for the Southern District of New York entered an order permitting the relinquishment of the Parkview Hotel.
**(4)** - First Highland, LLC and Commerce Center Holdings, which are TIC properties, are included at 100 percent even though the Wextrust interest is less (78.21 percent and 35 percent, respectively).

As of May 31, 2009, Wextrust Entities and Affiliates had approximately $17.0 million[19] in cash in over 190 U.S. bank accounts identified by the Receiver to date.[20]  This compares to $21.3 million in cash reported in the Third Interim Report as of February 28, 2009, $23.1 million in cash reported in the Second Interim Report as of November 30, 2008, and $22.1 million reported in the First Interim Report as of September 30, 2008.

---

[19] The cash balance will not agree with the amount reported on the SFARs mainly due to the exclusion of bank accounts held by the third-party hotel managers for the Wyndham Drake and Crowne Plaza Phoenix hotels, which were relinquished under an order approved by the Court on May 1, 2009.
[20] The number of bank accounts is less than that reported in the Third Interim Report due to the implementation of the cash management plan discussed in Section III.B.2.  At this point, new bank accounts at the Private Bank have been opened, but legacy Wextrust accounts have been closed.

For the three months ending May 31, 2009, the Receiver authorized payment of approximately $5.2 million in expenses necessary to preserve the *status quo* of the Wextrust enterprise, as shown in Table 5, below.[21] The vast majority of those expenses (approximately $4.1 million) were paid in connection with operating the WEP real estate portfolio, including approximately $2.1 million in debt service payments; $910,000 in ordinary course expenses; and $460,000 in capital expenditures, tenant improvements, and leasing commissions. For the same period, as shown in Table 5, WEP had tenant receipts of approximately $5.9 million, which included tenant reimbursement for insurance and taxes on several of the WEP properties.

## Table 5: Receipts and Disbursements

Wextrust Capital, LLC, et al.
Consolidated Cash Receipts and Disbursements - Rounded     (1) (2)
from 03/01/09 through 05/31/2009

| RECEIPTS | Wextrust Capital, LLC and Affiliates | Commodity Funds | Wextrust Equity Partners, LLC and Affiliates | PAM | Wexford Development Group, LLC and Affiliates | Axela Hospitality, LLC and Affiliates | TOTAL |
|---|---|---|---|---|---|---|---|
| Tenant Receipts  **(3)** | - | - | 5,940,000 | - | - | - | 5,940,000 |
| Sale of Receivership Assets | 30,000 | - | 820,000 | - | - | - | 850,000 |
| Construction Draws | - | - | - | - | 620,000 | - | 620,000 |
| Other Receipts | 40,000 | - | 220,000 | - | 30,000 | 110,000 | 400,000 |
| **TOTAL RECEIPTS** | **70,000** | **-** | **6,980,000** | **-** | **650,000** | **110,000** | **7,810,000** |
| **DISBURSEMENTS** | | | | | | | |
| Capital Expenditures, Tenant Improvements & Leasing Commissions | - | - | 460,000 | - | 630,000 | - | 1,090,000 |
| Insurance | 10,000 | - | 10,000 | - | 50,000 | - | 70,000 |
| Loan Payments | - | - | 2,130,000 | - | 10,000 | - | 2,140,000 |
| Management Fees | - | - | 240,000 | - | - | - | 240,000 |
| Ordinary Course Expenses | 50,000 | 40,000 | 910,000 | - | 20,000 | (10,000) | 1,010,000 |
| Labor Costs | 30,000 | 120,000 | 250,000 | - | 40,000 | 40,000 | 480,000 |
| Professional Expenses - Non-Receiver   **(4)** | - | - | - | - | - | - | - |
| Taxes | - | - | 140,000 | - | - | - | 140,000 |
| **TOTAL DISBURSEMENTS** | **90,000** | **160,000** | **4,140,000** | **-** | **750,000** | **30,000** | **$  5,170,000** |
| **NET CASH GENERATION / (BURN)** | **(20,000)** | **(160,000)** | **2,840,000** | **-** | **(100,000)** | **80,000** | **$  2,640,000** |

**(1) -** The receipts and disbursements in this analysis are cash transactions that are grouped by the entities that initiated the transaction; however, in some cases the cash transactions were executed on behalf of other Wextrust entities. The cash transactions have been categorized by type based on information contained within the books and records of the Wextrust Entities. The sources of cash receipts and disbursements data were a combination of general ledgers and bank transaction data. Not all bank accounts or general ledgers were included in this analysis; entities with no or insignificant transaction activity during the period presented may not have been included. This analysis includes Wextrust entities that were not reported in the Standardized Fund Accounting Reports (SFARs) because additional information continues to become available. The analysis does not include certain third party receipts and disbursements reflected in the SFARs.

