**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

SECURITIES AND EXCHANGE COMMISSION,

                    Plaintiff,

    - against -

STEVEN BYERS, JOSEPH SHERESHEVSKY,
WEXTRUST CAPITAL, LLC, WEXTRUST
EQUITY PARTNERS, LLC, WEXTRUST
DEVELOPMENT GROUP, LLC, WEXTRUST
SECURITIES, LLC, and AXELA HOSPITALITY,
LLC,

                    Defendants,

    - and -

ELKA SHERESHEVSKY,

                    Relief Defendant.

08 Civ. 7104 (DC)

ECF Case

---

**RECEIVER'S RESPONSE TO THE COURT'S ORDER OF
AUGUST 18, 2009 AND IN SUPPORT OF FOURTH AND FIFTH
JOINT MONTHLY APPLICATIONS OF THE RECEIVER AND
DEWEY & LEBOEUF LLP FOR ALLOWANCE OF
<u>COMPENSATION AND REIMBURSEMENT OF EXPENSES</u>**

Harvey Kurzweil
Mark S. Radke
DEWEY & LEBOEUF LLP
1301 Avenue of the Americas
New York, NY 10019-6092
(212) 259 8000 (t)
(212) 259 6333 (f)

September 14, 2009                                    *Attorneys for the Receiver*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

DISCUSSION ....................................................................................................................... 2

    **I.**    **Results Achieved by the Receiver** ............................................................... 4

    **II.**    **Future Anticipated Receivership Responsibilities and Asset Recoveries** ................ 7

        A.    Management and Marketing of Existing Assets ...................................................... 8

        B.    Third-Party Litigation and Asset Recovery ............................................................ 8

        C.    Claims Verification Process and Distribution of Assets ......................................... 9

        D.    Ongoing Ancillary and Appellate Litigation .......................................................... 9

    **III.**    **Factors to Be Considered By the Court in Fashioning a Reasonable Fee Award** .. 9

        A.    Interim Fees and Expenses to Date ...................................................................... 11

        B.    Projection of Future Fees and Expenses .............................................................. 14

CONCLUSION .................................................................................................................... 15

Timothy J. Coleman, Receiver ("Receiver") for the Defendant Wextrust Entities and all entities they control or in which they have an ownership interest (collectively, the "Wextrust Entities and Affiliates"), respectfully submits this response to the Court's Order of August 18, 2009 ("August Fee Order") (Dkt. No. 439) and in support of the Receiver and Dewey & LeBoeuf LLP's fourth and fifth joint monthly fee applications (Dkt. Nos. 359, 429).[1]

## PRELIMINARY STATEMENT

In the August Fee Order, the Court asked the Receiver to respond to concerns expressed by the Court about "concrete results" achieved thus far in this receivership. As this memorandum will describe in detail, the concrete results achieved by the Receiver and by Dewey & LeBoeuf LLP ("D&L"), the firm that has assisted the Receiver, have been substantial, when measured in terms of the task assigned to the Receiver in the first instance.

That task was an immense one. When this receivership commenced, it confronted an alleged Ponzi scheme involving north of $300 million, assets, including real estate, located all over the world, significant contingent liabilities, and the fact that Wextrust had no centralized accounting system. The hope existed that many of these assets could be recovered for the benefit of defrauded investors. The attempt to attain this objective required substantial effort, which the Court has acknowledged has been undertaken skillfully by the Receiver and D&L. Unfortunately, what this effort has revealed is that the fraud that gave rise to the receivership consumed much of the assets initially believed to be potentially available for recovery to investors. The ensuing unprecedented and highly unfavorable worldwide real estate collapse has only made the recovery prospect worse.

---

[1] The Securities and Exchange Commission ("SEC") has indicated that it has no objection to either application after reviewing them pursuant to its Billing Instructions for Receivers in Civil Actions Commenced by the U.S. Securities and Exchange Commission ("SEC Billing Guidelines"). (*See* Dkt. Nos. 359, 429.)

