**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

SECURITIES AND EXCHANGE COMMISSION,

          Plaintiff,

   - against -

STEVEN BYERS, JOSEPH SHERESHEVSKY,
WEXTRUST CAPITAL, LLC, WEXTRUST
EQUITY PARTNERS, LLC, WEXTRUST
DEVELOPMENT GROUP, LLC, WEXTRUST
SECURITIES, LLC, and AXELA HOSPITALITY,
LLC,

          Defendants,

   - and -

ELKA SHERESHEVSKY,

          Relief Defendant.

08 Civ. 7104 (DC)

ECF Case

---

**RECEIVER'S RESPONSE TO THE COURT'S ORDER OF
AUGUST 19, 2009 OUTLINING ACTIVE CLAIMS DISPUTES
RELATED TO THE PLAN OF DISTRIBUTION**

Mark S. Radke
John K. Warren
DEWEY & LEBOEUF LLP
1101 New York Avenue, NW
Washington, D.C. 20005
202-346-8000 (t)
202-346-8102 (f)

September 14, 2009

*Attorneys for the Receiver*

<u>**TABLE OF CONTENTS**</u>

DISCUSSION ........................................................................................................................ 1

I.      The Plan of Distribution ......................................................................................... 1

II.     The Claims Adjudication Process........................................................................... 2

        A.      Investor Claims Adjudication Process ......................................................... 2

        B.      Claims Adjudication Process for Potentially-Disqualified Individuals ............... 4

        C.      Creditor Claims Adjudication Process......................................................... 6

III.    Active Investor Disputes ........................................................................................ 7

        A.      Disputes Related to the *Pro Rata* Method of Distribution................................... 8

        B.      Disputes Related to the Method of Calculating the *Pro Rata* Distribution ........ 10

        C.      Disputes Related to Personal Dealings with Defendant Joseph Shereshevsky... 12

        D.      Disputes Resolved by the Receiver, Accepting in Part or Rejecting an
                Investor's Claim, but No Response Provided By Investor ................................. 19

IV.     Active Potentially-Disqualified Investor Disputes ............................................. 20

        A.      Fully-Disqualified Investors ....................................................................... 20

        B.      Partially-Disqualified Investors ................................................................. 23

                1.      90% Disqualifications ..................................................................... 23

                2.      50% Disqualifications ..................................................................... 24

                3.      25% Disqualifications ..................................................................... 26

V.      Active Unsecured Creditor Disputes ................................................................... 28

        A.      56 Walker, LLC ........................................................................................... 28

        B.      Appleby and DMS Management ................................................................. 28

        C.      625 W. Division Condominium, L.P; John and Jan Breugelmans; and
                Kingsdale Enterprises LLC.......................................................................... 29

        D.      Broadway Bank............................................................................................ 30

        E.      G&H Partners AG........................................................................................ 37

        F.      Nashville Warehouse Partners, LLC and Southeast Warehouse Partners, LLC. 38

        G.      Pinnacle Fund Administration .................................................................... 42

        H.      Q&Q Limited Partnership............................................................................ 43

        I.      Regions Bank and TCF National Bank ...................................................... 45

        J.      Sheldon Liebb .............................................................................................. 46

        K.      Space Park AIM Partnership & Space Park ISSB Partnership ..................... 49

        L.      The Drake OakBrook, LLC Pension Fund ................................................. 52

        M.      Ticor Title Insurance Company ................................................................... 54

        N.      Universal Restoration Services ................................................................... 55

CONCLUSION ................................................................................................................. 56

Timothy J. Coleman, Receiver ("Receiver") for the Defendant Wextrust Entities and all entities they control or in which they have an ownership interest (collectively, the "Wextrust Entities and Affiliates"), respectfully submits this Response to the Court's Order of August 19, 2009 ("Claims Order") (Dkt. No. 442) requesting a statement setting forth the Receiver's position on all remaining active disputes relating to the plan of distribution approved by the Court on July 23, 2009 ("Distribution Opinion") (Dkt. No. 428). This Response supplements the documentation and evidence sent via Federal Express for delivery to the Court on Monday, September 14, 2009. A redacted copy of this documentation and evidence is being filed concurrently herewith.

## DISCUSSION

I. **The Plan of Distribution**

The plan of distribution, as approved by the Court on July 23, 2009 in the Distribution Opinion, has four main components. First, estate assets will be distributed on a *pro rata* basis to investors and unsecured creditors. Second, distributions will be calculated using the "net investor method." Under this method, cash distributions received by an investor prior to the commencement of the SEC's complaint will be subtracted from the total amount of the investor's investment. This adjusted figure will serve as the starting point for determining the investor's *pro rata* distribution. Those investors who chose to roll-over their distributions into additional Wextrust investments – rather than take the distribution in cash – will have the distribution amount added to the amount of their investments. Third, secured creditors are barred from asserting deficiency claims against the general receivership estate and from receiving cash distributions under the approved plan. Fourth, certain groups of individuals may be disqualified from obtaining distributions, in whole or in part, based on their participation in the misconduct or

on other equitable grounds.  Claimants objected to each component of this plan.

## II.     The Claims Adjudication Process

Over the past several months, the Receiver and his advisors have expended considerable effort to complete the claims process designed by the Receiver and implemented by the Distribution Opinion.  Despite over 100 objections to the Receiver's Proposed Plan of Distribution (Dkt. No. 243) and several hundred initial claims disputes, the vast majority of disputed claims have now been resolved, and the few remaining disputes are scheduled to be heard by the Court in the coming weeks.  The Receiver's work in eliminating invalid claims and reducing disputed claims decreased the pool of demands on the funds available for distribution, thus increasing recoveries for all victims holding valid claims.  The Receiver's position with respect to the remaining active claims disputes is detailed in the following sections.

The claims adjudication process focused on three primary groups of claimants – investors, unsecured creditors, and potentially-disqualified individuals based on alleged participation in the Wextrust scheme or other equitable grounds.  Overall, the Receiver and his representatives have responded to more than 400 telephone inquiries and over 425 email inquiries from investors relating to the plan of distribution, particularly with respect to the claims validation and solicitation process.

### A.     Investor Claims Adjudication Process

The claims adjudication process for investor claimants moved through four phases.  First, in May 2009, the Receiver and his forensic accountant, Deloitte Financial Advisory Services LLP ("Deloitte"), prepared and mailed more than 1,750 claim statements to investors.[1]  Of the

---

[1]     There was some duplication in the number of statements sent to investors because the Receiver had multiple addresses on file for certain investors, and thus wanted to ensure that one or more of the statements reached the intended investors.  To date, Deloitte has determined that there are approximately 1,353 unique investors in the Wextrust enterprise.

approximately 1,750 claims statements sent to investors, approximately 540 statements were returned to the Receiver accepting the investors' claims amounts, 202 were returned disputing the claims amounts, 51 investor statements were returned to sender, and approximately 10 additional statements were created for new claimants.[2]

Second, the Receiver and Deloitte evaluated the approximately 750 responses received from investors. For each dispute, the Receiver analyzed the objection, examined the available supporting documentation (including any materials provided by the investor and/or contained in Wextrust records), and obtained the advice and counsel of his professional advisers. The Receiver acceded to the position of 136 initial disputants in full. The remaining 66 were accepted in part, were rejected, or the claimants were sent a request for additional information. Investors were given the opportunity to further dispute their claim amounts and were provided detailed contact information for the receivership as well as instructions on how to further dispute the amount of their claims. These letters concluded:

> At this point, we consider your dispute resolved. No further action is required by you. If, however, you wish to further modify the revised claim amount, you must inform us of that decision and your reason for doing so by Friday, August 21, 2009.

On August 13, 2009, the Receiver posted a notice on his website and sent an email to all investors with email addresses on file informing investors to respond by August 21, 2009. On August 19, 2009, the Receiver posted to his website the Court's Claims Order, which elaborated further on the claims adjudication process and timeline. Of the 66 remaining disputed claims, 43 have not responded and the Receiver considers their disputes resolved.

---

[2]    For each of the 51 investor claim statements returned as undeliverable, the Receiver examined Wextrust records, researched internet databases, and attempted to contact the investor by telephone and resent the claim statement to all known addresses. The Receiver was able to identify the proper mailing address for 42 of the 51 investor statements returned to sender. Of the remaining nine, seven had negative net investor claim amounts, meaning they would be ineligible for a distribution. Two investors, Investor 1471 and Investor 1478, had positive net investor claims of $12,885.17 and $50,398.20, respectively.

Third, the Receiver accepted additional materials from investors, conducted further analysis, and discussed disputes with investors. Finally, the Receiver mailed final determination letters to investors in early September. Overall, the Receiver resolved investors' confusion or disputes in all but 15 of the total 218 claims disputes.[3] Throughout this process, the Receiver remained committed to ensuring that investors were afforded a full and fair opportunity to review and understand their claims, ask questions, and dispute their claims amounts.

The Receiver's representatives have contacted and spoken with each of the 15 investors for whom the Receiver and the investor were unable to reach an amicable resolution.

**B.      Claims Adjudication Process for Potentially-Disqualified Individuals**

In the Distribution Opinion, the Court approved the Receiver's proposal "to treat differently those involved in the fraudulent scheme." (Distribution Opinion at 38-39.) The Court instructed the Receiver to notify each individual whom the Receiver intended to exclude from receiving a distribution "of the Receiver's decision and the evidence supporting it." (*Id.* at 39.)

Pursuant to the Receiver's Plan of Distribution, the Receiver recommended that Wextrust employees or individuals providing referral services in exchange for compensation ("finders") be subject to a reduction in their net investor claims. More specifically, the Receiver recommended that Wextrust employees or finders who received more than $100,000 in commissions or finder's fees be subject to a 90% reduction in their net investor claims; that those who received between $10,001 and $100,000 in commissions or fees be subject to a 50% reduction in their net investor

---

[3]      In the third round, the Receiver followed the same process as before by analyzing each objection, examining the available supporting documentation, and obtaining the advice and counsel of his professional advisers. The Receiver accepted 15 disputes in full; five disputes were accepted in part or denied; four investors withdrew their dispute; and the remaining 15 were referred to the Court. Investor 34 was inadvertently included as an active dispute in the submission of materials to the Court; the Receiver denied that claim on August 10, 2009 and has not heard from the investor.

claims; and that those who received $10,000 or less in commissions or fees be subject to a 25% reduction in their net investor claims. The Receiver is also recommending to the Court that the named defendants and those who actively facilitated the fraudulent scheme should be disqualified entirely from any recovery based on the equitable doctrine of unclean hands.

Based on the criteria outlined above, the Receiver, his accountants, and the Receiver's other professional advisors reviewed Wextrust payroll and other records and conducted numerous interviews with former and current Wextrust employees and defrauded investors. Based on a review of this evidence and a totality of the circumstances, the Receiver initially recommended that 4 individuals be subject to a 90% reduction in their net investor claims; 11 individuals be subject to a 50% reduction in their net investor claims; 20 individuals be subject to a 25% reduction in their net investor claims; and 9 individuals be subject to a 100% reduction in their net investor claims based on the doctrine of unclean hands. All such individuals were sent a letter with attached backup documentation demonstrating their receipt of Wextrust compensation on August 14, 2009.[4]

Over the next several weeks, the Receiver and his advisors discussed many of these claims at length with the potentially-disqualified individuals and received and reviewed contradictory evidence as well. Based on these discussions and a review of all submitted materials, the Receiver determined that it would be inequitable under the circumstances to disqualify certain individuals who were not actively and purposefully recruiting additional Wextrust investors but rather were compensated a relatively insignificant amount (e.g, $500) for

---

[4]     Additionally, as the Court is aware, there is also one additional investor for whom the Receiver has not yet determined whether to recommend disqualification in full or in part. Pursuant to the Court's Order dated August 20, 2009, the Receiver is set to depose this investor on two days prior to October 3, 2009 at Dewey & LeBoeuf LLP's offices in Boston, Massachusetts. (*See* Dkt. No. 443 at 3.) The Receiver anticipates making a recommendation to the Court shortly after the taking of this deposition.

simply having mentioned their Wextrust investment portfolio to friends and family members. For these individuals, the funds received were also insignificant when compared with the individuals' total investments. Each individual removed from the disqualification recommendation list was notified on a rolling basis during August and early September.

At final count, the Receiver is now recommending that 4 individuals be subject to a 90% reduction in their net investor claims; that 6 individuals be subject to a 50% reduction in their net investor claims; that 6 individuals be subject to a 25% reduction in their net investor claims; and that 9 individuals be subject to a 100% reduction in their net investor claims based on the doctrine of unclean hands. As detailed below, the Receiver considers only 12 of the 25 total disputes to be active at this time because the remaining 13 individuals have not notified the Receiver that they intend to dispute the Receiver's disqualification recommendation with the Court at the upcoming claims hearing.

