# APPENDIX "B"

# (Part 1)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SECURITIES AND EXCHANGE COMMISSION,

                Plaintiff

      -against-

STEVEN BYERS, JOSEPH SHERESHEVSKY,
WEXTRUST CAPITAL, LLC, WEXTRUST
EQUITY PARTNERS, LLC, WEXTRUST
DEVELOPMENT GROUP, LLC, WEXTRUST
SECURITIES, LLC, and AXELA HOSPITALITY,
LLC,

                Defendants,

      -and-

ELKA SHERESHEVSKY,

                Relief Defendant.

Civil Action No.: 08-CV-07104 (DC)

**DECLARATION OF
RUSSELL McMINN**

---

RUSSELL McMINN declares, pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1.      I am a Senior Vice President of Secured Creditor TCF National Bank ("TCF") and make this Declaration in support of the Motion of TCF to Modify Injunction filed simultaneously herewith.

2.      As described in TCF's prior submissions to the Court (*see* Docket No. 499), and as set forth with greater particularity in the Claim and Invoice of Secured Creditor TCF National Bank and Reservation of Rights and Objections dated and filed by TCF in the captioned case on June 26, 2009 (the "TCF Proof of Claim"), TCF is a secured creditor of Peoria Office Holdings, LLC ("POH"), an entity related to defendants Wextrust Capital, LLC and Wextrust Equity Partners, LLC.

3.     On or about December 10, 2007, Peoria Office Holdings, LLC ("POH") and TCF entered into a Loan Agreement (the "Loan Agreement") pursuant to which TCF agreed to lend to POH certain amounts as provided therein. A copy of the Loan Agreement is annexed hereto and made a part hereof as Exhibit "A".

4.     Also on or about December 10, 2007, POH executed and delivered to TCF its Term Note (the "Term Note") which evidenced the indebtedness of POH to TCF pursuant to the Loan Agreement (the "Indebtedness"). A copy of the Term Note is annexed hereto and made a part hereof as Exhibit "B".

5.     As of the date hereof, the principal amount of the Indebtedness, together with accrued but unpaid interest, is $11,083,540.30.

6.     As security for the Indebtedness, POH executed and delivered to TCF, among other things:

    a.     a Mortgage dated December 10, 2007 (the "Mortgage") covering a multi-use office building located in Peoria, Illinois (the "Mortgaged Premises");

    b.     an Assignment of Rents and Leases dated December 10, 2007 (the "Lease Assignment") concerning the Mortgaged Premises; and

    c.     a Collateral Pledge Agreement dated December 10, 2007 (the "Pledge Agreement") relating to proceeds in a Property Maintenance Reserve Account established pursuant to the Loan Agreement (the "Reserve Account"), earmarked for certain improvements in the Mortgaged Premises, including approximately $400,000 for renovating the lobby.

Copies of the Mortgage, the Lease Assignment and the Pledge Agreement are annexed hereto as Exhibits "C," "D" and "E," respectively.

7.     Pursuant to separate Guaranties dated December 10, 2007 (the "Guarantees") that were executed and delivered by WexTrust Equity Partners, LLC, WexTrust

Capital, LLC, Stephen Byers and Matthew Gurvey (the "Guarantors"), the Guarantors guaranteed the obligations of POH to TCF, including repayment of the Indebtedness.

8.     The liens and security interests of TCF were and are duly recorded and perfected under applicable law. Pursuant to the Mortgage, TCF holds a mortgage lien covering the Mortgaged Premises. Pursuant to the Mortgage and the Lease Assignment, TCF holds a lien and security interest in all rents, income, issues and profits (and proceeds thereof) due or to become due with respect to, or derived from, the Mortgaged Premises (the "Rent"), and all leases relating to the Mortgaged Premises. Pursuant to the Pledge Agreement, TCF holds a lien and security interest covering the Reserve Account, which currently has a balance of more than $700,000 (the "Reserve Account Proceeds").

9.     The Receiver's staff has informed TCF that Caterpillar, a major tenant of the Mortgaged Premises that occupies greater than 20% of the leasable space thereof, has exercised an option that it holds under its lease for early termination of its tenancy effective December 31, 2009 (the "Early Termination Option"). In connection therewith, Caterpillar has paid to POH a liquidated amount to exercise the Early Termination Option (the "Caterpillar Liquidated Payment"). Under the terms of the Mortgage and the Lease Assignment, the Caterpillar Liquidated Payment constitutes TCF's Collateral. The Rent, the Reserve Account Proceeds, and the Caterpillar Liquidated Payment are collectively referred to as the "Cash Collateral."

10.     In addition to the Caterpillar vacancy, the most recent rent roll supplied to TCF by the Receiver's staff shows that nearly 20% of the remaining leasable space in the building is vacant, therefore almost 40% of the Mortgaged Premises appears to be vacant at this time.

11.     On October 9, 2009, I met in person with Don Price, an employee of Wextrust who is under the supervision of the Receiver and who serves as the property manager for POH, and Mitchell P. Kahn, the Chief Executive Officer of Hilco Real Estate, LLC ("Hilco"). I am informed by TCF's counsel that Hilco has represented to the Court that it was engaged by the Receiver in this action "to advise on the real estate assets held, owned or controlled by the Wextrust Entities and under the Receivership." *See* Declaration of Mitchell P. Kahn, sworn to on December 1, 2008 [Docket No. 124]. Also in attendance at the meeting on behalf of TCF was Debra Gierach.

12.     The purpose of my meeting with Mr. Price and Mr. Kahn was to discuss the Receiver's plan for the Mortgaged Premises, including plans for any new tenant to replace Caterpillar and other vacating tenants, and plans for funding required improvements to satisfy prospective new tenants.

13.     During the meeting, Mr. Price and Mr. Kahn informed me that the Receiver is holding approximately $800,000, representing proceeds of Rent and the Caterpillar Liquidated Payment, in a segregated account pursuant to the direction of the Court (the "Rent Proceeds"). Mr. Kahn informed me that he was aware that the Receiver was currently seeking permission from the Court to liquidate such account and to draw the Rent Proceeds into the Receivership Estate so that the Receiver may utilize those proceeds to fund expenses of the Receivership Estate and/or distributions to holders of claims.

14.     Mr. Price and Mr. Kahn confirmed that although certain discussions have occurred with potential replacement tenants, those tenants will not enter into new leases until certain expenditures are made for leasehold improvements on the Mortgaged Premises. Ordinarily, these expenditures would be the obligation of the owner of the building, POH.

15. Mr. Kahn advised me that the Receiver was unwilling to fund the cost of such tenant improvements out of the Rent Proceeds being held by the Receiver, because the Receiver does not believe that doing so will increase the value of the Mortgaged Premises sufficiently such that the sale price of the property would exceed the amount of the secured debt owing to TCF. Therefore, according to Mr. Kahn, the Receiver is unwilling to permit such expenses to be funded out of the Rent Proceeds; instead, the Receiver wishes to divert the Rent Proceeds into the Receivership Estate to be used for other purposes.

16. In addition, Mr. Kahn informed me that Hilco is not at this time actively marketing for sale the Mortgaged Premises, because in view of the substantial percentage of vacancy that now exists on the Mortgaged Premises, Mr. Kahn does not believe that any sale of the Mortgaged Premises at this time would produce a return to the receivership estate.

