# APPENDIX "B"

# (Part 2)

**EXHIBIT "C"**

04851

# MORTGAGE

THIS MORTGAGE is made as of this 10th day of December, 2007, by Peoria Office Holdings, LLC, a Delaware limited liability company, whose address is 333 West Wacker Drive, Suite 1600, Chicago, Illinois 60606 (the "**Borrower**"), for the benefit of TCF National Bank, a national banking association, whose address is 500 West Brown Deer Road, Milwaukee, Wisconsin 53217 (the "**Bank**").

This is a purchase money and construction mortgage.

This is not homestead property.

Borrower is indebted to Bank in the principal sum of Eleven Million Sixty-three Thousand and 00/100 Dollars ($11,063,000.00), which indebtedness is evidenced by Borrower's Term Note in the principal amount of $11,063,000.00 dated of even date herewith (the "**Note**");

To secure to Bank:

(a) the prompt payment of the indebtedness and liability evidenced by the Note, with interest thereon or thereunder including any extensions, renewals or modifications thereof;

(b) the payment of all other sums, with interest thereon, advanced in accordance herewith to protect the security of this Mortgage, and the performance of the covenants and agreements of Borrower herein contained; and

(c) payment of all other debts, obligations and liabilities of every kind and character of Borrower to Bank whether now owed or hereafter arising, including all indebtedness incurred or arising pursuant to the provisions of this Mortgage or any other instrument now or hereinafter evidencing, governing or securing the above described indebtedness or any part thereof, whether such debts, obligations or liabilities are direct or indirect, primary or secondary, joint or several, fixed or contingent, and whether originally payable to Bank or to a third party and subsequently acquired by Bank, and whether the debts, obligations and liabilities are evidenced by a promissory note, open account, overdraft, endorsement, surety agreement, guaranty or otherwise, it being contemplated that Borrower may hereinafter become indebted to Bank in further sum or sums

(collectively, the "**Obligations**"), Borrower does hereby mortgage, convey and warrant to Bank the premises and property described in **Exhibit A** (hereafter the "**Property**"), attached hereto and made a part hereof, together with all of the following:

(i) all easements, rights-of way, strips of land, streets, sewer and water lines, sewer rights, waters, water courses, water rights and powers, riparian rights, and all estates, rights, titles, interests, privileges, licenses, tenements, hereditaments and

appurtenances whatsoever, in any way belonging, relating or appertaining to the Property or which hereafter shall in any way belong, relate or be appurtenant thereto, whether now owned or hereafter acquired by the Borrower; including, but not limited to, all judgments, awards of damages and settlements hereafter made resulting from condemnation proceedings or the taking of all or any part of the Property under the power of eminent domain, and for any damage (whether caused by such taking or otherwise) to the Property or any part thereof, or to any rights appurtenant thereto; and all proceeds of any sales or other dispositions of the Property; all royalties, minerals, oil and gas rights and profits, water and water rights (whether or not appurtenant) owned by Borrower; and also all the estate, right, title and interest of the Borrower, either in law or in equity, of, in and to the Property and every part thereof;

(ii) all buildings, structures, fixtures and improvements, now or hereafter erected on the Property, all right to insurance proceeds and all proceeds, products, replacements, additions, substitutions, renewals and accessions of any of the foregoing;

(iii) all rents, income, issues and profits due on or to become due with respect to the foregoing, and all leases of the Property, if any, and all right, title and interest of the Borrower thereunder, including, without limitation, security deposits thereunder to secure performance by the lessees of their obligations thereunder, including the right upon the happening of any event of default as described herein, to receive and collect the rents thereunder; and

(iv) all other improvements now or hereafter situated on the Property (hereafter collectively with the Property, referred to as the "**Mortgaged Premises**").

The Mortgaged Premises is not homestead property.

Borrower covenants to the Bank as follows:

## ARTICLE I.   COVENANTS AS TO TITLE

1.1     Borrower covenants that it is lawfully seized of an indefeasible estate in fee simple in the Mortgaged Premises free of (and Borrower will warrant and forever defend the title to the Mortgaged Premises against) all claims, demands, easements, restrictions and encumbrances, except those listed in the schedule of exceptions attached hereto as **Exhibit 1.1** and Permitted Liens as defined in the Loan Agreement dated of even date herewith (which, except for taxes and assessments, shall be subordinate to the lien of this Mortgage).

1.2     During the term of this Mortgage, Borrower shall not sell, assign, lease, mortgage, alienate, transfer or dispose of all or any part of the Mortgaged Premises, except as provided in the Loan Agreement and except for the existing leases of the Mortgaged Premises and any extensions, amendments, renewals or substitutions thereof, and any new leases of the Mortgaged Premises provided such leases have been approved in writing by the Bank.

04853

## ARTICLE II. PAYMENT OF TAXES, ASSESSMENTS, ETC.

2.1    Borrower agrees to pay to Bank on the day monthly installments are payable under the Note, until the Note is paid in full, a sum (hereafter referred to as "**Escrow**") sufficiently reasonable (as estimated by Bank) to anticipate the payment of taxes, assessments, and similar items that may accrue against the Mortgaged Premises. If payment under this §2.1 is excused, Bank may nonetheless require payment by notice to Borrower at any time. If the amount of the Escrow held by Bank shall not be sufficient to pay taxes, assessments, and similar items as they fall due, Borrower shall pay to Bank any amount necessary to make up the deficiency upon demand by Bank. The Escrow shall be held by Bank and may be commingled with other such funds or its own funds, and Bank may pay such items as charged or billed, without further inquiry, from such payments or its own funds. Bank shall be required to pay Borrower all interest earned on the Escrow.

2.2    To the extent not paid by Bank pursuant to §2.1, Borrower shall pay before any fine, penalty, interest or cost may be added thereto, or become due or be imposed by operation of law for the non-payment thereof, all taxes, assessments, water and sewer charges, charges for public utilities, excises, levies, license and permit fees and other governmental charges, general and special of any kind whatsoever ("**Impositions**"); which at any time prior to or during the term of this Mortgage may be assessed, levied, or become due and payable out of or in respect of, or become a lien on, the Mortgaged Premises or any part thereof, prior to the lien of this Mortgage provided, however, that if, by law, any Imposition may at the option of Borrower be paid in installments, Borrower may exercise the option to pay the same in installments and, in such event, shall pay such installments as the same respectively become due and before any fine, penalty, further interest or cost may be added thereto. Distribution by Bank for such Impositions shall be made no more frequently than annually.

2.3    Borrower shall have the right to contest the amount or the validity, in whole or in part, of any Imposition by appropriate proceedings diligently conducted in good faith, and, notwithstanding the provisions of §2.2, Borrower may postpone or defer payment of such Imposition, if Borrower, prior to such postponement or deferment:

(a)    deposits or causes to be deposited with Bank a surety bond issued by a surety company acceptable to Bank securing the payment of the same, plus all fines, interest, penalties or costs which may become due pending the determination of such contest, or

(b)    deposits or causes to be deposited with Bank an amount equal to one hundred twenty-five percent (125%) of such Imposition or any balance thereof remaining unpaid, and from time to time but not more frequently than quarter-annually deposit additional amounts in order to keep on deposit at all such times an amount equal to one hundred twenty-five percent (125%) of the maximum Imposition remaining unpaid and all interest, penalties, costs and charges accrued or accumulated thereon, or

(c)    furnishes or causes to be furnished to Bank other security satisfactory to Bank.

04854

If any such deposit is made or such security furnished and Borrower continues in good faith to contest the validity of such Imposition by appropriate legal proceedings which shall operate to prevent the collection of such Imposition so contested and the sale of the Mortgaged Premises or any part thereof to satisfy the same, Borrower shall have the full power and authority to apply or require the application of any amount so deposited to payment of any unpaid Imposition to prevent the sale or forfeiture of the Mortgaged Premises for non-payment thereof without liability, however, for any failure so to apply any amount so deposited unless Borrower or the person making such deposit in writing requests the application of such amount to the payment of the particular Imposition with reference to which it was deposited. Any surplus remaining in the hands of Bank after the Imposition for which the deposit was made has been paid in full shall be repaid to Borrower or the person making such deposit unless Borrower shall be in default in the payment of any Obligations or other charges required to be paid under the provisions of this Mortgage and in case of such default so much of such surplus shall be applied on account of such Obligations or other charges.

Upon termination of any such proceedings, Borrower shall pay the amount of such Imposition or part thereof as finally determined in such proceedings, the payment of which shall have been deferred during the prosecution of such proceedings, together with any costs, fees, interest, penalties and other liabilities in connection therewith. However, if monies have been deposited with Bank pursuant to this Section, said funds shall be used to make payment and the balance remaining of the funds deposited pursuant to this Section, if any, shall be returned to Borrower.

ARTICLE III. INSURANCE

3.1      Borrower, at its sole cost and expense, shall:

(a)      Keep the Property insured during the term of this Mortgage, against loss or damage by fire and other risks now or hereafter embraced by all risk extended coverage, in an amount equal to one hundred percent (100%) of the full replacement cost. As used in this Mortgage, "full replacement cost" shall mean: (i) with reference to all buildings and all improvements now or hereafter erected, located on the Property on or after the date of this Mortgage and any restoration or replacement thereof pursuant to the provisions hereof ("Buildings"), the cost of replacing the Buildings, exclusive of the cost of excavations, foundations and footings below the lowest basement floor, without depreciation of the Buildings; and (ii) with reference to personal property and other improvements the cost of replacing such property. The full replacement cost shall be determined from time to time at the request of Bank by an insurer or by an appraiser, engineer, architect or contractor designated by Borrower and approved by Bank (such approval not to be unreasonably withheld) and paid by Borrower. No omission on the part of Bank to request any such determination shall relieve Borrower of any of its obligations under this Section.

