UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

SECURITIES AND EXCHANGE COMMISSION,

                Plaintiff,

   - against -

STEVEN BYERS, JOSEPH SHERESHEVSKY,
WEXTRUST CAPITAL, LLC, WEXTRUST
EQUITY PARTNERS, LLC, WEXTRUST
DEVELOPMENT GROUP, LLC, WEXTRUST
SECURITIES, LLC, and AXELA HOSPITALITY,
LLC,

                Defendants,

   - and -

ELKA SHERESHEVSKY,

                Relief Defendant.

No. 08 Civ. 7104 (DC)

ECF Case

---

## FIFTH INTERIM REPORT OF RECEIVER

TIMOTHY J. COLEMAN
Receiver for Wextrust Entities

DEWEY & LEBOEUF LLP
1301 Avenue of the Americas
New York, NY 10019-6092
Tel. (212) 259-8000

November 11, 2009

Attorneys for Receiver

# TABLE OF CONTENTS

**Page**

I.     LIQUIDATION OF WEXTRUST ASSETS ...................................................................2

     A.     Liquidation of U.S. Assets ......................................................................2

     B.     U.S. Marketing Activities .......................................................................2

     C.     Liquidation of Wextrust Interests in Africa ............................................6

II.     DISTRIBUTION TO THE WEXTRUST VICTIMS ..........................................7

     A.     Status of the Claims Adjudication Process ............................................7

         1.     Investor Claims Disputes ...........................................................8

         2.     Disqualification Disputes ...........................................................9

         3.     Creditor Disputes .....................................................................10

     B.     September 24, 2009 Claims Hearing .....................................................11

     C.     Preparation for the First Interim Distribution ......................................12

III.     ESTATE MANAGEMENT OPERATIONS .....................................................13

     A.     Management of Remaining Real Estate Properties ...............................13

         1.     U.S. Real Estate Operations .....................................................13

         2.     High Yield Loans ......................................................................14

     B.     Financial Management ..........................................................................16

     C.     Taxes ....................................................................................................17

IV.     FINANCIAL CONDITION OF THE WEXTRUST ENTITIES AND AFFILIATES .....18

V.     INVESTIGATIONS AND LITIGATION ........................................................23

     A.     Claims Against Parties in the United States .........................................23

     B.     Claims against Non-U.S. Parties...........................................................25

     C.     Ancillary Litigation..............................................................................25

     D.     Appellate Litigation .............................................................................26

VI.     CONCLUSION...............................................................................................28

Timothy J. Coleman, Receiver for the Wextrust Entities ("Receiver"), respectfully submits this Fifth Interim Report, pursuant to the Court's Order Appointing Temporary Receiver, dated August 11, 2008, as amended by order dated September 11, 2008 (Dkt. No. 36) ("Receiver Order").

As discussed in previous reports, the Receiver has completed many of the tasks directed by the Court in the Receiver Order, including taking a variety of steps to preserve the *status quo*, making determinations about the extent of commingling among the Wextrust Entities and the entities they control or in which they have an ownership interest ("Wextrust Entities and Affiliates"), and proposing a plan of distribution, which was approved by the Court on July 23, 2009 ("Distribution Order") (Dkt. No. 428). The Receiver has completed the claims verification process outlined in the Plan of Distribution (Dkt. No. 243) and submitted all claims that remain in dispute to the Court. Once the Court has resolved these claims, the Receiver will make the first interim distribution to the Wextrust victims. In addition, the Receiver has continued to market the Wextrust real estate portfolio and, in the last 90 days, has successfully finalized the sales of two properties for a total of approximately $12 million. The Receiver is also currently negotiating with buyers on two additional properties. This Fifth Interim Report describes the Receiver's efforts over the past three months.

Section I summarizes the status of the liquidation of Wextrust assets. Section II describes the implementation of the Plan of Distribution, including the claims process. Section III is an overview of the Receiver's continuing management of the Wextrust Entities and Affiliates, including the management of Wextrust real estate operations and all other business and financial aspects of the Wextrust enterprise. Section IV reports on the current financial condition of the receivership estate, including a description of the estate's administrative costs and the additional

10 percent discount Dewey & LeBoeuf ("D&L") will apply to its fees going forward.  Section V

discusses the status of Wextrust-related litigation in the United States and Africa, including the

Receiver's handling of affirmative claims against third parties.

I.      **LIQUIDATION OF WEXTRUST ASSETS**

      A.      **Liquidation of U.S. Assets**

Pursuant to the Distribution Order, the Receiver has continued the process of liquidating

assets of the receivership estate.  In the United States, those assets were comprised of the

Wextrust real estate portfolio as well as other assets, such as the personalty associated with

Wextrust's several offices.  As described in previous interim reports, the Receiver conducted

sales of personalty in conjunction with the closing of the Norfolk, Chicago, and New York

Wextrust offices.  These sales have now been completed and, in total, raised approximately

$60,000.  The Receiver, with the Court's approval, also relinquished 11 real estate properties that

had market values substantially below the amount of debt secured by the properties and

significant carrying costs.  (*See* Dkt No. 433 at 4-6.)  As discussed in Section I.B below, the

Receiver is currently marketing the remaining Wextrust real estate portfolio, and several

properties are at various stages of being sold.

      B.      **U.S. Marketing Activities**

As discussed in the Fourth Interim Report, the commercial properties owned and

operated by Wextrust Equity Partners ("WEP") make up the majority of the Wextrust real estate

portfolio to be liquidated.  The marketing phase of the sales process is well underway, and due

diligence information on the properties is available from the Receiver's real estate advisor, The

Hilco Organization ("Hilco").[1]  This marketing effort has generated a substantial amount of

---

[1] The Hilco website is http://www.hilcorealestate.com/property/ properties.asp?client_id=226.  The Receiver's
website also contains a link to the Hilco website.  Among other things, Hilco has collected and analyzed leases;

interest in the portfolio.  As of the beginning of November, more than 450 inquiries have been received and approximately 300 confidentiality agreements have been signed.

The Receiver has also continued to take targeted steps to increase the market value and saleability of the properties, including certain improvements, lease renewals, and new leases, as shown in Table 1 below.  These improvements and lease renewals have, in turn, increased the value of the properties and, in some instances, already resulted in the sale of the property.  For example, as discussed in the Fourth Interim Report, the Receiver made significant tenant improvements and renewed several leases on the West Bearden Office Plaza, a six-building office park located in Knoxville, Tennessee.  (Dkt. No. 433 at 7.)  As a result of these improvements and Hilco's marketing efforts, 46 potential purchasers entered into confidentiality agreements and were granted access to due diligence documents.  (Dkt. No. 528 at 2.) Ultimately, two offers were made, and the Receiver executed a purchase and sale agreement with one of the offerors on September 3, 2009.  (*Id*. at 2-3.)  The sales price for this property was $8.8 million, and the sales agreement allowed a 45-day marketing period, during which the Receiver could continue to market the property to procure higher offers.  After the marketing period passed, without any higher offers being submitted, the Receiver filed a motion for the Court to approve the sale.  (*See* Dkt. No. 528 at 2-4.)  The Court approved the sale on November 9, 2009. (Dkt. No. 542.)

Similarly, the Receiver made certain improvements to the Hammond Industrial property in Louisiana and, as a result, renewed several significant leases for this property that were expiring or set to expire within the next few months.  These lease extensions, which comprise approximately 78 percent of the leasable space, are estimated to result in millions of dollars of

---

environmental reports; financial documents, such as operating statements and budgets; rent rolls; title documents; maps and surveys; zoning information; and demographic information for the WEP properties.  Hilco has made available information about 33 WEP properties (associated with 20 WEP entities).

revenue over the life of the leases, thus creating substantial value for the property.[2]  The Receiver

is currently negotiating with three buyers and plans to conduct an auction for the purchase of this

property in the near future.

