UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - -x

SECURITIES AND EXCHANGE               :
COMMISSION,
                                      :
              Plaintiff,
                                      :
         - against -                          **OPINION**
                                      :
STEVEN BYERS et al.,                          08 Civ. 7104 (DC)
                                      :
              Defendants,
                                      :
         - and -
                                      :
ELKA SHERESHEVSKY,
                                      :
              Relief Defendant.
                                      :
- - - - - - - - - - - - - - - - - -x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 9 3 09

**APPEARANCES:**        (See last page.)

**CHIN, District Judge**

In an opinion dated July 23, 2009 (the "Distribution
Opinion"), I approved the distribution plan proposed by the
Receiver (the "Distribution Plan"). See SEC v. Byers, No. 08
Civ. 7104 (DC), 637 F. Supp. 2d 166 (S.D.N.Y. 2009). In the
Distribution Opinion, I ordered the Receiver to work with
investors and creditors to attempt to agree on distributions, but
made clear that I would resolve disputes as needed. On September
24, 2009, I held a hearing (the "Hearing") to discuss the
outstanding disputes. I ruled on certain disputes and reserved
decision on others. Set forth below are my rulings, grouped by
the following categories: Investor disputes, disqualification
disputes, and creditor disputes.

This decision only resolves active disputes. An active dispute is any dispute that existed after August 24, 2009 -- the deadline I set for the Receiver to resolve all disputes with investors -- or any dispute that the investor or creditor otherwise explicitly asked the Court to resolve.

## A. Investor Disputes

To protect the privacy of investors, the Receiver assigned each investor a number. The Court will refer to investors by number in this decision.

### 1. Investor 2

Investor 2 received cash distributions in the amount of $29,864.48, and paid taxes of $8,750.29 on those distributions. Investor 2 argues that his net investment claim should be increased by the amount he paid in taxes. Because all investors would have been required to comply with federal and state tax laws and to pay applicable taxes on any distributions that they received, Investor 2 is not in a unique position. The claim is denied.

### 2. Investor 24

Investor 24 requests credit for interest that he believes his Wextrust account earned on a monthly basis from January 2008 through May 16, 2008. He calculates the amount that he believes he should be credited based on the account's 2007 rate of return. Wextrust records indicate that interest payments were generally credited on a quarterly -- not monthly -- basis.

The records further indicate that Investor 24 has already been credited with his first quarter distribution of interest from 2008, paid on March 31, 2008, but that Wextrust never credited any other distributions of interest to the account because they decided to defer distributions indefinitely, notifying investors of that decision on May 16, 2008. Investor 24 has been credited with all of the interest that actually accrued to his account in 2008, and his claim is denied.

### 3. **Investor 35**

Investor 35 received $113,332.71 in cash distributions from Wextrust. He objects to this amount being subtracted from his net investor claim because he argues that the payments represent legitimate interest that was actually earned from real loans. In effect, Investor 35 argues in favor of "tracing" the relative legitimacy or illegitimacy of each investor's individual investment with Wextrust. I explicitly rejected the "tracing" method in the Distribution Plan. SEC v. Byers, 637 F. Supp. 2d at 176-77. Accordingly, the claim is denied.

### 4. **Investors 71, 485, and 679**

Investors 71, 485, and 679 request modifications to the Receiver's treatment of three separate investments.

First, the three investors request recognition of profits promised -- but not paid -- for their investment in Lion's Walk. The Distribution Plan does not provide for return of any of Wextrust's promised but undelivered profits. Accordingly, this claim is denied.

-3-

Second, Investor 485 and Investor 679 request that
their claim not be reduced by the amount of cash distributions
that they received on investments in Brandon Investments, LLC.
This objection is an objection to the "net investor method"
adopted by the Distribution Plan. SEC v. Byers, 637 F. Supp. 2d
at 182. The claim is denied.

Finally, all three investors request recognition of an
investment in Pure Africa Mining (Pty.) Ltd. that was not fully
documented. For the reasons stated on the record at the Hearing,
these claims are granted.

### 5. Investors 76 and 77

Investors 76 and 77 (the same individual) received
distributions from her Wextrust account and reinvested them in an
IRA account. She argues that these monies should not be
subtracted from her net investment claim because she did not
receive cash payments -- rather, she rolled the distributions
into another brokerage account. This investor has received the
full value of her distributions, and thus her claim is denied.

