UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SECURITIES AND EXCHANGE COMMISSION,

                    Plaintiff,

   - against -

STEVEN BYERS, JOSEPH SHERESHEVSKY,
WEXTRUST CAPITAL, LLC, WEXTRUST
EQUITY PARTNERS, LLC, WEXTRUST
DEVELOPMENT GROUP, LLC, WEXTRUST
SECURITIES, LLC, and AXELA HOSPITALITY,
LLC,

                    Defendants,

   - and -

ELKA SHERESHEVSKY,

                    Relief Defendant.

No. 08 Civ. 7104 (DC)

ECF Case

## ELEVENTH INTERIM REPORT OF RECEIVER

TIMOTHY J. COLEMAN
Receiver for Wextrust Entities

FRESHFIELDS BRUCKHAUS DERINGER US LLP
701 Pennsylvania Avenue, NW
Washington, DC 20004
Tel. (202) 777-4500

August 13, 2012

*Attorneys for Receiver*

# TABLE OF CONTENTS

**Page**

I.  LIQUIDATION OF WEXTRUST ASSETS ..........................................................1

II.  DISTRIBUTION TO THE WEXTRUST VICTIMS ..........................................4

III.  ESTATE MANAGEMENT OPERATIONS ......................................................6

    A.  Management of Remaining Real Estate Properties .................................6

        1.  U.S. Real Estate Operations..........................................................6

        2.  High Yield Loans ...........................................................................7

    B.  Other Business and Financial Management.............................................7

IV.  FINANCIAL CONDITION OF THE WEXTRUST ENTITIES AND AFFILIATES .......8

V.  INVESTIGATIONS AND LITIGATION ......................................................15

    A.  Claims Against Third Parties ................................................................15

    B.  Ancillary Litigation..............................................................................17

VI.  INVESTOR COMMUNICATIONS...............................................................17

VII.  CONCLUSION..............................................................................................18

Timothy J. Coleman, Receiver for the Wextrust Entities and Affiliates ("Receiver"), respectfully submits this Eleventh Interim Report, pursuant to the Court's Order Appointing Temporary Receiver, dated August 11, 2008, as amended by order dated September 11, 2008 (the "Receiver Order") (Dkt. No. 36).

Today, total receivership cash is $14.2 million. In the past six months, the Receiver has continued to carry out the work mandated by the Receiver Order while minimizing costs. He has managed the receivership assets, which continue to produce a positive net cash flow. In addition, the Receiver has revised his plans for the marketing and sale of the remaining properties. Finally, the Receiver concluded settlement agreements with Wextrust's former law firms, which were approved by the Court and total $7.9 million in cash payments that will be collected in full by September 2012.

This Eleventh Interim Report describes the Receiver's work since February 11, 2012. Section I summarizes the status of the liquidation of Wextrust assets. Section II reports on the prospect of a future interim distribution to investors. Section III provides an overview of the Receiver's management of the Wextrust Entities and Affiliates. Section IV reports on the current financial condition of the receivership estate and its administrative costs. Section V discusses the status of Wextrust-related litigation.

## I.    LIQUIDATION OF WEXTRUST ASSETS

Since the inception of the receivership, the Receiver has sold 18 properties resulting in $60.1 million in gross sales. From those sales, $47.5 million went to repay secured creditors, the estate benefited from the forgiveness of $3.7 million in secured debt owed by the estate, and the estate received $7.4 million in net cash. Additionally, the three Axela-owned hotels were relinquished, as were five other properties that had no likely basis of net cash recovery for the estate. The relinquishments allowed secured creditors to obtain the collateral behind $149.5

million of debt and released the estate from those obligations.  Sale of other receivership assets, settlements with third parties, and other recoveries have resulted in an additional $12.7 million cash benefit to the estate for victims (including the recent law firm settlements).

Today, the Wextrust portfolio consists primarily of 12 commercial properties.  The properties are projected to generate $7.7 million in net operating income for the year ending December 2012 and result in $4.93 million of net cash flow to the receivership estate, inclusive of sale proceeds.  The properties are managed by three full-time Wextrust employees who are overseen by Chief Restructuring Officer, Mitchell P. Kahn of Badger Real Estate Advisors, LLC ("Badger").  Badger's consulting agreement provides for a monthly fee of $20,000.

In the last six months, the Receiver has continued efforts to liquidate the remaining U.S. assets in the receivership estate per the Court's plan of distribution order entered on July 23, 2009 (the "Distribution Order") (Dkt. No. 428).  The U.S. assets currently consist of (1) commercial real estate properties owned and operated by Wextrust Equity Partners ("WEP"), which account for the largest part of the remaining estate; (2) two high yield loan portfolios; and (3) residential real estate formerly owned by Byers and Shereshevsky personally.

The remaining 12 commercial real estate assets are located in Alabama, Illinois, Mississippi, Tennessee, and Wisconsin.[1]  The Receiver has continued to oversee the management and marketing of these properties with his real estate advisors, The Hilco Organization ("Hilco") and Badger Real Estate Advisors, LLC ("Badger").  In May and June, the Receiver met with Badger to discuss updated strategies and timelines for the liquidation of these remaining properties.  Those strategies are now being implemented and were outlined to the Court for the June 28, 2012 hearing.

