UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
SECURITIES AND EXCHANGE COMMISSION,

                Plaintiff,

        - against -

STEVEN BYERS, JOSEPH SHERESHEVSKY,
WEXTRUST CAPITAL, LLC, WEXTRUST
EQUITY PARTNERS, LLC, WEXTRUST
DEVELOPMENT GROUP, LLC, WEXTRUST
SECURITIES, LLC, and AXELA HOSPITALITY,
LLC,
                Defendants,

- and -

ELKA SHERESHEVSKY,
                Relief Defendant.

-----------------------------------------------------------------x

08 Civ. 7104 (DC)

ECF Case

## FIRST AND FINAL APPLICATION OF JERRY B. KLEIN FOR ALLOWANCE OF COMPENSATION AND REIMBURSEMENT OF EXPENSES INCURRED FROM AUGUST 20, 2008 THROUGH JUNE 30, 2009

Jerry B. Klein ("Mr. Klein" or "Applicant"), retained by Timothy J. Coleman, duly appointed receiver (the "Receiver") for Wextrust Capital, LLC, *et al.* (collectively, the "Wextrust Entities"), hereby submits his First and Final Application for Allowance of Compensation Incurred From August 20, 2008 through June 30, 2009 ("Klein Application"). Mr. Klein requests final approval of fees in the amount of $354,069.00, and reimbursement of expenses in the amount of $5,449.80 for the 9-month period from August 20, 2008 through June 30, 2009 (the "Application Period").

      1.    Based on Mr. Klein's expertise in forensic accounting in connection with SIPC and

bankruptcy liquidations, as well as having served as a SIPC trustee, Mr. Klein was contacted by the Trustee shortly after the commencement of this case to review and analyze the record keeping and related documentation maintained by the Wex entities, and use this data to identify assets and promising areas for the recovery of funds. In addition, Mr. Klein was also to serve as Consulting Expert in monitoring and directing the efforts of Deloitte Consulting ("Deloitte") in an effort to maximize efficiency in the course of the investigation.

2. Although Mr. Klein's involvement in the case was foreshortened due to the lack of cooperation of Deloitte and its personnel, Mr. Klein and his associates produced a substantial amount of accounting evidence with respect to fraudulent and suspect transfers involving the Wex entities, Wex principals and the banks servicing Wex accounts. In addition, Mr. Klein documented a number of highly questionable transfers of Wex funds to certain "charities" with a view to supporting potential fraudulent conveyance actions.

3. This Application **Section I** provides the information required by Section C of the Billing Instructions for Receivers in Civil Actions Commenced by the U.S. Securities and Exchange Commission ("SEC Billing Guidelines").**Section II** contains a narrative of the work that Mr. Klein performed under each task code in accordance with Section D of the SEC Fee Guidelines. **Section III** describes the standards to be applied by the Court in determining fee awards in SEC equity receiverships. **Section IV** contains a request that the Court allow the Receiver to pay Mr. Klein

## APPLICATION REQUIREMENTS

### A. Information About the Applicant and the Application

4. **Application Period.** This application covers the period August 20, 2008 through June

30, 2009.

5. **Appointment of Receiver.** On August 11, 2008, the SEC filed its Complaint against Joseph Shereshevsky, Steven Byers and the Wextrust Entities and Affiliates (collectively, the "Defendants"). The same day, the District Court entered its Order Appointing Temporary Receiver ("Initial Receiver Order") (Dkt. No. 2), which appointed Timothy J. Coleman as Temporary Receiver. On September 11, 2008, the Court amended the Initial Receiver Order by the Amended Order Appointing Temporary Receiver (Dkt. No. 36) ("Amended Receiver Order"). The Amended Receiver Order is incorporated by reference in the Court's Amended Order on Consent Imposing Preliminary Injunction and Other Relief Against the Defendants and Relief Defendant, entered on October 24, 2008 (Dkt. No. 65) ("P.I. Order").

