UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>                Plaintiff,<br><br>- against -<br><br>STEVEN BYERS, JOSEPH SHERESHEVSKY, WEXTRUST CAPITAL, LLC, WEXTRUST EQUITY PARTNERS, LLC, WEXTRUST DEVELOPMENT GROUP, LLC, WEXTRUST SECURITIES, LLC, and AXELA HOSPITALITY, LLC. | No. 08 Civ. 7104 (DC)<br><br>ECF Case |

# THIRTEENTH INTERIM REPORT OF RECEIVER

TIMOTHY J. COLEMAN
Receiver for Wextrust Entities

FRESHFIELDS BRUCKHAUS DERINGER US LLP
701 Pennsylvania Avenue, NW
Washington, DC 20004
Tel. (202) 777-4500

August 11, 2013

**TABLE OF CONTENTS**

|      |                                                                              | Page |
|------|------------------------------------------------------------------------------|------|
| I.   | DISTRIBUTION TO THE WEXTRUST VICTIMS ......................................................... | 2 |
| II.  | LIQUIDATION OF WEXTRUST ASSETS ................................................................. | 3 |
| III. | ESTATE MANAGEMENT OPERATIONS ................................................................. | 6 |
|      | A.   U.S. Real Estate Operations .......................................................................... | 6 |
|      | B.   High Yield Loans ............................................................................................ | 8 |
| IV.  | FINANCIAL CONDITION OF THE WEXTRUST ENTITIES AND AFFILIATES ....... | 9 |
| V.   | INVESTIGATIONS AND LITIGATION ..................................................................... | 14 |
| VI.  | INVESTOR COMMUNICATIONS ............................................................................. | 14 |
| VII. | CONCLUSION ............................................................................................................. | 15 |

Timothy J. Coleman, Receiver for the Wextrust Entities and Affiliates ("Receiver"), respectfully submits this Thirteenth Interim Report, pursuant to the Court's Order Appointing Temporary Receiver, dated August 11, 2008, as amended by order dated September 11, 2008 (the "Receiver Order") (Dkt. No. 36).

Today, total receivership cash is $19.5 million. The Receiver has been intensely focused in the past six months on ways to streamline operations, resolve federal tax issues, wind up property operations on favorable terms, and aggressively pursue all remaining avenues for recovery. Immediately after the last Interim Report, the Receiver directed a top-to-bottom review of operations that resulted in approximately $440,000 in annual operational savings. The Receiver also hired new brokers to take a fresh look at the Wextrust properties and to aggressively market them as economic conditions slowly improved in 2013. As a result, the Receiver has sold one property, has contracts executed on three properties, has letters of intent on five properties, and is actively marketing the remainder. Based on the anticipated sale of the properties and recoveries from third parties, the Receiver expects as much as an additional $5 million to $10 million in net proceeds to the receivership estate. Thus, the total available for distribution to investors and for the administrative expenses of the estate would be $25 million to $30 million, on top of the $5 million already distributed to investors. This, of course, is dependent on resolution of the receivership's tax obligations.

After years of negotiation with the IRS to avoid massive tax liabilities and expenditure of the receivership's limited funds on tax accounting, the Receiver submitted draft returns to the IRS on March 1 for tax years 2008 through 2011. The returns showed a $17.4 million loss, and thus no tax liability. Surprisingly, the IRS said it would conduct a full audit that could take until Spring 2014. In early August, the IRS informed the Receiver that it had completed a large part of its audit and identified $500,000 *in additional losses*. Although a few outstanding tax issues

remain to be resolved, the Receiver is hopeful the process will conclude this year and allow for a distribution.

This Thirteenth Interim Report describes the Receiver's work since February 11, 2013. Section I reports on the prospect of a future interim distribution to investors. Section II summarizes the status of the liquidation of Wextrust assets. Section III provides an overview of the Receiver's management of the Wextrust Entities and Affiliates. Section IV reports on the current financial condition of the receivership estate and its administrative costs. Section V discusses the status of Wextrust-related litigation. Section VI summarizes investor relations.

**I.     DISTRIBUTION TO THE WEXTRUST VICTIMS**

The work of the Receiver in the last interim period was focused on expediting the ability to issue a distribution to investors and on maximizing the additional funds available for distribution. The Receiver's ability to make a second distribution depends on resolution of the receivership's tax liability and filing obligations for the Wextrust entities.

As previously reported, the Receiver has verified and recognized the claims of Wextrust victims totaling $238 million among 1,221 equity investors and 100 unsecured creditors. The Court approved a first interim distribution of approximately $5 million in December 2010. A.B. Data, which was hired to manage the logistics of the distribution, was unable to deliver 12 checks totaling $37,006.93, which remain unclaimed. The Receiver encourages claimants to provide any updated contact information (**1-800-985-4155 or wextrustreceiver@abdata.com).**

On March 1, 2013, the Receiver submitted draft federal tax returns as a Qualified Settlement Fund ("QSF") for tax years between 2008 and 2011. The draft returns showed the receivership as having $17.4 million in losses, and thus, no tax liability during that period. As agreed with the Internal Revenue Service ("IRS") and the United States Attorney's Office, the draft returns were submitted to a special IRS examination team. The Receiver and his advisors

have worked with the IRS examination team since March to resolve the team's questions about the draft tax returns and the receivership's tax liability.  After reviewing the draft returns and the additional information provided by the Receiver, the IRS team has proposed additional deductions for the tax returns.  However, the IRS team's appraisal of the receivership's real property has not yet been completed and the impact of any resulting adjustment to the initial value of the receivership's assets is unknown.

