UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
                                                           :
SECURITIES AND EXCHANGE COMMISSION,   :   Civil Action No. 08-CV-07104(DC)
                                                           :
          Plaintiff,                                :
                                                           :
     -against-                                     :
                                                           :
STEVEN BYERS, JOSEPH SHERESHEVSKY,    :
WEXTRUST CAPITAL, LLC, WEXTRUST EQUITY :
PARTNERS, LLC, WEXTRUST DEVELOPMENT    :
GROUP, LLC, WEXTRUST SECURITIES, LLC and :
AXELA HOSPITALITY, LLC,                                     :

          Defendants,

     -and-

ELKA SHERESHEVSKY,

          Relief Defendant.

-----------------------------------------------------------X

## MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR
## RETURN OF SECURED COLLATERAL FUNDS
## IMPROPERLY SENT TO THE RECEIVER

Between November 2011 and January 2012, premised on a mistake of fact, three wire transfers of funds belonging to U.S. Bank National Association, as Trustee, for the Registered Holders of Credit Suisse First Boston Mortgage Securities Corp., Commercial Mortgage Trust Pass-Through Certificates, Series 2007-C3 (the "Successor Lender") were sent to the Receiver. When wired, the funds (totaling over $582,000) were collateral for a loan related to a Wextrust commercial property and subject to a perfected first priority security interest in favor of Successor Lender. Because perfection of a security interest cannot be vitiated by a mistake, Successor Lender respectfully moves that the Receiver be ordered to return the funds.

## BACKGROUND

The funds that were wired to the Receiver came from a Cash Management Account that served as a source of collateral for a loan used to finance certain Wextrust commercial property. Successor Lender's security interest in the funds in that account is, and has always been, perfected by dominion and control over it, as detailed below.

**The Terms of the Loan and The Lender's Collateral**

On or about June 7, 2007, S. Pine Street Holdings, LLC ("Borrower"), a Wextrust single purpose entity, borrowed from Column Financial Inc. ("Lender") the principal amount of $8,500,000 (the "Loan"), secured in part by the Pinecrest Shopping Center located in Racine County, Wisconsin, (the "Property").[1] Subsequently, the Loan was securitized and all the rights, title and interests of the Lender pursuant to the Loan and related documents (collectively, the "Loan Documents") were assigned to the Successor Lender, which now stands in the shoes of the Lender. Upon securitization of the Loan, Wells Fargo Commercial Mortgage Servicing was appointed as the "Master Servicer" for the Loan with responsibilities including collecting monthly Loan payments, ensuring timely payment of real estate taxes and monitoring the performance of the loan. In the Event of Default (as defined in the Mortgage), the Master Servicer was to send the Loan to the "Special Servicer," which then would take responsibility for contacting the Borrower and resolving the default, including pursuing remedies available to the Lender (and now, its successor) under the Loan Documents. C-III Asset Management LLC is now the Special Servicer for the Loan.

---

[1] On December 6, 2013, this Court granted the Receiver's request to transfer, for $10,000, the membership interest of the Wextrust entity in whose shoes he stands to an affiliate of a mezzanine lender involved in the Property's financing. The Receiver has not sought approval to transfer or distribute the funds that are the subject of this Motion, however, and their disposition therefore remains a live issue before this Court.

As a pre-condition for the Loan, the Borrower and the Lender, together with MLG Management LLC ("Manager") and a mezzanine lender, (collectively, the "Parties") entered into a Cash Management Agreement (the "Agreement," attached as Exhibit 1).  The Agreement provides that revenue from the Property would be deposited into a Lock Box Account held under the sole dominion and control of the Lender (Agreement, § 2(a)), and that funds from the Lock Box Account would be swept weekly into a Cash Management Account.  (Agreement § 3(b).)

