UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - -x

SECURITIES AND EXCHANGE COMMISSION :

                    Plaintiff,        :

        - against -                   :        OPINION

STEVEN BYERS et al.,                  :        08 Civ. 7104 (DC)

                    Defendants.       :

- - - - - - - - - - - - - - - - - -x

```
┌─────────────────────────────────┐
│ USDC SDNY                        │
│ DOCUMENT                         │
│ ELECTRONICALLY FILED             │
│ DOC #:_____             │
│ DATE FILED: 12-22-2014           │
└─────────────────────────────────┘
```

**APPEARANCES:**        (See last page)


CHIN, Circuit Judge:

        In this securities fraud case, Regions Bank
("Regions") seeks turnover of "excess cash" generated by
properties owned by Tennessee Office Holdings, LLC ("TOH")
pursuant to the terms of an agreement executed by the court-
appointed receiver Timothy J. Coleman (the "Receiver") and
Regions on March 18, 2014.  Additionally, Regions requests that
the Receiver pay the amounts due for the 2013 property taxes,
which were assessed for a time period when the properties were
under the Receivership's control.  Finally, Regions requests
reimbursement of their attorneys' fees in pursuing this matter.

I conducted an evidentiary hearing on October 6, 2014, at the conclusion of which I reserved decision. (Tr. 105).[1] For the reasons that follow, Regions' requests for the turnover of excess cash and payment of 2013 property taxes is **GRANTED** to the extent set forth below, and its request for attorneys' fees is **DENIED**. The following constitute my findings of fact and conclusions of law.

BACKGROUND[2]

1.  **The Receivership**

On August 11, 2008, the Securities and Exchange Commission ("SEC") brought this action against Steven Byers, Joseph Shereshevsky, and Wextrust affiliated entities, seeking, inter alia, the appointment of a receiver to exercise control over the assets and property interests of Wextrust, including those of TOH. (Stip. ¶ 9). This Court entered its order appointing the Receiver on September 11, 2008. (Id. ¶ 10).

---

[1]    References are as follows: "Tr." refers to the transcript of the hearing on October 6, 2014; "Stip." refers to the parties Joint Stipulated Facts; "RX" refers to exhibits offered by Regions and received into evidence at the hearing; "Phipps Dep." refers to the deposition transcript of Aaron Phipps, received as RX 1; and "Coleman Dep." refers to the deposition transcript of Timothy J. Coleman, received as RX 2.

[2]    Familiarity with the facts and procedural history of this case is assumed. For further recitations of the facts of this case, see the Court's prior decisions: SEC v. Byers, 637 F. Supp. 2d 166 (S.D.N.Y. 2009) aff'd sub nom. SEC v. Malek, 397 F. App'x 711 (2d Cir. 2010) and aff'd sub nom. SEC v. Orgel, 407 F. App'x 504 (2d Cir. 2010); SEC v. Byers, 592 F. Supp. 2d 532 (S.D.N.Y. 2008), aff'd, 609 F.3d 87 (2d Cir. 2010); SEC v. Byers, 590 F. Supp. 2d 637 (S.D.N.Y. 2008); SEC v. Byers, No. 08 Civ. 7104 (DC), 2008 WL 5102017 (S.D.N.Y. Nov. 25, 2008).

As part of his duties, the Receiver and his advisors reviewed, verified, and recognized the claims of more than 1,200 investors, 100 unsecured creditors, and numerous secured creditors, including Regions, as having claims related to the assets under his control. (Id. ¶ 12). The combined claims totaled approximately $525 million and the mortgaged debt held by secured creditors was approximately $285 million. (Id. ¶ 13).

On March 27, 2009, the Receiver submitted his Proposed Plan of Distribution, Dkt. No. 243, and the Court later approved it. (Dkt. No. 428 (the "Distribution Opinion")). The Court limited secured creditors to "recourse against specific collateral" and secured creditors were only to receive payment from the "proceeds of that collateral." (Distribution Opinion at 8). The Court also limited the possibility of a deficiency specifically to "the property-specific limited liability holding company," which in effect meant "the Plan proposes that the deficiency claims [of secured creditors] be excluded entirely from the distribution." (Id. at 13). The Court approved this approach in the Distribution Opinion in the face of objections from various parties. (Id. at 38). For secured creditors like Regions, this meant that certain recourse loans became non-recourse. (Stip. ¶ 16).