**(2) -** This analysis was prepared on a cash basis, therefore the timing of receipts and disbursements are different than what may be contained in accrual based financial reports. For example, receipts may not be matched to related disbursements, or vice versa. In addition, some disbursements included in this analysis had not cleared the bank as of May 31, 2009.

**(3) -** Approximately $460,000 was collected, in addition to monthly rent, from tenants for property taxes and insurance.

**(4) -** Receivership professional expenses are not included in this analysis.

---

[21] The Court has authorized the Receiver to make and authorize payments in the ordinary course of business and to pay necessary business expenses from available funds. (Receiver Order at 5, 7-8.)

Table 5 also shows a positive cash flow of approximately $2.6 million for the Wextrust enterprise for the three months ending May 31, 2009, a result that is significantly better than the projected cash flow of $1.4 million for this period.[22]  As shown in Table 6 below, however, this difference is primarily due to timing factors concerning the WEP properties, such as late-paid rent, prepaid rent, and other timing issues related to ordinary course expenses.  In addition, debt service and operating expenses projected for the hotel properties were not paid (because the hotels were relinquished), resulting in significant savings.

**Table 6:  Comparison of Cash Projections and Actual Cash Flow**

Wextrust Capital, LLC, et al.
Cash Projections versus Actual from Cash Receipts and Disbursement Analysis
For the 3 Months Ended May 31, 2009

| Entity | Projected Net Cash Flow for the 3 months ended May 31, 2009 (1) | Actual Net Cash Flow per the Cash Receipts and Disbursement Analysis for the 3 months ended May 31, 2009 | Difference - Favorable / (Unfavorable) | |
|---|---|---|---|---|
| WEP | 2,040,000 | 2,840,000 | 800,000 | (4) |
| WDG | (80,000) | (100,000) | (20,000) | |
| WTC (2) | (190,000) | (180,000) | 10,000 | |
| Axela (3) | (400,000) | 80,000 | 480,000 | (5) |
| Total | 1,370,000 | 2,640,000 | 1,270,000 | |

(1) - Projections do not include receivership administrative fees.
(2) - Includes the Commodity Funds.  Does not include projection or payment of receivership administrative fees.
(3) - Excludes hotel operations.
(4) - Difference is mainly attributable to the late payment of rent from tenants, prepaid rent and the timing on the payment of ordinary course expenses.
(5) - Difference is mainly attributable to the projected payment of debt and ordinary course expenditures that were not paid.

Deloitte has assisted in preparing a cash forecast for Wextrust for August 1, 2009 through November 30, 2009, shown in Table 7.  This cash flow forecast anticipates that, on a combined

---

[22] The cash forecast in the Third Interim Report showed a net cash flow of $922,789 for the four months ending August 31, 2009, and thus cannot be compared to the actual net cash flow reflected in the Receipts and Disbursements analysis.  The $1,370,000 projected net cash flow shown in Table 6 is for the period March through May 2009, the same period as the Receipts and Disbursements analysis.  The projected net cash flow numbers reflected in Table 6 are drawn from monthly cash flow projections.

basis, the Wextrust Entities will generate positive cash flow of approximately $397,000, with the active WEP properties providing most of the positive cash flow (approximately $557,000). This projected cash flow is significantly less than the actual net cash flow for the three-month period ending May 31, 2009, shown in Table 5 above. However, as noted above, there were timing issues that positively affected the actual net cash generation over that period. In addition, there were non-recurring receipts, such as collection of common area maintenance charges, which are paid once a year; and a one-time escrow refund on one of the WEP properties that also increased cash generation for that period. Similarly, certain factors had a negative impact on cash flow in the cash forecast period, including rent abatement and capital expenses related to renewing leases.[23]