That the achievable recovery for investors is likely to be less than the size of the assets first believed to be recoverable should not detract from the outstanding work performed by the Receiver and D&L. As the Court has observed, D&L did not undertake this assignment on either a pro bono or contingent fee basis. D&L nevertheless is prepared to reduce its fee request by an additional 10% discount on fees incurred from November 2008 through the end of the case in recognition of the fact that many victims of the fraud will receive only a fraction of what they invested. But the hard work of the Receiver and D&L cannot be ignored, and a reasonable fee award should take this into account. In compliance with the August Fee Order and to assist the Court in entering an award fairly to compensate the Receiver and D&L, this memorandum will describe the work performed, the results achieved to date, anticipated future asset and third-party litigation recoveries, and the fees and expenses already incurred by D&L and the Receiver through July 2009. This memorandum will also project future fees for the next six months.

## DISCUSSION

On August 11, 2008, the SEC filed a civil enforcement action against Steven Byers, Joseph Shereshevsky, and the five Wextrust Entities. Byers and Shereshevsky are alleged to have operated a massive Ponzi scheme involving approximately $313 million in investor funds from some 1,353 investors.[2] Simultaneously with the filing of its complaint, the SEC sought and obtained certain emergency relief including a temporary restraining order, an asset freeze order, and the appointment of an equity receiver. On August 11, 2008, Judge Sullivan selected Mr. Coleman as receiver. The Receiver then hired D&L and other professionals pursuant to an order appointing a temporary receiver. (Dkt. No. 2.) That order was subsequently amended on September 11, 2008 (Dkt. No. 36) (hereinafter the "Receiver Order"). D&L undertook the

---

[2]     *See* Third Interim Report of Receiver, Dkt. No. 308 at 27 n.22; Fourth Interim Report of Receiver, Dkt. No 433 at 12 n.12.

representation at the request of the SEC and on the assumption that there had been a massive fraud and there were significant assets within the estate to return to victims and finance the complex administration of the receivership estate.  (*See* Declaration of Harvey Kurzweil ("Kurzweil Decl."), sworn to September 14, 2009, at ¶ 3.)

At the time of the Receiver's appointment, however, the Wextrust Entities and Affiliates were in a state of complete disarray, with a lack of internal controls for business decisions and cash management, hundreds of bank accounts held in dozens of banks, and high operating and other expenses.[3]  As a result, the ultimate results at the outset of the investigation were uncertain. (*See id.* at ¶¶ 3-7.)  In addition, the legal issues the Receiver confronted were complex and could not be assigned to inexperienced lawyers.  (*Id.*)

Faced with this daunting task, D&L assigned a large team of lawyers with experience in a variety of legal disciplines, including complex litigation, commodities trading, real estate finance, bankruptcy, and domestic and foreign taxation, to the task of investigating the byzantine transactions of Wextrust and marshaling and preserving its assets.  D&L would have done no less for any other major client, and the time charges incurred were appropriate in light of the complexity of the legal issues confronted and the need to accomplish as much as possible in an expedited fashion.  (*Id.* at ¶ 4.)

The Receiver and D&L have taken a number of significant steps to stabilize, secure, and add value to the receivership estate.  The administration of the estate remains a highly complex endeavor that involves a tremendous amount of time and skill, particularly by more experienced

---

[3]     The recession has compounded these difficulties, as the commercial and residential real estate markets have suffered a precipitous decline over the past year and the market for traditional bank financing of commercial real estate ventures has collapsed.  These developments are particularly problematic in this case because most Wextrust real estate assets are heavily leveraged.  As a result of the recession, the value of these assets has declined substantially and sales and marketing efforts have been exceedingly difficult.

attorneys, as this Court recognized in its Memorandum Decision of May 29, 2009 approving the

Receiver and D&L's third interim fee application.  (*See* Memorandum Decision ("Second Fee

Opinion") (Dkt. No. 353) at 5 ("[T]he complexity of this case was apparent at a hearing held on

May 21, 2009 to discuss the Receiver's proposed plan of distribution.")).[4]  Thus, it would be

reasonable to ask the Court to approve all of D&L's fees on the basis of the fee structure

proposed to the SEC prior to the commencement of the receivership.

In light of the public service nature of the receivership, however, D&L is prepared to

accept payment for services on unpaid fees incurred from November 2008 through the end of the

case at rates that are significantly less than it might charge in a normal commercial

representation.  As set forth below, D&L would agree to be compensated for services at an

additional 10% discount from its adjusted lodestar amount for these periods.  For clarification

purposes, the "base lodestar" is the gross invoice amount reflecting fees incurred before any

deductions are taken.  The "adjusted lodestar" is the base loadstar minus all SEC discounts – in

other words, the amount to which the Receiver and D&L would be entitled under the fee

structure agreed to with the SEC.  The 10% absolute discount would be deducted from that

adjusted lodestar amount, followed by a 20% hold-back.  The resulting amount would make up

the interim fee request to be presented to the Court for approval.  (Kurzweil Decl. ¶ 10.)