### C. Creditor Claims Adjudication Process

On July 7, 2009, the Receiver posted a spreadsheet of all unpaid, unsecured claims of creditors on the receivership website. The spreadsheet reflected the claims against the estate the Receiver had received as of that date, but did not indicate whether such claims were determined to be valid at that time. The Receiver gave notice to all creditors for whom contact information was available and encouraged them to review and/or dispute their claims information. Many creditors have also communicated with the Receiver's representatives and counsel by telephone and email about issues relating to the claims process. The Receiver then collected, categorized, and logged each claim on a rolling basis.

From July 7, 2009 through August 24, 2009 (the deadline imposed by the Court in the Claims Order for resolving all disputes with claimants), the Receiver reviewed and disputed approximately 72 claims of creditors and added approximately 29 new claims to the list of

outstanding receivership claims. The disputed claims primarily fell into one of four different categories of disputed claims. First, the claims presented were secured claims and thus not entitled to an interim *pro rata* cash distribution of estate assets under the Distribution Opinion. Second, the claims presented were not sufficiently supported by adequate documentation. Third, the claims were presented by individuals whom the Receiver recommended to be disqualified in full based on the doctrine of unclean hands as described above. Fourth, the claims presented were contingent or unliquidated, and thus were also not entitled to an interim *pro rata* cash distribution of estate assets under the Distribution Opinion. In addition to these claim categories, several claims involved very unique facts and circumstances and required a more detailed individual response.

34 of the 72 initially disputed claims were resolved amicably after discussions with creditors and the review of internal Wextrust records as well as additional information submitted to the Receiver. As detailed below, the Receiver considers only 15 of the remaining 38 disputed claims to be active at this time; the remaining claimants have either withdrawn their claims or have not communicated their desire to have the Court resolve the dispute at the upcoming claims hearing. Although these figures are current as of the date of this filing, the Receiver will supplement this filing and produce supporting evidence and documentation if any of the dormant disputes become active in advance of the upcoming hearing.

## III. <u>Active Investor Disputes</u>

In order to respect privacy concerns and maintain confidentiality, the Receiver assigned each investor a unique identification number. When discussing investors' disputes, the Receiver will use this number. The true identity of each investor along with all related documentation was

provided to the Court under separate cover on September 14, 2009, at the Court's request. A redacted version of those materials is being filed concurrently with this Response.

## A.    Disputes Related to the *Pro Rata* Method of Distribution

Three investors dispute the *pro rata* method of distribution generally, notwithstanding the fact that the Court approved this method over several similar objections when it issued the Distribution Opinion on July 23, 2009.

**Investor 35** objects to the subtraction of interest as a cash distribution from his net investor claim. The investor states that these payments were "real interest" that was "honestly earned" from the High Yield I investment. The investor submitted IRS Schedule K-1 forms and represented that Wextrust's outside certified public accountant and a third party institutional investor had confirmed to him that the investment and interest payments were real. The investor further states that it is "grossly unfair and inequitable" to "take an all or nothing position and say that all interest payments were illusory since the hard facts . . . show that real loans were in place for which real interest was derived." The investor does not dispute that he received $113,332.71 in cash distributions, but requests this sum not be deducted from his investor claim because it was legitimate interest earned. In essence, the investor argues for basing the distribution on the tracing of each individual investor's investment. The Receiver considered and rejected that proposal in the Proposed Plan of Distribution. (*See* Dkt. No. 243 at 8-16.)

**Investor 1611** disputes the *pro rata* method of distribution by arguing that $200,000 was invested in the final days of the Wextrust operation and never commingled. Therefore, the investor argues, the funds should be returned in full and not be included as part of the *pro rata* distribution to investors and unsecured creditors. The investor raised the same objection to the Receiver's Plan of Distribution before entry of the Court's Distribution Opinion. These concerns were also addressed by the Receiver in his May 11, 2009 Response to Objections. (*See* Dkt. No.

304 at 4) (Investor 1611 provided Statement Numbers 43 and 52 and Docket Numbers 257 and 263). The Court approved the Receiver's *pro rata* method and overruled these objections and all outstanding objections not specifically addressed in the Distribution Opinion. (Dkt. 428 at 22-33, 41.) Thus, the Receiver believes that Investor 1611 does not have a valid dispute.

Similarly, **Investor 1046** continues to dispute the inclusion of funds intended to be invested in the Wextrust Commodity Funds as part of the pool of assets available for distribution to victims. The investor also requests profits alleged to have accrued since the Receiver took control. The investor states: "As per the Commodity Pool Operator of WexTrade the fund would have been up 28% therefore $256,000 would be the correct [investor claim] amount . . . ." The investor first raised these objections in writing to the Receiver on September 9, 2009. The investor did not provide supporting documentation.

The issue of whether the victims who purchased securities issued by the Wextrust Commodity Funds are part of the larger Wextrust fraud has been briefed exhaustively on several prior occasions.[5] Moreover, the Court heard and specifically rejected the extensive arguments on behalf of investors in the Wextrust Commodity Funds that the pools should be treated differently. (*See* Distribution Opinion at 26-33.) Thus, the Receiver opposes Investor 1046's request as an objection to the Plan of Distribution itself, which the Court has already approved. The Receiver has modified Investor 1046's claim to reflect the last Wextrust statement generated before the Receiver took control; the request for hypothetical profits is contrary to the formula set forth in the Distribution Opinion.

---

[5]     *See* Response to Objections to the Receiver's Proposed Plan of Distribution at 13-28 (Dkt. No. 304); Response to Supplemental Objections to the Receiver's Proposed Plan of Distribution at 6-8 (Dkt. No. 368); Receiver's Memorandum of Law in Opposition to the Proposed Intervening Defendants' Motion to Intervene and Supporting Declarations (Dkt. Nos. 154-158).

## B.    Disputes Related to the Method of Calculating the *Pro Rata* Distribution

Several Wextrust investors dispute the Receiver's method of calculating the *pro rata* distribution.  On May 11, 2009, the Receiver further explained his proposed treatment of cash distributions in his Response to Objections to the Receiver's Proposed Plan of Distribution ("Receiver's Response") (Dkt. No. 304 at 11-12) with the following uniform formula for calculating distributions for investors:

Pro Rata Share = [(Total Out of Pocket Cash Investment Paid Into Wextrust Scheme) + (Roll-Over Distributions – Cash Distributions)] X (times) Pro Rata Multiplier

The Court subsequently approved this method and overruled all contrary objections in the Distribution Opinion.  (Distribution Opinion at 33-35.)  Thus, the Receiver opposes all of the disputes in this category.

**Investor 2** requests that cash distributions should not include amounts paid by the investor for state and federal taxes.  The investor does not dispute receiving $29,864.48 in cash distributions.   The investor provided a statement from his accountant indicating that he paid $8,750.29 in taxes on those distributions.  Thus, the investor contends that $8,750.29 should not be deducted from the net investor claim amount.

**Investor 24** requests credit for interest thought to have accrued monthly on his investment in 2008.  The investor states that he was formerly able to track his monthly distributions on Wextrust's website, but did not provide any documentation evidencing monthly accruals.  Instead, the investor provided a Wextrust report dated May 9, 2008 that states the total yield for the investment was 12.83% in 2007.  The investor also provided a letter from Wextrust dated May 16, 2008 notifying investors that distributions would be delayed.  The investor requests his claim be increased by the 2007 rate of return for the 2008 time period, at least through May 16, 2008.  The investor calculates this amount to be $19,245.

Wextrust records evidence that cash distributions were credited, at a minimum, on a quarterly basis. Further, the records indicate that the only distribution to the investor in 2008 was paid on March 31, 2008 for $5,736.29. This has already been credited to the investor's net claim as a roll-over distribution. Therefore, at most, the investor's claim for 2008 is $13,508.71. The May 16, 2008 letter states: "As detailed in the Private Placement Memorandum (PPM) governing [this] investment, the Manager [Wextrust] determines when to make cash distributions . . . . This means sometimes it is necessary to defer distributions . . . ." Thus, by agreement, the timing of dividends was at Wextrust's sole discretion. This is consistent with the fact that the 2008 distribution (before it was stopped) was smaller than prior quarterly distributions.

**Investor 76** and **Investor 77** are the same individual. The investor received distributions paid directly into IRA accounts established in the investor's name at Charles Schwab in the amounts of $4,450.84 and $1,000.00, respectively. The investor states: "I never took a cash distribution. I rolled money into another brokerage firm . . . . I was never old enough to take a withdrawal. The investor was actually Charles Schwab's alternative investments and therefore I should not be penalized." The investor further states: "I feel Charles Schwab has a responsibility since they did their due diligence on behalf of their investors and agreed to be the holder of the investments." The Receiver confirmed payments to the investor's account at Charles Schwab by obtaining bank statements and checks. Further, the investor has admitted, "I rolled money into another brokerage firm."

**Investor 519** objects to the deduction of $32,382.76 in cash distributions to calculate his net investor claim. The Receiver verified all of these payments through Wextrust bank records except for $2,203.61, for which the Receiver increased the investor's claim.

**Investor 797** obtained a $200,000 home equity line of credit to invest in Wextrust. The investor states that the fees and interest-only payments to date on that third party instrument equal $45,695.92. The investor requests that these funds be added to his net investor claim. The investor did not provide any supporting documentation. The Receiver had recognized the $200,000 investment in Wextrust, but not the investor's payments to a third party to obtain the line of credit.

On September 9, 2009, **Investor 1645** objected to the subtraction of interest as a cash distribution from his net investor claim. The investor states: "$27,479.60 received was distribution of revenue – not capital." The investor provided a Wextrust Investment Report indicating distributions and no change in principal. The investor does not dispute that he received $27,479.60 in cash distributions.

**Investor 1680** requests that his claim be increased by the amount of interest promised to be paid to him by his investment in Wextrust, approximately $34,000. The investor did not provide any supporting documentation. The Receiver increased the investor's claim by $2,126.03 to account for distributions that could not be documented by bank records.

In sum, all of these outstanding objections are untimely and should be dismissed. Moreover, as equity aims to treat all parties fairly, changing the methodology at this stage for one investor would require a change for all investors and cause further delay.

C.     **Disputes Related to Personal Dealings with Defendant Joseph Shereshevsky**

**Investors 1486**, relatives of Defendant Joseph Shereshevsky, request recognition of two purported investments – $70,000.00 in Highland Park and $50,000.00 in Hyde Park. The investors provided nearly identical documents to the Receiver on September 22, 2008, June 7,

2009, August 19, 2009, and August 28, 2009 requesting that their claim be accepted.[6]  The

Receiver's forensic accountants could not identify any deposit of $70,000 or $50,000 by the

investors into any Wextrust account.  Indeed, an email from Joseph Shereshevsky dated February

11, 2005 stated: "[Y]ou wont [sic] find any bank back up.  [S]teve [Byers] knows this.  [W]e

gave [the investors] [sic] for monies lost on other deals."

    In their four submissions, the investors did not disclose that this matter was subject to

litigation in the Eastern District of Virginia from 2007 to 2008 and did not disclose the pertinent

facts from that case.  (*See Peck v. Wextrust Capital LLC,* No. 2:07-cv-538 (E.D. Va. filed Nov.

23, 2007)).  According to the investors' complaint and the district court's opinion and order

dismissing the complaint, before Shereshevsky joined Wextrust, the investors gave him $200,000

for a real estate scheme – Arbor Village – that eventually failed.  (Memorandum and Opinion

Order, No. 2:07-cv-538 at 2 (E.D. Va. Sept. 24, 2008)).  Upset with the loss, the investors

confronted Shereshevsky, who had since joined Wextrust.  In 2004, Byers and Shereshevsky told

the investors that their investment with Shereshevsky was "oversold," to which the investors

responded "that [they] intended to report the matter to the Securities and Exchange

Commission."  (Compl. ¶¶ 15-16).  "Byers and Shereshevsky requested that Plaintiffs not

contact the SEC and represented that WexTrust would replace the failed investment with new

---

6       Those documents include: (1) a First Highland LLC operating agreement with a blank amount of
capital contribution signed by the investor on November 15, 2004 and executed by Steven Byers for
Wextrust on November 18, 2004; (3) a First Highland LLC subscription agreement with a blank amount
of ownership value signed by the investor on November 15, 2004 and executed by Steven Byers for
Wextrust on November 18, 2004; (3) a letter from Steven Byers dated November 15, 2004 and titled
"Replacement for Arbor Village" that states, "Thank you for your deposit of . . . $70,000 to be invested in
Highland Park;" (4) a December 23, 2004 investment statement for Highland Park indicating a $70,000
investment on November 9, 2004; (5) a January 11, 2005 Wextrust investment statement indicating a
$70,000 investment in Highland Park on November 9, 2004; and (6) a Hyde Park Investors LLC
subscription agreement for $50,000 signed by the investor on April 13, 2005 and executed by Steven
Byers for Wextrust on June 22, 2005.  A Wextrust email on November 9, 2004 references a $70,000
investment in Highland Park effective that day.

and different securities of equal value." (Compl. ¶¶ 17-19). There is no documentation of that agreement. "In reliance on Wextrust, Byers and Shereshevksy's representations [to issue new securities], the [investors] did not contact the SEC, conducted no further investigation of the failed Arbor Village investment, and took no action against . . . Shereshevsky." (Compl. ¶¶ 19-20).