17. During the meeting, I urged Mr. Kahn and Mr. Price to pay for the necessary tenant improvements out of the Rent Proceeds, indicating that TCF would consent to such expenditure. Mr. Kahn, speaking on behalf of the Receiver, flatly refused, indicating confidently that the Court would rule in favor of the Receiver and allow the Receiver to draw the Rent Proceeds out of POH, and further asserting that TCF should consent to the withdrawal of funds from the Maintenance Reserve Account to conduct all of the tenant improvements, even though the Loan Agreement would not permit the entire cost of the tenant improvements to be funded from the Maintenance Reserve Account.

18. Mr. Kahn threatened that if TCF did not accede to his demand, he would overspend the money in the Maintenance Reserve Account for unnecessary improvements to the property and "build a Taj Mahal in Peoria." Therefore, Mr. Kahn threatened to commit waste of TCF's collateral unless it acceded to his request.

I declare under penalty of perjury that the foregoing is true and correct.

EXECUTED on October 22, 2009.

Russell McMinn

**EXHIBIT "A"**

04824

# LOAN AGREEMENT

THIS LOAN AGREEMENT dated as of the 10th day of December, 2007, is between PEORIA OFFICE HOLDINGS, LLC, a Delaware limited liability company (the "Borrower"), and TCF NATIONAL BANK, a national banking association (the "Bank").

In consideration of the mutual covenants, conditions and agreements set forth herein, and for other good and valuable consideration, the Borrower and Bank agree as follows:

## ARTICLE I. LOAN

Subject to all the terms and conditions of this Agreement:

1.1  Term Loan.

(a)  Borrower agrees to borrow from Bank and Bank agrees to lend to Borrower, subject to this Agreement, the amount of $11,063,000.00 (the "Term Loan").

(b)  The Term Loan shall be evidenced by the promissory note of Borrower payable to the order of Bank, dated as of the date of this Agreement, in substantially the form of Exhibit 1.1 attached hereto, as it may be amended or extended from time to time (the "Note").

(c)  All amounts advanced under the Note may not be reborrowed by Borrower.

1.2  Principal and Interest Payment.

(a)  Principal and interest shall be payable on the Term Loan as provided in the Note.

(b)  The interest rate described in the Note may or may not be the lowest rate charged by the Bank. Any change in the interest rate resulting from a change in any indexed rate described in the Note shall become effective without notice to the Borrower as of the day on which such change in the index described in the Note becomes effective. A change in the interest rate will apply to the outstanding principal balance of the Note.

(c)  Unpaid principal and interest bear interest after maturity (whether by acceleration or lapse of time) until paid at the rate which would otherwise be applicable plus 2 percentage points.

(d)  Interest is computed on the basis of the actual number of days the principal balance is unpaid based upon a year of 360 days.

1.3  Payment Procedure. The Bank is authorized and directed to credit any of the Borrower's accounts with the Bank (or to the account the Borrower designates in writing) for the

Term Loan made hereunder, and the Bank is authorized to debit such account or any other account of the Borrower with the Bank for the amount of any principal, interest or expenses due under the Note, Mortgage, Security Agreements or other amount due hereunder on the due date with respect thereto.

1.4    Closing Fee.    The Borrower will pay the Bank a one-time closing fee of $75,315.00 contemporaneously with the execution of this Agreement.    This fee shall be in addition to all other fees, expenses and amounts due hereunder.

1.5    Prepayment.    The Term Loan may be prepaid on the conditions set forth in the Note.

1.6    Non-Business Days.    Whenever any payment to be made hereunder or under the Notes shall be stated to be due on a Saturday, Sunday or a day when the Bank is not open for business to the public, such payment may be made on the next succeeding business day, and such extension of time shall be included in the computation of interest under the Notes.

## ARTICLE II.    RESERVE ACCOUNTS

2.1    Property Maintenance Reserve Account.    On the Closing Date, Borrower shall deposit the amount of $1,000,000.00 with Bank (the "Maintenance Reserve Account") for parking garage repairs, lobby renovation and other improvements to be made to the Property (the "Property Maintenance").    Within thirty (30) days after the Closing Date, Borrower shall deposit an additional $400,000.00 into the Maintenance Reserve Account ("Additional Reserve Deposit"); the failure to make the Additional Reserve Deposit shall constitute an Event of Default (defined below) of this Agreement.    The Maintenance Reserve Account shall be available to fund the Property Maintenance and shall be advanced pursuant to the terms and conditions of this Agreement and the Disbursing Agreement (defined below).    Borrower shall complete the Property Maintenance within twenty-four (24) months from the date of this Agreement.    The amount in the Maintenance Reserve Account shall be allocated among the Property Maintenance as follows: $900,000 for parking garage repairs, $400,000 for lobby renovation and $100,000 for miscellaneous improvements, tenant improvements and leasing commissions.    To the extent that not all of the funds allocated for parking garage repairs are utilized by Borrower, Borrower may use the remainder for lobby renovation; to the extent that not all funds allocated for the lobby renovation are used, Borrower may use the remainder for miscellaneous improvements to the Property.

2.2    Tenant Improvement/Lease Holdback Reserve Account.    Pursuant to the Purchase and Sale Agreement between Borrower and ADC-CR Peoria, LLC ("Seller") dated July 25, 2007 as amended (the    "Purchase and Sale Agreement"), Borrower shall deposit the amount of $667,000.00 with Title Company (the "TI/Holdback Reserve Account") for lease holdbacks and tenant improvements pursuant to that certain Holdback Escrow Agreement attached hereto as Exhibit A.    The TI/Holdback Reserve Account shall be available to Borrower after expiration of the leases for basement suite 100, suite F10, suite 400 and suite 300 of the Property ("Leased

04826

Spaces"), at which time Borrower shall receive an amount equal to the sum of base rent for the Leased Spaces and tenant improvement costs expended by Borrower to relet the Leased Spaces (the "Reimbursement"). The Reimbursement shall be made on or before December 31, 2009. If the total amount of the Reimbursement is less than the amount in the TI/Holdback Reserve Account, the balance shall be returned to the Seller pursuant to the Purchase and Sale Agreement.

## ARTICLE III. CONDITIONS OF BORROWING

Without limiting any of the terms of this Agreement, the Bank is not required to make the Term Loan to the Borrower hereunder unless all of the following conditions are satisfied:

3.1    Note.   The Borrower shall have executed and delivered the Note described in Article I.

3.2    Security Documents.   The Bank shall have received, properly executed, the following security documents (the "Security Documents") in form and substance satisfactory to the Bank and its counsel:

(a)    Mortgage (the "Mortgage") covering the property located at 124 South West Adams Street, Peoria, Illinois (the "Property"), in favor of the Bank, subject only to Permitted Liens and other mortgage liens on the Property in favor of the Bank;

(b)    an Assignment of Rents and Leases covering all leases of the Property;

(c)    Unlimited Continuing Guaranties from WexTrust Equity Partners, LLC and WexTrust Capital, LLC;

(d)    Unlimited Continuing Guaranties from Steven Byers and Matthew Gurvey ("Individual Unlimited Guaranties");

(e)    Collateral Pledge Agreement by Borrower in favor of Bank with respect to the Maintenance Reserve Account;

(f)    Subordination Agreement among Borrower, Bank and ADC-CR Peoria, LLC; and

(g)    all other forms or documents necessary or requested by the Bank for the purpose of taking or perfecting the security interests described above.

3.3    Closing Certificates of Manager.   The Bank shall have received copies, certified by the Manager of Borrower as true and correct of:

(a)    the Articles of Organization and Operating Agreement of the Borrower;

(b)    resolutions of the Borrower authorizing the execution, issuance, delivery and performance of this Agreement, the Note, and the Security Documents; and

04827

(c)     a statement of the names and titles of officers, members and managers of the Borrower authorized to sign this Agreement, the Note, and the Security Documents, together with true signatures of such representatives.