(b)      Maintain insurance against loss or damage from: (i) leakage of sprinkler systems; and (ii) explosion from steam boilers, air conditioning equipment, pressure vessels or similar apparatus now or hereafter installed in the Buildings and other improvements in such amounts as Bank may from time to time require.

04855

(c)     Maintain rent insurance in an amount not less than one (1) year's gross minimum rentals from the leases.  Borrower shall assign to Bank the proceeds of the insurance to be held by Bank as security for the payment of the indebtedness secured by this Mortgage until such time as the Mortgaged Premises shall have been restored and placed in full operation, at which time, provided Borrower is not then in default under this Mortgage (or after the curing of any such default), such deposit shall be returned by Bank to Borrower or Borrower's designee.

(d)     When required by any federal, state or local law, rule, statute, ordinance or regulation, flood insurance on the Buildings in an amount equal to the lesser of the "full replacement cost" thereof or the maximum amount of insurance available.

(e)     Maintain a policy of public liability, covering the Mortgaged Premises in an amount reasonably satisfactory to Bank, with a provision that such coverage shall not be terminated without at least thirty (30) days' prior written notice to Bank; and

(f)     Maintain such other insurance and in such amounts as may from time to time be reasonably required by Bank against other insurable hazards which at the time are commonly insured against and generally available in the case of premises similarly situated.

3.2     Borrower may effect for its own account any insurance not required under the provisions of this Mortgage but any insurance effected by Borrower on the Buildings and improvements, whether or not required under this Article III, shall be for the mutual benefit of Borrower and Bank, as their interest may appear, and shall be subject to all other provisions of this Article III.

3.3     **Benefit of Insurance**.  Except as hereinafter otherwise provided, all insurance provided for in this Article III shall be effected under valid and enforceable policies issued by financially responsible insurers incorporated under the laws of the United States or any state thereof and authorized to do business in the State of Illinois and which are approved in writing by Bank.  All policies shall contain a standard non-contributory mortgage clause in favor of and in form acceptable to Bank.  Upon the execution of this Mortgage and thereafter not less than thirty (30) days prior to the expiration dates of the expiring policies furnished pursuant to this Article III, or any other Article of this Mortgage, originals of the policies bearing notations evidencing the payment of premiums or accompanied by other evidence satisfactory to Bank of such payment, shall be delivered by Borrower to Bank.

3.4     All policies of insurance provided for in 3.1 shall include the interest of Bank. The loss, if any, under these policies shall be adjusted with the insurance companies solely by Bank.  The proceeds of any such insurance shall be payable to Bank.  Each such policy shall contain an agreement by the insurer that such policy shall not be canceled without at least thirty (30) days' prior notice to Bank.

3.5     All premiums on insurance policies required herein shall be paid by Borrower when due, or, if not timely paid, by Bank, at Bank's option, making payment, when due, directly to the insurance carrier.  In the event that Borrower does not deposit with Bank a new policy of insurance with evidence of payment of premiums thereon at least ten (10) days prior to the

20637561_4.DOC                                    - 5 —

04856

expiration of any expiring policy, then Bank may, but shall not be obligated to, procure insurance for its own benefit as it deems necessary to protect the value of and Bank's rights in the Mortgaged Premises and pay the premiums therefore and Borrower agrees to repay to Bank the premiums thereon promptly upon demand, together with interest thereon at the highest rate in effect under the Note.

## ARTICLE IV. REPAIRS AND MAINTENANCE

4.1     Throughout the term of this Mortgage, Borrower shall not permit or commit waste, and shall keep the improvements and other structures on the Mortgaged Premises in good condition, and make all necessary repairs thereto, interior and exterior, structural and non-structural, ordinary and extraordinary, and foreseen and unforeseen. Borrower shall also keep any fixtures related to the Mortgaged Premises in good condition and repair.

4.2     If the Borrower fails to maintain the Mortgaged Premises as herein required, the Bank may, but is not obligated to, make such repairs or perform such maintenance or take such other steps as it deems advisable to protect the Mortgaged Premises or to prevent or cure waste. Any such actions by the Bank shall be at the cost and expense of the Borrower. Borrower shall pay to Bank immediately upon demand, all sums of money advanced by Bank pursuant to this §4.2 together with interest on all sums advanced as of the date of each advance at the highest interest rate in effect under any Note.

## ARTICLE V. USE OF MORTGAGED PREMISES

5.1     Borrower will use the Mortgaged Premises continuously as a multi-tenant commercial office building.  Borrower shall not use, or permit the use of the Mortgaged Premises for any other use without the prior written consent of Bank.

5.2     Throughout the term of this Mortgage, Borrower shall promptly comply with all present and future laws, ordinances, orders, rules, regulations and requirements of all federal, state and municipal governments, courts, departments, commissions and boards, or any other body exercising functions similar to those of the foregoing, which may be applicable to the Mortgaged Premises or to the use of the Mortgaged Premises.

5.3     Borrower shall have the right to make changes and alterations in or to the Mortgaged Premises, subject, however, in all cases to the following:

> (a)     No change or alteration costing in excess of $100,000 (other than the Property Maintenance described in the Loan Agreement), including any restoration required by Article VI or Article VII, shall be made without the prior written consent of Bank, which consent shall not be unreasonably withheld or delayed, and, in connection with such change or alteration, Bank shall have received an endorsement to the mortgage title insurance policy obtained in connection with acceptance of the Mortgage by Bank,

04857

satisfactory to Bank, or other evidence satisfactory to Bank, insuring against any vendor's, mechanic's, laborer's, materialman's or other lien.

(b)  Any change or alteration shall, when completed, be of such a character as not to materially reduce the economic value of the Mortgaged Premises below its value immediately before such change or alteration.

(c)  Any change or alteration, once commenced, shall be made promptly and in a good and workmanlike manner and in compliance with all applicable permits and authorizations and building and zoning laws.

## ARTICLE VI. DAMAGE OR DESTRUCTION

6.1    In case of casualty to the Mortgaged Premises resulting in damage or destruction, Borrower shall promptly give written notice thereof to Bank. Bank shall have the option to apply the insurance proceeds to any Obligation secured by this Mortgage, or to permit use of the proceeds for restoration. Bank shall advise Borrower, at Bank's option, as to whether Bank elects to apply the insurance proceeds to reduce the unpaid sum due Bank or whether it will make such proceeds available to Borrower to restore the damage. Regardless of the amount of any such damage or destruction, if Bank elects to permit Borrower to use the insurance proceeds to restore rather than use the insurance loss proceeds to reduce the unpaid balance, Borrower shall at its sole cost and expense, except as otherwise provided in this Article VI, and whether or not the insurance proceeds shall be sufficient for the purpose, restore, repair, replace, rebuild or alter the same as nearly as possible to its value, condition and character immediately prior to such damage or destruction or with such changes or alterations as may be made at Borrower's election in conformity with and subject to the conditions of Article V. Notwithstanding the foregoing, so long as the available insurance proceeds, together with other funds made available by Borrower, are sufficient to pay for any necessary restorations, Bank shall make such proceeds available to Borrower to restore the damage, provided no uncured Event of Default has occurred.

6.2    Subject to the provisions of §6.5 and §6.6 and if Bank elects to use or permit the use of the insurance loss proceeds to restore the Mortgaged Premises, all insurance money paid to Bank on account of such damage or destruction, less the actual cost, fees and expenses, if any, incurred in connection with adjustment of the loss, shall be applied by Bank to or made available to Borrower for the payment of the cost of the restoration, repairs, replacement, rebuilding or alterations, including the cost of temporary repairs or for the protection of property pending the completion of permanent restoration, repairs, replacements, rebuilding or alterations (all of which temporary repairs, protection of property and permanent restoration, repairs, replacement, rebuilding or alterations are hereafter collectively referred to as the "Restoration"), and shall be paid out from time to time as such Restoration progresses upon the written request of Borrower, if the work for which payment is requested has been done in a good workmanlike manner and substantially in accordance with the plans and specifications approved by the Bank therefor, if any. Each request shall be accompanied by the following:

04858

(a) A certificate signed by Borrower, dated not less than thirty (30) days prior to such request, setting forth the following:

    (i) That the sum then requested either has been paid, or is justly due to contractors, subcontractors, materialmen, engineers, architects or other persons who have rendered services or furnished materials for the Restoration therein specified or have paid for the same, the names and addresses of such persons, a brief description of such services and materials, the several amounts so paid or due to each of said persons in respect thereof, that no part of such expenditures has been or is being made, in any previous or then pending request, for the withdrawal of insurance money or has been made out of the proceeds of insurance received by Borrower or other sums deposited with Bank for the Restoration.

    (ii) That the cost, as estimated by the persons signing such certificate, of the Restoration required to be done subsequent to the date of such certificate in order to complete and pay for the same, does not exceed the insurance money, plus any amount deposited by Borrower to defray such cost and remaining in the hands of Bank after payment of the sum requested in such certificate.

(b) An endorsement to the mortgage title insurance policy obtained in connection with acceptance of the Mortgage by Bank, satisfactory to Bank, or other evidence satisfactory to Bank, insuring against any vendor's, mechanic's, laborer's, materialman's or other lien.