In addition, the Receiver has reached agreements to sell: (1) an office/retail space in

Elmhurst, Illinois (116 N. York Road) and (2) a grocery-anchored retail space located in

Burlington, Wisconsin (South Pine).  With respect to the 116 N. York Road property, the

Receiver has entered into a purchase and sale agreement with a sales price of $3.15 million.  The

sales agreement provided a period for the Receiver to market the property to obtain higher bids.

After signing the purchase and sale agreement, the Receiver worked with the lender to have the

loan assumed by the buyer, a process which took several months.  That process was recently

completed, and the Receiver filed a motion with the Court to approve the sale.  (*See* Dkt. No.

531.)  The Court approved the sale on November 9, 2009.  (Dkt. No. 541.)  With respect to the

South Pine property, the Receiver has reached an agreement with a potential buyer and is

currently working with the lender on the potential buyer's assumption of the loan.

The Receiver has also taken a number of steps to preserve value to the estate from the

Belle Meade Centre property, an office/retail condominium project located in Nashville,

Tennessee.  While some of the retail condominiums of this property have been sold,

approximately two-thirds remain for sale, and the Receiver believes there is the potential for

equity to be realized from this property.[3]  The loan on Belle Meade matured in December 2008,

and the Receiver and the lender, Regions Bank, entered into a forbearance agreement under

---

[2] Because the amount to be paid under one of the renewed leases is greater than $750,000, the proposed lease extension required Court approval, consistent with the notice obligations outlined in the Receiver Order.  (Receiver Order at 8.)  The Receiver filed a motion to approve the extension of the lease with the Court, and the Court approved the lease extension on September 25, 2009.

[3] Because the condominium units in Belle Meade are offered for sale rather than rented, Belle Meade produces no income.

which Regions deferred debt service.  After the forbearance expired, the Receiver attempted to negotiate with the lender for time to market the Belle Meade property with the understanding that the net sale proceeds would be used to pay down the outstanding principle and interest balance on the loan.  The negotiations were unsuccessful, however, and lender filed a motion to modify the Receiver Order to allow it to obtain possession of the property.  The Receiver opposed the lender's motion, but the Court ruled that if the Receiver and lender did not reach an agreement within 90 days, the Receiver would be required to relinquish the property or pay the lender its secured claim.  Subsequent to the Court's order, the Receiver found a buyer for the bank's loan.  The buyer purchased the loan at a discount, and the Receiver and buyer negotiated an agreement dated October 26, 2009, under which the Receiver has nine additional months to market the property without the obligation to pay debt service.  At the end of the nine months, the Receiver will either pay the loan amount owed to the bank prior to the buyer's purchase of the loan or relinquish the property.  Thus, the Receiver has extended his ability to market the condominiums for an additional nine months with minimal cost to the receivership estate.

**Table 1: Leasing Activities on Wextrust Real Properties**

|   | Name | Leases Renewed | New Leases Signed |
|---|------|----------------|-------------------|
| 1 | 45 S. Washington | 1 | 0 |
| 2 | 116 North York Street | 1 | 0 |
| 3 | First Highland | 2 | 5 |
| 4 | The Chase Bank Building (Peoria) | 4 | 0 |
| 5 | South Pine | 0 | 0 |
| 6 | Belle Meade Centre | 0 | 0 |
| 7 | Clarksville Industrial | 2 | 0 |
| 8 | Corinth Industrial | 0 | 0 |
| 9 | Executive Plaza | 1 | 1 |

| | Name | Leases Renewed | New Leases Signed |
|----|------|----------------|-------------------|
| 10 | Hammond Industrial Park | 4 | 0 |
| 11 | Interstate Park | 28 | 12 |
| 12 | Myatt | 0 | 0 |
| 13 | New Salem | 0 | 0 |
| 14 | Park Village & Parkway Business Center II | 1 | 0 |
| 15 | Shallowford Business Park East | 3 | 2 |
| 16 | Tennessee Portfolio | 0 | 0 |
| 17 | West Bearden Office Plaza | 15 | 6 |
| 18 | Wilma Rudolph | 1 | 0 |
| 19 | Workman Road | 1 | 0 |
| 20 | Commerce Center | 1 | 1 |
| | **TOTALS** | **65** | **27** |

Over the past three months, the Receiver has renewed 13 leases and negotiated 5 new leases on properties, for a total of approximately 362,000 square feet of leasable space. The Receiver estimates these leases will result in approximately $5.4 million in revenue over the life of the leases, thereby enhancing the value of the properties and the expected proceeds of the liquidation.

### C.    Liquidation of Wextrust Interests in Africa

As previously reported, the Receiver is participating in various liquidation proceedings in South Africa and Namibia. The status of the African liquidation proceedings is summarized in Table 2, below.

**Table 2: PAM Syndicate Liquidation Proceedings**

| DEBTOR/DEFENDANT | JURISDICTION | DATE FILED | STATUS |
|---|---|---|---|
| Pure Africa Minerals (Pty) Ltd. | South Africa | 9/11/08 | Final liquidation order granted on 9/16/08 |
| Redlex 420 (Pty) Ltd. | South Africa | 11/20/08 | Final liquidation order granted 1/15/09 |
| African Spirit (Pty) Ltd. | South Africa | 11/20/08 | Final liquidation order granted on 1/15/09 |
| Vaticano Traders (Pty) Ltd. | South Africa | 11/20/08 | Final liquidation order granted on 2/24/09 |
| Brett Investments (Pty) Ltd. | Namibia | 11/12/08 | Final liquidation order granted on 9/21/09 |

Most expenses associated with the liquidation proceedings, including the fees of local counsel in South Africa and Namibia, and expenses incurred by the court-appointed liquidators, will be paid by the liquidators from the liquidation estates in those countries. In addition to the proceedings summarized above, the Receiver has requested assistance from various government agencies in liquidating assets expeditiously. For example, the Receiver has requested assistance from the Namibian Ministry of Mines and Energy in liquidating diamonds, mining equipment and other property in Namibia. The Receiver will continue to take steps to liquidate Wextrust assets in Africa as promptly and efficiently as possible. The Receiver will then take the necessary steps to repatriate such assets and distribute them to victims pursuant to the Distribution Order.

## II.     DISTRIBUTION TO THE WEXTRUST VICTIMS

### A.     Status of the Claims Adjudication Process

As discussed in the Fourth Interim Report, the Receiver's Plan of Distribution, as approved by the Court on July 23, 2009, sets forth the claims verification process to be followed

in distributing the assets of the receivership estate to victims.  (*See* Dkt. No. 433 at 11-13.)  As discussed below, the Receiver has resolved the vast majority of disputed investor claims, disqualification disputes, and unsecured creditor disputes, and the few remaining disputes have been submitted to the Court.  Once the Court resolves these outstanding issues, the Receiver will make the first interim distribution to the Wextrust victims.

## 1.     <u>Investor Claims Disputes</u>

As described in the Fourth Interim Report, the Receiver and his advisor, Deloitte Financial Advisory Services LLP ("Deloitte"), prepared and mailed more than 1,750 claim statements to investors in May 2009, approximately 218 of which were disputed.  For each dispute, the Receiver analyzed the objection, examined the available supporting documentation, and obtained input from counsel and professional advisers.  The Receiver accepted the position of 155 disputants in full, and the remaining 63 disputes were accepted in part, rejected, or deemed to require additional information.  Investors were then given the opportunity to further dispute their claim amounts.  Of the 63 remaining disputed claims, 33 did not respond to the Receiver in advance of the deadline for submitting final disputes, and the Receiver deemed those disputes resolved.  For those investors who supplied additional information, the Receiver conducted further analysis and discussed disputes with investors.  Through this process, the Receiver resolved all but 15 investor disputes.  The Receiver mailed final determination letters to investors in early September and, pursuant to this Court's August 19, 2009 Order ("Claims Order"), the Receiver forwarded materials concerning the remaining disputes to the Court on September 14, 2009, together with a statement setting forth the Receiver's position on the disputes.  (*See* Dkt. No. 487.)