### 6. Investor 519

Investor 519 objects to the method used to calculate
his investor claim. Specifically, he objects to the deduction of
$39,382.76 in cash distributions from his net claim. This
objection is to the "net investor method" adopted by the
Distribution Plan. SEC v. Byers, 637 F. Supp. 2d at 182. It is
overruled.

-4-

## 7. **Investor 797**

Investor 797 took out a \$200,000 home equity loan so that he could invest the proceeds in Wextrust. He requests that he be credited with the fees and interest that he has paid to a third party to obtain that loan. Such monies were never invested in Wextrust, and they cannot be counted as part of his net investment. Investor 797's claim is denied.

## 8. **Investor 1046**

For the reasons stated on the record at the Hearing, this claim is denied to the extent that Investor 1046 seeks interest on his original investment. As discussed on the record, however, the Receiver shall conduct an investigation to determine whether any investors were mistakenly given credit for interest on their original investments and, if so, the Receiver shall advise the Court how he intends to rectify the mistakes.

## 9. **Investor 1486**

Investor 1486 is a group of relatives of Joseph Shereshevsky. The group requests recognition of undocumented investments in Wextrust that they claim Mr. Shereshevsky gave to them as "replacements" for a failed investment in an earlier, non-Wextrust investment scheme. In exchange for these Wextrust investments, the group claims that they promised not to report Mr. Shereshevsky to the SEC. This transaction was already the subject of litigation in the Eastern District of Virginia, and

Investor 1486's claims against Wextrust have already been dismissed in that court. They are dismissed here as well.

#### 10. **Investor 1611**

For the reasons stated on the record at the Hearing, this claim is denied.

#### 11. **Investor 1645**

Investor 1645 objects to the deduction of $27,479.60 in cash distributions from his net claim. This objection is an objection to the "net investor method" adopted by the Distribution Plan. SEC v. Byers, 637 F. Supp. 2d at 182. The claim is denied.

#### 12. **Investor 1680**

Investor 1680 requests that his net investment claim be increased by the amount of interest that he claims Wextrust promised to pay him on his account. The Distribution Plan does not permit recovery of any of Wextrust's promised -- but undelivered -- interest payments. This claim is denied.

### B. **Disqualification Disputes**

In the Distribution Opinion, I held that the Receiver's "proposal to treat differently those involved in the fraudulent scheme when distributions are being made is eminently reasonable and is supported by caselaw." SEC v. Byers, 637 F. Supp. 2d at 184. The Receiver has therefore disqualified, to varying degrees, Wextrust employees, and any investor who received referral fees for encouraging others to invest in the Ponzi

scheme. The Receiver has done so irrespective of evidence that the individual had any knowledge that it was a Ponzi scheme. In other words, it is the Receiver's position that, even assuming an individual was unaware of the fraudulent nature of the scheme, the equities weigh in favor of disqualifying, to some degree, anyone who received compensation from Wextrust.

To that end, the Receiver has proposed the following benchmarks for disqualification:

- Any investor who actively facilitated the fraudulent scheme is subject to a 100% disqualification.
- Any investor who received more than $100,000 in commissions or finder's fees is subject to a 90% reduction.
- Any investor who received between $10,001 and $100,000 in commissions or fees is subject to a 50% reduction.
- Any investor who received $10,000 or less in commissions or fees is subject to a 25% reduction.

## 1. **Fully-Disqualified Investors**

### a. **Investor 1441**

Investor 1441 is the Relief Defendant in this case. She received over $3.8 million in compensation from Wextrust between 2003 and 2008. She is 100% disqualified from the Distribution Plan.

-7-

### b. **Investor 1094**

Investor 1094 received over $2 million in compensation from Wextrust between 2004 and 2008. He is 100% disqualified from the Distribution Plan.

### 2. **90% Disqualified Investors**

#### a. **Investor 71**

Investor 71 received a total of $267,293.20 in compensation from Wextrust between 2003 and 2008. Her net investment claim is reduced by 90%.

#### b. **Investor 1534**

Investor 1534 received a total of $188,590.90 in compensation from Wextrust. Her net investment claim is reduced by 90%.

### 3. **50% Disqualified Investors**

#### a. **Investor 305**

Investor 305 received a total of $10,719.21 in compensation from Wextrust from 2005 to 2008. This amount includes $1,400 in fees that were related to investments that he made in his own name. Accordingly, Investor 305 earned less than $10,000 in fees for referring other investors to Wextrust. He is hereby moved into the 25% category.