---

[1] On August 6, 2012, the Court approved the sale of the First Highland Property, which will leave 11 commercial real estate assets in the estate.  (*See* Dkt. No. 830)

The Receiver has also continued efforts to maximize the value of the commercial properties by making improvements, renewing profitable leases, and negotiating new leases. Specifically, the Receiver has negotiated 14 new and renewal leases on properties over the past six months. The Receiver estimates that these leases will produce revenues of approximately $1.1 million over the life of the leases, thereby enhancing the value of the properties and the expected proceeds of their liquidation. Repairs and improvements on the remaining properties have been kept to a reasonable minimum.

To reduce the ongoing expense of managing multiple properties, the Receiver is negotiating with lenders and tax authorities. In the last six months, several property tax appeals to state agencies have been successfully resolved, resulting in savings of over $140,000 between 2011 and 2012. Additional positive results are expected in the coming weeks. The Receiver is also working to renew or renegotiate new loans on several properties. His advisors have held conference calls and onsite meetings with four lenders and servicers for the remaining assets, and will continue the negotiations in parallel with sales efforts.

Finally, the Receiver has made advances to liquidate the residential real estate assets formerly owned by Defendants Byers and Shereshevsky. These residences are heavily leveraged and, based on market conditions and projected maintenance costs, cumulatively represent little to no value to the receivership estate. The Receiver has an agreement with a secured lender that holds mortgage interests in five residential residences owned by Shereshevsky and/or his wife. The agreement with the lender will result in a cash payment to the receivership estate that is around three times the current total equity in the relevant properties. The Receiver will also file a settlement agreement with certain Shereshevsky family members in the immediate future that will result in a cash payment to the receivership of around $150,000, which represents the net

amount of money transferred from Wextrust accounts to make mortgage payments toward certain Shereshevsky family residential properties.

After being served with a notice to vacate by the Receiver, Lisa Byers, wife of Defendant Steven Byers, vacated the Byers' formal personal residence in Oakbrook, Illinois on April 1, 2012. The residence was placed in the receivership estate in accordance with the Receiver Order. The Receiver's advisors are considering the best options to maximize a return.

Some investors have questioned the Receiver's returns on the Wextrust real estate investments. In the Receiver's view, it is critically important to recall the circumstances in which Wextrust funds were invested and the market realities today. Wextrust raised more than $212 million, the bulk of its funds, in securities for real estate investments or high-yield lending. (*See* Receiver's First Interim Report, Dkt. No. 88, at 22.) At the time the Receiver took control, the U.S. commercial real estate market had already begun a precipitous collapse. From 2007, the year in which Wextrust raised the greatest amount of money from investors to buy real estate, until 2011, prices in the commercial real estate market fell by approximately 43 percent. (*See* Receiver's June 26, 2012 Letter to Judge Chin at Attachment E.) Compounding the situation is the fact that all or nearly all of the property transactions involving Wextrust were highly leveraged. Investors were equity participants who bore the brunt of the market collapse. Secured creditors, by virtue of their right to collateral, were better positioned, but in many cases have absorbed millions of dollars in losses as well. The unfortunate result has been the opposite of investors' expectations, resulting in a "buy high," "sell low" reality. Nevertheless, the Receiver has been committed to obtaining the best market result possible.

## II.    DISTRIBUTION TO THE WEXTRUST VICTIMS

The Receiver is prepared to make a second distribution to the Wextrust investor victims, but is unable to do so until a resolution with the Internal Revenue Service ("IRS") regarding the

taxation of the receivership is concluded.  The reasons for this are many, and will be explained in a letter that the Receiver will send to the Court and post to the receivership website on August 14, 2012.  A resolution is of the highest priority.  Based on an email received on August 10 from the United States Attorney's Office, which represents the IRS, the Receiver is hopeful that a resolution may be reached in the immediate future.

During the eleventh interim period, the Receiver provided the Court a written status report on his negotiations with the IRS on June 26, 2012.  The Court discussed the matter with the IRS and Receiver at a hearing on June 28.  Negotiations then continued and the Receiver provided the Court with another written status report on July 12.  On July 17, the Court ordered the IRS to respond to the Receiver's letter of July 12 and to "address whether [the Court] has authority or jurisdiction to resolve the IRS's tax claims against the Receivership." (*See* Order dated July 17, 2012, Dkt. No. 827.)  The Court also ordered the Receiver to send a follow-up response by August 14.  (*Id*.)  The IRS Duly filed its letter.  (*See* July 31, 2012 letter of AUSA Tomoko Onozawa, Dkt. No. 829.)