6. **Appointment of Applicant.** The Initial Receiver Order authorized the Receiver to engage attorneys, accountants and experts to assist him in carrying out his duties. To that end, the Receiver, in consultation with the receiver's counsel, retained Mr. Klein pursuant to the Amended Order Appointing Temporary Receiver (Dkt. No. 36) to act as a Consulting Expert with respect to the investigation of Wex Entity and Family transactions and disposition of funds, and provide documentation and evidence to support actions for the recovery of same.

7. **Fee Schedule.** Mr. Klein and his staff were to be paid as follows:

    a. Jerry B. Klein, C.P.A. - $375 per hour;

    b. John Biegel, C.P.A. - $335 per hour;

    c. Douglas Klein, C.P.A., C.F.E. - $325 per hour;

    d. Yuri Khymych, E.A., Staff Accountant - $200 per hour;

    e. Edna Cooney, Staff Assistant - $135 per hour; and

f. Rodora Gozon, Staff Assistant - $100 per hour.

Said rates to be billed in tenth of an hour increments

**8. Prior Applications.** This is Mr. Klein's first and final application.

## B. Case Status

9. Due to the Applicant's limited involvement in this case, first hand knowledge of the case status is limited to the review of pleadings filed. To that extent, Applicant is informed and believes the following;

a. **Cash on Hand and Unencumbered Funds.** As of January 31, 2012, the receivership estate had approximately $13 million in cash.

b. **Accrued Administrative Expenses.** It is estimated that, as of October 31, 2011, accrued, unpaid administrative expenses amounted to approximately $2.1 million, net of discounts. These expenses consist largely of the following: D&L, $825,000; Deloitte, $310,000; Freshfields, $356,000; Badger, $200,000; Receiver, $48,000; and Arent Fox, $8,000. Expenses and additional fees of other professionals and service providers are estimated to be $265,000. Finally, these amounts do not include Court required and estimated holdbacks of $3.4 million for D&L; $519,000 for Deloitte; $136,349.50 for Freshfields; $17,437.50 for the Receiver; and $27,610.00 for Arent Fox.

c. **Summary of Receipts and Disbursements.** The Receiver regularly filed the Standardized Fund Accounting Reports ("SFARs") with the SEC for period through August 31, 2010. The SEC then agreed with the Receiver not to require quarterly filings of the SFARs in return for the Receiver continuing to make financial information available in his Interim Reports and maintaining all SFARs based data for submission at the conclusion of the case.

d. **Closing of Case.** The Receiver cannot at this time state when the case will be concluded. While much of the work required by the Initial and Amended Receiver Orders has been accomplished, the primary events delaying the conclusion of the case are the sale of estate assets and resolution of claims against third parties to recover additional funds for the estate.

e. **Summary of Creditor Claims Proceedings.** This Court resolved all creditor claims in its Opinion of December 3, 2009 (Dkt. No. 579) in accordance with its Opinion and Order concerning the Receiver's Plan of Distribution (Dkt. No. 428).

f. **Summary of Assets.** Unless otherwise indicated, as of November 30, 2011, the primary assets of the Wextrust estate consisted of the following:

(i) Cash and cash equivalents of approximately $13 million as of January 31, 2012;

(ii) Funded loans held by various Wextrust Entities and Affiliates primarily Wextrust High Yield Debt Funds I and III, and certain of their joint venture partners;

(iii) LLC entity common membership interests held by defendant WEX in various office buildings, warehouses and a retail shopping center with a combined book value, net of related debt, of approximately $25 million;

(iv) Investments in PAM and other South African mining properties with an as yet undetermined book value; and

(v) Various investor notes and other payables reflected on the books and records of Wex with a combined value as yet undetermined; and unliquidated litigation recoveries.

g. The Receiver has obtained valuations of certain real estate projects in which one or more of the Wextrust Entities and Affiliates either hold or control. The Receiver has decided not to disclose these valuations to maximize the estate's ability to market and sell those properties.