Once the IRS examination team has completed its review of the draft tax returns, the Receiver will request that the IRS enter into a closing agreement.  The requested closing agreement would settle the receivership's tax liability for tax years between 2008 and 2011 and any obligations to file partnership tax returns.  The Receiver believes that the IRS's review of the draft tax returns has provided the IRS with ample opportunity to establish the receivership's tax liability for this period.  Furthermore, to the extent there is any remaining disagreement with the IRS as to whether the receivership is required to file informational partnership tax returns for the Wextrust entities, the Receiver believes that this issue can now be resolved because the parties have agreed that the receivership should file tax returns as a QSF and the IRS has had a chance to review the receivership's tax returns.  Once the closing agreement has been agreed, the receivership will file final tax returns attaching the closing agreement, and will then promptly seek the Court's permission to make a further distribution to Wextrust investor victims.  The receivership is also currently in the process of preparing a tax return for the 2012 tax year, and will be required to file a tax return for the 2013 tax year.

II.     **LIQUIDATION OF WEXTRUST ASSETS**

Since the start of the receivership, the Receiver has sold 20 properties, resulting in $68.8 million in gross proceeds.  From those sales, $55.1 million were used to repay secured creditor victims of the Wextrust fraud.  The estate benefited from the forgiveness of $7.3 million in

secured debt owed by the estate, and the estate received $7.4 million in net cash. Additionally, the three hotels were relinquished, as were 18 other properties as to which there was no expectation of a net cash recovery for the estate. The relinquishments allowed secured creditor victims to obtain the collateral for $180.7 million of debt, and released the estate from those obligations. The Receiver has recovered $13 million through the sale of other receivership assets, settlements with third parties, and other recoveries.

In the past six months, the Receiver refocused efforts to monetize the remaining assets in the receivership estate per the Court's plan of distribution order entered on July 23, 2009 (the "Distribution Order") (Dkt. No. 428). The assets currently consist of (1) commercial real estate properties, which account for most of the remaining estate; (2) high yield loan portfolios. The commercial real estate properties consist primarily of 21 properties (13 of those properties are grouped under one portfolio umbrella – "Tennessee Office"). The properties are projected to generate $4.8 million in net operating income for the year ending December 2013, and $1.5 million of net cash flow from operations for the same period. The properties are managed by three full-time employees who are supervised by the Receiver. The 21 commercial real estate properties of the receivership are located in Tennessee, Mississippi, and Wisconsin. The Receiver continues to supervise the management and marketing of these properties. He is seeking to sell the properties by the end of this year or to negotiate relinquishments to the secured lenders where market value is less than the secured debt.

- 5 -

**Status of Properties Held By Wextrust Equity Partners**

| Owner Entity | City/State | Status |
| --- | --- | --- |
| Corinth Industrial | Corinth, MS | Contract executed |
| Park Village | Knoxville, TN | LOI executed; negotiating contract |
| Parkway | Knoxville, TN | LOI executed; negotiating contract |
| Workman Road | Knoxville, TN | LOI executed; negotiating contract |
| Myatt | Madison, TN | LOIs received; negotiating |
| Pinecrest | Burlington, WI | LOIs received; negotiating |
| Clarksville Industrial | Clarksville, TN | Marketing |
| Tennessee Office | Cookeville, TN | Marketing |
|  | Knoxville, TN (3711) | Preparing for market |
|  | Knoxville, TN (3712) | Preparing for market |
|  | Athens, TN | Preparing for market |
|  | Nashville, TN (Blanton) | Preparing for market |
|  | Clinton, TN | Preparing for market |
|  | Columbia, TN | Preparing for market |
|  | Nashville, TN (Dickerson) | Preparing for market |
|  | Kingston, TN | Preparing for market |
|  | Lenoir City, TN | Preparing for market |
|  | Morristown, TN | Preparing for market |
|  | Shelbyville, TN | Preparing for market |
|  | Tullahoma, TN | Preparing for market |
| Commerce Center | Clarksville, TN | Preparing for market |

Finally, the Receiver closed on the sale of the personal residence of defendant Steven Byers in Oakbrook, Illinois in early August. Although the property was worth less than the secured debt, the Receiver negotiated a settlement with the secured lender which resulted in approximately $100,000 in cash for the estate.

### III.     ESTATE MANAGEMENT OPERATIONS

Since the inception of the receivership, the Wextrust properties have generated $75.4 million in lease income and approximately $21.9 million in net cash flow to the receivership estate.  (*See* Table 5 below.)  The Receiver has executed 78 new leases and 182 lease renewals, representing $39.4 million in aggregate rental revenue.  The overall percentage of leases renewed represents a renewal rate of approximately 70 percent.