The Borrower granted the Lender and its successor a continuing perfected first priority security interest in and to:  (1) the Cash Management Account (and its sub-accounts); (2) the Lock Box Account; (3) all cash, property or rights transferred to or deposited in those accounts, as well as the proceeds from them; and (4) all earnings, investments and securities held in the Cash Management Account.  (Agreement, § 6(b).)  The Cash Management Account was and is "*subject to the sole dominion, control and discretion*" of the Successor Lender.  (Agreement § 3(g) (emphasis added).)  Any additional funds deposited into the Cash Management Account are likewise subject to the same control.  (Agreement, § 6(c).)  As the attached Declaration of Sean D. Reilly reflects, the Master Servicer is the customer of Wachovia (the depository institution) with respect to the Cash Management Account and all its sub-accounts.  (Exhibit 2, Declaration of Sean D. Reilly at ¶ 7; *see also* N.Y. U.C.C. LAW § 9-104(a)(3) (McKinney 2001) ("A secured party has control of a deposit account if . . . the secured customer becomes the bank's customer with respect to the deposit account.")

The Agreement establishes waterfall procedures to allocate and disburse funds deposited into the Cash Management Account and its various sub-accounts; the final sub-account funded is the Borrower Remainder Sub-Account.  Once an Event of Default occurs, the Successor Lender has the right to apply any or all funds held in the Cash Management Account (including funds

held in the Borrower Remainder Sub-Account) to the outstanding Loan obligations that the Borrower owes to the Lender "in any order and in such manner as the [Successor] Lender may determine in its sole discretion." (Agreement, §§ 4(c)(vii), 7(b).)

The appointment of the Receiver constituted an Event of Default under the terms of the Loan Documents (Mortgage, § 2.1(i) ("Event of Default" defined therein to include where "an order, judgment or decree is entered appointing, with or without the consent of Borrower….a receiver … for Borrower …or for any substantial part of any of the properties of Borrower….")), which authorized the Successor Lender to exercise the rights and remedies available in an Event of Default including, without limitation, the right to disburse the funds in the Cash Management Account at Successor Lender's sole discretion. (Agreement, §§ 4(c)(vii), 7(b).)

**This Court's Orders**

This Court's Amended Order Appointing Temporary Receiver, entered on September 11, 2008 ("Order Appointing Receiver"), instructs that "all banks, dealers, depositories and any other business entities having possession, custody or control of any assets, funds, or accounts *in the name of or for the benefit of any Wextrust Entities or entities they own or control* shall cooperate expeditiously in the transfer of funds, other assets, and accounts to the Receiver or at the direction of the Receiver." (Order Appointing Receiver, pp. 8-9) (emphasis added.) Similarly, the Order on Consent Imposing Preliminary Injunction and Other Relief Against the Defendants and Relief Defendant ("Preliminary Injunction Order"), entered on October 24, 2008, enjoined defendants and various non-parties to "hold and retain within their control, and otherwise prevent, any withdrawal, transfer, pledge, encumbrance, assignment, dissipation, concealment or other disposal of any assets, funds or other *property […] of, held by, or under the direct or indirect control of the Defendants and Relief Defendant*…." (Preliminary Injunction

Order, p. 4) (emphasis added.)  These Orders do *not* direct that property held as collateral for a previously executed loan be transferred, and certainly do not hold that property subject to a perfected first priority security interest be distributed by the Receiver.

**Letter Agreement between Special Servicer and Receiver**

After the Receiver was appointed, the Master Servicer held funds generated from the Property rather than disbursing them to pay accruing Property expenses.  Without access to those funds to operate and maintain the Property, tenants likely would have vacated, further reducing the value of the Property.