-3-

2.   <u>The TOH and Regions Properties</u>

Regions was and remains a secured creditor in relation to certain real property assets of the Wextrust entities. (<u>Id.</u> ¶ 15). At the start of the case, Regions was owed more than $70 million as a result of loans made to Wextrust affiliates to secure two hotels, two industrial buildings, two warehouses, 13 office buildings, and an office condominium development (the "Regions Properties"). (<u>Id.</u> ¶ 15).

On June 30, 2006, TOH financed 13 commercial properties (the "TOH Properties") located across 12 counties in Tennessee through an original promissory note (the "2006 Note") in the amount of $14,800,000.00 securing a loan made by Regions. (<u>Id.</u> ¶ 2; Tr. 9). As of October 2, 2014, TOH still owed Regions principal of approximately $12,776,735.26. (<u>Id.</u> ¶ 3; <u>see</u> Tr. 29: approximately $12,777,000 as of date of hearing)).

TOH still owns the TOH Properties. (Stip. ¶ 4; Tr. 9). Prior to the start of this case in August 2008, TOH leased 12 of the TOH Properties to various divisions of the State of Tennessee. (Stip. ¶ 5). None of the leases was terminated during the receivership and most remain in effect subject to holdover agreements. (<u>Id.</u>). One of the TOH Properties was damaged by fire and the State has stopped paying rent on it, and another of the TOH Properties is vacant. (<u>Id.</u>; Tr. 10-11). One lease (Cookeville) was renewed contingent on certain

-4-

improvements to be made by the landlord; these improvements have
not been made and thus the increased rent has not taken effect.
(Stip. ¶ 6; Tr. 13-14, 22-23, 31).

The Cookeville Lease also provides that the "Landlord
shall be responsible for payment of all real estate taxes
assessed against the Building or land on which the Building is
located, as well as all applicable local, state and federal
income taxes which are or may be payable by Landlord." (Stip.
¶ 7). The property tax provision contained in the Cookeville
Lease is consistent with the tax provisions in the balance of
the leases. (Id. ¶ 8). Under the leases, TOH, as landlord, was
responsible for payment of real estate and related taxes
assessed against the individual properties. (Id.).

The Regions Properties, including the TOH Properties,
have been subject to the preliminary injunction entered in this
case on October 24, 2008. (Id. ¶ 17, citing Dkt. No. 65). The
preliminary injunction is incorporated into the Court's Receiver
Order, which provided "that no person or entity, including any
creditor or claimant against any of the Defendants, or any
person acting on behalf of such creditor or claimant, shall take
any action to interfere with the taking control, possession, or
management of the assets, including, but not limited to, the
filing of any lawsuits, liens or encumbrances, or bankruptcy
cases to impact the property and assets subject to this order."

-5-

(Receiver Order at 6).  The Receiver Order did not specify an end time.  (Id. ¶ 17).

The Receiver no longer controls any of the Regions Properties.  (Id. ¶ 18).  Each of the Regions Properties has been sold at an amount satisfying the debt to Regions, relinquished to Regions and sold for an amount below the secured debt, or, in the case of the TOH Properties, the Court lifted its anti-litigation injunction to permit Regions to have a state court receiver appointed to oversee the management and sale of the properties.  (Id.).

3.   **The Receiver's Agreements with Regions**

On June 30, 2011, Regions and the Receiver entered into an Amended and Restated Promissory Note (the "2011 Note") that amended and superseded the 2006 Note.  (Id. ¶ 20; RX 16). The 2011 Note matured on June 30, 2013.  (Id.).  The obligations under the 2011 Note remained secured by individual Deeds of Trust with respect to each of the TOH Properties (the "Deeds of Trust").  (Id. ¶ 21).  Each of the Deeds of Trust included a provision requiring the Borrower -- TOH -- to satisfy all property taxes assessed against each individual TOH Property. (Id.).  The Deeds of Trust specified that failure to pay such taxes is an event of default under the Deeds of Trust.  (Id.). The 2011 Note specified that a default under the Deeds of Trust constituted a default under the 2011 Note.  (Id.).