### Table 7: Wextrust Cash Forecast

Base Cash Flow Projections for Wextrust Capital, LLC and Affiliates, et al. for the Four Months Ending November 30, 2009 (1)

| | WexTrust Capital, LLC and Affiliates (2) | Wextrust Equity Partners, LLC and Affiliates (3) | WexFord Development Group, LLC and Affiliates | Axela Hospitality, LLC and Affiliates (4) | Total for the 4 Months Ending 11/30/09 |
|---|---|---|---|---|---|
| Total Effective Income | - | 6,869,459 | - | 21,700 | 6,891,159 |
| Total Operating Expenses | 100,000 | 2,528,955 | 64,720 | 17,000 | 2,710,675 |
| Net Operating Income | (100,000) | 4,340,504 | (64,720) | 4,700 | 4,180,484 |
| | | | | | |
| Non Operating Expenses: | | | | | |
| Debt Service - Interest (Including Swap Payments) | - | 2,436,576 | - | - | 2,436,576 |
| Debt Service - Principal | - | 456,123 | - | - | 456,123 |
| Capital Expenditures    (5) | - | 68,282 | - | - | 68,282 |
| Tenant Improvements & Lease Commissions | - | 624,411 | - | - | 624,411 |
| Reserves | - | 78,392 | - | - | 78,392 |
| Other Non-Operating Expenses | - | 119,531 | - | - | 119,531 |
| Total Non-Operating Expenses | - | 3,783,315 | - | - | 3,783,315 |
| | | | | | |
| Net Cash Flow   (6) | (100,000) | 557,189 | (64,720) | 4,700 | 397,169 |

(1) - Does not include any distributions under the Plan of Distribution.
(2) - Includes WexTrust Securities, LLC; WexTrade Financial, LLC; the commodity fund entities; and the high-yield fund entities.
(3) - Amounts include First Highland, LLC and Commerce Center Holdings, which are TIC properties, at 100 percent even though the Wextrust interest is less (78.21 percent and 35 percent, respectively). Amounts exclude past due property taxes in excess of $90,000 and expected sale of receivership assets. For information on the expected sale of receivership assets, please refer to Section I.A.1.
(4) - Does not include net cash flow from third-party managed hotel properties (Drake Oak Brook and CP Phoenix) which were relinquished under an order approved by the United States District Court for the Southern District of New York on May 1, 2009.
(5) - Net of escrow draws available for capital expenditures.
(6) - Does not include receivership related professional fees.

---

[23] In addition, cash flow from a property that has now been sold and rent from a tenant who did not renew a lease was captured in the Receipts and Disbursements analysis but not reflected in the cash forecast.

The above analysis does not include expenses associated with the administration of the receivership, the largest component of which is professional fees due to the Receiver and receivership counsel. As shown in Table 8, fees for the Receiver and D&L have declined substantially in every month through January 2009, and the Receiver expects fees to continue to either decline or not increase substantially in the coming months.[24]

**Table 8: Administrative Costs**



*Total Fees for February 2009 through June 2009 are based on unaudited bills. Fees Requested for February 2009 through June 2009 are estimates based on prior discount and holdback amounts.**

## V. INVESTIGATIONS AND LITIGATION

### A. Claims Against Parties in the United States

The Receiver is authorized to take preliminary steps to locate any assets that may have

---

[24] Gross fees and expenses for D&L and the Receiver declined by approximately 18 percent from September to October, 29 percent from October to November, 30 percent from November to December, and 22 percent from December to January.

been conveyed to third parties and to investigate, prosecute and otherwise participate in litigation to collect, conserve or recover assets of Wextrust. (Receiver Order at 5, 8.) As required by the Court's orders, the Receiver is continuing to investigate potential claims against third parties. To date, receivership attorneys and investigators have interviewed and/or deposed more than 65 witnesses. The Receiver has subpoenaed more than 15 entities and has collected and reviewed over 75,000 documents obtained in response to those subpoenas.