I.   **Results Achieved by the Receiver**

The receivership has been in operation for over 13 months.  The Receiver has

successfully accomplished the following essential steps unique to the Wextrust receivership as

well as having achieved most of the early steps common to many receiverships:

- Provided active and ongoing management of dozens of commercial real estate, hotel, and other properties in the receivership estate, including those segments of

---

[4]     The Second Fee Opinion is reported at 2009 U.S. Dist LEXIS 51429.

the business operations located in foreign jurisdictions with a history of official corruption and a failure to cooperate with U.S. law enforcement and judicial authorities.[5]  (*See* Fourth Interim Report at 14-19.)

- Developed a Plan for Management of Wextrust Real Estate Portfolio (Dkt. No. 172), submitted on January 15, 2009 without objection, which included an assessment of 36 properties located in 8 different states.

- Relinquished 11 real estate assets to date, achieving approximately $7.8 million in annual savings to the estate and extinguishing over $136 million in secured indebtedness, which provided substantial recoveries for Wextrust secured creditor-victims while also providing significant benefits to defrauded investors and unsecured creditors who otherwise would take substantially less.  (Fourth Interim Report at 5-6.)  Through sales and relinquishments of receivership assets, the Receiver expects a significant recovery for Wextrust secured creditor-victims.  (*Ex Parte* Declaration of Mark S. Radke ("Radke Decl."), sworn to September 14, 2009, at ¶ 24.)[6]

- Began the liquidation of real estate assets in both the United States and Africa, which has reached the point where sufficient assets have been liquidated to enable the Receiver to contemplate a first interim distribution.  The sales of the Hammond, 451 Repton, 6126 Plymouth, and Bax Realty properties and the forthcoming sale of the West Bearden property in Knoxville, Tennessee resulted in an approximate $18,406,000 benefit to the estate in the form of cash sales proceeds to be distributed to investor-victims and full recoveries for secured creditor-victims.[7]  (Third Interim Report at 7.)  Several additional sales are also in the final stages of negotiation.  (Radke Decl. at ¶ 10.)

- Developed a Proposed Plan of Distribution (Dkt. No. 243) that was filed only eight months after commencement of the receivership.  The Plan was formulated in cooperation with the SEC, which supports the Plan in its entirety.  The Court approved the Plan over objections in its 41-page Opinion of July 23, 2009 ("Distribution Opinion") (Dkt. No. 428.)

---

[5]      Pursuant to 28 U.S.C. § 959(b), the Receiver must "manage and operate the property in his possession . . . in the same manner that the owner and possessor thereof would be bound to do if in possession thereof."  Here, the Wextrust assets involve a high degree of active management, a responsibility that should not be ignored merely because there are no quickly realized tangible recovery benefits to the receivership estate realized through the fulfillment of this duty.

[6]      The Radke Decl. is being submitted *ex parte* and under seal.

[7]      The Receiver has agreed in principal to a sale of the West Bearden property located in Knoxville, Tennessee, subject to approval by the Court, which will realize an $8.7 million recovery to the estate in the form of $1.5 million in cash proceeds and a $7.2 million recovery to the property's secured creditor.  There has also been continued progress in the liquidation of Wextrust's African assets and the liquidation of computers and other personal property from Wextrust's domestic offices.  (*See* Fourth Interim Report at 4, 10; Radke Decl. ¶ 10.)

- Largely completed the claims process designed by the Receiver and implemented by the Distribution Opinion. Despite over 100 objections and several hundred initial claims disputes, the vast majority of disputed claims have been resolved and the few remaining disputes will be heard by the Court in the coming weeks.

- Commenced the continuing process of reducing Wextrust operating expenses, including implementing significant headcount reductions and the closing of all but one Wextrust office. Reducing the amount of expenses and outstanding claims against the estate has had the same net effect as recovering additional estate assets for distribution.[8]

- Transformed a substantially negative cash flow into a positive cash flow, exclusive of administrative costs. Cash flow for the quarter ending November 10, 2009 is projected to continue to be positive, and administrative costs have declined dramatically. (Fourth Interim Report at 25-27.)