Like the investors' first failed investment with Shereshevsky, the purported second investment proved to be equally disastrous after Wextrust stopped making "dividend" payments. The investors approached Wextrust in June 2007 requesting $300,000. In response, Shereshevsky wrote to Byers on June 4, 2007: "[Investor 1486] is not an investor . . . . This to me is nothing more than an attempt to extort moneys from us, and I would like to call in the FBI." The investors rejected a settlement offer of $210,000. They sued Wextrust in November 2007 for $1,500,000.00.

Wextrust filed a motion to dismiss in July 2008. In September 2008, the district court in *Peck* dismissed the investors' eight-count complaint. The Court held, in part: "The Plaintiffs have not pled any legally enforceable obligation. First, Plaintiffs seek to enforce an illegal contract to withhold evidence of alleged securities violations from the SEC, which is unenforceable as a matter of law. Second, Plaintiffs seek to enforce operating agreements that are not supported by any valid consideration by Plaintiffs." (September 24, 2008 Order at 9.)

The investors informed the Receiver that in late July and early August 2008 they were developing a response to Wextrust's motion to dismiss but "[saw] no benefit to continue the expense" after the Receiver took control and instead "elected not to pursue the matter and dismissed [their] attorney." The investors state: "It seems grossly unfair that this suit, which was apparently decided procedurally, has now been resurrected so that its decision could become

the basis for causing [us] further financial damage solely because [our] attorney did not think to immediately withdraw it when we suddenly learned of Wextrust's fate and it was exposed for what we assumed it was."

The Receiver has determined to deny this claim for the same reasons as provided by the district court in *Peck*. Even foregoing *res judicata* and collateral estoppel considerations, the facts in the investors' complaint alone provide a sufficient basis to deny the claim. They did not invest funds in Wextrust or form a valid enforceable contract to qualify as unsecured creditors.

**Investor 71, Investor 485,** and **Investor 679** are relatives and were each involved with Defendant Shereshevsky concerning certain transactions relating to South Africa. As described below, they request recognition of three investments: Brandon Investments, LLC; Lion's Walk, LLC; and Pure Africa Mining (Pty.) Ltd. Investor 71 requests recognition of an additional $125,000. Investor 679 requests recognition of an additional $150,000. Investor 485 requests recognition of an additional $200,000. The investors' statements are largely consistent, although each has submitted differing degrees of documentation.

Lion's Walk. All three investors request recognition of profits promised to them for their investment in Lion's Walk. Wextrust records confirm the following investments in Lion's Walk in June 2004: (a) $20,000 by Investor 71, (b) $60,000 by Investor 485, and (c) $50,000 by Investor 679. The investors state these amounts were paid to the "Shereshevsky Family Partnership for Lion's Walk." Investor 485 states: "[t]he deal would be for one to two years with a 50% return on the money." In Wextrust's records, the statement, "Principal paid profit pending," appears after each investment. The investors did not submit documentation establishing the terms of the loan or Mr. Shereshevsky's promise to pay a return.

The Receiver has recognized the investments in Lion's Walk but denied the claims for promised profits. Even assuming documentation existed to confirm the details of the transaction, the investors request a return of expected profit, which is not a part of the distribution calculation.

Brandon Investments, LLC.  Investors 485 and 679 request their claim not be reduced by payments received under promissory notes.  The Receiver recognized a $50,000 investment by Investor 679 and a $100,000 investment by Investor 485 in Brandon Investments.  The Receiver then reduced the net investor claim by the amount of cash distributions received, $33,400 and $33,000, respectively.  Both investors objected to this deduction.  For example, Investor 679 stated: "I respectfully submit that I am due . . . the [the full amount] secured by a promissory note which legally takes precedence over a general distribution."  The Receiver opposes this request.  The Plan of Distribution groups investors with unsecured creditors, such as noteholders. The Receiver is treating interest or principal paid to unsecured creditors the same as interest or profit paid to investors.

Pure Africa Mining (Pty.) Ltd. ("PAM").  The investors state that they met with Joseph Shereshevsky in Wextrust's Norfolk office to discuss PAM in November 2005.  The investors then wrote checks to Shereshevsky and/or his family with the understanding that they were purchasing a part of Shereshevsky's personal ownership of PAM.  The Receiver did not accept these claims based on a lack of sufficient documentation of a nexus with Wextrust.  There is no documentation, for example, that any of the three investors were an owner of or investor in PAM.

Of the November 2005 meeting, Investor 485 writes: "Mr. Shereshevsky explained that [PAM] was an affiliate of WexTrust Capital that was engaged in operating diamond mining

facilities in South Africa and that he personally owned 20% of PAM. He said that because he and [Investor 71] and [Investor 1094] had been so loyal and worked for him so diligently he was selling them each 1 point of his 20%. . . . [H]e was also offering [Investors 485 and 679] a one percentage point of the remaining 18% he owned of PAM. . . . Mr. Shereshevsky explained that since he owed [each investor] $25,000 for [their] return on Lion's Walk, he would apply that to [their] PAM purchase and [they] could therefore consummate the investment by each giving him a $125,000 check."

Investor 485 submitted a personal check dated November 14, 2005 and made payable to "Elka and Joe Shereshevsky" for $125,000. Investor 679 submitted a cashier's check he purchased dated November 14, 2005 in the amount of $150,000 and made payable to "Elka & Joe Shereshevsky." The memo lines on both checks are blank and there is no notation as to what the funds relate. Investor 71 submitted seven personal checks dated November 8, 2005, written individually to Joseph Shereshevsky, Elka Shereshevsky, and their children and grandchildren totaling $95,000 in amounts of $5,000, $10,000, and $45,000. In the memo line of each check, the investor wrote "gift," with the exception of the $45,000 check to Elka Shereshevsky, which is blank. For the remaining $30,000 of the claim, Investor 71 states: "[t]he difference is what [Shereshevsky] owed me for my investment w/ [Investor 679] [and] [Investor 485] in Lion's Walk." Investor 485, however, writes that Investor 71 "was involved for $20,000" in Lion's Walk.

Investor 485, on behalf of the three investors, states: "We did not receive written evidence of the receipts of the checks or ownership of our share of PAM, although we were told it would be forthcoming. At a later time, Mr. Shereshevsky informed us that Steve Byers and

Herbert Zuckerman had been made aware of our investment in PAM." What follows is a description of the only documentation identified in Wextrust records.

On February 26, 2006, Investor 71 wrote to Shereshevsky: "I never signed the letters that [your assistant] typed up indicating money I gifted all of you in 11/05 and again in 1/06. Don't they still have to be signed? Did [Investor 679] [and] [Investor 485] ever sign the one's from them??" Shereshevsky responded: "We may need to make a change or two. I don't know if everyone is better off in PAM or IDEX. I need to think about it for another week or two[.]"

On June 21, 2006, Investor 71 wrote to Shereshevksy: "Is [your attorney] still working on the legal papers that need to be signed regarding either PAM/IDEX." Shereshevsky responded and requested a meeting the following day.

On June 26, 2006, Investor 71 wrote to Shereshevksy: "I have not signed the new trust agreement. Should anything happen to me, the percentage of PAM stays with you since there is nothing to show of its purchase in my estate and my current trust does not make mention of it."

In March 2008, Investor 71 corresponded with Investor 1094. In an email with the subject, "Yours, Mine, and [Investors 485 and 679]'s Share of PAM," Investor 71 asked: "do you know if we need to wait til the papers get signed for the percentages/shares that we are still to get?" Investor 1094 responded: "I have not completed any transaction with Joe [Shereshevsky] yet. I don't know when we will." Investor 71 responded, "I'm sure you are correct."

On August 1, 2008, Investor 485 states that he met with Shereshevsky along with Investor 71 and Investor 679. At that meeting, Shereshevsky told them that his accountant "was working on preparing the papers for [them] and then he proceeded to outline for [them] how well the diamond mines were doing and how wealthy [they] were going to become from [their] shares

of PAM." The Receiver does not have sufficient documentation of a nexus to Wextrust to recognize the claims submitted by Investors 485, 71, and 679.

**D.     Disputes Resolved by the Receiver, Accepting in Part or Rejecting an Investor's Claim, but No Response Provided By Investor**

As noted above, of the 82 investors for whom the Receiver did not fully accept their dispute after the first round process, 36 responded, but 46 did not. The vast majority of these disputes were objections to the deduction for cash distributions, for which the Receiver was able to verify with Wextrust bank records. The Receiver believes that the notice procedures described above were sufficient to give all investors adequate and sufficient time to review their claims and raise any objections with the Receiver. To date, no response has been received for these 46 outstanding disputes. At the Court's request, the Receiver has not submitted documents for these 46 claims because the Receiver considers them to be resolved.

**IV.** **Active Potentially-Disqualified Investor Disputes**

The Receiver is recommending that 4 individuals be subject to a 90% reduction in their net investor claims; that 6 individuals be subject to a 50% reduction in their net investor claims; that 6 individuals be subject to a 25% reduction in their net investor claims; and that 9 individuals be subject to a 100% reduction in their net investor claims based on the doctrine of unclean hands. A full list of these individuals has been provided to the Court, and a redacted version is being filed concurrently herewith. Only 12 of the 25 total disputes are considered by the Receiver to be active at this time because 13 individuals have not notified the Receiver that they intend to dispute the Receiver's disqualification recommendation with the Court at the upcoming claims hearing. Accordingly, the Receiver considers these 13 disputes to be resolved. The remaining active disputes are set forth below.

**A.** **Fully-Disqualified Investors**

The Receiver is recommending to the Court that nine individuals be subject to a 100% reduction in their net investor claims based on the doctrine of unclean hands. The Receiver based this determination on a review of all evidence amassed to date, which consists primarily of Wextrust payroll and other records and interviews with former and current Wextrust employees and defrauded investors. Based on a totality of the circumstances, the Receiver believes that, given the extent of compensation received by a select few Wextrust employees and their significant positions of leadership within the company, these 9 individuals should not be permitted to receive a distribution from the receivership estate. To date, only two of these individuals have decided to dispute the Receiver's recommendation.

**Investor 1441** is the Relief Defendant in this matter. The Receiver has concluded that Defendant Joseph Shereshevsky placed assets that he owned or controlled – including residential

real estate, bank accounts, and his ownership interest in Wextrust – in the name of his wife, Elka

Shereshevsky.  (*See* Declaration of Timothy J. Coleman, Receiver, executed on August 27, 2008

at ¶ 7 ("Coleman Decl.") (Dkt. No. 21).)  In addition, based on an examination of Wextrust

business records, Elka Shereshevsky was compensated as though she were an employee of

Wextrust.  However, Mrs. Shereshevsky (1) performed no services for Wextrust; (2) had no set

responsibilities with respect to Wextrust; (3) held no regular hours at Wextrust; (4) did not

maintain an office or other work space on the premises of any Wextrust office at the inception of

the receivership; (5) did not report to Wextrust in any significant respect; and (6) only visited

Wextrust offices on infrequent occasions.  (*Id.* at ¶ 8.)  Notwithstanding these facts, Elka

Shereshevsky received over $3.8 million in "compensation" from Wextrust during the period

from 2003-2008.  Accordingly, regardless of culpability, it would be flatly inequitable for Mrs.

Shereshevksy to receive an additional distribution from limited estate funds in this case given her

already significant level of compensation paid to date.  Indeed, were Mrs. Shereshevsky's assets

not already in the estate for distribution, the Receiver would propose to claw back the

compensation she received.

**Investor 1094** also disputes disqualification and presented claims both as an unsecured

creditor and as an investor.  Like Mrs. Shereshevsky, Investor 1094 received significant

compensation from Wextrust during his employment.  In total, the investor received over $2

million in compensation in his position as the Director of Wextrust's Private Equity Group and

the lead broker for Wextrust Securities from 2004 through 2008.  According to interviews with

investors and other Wextrust records, in this position, Investor 1094 relied upon unlicensed

brokers to sell Wextrust securities, omitted information to investors, and allowed overly

aggressive sales tactics to predominate Wextrust.