3.4     Environmental Indemnity Agreement. The Bank shall have received from the Borrower the Environmental Indemnity Agreement in a form acceptable to the Bank.

3.5     Title Insurance. The Bank shall have received a satisfactory current commitment for an ALTA Form B (2006) Lender's policy of title insurance, along with a copy of each easement, restriction, limitation or condition of title which is referred to in it (the "Title Policy") from a title insurance company acceptable to Bank (the "Title Company"), in the amount of the Note insuring the first lien priority of Bank in the Property, subject only to Permitted Liens. The Title Policy shall contain include the following: gap or extended coverage, as appropriate, Lender's comprehensive endorsement, environmental 8.1 endorsement, survey endorsement, access endorsement, zoning endorsement to the extent available and such other special endorsements as Bank may deem appropriate for Bank's protection.

3.6     Counsel Opinion. The Bank shall have received from the Borrower's independent counsel, satisfactory opinions as to the matters referred to in Sections 5.1, 5.2 and 5.10, and such other matters relating to the validity and enforceability of this Agreement, the Note and the Security Documents required by this Article III as the Bank shall reasonably require.

3.7     Rent Roll. The Bank shall have received a copy, certified by the Manager of Borrower as true and correct, of a rent roll for the Property:

3.8     Leases. The Bank shall have received copies, certified by the Manager of Borrower to the best of its knowledge as true and correct, of the leases for the Property.

3.9     Proceedings Satisfactory. All proceedings taken in connection with the transactions contemplated by this Agreement, and all instruments, authorizations, consents, releases, terminations, title insurance and other documents applicable thereto, shall be satisfactory in form and substance to the Bank and its counsel.

## ARTICLE IV. CONDITIONS PRECEDENT TO ADVANCES FROM MAINTENANCE RESERVE ACCOUNT

In addition to the requirements of Article III, all of the following conditions shall have been fulfilled, to the Bank's reasonable satisfaction, prior to any disbursement from the Maintenance Reserve Account:

4.1     The Bank shall have received a signed construction contract, verified cost breakdown and budget listing the maximum intended cost of each improvement and construction expense related to the repair work on the Property. The cost breakdown and budget shall be verified by Borrower and Borrower's architect or engineer and shall be acceptable to Bank. Borrower shall also provide Bank with copies of all construction bids for the purpose of Bank

04828

confirming the existence of such bids and that Borrower executes a construction contract memorializing the work as contained in the bid accepted by Borrower. If the Bank does not receive a signed construction contract, verified cost breakdown and budget for the garage repair work within one hundred eighty (180) days from the date of this Agreement, it shall be an Event of Default (defined below) under this Agreement.

4.2     The Bank shall have received a disbursing agreement in form acceptable to the Bank, signed by Borrower and Title Company (the "Disbursing Agreement").

4.3     At least five business days prior to each disbursement, the Bank and the Title Company shall each have received an application for the disbursement, in form satisfactory to the Bank and otherwise containing detail satisfactory to the Bank and the Title Company, signed by Borrower. The Title Company's copy of such application shall be accompanied by waivers of liens from the contractors to be paid with monies from the disbursement, satisfactory to the Title Company (except that a final lien waiver in full from the respective subcontractor or materialman shall accompany the application which requests final payment for such subcontractor or materialman). Each such application shall be in form and content reasonably satisfactory to the Bank and sufficient to cause the Title Company to issue an endorsement removing or assuring against any lien of the contractors and materialmen being paid from the advance.

4.4     There shall be no substantial unrepaired damage to the Property by fire or other casualty which is not covered by insurance collected or in the process of collection.

4.5     There shall be no condemnation or eminent domain proceeding pending or threatened against all or any material portion (as determined by the Bank) of the Property.

4.6     No Event of Default shall exist on the date of each such disbursement, and, if requested by the Bank, the Bank shall have received a certificate to that effect dated the date of each such advance and signed by Borrower.

4.7     The Bank shall have received, or the Title Company shall have committed to issue, proper updating endorsements to the Bank's title insurance policy (or the commitment therefore) in the face amount of the total sum outstanding hereunder, including the requested advance, insuring the Mortgage as a first lien upon the Property and down-dating the policy or commitment through the date of the disbursement of the amount requested.

4.8     Borrower shall have complied in all material respects with all other requirements set forth in the Disbursing Agreement.

4.9     In the case of the last disbursement hereunder, all of the foregoing conditions shall have been met and, in addition, the Bank shall have received:

(a)     full lien waivers from all contractors, subcontractors and materialmen showing that all amounts payable to such parties for any work or materials provided to the Property have been paid or will be paid out of the final disbursement; and

04829

(b)     a certificate evidencing that Borrower has obtained a policy or policies of insurance and such other coverage as the Bank may reasonably require for the Property in accordance with the Mortgage.

## ARTICLE V     REPRESENTATIONS AND WARRANTIES

In order to induce the Bank to make the loans as herein provided, the Borrower represents and warrants to the Bank as follows:

5.1     Organization.  The Borrower is a limited liability company duly organized and existing in good standing under the laws of the State of Delaware and has all requisite power and authority to conduct its business and to own its properties.  The Borrower is duly licensed or qualified to do business and is in good standing in all jurisdictions in which the nature of its business or the ownership of its properties requires such qualification.

5.2     Authority.  The execution, delivery and performance of this Agreement, the Note, and the Security Documents are within the corporate powers of the Borrower, have been duly authorized by all necessary action and do not and will not (i) require any further consent or approval of the directors or members of the Borrower, (ii) violate any provision of the articles of organization or operating agreement of the Borrower or any law, rule, regulation, order, writ, judgment, injunction, decree, determination or award presently in effect having applicability to the Borrower; (iii) require the consent or approval of, or filing or registration with, any governmental body, agency or authority other than the ministerial act of recording the mortgage and financing statement and filing the financing statements with the appropriate authority; or (iv) result in a breach of or constitute a default under, or result in the imposition of any prohibited lien, charge or encumbrance upon any property of the Borrower, pursuant to any indenture or agreement or instrument under which the Borrower is a party, or by which it or its properties may be bound or affected.  This Agreement, the Security Documents and the Note when delivered will constitute legal, valid and binding obligations of the Borrower enforceable against the Borrower and its properties in accordance with their respective terms.

5.3     Investment Company Act of 1940.  The Borrower is not an "investment company" or a company "controlled" by an "investment company" within the meaning of the Investment Company Act of 1940, as amended.

5.4     Regulation U.  The Borrower is not engaged principally, or as one of its important activities, in the business of extending credit for the purpose of "purchasing" or "carrying" any "margin stock" (all as defined in Regulation U of the Board of Governors of the Federal Reserve System, as amended from time to time).  No part of the proceeds of any Loans will be used to purchase or carry any such "margin stock."

5.5     Employee Retirement Income Security Act.  All Plans (as hereinafter defined) which are maintained for employees of the Borrower or any subsidiary, or any member of the Controlled Group (as hereinafter defined), are in compliance in all material respects with the

04830

applicable provisions of the Employee Retirement Income Security Act of 1974 ("ERISA"), as the same may be in effect from time to time. Neither the Borrower nor any subsidiary has incurred any material "accumulated funding deficiency," within the meaning of Section 302(a)(2) of ERISA in connection with any Plan. There has been no Reportable Event (defined in Title IV of ERISA) for any Plan, the occurrence of which would have a materially adverse effect on the Borrower, nor has the Borrower incurred any material liability to the Pension Benefit Guaranty Corporation under Section 4062 of ERISA in connection with any such Plan.