6.3    In the event that any Restoration involves expenditures in excess of $100,000, in addition to the certificate required by §6.2(a) there shall also be furnished a certificate signed by the architect and/or engineer in charge of the Restoration, who shall be selected by or on behalf of Borrower and approved in writing by Bank, such approval not to be unreasonably withheld, certifying to the facts set forth in §6.2(a)(ii).

6.4    Upon compliance with the provisions of §6.2, Bank shall, if it has elected to permit use of insurance proceeds for Restoration, out of such insurance money and other sums deposited with Bank for the Restoration, pay or cause to be paid to Borrower or the persons named (pursuant to §6.2(a)(i)) in such certificate the respective amounts stated therein to be due to them, as the case may be.

6.5    If the insurance money at the time held by Bank less the actual cost, fees and expenses, if any, incurred in connection with the adjustment of the loss, shall be insufficient to pay the entire cost of such Restoration, Borrower will promptly, upon written demand from Bank, deposit with Bank any sums necessary to make up such deficiency, which sum shall be held by Bank in a non-interest bearing account.

04859

6.6     Upon (a) completion of all the Restoration in a good and workmanlike manner and substantially in accordance with the plans and specifications therefor, if any, and (b) receipt by Bank of satisfactory evidence of the character required by §6.2, that the Restoration has been completed and paid for in full (or if any part of the Restoration has not been paid for, adequate security for such payment shall exist in form satisfactory to Bank) and that there are no liens of the character referred to in §6.2(b), any balance of the insurance money at the time held by Bank shall be paid within ten (10) days after fulfillment of subsection (b) herein to Borrower or its designee provided Borrower is not then in default hereunder.

## ARTICLE VII.  CONDEMNATION

7.1     In the event that the Mortgaged Premises, or any part thereof, shall be taken in condemnation proceedings or by exercise of any right of eminent domain (collectively, **"Condemnation Proceedings"**), Borrower and Bank shall have the right to participate in any Condemnation Proceedings and the award that may be made in any Condemnation Proceedings or proceeds thereof shall be deposited with Bank and distributed in the manner set forth in this Article VII.  The parties agree to execute any and all further documents that may be required in order to facilitate collection of any award or awards and the making of any such deposit.

7.2     If at any time during the term of this Mortgage, title to the whole or any part of the Mortgaged Premises (including, without limitation, the taking for temporary use of the whole or any part of the Mortgaged Premises or any taking resulting in an award for consequential damages or for the taking of rights in, under or above the adjoining streets, or the rights and benefits of light, air or access to said street, or for taking of space, or rights therein, below the surface of, or above the Mortgaged Premises) shall be taken in Condemnation Proceedings or by agreement between Borrower, Bank and those authorized to exercise such right, Bank may, at its option, apply such award or proceeds to payment of the indebtedness or liabilities secured by this Mortgage and any balance then remaining shall be paid to Borrower within ten (10) days after such application of funds.  In the event of a complete condemnation of the Mortgaged Premises, if the amount of the award or proceeds received by Bank shall not be sufficient to pay the then unpaid balance of the said indebtedness or liabilities, with the accrued interest thereon, Borrower shall, within ten (10) days after the application of the award or proceeds as aforesaid, pay such deficiency to Bank.

7.3     If at any time title to the whole or any part of the Mortgaged Premises shall be taken (including, without limitation, the taking for temporary use of the whole or any part of the Mortgaged Premises or any taking resulting in an award for consequential damages or for the taking of rights in, under or above the adjoining streets, or the rights and benefits of light, air or access to said street, or for taking of space, or rights therein, below the surface of or above the Mortgaged Premises) as aforesaid, and provided Bank has not elected to apply the awards or proceeds to reduce the indebtedness or liabilities secured by the Mortgage, after payment of the costs and expenses provided in §11.5, the balance of the award or proceeds collected by Bank pursuant to §11.1 shall be held by Bank and applied and paid over toward the cost of demolition, repair and Restoration, substantially in the same manner and subject to the same conditions as those provided in §10.2, §10.3 and §10.4 with respect to insurance and other monies (reference to the casualty shall be deemed to be the condemnation and reference to insurance money shall be deemed to be the

04860

condemnation proceeds). Any balance remaining in the hands of Bank after payment of such costs of demolition, repair and Restoration shall be retained by Bank and applied in reduction of the indebtedness secured by the Mortgage. In the event that the costs of demolition, repair and Restoration shall exceed the net amount collected by Bank, Borrower shall pay the deficiency or the costs of demolition, repair and Restoration, as the case may be.

7.4     Notwithstanding any provision of this Article VII to the contrary, if at the time of the notice of the condemnation or at any time during any demolition, repair and Restoration of the Mortgaged Premises, Borrower was in default, beyond any applicable time period, under any provision of this Mortgage or any documents collateral to this Mortgage, Bank shall have no obligation to apply the condemnation proceeds to further demolition, repair and Restoration and may apply such condemnation proceeds to cure any default under this Mortgage, or any collateral documents related thereto, to reduce the outstanding indebtedness secured by the Mortgage to complete any demolition, repair or Restoration or any one or more of the foregoing as Bank, in its sole discretion, may determine.

7.5     In the case of any taking covered by the provisions of this Section 7.5, Bank (to the extent that Bank has not been reimbursed therefor by Borrower) shall be entitled as a first priority to reimbursement out of any award or awards for all reasonable costs, fees, reimbursements to Bank and expenses incurred in the determination and collection of any such awards.

7.6     Any reduction in the principal sum resulting from Bank's application of any award or payment as hereinafter set forth shall be deemed to take effect only on the date of such receipt and application. If prior to Bank's receipt of such award or payment the Mortgaged Premises shall have been sold on foreclosure of this Mortgage, Bank shall have the right to receive the award or payment to the extent of any portion of the indebtedness still unpaid after application of the proceeds of the foreclosure sale, with legal interest thereon, plus the reasonable attorneys' fees, costs and disbursements incurred by Bank in connection with the collection of such award or payment and in establishing the deficiency.

7.7     The application of condemnation proceeds to the obligations secured by this Mortgage, whether or not then due and payable, shall not postpone, abate or reduce any of the periodic installments of principal and/or interest thereafter to become due under the Note until the obligations secured under this Mortgage are paid in full.

7.8     In the event that the outstanding principal balance and all accrued interest thereon has been fully paid and satisfied, and all other costs, fees and expenses of Bank due under this Mortgage, or any other collateral document relating thereto, have been fully paid and satisfied, then in that event the balance of any net proceeds which remain in possession of Bank after such satisfaction shall be paid by Bank to Borrower within ten (10) days of such satisfaction.

7.9     Condemnation awards received by Bank and applied to the amounts due on the Note shall not be considered prepayments of the Note.

04861

## ARTICLE VIII. GENERAL COVENANTS

Borrower acknowledges, warrants, represents and covenants as follows:

8.1     This Mortgage is a valid, first priority, mortgage lien on the Mortgaged Premises and there are no setoffs, counterclaims or defenses to the principal sum above mentioned as being unpaid, secured hereby, or to any part thereof, or the interest thereon, either at law or in equity.

8.2     Except as permitted by Bank, Borrower covenants and agrees that it will not, without the prior written consent of Bank, place on, or permit any secondary financing or any other liens of any kind to encumber or attach to, the Mortgaged Premises other than this Mortgage and the Permitted Liens.

8.3     Upon request of Bank, Borrower shall deliver such other instruments and documents as may be reasonably requested by Bank to more effectively carry out the purposes of this Mortgage and to pay any and all reasonable costs related to the preparation and delivery of such documents and instruments.

8.4     If Borrower fails to perform the covenants and agreements contained in this Mortgage, or there is a legal proceeding that may affect Bank's rights in the Mortgaged Premises, then Bank may do and pay for whatever is necessary to protect the value of and Bank's rights in the Mortgaged Premises. Although Bank may take action under this section, the Bank is not obligated to take any such action. Any amounts disbursed by Bank under this section shall become additional debt secured by this Mortgage. These amounts shall bear interest from the date of disbursement at the highest Note rate and shall be payable, with interest, upon notice from Bank to Borrower requesting payment.

8.5     Bank is subrogated to the lien of any mortgage or other lien discharged in whole or in part by the proceeds of the Note identified in the introductory part of this Mortgage.

8.6     Bank and its authorized representatives may enter upon the Mortgaged Premises at any reasonable time and upon 24 hours notice (except in the event of an emergency or an Event of Default) to inspect it, and at Bank's option, to repair or restore it and to conduct environmental assessments of it, provided, however, that Bank shall not conduct any environmental assessments except (i) in the Event of Default which remains uncured beyond any applicable cure period, or (ii) in the event the Bank has cause to believe the Borrower is in violation of or likely to violate any environmental covenants set forth in the Loan Agreement dated of even date herewith.

8.7     No existing tenancy, subtenancy, lease or sublease of the Mortgaged Premises or any part thereof having an unexpired term of more than two (2) years shall be canceled, abridged or otherwise modified in any material respect nor shall prepayments of installments of rent to become due thereunder be accepted, without the written consent of Bank, which consent will not be unreasonably withheld or delayed.

04862

## ARTICLE IX. DEFAULT AND REMEDIES

9.1 Subject to any applicable notice and cure provisions in Article VIII of the Loan Agreement between Borrower and the Bank dated of even date herewith, (a) there is a default under any Obligation secured by this Mortgage, or (b) Borrower fails timely to observe or perform any of Borrower's covenants or duties contained in this Mortgage, or (c) there is a default or an event of default occurs under any agreement, note, liability or obligation owed Bank by Borrower (a default occurring under (a), (b) or (c), an "Event of Default"), then, at the option of Bank each Obligation and every indebtedness, liability and note of Borrower to Bank will become immediately payable. If Bank exercises its option to accelerate, the unpaid principal and interest owed on the Obligations, together with all sums paid by Bank as authorized or required under this Mortgage or any Obligation, shall be collectible in a suit at law or by foreclosure of this Mortgage by action, or both, or by the exercise of any other remedy available at law or equity.