## 2. **Disqualification Disputes**

In the Plan of Distribution, the Receiver recommended that Wextrust employees or individuals providing referral services in exchange for compensation ("finders") be subject to a reduction in their net investor claims.[4]  The Distribution Order approved the Receiver's proposal "to treat differently those involved in the fraudulent scheme."  The Court instructed the Receiver to notify each individual whom the Receiver intended to exclude from receiving a distribution "of the Receiver's decision and the evidence supporting it."  (Distribution Order at 38-39.)

The Receiver, his accountants, and the Receiver's other professional advisors reviewed Wextrust payroll and other records and conducted numerous interviews with former and current Wextrust employees and defrauded investors.  Based on a review of this evidence and a totality of the circumstances, the Receiver initially determined that 4 individuals be subject to a 90 percent reduction in their net investor claims; 11 individuals be subject to a 50 percent reduction in their net investor claims; 20 individuals be subject to a 25 percent reduction in their net investor claims; and 9 individuals be subject to a 100 percent reduction in their net investor claims.  On August 14, 2009, the Receiver complied with the Court's notice requirements by sending each individual a letter and documentation demonstrating the receipt of Wextrust compensation.

Many of the investors who received disqualification letters objected to having their net investor claims reduced.  The Receiver's advisors spoke with these investors, reviewed additional evidence, and concluded that it would be inequitable to disqualify certain individuals,

---

[4] In the Receiver's Response to Objections to the Receiver's Proposed Plan of Distribution (Dkt. No. 304), the Receiver clarified this proposal by recommending that Wextrust employees or finders who received more than $100,000 in commissions or finder's fees be subject to a 90 percent reduction in their net investor claims; that those who received between $10,001 and $100,000 in commissions or fees be subject to a 50 percent reduction in their net investor claims; and that those who received $10,000 or less in commissions or fees be subject to a 25 percent reduction in their net investor claims.  The Receiver also recommended that the named defendants and those who actively facilitated the fraudulent scheme should be disqualified entirely from any recovery based on the equitable doctrine of unclean hands.

such as those who were simply paid a few hundred dollars for mentioning their Wextrust investment portfolio to friends and family members. The Receiver determined that these individuals were not actively and purposefully recruiting additional Wextrust investors, and that the funds they received were also insignificant when compared with the individuals' total investments. Each individual removed from the disqualification recommendation list was notified by early September 2009.

The Receiver ultimately recommended to the Court that four individuals be subject to a 90 percent reduction in their net investor claims; six individuals be subject to a 50 percent reduction in their net investor claims; six individuals be subject to a 25 percent reduction in their net investor claims; and nine individuals be subject to a 100 percent reduction in their net investor claims based on the doctrine of unclean hands. At the time of the claims hearing on September 24, 2009, only 12 disputes remained.[5]

### 3. Creditor Disputes

As discussed in the Fourth Interim Report, the Receiver posted a spreadsheet of all unpaid, unsecured claims of creditors on the receivership website in July 2009. The Receiver gave notice to all creditors for whom contact information was available and encouraged them to review and/or dispute their claims information. Many creditors contacted the Receiver's representatives and counsel about issues relating to the claims process, and the Receiver collected, categorized, and logged each claim on a rolling basis.

The Receiver reviewed claims from unsecured creditors submitted before August 24, 2009, the deadline imposed by the Court in the Claims Order for resolving disputes with claimants. After analyzing the submitted claims, the Receiver added approximately 29 new

---

[5] The remaining claimants did not communicate their desire to have the Court resolve their disputes at the claims hearing within the deadline for submitting final disputes.

claims and disputed approximately 72 claims. The disputed claims fell primarily into one of four categories: (1) deficiency claims from secured creditors; (2) claims not sufficiently supported by documentation; (3) claims presented by individuals whom the Receiver recommended be disqualified; and (4) claims that are contingent or unliquidated. Most of the disputed claims were resolved after discussions with creditors, the review of Wextrust records, and additional information submitted by the creditor to the Receiver. At the time of the claims hearing on September 24, 2009, only 15 creditor claims remained in dispute.[6]

**B.      September 24, 2009 Claims Hearing**

The Court held a hearing on September 24, 2009 to hear evidence and arguments regarding all outstanding investor and creditor claims disputes related to the Distribution Order. Represented at the hearing were three investors or their counsel, one potentially-disqualified investor, and counsel for seven creditors. At the hearing, the Court denied the relief sought by one investor and three of the seven creditors, accepted in part and denied in part the relief sought by one creditor and one investor, and moved one potentially-disqualified investor from the 50 percent disqualification category into the 25 percent disqualification category.

Since the hearing, the Receiver has reviewed the claims of commodity funds investors to ensure that their claims reflect the full amount of their initial investments (and any reinvestments, less cash distributions), without adjustments for profit or loss, per the Court's clarification at the hearing. In early October, the Receiver notified 10 such investors that their claims would be modified.

Additionally, the Receiver has settled two additional disputes and is in active settlement discussions to resolve another dispute. Through the creditor claims resolution process, the

---

[6] The remaining claimants either withdrew their claims or did not communicate their desire to have the Court resolve their disputes at the claims hearing within the deadline for submitting final disputes.

Receiver has reduced the total pool of creditor claims against the estate by tens of millions of dollars, thus significantly increasing the ultimate recovery for victims.

### C.    Preparation for the First Interim Distribution

Once the Court resolves the remaining claims disputes, the Receiver will be in a position to seek permission from the Court to make a first interim distribution to victims.  The Receiver's ability to make a timely first interim distribution, however, has been impacted recently by the filing of a motion seeking a stay of the distribution of receivership assets under the Court's plan of distribution pending the outcome of an appeal of the plan.  The motion to stay the distribution was brought by a single investor, Martin Malek, on November 3, 2009 – over 14 weeks after entry of the Court's plan of distribution decision on July 23, 2009 and five weeks after Mr. Malek participated in person at the claims adjudication hearing on September 24, 2009.

If the motion to stay the distribution of assets were granted by the Court, any distribution of assets to victims would be delayed until after the Second Circuit issues its ruling on the plan of distribution appeal.  Oral argument for that appeal has been tentatively scheduled for no earlier than March 15, 2010, and a decision may not be issued for many weeks or months after that time.  Accordingly, the Receiver and the SEC intend to vigorously oppose this motion.  As the Court held in its plan of distribution decision, "[t]he interest of fairness overwhelmingly weighs in favor of a prompt resolution of this case and a distribution of assets to defrauded investors." (Distribution Order at 16 n.9.)  In light of the immense hardship facing the victims in this case and the substantial delay that would result by the entry of a stay, the Receiver believes that the interests of justice weigh heavily against a stay of the timely distribution of assets to victims.  Moreover, the time and effort expended by the Court, the Receiver, and all aggrieved claimants in resolving claims since entry of the Court's plan of distribution decision militate strongly against a stay.

If the Court denies the motion to stay the distribution of assets, the distribution will be handled by an experienced third party distribution firm, which will coordinate all logistical and investor-relations functions related to the distribution of funds to victims. Future distributions will then be paid on a periodic basis, after approval by the Court, from the reserve, the proceeds of the sale of receivership assets, and other estate income.