#### b. **Investor 1416**

For the reasons stated on the record at the Hearing, Investor 1416 is hereby moved into the 25% category.

### c. Investor 1520

Investor 1520 received $59,170.45 in compensation from
Wextrust. Because the account was jointly held by a husband and
wife, and because the wife did not personally earn compensation
from Wextrust, Investor 1520 argues that it is inequitable to
reduce the wife's share of the net investment claim. Both
spouses, however, received the benefits of the cash compensation
that the husband earned finding investors for Wextrust's
fraudulent scheme. The claim is denied.

### 4. 25% Disqualified Investors

Investors 189, 1460, 1486, 1556, and 1662 all object to
the Receiver's recommendation to reduce the amount of their net
claims by 25% based on each one's receipt of commission payments
of less than $10,000 for referring investors to Wextrust. Each
investor claims that he or she was unaware of the fraudulent
nature of the Wextrust enterprise. Given the limited pool of
funds available to compensate all defrauded investors and
creditors, the Court must make difficult choices. Regardless of
these investors' knowledge of Wextrust's fraud, they each
profited from recommending the Ponzi scheme to others. Their
objections are overruled.

## C. Creditor Disputes

### 1. 56 Walker, LLC

56 Walker, LLC has withdrawn its claim against the
receivership estate. Accordingly, its claim is dismissed.

-9-

## 2. **Appleby and DMS Management**

Appleby and DMS Management presented claims against the receivership estate for fees for professional services provided to the Wextrust High Yield Debt Offshore Fund, Ltd. ("Offshore Fund"). The Offshore Fund was managed independently from Wextrust Capital, and it is not currently included in the receivership estate. At this time, Appleby and DMS Management must seek payment from the Offshore Fund exclusively. If, at a later time, the Offshore Fund is included in the receivership estate, the Receiver will notify Appleby and DMS Management, along with all other creditors of the Offshore Fund.

## 3. **625 West Division Condominium; John and Jan Breugelmans; and Kingsdale Enterprises, LLC**

The receivership estate has entered a settlement agreement with 625 West Division Condominium, John and Jan Breugelmans, and Kingsdale Enterprises, LLC, and the Court has approved the settlement. This claim is dismissed.

## 4. **Broadway Bank**

In May 2007, Broadway Bank ("Broadway") and Wexford/HPC Mortgage Fund L.P. ("HPC") pooled money to make a $7.75 million loan (the "Boardwalk Loan") to Boardwalk & Lincoln, LLC ("Boardwalk") to purchase four properties in Atlantic City, New Jersey. HPC contributed $2.625 million toward the Boardwalk Loan, and Broadway contributed $5.125 million. Broadway and HPC executed a mortgage and a mortgage note with Boardwalk. Broadway and HPC also executed a Loan Participation and Servicing

Agreement (the "Participation Agreement") among themselves. The Participation Agreement named HPC as the "Lender" and Broadway as the "Participant" in relation to the Boardwalk Loan, and it designated HPC as the servicer for all collections received from Boardwalk under the Boardwalk Loan. The Participation Agreement states: "Lender [HPC] shall manage, perform, and enforce the Loan, the Loan Documents and the Collateral and/or collect the Collateral, for the joint benefit of Lender [HPC] and Participant [Broadway]." (Participation Agreement ¶ 3). Boardwalk was not a party to the Participation Agreement.

By September 2007, Boardwalk was in default. Broadway sold its interests in the Boardwalk Loan and the Participation Agreement to Wexford High Yield Debt Fund III, LP ("High Yield") for the principal amount owed to Broadway ($5.125 million) plus a payment of $93,388.89. (Agreement ¶¶ 2, 4). To finance the purchase of Broadway's interest in the Boardwalk Loan and the Participation Agreement, High Yield took a loan from Broadway for $5.125 million (the "High Yield Loan"). As security for the High Yield Loan, Broadway took back "a Collateral Assignment of Loan Documents of Boardwalk & Lincoln, LLC." (9/28/07 Loan Note, ¶ 4).