The Receiver believes that there are various paths that can effect a quick resolution of the tax issues, including ones that would defer to the judgment of the Court.  The Receiver will highlight prior cases in which the IRS worked with receivers to achieve the most fair result for investor victims by minimizing the burden of receivership federal tax filing and payment obligations.  Ultimately, the Receiver's proposals may not be accepted by the IRS, and the Court may agree with the IRS that the Court lacks authority to intervene.  In that event, the Receiver must proceed with the preparation and filing of federal tax returns as a Qualified Settlement Fund ("QSF").  Unfortunately, as the Court and Receiver have noted, this process will be costly, it will delay even a small distribution to victims, its precise scope is undefined, and its ultimate outcome is indeterminate because the IRS will not provide clarity on proper deductions or the

- 5 -

need for the receivership to file partnership returns in advance. The Receiver will outline his proposed options in a letter to be sent to the Court on August 14.

In past interim periods, the Receiver has verified and recognized the claims of Wextrust victims totaling $238 million among 1,221 equity investors and 100 unsecured creditors. The Court approved a first interim distribution of approximately $5 million in December 2010. As of February 2012, 1,280 checks totaling $4,935,946.81 had been cashed. A.B. Data, the vendor hired to manage the logistics of the distribution, was able to find updated addresses for 6 of the 18 checks that were returned as undeliverable as addressed. As such, 12 checks totaling $37,006.93 remain undelivered. The Receiver encourages victims to provide any updated contact information. **New contact details are as follows: 1-800-985-4155 or wextrustreceiver@abdata.com.**

## III.   ESTATE MANAGEMENT OPERATIONS

### A.   Management of Remaining Real Estate Properties

Since inception of the receivership, the Wextrust properties have generated $65.7 million in tenant receipts and approximately $11 million in net cash flow to the receivership estate. (*See* Table 5 below) The Receiver has executed 67 new leases and 173 lease renewals, representing $35.6 million in aggregate rental revenue. The overall percentage of leases renewed represents a renewal rate of approximately 70 percent. In addition, the number of tenants that are delinquent on rent for more than 30 days is virtually nil.

#### 1.   U.S. Real Estate Operations

As directed by the Court, the Receiver took control of all Wextrust real estate assets, which now consist primarily of the WEP commercial properties. In the six months ending May 11, 2012, the Receiver collected approximately $6.1 million in rent (*see* Table 2 below). As

discussed in Section I.A above, the Receiver has negotiated 14 new and renewal leases on properties during this period.

The Receiver continues to incur minimal expenses related to the condominiums that were developed and sold at the 47 Dean Street property located in Brooklyn. The units were sold last year for more than $12 million, with a net of approximately $4.2 million. As developer, the receivership has certain obligations to meet with the newly constructed building.

### 2.   High Yield Loans

The Receiver has continued ongoing management and sales efforts for Wextrust's two high yield loan portfolios: 1) the Wexford High Yield Debt Fund I, LLC ("High Yield I") consisting of 5 loans in which Wextrust has an aggregate direct and joint-venture participation interest of approximately $1.75 million, all of which are in default; and 2) the Wexford High Yield Debt Fund III, LLC ("High Yield III") and its offshore participant, Wexford High Yield Debt Offshore Fund, Ltd. ("Offshore Fund"), presently include 10 loans for which Wextrust has a combined direct and joint-venture participation interest of approximately $6 million. The loans in those portfolios are secured by a variety of commercial and residential real estate assets. In the last six months, the Receiver has continued his efforts to obtain value from the high yield loan portfolios.[2]

### B.   Other Business and Financial Management

The Receiver has continued to emphasize cost reductions across all professionals and within the Wextrust Entities and Affiliates. In the last six months, the Receiver has continued to pursue cost saving measures associated with the ongoing management of the commercial real

---

[2] The Receiver has negotiated buyouts with both of its joint venture partners to purchase the participations in loans owned by the partnership, all of which are non-performing. While the sales would represent a discount of the original principal invested, the buyout terms maximize the potential return to the estate, as the sale will eliminate the shared expenses the estate would have had to contribute to the partnership.

estate assets, including rebidding service contracts and accomplishing successful appeals of property taxes.

## IV.    FINANCIAL CONDITION OF THE WEXTRUST ENTITIES AND AFFILIATES

As in previous reports, Deloitte has assisted in compiling financial information from the financial systems and books and records of the Wextrust Entities and Affiliates. Those financial records reflect the book value of the principal real estate assets, as recorded in the company's books and records but not necessarily in accordance with generally accepted accounting principles. As shown in Table 1, the total book value of the remaining Wextrust real estate portfolio is approximately $26.8 million. This value is based on the accounting records and other information maintained by Wextrust and its accountants and does not represent current market value. Moreover, as discussed in previous reports, these properties were purchased at the height of the commercial real estate boom and are heavily leveraged by secured debt. The Receiver contemplates that most of the proceeds of the sales of these properties will be used to repay such debt, pursuant to the Court's Distribution Order.