C. **Current and Previous Billings**

10. This is Mr. Klein's first and final application. He requests approval of compensation for 9 months' of work in the amount of $354,069.00 for 1,523.80 hours of work performed, and the reimbursement of expenses in the amount of $5,449.80 from August 20, 2008 through June 30, 2009, none of which has been paid.

D. **Exhibits**

11. These exhibits are attached:

(a) **Exhibit A:** Time records of Mr. Klein and his staff by category and tasks performed; and

(b) Also submitted herewith is the Certification required by Section A.1 of the SEC Fee Guidelines.

12. In accordance with the SEC Billing Guidelines, Mr. Klein has submitted the First And Final Application to the SEC prior to filing with this Court. Neither the SEC nor the Receiver has approved the Application.

II. **SERVICES RENDERED BY MR. KLEIN DURING THE APPLICATION PERIOD**

13. In accordance with Section D.3 of the SEC Billing Guidelines, Mr. Klein has divided the work performed during the Application Period into the following activity categories: Forensic Analysis; Case Administration; Cash Management; Claims Administration; Reporting Compliance; and Tax Issues. All of the work performed has been designated under these

categories on the time sheets annexed.

14. Initially, Applicant set up a working relationship with IRS Bankruptcy and Insolvency Unit and prepared Power of Attorney Forms permitting access to IRS communications. Applicant created a worksheet listing the entities involved, and their Employee Identification Numbers, which was submitted to the Service. Procedures were established with an IRS specialist to determine any recoveries of taxes that may have been available to any Wex entity, and to file any tax returns required to be filed. Some of the entities were Partnerships which would require filing tax returns and distribution of Form K-1 to the partners.

15. Applicant outlined procedures and guidelines for tracing investor account transactions so that possible "clawback" claims could be pursued. Applicant hoped to work with Wex personnel on this area, but the Receiver apparently used other resources to complete this task.

16. At the inception of the case, Applicant did field work in the Wex Norfolk, VA office on several occasions, as indicated on our expense reports. Pursuant to these trips Applicant determined that it would be necessary to gain access to the Chicago office to review contracts and other data that had sent to there for final processing, and, ultimately However, Applicant only gained access to this material shortly before the services were terminated by the Receiver and were of limited import.

17. During the course of Applicant's retention, Applicant was in daily contact with the Receiver and provided him and his counsel with extensive documentation and evidence relating to the areas that it was determined would be ripe for recoveries, as summarized as follows:

(a) Applicant scheduled insurance policies maintained by the Wex entities, paying particular attention to D & O policies covering acts of the principals, and forwarded this

information to the Receivers' office.

(b) Applicant reviewed records in the captive broker-dealer operation in Norfolk, VA office. Wex had set up a broker-dealer Corporation which appeared to have little or possibly no activity. There were numerous cash transactions between the broker-dealer and several of other Wex entities. On the brokerage books, transaction memoranda were booked under fictitious names. On the other entities books, transactions were listed as advances. It was apparent that a complete set of fictitious accounting records had been created, and were then audited as per regulatory pronouncements. A small accounting firm completed the "audit" in one day of field work, and rendered an unqualified financial report. In our estimation, the attorney in charge of this department may have been liable for damages and perhaps subject to fraud charges.

(c) Working with former employees employed by the Receiver, Applicant prepared salary and commission reports totaled annually for four years. It was assumed that some of the commissions paid were fraudulent and subject to recovery.

(d) Applicant also reviewed records in the Wex compliance department .In the compliance area, Applicant reviewed two years of audited financial statements indicating scant activity for a firm with a large number of licensed representatives. Apparently, the auditor had been told that most of the offerings were private placements not requiring SEC reporting. However, other evidence seemed to belie this representation. In our estimation, which we presented to the Receiver, the auditing firm, by not asking obvious questions, had in effect aided the effort to dupe the SEC and thus hindered regulatory efforts that may have prevented investors from losing their investment funds.