#### A.     U.S. Real Estate Operations

As directed by the Court, the Receiver took control of all Wextrust real estate assets, which now consist primarily of commercial properties.  In the six months ending August 11, 2013, the Receiver collected approximately $3.7 million in rent.  As discussed in Section II above, the Receiver negotiated seven new and renewal leases on properties during this period.  These leases are expected to generate approximately $4.0 million in revenue over their term.  Repairs and improvements on the remaining properties have been minimized where appropriate.

In February, the Receiver initiated a top-to-bottom review of receivership operational expenses.  Given slowly improving commercial real estate market conditions and the length of the case, the Receiver is seeking to wind up property operations in 2013. After analyzing various options, the Receiver decided to downsize the Wextrust staff by transferring the responsibilities of one Wextrust employee to the now-remaining three; other tasks were taken up by the Receiver's counsel.  Next, the Receiver determined that it was in the estate's best interest to continue in part the property disposition strategy developed in 2012 with Badger Real Estate Advisors LLC ("Badger"), the Receiver's real estate advisors at the time, and to terminate the estate's agreement with Badger.  Third, working with the Wextrust employees, the Receiver identified and implemented approximately $120,000 in other annual savings.  For example: the Receiver canceled a third-party property management agreement covering seven office buildings

and transferred that work to the Wextrust employees; reduced the monthly expense of Wextrust's accounting system given the reduced property portfolio; renegotiated the monthly fees for banking services given his consolidation of accounts; reduced non-essential employee travel; and terminated non-essential telecommunications contracts, among other reductions. In addition, the Receiver renegotiated loans with two secured lenders to allow the estate time to sell the underlying collateral. Several property tax appeals to state agencies were successfully resolved and resulted in savings of over $10,000 between 2013 and 2014.

As part of the Receiver's top-to-bottom review, he solicited proposals from three broker entities to replace the former broker team. In March, the Receiver selected CB Richard Ellis Nashville Private Capital Group ("CBRE") to market and sell the remaining commercial properties based on its presence in Tennessee where the majority of remaining properties are located and its proven track record. CBRE brought a fresh look to the marketing and sale of the properties. CBRE conducted a thorough analysis and due diligence of the Wextrust portfolio and launched a targeted marketing campaign on April 24.

CBRE's marketing campaign targeted more than 7,000 of its key investors and brokers whose stated investment criteria matched that of the Wextrust properties. As a result, 535 parties visited the CBRE Marketplace website where they were able to access offering memoranda for the properties and due diligence materials. Approximately 180 offering memoranda and 1,269 due diligence files have been downloaded to date. Seven offers have been received and one purchase and sale agreement has been fully executed. CBRE continues to aggressively market the properties.

The Receiver's obligations related to the condominiums that were developed and sold at the 47 Dean Street property located in Brooklyn have now ended. The units were sold last year for more than $12 million, with net proceeds to the estate of approximately $4.2 million.

- 8 -

## B. High Yield Loans

As reported in the last Interim Report, the Receiver has conducted a continuing review of the prospects for recovery from the remaining Wextrust high yield loans, nearly all of which are in default and are worth less than the amount Wextrust had contributed. The high yield loans consist of some loans that were 100-percent funded by Wextrust, and others which were funded by joint ventures ("JVs") between Wextrust and other entities. The Receiver's investigation into the JVs has revealed substantial irregularities. In the last interim period, the Receiver issued approximately 10 subpoenas related to the JVs. The Receiver is continuing to investigate those matters, in coordination with state and federal authorities.

**Wextrust direct loans.** At the start of the receivership, there were approximately 13 loans that Wextrust had funded directly, all of which were in default and totaled approximately $8.4 million in principal. To date, the Receiver has recovered $602,000 on three of these loans. For two of the loans, the Receiver moved to finalize the foreclosure process in the last interim period and has scheduled sheriff's sales for late August and early October to take title to those properties and then sell them. One property consists of vacant land in Bethel Park, Pennsylvania; the other is a single family home in Mine Hill, New Jersey. Most of the Wextrust direct loans were made on properties where little to no recovery is expected given the existence of a senior loan. The Receiver is pursuing deficiency claims against guarantors and/or successors wherever feasible.

**Wexwater, LLC.** Wexwater, LLC ("Wexwater"), was formed in February 2005 between Wextrust Capital, LLC and Stillwater Capital Partners, Inc. ("Stillwater"). Wexwater engaged in high yield lending serviced by Wextrust. Wextrust's principal exposure in Wexwater loans is approximately $1.7 million. Between 2010 and 2012, Stillwater apparently transferred its interests in Wexwater to or among Gerova Financial Group and/or Net Five Holdings, each of

which has been the subject of lawsuits for fraud.  Stillwater has been the subject of an enforcement action by the U.S. Commodity Futures Trading Commission and several fraud lawsuits.  Two prospects for recovery in the Wexwater portfolio are vacant land in Connecticut and property outside Richmond, Virginia.  The Receiver is pursuing litigation in Connecticut and Virginia to secure and monetize those assets.