By letter agreement dated December 30, 2008 (the "Letter Agreement," attached as Exhibit 3), the Receiver and the then-special servicer LNR ("LNR") agreed that funds in the Lock Box Account would be used, consistent with the Loan Documents, to:  (1) pay debt-service amounts owing Successor Lender and the mezzanine lender, under their respective loans; (2) fund any reserves due and owing in accordance with the Loan Documents, excluding late charges and default interest; and (3) pay budgeted operating expenses.  The Letter Agreement further provided that the balance of the funds held in the Lock Box Account were to be disbursed and applied "*in accordance with ordinary course practice and the terms of the Loan Documents*." (Letter Agreement, p. 2.) (emphasis added.)

The Letter Agreement did not reference an Event of Default under the Loan Documents.  Consequently, Successor Lender (through its agent, LNR) did not waive the already-existing Event of Default, and remained authorized to control the Borrower Remainder Sub-Account as expressly provided in the Agreement.  Consistent with the Letter Agreement and the terms of the Agreement, no special servicer representing Successor Lender – either LNR or C-III – has ever distributed Borrower Remainder Sub-Account funds to the Receiver.

**Reservation of Rights Letter Dated August 11, 2011 from LNR to Borrower**

As dictated by both the Agreement and the Letter Agreement, and consistent with the Parties' understanding that the Loan remained in default, all funds deposited into the Borrower Remainder Sub-Account remained under the Successor Lender's dominion and control for nearly three years thereafter. On August 11, 2011, LNR wrote to notify the Borrower that the Loan remained in default and that LNR demanded strict compliance with the Loan Documents (the "Reservation of Rights Letter," attached as Exhibit 4). The Reservation of Rights Letter informed the Borrower that it was returning the Loan servicing to the Master Servicer, but also made clear that Successor Lender "reserved the right to pursue the Default by virtue of the failure to pay all amounts when due *or for any other reason as set forth in the Loan Documents*." (Reservation of Rights Letter, p. 1) (emphasis added.)

Importantly, over the 30 months from when the Letter Agreement was executed through the time that the Reservation of Rights Letter was sent, all funds accumulating in the Borrower Remainder Sub-Account were held by the Successor Lender, and none of those funds were sent to the Receiver.

Shortly after the Reservation of Rights Letter was sent, in September 2011, the Master Servicer resumed servicing the Loan. Between November 2011 and January 2012, the funds in the Borrower Remainder Sub-Account were wired to the Receiver in three increments despite the Successor Lender's perfected security interest. First, on November 2, 2011, NAI MLG Management LLC, the "Successor Manager" of the Property, wired the Receiver $476,635.08 that the Master Servicer previously had wired to the Successor Manager from the Borrower Remainder Sub-Account. Second, on November 14, 2011, the Master Servicer wired another $25,133.25 from the Borrower Remainder Sub-Account directly to the Receiver. And third, on

January 20, 2012, the Master Servicer wired $80,239.92 from the Borrower Remainder Sub-Account to the Receiver.  Collectively, the Successor Manager and the Master Servicer wired the Receiver $582,008.25 that (pursuant to the Agreement and the Letter Agreement) had been held by the Successor Lender as its cash collateral.

## ARGUMENT

**The Successor Lender's Security Interest Was Perfected.**

The Successor Lender's security interest over the Cash Management Account, including the Borrower Remainder Sub-Account, was perfected pursuant to N.Y. U.C.C. LAW § 9-104(a)(3) (McKinney 2001) [2] because the Successor Lender was the customer of the institution where those funds were deposited.  (Exhibit 2, Declaration of Sean D. Reilly at ¶ 3; *see also* N.Y. U.C.C. LAW § 9-104(a)(3) (McKinney 2001))

Through this heightened level of control, the Borrower Remainder Sub-Account constituted collateral property, like real estate subject to a mortgage.  Hundreds of properties were pledged by various Wextrust Entities.  Yet, this Court has not construed the Preliminary Injunction Order or the Order Appointing Receiver to require that mortgagees release their secured interests following an event of default; to do so would defy common sense.  Similarly, this Court's Orders cannot require the Successor Lender to turn over the Borrower Remainder Sub-Account funds to the Receiver – following an event of default, those funds are subject to the same perfected security interest as mortgaged real estate.