-6-

On April 15, 2013, Regions and the Receiver entered
into a Forbearance Agreement (the "2013 Agreement") in advance
of the expiration of the 2011 Note.  (Id. ¶ 22; RX 5).  Regions
contended that the borrowers under the 2011 Note were in
default, but they agreed to forbear from pursuing their remedies
to give the Receiver an opportunity to sell the properties.  (RX
5 at 2; see Coleman Dep. at 12-13).  By December 31, 2013, the
Receiver had not completed a sale of any of the TOH Properties.
(Stip. ¶ 23; see Coleman Dep. at 11-12).

In January 2014, as a consequence of the delay,
Regions submitted a letter to the Court requesting a conference
to discuss filing a motion to seek relief with respect to the
alleged breach of the 2013 Agreement.  (Id. ¶ 24; RX 22).  The
Receiver advised the Court that there was a possibility that at
least two of the TOH Properties would be sold in the near future
at amounts that would satisfy those properties' pro rata share
of the 2011 Note obligations.  (Stip. ¶ 24).  The Court
encouraged the parties to reach an accord that might permit the
sale of these properties.  (Id.).

On March 18, 2014, Regions and the Receiver entered
into an agreement (the "2014 Agreement") modifying the terms and
conditions of the 2013 Agreement.  (Id. ¶ 25; RX 4).  Regions
again agreed to refrain from pursuing relief for what it
contended was a breach of the 2013 Agreement, in return for

-7-

certain promises made by the Receiver.  The 2014 Agreement
provided that "[w]ithin three business days of filing a
motion(s) with the Court to confirm the sale of any of the TOH
properties, the Receiver shall send to [Regions] the excess
cash, if any, for the period January 1, 2014 through February
28, 2014, generated from those properties owned by TOH, along
with an accounting for all TOH properties for that period."  (RX
4, at ¶ 4).  It further provided that: "On or before the 15th
day of each month thereafter, the Receiver shall send [Regions]
the excess cash generated by the TOH properties until such time
as all sales have closed or [Regions] has assumed control of the
balance of the TOH properties."  (Id.).

4.   **The Receiver Relinquishes the TOH Properties**

On April 4, 2014, the Receiver asked the Court to
approve the sale of two TOH Properties, 3711 Middlebrook Pike in
Knoxville, Tennessee and 1300 Salem Road in Cookeville,
Tennessee.  (Stip. ¶ 27).  Simultaneously, the Receiver asked
the Court for limited relief from the litigation stay relating
to the Receivership's interest in the remaining 11 TOH
Properties.  (Id.; RX 12).

On May 9, 2014, the Court approved the Receiver's
request regarding the limited relief from the litigation stay as
to 11 of the TOH Properties; the Court's order took immediate
effect and permitted Regions either to take control of the

-8-

properties or to seek to have a state court receiver appointed.
(Stip. ¶ 29).  The Court also permitted Regions to conduct a
limited amount of discovery in advance of a hearing.  (Id.).

        On May 15, 2014, the Receiver informed the Court that
the two pending sale contracts had been terminated, withdrew
both pending sale motions, and asked the Court to grant the same
relief with respect to those properties as was granted regarding
the 11 other TOH Properties.  (Id. ¶ 30).  On May 20, 2014, the
Court granted the Receiver's request.  (Id.).

        On July 1, 2014, Regions moved in Tennessee State
court for a State-appointed receiver to take responsibility for
the operation and maintenance of the TOH Properties.  (Id.
¶ 31).  The Tennessee court approved the motion on July 16,
2014.  (Id.).  The July 16, 2014 order from the Chancery Court
of Davidson County, Tennessee provides: "The receipts received
from the operation of the [TOH Properties] shall be applied to
reimburse the [State Court receiver] for all reasonable costs
and expenses that it (or its delegates, including Colliers
International) incur as a result of serving as receiver, for
payment of insurance premiums and management fees authorized
thereunder, to compensate Receiver for its services as receiver,
and for payment of all obligations under the Loan Documents."
(Id. ¶ 32).  On July 21, 2014, representatives of the Receiver
met with counsel for Regions, the State Court receiver, and the

State Court receiver's property management team to transition control of the TOH properties to the State Court receiver. (<u>Id.</u> ¶ 33). The Receiver continued to manage the TOH Properties until transfer to the State Court receiver on July 21, 2014. (<u>Id.</u> ¶ 34).