The Receiver has identified numerous claims against various third parties. Such claims include, *inter alia*, fraudulent transfers, fraud, breach of fiduciary duty, and professional malpractice. In assessing such claims, the Receiver is considering a variety of legal issues, including standing, jurisdiction, and other procedural issues that are particular to the receivership context. *See, e.g.*, *Eberhard v. Marcu*, 530 F.3d 122, 133-35 (2d Cir. 2008) (vacating trial verdict in fraudulent conveyance action based on receiver's lack of standing); *SEC v. Ross*, 504 F.3d 1130, 1140-45 (9th Cir. 2007) (vacating disgorgement order based on receiver's failure to obtain *in personam* jurisdiction over intervenor). The Receiver is also evaluating whether pursuing these claims would produce a net economic benefit to the estate. *See* UNITED STATES SECURITIES AND EXCHANGE COMM'N, BILLING INSTRUCTIONS FOR RECEIVERS IN CIVIL ACTIONS COMMENCED BY THE U.S. SECURITIES AND EXCHANGE COMMISSION (2008), at 1, 7.

The Receiver has made formal written demands on 30 parties for payment in connection with various claims. The Receiver is seeking to resolve those claims through settlement, subject to Court approval, in order to avoid the cost and delay of litigation. However, the Receiver is prepared to litigate claims as necessary to recover funds for the benefit of Wextrust victims. The Receiver is participating in depositions of certain professionals, which were noticed by the SEC. The Receiver will continue to consult with the SEC on the retention of professionals and the

commencement of any civil actions.

B.  Claims against Non-U.S. Parties

The Receiver Order requires the Receiver to "[t]ake all necessary steps to gain control of the Defendants' interests in assets in foreign jurisdictions," and to take "steps necessary to repatriate foreign assets." (Receiver Order at 5.) As discussed above, the Receiver is participating in numerous liquidation proceedings in South Africa and Namibia. (*See* Section I.C, *supra.*) In addition, the Receiver and the PAM Liquidators have taken additional steps, including litigation, to gain control of Wextrust assets.

As discussed in previous reports, the Receiver's initial efforts to gain control over Wextrust interests in Africa were obstructed by individuals who had ownership interests in, and management control over, PAM and PAM Syndicate entities. Those individuals include Michael van der Merwe ("van der Merwe"), CEO of PAM; Sybrand Hanekom ("Hanekom"), a disbarred chartered accountant; Thomas Lewis ("Lewis"), former CFO of PAM, and Lawrence Costa ("Costa"), a former director of Deva Investments (Pty) Ltd., a Wextrust affiliate with operations in Namibia.

The Receiver and the Liquidators have conducted an extensive investigation, which is ongoing. Among other things, the Liquidators obtained search and seizure warrants authorizing them to recover paper and electronic records from various PAM Syndicate entities and from individual associates of van der Merwe. The investigation has included oral examinations of approximately a dozen witnesses. In South Africa, the witnesses included van der Merwe, Hanekom, PAM attorney Christoffel Lombard and numerous relatives and other associates of van der Merwe. In the United States, the Receiver conducted a deposition of Lewis, who recently returned from Africa, in May 2009. The Receiver has sought an order from the Court requiring Costa to appear for a deposition.

The Liquidators have identified several potential claims that may be brought against third parties in Africa. Because Wextrust is the largest creditor, the receivership estate would be entitled to the largest share of the proceeds of such claims. The Receiver has requested from the Liquidators and counsel an analysis of the costs and benefits of pursuing such claims, based on the likelihood of recovery, the cost of litigation, and other relevant factors. Based on that analysis, the Receiver, in consultation with the SEC, will make a determination of whether such claims should be pursued, and will instruct the Liquidators accordingly. Based on the initial assessment of South African counsel, it appears that the proceeds of assets sales in Africa, discussed above, will be sufficient to fund the expense of any such litigation.

C.    **Ancillary Litigation**

The Receiver has participated in a variety of litigation ancillary to this action. First, the Receiver moved to compel discovery from one of Wextrust's former professional advisors. On November 17, 2008 the Receiver issued a subpoena to Huff, Poole & Mahoney ("Huff Poole"), a Virginia Beach law firm, which performed legal services for Wextrust, Steven Byers, Joseph Shereshevsky, and their spouses in their personal capacities. On December 18, 2008, Huff Poole filed a motion to quash the Receiver's subpoena in the U.S. District Court for the Eastern District of Virginia, Norfolk Division. The Receiver opposed the motion, which was denied after a hearing. Huff Poole subsequently produced certain documents. The SEC has noticed the depositions of two Huff Poole partners.