- Responded to thousands of inquiries from victims seeking information and assistance. The Receiver has also contacted and interviewed a total of 1,061 investors, or approximately 75 percent of the approximately 1,400 individual investors.

- Took control of Wextrust operations in Israel and instituted steps to prevent further dissipation, encumbrance, and disposal of Wextrust assets and interests in Africa.

- Maintained a website for victims as well as potential purchasers of properties. The website continues to provide access to all public court filings in the civil and criminal actions, explanatory materials, and links to other electronic resources.

The foregoing accompanied the fulfillment of the Receiver's following steps common to many receiverships, notwithstanding the profound instability and turmoil of the Wextrust Entities and Affiliates at the outset of the receivership:

- In order to stabilize and secure Wextrust business operations, properties and assets, the Receiver conducted crisis management and security operations and has taken control of the management of the of the Wextrust Entities and Affiliates. This was accomplished notwithstanding the fact that Wextrust's financial records were materially inaccurate, there was significant commingling of assets among the various funds, and Wextrust had no effective system of internal controls.

---

[8] These actions have resulted in a net monthly savings of $25,000 over and above the already significant payroll savings realized to date. Wextrust's monthly rental expenses have also been reduced from more than $90,000 at the commencement of the receivership to $1,500 currently, in addition to the elimination of over $290,000 in back rent. (Fourth Interim Report at 20.)

- Identified and consolidated more than 300 Wextrust accounts at banks and other financial institutions and took exclusive control of those accounts as sole authorized signatory, thereby establishing a more efficient and effective cash management system.

- Responded to numerous litigation demands and requirements. At the time of the Receiver's appointment, a number of lawsuits were pending against Wextrust Entities and Affiliates seeking substantial damages. The docket sheets in the underlying litigation in this Court contain in excess of 450 docket entries, including six notices of appeal to the Second Circuit.[9]

- Provided substantial assistance to the SEC, FBI, U.S. Attorney's Office, NFA, FINRA, and CFTC in their various Wextrust-related prosecutions and investigations. These agencies have relied extensively on the data gathering and organizational efforts undertaken by the Receiver's professionals mandated by the Receiver Order.[10] (*See* Kurzweil Decl. ¶¶ 6-7.) This assistance did not end after the initial phase of the case. The Receiver and D&L continue to assist federal authorities in their prosecutions and investigations. (*Id.* ¶ 8.)

- Acquired as much information as possible, as quickly as possible, to fulfill the indispensible requirement that no Receiver should act on the basis of incomplete or other questionably accurate information, in order to avoid further prejudice to already disadvantaged victims.

- Analyzed and made forensically sound copies of substantially all Wextrust business records and electronic media files maintained at 10 different office sites in the United States and Israel.

## II.    Future Anticipated Receivership Responsibilities and Asset Recoveries

The bulk of the Receiver's continuing efforts in this case will focus on sales of existing estate assets and the prosecution of causes of action against third parties complicit in the fraudulent scheme. Each avenue and its anticipated recovery is described in greater detail below and in the accompanying declaration of Mark S. Radke, which is being submitted *ex parte* and

---

[9]    Such actions included objections to the relinquishments of estate assets (*see* Dkt. Nos. 152-53), motions to intervene or modify the receivership order (*see, e.g,* Dkt. Nos. 41, 75, 96, 145), which would have increased discovery and estate management costs significantly – thus depleting estate assets available for later distribution, and attempts to move the proceeding into bankruptcy for certain unknown Wextrust entities and assets (Dkt. No. 70), which would have had disastrous consequences to the estate by increasing administration expenses considerably.

[10]    The Receiver has interviewed and/or examined under oath over 65 witnesses and the majority of the defrauded Wextrust investors, subpoenaed more than 15 entities, and reviewed and made available to the government tens of thousands of documents. (Fourth Interim Report at 28.)

under seal in order to preserve the integrity of settlement negotiations with third parties and to elicit the highest possible future sales prices for the remaining real estate assets.