For example, one investor gave the Receiver email correspondence and handwritten notes relating to a meeting with Investor 1094 on May 19, 2006 in which the investor was pitched to invest in the General Services Administration offering (the "GSA offering"). However, Wextrust never purchased the seven properties identified in the GSA offering documents. (*See* First Amended Compl. ¶ 4) (Dkt. No. 16.) Notwithstanding this fact, Investor 1094 made assurances that "Wextrust does not get their [sic] money until investors get theirs first," and refused to correct an investor's understanding that the GSA offering was "the safest." (*See* claims documentation and evidence submitted to Court at 03290-03292.) Moreover, Investor 1094 refused to cooperate with the Receiver during his initial investigation and refused to surrender Wextrust property within the investor's possession.

In response, Investor 1094 argues that there has never been any determination or accusation that Investor 1094 was knowingly involved in any fraud. Second, Investor 1094 argues that he loaned much of the compensation he received back to Wextrust as a good-faith creditor, and likewise invested a portion of his salary and commissions in what he believed to be bona fide Wextrust investments. As the Receiver has stated in his numerous prior submissions, however, although it may be the case that certain employees were entirely unaware of Wextrust's fraudulent enterprise, and Investor 1094 may well be among them, there is still ample justification for finding that these former employees were not similarly situated in their relationship to the defrauders when compared with the other investors. Given the limited pool of resources available, as explained further below, there is clear case law standing for the proposition that a reduction or elimination of the employees' investment claims is warranted in order to provide recovery for investors who did not participate in perpetuating the scheme.

### B.    Partially-Disqualified Investors

Like Investor 1094, the remaining 10 investors who are actively disputing the Receiver's recommendation that they be partially disqualified from receiving a full distribution in this matter argue that they were entirely unaware of Wextrust's fraudulent enterprise, will stand to lose more money as a result of the fraud than they received in commissions, and thus are being unfairly singled out for a reduced claim.

#### 1.    90% Disqualifications

The Receiver proposed that Wextrust employees or finders who received more than $100,000 in commissions or finder's fees be subject to a 90% reduction in their net investor claims.  Of the four individuals who fall into this category, only two have challenged the Receiver's recommendation – **Investor 71** and **Investor 1534**.  Both investors argue that they were unaware of the scheme and did nothing wrong other than receive compensation from Wextrust.  Investor 1534 received a total of $188,590.90 in compensation from Wextrust during her tenure as Senior Investment Analyst in the Wextrust Commodity Funds.  Based on this compensation, the Receiver is recommending a 90% reduction of her original net investor claim of $215,986.76, thus reducing her net investor claim to a total of $21,598.58.

Similarly, Investor 71 received a total of $267,293.20 in compensation from Wextrust in the form of referral compensation between 2003 and 2008.  Based on this compensation, the Receiver is recommending a 90% reduction of her original net investor claim of $215,986.76, thus reducing her net investor claim to a total of $68,544.33.

Investors 71 and 1534 – regardless of their knowledge or intent – received significant value from a Ponzi-scheme operation.  Accordingly, in equity, they should take less than truly innocent investors who neither worked for nor actively referred other investors to Wextrust.  Their activities perpetuated the scheme and they were well compensated for their participation.

Moreover, what they have already received in compensation, which the Receiver is not seeking to claw back, will in most instances be significantly greater than the majority of victims' *pro rata* recoveries in this case.

Other courts have found such plans to be reasonable. In *Basic Energy & Affiliated Resources, Inc.*, 273 F.3d 660 (6th Cir. 2001), the Sixth Circuit approved a plan of distribution that categorized investors and adjusted their investor claims based upon their status as (1) non-marketers; (2) substantial marketers; (3) insubstantial marketers; and (4) defendants. Indeed, as noted in *SEC v. Enterprise Trust Co.*, No. 08-cv-1260, 2008 U.S. Dist. LEXIS 79732, *10 (N.D. Ill. Oct. 7, 2008), where the court disqualified two of the company's principals from any compensation, "[d]isqualifying those who took the business over the edge is the most common feature, and the least contested aspect of distribution plans." Disqualification of such individuals is also consistent with the view of the Second Circuit that the "most grievously injured claimants should receive the greatest share" in any distribution. *Official Committee of Unsecured Creditors of WorldCom, Inc. v. SEC*, 467 F.3d 73, 84 (2d Cir. 2006).

Permitting affiliated Wextrust individuals to participate in the *pro rata* distribution would diminish the pool of resources available to compensate unaffiliated investors and frustrate equity. Wextrust records provided to the Court demonstrate that many employees and finders received thousands, and in a few cases hundreds of thousands of dollars, purely as commissions for bringing new investors into Wextrust. In the Receiver's judgment, providing the same individuals who profited from Wextrust's fraud for years with their full ratable shares of any distribution would be clearly inequitable.

2.    50% Disqualifications

The Receiver proposed that Wextrust employees or finders who received between $10,001 and $100,000 in commissions or fees be subject to a 50% reduction in their net investor

claims. Of the six individuals who fall into this category, only three have challenged the Receiver's recommendation – **Investor 305, Investor 1416, and Investor 1520**.

**Investor 305** received a total of $10,719.21 in compensation from Wextrust in the form of finders' or referral fees. Based on this compensation, the Receiver is recommending a 50% reduction of his original net investor claim of $195,609.65, thus reducing his net investor claim to a total of $97,804.82. Investor 305 states that he did nothing wrong and is being unfairly penalized.

**Investor 1416** received a total of $63,750 in compensation from Wextrust in the form of finders' or referral fees. Based on this compensation, the Receiver is recommending a 50% reduction of his original net investor claim of $739,052.05, thus reducing his net investor claim to a total of $369,526.02. Investor 1416 also states that he is innocent of wrongdoing, that his activities were only a part-time job, and that the amount received in compensation pales in comparison with the proposed reduction in his net investor claim.

**Investor 1520** received a total of $59,170.45 in compensation from Wextrust in the form of finders' or referral fees. Based on this compensation, the Receiver is recommending a 50% reduction of his original net investor claim of $204,031.16, thus reducing his and his spouse's joint net investor claim to a total of $102,015.58. Investor 1520 similarly states that he had no knowledge of the fraud.

In addition, Investor 1520's spouse states that her share of the net investor claim should not be reduced because she was not employed by Wextrust – only her husband was. However, the investment was jointly held. It is the Receiver's position that both spouses received the benefit of this cash compensation from Investor 1520's efforts – a benefit that was not enjoyed by other investors who were unaffiliated with Wextrust and did not contribute to the perpetuation

of the scheme. Accordingly, given the joint nature of the investment and joint enjoyment of the working spouse's compensation, the Receiver opposes Investor 1520's spouse's request to be treated separately.

> 3. 25% Disqualifications

The Receiver proposed that Wextrust employees or finders who received $10,000 or less in commissions or fees be subject to a 25% reduction in their net investor claims. Five of the six individuals who fall into this category have challenged the Receiver's recommendation – **Investor 1662, Investor 1460, Investor 1556, Investor 1486, and Investor 189.**

**Investor 1662** received a total of $1,500 in compensation from Wextrust in the form of finders' or referral fees. Based on this compensation, the Receiver is recommending a 25% reduction of the investor's original net investor claim of $77,561.61, thus reducing the net investor claim to a total of $58,171.20.

**Investor 189** received a total of $1,750 in compensation from Wextrust in the form of finders' or referral fees. Based on this compensation, the Receiver is recommending a 25% reduction of his original net investor claim of $103,589.54, thus reducing his net investor claim to a total of $77,692.15.

**Investor 1460** received a total of $1,500 in compensation from Wextrust in the form of finders' or referral fees. Based on this compensation, the Receiver is recommending a 25% reduction of the investor's original net investor claim of $47,339.71, thus reducing the net investor claim to a total of $35,504.75.

**Investor 1486** received a total of $8,150 in compensation from Wextrust in the form of finders' or referral fees. Based on this compensation, the Receiver is recommending a 25% reduction of the original net investor claim of negative $974.15, thus reducing the net investor claim to zero.

**Investor 1556** received a total of $1,500 in compensation from Wextrust in the form of finders' or referral fees. Based on this compensation, the Receiver is recommending a 25% reduction of his original net investor claim of $33,779.49, thus reducing his net investor claim to a total of $25,334.62.

None of these investors dispute the fact that they received funds for providing referral services for Wextrust; rather, they submit that it is inequitable to disqualify them from 25% of their distributions given the relative insignificance of the fees received and their lack of knowledge of the fraudulent scheme. The Receiver's approach is supported by precedent. A court sitting in equity has wide discretion to deny or limit relief to a party who has unclean hands. *See, e.g., Precision Instrument Manufacturing Co. v. Automotive Maintenance Machinery Co.*, 324 U.S. 806, 814-15 (1945) (finding that a district court may freely refuse to "aid the unclean litigant"); *see also Basic Energy*, 273 F.3d at 660-61, 667 (affirming district court's reduction of investor's claim by 50 percent for being paid $600 in commissions). The Receiver has also been consistent in this objective approach to partial disqualification since first proposing his plan of distribution. Accordingly, in the Receiver's judgment, providing individuals who profited from Wextrust's fraud with their full ratable shares of any distribution would lead to an inequitable result, particularly given the limited pool of resources available to compensate investors uninvolved in marketing the fraud.

## V. <u>Active Unsecured Creditor Disputes</u>

### A. 56 Walker, LLC

By letter dated September 11, 2009, Mr. Guy Morris and 56 Walker, LLC (collectively, "56 Walker") withdrew their claim against the receivership estate. A copy of the letter is attached as Exhibit A to the Declaration of John K. Warren ("Warren Decl."), sworn to September 14, 2009.

### B. Appleby and DMS Management

Among various other creditors, Appleby and DMS Management[7] presented claims against the Wextrust receivership estate that the Receiver and his professional advisors have determined should have been brought against Wextrust High Yield Debt Offshore Fund, Ltd. (the "Offshore Fund"), and not against the receivership estate generally. The Offshore Fund was created in early 2008 for the purposes of participating in high yield loans made by Wextrust High Yield Debt Fund III, LLC ("High Yield III") or its partner Wextrust/HPC Mortgage Fund, LP ("Wex/HPC").[8] The Offshore Fund is an independent Cayman Islands tax-exempt company, wholly-owned by foreign investors seeking to invest in short-term, high yield construction loans and project finance in the United States.[9] Wextrust Capital served as the investment manager for the Offshore Fund.

The business and affairs of the Offshore Fund are managed by two independent directors based in the Cayman Islands. DMS provides administrative services to the independent directors

---

[7] A copy of a supplemental letter dated September 7, 2009 pertaining to Appleby and DMS Management's claims is attached as Exhibit B to the Warren Decl. This submission is intended to supplement the documentary evidence provided to the Court on Monday, September 14, 2009.

[8] Wex/HPC is a separate joint venture in which Wextrust Capital holds a partnership interest and High Yield III owns participation interests in various loans. HPC US Fund I, L.P. ("HPC"), an entity neither within the receivership estate nor under the control of the Receiver, serves as the General Partner of Wex/HPC. Wex/HPC is neither managed nor operated by the Receiver, but rather by HPC.

[9] The Offshore Fund invested in seven high yield loans originated by High Yield III or Wex/HPC.

of the Offshore Fund. Appleby provides legal services to the Offshore Fund. At this time, it is the Receiver's position that creditors such as Appleby and DMS Management must look to satisfy any and all claims against the Offshore Fund. To the extent the Receiver determines, in conjunction with the independent directors, that the assets and liabilities of the Offshore Fund should subsequently be included within the receivership estate, the creditors will be notified of their right to recoveries from the receivership estate. Both DMS and Appleby have already been informed of the Receiver's determination on their claims. Neither is expected to challenge such determination at the upcoming hearing.

**C.     625 W. Division Condominium, L.P; John and Jan Breugelmans; and Kingsdale Enterprises LLC**

The related entities of 625 W. Division Condominium, L.P.; John and Jan Breugelmans; and Kingsdale Enterprises LLC (the "Division Entities") submitted unsecured claims in excess of $19 million against the estate. Most of these claims relate to the planned development of a twin-tower building in Chicago for use as commercial and residential condominiums. The Receiver opposes these claims.

The Receiver and the Division Entities entered into a Mutual Release and Settlement Agreement ("Settlement Agreement") on September 11, 2009. The Settlement Agreement, *inter alia,* provides for the release and discharge of all the claims lodged by the Division Entities. The Receiver will file a motion seeking the District Court's approval of the Settlement Agreement on September 15, 2009. The Receiver respectfully requests that the Court defer consideration of the claims lodged by the Division Entities until after the Court considers the motion seeking approval of the settlement. If the Court denies approval of the settlement motion, the Receiver reserves the right to oppose the Division Entities' claims.