5.6    Liens. The Borrower has good and marketable title to the Property, free and clear of all liens, security interests, mortgages and encumbrances of any kind, except Permitted Liens and liens to be discharged out of loan proceeds at the signing of this Agreement. The Property is in good condition and repair and, to the best of the Borrower's knowledge and belief, conforms to all applicable laws, regulations and ordinances.

5.7    Contingent Liabilities. The Borrower has no guarantees or other contingent liabilities outstanding (including, without limitation, liabilities by way of agreement, contingent or otherwise, to purchase, to provide funds for payment, to supply funds to or otherwise invest in any debtor or otherwise to assure the creditor against loss).

5.8    Taxes. The Borrower has no material outstanding unpaid tax liability (except for taxes which are currently accruing from current operations and ownership of property, which are not delinquent), and, to the best knowledge of the Borrower, no tax deficiencies have been proposed or assessed against the Borrower.

5.9    Absence of Litigation. The Borrower is not a party to any litigation or administrative proceeding, nor so far as is known by the Borrower is any litigation or administrative proceeding threatened against it, (i) which relates to the execution, delivery or performance of this Agreement, the Note or any Security Document required hereunder, or (ii) which would, if adversely determined, cause any material adverse change in, or have a material adverse affect on the property, financial condition or business operations of the Borrower.

5.10    Absence of Default. No event has occurred which either of itself or with the lapse of time or the giving of notice or both, would give any creditor of the Borrower the right to accelerate the maturity of any indebtedness of the Borrower for borrowed money. The Borrower is not in default under any other lease, agreement or instrument, or to the best knowledge of the Borrower any law, rule, regulation, order, writ, injunction, decree, determination or award, non-compliance with which would materially adversely affect its property, financial condition or business operations.

5.11    No Burdensome Agreements. The Borrower is not a party to any agreement, instrument or undertaking, or subject to any other restriction, (i) which materially adversely affects or may in the future so affect the property, financial condition or business operations of the Borrower, or (ii) under or pursuant to which the Borrower is or will be required to place (or under which any other person may place) a lien upon any of its properties securing indebtedness either upon demand or upon the happening of a condition, with or without such demand.

04831

5.12   Trademarks, etc.   The Borrower possesses adequate trademarks, trade names, copyrights, patents, permits, service marks and licenses, or rights thereto, for the present and planned future conduct of its business substantially as now conducted, without any known conflict with the rights of others which might result in a material adverse effect on the Borrower.

5.13   Full Disclosure.   No information, exhibit or report furnished by the Borrower to the Bank in connection with the negotiation or execution of this Agreement contained any material misstatement of fact as of the date when made, or omitted to state a material fact or any fact necessary to make the statements contained therein not misleading as of the date when made.

5.14   Hazardous Substances.   Except as disclosed in the Phase I Environmental Assessment Report dated June 27, 2000:  (i) There is no substance which has been, is, or will be present, used, stored, deposited, treated, recycled or disposed of on, under, in or about the Property in a form, quantity or manner which, if known to be present on, under, in or about the Property would require clean-up, removal or some other remedial action ("Hazardous Substance") under any federal, state or local laws, regulations, ordinances, codes or rules ("Environmental Laws"); (ii) there are no Hazardous Substances on the Property; (iii) the Property contains no asbestos, polychlorinated biphenyl components (PCBs) or underground storage tanks; (iv) there are no conditions existing currently or likely to exist during the term of this Agreement which would subject the Borrower to any damages, penalties, injunctive relief or clean-up costs in any governmental or regulatory action or third-party claim relating to any Hazardous Substance; (v) the Borrower is not subject to any court or administrative proceeding, judgment, decree, order or citation relating to any Hazardous Substance; and (vi) the Borrower in the past has been, at the present is, in compliance with all Environmental Laws.  The Borrower shall indemnify and hold harmless Bank, its directors, officers, employees and agents from all loss, cost (including reasonable attorneys' fees and legal expenses), liability and damage whatsoever directly or indirectly resulting from, arising out of, or based upon:  (1) the presence, use, storage, deposit, treatment, recycling or disposal, at any time, of any Hazardous Substance described above, on, under, in or about the Property, or the transportation of any Hazardous Substance to or from the Property, (2) the violation or alleged violation of any Environmental Law, permit, judgment or license relating to the presence, use, storage, deposit, treatment, recycling or disposal of any Hazardous Substance on, under, in or about the Property, or the transportation of any Hazardous Substance to or from the Property, or (3) the imposition of any governmental lien for the recovery of environmental clean-up costs expended under any Environmental Law.  The Borrower shall immediately notify Bank in writing of any governmental or regulatory action or third-party claim instituted or threatened in connection with any Hazardous Substance on, in, under or about the Property.

5.15   Fiscal Year.  The fiscal year of the Borrower ends on December 31.

5.16   Use of Proceeds.  Borrower will use the proceeds of the Term Loan to acquire the Property and to complete the Property Maintenance.

04832

# ARTICLE VI. NEGATIVE COVENANTS

While any part of the credit granted to the Borrower hereunder is available or while any part of the principal of or interest on the Note remains unpaid, the Borrower shall not do any of the following, without the prior written consent of the Bank:

6.1    Limitations on Indebtedness.    Create, incur, assume or have outstanding any indebtedness for borrowed money except indebtedness owed Bank and the trade payable in the ordinary course of business.

6.2    Liens.    Create, incur, assume or permit to be created or allow to exist any mortgage, pledge, encumbrance or other lien upon the Property, except Permitted Liens (as defined in Article IX below).

6.3    Change in Controlling Interest, Structure.    Transfer (whether or not for consideration or of record) all or any portion of the Property or any direct or indirect legal, equitable, beneficial or other interest (a) in all or any portion of the Property; (b) in Borrower by Controlling Persons; or (c) at each and every tier or level of ownership, in Borrower's direct or indirect partners, members, shareholders, beneficial or constituent owners who are Controlling Persons including (i) an installment sales agreement for a price to be paid in installments; (ii) any leases or a sale, assignment or other transfer of, or the grant of a security interest in, Borrower's right, title and interest in and to any leases or any rents; (iii) any direct or indirect voluntary or involuntary sale of any ownership interest in Borrower or other Person directly or indirectly owning any direct or indirect interest in Borrower who is a Controlling Person; (iv) the creation, issuance or redemption of direct or indirect ownership interests by Borrower or any Person owning a direct or indirect interest in Borrower (at each every tier or level of ownership) who is a Controlling Person; (v) any merger, consolidation, dissolution, conversion or liquidation; and (vi) without limitation of any of the foregoing, any direct or indirect voluntary or involuntary Transfer by any Person of its direct or indirect controlling interests in Borrower.  For purposes of this Section 6.3, the term "Controlling Person" shall mean any Person which directly or indirectly has the power to direct or cause the direction of management or policies of the Person.