9.2 No failure by Bank to insist upon the strict performance of any covenant, term or condition of this Mortgage or to exercise any right or remedy consequent upon a breach thereof, shall constitute a waiver of any such breach or of such covenant, term or condition. No covenant, term or condition of this Mortgage to be performed or complied with by Borrower, and no breach thereof, shall be waived, altered, or modified except by a written instrument executed by Bank. No waiver of any breach shall affect or alter this Mortgage, but each and every covenant, term and condition of this Mortgage shall continue in full force and effect with respect to any other then existing or subsequent breach thereof.

9.3 Each right and remedy of Bank provided for in this Mortgage shall be cumulative and shall be in addition to every other right or remedy provided for in this Mortgage or now or hereafter existing at law, or in equity or by statute or otherwise. The exercise or beginning of the exercise by Bank of any one or more rights or remedies shall not preclude the simultaneous or later exercise by Bank of any or all other rights or remedies.

9.4 Upon the filing of an action to foreclose following an Event of Default this Mortgage in any court having jurisdiction thereof, such court may, at any time before or after sale, without notice to Borrower or any party claiming under Borrower and without regard to the then value of the Mortgaged Premises, appoint a receiver with power to collect the rents, rental value, issues and profits arising out of the Mortgaged Premises, during the pendency of the foreclosure action and until the expiration of the time to redeem the same from any sale that may be had under any judgment or decree foreclosing the mortgage. When collected, such rents, issues and profits may be applied, either before or after sale, toward the payment of taxes and special assessments levied against the Mortgaged Premises, and payment of indebtedness and costs arising under this Mortgage or any other documents securing the Note. Upon foreclosure and sale of the Mortgaged Premises, there shall be paid out of the proceeds of such sale: first, all expenses of advertising, selling and conveying the Mortgaged Premises, and all money advanced for insurance, taxes and other liens or assessments and sums which shall have been expended for the preservation of the Mortgaged Premises, outlays for documentary evidence, all court and taxable costs and disbursements, sheriff's fees, and costs of procuring or completing an abstract of title or guarantee policy showing the whole title to the Mortgaged Premises, and including the

04863

foreclosure judgment or decree, together with a reasonable sum of money as attorneys' fees; and then the principal of the indebtedness, and the interest due thereon up to the time of such sale or payment. Any surplus shall be paid as directed by the court, and it shall not be the duty of the purchaser to see to the application of the purchase money. If said indebtedness is paid after the filing of an action to foreclose this Mortgage but before entry of a decree of sale, all taxable costs and disbursements and a reasonable sum for legal services rendered to the time of such payment shall be allowed as attorneys' fees, which, together with any sum paid for title costs, court costs, disbursements and expenses of such proceeding, shall be additional indebtedness secured by this Mortgage. Notwithstanding anything to the contrary contained in this Mortgage, Borrower agrees that, in the event of the commencement of foreclosure proceedings, Bank may elect to proceed according to the conditions set forth in the applicable provisions of 735 ILCS 5/Art. XV, as the same may be renumbered or amended from time to time.

9.5     If a default shall exist in any of the terms, clauses, conditions or covenants of this Mortgage which is not cured within thirty (30) days after notice thereof, as now or hereafter modified or extended, or of the Obligations secured thereby, Bank shall have the right forthwith, with the irrevocable consent of Borrower, hereby given and evidenced by the execution of this Mortgage, to enter upon and take possession of the Mortgaged Premises (subject to the rights of tenants in possession), and let the same and receive all the rents, issues and profits thereof, due or to become due, and apply the same, after payment of all necessary charges and expenses, on account of the indebtedness secured by this Mortgage, and said rents, issues and profits are, in event of any such default which shall not have been cured, hereby assigned to Bank as additional security for the indebtedness thereby secured, together with the leases and all other documents evidencing such rents, issues and profits, and any and all deposits held as security under said leases. At the option of Bank, such entry and taking possession of the premises shall be accomplished either by actual entry and possession or by notice to Borrower. In such event, any lessee defaulting in the payment to Bank of any rent may be dispossessed by proceedings pursuant to the written lease, if any, and/or applicable law. This covenant shall be effective whether foreclosure has been instituted or not and without applying for a receiver.

9.6     Borrower agrees to pay all reasonable costs and expenses before and after judgment, including without limitation attorneys fees, fees and expenses for environmental assessments, inspection or remediation, and fees and expenses for obtaining title evidence, incurred or paid by Bank in protecting or enforcing Bank's rights under this Mortgage.

·9.7     Bank shall not be required to make any demand upon or pursue or exhaust any of its rights or remedies against Borrower or others with respect to payment of the Note, or to pursue or exhaust any of its rights or remedies with respect to any security, or any direct or indirect guarantee thereof. Bank shall not be required to marshall the Mortgaged Premises or any other collateral securing the Note or any guarantee of the Note or to resort to any other collateral or any such guarantee in any particular order and all of the rights of Bank hereunder shall be cumulative.

04864

## ARTICLE X.  MISCELLANEOUS

10.1  _Invalidity of Particular Provisions_.  If any term or provision of this Mortgage or the application thereof to any person or circumstance shall, to any extent, be determined by a court of competent jurisdiction to be invalid or unenforceable, the remainder of this Mortgage or the application of such term or provision to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and each term and provision of this Mortgage shall be valid and be enforced to the fullest extent permitted by law.

10.2  _Notices_.  All notices, demands, requests and consents required under this Mortgage shall be in writing.  All such notices, requests and consent shall be deemed to have been properly given if served in person or if sent by United States first class mail, postage prepaid, addressed to Borrower at the address set forth for Borrower in the heading of this Mortgage, with a copy to Larry Feller, Esq., Harwood Marcus & Berk Chartered, 180 North LaSalle Street, Suite 3700, Chicago, Illinois 60601, facsimile: 312-261-9923 and addressed to Bank at the address set forth for Bank in the heading of this Mortgage, or to such other address as the parties may from time to time respectively designate by notice given in accordance with the provisions of this Article X.

10.3  _Consent to Jurisdiction_.  If there is a lawsuit, Borrower agrees upon Bank's exclusive request to submit to the jurisdiction of the Courts of Peoria County, State of Illinois.

10.4  _Successors_.  This Mortgage shall bind and inure to the benefit of the respective successors and assigns of Borrower and of Bank, and cannot be changed or terminated orally.

10.5  _Entire Agreement_.  This Mortgage is intended by Borrower and Bank as a final expression of this Mortgage and as a complete and exclusive statement of its terms, there being no conditions to the full effectiveness of this Mortgage.

10.6  _Governing Law_.  This Mortgage and the Note secured hereby and all other instruments securing or evidencing this indebtedness will be governed by federal law applicable to Bank and, to the extent not preempted by federal law, the laws of the State of Illinois without regard to its conflicts of law provisions.  This Mortgage has been accepted by Bank in the State of Illinois.

### ARTICLE XI.  NOTE AND MORTGAGE ONE CONTRACT

This Mortgage secures a Mortgage Note to Bank bearing even date herewith and all of the terms and conditions of the Note are incorporated herein and made a part of this Mortgage.

**[SIGNATURES CONTAINED ON FOLLOWING PAGE]**

26837581_4.DOC

– 14 –

04865

IN WITNESS WHEREOF, Borrower has caused this Mortgage to be executed under seal as of the day and year first written above.

PEORIA OFFICE HOLDINGS, LLC
a Delaware limited liability company

By:   Peoria Office Investors, LLC
      a Delaware limited liability company
Its:   Member

     By:   Peoria Office Manager, LLC
         a Delaware limited liability company
     Its:   Manager

          By:   WexTrust Equity Partners, LLC
             an Illinois limited liability company
          Its:   Manager

             By: _____
                 Steven Byers, its Manager

STATE OF _Illinois_ )
                  ) ss.
_Cook_ COUNTY )

Personally came before me this _6th_ day of December, 2007, the above-named Steven Byers, to me known to be the Manager of WexTrust Equity Partners, LLC, which is the Manager of Peoria Office Manager, LLC, which is the Manager of Peoria Office Investors, LLC, which is the member of Peoria Office Holdings LLC, and the person who executed the foregoing document as the deed of said limited liability company, by its authority.

OFFICIAL SEAL
Notary Public, State of Illinois
My Commission Expires
September 29, 2009

_____
Notary Public, State of _Illinois_
My Commission: _____

THIS INSTRUMENT IS DRAFTED BY:

Anne Wal, Esq.
von Briesen & Roper, s.c.
411 East Wisconsin Avenue, Suite 700
Milwaukee, WI 53202

THIS DOCUMENT SHOULD BE RETURNED TO:

TCF National Bank
Attn: Commercial Banking
500 West Brown Deer Road
Milwaukee, WI 53217

20837561_4.DOC

– 15 –

04866

## EXHIBIT A

### Legal Description

Parcel 1:
Part of Lot 3 in Block 6 in the Original Town (now city) of Peoria more particularly described as follows:

Commencing on Adams Street at the corner of said Lots 3 and 4; thence along the line dividing Lots 3 and 4, 171 feet to the alley in said block; thence Northeasterly, along the line of said alley, 20 feet; thence Northwesterly, parallel with the dividing line between Lots 3 and 4 towards and to the line of Adams Street; thence Southwesterly, along the line of Adams Street, 20 feet to the point of beginning in Peoria County, Illinois.