## III.    ESTATE MANAGEMENT OPERATIONS

### A.    Management of Remaining Real Estate Properties

#### 1.    U.S. Real Estate Operations

As directed by the Court, the Receiver took control of all of the real estate assets of the Wextrust Entities and Affiliates, which now consist primarily of the WEP commercial properties. In the 90 days ending October 31, 2009, the Receiver has collected approximately $5.1 million in rent. As discussed in Section I.B above, the Receiver has renewed 13 leases and negotiated 5 new leases on properties during this period.

The Receiver also continues to manage development and construction work on the 47 Dean Street project, a residential condominium in the Boerum Hill neighborhood in Brooklyn, New York. Significant progress has been made over the past three months, and the project is now expected to be substantially completed by the end of December. Nearly all of the interior partitions are in place, insulated, sheetrocked, and taped. All rough plumbing and electrical inspections are complete, and the elevator cab has been installed. The roofing system, exterior brick, and stucco facades are complete, and the exterior scaffolding has been removed.

The Receiver will begin to market and sell the units once final approval is obtained from the New York Attorney General for the sale of the units. More than 400 potential buyers have expressed interest in the 10 units in the building.

## 2. High Yield Loans

The Receiver continues to manage the Wextrust portfolio of high yield loans.  As discussed in prior interim reports, there are two high yield loan portfolios.  The Wexford High Yield Debt Fund I, LLC ("High Yield I") consists of eleven loans in which Wextrust has an aggregate direct and joint-venture participation interest of over $5 million, all of which are in default.  The Wexford High Yield Debt Fund III, LLC ("High Yield III") and its offshore participant, Wexford High Yield Debt Offshore Fund, Ltd. ("Offshore Fund") presently includes 15 loans for which Wextrust has a combined direct and joint-venture participation interest in excess of $9 million.  The loans in those portfolios are secured by a variety of commercial and residential real estate assets.

As discussed in previous interim reports, the Receiver has taken a number of actions to obtain value from the high yield loan portfolios, including instituting foreclosure proceedings on properties used to secure the loans, marketing properties obtained from foreclosure proceedings or settlements, negotiating with joint venture partners to obtain necessary funding for properties obtained from foreclosure proceedings or settlements, and reaching agreements regarding loan payoffs with borrowers.  (*See, e.g.*, Dkt. No. 433 at 17; Dkt. No. 308 at 13-15).  Tables 3-4 below provide information about the loans that make up the High Yield I and High Yield III portfolios and the potential recoveries from these loans.[7]

---

[7] The projected Wextrust recovery included in each of the tables below is an evolving estimate that has been modified materially during the pendency of this case, and will likely continue to change until the ultimate liquidation of the high yield portfolio.  The projected recoveries are dependent on a host of factors outside of the Receiver's control, including, but not limited to, the nature of Wextrust's interests in the loan, type of collateral, local and national commercial real estate market conditions, litigation risks, and transaction costs.

## Table 3: High Yield I Loan Portfolio

| HY I | Principal Amount of Loan | Stillwater Exposure | Wextrust Exposure | Wextrust % of Principal Loan Amount | Projected Wextrust Recovery |
|---|---|---|---|---|---|
| Bedford Place | $200,000 | $0.00 | $200,000 | 100% | $0.00 |
| 21 Licensk | $450,000 | $0.00 | $450,000 | 100% | $160,000 |
| Group West Builders | $365,000 | $328,500 | $36,500 | 10% | $0.00 |
| Group West Builders | $317,500 | $0.00 | $317,500 | 100% | $0.00 |
| Brandermill Inn | $2,900,000 | $2,610,000 | $290,000 | 10% | $60,000 |
| Walnut Hill Properties, LLC | $1,800,000 | $1,620,000 | $180,000 | 10% | $90,000 |
| MEG Crown Point LLC | $650,000 | $585,000 | $ 65,000 | 10% | $0.00 |
| Laura Lee Properties | $650,000 | $585,000 | $65,000 | 10% | $0.00 |
| Agio Pizza, Inc. | $635,000 | $0.00 | $635,000 | 100% | $150,000 |
| Eli Hadad | $2,350,000 | $0.00 | $2,350,000 | 100% | $0.00 |
| KMM Ventures, Inc. | $560,000 | $0.00 | $560,000 | 100% | $300,000 |
| **Total** | **$10,877,500** | **$5,728,500** | **$5,149,000** | | **$760,000** |

## Table 4:  High Yield III Loan Portfolio

| HY III and Offshore | Principal Amount of Loan | HPC Exposure | Wextrust Exposure | Wextrust % of Principal Loan Amount | Projected Wextrust Recovery |
|---|---|---|---|---|---|
| Five Star Premier Properties LLC | $1,625,000 | $1,462,500 | $162,500 | 10% | $16,000-$30,000 |
| RRA Development LLC | $1,570,348 | $1,177,761 | $392,587 | 25% | $170,000-$200,000 |
| Kingsdale LLC (Breugelmans) | $176,758 | $0.00 | $176,758 | 100% | $158,000 |
| Kingsdale LLC (Breugelmans) | $170,000 | $0.00 | $170,000 | 100% | $0.00 |
| Lapahana LLC (10%) | $1,760,000 | $1,574,976 | $135,194 | 7.7% | $0.00 |
| Boardwalk & Lincoln LLC | $7,750,000 | $1,312,500 | $1,312,500 | 16.94% | N/A |
| Ellis Family Partnership | $1,400,000 | $700,000 | $700,000 | 50% | $0.00 |
| Metro Development Group LLC | $675,000 | $0.00 | $675,000 | 100% | $200,000-$300,000 |
| Myra Jordan | $1,415,000 | $707,582 | $707,582 | 50% | $0.00 |
| 56 Walker & Guy Morris | $10,911,064 | $1,455,532 | $1,455,532 | 13.34% | $0.00 |
| 625 W Division | $2,460,616 | $0.00 | $2,460,616 | 100% | $0.00 |
| Seed America | $910,000 | $455,000 | $455,000 | 50% | $455,000 |
| John Breugelmans | $50,000 | $0.00 | $50,000 | 100% | $0.00 |
| Ferry Street Partners | $21,610 | $0.00 | $21,610 | 100% | $0.00 |
| Fountainside | $3,768,000 | $1,695,600 | $188,400 | 5% | $0.00 |
| Intervale Holdings | $359,448 | $0.00 | $359,448 | 100% | $250,000-$300,000 |
| **Total** | **$35,022,844** | **$10,541,451** | **$9,422,727** | | **$1,250,000-$1,443,000** |

In the last three months, the Receiver has finalized a significant settlement related to the high yield portfolio. In 2007, High Yield III made a series of loans to Kingsdale Enterprises LLC, an entity owned by John Breugelmans, for approximately $350,000. A Wextrust Affiliate, 625 Paragon Holdings, LLC, later entered into a joint-venture agreement with 625 W. Division Condominium, L.P., called Paragon/Division LLC, to develop a condominium project in Chicago, Illinois. The joint venture failed. The Division Entities subsequently asserted claims against the receivership estate in excess of $19 million related to the joint-venture, which the Receiver opposed.