In March 2009, Broadway notified the Receiver that High Yield was in default on the High Yield Loan. Broadway now seeks treatment as a secured creditor with respect to the $5.125 million debt. In the alternative, Broadway asks for one of two equitable remedies. First, it argues that the Court should find

-11-

that the parties intended for Broadway to be a secured creditor, even if the documents that they executed reveal that they failed to accomplish that result. Second, it contends that it was fraudulently induced to sell its interest in the Boardwalk Loan to High Yield in the first place, and that the Court should rescind the sale altogether. The Receiver, on the other hand, maintains that Broadway never perfected its security interest, and that Broadway is, therefore, an unsecured creditor, subject to pro rata distribution under the Distribution Plan. The Receiver also argues that the equities do not favor Broadway, and that the Court should not place Broadway in a better position than other unsecured creditors that seek payment from the receivership estate. For the reasons that follow, I find that Broadway Bank is an unsecured creditor, and is subject to pro rata distribution under the Distribution Plan in the same manner as other unsecured creditors. I decline to order any equitable remedy on Broadway's behalf.

In its papers, Broadway argues that it possesses "a perfected security interest in the Participation Agreement that Broadway sold to High Yield." (9/22/09 Letter at 1). Broadway characterizes the interest that it claims to hold in the Participation Agreement as a "payment intangible." (Id.). Broadway argues that, under the UCC, the assignment of a payment intangible is automatically perfected under UCC § 9-309(2). Though the Receiver disputes Broadway's characterization of the interest in the Participation Agreement as a "payment

-12-

intangible," and disputes Broadway's interpretation of UCC § 9-309(2) as applying to collateral assignments as well as to outright assignments, I do not need to decide those questions, here. By the plain terms of Broadway's agreement with High Yield, Broadway did not take any collateral assignment -- perfected or unperfected -- of the interest in the Participation Agreement.

Both the loan note between Broadway and High Yield and the Collateral Assignment agreement between Broadway and High Yield describe Broadway's security interest as an interest in "All Loan Documents" related to the Boardwalk Loan. (Collateral Assignment ¶ 1.1; 9/28/07 Loan Note ¶ 4). Though the term "Loan Documents" is not defined either in the loan note or in the Collateral Assignment agreement, it is used in a consistent way throughout all documents related to this series of transactions. The term "Loan Documents" refers to those documents that bind Boardwalk. It does not include the Participation Agreement.

Throughout the various documents that memorialize the series of transactions between Broadway, HPC, Boardwalk, and High Yield, the term "Loan Documents" does not include the Participation Agreement. Instead, the term "Loan Documents" refers only to those documents that bind Boardwalk under the Boardwalk Loan. For instance, the mortgage note for the Boardwalk Loan, executed by Boardwalk as mortgagor and by HPC and Broadway as co-mortgagees, states: "Borrower [Boardwalk] shall be bound by and shall comply with all terms, covenants and

-13-

conditions of the Loan Documents, all of which shall be construed as one instrument . . . ." (Mortgage Note ¶ 1). Boardwalk is not a party to the Participation Agreement, and therefore is not and cannot be bound by it.

Consistent with the Mortgage Note, the Participation Agreement uses the term "Loan Documents" in the same way: "the Lender [HPC] has agreed to sell to the Participant [Broadway], and the Participant has agreed to acquire from the Lender, an undivided interest (the 'Participation Interest') in the Loan for the sum of $5.125 million, and in the property, liens, security interest and/or guarantees and Loan Documents received by Lender as security for the Loan . . . ." (Participation Agreement at 1). Here, the Participation Agreement gives Broadway an interest in the Loan Documents -- but it does not incorporate the Participation Agreement as one of the Loan Documents.

Finally, the sale agreement between Broadway and High Yield also treats the "Loan Documents" as separate from and not including the Participation Agreement. That agreement states: "WHEREAS, Broadway and Wexford [HPC] entered into a Participation Agreement ("Participation") dated as May 25, 2007 with regard to a $7,750,000.00 loan ("Loan") to Boardwalk & Lincoln LLC ("Boardwalk") under various loan documents in which Broadway and Wexford [HPC] are jointly named (collectively referred to as "Loan Documents.")." In other words, the Participation Agreement allocates certain interests in the Loan Documents, but it is not, itself, one of the Loan Documents.