## Table 1:  Book Value of Wextrust Real Estate Assets

Wextrust Capital, LLC, et al.
Net Book Value (1) (2)
as of May 31, 2012

|  | Axela (3) | WEP (4) | WDG (5) | Consolidated |
|---|---|---|---|---|
| Property |  |  |  |  |
| Building / Land | - | 112,216,987 | - | 112,216,987 |
| Loan Payable on Property | - | 88,824,564 | - | 88,824,564 |
| **Net Book Value (6)** | $       - | $  23,392,424 | $       - | $  23,392,424 |
|  |  |  |  |  |
| Capitalized Costs: |  |  |  |  |
| Tenant Improvements | - | 1,467,349 | - | 1,467,349 |
| Capital Improvements | - | 1,932,104 | - | 1,932,104 |
| **Total Capitalized Costs** | $       - | $   3,399,453 | $       - | $   3,399,453 |
|  |  |  |  |  |
| **Net Book Value (6)** | $       - | $  26,791,876 | $       - | $  26,791,876 |

**(1)** - Where possible, net book values were obtained from accounting information as of May 31, 2012 provided by Wextrust. However, the cost of the building and the balance of the loan payable on the property were not always recorded in the accounting system.  To the extent available, these amounts were obtained from other internal sources as of the most recent date available. In some cases, loan payable amounts include accrued interest and late fees assessed by the lender.
**(2)** - The amounts shown do not include properties that were sold or where the relinquishment process was initiated or had been relinquished as of May 31, 2012.
**(3)** - As of August 31, 2009, the Court had entered orders permitting the relinquishment of all hotel properties.
**(4)** - First Highland, LLC and Commerce Center Holdings, which are TIC properties, are included at 100% even though the Wextrust interest is less (78.21% and 35%, respectively).
**(5)** - All condominium units developed by 47 Dean Street have been sold.
**(6)** - There may be other payable amounts due upon sale of property, including property taxes, etc.

For the six months ending May 31, 2012, Wextrust had a positive net cash flow of $3.6 million, which includes $2.74 million in proceeds from the sale of condominium units at the 47 Dean Street property.  Total receipts were $9.2 million against $5.6 million in expenses authorized by the Receiver to preserve the status quo of the Wextrust enterprise, as shown in Table 2 below.  The vast majority of those expenses were paid in connection with operating the WEP real estate portfolio.  As of August 9, 2012, Wextrust had more than $14.2 million in cash in approximately 35 U.S. bank accounts.

### Table 2:  Receipts and Disbursements

**Wextrust Capital, LLC, et al.**
**Consolidated Cash Receipts and Disbursements (1) (2)**
**from 12/01/11 through 05/31/2012**

| RECEIPTS | Wextrust Capital, LLC and Affiliates | Commodity Funds | Wextrust Equity Partners, LLC and Affiliates | PAM | Wexford Development Group, LLC and Affiliates | Axela Hospitality, LLC and Affiliates | TOTAL |
|---|---|---|---|---|---|---|---|
| Tenant Receipts (3) | - | - | 6,070,954 | - | - | - | 6,070,954 |
| Sale of Receivership Assets (4) | 2,737,939 | - | - | - | - | - | 2,737,939 |
| Construction Draws | - | - | - | - | - | - | - |
| Other Receipts | 21,251 | - | 328,041 | - | - | - | 349,292 |
| **TOTAL RECEIPTS** | **2,759,190** | **-** | **6,398,995** | **-** | **-** | **-** | **9,158,185** |
| | | | | | | | |
| **DISBURSEMENTS** | | | | | | | |
| | | | | | | | |
| Capital Expenditures, Tenant Improvements & Leasing | | | 399,110 | | | | 399,110 |
| Commissions | - | - | 399,110 | - | - | - | 399,110 |
| Insurance | - | - | 79,061 | - | - | - | 79,061 |
| Loan Payments | - | - | 2,182,122 | - | - | - | 2,182,122 |
| Management Fees | - | - | 260,127 | - | - | - | 260,127 |
| Ordinary Course Expenses | 16,367 | - | 1,045,876 | - | - | - | 1,062,243 |
| Labor Costs | 64,299 | - | 394,158 | - | - | - | 458,457 |
| Professional Expenses - Non-Receiver | 30,646 | - | 76,038 | - | - | - | 106,684 |
| Taxes | 12,543 | - | 995,329 | - | - | - | 1,007,872 |
| Professional Expenses - Receiver (5) | 6,685 | - | - | - | - | - | 6,685 |
| Transfer to 3rd pty for distribution to investors | - | | | | | | - |
| Other | - | - | - | - | - | | - |
| **TOTAL DISBURSEMENTS** | **130,540** | **-** | **5,431,820** | **-** | **-** | **-** | **5,562,361** |
| **NET CASH GENERATION / (BURN)** | **2,628,649** | **-** | **967,175** | **-** | **-** | **-** | **$ 3,595,824** |

**(1) -** The receipts and disbursements in this analysis are cash transactions that are grouped by the entities that initiated the transaction, however, in some cases the cash transactions were executed on behalf of other Wextrust entities.  The cash transactions have been categorized by type based on information contained within the books and records of the Wextrust Entities.  The sources of cash receipts and disbursements data were a combination of general ledgers and bank transaction data. Not all bank accounts or general ledgers were included in this analysis; entities with no or insignificant transaction activity during the period presented may not have been included.
**(2) -** This analysis was prepared on a cash basis, therefore the timing of receipts and disbursements are different than what may be contained in accrual based financial reports.  For example, receipts may not be matched to related disbursements, or vice versa.  In addition, some disbursements included in this analysis had not cleared the bank as of May 31, 2012.
**(3) -** Approximately $476,000 was collected, in addition to monthly rent, from tenants for property taxes and insurance.
**(4) -** The Sale of Receivership Assets represent the net proceeds from the sale of remaining condo units developed by 47 Dean Street Holdings, LLC.
**(5) -** This category relates to fees for the marketing of properties for sale, etc. Receivership professional expenses are not included in this analysis.