(e) Applicant reviewed and summarized the ownership transactions of three residences owned by Joseph Shereshevsky and/or his second wife Elka (Two were located in

Norfolk, VA, and one located Brooklyn, NY) for the purpose of establishing the Receiver's right to take title to same. In addition, Applicant investigated numerous transfers aggregating millions of dollars into personal investment accounts in the names of Joseph and Elka Shereshevsky which were maintained at an investment company called Terra Nova Investments. In addition to the foregoing, Applicant prepared extensive reports on personal expenses paid with corporate funds by Elka Shereshevsky and to a lesser degree, Joseph Shereshevsky

(f) Applicant prepared schedules documenting roughly $5.5 million which had been "contributed" to various Jewish organizations and a number of religious personalities either directly from Wex bank accounts, or from Elka Shereshevsky's accounts using funds transferred from Wex bank accounts. This was done with a view to recovering said funds as has been done in a number of similar fraud cases and provided to the Receiver and his counsel.

(g) Almost all the activities referred to above involved hundreds of transfers totalling millions of dollars from one bank account to another. In many cases Applicant found that the transfers were made without proper authorization; some were made with patently fraudulent documents. Copies of banking statements and documents were examined by Applicant including numerous transfiles of banking records which revealed countless improperly authorized transfers of cash to third parties, including millions to a South African mining company, as well as to Joseph and Elka Shereshevsky, through an investment entity set up for their personal assets. Many of these transfers were initiated by unsigned documents or documents containing obviously forged signatures. Applicant proposed additional research and schedule preparation with a view to bring legal action against certain banks which "enabled" the illicit transfers of funds, but was rebuffed. Applicant further offered to utilize certain foreign contacts familiar with South African transactions with a view to potentially recover funds, but said offer was also

declined.

## III. <u>FACTORS TO BE CONSIDERED BY THE COURT IN AWARDING FEES</u>

18. As this Court stated in the First Fee Opinion (Dkt. No. 166): "A receiver appointed by a court who reasonably and diligently discharges his duties is entitled to be fairly compensated for services rendered and expenses incurred." 590 F. Supp. 2d 637. In setting a reasonable fee, this Court has repeatedly applied the widely accepted lodestar method and considered "the complexity of the problems faced, the benefits to the receivership estate, the quality of the work performed, and the time records presented." *Id.* at 14 (quoting *SEC v. Fifth Ave. Coach Lines, Inc.*, 364 F. Supp. 1220, 1222 (S.D.N.Y. 1973)). "Under the lodestar method, the Court first ascertains the number of hours reasonably billed and then multiples that figure by the appropriate hourly rates to reach the lodestar amount." *Id.* at 15. Hours reasonably billed should exclude excessive, redundant, or unnecessary tasks, while hourly rates are appropriate if they "are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation." *Id.* (quoting *Blum v. Stenson*, 465 U.S. 886, 896 n.11 (1984)). Adjustments may then be made based on the quality and expertise of counsel, the magnitude and complexities of the litigation, the risks involved, the relation of the fees to any recovery, and other public policy considerations. *Id.* at 16. In so doing, this Court recognized a "rule of moderation." *Id.* 30. Under these standards, Mr. Klein respectfully submits that the amount of fees requested is fair, reasonable, and moderate. The issues addressed by Applicant were complex and covered a broad range of issues. Applicant has provided the Receiver with a great amount of expertly garnered documentation and evidence sufficient to support numerous recovery actions.

19. Mr. Klein has taken on a difficult assignment and performed admirably. His

compensation rate is well within the normal range of fees for similar level work and personnel. In fact it is considerably less than Deloitte's rate scale.. Based on the foregoing, Applicant respectfully submits that the compensation sought is wholly warranted.

**WHEREFORE,,** Applicant respectfully requests that the Court: (a) grant approval of Applicant's request for compensation for the period August 20, 2008 through June 30, 2009 in the amount of $$359,518.80, and reimbursement of expenses in the amount of $5,449.80; (b) direct the forthwith payment of said sums; and (g) grant such other relief as the Court deems appropriate.

Dated: New York, NY
      July 18, 2012

*[signature]*
Jerry B. Klein, C.P.A.
225 Broadway, Suite 2713
New York, NY 10007