**Wextrust/HPC Mortgage Fund, LP.**  In 2006, Wextrust Capital, LLC, various Wextrust affiliates, and HPC US Fund 1, LP formed what is now known as Wextrust/HPC Mortgage Fund, LP ("Wex/HPC").  Wex/HPC engaged in high yield lending serviced by Wextrust.  Wextrust's principal exposure in Wex/HPC loans is approximately $5.5 million.  Today, only one of the Wex/HPC loans are performing.  Of the remaining loans: one was repaid; one defaulted and Wex/HPC foreclosed upon and sold the collateral; two remain in litigation; and  the rest defaulted and Wex/HPC has foreclosed on the collateral and taken title.  The Receiver has executed contracts for sale for two of the properties and is actively marketing the remainder.

### IV.     FINANCIAL CONDITION OF THE WEXTRUST ENTITIES AND AFFILIATES

As in previous reports, Deloitte assisted in compiling financial information from the financial systems and books and records of the Wextrust Entities and Affiliates.  Those financial records reflect the book value of the principal real estate assets, as recorded in the company's books and records, but not necessarily in accordance with generally accepted accounting principles.  As shown in Table 1, the total book value of the remaining Wextrust real estate portfolio is approximately $17.0 million.  This value is based on the accounting records and other information maintained by Wextrust and its accountants, and does not represent current market value.  Moreover, as discussed in previous reports, these properties were purchased at the height of the commercial real estate market and are heavily leveraged by secured debt.  The

Receiver contemplates that most of the proceeds of the sales of these properties will be used to repay such debt, pursuant to the Court's Distribution Order.

**Table 1:  Book Value of Wextrust Real Estate Assets**

**Wextrust Capital, LLC, et al.**
**Net Book Value (1) (2)**
**as of May 31, 2013**

|  | Axela (3) | WEP (4) | WDG (5) | Consolidated |
|---|---|---|---|---|
| Property |  |  |  |  |
|   Building / Land | - | 63,915,393 | - | 63,915,393 |
|   Loan Payable on Property | - | 48,984,173 | - | 48,984,173 |
| **Net Book Value (6)** | $ - | $ 14,931,220 | $ - | $ 14,931,220 |
|  |  |  |  |  |
| Capitalized Costs: |  |  |  |  |
|   Tenant Improvements | - | 662,573 | - | 662,573 |
|   Capital Improvements | - | 1,439,584 | - | 1,439,584 |
| **Total Capitalized Costs** | $ - | $ 2,102,157 | $ - | $ 2,102,157 |
|  |  |  |  |  |
| **Net Book Value (6)** | $ - | $ 17,033,377 | $ - | $ 17,033,377 |

**(1)** - Where possible, net book values were obtained from accounting information as of November 30, 2011 provided by Wextrust.  However, the cost of the building and the balance of the loan payable on the property were not always recorded in the accounting system.  To the extent available, these amounts were obtained from other internal sources as of the most recent date available. In some cases, loan payable amounts include accrued interest and late fees assessed by the
**(2)** - The amounts shown do not include properties that were sold or where the relinquishment process was initiated or had been relinquished as of May 31, 2013.
**(3)** - As of August 31, 2009, the United States District Court for the Southern District of New York had entered orders permitting the relinquishment of all hotel properties.
**(4)** - Commerce Center Holdings, a TIC property, is included at 100% even though the Wextrust interest is less (35%).  The balance excludes property owned by: <1>  Executive Plaza, LLC that was sold in January 2013, <2> Interstate Park Holdings, LLC that was relinquished in February 2013, <3> Shallowford Holdings, LLC and Wilma Rudolph Holdings, LLC that were relinquished in January 2013.
**(5)** - All condominium units developed by 47 Dean Street have been sold.
**(6)** - There may be other payable amounts due upon sale of property, including property taxes, etc.

For the six months ending May 31, 2013, Wextrust had a positive net cash flow of approximately $387,000.  Total receipts were $4.68 million against $4.29 million in expenses authorized by the Receiver to preserve the status quo of the Wextrust enterprise, as shown in Table 2 below.  The vast majority of those expenses were paid in connection with operating the WEP real estate portfolio.  As of July 31, 2013 Wextrust had more than $19.6 million in cash in approximately 25 U.S. bank accounts at five financial institutions.

## Table 2: Receipts and Disbursements

**Wextrust Capital, LLC, et al.**
**Consolidated Cash Receipts and Disbursements - Rounded (1) (2)**
**from 12/01/2012 through 05/31/2013**