---

[2] "The duties of a receiver with regard to the manner in which he is to conduct the administration are determined by the local law of the state of his appointment." RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 371 (1971); *see also Fleeger v. Clarkson Co. Ltd.*, 86 F.R.D. 388 (N.D. Tex. 1980) (applying the law of the appointing jurisdiction to a suit brought against the receiver).  Furthermore, "[t]he manner in which a claim may be proved in a state is determined by the local law of that state." RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 398 (1971).

Perfection provides the key factual distinction from an attempt earlier in this proceeding by TCF National Bank to recover what it had termed to be its "Cash Collateral." (*See* Order dated December 3, 2009 (the "Dispute Order") (Dkt. No. 579), at pp. 19-21.) TCF's submission to this Court reveals that the funds at issue there had been held and controlled not by TCF, the lender, but by Peoria Office Holdings, LLC ("POH"), the single-purpose entity that was TCF's debtor. (*See* September 23, 2009, Reply of TCF National Bank to Receiver's Response dated September 14, 2009 to the Court's Order of August 19, 2009 Outlining Active Claims Disputes Related to the Plan of Distribution ("TCF's Reply") at page 5, ¶ 15 ("POH *also holds, and continues to receive, Cash Collateral . . ..*").)

The Dispute Order is not binding and does not operate as the "law of the case" against Successor Lender.[3] More importantly, though, the facts here differ from those involving TCF. While TCF asserted that its security interest in "Cash Collateral" was perfected (*see* TCF Reply at page 3, ¶ 6), clearly it was not because the funds were held by the borrower, not by TCF. Not so as to the Borrower Remainder Sub-Account funds at issue here. As a sub-account to the Cash Management Account, the Successor Lender maintained full dominion and control over those funds while they were on deposit, which perfected the security interest. N.Y. U.C.C. LAW § 9-104(a)(3) (McKinney 2001)

---

[3] Under New York law, "parties or their privies are 'preclude[d from] relitigating an issue decided in an ongoing action where there previously was a full and fair opportunity to address the issue." *Briggs v. Chapman*, 53 A.3d 900, 901 (N.Y. 2008). Additionally, "[p]rivity is established when 'the connection between the parties [is] such that the interests of the nonparty can be said to have been represented." *Id.* (internal citations omitted). The law of the case doctrine normally applies to motions (*Fourth Federal Savings Bank v. Nationwide Assoc. Inc.*, 183 Misc.2d 165, 169 (N.Y. 1999)), but not where, as here, the motions are significantly different in terms of procedural posture or evidentiary burdens. *See Feinberg v. Boros*, 99 A.D.3d 219, 224. The Parties here are not in privity with TCF, and the Successor Lender did not have a full and fair opportunity to address this issue with the Court before the Master Servicer and Successor Manager mistakenly turned over the Borrower Remainder Sub-Account funds to the Receiver.

And it is this perfection that draws the determinative distinction here. TCF effectively asked to "clawback" funds that POH always had possessed. Conversely, the Successor Lender held the accumulating Borrower Remainder Sub-Account funds until they were mistakenly wired to the Receiver. Because this is undeniably true, the Successor Lender cannot credibly be characterized as "attempt[ing] to make an end-run around the Court's injunction" or to "unfairly maximize [it's] recovery at the expense of others." *Cf.* Dispute Order at 21. Rather than seeking to pursue a deficiency claim, the Successor Lender seeks only to assert its contractually-granted rights over its secured collateral.

**Mistake Does Not Vitiate Perfection Under New York Law.**

The question, then, is whether the mistake of wiring the Borrower Remainder Sub-Account funds to the Receiver during the existence of an Event of Default destroys the Successor Lender's perfection of its security interest. It does not. Indeed, the Uniform Commercial Code, as adopted in New York, expressly recognizes that "[u]nless displaced by the particular provisions of this Act, the principles of law and equity, including . . . the law relative to . . . mistake . . . shall supplement its provisions." N.Y. U.C.C. LAW § 1-103 (McKinney 2001).