5. **Excess Cash**

The 2014 Agreement does not define the term "excess cash." (RX 4; Tr. 53-54, 81). Regions's expert witness defined "excess cash" as "the amount of money left over after the properties have taken care of their obligations." (Tr. 76, 80).

For the period from January 1, 2009 through December 31, 2013, the TOH Properties generated rental income of approximately $10,813,738. (RX 11 at 5; Phipps Dep. at 18 (TOH Properties operated at "a positive cash flow")). For the same period, the Receiver paid Regions debt service of approximately $80,000 a month (Tr. 30, 51, 55-56), for a total of $3,942,203.98 in principal, interest, and/or fees. (Letter from Freshfields to Court, dated Oct. 14, 2014; <u>see</u> Tr. 87-90). The Receiver also paid substantial sums in property taxes, management fees to Wextrust Equity Partners, LLC, and operating and other expenses. (RX 11 at 5; <u>see also</u> RX 6, 7). The management fees paid to Wextrust Equity Partners, LLC., were paid into the receivership, for services related to the day-to-

day operations of the properties.  (Phipps Dep. at 23; Coleman Dep. at 13-14; Tr. 102-03).

For the period from January 1, 2014 to June 30, 2014, the TOH properties generated approximately $1,069,660 in rental income.  (RX 11 at 3).  After debt service, taxes, management fees to Wextrust Equity Partners, and other expenses, there remained a balance of $367,557, which amount was retained by the Receiver.  (Id.; Tr. 79-80, 86).  This amount does not reflect any deduction specifically for general receivership expenses such as the fees of the Receiver's counsel or administrative expenses.  (Tr. 83-86).  Some of the $367,557 would have been used by the Receiver for general administrative expenses of the receivership.  (Tr. 87).

After the Receiver relinquished the TOH Properties to Regions, he paid $178,276.70 to the State Court receiver.  (Tr. 24).  The Receiver did not make any payments to Regions designated "excess cash" after entering into the 2014 Agreement. (Id. 36, 56).

In October 2013, the Receiver turned over to Regions $91,932 in "Net Cash Flow After Debt Service" in connection with another property, the Myatt property.  (Tr. 41-42; GX 9).  This was the amount left over after taking rental income less expenses for two months.  (Tr. 42-43; RX 9).  No deductions were

-11-

made for general receivership expenses.  (Tr. 42; see Phipps
Dep. at 51).

In April 2014, in connection with settlement
discussions, the Receiver provided a calculation of "Net Cash
Flow After Debt Service" for the TOH Properties, which showed
the net cash flow after deducting debt service and expenses from
rental income.  (RX 6; Tr. 36-38).  The Receiver made no
deduction for general administrative expenses of the
receivership.  (Tr. 39).  The analysis showed "Net Cash," after
deducting debt service and expenses from rental income, of
$241,262 for the period from January 1, 2014 through April 23,
2014.  (RX 6).  Several months later, after June 2014, the
Receiver made a similar calculation, again for settlement
purposes.  (RX 7; Tr. 38, 39-40).  This time, however, he did
deduct amounts for an allocated share of general receivership
expenses, i.e., $4,694,451 for professional fees and $109,864
for tax preparation fees through December 31, 2013 and estimates
of $100,000 for professional fees and $25,000 for tax
preparation fees for 2014, resulting in the elimination of all
net cash.  (Tr. 40; Phipps Dep. at 44-45; RX 7).  This was the
first time the Receiver had taken the position that a share of
general receivership expenses was to be deducted in calculating
excess cash.  (Tr. 40-41; see Phipps Dep. at 48).  The analysis
showed that net cash flow after debt service for January,

-12-

February, March, April, May, and June 2014 -- without deducting
for general administrative expenses -- would have been $72,161,
$70,147, $28,710, $44,743, $63,587, and $41,587, respectively,
for a total of $320,935.  (RX 7).[3]