The Receiver has been required to participate in litigation related to the Wextrust high yield loan portfolio. For example, Broadway Bank initiated a foreclosure action on certain real property located at 56 Walker Street, a condominium building in Tribeca to which Wex/HPC made a high yield loan and two additional loans. Broadway Bank claims a senior interest in its loan amount ($8,000,000) to that issued by Wex/HPC in the form of the Restated Loan, the

Building Loan, and the Project Loan (collectively, $3,250,000). Wex/HPC has filed an answer to the Complaint and the parties are engaged in discovery.

Broadway Bank also filed an action to determine and enforce its rights, claims, and interests (if any) against HPC and Wex/HPC with respect to a property located in Atlantic City, New Jersey. The property served as collateral for a high yield loan issued by Wex/HPC. Broadway Bank also participated in the loan. When Broadway Bank's loan matured in August 2007, the borrower defaulted on the payment of principal, interest and other charges due and was subsequently placed into an involuntary bankruptcy by certain of its creditors. Broadway Bank then sold its participation interest in the loan to High Yield III, one of the partners of the Wex/HPC joint venture, and financed the sale through a loan to High Yield III. The parties currently dispute the nature and extent of Broadway Bank's claim and security interest, if any.

In addition, a number of Wextrust Entities and Affiliates were parties in pending litigation in various courts (particularly in the Circuit Court of Cook County, Illinois) at the commencement of the receivership. The Receiver's counsel entered appearances in these cases and attended various hearings in order to insure that the litigation stay entered by the Court was implemented and to insure that the rights and interests of Wextrust Entities and Affiliates were not otherwise prejudiced. For example, in *Baskin v. West 82nd Holdings* and *Whitestone Mgmt. v. Wextrust Capital*, the Receiver's counsel obtained stays of litigation.[25]  In some cases, Wextrust Entities are plaintiffs in pending Circuit Court litigation. For example, in *2435 W. Belmont Dev., LLC v. CD Belmont, LLC and A. Goyal*, receivership counsel continue to press a breach of contract and fiduciary duty case against one of the principals of the development company for mismanagement of the condominium development. In *2825 N. Oakley Dev., LLC*

---

[25] In cases where the Wextrust Entity has no assets and the litigation largely involved third parties, the Receiver determined that participation would not constitute an efficient use of the estate's assets, so receivership counsel terminated their participation.

*v. Centerstone Dev., LLV and A. Goyal*, receivership counsel are involved in litigation with the same group of defendants related to a mechanics' liens placed on the property by the general contractor. Receivership counsel have entered into settlement discussions in both cases with the defendants and the mortgage lenders on these properties.

### D. Receivership Court Litigation

Motions practice in the civil case has been extremely active, with over 430 docket entries to date. Most of the issues litigated have focused on attempts by investor groups and others to intervene in the proceeding for a variety of reasons, motions related to the sales or relinquishments of properties, and motions to compel discovery. Table 9 details these issues and reports on their status.

**Table 9: Receivership Court Motion Practice**

| Description | Status |
|---|---|
| **Receiver's Oppositions to Motions to Intervene or Modify Receiver Order** | |
| Motion of G&H Partners AG to Intervene | Denied |
| G&H Partners AG's Motion to Modify Receivership Order and Preliminary Injunction | Denied |
| Motion by Avroham Shereshevsky to Modify Preliminary Injunction to Set Aside Lakewood Property | Denied |
| International Ad-Hoc Committee of Wextrust Creditors and International Consortium of Wextrust Creditors' Joint Motion to Modify Receiver Order | Granted in part and denied in part |
| Motion of Larry Costa to Modify Receiver Order | Denied |
| Commodity Fund Investors' First Motion to Intervene | Denied |
| Motion of Regions Bank to Modify Injunction | Granted in part and denied in part[26] |