## A. Management and Marketing of Existing Assets

Although much of the work of the receivership has now been completed, there is very important work still left to be accomplished. For example, there are dozens of real estate assets remaining in the estate that the Receiver and his professional advisors believe will provide a substantial return to Wextrust victims. (*See* Radke Decl. ¶¶ 11, 24-25.) To that end, the marketing efforts undertaken to date have generated a substantial amount of interest in the remaining portfolio. In the meantime, the Receiver has taken steps to increase the attractiveness of the remaining properties, including certain improvements, lease renewals, and new leases.[11]

## B. Third-Party Litigation and Asset Recovery

The Receiver has commenced negotiations with approximately 30 third-parties, including former Wextrust law firms and charitable organizations that the Receiver believes were either complicit or negligent in connection with the Wextrust scheme or received improper charitable contributions consisting of funds misappropriated from defrauded Wextrust victims. An analysis of these claims and the anticipated recovery to the estate is included in the accompanying declaration of Mark S. Radke. (*See* Radke Decl. ¶¶ 13-25.)

Moreover, there has also been continued progress in the liquidation of Wextrust's African assets, with additional sales and potential third-party actions expected in the coming months. (*See* Radke Decl. ¶ 13-17.)

---

[11] Over the past year, the Receiver has renewed 36 leases and negotiated 15 new leases on properties, for a total of approximately 496,000 square feet of leasable space. The Receiver estimates these leases will result in approximately $13.6 million in revenue over the life of the leases, thereby enhancing the value of the properties and the expected proceeds of the liquidation. (Fourth Interim Report at 4; Radke Decl. ¶ 6.)

### C. Claims Verification Process and Distribution of Assets

One of the additional outstanding tasks is the completion of the claims verification process and the distribution of assets to Wextrust victims. Although largely complete, the process is likely to continue into the fall and may require significant time and resources. The Receiver is exploring lower-cost options for the processing and distribution of checks for the first interim cash distribution of assets and future distributions upon the sale or recovery of additional assets. Furthermore, eliminating invalid claims will have the effect of reducing the pool of demands on the funds available for distribution, thus increasing recoveries for all victims holding valid claims.

### D. Ongoing Ancillary and Appellate Litigation

Finally, the Receiver must supervise and participate in additional ancillary and appellate litigation in order to preserve estate assets and advance the rights and interests of the beneficiaries of the receivership estate. Currently, two appeals noticed by various groups of Wextrust victims are at the post-briefing stage at the Second Circuit, and additional notices of appeal have been lodged with respect to the Court's July 23, 2009 Distribution Opinion.

### III. Factors to Be Considered By the Court in Fashioning a Reasonable Fee Award

In its Opinion of December 30, 2008 (Dkt. No. 166), reported at 590 F. Supp. 2d 637 ("First Fee Opinion"), this Court discussed in considerable detail the factors a receivership court should consider in awarding professional fees. The Court applied the "rule of moderation" in considering the First Interim Application of D&L and the Receiver. (*See* First Fee Opinion at 16.) The Court approved the Receiver's fee and D&L's request for reimbursement of its expenses, but approved D&L's interim fee request subject to an additional hold-back of 20%, with D&L having the right to apply for all or part of that hold-back at the conclusion of the case.

(*Id.* at 23.)  In keeping with the First Fee Opinion, D&L, in addition to discounting its fees based on a self-audit and other factors (which often results in a considerable discount), has further reduced all of its interim fee requests, including those in the Fourth and Fifth Interim Applications, by an additional 20% hold-back.  (*See, e.g.,* Fifth Interim Application at ¶¶ 26-28.)

Although the Court has stressed the importance of benefit to the estate in connection with awarding any hold-back amounts (*see* First Fee Opinion at 23), the Court has not, either in the First Fee Opinion or any subsequent opinion or order, held that monetary recovery to defrauded investors is the sole factor a receivership court should consider in awarding professional fees.  As the Court noted in its First Fee Opinion, a court reviewing fees in the context of a federal equity receivership looks at "all of the factors involved in a particular receivership . . . ."  (First Fee Opinion at 14) (quoting *Gaskill v. Gordon,* 27 F.3d 248, 253 (7th Cir. 1994)).  The factors include "the complexity of the problems faced, the benefits to the receivership estate, the quality of the work performed, and the time records presented."  (*Id.*) (quoting *SEC v. Fifth Ave. Coach Lines, Inc.,* 364 F. Supp. 1220, 1222 (S.D.N.Y. 1973)).