### D. Broadway Bank

Broadway Bank asserts a secured claim, dated June 4, 2009, for $5,125,000 (the "Atlantic City Claim") against Wexford High Yield Debt Fund III, LLC n/k/a Wextrust High Yield Debt Fund III, LLC ("High Yield III"). Broadway Bank also asserts a claim (the "56 Walker Claim") concerning rights and causes of action brought in a foreclosure action in *Broadway Bank v. 56 Walker, LLC, Wexford/HPC Mortgage Fund, LP, et al*., Index No. 105617/09 (N.Y. Sup. Ct. N.Y. Co.) (the "56 Walker Foreclosure Action"). In a letter to Broadway Bank, dated August 14, 2009, the Receiver stated that the Atlantic City Claim was under advisement and would be reviewed and decided on by this Court as part of the claims adjudication process. By that same letter, the Receiver also informed Broadway Bank that it would not be entitled to distributions from the receivership estate based on the 56 Walker Claim. By correspondence dated August 20, 2009 and September 8, 2009, Broadway Bank has supplemented its Atlantic City Claim (the "Broadway Bank Supplemental Filings").[10] Broadway Bank has not contested the Receiver's determination to deny the 56 Walker Claim. Therefore, the Receiver considers that claim resolved. The remainder of this section addresses Broadway Bank's Atlantic City Claim.

Based on the Receiver's review of the underlying documents and Article 9 of the Uniform Commercial Code ("UCC"), Broadway Bank appears to hold an unsecured claim against the receivership estate. As discussed below, Broadway Bank's security interests, if any, were unperfected as of the date of the appointment of the Receiver. The Order Appointing Temporary Receiver dated August 11, 2008, as amended (the "Receiver Order") expressly enjoins any creditor from filing liens against the receivership estate after the appointment of the

---

[10] A copy of a supplemental letter dated September 10, 2009 pertaining to Broadway's claims is attached as Exhibit C to the Warren Decl. This submission is intended to supplement the documentary evidence provided to the Court on Monday, September 14, 2009.

Receiver.  (*See* Receiver Order at 6.)  Under the UCC, Broadway Bank's interests in any collateral are subordinated by the interests of the receivership in the same.  Based on the Receiver's analysis of Broadway Bank's claim, discussed below, Broadway Bank should at most be treated as a general, unsecured creditor, entitled to a *pro rata* distribution.

By way of background, Broadway Bank is party to the Participation Agreement dated May 25, 2007, between Broadway Bank and Wexford/HPC Mortgage Fund, LP n/k/a Wextrust/HPC Mortgage Fund, LP ("Wex/HPC").[11]  The Participation Agreement describes Wex/HPC as the lender and Broadway Bank as the participant and was entered into to allow Broadway Bank to participate in and contribute $5,125,000.00 (the "Bank Portion") of a $7,750,000 loan made by Wexford/HPC to Boardwalk and Lincoln, LLC ("Boardwalk").  The underlying loan was made to enable Boardwalk to acquire four parcels of real estate located in Atlantic City, New Jersey (the "Boardwalk Property").  Boardwalk executed a Mortgage Note dated May 25, 2007 (the "Boardwalk Note") and a Mortgage dated May 25, 2007 (the "Boardwalk Mortgage") in favor of both Broadway Bank and the HPC Fund.

In September 2007, Broadway Bank sold its participation interest in the Boardwalk Note, the Boardwalk Mortgage, and the Participation Agreement to High Yield III.  Specifically, Broadway Bank, Wex/HPC, and High Yield III executed the Agreement (the "Sale Agreement")[12] to sell the Participation interest to High Yield III for the current principal amount owed to Broadway Bank under the Boardwalk Note ($5,125,000) and an additional payment of

---

[11]     Wex/HPC is a partnership created by, among others, Wextrust Capital, High Yield III and HPC US Fund I, LP ("HPC") to invest in high yield loans originally originated and serviced by Wextrust Capital.  Wextrust Capital maintains ten percent (10%) of the partnership interests in Wex/HPC and HPC maintains the other ninety percent (90%), with the parties' participation interests in loans split pursuant to the funding provided for the same.  Prior to the appointment of the Receiver, HPC was substituted as general partner, loan originator and servicer for Wex/HPC.

[12]     The Agreement, which appears to be undated, is believed to have been entered into by the parties in September 2007.

$93,388.89.  In return, Broadway Bank received the Loan Note, dated September 28, 2007,

executed by High Yield III (the "High Yield Note") in the amount of $5,125,000.00 along with

payment of $93,388.89.

As security for payment of the obligations under the High Yield Note, Broadway Bank

and High Yield III entered into a Collateral Assignment of Loan Documents, dated September

28, 2007 (the "Collateral Assignment"), whereby High Yield III assigned back to Broadway

Bank all right, title and interest to the "Additional Collateral."  Under the Collateral Assignment,

the "Additional Collateral" is defined to include all "Loan Documents" "with regard to the Loan

dated May 25, 2007 to Boardwalk & Lincoln, LLC . . . ."  There is no further description or

clarification in the Collateral Assignment regarding the "Additional Collateral" or the "Loan

Documents."  Broadway Bank argues that the Loan Documents consist of (its interests in) the

Participation Agreement, the Boardwalk Note, the Boardwalk Mortgage and the rights granted

under each of the foregoing to Broadway Bank.  That interpretation seems correct.  Copies of all

relevant documents, including the Boardwalk Note, the Boardwalk Mortgage, the Sale

Agreement, the High Yield Note and the Collateral Assignment are attached as exhibits to the

Broadway Bank Supplemental Filings.

Under a Loan Modification Agreement dated May 27, 2008, in return for payment of

certain fees, the maturity date of the High Yield Note was extended from February 24, 2008 to

November 27, 2008.  When the High Yield Note matured, High Yield III failed to make the

required payments.  In a default letter dated March 4, 2009 to High Yield III and the Receiver,

Broadway Bank provided notice of the payment breach and its election of rights and remedies

"at law, in equity, under the Loan Documents, or otherwise."  Under the Receiver's Plan of

Distribution, secured creditors are limited in enforcement of payment of their claims against their

respective collateral.  Broadway Bank now seeks to pursue its remedies as a secured creditor under the Loan Documents.

Irrespective of the ultimate breadth of Loan Documents, Broadway Bank does not appear to have perfected its security interest in them.  Broadway Bank does not maintain possession of the Loan Documents; Wex/HPC does.  As of the date of the commencement of the receivership, Broadway Bank had not filed any financing statements to perfect its interests in the Loan Documents.  As noted above, the Receiver Order prevents a creditor from perfecting its security interest, by filing a lien, from the onset of the receivership.

The Sale Agreement, High Yield Note and the Collateral Assignment appear to be governed by Illinois law.  (*See, e.g*., Sale Agreement, ¶7; High Yield Note, ¶14; Collateral Assignment, ¶13.)  Illinois has adopted the UCC.  (*See* 810 ILCS 5/1-101.)  Section 9-317(a)(2) of the UCC provides that an unperfected security interest is subordinate to the rights of a lien creditor.  (*See* 810 ILCS 5/9-317(a)(2).)  A lien creditor, in turn, is defined in UCC §9-102(52) as including a receiver in equity from the date of appointment.  (*See* 810 ILCS 5/9-102(52)(d).)

On September 10, 2009, Broadway Bank set forth four arguments as to why it should continue to be treated as a secured creditor:

(1)   First, Broadway Bank's interests in the Loan Documents were perfected pursuant to the terms of the UCC by automatic perfection under UCC §§ 9-309 and 9-203. Alternatively, Broadway Bank's interests were perfected by possession of the collateral – the Loan Documents – by Broadway Bank.

(2)   Even if Broadway Bank's security interest was not perfected, under principles of equitable subrogation, the Receiver's interests are subordinate to Broadway Bank's interests in the Loan Documents.

(3)   If Broadway Bank's security interest was not perfected, the Sale Agreement should be voided and the deal rescinded based upon material misrepresentations amounting to actual legal fraud.

(4)   Even if Broadway Bank's security interest was not perfected, the Receiver does not have authority to void Broadway Bank's security interest in the Loan

Documents.  Unlike a trustee in bankruptcy, a receiver cannot divest a secured creditor of its right to enforce liens against property of the estate.

As addressed below, each of the arguments fail.  Indeed, it is obvious from Broadway Bank's ancillary perfection arguments that it failed to file the requisite financing statements perfecting its interests in its collateral.  (*See, e.g.*, UCC §9-312(a) (a security interest in instruments may be perfected by filing); 810 ILCS 5/9-312(a)).

As of the appointment of the Receiver, Broadway Bank had not perfected its security interests in the Loan Documents.  Contrary to Broadway Bank's arguments, there is no automatic perfection of interests in the Loan Documents.  Broadway Bank argues that under the UCC, a security interest granted in connection with the sale of a payment intangible is automatically perfected upon execution of sale documents, without any need to file a financing statement or take possession or control.  It cites to UCC §§ 9-309(3) and 9-203(b)(3).  UCC §9-203(b)(3), however, only addresses the creation of a security interest and not its perfection.[13]

Here, the Receiver's argument concerns perfection, not creation of the security interest through the Collateral Assignment.  UCC §9-309(3) grants automatic perfection to the *sale* of a payment intangible.  Broadway Bank argues that loan participations constitute payment intangibles, which is correct, but it either misunderstands or mischaracterizes the purpose and import of that section.  In this case, the only *sale* of any right to payment was the sale of the participation interest from Broadway Bank to High Yield III.  The language in section 9-309(3) is designed to protect a purchaser of a participation interest in a loan from having to do anything further to perfect its interests.  (*See e.g.*, UCC §9-309, Official Comment 4.)  Therefore, High Yield III did not have to file anything further to protect its underlying participation interests.

---

[13]  UCC §9-203(b)(3) provides, in relevant part, that "a security interest is enforceable against a debtor and third parties with respect to collateral only if . . . one of the following conditions is met: (A) the debtor has authenticated a security agreement that provides a description of the collateral . . . ."

Because there was no sale of any right to payment from High Yield III to Broadway Bank, UCC §9-309(3) does not apply. Accordingly, it does not provide automatic perfect to the second part of the transaction: the grant of a security interest by High Yield III in a payment intangible to secure a loan from Broadway Bank. Broadway Bank further cites to UCC §9-309(9) arguing that a security interest granted in connection with the sale of a promissory note is automatically perfected. But, here, there was no sale of a promissory note from Broadway Bank to High Yield III. Accordingly, UCC §9-309(9) does not apply.

Further, there is no perfection by actual or constructive possession. Assuming that Broadway Bank has a security interest in an instrument (as opposed to a right to payment), Broadway Bank has not perfected that security interest by possession of the instrument. It is uncontroverted that Wex/HPC was and has been in possession of the Loan Documents. Nor did Wex/HPC act as Broadway Bank's agent or authenticate a record acknowledging that it was holding the Loan Documents as collateral for High Yield III's debt to Broadway Bank under UCC §9-313(c). UCC §9-313(c) contemplates not only notice by a secured party to a third party holding collateral, but also express authentication of an acknowledgement that the person is holding possession of the collateral for the secured party's benefit. (*See* UCC §9-313(c), Official Comment 4; 810 ILCS 5/9-313(c).)

Neither the Participation Agreement nor the Sale Agreement satisfies these requirements. Although paragraph 4 of the Participation Agreement provides that the Loan Documents are enforced for the benefit of Wex/HPC and the "Participant," the Participant was High Yield III after the sale of Broadway Bank's interest. Broadway Bank further argues that the Sale Agreement constitutes an acknowledgement by Wex/HPC. Although Wex/HPC consented to the

sale of Broadway Bank's participation interest to High Yield III,[14] Wex/HPC did not join in or consent to the collateral assignment in paragraph 4. Even if Wex/HPC's consent is implied, there is still no express acknowledgement in the form required by UCC §9-313(c) that Wex/HPC would hold possession of the Loan Documents for the benefit of Broadway Bank as a secured party.

Broadway Bank also makes a number of arguments based on equity. These are misplaced. As a creditor, Broadway Bank had the duty to perfect its interests in its collateral. It failed to do so. The appointment of the Receiver and the restrictions on liens under the Receiver Order now prevent it from doing so.