Notwithstanding the foregoing, Bank hereby consents to the pledge of WexTrust Equity Partners, LLC's ("WexTrust") interests ("WexTrust's Interests") and Gracie Capital Inc.'s ("Gracie") interests ("Gracie's Interests") in Peoria Office Ventures, LLC ("Ventures") to ADC-CR Peoria, LLC ("Seller") for the sole purpose of securing the repayment of a Purchase Money Promissory Note in the principal amount of $600,000.00 from Borrower to Seller dated even date herewith ("Seller Note"), which Seller Note is further secured by a mortgage against the Property dated even date herewith which shall be subordinate to the Mortgage ("Junior Mortgage").  Such pledge of WexTrust's Interest and Gracie's Interests to Seller shall be memorialized by an Assignment of Membership Interest (Security Interest) by each of WexTrust and Gracie in favor of Seller dated even date herewith (collectively, "Assignment of Membership Interest").  Bank further agrees that in the event of default by Borrower under the Seller Note or Junior Mortgage, Seller may exercise its remedies under the Assignment of Membership Interest, and if those remedies include acquiring or assuming the management, control or voting rights of Borrower or Ventures, then Seller must comply with the reasonable conditions of the Bank prior to exercising such remedies.

04833

6.4    Acquisitions and Investments.  Acquire any subsidiary, business or line of business other than now owned or operated by Borrower; or make any loan, advance or extension of credit to, or investment in, any other Person, including investments acquired in exchange for stock or other securities or obligations of any nature of the Borrower, or create or participate in the creation of any joint venture, except:

(a)    investments in (i) bank repurchase agreements; (ii) savings accounts or certificates of deposit in a financial institution of recognized standing; (iii) obligations issued or fully guaranteed by the United States, and (iv) prime commercial paper maturing within 90 days of the date of acquisition by the Borrower;

(b)    loans and advances made to employees and agents in the ordinary course of business, such an travel and entertainment advances and similar items; or

(c)    extensions of credit to account debtors in the ordinary course of business in the form of trade credit receivables.

6.5    Contingent Liabilities.  Assume, guarantee, endorse or otherwise become liable for obligations of another (except endorsements of negotiable instruments for deposit or collection in the ordinary course of business).

6.6    Fiscal Year.  Change its fiscal year end.

ARTICLE VII.        AFFIRMATIVE COVENANTS

While any part of the credit granted to the Borrower is available or while any part of the principal of or interest on the Note remains unpaid, the Borrower shall, unless waived in writing by Bank:

7.1    Financial Status.  Timely perform and observe the following financial covenants, all calculated in accordance with the definitions in this Agreement or, if not herein defined, in accordance with generally accepted accounting principles, applied on a consistent basis:

(a)    Maintain an Interest Coverage Ratio of not less than 1.80 to 1 for the years ending December 31, 2008 and December 31, 2009, calculated on an annual basis as of the end of such periods; and

(b)    Maintain a Debt Coverage Ratio of not less than 1.20 to 1 beginning for the year ending December 31, 2010, and for each year thereafter, calculated on an annual basis as of the end of such periods.

7.2    Accounting Records; Reports.  Maintain a standard and modern system for accounting in accordance with Borrower's customary, sound accounting principles consistently applied (as such principles were presented to Bank at the time the Term Loan was underwritten

04834

by Bank) ("Accounting Principles") throughout all accounting periods; and furnish to the Bank such information respecting the business, assets and financial condition of the Borrower as the Bank may reasonably request and, without request, furnish to the Bank:

(a) As soon as available, and in any event within 90 days after the close of each fiscal year of the Borrower, a copy of the Borrower's internally-prepared financial statements, including a balance sheet, and statements of income, retained earnings and cash flow, in form satisfactory to the Bank, as well as third-party support for the write-up in value of any real estate assets reflected on such financial statements;

(b) As soon as available, and in any event with 120 days after the close of each fiscal year of WexTrust Equity Partners LLC, copies of its reviewed financial statements, including a balance sheet, and statements of income, retained earnings and cash flow, in form satisfactory to the Bank, as well as third-party support for the write-up in value of any real estate assets reflected on such financial statements;

(c) As soon as available, and in any event with 120 days after the close of each fiscal year of WexTrust Capital LLC, copies of its reviewed financial statements, including a balance sheet, and statements of income, retained earnings and cash flow, in form satisfactory to the Bank, as well as third-party support for the write-up in value of any real estate assets reflected on such financial statements;

(d) By March 31st of each year, complete, sworn and notarized personal financial statements from Steven Byers and Matthew Gurvey, in a form acceptable to the Bank, and by April 30th of each year or within 15 days after filing if either shall seek an extension, copies of their respective annual federal tax returns;

(e) Within 90 days after the close of each fiscal year of the Borrower, a rent roll showing a list of tenants of the Property, rent and expiration date of the lease for each tenant.

The financial statements referred to in (a), above, shall be accompanied by a written statement by Borrower's accountant (and certified by the chief financial officer of the Borrower in his corporate capacity, to the best of his knowledge) that, as of the close of the last period covered in such financial statements, no condition or event had occurred which constitutes a Default hereunder or which, after notice or lapse of time or both, would constitute an Event of Default hereunder (or if there was such a condition or event, specifying the same).

7.3    Insurance. At its sole cost and expense, shall:

(a) Keep the Property insured against loss or damage by fire and other risks now or hereafter embraced by all risk extended coverage, in an amount equal to one hundred percent (100%) of the full replacement cost. As used herein, "full replacement cost" shall mean: (i) with reference to all buildings and all improvements now or hereafter erected, located on the Property on or after the date of this Agreement and any restoration or replacement thereof pursuant to the

04835

provisions hereof ("Buildings), the cost of replacing the Buildings, exclusive of the cost of excavations, foundations and footings below the lowest basement floor, without depreciation of the Buildings; and (ii) with reference to personal property and other improvements the cost of replacing such property. The full replacement cost shall be determined from time to time at the request of Bank by an insurer or by an appraiser, engineer, architect or contractor designated by Borrower and approved by Bank (such approval not to be unreasonably withheld) and paid by Borrower. No omission on the part of Bank to request any such determination shall relieve Borrower of any of its obligations under this Section.

(b)     Maintain insurance against loss or damage from: (i) leakage of sprinkler systems; and (ii) explosion from steam boilers, air conditioning equipment, pressure vessels or similar apparatus now or hereafter installed in the Buildings and other improvements in such amounts as Bank may from time to time require.

(c)     Maintain rent insurance in an amount not less than one (1) year's gross minimum rentals from the leases. Borrower shall assign to Bank the proceeds of the insurance to be held by Bank as security for the payment of the indebtedness secured by the Security Documents until such time as the Property shall have been restored and placed in full operation, at which time, provided Borrower is not then in default under this Agreement or Security Documents (or after the curing of any such default), such deposit shall be returned by Bank to Borrower or Borrower's designee.

(d)     When required by any federal, state or local law, rule, statute, ordinance or regulation, flood insurance on the Buildings in an amount equal to the lesser of the "full replacement cost" thereof or the maximum amount of insurance available.

(e)     Maintain a policy of public liability, covering the Property in an amount reasonably satisfactory to Bank, with a provision that such coverage shall not be terminated without at least thirty (30) days' prior written notice to Bank; and

(f)     Maintain such other insurance and in such amounts as may from time to time be reasonably required by Bank against other insurable hazards which at the time are commonly insured against and generally available in the case of premises similarly situated.

Borrower may effect for its own account any insurance not required under this Section but any insurance effected by Borrower on the Property and improvements, whether or not required hereunder or in the Mortgage, shall be for the mutual benefit of Borrower and Bank, as their interest may appear, and shall be subject to all other provisions of this Agreement and the Security Documents.

7.4     Inspection of Property and Records. Keep complete and accurate books of records and accounts and permit any representatives of Bank to examine, copy, and/or audit any of the

04836

books or records no more than once a quarter provided an Event of Default exists and to visit and inspect the Property as often as desired.