Parcel 2:
A part of Lot 4 in Block 6 in the Original Town (now city) of Peoria more particularly described as

follows:

Commencing on Adams Street on the line dividing Lots 3 and 4 in said Block 6; thence along said dividing line, a distance of 171 feet to the alley in the rear of said Lot 4; thence along said alley towards Fulton Street, 21 feet; thence at right angles, parallel with the line dividing Lots 3 and 4, a distance of 171 feet to Adams Street; thence along the line of Adams Street towards Main Street, a distance of 21 feet, to the place of beginning, in Peoria County, Illinois.

Parcel 3:
A part of Lot 4 in Block 6 in the Original Town (now city) of Peoria more particularly described as follows:

Commencing on Adams Street 21 feet towards Fulton Street from the line dividing Lots 3 and 4 in said Block; running thence parallel with said dividing line, 171 feet to the alley in said Block; thence along the line of said alley toward Fulton Street, 21 feet; thence parallel with the said dividing line between said Lots 3 and 4, 171 feet to Adams Street; thence on and along the line of Adams Street towards Main Street 21 feet to the place of beginning, in Peoria County, Illinois.

Parcel 4:
30 feet of even width by full depth of lot off of the Southwesterly side of Lot 4, also all that part of Lot 5 which lies Northeasterly of the center line, from Adams Street to the alley, of the party wall now constructed between the properties of Schipper and Block Incorporated and the Estate of Melinda Anderson, deceased, all in Block 6 in the original town (now city) of Peoria, in Peoria County, Illinois.

Parcel 5:
Lots 6, 7, 8 and 9 in Block 6 in the Original Town (now city) of Peoria, and all that part of Lot 5 in Block 6 in the Original Town (now city) of Peoria which lies Southwesterly of the center line of the party wall built by Schipper & Block under a certain Party Wall Agreement between Melinda Anderson, first party, and Fred L. Block, second party, which Agreement bears date, the 9th day of April A.D. 1904 and is recorded in Book Y.I., Page 122, in the Recorder's Office of Peoria County, Illinois, which said party wall extends from Adams Street to the alley through said block, the center line of said party wall, as is provided in said Agreement is 71 feet and 10 inches Northeasterly from and parallel to the exterior face of the present wall of Schipper & Block's building on Fulton Street and extending from Adams Street to the alley; the measurement therefor being made from and upon where the sidewalk grade of Adams Street intersects the said exterior face of the wall and to be made from the face of the wall which is 1 inch and one-fourth North of the base of the Pilasters at the corner on Adams Street and the alley of Fulton Street, all situated, lying, and being in the City of Peoria, in Peoria County, Illinois.

SAID PROPERTY TAKEN AS A TRACT, IS DESCRIBED AS FOLLOWS:

The Southwesterly 21 feet of Lot 3, measured along the Northwesterly and Southeasterly lines, and all of Lots 4, 5, 6, 7, 8 and 9 all in Block 6 in the Original Town (now city) of Peoria, in Peoria County, Illinois.

04868

**EXHIBIT "D"**

## ASSIGNMENT OF RENTS AND LEASES

This ASSIGNMENT OF RENTS AND LEASES *("Assignment")* is made as of the 10th day of December, 2007, by **PEORIA OFFICE HOLDINGS, LLC,** a Delaware limited liability company *("Borrower"),* to **TCF NATIONAL BANK,** a national banking association *("Bank").*

### RECITALS

A.     Borrower is the owner of the real property described in **Exhibit A** attached hereto and made a part of, (the *"Property"*) and has requested a loan from Bank in the amount of Eleven Million Sixty-three Thousand and 00/100 Dollars ($11,063,000.00) *(the "Loan").*

B.     Bank, as a condition of making the Loan, has required that Borrower, in addition to executing its note for the Loan amount *(the "Note")* and executing and delivering its mortgage of the Property *(the "Mortgage"),* execute and deliver this Assignment.

**NOW, THEREFORE,** to better secure the obligations of Borrower under the terms and conditions of the Note and Mortgage, Borrower hereby absolutely and unconditionally assigns to Bank, its successors and assigns, Borrower's interest in all the rents, issues and profits due and to become due from the Property, together with all leases, agreements and service contracts affecting the Property now or hereinafter existing *(the "Assigned Assets").* This Assignment shall be effective upon execution, and Bank's interest in the rents and leases assigned shall be perfected as of the date of recording of this Assignment. As an additional nonexclusive means of perfection of Bank's interest, Bank's interest shall be perfected at the time Bank mails notice to Borrower or any tenant pursuant to this Assignment, advising that person that Bank is exercising its rights under this Assignment, unless perfection occurs, or is deemed to occur, prior to such notice.

Borrower further agrees as follows:

1.     **Rights of Borrower in Absence of Default.** Before default in monthly payments or in the performance of any of the other terms and conditions of the Note, the Mortgage or any related loan document, Borrower shall have the right to collect the rents, income and profits from the leases and to retain, use and enjoy the same; provided, however, that even before default occurs no more than one month's advance rent shall be collected or accepted without the prior written consent of Bank.

2.     **Rights of Bank Upon Default.** In the Event of Default, as defined in the Mortgage, which remains beyond any applicable cure period:

(a)     Bank may, at its option, without notice to or demand on Borrower do any or all of the following:

(i)     Enter and take possession of the Property.

(ii)     Demand, collect and receive from the tenants, lessees or other occupants now or at any time hereafter in possession of the Property or any part

thereof, rents now due or to become due; endorse the name of Borrower or any subsequent owner of the Property on any check, note or other instrument for the payment of money; and deposit the same in demand accounts; institute, prosecute, settle or compromise any summary or legal proceeding for the recovery of rents or profits pertaining to the Property; recover the whole or any part of the Property; institute, prosecute, settle or compromise any other proceeding for the protection of the Property, the recovery of any damages done to the Property, or the abatement of any nuisance thereon; and defend any legal proceedings brought against Borrower or against owners arising out of the operation of the Property.

(iii)    Lease or rent the Property, or any part thereof; employ an agent to rent and manage the Property; make any change or improvement it deems necessary or expedient for leasing or renting of the Property; keep and maintain the Property in a tenable and rentable condition, as well as in a good state of repair; purchase all equipment or supplies necessary or desirable in the operation and maintenance of the Property; pay for all fuel, electricity, power, painting, repairs, wages of employees, and other items for the maintenance of the Property; pay interest or principal on any prior mortgages on the Property now due or to become due; pay any taxes, assessments, water or sewage charges, and meter charges now due and unpaid, or which may hereinafter become due and constitute a charge or lien against the Property; pay the principal and/or the interest of the Note and Mortgage, now due or hereafter to become due; pay the premiums on all policies of insurance now or hereinafter effected by Borrower; comply with the orders of any governmental body or entity having jurisdiction against the Property; remove any mechanic's lien, security interest or other lien against the Property; and, in general, pay all charges and expenses incurred in the management and operation of the Property.

(b)    Bank may pay the cost of all the matters provided for under this Section 2 out of the rents or revenues received from the Property. Any payments advanced by Bank under any of the provisions of this Assignment, including expenses and reasonable attorneys' fees, shall be charged to Borrower, and shall for all purposes be deemed secured hereby and be payable to Bank out of the rents of the Property.

(c)    Notwithstanding any other provision of this Assignment, Borrower assigns to Bank: (i) any award made hereafter to it in any court proceeding involving any of the lessees in any bankruptcy, insolvency or reorganization proceeding in any state or federal court; and (ii) any and all payments made by lessees in lieu of rent. Borrower irrevocably appoints Bank as its attorney-in-fact to appear in any action and/or to collect any such award or payment.

3.    **Obligations of Bank.**

(a)    Bank shall in no way be liable for any act done or anything omitted by it but shall be liable to account for all monies that it may receive hereunder. Nothing in this Assignment shall be construed to: (i) prejudice Bank's right to institute or prosecute any proceeding to foreclose the Mortgage, to enforce any lien on any other collateral which

04871

Bank may have; or (ii) prejudice any right which Bank may have by reason of any present or future default under the terms of the Note, the Mortgage or any related loan documents.

(b)     Bank shall not be obligated to perform or discharge any obligation or duty to be performed or discharged by Borrower under any lease or any of the Assigned Assets. Borrower agrees to indemnify Bank for, and to save Bank harmless from, any and all liability arising from any Assigned Asset or from any act or omission under this Assignment. This Assignment shall not place responsibility for the control, care, management or repair of Property upon Bank, or make Bank responsible or liable for any negligence in the management, operation, upkeep, repair or control of the Property resulting in damage, loss, injury or death to any property, tenant, lessee, employee, agent, invitee, licensee, or stranger except for Bank's misconduct.

(c)     Bank shall not be responsible or liable for any misuse of or failure to account for any rents collected by any agent, employee or representative of Borrower.

(d)     Bank shall not be obligated to borrow or advance funds for any debt or obligation incurred in connection with the Property.

(e)     Bank may (but shall not be obligated to) turn over to Borrower any surplus which Bank may have after paying all expenses in connection with the operation and maintenance of the Property and after setting up a necessary reserve for contingencies and emergencies and for the payment, upon the due date, of fixed charges against the Property, including real estate taxes and assessments. Turning over any surplus to Borrower shall not obligate Bank to turn over such surplus in the future.