On September 11, 2008, the Receiver and the Division Entities entered into a Mutual Release and Settlement Agreement (the "Settlement Agreement"). The Settlement Agreement provides for the settlement and compromise of all pending claims and controversies by and between the Wextrust Parties and the Division Entities, including claims arising out of the high yield loans and the unsecured claims filed by the Division Entities against the estate.[8] In addition, the Settlement Agreement provides that, at the closing of the transactions contemplated therein, the Division Parties will transfer to and for the benefit of the receivership estate $158,000 of proceeds from the sale of one of their remaining condominiums. The Receiver filed a motion seeking the Court's approval of the Settlement Agreement on September 15, 2009 (Dkt. Nos. 471-76), which the Court approved on September 25, 2009. (Dkt. No. 510.) The parties have since consummated the settlement.

### B.  Financial Management

As discussed in the Fourth Interim Report, the Receiver has continued to manage the business and financial aspects of the Wextrust enterprise, including taking additional expense

---

[8] The Settlement Agreement also provides for the termination of a joint venture between Wextrust and the Division Entities.

reduction actions and continuing to implement a more efficient cash management system. In the last three months, the transition of management and sale of the WEP real estate assets to Badger Real Estate Advisors, LLC ("Badger") has been completed. Mitchell Kahn, the lead contact for Badger, provides the Receiver with a monthly budget for each of the properties and is responsible for coordinating the payment of bills that arise in the ordinary course of business.[9] During the last three months, the Receiver also made an additional headcount reduction, reducing the number of employees from 15 to 14.

In addition, the bank consolidation efforts and cash management system discussed in previous interim reports has now been completed. Approximately 227 accounts held at dozens of financial institutions were consolidated into 67 Private Bank accounts. All of the Private Bank accounts that were established in the consolidation process for operating entities are currently receiving deposits and processing withdrawals in the ordinary course of business.

C.    **Taxes**

The Receiver's tax counsel continue to manage the estate's income tax liabilities and compliance obligations. The Receiver is coordinating his efforts with the Bankruptcy and Insolvency Unit of the Internal Revenue Service ("IRS"), which is responsible for the IRS' interests in this matter. In the last three months, the Receiver's tax counsel have also continued discussions with the IRS Office of Chief Counsel regarding the obligations of the Wextrust Entities and Affiliates to file returns, and the Receiver's tax counsel recently made a proposal in this regard. The Receiver and his tax counsel will continue to work with the IRS to resolve outstanding tax issues as they arise.

---

[9] As discussed in the Fourth Interim Report, Kahn was previously a Principal of Hilco and the Hilco professional primarily responsible for the Wextrust matter.

# IV. FINANCIAL CONDITION OF THE WEXTRUST ENTITIES AND AFFILIATES

As in previous reports, Deloitte has assisted in the aggregation of financial information from the financial systems and books and records of Wextrust Entities and Affiliates. Those financial records reflect the book value of the principal real estate assets, as recorded in the company's books and records, but may not be recorded in accordance with accepted accounting standards. As shown in Table 5, the total book value of the remaining Wextrust real estate portfolio is approximately $184 million.[10] Those values are based upon the accounting records and other information maintained by Wextrust and do not represent current market value. Moreover, as discussed in previous reports, these properties were purchased at the height of the commercial real estate market and are heavily leveraged. The Receiver contemplates that most of the proceeds of the sales of these properties will be used to repay secured debt.

## Table 5: Book Value of Wextrust Real Estate Assets

Wextrust Capital, LLC, et al.
Net Book Value (1) (2)
as of August 31, 2009

| | Axela (3) | WEP (4) | WDG | Consolidated |
|---|---|---|---|---|
| Property | | | | |
| Building / Land | - | 177,520,056 | 6,767,579 | 184,287,635 |
| Loan Payable on Property | - | 141,526,561 | 5,489,851 | 147,016,412 |
| **Net Book Value (5)** | $ - | $ 35,993,495 | $ 1,277,728 | $ 37,271,223 |
| | | | | |
| Capitalized Costs: | | | | |
| Tenant Improvements | - | 2,125,830 | - | 2,125,830 |
| Capital Improvements | - | 2,111,414 | - | 2,111,414 |
| **Total Capitalized Costs** | $ - | $ 4,237,244 | $ - | $ 4,237,244 |
| | | | | |
| **Net Book Value (5)** | $ - | $ 40,230,739 | $ 1,277,728 | $ 41,508,468 |

**(1)** - Where possible, net book values were obtained from the SFAR as of August 31, 2009 although the amounts noted here will not always agree with amounts reported on the SFAR's. SFAR data was based on accounting information provided by Wextrust. However, the cost of the building and the balance of the loan payable on the property were not always recorded in the accounting system. To the extent available, these amounts were obtained from other internal sources as of the most recent date available. In some cases, loan payable amounts include accrued interest and late fees assessed by the lender.
**(2)** - The amounts shown do not include properties where the relinquishment process was initiated or had been relinquished as of August 31, 2009.
**(3)** - As of August 31, 2009, the United States District Court for the Southern District of New York had entered orders permitting the relinquishment of all hotel properties.
**(4)** - First Highland, LLC and Commerce Center Holdings, which are TIC properties, are included at 100% even though the Wextrust interest is less (78.21% and 35%, respectively).
**(5)** - There may be other payable amounts due upon sale of property, including property taxes, etc.

---

[10]The Fourth Interim Report indicates a book value of approximately $219 million. The difference in that book value and the book value shown in Table 5 is attributable primarily to the relinquishment of the Park View Hotel.

As of August 31, 2009, Wextrust Entities and Affiliates had approximately $16.3 million[11] in cash in approximately 140 U.S. bank accounts.  For the three months ending August 31, 2009, the Receiver authorized payment of approximately $5.8 million in expenses necessary to preserve the *status quo* of the Wextrust enterprise, as shown in Table 6 below.  The vast majority of those expenses were paid in connection with operating the WEP real estate portfolio, including approximately $2 million in debt service payments; $1 million in ordinary course expenses; and $210,000 in capital expenditures, tenant improvements, and leasing commissions.  For the same period, WEP had tenant receipts of approximately $5.4 million, which included tenant reimbursement for insurance and taxes on several of the WEP properties.

### Table 6:  Receipts and Disbursements

Wextrust Capital, LLC, et al.
Consolidated Cash Receipts and Disbursements - Rounded (1) (2)
from 06/01/09 through 08/31/2009

| RECEIPTS | Wextrust Capital, LLC and Affiliates | Commodity Funds | Wextrust Equity Partners, LLC and Affiliates | PAM | Wexford Development Group, LLC and Affiliates | Axela Hospitality, LLC and Affiliates | TOTAL |
|---|---|---|---|---|---|---|---|
| Tenant Receipts (3) | - | - | 5,380,000 | - | - | - | 5,380,000 |
| Sale of Receivership Assets | 10,000 | - | - | - | - | - | 10,000 |
| Construction Draws | - | - | - | - | 660,000 | - | 660,000 |
| Other Receipts | - | - | 250,000 | - | 10,000 | 80,000 | 340,000 |
| **TOTAL RECEIPTS** | **10,000** | **-** | **5,630,000** | **-** | **670,000** | **80,000** | **6,390,000** |
| **DISBURSEMENTS** | | | | | | | |
| Capital Expenditures, Tenant Improvements & Leasing Commissions | - | - | 210,000 | - | 690,000 | - | 900,000 |
| Insurance | - | - | 30,000 | - | - | - | 30,000 |
| Loan Payments | - | - | 2,030,000 | - | - | - | 2,030,000 |
| Management Fees | - | - | 240,000 | - | - | - | 240,000 |
| Ordinary Course Expenses | 30,000 | 60,000 | 1,030,000 | - | 10,000 | - | 1,130,000 |
| Labor Costs | 10,000 | 50,000 | 270,000 | - | 70,000 | 20,000 | 420,000 |
| Professional Expenses - Non-Receiver (4) | - | 90,000 | - | - | - | - | 90,000 |
| Taxes | - | - | 500,000 (5) | - | - | - | 500,000 |
| Other (6) (7) | - | 110,000 | - | - | 380,000 | - | 490,000 |
| **TOTAL DISBURSEMENTS** | **40,000** | **310,000** | **4,310,000** | | **1,150,000** | **20,000** | **5,830,000** |
| **NET CASH GENERATION / (BURN)** | **(30,000)** | **(310,000)** | **1,320,000** | | **(480,000)** | **60,000** | **$ 560,000** |

(1) - The receipts and disbursements in this analysis are cash transactions that are grouped by the entities that initiated the transaction, however, in some cases the cash transactions were executed on behalf of other Wextrust entities.  The cash transactions have been categorized by type based on information contained within the books and records of the Wextrust Entities.  The sources of cash receipts and disbursements data were a combination of general ledgers and bank transaction data.  Not all bank accounts or general ledgers were included in this analysis; entities with no or insignificant transaction activity during the period presented may not have been included.  This analysis includes Wextrust entities that were not reported in the Standardized Fund Accounting Reports (SFARs) because additional information continues to become available.  The analysis does not include certain third party receipts and disbursements reflected in the SFARs.