-14-

It is relevant that Broadway's security interest is in the Loan Documents -- and not in the Participation Agreement -- because only the Participation Interest could possibly be construed as a "payment intangible." A "payment intangible" is a "'general intangible' under which the account debtor's primary obligation is a monetary obligation." UCC § 9-102(a)(61). A "general intangible" explicitly excludes "instruments" from its definition. UCC § 9-102(a)(42). The Loan Documents -- which include a mortgage and a mortgage note -- are instruments. Under the UCC, the assignment of a payment intangible is automatically perfected. UCC § 9-309(2). A security interest in instruments, however -- such as the Loan Documents at issue here -- is not automatically perfected.

Under the UCC, a security interest in an instrument is perfected either by filing, or when the holder of the interest takes actual or constructive possession of the instrument. UCC §§ 9-313(a); 9-312(a). Broadway did not file a security statement, nor did it possess the Loan Documents. The Loan Documents were possessed by HPC. Though HPC was initially holding the Loan Documents for Broadway's benefit under the Participation Agreement, once Broadway was no longer a party to the Participation Agreement, HPC held the Loan Documents for the benefit of the successor Participant, i.e., High Yield. (Participation Agreement ¶ 4(d)). After Broadway sold its Participation Interest to High Yield, HPC never "authenticated a record" acknowledging that it held the Loan Documents for

-15-

Broadway's benefit as would have been required by UCC § 313(c). As Broadway had neither actual or constructive possession of the Loan Documents, its security interest in the Loan Documents was unperfected.

Nor does the balance of equities weigh in favor of any equitable relief for Broadway. Broadway first argues that "it is clear" that all of the parties intended for Broadway to have a perfected security interest in the amount of $5.125 million, and that to contravene this "clear" intent would "cause an injustice." (9/22/09 Letter at 8). In the alternative, Broadway argues that regardless of what the documents say on their face, the Court should grant Broadway "an opportunity to be heard" on the subjective intent of the parties to the agreement so that the Court can weigh whether equitable relief would be appropriate.

Broadway has had "an opportunity to be heard" in its letter briefs to the Court and at its appearance at the September 24, 2009 hearing. I have reviewed all of Broadway's arguments, and all the documents relating to the loan at issue. The result is unambiguous that Broadway does not possess a perfected security interest. The documents also make clear that Broadway must have considered filing a security statement under the UCC when it signed the loan note with High Yield. The text of the document says as much: "This Note is evidenced or secured by: (i) this Note, (ii) a Collateral Assignment of Loan Documents of Boardwalk & Lincoln, LLC ("Loan Documents"); (iii) UCC Filings if Payee [Broadway] chooses to file the same . . . ." (Loan Note ¶

-16-

4). But Broadway failed to protect its interests by making such a filing.

"Equity aids the vigilant." John Norton Pomeroy, I A Treatise on Equity Jurisprudence, § 364 (2d ed. 1899). Broadway was not vigilant in protecting its rights. In this case, there are hundreds of defrauded investors and unsecured creditors who must share a finite pot of money. Given that Broadway had an opportunity to protect its interests, but failed to do so, I find that it would be inequitable to elevate Broadway's claim above the claims of others, most of whom are entirely blameless for their predicament. Broadway's claims are denied to the extent it seeks treatment as a secured creditor or rescission.

### 5. **G&H Partners, AG**

For the reasons stated on the record at the Hearing, G&H's claim for $7,608,333 is denied.

### 6. **Nashville Warehouse Partners LLC and Southeast Warehouse Partners LLC**

Nashville Warehouse Partners LLC and Southeast Warehouse Partners LLC argue that they hold interests in entities -- Myatt Holdings, LLC and Baxtech Holdings, LLC -- that ought not to have been included in the receivership estate. Their argument fails. Both entities were managed by Wextrust personnel, and Wextrust's funds were co-mingled in the accounts of both. These entities are not differently situated from other Wextrust assets included in the receivership. The claim is denied.

-17-

## 7. **Pinnacle Fund Administration**

Like Appleby and DMS Management, Pinnacle Fund Administration seeks payment for services performed for the benefit of the Offshore Fund. The Offshore Fund is not currently part of the receivership estate. Pinnacle Fund Administration must seek payment from the Offshore Fund. If, at a later time, the Offshore Fund is included in the receivership estate, Pinnacle Fund Administration will be notified, along with all other creditors of the Offshore Fund.