Deloitte has also assisted in the preparation of a cash forecast for three three-month periods through February 28, 2013, as shown in Table 3.  The net cash flow is projected to be a net positive of $947,530.  The three month period ending February 28, 2013 shows a comparatively lower net cash flow because of property taxes and insurance payments, which are paid during the period but funded in part by the monthly and annual collections of tenants' fees.

### Table 3:  Wextrust Cash Forecast

Base Cash Flow Projections for Wextrust Capital, LLC and Affiliates, et al. for the Nine Months Ending February 28, 2013 (1) (2)

|  | WexTrust Capital, LLC, et al. for the 3 - Months Ending August 31, 2012 | WexTrust Capital, LLC, et al. for the 3 - Months Ending November 30, 2012 | WexTrust Capital, LLC, et al. for the 3 - Months Ending February 28, 2013 | Total |  |
|---|---|---|---|---|---|
| Total Effective Income | $        2,981,013 | $        2,925,808 | $        3,108,444 | $  9,015,265 | (3) |
| Total Operating Expenses | 961,034 | 944,636 | 1,665,091 | 3,570,761 |  |
| Net Operating Income | 2,019,979 | 1,981,172 | 1,443,353 | 5,444,504 |  |
| Non Operating Expenses: |  |  |  |  |  |
| Debt Service - Interest (Including Swaps) | 1,088,826 | 1,095,963 | 1,081,269 | 3,266,058 |  |
| Debt Service - Principal | 256,441 | 273,441 | 273,441 | 803,323 |  |
| Capital Expenditures (4) | 101,600 | 15,000 | 15,000 | 131,600 | (5) |
| Tenant Improvements & Lease Commissions | 46,968 | - | - | 46,968 |  |
| Reserves | 16,599 | 16,599 | 16,599 | 49,797 |  |
| Other Non-Operating Expenses | 66,239 | 65,607 | 67,382 | 199,228 |  |
| Total Non-Operating Expenses | 1,576,673 | 1,466,610 | 1,453,691 | 4,496,974 |  |
| Net Cash Flow (6) | $           443,306 | $           514,562 | $         (10,338)  (7) | $     947,530 |  |

**(1)** - Does not include any distributions under the Plan of Distribution.  The Court approved orders relinquishing all hotel properties as of August 31, 2009.
**(2)** - Amounts include First Highland, LLC, which is a TIC property, at 100% even though the Wextrust interest is less (78.21%).  Amounts exclude Commerce Center Holdings, which is a TIC property where Wextrust interest is 35%.  The cash projections include the expected cash activity for properties that are currently in sale negotiations but do not include the expected net sale proceeds.  For information on the expected sale of Receivership assets, please refer to Section I.A.
**(3)** - Amount includes approx. $810,000 and $440,000 in tenant rent receipts from approx. 27 tenants who are assumed to renew their leases and approx. 16 tenants who are assumed to remain on a month-to-month lease, respectively.
**(4)** - Net of escrow draws available for capital expenditures.
**(5)** - In order to better manage cash flow on a per-property basis, Capital Expenditures projects are evaluated on an as-needed basis.  Due to that methodology, a minimal amount of Capital Expenditures are projected unless there is a known, necessary repair or replacement imminent.
**(6)** - Does not include Receivership related professional fees.
**(7)** - The negative net cash flow projected for the 3 months ended February 28, 2013 is mainly attributable to the projected payment of 2012 property taxes and insurance in February of 2013 totaling approximately $680,000.  This payment is funded in part by the monthly and annual collections of CAM fees from tenants.

The above analysis does not include expenses associated with the administration of the receivership, the largest component of which is professional legal fees. These include fees due to the Receiver and receivership counsel, Freshfields Bruckhaus Deringer US LLP ("Freshfields") (since March 2010) and to a minor extent, Arent Fox LLP (since June 2010).  Dewey & LeBoeuf LLP ("D&L") provided services to the Receiver through December 2010.

The Court approved fee applications during the last six month period for the Receiver ($22,750), Freshfields ($282,714), Deloitte ($212,363), and Sheldon Liebb ($144,822).  This represented a substantial discount of the professionals' standard rates, under which fees for the

periods of those applications would have otherwise been: Receiver ($127,840); Freshfields ($449,932); and Deloitte ($1,251,816).

For all professionals, Wextrust has incurred and paid $16,428,705.35 in professional fees as of July 31, 2012 as follows: Freshfields, $419,063.05; Arent Fox, $33,216.50; D&L, $9,423,211.76; Deloitte, $4,291,938; Hilco, $940,500; Receiver, $418,250.00; various South African professionals, $338,553; Badger, $380,000; and other professionals, $183,973.  Legal fees during the eleventh interim period were an estimated $170,000 and Deloitte's fees were an estimated $50,000.