| RECEIPTS | Wextrust Capital, LLC and Affiliates | Commodity Funds | Wextrust Equity Partners, LLC and Affiliates | PAM | Wexford Development Group, LLC and Affiliates | Axela Hospitality, LLC and Affiliates | TOTAL |
|---|---|---|---|---|---|---|---|
| Tenant Receipts (3) | - | - | 4,263,000 | - | - | - | 4,263,000 |
| Sale of Receivership Assets (4) | - | - | 6,000 | - | - | - | 6,000 |
| Construction Draws | - | - | - | - | - | - | - |
| Other Receipts (5) | 266,000 | - | 145,000 | - | - | - | 411,000 |
| TOTAL RECEIPTS | 266,000 | - | 4,414,000 | - | - | - | 4,680,000 |
| DISBURSEMENTS | | | | | | | |
| Capital Expenditures, Tenant Improvements & Leasing Commissions | - | - | 305,000 | - | - | - | 305,000 |
| Insurance | - | - | 116,000 | - | - | - | 116,000 |
| Loan Payments | - | - | 2,212,000 | - | - | - | 2,212,000 |
| Management Fees | 9,000 | - | 154,000 | - | - | - | 163,000 |
| Ordinary Course Expenses | 18,000 | - | 393,000 | - | - | - | 411,000 |
| Labor Costs | 58,000 | - | 291,000 | - | - | - | 349,000 |
| Professional Expenses - Non-Receiver (6) | 25,000 | - | 2,000 | - | - | - | 27,000 |
| Taxes | - | - | 710,000 | - | - | - | 710,000 |
| Other | - | - | - | - | - | - | - |
| TOTAL DISBURSEMENTS | 110,000 | - | 4,183,000 | - | - | - | 4,293,000 |
| NET CASH GENERATION / (BURN) | 156,000 | - | 231,000 | - | - | - | $ 387,000 |

**(1)** - The receipts and disbursements in this analysis are cash transactions that are grouped by the entities that initiated the transaction, however, in some cases the cash transactions were executed on behalf of other Wextrust entities. The cash transactions have been categorized by type based on information contained within the books and records of the Wextrust Entities. The sources of cash receipts and disbursements data were a combination of general ledgers and bank transaction data. Not all bank accounts or general ledgers were included in this analysis; entities with no or insignificant transaction activity during the period presented may not have been included.
**(2)** - This analysis was prepared on a cash basis, therefore the timing of receipts and disbursements are different than what may be contained in accrual based financial reports. For example, receipts may not be matched to related disbursements, or vice versa. In addition, some disbursements included in this analysis had not cleared the bank as of May 31, 2013.
**(3)** - Approximately $492,000 was collected, in addition to monthly rent, from tenants for property taxes and insurance.
**(4)** - The $6,000 in Sale of Receivership Assets represent the net proceeds from the sale of property owned by Executive Plaza, LLC.
**(5)** - The $411,000 in Other Receipts is mainly comprised of: <1> $70,000 in settlements with third parties, <2> $38,000 in funds received from the relinquishment of Interstate Park Holdings LLC, <3> $136,000 received from income distributions from Commerce Center Holdings, LLC and <2> $145,000 in property
**(6)** - Receivership professional expenses are not included in this analysis. The payment of Professional Expenses - Non-Receiver represent fees relating to the marketing of properties for sale, etc.

Deloitte also assisted in the preparation of a cash forecast for three three-month periods through February 28, 2014 as shown in Table 3. The net cash flow is projected at $958,732. The three month period ending February 28, 2014 shows a comparatively lower net cash flow because of property taxes and insurance payments, which are paid during the period but funded in part by the monthly and annual collections of tenants' fees.

### Table 3: Wextrust Cash Forecast

Base Cash Flow Projections for Wextrust Capital, LLC and Affiliates, et al. for the Nine Months Ending February 28, 2014 (1) (2)

| | WexTrust Capital, LLC, et al. for the 3 - Months Ending August 31, 2013 | WexTrust Capital, LLC, et al. for the 3 - Months Ending November 30, 2013 | WexTrust Capital, LLC, et al. for the 3 - Months Ending February 28, 2014 | Total |
|---|---:|---:|---:|---:|
| Total Effective Income | $ 1,650,886 | $ 1,619,840 | $ 1,641,991 | $ 4,912,717 (3) |
| Total Operating Expenses | 292,803 | 306,975 | 830,060 | 1,429,838 |
| Net Operating Income | 1,358,083 | 1,312,865 | 811,931 | 3,482,879 |
| Non Operating Expenses: | | | | |
| Debt Service - Interest (Including Swap Payments) | 509,265 | 503,865 | 544,815 | 1,557,945 |
| Debt Service - Principal | 232,277 | 231,126 | 198,816 | 662,219 |
| Capital Expenditures (4) | 29,000 | - | - | 29,000 (5) |
| Tenant Improvements & Lease Commissions | 58,950 | 58,950 | - | 117,900 |
| Reserves | 5,625 | 5,625 | 5,625 | 16,875 |
| Other Non-Operating Expenses | 47,860 | 47,519 | 44,829 | 140,208 |
| Total Non-Operating Expenses | 882,977 | 847,085 | 794,085 | 2,524,147 |
| Net Cash Flow (6) | $ 475,106 (7) | $ 465,780 | $ 17,846 (8) | $ 958,732 |