Under New York law, "[t]he principle that a party who pays money, under a mistake of fact, to one who is not entitled to it should, in equity and good conscience, be permitted to recover it back is long standing and well recognized" *Manufacturers Hanover Trust Co. v. Chemical Bank*, 160 A.D.2d 113, 117 (N.Y. App. Div. (1990)) (citing *Ball v. Shepard*, 202 N.Y. 247, 253 (1911)). This rule applies even if the mistake is due to the negligence of the payor. *Id*. (citing *Manufacturers Trust Co. v. Diamond*, 17 Misc.2d 909, (N.Y. App. Term. 1959).

In the Reservation of Rights Letter, LNR informed the Borrower that the Loan was in default "by virtue of the failure to pay all amounts when due *or for any other reason as set forth*

9

*in the Loan Documents*." (Emphasis added.) Though the Reservation of Rights Letter did not expressly identify the appointment of the Receiver as a default under the Loan Documents, it did indicate that the Successor Lender had reserved its rights to pursue remedies for "any other reason as set forth in the Loan Documents."

To characterize the wiring of the Borrower Remainder Sub-Account funds as a waiver would ignore that the act was predicated on a mistake. "Waiver requires the voluntary and intentional abandonment of a known right which, but for the waiver, would have been enforceable." *General Motors Acceptance Corp. v. Clifton-Fine Cent. School Dist.*, 85 N.Y.2d 232, 36 (1995). The wiring of the Borrower Remainder Sub-Account proceeds was a mistake, not a manifestation of intent to pay those funds to the Receiver.

Of course, mistakes of fact may be related to issues with legal significance. In *Island Federal Credit Union v. Smith*, 60 A.D.3d 730 (N.Y. App. Div. 2009), a credit union sought to recover funds that it paid Gerald J. Smith, the son of the deceased Gerald K. Smith. The son had been the representative of an estate account. The credit union was under the mistaken belief that the estate account was in fact a joint account with a right of survivorship of which the father was a joint tenant. *Id*. at 732-33. But under New York law, an estate cannot create a joint tenancy with a natural person. *Id*. Based on a misunderstanding of the legal status of the account, the credit union paid the account proceeds to the son, believing that, as the executor and a distributee of his father's estate, the son was entitled to the account assets. *Id*. The New York Supreme Court granted the son's motion for summary judgment, finding no evidence that the credit union made a mistake of fact when it made its payment. *Island Federal Credit Union v. Smith*, 2007 WL 4162540. The Appellate Division of the New York Supreme Court reversed, finding that the credit union's mistake of the type of account was a "mistake of fact" that could allow the

credit union to recover the funds it paid. *See Island Federal Credit Union v. Smith*, 60 A.D.3d at 733.[4]

Likewise, wiring funds to the Receiver from the Borrower Remainder Sub-Account reflects a mistaken understanding of the continuing Event of Default. As discussed above, under the Agreement, the appointment of the Receiver constituted an Event of Default and entitled the Successor Lender, acting through the Master Servicer, to have applied the Wire Transfer Funds to the obligations owing to it under the Loan. The Successor Lender, in the Reservation of Rights Letter sent in August 2011, affirmed its intent to act consistently with all rights granted by the Agreement and to waive nothing. The Wire Transfer Funds should not have been wired to the Receiver or to the Successor Manager (which, in turn, promptly wired the $476.635.08 to the Receiver) because the Borrower had no right to the Wire Transfer Funds by virtue of the existing Event of Default.