6.   **Property Taxes**

In Tennessee, property tax records -- and payment of
property taxes -- are a matter of public record. (Stip. ¶ 26).
The 2013 property taxes came due and were payable during the
time the Receiver was in possession and control of the TOH
Properties.  (Id.).  The receivership paid the property taxes
for the TOH Properties for the tax years 2008, 2009, 2010, 2011,
and 2012 in or about February of the year following the
corresponding tax year.  (Stip. ¶ 35).  The Receiver did not pay
the property taxes for tax year 2013, which became delinquent
after they remained unpaid as of February 28, 2014.  (Id.; see
Tr. 16-17, 19 (under Tennessee law, taxes are not deemed late
until February 28 of subsequent year), 48 (taxes are timely paid
if paid by "the final due date, which is February 28" of the
following year).  The Receiver did not make the tax payments for
2013 because the properties were being turned over to the State
Court receiver.  (Coleman Dep. at 14 ("I made a decision that
TOH would not make a property tax payment in 2014."), 15).

---

[3]     The amount of $41,587 for June is calculated by taking the
number for net cash flow after debt service of -$83,413 and adding back the
amounts of $25,000 and $100,00 that had been deducted for a pro rata share of
estimated 2014 tax preparation and professional fees.  (RX 7).

Regions never asked TOH to escrow monies for property taxes. (Tr. 48-50).

The property taxes due for 2013 with respect to the TOH Properties was $258,572.17. (RX 15). With penalties and interest, the amount due and owing as of October 31, 2014 was $289,264.81. (Id.; see Tr. 17-18).

For the period from January 1, 2014 and July 31, 2014, the State tenants paid $1,247,939 in rent to a TOH account under the Receiver's control. (Id. ¶ 36).[4] Since the transfer, the TOH properties have continued to generate approximately $166,776 per month in cash. (Tr. 19). Despite this income, the State Court receiver has not paid the 2013 property taxes. (Tr. 24). The State Court receiver and his management company, in consultation with Regions, have elected instead to pay other expenses, including repairs and maintenance. (Tr. 24-26).

## DISCUSSION

Regions seeks an order requiring the Receiver to pay (1) "excess cash" generated by the TOH Properties for the period from January 1 through June 30, 2014 (Tr. 45); (2) property taxes for 2013, including interest and penalties; and (3) attorneys' fees associated with the prosecution of these claims.

---

[4]     The rent payment on account of July was collected by the Receiver and turned over to Regions. (Coleman Dep. at 15).

-14-

A.   <u>Applicable Law</u>

As an initial matter, this Court has "broad powers and wide discretion" in fashioning equitable relief in a securities enforcement action, <u>S.E.C. v. Credit Bancorp, Ltd.</u>, 124 F. Supp. 2d 824, 827 (S.D.N.Y. 2000), including the power to appoint a receiver "where necessary to prevent the dissipation of a defendant's assets pending further action by the court." <u>S.E.C. v. Am. Bd. of Trade, Inc.</u>, 830 F.2d 431, 436 (2d Cir. 1987). Federal law provides that a "receiver appointed in any civil action or proceeding involving property, real, personal or mixed, be vested with complete jurisdiction and control of all such property with the right to take possession thereof." 28 U.S.C. § 754 (2013).

In interpreting a contract, a court's task "is to give effect to the intent of the parties as revealed by the language they chose to use." <u>Seiden Associates, Inc. v. ANC Holdings, Inc.</u>, 959 F.2d 425, 428 (2d Cir. 1992). The threshold question is whether the language chosen by the parties is ambiguous, after giving all "words and phrases . . . their plain meaning." <u>Olin Corp. v. Am. Home Assurance Co.</u>, 704 F.3d 89, 99 (2d Cir. 2012) (quotation mark omitted). Courts should not take particular phrases in isolation; rather, they should interpret them in light of the parties' intent as manifested by the

-15-

contract as a whole.  See Union Carbide Corp. & Subsidiaries v.
C.I.R., 697 F.3d 104, 108 (2d Cir. 2012).  The language is
unambiguous only if it has "a definite and precise meaning,
unattended by danger of misconception in the purport of the
contract itself, and concerning which there is no reasonable
basis for a difference of opinion."  John Hancock Mut. Life Ins.
Co. v. Amerford Int'l Corp., 22 F.3d 458, 461 (2d Cir. 1994)
(alteration and quotation marks omitted).  If the terms suggest,
however, that more than one meaning can be construed "when
viewed objectively by a reasonably intelligent person . . . then
the agreement is ambiguous and extrinsic evidence may be
considered to determine the parties' intent."  Gary Friedrich
Enterprises, LLC v. Marvel Characters, Inc., 716 F.3d 302, 314
(2d Cir. 2013) (quotation mark omitted).