[26] Regions Bank sought to modify the litigation stay entered by the Court to compel the Receiver to relinquish the Belle Meade Centre property located in Nashville, Tennessee from the receivership estate for non-payment of debt service. Belle Meade Centre is a non-income producing property structured as several commercial condominium units. According to a valuation of the property prepared by Hilco as well as comparable sales information and other market factors, the Receiver believes that there is equity in the property. Accordingly, the Receiver requested additional time to continue marketing the property for immediate sale with the hope of providing some meaningful recovery to the Wextrust victims. During a hearing on Regions' motion on July 27, 2009, the Court ruled that the Receiver would be permitted 90 additional days to continue marketing the property for sale without having to pay

| Description | Status |
|---|---|
| **Receiver's Motions for Confirmation of Sales and Approval of Other Transactions** | |
| Confirmation of Sale for Certain Property of Hammond Industrial Outlots, LLC | Granted (over objections) |
| Confirmation of Sale for 451 Repton Road | Granted (without objections) |
| Relinquishment of Interests in Rogers Plaza Property | Granted (over objections) |
| Relinquishment of Interests in Certain Residential Realty (2435 West Belmont Development, LLC; 2825 Oakley, LLC; Riverside Arcade, LLC; and SF Development Company, LLC) | Granted (without objections) |
| Relinquishment of Interests in the Wyndham Drake and Crowne Phoenix Hotel Properties | Granted (over objections) |
| Relinquishment of the Hilltop and Homer Glen Properties | Granted (without objections) |
| Confirmation of Sale for the Bax Realty Property | Granted (without objections) |
| Relinquishment of the Hamptons of Hinsdale Property | Granted (without objections) |
| Relinquishment of Interests in the Park View Hotel | Granted (without objections) |
| Confirmation of Extension of Lease on the Workman Road Property | Granted (without objections) |
| **Other Motions** | |
| Receiver's Proposed Plan of Distribution | Granted over numerous objections |
| Motion for Contempt and Other Relief (Costa) | Pending |
| Shereshevsky's Motion to Stay Action | Denied |

E.      **Appellate Litigation**

The Receiver is involved in appellate litigation over motions to intervene in the civil case brought by various groups of Wextrust investors.  The first appeal involves the motion the International Ad-Hoc Committee of Wextrust Creditors and the International Consortium of Wextrust Creditors (collectively, the "Committees") to modify the Receiver Order.  The Committees sought, *inter alia*, to modify the Receiver Order so that involuntary bankruptcy

---

past or current debt service on the property to Regions.  If the Receiver is unable to sell the property or reach an amicable settlement with Regions by October 26, 2009, the Receiver will be required to either relinquish the property to Regions or pay Regions the full value of its secured interest in the property.

petitions could be filed against the estate.  On December 17, 2008, the Court granted in part and denied in part the requested relief.  (*See* Memorandum Decision, Dkt. No. 148.)  The Court found that it had the authority to preliminarily enjoin non-parties from filing involuntary bankruptcy petitions against the estate but modified the Receiver Order to permit any party or non-party – including the Committees – to apply to the Court for an order seeking permission to file an involuntary bankruptcy petition upon a showing that such a petition is appropriate and would benefit the receivership estate.  (*Id*. at 5, 9.)  To date, no such application has been made.

The Committees filed their notice of appeal of the Court's decision to the U.S. Court of Appeals for the Second Circuit on January 14, 2009, and an amended notice of appeal on February 4, 2009.  The Committees then filed a motion to expedite the appeal on February 10, 2009, which was denied the next day.  Briefing was completed on May 20, 2009.  Oral argument has not been scheduled.

The second appeal involves a motion to intervene filed by a group of eight Wextrust investors (collectively, the "Commodity Fund Victims"), who seek to have the Court declare that the Wextrust Commodity Funds were improperly included in the receivership estate.  On January 30, 2009, the Court denied the Commodity Fund Victims' motion, ruling that the Receiver and the SEC had adequately represented the Commodity Fund Victims' interests and that "[t]he position of the Proposed Intervenors is no different from that of the other creditors and victims in this case."  (Memorandum Decision, Dkt. No. 181 at 2.)  The Commodity Fund Victims filed their notice of appeal of the decision to the Second Circuit on March 2, 2009.  Briefing was completed on July 1, 2009.  Oral argument has not been scheduled.

**VI.    <u>CONCLUSION</u>**

The majority of the work mandated by the Court under the Receiver Order has been completed.  The Receiver has secured the books, records and documents of the Wextrust Entities

and Affiliates in the United States and obtained certain books and records related to the Wextrust investments in Africa. The Receiver has determined the extent of commingling among the Wextrust Entities and Affiliates and has analyzed the disposition of investor funds. In addition, the Receiver's Plan of Distribution has been approved by the Court, and the Receiver has begun implementing the Plan.