The Court provided further guidance on this point in its Second Fee Opinion.  In deciding whether to approve a future request for payment of hold-back amounts, the Court stated that it would look at "all relevant factors, and not solely on whether . . . 'a majority of victims' assets is recovered.'"  (Second Fee Opinion at 5.)  Thus, although the net financial recovery achieved for beneficiaries of the receivership estate is an important factor, it is not the only factor.[12]  Moreover, courts in this district have found that court appointed receivers may have a superior right to payment over estate creditors to limited estate funds because of the important public interest in ensuring that persons "of the background and competency to be receivers" are

---

[12]     *See also* Fifth Interim Application at 42-44 (discussing factors to be reviewed by a court in determining a reasonable fee award).

"willing to undertake that necessary job." *SEC v. Giacchetto*, No. 00-cv-2502, 2000 U.S. Dist. LEXIS 9453, *4 (S.D.N.Y. July 7, 2000).

### A. Interim Fees and Expenses to Date

The Court has awarded the Receiver and D&L interim fees of $4,594,760.87 and expenses of $384,148.30 for application periods through October 31, 2008. (August Fee Order at 18.) There has been a substantial reduction in the monthly fees of the Receiver and D&L since that time. The graph in Table 1 below, which was taken from the Receiver's Fourth Interim Report, demonstrates that fees for the Receiver and D&L have declined substantially in every month through January 2009.[13]

**Table 1**



---

[13]     Gross fees and expenses for D&L and the Receiver declined by approximately 18 percent from September to October, 29 percent from October to November, 30 percent from November to December, and 22 percent from December to January. The fees for February through June are based on unaudited bills, and thus fees requested for this period are estimates only based on prior discounts and hold-back amounts. A reduction factor of 38% was used in calculating these estimates.

With respect to fees and expenses previously awarded and those sought in applications currently pending approval by the Court, Table 2 below sets forth what is described as the base lodestar, or the gross invoice amount reflecting fees incurred before any deductions are taken. Also shown are the interim fees sought by the Receiver and D&L (after various deductions and the 20% hold-back instituted by the Court) and all fees awarded to date.[14]

**Table 2**

| | First Application (August) | Second Application (September) | Third Application (October) | Fourth Application (November) | Fifth Application (December) | Sixth Application (January)[15] |
|---|---|---|---|---|---|---|
| **Base Lodestar Amount** | | | | | | |
| **Total** | $2,725,467.75 | $3,015,436.60 | $2,489,277.00 | $1,772,387.50 | $1,244,700.25 | $972,066.25 |
| **Fees Sought after Deductions and Hold-Backs** | | | | | | |
| **Receiver** | $57,300.00 | $51,562.50 | $41,725.00 | $32,887.50 | $24,975.00 | $20,350.00 |
| **D&L** | $2,147,666.75 | $1,510,024.00 | $1,216,004.97 | $916,432.80 | $674,399.00 | $588,253.30 |
| **Total Amount Awarded** | | | | | | |
| **Receiver** | $57,300.00 | $51,562.50 | $41,725.00 | N/A | N/A | N/A |
| **D&L** | $1,718,144.40 | $1,510,024.00 | $1,216,004.97 | N/A | N/A | N/A |

D&L has two pending fee requests before the Court in the total amount of $1,590,831.80. Those fee requests reflect substantial reductions not included in the firm's original proposal to the SEC.[16]  The discounts and the 20% hold-back for November 2008 reduce D&L's fee request to approximately 55% of the D&L base lodestar.  The same types of reductions reduce the fee request to approximately 58% of the D&L base lodestar for December 2008.  The SEC

[14]     The Court should note that, under the SEC Fee Guidelines, the Receiver and D&L may not seek compensation for any matter relating to their fee applications.  The Receiver and D&L have devoted a considerable amount of time over the last year to fee application matters.  For example, in December 2008, the Receiver and D&L devoted a total of 441.5 hours to task code B410 (Fee Applications and Reports).  D&L professionals devoted more time to only two other task codes during this period.

[15]     The Receiver and D&L submitted the Sixth Interim Application to the SEC on August 7, 2009.  It is currently being reviewed by the SEC and has not yet been filed with the Court.

[16]     Although the August Fee Order correctly states a total fee award to the Receiver and D&L of $4,594,760.87, the primary focus of the Court in its opinions and orders and in objections by interested parties has been the fee requests of D&L.  Consequently, this response focuses on D&L's pending fee requests and future fee requests rather than the Receiver's requests or requests for reimbursement of expenses.

has no objection to either of these pending applications.