Equitable subordination is inapplicable given the clear command of UCC §9-317(a)(2) that an unperfected security interest is subordinate to the rights of a lien creditor, including a receiver. (*See* 810 ILCS 5/9-317(a)(2).) Broadway Bank does not address or even contest the application of UCC §9-317(a)(2). Contrary to Broadway Bank's argument, it received payment for its sale of the participation interest: a promissory note, together with payments made by High Yield III pursuant to the High Yield Note. The fact that Broadway Bank did not properly perfect its security interest cannot be justification for any equitable subordination given the plain language of UCC §9-317(a)(2).

Nor can Broadway Bank argue that the initial sale of its participation interest can or should be voided by any alleged fraud by High Yield III. Based on information and belief, at the time of the sale of Broadway Bank's participation interest in September 2007, the Boardwalk Note was in default and Broadway Bank wanted to sell its participation interest to High Yield III to avoid compliance with bank regulations. High Yield III breached its payment obligations

---

[14]     *See* Sale Agreement ¶3.

under the High Yield Note, but there is no evidence of any fraud perpetrated upon Broadway Bank or any misrepresentations made to Broadway Bank. Broadway Bank's allegations about the Ponzi scheme at Wextrust do not suffice, nor do they excuse Broadway Bank's compliance with the requirements for perfection under the UCC. Indeed, if anything, the Receiver seeks to place Broadway Bank on an equal plane along with other investors and creditors defrauded by Wextrust. In an equity receivership, where a majority of the Wextrust investors and creditors were defrauded and are being subjected to *pro rata* recoveries from the receivership estate, it would be inequitable to treat Broadway Bank differently. As a secured creditor, Broadway Bank had an opportunity to protect itself in a manner that other investors and creditors of the receivership estate did not.

Finally, Broadway Bank incorrectly draws comparisons to a trustee in bankruptcy. The Receiver Order prohibits any creditor from filing liens against the property or assets of the receivership estate. UCC §§ 9-317(a)(2) and 9-102(52) provide that an unperfected security interest is subordinate to the rights of a lien creditor, which is defined to include a receiver in equity. The outcome here is clear. Broadway Bank is an unsecured creditor, with a claim against the receivership estate in the original principal amount of the High Yield Note, and should be paid a *pro rata* distribution on account of the same.

### E.     G&H Partners AG

Under a settlement agreement dated March 25, 2008, G&H Partners AG ("G&H") was owed $4,250,000 from certain Wextrust Entities and Affiliates to settle claims arising out of the Wextrust fraud. According to Wextrust records, G&H received $175,000 in payments under the settlement agreement. G&H's <u>creditor</u> claim in the amount of $4,075,000 is not disputed. The Receiver has also determined that G&H has a $2,450,000 <u>investor</u> claim. Because investors and

unsecured creditors receive the same *pro rata* treatment under the Distribution Opinion, the

Receiver thus determined that G&H has total claim of $6,525,000 against the estate.

G&H argues that its combined claim should be $7,608,333 – which includes $2,450,000

(representing its continued investment in IDEX) plus $5,333,333 that it invested in another

Wextrust entity that was extinguished by the March 25, 2008 settlement agreement. The

Receiver has determined that he lacks authority under the Distribution Opinion to negate the

settlement agreement entirely and recognize G&H's request in equity.

**F.    Nashville Warehouse Partners, LLC and Southeast Warehouse Partners, LLC**

The parties discussed in this section are attempting to re-litigate their objections to the

Receiver's Plan of Distribution. Thus, the Receiver opposes their requests. **Nashville**

**Warehouse Partners, LLC ("Nashville")** argues that: (i) its claim is against Myatt Holdings,

LLC ("Myatt"), one of the Wextrust Affiliates; (ii) Myatt is not part of the receivership estate;

(iii) Nashville is entitled to all distributions from Myatt under the Myatt operating agreement;

and (iv) the Receiver cannot interfere with Nashville's rights under the Myatt operating

agreement. The Receiver has determined Nashville's claim to be $1,093,787.60.

In objecting to the Plan of Distribution, Nashville and Southeast Warehouse Partners,

LLC (collectively, the "Beall Investors") argued that Myatt was not a part of the receivership

estate and that they are entitled to separate treatment under their operating agreements. (Dkt. No.

290). The Receiver disagreed and stated that Myatt should be treated the same as the other

Wextrust Entities and Affiliates. In the Distribution Opinion, the Court overruled all objections

and authorized the consolidation of all of the Wextrust Entities and Affiliates.

On August 14, 2009, the Receiver informed Nashville that Wextrust records indicated

that Nashville had been paid its principal contribution in full, recovering an approximate 14.4%

annual rate of return on its investment in Myatt. Therefore, Nashville would not be authorized to any further *pro rata* distributions from the receivership estate on account of its claim for $1,093,787.60. On August 20, 2009, Nashville disputed that "any property owned by Myatt Holdings, LLC . . . including any cash proceeds from the sale of real property, is part of the Receivership estate." In other words, instead of addressing the Receiver's decision excluding Nashville from distributions, the Beall Investors seek to revisit their arguments concerning the Plan of Distribution. On August 31, 2009, the Beall Investors submitted to the Receiver the following documents (collectively, the "Beall Supplemental Submissions"): (i) Nashville & Southeast's Supplemental Objection to Receiver's Contention that Baxtech Holdings, LLC's, which wholly owns Jeffmet Holdings, LLC and Bax Realty Holdings, LLC, and Myatt Holdings, LLC's Assets are Property of the Receivership Estate; and (ii) Declaration of Alan E. Marder in Support of Supplemental Objection by Nashville Warehouse Partners, LLC and Southeast Warehouse Partners, LLC to Receiver's Contention that Baxtech Holdings, LLC's, which wholly owns Jeffmet Holdings, LLC and Bax Realty Holdings, LLC, and Myatt Holdings, LLC's Assets are Property of the Receivership Estate.

Nashville holds 65% of the interests in Myatt. ROMM3, LLC ("ROMM3"), another Wextrust Affiliate, holds the remaining 35% interest and operates the property and Myatt.[15] Myatt owns a warehouse in Madison, TN, which was acquired on December 4, 2001 for $10,600,000. Wextrust continues to manage this property.

---

[15] *See, e.g.*, Operating Agreement of Myatt Holdings, LLC, effective December 24, 2001 (the "Myatt Operating Agreement"), a copy of which is attached as Exhibit B to the Beall Supplemental Submissions, Section 2.3 (discussion on ROMM3 fees); 5.7 (ROMM3's designation as tax matters partner); Section 6.1 (ROMM3 shall keep the books and records); Section 6.2-6.7 (ROMM3 shall cause to be prepared financial reports, tax returns, business plans, etc.); and Section 7.1 (ROMM3 shall manage the business and affairs of Myatt).

Nashville states that it funded $1.6 million on or about December 24, 2001 as an investment contribution to acquire the Myatt property. According to the Receiver's records, Wextrust Equity Partners, LLC ("WEP") provided $150,000 in earnest money deposit on September 14, 2001 to acquire the Myatt property.[16] WEP also took a distribution of excess capital related to the purchase of the Myatt property on December 24, 2001 in the amount of $531,473.80. From January 2002 through July 2008, Wextrust Capital made distributions to Nashville totaling $3,157,147.54.[17] Nashville has been paid $3,157,147.54 on its initial capital contribution of $1,600,000. Nashville also requests hundreds of thousands of dollars in unpaid distributions under the Myatt Operating Agreement.

**Southeast Warehouse Partners, LLC ("Southeast")** agrees that its claim is in the amount of $570,000.00, but states this claim is against BaxTech Holdings, LLC ("BaxTech"), a Wextrust Affiliate. Southeast otherwise raised the same arguments as those raised by Nashville. The Receiver informed Southeast that, based on Wextrust records, Southeast had already been paid its principal contribution in full, recovering an approximate 20% annual rate of return. Thus, Southeast would not be authorized to any further distributions. On August 20, 2009, Southeast disputed "that any property owned by Bax Tech Holdings, LLC . . . including any cash proceeds from the sale of real property, is part of the Receivership estate."

---

[16]   WEP used money it had obtained from a line of credit it had with Cole Taylor Bank. WEP paid $150,000 back on the line with money it received as a distribution of excess capital on the purchase of the Myatt property.

[17]   In February 2008, Wextrust refinanced the loan from Regions Bank, added to the principal balance, and made a distribution to Nashville in the amount of $1,548,034.39. In March 2008, Wextrust disbursed an additional $179,191.77 to Nashville from the refinancing proceeds. Both these sums are included in the $3,157,147.54 aggregate sum paid to Nashville.

Southeast holds 65% of the interest in BaxTech; ROMM3 holds 30% of the interest and controls and operates the property and BaxTech.[18] The remaining 5% membership interests are held by RAM-TEN, LLC, which is wholly-owned by Richard A. Merel, a prior attorney for Mr. Steve Byers and Wextrust Capital.[19] Southeast states that it funded $3,350,000 as an investment contribution to acquire the BaxTech property in January 2004. Bax previously owned two properties. The first was a manufacturing facility located in the Jefferson Memorial Industrial Park in Birmingham, Alabama. The Alabama facility was acquired in January 2004 for approximately $11.4 million. It was sold in December 2007 for approximately $14.4 million. The second was a warehouse facility located in Memphis, Tennessee. The Tennessee facility was acquired in January 2004 for approximately $3,610,000. It was sold, after Court approval, by the Receiver for $3,716,000, with the sale closing on April 10, 2009. The net sum of $817,893.04 was transferred to Wextrust at closing.

From March 2004 through May 2008, Wextrust Capital paid distributions to Southeast totaling $1,303,289.78. In addition, upon sale of the Birmingham, Alabama property, Southeast received an additional distribution of $4,715,087.73 from Wextrust Capital. Southeast has thus been paid $6,018,377.50 on its initial capital contribution of $3,350,000. Southeast now requests

---

[18]     *See, e.g*., Operating Agreement of BaxTech Holdings, LLC, effective January 26, 2004 (the "BaxTech Operating Agreement"), a copy of which is attached as Exhibit I to the Beall Supplemental Submissions. The BaxTech Operating Agreement is substantively identical to the Myatt Operating Agreement, with the same language regarding operational and management control in ROMM3.

[19]     The Receiver is still investigating the circumstances of Mr. Merel's involvement in the BaxTech deal. Unlike Southeast, RAM-TEN did not provide any equity investment in BaxTech. Upon information and belief, Mr. Merel represented Wextrust from time to time on different matters. Mr. Merel represented that he received a 5% equity interest after putting up a temporary letter of credit in the amount of $250,000 during the due diligence period for BaxTech. However, according to the Receiver's own due diligence, Wextrust Capital put up the Letter of Credit and Wexford Bancorp paid the Letter of Credit fee. The amount of the Letter of Credit was $308,200 and the fee was $1,020.50. According to the Receiver's records, the payment for the Letter of Credit came out of the Wexford Capital operating account. Mr. Merel was paid for any services performed on behalf of Wextrust Entities, so it is unclear what, if any, consideration he provided for an equity interest in BaxTech.

an additional distribution of $570,017 from sale proceeds relating to the Memphis, Tennessee property. BaxTech is managed by Wextrust personnel as one of the Wextrust properties. Indeed, based on an analysis by Deloitte, a number of dividends for BaxTech to Southeast were paid by Wextrust using commingled funds.

Exhibit A to the Receiver Order lists both Myatt and BaxTech as part of the receivership estate. Both entities were being managed out of the Wextrust offices by Wextrust personnel prior to the Receiver's appointment and after. There has been no change and no basis to challenge otherwise.

The Beall Investors are thus re-litigating their arguments and objections to the Plan of Distribution. The Receiver considered and rejected their arguments – a position adopted by this Court. (*See, e.g.*, Distribution Opinion at 25-26) (discussing commingling in the real estate funds). The Beall Investors are no different from other Wextrust investors – save in one respect. Distributions *already made* to the Beall Investors are far in excess of recoveries that have or will be provided to any other creditor or investor. For these reasons, the Receiver opposes the Beall Investors' requests.

## G. Pinnacle Fund Administration

The Pinnacle Fund Administration LLC ("Pinnacle") submitted an invoice dated February 25, 2009 in the amount of $24,000 seeking payment for services performed for Wextrust High Yield Debt Offshore Fund, Ltd. (the "Offshore Fund"). On August 14, 2009, the Receiver informed Pinnacle that it would not be entitled to any recovery from the receivership estate and would have to look, instead, to the Offshore Fund for payment. Pinnacle has not responded to the Receiver's determination.