7.5    Taxes.  Pay and discharge all lawful taxes, assessments and governmental charges upon the Borrower or against its properties prior to the date on which penalties attach, unless and to the extent only that such taxes, assessments and charges are contested in good faith and by appropriate process by the Borrower.

7.6    Existence.  Do all things necessary to maintain its existence, to preserve and keep in full force and effect its rights and franchises necessary to continue its business, and comply with all applicable laws, regulations and ordinances.

7.7    Management.  Notify the Bank of any change in the management of the Borrower.

7.8    Accounts.  Maintain all its financial institution depository (including, without limitation, all time, demand and money market) accounts at the Bank.

7.9    Environmental Laws.  Remain in compliance with all Environmental Laws.

7.10    Distributions.  Be permitted to declare distributions or dividends on any limited liability membership interest in the Borrower ("Membership Interest"), whether now or hereafter outstanding, make any payment on account of any Membership Interest, whether now or hereafter outstanding, set apart assets for a sinking or other analogous fund for the purchase, redemption, retirement or other acquisition of any Membership Interest, whether now or hereafter outstanding, or make any other distribution either directly or indirectly, whether in cash, property or obligations in respect of, or on account of, or purchase or otherwise acquire any Membership Interest, whether now or hereafter outstanding, from any Person, provided that Borrower shall provide Bank with the Compliance Certificate substantially in the form of Exhibit B attached hereto and incorporated herein by reference, stating that the Interest Coverage Ratio or Debt Coverage Ratio, as applicable, (i) immediately before such distribution is paid is in compliance with Section 7.1 hereunder, and (ii) immediately after such distribution is paid, is at least 1.0 to 1.0.  In calculating the Interest Coverage Ratio or Debt Coverage Ratio after distribution, the Borrower shall include the amount of the distribution in the denominator.

## ARTICLE VIII.    DEFAULTS

The following are each "Events of Default" or defaults under this Agreement, each Note, and each Security Document:

8.1    Default in Payment.  The Borrower shall fail to pay any interest or principal when it is due under the Note, or any other amount payable hereunder or under any Security Document within five (5) calendar days after the date due;

04837

8.2    Default on Covenants.  The Borrower fails to timely perform or observe any of the covenants set forth in Article VI or Sections 7.1, 7.2, 7.3, 7.4 and 7.10 of this Agreement and such failure is not cured within thirty (30) calendar days after written notice thereof.

8.3    Default on Other Covenants.  The Borrower fails to timely perform or observe any agreement, covenant, condition, provision or term contained in this Agreement other than those identified in Section 8.2, and such failure is not cured within thirty (30) calendar days after written notice thereof;

8.4    Default in Performance of Other Agreements.  Any default or event of default occurs in the performance or observance of any of the other agreements, covenants, conditions, provisions or terms in any Security Document, or in any other agreement securing this Agreement or the Note and such default is not cured within five (5) calendar days after written demand therefor;

8.5    Representations or Statements False.  Any representation or warranty made by the Borrower in this Agreement or in any Security Document, or any certificate delivered pursuant hereto, or any financial statement delivered to the Bank hereunder, shall prove to have been false, misleading, erroneous, inaccurate or breached in any material respect as of the time when made or given;

8.6    Default on Other Obligations.  The Borrower shall fail to pay all or any part of, the rentals due under any lease or sub-lease, and such default shall not be cured within the period or periods of grace, if any, specified in the instruments governing such obligations; or default shall occur under any other evidence of indebtedness, or any indenture, lease, sub-lease agreement, other instrument representing Borrower's obligation in excess of $250,000, or other agreement governing or securing such obligation, and such default shall continue for a period of time sufficient to permit the acceleration of the maturity of any such indebtedness or the termination of such lease, sub-lease or agreement.

8.7    Judgments.  A final judgment which, together with other outstanding final judgments against the Borrower exceeds an aggregate of $100,000 shall be entered against the Borrower and shall remain outstanding and unsatisfied, unbonded or unstayed after 60 days after the date of entry thereof;

8.8    Bankruptcy; Insolvency.  The Borrower or a Guarantor shall (a) become insolvent or die; or (b) be unable, or admit in writing its inability to pay its debts as they mature; or (c) make a general assignment for the benefit of creditors or to an agent authorized to liquidate any substantial amount of its property; or (d) become the subject of an "order for relief" within the meaning of the United States Bankruptcy Code (which is not set aside within sixty (60) days in the case of an "order for relief" entered in an involuntary bankruptcy); or (e) file a petition in bankruptcy, or for reorganization, or to effect a plan or other arrangement with creditors; or (f) file an answer to a creditor's petition (admitting the material allegations thereof) for liquidation, reorganization or to effect a plan or other arrangement with creditors; or (g) apply to a court for the appointment of a receiver for any of its assets; or (h) have a receiver appointed for any of its assets (with or without its consent) which is not removed within sixty (60) days in the case of an involuntary bankruptcy;

04838

or (i) otherwise become the subject of any insolvency or liquidation or other proceedings for the winding up of its business, and such proceedings are not dismissed or abandoned within 60 days after commencement;

8.9    Validity.    This Agreement, the Note, any Security Document, or any other agreement securing or guaranteeing the Note shall, at any time after their respective execution and delivery, and for any reason, cease to be in full force and effect or shall be declared null and void, or be revoked or terminated, or the validity or enforceability thereof or hereof shall be contested by the Borrower or any member of the Borrower, or the Borrower shall deny that it has any or further liability or obligation thereunder or hereunder, as the case may be; and

Upon the occurrence and during the continuance of any Event of Default, and at any time thereafter, and in each case, the Bank may, by written notice to the Borrower, immediately declare the unpaid principal balance of the Note, together with all interest accrued thereon, to be immediately due and payable; and the unpaid principal balance of and accrued interest on the Note shall thereupon be due and payable without presentment, demand, protest, or further notice of any kind, all of which are hereby waived, and notwithstanding anything to the contrary in the Note or Security Documents. The Bank shall also then, without limitation, have all rights and remedies provided in the Note, Security Document, by law, or otherwise, including the right of setoff, all without any further notice to Borrower. The Bank may proceed to protect its rights in or outside of court, by suit in equity or action at law, or by other appropriate measures, including, without limitation, for the specific performance of any covenant or agreement.

## ARTICLE IX.    DEFINITIONS

9.1    Accounting Terms; Definitions.    Except as otherwise provided or defined herein, all accounting terms shall be construed in accordance with Borrower's Accounting Principles consistently applied, and financial data submitted pursuant to this Agreement shall be prepared in accordance with such principles.  As used herein:

(a)    "Closing Date" shall mean December 10, 2007.

(b)    "Debt Coverage Ratio" means the relationship, expressed as a numerical ratio, which:

(i)    Net income (calculated pursuant to Borrower's customary, sound accounting principles) of Borrower, increased by depreciation, amortization of good will and non-cash deductions, and accrued interest expenses, bears to

(ii)    Debt Service Expense.

(c)    "Debt Service Expense" means all interest and principal charges paid or accrued with respect to any indebtedness of Borrower for borrowed money.

04839

(d)     "Default" shall mean any of the events specified in Article VIII hereof, whether or not any requirement for the giving of notice, the lapse of time, or both, or any other condition has been satisfied.

(e)     "EBIT" means with reference to any period, net income for such period, plus all amounts deducted in arriving at such net income in respect of (a) interest expense for such period and federal, state and local income taxes for such period.

(f)     "Event of Default" means any of the events specified in Article II hereof, provided that any requirement for the giving of notice, the lapse of time, or both, or any other condition has been satisfied.