4.     **Modification of Leases.** Except as to leases for a term of two years or less, Borrower will not, without the prior written consent of Bank not to be unreasonably withheld:

(a)     Cancel, modify in any material respect, terminate or surrender any lease now existing in respect to any portion of the Property;

(b)     Reduce any rents, or change, modify or waive any material provision of any existing lease;

(c)     Exercise any option which might lead to a termination material or change of any lease; or

(d)     Consent to the release of any party liable under any lease or to the assignment of the lessee's interest written consent.

(e)     Enter into or renew a lease for any portion of the Property.

5.     **Authorization To Give Notice.** Borrower authorizes Bank to give notice of this Assignment in writing at any time to any tenant under any of the leases covered by this Assignment.

20837502_5.DOC                                -3-

04872

**6.  Reinstatement Of Security Interest.**  If payment is made by Borrower, whether voluntarily or otherwise, or by guarantor or by any third party, on the indebtedness and thereafter Bank is forced to remit the amount of that payment (a) to Borrower's trustee in bankruptcy or to any similar person under any federal or state bankruptcy law or law for the relief of debtors, (b) by reason of any judgment, decree or order of any court or administrative body having jurisdiction over Bank or any of Bank's property, or (c) by reason of any settlement or compromise of any claim made by Bank with any claimant (including without limitation Borrower), the Loan shall be considered unpaid for the purpose of enforcement of this Assignment and this Assignment shall continue to be effective or shall be reinstated, as the case may be, notwithstanding any cancellation of this Assignment or of any note or other instrument or agreement evidencing the Indebtedness and the Property will continue to secure the amount repaid or recovered to the same extent as if that amount never had been originally received by Bank, and Borrower shall be bound by any judgment, decree, order settlement or compromise relating to the indebtedness or to this Assignment.

**7.  Further Assignment Permitted.**  Bank may assign all of its right, title and interest in and to this Assignment to any person or entity to whom the Note and Mortgage are assigned, in such a manner as to provide that assignee all the rights and privileges afforded to Bank by this Assignment to the same extent as if that assignee were originally Bank.

**8.  Authority To Assign.**  Borrower covenants and represents that Borrower has full right and title to assign the Assigned Assets and the rent, income and profits due or to become due thereunder, and that no other assignment of any interest therein has been or will be made.

**9.  Void Upon Full Performance.**  The full performance of the Note and Mortgage and the duly recorded release or reconveyance of the Property shall render this Assignment void.

**10.  Benefit of This Assignment.**  This Assignment shall inure to the benefit of and bind Borrower and Bank and their respective successors and assigns, as well as any subsequent owner of the Property and any assignee of the Note and Mortgage.

**11.  Confirmation of Assignment.**  At the request of Bank, Borrower will execute confirmation of the assignment of any future leases, agreements and service contracts affecting any part of the Property.  Upon request of Bank, any existing lease or management, vending or other service contract shall be unconditionally subordinated to the Mortgage, and Borrower shall cooperate to deliver to Bank a written, fully executed subordination agreement in a form acceptable to Bank.

**12.  Waiver Of Homestead Exemption.**  Borrower hereby releases and waives all rights and benefits of the homestead exemption laws of the State of Illinois as to all indebtedness secured by this Assignment.

**13.  Governing Law.**  This Assignment will be governed by federal law applicable to Bank and, to the extent not preempted by federal law, the laws of the State of Illinois without regard to its conflicts of law provisions.  This Assignment has been accepted by Bank in the State of Illinois.

04873

14.     **Jurisdiction; Venue.**  If there is a lawsuit, Borrower agrees upon Bank's request to submit to the jurisdiction of the Courts of Peoria County, State of Illinois.

15.     **WAIVE JURY.**  ALL PARTIES TO THIS ASSIGNMENT HEREBY WAIVE THE RIGHT TO ANY JURY TRIAL IN ANY ACTION, PROCEEDING, OR COUNTERCLAIM BROUGHT BY ANY PARTY AGAINST ANY OTHER PARTY.

16.     **Authority.**  If any party to this Assignment is a legal entity, each individual executing this Assignment on behalf of said entity represents and warrants that he/she is duly authorized to execute and deliver this Assignment on behalf of said entity, and that this Assignment is binding upon said entity in accordance with its terms.

04874

IN WITNESS WHEREOF, Borrower has executed this Assignment as of the day and year first written above.

BORROWER:

**PEORIA OFFICE HOLDINGS,LLC**
a Delaware limited liability company

By:   Peoria Office Investors, LLC
       a Delaware limited liability company
Its:   Member

By:   Peoria Office Manager, LLC
       a Delaware limited liability company
Its:   Manager

By:   WexTrust Equity Partners, LLC
       an Illinois limited liability company
Its:   Manager

By:   _____
       Steven Byers, its Manager

STATE OF ___Illinois___ )
                                      ) ss
___Cook___ COUNTY)

Personally came before me this _10_ day of December, 2007, the above-named Steven Byers, to me known to be the Manager of WexTrust Equity Partners, LLC, which is the Manager of Peoria Office Manager, LLC, which is the Manager of Peoria Office Investors, LLC, which is the member of Peoria Office Holdings LLC, and the person who executed the foregoing document as the deed of said limited liability company, by its authority.

```
┌──────────────────────────────────┐
│  PERRINE E. KNIGHT               │
│  OFFICIAL SEAL                   │
│  Notary Public, State of Illinois│
│  My Commission Expires           │
│  September 29, 2009              │
└──────────────────────────────────┘
```
_____, Notary Public
Perrine Knight
State of ___Illinois___
My Commission: ___9/29/09___

THIS INSTRUMENT IS DRAFTED BY:
Anne Wal, Esq.
von Briesen & Roper, s.c.
411 East Wisconsin Avenue, Suite 700
Milwaukee, WI 53202

THIS DOCUMENT SHOULD BE RETURNED TO:
TCF National Bank
Attn:  Commercial Banking
500 West Brown Deer Road
Brown Deer, WI 53217

20637562_5.DOC                              -6-

04875

## EXHIBIT A
## LEGAL DESCRIPTION

Parcel 1:
Part of Lot 3 in Block 6 in the Original Town (now city) of Peoria more particularly described as follows:

Commencing on Adams Street at the corner of said Lots 3 and 4; thence along the line dividing Lots 3 and 4, 171 feet to the alley in said block; thence Northeasterly, along the line of said alley, 20 feet; thence Northwesterly, parallel with the dividing line between Lots 3 and 4 towards and to the line of Adams Street; thence Southwesterly, along the line of Adams Street, 20 feet to the point of beginning in Peoria County, Illinois.

Parcel 2:
A part of Lot 4 in Block 6 in the Original Town (now city) of Peoria more particularly described as

follows:

Commencing on Adams Street on the line dividing Lots 3 and 4 in said Block 6; thence along said dividing line, a distance of 171 feet to the alley in the rear of said Lot 4; thence along said alley towards Fulton Street, 21 feet; thence at right angles, parallel with the line dividing Lots 3 and 4, a distance of 171 feet to Adams Street; thence along the line of Adams Street towards Main Street, a distance of 21 feet, to the place of beginning, in Peoria County, Illinois.

Parcel 3:
A part of Lot 4 in Block 6 in the Original Town (now city) of Peoria more particularly described as follows:

Commencing on Adams Street 21 feet towards Fulton Street from the line dividing Lots 3 and 4 in said Block; running thence parallel with said dividing line, 171 feet to the alley in said Block; thence along the line of said alley toward Fulton Street, 21 feet; thence parallel with the said dividing line between said Lots 3 and 4, 171 feet to Adams Street; thence on and along the line of Adams Street towards Main Street 21 feet to the place of beginning, in Peoria County, Illinois.

Parcel 4:
30 feet of even width by full depth of lot off of the Southwesterly side of Lot 4, also all that part of Lot 5 which lies Northeasterly of the center line, from Adams Street to the alley, of the party wall now constructed between the properties of Schipper and Block Incorporated and the Estate of Melinda Anderson, deceased, all in Block 6 in the original town (now city) of Peoria, in Peoria County, Illinois.

Parcel 5:

Lots 6, 7, 8 and 9 in Block 6 in the Original Town (now city) of Peoria, and all that part of Lot 5 in Block 6 in the Original Town (now city) of Peoria which lies Southwesterly of the center line of the party wall built by Schipper & Block under a certain Party Wall Agreement between Melinda Anderson, first party, and Fred L. Block, second party, which Agreement bears date, the 9th day of April A.D. 1904 and is recorded in Book Y.I., Page 122, in the Recorder's Office of Peoria County, Illinois, which said party wall extends from Adams Street to the alley through said block. the center line of said party wall, as is provided in said Agreement is 71 feet and 10 inches Northeasterly from and parallel to the exterior face of the present wall of Schipper & Block's building on Fulton Street and extending from Adams Street to the alley; the measurement therefor being made from and upon where the sidewalk grade of Adams Street intersects the said exterior face of the wall and to be made from the face of the wall which is 1 inch and one-fourth North of the base of the Pilasters at the corner on Adams Street and the alley of Fulton Street, all situated, lying, and being in the City of Peoria, in Peoria County, Illinois.

SAID PROPERTY TAKEN AS A TRACT, IS DESCRIBED AS FOLLOWS:

The Southwesterly 21 feet of Lot 3, measured along the Northwesterly and Southeasterly lines, and all of Lots 4, 5, 6, 7, 8 and 9 all in Block 6 in the Original Town (now city) of Peoria, in Peoria County, Illinois.