(2) - This analysis was prepared on a cash basis, therefore the timing of receipts and disbursements are different than what may be contained in accrual based financial reports.  For example, receipts may not be matched to related disbursements, or vice versa.  In addition, some disbursements included in this analysis had not cleared the bank as of August 31, 2009.

(3) - Approximately $253,000 was collected, in addition to monthly rent, from tenants for property taxes and insurance.

(4) - Receivership professional expenses are not included in this analysis.  The payment of Professional Fees - Non-Receiver represent fees relating to the marketing of property.

(5) - Approximately $200,000 is related to 2008 property taxes and the remaining balance is related to the 2009 tax escrow payments.

(6) - Per the terms of the Dean at Boreum Hill, LLC Operating Agreement, approximately $110,000 was transferred to the Managing Member of the joint venture, Recal Partners at Dean, LLC, from the Commodity Funds for proceeds received from the sale of two parking spaces at 52 Dean Street.

(7) - Approximately $380,000 was paid out of Wexford Development Group, LLC.  <1> approximately $365,000 for the reimbursement of earnest money deposits to the contract purchasers at the Hamptons of Hinsdale in accordance with the terms of the approved Court Order dated June 26, 2009 and <2> approximately $15,000 of funds were disbursed to Bank of Hinsdale due to deed in lieu transactions.

[11] The cash balance will not agree with the amount reported on the SFARs due primarily to the exclusion in the SFARs of accounts with escrowed monies that cannot be transferred at this time, accounts managed by a third party property manager,  accounts subject to a dispute, or accounts located outside the United States.

Table 6 also shows a positive cash flow of approximately $560,000 for the Wextrust enterprise for the three months ending August 31, 2009, a result that is below the projected cash flow of $850,000 for this period.[12]  This difference is primarily due to the reimbursement of earnest money deposits to buyers who signed contracts to purchase homes in the uncompleted Hamptons of Hinsdale project, and payments made to a joint venture partner in connection with the sale of parking spaces at 52 Dean Street in late 2008, neither of which was projected to occur in the time period of the cash flow forecast.  In addition, the difference was also impacted by timing of receipts and disbursements for the WEP properties.

Deloitte has also assisted in preparing a cash forecast for Wextrust for two three-month periods: September 1, 2009 through November 30, 2009 and December 1, 2009 through February 28, 2010, shown in Table 7.  Previous reports have projected four months in advance.  However, projecting these two, three-month periods will allow the cash forecasts to be more easily compared to the receipts and disbursements going forward and provide greater transparency into the financial condition of the estate while still providing enough of a forecast period to be useful.  Because the receivership estate is now comprised primarily of the WEP properties, and the income and operating expenses are mostly attributable to the WEP portfolio, this cash forecast was prepared at the enterprise level rather than at the business unit level.

This cash forecast anticipates that Wextrust will generate positive cash flow of approximately $363,000 for the three-month period ending November 30, 2009.  This figure is slightly less than the $560,000 actual net cash flow for the three month period ending August 31, 2009, shown in Table 6 above.  The difference is attributable primarily to timing issues of

---

[12] The cash forecast in the Fourth Interim Report showed a projected net cash flow of $397,169 for the four months ending November 30, 2009, and thus cannot be compared to the actual net cash flow reflected in the Receipts and Disbursements analysis.  The $850,000 projected net cash flow is for the period June through August 2009, the same period as the Receipts and Disbursements analysis, and is drawn from monthly cash flow projections.

receipts and disbursements. The cash flow for the period ending February 28, 2010 is projected

to be negative. The negative cash flow is attributable primarily to the February 2010 annual

payment of property taxes on the WEP properties, which total approximately $900,000. A

significant portion of the tax expense will be reimbursed by the tenants and reflected in the

subsequent cash flow forecast period. On an annualized basis, the Wextrust enterprise is

projected to generate a positive cash flow.

### Table 7: Wextrust Cash Forecast

**Base Cash Flow Projections for Wextrust Capital, LLC and Affiliates, et al. for the Six Months Ending February 28, 2010**
**(1) (2)**

| | WexTrust Capital, LLC, et al. for the 3 - Months Ending November 30, 2009 | WexTrust Capital, LLC, et al. for the 3 - Months Ending February 28, 2010 | Total |
|---|---|---|---|
| Total Effective Income | 5,088,264 | 5,122,269 | 10,210,533 |
| Total Operating Expenses | 1,982,119 | 2,946,662 | 4,928,781 |
| Net Operating Income | 3,106,145 | 2,175,607 | 5,281,752 |
| | | | |
| Non Operating Expenses: | | | |
| Debt Service - Interest (Including Swap Payments) | 1,784,811 | 1,779,249 | 3,564,061 |
| Debt Service - Principal | 354,236 | 354,236 | 708,472 |
| Capital Expenditures (3) | 169,731 | - | 169,731 |
| Tenant Improvements & Lease Commissions | 277,114 | 253,000 | 530,114 |
| Reserves | 58,794 | 58,794 | 117,589 |
| Other Non-Operating Expenses | 98,339 | 98,770 | 197,109 |
| Total Non-Operating Expenses | 2,743,025 | 2,544,049 | 5,287,074 |
| | | | |
| Net Cash Flow (4) | 363,120 | (368,442) (5) | (5,322) |

**(1)** - Does not include any distributions under the Plan of Distribution. As of August 31, 2009, the United States District Court for the Southern District of New York approved orders to relinquish all hotel properties.
**(2)** - Amounts include First Highland, LLC and Commerce Center Holdings, which are TIC properties, at 100% even though the Wextrust interest is less (78.21% and 35%, respectively). The cash projections include the expected cash activity for properties that are currently in sale negotiations but do not include the expected net sale proceeds. For information on the expected sale of Receivership assets, please refer to Section I.A.1.
**(3)** - Net of escrow draws available for capital expenditures.
**(4)** - Does not include Receivership related professional fees.
**(5)** - The negative net cash flow projected is mainly attributable to the projected payment of 2009 property taxes in February of 2010 totaling approximately $900,000. This payment is funded in part by the monthly and annual collections CAM fees from tenants.

The above analysis does not include expenses associated with the administration of the

receivership, the largest component of which is professional fees due to the Receiver and

receivership counsel. As shown in Table 8, fees for the Receiver and D&L have continued to

decline.

## Table 8:  Administrative Costs



*Total Fees for May 2009 through September 2009 are based on unaudited bills.  Fees Requested for May 2009 through September 2009 are estimates based on prior discount and holdback amounts.