## 8. **Q&Q Limited Partnership**

Q&Q Limited Partnership loaned $1.5 million to Wextrust Equity Partners ("WEP"), which was never repaid. A portion of that money -- $200,000 -- was supposed to have been segregated in a separate escrow account and treated as an interest reserve. WEP did not segregate the funds. Q&Q, therefore, seeks full recovery of the $200,000, and pro rata distribution of the remaining $1.3 million. The Distribution Plan does not distinguish between these two types of losses that Q&Q suffered. The entire $1.5 million claim is treated as subject to the pro rata distribution plan.

## 9. **Regions Bank**

Regions Bank holds both secured and unsecured claims against the receivership estate. Regions Bank does not dispute the Receiver's handling of its unsecured claim of $296,203.29. It objects to the Distribution Plan's method of dealing with any

-18-

deficiencies on secured claims. Regions Bank holds over $72 million in secured claims on real estate holdings. Because Regions Banks' objection is to the Distribution Plan itself rather than to the Receiver's implementation of the Plan, it is overruled.

## 10. TCF National Bank

TCF National Bank ("TCF") is a secured creditor of a Wextrust entity, Peoria Office Holdings, LLC ("POH"). In December 2007, TCF loaned $11,063,000 to POH to finance the purchase of an office building in Peoria, Illinois. TCF took back a security interest in the property, including all buildings, structures, fixtures, improvements, rents, incomes, and profits. (Mortgage, 12/10/07, ¶¶ (i)-(iv)). TCF and POH also executed a "Collateral Pledge Agreement" relating to TCF's security interest in the Property Maintenance Reserve Account. (Collateral Pledge Agreement, 12/10/07). According to the documents, POH is only entitled to use the funds in the Property Maintenance Reserve Account for improvements to the Peoria property. (Loan Agreement, 12/10/07, ¶ 2.1). According to the "Assignment of Rents and Leases" agreement, however, POH may use the property's rents, incomes, and profits freely for as long as POH is not in default under the mortgage. (Assign. of Rents & Leases, 12/10/07, ¶ 1).

At the hearing on September 24, 2009, TCF asked the Court to direct the Receiver to segregate all of its "cash collateral" for the "benefit of TCF." (Tr. at 50). Counsel for

-19-

the Receiver indicated that, off the top of his head, he did not remember what, precisely, the loan documents provided regarding TCF's security interest in any "cash collateral." (Id. at 53). The Court conditionally granted TCF's request, stating that it "sound[ed] reasonable subject to what the [loan] documents say." (Id. at 54). After further briefing on the issues, and after reviewing the loan documents in question, I now modify my initial ruling.

TCF argues that the Receiver should be ordered immediately to segregate all of the "cash collateral" -- both the funds in the Property Maintenance Reserve Account and all the property's rents, incomes, and profits -- because according to the mortgage's terms, POH is already in default. The appointment of a receiver is a condition of default under the loan documents. (Loan Agreement, 10/21/07, Art. VIII, ¶ 8.8). The Receiver, on the other hand, argues that because the Receiver is current on its debt payments, it should not be considered "in default" simply because the receivership exists. The Receiver would like to use the property's rents, incomes, and profits for other Receivership expenses, as it sees fit.

The mortgage document permits POH to use the Peoria property's rents, incomes, and profits in any way that it wishes -- as long as POH is not in default. TCF may not treat POH as a defaulting mortgagor simply because the receivership exists because the preliminary injunction that was imposed on October 24, 2008 absolutely prevents TCF from declaring an event of

-20-

default and foreclosing on the Peoria property. The reason for that stay of litigation is to preserve the value of the entire estate to maximize recovery for all creditors and investors. Without it, the estate's secured creditors would all immediately foreclose, wasting the estate's value. TCF's request to freeze all "cash collateral" in POH is an attempt to make an end-run around the Court's injunction, and to achieve immediate foreclosure by another name. TCF would like to unfairly maximize TCF's recovery at the expense of others at a time when TCF is receiving full debt service on its mortgage each month. The mortgage documents permit POH "to use and enjoy" its rents and income in the absence of default, and the Court will not order otherwise. (Assign. Of Rents & Income, 112/10/07, ¶ 1).

The Receiver is ordered to segregate the Property Maintenance Reserve Account for exclusive use for maintenance on the Peoria property. The Receiver may use the property's rents, incomes, and profits as it sees fit for as long as it is current on its debt payments to TCF.[1]

## 11. **Sheldon Liebb**

For the reasons stated on the record at the Hearing, Liebb's claim for $326,000 is denied.