The level of professional administrative costs have been a concern of the Receiver, the Court, and investors.  The Court has required professionals to hold back more than $4.3 million in fees until the end of the case.  In addition, the professionals have applied discounts and writeoffs of more than $15.7 million as a reflection of the public service nature of their engagement.  As shown in Chart 1, fees have declined precipitously and remained low as the Receiver completed the tasks required by the Receiver Order and successfully defended the numerous appeals of the Court's orders – for example, ninety-five percent of fees incurred and paid to date occurred during the first 17 months of the receivership (through December 2009).

**Chart 1:  Administrative Costs[3]**



The decline in administrative costs of the receivership is consistent with the progression observed in other receiverships.  While it is impossible to compare any two receiverships given the unique factual and legal complexities of each, the Stanford receivership is similar to the Wextrust receivership in a number of ways – each involved massive frauds across multiple states and countries; each had numerous assets in the United States and abroad, including hundreds of bank accounts and real estate holdings; and each receiver employed a large international law firm to carry out his multi-jurisdictional duties.  *See SEC v. Stanford Int'l Bank, Ltd., et al.*, No. 09-CV-0298, (N.D. Tex. filed Feb. 17, 2009).  As shown in Chart 2, legal fees fell rapidly as the Receiver accomplished the numerous immediate and short term tasks required by the Receiver

---

[3] This chart includes fees for all professionals submitting applications to the Court; "fees incurred" represents total fees at standard rates not including any discounts, holdbacks, or fee arrangements; prior interim reports included only fees of D&L and Deloitte as requested, as such they did not reflect the full value of receivership savings.

Order.  The Receiver also acted with comparative speed to prepare and conclude a plan of

distribution and to make an initial distribution.

**Chart 2: Comparison of Receivership Administrative Costs and Receiver Actions[4]**



In response to investor inquiries, the Receiver has also calculated total receipts and

disbursements since the start of the receivership on August 11, 2011.  Total receipts were

approximately $82.3 million while total disbursements were approximately $69.4 million, not

including the administrative costs described above.

---

[4] Data taken from publicly filed documents in each case (all cost data through December 2011).  Fees for partial months prorated to a full month equivalent.  Where costs had been aggregated costs across multiple months, an average monthly cost was used.

## Table 5: Receipts and Disbursements (Since Receivership Start)

Wextrust Capital, LLC, et al.
Consolidated Cash Receipts and Disbursements - Rounded (1) (2) (3)
from 08/11/08 through 05/31/2012

| RECEIPTS | Wextrust Capital, LLC and Affiliates | Commodity Funds | Wextrust Equity Partners, LLC and Affiliates | PAM | Wexford Development Group, LLC and Affiliates | Axela Hospitality, LLC and Entities | TOTAL |
|---|---|---|---|---|---|---|---|
| Tenant Receipts | - | - | 65,700,000 | - | - | - | 65,700,000 |
| Sale of Receivership Assets | 4,370,000 | - | 2,970,000 | - | 600,000 | - | 7,940,000 |
| Construction Draws | 70,000 | - | - | - | 4,220,000 | - | 4,290,000 |
| Other Receipts | 1,370,000 | 230,000 | 2,380,000 | - | 100,000 | 240,000 | 4,320,000 |
| | | | | | | | |
| **TOTAL RECEIPTS** | **5,810,000** | **230,000** | **71,050,000** | **-** | **4,920,000** | **240,000** | **82,250,000** |
| | | | | | | | |
| **DISBURSEMENTS** | | | | | | | |
| | | | | | | | |
| Capital Expenditures, Tenant Improvements & Leasing Commissions | - | 60,000 | 4,750,000 | - | 4,310,000 | 110,000 | 9,230,000 |
| Insurance | 28,000 | 2,000 | 935,000 | - | 89,000 | 4,000 | 1,058,000 |
| Loan Payments | 150,000 | 20,000 | 26,740,000 | - | 360,000 | 60,000 | 27,330,000 |
| Management Fees | - | - | 2,970,000 | - | - | - | 2,970,000 |
| Ordinary Course Expenses | 420,000 | 120,000 | 13,330,000 | - | 120,000 | 310,000 | 14,300,000 |
| Labor Costs | 1,013,000 | 554,000 | 3,997,000 | 93,000 | 296,000 | 202,000 | 6,155,000 |
| Professional Expenses - Non-Receiver (4) | 230,000 | 240,000 | 250,000 | - | 10,000 | - | 730,000 |
| Taxes | 80,000 | 10,000 | 7,040,000 | - | 50,000 | - | 7,180,000 |
| Other | - | 110,000 | - | - | 380,000 | - | 490,000 |
| | | | | | | | |
| **TOTAL DISBURSEMENTS** | **1,921,000** | **1,116,000** | **60,012,000** | **93,000** | **5,615,000** | **686,000** | **69,443,000** |
| **NET CASH GENERATION / (BURN)** | **3,889,000** | **(886,000)** | **11,038,000** | **(93,000)** | **(695,000)** | **(446,000) $** | **12,807,000** |