**(1)** - Does not include any distributions under the Plan of Distribution. As of August 31, 2009, the United States District Court for the Southern District of New York approved orders to relinquish all hotel properties.
**(2)** - Amounts exclude Commerce Center Holdings, which is a TIC property where Wextrust interest is 35%. The cash projections include the expected cash activity for properties that are currently in sale negotiations but do not include the expected net sale proceeds. For information on the expected sale of Receivership assets, please refer to Section I.A.
**(3)** - Amount includes approx. $1,525,000 and $125,000 in tenant rent receipts from approx. 13 tenants who are assumed to renew their leases and approx. 3 tenants who are assumed to remain on a month-to-month lease, respectively.
**(4)** - Net of escrow draws available for capital expenditures.
**(5)** - In order to better manage cash flow on a per-property basis, Capital Expenditures projects are evaluated on an as-needed basis. Due to that methodology, a minimal amount of Capital Expenditures are projected unless there is a known, necessary repair or replacement imminent.
**(6)** - Does not include Receivership related professional fees.
**(7)** - The net cash flow projected for the 3 months ended February 28, 2014 includes projected payments of 2013 property taxes and insurance in February of 2014 totaling approximately $524,000. This payment is funded in part by the monthly and annual collections of CAM fees from tenants.
**(8)** - The net cash flow for the 3-months ending February 28, 2014 excludes expenses for Clarksville Industrial Holdings, LLC totaling approx. $127,000. As of the date of this report, the single tenant who occupied the entire building has vacated the property but will continue to pay rent through November 2013. It is anticipated that a new tenant will be found prior to November but if not, the property will be divested.

The above analysis does not include expenses associated with the administration of the receivership, the largest component of which is professional legal fees. These include fees due to the Receiver and receivership counsel, Freshfields Bruckhaus Deringer US LLP ("Freshfields") (since March 2010). Dewey & LeBoeuf LLP ("D&L"), which is now defunct, has not provided services to the Receiver since December 2010. On August 8, the Court stated that "clearly the Receiver accomplished quite a lot in the last year" (Tr. 8/8/13 at 3) and approved the following fee applications: the Receiver and Freshfields for $455,264.86 (Dkt. No. 928); Deloitte for $74,445 (for work December 1, 2011 through December 31, 2012) (Dkt. No. 927); and LBMC, the Receiver's tax accountants, for $200,222.69 (Dkt. No. 926).

For all professionals, Wextrust has incurred and paid $17,505,018.48 in professional fees as of August 10, 2013 as follows: Receiver, $436,456; Freshfields, $842,724.93; Lattimore Black Morgan & Cain, PC, $200,000; Arent Fox, $33,216.50; D&L, $9,423,211.76; Deloitte, $4,366,383; Hilco, $940,500; various South African professionals, $338,553; Badger, $740,000; and other professionals, $183,973.  Legal fees during the thirteenth interim period were an estimated $400,000 and Deloitte's fees were an estimated $40,000.

The level of professional administrative costs have been a concern of the Receiver, the Court, and investors.  The estate professionals have held back more than $4.6 million in fees, which the Court has said may be applied for at the end of the case.  In addition, various professionals have applied discounts and write-offs of more than $14.8 million as a reflection of the public service nature of their engagement.  Fees have declined precipitously and remained low as the Receiver completed the tasks required by the Receiver Order and successfully defended the numerous appeals of the Court's orders – for example, more than 90 percent of fees incurred and paid to date occurred during the first 17 months of the receivership (through December 2009).

In October 2012, Jerry B. Klein and Associates ("JBKA"), an accounting firm hired by D&L, submitted a fee application for $360,000 for work performed in 2008 and 2009.  The SEC and Receiver opposed the fees.  On May 21, 2013, the Court agreed with the Receiver's objections and denied the JBKA application.  (*See* Dkt. No. 889)  On June 5, JBKA requested the Court to vacate its order (Dkt. No. 892), which was immediately opposed by the SEC (Dkt. No. 893).

The Receiver has also calculated total receipts and disbursements since the start of the receivership on August 11, 2008.  Total receipts were $100.6 million while total disbursements were $78.6 million, not including administrative costs described above.

- 13 -

### Table 5: Receipts and Disbursements (Since Receivership Start)

**Wextrust Capital, LLC, et al.**
**Consolidated Cash Receipts and Disbursements - Rounded (1) (2) (3)**
**from 08/08/11 through 05/31/2013**

| RECEIPTS | Wextrust Capital, LLC and Affiliates | Commodity Funds | Wextrust Equity Partners, LLC and Affiliates | PAM | Wexford Development Group, LLC and Affiliates | Axela Hospitality, LLC and Affiliates | TOTAL |
|---|---|---|---|---|---|---|---|
| Tenant Receipts | - | - | 75,360,000 | - | - | - | 75,360,000 |
| Sale of Receivership Assets | 4,470,000 | - | 2,980,000 | - | 600,000 | - | 8,050,000 |
| Construction Draws | 70,000 | - | - | - | 4,220,000 | - | 4,290,000 |
| Other Receipts | 9,550,000 | 230,000 | 2,740,000 | - | 100,000 | 240,000 | 12,860,000 |
| **TOTAL RECEIPTS** | **14,090,000** | **230,000** | **81,080,000** | **-** | **4,920,000** | **240,000** | **100,560,000** |
| **DISBURSEMENTS** | | | | | | | |
| Capital Expenditures, Tenant Improvements & Leasing Commissions | - | 60,000 | 5,340,000 | - | 4,310,000 | 110,000 | 9,820,000 |
| Insurance | 28,000 | 2,000 | 1,122,000 | - | 89,000 | 4,000 | 1,245,000 |
| Loan Payments | 150,000 | 20,000 | 31,180,000 | - | 360,000 | 60,000 | 31,770,000 |
| Management Fees | 10,000 | - | 3,420,000 | - | - | - | 3,430,000 |
| Ordinary Course Expenses | 460,000 | 120,000 | 14,830,000 | - | 120,000 | 310,000 | 15,840,000 |
| Labor Costs | 1,133,000 | 554,000 | 4,664,000 | 93,000 | 296,000 | 202,000 | 6,942,000 |
| Professional Expenses - Non-Receiver (4) | 250,000 | 240,000 | 310,000 | - | 10,000 | - | 810,000 |
| Taxes | 100,000 | 10,000 | 8,140,000 | - | 50,000 | - | 8,300,000 |
| Other | - | 110,000 | - | - | 380,000 | - | 490,000 |
| **TOTAL DISBURSEMENTS** | **2,131,000** | **1,116,000** | **69,006,000** | **93,000** | **5,615,000** | **686,000** | **78,647,000** |
| **NET CASH GENERATION / (BURN)** | **11,959,000** | **(886,000)** | **12,074,000** | **(93,000)** | **(695,000)** | **(446,000)** $ | **21,913,000** |