**The Receiver Has Not Distributed The Borrower Remainder Funds.**

Money paid by mistake may not be recovered if the payee has detrimentally relied on the payment. *See Bank of New York v. Spiro*, 267 A.D.2d 339, 340 (N.Y. App. Div. 1999). Here, the Receiver has retained the funds wired from the Borrower Remainder Sub-Account, and so there can be no argument that any detrimental reliance would overcome the operation of New York law regarding wire transfers made on behalf of the Successor Lender by mistake.

In this regard, the Receiver has acted consistently with his duty to *all* the victims of Defendant's misdeeds: "[a] receiver, as 'an officer or arm of the court,' is a trustee with the

---

[4] Moreover, even if wiring the funds to the Receiver were somehow characterized as a mistake of law rather than one of fact, New York statutory law makes clear that "[w]hen relief against a mistake is sought in an action or by way of a defense or counterclaim, relief shall not be denied merely because the mistake is one of law rather than one of fact." N.Y. C.P.L.R. 3005 (McKinney 2001).

highest kind of fiduciary obligations.  *He owes a duty of strict impartiality, of 'undivided loyalty,' to [all] persons interested in the receivership estate*, and must not 'dilute' that loyalty.  He is 'bound to act fairly and openly with respect to every aspect of the proceedings before the court.'"  *Phelan v. Middle States Oil Corp.*, 154 F.2d 978, 991 (2d Cir. 1946), cited with approval in *Golden Pac. Bancorp v. F.D.I.C.*, 375 F.3d 196, 201 (2d Cir. 2004) (emphasis added).  And the Receiver recognizes that secured creditors have been victimized by the wrongdoing of the Defendants.  (*See, e.g.,* Thirteenth Interim Report of Receiver, filed August 11, 2013, at p. 3 ("Since the start of the receivership, the Receiver has sold 20 properties, resulting in $68.8 million in gross proceeds.  From those sales, $55.1 million were used to repay *secured creditor victims* of the Wextrust fraud.") (emphasis added).

**The First Interim Distribution Was Made While The Successor Lender Held The Borrower Remainder Sub-Account Funds.**

Finally, when the Receiver made the first interim distribution of approximately $5 million in December 2010, the funds in the Borrower Remainder Sub-Account were under the Successor Lender's full dominion and control; those funds had accumulated, without distribution, ever since the Letter Agreement was signed in December 2008.  Consistent with both that Letter Agreement and the Cash Management Agreement signed when the loan was made in June 2007, the Successor Lender maintained sole control over the Borrower Remainder Sub-Account and the Receiver never had possession of those funds until they were mistakenly wired by the Master Servicer in late 2011 and early 2012.  The Receiver cannot credibly claim some right to the Successor Lender's cash collateral now, years after it made its first distribution, when the only changed circumstance since the first distribution is the mistaken wiring of those funds.

**CONCLUSION**

The Successor Lender seeks only the deal for which it bargained, and the security that was required to lend $8,500,000 to a single-purpose entity controlled by the Defendants. Because its mistake cannot override its perfected security interest, Successor Lender respectfully moves that the Borrower Remainder Sub-Account funds be returned, and for whatever other relief the Court deems appropriate.

Dated:   February 28, 2014

DYKEMA GOSSETT PLLC

By:   s/ Edward S. Weil
Edward S. Weil (Admitted *pro hac vice*)
Todd Gale (Admitted *pro hac vice*)
Karen L. Courtheoux
DYKEMA GOSSETT PLLC
10 South Wacker Drive, Suite 2300
Chicago, Illinois 60606
Tel:   (312) 876-1700
Fax:   (312) 627-2302
Email: eweil@dykema.com

Attorneys for U.S. BANK NATIONAL ASSOCIATION, AS TRUSTEE FOR THE REGISTERED HOLDERS OF CREDIT SUISSE FIRST BOSTON MORTGAGE SECURITIES CORP., COMMERCIAL MORTGAGE TRUST PASS-THROUGH CERTIFICATES, SERIES 2007-C3, by C-III Asset Management LLC, as Special Servicer