B.   **Application**

         I discuss in turn the claims for (1) excess cash, (2)
property taxes, and (3) attorneys' fees.

1.   **Excess Cash**

         Two principal issues are presented:  (a) what is
"excess cash" for purposes of the 2014 Agreement; and (b) how
much, if any, "excess cash" was there for the period from
January 1, 2014 through June 30, 2014?

-16-

a)    What Is "Excess Cash?"

The 2014 Agreement required the Receiver to pay to
Regions "the excess cash generated by the TOH [P]roperties [from
January 1, 2014] until such time as all sales have closed or
[Regions] has assumed control of the balance of the TOH
[P]roperties."  (RX 4, at ¶ 4).  The 2014 Agreement did not
define the term "excess cash," nor did it provide any formula or
mechanism for calculating "excess cash."  The parties seem to
agree that "excess cash" means the rental income generated by
the TOH Properties less debt service and expenses, but they
disagree as to whether a pro rata portion of the Receiver's
general administrative expenses should be deducted as well.

As an initial matter, I conclude that the phrase
"excess cash" as used here is ambiguous.  While "excess" and
"cash" are simple terms, the 2014 Agreement does not make clear
the baseline above which cash is deemed excess.  Moreover, the
case law shows that "excess cash" can be and is defined to mean
different things.  See, e.g., Corbett v. MacDonald Moving
Servs., 124 F.3d 82, 86 (2d Cir. 1997) ("Excess Cash Flow"
defined as 50% of cumulative aggregate cash flow less cumulative
aggregate amounts previously paid to unsecured creditors); UBS
Capital Americas II, LLC v. Highpoint Telecomms. Inc., No. 01
Civ. 8113 (JSM), 2002 WL 377537, at *4 (S.D.N.Y. Mar. 8, 2002)
("Excess Cash" defined as cash or marketable securities received

-17-

after certain date); <u>Travelers Ins. Co. v. Broadway West Street</u>
<u>Assocs.</u>, 164 F.R.D. 154, 158 (S.D.N.Y. 1995) ("Excess Cash
Collateral" defined as excess rental income over certain
operating and other expenses).

Because the 2014 Agreement is unclear in this respect,
I must ascertain the intent of the contracting parties.  <u>See SR</u>
<u>Int'l Bus. Ins. Co. v. World Trade Ctr. Props., LLC</u>, 467 F.3d
107, 125 (2d Cir. 2006) ("The cardinal principle for the
construction and interpretation of . . . contracts . . . is that
the intention of the parties should control.") (internal
quotation marks omitted).  I conclude that the parties did not
intend to deduct general receivership expenses (as opposed to
property-specific expenses) from the rental income to arrive at
"excess cash."

First, the circumstances leading to the parties
entering into the 2014 Agreement suggest that they did not
intend for any portion of general receivership expenses to be
deducted.  The 2011 Note was set to mature on June 30, 2013,
when the Receiver would have been required to pay it, failing
which Regions would have been entitled to enforce its security
interest.  But the TOH Properties were generating substantial
income for the receivership estate, and the Receiver was hopeful
that he would be able to sell at least some of the properties at
sufficiently favorable prices to cover the obligations to

-18-

Regions and still return substantial sums to the receivership estate.  Regions agreed to refrain from exercising its rights to allow the Receiver to try to sell the properties.  When the Receiver was unable to do so by December 31, 2013, the parties entered into the 2014 Agreement.  Regions again agreed to give the Receiver more time, and the Receiver agreed to turn over "excess cash" to Regions.  If the Receiver's position that general receivership expenses must be deducted is accepted, all the excess cash would be wiped out.  I do not believe that this is what the parties intended.