In the coming months, the Receiver will continue to manage the estate in a manner designed to preserve the value of Wextrust properties and assets. In addition, the Receiver will continue to implement the Plan of Distribution, with a focus on liquidating the U.S. real estate assets, seizing and repatriating assets from Africa, completing the claims process, and making the first distribution. The Receiver will also continue to report on the financial condition of the receivership estate on a periodic basis and will continue to take steps to inform investors and other interested parties of significant developments.

Dated:  New York, New York,
          August 11, 2009

Respectfully submitted,

Timothy J. Coleman
Receiver for Wextrust Entities


s/ Mark S. Radke_____
Mark S. Radke, *pro hac vice*
DEWEY & LEBOEUF LLP
1301 Avenue of the Americas
New York, NY 10019-6092
Tel. (212) 259-8000

Attorneys for Receiver

<u>**CERTIFICATE OF SERVICE**</u>

The undersigned, an attorney, states that I am one of the attorneys for Timothy J. Coleman, Receiver, in this matter and do hereby certify that on **August 11, 2009** I directed the service of a true and correct copy of the foregoing **FOURTH INTERIM REPORT OF RECEIVER AND DECLARATION OF ILONA B. COLEMAN IN SUPPORT OF THE FOURTH INTERIM REPORT OF RECEIVER, AND EXHIBITS IN SUPPORT OF THE SAME** upon the following individuals in the manner indicated below:

<u>**Via First Class Mail**</u>
Joseph Shereshevsky, Registry No. 35857-054
c/o GEO Group
Queens Private Correctional Facility
182-22 150th Avenue
Jamaica, NY 11413
Pro Se Defendant

<u>**Via ECF Notification & Electronic Mail**</u>
Alexander M. Vasilescu, Esq.
Andrew M. Calamari, Esq.
Steven G. Rawlings, Esq.
Alistaire Bambach, Esq.
Danielle Sallah, Esq.
Philip Moustakis, Esq.
Neal R. Jacobson, Esq.
Attorneys for Plaintiff SEC

Barry S. Pollack, Esq.
Joshua L. Solomon, Esq.
Attorneys for non-party G&H Partners AG

Barry S. Zone, Esq.
Jason Canales, Esq.
Stephen Richard Popofsky, Esq.
Attorneys for Defendant Steven Byers

Michael Fred Bachner, Esq.
Attorney for Defendant Elka Shereshevsky

Philip A. Byler, Esq.
Andrew T. Miltenberg, Esq.
Attorneys for non-party Broadway Bank

Shalom Jacob, Esq.
Shmuel Vasser, Esq.
Attorneys for non-party Int'l Ad-Hoc
Committee of Wextrust Creditors

<u>**Via ECF Notification & Electronic Mail**</u>
Martin Siegel, Esq.
Attorney for non-party Int'l Consortium of
Wextrust Creditors

Paul A. Levine, Esq.
Attorney for non-party Key Equipment
Finance, Inc.

David B. Gordon, Esq.
Beth L. Kaufman, Esq.
Attorneys for non-party Lawrence Costa

Harris Kay, Esq.
Marc X. LoPresti, Esq.
Attorneys for various non-party investors

Ethan Holtz, Esq.
Edward P. Gilbert, Esq.
Attorneys for RAIT Partnership

Francesca Morris, Esq.
Attorney for Ticor Title Insurance Co. and
Heritage Community Bank

John M. Bradham, Esq.
Peter B. Katzman, Esq.
Attorneys for non-parties Space Park AIM and
ISSB Partnerships

Alan E. Marder, Esq.
Attorney for non-parties Nashville Warehouse
Partners and Southeast Warehouse Partners

Edward F. Malone, Esq.
George R. Mesires, Esq.
Attorneys for Barrington and Hinsdale Banks

**Via ECF Notification & Electronic Mail**
Louis Orbach, Esq.
Charles J. Sullivan, Esq.
Amy Marie Culver, Esq.
Attorneys for non-party TCF National Bank

Elizabeth P. Gray, Esq.
Attorney for Gerald Jaffe

**Via ECF Notification & Electronic Mail**
Susan F. Balaschak, Esq.
Keith N. Costa, Esq.
Randal S. Mashburn, Esq.
John H. Rowland, Esq.
Attorneys for non-party Regions Bank

_____ s/ Mark S. Radke_____