The Court has also asked for a rough estimate of the Receiver and D&L's fees accrued to date. Table 3 below sets forth the Receiver and D&L's monthly gross fees for February 2009 through July 2009 (the latest month for which D&L has processed its fees and expenses) and the estimated fee requests based on a combined discount and holdback factor of 40%.

**Table 3**

|  | February 2009 | March 2009 | April 2009 | May 2009 | June 2009 | July 2009 | Total |
|---|---|---|---|---|---|---|---|
| **Gross Fees (including the Receiver's fees)** | $1,183,061 | $920,761 | $908,074 | $951,052 | $898,081 | $735,626 | $5,596,655 |
| **Estimated Total Request Based on 40% Total Reduction Factor** | $709,837 | $552,457 | $544,844 | $570,631 | $538,849 | $441,376 | $3,357,994 |

Using a reduction factor of 40% (slightly below the approximate reduction factors applicable to the November 2008 and December 2008 interim applications), total fees requested for the February through July 2009 period are estimated at $3.36 million, a considerable decrease over the estimated gross fee figure for this period of approximately $5.6 million.

As noted in the accompanying declaration of Harvey Kurzweil, D&L is prepared to make additional concessions with respect to its fees. In connection with the fees and expenses incurred for the Fourth and Fifth Application Periods (November and December 2008), the Receiver and D&L would be prepared to agree to an additional deduction of 10% of the adjusted D&L lodestar amount (i.e. the amount remaining after applying the various discounts agreed to by D&L). This additional deduction would reduce D&L's interim requests for November from $916,432.80 to $824,789.52 and for December 2008 from $674,399 to $606,959.10, resulting in an interim request of $1,431,748.62 for the two periods. (Kurzweil Decl. ¶ 10(b).) D&L would retain the right to seek allowance of the 20% hold-back for November and December 2008 at the

conclusion of the case in accordance with the First and Second Fee Opinions.

Similarly, with respect to the fees accrued by the Receiver and D&L for the period January 1, 2009 through July 31, 2009, the Receiver and D&L would further agree to an additional deduction of 10% of the adjusted lodestar amount to be set forth in its future interim fee requests for this period as well. (Kurzweil Decl. ¶ 10(c).)

## B. Projection of Future Fees and Expenses

Finally, the Court has requested an estimate of the fees the Receiver and D&L anticipate going forward to the conclusion of this case. The Receiver and D&L cannot at this time provide a reliable estimate of the additional time needed to complete the case or the fees that would be incurred during that period, since it will depend on a number of factors, including the time the Receiver needs to complete sales of the remaining commercial leasing properties. However, the Receiver and D&L can reasonably estimate fees for the next six months of the case (from August 1, 2009 through January 31, 2010 ("Additional Estimated Fee Period")). During the last six months of the receivership, the total D&L base lodestar figure has fluctuated roughly between $1.2 million and $750,000 per month. However, D&L believes this figure will decrease significantly as the receivership winds down. D&L estimates that D&L fee requests during the Additional Estimated Fee Period will be within a range of from $1.5 million to 2.5 million, after applying a 10% discount and 20% hold-back. (Kurzweil Decl. ¶ 10(e).)

With respect to any future billings extending beyond January 31, 2010, D&L will review the amounts billed in light of the results accomplished and other applicable factors. (*Id.*) Table 4 below demonstrates the fees awarded to D&L to date and the Receiver and D&L's proposals and estimates with respect to D&L's pending and future fees through January 31, 2010, exclusive of future hold-back award requests and reimbursement of out of pocket expenses.

**Table 4**

| | Fees Awarded to Date[17] | November 2008 | December 2008 | January 2009 | February - July 2009[18] | August 2009 - January 2010 | Total |
|---|---|---|---|---|---|---|---|
| **D&L Base Lodestar** | $7,692,726 | $1,655,683 | $1,244,700 | $902,876 | $5,596,655 | $3,333,333 | **$20,425,973** |
| **Interim D&L Requests** | $4,444,173 | $824,790 | $606,959 | $529,428 | $3,357,994 | $2,000,000 | **$11,763,344** |

## CONCLUSION

In light of the foregoing, the Receiver respectfully requests that the Court approve the Receiver and D&L's fee proposals outlined herein and its outstanding fees and expenses as fair and reasonable in the context of this highly complex litigation.