The Offshore Fund is a Cayman Islands exempted company wholly owned by foreign investors seeking to invest in Wextrust High Yield Debt Fund I, LLC ("High Yield I") and High Yield III loan portfolios. Wextrust Capital served as the "Investment Manager" and was supposed to be compensated via management and servicing fees based on outstanding investment portfolio loan amounts and other factors. The Investment Manager has discretionary authority to invest the assets of the Offshore Fund, subject to the policies and control of an independent Board of Directors of the Offshore Fund. The Offshore Fund has two independent (non-Wextrust affiliated) board of directors based out of the Cayman Islands who are authorized to make all material decisions on behalf of the Offshore Fund. Pinnacle served as the administrator of the Offshore Fund.

While the Offshore Fund invested in High Yield I and III loans, no Wextrust Entity or Wextrust Affiliate owns or controls the Offshore Fund. As Investment Manager, Wextrust Capital must make distributions to the Offshore Fund on account of its participation interests in loans as and when High Yield I and III obtain recoveries. While the Receiver has not made a final decision on the administration of the Offshore Fund, it is clear that Pinnacle's claim lies against the assets of the Offshore Fund and not the receivership estate. To the extent the Receiver subsequently determines, in conjunction with the directors and investors of the Offshore Fund, that the Offshore Fund should be incorporated into the receivership estate, the Receiver will add Pinnacle and the Offshore Fund investors and directors to the distribution plan, subject to approval by the Court.

### H. Q&Q Limited Partnership

Q&Q Limited Partnership ("Q&Q") submitted a claim for $1.5 million, seeking a separate recovery on account of its claim. Briefly, Q&Q made a short-term bridge financing

loan of $1,500,000 to Wextrust Equity Partners ("WEP") to enable it to purchase the real property owned by Corinth Industrial Holdings in Corinth, Mississippi. Q&Q received a pledge of WEP's ownership interests in Corinth Industrial Investors as collateral for its loan. It was later learned that WEP did not own a membership interest in Corinth Industrial Investors, only Corinth Industrial Ventures, and that Mr. Byers had sold membership interests in Corinth Industrial Investors to other third-party investors. The Receiver responded that while Q&Q's claim would be allowed, it would only be entitled to a *pro rata* distribution along with the other unsecured creditors and investors of the receivership estate. (*See* Dkt. No. 306) On August 20, 2009, Q&Q supplemented its claim and acquiesced to *pro rata* treatment of a majority of its claim – $1,300,000. However, Q&Q requested payment in full of the remaining $200,000.

Pursuant to the terms of the loan and correspondence from Mr. Byers, WEP was supposed to segregate $200,000 of the loan proceeds in a separate escrow account held at Northern Trust as an interest reserve, payable to Q&Q upon maturity of the loan. However, there was no lockbox account or control agreement entered into by the parties. Predictably, after conducting inquiries on two separate occasions, neither the Receiver nor his advisors were able to locate the Northern Trust account referenced by Q&Q or a segregated sum of $200,000. To the extent that those funds were initially segregated, they have since been commingled.

Q&Q fits the typical mold of a creditor that has been defrauded by Wextrust. As set forth in the Plan Response and various correspondence with Q&Q, the principal amount of Q&Q's claim ($1.5 million) should be allowed in full and paid on a *pro rata* basis from distributions made by the receivership estate.

## I.      Regions Bank and TCF National Bank

Regions Bank ("Regions") has asserted a general unsecured claim against the receivership estate, which is in addition to their secured claims.  TCF argues that it should be permitted to pursue any deficiency claim against the single-asset entity (Peoria Office Holdings, LLC) which is the obligor on TCF's loan.  Regions' unsecured claim on its existing line of credit to Wextrust Equity Partners, LLC will be allowed and paid in the ordinary course of business as WEP remains current on its debt-service obligations.  The Receiver has determined that the remainder of Regions and TCF's claims are secured and, as such, not entitled to any distribution from the receivership estate.  Under the Distribution Opinion, the Court approved the Receiver's proposal to permit secured creditors to recover only out of their collateral, and prohibit them from recovering for any deficiency claims.  (Distribution Opinion at 36-38.)  In seeking to pursue deficiency claims against Peoria Office Holdings, TCF's argument amounts to a recovery against the receivership estate.  Peoria Office Holdings is a single-asset entity whose only property interest is in a multi-tenant commercial building in Peoria, Illinois.  In the event the Receiver relinquishes the Peoria property, TCF's claim will revert against the receivership estate, which outcome was expressly prohibited under the Distribution Opinion.

As this Court recognized in its Distribution Opinion, secured creditors such as Regions and TCF are likely to receive significantly greater recoveries in this case in light of their secured claims.  Per the Distribution Opinion, any recoveries for Regions or TCF will be limited upon a sale or other disposition of the underlying collateral securing their various liens.  Alternatively, if the Receiver relinquishes the property in question, Regions and TCF will be allowed to proceed with any legal or other remedies in foreclosing on their collateral.

It should also be noted that both Regions and TCF have filed notices of appeal challenging the Distribution Opinion. The Receiver believes that TCF and Regions' remedies lie with the pursuit of that appeal, and not with a challenge of their secured creditor status before this Court. Accordingly, the Receiver respectfully requests that the Court deny their outstanding objections.

**J.      Sheldon Liebb**

Mr. Liebb submitted three claims to the Wextrust receivership. All three claims emanate from his employment by Wexford Development New York, LLC ("WDNY"). As disclosed in his claims materials, Mr. Liebb was retained by Wextrust on September 12, 2005 for an initial salary of $125,000. By 2008, based on his own representations, his annual salary had been increased to $200,000. In addition to his base salary, WDNY implemented an incentive bonus structure reflected in the Mirror Membership Interest Agreement dated June 15, 2007 (the "Mirror Membership Agreement"), a copy of which was included with Mr. Liebb's claim. Under the Mirror Membership Agreement, Mr. Liebb was granted ten non-voting mirror interests in WDNY and entitled to receive a *pro-rata* share (10%) of any "Distributable Cash"[20] when the same was distributed to the members of WDNY.

Mr. Liebb's first claim (the "Liebb First Claim") was for an amount of $26,201 for unpaid "salary" through December 31, 2007, "based on 10% of $261,323 net income on multiple projects" for WDNY. In other words, the Liebb First Claim is not for payments outstanding on Mr. Liebb's base salary, which was in the annual amount of $200,000 and was paid through the termination of his employment. Instead, Mr. Liebb was asserting a claim for the bonus payment

---

[20]      Under the WDNY Operating Agreement effective April 23, 2007, "Distributable Cash" means all cash, revenues and funds received by WDNY from its operations, *less* sums paid or set aside by WDNY for (i) debt service, (ii) ordinary course business expenditures, and (iii) operating reserves.

under the Mirror Membership Agreement.  Further, in the Liebb First Claim, Mr. Liebb was not

seeking payment of an amount that reflected 10% of any "Distributable Cash."  Instead, he was

seeking 10% of net income of WDNY, *irrespective* of debt service, ordinary business

expenditures, or operating reserves required by the company.[21]  Naturally, the Liebb First Claim

is inconsistent with the clear and express terms of the Mirror Membership Agreement.  Finally,

under the Mirror Membership Agreement, Mr. Liebb was only entitled to a distribution when

WDNY made distributions of Distributable Cash to its members.  On Mr. Liebb's own

admissions, consistent with the Receiver's findings, no such distributions of Distributable Cash

were ever made to members of WDNY during the time period specified in Mr. Liebb's claim.

After further discussions with the Receiver's counsel, Mr. Liebb was unable to provide any

additional support for payment on his claim for unpaid salary.  Accordingly, the Receiver has

decided to deny the Liebb First Claim for unpaid salary.

Mr. Liebb next asserted a claim (the "Liebb Second Claim") of $300,561 for "unpaid

distributions on West 82nd Street, New York, NY (based on 10% of $3,005,614 net project

income)."  The Liebb Second Claim should be denied for the same reasons as the Liebb First

Claim.  Under the Mirror Membership Agreement, Mr. Liebb was not entitled to 10% of net

income.  He was only entitled to participate in 10% of Distributable Cash when distributed to

members.  There was no distribution of Distributable Cash to members of WDNY regarding the

West 82nd Street project.  Indeed, at the onset of the receivership, WDNY had still not completed

its books and records for the West 82nd Street project, and had not calculated the Distributable

Cash, if any.  Mr. Liebb has provided no further support for payment of the Liebb Second Claim.

---

[21]     WDNY was involved in rehab and construction projects in New York.  Based on the Receiver's
investigation and due diligence, WDNY would not have made distributions of net income to its members
or Mr. Liebb without first determining what amounts should be set aside for debt service, ordinary
business expenditures, and operating reserves.

Accordingly, the Receiver has decided to deny the Liebb Second Claim for unpaid distributions and requests that the Court approve the same.

Mr. Liebb also submitted a supplemental affidavit dated September 3, 2009 (the "Liebb Supplemental Affidavit") in support of the Liebb First Claim and the Liebb Second Claim. In the Liebb Supplemental Affidavit, Mr. Liebb concedes that no distributions were made by WDNY before it had ceased to operate. However, Mr. Liebb argues that he is entitled to the distributions anyway based on a *quantum meruit* theory. The Mirror Membership Agreement provides that Mr. Liebb would be entitled to his share of Distributable Cash if and when distributions were made to members. As Mr. Liebb conceded, no distributions were made by WDNY to members. The WDNY Operating Agreement provides Distributable Cash would exclude such items as debt service or reserves that the members deem reasonably necessary for the proper operation of WDNY's business. Although Mr. Liebb points to preliminary numbers of net income for WDNY and on the West 82nd Street project, which had not been finalized at the time of the receivership, he cannot point to what the distributions to members would have been since no one knows what reserves would have been set aside for debt service, ordinary business expenditures and operating expenses. The distributions to the members, and by extension, Mr. Liebb, were completely discretionary. There was no automatic right to distributions of Distributable Cash under the Mirror Membership Agreement. As such, each of Mr. Liebb's First and Second Claims fail and are not entitled to any recovery from the receivership estate.

Mr. Liebb also submitted a claim (the "Liebb Third Claim") for $941.38 seeking reimbursement of out-of-pocket expenses incurred in his employment for WDNY. The Receiver and his professional advisers have reviewed and approved the Liebb Third Claim.

### K.     Space Park AIM Partnership & Space Park ISSB Partnership

Space Park AIM Partnership ("AIM") and Space Park ISSB Partnership ("ISSB," and, collectively with AIM, the "AIM Parties") filed a claim dated June 10, 2009 in the aggregate amount of $155,518.69.  The AIM Parties also assert an unliquidated claim for interest, attorneys' fees, and costs.  By letter dated August 14, 2009, addressed to the AIM Parties, the Receiver informed the AIM Parties that because they had already "recovered the full amount of their equity contribution – indeed twice the amount of their equity contribution – the Receiver will not be making any further distributions to the [AIM Parties] from the receivership estate." By email correspondence dated August 31, 2009, counsel for the AIM Parties provided "additional documents to supplement the claims" of their clients (the "AIM Supplemental Submissions").  However, the AIM Parties did not address or dispute the Receiver's determination regarding distributions on the AIM Parties' claims.  Giving them the benefit of the doubt and assuming that the supplemental documents were in support of the AIM Parties' objections to the Receiver's treatment of their claims, the Receiver addresses their claims as follows.

Briefly, by way of background, the AIM Parties held membership interests (collectively 50%) in Space Park, LLC ("Space Park") along with ROMM3, LLC (49%) and Space I Corp. (1%), each of which, along with Space Park, are (i) owned and controlled by Wextrust Entities, (ii) listed on Exhibit A to the Receiver Order, and (iii) are, therefore, Wextrust Affiliates.

Space Park owned and invested in an industrial property portfolio located in Nashville, Tennessee, purchased on December 9, 2002 at a contract sale price of $23,500,000.  ROMM3 and Space I Corp. managed Space Park.  Based on a review of Wextrust records, AIM made an equity investment of $3,750,000 in Space Park and ISSB made an equity investment of

$1,390,000 in Space Park for an aggregate amount of $5,140,000. Each of the AIM Parties has since recovered all of its initial investments in Space Park along with a healthy return. Specifically, between August 1, 2003 and February 1, 2005, AIM received distributions in the amount of $1,114,393.00 from or on account of Space Park. During that same time period, ISSB received distributions in the amount of $434,505.00 from or on account of Space Park. Further, on August 31, 2007, after sale of the Space Park property, AIM received an additional distribution of $8,280,000.00 from or on account of Space Park. At that same time, ISSB received an additional distribution of $1,976,000.00 from or on account of Space Park. As of the date of this filing, the AIM Parties have recovered an aggregate of $11,804,898 on an initial investment of $5,140,000. In other words, the AIM Parties have more than doubled their investment and have been paid far in excess of amounts provided or available to just about any other investor or creditor, secured or unsecured, of the receivership estate.