(g)     "Guarantors" means Steven Byers, Matthew Gurvey, WexTrust Equity Partners, LLC and WexTrust Capital, LLC, or any of them.

(h)     "Interest Coverage Ratio" means the relationship, expressed as a numerical ratio, which:

    (i)     EBIT, bears to

    (ii)    interest paid or accrued with respect to any indebtedness of Borrower for borrowed money.

(i)     "Permitted Liens" shall mean:

    (i)     easements, restrictions, minor title irregularities and similar matters which have no adverse effect as a practical matter upon the ownership and use of the real estate;

    (ii)    liens for taxes, assessments, fees or governmental charges, which are either not delinquent or are being contested in good faith by the Borrower by appropriate proceedings which will prevent foreclosure of such liens, and against which adequate reserves have been provided;

    (iii)   liens or deposits in connection with worker's compensation insurance, or to secure customs' duties, or deposits required by law or governmental regulations as a condition to the transaction of Borrower's business;

    (iv)    liens in favor of the Bank;

    (v)     carriers', warehousemen's, mechanics', landlords', materialmen's, repairmen's or other similar liens arising in the ordinary course of business of the Borrower on its property provided they are not delinquent or remain payable without penalty, or those which the Borrower is contesting in good faith;

04840

(vi)     liens consisting of pledges or deposits by the Borrower required in the ordinary course of business in connection with workers' compensation, unemployment insurance and other social security legislation;

(vii)    liens consisting of judgment or judicial attachment liens against the Borrower, provided that the enforcement of such liens is effectively stayed and all such liens in the aggregate at any time outstanding for the Borrower does not exceed $100,000;

(viii)   those matters listed as encumbrances in the schedules appended to the title insurance policy referred to in Section 2.3 (b); and

(ix)     rights reserved to or vested in any governmental authority to control or regulate or use in any manner the business of the Borrower which do not adversely affect the business of the Borrower, the rights or remedies of the Bank or the value of the collateral.

(j)      "Person" means and includes natural persons, corporations, limited liability companies, limited partnerships, general partnerships, joint stock companies, joint ventures, associations, companies, trusts, banks, trust companies, land trusts, business trusts or other organizations, whether or not legal entities, and governments and agencies and political subdivisions thereof and their respective permitted successors and assigns (or in the case of a governmental person, the successor functional equivalent of such Person).

(k)      "Plan" means any employee pension benefit plan subject to Title IV of ERISA maintained by the Borrower or any member of the Controlled Group, or any such Plan to which the Borrower or any member of the Controlled Group is required to contribute on behalf of any of its employees.

(l)      "Transfer" means, (a) when used as a verb, to, directly or indirectly, lease, sell, assign, convey, give, exchange, devise, mortgage, encumber, pledge, hypothecate, alienate, grant a security interest, or otherwise create or suffer to exist any Lien, transfer or otherwise dispose, or to contract or agreement to do any of the foregoing, whether by operation of law, voluntarily, involuntarily or otherwise as well as any other action or omission which has the practical effect of initiating or completing the foregoing and (b) when used as a noun, a direct or indirect, lease, sale, assignment, conveyance, gift, exchange, devise, mortgage, encumbrance, pledge, hypothecation, alienation, grant of a security interest or other creation or sufferance of a lien, transfer of other disposition, or contract or agreement by which any of the foregoing may be effected, whether by operation of law, voluntary or involuntary and any other action or omission which has the practical effect of initiating or completing the foregoing.

04841

## ARTICLE X. MISCELLANEOUS

10.1   <u>Invalidity of Particular Provisions</u>. If any term or provision of this Agreement or the application thereof to any person or circumstance shall, to any extent, be determined by a court of competent jurisdiction to be invalid or unenforceable, the remainder of this Agreement or the application of such term or provision to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and each term and provision of this Agreement shall be valid and be enforced to the fullest extent permitted by law.

10.2   <u>Notices</u>. All communications or notices required under this Agreement shall be deemed to have been given on the date when deposited in the United States mail, postage prepaid, and addressed as follows (unless and until any of such parties advises the other in writing of a change in such address):

    (a)   if to the Borrower, to:

        Peoria Office Holdings, LLC
        333 West Wacker Drive, Suite 1600
        Chicago, IL 60606
        Attn: Matthew Gurvey

        with a copy to:

        Lawrence Feller, Esq.
        Harwood Marcus & Berk Chartered
        180 North LaSalle Street, Suite 3700
        Chicago, IL 60601
        Facsimile: 312-261-9923

    (b)   if to the Bank, to:

        TCF National Bank
        500 West Brown Deer Road
        Milwaukee, WI 53217
        Attn: Mr. Russell McMinn

10.3   <u>Expenses and Attorneys' Fees</u>. The Borrower shall be responsible for the prompt payment of all fees and out-of-pocket disbursements incurred by the Bank in connection with the preparation, execution, delivery, administration, interpretation, and enforcement of this Agreement, the Note, and the Security Documents, including all costs of collection, before and after judgment (including those incurred in any bankruptcy or insolvency proceeding), and including, without limitation, audit fees (except for the audit conducted prior to the signing of this Agreement) and the reasonable fees and disbursements of attorneys for the Bank.

04842

10.4 <u>Successors</u>. The provisions of this Agreement shall inure to the benefit of any holder of the Notes, and shall inure to the benefit of and be binding upon any successor to any of the parties hereto. Notwithstanding the foregoing, this Agreement is not assignable by the Borrower.

10.5 <u>Survival</u>. All agreements, representations and warranties made herein shall survive the execution of this Agreement, the making of the Loans hereunder and the execution and delivery of the Notes.

10.6 <u>Indemnification</u>. The Borrower agrees to defend, indemnify and hold harmless Bank, its directors, officers, employees and agents, from and against any and all loss, cost, expense, damage or liability (including reasonable attorneys' fees) incurred in connection with any claim, counterclaim or proceeding brought as a result of, arising out of, or relating to, any transaction financed or to be financed, in whole or in part, directly or indirectly, with the proceeds of any Loan or the entering into and performance of this Agreement or any document or instrument relating to the Agreement by Bank. This indemnity will survive termination of this Agreement, the repayment of the Term Loan and the discharge and release of any Security Documents.

10.7 <u>Amendment</u>. No amendment, modification, termination or waiver of any provision of this Agreement, nor consent to any departure by the Borrower from any provision of this Agreement shall in any event be effective unless it is in writing and signed by Bank, and then such waiver or consent shall be effective only in the specific instance and for the specific purposes for which given.

10.8 <u>Entire Agreement</u>. This Agreement, including the Exhibits attached to it and the Security Documents and any note evidencing the Term Loan, is intended by the Borrower and Bank as a final expression of this Agreement and as a complete and exclusive statement of its terms, there being no conditions to the full effectiveness of this Agreement except as set forth in this Agreement.

10.9 <u>No Waiver; Remedies</u>. No failure on the part of Bank to exercise, and no delay in exercising, any right, power or remedy under this Agreement shall operate as a waiver of such right, power or remedy; nor shall any single or partial exercise of any right under this Agreement preclude any other or further exercise of the right or the exercise of any other right. The remedies provided in this Agreement are cumulative and not exclusive of any remedies provided by law.

10.10 <u>Consent to Jurisdiction</u>. If there is a lawsuit, Borrower agrees upon Bank's request to submit to the jurisdiction of the Courts of Peoria County, State of Illinois.