20837562_6.DOC

| | ASSIGNMENT OF RENTS AND LEASES |
|---|---|
| Document Number | Document Title |

Recording Area

Name and Return Address

TCF National Bank
Attn: Commercial Banking
500 West Brown Deer Road
Milwaukee, WI 53217

███████ 0-017 ████████ 0-016

Parcel Identification Number (PIN)

20837561_5.DOC

04878

**EXHIBIT "E"**

W.B.A. [logo] ⬛⬛⬛⬛⬛ :0137:
©2001 Wisconsin Bankers Association / Distributed by F PcCoO

BUSINESS

## COLLATERAL PLEDGE AGREEMENT
### (For Collateral in Possession or Control of Lender)

(Use only for loans (1) to organizations, (2) primarily for a business
purpose, or (3) when the amount financed exceeds $25,000)

Dated  December 10, 2007

**1. COLLATERAL AND OBLIGATIONS.** In consideration of any financial accommodation at any time granted by TCF National Bank, a national

banking association                                                                                        ("Lender"),
to Peoria Office Holdings LLC                                                                               ("Borrower"),
each of the undersigned ("Debtor") grants to Lender a security interest in all property of any kind in which Debtor has an ownership interest and is now or
hereafter in the possession or control of Lender for collateral purposes pursuant to this Agreement and in the following described property:

Deposit Account Number ⬛⬛⬛⬛⬛

and all proceeds and all supporting obligations and other rights in connection with such property ("Collateral"). Listing of property in the collateral
records of Lender is prima facie evidence that it is held for collateral purposes. The Collateral shall secure all debts, obligations and liabilities to Lender
arising out of credit previously granted, credit contemporaneously granted and credit granted in the future by Lender to any Debtor, or any Borrower, to
any of them and another, or to another guaranteed or endorsed by any of them ("Obligations"). Debtor agrees promptly to deliver to Lender any property
received in exchange for or as a dividend or distribution (other than internal payments or ordinary cash dividends payable prior to the occurrence of an
event of default as described in Section 11 ("Event of Default")) on or with respect to any security constituting part of the Collateral.

**2. WARRANTY OF TITLE AND PURPOSE.** Each Debtor delivering or pledging any Collateral to Lender warrants that the Collateral is genuine, that
the Debtor owns (or with spouse owns) the Collateral, that the Collateral is free from all liens, encumbrances, or security interests (other than Lender's
security interest), that Debtor has complete authority to pledge such Collateral to Lender and agree to the terms of this Agreement, except as stated in
section 18, and that the Collateral is held or acquired primarily for ☐ personal, family or household purposes ☒ business purposes.

**3. PRESERVATION OF COLLATERAL.** Lender shall use reasonable care in the custody and preservation of Collateral in its possession, but this
standard does not include (a) insuring or taking any steps to collect or realize upon the Collateral or any distribution of interest or principal; (b) informing
Borrower or Debtor of any decline in the value of the Collateral; (c) sending notices, performing services or taking any other action in connection with the
management of the Collateral; or (d) ascertaining or informing Borrower or Debtor with respect to any maturities, calls, conversions, exchanges, offers,
tenders, or similar matters relating to the Collateral, or preserving rights in it against prior parties, whether or not the Lender has or is deemed to have
knowledge of it. Any requests concerning disposition of Collateral must be in writing and be received by Lender. Lender may in its sole discretion refuse
to take any steps or action requested which may adversely affect the value of the Collateral. Lender may refuse to sell any of the Collateral even though
requested in writing unless Lender is satisfied that the proposed sale plus other sums tendered by the Borrower or Debtor, if any, will pay in full all
Obligations or that substitute collateral satisfactory to Lender is delivered to Lender. Lender's refusal to dispose of Collateral under these circumstances,
or loss or damage to the Collateral, will not effect in any way Borrower's or Debtor's liability for the Obligations. Debtor shall, and Lender need not, keep
the Collateral free from all liens, encumbrances and security interests (other than those created or expressly permitted by this Agreement); pay and
discharge when due, all taxes, levies and other charges upon it and other charges incurred in the custody and preservation of the Collateral; defend it,
against all claims and legal proceedings by persons other than Lender; and/or preserve rights with respect to the Collateral against prior parties. At any
time, upon request, Debtor shall deliver to Lender all notices, statements and other communications received by Debtor as an owner or holder of the
Collateral.

**4. INSURANCE.** Debtor shall keep all goods evidenced by documents constituting Collateral, and Lender's interest in them, insured under policies
with such provisions, for such amounts and by such insurers as shall be satisfactory to Lender and shall furnish evidence of such insurance satisfactory
to Lender. Debtor assigns (and directs any insurer to pay) to Lender the proceeds of all insurance with respect to Collateral and any premium refund and
authorizes Lender to indorse in the name of the Debtor any instrument for such proceeds or refunds and, at the option of Lender, to apply such proceeds
and refunds to any unpaid balance of the Obligations, whether or not due, and/or to restoration of such goods, returning any excess to Debtor. Each
insurance policy shall contain a standard lender's loss payable endorsement in favor of Lender, and shall provide that the policy shall not be cancelled,
and the coverage shall not be reduced, without at least 10 days' prior written notice to the Lender. Lender is authorized, in the name of Debtor
or otherwise, to make, adjust and/or settle claims under any credit insurance financed by Lender or any insurance on the Collateral for goods evidenced
by Collateral, or cancel the same after the occurrence of an event of default.

**5. MAINTENANCE OF SECURITY INTEREST.** Debtor shall pay all expenses and, upon request, take any action reasonably deemed advisable by
Lender to preserve the Collateral or to establish, evidence, determine and maintain priority of, perfect, continue perfected, terminate and/or enforce
Lender's interest therein or rights under this Agreement, including, without limitation, executing and delivering one or more control agreements (including
directing any securities intermediary to execute and deliver such a control agreement) requested by Lender for the purpose of perfecting the security
interest granted by Debtor to Lender under this Agreement and any and all instruments, endorsements and documents to enable Lender to exercise the
rights of a secured party with respect to the Collateral as provided in this Agreement and applicable law. Debtor authorizes Lender to file Uniform
Commercial Code financing statements describing the Collateral and amendments and correction statements to such financing statements and ratifies
any such financing statement or amendment filed prior to the date of this Agreement. Debtor will cooperate with Lender in obtaining control of Collateral
and other security for the Obligations for which control may be required to perfect Lender's security interest under applicable law.

**6. RIGHTS OF DEBTOR IN COLLATERAL.** If the Collateral is held by a broker or other third party subject to a control agreement executed by the
broker or other third party with Lender ("Control Agreement"), Debtor may with the consent of the broker or other third party make trades of the Collateral
and exercise any rights or incidental ownership right that Debtor may have as to any of the Collateral for any purpose which is not inconsistent with this
Agreement provided that the proceeds of all trades shall remain in the account with the broker or third party subject to the Control Agreement. Upon the
occurrence of an Event of Default or upon notice from Lender to the broker or other third party holding the Collateral under any Control Agreement,
Debtor shall no longer have the right to make trades of the Collateral. Except for permitted trades of the Collateral, if any, Debtor shall not withdraw the
Collateral from any account held by any broker or other third party subject to a Control Agreement with Lender, before or after an Event of Default.

**7. PERSONS BOUND AND OTHER PROVISIONS.** Each person signing this Agreement is a Debtor. All Debtors are jointly and severally liable
under this Agreement. Agreement benefits Lender, its successors and assigns, and binds Debtor(s) and their respective heirs, personal
representatives, successors and assigns. Debtor represents that the legal name of Debtor and the address of Debtor's principal residence are as set
forth below. Debtor shall not change its legal name or address without providing at least 30 days prior written notice of the change to Lender. Debtor
acknowledges receipt of a completed copy of this Agreement. THIS AGREEMENT INCLUDES THE ADDITIONAL PROVISIONS ON PAGE 2 and 3.

PEORIA OFFICE HOLDINGS LLC                                                     (SEAL)

A Delaware limited liability company
                                                        (Type of Organization)

Address: _____          By: Peoria Office Investors, LLC, Its Member

Address: _____          By: Peoria Office Manager, LLC, Its Manager

Address:                               By: WexTrust Equity Partners, LLC, Its Manager
(SEAL) _____

Address: _____          By: _[signature]_                          (SEAL)
                                          Steven Byers, Manager

04885

## ADDITIONAL PROVISIONS

**8. AUTHORITY OF LENDER TO PERFORM FOR DEBTOR.** Upon the occurrence of an event of default, including Debtor's failure to perform any of Debtor's duties set forth in this Agreement or in any evidence of or document relating to the Obligations, Lender is authorized, in Debtor's name or otherwise, to take such action including without limitation signing or endorsing Debtor's name or paying any amount so required, and the cost shall be one of the Obligations secured by this Agreement and shall be payable by Debtor upon demand with interest from the date of payment by Lender at the highest rate stated in any evidence of any Obligation but not in excess of the maximum rate permitted by law.

**9. RIGHTS OF LENDER.** Lender may at any time, before or after maturity of any of the Obligations and without notice or demand of any kind, (a) transfer any of the Collateral into its name or that of its nominee, (b) notify obligors on or issuers of any Collateral to make payment or delivery to Lender of any amounts, securities or rights due or distributable thereon or notices given in connection therewith, (c) in Debtor's name or otherwise enforce collection of any Collateral by suit or otherwise, or surrender, release or exchange all or any part of it, or compromise, extend or renew for any period any obligation evidenced by the Collateral, (d) receive proceeds of the Collateral and exercise all rights as a holder of the Collateral, (e) hold any increase or profits (including money) received from the Collateral as additional security for the Obligations, and (f) sign or endorse Debtor's name on the Collateral. Further, Lender may, if the Collateral should decline in value or otherwise become unsatisfactory to it, demand from any Debtor who is also a Borrower additional Collateral satisfactory to Lender. Should such Debtor agrees to comply immediately with any such demand. Unless otherwise stated in section 18, when releasing Collateral Lender may deliver it to any Debtor.