The Receiver and D&L filed their fourth and fifth interim fee applications, covering November and December 2008.[13]  After deductions and hold-backs, the Receiver and D&L respectively sought interim awards of $32,887.50 and $916,432.80 for November 2008 and $24,975 and $674,399 for December 2008.[14]  Total reductions and holdbacks for these periods amounted to $823,067 and $545,326, respectively.  (*See* Dkt. 455 at 12.)  On August 18, the Court entered an Order requiring the Receiver to detail the beneficial results the Receiver has thus far achieved in recovering funds or assets, the prospects for future recovery, information

---

[13] On August 17, 2009, Deloitte filed its fourth interim fee application for the period January 1, 2009 through March 31, 2009, seeking fees in the amount of $825,000 and expenses of $40,013.15, which the Court approved.  On September 22, 2009, Hilco filed its second interim fee application for the period February 2, 2009 through June 1, 2009 seeking fees in the total amount of $165,000 and expenses of $43,985.17.

[14] D&L also sought expense reimbursement of $54,873.63 for November 2008 and $72,171.75 in expense reimbursement for December 2008.

about fees previously awarded, and an estimation of fees that will be incurred going forward. (See Dkt. 439 at 2) ("Fee Order").

The Receiver responded to the Fee Order on September 14, 2009 and provided information to the Court on the above-mentioned topics. D&L also agreed to an additional 10 percent discount on fees, in addition to the SEC discounts and holdbacks already in place. On October 5, 2009, the Court applied the 10 percent discount to D&L's fees and issued orders granting the November and December fee requests of D&L and the Receiver.[15]

On October 12, 2009, the Receiver and D&L filed their sixth interim fee application, seeking $20,350 in interim fees for the Receiver and $526,135.46 in interim fees for D&L. Total reductions and holdbacks, including the new 10 percent discount, amounted to $425,581 for this period.

## V.  INVESTIGATIONS AND LITIGATION

### A.  Claims Against Parties in the United States

The Receiver is authorized to take preliminary steps to locate any assets that may have been conveyed to third parties and to investigate, prosecute and otherwise participate in litigation to collect, conserve or recover assets of Wextrust. (Receiver Order at 5, 8.) As required by the Court's orders, the Receiver is continuing to investigate potential claims against third parties, including claims against former providers of professional services to Wextrust. As discussed in prior interim reports, receivership attorneys and investigators have interviewed witnesses, subpoenaed entities for testimony and documents, and collected and reviewed documents obtained in response to subpoenas. The Receiver has sent two demand letters to former Wextrust

---

[15] For November 2008, the Court allowed fees for the Receiver in the amount of $32,887.50, fees for D&L of $824,789.52, and reimbursement of D&L expenses in the amount of $54,873.63. For December 2008, the Court allowed fees for the Receiver in the amount of $24,975, fees for D&L of $606,959.10, and reimbursement of D&L expenses in the amount of $72,171.75.

advisors and is continuing to evaluate whether pursuing these claims will result in a net economic benefit to the estate. The Receiver is also coordinating with the SEC and the United States Attorney's Office to ensure that recoveries against third parties and are pursued in the most efficient and cost-effective manner.

The Receiver has also made formal written demands to 28 charities that received funds diverted from various Wextrust investments. To date, the Receiver has reached settlements in principal with 3 organizations for a total gross recovery of $37,000. The Receiver is also in active negotiations with the representatives or attorneys for 12 additional organizations that received the majority (over 70 percent) of the improper contributions.

In light of the current economic climate and the fact that many victims have strong ties to some of these charitable organizations, the Receiver and his advisors have been sensitive to the hardships faced by many of the organizations in attempting to locate funds to make potential repayments. At the time of this filing, the Receiver has decided to drop demands against eight organizations based on their proven insolvency, internal evidentiary inconsistencies in Wextrust financial records, and/or proof of the provision of legitimate goods or services to Wextrust in exchange for the contributions at issue. These eight organizations received cumulatively less than 15 percent of the total contributions in question. Four organizations, which received less than 10 percent of the total improper contributions, have not responded to the Receiver's demands. The Receiver is accordingly exploring options to litigate the claims via summary proceedings before the Court. Unless litigation becomes necessary, the Receiver will not disclose the organizations' names or contribution amounts publicly in order to respect their privacy and preserve the integrity of ongoing settlement negotiations.

### B.     Claims against Non-U.S. Parties

As previously reported, the Receiver and the court-appointed liquidators in South Africa have identified several potential claims that may be brought against third parties in Africa. Local counsel are continuing to assess those claims. In addition, the liquidators are conducting a forensic audit of the documentary evidence obtained in South Africa to date. The Receiver, in consultation with the SEC, will make a determination of whether such claims should be pursued, and will instruct the liquidators and counsel accordingly. As previously reported, based on the initial assessment of South African counsel, it appears that the proceeds of assets sales in Africa will be sufficient to fund the expense of any such litigation.

The Receiver is also working directly with senior advocates at the National Prosecuting Authority of South Africa, and with agents of the South African Police Service, Serious Economic Offences Unit, in connection with their ongoing investigation of the Wextrust fraud in South Africa. Should any assets be recovered by the authorities through forfeiture or other means, the Receiver will take steps to repatriate such assets and distribute them to victims.

### C.     Ancillary Litigation

As discussed in the Fourth Interim Report, a number of Wextrust Entities and Affiliates were parties in pending litigation in various courts (particularly in the Circuit Court of Cook County, Illinois) at the commencement of the receivership. For example, *2435 W. Belmont Dev., LLC v. CD Belmont, LLC and A. Goyal*, involved a breach of contract and fiduciary duty claims against one of the principals of the development company for mismanagement of the condominium development. The Receiver, however, determined that pursuing these claims would not yield a net economic benefit to the estate and thus dismissed the action. The mortgage lender on the 2435 W. Belmont property, First Bank, subsequently commenced a foreclosure action against 2435 W. Belmont Development Co., LLC in Cook County Chancery Court. The

Receiver executed a stipulation in that foreclosure case acknowledging that the loan is in default and, in return, First Bank has agreed to waive any deficiency claim against the receivership estate. *2825 N. Oakley Dev., LLC v. Centerstone Dev., LLV and A. Goyal* involved litigation with the same group of defendants related to mechanics' liens placed on the property by the general contractor. Having determined that pursuing this claim would not yield a net benefit to the estate, the Receiver also dismissed this action.

In addition, Broadway Bank also filed an action to determine and enforce its rights, claims, and interests (if any) against HPC and Wex/HPC with respect to a property located in Atlantic City, New Jersey. The Receiver and Broadway Bank also currently dispute the nature and extent of Broadway Bank's claim and security interest, if any, and the issue is presently before this Court.

**D.** **Appellate Litigation**

The Receiver is currently involved in four separate appeals before the United States Court of Appeals for the Second Circuit that were filed by various parties in interest to the case. The first appeal involves a joint motion by the International Ad-Hoc Committee of Wextrust Creditors and the International Consortium of Wextrust Creditors (collectively, the "Committees") to modify the Amended Order Appointing Temporary Receiver so that bankruptcy petitions could be filed against the receivership estate. Briefing for the appeal was completed on May 20, 2009, and the Second Circuit has scheduled oral argument for November 16, 2009.