---

[1] By letter dated October 28, 2009, TCF sought permission to file a motion to modify the preliminary injunction imposed on October 24, 2008 so that it can "exercise its rights as mortgagee and lienholder against all of its collateral, real and personal." (Letter from TCF, 10/28/09). Though I have already granted TCF permission to file such a motion without benefit of a pre-motion conference, it is unclear that they still have grounds for the relief they seek, given my holding here.

## 12. Space Park AIM Partnership and Space Park ISSB Partnership

For the reasons stated on the record at the Hearing, Space Park's claim for $155,518.69 is denied.

## 13. The Drake Oak Brook, LLC Pension Fund

The Drake Oak Brook, LLC Pension Fund (the "Drake Claimant") asserts two claims against the receivership estate. The first claim is for $99,507.00 -- an amount demanded from the Drake Claimant by the UNITE HERE National Retirement Fund. The Drake Claimant, however, has not even acknowledged liability for this claim. The receivership estate will not pay the Drake Claimant for a debt that the Drake Claimant has not yet paid or acknowledged that it is liable to pay.

The second claim is an indemnity claim for $107,897.84 -- an amount that Key Equipment Finance, Inc. ("Key Equipment") demands from the Drake Claimant for televisions purchased for the Drake Hotel. Steven Byers executed an indemnification agreement related to this debt, but he entered the agreement in his individual capacity. The receivership estate is not responsible for that individual indemnification agreement. Further, Key Equipment has already brought the same claim against the receivership estate. Because Key Equipment holds a secured interest in the televisions in question, its claim is being treated like the claims of all other secured creditors. The Drake Claimant's claims are denied.

-22-

## 14.  Ticor Title Insurance Company

Ticor Title Insurance Company ("Ticor") holds an
unmatured and contingent claim against the receivership estate.
The Receiver is directed to retain sufficient reserves within the
estate to satisfy the pro rata share of any future liability to
Ticor, should it become due.

## 15.  Universal Restoration Services

Universal Restoration Services ("Universal") has
settled its claim with the Receiver.  Accordingly, it is
dismissed.

### CONCLUSION

For the foregoing reasons, all active claims disputes
are now finally resolved, except as set forth above.  The
Receiver shall notify all interested parties of this decision.

SO ORDERED.

Dated:   New York, New York
         December 3, 2009

DENNY CHIN
United States District Judge

-23-

NEAL JACOBSON, ESQ.
3 World Financial Center
New York, New York  10281
Attorney for the United States
Securities and Exchange Commission

DEWEY & LeBOEUF
     By:  Mark S. Radke, Esq.
          John Warren, Esq.
          Jonathan Ware, Esq.
1101 New York Avenue, NW
Washington, DC  20005
Attorneys for the Receiver

MEYER SOUZZI ENGLISH & KLEIN, P.C.
     By: Alan Evan Marder, Esq.
990 Stewart Avenue
Garden City, New York  11530
Attorneys for Objectors Nashville
Warehouse Partners, LLC and
Southeast Warehouse Partners, LLC

MAZZEO SONG & BRADHAM LLP
     By: David H. Hartheimer, Esq.
708 Third Avenue, 19th Floor
New York, New York  10017
Attorneys for AIM Partnership and
Space Park ISSB Partnership

SULLIVAN & WORCESTER LLP
     By: Joshua Solomon, Esq.
One Post Office Square
Boston, Massachusetts  02109
Attorneys for G&H Partners, AG

BUDD LARNER
     By: James B. Daniels, Esq.
150 John F. Kennedy Parkway
Short Hills, New Jersey  07078
          -and-
NESENOFF & MILTENBERG LLP
     By: Ira S. Nesenoff, Esq.
363 Seventh Avenue
New York, New York  10001
Attorneys for Broadway Bank

BOND SCHOENECK & KING PLLC
     By: Louis Orbach, Esq.
One Lincoln Center
Syracuse, New York   13202
Attorneys for TCF National Bank

TARTER KRINSKY & DROGIN LLP
     By: Scott S. Markowitz, Esq.
1350 Broadway
New York, New York   10018
Attorneys for Universal Restoration

WEINBERGER COUNSEL
     By: Jeffrey H. Weinberger, Esq.
475 Park Avenue South, 33rd Floor
New York, New York   10016
Attorneys for Sheldon Liebb

MICHAEL S. GROSSMAN, ESQ
61 Broadway, Suite 1105
New York, New York   10006
Attorneys for Vivian Orgel