(1) - The receipts and disbursements in this analysis are cash transactions that are grouped by the entities that initiated the transaction, however, in some cases the cash transactions were executed on behalf of other Wextrust entities. The cash transactions have been categorized by type based on information contained within the books and records of the Wextrust Entities. The sources of cash receipts and disbursements data were a combination of general ledgers and bank transaction data. Not all bank accounts or general ledgers were included in this analysis; entities with no or insignificant transaction activity during the period presented may not have been included.
(2) - This analysis was prepared on a cash basis, therefore the timing of receipts and disbursements are different than what may be contained in accrual based financial reports. For example, receipts may not be matched to related disbursements, or vice versa. In addition, some items included in this analysis had not cleared the bank as of May 31, 2012.
(3) - The disbursements in this analysis does not include Receivership professional expenses and distributions to investors.
(4) - This category relates to fees for the marketing of properties for sale, etc. Receivership professional expenses are not included in this analysis.

# V.   INVESTIGATIONS AND LITIGATION

## A.   Claims Against Third Parties

The most important achievement of this interim period was the Court's approval on June 29, 2012 of the settlement agreements negotiated by the Receiver with two of Wextrust's former law firms. (*See* Dkt. Nos. 818, 819). This resulted in $7.9 million in cash for the receivership. The Court also approved a settlement with a former general contractor that resulted in a $560,000 benefit to the receivership. (Dkt. No. 817).

On May 14, 2012, the Receiver filed a motion for an order approving a new settlement agreement reached by the Receiver and Much Shelist Denenberg Ament & Rubenstein, P.C. ("Much Shelist") and its insurers. (Dkt. No. 792). Much Shelist is a law firm based in Chicago, Illinois. It represented the Wextrust Entities and Affiliates from approximately January 2005 through the start of this case. The Court had denied the Receiver's initial settlement agreement with Much Shelist because it did not involve an immediate cash payment or payment by Much

Shelist itself.  After additional negotiation and court-supervised mediation, the parties reached an agreement under which Much Shelist and its insurers agreed to pay $7 million to the receivership, including a $1 million payment by Much Shelist itself.

Also on May 14, 2012, the Receiver filed a motion for an order approving a settlement agreement with Poole Mahoney P.C., formerly operating as Huff, Poole & Mahoney P.C ("HPM").  (*See* Dkt. No. 789).  HPM is a Virginia law firm.  It represented various Wextrust Entities and Affiliates prior to the start of this case.  HPM had received approximately $275,000 in fees for legal work during the course of its representation of Wextrust.  Under the settlement, HPM has paid $900,000 to the receivership, which is more than three times what HPM had received in legal fees from Wextrust.

Finally, on June 29, 2012, the Court approved the Receiver's settlement of a dispute with Erin Construction & Development Co., Inc. ("Erin") relating to Erin's work as the general contractor of the 47 Dean Street project.  (*See* Order of June 29, 2012, Dkt. No. 817.)  The agreement resulted in a benefit to the receivership estate of approximately $560,000 and a release of $192,500 to Erin.  The agreement was reached after months of negotiations and litigation before the Court.  On February 28, 2012, the Court sided with the Receiver and rejected Erin's attempt to compel arbitration, which would have resulted in additional legal fees. (*See* Order, No. 780).  After further negotiations, including a mediation session with a Court-ordered mediator, the parties reached an agreement.  The development and sale of the 47 Dean property was a great success for the receivership.  It resulted in more than $12 million in gross revenue and $4.2 million in proceeds net of development costs, as the Receiver notified the Court in January 2012.  (*See* Dkt. No. 770).

### B.     Ancillary Litigation

As directed by the Receiver Order, the Receiver and his advisors are periodically required to participate in ancillary litigation that may impact receivership assets and interests.  During the past six months, counsel for the Receiver continued to monitor ongoing cases in both state and federal bankruptcy courts that implicate receivership property interests.  They will continue to do so, in consultation with the SEC, to preserve and protect the receivership estate's rights.

In June 2012, Regions Bank, one of the secured lenders for a number of receivership properties, motioned the Court to lift the litigation stay.  Granting such a motion would in effect let the bank take back three sets of properties that generate millions of dollars for the receivership.  The Receiver strongly opposed that motion. At a June 28 hearing, the Court sided with the Receiver and rejected the bank's request.  (Dkt. No. 823).

## VI.     INVESTOR COMMUNICATIONS

The Receiver will hold a virtual "town hall" teleconference in the near term for investors to ask questions and hear directly from him.  More information will be provided in a letter to investors.

In July 2012, the Receiver established a new phone number and email for Wextrust investor inquiries and communications, which are handled by A.B. Data.  The new number is **1-800-985-4155**.  The new email address is: **wextrustreceiver@abdata.com**.

For cost and efficiency purposes, the Receiver hired A.B. Data in 2010 to handle investor communications and the logistics of distributions to investors.  The Receiver's counsel provides support to A.B. Data professionals who interface directly with investors.  Where A.B. Data is unable to handle a question, it is forwarded to Receiver's counsel.  The Receiver recently became aware that in at least one instance an investor did not receive a timely response from A.B. Data.  As a result of the Receiver's inquiry into the matter, it was learned that the particular

- 17 -

A.B. Data professional responsible for responding to that investor's inquiry had since left the firm.  The Receiver imposed stricter monitoring of A.B. Data's communications to ensure that investors receive the timely and quality responses that they deserve.  The Receiver has requested that A.B. Data discount its fees as a result of this incident.