**(1)** - The receipts and disbursements in this analysis are cash transactions that are grouped by the entities that initiated the transaction, however, in some cases the cash transactions were executed on behalf of other Wextrust entities. The cash transactions have been categorized by type based on information contained within the books and records of the Wextrust Entities. The sources of cash receipts and disbursements data were a combination of general ledgers and bank transaction data. Not all bank accounts or general ledgers were included in this analysis; entities with no or insignificant transaction activity during the period presented may not have been included.

**(2)** - This analysis was prepared on a cash basis, therefore the timing of receipts and disbursements are different than what may be contained in accrual based financial reports. For example, receipts may not be matched to related disbursements, or vice versa. In addition, some disbursements included in this analysis had not cleared the bank as of May 31, 2012.

**(3)** - The disbursements in this analysis does not include Receivership professional expenses and distributions to investors.

**(4)** - Receivership professional expenses are not included in this analysis. The payment of Professional Expenses - Non-Receiver represent fees relating to the marketing of properties for

## V.  INVESTIGATIONS AND LITIGATION

As directed by the Receiver Order, the Receiver and his advisors are periodically required to participate in ancillary litigation that may impact receivership assets and interests. During the past six months, counsel for the Receiver continued to monitor ongoing cases in both state and federal bankruptcy courts that implicate receivership property interests, mainly through participation in the high yield loans described above. They will continue to do so, in consultation with the SEC, to preserve and protect the receivership estate's rights.

## VI.  INVESTOR COMMUNICATIONS

On April 30, 2013, the Receiver held a second "town hall" teleconference for investors to ask questions and hear directly from him. A summary of the call was posted on the receivership website, www.wextrustreceiver.com, including the questions asked and answers given. The

town hall teleconference format has received a positive response from investors. A third town hall teleconference will be scheduled for September or October.

Investor inquiries continue to be handled in the first instance by A.B. Data, which the Receiver engaged in 2010 to handle investor communications and the logistics of distributions to investors. The Receiver's counsel provides support to the A.B. Data professionals who interface directly with investors. Where A.B. Data is unable to handle a question, it is forwarded to Receiver's counsel.

In response to investor feedback after the April town hall, the Receiver implemented a system whereby interested investors can be automatically notified when the receivership website is updated. If investors wish to "opt in" and be notified, they should send an email to wextrustreceiver@abdata.com with "Opt-In" in the subject line. Last year, the Receiver established a new contact information for Wextrust investor inquiries and communications. The number is **1-800-985-4155**. The email address is: **wextrustreceiver@abdata.com**.

## VII.　CONCLUSION

The receivership estate has approximately $20 million cash and the Receiver is optimistic that by the end of the case the estate will have as much as $25 to $30 million for distribution to investors and for payment of administrative expenses. The Receiver is seeking to wind up all, or substantially all, property operations by the end of the year. As before, the Receiver continues to carry out the directives of the Receiver Order by managing the receivership estate, liquidating the real estate assets for the greatest return possible, and accomplishing further distributions to victims. The Receiver will continue to report on the financial condition of the receivership estate on a periodic basis, and will continue to take steps to inform investors and other interested parties of significant developments.

\* \* \*

Dated: Washington, DC
August 11, 2013

                              Respectfully submitted,

                              Timothy J. Coleman
                              Receiver for Wextrust Entities

                              <u>s/ Jonathan W. Ware</u>
                              Jonathan W. Ware, *pro hac vice*
                              Mia L. Havel, *pro hac vice*
                              FRESHFIELDS BRUCKHAUS DERINGER US LLP
                              701 Pennsylvania Avenue, NW
                              Washington, DC 20004
                              Tel. (202) 777-4500

                              *Attorneys for Receiver*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on **August 11, 2013** I directed the service of a true and correct copy of the foregoing **THIRTEENTH INTERIM REPORT OF RECEIVER** upon the following individuals in the manner indicated below:

**Via First Class Mail**
Joseph Shereshevsky, Registry No. 35857-054
c/o FCI Fort Dix
Federal Correctional Institution
P.O. Box 2000
Fort Dix, NJ  08640
Pro Se Defendant

**Via ECF Notification & Electronic Mail**
Alexander M. Vasilescu, Esq.
Andrew M. Calamari, Esq.
Steven G. Rawlings, Esq.
Alistaire Bambach, Esq.
Neal R. Jacobson, Esq.
Philip Moustakis, Esq.
Danielle Sallah, Esq.
Attorneys for Plaintiff SEC

**Via ECF Notification & Electronic Mail**
Barry S. Zone, Esq.
Attorney for Defendant Steven Byers

**Via ECF Notification & Electronic Mail**
Michael Fred Bachner, Esq.
Attorney for Relief Defendant Elka Shereshevsky

**Via ECF Notification & Electronic Mail**
Philip A. Byler, Esq.
Andrew T. Miltenberg, Esq.
Ira S. Nesenoff, Esq.
James B. Daniels, Esq.
Attorneys for non-party Broadway Bank

**Via ECF Notification & Electronic Mail**
Shalom Jacob, Esq.
Shmuel Vasser, Esq.
Attorneys for non-party Int'l Ad-Hoc Committee of Wextrust Creditors

**Via ECF Notification & Electronic Mail**
Paul A. Levine, Esq.
Attorney for non-party Key Equipment Finance, Inc.

**Via ECF Notification & Electronic Mail**
Beth L. Kaufman, Esq.
Attorneys for non-party Lawrence Costa

**Via ECF Notification & Electronic Mail**
Harris Kay, Esq.
Marc X. LoPresti, Esq.
Attorneys for various non-party investors

**Via ECF Notification & Electronic Mail**
Edward P. Gilbert, Esq.
Attorney for non-party RAIT Partnership

**Via ECF Notification & Electronic Mail**
Francesca Morris, Esq.
Attorney for non-parties Ticor Title Insurance Co. and Heritage Community Bank

**Via ECF Notification & Electronic Mail**
John M. Bradham, Esq.
Peter B. Katzman, Esq.
Attorneys for non-parties Space Park AIM and ISSB Partnerships

**Via ECF Notification & Electronic Mail**
Alan E. Marder, Esq.
Attorney for non-parties Nashville Warehouse Partners and Southeast Warehouse Partners

**Via ECF Notification & Electronic Mail**
Edward F. Malone, Esq.
George R. Mesires, Esq.
Attorneys for non-parties Barrington and Hinsdale Banks

| | |
|---|---|
| **Via ECF Notification & Electronic Mail**<br>Louis Orbach, Esq.<br>Charles J. Sullivan, Esq.<br>Attorneys for non-party TCF National Bank | **Via ECF Notification & Electronic Mail**<br>Susan F. Balaschak, Esq.<br>Keith N. Costa, Esq.<br>John H. Rowland, Esq.<br>Attorneys for non-party Regions Bank |
| **Via ECF Notification & Electronic Mail**<br>Elizabeth P. Gray, Esq.<br>Attorney for non-party Gerald Jaffe | **Via ECF Notification & Electronic Mail**<br>Emily S. Alexander, Esq.<br>Attorney for non-party Martin Malek |
| **Via ECF Notification & Electronic Mail**<br>John P. Doherty, Esq.<br>Attorney for non-party Wells Fargo Bank N.A. | **Via ECF Notification & Electronic Mail**<br>David B. Grantz, Esq.<br>Scott T. McCleary, Esq.<br>Attorneys for non-party Bank of America |
| **Via ECF Notification & Electronic Mail**<br>Jeffrey L. Schwartz, Esq.<br>John P. Amato, Esq.<br>Stephen W. Ragland, Esq.<br>Clarence A. Wilbon, Esq.<br>Attorneys for non-party First Tennessee Bank National Association | **Via ECF Notification & Electronic Mail**<br>Michael I. Silverstein, Esq.<br>Gerard P. Brady, Esq.<br>Attorneys for non-party Erin Construction & Development Co., Inc. |
| **Via ECF Notification & Electronic Mail**<br>Martin Siegel, Esq.<br>Attorney for non-party Int'l Consortium of Wextrust Creditors | **Via ECF Notification & Electronic Mail**<br>Alexander S. Lorenzo, Esq.<br>Attorney for non-party LNR Partners, Inc. |
| **Via ECF Notification & Electronic Mail**<br>Gustav P. Rech, Esq.<br>Attorney for non-party Jerry B. Klein, C.P.A. & Associates | **Via ECF Notification & Electronic Mail**<br>Carletta F. Higginson, Esq.<br>Howard S. Suskin, Esq.<br>Kristen E. Hudson, Esq.<br>Paula E. Litt, Esq.<br>Stephen L. Ascher, Esq.<br>Attorneys for non-party Much Shelist Denenberg Ament & Rubinstein, P.C. |
| **Via ECF Notification & Electronic Mail**<br>Brett David Goodman, Esq.<br>Attorney for non-parties Peck-Clarksville, LLC and B. David Peck | s/ Jonathan W. Ware<br>Jonathan W. Ware, Esq. |