Second, the 2014 Agreement makes no reference to general receivership expenses and it provides no formula for allocating a share of general receivership expenses to the TOH Properties.  If the parties had intended such an allocation, one would have expected to see such a formula in the document, as general administrative expenses could have been allocated in different ways.  (See Phipps Dep. at 60-66 (describing allocation based on number of buildings), 67-75 (discussing analysis using apparently different and unspecified allocation method)).  If the parties had intended that non-property related expenses would be deducted from the rental income in calculating "excess cash," they would have provided a method for doing so.  They did not.  See Nicholas Labs. Ltd. v. Almay, Inc., 900 F.2d 19, 21 (2d Cir. 1990) (noting that if the parties intended to

-19-

include a provision in the contract, "one would imagine that the parties would have used more explicit language to so indicate"); In re Stock Exchanges Options Trading Antitrust Litig., No. 99 Civ. 0962 (RCC), 2005 WL 1635158, at *8 (S.D.N.Y. July 8, 2005) ("[t]he fact that they omitted such a provision . . . suggests that the omission was intentional").

Finally, the parties' course of conduct also supports Regions's position. See Ocean Transp. Line v. American Philippine Fiber Indus., 743 F.2d 85, 91 (2d Cir. 1984) (holding that "[t]he parties' interpretation of the contract in practice, prior to litigation, is compelling evidence of the parties' intent" (citing Old Colony Trust Co. v. City of Omaha, 230 U.S. 100, 118 (1913))); see also Hoyt v. Andreucci, 433 F.3d 320, 332 (2d Cir. 2006) (holding that, under New York law, factfinder "may consider extrinsic evidence such as the parties' course of conduct throughout the life of the contract"). With respect to the Myatt property, the Receiver paid Regions "Net Cash" -- the equivalent here to "excess cash" -- for two months, and he made no deduction for general receivership expenses. In addition, in the context of settlement discussions, the Receiver calculated "Net Cash" for the TOH Properties, and, at least initially, he made no deduction for general receivership expenses. (RX 6). Indeed, it was not until after he had relinquished the TOH Properties that he first took the position that there was no

-20-

"excess cash" because a share of general administrative expenses had to be deducted.  (RX 7).

In sum, I hold that when the parties entered into the 2014 Agreement, they did not intend that a share of general receivership expenses would be deducted from rental income to arrive at "excess cash."

### b)   How Much Excess Cash Was There?

I find that the TOH Properties generated $367,557 in "excess cash" for the period from January 1 through June 30, 2014, subject to a further adjustment, which I discuss below. This was the figure calculated by Regions's expert (RX 11 at 3), and I accept it.  While there was some lack of precision as to the numbers with respect to debt service, that was for the period from January 1, 2009 through December 31, 2013.  (Letter from Freshfields to Court, dated Oct. 14, 2014; see RX 11 at 5; Tr. 87-90).  No such issue was raised with respect to the period from January 1 through June 30, 2014.  (See Tr. 87-88).  At the hearing, the Receiver presented no evidence to challenge the accuracy of the $367,557 amount; he argued only that it failed to account for general receivership expenses.  Finally, this figure is somewhat corroborated by the Receiver's own analysis, made for settlement purposes, which showed net cash flow after debt service of $320,935.  (RX 7).

-21-

The Receiver argues, in essence, that he should not be required to pay excess cash to Regions for equitable reasons. He contends that in a receivership proceeding such as this, administrative expenses -- general expenses of the receivership -- and the rights of the defrauded victims should be given a priority over Regions's debt.  But the equity argument only goes so far.  It provides no basis for re-writing or ignoring a contract entered into between the parties well after the receivership was created, that was intended to at least in part benefit the estate.  Moreover, Regions is a secured creditor; it refrained from exercising its rights to its collateral to give the Receiver an opportunity to try to sell the properties.  It agreed to do so in return for, among other things, the payment of excess cash.  It should not be deprived of the benefit of its bargain.  Moreover, the collateral has generated substantial income for the receivership estate, and Regions will suffer substantial losses as the properties will generate enough income to cover the debts.  (See Tr. 100-01).  Even assuming I had the discretion to override the 2014 Agreement, as the Receiver seems to suggest, I would decline to do so in the circumstances here.