Dated:  New York, New York  
       September 14, 2009

Respectfully submitted,

s/ Harvey Kurzweil_____  
Harvey Kurzweil  
Mark S. Radke  
DEWEY & LEBOEUF LLP  
1301 Avenue of the Americas  
New York, NY 10019-6092  
(212) 259 8000 (t)  
(212) 259 6333 (f)

*Attorneys for the Receiver*

---

[17]     Column 1 reflects the actual fees awarded to D&L for August, September, and October 2008, not its interim fee requests.

[18]     The estimated base lodestar for the period from February 1, 2009 through July 31, 2009 also includes the Receiver's estimated fees, which on a net basis average from $20,000 to $30,000 per month.

<u>**CERTIFICATE OF SERVICE**</u>

The undersigned, an attorney, states that I am one of the attorneys for Timothy J. Coleman, Receiver, in this matter and do hereby certify that on **September 14, 2009** I directed the service of a true and correct copy of the foregoing **Receiver's Response to the Court's Order of August 18, 2009 and in Support of Fourth and Fifth Joint Monthly Applications of the Receiver and Dewey & LeBoeuf LLP for Allowance of Compensation and Reimbursement of Expenses** upon the following individuals in the manner indicated below:

<u>**Via First Class Mail**</u>
Joseph Shereshevsky, Registry No. 35857-054
c/o GEO Group
Queens Private Correctional Facility
182-22 150th Avenue
Jamaica, NY 11413
Pro Se Defendant

<u>**Via ECF Notification & Electronic Mail**</u>
Alexander M. Vasilescu, Esq.
Andrew M. Calamari, Esq.
Steven G. Rawlings, Esq.
Alistaire Bambach, Esq.
Danielle Sallah, Esq.
Philip Moustakis, Esq.
Neal R. Jacobson, Esq.
Attorneys for Plaintiff SEC

Barry S. Pollack, Esq.
Joshua L. Solomon, Esq.
Attorneys for non-party G&H Partners AG

Barry S. Zone, Esq.
Jason Canales, Esq.
Stephen Richard Popofsky, Esq.
Attorneys for Defendant Steven Byers

Michael Fred Bachner, Esq.
Attorney for Defendant Elka Shereshevsky

Philip A. Byler, Esq.
Andrew T. Miltenberg, Esq.
Attorneys for non-party Broadway Bank

<u>**Via ECF Notification & Electronic Mail**</u>
Martin Siegel, Esq.
Attorney for non-party Int'l Consortium of Wextrust Creditors

Paul A. Levine, Esq.
Attorney for non-party Key Equipment Finance, Inc.

David B. Gordon, Esq.
Beth L. Kaufman, Esq.
Attorneys for non-party Lawrence Costa

Harris Kay, Esq.
Marc X. LoPresti, Esq.
Attorneys for various non-party investors

Ethan Holtz, Esq.
Edward P. Gilbert, Esq.
Attorneys for RAIT Partnership

Francesca Morris, Esq.
Attorney for Ticor Title Insurance Co. and Heritage Community Bank

John M. Bradham, Esq.
Peter B. Katzman, Esq.
Attorneys for non-parties Space Park AIM and ISSB Partnerships

Alan E. Marder, Esq.
Attorney for non-parties Nashville Warehouse Partners and Southeast Warehouse Partners

Edward F. Malone, Esq.
George R. Mesires, Esq.
Attorneys for Barrington and Hinsdale Banks

**Via ECF Notification & Electronic Mail**
Shalom Jacob, Esq.
Shmuel Vasser, Esq.
Attorneys for non-party Int'l Ad-Hoc
Committee of Wextrust Creditors

Louis Orbach, Esq.
Charles J. Sullivan, Esq.
Amy Marie Culver, Esq.
Attorneys for non-party TCF National Bank

Elizabeth P. Gray, Esq.
Attorney for Gerald Jaffe

**Via ECF Notification & Electronic Mail**
Susan F. Balaschak, Esq.
Keith N. Costa, Esq.
Randal S. Mashburn, Esq.
John H. Rowland, Esq.
Attorneys for non-party Regions Bank

Emily Alexander, Esq.
Attorney for non-party Martin Malek

_____s/ John K. Warren_____