On April 27, 2009 (Dkt. No. 228), the AIM Parties filed an objection to the Receiver's Plan of Distribution. On May 28, 2009, the AIM Parties filed a second, supplemental objection (collectively, the "AIM Plan Objections") to the Plan of Distribution. As set forth in their objections and claims, the AIM Parties argue that their circumstances are exceptional and that their additional claims should not be included in the general distribution of assets. The AIM Parties make essentially the same types of arguments as the Beall Investors regarding, *inter alia*, separateness of the entity, tracing, and lack of equity raise. The Receiver disagreed with and responded to the arguments set forth in the AIM Plan Objections. Specifically, Space Park was managed and controlled by Wextrust and its personnel prior to the appointment of the Receiver. Based on a limited records review previously undertaken by Deloitte, Space Park did not generate sufficient assets to independently maintain assets and operations. Instead, frequent cash

infusions and transfers were provided from time to time from other Wextrust-controlled accounts to and for the benefit of Space Park. That is exactly the type of commingling activity that led to the Court's determination in favor of *pro rata* distributions in the Distribution Opinion. Indeed, in approving the Receiver's Plan of Distribution, the Court expressly overruled all objections, including the objections of the AIM Parties.

Incredibly, the Space Park Investors[22] (along with the Beall Investors)[23] next moved for clarification as to whether the Court intended the adjudication procedure in the Distribution Opinion to apply to parties who maintain that their assets are not part of the receivership estate. In an Order dated August 13, 2009 (Dkt. No. 436), the Court held that it "did intend for such matters to be resolved within the context of the receivership, and, more specifically, that the adjudication procedure set forth in the [Plan of Distribution Ruling] would govern." The AIM Supplemental Submissions followed.

As discussed above, the claims process was not intended to provide fully-compensated investors with an additional forum to attack the Plan of Distribution or the Distribution Opinion. Instead, the claims process is an avenue for investors and creditors to investigate and finalize their claim amounts for distribution purposes. Given that the AIM Parties have already fully recovered twice the principal amount of their respective investments, the Receiver has determined that they should not be entitled to any further distributions under the Plan of Distribution. Nowhere in the AIM Supplemental Submissions do the AIM Parties challenge that determination. As such, the Court should disallow any distributions on claims asserted by the AIM Parties.

---

[22] The Space Park Investors submitted a letter dated August 3, 2009 seeking clarification of the Distribution Opinion as applying to the their claims.

[23] The Beall Investors submitted a letter dated July 31, 2009 seeking clarification of the Plan Opinion as applying to their claims.

## L.    The Drake OakBrook, LLC Pension Fund

On May 12, 2009, The Drake OakBrook, LLC (the "Drake Claimant") asserted two

claims against the Wextrust receivership estate.  Both claims relate to the Westin Drake Hotel

located in Oak Brook, Illinois, previously owned by Drake Oak Brook Holdings, LLC ("Drake

Holdings"), one of the Wextrust Affiliates.  The Drake Hotel was purchased from the Drake

Claimant pursuant to a Purchase and Sale Agreement and Escrow Instructions dated June 29,

2007 (the "Drake Purchase Agreement"), by and between the Drake Claimant and Wextrust

Equity Partners, LLC ("WEP").

The Drake Purchase Agreement provides that WEP assumed all obligations of the Drake

Claimant with respect to certain pension fund and union agreements.  In a letter dated March 19,

2009, UNITE HERE National Retirement Fund (the "Fund") informed the Drake Claimant that it

had incurred a complete withdrawal from the Fund on January 9, 2008.  The Fund made a

payment demand on the Drake Claimant in the amount of $99,507.00 relating to certain alleged

withdrawal liability from the Fund.  The Drake Claimant, in turn, asserts an indemnity claim

against the receivership estate in the full amount of the Fund's demand (the "Drake Pension

Claim").  However, following discussions with counsel for the Drake Claimant, it has become

apparent that the Drake Claimant has neither acknowledged liability to the Fund nor made any

payments in furtherance of the alleged withdrawal liability to the Fund.  Therefore, as of the date

of this response, the Drake Claimant holds a contingent, unliquidated claim against the

receivership estate.  The Drake Pension Claim is contingent on the Drake Claimant

acknowledging or being held liable to the Fund for withdrawal liability and it is, as yet,

unliquidated as no such liability has been assumed or payments made.  Further, the receivership

estate risks dual exposure in the event the Fund also asserts a similar claim against the

receivership estate. For that reason, until such time as the Drake Claimant has assumed liability and/or paid the Fund, the Drake Pension Claim should not be allowed or entitled to any distributions from the receivership estate.

Second, the Drake Claimant asserts an indemnity claim (the "Drake Equipment Claim") against the receivership estate based on a demand letter dated March 10, 2009 sent by Key Equipment Finance, Inc. ("Key Equipment"). Specifically, the Drake Claimant had entered into a financing lease with Key Equipment with respect to television sets delivered to the Drake Hotel. Pursuant to the Drake Purchase Agreement, the Drake Claimant had agreed to assign all of its right, title and interest in certain leases and agreements to the purchaser. The assignment was made effective pursuant to the Assignment and Assumption of Leases dated January 11, 2008 by and between the Drake Claimant and Drake Holdings. On January 11, 2008, Mr. Steve Byers, in his individual capacity, executed an Indemnification Agreement with respect to the Key Equipment lease for the benefit of the Drake Claimant. Drake Holdings subsequently breached the financing lease with Key Equipment and Key Equipment made the demand on the Drake Claimant in the amount $107,894.84. The Drake Equipment Claim against the Wextrust receivership is in the same amount.

The Drake Equipment Claim should be denied for two reasons. First, Mr. Byers entered into the Indemnification Agreement in his individual capacity and not as an officer or principal of any Wextrust Entity or Wextrust Affiliate. Second, Key Equipment has separately brought the same claim against the receivership estate, which has already been addressed by the Receiver. Given Key Equipment's status as a secured creditor, Wextrust has already responded that Key Equipment can realize its rights and remedies against its collateral. On March 3, 2009, the Receiver filed a motion (Dkt. No. 207) seeking to relinquish interests in the Wyndham Drake

hotel and allow parties-in-interest to pursue legal and other remedies against the underlying property and their collateral. This Court granted the Receiver's motion on May 1, 2009 (Dkt. No. 300), following which Key Equipment initiated an action in the DuPage County Circuit Court in Illinois to recover its collateral. *See Key Equipment Finance v. R.P. Fox Associates, Drake Oak Brook et al*., Case No. 09-L-621. Allowing the Drake Equipment Claim against Wextrust would, among other things, grant the Drake Claimant an end-run around the express limitations included in the Plan of Distribution for secured creditors. For the foregoing reasons, the Drake Equipment Claim should be denied.

### M. Ticor Title Insurance Company

Ticor Title Insurance Company ("Ticor") submitted a claim against Gold Coast Investors, LLC ("Gold Coast"), a Wextrust receivership entity, in the amount of $3,503,575.56. The Court approved the Receiver's recommendation to relinquish Gold Coast's (and thus the receivership's) interests in the Park View Hotel on July 23, 2009.

The Receiver and his professional advisers determined that Ticor's claim was filed as a protective claim in the event of future liabilities. Based on the Receiver's review of the claim, Ticor appears to hold an unmatured, contingent, unliquidated claim against the receivership estate. The Receiver's Plan of Distribution provides for an interim cash distribution to be paid only for qualifying individuals who, among other things, hold non-contingent, undisputed, and liquidated claims. (*See* Receiver's Proposed Plan of Distribution at 39.) Ticor's claim does not satisfy this requirement, and thus was denied as invalid.

Ticor does not dispute this classification of its claim, but rather requests that the Receiver retain sufficient reserves within the estate to satisfy this future liability should it become due.

The Receiver will agree to hold back an amount sufficient to meet the estimated *pro rata* value of this contingent liability.

### N.    Universal Restoration Services

Universal Restoration Services ("Universal") filed a $106,507.41 claim for emergency services, mold remediation, and other repair work done on the Park View Hotel.  On April 17, 2009, Universal filed two liens against the Park View Hotel in the amount of its claims.  On July 23, 2009, this Court approved the Receiver's Motion to relinquish all interests in the Park View Hotel and allowed secured creditors to enforce their rights and remedies against their collateral.  On August 14, 2009, the Receiver informed Universal that, as a secured creditor, Universal could proceed with its remedies against the Park View Hotel.

Universal now argues that it is not a secured creditor and seeks recovery from the receivership estate.  Municipal records that indicate Universal filed two mechanics liens against the Park View Hotel totaling $106,507.  The liens were filed on April 17, 2009 and remain on the property.  Universal is a secured creditor and, under the Distribution Opinion, its recovery should be limited to its collateral and not from the receivership estate.

## CONCLUSION

In light of the foregoing, the Receiver respectfully requests that the Court overrule the outstanding claims objections in this matter so that the Receiver may begin the process of distributing the proceeds and other assets of the receivership estate to the victims of this fraud, both investors and creditors of the Wextrust Entities and Affiliates, in accordance with the Distribution Opinion.

Dated:  Washington, D.C.
        September 14, 2009

Respectfully submitted,

s/ Mark S. Radke_____
Mark S. Radke, *pro hac vice*
DEWEY & LEBOEUF LLP
1101 New York Avenue, NW
Washington, D.C. 20005
202-346-8000 (t)
202-346-8102 (f)

*Attorneys for the Receiver*

*Of Counsel:*
John K. Warren
Jonathan W. Ware

<u>**CERTIFICATE OF SERVICE**</u>

The undersigned, an attorney, states that I am one of the attorneys for Timothy J. Coleman, Receiver, in this matter and do hereby certify that on **September 14, 2009** I directed the service of a true and correct copy of the foregoing **Receiver's Response to the Court's Order of August 19, 2009 Outlining Active Claims Disputes Related to the Plan of Distribution** upon the following individuals in the manner indicated below:

<u>**Via First Class Mail**</u>
Joseph Shereshevsky, Registry No. 35857-054
c/o GEO Group
Queens Private Correctional Facility
182-22 150th Avenue
Jamaica, NY 11413
Pro Se Defendant

<u>**Via ECF Notification & Electronic Mail**</u>
Alexander M. Vasilescu, Esq.
Andrew M. Calamari, Esq.
Steven G. Rawlings, Esq.
Alistaire Bambach, Esq.
Danielle Sallah, Esq.
Philip Moustakis, Esq.
Neal R. Jacobson, Esq.
Attorneys for Plaintiff SEC

Barry S. Pollack, Esq.
Joshua L. Solomon, Esq.
Attorneys for non-party G&H Partners AG

Barry S. Zone, Esq.
Jason Canales, Esq.
Stephen Richard Popofsky, Esq.
Attorneys for Defendant Steven Byers

Michael Fred Bachner, Esq.
Attorney for Defendant Elka Shereshevsky

Philip A. Byler, Esq.
Andrew T. Miltenberg, Esq.
Attorneys for non-party Broadway Bank

<u>**Via ECF Notification & Electronic Mail**</u>
Martin Siegel, Esq.
Attorney for non-party Int'l Consortium of Wextrust Creditors

Paul A. Levine, Esq.
Attorney for non-party Key Equipment Finance, Inc.

David B. Gordon, Esq.
Beth L. Kaufman, Esq.
Attorneys for non-party Lawrence Costa

Harris Kay, Esq.
Marc X. LoPresti, Esq.
Attorneys for various non-party investors

Ethan Holtz, Esq.
Edward P. Gilbert, Esq.
Attorneys for RAIT Partnership

Francesca Morris, Esq.
Attorney for Ticor Title Insurance Co. and Heritage Community Bank

John M. Bradham, Esq.
Peter B. Katzman, Esq.
Attorneys for non-parties Space Park AIM and ISSB Partnerships

Alan E. Marder, Esq.
Attorney for non-parties Nashville Warehouse Partners and Southeast Warehouse Partners

Edward F. Malone, Esq.
George R. Mesires, Esq.
Attorneys for Barrington and Hinsdale Banks

**Via ECF Notification & Electronic Mail**
Shalom Jacob, Esq.
Shmuel Vasser, Esq.
Attorneys for non-party Int'l Ad-Hoc
Committee of Wextrust Creditors

Louis Orbach, Esq.
Charles J. Sullivan, Esq.
Amy Marie Culver, Esq.
Attorneys for non-party TCF National Bank

Elizabeth P. Gray, Esq.
Attorney for Gerald Jaffe

**Via ECF Notification & Electronic Mail**
Susan F. Balaschak, Esq.
Keith N. Costa, Esq.
Randal S. Mashburn, Esq.
John H. Rowland, Esq.
Attorneys for non-party Regions Bank

Emily Alexander, Esq.
Attorney for non-party Martin Malek

_____ s/ John K. Warren _____