10.11 <u>WAIVER OF TRIAL BY JURY</u>. BORROWER AND BANK WAIVE TRIAL BY JURY IN ANY SUIT OR PROCEEDING BROUGHT IN CONNECTION WITH THIS AGREEMENT OR ANY OF THE SECURITY DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED IN THE SECURITY DOCUMENTS, INCLUDING TRIAL BY JURY WITH RESPECT TO A THIRD PARTY IN A SUIT OR PROCEEDING IN WHICH BORROWER IS A PARTY.

04843

10.12  Governing Law.  This Agreement shall be governed by federal law applicable to Bank and, to the extent not preempted by federal law, the laws of the State of Illinois without regard to its conflicts of law provisions.

04844

IN WITNESS WHEREOF, the parties have executed this Loan Agreement as of the day, month and year first above-written.

**PEORIA OFFICE HOLDINGS,LLC**
a Delaware limited liability company

By:    Peoria Office Investors, LLC
        a Delaware limited liability company
Its:    Member

       By:    Peoria Office Managers, LLC
             A  Delaware limited liability company
       Its:    Manager

            By:    WexTrust Equity Partners, LLC
                an Illinois limited liability company
            Its:    Manager
            By:  _____
                  Steven Byers, its Manager

**TCF NATIONAL BANK**

By:    _____
Name: _____
Title:  _____

IN WITNESS WHEREOF, the parties have executed this Loan Agreement as of the day, month and year first above-written.

**PEORIA OFFICE HOLDINGS LLC**
a Delaware limited liability company

By:   Peoria Office Investors, LLC
       a Delaware limited liability company
Its:   Member

     By:   Peoria Office Managers, LLC
          A Delaware limited liability company
     Its:   Manager

          By:   WexTrust Equity Partners, LLC
              an Illinois limited liability company
          Its:   Manager

              By:   _____
                   Steven Byers, its Manager

**TCF NATIONAL BANK**

By: _____
Name: _Kathleen J. Andreotti_
Title: _Vice President_

04846

**EXHIBIT "B"**

04847

## TERM NOTE

$11,063,000.00                                              December 10, 2007

The undersigned, Peoria Office Holdings LLC, a Delaware limited liability company ("Borrower"), promises to pay to the order of TCF National Bank, a national banking association ("Bank"), at Milwaukee, Wisconsin, the principal sum of Eleven Million Sixty-three Thousand and 00/100 Dollars ($11,063,000.00) and such additional sums as may be subsequently advanced to Borrower by Bank, together with interest at the Interest Rate (defined below) until the indebtedness shall have been fully paid.

For the period from December 10, 2007 to December 10, 2009, payments of accrued interest only shall be due and payable in consecutive monthly installments on the 10th day of each month commencing on January 10, 2007. Commencing on December 10, 2009, and on the same day of each consecutive month thereafter until the Maturity Date, Borrower shall make payments of both principal and interest amortized over a twenty-five (25) year period. All payments shall be applied first to late charges, then to interest on the unpaid principal balance of this Note, then to any applicable escrow requirements, and the remainder toward reduction of principal.

If not sooner paid, the unpaid principal and any accrued but unpaid interest shall be due and payable in full on November 10, 2017 (the "Maturity Date"). Bank may, at its option upon written agreement executed by Borrower, extend the Maturity Date or renew this Note from time to time for such further periods, at such rate of interest, and upon such conditions as may be then agreed upon. No extension or renewal shall operate to impair the Security Documents (defined below) securing this Note or release any maker, guarantor or endorser of this Note.

This Note shall bear interest at the initial rate of 5.57% per annum (the "Interest Rate"). The Interest Rate shall be adjusted based on the index of the 5-year average yield on the United States Treasury Securities as made available by the Federal Reserve Board plus 2.00%, rounded up to the nearest .125%. The first Interest Rate adjustment shall be made on November 1, 2012. Notwithstanding the preceding language, the Interest Rate shall never be less than 3.00% per annum.

Interest shall be computed for the actual number of days principal is unpaid on the basis of a 360 day year. Unpaid principal and interest bear interest after maturity (whether by acceleration or lapse of time) at a rate equal to 2.0% greater than the rate which would otherwise be applicable.

This Note may be prepaid in part or in full at any time with interest to the date of payment. However, in the event Borrower refinances this Note with another Bank, Borrower shall pay, at the time of prepayment, an exit fee ("Exit Fee") in the amount of:

(a)     five percent (5%) of the principal amount being prepaid if such prepayment occurs on or before November 10, 2008;

(b)　　four percent (4%) of the principal amount being prepaid if such prepayment occurs on or before November 10, 2009;

(c)　　three percent (3%) of the principal amount being prepaid if such prepayment occurs on or before November 10, 2010;

(d)　　two percent (2%) of the principal amount being prepaid if such prepayment occurs on or before November 10, 2011;

(e)　　one percent (1%) of the principal amount being prepaid if such prepayment occurs after November 10, 2011 and before the Maturity Date.

Notwithstanding the preceding language, the Exit Fee shall be an amount equal to one-half of one percent (.005%) of the amount being prepaid if the Property is sold in an arm's length transaction to a Person not related to or affiliated with Borrower or with any of Borrower's members. "Affiliated" for these purposes shall mean directly or indirectly controlling Borrower or any of Borrower's members, or controlled by, or under common control (to any degree) or ownership (to any degree) with Borrower or with any of Borrower's members or with any officer, director or managing agent of Borrower.

Bank may collect a late payment charge equal to five percent (5%) of the unpaid amount of any installment not paid on or before the 5th day after its due date. For the purpose of this charge, payments are applied first to the longest outstanding installment due

This Note evidences a Term Loan under, is subject to, governed by and entitled to the benefits of that certain Loan Agreement, as it may be amended from time to time, between the Bank and the Borrower originally dated December 10, 2007 ("Agreement"). This Note is secured by, among other things and without limitation, the Security Documents (as defined in the Agreement). Except as otherwise defined herein, all capitalized terms used in this Note shall have the meaning ascribed thereto in the Agreement.

Upon the occurrence and during the continuance of an Event of Default or default under the Agreement or under any of the Security Documents, all principal and interest then remaining unpaid on this Note may, at the option of the Bank, be declared to be immediately due and payable.

Borrower hereby waives demand, presentment, protest and any and all notices in connection with the delivery, acceptance, performance or enforcement of this Note. The Borrower agrees to pay on demand, in addition to the principal and interest due and payable hereon, all court costs, reasonable attorneys' fees and other collection costs and charges incurred by the Bank in collecting on this Note or protecting or enforcing Bank's rights hereunder, under the Agreement or under any Security Document, both before and after judgment, and including those incurred in any bankruptcy or insolvency proceeding.

If there is a lawsuit, Borrower agrees, upon Bank's request, to submit to the jurisdiction of the Courts of Peoria County, State of Illinois.

This Note will be governed by federal law applicable to Bank and, to the extent not preempted by federal law, the laws of the State of Illinois without regard to its conflicts of law provisions. This Note has been accepted by Bank in the State of Illinois.

Without affecting the liability of any Borrower, Bank may, without notice, accept partial payments, release or impair any collateral security to the payment of this Note or agree not to sue any party liable on it.

**PEORIA OFFICE HOLDINGS,LLC**
a Delaware limited liability company

By:    Peoria Office Investors, LLC
        a Delaware limited liability company
Its:    Member

     By:    Peoria Office Manager, LLC
           a Delaware limited liability company
     Its:    Manager

         By:    WexTrust Equity Partners, LLC
              n Illinois limited liability Company
         Its:    Manager

            By: _____
                Steven Byers, its Manager

20881351_1.DOC

04850