**10. ACTS NOT AFFECTING OBLIGATIONS.** None of the following shall affect the liabilities of any Debtor or Borrower under this Agreement, or the Obligations, or the rights of Lender with respect to the Collateral: (a) acceptance or retention by Lender of other property or interests as security for the Obligations, or for the liability of any person other than a Debtor with respect to the Obligations; (b) the release of all or any of the Collateral or any other security for any of the Obligations; (c) any release, extension, renewal, modification or compromise of any of the Obligations or the liability of any obligor thereon; or (d) failure by Lender to resort to other security or any person liable for any of the Obligations before resorting to the Collateral.

**11. DEFAULT.** Upon the occurrence of one or more of the following Events of Default:

    (a) **Nonperformance.** Any of the Obligations are not paid when due, or Borrower or Debtor, as applicable, fails to perform, or rectify breach of, any warranty or covenant or other undertaking in this Agreement or in any evidence of or document relating to the Obligations, or there is an event of default under any Control Agreement by Borrower, Debtor or the broker or other third party under the Control Agreement;

    (b) **Inability to Perform.** Borrower, Borrower's spouse, Debtor or a guarantor or surety of any of the Obligations dies, ceases to exist, becomes insolvent or the subject of bankruptcy or insolvency proceedings or any guaranty of the Obligations is revoked or becomes unenforceable for any reason;

    (c) **Misrepresentation.** Any warranty or representation made to induce Lender to extend credit under this Agreement or otherwise, is false in any material respect when made; or

    (d) **Insecurity.** At any time Lender believes in good faith that the prospect of payment or performance of any of the Obligations or performance under any agreement securing the Obligations is impaired;

then, at the option of Lender and without notice or demand to Borrower or Debtor, all the Obligations shall become immediately due and payable and Lender shall have all rights and remedies provided by the Uniform Commercial Code, as it may be amended from time to time, and by any other applicable law including without limitation the right to any deficiency remaining after disposition of Collateral for which Borrower or Debtor, as applicable, agrees to remain fully liable. Borrower or Debtor, as applicable, agrees Lender may exercise any or all of its rights and remedies as provided by law, and without limitation:

    (e) **Exercise Debtor's Rights.** Lender shall have the right, but not the obligation, to exercise and enforce any or all of Debtor's rights and remedies with respect to the Collateral, including, but not limited to, the right to demand, enforce, collect and receive all dividends, interest, principal payments and other sums that are at any time owing with respect to any of the Collateral and to apply such sums to the Obligations in any manner that Lender determines;

    (f) **Notice of Disposition.** Written notice, when required by law, sent to any address of Debtor in this Agreement at least 10 calendar days (counting the day of sending) before the date of a proposed disposition of the Collateral is reasonable notice;

    (g) **Expenses and Application of Proceeds.** Debtor shall reimburse Lender for any expenses incurred by Lender in protecting or enforcing its rights under this Agreement, before and after judgment, including, without limitation, reasonable attorneys' fees and legal expenses (including those incurred in successful defense or settlement of any counterclaim brought by Debtor or incident to any action or proceeding involving Debtor brought pursuant to the United States Bankruptcy Code) and all expenses of taking possession, holding, preparing for disposition, and disposing of the Collateral. After deduction of such expenses, Lender shall apply the proceeds of disposition to the extent actually received in cash to the Obligations in such order and amounts as it elects or as otherwise required under this Agreement. If Lender sells any Collateral on credit, Debtor will be credited only with payments that the purchaser actually makes and that Lender actually receives and applies to the unpaid balance of the purchase price of the Collateral; and

    (h) **Waiver.** Lender may permit Debtor or Borrower to remedy any default without waiving the default so remedied, and Lender may waive any default without waiving any other subsequent or prior default by Debtor. Lender shall continue to have all of its rights and remedies under this Agreement even if it does not fully and properly exercise them on all occasions.

**12. CONSUMER DEBT.** Even though the Collateral may at any time secure a consumer credit transaction as defined in the Wisconsin Consumer Act ("Consumer Debt") by reason of this or any other agreement, Lender may exercise the rights and remedies in the Collateral provided by this Agreement and the Uniform Commercial Code while any Obligation which is not Consumer Debt remains outstanding. If Lender disposes of Collateral pursuant to such rights, Lender shall hold as possessory Collateral to secure any unpaid Consumer Debt, subject to the terms of the Wisconsin Consumer Act and any separate consumer security agreement relating to the Collateral, any proceeds in excess of the amount required to satisfy the non-Consumer Debt and the expenses referred to in section 11(g) above.

**13. SALE OF UNREGISTERED SECURITIES (Letter, Control or Restricted Stock).** Whenever the Lender would have the right under this Agreement to sell any Collateral which is in the form of investment securities, Debtor agrees that if, in the opinion of the Lender or its legal counsel, sales of such securities by the Lender or the Debtor without registration of the securities under the Securities Act of 1933 (the "Act") might, unless accomplished by one or more of the methods described in subsections (a), (b) or (c) below, constitute either the Lender or the Debtor an "underwriter," as that term is defined in section 2(11) of the Act, it shall be commercially reasonable for the Lender without registration to:

    (a) sell all or part of the securities in compliance with Rule 144 or Regulation A under the Act as then in effect, or pursuant to any other rules or regulations under the Act then in effect, compliance with which would make applicable to the sale the exemptions provided pursuant to sections 3(b) or 4(1) of the Act; or

    (b) sell all or part of the securities in an interstate public offering within the meaning of section 3(a)(11) of the Act; or

    (c) sell all or part of the securities in one or more private transactions not involving any public offering in order to secure the exemption provided in section 4(1) of the Act; if:

       (i) the securities are sold for cash to the highest bidder after offers to purchase have been received from at least two offerors;

       (ii) the Lender has reasonable grounds to believe and does believe that each such offeror has sufficient financial resources to enable him to purchase the securities offered and that the offer was made in good faith;

       (iii) each such offeror was informed, prior to the time he made his offer to purchase, that offers to purchase the securities were also being solicited from others; and

       (iv) the Lender has, for at least 30 days prior to the sale, solicited offers to purchase the securities within the restrictions imposed by federal or state securities laws.

Nothing in this section shall prevent the Lender from making any other commercially reasonable disposition of the securities, and no sale of such securities shall be commercially unreasonable solely because it was not made in compliance with this section.

**14. IRREVOCABLE PROXY ON DEFAULT.** In addition to Lender's other rights, each Debtor irrevocably appoints Lender as proxy, with full power of substitution and revocation, upon the occurrence of any event of default to exercise Debtor's rights to attend meetings, vote, consent to and/or take any action respecting the Collateral or an issuer thereof as fully as Debtor might do. This proxy remains effective so long as any of the Obligations are unpaid.

**15. CHARGING DEBTOR'S CREDIT BALANCE.** Unless a lien would be prohibited by law or render a nontaxable account taxable, Debtor grants Lender, as further security for the Obligations, a security interest and lien in any deposit account Debtor may at any time have with Lender and other money now or hereafter owed Debtor by Lender and, in addition, agrees that Lender may, at any time after the occurrence of an event of default, without prior notice or demand, set-off all or any part of the unpaid balance of the Obligations against any deposit balances or other money now or hereafter owed Debtor by Lender.

**16. WAIVER AND CONSENT.** Each Debtor who is not also a Borrower expressly consents to and waives notice of the following by Lender without affecting the liability of any such Debtor: (a) the creation of any present or future Obligation, default under any Obligation, proceedings to collect from any Borrower or anyone else, (b) any surrender, release, impairment, sale or other disposition of any security or collateral for the Obligations, (c) any

04886

release or agreement not to sue any guarantor or surety of the Obligations, (d) any failure to perfect a security interest in or realize upon any security or collateral for the Obligations, (e) any failure to realize upon any of the Obligations or to proceed against any Borrower or any guarantor or surety, (f) any renewal or extension of the time of payment, (g) any allocation and application of payments and credits and acceptance of partial payments, (h) any application of the proceeds of disposition of any collateral for the Obligations to any obligation of any Debtor or Borrower secured by such collateral in such order and amounts as it elects, (i) any determination of what, if anything, may at any time be done with reference to any security or collateral, and (j) any settlement or compromise of the amount due or owing or claimed to be due or owing from any Borrower, guarantor or surety.

**17. INTERPRETATION.** The validity, construction and enforcement of this Agreement are governed by the internal laws of Wisconsin. All terms not otherwise defined have the meanings assigned to them by the Wisconsin Uniform Commercial Code, provided, however, that the term "instrument" shall be such term as defined in the Wisconsin Uniform Commercial Code-Secured Transactions Chapter 409. All references in this Agreement to sections of the Wisconsin Statutes are to those sections as they may be renumbered from time to time. This Agreement is intended by Debtor and Lender as a final expression of this Agreement and as a complete and exclusive statement of its terms, there being no conditions to the enforceability of this Agreement. This Agreement may not be supplemented or modified except in writing and upon the prior written consent of Lender. Unless otherwise required by law, invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provisions.

**18. OTHER PROVISIONS.** (If no other provisions are stated below, there are no other provisions.)

04887