The second appeal involves a motion to intervene filed by a group of eight Wextrust investors (collectively, the "Commodity Fund Victims"), who sought to have the Court declare that the Wextrust Commodity Funds were improperly included in the receivership estate. Briefing for the appeal was completed on May 20, 2009, and the Second Circuit has scheduled

oral argument for November 16, 2009.  Counsel for the Commodity Fund Victims, however, filed a motion on November 4, 2009 seeking a postponement of oral argument and/or the consolidation of the appeal into a subsequent appeal filed by one of the Commodity Fund Victims that challenges the Court's July 23, 2009 Distribution Order (discussed below).  The Receiver will oppose the Commodity Fund Victims' attempt to postpone argument or consolidate the appeal for a variety of reasons, including that briefing has been complete for several months, both the Committees' appeal and the Commodity Fund Victims' appeal will be argued on the same date, and the issues presented in the Commodity Fund Victims' appeal differ from the appeal challenging the Distribution Order.

The third case arises from the appeals of four interested parties:  (1) Mr. Martin Malek, one of the Commodity Fund Victims; (2) TCF National Bank; (3) Space Park AIM and ISSB Partnerships; and (4) Regions Bank.  Each party filed a separate notice of appeal to the Second Circuit seeking to challenge various aspects of the Court's July 23, 2009 Distribution Order, including the inclusion of certain assets in the receivership estate and the treatment of secured claimants' deficiency claims.  The four cases were subsequently consolidated into a single appeal, *Securities and Exchange Commission v. Byers*, 09-3583-cv (L), 09-3593-cv (CON), 09-3596-cv (CON), 09-3633-cv (CON) (2d Cir.).  Since the consolidation of the appeal, one party – Space Park AIM and ISSB Partnerships – has withdrawn its appeal and has indicated that it will not continue to challenge the Distribution Order.  On September 28, 2009, the Second Circuit issued it second scheduling order in the appeal, which calls for oral argument to be held no earlier than March 15, 2010.

The fourth appeal was filed by Broadway Bank on September 21, 2009.  Broadway Bank appeals from the Court's August 19, 2009 decision denying its motion to intervene as a party.

(*See* Dkt. No. 441.)[16]  On November 9, 2009, the Second Circuit approved a stipulated agreement between the Receiver and Broadway Bank withdrawing the appeal without prejudice to Broadway Bank's right to re-file at a later date and pursue any substantive or procedural appellate arguments at that time.

## VI.    <u>CONCLUSION</u>

The majority of the work mandated by the Court under the Receiver Order has been completed.  The Receiver has secured the books, records and documents of the Wextrust Entities and Affiliates in the United States and obtained certain books and records related to the Wextrust investments in Africa.  The Receiver has determined the extent of commingling among the Wextrust Entities and Affiliates and has analyzed the disposition of investor funds.  In addition, the Receiver's Plan of Distribution has been approved by the Court, and the Receiver has nearly completed the claims process.

In the coming months, the Receiver will continue to manage the estate in a manner designed to preserve the value of Wextrust properties and assets.  In addition, the Receiver will continue to implement the Plan of Distribution, with a focus on liquidating the U.S. real estate assets, seizing and repatriating assets from Africa, completing the claims process, and making the first interim distribution.  The Receiver will also continue to report on the financial condition

---

[16] This appeal was styled as *Securities and Exchange Commission v. Byers*, 09-3973-cv (2d Cir.).

of the receivership estate on a periodic basis and will continue to take steps to inform investors

and other interested parties of significant developments.

Dated:  New York, New York,
        November 11, 2009

Respectfully submitted,

Timothy J. Coleman
Receiver for Wextrust Entities

s/ Mark S. Radke_____
Mark S. Radke, *pro hac vice*
DEWEY & LEBOEUF LLP
1301 Avenue of the Americas
New York, NY 10019-6092
Tel. (212) 259-8000

Attorneys for Receiver

<u>**CERTIFICATE OF SERVICE**</u>

The undersigned, an attorney, states that I am one of the attorneys for Timothy J. Coleman, Receiver, in this matter and do hereby certify that on **November 11, 2009** I directed the service of a true and correct copy of the foregoing **FIFTH INTERIM REPORT OF RECEIVER** upon the following individuals in the manner indicated below:

**Via First Class Mail**
Joseph Shereshevsky, Registry No. 35857-054
c/o GEO Group
Queens Private Correctional Facility
182-22 150th Avenue
Jamaica, NY 11413
Pro Se Defendant

**Via ECF Notification & Electronic Mail**
Alexander M. Vasilescu, Esq.
Andrew M. Calamari, Esq.
Steven G. Rawlings, Esq.
Alistaire Bambach, Esq.
Neal R. Jacobson, Esq.
Philip Moustakis, Esq.
Danielle Sallah, Esq.
Attorneys for Plaintiff SEC

**Via ECF Notification & Electronic Mail**
Barry S. Pollack, Esq.
Joshua L. Solomon, Esq.
Attorneys for non-party G&H Partners AG

**Via ECF Notification & Electronic Mail**
Barry S. Zone, Esq.
Jason Canales, Esq.
Attorneys for Defendant Steven Byers

**Via ECF Notification & Electronic Mail**
Michael Fred Bachner, Esq.
Attorney for Relief Defendant Elka Shereshevsky

**Via ECF Notification & Electronic Mail**
Philip A. Byler, Esq.
Andrew T. Miltenberg, Esq.
Ira S. Nesenoff, Esq.
James B. Daniels, Esq.
Attorneys for non-party Broadway Bank

**Via ECF Notification & Electronic Mail**
Martin Siegel, Esq.
Attorney for non-party Int'l Consortium of Wextrust Creditors

**Via ECF Notification & Electronic Mail**
Paul A. Levine, Esq.
Attorney for non-party Key Equipment Finance, Inc.

**Via ECF Notification & Electronic Mail**
David B. Gordon, Esq.
Beth L. Kaufman, Esq.
Attorneys for non-party Lawrence Costa

**Via ECF Notification & Electronic Mail**
Harris Kay, Esq.
Marc X. LoPresti, Esq.
Attorneys for various non-party investors

**Via ECF Notification & Electronic Mail**
Ethan Holtz, Esq.
Edward P. Gilbert, Esq.
Attorneys for non-party RAIT Partnership

**Via ECF Notification & Electronic Mail**
Francesca Morris, Esq.
Attorney for non-parties Ticor Title Insurance Co. and Heritage Community Bank

**Via ECF Notification & Electronic Mail**
John M. Bradham, Esq.
Peter B. Katzman, Esq.
Attorneys for non-parties Space Park AIM and ISSB Partnerships

**Via ECF Notification & Electronic Mail**
Alan E. Marder, Esq.
Attorney for non-parties Nashville Warehouse Partners and Southeast Warehouse Partners

**Via ECF Notification & Electronic Mail**
Shalom Jacob, Esq.
Shmuel Vasser, Esq.
Attorneys for non-party Int'l Ad-Hoc
Committee of Wextrust Creditors

**Via ECF Notification & Electronic Mail**
Louis Orbach, Esq.
Charles J. Sullivan, Esq.
Amy Marie Culver, Esq.
Attorneys for non-party TCF National Bank

**Via ECF Notification & Electronic Mail**
Elizabeth P. Gray, Esq.
Attorney for non-party Gerald Jaffe

**Via ECF Notification & Electronic Mail**
Edward F. Malone, Esq.
George R. Mesires, Esq.
Attorneys for non-parties Barrington and
Hinsdale Banks

**Via ECF Notification & Electronic Mail**
Susan F. Balaschak, Esq.
Keith N. Costa, Esq.
Randal S. Mashburn, Esq.
John H. Rowland, Esq.
Attorneys for non-party Regions Bank

**Via ECF Notification & Electronic Mail**
Emily Alexander, Esq.
Attorney for non-party Martin Malek

**Via ECF Notification & Electronic Mail**
David B. Grantz, Esq.
Scott T. McCleary, Esq.
Attorney for non-party Bank of America

_____ s/ Mark S. Radke_____