**VII.    CONCLUSION**

The Receiver continues to implement the directives of the Receiver Order by managing the receivership estate, liquidating the real estate assets at the greatest return possible, and accomplishing further distributions to victims.  The Receiver will continue to report on the financial condition of the receivership estate on a periodic basis, and will continue to take steps to inform investors and other interested parties of significant developments.

Dated: Washington, DC
        August 13, 2012

Respectfully submitted,

Timothy J. Coleman
Receiver for Wextrust Entities

s/ Jonathan W. Ware
Jonathan W. Ware, *pro hac vice*
Mia L. Havel, *pro hac vice*
FRESHFIELDS BRUCKHAUS DERINGER US LLP
701 Pennsylvania Avenue, NW
Washington, DC 20004
Tel. (202) 777-4500

*Attorneys for Receiver*

- 18 -

<u>**CERTIFICATE OF SERVICE**</u>

The undersigned hereby certifies that on **August 13, 2012** I directed the service of a true and correct copy of the foregoing **TENTH INTERIM REPORT OF RECEIVER** upon the following individuals in the manner indicated below:

<u>**Via First Class Mail**</u>
Joseph Shereshevsky,
Registry No. 35857-054
c/o GEO Group
Queens Private Correctional Facility
182-22 150th Avenue
Jamaica, NY 11413
Pro Se Defendant

<u>**Via Electronic Mail**</u>
Alexander M. Vasilescu, Esq.
Andrew M. Calamari, Esq.
Steven G. Rawlings, Esq.
Alistaire Bambach, Esq.
Neal R. Jacobson, Esq.
Danielle Sallah, Esq.
Attorneys for Plaintiff SEC

<u>**Via Electronic Mail**</u>
Barry S. Pollack, Esq.
Joshua L. Solomon, Esq.
Attorneys for non-party G&H Partners AG

<u>**Via Electronic Mail**</u>
Barry S. Zone, Esq.
Jason Canales, Esq.
Attorneys for Defendant Steven Byers

<u>**Via Electronic Mail**</u>
Michael Fred Bachner, Esq.
Attorney for Relief Defendant Elka
Shereshevsky

<u>**Via Electronic Mail**</u>
Martin Siegel, Esq.
Attorney for non-party Int'l Consortium of
Wextrust Creditors

<u>**Via Electronic Mail**</u>
Harris Kay, Esq.
Marc X. LoPresti, Esq.
Attorneys for various non-party investors

<u>**Via Electronic Mail**</u>
Francesca Morris, Esq.
Attorney for non-parties Ticor Title
Insurance Co. and Heritage Community
Bank

<u>**Via Electronic Mail**</u>
John M. Bradham, Esq.
Peter B. Katzman, Esq.
Attorneys for non-parties Space Park AIM
and ISSB Partnerships

<u>**Via Electronic Mail**</u>
Beth L. Kaufman, Esq.
Attorney for non-party Lawrence Costa

<u>**Via Electronic Mail**</u>
Alan E. Marder, Esq.
Attorney for non-parties Nashville
Warehouse Partners and Southeast
Warehouse Partners

<u>**Via Electronic Mail**</u>
Edward F. Malone, Esq.
Attorney for non-parties Barrington and
Hinsdale Banks

**<u>Via Electronic Mail</u>**
Philip A. Byler, Esq.
Andrew T. Miltenberg, Esq.
James B. Daniels, Esq.
Attorneys for non-party Broadway Bank

**<u>Via Electronic Mail</u>**
Shalom Jacob, Esq.
Shmuel Vasser, Esq.
Attorneys for non-party Int'l Ad-Hoc
Committee of Wextrust Creditors

**<u>Via Electronic Mail</u>**
Emily S. Alexander, Esq.
Attorney for non-party Martin Malek

**<u>Via Electronic Mail</u>**
Elizabeth P. Gray, Esq.
Attorney for non-party Gerald Jaffe

**<u>Via Electronic Mail</u>**
John P. Doherty, Esq.
Attorney for non-party Wells Fargo Bank
N.A.

**<u>Via Electronic Mail</u>**
Alexander S. Lorenzo, Esq.
Attorney for non-party LNR Partners, Inc.

**<u>Via Electronic Mail</u>**
Susan F. Balaschak, Esq.
Keith N. Costa, Esq.
Randal S. Mashburn, Esq.
John H. Rowland, Esq.
Attorneys for non-party Regions Bank

**<u>Via Electronic Mail</u>**
David B. Grantz, Esq.
Attorneys for non-party Bank of America

**<u>Via Electronic Mail</u>**
Adam W. Downs, Esq.
Gerard P. Brady, Esq.
Attorneys for non-party Erin Construction
& Development Co., Inc.

<u>s/ Jonathan W. Ware</u>
**Jonathan W. Ware**