2.   **Property Taxes**

The 2013 property taxes for TOH remain unpaid.  In Tennessee, property taxes become due on the first Monday in October for the given year, but no penalties or interest will

accrue until March 1 of the following year.  For 2013, the
Receiver had control of the TOH Properties and was contractually
obligated to pay the taxes.  When the Receiver executed the 2011
Note (RX 16), he acknowledged that the indebtedness remained
secured by Deeds of Trust that required TOH to satisfy all tax
assessments related to the respective properties.  (RX 17).
Moreover, the leases between TOH and the various agencies of the
State of Tennessee also required the payment of property taxes.
(RX 18).  Accordingly, I find that the Receiver was and still is
responsible for paying the 2013 property taxes for the TOH
Properties.

        Nonetheless, the Receiver was not required to pay the
2013 taxes in 2013, nor was he required to escrow any funds for
property taxes.  In fact, it has been the practice of the
Receiver to pay property taxes by February 28 of the following
year, using the cash on hand when the payment was remitted.  To
the extent that Regions argues that only 2013 funds could have
been used to pay 2013 taxes, this argument is rejected.  The
Receiver could have used 2014 funds to pay the 2013 property
taxes.

        Of course, if the Receiver had paid the taxes in 2014,
the amount of excess cash would have been substantially less.
The taxes are a property-specific expense, and they would have
properly been deducted, along with other property-specific

-23-

expenses, from rental income to calculate "excess cash."
Obviously, there would have been less excess cash if some of the
rental income had been used to pay taxes.

Accordingly, I find that the Receiver is responsible
for 2013 taxes in the principal amount of $258,572.17.  (RX 15).
I find further that the Receiver is responsible for penalties
and interest through July 31, 2014.  The State Court receiver
was appointed in July 2014 and he could have paid the taxes
after he took over.  Indeed, he testified that the TOH
Properties continued to generate substantial rental income, but
that he determined to pay other expenses first.  In these
circumstances, I conclude that the Receiver is not responsible
for penalties and interest after July 31, 2014.

The amount of taxes, penalties, and interest would
reduce the excess cash figure by that amount.  The end result is
that the Receiver is obligated to pay to Regions, on account of
both excess cash and taxes, penalties, and interest, the sum of
$367,557.

### 3.  __Attorneys' Fees__

Finally, Regions seeks reimbursement for its
attorneys' fees incurred in this matter.  Regions has not,
however, identified the legal basis for an award of fees.  (<u>See</u>
Pre-Hearing Brief of Regions Bank, at 14).  The 2014 Agreement
does not contain a fee-shifting provision.  (<u>See</u> RX 4).  To be

-24-

sure, "a court may, pursuant to its inherent equitable powers, assess attorneys' fees and costs when a party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons." China Nat. Chartering Corp. v. Pactrans Air & Sea, Inc., 882 F. Supp. 2d 579, 605 (S.D.N.Y. 2012) (internal quotation marks omitted). But I find here that the Receiver has not acted in bad faith or in a vexatious, wanton, or oppressive manner. Moreover, an award of attorneys' fees would reduce the funds available to compensate the victims. Accordingly, I decline to award attorneys' fees.

CONCLUSION

For the foregoing reasons, Regions' requests for the turnover of excess cash and payment of property taxes is **GRANTED** to the extent that the Receiver shall pay Regions within ten business days hereof the sum of $367,557. The request for attorneys' fees is **DENIED**. No costs. Regions shall submit a proposed judgment, on notice, within ten business days hereof.

SO ORDERED.

Date:    New York, New York
         December 22, 2014

DENNY CHIN
United States Circuit Judge
Sitting by Designation

-25-

APPEARANCES:

FRESHFIELDS BRUCKHAUS DERINGER US LLP
        By:  Jonathan W. Ware, Esq.
             Tyler S. Clarkson, Esq.
701 13th Street, NW, Suite 600
Washington, D.C.  20005
Attorneys for Receiver Timothy J. Coleman


BAKER, DONELSON, BEARMAN, CALDWELL &
   BERKOWITZ, P.C.
        By:  John H. Rowland, Esq.
             Jaime DeRensis, Esq.
211 Commerce Street, Suite 800
Nashville, Tennessee  37201

             -and-

DILWORTH PAXSON, LLP
        By:  Keith N. Costa
99 Park Avenue, Suite 320
New York, New York  10016
Attorneys for Regions Bank

-26-